# EXHIBIT 3

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4  TRACY ALVES, AN INDIVIDUAL   ) CASE NO.: 19-CV-02083-JGB
    AND AS SUCCESSOR IN INTEREST )                    (SHKx)
 5  FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
 6                               )
                                 )
 7                    PLAINTIFF, )
                                 )
 8       VS.                     )
                                 )
 9  RIVERSIDE COUNTY, RIVERSIDE  )
    SHERIFF'S DEPARTMENT,        )
10  SHERIFF-CORONER CHAD BIANCO, )
    DEPUTY SONIA GOMEZ, DEPUTY   )
11  BRIAN KEENEY, AND DOES 3-10, )
                                 )
12                    DEFENDANTS.)
                                 )
13  _____)
14
15      DEPOSITION OF SERGEANT SEAN VICKERS, P.M.K.
16             THURSDAY, DECEMBER 3, 2020
17
18
19
20
21  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
22  REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
    1244 West Edgewood Circle
23  Coeur d'Alene, Idaho 83815
    (661) 775-8299
24
25  FILE NO. 20486
```

---

**Page 2**

```
 1      DEPOSITION OF SERGEANT SEAN VICKERS, P.M.K.,
 2      A WITNESS, TAKEN ON BEHALF OF PLAINTIFF, VIA
 3      VIDEOCONFERENCE, COMMENCING AT 10:01 A.M.,
 4      ON THURSDAY, DECEMBER 3, 2020, BEFORE ROSA
 5      I. GUZMAN, CSR NO. 12024, PURSUANT TO
 6      NOTICE OF TAKING DEPOSITION.
 7                      * * *
 8  APPEARANCES OF COUNSEL:
 9  FOR PLAINTIFF:     THE LAW OFFICES OF JOHN BURTON
                       BY:  JOHN BURTON, ESQ.
10                     128 NORTH FAIR OAKS AVENUE
                       PASADENA, CALIFORNIA 91103
11                     (626) 449-8300
12                          - and -
13                     HELM LAW OFFICE, PC
                       BY:  T. KENNEDY HELM, IV
14                     644 40TH STREET
                       SUITE 305
15                     OAKLAND, CALIFORNIA 94609
                       (510) 350-7517
16
17  FOR DEFENDANTS:    MANNING & KASS
                       ELLROD, RAMIREZ, TRESTER, LLP
18                     BY:  TONY M. SAIN, ESQ.
                            GARROS CHAN, ESQ.
19                     801 SOUTH FIGUEROA STREET
                       15TH FLOOR
20                     LOS ANGELES, CALIFORNIA 90017
                       (213) 624-6900
21
22
23
24
25
```

---

**Page 3**

```
 1                    I N D E X
 2  WITNESS              EXAMINATION            PAGE
 3  SGT. SEAN VICKERS    BY MR. BURTON            5
 4
 5
 6                   E X H I B I T S
 7  PLAINTIFF'S:                                 PAGE
 8   1    RESUME (1 page)                          9
 9   2    (None Offered)                           -
10   3    IACP MODEL POLICY - EXCITED DELIRIUM
          (3 pages)                               30
11
     4    DEPLOYMENT AND USE OF THE TASER
12        CONDUCTED ELECTRICAL WEAPON SYSTEM
          (9 pages)                               36
13
     5    INTERACTING WITH MENTALLY DISTURBED AND
14        DISABLED PERSONS SECTION 404.16 (7 pages) 40
15   6    INTERACTING WITH MENTALLY DISTURBED AND
          DISABLED PERSONS SECTION 439 (7 pages)  50
16
     7    DETENTION OF PERSONS PER WELFARE AND
17        INSTITUTIONS CODE 5150 (6 pages)        51
18   8    CRISIS INTERVENTION TRAINING COVER PAGE
          (1 page)                                53
19
     9    INVOLUNTARY HOLD 5150 AND LEGAL PROCESS
20        TRAINING SLIDE (1 page)                 57
21  10    CRISIS INTERVENTION TRAINING
          TRAINING SLIDE (1 page)                 59
22
    11    DE-ESCALATION SKILLS: COMMUNICATION
23        COVER PAGE (1 page)                     61
24  12    EXCITED DELIRIUM TRAINING SLIDES
          (5 pages)                               63
25
```

---

**Page 4**

```
 1  EXHIBITS (Continued)                         PAGE
 2  13    RCSD POLICY 214 - ADMINISTRATIVE
          COMMUNICATIONS   (2 pages)              25
 3
 4  14    RCSD POLICY 300 - USE OF FORCE (6 pages) 70
 5  15    RCSD POLICY 306.6 - APPLICATION OF LEG
          RESTRAINT DEVICES   (2 pages)           72
 6  16    RCSD POLICY 414 - MEDICAL AID/NALOXONE
          PROTOCOLS (9 pages)                     75
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

SERGEANT SEAN VICKERS, P.M.K.
the witness herein, having first been duly administered
the oath, deposed and testified as follows:

EXAMINATION
BY MR. BURTON:

Q   Good morning, Sergeant Vickers.  Thank you for joining us today.
A   Good morning.
Q   Have you ever had your deposition taken before?
A   No, I have not.
Q   I'm sure you've had the opportunity to review the nature of these proceedings with counsel for the County of Riverside.  Just very briefly, I'm going to be asking you a series of questions.  The questions are asked of you not as an individual but as a representative of your employer, which I understand to be the County of Riverside and the Riverside Sheriff's Department.  So you will be speaking not only individually but also in a way that binds the Department, and that's pursuant to a Notice that listed a series of topics that you've been designated as their person most knowledgeable to talk to us about.
     So the rule is, I think, that if we ask a

Page 6

question and it goes into a subject matter that you feel is not something that you appropriately can answer on behalf of the County, then you should let us know, and we can work that out because otherwise your answers are going to be considered binding on the County.
     The other rules, they go for all depositions besides this one.  I'm sure you've testified multiple times in court in connection with your work as a law enforcement officer.  So the rules are basically the same with two what I think are significant differences.
     The first is that this is a process called "discovery."  There's no judge.  There's no jury.  So we're not here to try to get part of the story or to ask leading questions that are going to create an impression on a fact-finder.  We're just here to get your testimony about the subject matter identified in the Notice.
     So the implications of that are unlike when you are in court, where you are generally supposed to answer the question that's posed to you by the attorney unless the judge or somebody intervenes.  Here, if you don't understand a question or you think it's unclear or you think that for whatever reason if you answer the question the way it's phrased won't accurately reflect what you mean to say, then you should let us know, and we'll try to rephrase the question and remove any

Page 7

difficulty from it.
     Our objective is to get this court reporter as clear a record as possible so that, when it comes up downstream in this litigation, we don't wind up in a dispute over what was meant or what was said or something.  So just let us know if you have a problem with the question for any reason.
     The second thing that's different is that you'll actually get an opportunity to review your transcript and then sign off under penalty of perjury.  In my experience, many witnesses take this opportunity to make what I would consider to be very helpful typographical type of corrections, like a date was wrong or a name or something.  That's very helpful.
     Sometimes a witness will exercise the right to change testimony that was given under oath today, because you are under oath now, when you're answering, and also under oath when you are correcting the transcript, like changing "The light was green" to "The light was red."  And those kind of changes can be commented upon and used for impeachment.
     So what we try to do is make sure everything is as accurate as possible the first time, which includes the rule that if we're going along in testimony and you think of an answer you gave earlier that maybe was

Page 8

incomplete or misleading for whatever reason, it didn't say exactly what you meant to say or what you recall, you can bring that to our attention, and we can amend the answer right then.  You can explain it or elaborate, whatever you feel you need to do.  So just bring that to our attention.  The goal, again, is to get as complete and accurate a record today as possible.
     Anything about this procedure, including your role as a spokesperson for the County or the rules of deposition, that you're unclear on and that you would like me to elaborate?
A   I'm good.
Q   And my other question, before I get into the substance, is sometimes witnesses have issues that prevent them from giving their best testimony.  Some I've heard in the past include medication, something distressing in their life.  Law enforcement officers sometimes are fatigued from working a recent shift.
     Is there any reason why you cannot give your best testimony here today?
A   No.
Q   I was provided a copy of your résumé, and we marked that as Exhibit 1.  Do you have access to the exhibits that we provided your counsel?
     MR. SAIN: No, I thought you were going to be

Page 13

1  Can you estimate how many of those there were
2  while you were a supervisor in Professional Standards.
3      MR. SAIN: Vague as phrased.
4      THE WITNESS: I'm sorry. What was that?
5  Q   BY MR. BURTON: Just a rough estimate. You
6  said there were ten death investigations. Some of those
7  were jails. So how many were not jail?
8  A   So if I had to estimate that were
9  non-deputy-involved shooting incidents, I would say
10 three. But those incidents were not related to anything
11 similar to this one.
12 Q   They were not similar to this one?
13 A   No, they were not.
14 Q   Can you just explain how they were dissimilar.
15 I don't want to go into much detail on them, but just
16 very briefly, why would you say that?
17 A   So our department qualifies an in-custody death
18 that could be anybody that was released recently from
19 our jail system. So within a certain time frame, if
20 they died in the streets after being released, they
21 would consider that an in-custody death.
22     Also, if our officers or deputies were present
23 in the household when somebody killed themselves, we
24 would qualify that as an in-custody death. Those were
25 the situations that I was a part of and involved in.

Page 14

1  Q   Got it. Thank you. Do you think it's accurate
2  that during -- and then I'll move on. This is really my
3  last question in this area.
4      I guess you were a supervisor in Professional
5  Standards for about three years. I actually have two
6  questions. Would it be accurate to say that there was
7  no death that you supervised the investigation of during
8  those three years that had a scenario that was, let's
9  say, recently similar to the one that we're here on
10 today?
11 A   Excuse me. I'm just trying to think through
12 all the different cases. Not that I can recall that I
13 directly responded to or that I can even think of that I
14 reviewed the investigation of.
15 Q   Thank you. And then this is another question I
16 thought of. Would it be your department's, let's say,
17 policy or practice for Professional Standards to
18 investigate any kind of arrest-related in-custody death
19 regardless of whether there was any allegation of any
20 policy violation by any deputy?
21 A   During the time period when I was assigned to
22 the Professional Standards Bureau, we responded to
23 almost all in-custody deaths that occurred unless it was
24 something that was monitored and, like, by a doctor from
25 the jail system where someone died of natural causes or

Page 15

1  some other form of ailment they had. We wouldn't
2  necessarily respond to something like that.
3  Q   Okay. Thank you. So now I'd like to get into
4  your current assignment, which I understand is the
5  reason why you've been designated to testify in this
6  case. So could you just tell us a little bit about the
7  Training Center. Does Riverside, for example, have its
8  own Sheriff's Academy?
9  A   Yes.
10 Q   And is that at the Training Center?
11 A   Yes.
12 Q   One of the things that you do is train whatever
13 you call them, cadets or recruits?
14 A   My active involvement with the training of
15 recruits is related to defensive tactics, and I also
16 previously have helped and assisted with their emergency
17 vehicle operations and scenario turning.
18 Q   And then the other thing that goes on in the
19 Training Center, in-service training for deputies? I
20 think there's a POST requirement of regular update kind
21 of training in various subjects. So is the Training
22 Center responsible for that?
23 A   Yes.
24 Q   Now, is the Training Center responsible for the
25 Department's written policies on field operations such

Page 16

1  as use of force, use of restraints, handcuffing, dealing
2  with the mentally ill? That sort of thing?
3  A   People that are preparing those policies may
4  reach out to us for input, but we do not physically
5  write them or publish them.
6  Q   And from your point of view, at the Training
7  Academy, who are these people who are responsible for
8  actually writing the policies?
9  A   All these come from Sheriff's Administration.
10 Q   Are you comfortable with the term they come
11 from the "brass"?
12 A   I'm familiar with that term, yes.
13 Q   Okay. And would that be accurate, that the
14 brass are responsible for the policies and, while
15 individual high-level officials may not actually do the
16 work, they are supervising it and directing it under
17 their direct control?
18     MR. SAIN: Vague and compound as phrased.
19 Q   BY MR. BURTON: You can answer.
20 A   I don't feel comfortable referring to them as
21 "brass." So I would refer to them as "Sheriff's
22 Administration." But they are the ones who decide on
23 the policies and publish them.
24 Q   Now, in terms of policies, that term could be
25 used in law enforcement sort of in a very narrow,

Page 17

 1  precise way, that there's policies that deputies have to
 2  follow.  They're written.  Hopefully they're clear and
 3  reasonable.  And then if a deputy violates a policy,
 4  that can relate to discipline.  So are you comfortable
 5  with using the term "policy" in that narrow way?
 6        MR. SAIN:  Vague.  Argumentative.
 7        THE WITNESS:  Yes.  "Policy" can be used in,
 8  like you said, many different variations of it, whether
 9  it's a procedure, policy.  But yeah, I'm fine with that.
10     Q   BY MR. BURTON:  Okay.  So I'll try to use
11  "policy" in that way.  Because there's also practices
12  and procedures that officers are given, through training
13  and maybe some other mechanisms, that might not be
14  specified in the policy manual but are nevertheless
15  provided in written form or perhaps orally to deputies.
16  So I'll try to refer to those as "training procedures,"
17  "practices," that sort of thing.
18        Is that okay with you?
19     A   Yes.
20     Q   Okay.  And hopefully we'll get a clear
21  transcript.
22        Now, we know from our Internet research that
23  the Riverside Sheriff's Department currently has a
24  comprehensive policy manual.  Would you agree with that?
25  That there is a comprehensive policy manual for the

Page 18

 1  Riverside Sheriff's Department?
 2     A   Yes.  We use the -- it's called the "Department
 3  Standards Manual."
 4     Q   You sometimes call it the "DSM"?
 5     A   Yes.
 6     Q   Okay.  Do you know when the current DSM went
 7  into effect?
 8     A   I don't know the exact date, but I know it was
 9  after Sheriff Bianco took office.
10     Q   Do you know if it was before or after our
11  incident, which was on the end of July, 2019?
12     A   I don't know the exact date of when it went
13  into effect, but I know that the policies were released
14  not all in one batch.  So they were released
15  periodically as they were completed.
16     Q   Do you know if his policy manual, DSM -- and
17  maybe you don't know this but if you do -- was prepared
18  in consultation with a company called Lexipol?
19     A   Yes, it was.
20     Q   Did you have a role in the preparation of the
21  DSM?
22     A   I had a role prior to the DSM being implemented
23  when I was assigned to the Professional Standards
24  Bureau.  But the only role I would have had is when the
25  policies were released, if I noticed a typo or something

Page 19

 1  that was not, you know, consistent, I would let the
 2  people that were creating it know.
 3     Q   Did you personally have any direct contact with
 4  Lexipol regarding the policies?
 5     A   Our current policies, no.
 6     Q   Is that something you had done in the past?
 7     A   In the past we utilized Lexipol to create our
 8  General Orders and Field Operations Manual that we had,
 9  and I was in contact with a Lexipol representative but
10  mainly just for assistance in showing me how to use the
11  program and finding other policies.
12     Q   Was that in connection with your work for
13  Professional Standards?
14     A   Yes, it was.
15     Q   Okay.  So you kind of anticipated my next
16  question, which is -- correct me if I'm wrong, but if I
17  understand this correctly, if there's a Riverside County
18  Sheriff's deputy who wants to know what the policies for
19  the department are, the deputy can access the DSM, and
20  they're all right there in black and white and, I'm
21  sure, updated from time to time and so on, but there's a
22  current version that's available to deputies so they
23  have access to all the written policy; is that correct?
24     A   Yes.
25     Q   So prior to the publication of the DSM, which I

Page 20

 1  understand was in the last, let's say, year or two, how
 2  did the deputy get that policy information?
 3     A   Deputies were able to go to the sheriff's
 4  Internet website, and they could access the General
 5  Orders and Field Ops.
 6     Q   So "policy," as I sort of defined it earlier,
 7  would be stated in what were called "General Orders,"
 8  and then you said "Field Ops."  Is that short for
 9  something?
10     A   That's the Field Operations Manual, which would
11  be more consistent with what you referred to as
12  "procedures" earlier.
13     Q   So there might be a Field Operations Manual,
14  let's say, that patrol deputies could look at?
15     A   Yes.
16     Q   Or one that, let's say, custody deputies could
17  look at that would have different subjects?
18     A   The ones for Corrections is different.  They
19  have a Corrections Policy and Procedures.
20     Q   Okay.  So was there one Field Operations Manual
21  in effect, or was there more than one?
22        MR. SAIN:  Vague as to time.
23     Q   BY MR. BURTON:  Let's say in the time period
24  immediately before the DSM was adopted.
25     A   There's only one Field Operations Manual that

Page 21

1  I'm aware of.
2    Q   And so would it be fair to say that the Field
3  Operations Manual was superseded by the DSM?
4    A   The procedures set forth in the Field
5  Operations Manual would only be superseded by the DSM if
6  a policy related to the DSM came out in relation to what
7  was in the Field Operations Manual.  Just recently they
8  put out that the DSM is the only manual that's in
9  existence now.
10   Q   Okay.  I'm sorry.  I didn't quite understand
11 your last answer.  It was probably my fault.  Is the
12 Field Operations Manual no longer in effect?
13   A   That is my understanding, yes.
14   Q   And do you know what date it became
15 ineffective?
16   A   I do not know, sir.
17   Q   And do you know if that was before or after the
18 end of July, 2019, when this incident occurred?
19   A   It would have been after.
20   Q   Now let's talk about General Orders.  Would
21 those be policy?
22   A   Yes.
23   Q   And so were the General Orders kept in a way
24 that was sort of indexed, where a deputy, for example,
25 could look up what are the General Orders that have to

Page 22

1  do with handcuffing or drunk-driving arrest or whatever
2  specific question that deputy had?
3    A   I don't know if they'd be able to find those
4  specific topics within the General Orders, but they have
5  the ability to search it as a PDF document.
6    Q   So was this compilation of General Orders kind
7  of like the DSM but maybe not organized as well?
8    A   I don't want to say that, but I would say that
9  the DSM is more easily searchable, and the General
10 Orders was a PDF document that you had to search for
11 words.
12   Q   So is it correct that the adoption of the DSM,
13 which I understood took some time before it was
14 complete, has superseded the General Orders?
15   A   Yes.
16   Q   Now, you said that the different sections of
17 the DSM were enacted at different times.  I mean, there
18 was sort of a rollout.  Is there a schedule that we
19 could access that would say when certain, let's say,
20 sections of the DSM became effective?
21   A   I don't know specifically, but I would imagine
22 that you could tell when certain policies were enacted.
23   Q   And is it correct that they have all been
24 enacted now, today?
25   A   As of today, yes.

Page 23

1    Q   Do you know when the last one was enacted?
2    A   We get policy updates all the time via E-mail
3  where we log in and check.  I don't know the exact date
4  of when the last one came out.
5    Q   Do you know when the process began, when the
6  first section of the DSM was -- I guess "enacted" is the
7  term.
8    A   I don't know the exact date, but it was shortly
9  after Sheriff Bianco came into office.
10   Q   Then there's also training materials and
11 syllabuses that are provided to deputies during, let's
12 say, their in-service training.  Would that be correct?
13   A   We provide department directives, department
14 memorandums.  We'll send out training material via our
15 computer databases within the department.  Those are
16 constantly done throughout the year.
17   Q   Let's say a law enforcement issue comes up,
18 whatever.  It's got to do with drunk driving, something
19 that has nothing to do with this case.  The department
20 wants its patrol deputies to know about this new issue,
21 whatever it is, right away.  So they could send out a
22 department directive or memorandum that would then be
23 distributed to, let's say, patrol deputies?
24   A   Yes, along with training videos produced at the
25 Training Center.

Page 24

1    Q   And these could be disseminated, let's say, for
2  example, depending on what they were, and discussed at,
3  let's say, roll calls?
4    A   Yes.
5    Q   And they could also be part of a regular
6  in-service training program at your Training Center
7  depending on the timing and the subject matter,
8  et cetera?  Would that be accurate?
9    A   Yes.
10   Q   Who issues these department directives or
11 memorandum?  Where exactly do they come from?
12   A   Department directives and memorandums come
13 from -- they're actually orders from the sheriff, and
14 they come from Sheriff's Administration.
15   Q   And depending on the subject matter, you and
16 the Training Center might have some input or not?  Would
17 that be correct?
18   A   Yes.
19   Q   And do you at the Training Center have any role
20 in distributing these directives or memoranda?
21   A   We don't distribute them.  That comes from
22 Sheriff's Administration.
23   Q   But you might use them as part of your
24 instruction for in-service deputies?
25   A   If they asked us to put together a training

Page 25

1  topic, we would put that training topic together,
2  provide it to Sheriff's Administration, who would then
3  disseminate the information.
4      Q   And so that's something that happens from time
5  to time?
6      A   Yes.
7      Q   Okay.  This is Exhibit No. 13.  Can you see
8  that?
9      A   Yes, I can now.
10     Q   Okay.  Thank you.
11         (Plaintiff's Exhibit No. 13 was marked for
12     identification by the reporter and is included
13     herewith.)
14     Q   BY MR. BURTON:  So I think this sort of
15 summarizes what we were just discussing.  This is
16 Policy 214 from the current DSM.  I mean, that's where
17 we got it.  Are you generally familiar with this?
18     A   Yes, I am.
19     Q   I'm just showing it to you just to go through
20 what these written policies and procedures -- you know,
21 using the broad term -- how they are disseminated.
22         So the first one, which is 214.2 is "Department
23 Directives."  We discussed that.  Those existed before
24 the DSM; is that correct?
25     A   Yes, they existed before the DSM, but this is

Page 26

1  the current definition of what they are.
2      Q   And do you think this changed, the definition
3  of what they are?
4      A   I don't know verbatim what it was prior, but I
5  would say in general it's similar.
6      Q   So when it says at the bottom of 214.2,
7  "Department directives may temporarily modify or alter
8  Department policies or standards," I understand that to
9  mean that the DSM is meant to be a comprehensive
10 formulation of department policy.  But sometimes a
11 policy needs to be changed, let's say, more quickly than
12 the time needed to amend the DSM.  So a department
13 directive can come out and be specifically a change in
14 policy.
15         MR. SAIN: Objection.
16         Rule 26.  Relevance.
17     Q   BY MR. BURTON:  Is that your understanding?
18     A   Yes.  They don't necessarily change the policy.
19 It may just be a modification to the policy.
20     Q   And then theoretically -- maybe this doesn't
21 always happen, but theoretically, then the policy manual
22 could eventually be amended to catch up, let's say, with
23 the department directive?
24         MR. SAIN: Same objection.
25     Q   BY MR. BURTON:  Is that correct?

Page 27

1      A   Yes.
2      Q   Okay.  So the next category is 214.3.1 that you
3  mentioned, "Department Memorandum."  In your mind, can
4  you explain how department memoranda are different than
5  department directives.
6      A   Directives are usually something about
7  something very specific or a topic.  Potentially like,
8  you know, something to do with, let's say, a Taser to
9  where a memorandum is more like an announcement of
10 something that's going on.
11     Q   And was the practice of using department
12 memoranda -- that was in place before the DSM and then
13 has continued after the DSM; is that correct?
14     A   Yes.
15     Q   And then the next one is a special order.  Do
16 you have an understanding of what a special order is and
17 how it's different than the other two besides what's
18 written here?
19     A   Yes.
20     Q   And can you explain.
21     A   Special orders are utilized to give deputies
22 specific instruction to attend training or other
23 activities at certain locations.  It's used just
24 basically to assign training mostly.
25     Q   So would it be correct that generally we would

Page 28

1  not look at special orders to see what the policies or
2  practices or procedures of the department are?
3      A   No, you would not.
4      Q   Thank you.  Now, this document I'm showing --
5  why don't I go ahead and mark this.  It's not in the
6  packet, but it will be Exhibit 17, and this is the
7  Notice of the deposition today.  So it just has the
8  categories and also the Request for Production.
9          (Plaintiff's Exhibit No. 17 was marked for
10     identification by the reporter and is included
11     herewith.)
12     Q   BY MR. BURTON:  Sergeant Vickers, some
13 documents have been produced to us over the course of
14 this litigation, some quite recently in connection with
15 this deposition.  Did you personally have a role in
16 assembling the documents that were produced?
17     A   Yes.
18     Q   And were you provided this list that is here in
19 Exhibit 17 I'm showing you?
20     A   Yes, I was.
21     Q   And can you just describe just very generally,
22 in not a lot of detail, the procedure you followed to
23 assemble those documents.  And please don't talk about
24 whatever communications you had with your lawyer.
25 That's privileged.  But just what you did to put these

Page 29

together, how you went about it.
 A  I went through each line topic in there, and I searched through our databases of the Training Center and, you know, the department databases that I have access to, to find information related to those specific topics that were in place at the time of July, 2019.
 Q  Okay. It actually was not limited to July, 2019. It was for three years before July, 2019, to the present. Would there be other documents that you would include if you expanded it to that, roughly, four-year period?
 A  No. The documents that I located were the only ones that were available for that time frame.
 Q  Okay. And do you feel like you found them all? I mean, I know we've all gone through where we search, we put something together, we thought we had everything, and then something else turns up. But do you feel pretty confident that you got them all?
      MR. SAIN: Calls for speculation.
      THE WITNESS: I feel like I located them all. I mean, I can only search so many different areas.
 Q  BY MR. BURTON: Okay. Thank you.
      Are you a member of the International Association of the Chiefs of Police?
 A  No, I am not.

Page 30

 Q  Are you familiar with that organization?
 A  I know of it. I'm not familiar with it.
 Q  Do you know if, in connection with your work for the Riverside County Sheriff's Department, you've ever encountered model policies from the IACP?
 A  Not that I can think of, no.
 Q  Okay. I'm going to show you an IACP model policy, and we marked this as Exhibit 3.
      (Plaintiff's Exhibit No. 3 was marked for identification by the reporter and is included herewith.)
 Q  BY MR. BURTON: And I'll explain my purpose in showing it to you in a moment. My first question is just -- this is a model policy on excited delirium that was published by the IACP in April of 2017. So my first question is to your knowledge, have you ever seen this before?
 A  I have not.
 Q  So I want to invite your attention to page 2, which I'm showing you, and I've got a couple subparagraphs here highlighted. What I'm going to do is I'm going to read these subparagraphs and ask you whether there's some comparable provision in the County of Riverside policy, Practices, or procedures that we've just discussed. So that's my purpose here.

Page 31

      Section C is on control, and there's several subsections, and subsection six says, "When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck, or head."
      Do you see that provision?
      MR. SAIN: Objection.
      Exceeds the scope of the person most knowledgeable designation. Rule 26. Relevance.
      THE WITNESS: Yes.
 Q  BY MR. BURTON: And this is in context. I mean, this is for somebody who is showing, I guess, some of the signs of excited delirium. And what my question is in the policy, practices, or training of the department, the Riverside County Sheriff's Department, is there a comparable provision?
 A  So in our training related to the carotid restraint, after a subject has been rendered unconscious, we do train them to, once he is handcuffed, to place them on their side, monitor his brachial pulse and breathing. But that policy is no longer in place because we no longer authorize the use of the carotid method. 2019 it was.
 Q  Parenthetically I commend your department for discontinuing that hold.

Page 32

      Is that the only place where this concept of putting someone, after being restrained, into a position that will assist breathing, such as placement on the side or sitting up, is mentioned?
 A  They're placed into that position mainly so that we can monitor them. It doesn't really have anything to do with assisting their breathing. But the carotid is the only training that we provided that had us place subjects on their side, check their brachial, and monitor their breathing.
 Q  Okay. Thank you. Subparagraph eight of Section C -- I'll just read it: "Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object using their body weight."
      So my question is the same. Is that concept anywhere in the Riverside County Sheriff's Department policy, procedures, or directives that we've discussed?
 A  The training that we provide is to safely secure the individual who is being resistive, and once that resistance, depending on what it is -- if he's kicking, spitting -- but as that resistance fades or he becomes compliant, we instruct them to basically, you know, release that pressure, and then once they're safe, they just secure them to somewhere that they secure

Page 33

1  them.
2  Q   Do you train that, once the handcuffs are
3  attached, the person should be rolled onto his or her
4  side or sat up?
5  A   When handcuffs are applied, it's all going to
6  depend on what the suspect's actions are as far as what
7  the deputy's actions will be.  If the suspect is
8  handcuffed, we put them on their side in an effort to
9  assist them in sitting up, and so that way they can
10 stand up on their own.
11 Q   Now, this is subparagraph No. 9, Section C.
12 I'll just read it again: "Officers should check the
13 subject's pulse and respiration on a continuous basis
14 until transferred to EMS personnel.  Officers shall
15 ensure the airway is unrestricted and be prepared to
16 administer CPR or an automated external defibrillator,
17 AED, if the subject becomes unconscious."
18     Does your department train on that subject?
19 A   Mr. Burton, my screen -- I lost the document.
20 Q   Okay.  Did that just happen?
21 A   I have it back.  It was something.
22 Q   Yeah, take your time.  And I won't read it
23 again because I think it's already in the record, but
24 it's paragraph No. 9 there.  It's highlighted for
25 convenience.

Page 34

1  A   Sorry, I'm not trying to get close.  It's just
2  small print.  I'm getting old.
3      So again, the training that we provide related
4  to the carotid restraint is once the subject is rendered
5  unconscious and handcuffed, we would, you know, monitor
6  their pulse via the brachial pulse and monitor their
7  breathing.
8  Q   Are Riverside sheriff deputies on patrol
9  provided AED's?
10 A   I know that they're in the stations, and I'm
11 not sure if they're in some of the vehicles yet.
12 Q   Are deputies uniformly trained on how to
13 administer CPR?
14     MR. SAIN:  Exceeds the scope of the
15 designation.  Rule 26.  Relevance.
16     THE WITNESS:  Yes, they are.
17 Q   BY MR. BURTON:  Are deputies trained that
18 whenever a person becomes unresponsive and appears to
19 need CPR, that they must administer CPR?
20     MR. SAIN:  Same objections.
21     THE WITNESS:  Once we determine that somebody
22 does not have a pulse, deputies are supposed to initiate
23 CPR.
24 Q   BY MR. BURTON:  In regard to that training, are
25 deputies trained specifically that when they feel for a

Page 35

1  pulse, they may get a false positive?  They may think
2  there's a pulse when, in fact, there is not a pulse?
3      MR. SAIN:  Same objections.
4      THE WITNESS:  We're instructed on where to
5  check for pulses, and we will do practical application
6  of that whether it be wrist, brachial, carotid, and
7  basically so that way we know what a pulse feels like.
8  Q   BY MR. BURTON:  Okay.  I don't want to belabor
9  this, but let me just try once more.
10     We had a paramedic testify not too long ago in
11 this case, and she said that part of their training is
12 that sometimes a first responder can think there's a
13 pulse but there's actually not a pulse because they're
14 kind of -- with the adrenaline of the situation and
15 everything, they can feel their own pulse when they
16 think they're feeling the pulse of the person they're
17 checking.  She described that.  And my only question to
18 you is not whether that's true or not but whether that
19 concept or topic is trained to Riverside County
20 Sheriff's deputies or not.
21     MR. SAIN:  Exceeds the scope of the
22 designation.  Rule 26.  Relevance.
23     THE WITNESS:  I've never heard that during any
24 of my CPR training.
25 Q   BY MR. BURTON:  Okay.  Thank you.

Page 36

1      I'd like to now go through some of the
2  policies that we were provided in discovery.  This is
3  Exhibit No. 4.
4      (Plaintiff's Exhibit No. 4 was marked for
5      identification by the reporter and is included
6      herewith.)
7  Q   BY MR. BURTON:  We understand this to be --
8  well, it's a supplement to a department directive on
9  using Tasers, conducted electrical weapons, electronic
10 controlled devices.
11     Can you see that okay?
12 A   Yes, I can.
13 Q   Not necessarily read it but at least see it
14 there.
15     And so this would be a department directive as
16 we discussed before?
17 A   Yes.
18 Q   And was this in effect -- this is dated
19 December 22nd, 2014.  Was this in effect in the end of
20 July, 2019, when this incident occurred?
21 A   Yes.
22 Q   I've got on page 6, a box here.  Let me see if
23 I can enlarge it a little.  Let me just read it.  This
24 is POST Deployment Procedure A.1.  I'll just read it.
25 Quote, "Secure the subject to minimize the threat of

Page 37

1 injury to the officer, the subject, or another person.
2 Department members are to use caution that any
3 restraint, device, or technique used does not impair the
4 breathing of the subject," unquote.
5     And was that the training that the department
6 gave its deputies as of the date of this incident?
7  A   Yes.
8  Q   And so would it be fair for us to assume that
9 Deputies Gomez and Keeney, the two who were involved in
10 this incident, would have gotten this specific
11 directive?
12  A   They would've received this directive, yes.
13  Q   And are deputies trained on what restraint
14 techniques impair breathing?
15  A   I don't understand the question.  I'm sorry.
16  Q   Well, it's specifically in reference to this
17 paragraph.  It says that deputies should use caution
18 that their restraint technique does not impair
19 breathing.  That's how I read that.  Are they told what
20 restraint techniques do impair breathing?
21  A   During the training for the Tasers, once the
22 subject has been secured and detained and they're no
23 longer a threat to either themselves or the officers,
24 they're trained to, as I said before, if they're
25 applying pressure and the subject is compliant, that

Page 38

1 they should be releasing that pressure with the
2 subject's compliance.
3  Q   That would be pressure to the back if the
4 subject were in a prone position?
5  A   It would be pressure anywhere on their body,
6 based on their compliance with our commands.
7  Q   Is there any training given that the subject
8 should be taken off of their chest?
9     MR. SAIN:  Vague as to time.
10  Q   BY MR. BURTON:  Well, let me address that.
11 We're talking about in connection with this directive,
12 which was in effect in July of 2019, where deputies who
13 were provided this directive trained that leaving a
14 subject on his or her chest or in a prone position can
15 impair the breathing of the subject and caution should
16 be used not to do that.
17  A   The training that they're provided would -- we
18 don't tell them that having someone in a prone position
19 restrains their breathing because it doesn't.  We just
20 tell them if the person is in compliance and they're no
21 longer resistive or assaultive and it's safe to do so,
22 that they release that pressure.  The policy also states
23 that they have to ask for medical personnel to respond
24 to provide them any treatment that would be necessary.
25  Q   So do you consider yourself an expert on body

Page 39

1 positions that impair breathing?
2  A   I know of positions that a body could be placed
3 into that may.  I've never personally seen any of them.
4  Q   But in connection with this paragraph -- and
5 then I'll move on -- is there specific training that
6 after a Taser has been used, as it was in this case that
7 we're here about, and the person is restrained -- and
8 I'll just use the definition of handcuffed behind his
9 back -- that the person should not be left in a prone
10 position but should be rolled on his side or sat up?
11  A   The training provided related to the Taser is
12 that once the individual is compliant and no longer
13 resistive or assaultive, that the deputies should be
14 easing up any pressure that they're applying to him.  If
15 it's safe to do so, they could sit him up, they could
16 put him in a police car, they could do whatever at that
17 time that they believe to be reasonable.
18  Q   Okay.  Thank you.
19     I'm now going to show you -- you should have on
20 your screen "Interacting with mentally disturbed and
21 disabled persons," Section 404.16.
22     Do you see that?
23  A   Yes, sir.
24     MR. SAIN:  Mr. Burton, can you identify the
25 exhibit number, please.

Page 40

1     MR. BURTON: I'm sorry.  I meant to do that.
2 Thank you.  That would be Exhibit No. 5.
3     MR. SAIN: Thank you, sir.
4     (Plaintiff's Exhibit No. 5 was marked for
5     identification by the reporter and is included
6     herewith.)
7  Q   BY MR. BURTON:  So we understand this to be an
8 excerpt from the Field Operations Manual that we were
9 discussing earlier.  It's dated September, 2012.  Is
10 this what you understand was the directive, the policy,
11 procedure from the department that was in effect when
12 this incident occurred?
13  A   Yes.
14  Q   And, again, I'd like to invite your attention
15 to the part that I put in the red box, and this would be
16 toward the end of the policy.  I'll call it "policy" if
17 that's okay.  Is that okay if I refer to this as policy?
18  A   This would be the Field Operations Manual,
19 which would be more of, like, procedures than policy,
20 but --
21  Q   Okay. So I'll call it --
22  A   I use the terms intermingling.  So you can
23 refer to it however you like.
24  Q   We all do.  And I just want to try to be
25 precise.  So I'll call this department procedure.

Page 73

1 authorize tying somebody's feet together and then tying
2 the cord to the handcuffs?
3   A   No, we do not.
4   Q   Now, I did this before, and I'll do it again.
5 Parenthetically, that's good you don't authorize that,
6 in my opinion.
7       The guidelines for the use of leg restraints
8 which are in effect now with the DSM -- and I don't have
9 any evidence they weren't in effect before, but it
10 really doesn't matter because they weren't used here.
11       But the reason I'm asking is I'm seeing
12 306.6.1, subject D: "Hobble suspects may be transported
13 in a sheriff's unit. When it is safe, the restrained
14 person should be seated in an upright position."
15       This is just referring to placement in the
16 vehicle; is that correct?
17       MR. SAIN: Objection.
18       Rule 26. Relevance. Exceeds the scope of the
19 designation.
20       THE WITNESS: Yes, this is specific to being
21 placed in the sheriff's unit.
22   Q   BY MR. BURTON: And that would be the same in
23 Sections F and G. "G," for example, says, "The deputy
24 should ensure that the person does not roll onto and
25 remain on his or her stomach."

Page 74

1       Is that referring to transportation vehicle?
2       MR. SAIN: Same objection.
3       THE WITNESS: Yes, that's referring to the
4 transportation.
5   Q   BY MR. BURTON: And I guess "H," I have the
6 same question: "The deputy should look for signs of
7 labored breathing and take appropriate steps to relieve
8 and minimize any obvious factors contributing to this
9 condition."
10       Again, that's referring to the process of
11 transportation?
12       MR. SAIN: Same objections.
13       THE WITNESS: Yes, that's referring to the
14 process of transportation, but it's also information
15 that we provide during our perishable skills training
16 that they receive because, you know, whenever we use
17 force or anything on an individual, we are always
18 monitoring the breathing.
19   Q   BY MR. BURTON: Okay. Do you know why the
20 Department has Subsection G, "The deputy should ensure
21 that the person does not roll onto and remain on his or
22 her stomach"?
23       MR. SAIN: Same objections.
24       THE WITNESS: My assumption would be so that
25 they don't get injured while they're being transported.

Page 75

1   Q   BY MR. BURTON: Well, do you think that has
2 something to do with breathing?
3       MR. SAIN: Same objections.
4       Calls for speculation.
5       THE WITNESS: I don't believe that someone
6 being on their stomach inhibits their ability to
7 breathe.
8   Q   BY MR. BURTON: Okay. Thank you.
9       I'm now showing you -- this is the last
10 exhibit, which is Exhibit No. 16, titled "Policy 414
11 Medical Aid/Naloxone Protocols." And this is from the
12 DSM.
13       (Plaintiff's Exhibit No. 16 was marked for
14   identification by the reporter and is included
15   herewith.)
16   Q   BY MR. BURTON: Do you happen to know whether
17 this Policy 414 was enacted after this incident?
18   A   I do not know, sir.
19   Q   Was there a comparable division, order, policy,
20 field operation, provision covering this subject matter
21 before the DSM; or did this change department policy?
22       MR. SAIN: Vague as to context. Exceeds the
23 scope of the designation. Rule 26. Relevance.
24       THE WITNESS: Medical aid was always included
25 with the applications of force and our duty to provide

Page 76

1 it as deputy sheriffs. Naloxone, or Narcan -- that was
2 fairly new. I'm not aware of exactly when the Narcan
3 was provided out there, but I do believe it was in the
4 field at the time of this incident. I would have to
5 research exactly when.
6   Q   BY MR. BURTON: Okay. But this Policy 414, as
7 I read it, is broader than the use of force in the sense
8 that the use of force policy says if deputies use force
9 and somebody is injured, they need to provide medical
10 attention. This says if deputies in the field encounter
11 somebody who needs medical attention, they need to give
12 it, just to oversimplify the subject matters.
13       Would you agree with that?
14       MR. SAIN: Argumentative. Misstates document.
15       THE WITNESS: I would say that this document
16 here, which was after the incident, is specific to our
17 duty to provide medical aid and the protocols related to
18 naloxone, or Narcan. I would have to do a little bit of
19 research, but I believe then there was a General Order
20 section that said that we had a duty to provide aid, to
21 render aid to individuals.
22   Q   BY MR. BURTON: Okay. And this may be a case
23 where maybe a General Order that maybe we think
24 should've been produced wasn't located or wasn't
25 identified; and if that's appropriate, if there's a