# EXHIBIT A

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

CONFIDENTIAL
DOCUMENT

EXHIBIT A IN
SUPPORT OF
SUMMARY
JUDGMENT
FILED 05/17/21

**ALVES v. COUNTY OF RIVERSIDE**
Case No. 5:19-CV-02083-JGB (SHKx)

INCIDENT COMPOSITE VIDEO
BATE STAMP NO. COR 000054

# EXHIBIT B

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
—— ATTORNEYS AT LAW ——

CONFIDENTIAL
DOCUMENT

EXHIBIT B IN
SUPPORT OF
SUMMARY
JUDGMENT
FILED 05/17/21

ALVES v. COUNTY OF RIVERSIDE
Case No. 5:19-CV-02083-JGB (SHKx)
ENGLERT FORENSIC
INCIDENT TIMELINE
BATE STAMP NO.
COR 03098

# EXHIBIT C

Case 5:19-cv-02083-JGB-SHK Document 59-3 Filed 05/17/21 Page 6 of 322 Page ID
#:569
Case 5:19-cv-02083-JGB-SHK Document 34-1 Filed 07/17/20 Page 6 of 13 Page ID #:280

John Burton, State Bar No. 86029
jb@johnburtonlaw.com
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 449-8300
Facsimile: (626) 449-8197

Attorneys for Plaintiff Tracy Alves, Individually and as
Successor in Interest for Kevin R. Niedzialek, Deceased,

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased,<br><br>Plaintiff,<br><br>v.<br><br>RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3-10,<br><br>Defendants. | Case No. 19-CV-02083-JGB (SHKx)<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES:**<br><br>**1.  42 U.S.C. § 1983**<br><br>**2.  Cal. Civ. Code § 52.1**<br><br>**3.  Assault and Battery**<br><br>**4.  Police Negligence**<br><br>**DEMAND FOR JURY TRIAL** |

## JURISDICTION

1.  Plaintiff Tracy Alves brings this action pursuant to 42 U.S.C. § 1983, and under the Fourth and Fourteenth Amendments to the United States Constitution. Accordingly, jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Plaintiff alleges state-law theories of recovery that are so related to the federal claims as to form part of the same case and controversy, and therefore invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.

**PARTIES**

2.      The Decedent is Kevin Robert Niedzialek, who died at age 34 without any living parent, spouse or issue. Plaintiff is Decedent's sole surviving sibling and therefore is his sole heir and has standing to assert the wrongful death claims alleged herein. She sues individually and as her brother's successor in interest. She filed the required Declaration pursuant to Cal. Civ. Code § 377.32 with the initial complaint.

3.      Defendant County of Riverside is a government entity operating pursuant to the general laws of California. Defendant Riverside Sheriff's Department (RSD) is a public agency subject to suit.

4.      Defendant Chad Bianco is the Sheriff-Coroner of Riverside County.

5.      Defendants Sonia Gomez and Brian Keeney are RSD deputy sheriffs. They were sued in the Complaint as Does 1 and 2.

6.      Does 3 to 10 are unnamed because their identities have yet to be ascertained.

7.      Each Doe defendant acted under color of law and within the scope of his or her agency and employment for Defendants County and RSD, and in some manner contributed to the death of Decedent, or otherwise caused the deprivation of Decedent's rights and other harm as alleged below.

8.      Plaintiff is informed and believes and thereon alleges that each Defendant was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the acts and omissions alleged, was acting within the course and scope of those relationships. Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and authorized the acts or omissions of each Defendant as alleged. At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other harm.

- 2 -

9.     Plaintiff bring these claims pursuant to Cal. Civil Proc. Code §§ 377.20 et seq. and §§ 377.60 et seq., which provide for survival and wrongful death actions and are incorporated into the § 1983 claims through 42 U.S.C. § 1988. Plaintiff also brings her claims individually and on behalf of Decedent on the basis of 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, Cal. Civ. Code § 52.1, and other provisions of federal and state civil-rights law. Plaintiff bring these claims as a Private Attorney General to vindicate not only her rights and those of Decedent, but others' civil rights of great importance.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     Prior to retaining counsel, Plaintiff timely filed a governmental tort claim with the County pursuant to Cal. Gov't Code § 910. The claim was denied on August 23, 2019, and this action is timely filed within all applicable statutes of limitation. Plaintiff timely filed an amended claim through counsel that has been pending more than 45 days. Plaintiff fully exhausted her administrative remedies as to all state claims.

## FACTS

11.     Plaintiff and Kevin are siblings. In part because both their parents and the third sibling passed away, they were extremely close. Plaintiff and her husband have a blended family of seven children. Kevin was very much a part of that nuclear family unit, and was highly involved with their children's lives. Plaintiff functioned somewhat as a parental figure for Kevin, and they loved each other immensely.

12.     In the past Kevin struggled with substance abuse, on and off. For the last two years of his life he lived clean and sober. Plaintiff is informed and believes that Kevin relapsed a few days before his death by using methamphetamine. Plaintiff alleges that the relapse was not a proximate cause of his death, and would not have affected their relationship, as he had in the past demonstrated the ability to abstain.

13.     When the relapse happened, Kevin was staying temporarily with a friend he knew from recovery meetings at Apartment 27A in a complex located at 42200 Moraga Road in Temecula, California. During the early afternoon of July 29, 2019,

- 3 -

1   Kevin sustained a large laceration on his head, apparently while inside the apartment.

2   The wound bled profusely. Plaintiff does not know the cause of this injury, but is

3   informed and believes that Kevin may have had an accident or been the victim of an

4   assault and battery. The impact may have caused a serious concussion that adversely

5   affected Kevin's cognition and behavior during his interaction with the deputies. The

6   wound, though bloody and severe enough to require immediate medical attention, was

7   not life threatening and did not cause this death.

8          14.     Starting shortly after 2:10 p.m., RSD dispatch received several 911 calls

9   from neighbors who reported noises, yelling and other actions by an unarmed man with

10  a bloody head wound. The dispatcher wrote on the dispatch log sent to the deputies'

11  car computer terminals that the person sounded incoherent and appeared

12  psychologically disturbed. According to the callers, the person started out in an

13  apartment but moved into the common area of the apartment complex. He was

14  reportedly wearing pajama pants with no shirt, and was bleeding from the head. From

15  the outset, this man, Kevin, presented a health issue. There was no crime reported.

16         15.     Shortly after 2:30 p.m., RSD deputies Keeney and Gomez arrived

17  separately at the apartment complex. They parked in different areas, and approached

18  the scene from different directions. Deputy Keeney was not wearing a camera, but

19  Deputy Gomez activated her body-worn camera, which captured video that provides a

20  record of events.

21         16.     Deputy Keeney found Kevin covered in blood from the head wounds,

22  sitting on concrete with his back against a wall in a common-area alcove. Kevin was not

23  wearing a shirt and was obviously not armed. Kevin was highly agitated and incoherent,

24  repeating "Here, here, here," "Please, please, please," and making other sounds. Both

25  deputies could see that Kevin was irrational and needed immediate medical attention.

26  There was no apparent crime, but Kevin needed to be medically evaluated and, perhaps,

27  involuntarily committed to an appropriate mental health facility pursuant to Cal. Welf.

28  & Inst. Code § 5150. Neither deputy called for medical or mental assistance, however.

44.     Defendants County and RSD are vicariously liable for the negligence of their employees pursuant to Cal. Gov't Code § 815.2.

WHEREFORE, Plaintiff prays for judgment as follows:

**On All Causes of Action:**

a.     Compensatory general and special damages in accordance with proof;

b.     Costs of suit necessarily incurred herein; and

c.     Such further relief as the Court deems just or proper.

**On the First and Second Causes of Action:**

d.     Reasonable attorney's fees and expenses of litigation.

**On the First, Second and Third Causes of Action:**

e.     Exemplary damages against the Defendants (except the County and RSD) in an amount sufficient to make an example of those defendants and to deter future misconduct.

**On the Second Cause of Action:**

f.     Statutory damages against the Defendants (except the immune entity defendants, the County and RSD).

Dated:  July 14, 2020                    THE LAW OFFICES OF JOHN BURTON


                                        _____/s/ John Burton_____
                                             John Burton
                                          Attorneys for Plaintiff


**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated: July 14, 2020                    THE LAW OFFICES OF JOHN BURTON


                                        _____/s/ John Burton_____
                                             John Burton
                                          Attorneys for Plaintiff

- 13 -

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS   )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED,              )
                                   )
              PLAINTIFF,           )
                                   )
     VS.                           ) CASE NO. 5:19-CV-02083-JGB
                                   )
RIVERSIDE COUNTY, RIVERSIDE        )
SHERIFF'S DEPARTMENT,              )
SHERIFF-CORONER CHAD BIANCO AND    )
DOES 1-10,                         )
                                   )
              DEFENDANTS.          )
_____)


DEPOSITION OF ANGELINA AISPURO

TAKEN ON

TUESDAY, OCTOBER 6, 2020


MELINDA S. WOMELSDORF, C.S.R. NO. 13124


NORMAN SCHALL & ASSOCIATES
(800) 734-8838

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
   TRACY ALVES, INDIVIDUALLY AND AS  )
5  SUCCESSOR IN INTEREST FOR KEVIN R. )
   NIEDZIALEK, DECEASED,             )
6                                    )
                  PLAINTIFF,          )
7                                    )
       VS.                           )  CASE NO. 5:19-CV-02083
8                                    )            JGB
   RIVERSIDE COUNTY, RIVERSIDE       )
9  SHERIFF'S DEPARTMENT,             )
   SHERIFF-CORONER CHAD BIANCO AND   )
10 DOES 1-10,                        )
                                     )
11                DEFENDANTS.         )
   _____)

12

13

14

15

16         DEPOSITION OF ANGELINA AISPURO, taken on behalf of

17  the Defendants, at 24641 Washington Avenue, Murrieta, CA,

18  commencing at 2:00 P.M., Tuesday, October 6, 2020, before

19  Melinda S. Womelsdorf, Certified Shorthand Reporter, License

20  No. 13124, for the State of California, pursuant to Notice.

21

22

23

24

25

                                                    2

14:01:58:10  1    plaintiff, Tracy Alves.

2         VIDEOGRAPHER:  The court reporter may now swear in

3    the witness.

4                        ANGELINA AISPURO,

14:02:02:19  5         Having been first duly sworn, was

6              examined and testified as follows:

7

8                        EXAMINATION

9

14:02:14:24 10    MR. SAIN:  As a preliminary matter, I'll be

11   attaching as Exhibit 1 the deposition notice, subpoena,

12   and proof of service for this witness.

13            (Exhibit 1 was marked for identification

14            by the Certified Shorthand Reporter and

14:02:21:05 15            a copy is attached hereto.)

16   BY MR. SAIN:

17       Q    Ma'am, if you would just briefly lower your

18   mask and say your name on the record.

19       A    My name is Angelina Aispuro.

14:02:27:23 20       Q    Thank you.  Put it back on.

21            All right.  Ma'am, have you ever had your

22   deposition taken before?

23       A    No.

24       Q    Okay.  So a deposition is a very unusual

14:02:35:20 25   proceeding, and it usually helps if we go over what we

6

14:54:15:13 1    Niedzialek may have told you, how he came to be a drug

2    and alcohol counselor?

3         A    Um, he wanted to help people that was -- were

4    struggling with addiction due to his personal, um,

14:54:40:16 5    experience.

6         Q    What personal experience?

7         A    Dealing with an illness of addiction.

8         Q    Are you saying that Kevin N. became a drug and

9    alcohol counselor because he had had his own drug

14:54:58:09 10   addiction?

11        A    Correct.

12        Q    This is something he had told you?

13        A    Yes.

14        Q    What did he tell you that was the drug that he

14:55:10:10 15   had been addicted to?

16        A    Um, it was heroin.

17        Q    At the time that you met Kevin N., uh, had you

18   ever observed him using any illicit drugs like heroin or

19   methamphetamine?

14:55:32:01 20        A    Never.

21        Q    So at the time that you knew Kevin N., he was

22   sober?

23        A    Correct.

24        Q    Did he ever tell you how long he had been

14:55:49:03 25   sober?

46

14:55:49:19  1         A     He was almost two years.

2         Q     Different people with different habits have

3    different versions of sober.  Was Kevin the kind of

4    sober where he would drink alcohol but not use drugs, or

14:56:21:07  5    was -- did he abstain from everything?

6         A     He abstained from everything.

7         Q     No alcohol, no drugs of any kind for Kevin N.?

8         A     Correct.

9         Q     Did he ever talk to you -- when he talked to

14:56:32:18 10   you about his addiction, his drug addiction, did he ever

11   give you some examples of how bad it had been before he

12   got clean?

13        A     Um, no.  It wasn't something that we

14   discussed.

14:56:49:26 15        Q     Never discussed the details of him waking up

16   somewhere, doing something?

17        A     No.

18        Q     So he never traded any war stories with you

19   about how he got when he was on drugs?

14:56:59:22 20        A     No.  I had no interest in it.

21        Q     And all the way up to the end of July 2019,

22   you never saw Kevin N. take or use any kind of drugs; is

23   that correct?

24        A     That is correct.

14:57:17:00 25        Q     So all the way up until the end of July 2019,

47

14:57:20:01 1    you never saw Kevin N. under the influence of any drug?

2         A    Yes, you're correct.

3         Q    Okay.  All the way up to the incident date,

4    for the entire time that you knew Kevin N., was there

14:57:45:27 5    anything that you observed or anything that was said to

6    you that caused you any concern that Kevin N. might be

7    using drugs?

8         A    I think the answer is yes.

9         Q    What was that?

14:58:06:07 10   A    He -- um, he had called me, um, when he -- um,

11   one night really late, and, um, I didn't witness him

12   using, but he told me in the parking lot of WinCo that

13   he had relapsed.

14        Q    Do you remember approximately when that was?

14:58:27:26 15   A    I do not.  I know that I told the officer, but

16   this was over a year ago, so I don't -- I do not know

17   the date.

18        Q    About how long -- strike that.

19             Was this call from Kevin N. where he told you

14:58:40:00 20   that he had relapsed -- did that call occur in

21   July 2019?

22        A    Yes.

23        Q    Okay.  Before July 2019, was there anything

24   that you observed or anything that was reported to you

14:58:57:20 25   that raised any concerns in your mind that Kevin N.

48

15:01:49:23   1   of his prior methamphetamine use, his use of

2   methamphetamine before July 2019, you have no knowledge

3   one way or the other what the frequency of his

4   methamphetamine use was; is that true?

15:02:03:15   5        A    Yes, that is true.

6        Q    For all you know, before July 2019, Kevin N.

7   could have used methamphetamine just one time; true?

8        A    Correct.  That is correct.

9        Q    Okay.  When you had this call in July of 2019,

15:02:29:20  10   about -- where Kevin N. told you that he had relapsed,

11   did he tell you what he had relapsed with?  What drug?

12        A    Yes, he did.

13        Q    What did he say?

14        A    Methamphetamine.

15:02:43:15  15        Q    Did he tell you how much he had relapsed with?

16        A    No.  He -- I take that back.  He said, "I only

17   did it once," but he didn't -- he didn't give me, like,

18   any other specifics other than it was just that one --

19   one occurrence.

15:03:02:11  20        Q    So when Kevin N., in July 2019, told you that

21   he had relapsed by taking meth, he told you that he had

22   taken meth just once in July 2019; is that correct?

23        A    Correct.

24        Q    And when Kevin N., in July 2019, told you that

15:03:19:17  25   he had relapsed by taking meth, he did not tell you the

51

15:06:01:28  1        So basically what you're saying is that there

2   were two conversations before the incident where

3   Kevin N. told you he had used?

4        A    Yes, sir.

15:06:13:12  5        Q    There was one where he told you about five

6   days before the incident in July of 2019 that he had

7   used an unspecified amount of meth that caused him to

8   relapse; correct?

9        A    Yes, that is correct.

15:06:27:21 10        Q    And then there was a second conversation with

11  Kevin N. at some point after that, closer in time to the

12  incident date, where he told you he had been using

13  again?

14       A    Correct.

15:06:36:24 15        Q    And when did that second conversation happen?

16       A    It happened Sunday, the night before the

17  accident -- the incident.

18       Q    So one day before the incident?

19       A    Correct.

15:06:53:19 20        He did tell me he had not used that day.

21  Because I told him I would not meet him if he was high.

22       Q    So let's go in order.

23        After the July 2019 call, approximately five

24  days before the incident, where Kevin N. told you that

15:07:14:10 25  he had relapsed by taking a non-specified amount of

54

15:07:18:08  1   meth, you had a second conversation with him about one

 2   day before the incident where he admitted that he was

 3   still using drugs; correct?

 4       A    Correct.

15:07:26:25  5       Q    And in that second conversation, did he

 6   specify what drugs he was still using?

 7       A    He said methamphetamine and marijuana.

 8       Q    And in that second conversation, did he

 9   specify the amount or quantity of methamphetamine he had

15:07:43:10 10   been using since your last talk?

11       A    No, he had not.

12       Q    In your second conversation, did Kevin N.

13   specify how often he had been using methamphetamine

14   since your last talk?

15:08:04:02 15       A    No.

16       Q    So in your second conversation, Kevin N. never

17   provided you with any information about the frequency of

18   his drug use in July 2019; is that correct?

19       A    Correct.

15:08:26:04 20       Q    When Kevin N. said to you, in the second

21   conversation in July of 2019, that he had been using

22   meth again, did he communicate to you how much meth he

23   had been using?

24       A    No, he did not.

15:08:42:00 25       Q    In the second conversation, did Kevin N.

55

1  State of California   )
                          )  SS.
2  County of_____)

3

4          I, Angelina Aispuro, say I have read the

5  foregoing deposition and declare under penalty of

6  perjury that my answers as indicated are true and

7  correct.

8

9

10  _____
              (DATE)
11

12

13

14                              _____
                                       (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25

                                                      77

```
 1  State of California      )
                             )  SS.
 2  County of San Bernardino )

 3

 4          I, MELINDA WOMELSDORF, Certified Shorthand

 5  Reporter, License No. 13124, for the State of

 6  California, do hereby certify:

 7          That, prior to being examined, the witness

 8  named in the foregoing deposition, to wit, Angelina

 9  Aispuro, was by me duly sworn to testify the truth, the

10  whole truth and nothing but the truth;

11          That said deposition was taken down by me

12  in shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription under

14  my direction;

15          That the foregoing transcript, as typed, is

16  a true record of the said proceedings.

17          I further certify that I am not interested

18  in the event of the action.

19          Witness my hand this 28th day of October,

20  2020.

21

22

23          MELINDA WOMELSDORF, CSR. NO. 13124

24

25
                                                      78
```

# EXHIBIT E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS   )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED,              )
                                  )
          PLAINTIFF,        )
                                  )
     VS.                    ) CASE NO. 5:19-CV-02083-JGB
                                  )
RIVERSIDE COUNTY, RIVERSIDE     )
SHERIFF'S DEPARTMENT,          )
SHERIFF-CORONER CHAD BIANCO AND   )
DOES 1-10,                 )
                                  )
          DEFENDANTS.      )
_____)


DEPOSITION OF CAREY CZUCZKA

TAKEN ON

WEDNESDAY, SEPTEMBER 16, 2020



MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
   TRACY ALVES, INDIVIDUALLY AND AS  )
5  SUCCESSOR IN INTEREST FOR KEVIN R. )
   NIEDZIALEK, DECEASED,             )
6                                    )
                    PLAINTIFF,       )
7                                    )
        VS.                          ) CASE NO. 5:19-CV-02083
8                                    )              JGB
   RIVERSIDE COUNTY, RIVERSIDE       )
9  SHERIFF'S DEPARTMENT,             )
   SHERIFF-CORONER CHAD BIANCO AND   )
10 DOES 1-10,                        )
                                     )
11                  DEFENDANTS.      )
   _____)

12

13

14

15

16          DEPOSITION OF CAREY CZUCZKA, taken on behalf of

17  the Defendants, at 24641 Washington Avenue, Murrieta, CA,

18  commencing at 10:06 A.M., Wednesday, September 16, 2020,

19  before Melinda S. Womelsdorf, Certified Shorthand Reporter,

20  License No. 13124, for the State of California, pursuant to

21  Notice.

22

23

24

25

                                                        2

10:19:08:11 1   to the witness.

2                         CAREY CZUCZKA,

3               Having been first duly sworn, was

4               examined and testified as follows:

10:19:09:03 5

6                         EXAMINATION

7

8   BY MR. CHAN:

9       Q    Thank you.  This is Garros Chan on behalf of

10:19:25:10 10  the County of Riverside, Sheriff-Coroner Chad Bianco,

11  Deputy Brian Keeney, and Deputy Sonia Gomez.

12              Ms. Czuczka?  Am I getting that right?

13      A    That works.

14      Q    Thank you.

10:19:38:26 15              Thank you for coming.  Thank you for taking

16  the time to be here for -- for your deposition to be

17  taken.

18              As a preliminary -- as a preliminary matter,

19  can we have the appearances of all that are in this

10:19:52:06 20  room?

21              Mr. Kennedy?

22              I mean Mr. Helm?

23      MR. HELM:  Yes?

24      MR. CHAN:  Yeah.  Could we just get your appearance

10:20:06:01 25  real quick?

                                                            7

| | | | |
|---|---|---|---|
| 10:33:57:24 | 1 | A | I don't know her last name. |
| | 2 | Q | How do you spell Lynn? |
| | 3 | A | L-Y-N-N. |
| | 4 | Q | Okay.  Thank you. |
| 10:34:07:12 | 5 | | And what type of residence is this? |
| | 6 | A | It's a home. |
| | 7 | Q | It's a home.  Okay. |
| | 8 | | And before moving into the home in Wildomar, |
| | 9 | | where did you live previously? |
| 10:34:21:05 | 10 | A | In Murrieta. |
| | 11 | Q | Okay.  What was the address? |
| | 12 | A | 37817 Rainbow Drive. |
| | 13 | Q | Rainbow.  Okay. |
| | 14 | A | Murrieta, California 92563. |
| 10:34:36:01 | 15 | Q | Okay.  And how long did you live at that |
| | 16 | | address? |
| | 17 | A | I lived there from October to August. |
| | 18 | Q | What year? |
| | 19 | A | October 2019. |
| 10:34:53:26 | 20 | Q | Okay. |
| | 21 | A | To August of this year. |
| | 22 | Q | Okay.  And prior to that, where did you live? |
| | 23 | A | At 422 -- 42200 Moraga Road, Apartment 27A, |
| | 24 | | Temecula. |
| 10:35:18:07 | 25 | Q | Okay.  Thank you. |

20

11:26:46:19 1    multiple days or just one day?

2        A    I hadn't heard from him in a few days.  So I

3    texted him on the 23rd.

4        Q    Okay.  Okay.  Do you have any -- have you made

11:27:02:04 5    any observations or come to any information that Kevin

6    Niedzialek has any mental problems or illnesses?

7        A    No.

8        Q    Okay.  So just in summary -- and of course

9    clarify me if I'm wrong or incorrect -- um, but with

11:27:25:19 10   regards to any prior crimes, um, you do not have any

11   observations or information that Kevin Niedzialek

12   committed any prior crimes; correct?

13       A    Correct.

14       Q    And with regards to prior acts of violence by

11:27:40:13 15   Kevin Niedzialek, you do not have any observations or

16   information with regards to those prior acts of

17   violence; would that be correct?

18       A    Correct.

19       Q    And your only observation or information

11:27:51:07 20   regarding drug use by Kevin Niedzialek is on July 23 --

21   23rd, 2019, when he discussed with you that he was using

22   methamphetamines -- or around that date; correct?

23       A    Correct.

24       Q    Okay.  So you do not have any -- any other

11:28:09:04 25   observations or any type of information that he used any

53

12:17:57:21  1   with a girlfriend also?

2        A     Yep.  Yes.

3        Q     So when did she move out, again?

4        A     July 9th -- or I'm sorry.  June 9th.

12:18:10:08  5   Q     Same year?

6        A     Same year.

7        Q     So it was from June 9th, 2019, all the way up

8   to July 23rd, 2019, you were living alone?

9        A     Yes.

12:18:18:18 10   Q     Okay.  And why did you offer Kevin Niedzialek

11  to stay at your apartment?

12       A     Um, he told me he didn't have anywhere else to

13  go.

14       Q     Where was he staying before?

12:18:34:12 15   A     He was staying with Aaron Ernest.

16       Q     Who is Aaron Ernest?

17       A     A friend of his.

18       Q     Do you know Mr. Ernest?

19       A     Yes.

12:18:44:27 20   Q     How do you know him?

21       A     We work together.

22       Q     Work together where?

23       A     At Solution Based Treatment and Detox.

24       Q     Okay.  Okay.  How long have you known

12:18:56:00 25  Mr. Ernest?

85

| | | |
|---|---|---|
| 12:22:02:29 | 1 | A    Dropped Kevin off.  Waited with Kevin until I |
| | 2 | arrived, and then he left. |
| | 3 | Q    "Him" being -- "him" leaving being Mr. Pyburn? |
| | 4 | A    Yes. |
| 12:22:12:21 | 5 | Q    Okay.  So he drove Mr. Niedzialek to your |
| | 6 | apartment, and then he proceeded to leave? |
| | 7 | A    Yes. |
| | 8 | Q    Okay.  All right.  Did you -- when he, um, was |
| | 9 | staying at your apartment at the very beginning, did you |
| 12:22:31:08 | 10 | set any ground rules with him, with Mr. Niedzialek? |
| | 11 | A    Yes. |
| | 12 | Q    What were those ground rules? |
| | 13 | A    I told him, if he was going to use any drugs, |
| | 14 | that -- um, that he couldn't stay. |
| 12:22:47:26 | 15 | Q    Okay.  Anything else? |
| | 16 | A    That was it. |
| | 17 | Q    And what did Mr. Niedzialek say? |
| | 18 | A    He said okay. |
| | 19 | Q    Did he mention that he may be under the |
| 12:22:59:20 | 20 | influence of any controlled substance when he arrived at |
| | 21 | your apartment? |
| | 22 | A    Yes. |
| | 23 | Q    What did he say? |
| | 24 | A    He said that he needed to get some rest |
| 12:23:17:28 | 25 | because he was coming down. |

88

| | |
|---|---|
| 12:23:20:29 | 1      Q    Did Mr. Niedzialek state how long he was on |
| | 2   drugs or -- I'm sorry. |
| | 3         Did Mr. Niedzialek identify what he was coming |
| | 4   down from? |
| 12:23:30:28 | 5      A    Yes. |
| | 6      Q    What was it? |
| | 7      A    Methamphetamine. |
| | 8      Q    Okay. Did he state how long he was on |
| | 9   methamphetamine? |
| 12:23:41:26 | 10      A    If I recall correctly, it was two days. |
| | 11      Q    Two days. |
| | 12         So from July 23rd, two days back would be |
| | 13   July 22nd -- July 21. |
| | 14         Would that be accurate? |
| 12:23:57:11 | 15      A    Yes. |
| | 16      Q    Okay. Did it appear to you that he was on |
| | 17   methamphetamine at the time of -- when you were speaking |
| | 18   with him on July 23rd? |
| | 19      A    No. He seemed pretty normal to me. |
| 12:24:23:06 | 20      Q    So the only information that you know that he |
| | 21   was on methamphetamines was he told you? |
| | 22      A    Yeah. |
| | 23      Q    Okay. |
| | 24      A    Yes. |
| 12:24:31:00 | 25      Q    Did he make any statement to you that he was |

89

1  State of California   )
                         )   SS.
2  County of_____)

3

4           I, Carey Czuczka, say I have read the

5  foregoing deposition and declare under penalty of

6  perjury that my answers as indicated are true and

7  correct.

8

9

10  _____
              (DATE)
11

12

13

14                              _____
                                        (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25

                                                      172

1  State of California     )
                          )  SS.
2  County of San Bernardino)

3

4          I, MELINDA WOMELSDORF, Certified Shorthand

5  Reporter, License No. 13124, for the State of

6  California, do hereby certify:

7          That, prior to being examined, the witness

8  named in the foregoing deposition, to wit, Carey

9  Czuczka, was by me duly sworn to testify the truth, the

10 whole truth and nothing but the truth;

11         That said deposition was taken down by me

12 in shorthand at the time and place therein named and

13 thereafter reduced to computer-aided transcription under

14 my direction;

15         That the foregoing transcript, as typed, is

16 a true record of the said proceedings.

17         I further certify that I am not interested

18 in the event of the action.

19         Witness my hand this 5th day of October,

20 2020.

21

22                         _____

23                         MELINDA WOMELSDORF, CSR. NO. 13124

24

25

                                                      173

# EXHIBIT F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS        )
SUCCESSOR IN INTEREST FOR KEVIN R.      )
NIEDZIALEK, DECEASED,                    )
                                         )
            PLAINTIFF,                    )
                                         )
      VS.                                ) CASE NO. 5:19-CV-02083-JGB
                                         )
RIVERSIDE COUNTY, RIVERSIDE             )
SHERIFF'S DEPARTMENT,                    )
SHERIFF-CORONER CHAD BIANCO AND         )
DOES 1-10,                               )
                                         )
            DEFENDANTS.                   )
_____)


DEPOSITION OF AARON EARNEST

TAKEN ON

TUESDAY, OCTOBER 13, 2020


MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4                                        )
     TRACY ALVES, INDIVIDUALLY AND AS    )
5    SUCCESSOR IN INTEREST FOR KEVIN R.  )
     NIEDZIALEK, DECEASED,               )
6                                        )
                      PLAINTIFF,         )
7                                        )
          VS.                            ) CASE NO. 5:19-CV-02083
8                                        )              JGB
     RIVERSIDE COUNTY, RIVERSIDE         )
9    SHERIFF'S DEPARTMENT,               )
     SHERIFF-CORONER CHAD BIANCO AND     )
10   DOES 1-10,                          )
                                         )
11                    DEFENDANTS.        )
     _____)
12

13

14

15

16           DEPOSITION OF AARON EARNEST, taken on behalf of

17   the Defendants, at 24641 Washington Avenue, Murrieta, CA,

18   commencing at 10:01 A.M., Tuesday, October 13, 2020, before

19   Melinda S. Womelsdorf, Certified Shorthand Reporter, License

20   No. 13124, for the State of California, pursuant to Notice.

21

22

23

24

25

                                                              2

10:02:41:24  1      MR. HELM:  Kennedy Helm on behalf of the plaintiff,

2  Tracy Alves.

3      VIDEOGRAPHER:  The court reporter may now swear in

4  the witness.

10:02:48:10  5                      AARON EARNEST,

6              Having been first duly sworn, was

7              examined and testified as follows:

8

9                      EXAMINATION

10:02:48:12 10

11  BY MR. SAIN:

12      Q    Good morning, sir.

13      A    Good morning.

14      Q    As a preliminary matter, will you just lower

10:03:04:20 15  your mask for one second and state your full name on the

16  record?

17      A    My name is Aaron Earnest.

18      Q    You can put your mask back on.  Thank you so

19  much.

10:03:11:06 20              As a preliminary matter, I'll be attaching as

21  Exhibit 1 the Deposition Notice, Subpoena, and Proof of

22  Service for this witness.

23              (Exhibit 1 was marked for identification

24              by the Certified Shorthand Reporter and

10:03:17:20 25              a copy is attached hereto.)

6

11:19:22:13 1   using for about a year, so I didn't see him at all.  And

2   then all the other times I would see him pretty --

3   pretty frequently when he was clean.

4        Q    About when during the period of time that you

11:19:34:03 5   knew Kevin Niedzialek did he relapse?

6        A    It -- he relapsed off and on a lot.  But that

7   one time where he was gone for a while -- again,

8   estimating here -- it would have to be in the 2015

9   range.

11:19:48:21 10        Q    So around 2015, your understanding was that

11   Kevin N. had relapsed for about a year?

12        A    Yeah.  He was on the streets, using.

13        Q    And after this approximately one-year period

14   in 2015 where Kevin N. had relapsed, did he ever relapse

11:20:08:05 15   again, to your knowledge?

16        A    Um, yeah.  I mean, he would get a little bit

17   of time and then relapse.  And then the last, uh, couple

18   years before he passed away, that's when he had

19   abstained the most clean time.

11:20:22:05 20        Q    Okay.  So for a full two years before

21   July 2019, your understanding was that Kevin N. had been

22   completely sober?

23        A    Until the last week of his life or so.  It was

24   seven to ten days.  I didn't know he'd relapsed at that

11:20:40:19 25   point.

57

11:20:41:11  1      Q     Okay.  So until about two weeks prior to our

2    incident date, for two years prior to that, your

3    understanding was that Kevin N. had been completely

4    sober?

11:20:53:14  5      A     I think it's about a year and a half.  But,

6    yes, for about a year and a half he had been completely

7    sober from my understanding.

8      Q     So if you were saying it's -- is it your

9    estimate that it's about a year and a half to two years

11:21:16:05 10   prior to the incident?

11      A     Yeah.  I'm -- I would say a year and a half to

12   two years.  Again, speculating, but, um, I know there

13   was at least a year and a half where -- he moved in with

14   me when he had six months clean.  He lived with me for a

11:21:31:22 15   year before he passed away.  Um, so a year and a half is

16   what I would remember.

17      Q     Fair enough.

18            So in terms of your best estimate, based on

19   your personal knowledge -- don't want you to speculate.

11:21:44:11 20      A     Uh-huh.

21      Q     Based on your personal knowledge of Kevin

22   Niedzialek, for approximately one and a half years

23   before July 2019, Kevin N. had been completely sober?

24      A     Yes.

11:21:58:04 25      Q     And your understanding is that that stretch of

58

11:22:03:01  1  sobriety ended about ten days before the incident date?

2      A    Yes.

3      Q    Okay.  So approximately July 19th, somewhere

4  in there?

11:22:11:07  5      A    Yes.

6      Q    All right.  So working our way backward a year

7  and a half prior to July 2019, your estimate and

8  recollection is that, all the way back to roughly

9  January of 2018, Kevin N. had been completely sober?

11:22:31:10 10      A    Uh, yeah.  The dates are all throwing me off.

11  But can you -- can you repeat it?

12      Q    Sure.

13           If the last time that his sobriety ended was

14  July of 2019 --

11:22:45:29 15      A    Uh-huh.

16      Q    -- and we work our way backwards about a year

17  and a half prior to that, a year and a half prior to

18  July 2019 would be January 2018; right?

19      A    Okay.

11:22:56:00 20      Q    Is that right?

21      A    Yes, that's correct.

22      Q    So based on your personal knowledge and

23  recollection, your best estimate is that, from

24  approximately January 2018 to approximately July '19 --

11:23:07:22 25  give or take some days -- 2019, according to your

59

11:39:44:20 1   knowledge about.

2                Based on your personal knowledge, for that

3   period from when you first meet him until January 2018,

4   do you, Mr. Earnest, know -- personally know one way or

11:39:57:10 5   the other whether or not Kevin N. was a chronic user of

6   meth?

7       A    No.

8       Q    Okay.  Once, uh, you start seeing him daily

9   beginning in approximately January '18 until about seven

11:40:10:20 10   to ten days before the incident -- so approximately

11   July, uh, '19, during that approximately

12   one-and-a-half-year period, though, based on your own

13   personal observations, you know that he was definitely

14   not a chronic user of drugs; correct?

11:40:24:21 15       A    Yes.

16       Q    What I said is correct?

17       A    He was not.

18            Huh?

19       Q    What I said was correct?

11:40:27:24 20       A    What you said is correct, yes.

21       Q    Okay.  He was not a chronic user during that

22   one-and-a-half-year period?

23       A    That is true.

24       Q    Okay.  So how is it that you came to see

11:40:36:20 25   Kevin N. daily beginning in January of 2018?

75

11:40:39:21  1      A     He came back to the Narcotics Anonymous

2    meetings.

3           Q     And then all the way up until approximately

4    July 19, 2019, Kevin N. was completely sober?

11:41:05:00  5      A     Yes.

6           Q     So what changed?

7           A     His mother passed away earlier in 2019.  He

8    lost his job.  Um, he just got hit from all sides.  He

9    was depressed in certain aspects.  No, I wouldn't say

11:41:25:22 10   depressed.  I would say down.

11          Um, he's never really been good about

12   communicating his feelings, so -- it was still

13   surprising when he relapsed, but it was also, like, not

14   that surprising when you look back on it.

11:41:42:19 15      Q     How did you discover that Kevin N. had

16   relapsed in July 2019?

17          A     So his girlfriend, and he kind of lived with

18   me during that time.  Um, his girlfriend, Angie, had

19   called me one day and asked me to go check to see if he

11:41:58:08 20   was breathing in his bed.  That was very odd for me

21   because why would I have to do that.  Um, so I checked.

22   He was fine.

23          That kind of alerted me that something else

24   was going on, if people are worried about him in that

11:42:13:06 25   aspect.  So I confronted him, and he admitted it to me.

76

11:42:16:20 1    Um, at that period in time, he was very honest, and he

2    had told me that he had used -- had started using a

3    couple days ago or something like that.

4         So I -- obviously I took his house key back.

11:42:28:06 5    I told him he could not live here because I was -- I'm a

6    single father taking care -- I've been taking care of my

7    son on my own for a long time.  Um, he understood that.

8    He left.  He left his stuff, though.

9         So then there was other incidences where we

11:42:42:06 10   interacted after that to get his belongings and whatnot

11   when he could.

12        Q    So sometime around seven to ten days before

13   our incident, approximately January -- excuse me --

14   approximately July, uh, '19, give or take a few days,

11:43:08:19 15   Kevin Niedzialek admitted to you that he had started

16   using illicit drugs about two days prior?

17        A    Yes.

18        Q    And did he admit to you what drugs he was

19   using?

11:43:20:14 20   A    Yes.

21        Q    What drugs?

22        A    Methamphetamine.

23        Q    And did he tell you how much he was using?

24        A    No.

11:43:28:07 25   Q    Did he tell you how often he was using?

77

State of California   )
                      )  SS.
County of_____ )


       I, Aaron Earnest, say I have read the foregoing deposition and declare under penalty of perjury that my answers as indicated are true and correct.


_____
    (DATE)


                     _____
                         (SIGNATURE)

91

```
 1  State of California     )
                            )  SS.
 2  County of San Bernardino)

 3

 4              I, MELINDA WOMELSDORF, Certified Shorthand

 5  Reporter, License No. 13124, for the State of

 6  California, do hereby certify:

 7              That, prior to being examined, the witness

 8  named in the foregoing deposition, to wit, Aaron

 9  Earnest, was by me duly sworn to testify the truth, the

10  whole truth and nothing but the truth;

11              That said deposition was taken down by me

12  in shorthand at the time and place therein named and

13  thereafter reduced to computer-aided transcription under

14  my direction;

15              That the foregoing transcript, as typed, is

16  a true record of the said proceedings.

17              I further certify that I am not interested

18  in the event of the action.

19              Witness my hand this 4th day of November,

20  2020.

21

22
                    MELINDA WOMELSDORF, CSR. NO. 13124
23

24

25
                                                        92
```

# EXHIBIT G

United States District Court

Central District of California

Tracy Alves, Individually and          )
as Successor in Interest for           )
Kevin R. Niedzialek, deceased,         )
                                       )
          Plaintiff(s),                )
                                       )
     vs.                               )    No. 5:19-CV
                                       )    02083JGB (SHKx)
Riverside County, Riverside            )
Sheriff's Department,                  )
Sheriff -- Coroner Chad                )
Bianco, and Does 1-10,                 )
                                       )
          Defendant(s).                )
_____)

DEPOSITION OF BRENDEN GRAFF

Taken on

Thursday, October 8, 2020

Elena Schall, CSR No. 7638

```
1                 United States District Court

2               Central District of California

3

4    Tracy Alves, Individually and    )
     as Successor in Interest for     )
5    Kevin R. Niedzialek, deceased,   )
                                      )
6                     Plaintiff(s),   )
                                      )
7         vs.                         )  No. 5:19 CV
                                      )  02083 JGB
8    Riverside County, Riverside      )  (SHKx)
     Sheriff's Department,            )
9    Sheriff-Coroner Chad Bianco,     )
     and Does 1-10,                   )
10                                    )
                      Defendant(s).   )
11   _____)

12

13          DEPOSITION OF BRENDEN GRAFF, taken by the

14   Defendants at 600 West Broadway, Suite 700, San Diego,

15   California, commencing at 12:05 o'clock p.m. on Thursday,

16   October 8, 2020, before Elena Schall, Certified Court

17   Reporter, License No. 7638, for the State of California,

18   pursuant to notice.

19

20                        ---oOo---

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | Today we are at the office of Premier Work | *01:01PM* |
| 2 | Spaces located at 600 West Broadway, Suite 700, San Diego | *01:01PM* |
| 3 | California 92011. | *01:01PM* |
| 4 | This deposition is being videotaped at the | *01:01PM* |
| 5 | request of Manning and Kass representing the defense. | *01:01PM* |
| 6 | Counsel, if you can introduce and state your | *01:01PM* |
| 7 | appearances for the record? | *01:01PM* |
| 8 | MR. SAIN:  Tony Sain on behalf of Defendants | *01:01PM* |
| 9 | County of San Bernardino, Riverside County Sheriff's | *01:01PM* |
| 10 | Department deputies. | *01:01PM* |
| 11 | MR. HELM:  Kennedy Helm for the plaintiff Tracy | *01:02PM* |
| 12 | Alves. | *01:02PM* |
| 13 | THE VIDEOGRAPHER:  The court reporter may now | *01:02PM* |
| 14 | swear in the witness. | |
| 15 | | |
| 16 | BRENDEN GRAFF, | |
| 17 | called as a witness by the Defendants, | |
| 18 | being first duly sworn, was examined | |
| 19 | and testified as follows: | |
| 20 | | |
| 21 | EXAMINATION | |
| 22 | BY MR. SAIN: | *01:02PM* |
| 23 | Q.   I have already attached as Exhibit 1 the | *01:02PM* |
| 24 | deposition notice and subpoena and proof of service for | *01:02PM* |
| 25 | this witness. | *01:02PM* |

```
 1   girl named Carey.  And Kevin was sleeping on her couch,      01:44PM

 2   and he had just -- I don't know where he was living, but     01:44PM

 3   he wasn't living there any longer.  And he was coming off    01:44PM

 4   what anyone in the room would call, a bender.  And he        01:44PM

 5   looked a little rough, and he was trying to figure out       01:44PM

 6   what it was he was going to do, if he was going to go back   01:44PM

 7   to sober living or go to a rehab facility.                   01:44PM

 8        Q.   For the July 2019 relapse, did Kevin Niedzialek    01:44PM

 9   tell you what drugs he relapsed with?                        01:44PM

10        A.   No.                                                01:44PM

11        Q.   So would it be accurate to say that for the        01:45PM

12   entire time that you knew Kevin Niedzialek, you never had    01:45PM

13   any personal knowledge about what drugs he may or may not    01:45PM

14   have been using?                                             01:45PM

15        A.   No.                                                01:45PM

16        Q.   So what I said was accurate?                       01:45PM

17        A.   Yes, sir.                                          01:45PM

18        Q.   When you saw Kevin Niedzialek at the time of the   01:45PM

19   July relapse, the relapse that occurred approximately        01:45PM

20   three days before our incident, was there anything that      01:45PM

21   you observed in his conduct or appearance that caused you    01:45PM

22   any concern about his health or sobriety?                    01:45PM

23        A.   Can I get the question again, sir?                 01:45PM

24             (Record read.)                                     01:45PM

25             THE WITNESS:  Yes.  He looked a little rough.      01:46PM
```

1   He had come off a run, and was doing whatever he was doing          01:46PM

2   and looked like he had lost some weight, was kind of all            01:46PM

3   over the place.  But like having been in that situation,            01:46PM

4   it kind of made sense, you know, he was kind of burned              01:46PM

5   down on life here, we are got to put it back together, so           01:46PM

6   yes.                                                                01:46PM

7       Q.    So this time, the July relapse was different              01:46PM

8   than the June 2018 relapse?                                         01:46PM

9       A.    Yes, sir, it was.                                         01:46PM

10      Q.    This time for the July 2019 relapse as opposed            01:46PM

11  to the -- strike that.                                              01:47PM

12            This time for the July 2019 relapse as opposed            01:47PM

13  to the June 2018 relapse, Kevin's conduct and appearance            01:47PM

14  was of greater concern to you?                                      01:47PM

15      A.    Yes.                                                      01:47PM

16      Q.    You mentioned that he looked like he had lost             01:47PM

17  some weight for the July 2019 relapse; yes?                         01:47PM

18      A.    Yes, sir.                                                 01:47PM

19      Q.    Did it appear he looked unhealthy?                        01:47PM

20      A.    Yes, sir.                                                 01:47PM

21      Q.    Did you have any knowledge or information about           01:47PM

22  how many drugs Kevin had used for this July 2019 relapse?          01:47PM

23      A.    No, sir.                                                  01:47PM

24      Q.    And you didn't know what kind of drugs he had            01:47PM

25  used; correct?                                                      01:47PM

1    Q.    I see.  Okay.  So let's clean that up a little        02:40PM

2    bit.                                                        02:40PM

3          So far you told me that for the entire time you       02:40PM

4    knew him, you were aware of only two times where Kevin      02:40PM

5    Niedzialek had used drugs.  The first was on or about June  02:40PM

6    of 2018 when he advised you he had relapsed with an         02:41PM

7    unidentified drug; correct?                                 02:41PM

8    A.    Correct.                                              02:41PM

9    Q.    And for that single incident relapse, he did not      02:41PM

10   tell you what drug he used, how much he had used, or how    02:41PM

11   he even had used; correct?                                  02:41PM

12   A.    Correct.                                              02:41PM

13   Q.    As far as you knew, there had been a single time      02:41PM

14   where he had used unspecified drugs; correct?              02:41PM

15   A.    Correct.                                              02:41PM

16   Q.    Based on his appearance, his conduct, your            02:41PM

17   discussion with him, that single relapse in June 2018 did   02:41PM

18   not cause you any concern for his health or wellbeing;      02:41PM

19   correct?                                                    02:41PM

20   A.    When I saw him, he was clean.                         02:41PM

21   Q.    What I said was correct?                              02:41PM

22   A.    Yes.                                                  02:41PM

23   Q.    The second time you were aware of Kevin               02:41PM

24   Niedzialek using drugs was in July 2019, about three days   02:41PM

25   or so before our incident with the Sheriff's Department;    02:41PM

1   correct?                                                      02:41PM

2       A.    Correct.                                            02:41PM

3       Q.    So what you are saying to me now is that for the    02:41PM

4   second relapse, Kevin Niedzialek had advised you that the    02:41PM

5   drugs he relapsed with was methamphetamine and heroin?       02:41PM

6       A.    Just meth.                                          02:41PM

7       Q.    Okay.  And when for the second relapse, the July    02:41PM

8   2019 relapse had Kevin Niedzialek advised you how much       02:42PM

9   meth he had consumed?                                        02:42PM

10      A.    No.                                                 02:42PM

11      Q.    For the second relapse, the July 2019 relapse,      02:42PM

12  did Kevin Niedzialek advise you how often he had taken       02:42PM

13  meth resulting in this relapse or a result of this           02:42PM

14  relapse?                                                     02:42PM

15      A.    No, sir.                                            02:42PM

16      Q.    So other than the fact that for all you knew,       02:42PM

17  Kevin Niedzialek had relapsed a second time with            02:42PM

18  methamphetamine, did you have any other personal knowledge   02:42PM

19  about his drug use pertaining to this July 2019 relapse?     02:42PM

20      A.    No.                                                 02:42PM

21      Q.    Okay.  So then in terms of your personal           02:42PM

22  knowledge, other than what you testified to here today, do   02:42PM

23  you have any other personal knowledge about any of Kevin     02:42PM

24  Niedzialek's relapses, drug use, or sobriety other than      02:42PM

25  what you already said on the record?                         02:42PM

```
1   STATE OF CALIFORNIA        )

2                             )

3   COUNTY OF_____)

4

5

6               I, Brenden Graff, say I have read or had

7   interpreted to me the foregoing deposition and declare

8   under penalty of perjury that my answers as indicated are

9   true and correct.

10

11  _____
              (Date)
12

13

14

15                           _____
                                      (Signature)
16

17

18

19

20

21

22

23

24

25
```

1                       REPORTER'S CERTIFICATE

2

3            I, Elena Schall, CSR No. 7638, Certified

4    Shorthand Reporter in the State of California, do hereby

5    certify:

6            That prior to being examined, the witness named

7    in the foregoing proceeding was by me duly sworn to

8    testify the truth, the whole truth, and nothing but the

9    truth;

10           That said proceeding was taken down by me in

11   stenotype to the best of my ability at the time and place

12   named herein and was thereafter reduced to computer-aided

13   transcription under my direction and supervision;

14           That foregoing deposition is a full, true, and

15   correct transcription of my original stenotype notes.

16           I further certify that I have no interest in the

17   outcome of the action.

18

19           Witness my hand this 24th day of November, 2020.

20

21           _____
             Elena Schall, CSR No. 7638
22           Certified Court Reporter in
             and for the State of California
23

24

25

# EXHIBIT H

1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3

4    TRACY ALVES, AN INDIVIDUAL  )  CASE NO.: 19-CV-2083-JGB
     AND AS SUCCESSOR IN INTEREST )                    (SHKx)
5    FOR KEVIN R. NIEDZIALEK,     )
     DECEASED,                    )
6                                 )
                    PLAINTIFF,    )
7                                 )
         VS.                      )
8                                 )
     RIVERSIDE COUNTY, RIVERSIDE  )
9    SHERIFF'S DEPARTMENT,        )
     SHERIFF-CORONER CHAD BIANCO, )
10   DEPUTY SONIA GOMEZ, DEPUTY   )
     BRIAN KEENEY, AND DOES 3-10, )
11                                )
                    DEFENDANTS.   )
12   _____)

13

14             DEPOSITION OF DEPUTY BRIAN L. KEENEY

15                    ZOOM VIDEOCONFERENCE

16                  FRIDAY, DECEMBER 18, 2020

17

18

19

20

21
     RON FERNICOLA & ASSOCIATES
22   CERTIFIED SHORTHAND REPORTERS
     REPORTED BY: LESLIE A. TOLEDO, CSR NO. 8345
23   1244 West Edgeowwd Circle
     Coeur d'Alene, Idaho 83815
24   (661) 775-8299

25   FILE NO: 20518
                                                          1

1    DEPOSITION OF DEPUTY BRIAN L. KEENEY, A DEFENDANT, TAKEN

2    ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

3    COMMENCING AT 10:00 A.M., AND ENDING AT 2:15 P.M., ON

4    FRIDAY, DECEMBER 18, 2020, BEFORE LESLIE A. TOLEDO,

5    CSR NO. 8345, PURSUANT TO SUBPOENA.

6                              * * *

7    APPEARANCES OF COUNSEL:

8    FOR PLAINTIFF:        THE LAW OFFICES OF JOHN BURTON
                           BY:  JOHN BURTON, ESQ. - VIA ZOOM
9                          128 NORTH FAIR OAKS AVENUE
                           PASADENA, CALIFORNIA 91103
10                         (626) 449-8300

11                             - and -

12                         HELM LAW OFFICES, PC
                           BY:  T. KENNEDY HELM, IV - VIA ZOOM
13                         644 40TH STREET
                           SUITE 305
14                         OAKLAND, CALIFORNIA 94609
                           (510) 350-7517
15

16   FOR DEFENDANTS:       MANNING & KASS
                           ELROD, RAMIREZ, TRESTER, LLP
17                         BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                           BY:  GARROS CHAN, ESQ. - VIA ZOOM
18                         801 SOUTH FIGUEROA STREET
                           FIFTEENTH FLOOR
19                         LOS ANGELES, CALIFORNIA 90017
                           (213) 624-6900
20                         TMS@MANNINGLLP.COM

21

22

23

24

25
                                                              2

```
 1      FRIDAY, DECEMBER 18, 2020; VIA ZOOM VIDEOCONFERENCE

 2                        10:00 A.M.

 3

 4                  DEPUTY BRIAN L. KEENEY,

 5   the witness herein, having first been duly administered

 6   the oath, testified remotely as follows:

 7

 8                       EXAMINATION

 9   BY MR. BURTON:

10      Q.    Good morning, sir.  Could you please state your

11   complete name for the record?

12      A.    Brian, B-r-i-a-n, Lee, L-e-e, Keeney,

13   K-e-e-n-e-y.

14      Q.    Are you currently a Riverside County deputy

15   sheriff?

16      A.    Yes.

17      Q.    Have you ever had a deposition taken before?

18      A.    No.

19      Q.    I understand that you were on the Zoom yesterday

20   during Deputy Gomez's deposition; is that correct?

21      A.    Yes.

22      Q.    And I'm sure you've had an opportunity to

23   discuss these proceedings with your counsel, which I

24   don't want to ask about.  Just very briefly, let me know

25   if I've phrased a question in a way that presents any
```

4

**Ron Fernicola & Associates**

1   breathing.

2       Q.   Well, in this case, did you think that

3   Mr. Niedzialek's breathing became labored?

4       A.   I believe the breathing slowed down.

5       Q.   Well, was there a question, in your mind, as to

6   whether or not it had stopped entirely?

7           MR. SAIN:   Vague as to time.

8       Q.   BY MR. BURTON:   I'm sorry, the question

9   pending -- I don't know if you were thinking or you

10   were --

11       A.   No.

12       Q.   So at one point, you turned Mr. Niedzialek onto

13   his back; correct?

14       A.   Yes.

15       Q.   So prior to doing that, was there a point where

16   you did not think he was breathing anymore?

17       A.   Yes, the breathing had slowed and that's why I

18   turned him on his back.

19       Q.   Well, that's a little different than the

20   question I asked.   Did you think that he wasn't breathing

21   anymore before you turned him on his back?

22       A.   At the point that I turned him over, I needed to

23   get a clearer view to help me determine and see him

24   breathing.

25       Q.   So were you monitoring his breathing the whole

26

1    time, after he was handcuffed, before you turned him on

2    his back?

3        A.   Yes.

4        Q.   And during that time, was it slowing down?

5        A.   I recall seeing him breathing, the rise and fall

6    of his back.

7        Q.   I understand that.  What I'm asking you, since

8    you were monitoring it, initially, when he was

9    handcuffed, would you say he was breathing vigorously?

10       A.   I can't say.

11       Q.   Well, he was flailing his legs when he was

12    handcuffed; correct?

13       A.   Yes.

14       Q.   And then he continued to flail his legs for a

15    period of time after he was handcuffed; correct?

16       A.   Yes.

17       Q.   And then at some point, he stopped moving his

18    legs; is that correct?

19       A.   Yes.

20       Q.   And from that point until you turned him over,

21    were you monitoring his breathing?

22       A.   Yes, I was kneeling at his side.

23       Q.   Okay.  And while you were kneeling at his side,

24    you were monitoring his breathing as you were trained to

25    do; correct?

                    27

1      A.    Holding on to his hand, I had my left hand on

2   his shoulder blade, and I had my right hand on his left

3   hand, and I could tell the rise and fall of his back.

4      Q.    So the answer is, "Yes," you were monitoring his

5   breathing, from the time after he stopped flailing his

6   legs until the time that you rolled him over; correct?

7      A.    I monitored his breathing the entire time.

8      Q.    And -- right.  But I'm asking specifically

9   about, you know, that -- that period of time.  And during

10   that time, from the time that his legs stopped moving

11   until the time that you rolled him over, while you were

12   monitoring his breathing, did his breathing slow down?

13      A.    From the time when he was originally handcuffed,

14   until he stopped flailing, I could not make a

15   determination at the speed of how he was breathing.

16      Q.    Deputy Keeney, I've been doing this a long time

17   and I sort of like to break things into certain segments.

18   Just the way I think.  The segment I'm asking about

19   starts with when his legs stop moving.  We all see that

20   on Deputy Gomez's body-worn video.  At one point, his

21   legs stop moving, and you agree that you saw that;

22   correct?  You were aware at one point his legs stopped

23   moving; correct?

24      A.    Yes.

25      Q.    And then the other end of the segment I'm asking

28

**Ron Fernicola & Associates**

1    the present, first aid/CPR and refresher courses?

2        A.   Yes.

3        Q.   I mean, just for example, when was the last time

4    you had one?

5        A.   2020.

6        Q.   So are these at about two-year increments,

7    generally speaking?

8        A.   Yes.

9        Q.   Do you know if they're required by POST?

10       A.   I don't know.

11       Q.   But they're required by your department;

12   correct?

13       A.   Yes.

14       Q.   And during this training, you're trained on how

15   to recognize the need for CPR and how to administer CPR;

16   correct?

17       A.   We're given the basic instructions for CPR.

18       Q.   And are you -- it's your understanding of your

19   job that you're expected to administer CPR, if it's

20   indicated?

21       A.   If we can do so safely, yes.

22       Q.   Why didn't you do CPR before the paramedics

23   arrived, in this case?

24       A.   I saw the subject breathing and Deputy Gomez

25   indicated that he had a pulse.

                                                        32

**Ron Fernicola & Associates**

1   and the officer, the other student, walking up and

2   practicing going through how to control the arm, how to

3   place the knee across the shoulder, how to handcuff.

4          And I, personally, myself, both in the academy

5   and during these classes, have been in the prone position

6   for an extended amount of time, both unhandcuffed and

7   handcuffed.

8      Q.   And again, my question was:  Were you given any

9   training, either in the academy or during these refresher

10  courses, that after you put somebody in handcuffs in a

11  prone position, to move them off their chest?

12     A.   No.

13     Q.   I'm sorry, did you answer or are you thinking?

14  I just --

15          MR. SAIN:  He answered.

16     Q.   BY MR. BURTON:  The answer was, "No"?  It's just

17  sometimes it's hard to pick it up.

18     A.   We can defer to the court reporter for a read

19  back.

20          MR. BURTON:  Yeah, could I just get the question

21  and answer read back, please.

22              (The record was read back.)

23     Q.   BY MR. BURTON:  So you mentioned that during

24  this training, you had a lot of experience in the role of

25  the suspect, the person getting handcuffed in a prone

                                                        38

**Ron Fernicola & Associates**

1    position.  And that during your experience doing this,

2    you never had trouble breathing; is that correct?

3        A.   I have never had any trouble breathing in the

4    prone position.

5        Q.   So has anybody from your department told you

6    anything to the effect of, while a healthy person might

7    not have any difficulty breathing while in a prone

8    position, handcuffed, with officers holding him down to

9    one degree or another, a person who is in a state of

10   agitated or excited delirium, or who is under the

11   influence of a stimulant drug, or who had just been in a

12   fight with officers, and has lots of adrenaline going and

13   so on, they might experience a negative effect from being

14   held on their chest?

15            So after they're handcuffed, when it's safe to

16   do so, they should be rolled onto their side, or sat up,

17   or at least taken off their chest in some position.  Did

18   you ever get any instructions, generally, along those

19   lines?

20       A.   My training and experience is, there has been no

21   difficulties while breathing in the prone position.

22       Q.   Well, do you include in your experience what

23   happened to Mr. Niedzialek?

24            MR. SAIN:  Vague as phrased.

25            THE WITNESS:  I don't understand.

39

**Ron Fernicola & Associates**

1    least a contributing role in this death?

2          MR. SAIN:  Assumes facts not in evidence,

3    argumentative, calls for an expert opinion, misstates

4    testimony.

5          THE WITNESS:  I'm not the coroner, sir, so I

6    don't know what that means.

7      Q.   BY MR. BURTON:  Right.  I'm asking how you

8    understood the fact that you were told that this death

9    has been deemed a homicide.  Did you understand that to

10   mean that your restraints and those of Deputy Gomez may

11   have played a role in his death?

12         MR. SAIN:  Same objections, asked and answered,

13   argumentative.

14         THE WITNESS:  I'm not the coroner and I don't

15   understand what that means.

16     Q.   BY MR. BURTON:  Do you recall, at one point,

17   Mr. Niedzialek tried to roll off his chest onto his side?

18     A.   Yes.

19     Q.   And did you respond to that by pushing him back

20   down on his chest?

21     A.   I believe it was within approximately seven

22   minutes, 44, in Deputy Gomez's video, you can see the

23   subject begin to roll to his left, and it pushes me back,

24   and I steady myself by placing my left hand on his

25   shoulder blade, and I just rest my hand on his shoulder

                                                        41

```
 1   blade to make sure that he's not continuing to roll
 2   towards me.
 3        Q.   Well, why didn't you let him roll onto his side?
 4             MR. SAIN:  Vague as to time.
 5             THE WITNESS:  He's still combative.  He's still
 6   trying to either stand up or resist.
 7        Q.   BY MR. BURTON:  Well, in retrospect, do you
 8   think he was trying to roll on his side so he could
 9   breathe better?
10             MR. SAIN:  Assumes facts, argumentative, calls
11   for speculation.
12             THE WITNESS:  I don't know what someone is
13   trying do.
14        Q.   BY MR. BURTON:  I mean, in retrospect, do you
15   wish you would have let him roll on his side?
16        A.   Again, I don't know what someone is trying to
17   do.  I can deal with the situation, as far as if they're
18   still combative, to leave them in the prone position.
19        Q.   Well, have you ever been trained by your
20   department in this training that we're going through,
21   that someone is being held down in handcuffs, may appear
22   to be combative, but actually they're struggling to
23   breathe?
24             MR. SAIN:  Assumes facts.
25             THE WITNESS:  What I believe I stated is that
```

                                                          42

1  with a person who is in a state of excited delirium, that

2  after getting them cuffed and a hobble put on their legs,

3  if necessary, they should be rolled onto their side or

4  sat up?  Have you ever been trained that?

5      A.   The only training that I received in regards to

6  rolling someone on their side would be after the

7  application of the carotid restraint.

8      Q.   Now, Mr. Niedzialek was flailing his legs;

9  correct?

10     A.   After he was handcuffed, yes.

11     Q.   So why wasn't his -- why weren't his legs put in

12  a hobble restraint?

13     A.   I only typically use a hobble restraint to

14  prevent someone from trying to kick out my patrol car

15  door.

16     Q.   Now, in this crisis intervention, you were also

17  trained on how to speak to someone who was in -- sort of,

18  a mental ill or under the influence, or some combination

19  state, to try to build a rapport as part of the effort to

20  control them; correct?

21     A.   Some resources were given as far as how to

22  approach the situation and discuss or try and make an

23  attempt to communicate with someone.

24     Q.   And one of the things that you were trained was

25  to use a calm voice?

51

1    A.   Yes.

2    Q.   And I've seen the video of your interactions

3  with Mr. Niedzialek, and I would agree that -- recognize

4  that you were using a calm voice in trying to talk to

5  him.  And were you trying to use this training when you

6  were doing that?

7    A.   I think encompassing all my training, and you

8  know, field experience in dealing with people, that,

9  initially, upon contact with a subject, he appeared

10  agitated.  He had an injury to his head, and I

11  immediately requested medical to respond to the location.

12  And after I took a few steps forward to try and further

13  the communication, I saw that he became more agitated, so

14  I stopped.

15    Q.   Was another thing that you were trained in this

16  CIT, in communicating with a person like this, that when

17  possible, one officer, or one deputy, should be in charge

18  of communication?

19    A.   In all situations, as far as dealing with

20  subjects, whether that be a crisis or a hostage

21  situation, we always want to try and have one person

22  establish communication.

23    Q.   And then other deputies should provide backup,

24  but otherwise not verbalize.  Would you agree with that?

25    A.   At the time I was speaking with the subject, it

52

**Ron Fernicola & Associates**

1  state of excited or agitated delirium when you

2  encountered him?

3      A.    I formed no opinion at that time.

4      Q.    Well, weren't you given instructions that when

5  you encounter somebody in this state, you should consider

6  that in terms of your interactions with them?

7          MR. SAIN:  Assumes facts, argumentative as

8  phrased.

9          THE WITNESS:  Could I have the reporter repeat

10  the question?

11          MR. BURTON:  Yes.

12              (The record was read back.)

13          MR. SAIN:  Same objections.

14          THE WITNESS:  Based upon my field experience, I

15  can't make a determination if someone is immediately

16  under the influence, or if they're having a mental

17  episode.  Further investigation would have to be done to

18  try and make a determination.

19      Q.   BY MR. BURTON:  And that would be true in

20  Mr. Niedzialek's case; correct?

21      A.    Regarding further investigation as to...?

22      Q.    Well, when you saw Mr. Niedzialek and his

23  behavior, which we all see on Deputy Gomez's body-worn

24  video, is it correct that you did not know whether that

25  was a result of mental illness, or drug intoxication, or

54

**Ron Fernicola & Associates**

1  head trauma, or some combination?

2       A.   I didn't form an opinion as to what was going

3  on.  I perceived the situation as medical was needed.  I

4  requested medical.

5       Q.   And then you had to control Mr. Niedzialek;

6  correct?

7       A.   At some point, he unprovokingly (sic) stood up

8  and ran towards me.

9       Q.   And, in fact, he did that twice; correct?

10      A.   Yes.  Deputy Gomez deployed the Taser the first

11  time, the subject fell to his right side.  I ran over to

12  his left side and attempted to handcuff him at that

13  point, but he rolled onto his back before I could gain

14  control of his hands, and he began to kick at me, and I

15  immediately backed away.

16      Q.   And you tried to talk to him in a calming

17  manner; correct?

18      A.   I told him to relax.

19      Q.   In a calm tone of voice?

20      A.   Yes.

21      Q.   And that was deliberate, based on your training

22  and experience, that that was the best way to deal with

23  the situation; correct?

24      A.   That's how I approach every situation.  I don't

25  usually get excited in situations.

55

**Ron Fernicola & Associates**

1       Q.   Now, in your mind, were you thinking, "This

2  person meets the criteria that I've been given for

3  excited delirium"?

4            MR. SAIN:  At the time?

5       Q.   BY MR. BURTON:  Yeah.  I mean, you're sitting

6  there interacting with him.  He's sitting on this -- I

7  call it, "dirt."  You were unable to handcuff him.  You

8  heard what he said.  We all hear it on the tape and see

9  his behavior.  Were you thinking, this is -- appears to

10 be a situation of excited delirium?

11      A.   Without further information, I did not form an

12 opinion.

13      Q.   Well, was it your belief that the person that

14 you were dealing with was at a higher risk of restraint

15 asphyxia than other people?

16           MR. SAIN:  Assumes facts, calls for expert

17 opinion.

18           THE WITNESS:  I formed no opinion as to what may

19 be occurring with the subject.

20      Q.   BY MR. BURTON:  Did you only have this one CIT

21 training?  I only saw it on here once.  Maybe I missed

22 it.

23      A.   That specific course, yes.

24      Q.   It says you also had a, "Electronic Control

25 Device (Re-cert)."  That was on 4/9/11.  And that's also

56

**Ron Fernicola & Associates**

1     A.   Yes.

2     Q.   And would that be the extent of your contact or

3  your knowledge of Deputy Gomez before this incident?

4     A.   Yes.

5     Q.   So when you parked and got out of the car, what

6  was the next thing that you did?

7     A.   I began walking southbound through the complex

8  towards where Deputy Gomez was standing.

9     Q.   How did you know that's where she would be

10 standing?

11    A.   At some point while I was walking through the

12 courtyard area of the complex, I could see her standing

13 at the southeast corner of the apartment building.

14    Q.   So did you see Deputy Gomez before you saw

15 Mr. Niedzialek?

16    A.   Yes.

17    Q.   When you first saw Deputy Gomez, had you heard

18 Mr. Niedzialek?

19    A.   I don't recall.

20    Q.   It turned out that Mr. Niedzialek was sort of in

21 between, but off to your right, but in between you and

22 Deputy Gomez; correct?

23    A.   He was crouched on the porch of Unit 22D, David,

24 along the north wall.

25    Q.   But that was more or less between you and Deputy

60

1    Gomez when you first saw each other; correct, or at least

2    when you first saw her?

3        A.    In the middle, between.

4        Q.    So when you saw Deputy Gomez, you began walking

5    toward her; would that be correct?

6        A.    Yes.  After I got out of the car, I began

7    walking south towards the area.

8        Q.    You saw her.  You started walking to where she

9    was standing?

10       A.    Yes.

11       Q.    Was she actually standing, or was she walking

12   toward you?

13       A.    Specifically, I don't recall.

14       Q.    And then before you got to her, that's when you

15   noticed Mr. Niedzialek; correct?

16       A.    As I was walking through the complex southbound

17   towards Deputy Gomez, dispatch was providing additional

18   details via our radio, and they indicated that there was

19   a subject at apartment 22D, David.  As I continued to

20   walk, I looked towards my right, which would be west, and

21   I saw the subject crouched along the north wall in the

22   patio area of 22D, David.

23       Q.    Did you notice right away that he had a bloody

24   wound on his head?

25       A.    Yes.

61

**Ron Fernicola & Associates**

1      Q.   Did you consider that he might have a head

2    trauma?

3      A.   After seeing the wound on his head, I

4    immediately let dispatch know via the radio that I was

5    out with the subject, and I requested medical.

6      Q.   Did you request that medical roll in, or stage,

7    or did you say?

8      A.   I requested -- requested medical respond to the

9    location.

10     Q.   And then when you first saw Mr. Niedzialek, was

11   he making noises?

12     A.   I can't recall.

13     Q.   And then the video, I think, starts right around

14   this time.  You stopped, you turned toward him.  He was

15   sort of saying the same word over and over again, like,

16   "Please, please, please, please, please," and you were

17   talking to him in a calm way.  That's how the video

18   starts when I view it.  Is that how you recall your

19   contact with Mr. Niedzialek beginning?

20     A.    Initially, upon seeing the subject, I took a few

21   steps forward towards him, and asked him his name, and

22   that's when the nonverbal responses started coming.  I

23   immediately stopped, and I just remained there, and tried

24   to calm him by saying, "It's okay.  Stay there.  Medical

25   is on its way."

62

1    was seated.  I told him to remain there, medical was on

2    the way.  And during that short period, he stood up

3    unprovokingly (sic) and began running towards me.  He

4    paused for a split second and continued, and during this

5    incident, my hands were at my side as well.  And as soon

6    as he got close enough to me, I put my left hand out to

7    push away, and I stepped back.

8         Q.   BY MR. BURTON:  And then he went down because of

9    the Taser.  The taser appeared to have immediate effect;

10   correct?

11        A.   Yes.

12        Q.   And then your response was to move in to

13   handcuff; correct?

14        A.   I ran approximately five to six feet to where he

15   was, to try to control his hands to prevent him from

16   standing up, and to handcuff him.

17        Q.   But before you were able to do that, he flipped

18   over, and got into a seated position, and sort of kicked

19   at you with his feet, and so you backed up --

20        A.   The subject --

21        Q.   I'm sorry.

22        A.   The subject rolled over onto his back, as I was

23   trying to control his left leg, and into a seated

24   position, and began kicking at me, and again, I backed

25   away from him.

                                                          64

**Ron Fernicola & Associates**

1    Q.   And again tried to use calming communication;

2    would that be correct?

3    A.   Yes.

4    Q.   Now, what we see on the video -- I just wanted

5    to ask you about -- he's sitting, and all of sudden, he

6    seems to lie down on his back for at least a moment

7    before he gets up and starts moving toward you again.

8         What did he seem to be doing when you were

9    watching that?

10   A.   Really erratic movements and didn't seem to be

11   following commands.  Deputy Gomez was giving commands for

12   him to, I believe, initially, she said, "Put your hands

13   behind your back," and then she gave several other

14   commands for him to roll over onto his stomach.

15   Q.   I was just wondering if you had an

16   interpretation of when he laid down flat on his back.  I

17   don't know if you recall that or if you -- if you

18   interpreted that in any kind of way?  That's my question.

19   A.   I don't know why.

20   Q.   And then he -- he stood up, and this would be

21   the second time he sort of quickly, without provocation,

22   got to his feet and stepped toward you; correct?

23   A.   The subject remained in a seated position for a

24   few seconds, and seemed to have turned his attention

25   between myself and Deputy Gomez, and then again,

65

**Ron Fernicola & Associates**

1   unprovokingly (sic) stood up, and moved towards me.

2       Q.   And again, did you think he was attacking you?

3       A.   If someone stands up, unprovokingly and begins

4   to come towards me, I have to defend myself.

5       Q.   I understand that.  But did you think that

6   that's what he was doing, was attacking you?

7       A.   If someone unprovokingly stands up and begins to

8   come at me, then I would assume that they're coming at me

9   to assault me.

10      Q.   And so I think you took a couple steps back and

11  then Deputy Gomez reactivated the Taser, the darts were

12  already in place, and then he went down a second time,

13  face first into the planter next to the tree.  Would you

14  agree with that?

15      A.   After the second activation of the Taser, the

16  subject fell forward into the common courtyard dirt.

17      Q.   And then this time you were able to move in and

18  start the handcuffing procedure; correct?

19      A.   After the subject fell to the ground, I was

20  within two steps, three steps, from where he fell.

21      Q.   Did you make a point of moving in quickly so

22  that he wouldn't be able to get back up again a third

23  time?

24      A.   Both times I attempted to get to him quickly so

25  I could detain him.

66

**Ron Fernicola & Associates**

1      Q.    And then you got to him on his left side;

2    correct?

3      A.    Yes.

4      Q.    And did you have any trouble sort of controlling

5    his left arm?

6      A.    I don't recall anything specific.

7           MR. SAIN:  Were you done with your answer?

8           THE WITNESS:  I don't recall anything specific.

9      Q.    BY MR. BURTON:  Okay.  Thank you.  And then did

10   you put your left knee on his left shoulder?

11     A.    I placed my left knee about midback, which

12   extended my foot beyond his buttocks to try and attempt

13   to control him from kicking.

14     Q.    Did you put your right knee on his back

15   anywhere?

16     A.    I don't recall.

17     Q.    And then were you aware that Deputy Gomez was

18   controlling his right arm?

19     A.    Deputy Gomez ran to the subject's right side,

20   and I could see her kneeling at the subject's right side

21   near his right shoulder, as she made several commands for

22   him to pull his hand out, to give her his hand, and I

23   could see her struggling with the arm, and eventually

24   remove it, and place it towards the center of his back.

25     Q.    Now, did you see whether Deputy Gomez put either

67

**Ron Fernicola & Associates**

1      Q.   And was he unresponsive when Deputy Gomez spoke

2    to him?

3      A.   Yes.

4      Q.   Is falling asleep -- when he appears to be

5    falling asleep another way of saying he appears to be

6    becoming unresponsive?

7      A.   I think that's just my term as far as that;

8    again, the subject was not being resistant at that time.

9      Q.   Well, do you think that maybe you should have

10   rolled him over, when you thought he might be falling

11   asleep, to make sure he was okay?

12            MR. SAIN:  Assumes facts.

13            THE WITNESS:  Throughout the entire time, I

14   monitored his breathing.

15     Q.   BY MR. BURTON:  Well, so you didn't need to roll

16   him over to check to see if he was okay?

17     A.   After I tapped on his arm a couple times and I

18   received no response, I needed to roll him over to,

19   again, get a clearer picture of what was going on.

20     Q.   So the reason you rolled him over was to better

21   monitor his condition and see what his condition was;

22   correct?

23     A.   Yes.

24     Q.   So why didn't you roll him over sooner?

25     A.   At that time, I could tell he was still

                                                        89

1    breathing.

2        Q.   Well, was he still breathing when you rolled him

3    over?

4        A.   Yes.

5        Q.   So why did you roll him over then if he was

6    okay?

7        A.   Because again, I needed to get a clearer picture

8    of what was going on after he did not respond to me

9    tapping on his arm.

10       Q.   Well, don't you think you needed to get a

11   clearer picture of what was going on when you thought

12   this guy who was on methamphetamine, was falling asleep?

13            MR. SAIN:  Asked and answered, argumentative.

14            THE WITNESS:  I monitored his breathing.  I

15   could see his back fall -- rise and fall.

16       Q.   BY MR. BURTON:  Have we covered all of the

17   conversations that you had with Investigator Trudeau

18   about this case?  There was the first one when he asked

19   you for an interview and you agreed.  The second one when

20   he told you that they weren't going to do an interview,

21   and the third one, when he told you that the coroner

22   determined the manner of death to be homicide.  Did you

23   have any other conversations with him about this case?

24       A.   I can't recall any other conversations with him.

25       Q.   Did you have any conversations with any other

90

**Ron Fernicola & Associates**

1   people from your department, or the district attorney's

2   office, or the coroner's office, but not including

3   counsel, about this case?

4       A.   I guess I don't understand, "conversations."

5       Q.   Well, did anybody who falls into one of those

6   categories, an investigator, let's say, a superior from

7   the sheriff's department, an investigator from the

8   coroner's office, or an investigator/attorney from the

9   district attorney's office, speak to you about this case,

10  other than those three conversations with Investigator

11  Trudeau?

12      A.   I mean, I spoke with the sergeant on scene.  I

13  spoke with the deputies who were present on scene.

14      Q.   So is that everyone?

15          MR. SAIN:  Counsel?

16          MR. BURTON:  Okay.  Thank you.  I have no

17  further questions at this time.

18          MR. SAIN:  All right.  Deputy Keeney, just a few

19  clarifications.

20                      EXAMINATION

21  BY MR. SAIN:

22      Q.   This mechanism of communication sometimes is

23  fallible, so I'm not sure I heard your answers to a few

24  of Mr. Burton's questions.  Mr. Burton was asking you

25  about, in general, whether or not you've received any

                                                    91

**Ron Fernicola & Associates**

```
 1   training that restraining someone in the prone position
 2   may affect or impair breathing.
 3           Is that anything that you've been trained on,
 4   that restraining someone in a prone position may impair
 5   breathing?
 6       A.   No.
 7       Q.   And Mr. Burton was asking questions about
 8   whether or not you received any training, that someone
 9   with excited delirium, or with symptoms of excited
10   delirium, might have a higher risk of death in
11   association with restraint?  Have you ever received any
12   training to that effect?  In other words -- sorry -- go
13   ahead.
14       A.   What I recall from the portion of excited
15   delirium is that, again, our responsibility is to try and
16   contain the subject, but to have medical respond as soon
17   as possible.
18       Q.   Fair enough.  I think the thrust of Mr. Burton's
19   questions was trying to determine if, as a part of your
20   training, someone had ever said to you that someone with
21   excited delirium might be in greater danger from being
22   restrained than other people?  Is that something that
23   somebody said to you in training or not?
24       A.   I don't recall it being covered.
25       Q.   And similarly, I think Mr. Burton was asking
```
                                                                    92

1   you -- and I wasn't sure if I heard the answer -- as to

2   whether or not in any part of your training, someone

3   relayed to you that people who may be experiencing

4   excited delirium may have an elevated or increased need

5   for oxygen?  Is that something you recall being covered

6   in any of your training, or no?

7        A.   I don't recall.

8        Q.   And then during your post-cuffing restraint of

9   Mr. Niedzialek on the ground, from the time that he is in

10  cuffs until the time that you flip him from a face-down

11  prone position into a face-up supine position, during

12  that time from cuffing to flipping over, did you have any

13  of your body weight on Mr. Niedzialek?

14       A.   I believe I was resting my left hand on his left

15  shoulder, my left knee was making contact with his -- the

16  left side of his back, but there was no pressure

17  exhibited, no body-weight pressure, and my right hand was

18  maintaining a grip on his left hand.

19       Q.   And from the time after the second Taser, when

20  Mr. Niedzialek goes down to the ground, until the time

21  when he no longer appears to be moving, during that

22  period of time, of him going down to the ground until he

23  stops moving, how would you describe Mr. Niedzialek's

24  movements during that period?

25       A.   His torso, upper torso, tried to buck up, like

93

**Ron Fernicola & Associates**

1  push up off the ground, rolled to the left, legs

2  continued to kick until that stopped.

3      Q.   Those movements that you just described, did you

4  view those movements as threatening to you or to others?

5      A.   I viewed them as someone who is trying -- who is

6  trying to either prevent from being detained or to get up

7  and possibly assault myself or Deputy Gomez.

8      Q.   In terms of your contact with Mr. Niedzialek on

9  the incident date, would it be accurate to say that you

10  did not use any weapons on Mr. Niedzialek?

11      A.   I did not.

12      Q.   Would it be accurate to say that the only

13  physical contact that you had with Mr. Niedzialek is the

14  hands-on restraint that you've described today and/or

15  that we can see in the video?

16      A.   Yes.

17      Q.   And then, finally, Mr. Burton was asking

18  questions about before the first Taser, and then again

19  before the second Taser, during those two advancements by

20  Mr. Niedzialek towards you, I believe you said that

21  generally you would assume in such a situation that that

22  person was about to assault you.

23          Do you remember that testimony earlier today?

24      A.   Yes.

25      Q.   So I think the question that wasn't quite clear

94

**Ron Fernicola & Associates**

1       (Signature page to the deposition of

2          Deputy Brian L. Keeney.)

3

4              --oOo--

5    I hereby certify under the penalty of perjury that I

6 have read the foregoing transcript.

7    Corrections, if any, were noted by me, and the same

8 is now a true and correct transcript of my testimony.

9    Executed this _____day of _____,

10 2021, at _____.

11

12

13                    _____

                      DEPUTY BRIAN L. KEENEY

14

15

16

17

18

19

20

21

22

23

24

25

                                                      97

1

2

3                         REPORTER'S CERTIFICATE

4

5        I, Leslie A. Toledo, CSR #8345, a certified shorthand

6    reporter licensed by the State of California, do hereby

7    certify:

8        That prior to being examined, the witness named in

9    the foregoing deposition, BRIAN L. KEENEY, stated to

10   testify to the truth, the whole truth, and nothing but

11   the truth;

12       That the said deposition, taken down by me in

13   stenotype, was thereafter reduced to typewriting by

14   computer-aided transcription under my direction and is a

15   true record of the testimony given and of any changes

16   made by the deponent.

17       I further certify that I am not in any way

18   interested in the outcome of this action and that I am

19   not related to any of the parties thereto.

20       Witness my hand this day      of             , 2020.

21

22                          _____

23                          LESLIE A. TOLEDO, CSR #8345

24

25
                                                              99

**Ron Fernicola & Associates**

# EXHIBIT I

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, AN INDIVIDUAL   )  CASE NO.: 19-CV-2083-JGB
    AND AS SUCCESSOR IN INTEREST )                  (SHKx)
5   FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
6                                )
                    PLAINTIFF,   )
7                                )
         VS.                     )
8                                )
    RIVERSIDE COUNTY, RIVERSIDE  )
9   SHERIFF'S DEPARTMENT,        )
    SHERIFF-CORONER CHAD BIANCO, )
10  DEPUTY SONIA GOMEZ, DEPUTY   )
    BRIAN KEENEY, AND DOES 3-10, )
11                               )
                    DEFENDANTS.  )
12  _____)

13

14          DEPOSITION OF DEPUTY SONIA M. GOMEZ

15               ZOOM VIDEOCONFERENCE

16             THURSDAY, DECEMBER 17, 2020

17

18

19

20

21
    RON FERNICOLA & ASSOCIATES
22  CERTIFIED SHORTHAND REPORTERS
    REPORTED BY: LESLIE A. TOLEDO, CSR NO. 8345
23  1244 West Edgewood Circle
    Coeur d'Alene, Idaho 83815
24  (661) 775-8299

25  FILE NO. 20513

                                                    1

1   DEPOSITION OF DEPUTY SONIA M. GOMEZ, A DEFENDANT, TAKEN

2   ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

3   COMMENCING AT 10:02 A.M., AND ENDING AT 3:26 P.M., ON

4   THURSDAY, DECEMBER 17, 2020, BEFORE LESLIE A. TOLEDO,

5   CSR NO. 8345, PURSUANT TO SUBPOENA.

6                           * * *

7   APPEARANCES OF COUNSEL:

8   FOR PLAINTIFF:      THE LAW OFFICES OF JOHN BURTON
                        BY:  JOHN BURTON, ESQ. - VIA ZOOM
9                       128 NORTH FAIR OAKS AVENUE
                        PASADENA, CALIFORNIA 91103
10                      (626) 449-8300

11                           - and -

12                      HELM LAW OFFICES, PC
                        BY:  T. KENNEDY HELM, IV - VIA ZOOM
13                      644 40TH STREET
                        SUITE 305
14                      OAKLAND, CALIFORNIA 94609
                        (510) 350-7517

15

16  FOR DEFENDANTS:     MANNING & KASS
                        ELROD, RAMIREZ, TRESTER, LLP
17                      BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                        BY:  GARROS CHAN, ESQ. - VIA ZOOM
18                      801 SOUTH FIGUEROA STREET
                        FIFTEENTH FLOOR
19                      LOS ANGELES, CALIFORNIA 90017
                        (213) 624-6900
20                      TMS@MANNINGLLP.COM

21  ALSO PRESENT:       DEPUTY BRIAN L. KEENEY - VIA ZOOM

22

23

24

25
                                                            2

**Ron Fernicola & Associates**

```
 1      THURSDAY, DECEMBER 17, 2020; VIA ZOOM VIDEOCONFERENCE

 2                        10:02 A.M.

 3

 4                  DEPUTY SONIA M. GOMEZ,

 5   the witness herein, having first been duly administered

 6   the oath, testified remotely as follows:

 7

 8                       EXAMINATION

 9   BY MR. BURTON:

10      Q.   Good morning, Deputy Gomez.  I can kind of --

11   make sure we keep our voice up, because we have to do

12   things a little differently to make sure we get a good

13   record on Zoom.

14           Have you ever had your deposition taken before?

15           I'm sorry?

16      A.   No.

17      Q.   I think that's an example.  Okay.  Could we

18   start by, could you state your complete name for the

19   record, please?

20      A.   Sonia Gomez.

21      Q.   Do you have a middle name?

22      A.   Sonia Maria Gomez.

23      Q.   And are you currently a deputy sheriff with the

24   County of Riverside?

25      A.   Yes.
```

                                                        4

**Ron Fernicola & Associates**

1  it lately.  Okay.

2      Q.   BY MR. BURTON:  Is there anything about this

3  particular procedure that you don't understand or that

4  you would like clarified?

5      A.   No.

6      Q.   Are you speaking into a mic?

7      A.   I have a speaker in front right here.  Can you

8  hear me better if I pull it close?

9      Q.   That's what I'm thinking, you're probably too

10  far away.

11      A.   Does that sound better?

12      Q.   Yes.  Definitely better.  Thank you.  Thank you

13  very much for that.

14          Is there any reason why you think you might not

15  be able to give your best testimony here today?  And

16  examples that we've heard in the past have included

17  things like being under the influence of a medication, or

18  ill, or something distressing happened recently in your

19  life, or sometimes with law enforcement officers, they're

20  fatigued because they just worked a recent shift.

21          Is there any reason why you cannot give your

22  best testimony here today?

23      A.   No.

24      Q.   I'd like to start with your personal background,

25  please.  When were you hired by the Riverside Sheriff's

8

1   Department?

2        A.    November 14th, 2005.

3        Q.    So one month ago, you had your 15th anniversary?

4        A.    Yes.

5        Q.    Did you have prior law enforcement experience?

6        A.    No.

7        Q.    Did you have prior experience in a corrections

8   setting?

9        A.    No.

10       Q.    What was the highest level of education you

11  completed before your date of hire?

12       A.    A high school diploma and some college.

13       Q.    Have you obtained any degrees since you were

14  hired?

15       A.    Yes, I have a bachelor's in health

16  administration.

17       Q.    When and where did you get that degree?

18             MR. SAIN:  Objection.  Rule 26, relevance,

19  privacy.

20             You can answer.

21             THE WITNESS:  From University of Phoenix about

22  three years ago.

23       Q.    BY MR. BURTON:  Do you have any other degrees

24  since you were hired?

25       A.    No.

9

1    the X2 in 2016.  That would be March of 2016.  So I know

2    it's a while, it's hard to remember.

3            But were you trained at that time that if

4    confronted with a suspect who is exhibiting signs of

5    excited or agitated delirium, the use of the Taser could

6    increase the risk of death or great bodily injury?

7        A.   I don't recall.  I know it's talked about, but I

8    don't recall exactly.

9        Q.   Do you recall whether you were trained that when

10   a Taser is being used on a person who might be exhibiting

11   signs of agitated or excited delirium, that the object

12   was to get the person into restraints as quickly as

13   possible and to minimize the length of time of the

14   struggle?

15       A.   I know when someone is experiencing -- if we

16   assume that they're experiencing excited delirium, our

17   priority is to secure the subject and request medical

18   assistance immediately.

19       Q.   So let's now, if we could, shift topics from the

20   Taser to excited delirium, or agitated delirium.  These

21   are phrases that are used sometimes to describe a

22   condition that law enforcement officers sometimes

23   encounter in the field.

24           Have you been trained in these concepts,

25   agitated or excited delirium?

                                                         38

**Ron Fernicola & Associates**

1     A.   Yes, I have been trained about it.

2     Q.   Do you recall whether you were trained about it

3  when you were in the academy?

4     A.   Possibly, I don't -- I don't recall.

5     Q.   When do you recall first being trained about it?

6     A.   I don't recall the exact date, but I do know

7  that I was trained on it.

8     Q.   Now, besides the academy training you had, and

9  what we've talked about as transition school, you've had

10  regular additional training from your department;

11  correct?

12     A.   Yes.

13     Q.   And that could be on a variety of topics.  We've

14  covered a couple of them.  For example, the Taser X26 and

15  the Taser X2.  Have you had any additional training

16  specifically on agitated or excited delirium?

17     A.   I've had CIT training, which is Crisis

18  Intervention Training.  I've had two courses in that,

19  which is 16-hour courses, one in 2011 and one in 2015.

20  And it talks about people with mental illness, mental

21  health, and I believe excited delirium was introduced in

22  that course.

23     Q.   Maybe -- let's see if we can find that on

24  Exhibit 18, if that's okay?  So the first one you said

25  was in 2011?

                                                    39

1    be some combination of the two; is that correct?

2        A.   That's correct.

3        Q.   And so is it possible for you as a responding

4    deputy to diagnose whether it's a mental illness, whether

5    it's drugs, or whether it's a combination when you

6    initially encounter the person, and you don't know any

7    history, no one has told you he's been smoking meth or

8    whatever?

9        A.   I don't understand the question.

10       Q.   Well, I think what I'm getting at is, whether,

11   when you encounter somebody like that and you don't know

12   how they got that way, it could be mental illness, it

13   could be drugs, or it would be a combination, whether how

14   they got that way would make any difference in how you

15   would deal with them, or you would -- according to your

16   CIT training, deal with them the same way regardless?

17       A.   Yes.  When dealing with anyone with mental

18   illness or maybe under the influence, our job is to make

19   sure -- secure them, make sure they're safe, and others

20   are safe, so we can safely find out what's going on with

21   them.

22            And if, in the course of that, force is used,

23   assess their medical need, and then if they do need

24   medical assistance, get medical help.

25       Q.   And in regards to safely restraining them, were

48

1    you trained in either of these two CIT courses that a

2    person who is in a state of excited or agitated delirium,

3    is more susceptible to an in-custody and arrest-related

4    death, while being taken into custody than other people?

5              MR. SAIN:  Assumes facts.

6              THE WITNESS:  I was trained that whenever we

7    encounter somebody experiencing excited delirium, secure

8    them as safe as possible to make sure they're not a

9    threat to themselves or others, and request medical help

10   immediately.

11       Q.   BY MR. BURTON:  Now, once -- were you trained at

12   any point in your career, that once a person is

13   restrained, and if they're in a state of excited or

14   agitated delirium, that they should be put in a position

15   where they can breathe?

16             MR. SAIN:  Vague and unintelligible.

17             THE WITNESS:  Once someone is secured, we'll put

18   them in a position that's safe for ourselves as well and

19   them.  And once we feel like it's safe, we'll request

20   medical help -- medical help immediately.

21       Q.   BY MR. BURTON:  Right now, I'm focused on a

22   person who has been put into handcuffs.  Have you ever

23   been trained that once the person is restrained in

24   handcuffs, if possible, they should be put into a --

25   what's called a "recovery position"?

49

**Ron Fernicola & Associates**

1      A.    We keep them where at the time, whenever they're

2    handcuffed, keep them in a position that we feel safe for

3    ourselves and for them as well.

4      Q.    Well, have you been trained that certain

5    positions for them, for the people who are being

6    restrained who are in excited delirium or agitated

7    delirium, that certain positions are more dangerous than

8    other positions?

9      A.    No.

10      Q.    Well, your answer was that you were trained to

11    keep them in a position that was safe for them.

12      A.    Yes.

13      Q.    What were you trained about what positions are

14    safe and what positions are not safe?

15      A.    All the positions that we are trained on have

16    been considered safe.

17      Q.    Have you ever heard in your training, in this

18    context, general context, the phrase, "recovery

19    position"?

20      A.    I don't recall.

21      Q.    Have you ever been trained that when somebody is

22    in handcuffs and is under control, and if they're in a

23    state of excited or agitated delirium, that it would be

24    safer to have them on their side or sitting up, rather

25    than on their chest?

50

1           MR. SAIN:  Assumes facts.

2           THE WITNESS:  From our understanding, being in

3    the prone position doesn't affect their breathing, and

4    doesn't state that we have to put them on their side.

5       Q.   BY MR. BURTON:  So you've never been trained --

6    this is your testimony -- that after somebody who has

7    been in an agitated or excited state, is in handcuffs,

8    that it's preferable to put them on their side, or

9    sitting them up, rather than leaving them on their chest;

10   is that correct?

11          MR. SAIN:  Asked and answered.

12          THE WITNESS:  That's correct.  We don't have to

13   put them on their side.  If we still feel the need that

14   they need to be proned on their chest, then for safety

15   reasons, then we'll keep them there, but we have not been

16   trained where we have to put them on their side.

17      Q.   BY MR. BURTON:  Well, you keep --

18      A.   Excuse me.  I wasn't finished.  The only time

19   that was said was when we, at one point, was able to use

20   a carotid restraint, and that was only to assist them and

21   help them to their feet.  But we no longer use the

22   carotid restraint, so therefore, that doesn't exist

23   anymore.

24      Q.   In your entire career -- I'm sorry, you keep

25   sort of changing my question a little bit.  I'm not

                                                    51

**Ron Fernicola & Associates**

1   talking about what you have to do.  It's a little more

2   nuanced than that.

3          Have you ever been trained that when dealing

4   with a person who might be in a state of excited or

5   agitated delirium, and the person is restrained, and is

6   handcuffed behind his back in a prone position, that when

7   feasible, it is preferable to put that person on his

8   side, or sit him up rather than leaving him prone?

9          MR. SAIN:  Asked and answered twice.

10          THE WITNESS:  When dealing with excited

11   delirium, we are told to secure the person, make sure

12   they are safe from themselves and from others, and

13   request medical assistance immediately.  And as far as

14   putting them on their side, we have not been trained that

15   we need to put them on their side.

16     Q.   BY MR. BURTON:  Well, you keep saying you've not

17   been trained that you need to put them on their side, but

18   have you been trained that, when feasible, it's

19   preferable to put them on their side?

20          MR. SAIN:  Same objections.

21          THE WITNESS:  We don't have to put them on their

22   side.

23     Q.   BY MR. BURTON:  I get that.  You've said that,

24   like, four or five times.  But have you been trained, yes

25   or no, that, when feasible, it's preferable to put them

52

**Ron Fernicola & Associates**

1  on their side?

2         MR. SAIN:  Same objections.

3         THE WITNESS:  No.  If we monitor them and

4  they're fine in the prone position, and we feel safe

5  leaving them there, they can stay there until we need to

6  get them up.

7     Q.  BY MR. BURTON:  When were you trained that?

8     A.  During my training.

9     Q.  I mean, can you point to any -- I, mean we've

10 had, you know, the academy, transition school, CIT, Taser

11 training.  I'm sure you've had other training that's

12 detailed on Exhibit 18.

13        I mean, do you know what training you got, that

14 particular training?

15    A.  Yes.  We've had arrest and control and technical

16 communications training, even in the academy, learning

17 how to properly restrain subjects.

18    Q.  And any other training where you specifically

19 got that training?

20    A.  We were trained in the training to keep them in

21 the position that you feel necessary for their safety and

22 for our safety.

23    Q.  Now, you mentioned in your prior answer a few

24 answers ago, that it was okay to leave them on their

25 chest as long as you, the deputies, monitored them.  Do

                                                    53

**Ron Fernicola & Associates**

1    Q.   Yes.

2    A.   Yes.

3    Q.   And is it the case that you would get first aid

4  and CPR training regularly since you were hired by the

5  department?

6    A.   Yes, we get training on CPR and first aid every

7  two years.

8    Q.   Do you understand it to be the policy of your

9  department, that if somebody appears to be in need of

10  CPR, according to the criteria that you've been taught in

11  these courses, that you as deputies are to administer

12  CPR?

13    A.   If someone needs CPR, yes, we are to administer

14  it.

15    Q.   Do you have an automatic external

16  defibrillators, AEDs, in your cars?

17    A.   No.

18    Q.   Do you have first aid kits in your car?

19    A.   Yes.

20    Q.   Now, in connection with CPR and giving CPR, were

21  you trained that you only need to give CPR if you cannot

22  feel a pulse?

23    A.   If they're not breathing and there's no pulse,

24  then that's when you give CPR.

25    Q.   In that connection, were you ever warned that

60

**Ron Fernicola & Associates**

1    you might think you feel a pulse, but if they're not

2    breathing and the pulse is not strong, you should go

3    ahead and give CPR?

4            MR. SAIN:  Asked and answered, assumes facts not

5    in evidence.

6            THE WITNESS:  If they're not breathing and

7    there's no pulse, then we perform CPR.

8        Q.   BY MR. BURTON:  Right.  But were you ever warned

9    that just because you think you feel a pulse, you might

10   need to give CPR anyway?

11           MR. SAIN:  Same objections.

12           THE WITNESS:  I was trained that if there's no

13   breathing and no pulse, then you perform CPR.

14       Q.   BY MR. BURTON:  Now, we were talking about your

15   training in restraints.  Obviously, your training in

16   restraints, including handcuffs, began at the academy;

17   correct?

18       A.   Correct.

19       Q.   And you've been trained in various kinds of

20   control holds and restraints starting with the academy

21   right up to, essentially, the present; would that be

22   correct?

23       A.   Correct.

24       Q.   Now, were you trained that one of the options

25   deputies have is to use prone restraints?

61

**Ron Fernicola & Associates**

1    day.  So when I do get called, I still have to find my

2    way, what apartment I'm looking for.

3         Q.   Now, in this case, you were dispatched and -- or

4    at least you responded to the call initially and so did

5    Deputy Keeney.  Was one of you primary and the other one

6    backup?

7         A.   I was the primary deputy on the call and when I

8    requested assistance, Deputy Keeney was the backup that

9    arrived.

10        Q.   Were you assigned the call or when it came out,

11   did you say you were free and you would take it?

12        A.   I believe at the time I was dispatched on a call

13   already and then dispatch told me to stand by and she

14   sent me that call.

15        Q.   So if I understand what you just said, you were

16   assigned an unrelated call for service, and then you sort

17   of got called off of that and sent on this one?

18        A.   Correct.

19        Q.   Do you, in your department, have priority for

20   calls?

21        A.   Yes.

22        Q.   And so what is the priority scale, just in

23   general?

24        A.   You've got priority one, two, three, and four.

25        Q.   And just very generally, what do those numbers

78

**Ron Fernicola & Associates**

1     A.   No, I did not think that at the time.

2     Q.   Can you explain why you didn't think that?

3     A.   I haven't come in contact with anybody with

4  excited delirium to really get the experience and

5  understanding of somebody who is under -- experiencing

6  excited delirium, but I have come in contact with people

7  who were 5150, or under the influence that acted -- that

8  were acting in his way.

9     Q.   So when you first saw him, and Deputy Keeney was

10  talking to him, and he was saying these -- you know,

11  repeating these words.  We hear that.  Were you

12  formulating a plan as to what you needed to do?

13     A.   Yes.  Well, first thing when I saw him and I saw

14  the blood, I immediately requested medical.  I said,

15  "Stage medical."

16          But our main job -- my priority was to secure

17  him to keep him safe from hurting himself, and knowing

18  that there's kids around too, and for our safety keep

19  our -- make sure we're safe and the public around us.  So

20  my concern was to secure him, and then assess his

21  injuries, and then make sure medical was on the way.

22     Q.   I note that you called medical right after you

23  handcuffed him.  Do you think you called medical before

24  then?

25     A.   I did.  I just said I did.  I called right when

86

**Ron Fernicola & Associates**

1  I saw him, when Officer Keeney was speaking with him, and

2  I walked up to Officer Keeney -- or walked up to them --

3  right when I saw the subject, and I saw his -- the blood

4  on his face, I immediately said, "Stage medical."  You

5  can hear it on my body cam.

6      Q.   So you're wearing a radio right on your uniform

7  you can just kind of touch, and say, "Stage medical,"

8  and then that would be it?

9      A.   Yes.

10     Q.   So we see what happens next and your first Taser

11 deployment and the effect it had.  You would agree it

12 worked exactly as you were trained it should work, if

13 everything worked right?

14     A.   Yes.  As I deployed the Taser, the subject did

15 lock up and fall to the ground.

16     Q.   And it seemed like you shot him -- I mean, your

17 perspective at the scene might be a little different than

18 when I watch it on the video, but you hit him on the

19 right side, and both darts made good contact, and you had

20 a good spread, so it was -- it was very effective

21 deployment.  Was that how you saw it?

22     A.   Yes.

23     Q.   And then you allowed it to cycle through the

24 five seconds; correct?

25     A.   Yes.

87

1    Q.   And then we see this on the tape -- I mean, I'm

2    just going to say it just to sort of move this along --

3    it looks like Deputy Keeney moves in to handcuff, and

4    before he's able to do that, Mr. Niedzialek sort of flips

5    over because he was prone from when he fell, and is now

6    sitting in kind of this dirt patch in the common area.

7    And was kind of sitting there and not -- not complying

8    with getting prone so he could be handcuffed; would you

9    agree with that?

10   A.   Yeah, after I deployed the Taser, he fell to the

11   ground.  As Deputy Keeney tried to go in to place

12   handcuffs on him, he flipped on his back, and started

13   kicking at Keeney, and flailing his arms.  We told him to

14   calm down.  He -- he then sat up.  And then I kept

15   telling him, get on his back -- "Put your hands behind

16   your back," and lay on his stomach a couple times.

17            He laid on his back, but then he sat right back

18   up, stared at me, and turned to Officer Keeney.  And I

19   kept telling him to, "Stay calm.  Stay calm.  Calm down."

20   And then he stood up and advanced towards Keeney.  And at

21   that time, I deployed the second Taser.

22   Q.   We covered that.  You used the side button to

23   send the second five-second discharge through the

24   existing darts that were already in him?

25   A.   Correct.

88

1    Q.   And then it had, again, the desired effect he

2 went right down prone; correct?

3    A.   He fell face down, yes.

4    Q.   So I'd like to go back a minute to when -- after

5 the first tasing.  Deputy Keeney after the first tasing,

6 and he's, I'll say, started squirming and flailing, when

7 Deputy Keeney moved in to handcuff him.  Deputy Keeney

8 was talking to him; correct?

9    A.   He told him to relax.  I don't recall if he said

10 anything else.  I started giving commands.  Telling him

11 to calm down, and put his hands behind his back, and lay

12 on his stomach.  And --

13    Q.   And that's my question right there, is --

14         MR. SAIN:  Hold on.  I think she was in mid-word

15 there.

16         Were you done with your answer?

17         THE WITNESS:  No.  Like I said, after I gave

18 commands -- well, I kept giving commands, and that's when

19 he stood up and advanced towards Officer Keeney.

20    Q.   BY MR. BURTON:  I got that.  But I wanted to ask

21 about, what I'm trying to set up with this questioning

22 is, if Officer Keeney was talking to him in a calm way

23 trying to establish a rapport get him to calm down, why

24 didn't you follow the training that said only one officer

25 should talk?

                                                        89

**Ron Fernicola & Associates**

1          MR. SAIN:  Assumes facts not in evidence,

2   argumentative.

3          THE WITNESS:  Officer Keeney told him, "Relax,"

4   and then he started putting his gloves on.  And I'm not

5   sure if he went on the radio or not, but he wasn't saying

6   anything at the time.  And the guy was shouting, so I

7   stepped in and started to give commands to "Calm down,

8   calm down, calm down," and then I also told him, "Hey,

9   put your hands behind your back.  Put your hands behind

10  your back.  Lay on your stomach.  Lay on your stomach."

11         And at that point, that's when he stood up and

12  advanced towards Keeney.

13     Q.   BY MR. BURTON:  Well, you also threatened him;

14  correct?  You said, "Get down.  Put your hands behind

15  your back or you'll get tased again."

16     A.   I did say, "Calm down, calm down or you're going

17  to get it again."

18     Q.   Meaning another activation of the Taser;

19  correct?

20     A.   Correct.

21     Q.   Were you speaking, in your mind, calmly or were

22  you yelling commands?

23     A.   I was shouting some commands because he was

24  shouting at the same time, so I was trying to overcome --

25  talk over him, I guess to say, so he can hear me.  I

                                                        90

1   probably didn't realize how loud I am, but I was

2   shouting, "Calm down, calm down.  Put your hands behind

3   your back."

4       Q.   Is there some reason why you didn't just elect

5   to let Deputy Keeney, who had initially contacted

6   Mr. Niedzialek, handle the verbal part of this encounter?

7           MR. SAIN:  Asked and answered.

8           THE WITNESS:  We weren't really -- he didn't

9   really have a chance to try to talk to him.  He wasn't

10  really given that chance by the subject.  And when after

11  the first tase, and the subject went down, and he flipped

12  on his back, Officer Keeney just said, "Relax, buddy."

13  And then he started to put his gloves on, so there was a

14  moment of silence and nothing.

15          The guy, it seemed like he kept being agitated

16  and kept shouting, so that's when I just stepped in and

17  said, "Calm down.  Calm down."  And he seemed to have

18  calmed down for a brief second, but then he, again,

19  started shouting and stood up.

20      Q.   BY MR. BURTON:  And so when he stood up -- and

21  he did, he moved toward Deputy Keeney.  You activated the

22  Taser a second time and he went down face first; correct?

23      A.   Yes, after he stood up, he advanced toward

24  Officer Keeney, and I thought Officer Keeney might get

25  assaulted, so I deployed the Taser, and yes, he fell face

91

1    down.

2        Q.   And then we see this very clearly on the video,

3    as soon as he goes down, he's already prone because he

4    lands that way.  And then Deputy Keeney moves in from

5    what would be Mr. Niedzialek's left side, and you move in

6    from his right side.  And he takes control of the left

7    arm, and then you have to bring the right arm out from

8    underneath him -- we see this very clearly -- and then

9    behind his back for handcuffing.

10           Do you recall that?

11       A.   Yes.  After he fell to the ground, Officer

12   Keeney went to the left side of him, grabbed his left

13   arm.  I had to go to the right side and I had to grab his

14   right arm from under him, under his torso, and place it

15   behind his back.

16       Q.   Now, can you just describe, was his arm limp?

17   Was he fighting you?  Was it -- I mean, how was it trying

18   to move his arm?  It just looks like you're able to do

19   it, you know, fairly smoothly.

20           MR. SAIN:  Argumentative, vague as to time.

21           THE WITNESS:  When he fell to the ground after

22   the second tase and I went to the right side of him, he

23   had his arm underneath him.  It was -- there was some

24   resistance, that's why both my knees were both on the

25   ground, and I had to sort of yank his arm out from

92

1  underneath him, and place it behind his back.

2      Q.   BY MR. BURTON:  Were you able to do that without

3  too much difficulty?

4          MR. SAIN:  Asked and answered.

5          THE WITNESS:  No, there was some resistance.

6  Like I said, I had to put my knees on the ground -- he

7  was on the ground -- in order to give me that stability

8  to be able to pull his arm out from underneath him.

9      Q.   BY MR. BURTON:  So now, you've got his right arm

10 and Deputy Keeney has his left arm behind his back.  We

11 see Deputy Keeney's knee -- and I can ask Deputy Keeney

12 about that tomorrow -- but did you put either of your

13 knees on his back or his shoulder at that point?

14     A.   If anything, my knee, my right knee, may have

15 been hovering over his shoulder blade, because I had to

16 put my right knee up in order to try to get my handcuffs

17 out.  And once I was able to find my handcuffs, which I

18 think were on my left side, I was, like, on the balls of

19 my feet with my right foot, and my left knee was on the

20 floor.  And once I put the handcuffs on, both my knees

21 were placed on the ground.

22     Q.   Okay.  I'm going to come back to that in a

23 second.  But you got your handcuffs out, so those were

24 your handcuffs that were used; correct?

25     A.   Yes, they were my handcuffs.

93

**Ron Fernicola & Associates**

1      Q.    And then you handcuffed your wrist, which was

2   Mr. Niedzialek's right wrist first; correct?

3      A.    Correct.

4      Q.    And then Deputy Keeney had his left wrist in his

5   grip, in Deputy Keeney's grip, so he kind of brought it

6   over and you were able to click the left handcuff on;

7   correct?

8      A.    Correct.

9      Q.    And then you did not double-lock the handcuffs

10  at that time; correct?

11     A.    I believe I did not.  He was still moving and

12  kicking, so I was unable to.

13     Q.    Is it the policy of your department to

14  double-lock?

15     A.    When -- if possible, when they are not still

16  being combative, and you have an opportunity to

17  double-lock it, that's when you can double-lock it.  But

18  there's in certain situations where you don't get that

19  opportunity.  The person is still resisting and fighting

20  and you have to do it at a later time.

21     Q.    So in this case, you never double-locked those

22  handcuffs; correct?

23     A.    I -- I don't recall.  I don't believe I did.

24     Q.    And then as soon as the handcuffs are -- the

25  second handcuff is ratcheted shut -- we hear it -- you go

94

**Ron Fernicola & Associates**

1   on the radio and call for medical; correct?

2       A.   Yes.  After I placed the handcuffs the second

3   time, I called AMR the second time -- or through

4   dispatch, I asked for medical for the second time.

5       Q.   So the first time you asked for to medical

6   stage.  The second time you asked for medical, they would

7   know that would be for them to come right to you; is that

8   correct?

9       A.   Yes, I said, "Have medical right away."

10      Q.   So theoretically, medical should have already

11  been on the way from the first call, and then this is

12  telling them, don't stage, come right to where you are;

13  would that be correct?

14      A.   Yes.

15      Q.   Now, after you shut the second handcuff, and you

16  call medical, were either of your knees on

17  Mr. Niedzialek's back?

18      A.   My knees were not on his back.  Officer Keeney

19  had his right knee on the subject's lower back while we

20  were trying to restrain him.  After he seemed to calm

21  down, after a few seconds, that's when Officer Keeney

22  then moved his knee towards the shoulder blade, or up top

23  of the shoulder area, and I believe it just had it

24  hovering over him, and his other knee was placed on the

25  ground.

                                                          95

1    Q.    What about your knees, did you ever have your

2  knees on any part of his back or shoulder after the

3  second handcuff was closed?

4           MR. SAIN:  Asked and answered.

5           THE WITNESS:  No, I did not have my knees on him

6  after the handcuffs were placed on.

7    Q.    BY MR. BURTON:  Were you holding him down with

8  your hand?

9           MR. SAIN:  Vague as to time.

10           THE WITNESS:  When he was on the ground after

11  the handcuffs were placed on him, I placed my right hand

12  on his back.

13    Q.    BY MR. BURTON:  Now, initially, did you notice

14  that his feet were kicking, like, the ground, like

15  flailing?

16    A.    When we were trying to put the handcuffs on him

17  when he went down after the second tase, yes, he was

18  kicking.  He was kicking his feet and kicking his legs.

19    Q.    And he continued doing that after the second

20  handcuff was shut, do you recall that?

21    A.    Yes, after the second handcuff, he still

22  continued to move and try to turn over, and that's why I

23  did place my hand on his back.

24    Q.    So he tried to turn over after he was

25  handcuffed?

                                                      96

1      A.   Yes.

2      Q.   And did you let him roll over onto his side?

3      A.   No.  I did not let him roll over onto his side

4  or get up because I don't know if he's trying to get up

5  to try to assault us, or try to escape, and I did not --

6      Q.   I'm sorry, I didn't mean to cut you off.

7           THE WITNESS:  I said, we don't -- our job is to

8  secure him, to make sure he's not going to hurt himself

9  or others, because even in handcuffs, people can do

10  things.  They can still fight us, even possibly get a

11  weapon, or something and still use it against us.  And I

12  didn't want him to escape, so that's why the prone

13  position was a good position to just keep them in until

14  they are calm.

15      Q.   BY MR. BURTON:  Well, once he became calm, did

16  you immediately take him out of the prone position?

17      A.   No, he stayed in the prone position.

18           MR. BURTON:  Why don't we go off the record a

19  second.  Off the record?

20           MR. SAIN:  Sure.

21               (A short break was taken.)

22           MR. BURTON:  Back on the record.

23      Q.   BY MR. BURTON:  So Deputy Gomez, I'd like to ask

24  you about what steps you took to monitor Mr. Niedzialek

25  after the handcuffs were attached.  Did you monitor his

97

**Ron Fernicola & Associates**

1  condition?

2      A.   Yes, after he had the handcuffs on, we did

3  monitor his condition.  We -- you could see in the video,

4  and as we were there in person -- you could see his

5  boxers, his pants, go up and down, along with our hands

6  were going up and down every time he took a breath.

7      Q.   Could you hear any sounds from him?

8      A.   Yes, in the beginning we did hear some sounds.

9  Him just breathing.

10      Q.   Did you hear sounds that sounded like moans or

11  snoring, kind of slightly unusual sounds, rather than

12  just regular breathing sounds?

13      A.   What I heard didn't seem unusual.

14      Q.   Did you hear anything that sounded like moaning

15  or snoring?

16      A.   No, I just heard him breathing.  I don't think

17  it was, like, snoring.

18      Q.   And so you were monitoring his breathing by --

19  I'm just trying to paraphrase what you just said -- by

20  holding your hand on his back, and watching his chest go

21  up and down?

22      A.   While my hand was placed on his back, I could

23  feel his breathing and you could see our hands moving up

24  and down, and you could hear his breathing.

25      Q.   And did that stop at some point?

98

**Ron Fernicola & Associates**

1  first time that you tried to speak to him after the

2  handcuffing; correct?

3      A.   Yes, I believe so.

4      Q.   And he didn't respond at all to you; correct?

5      A.   Correct.

6      Q.   Well, did you think that because he didn't

7  respond at all, there might be something wrong with him

8  at that point?

9      A.   It was then that's when I think Officer Keeney,

10 a few seconds later, turned him over to check.

11     Q.   Now, when Officer Keeney turned him over, did

12 you look at his face, not Keeney's face, but

13 Mr. Niedzialek's face?

14     A.   I did, and then that's when I felt for a pulse.

15     Q.   But did you see that his eyes were opened?

16     A.   I believe they were.

17     Q.   And that's when I was asking you before about

18 pupils being fixed and dilated.  Did it seem like -- like

19 his eyes were open and his pupils were fixed and dilated?

20     A.   I didn't focus too much on his eyes.  I saw his

21 eyes were open, and I went and felt for a pulse.

22     Q.   And then we hear what you're saying, which is

23 that you thought you felt a pulse; correct?

24     A.   Yes, I felt a pulse.

25     Q.   As you sit here today -- and I don't want to pry₁₀₀

**Ron Fernicola & Associates**

1   into what conversations you had with your attorneys in

2   this case -- but knowing that the EMTs got there, and put

3   a cardiac monitor on him and he had no pulse, do you

4   still think you felt a pulse right up until the time the

5   EMTs arrived?

6       A.   When I checked the subject, he had a pulse.

7       Q.   I mean -- I don't mean to belabor this, but

8   that's your testimony, rather than your testimony saying,

9   "I thought I felt a pulse"?

10      A.   When I checked the subject, I felt a pulse.  And

11  I think maybe a few seconds later, or a minute later,

12  like, he opened his mouth, and seemed to take a breath,

13  and then about another 30 seconds later, AMR arrived on

14  scene.

15      Q.   And they immediately -- because we hear the

16  paramedic immediately say -- Paramedic LaRusso -- "He's

17  not breathing."  Do you remember that?

18      A.   Yes.

19      Q.   And when she said that, "He's not breathing," I

20  mean, did you -- did you agree?  Did you believe he

21  wasn't breathing or did you think he was breathing?

22      A.   I don't know.  She said he wasn't breathing.  So

23  it was --

24      Q.   I'm sorry.

25      A.   When she told us he wasn't breathing, that's

101

**Ron Fernicola & Associates**

1    when she instructed Officer Keeney to do CPR.

2        Q.   So up until that point when she said he wasn't

3    breathing, was it your assessment that he did not need

4    CPR?

5        A.   When I checked for a pulse, I felt a pulse, and

6    then maybe a minute or a few seconds later, he had took a

7    breath, so it assured me that he was still breathing, and

8    then 30 seconds later, AMR arrived on scene.

9        Q.   Are you familiar -- have you ever heard the

10   expression, "agonal breathing"?

11       A.   No.

12       Q.   So when you say he took a breath, I mean, do you

13   literally mean he took a breath, like he wasn't

14   breathing, and then he took a breath, and then wasn't

15   breathing?

16       A.   He had opened his mouth and seemed to be

17   breathing.  His mouth had moved and he seemed to be

18   breathing.

19       Q.   I mean, the whole time that you were with him,

20   until AMR took over, did he seem to be inhaling and

21   exhaling the whole time?

22       A.   I don't know.  I know he had a pulse when I

23   checked, and a few seconds later, or a minute later,

24   that's when I saw his mouth open and he appeared to be

25   breathing.

                                                      102

**Ron Fernicola & Associates**

1    believe or suspect that Mr. Niedzialek was under the

2    influence of any drugs?

3        A.   Yes, he could have been.

4        Q.   Was that a concern to you at that time?

5        A.   Yes, because certain subjects, when they're

6    on -- under the influence of something, can be

7    unpredictable, and can be violent.

8        Q.   Mr. Burton asked you about the events leading up

9    to the second Taser deployment.  So the second Taser

10   deployment would be after the darts are already in

11   Mr. Niedzialek, and when you press the side button, and

12   it sends the second electrical discharge into

13   Mr. Niedzialek's body; is that what you were referring

14   to?

15       A.   Yes.

16       Q.   So would the first deployment have been when you

17   pressed the trigger on the X2 device, to launch the darts

18   into Mr. Niedzialek's body?

19       A.   Yes.

20       Q.   At the point in time when you made the decision

21   to launch the darts, the first deployment, the first

22   Taser into Mr. Niedzialek, what was it that you observed

23   that caused you to make that decision?

24       A.   Due to his irrational behavior, being

25   incoherent, and when he stood up and ran towards Keeney,

115

1  paused for a second, and then lunged or tried to grab

2  Officer Keeney, so I felt Officer Keeney was going to be

3  assaulted, so I deployed the Taser.

4      Q.   And then you testified, I believe, and please

5  correct me if I'm wrong, that after Mr. Niedzialek went

6  down to the ground after that first Taser, that he tried

7  to get back up again, he advanced toward Deputy Keeney

8  again; is that what you said?

9      A.   Yes, after the first deployment, after he went

10  down to the ground and stood up, he advanced toward

11  Officer Keeney again.  And therefore, I arced the Taser.

12      Q.   Why did you arc the Taser the second time?  Why

13  did you deploy it that second time against

14  Mr. Niedzialek?

15      A.   I think he made another advancement towards

16  Officer Keeney and I felt Officer Keeney was going to be

17  assaulted.

18      Q.   We all know the answer to this, but I don't

19  believe it's been stated in the record.  You've been

20  referencing the term, "5150."  What does that term mean

21  in your training and experience?

22      A.   Someone suffering from mental illness who is a

23  danger to himself, or to others, or gravely disabled.

24      Q.   Based on your observations of Mr. Niedzialek,

25  did you believe that day that he was a danger to himself?

116

**Ron Fernicola & Associates**

1     A.    Yes.

2     Q.    Based on your observations of Mr. Niedzialek

3 that day, did you believe he was a danger to others?

4     A.    Yes.

5     Q.    In response to Mr. Burton's questioning at one

6 point, you mentioned that at a certain point when he was

7 proned, cuffed behind the back on the ground, that he

8 became calm.  Do you remember that testimony?

9     A.    Yes.

10     Q.    So once -- we're after the second Taser

11 deployment -- he's on the ground, up to him being calm,

12 so from second Taser when he goes down to him being calm,

13 what is Mr. Niedzialek doing?

14     A.    He's on the ground laying there breathing.

15     Q.    From second Taser all to way to him becoming

16 calm, like, right when he falls down after the second

17 Taser, all the way, tell us what actions Mr. Niedzialek

18 is taking during that period.

19     A.    When he first fell to the ground after the

20 second deployment, he was kicking his legs, screaming,

21 shouting.  And then after we placed the handcuffs on him,

22 he still continued to resist, and continued to try to get

23 up.  And after a few seconds, then he seemed to calm down

24 and just lay there calm.

25     Q.    From the time that you deployed the second Taser 117

1  up to the point in time when Kevin Niedzialek finally

2  seemed to calm down, when he's in cuffs in the prone

3  position, during that whole period of time, did it appear

4  to you that Kevin Niedzialek was resisting your efforts

5  to restrain him?

6      A.   Yes.  When he first went down, yes, he was still

7  creating some resistance, was still trying to fight us to

8  get up.

9      Q.   And did that conduct by Mr. Niedzialek, during

10  that period of time, raise any concerns for you?

11      A.   Yes.  I didn't want him to get up in order to

12  harm himself some more or harm anyone else.

13      Q.   You mentioned that according to your training --

14  in response to Mr. Burton's questions, you mentioned that

15  according to your training, that even after a prone

16  suspect has calmed down and is no longer a threat, you're

17  allowed to keep a hand, or some amount of pressure on

18  them, in the event that they're playing possum and might

19  try to get up and harm you.

20          Do you remember your testifying about that

21  earlier?

22      A.   Yes.

23      Q.   Once Kevin Niedzialek became calm, you said you

24  kept a hand on him.  Why did you keep a hand on him after

25  he became calm?  Why did you keep him in the prone

118

**Ron Fernicola & Associates**

1        (Signature page to the deposition of

2              Deputy Sonia M. Gomez.)

3

4                    --oOo--

5      I hereby certify under the penalty of perjury that I

6   have read the foregoing transcript.

7      Corrections, if any, were noted by me, and the same

8   is now a true and correct transcript of my testimony.

9      Executed this _____day of _____,

10  2021, at _____.

11

12

13                    _____

                      DEPUTY SONIA M. GOMEZ

14

15

16

17

18

19

20

21

22

23

24

25                                                      124

1

2

3                       REPORTER'S CERTIFICATE

4

5       I, Leslie A. Toledo, CSR #8345, a certified shorthand

6   reporter licensed by the State of California, do hereby

7   certify:

8       That prior to being examined, the witness named in

9   the foregoing deposition, SONIA M. GOMEZ, stated to

10  testify to the truth, the whole truth, and nothing but

11  the truth;

12      That the said deposition, taken down by me in

13  stenotype, was thereafter reduced to typewriting by

14  computer-aided transcription under my direction and is a

15  true record of the testimony given and of any changes

16  made by the deponent.

17      I further certify that I am not in any way

18  interested in the outcome of this action and that I am

19  not related to any of the parties thereto.

20      Witness my hand this day      of            , 2020.

21

22                           _____

23                           LESLIE A. TOLEDO, CSR #8345

24

25
                                                            126

# EXHIBIT J

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS     )
SUCCESSOR IN INTEREST FOR KEVIN R.   )
NIEDZIALEK, DECEASED,                )
                                     )
            PLAINTIFF,               )
                                     )
      VS.                            ) CASE NO. 5:19-CV-02083-JGB
                                     )
RIVERSIDE COUNTY, RIVERSIDE          )
SHERIFF'S DEPARTMENT,                )
SHERIFF-CORONER CHAD BIANCO AND      )
DOES 1-10,                           )
                                     )
            DEFENDANTS.              )
_____)


DEPOSITION OF MARK A. FAJARDO, M.D.

TAKEN ON

FRIDAY, AUGUST 21, 2020


MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
   TRACY ALVES, INDIVIDUALLY AND AS  )
5  SUCCESSOR IN INTEREST FOR KEVIN R. )
   NIEDZIALEK, DECEASED,             )
6                                    )
                PLAINTIFF,           )
7                                    )
       VS.                           ) CASE NO. 5:19-CV-02083
8                                    )           JGB
   RIVERSIDE COUNTY, RIVERSIDE       )
9  SHERIFF'S DEPARTMENT,             )
   SHERIFF-CORONER CHAD BIANCO AND   )
10 DOES 1-10,                        )
                                     )
11              DEFENDANTS.          )
   _____)

12

13

14

15

16         DEPOSITION OF MARK A. FAJARDO, M.D., taken on

17 behalf of the Defendants, at 800 S. Redlands, Perris, CA,

18 mfajardo@riversidesheriff.org, commencing at 2:24 P.M.,

19 Friday, August 21, 2020, before Melinda S. Womelsdorf,

20 Certified Shorthand Reporter, License No. 13124, for the

21 State of California, pursuant to Notice.

22

23

24

25
                                                        2

```
1                    PERRIS, CALIFORNIA

2                 FRIDAY, AUGUST 21, 2020

3                     AT 2:24 PM

4

5              MARK A. FAJARDO, M.D.,

6         Having been first duly sworn, was

7         examined and testified as follows:

8

9                     EXAMINATION

10

11  BY MR. SAIN:

12      Q    Sir, would you please state your full name?

13      A    Mark Fajardo, M-A-R-K, F-A-J-A-R-D-O.

14      Q    Good morning.  It's good to see you again,

15  Dr. Fajardo.

16      A    Good afternoon.

17      Q    Good afternoon.  Thank you.  And it's good to

18  see you again, Dr. Fajardo.

19           At this time, since we have a number of people

20  who, pursuant to a Rule 29 stipulation, are appearing

21  via remote deposition means, via ZOOM specifically, I'd

22  like to ask everyone who is appearing in this case at

23  this deposition to identify themselves for the record,

24  please.

25      MR. BURTON:  John Burton for the plaintiff.
```

5

1      A      Correct.

2      Q      And you have been a staff forensic pathologist

3   at Regional West Medical Center at Scottsbluff, Nebraska

4   from '99 to 2000; is that correct?

5      A      Yes.

6      Q      And you were the chief forensic pathologist

7   and staff pathologist for the County of Riverside from

8   2000 to 2013; is that correct?

9      A      Correct.

10     Q      You were the chief medical examiner coroner

11  for Los Angeles County from 2013 to 2016; is that

12  correct?

13     A      Correct.

14     Q      Now you are once again the chief resident

15  pathologist and staff pathologist at the County of

16  Riverside; is that correct?

17     A      Correct.

18     Q      And you've held that position since 2016?

19     A      Yes.

20     Q      And you are a licensed physician with the

21  State of California?

22     A      I am.

23     Q      And you've been a licensed physician since

24  when?

25     A      Ninety -- it says in there.  '95, I believe.

                                                    10

1    that autopsy exam, performed by a forensic pathologist?

2        A    Yes.

3        Q    Does your forensic pathological process

4    involve going to the scene of the incident where the

5    person died or was -- the process of death was started?

6        A    Rarely will I do that.  I think I've done that

7    maybe, on average, about once a year since I've been

8    here.  So maybe 20 times I've been out at the scene.

9        Q    In general, how do you obtain, in your

10   forensic pathological process, circumstances related to

11   the death?  Like the incident facts.

12       A    So our deputy coroner is our eyes and ears.

13   They are the ones who provide us with a report which

14   informs us the circumstances surrounding the death of an

15   individual.

16       Q    At some point -- at any point in time, did you

17   conduct an autopsy of a person by the name of Kevin

18   Niedzialek --

19       A    Yes.

20       Q    -- N-I-E-D-Z-I-A-L-E-K?

21       A    Yes.

22       Q    Since I have trouble saying that last name,

23   I'm going to say Kevin N.

24           And prior to performing that autopsy, did you

25   ever observe any interaction in person, yourself -- any

                                                          52

1    back.

2           5-R is a similar picture, somewhat close up.

3           5-S, more to the right side of the decedent

4    with slight focus on a laceration to the right eyebrow

5    area.

6           5-T, the left side of the face.

7           5-U is a picture of the majority of the upper

8    portion of the body from above, after the decedent has

9    been washed.

10          5-V, similarly, only a little bit lower to

11   capture the knees and shins.

12          5-W, even lower to capture the legs and ankles

13   and feet.

14          5-X, the right side of the torso from the mid

15   chest to the knees.

16          5-Y is somewhat of an oblique picture, looking

17   at the left side of the face and torso.

18          5-Z, from the right, kind of an oblique

19   picture.

20          5-AA, the right side of the torso.

21          5-BB, a similar photo.

22          5-CC, the left side of the torso, extending

23   from the shoulders to the mid thigh.

24          5-DD is a puncture wound to the extremity that

25   I have circled, which may possibly represent a Taser

                                                         59

1  dart impact.

2          5-EE is a similar puncture wound to the torso,

3  which I have also circled, which may again indicate a

4  Taser dart application.

5      MR. BURTON:  Doctor?

6      THE WITNESS:  Yes, sir?

7      MR. BURTON:  If I could just interrupt.  If you

8  could just go back to when you said the possible Taser

9  dart mark to the extremity.  Could you just identify

10  which extremity it is?  I'm sorry for interrupting.

11     MR. SAIN:  That --

12     THE WITNESS:  Not at all.

13         That would be the right extremity, right arm

14  at the right biceps area.

15     MR. BURTON:  Thank you.

16     MR. SAIN:  That's 5-DD?

17     THE WITNESS:  That is 5-DD.

18     MR. SAIN:  Mr. Burton, for your edification, I was

19  actually about to do that.  I was going to let him get

20  through the list first.

21  BY MR. SAIN:

22     Q    And then 5-EE, which body part, since we're

23  doing that now?

24     A    It would be the right anterior torso.  That'd

25  probably be the best words for it.

60

1      Q      Anterior torso in lay terms is where on the
2    body?
3      A      Probably right above the end of the rib cage
4    on the right side.
5      Q      Thank you.  Please continue.
6      A      5-FF is the back of the decedent, extending to
7    the buttocks area.
8              5-GG is similar picture.
9              5-HH, the right buttocks -- I'm sorry.  Yes.
10   The right buttocks area and back region.
11             5-II is the lower back, the buttocks, and the
12   thighs from a back perspective.
13             5-JJ is the left lower extremities from a
14   lateral perspective.
15             5-KK are the shins and feet, highlighting the
16   abrasions.  There are abrasions to the feet themselves.
17             5-LL is similar, focusing on the right foot.
18             5-MM are the backs of the feet, the heel
19   regions.
20             Finally, 5-NN is a close-up of the left foot,
21   displaying the abrasions.
22     Q      And for Exhibit 5, those photographs you just
23   kindly identified on the record, do any of those
24   photographs document any wounds, marks, injuries,
25   defects, or abnormalities that you believe played a

61

1    Q    Okay.  Exhibit 7 is a group of 54 photographs.

2  You were kind enough to review those off the record.

3         (Exhibit 7 was marked for identification

4         by the Certified Shorthand Reporter and

5         a copy is attached hereto.)

6  BY MR. SAIN:

7    Q    What do they depict in total?

8    A    So to give you some background -- and I do

9  have to qualify the answer -- our -- our -- this

10 decedent, Kevin Niedzialek, was an organ donor.  And

11 OneLegacy is our organ procurement association, who was

12 part of the process by which organs were harvested.

13         It is our routine in cases such as this to

14 have what are called pre-procurement photos.  In other

15 words, before they take the organs from the decedent, we

16 dispatch a deputy.  And, in fact, I attended this

17 particular time when photographs were obtained, and I

18 actually witnessed the removal -- removal of the organs

19 that were donated as part of the documentary purpose.

20         But at the end of the day, these are those

21 photos, those pre-procurement photos, that were taken

22 prior to release of the organs.

23    Q    And do these photos, the 54 photos that

24 compromise -- or that consist of Exhibit 7, do they

25 fairly and accurately depict the condition of Kevin N.

66

1              6-M, a picture from the right side of the

2    head.

3              6-N, after we've extracted the brain, to

4    document that there are no base-of-skull fractures.

5              6-O -- I'm sorry.  I thought -- my mistake.

6    6-O is one of the pictures of the heart as it was

7    removed during the organ procurement.  So it is actually

8    not part of the aforementioned exhibit.  So that's a

9    picture of the heart itself, showing that it's intact

10   and atraumatic.

11             Likewise with the lungs for 6-P.

12             And 6-Q is the same thing, a picture of the

13   lungs.

14        Q    So why don't we take those last three, since

15   they don't belong in Exhibit 6.  Let's change the first

16   number to 7 and just -- we'll cross out the letter

17   there.  I'm going to move those over to Exhibit 7.

18        A    Call them 7-Q, 7-P?

19        Q    Actually, for right now, just do 7 blank.

20        A    7 blank.  7, 7, and 7.  I have done so.

21        Q    Thank you.

22             Because when we go through Exhibit 7, you're

23   going to have to put them on that side.

24             So focusing on Exhibit 6 minus those last

25   three pre-procurement -- pre-harvest photos, is there

                                                        69

1           7-BBB is the right foot, showing the

2    abrasions.

3        Q    So then if you would take the three photos

4    that we pulled from Exhibit 6, let's start with 7-CC.

5        A    CCC?

6        Q    Are we up to three Cs?

7        A    Yes.

8        Q    So 7-CCC.  And then tell us what is shown in

9    7CCC.

10       A    That is a heart as it's removed from the

11   decedent, displaying it's just fine.

12       Q    So in 7-CCC, we see Kevin N.'s heart when it

13   was harvested?

14       A    That's correct.

15       Q    Okay.  Next up would be 7-DDD.

16       A    7-DDD.

17       Q    And what's shown in 7-DDD?

18       A    The lungs.

19       Q    So 7-DDD would show Kevin N.'s lungs as they

20   appeared when they were harvested?

21       A    Correct.

22       Q    Is there anything abnormal that was documented

23   in 7-DDD?

24       A    Not at all.

25       Q    So those lungs are perfectly healthy?

74

1      A     Yes.

2      Q     And then 7-EEE would be the last one.  What's

3  documented in that photo?

4      A     Same thing with the lungs.  So 7-DDD are the

5  back of the lungs, and 7-EEE is the front of the lungs.

6      Q     So on how many occasions have you performed an

7  autopsy after someone's organs were harvested?

8      A     Probably upwards of 20 cases, I would think.

9      Q     Okay.  And in your experience would organs be

10  harvested if they had some sort of damage or defect or

11  abnormality?

12      A     Not at all.

13      Q     Why not?

14      A     Well, you don't want to put a bad organ into

15  somebody who desperately needs an organ.

16      Q     Okay.  And in terms of Exhibit 5, which were

17  the exterior autopsy photos, and Exhibit 7, which were

18  the pre-organ harvest photos, do any of those photos

19  document any injuries, wounds, defects, or abnormalities

20  that you believe played a proximate causal role in

21  Kevin N.'s death?

22      A     No.

23      Q     So in terms of your autopsy in this case, did

24  you determine what the proximate causal role of death

25  was?

75

1        MR. BURTON:  Can I interrupt a second?  I need to

2   take a break, and it sounds like we're -- this is sort

3   of a -- would be a convenient point to do it.

4        MR. SAIN:  Absolutely, Mr. Burton.  Why don't we

5   take ten minutes.

6        MR. BURTON:  Okay.  Thank you.

7        MR. SAIN:  You're more than welcome.  Off the

8   record.

9             (Brief pause in the proceedings.)

10  BY MR. SAIN:

11       Q    All right.  Thank you.  We're back on the

12  record.

13            Dr. Fajardo, during your autopsy exam of

14  decedent, Kevin N., did you observe any injuries,

15  wounds, marks, defects, or abnormalities on the exterior

16  of his body?

17       A    Yes, a whole -- yes.  Yes.

18       Q    What did you observe in that regard?

19       A    Multiple abrasions and contusions and

20  lacerations.

21       Q    Anything else?

22       A    No.

23       Q    Those multiple abrasions, contusions, and

24  lacerations, did any of them have a proximate causal

25  role in his death?

                                                    76

1       A     No.

2       Q     During your autopsy examination of Kevin N.,

3    did you observe any wounds, injuries, defects, or

4    abnormalities on the inside of Kevin N.'s body?

5       A     No.  Well, I take it back.  Yes.  There was

6    that hemorrhage into the right temporalis muscle.

7    Again, there's a laceration to the -- a tearing of the

8    skin right next to the right eyebrow area, which

9    explains why there's internal hemorrhage to that

10   chewing-muscle muscle.

11      Q     And based on your autopsy examination or

12   otherwise, were you able to determine what caused that

13   injury?

14      A     Yes.  Just like I said.

15      Q     What caused the injury to the head?

16      A     Oh, blunt force trauma.  So a splitting of the

17   skin results from blunt force trauma either applied --

18   in other words, like a striking to the head itself -- or

19   the head striking something else, like falling down,

20   hitting the ground.

21      Q     And based on your autopsy examination or

22   otherwise, do you know what blunt force trauma -- what

23   specific blunt force trauma caused that particular head

24   injury?

25      A     I do not.

77

1     Q     So, for example, can you say, based on your
2   personal knowledge, your experience, your expertise, or
3   as a result of your examination, one way or the other
4   whether or not that blunt force trauma injury to the
5   head was caused by any law enforcement officer?
6     A     I cannot.
7     Q     For all you know, it could have been caused
8   before law enforcement ever contacted Kevin N.; is that
9   right?
10    A     That's correct.
11    Q     Other than that head injury, did you observe
12  any other injuries, wounds, defects, or abnormalities
13  during your examination of Kevin N.'s interior?
14    A     No.
15    Q     In terms of the findings of your autopsy
16  examination, did you determine what the proximate cause
17  of Kevin N.'s death was?
18    A     Yes.
19    Q     What was that?
20    A     Acute methamphetamine toxicity.
21    Q     And in that context, what does the word
22  "acute" mean?
23    A     It means a -- more close in time to the
24  individual's death versus chronic, indicating a
25  prolonged use of a drug or medication.

78

1  beating or you stop breathing.  More likely than not,

2  again, a greater probability, it was his heart that did

3  not beat as it should and then fell into what is called

4  a fatal arrhythmia.  In other words, his heart became

5  disorganized.

6          And part of that, not just the

7  methamphetamine, but the physical exertion, the pain

8  associated with being taken into custody, the

9  application of the Taser, results in increased heart

10  rate, increased blood pressure, increased cardiac

11  requirements, and then ultimately contributing in some

12  fashion as to why his heart developed that fatal

13  arrhythmia.

14      Q    Based on your autopsy examination or

15  otherwise, did you determine that the application of a

16  Taser device to Kevin N. was a proximate cause of his

17  death?

18      A    So, no, it was not.

19      Q    Based on your autopsy examination of Kevin N.

20  or otherwise, did you determine that restraint maneuvers

21  were the proximate cause of his death?

22      A    No, they were not.

23      Q    Based on your autopsy examination or

24  otherwise, did you determine that anything that any law

25  enforcement officers may have done with Kevin N. was a

81

1    proximate cause of his death?

2        A    No.

3        Q    So nothing that the officers did was a

4    proximate cause of his death?

5        A    Correct.

6        Q    We talked earlier about asphyxia.  If Kevin N.

7    had died as a result of asphyxia, what would you have

8    expected to see in his body?

9        A    Kind of the same thing that we see here.

10   Basically asphyxia, meaning not enough oxygen to the

11   body to supply its requirements.  That can happen if

12   your heart stops beating.  Obviously your body is not

13   going to get the oxygen that it requires.

14            So almost the same thing that we see.  The

15   anoxic insult, the changes to the brain that we see.

16       Q    So would it be accurate to say that the

17   difference between an asphyxial death and -- respirator

18   brain I think is what you called it -- would be that, in

19   asphyxial death, the lack of oxygen intake would cause

20   the death, whereas any other way, the cardiac arrest

21   would cause the death and cause the brain injury -- the

22   anoxic injury?

23       A    Correct.

24       Q    Okay.  So it's really which comes first?

25       A    Yes.

                                                          82

1    Q    And is it your opinion -- based on your
2  autopsy examination and your associated investigation,
3  is it your opinion that, in terms of what came first
4  here with Kevin N., what came first here is that his
5  heart stopped?
6    A    Correct.
7    Q    And is it your opinion, based on your autopsy
8  examination and associated investigation, that the
9  reason Kevin N.'s heart stopped was because of the
10  methamphetamine he ingested?
11    A    Correct.
12    Q    So in terms of asphyxia, in your opinion,
13  based on your exam and your associated investigation,
14  did Kevin N.'s asphyxia -- was it the proximate cause of
15  his death?
16    A    No.
17    Q    You said that before -- strike that.
18         Before forming your opinions about causation
19  of death and contributing factors toward death, did you
20  review any videos?
21    A    Yes.
22    Q    And which videos did you review?
23    A    The body-worn camera videos.
24    Q    And is that the only video you reviewed prior
25  to forming your opinions in this case?

83

1      Q      At 15:29, basically 3:30 in the afternoon?

2      A      Correct.

3      Q      And is it your understanding that Kevin N.'s

4   encounter with Riverside County Sheriff's deputies

5   occurred on July 29, 2019?

6      A      Correct.

7      Q      So in terms of the blood sample that was taken

8   from Kevin N., it was taken the same day as his incident

9   encounter, yes?

10     A      Correct.

11     Q      Do you know what time he encountered the

12   officers out there before being brought in for

13   toxicology?

14     A      Not in my report.  It might be detailed in the

15   investigative report.

16     Q      The coroner's report?

17     A      Correct.

18     Q      And turn your attention to what I believe is

19   the third page of the toxicology report, where it says

20   "test amphetamines."  Do you see that page?

21     A      Yes.

22     Q      All right.  And what are the levels that the

23   tests revealed here in terms of Kevin N.'s toxicology

24   results?

25     A      So methamphetamine is at .757 milligrams per

87

1    liter, and amphetamine, which is the major metabolite of

2    methamphetamine, is .097 milligrams per liter.

3        Q    When you say a "metabolite," what do you mean?

4        A    So methamphetamine is transformed in the --

5    into the human body into amphetamine.  It's part of the

6    process of our body trying to get rid of the drug, so to

7    speak.  So that's what we call a metabolite, which is an

8    active component.  Amphetamine in and of itself also

9    increases the heart rate and blood pressure.

10       Q    And in terms of this level of methamphetamine,

11   0.757 milligrams per liter, what is the significance of

12   that level from a forensic pathological perspective?

13       A    It's a very high level.

14       Q    And this level, 0.757 milligrams per liter, is

15   this a lethal amount of methamphetamine?

16       A    Again, so I'm of the belief that, yes, this

17   would be a lethal level.

18       Q    Turning to the coroner's investigation section

19   of the autopsy report, Exhibit 3.  I believe it's the

20   second page of that section.  On the Bates stamped

21   version, it would be 561.

22            There's a section that says "cause of death"

23   and then an "A" with something next to it, and then

24   there's another section that says "other significant

25   conditions contributing to death but not related to

88

1    psychotic event up top and then the police restraint

2    maneuvers in the OSC, if that makes sense.

3         Q    I'm a little confused.  That's just me.  My

4    apologies.

5              So in that circumstance when you have somebody

6    who is having an excited delirium event, you would say

7    the excited delirium was the cause of death, and then

8    restraint was a contributing factor?

9         A    Pretty much.  I don't like using the words

10   "excited delirium" because it -- it -- characterize an

11   entity, which I don't personally believe in.  So it's

12   like shaken baby.

13             I'm not a big fan of the shaken baby.  I do

14   believe it does happen.  It is in contention in my

15   forensic community, especially excited delirium.  The

16   majority of us don't believe in it.  We believe that

17   there's either acute psychosis or drug effect.

18        Q    Okay.  So going back to my earlier question

19   because I'm not sure if I understood the answer.

20             In terms of the specific manner of restraint

21   you saw in the video -- you saw these deputies apply, is

22   it your opinion that that specific manner of restraint,

23   the techniques, the position, how they were holding him,

24   how long they were holding him -- is it your opinion

25   that that restraint caused Kevin N.'s death here?

                                                          141

1      A     My opinion is, no, it did not.

2      Q     Okay.  Now, by itself without any police

3  restraint, without any involvement of the police here,

4  was the meth that Kevin N. ingested by itself enough to

5  cause his death?

6      A     Absolutely.

7      Q     Okay.  Now, at some point in the video, would

8  you agree that, at some point after Kevin N. is in

9  handcuffs, he's restrained on the ground, he's kicking,

10 and all of a sudden, he kind of stops moving?

11          Would you agree that that's true?

12     A     Absolutely.

13     Q     And then -- so he goes from a lot of movement

14 to not so much movement while still in a prone position,

15 and then he's flipped into a supine position.

16          Would you agree that that's what the video

17 shows?

18     A     Yes.

19     Q     Okay.  Either as a result of your forensic

20 pathological examination, your autopsy, or as a result

21 of your associated investigation or as a result of

22 observing Exhibit 9, can you tell why Kevin N. stopped

23 moving at that point in the video?

24     A     Yes.  Putting all those things together, he --

25 I -- I agree that he suffered a fatal arrhythmia.  That

                                                    142

1  other whether or not he has suffered cardiac death up to

2  that point?

3       A    No.  And, again -- so cardiac death means

4  asystole and no heartbeat.  And we're not even talking

5  about PEA.  PEA, pulseless electrical activity, is a

6  different entity in its entirety.  That means you do

7  have electrical activity.  You're just -- heart's not

8  beating the way it should.

9            In either event I don't know what his rhythm

10  was at that time.  Was he in asystole?  I don't know.

11  Was he in v-tach?  I don't know.  Was he in vfib?  I

12  don't know.

13            So if he's in v-tach or vfib, he's still

14  technically not dead from a cardiac standstill

15  perspective.  He's not in asystole.

16       Q    So in terms of -- Mr. Burton asked you a

17  question about Mr. Kevin N. dying in custody.  Is it --

18  can you say, based on your forensic examination, your

19  associated investigation, or review of this video, that

20  Kevin N. died in police custody?

21       A    I cannot say that --

22       Q    Okay.

23       A    -- as we stand here today.

24       Q    And in terms of the blunt force trauma injury

25  to the head, did that play any causal role in Kevin N.'s

145

1   death?

2        A    It did not.

3        Q    Okay.  A few definitions.  You said that --

4   you described a condition called ventricular

5   tachycardia.  What is that?

6        A    That's when the heart is beating beyond its

7   capability to beat.  It's beating so rapidly that it

8   becomes a rhythm that no longer pumps blood effectively

9   to the body.

10        Q    And what is ventricular fibrillation?

11        A    Kind of the same thing, except it's a

12   degradation of ventricular tachycardia.  So v-tach, as

13   we call it, is the heart beating almost at unsustainable

14   levels.  And then at a point, the heart can no longer

15   beat that fast.  The ion channels and the mechanics of

16   how a heart beats is exceeded.

17             And at that point, it becomes very unorganized

18   beating, ventricular fibrillation.  They call it a bag

19   of worms because it doesn't look like it's beating

20   effectively.  It's not.  And then that ultimately

21   results in asystole.  The heart stops completely.

22        Q    Is methamphetamine a stimulant?

23        A    Absolutely.

24        Q    And can methamphetamine cause ventricular

25   tachycardia?

                                                      146

1    if it's more likely, but probable that some level of

2    acidosis was present at the time because of his agitated

3    state.

4        Q    Okay.  And can you say to a reasonable degree

5    of medical probability that it was more likely than not

6    that the acidosis was the proximate cause of his death?

7        A    Yeah.  So, yes, I can render an opinion.  The

8    answer is no.  That was not the cause.

9        Q    All right.  In your report which we attached

10   as Exhibit 3, did you list all of the factors that you

11   believe were the proximate cause or the cause of death

12   for Kevin N.?

13       A    I'm sorry.  Once again?

14       Q    Sure.

15           In your autopsy report which we attached as

16   Exhibit 3, did you list all of the factors that you

17   believe were the proximate cause or the cause of death

18   for Kevin N.?

19       A    Yes.

20       Q    And in terms of the proximate cause, the cause

21   of death, the moving force that caused Kevin N.'s death,

22   what did you find that cause of death to be?

23       A    Acute methamphetamine toxicity.

24       Q    Anything else?

25       A    No.

                                                    148

1       Q     And anywhere in your report or autopsy

2   findings, do you identify any asphyxia as the proximate

3   cause, the cause of death, for Kevin N.?

4       A     No.

5       Q     Anywhere in your autopsy report or findings,

6   do you identify asphyxia as a contributing factor toward

7   Kevin N.'s death?

8       A     No.

9       Q     Did you find any evidence that Kevin N. had

10  asphyxiated before the cardiac arrest?

11      A     No.

12      Q     Did you find any evidence that Kevin N. had

13  asphyxiated at all?

14      A     No.

15      Q     Would it be accurate to say that you found no

16  evidence that Kevin N. had died as a result of asphyxia?

17      A     Correct.

18      Q     Mr. Burton asked you some questions about the

19  paramedic report of the cardiac rhythm.

20            Based on your review of the video, would it be

21  accurate to say that Kevin N. was not hooked up to a

22  cardiac monitor until after he was in the supine

23  position?

24      A     Correct.

25      Q     So would it be accurate, then, to say that, in

149

1    terms of a paramedic cardiac monitor report, that would

2    only document the state of his heart at some point after

3    he was being restrained?

4         A    Correct.

5         Q    After the restraint was over; right?

6         A    Correct.

7         Q    I thought you said earlier -- and I just want

8    to make sure I got all this right -- that, if -- when an

9    organ is harvested, there's a company, and I didn't

10   quite hear the name.

11        A    OneLegacy, O-N-E, and then L-E-G-A-C-Y,

12   Legacy.

13        Q    Okay.  So when an organ donor says, "Hey, take

14   my organs if I die," when that happens, this company

15   evaluates the organs in question to determine if they

16   are healthy enough to put in some other human being?

17        A    They are the organ procurement agency.  They

18   are the ones that facilitate said harvesting and

19   placement of organs.  They have teams of physicians,

20   actually two separate teams:  The one that harvests, and

21   the one that transplants.  And, again, they evaluate

22   those organs, absolutely.

23        Q    Okay.  And if they determine that there's

24   something medically dangerous, wrong, bad about the

25   organ, they are not going to take it and use it for a

                                                        150

1  donor?

2      A    That's correct.

3      Q    Okay.  So, for example, if, for Kevin N.,

4  OneLegacy had found that Kevin N. had an enlarged heart

5  or cardiomegaly, that would have eliminated his heart

6  from the donation pool?

7      A    Correct.

8      Q    Okay.  So, based on that, do you think that

9  it's more likely than not that Kevin N.'s heart did not

10  have any enlarged heart or cardiomegaly properties?

11     A    Correct.

12     Q    And you said that, typically speaking, for

13  chronic abusers of methamphetamine, the overwhelming

14  majority of chronic abusers typically have an enlarged

15  heart or cardiomegaly?

16     A    I wouldn't say overwhelming majority, but a

17  strong majority have an enlarged heart.  That's correct.

18     Q    Earlier you were talking about compression

19  asphyxia.  Based on your review of Exhibit 9, the video,

20  is there anything that you observed the deputies doing

21  with Kevin N. that you believe caused any compression

22  asphyxia for Kevin N.?

23     A    That's a very important question.  Very

24  important.  So, yeah, I was majorly concerned that that

25  might be a possibility.  That it might be George Floyd.

                                                        151

1   This happened, obviously, way before that.

2           That's why I asked to review the footage.

3   That's why I did the posterior back dissection.  To

4   ensure that that did not compromise his ability to

5   breathe.

6           And so in my expert medical opinion, the

7   answer is, no, it did not.

8       Q    So in terms of the deputies' restraint of

9   Kevin N., based on your review of the video, based on

10  your forensic exam, based on your associated

11  investigation, your opinion is that his -- neither

12  compression nor his position nor anything about the

13  restraint impaired his breathing enough to cause him to

14  die?

15      A    In and of itself, that is correct.

16      Q    Okay.  Since you have conducted your autopsy

17  exam, since you've completed your report, formed all

18  your opinions, is there any additional evidence that

19  you've reviewed, other than what you've documented in

20  that report, that you have considered in connection with

21  this case?

22      A    No.

23      Q    Okay.  Other than the bystander witness video

24  you viewed today?

25      A    Correct.

152

State of California   )
                      )  SS.
County of_____)


        I, Mark A. Fajardo, M.D., say I have read
the foregoing deposition and declare under penalty of
perjury that my answers as indicated are true and
correct.




_____
       (DATE)




                              _____
                                      (SIGNATURE)




156

```
 1   State of California      )
                              )  SS.
 2   County of San Bernardino )

 3

 4              I, MELINDA WOMELSDORF, Certified Shorthand

 5   Reporter, License No. 13124, for the State of

 6   California, do hereby certify:

 7              That, prior to being examined, the witness

 8   named in the foregoing deposition, to wit, Mark A.

 9   Fajardo, M.D., was by me duly sworn to testify the

10   truth, the whole truth and nothing but the truth;

11              That said deposition was taken down by me

12   in shorthand at the time and place therein named and

13   thereafter reduced to computer-aided transcription under

14   my direction;

15              That the foregoing transcript, as typed, is

16   a true record of the said proceedings.

17              I further certify that I am not interested

18   in the event of the action.

19              Witness my hand this 9th day of September,

20   2020.

21

22              _____

23              MELINDA WOMELSDORF, CSR. NO. 13124

24

25

                                                    157
```

# EXHIBIT K

**Tracy Alves v Riverside County, Riverside Sheriff's Department, Sheriff-Coroner Chad Bianco, et al**
**Expert Opinion of Donald M Dawes, MD**
**1/27/21**

Anticipated Issue for Expert Opinion Testimony

***Did the TASER X2 conducted electrical weapon (CEW) cause or substantially contribute to the death of Mr. Niedzialek?***

*My testimony will be limited to the medical issues related to the TASER X2 CEW in this case. I am not opining as a use of force expert.*

This report is prepared pursuant to Federal Rule of Civil Procedure 26. Should a party seek my deposition in this matter, I will make myself available as feasible and request that the party coordinate with defense counsel to facilitate such deposition. All federal, state, and local health orders will be followed in the scheduling of such deposition. *This expert reserves the right as a physician to impose additional restrictions as deemed medically necessary due to the pandemic.*

Documents Reviewed

1) Deposition of Dr. Mark Fajardo
2) Transcript of 911 Calls
3) Transcript of Dispatch Recording
4) Transcript of Deputy Gomez
5) Transcript of Deputy Cramer
6) Transcript of Interview with Deputy Gomez
7) Transcript of Interview with Robert and Tracy Alves
8) Transcript of Interview with Eric Mireles
9) Riverside County Sheriff Incident Report authored by Deputy Gomez
10) Supplemental Report authored by Deputy Keeney
11) TASER Log
12) Inland Valley Medical Center Records of Kevin Niedzialek
13) AMR Records of Kevin Niedzialek
14) Deputy Gomez Body Worn Camera Recording
15) First Amended Complaint
16) Deposition of Deputy Keeney
17) Deposition of Deputy Gomez

I am informed and believe that I have received all disclosures and discovery responses produced in the case. The list of documents is in Appendix 1. The foregoing list underscores those records to which I devoted substantial consideration. In the event that any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.

CONFIDENTIAL DOCUMENT                                              COR 02974

Summary of Opinion

**To a reasonable degree of medical certainty or probability, the TASER X2 conducted electrical weapon (CEW) did not directly cause nor did it substantially contribute to the death of Mr. Niedzialek.**

Summary of the Facts of the Case

This summary is provided for convenience and does not necessarily itemize every single fact relied upon by this expert in the formulation of my opinions and conclusions in this matter. It is based on my review of the aforementioned records and materials. I do not contend to have direct personal knowledge of the incidental facts.

1) On July 30, 2019 at 14:12, a neighbor, Mr. Swindle, called 911 to report a "total, straight, fight-craziness meltdown." Mrs. Swindle placed a second 911 call at 14:30 to report: "He's outside bloody and running up and down the sidewalks, screaming." Mr. Niedzialek had overdosed on methamphetamine, had either injured himself or been the victim of an assault, and was causing a disturbance in his apartment complex, scaring neighbors (including children). The family admits he had a prior substance abuse history and reports he had recently relapsed after over two years of being "clean."

2) Riverside County Sheriff's (RSD) deputies were dispatched to the scene and Deputies Gomez and Keeney were the first to arrive and contact Mr. Niedzialek. Upon seeing blood at the apartment of Mr. Niedzialek, Deputy Gomez requested medical aid to stage in the area. Deputy Gomez stated, upon contacting Mr. Niedzialek, that he had a blank stare, and his eyes looked big (dilated). He was crouching, obviously bloody, couldn't sit still ("like a tweaker"), was rambling, talking fast, acting erratically and bizarrely.

3) Mr. Niedzialek quickly charged them, stopped, and then again advanced towards Deputy Keeney in a manner that made both deputies concerned he might assault Deputy Keeney. Deputy Gomez deployed her TASER X2 CEW in the probe mode, which struck Mr. Niedzialek in the right biceps and right hip causing him to "lock up" and fall to the ground. After the first use of the TASER X2, Mr. Niedzialek rolled onto his back and began to kick at Deputy Keeney as he moved in to control him. Deputy Keeney described him as "flailing his arms and legs and screaming." Mr. Niedzialek then stood up and advanced towards Deputy Keeney again at which time Deputy Gomez re-deployed the TASER X2 (same probes).The deputies called for the staged medical aid to come in after he was handcuffed to render aid.

4) Per Deputy Keeney, after the second TASER X2 CEW exposure, Mr. Niedzialek "continued to kick his legs." After a few minutes of continued struggle, Mr. Niedzialek became quiescent. In the video, Mr. Niedzialek appears to stop resisting between 1-2 minutes after being restrained. He can be seen to be breathing and can be heard to moan once. Deputy Keeney became concerned and rolled him over at which time he was unresponsive. Deputy Gomez said she felt a "very low" pulse. About 5 minutes after handcuffing, Mr. Niedzialek can be seen to take agonal breaths. Medical aid (AMR and Fire) arrived on scene quickly as they had already been previously asked to stage

and then to roll in after handcuffing. Witness Mr. Lubedi described the scene as "there were two officer subduing him. He was facedown. They were just kind of trying to keep him, and he was still screaming and kicking and stuff. And then he just slowly sort of, kind of, stopped moving." In an interview, he estimated the time to be 5 minutes.

5) Mr. Niedzialek had a long criminal history including a history of polysubstance abuse including prescription medication (tramadol and benzodiazepines), marijuana, heroin, and methamphetamines. He also had a history of assault, as well as uncooperative behavior and resisting arrest with the police. Mr. Niedzialek had a reported "allergy" to haldol and Abilify, which, based on my 20 years in the emergency department, is suspicious for prior use to control behavior acutely (the "allergy" is usually a dystonic reaction or just that they do not like it).

6) On arrival, medical aid determined Mr. Niedzialek was not breathing and had no pulse and had the deputies assist with CPR. He was bagged, intubated, had a venous and an intraosseus line established and was given epinephrine twice and narcan once as per advanced life support (ALS) protocols. His initial presenting rhythm was pulseless electrical activity (PEA) which he was in for 8 minutes before converting to atrial fibrillation with the return of spontaneous circulation (ROSC) per the EMS report.

7) Upon arrival to the emergency department, due to his scalp bleeding and hypotension, a massive transfusion protocol was initiated with 4 units of packed red cells, 2 units of fresh frozen plasma, and 4 platelet pheresis units and his hypotension responded to the protocol per his medical record. His hemoglobin (hgb) at 15:28 was 13.9 gm/dL which appears to be his initial hgb before transfusion. Mr. Niedzialek was profoundly acidotic with a pH of 7.19, a bicarbonate of 9 mmol/L, and a lactic acid of 29.7 mmol/L. He also had a troponin, a measure of heart muscle necrosis, of 1.354 mcg/L. He had acute tubular necrosis and "shock liver." His hospital toxicology screen was positive for amphetamine and cannabinoids. His head CT scan initially was negative but on the second day showed blurring of the grey-white matter junction, generalized edema and herniation. On admission, the trauma service stated that polysubstance abuse versus "concussion" (head injury) could have been contributing to his persistent depressed mental status after resuscitation.

8) On 7/30/19, Mr. Niedzialek was declared brain dead and underwent organ donation.

9) The AMR paramedic noted the TASER probes were in the right biceps and right hip area. On autopsy picture COR 000625, there are skin wounds marked by blue circles. One is at the right distal biceps and the other is at the right anterior iliac crest. These are shown closer up on COR 000628 and 000629. These are also seen on the hospital photographs. These represent the location of the two TASER X2 CEW probes.

10) The TASER X2 log shows trigger pulls at 14:29:09 and 14:29:51. Only one cartridge was deployed according to the log. In agreement with the video, the TASER X2 CEW was used twice for 5 seconds each time.

11) Based on the autopsy report and deposition of Dr. Fajardo, the medical examiner, Mr. Niedzialek died from acute methamphetamine toxicity with a level of 0.757 mg/L.

Electricity Primer

The primary determinant of electrical injury is the number of electrons transferred, <u>not the voltage or current</u>. As an example, Exhibit 1 is a movie clip from the television series "Myth Busters" in which a Van de Graaff generator, charged to 50,000 volts, similar to the arcing voltage of the TASER X2 CEW, is being demonstrated. The number of electrons transferred, or electrical charge, is very small which is why there is no injury (this would be in contrast to touching a train power line at 25,000 volts which would result in immediate death with massive numbers of electrons transferred). The voltage in a typical "static shock" that you can get from walking across the carpet in your socks during the winter and touching a door knob can be tens of thousands of volts. The number of electrons transferred from the door knob is very small and harmless.

Physiology Primer

Motor nerves, part of what is designated as the peripheral nervous system, control skeletal muscle. Normal signaling is an "electro-chemical process." Neurotransmitters are released from the signaling nerve and attach to receptors at the receiving nerve. This causes changes in the nerve cell membrane electrical potential (its resting electrical state) that can lead to the initiation of an action potential, a propagating change in the electrical potential down the membrane. The action potential will cause that nerve to signal the next nerve, or cause it to control its target organ, the skeletal muscles in the case of motor neurons. Nerves operate by an "all or none" principle in which the nerve fires or does not fire. There is no modulation of the signal strength through the action potential (it is a light switch, not a dimmer switch!). A single action potential will cause a single effect at the target organ. In other words, a single action potential will cause a single contraction of the effected skeletal muscle. Sustained contraction of skeletal muscle is effected by repeated action potentials. The force of contraction of muscle is related to the frequency of action potentials as well as the summation of action potentials from other nerves that effect that skeletal muscle.

Conducted Electrical Weapon Background

The TASER X2 CEW, like the Van de Graaff generator or a typical static shock, while having an open (no load) arcing voltage of 50,000 volts, actually delivers a small charge (small number of electrons). The delivered charge is about 63 *micro (a millionth!)* coulombs per pulse of electricity. The lithium battery used to power the TASER can produce 500 5-second discharges or 47,500 pulses. The primary mechanism by which the TASER X2 operates is not through the mass action of current in the body but through the electrical stimulation of peripheral motor nerves to skeletal muscle, very similar to the way in which the body controls the skeletal muscles normally. *The TASER CEWs do not work by electrical current flowing <u>through</u> the body.*

CONFIDENTIAL DOCUMENT                                          COR 02977

Motor neurons *within sufficiently strong electric fields* established by the wire-tethered metal probes (one "positive" and one "negative"), *strong enough to change the nerve membrane potential and to elicit an "all or none" action potential,* are stimulated at a sub-tetanic rate (19 pulses-per-second (PPS) with the TASER X2 CEW) leading to *involuntarily, fused* muscle contractions and therefore "incapacitation" of activated muscle groups. At stimulation rates lower than 19 PPS, there is not a fused contraction and this can allow some limited voluntary control at very low rates of stimulation depending on how much lower the rate is (in other words, there is enough time between pulses to allow signals from the brain to activate the same nerves). At the higher rates of stimulation(>= 19 PPS), the person cannot voluntarily control the activated muscle groups because the TASER CEW is working *between the brain and muscle groups* and, due to the rate, blocking conscious control (in other words, the "communication lines" are saturated, like a busy phone line). Stimulation rates higher than 19 PPS can lead to higher forces of contraction but do have a higher risk of injury to muscles and tendons the higher you increase the rate. The TASER CEW is set to a rate that is the *lowest to have fused contraction* to avoid such injury. The devices also do likely elicit some very, very small amount of direct muscle tissue stimulation in the area immediately adjacent to the metal probes where the field strengths are highest, and may cause more distant motor effects through the stimulation of reflex arcs via afferent nerve pathways and possibly some direct stimulation of descending tracks in the spinal cord, particularly in midline back exposures. The relative contributions from these other influences is not known, but felt to be lesser than the primary mechanism of peripheral motor neuron stimulation. We know the effect is *not* the mass action of current flow as the effect can be completely eliminated with motor-end-plate paralytic medications (medications that block the neurotransmitters from the motor nerve to the muscle). *To re-iterate, the TASER CEW does not work by electric current flowing <u>through</u> the body.*

The TASER CEWs can be operated in two modes. In the probe mode, which requires a cartridge containing the probes to be on the front of the device, compressed nitrogen gas is used to propel two probes (darts) through the air. The probes are intended to pierce and connect to clothing or skin through a backward facing barb enabling the establishment of the electrical "circuit" (the body is the "resistor" for those electrically inclined). It generally requires both probes to make contact to establish the circuit. The bottom probe has an 8-degree downward offset to cause the probes to spread out as they travel "down range." This offset leads to a spread of 12 inches at 7 feet.The wider the spread between the two probes, the more peripheral motor neurons affected or "captured" by the electric fields, and therefore the greater the "incapacitation." The "effectiveness" is also dependent on the region of the probes that then, in turn, determines which functional muscle groups are affected. Only motor neurons within the electric field would be (assuming enough field strength at that particular neuron) stimulated. The upper extremities, for example, would have no "incapacitation" in a smaller spread, lower center mass exposure from a TASER CEW. In a study by Ho, et al, we found that spreads of at least 9-12 inches were required for "true incapacitation" from a field use perspective, and that exposures in the front (abdomen to thigh) were not as effectives as back exposures. Deployments of the CEW at close range is a

common cause of weapon "failure." In addition, height, obesity, and muscle mass appear to be factors in effectiveness as well. With greater subject height, *for a given spread*, there will be fewer motor neuronal projections effected. With obesity, the subcutaneous fat resistance affects the electric field strengths. You can think of the clothing, air, skin, *and subcutaneous fat* as all being "barriers" that the "electrical pressure" has to push against. Individuals with low muscle mass will simply have less skeletal muscle to contract.

An example of a large spread in a non-obese, muscular person is in Exhibit 2. This is the *intended effect* of the device. This is considered "board-like rigidity." Because of how most training exposures are done, this is the usual effect officers *expect* when deploying the CEW. It is important to understand that this expectation can lead to officers to use the device multiple times when it does not work as expected. In the video in the exhibit, the probes were hand-placed in the skin with a large spread, encompassing the upper and lower back in a muscular, low body mass index individual. This would be considered an "ideal" effect for law enforcement arrest, as you can see how the incapacitation might allow officers to get access to the individual more safely to get hands-on control. In Exhibit 3, the subject has a 4-inch back exposure. Here there is essentially no incapacitation (just some regional shoulder girdle incapacitation), and little physiologic impact on the subject. In a "real world" example, Exhibit 4 shows a subject with a small spread and an ineffective exposure. This subject continued to fight with police outside of the restaurant for nearly 10 minutes and eventually died. The cause of death was listed as acute methamphetamine intoxication.

The theoretical safety construct of these devices lies in the difference in the strength-duration curves for excitability between motor neurons, and cardiac tissues, the latter requiring a higher-strength, longer-duration electrical stimulus to cause depolarization (or capture) than the former. In addition to this tissue characteristic effect, the heart is deeper in the body than targeted peripheral motor neurons, and the electric fields fall off rapidly as the distance from the probes increases ($r^{-3}$ - at twice the distance, the strength drops by 8 times, at three times the distance, the strength drops by 27 times, at four times the distance, the strength drops by 64 times, etc.).

Opinion (Expanded)

1) ***The TASER X2 CEW was <u>not the direct cause of death</u> of Mr. Niedzialek. The proposed mechanism for death would have to be a primary electrically-induced cardiac dysrhythmia. There is no scientific evidence to support an electrically-induced dysthymia from the TASER X2 CEW exposure in this case.***

Based on the evidence reviewed, Mr. Niedzialek received a TASER X2 CEW exposure to the distal right biceps (top probe) and the anterior right iliac crest (bottom probe) twice, 5 seconds each exposure. There was no exposure to the anterior chest. All animal studies on conducted electrical weapons, predominantly done in swine under 80 lbs which represents a conservative model for dysrhythmia induction (it is well-established that swine are more arrhythmogenic), have shown that <u>neither pacing nor</u>

CONFIDENTIAL DOCUMENT                                                    COR 02979

of Mr. Niedzialek both by witness observation and as seen on the video, the changes due to his own hyperactivity were likely much greater than any TASER CEW contribution. Mr. Niedzialek had been breaking things in his apartment, running around, throwing himself against a tree, charged the deputies, and resisted the handcuffing process, all which would have contributed to his acidosis. Furthermore, the acidosis and catecholamine response from his methamphetamine intoxication alone would have also likely been much greater than any TASER CEW contribution. Therefore, while we cannot parse out any contribution to his physiology from the TASER CEW, to a reasonable degree of medical certainty was not a significant contribution, and may have represented a reasonable option to control him for medical care. [**Ho**, et al. Acidosis and catecholamine evaluation following simulated law enforcement "use of force" encounters. Acad Emerg Med, 2010; e60-e68.; **Ho**, J, Dawes, D, Nystrom, P, Collins, D, Nelson, R, Moore, J, Miner, J. Markers of Acidosis and Stress in a Sprint Versus a Conducted Electrical Weapon. Forensic Sci Int, 2013; doi:10.1016/j.forsciint.2013.08.022]

It should be noted that given his mental status, and based on my > 20 years in the emergency department, it is unlikely he would have been easily coaxed into a voluntary medical evaluation, and even if he had been "de-escalated" for the sake of argument, he certainly would have required physical control before EMS could safely evaluate him or administer aid which would have meant handcuffs or some kind of limb restraint. He would certainly have to be restrained for transport to the hospital. In my experience in the emergency department, even those patients de-escalated often start to resist again when they are being physically restrained. It is uncommon they submit to it voluntarily. It is important for lay persons to understand that medical aid in these cases almost always requires restraint. It should also be noted that deaths during restraints of such patients has been an issue for a long time in medicine so it is not unique to policing.

As a last point, and this truly cannot be minimized, Mr. Niedzialek was covered in blood which does represent a real biohazard risk to the deputies in the scenario of going "hands-on." Blood borne pathogens are a real safety issue in these cases particularly when law enforcement is going to be fighting in an environment where they can have their skin injured (outdoors on the ground as in this case). The use of the TASER CEW to control Mr. Niedzialek at distance is clearly the safer option in terms of biohazard risk.

Conclusion

In it my opinion to a reasonable degree of medical and scientific certainty that the TASER X2 conducted electrical weapon (CEW) did not directly cause nor did it substantially contribute to the death of Mr. Niedzialek.

I reserve the right to modify my report and opinion based on additional information.

My opinion is not intended to usurp the province of the jury.

<u>Qualifications</u>

I have an M.D. from Duke University and completed my residency in emergency medicine at the Harbor-UCLA program in Torrance, CA. I am a diplomate of the American Board of Emergency Medicine (ABEM) and licensed to practice medicine in California and Indiana. I am currently the medical director for an urgent care site in Camarillo, CA after spending >20 years in emergency medicine in an academic and community setting. I am a consultant to Axon Enterprise, Inc (formerly TASER International). I have been researching conducted electrical weapons since 2006 in my role as a consultant and have dozens of peer-reviewed journal articles in the field, as well as a book chapter, and am one of the editors of a book in the field. My education background includes graduate studies in computer science at Stevens Institute of Technology and the University of California, San Diego. I have a B.S. in electrical engineering from Cornell University.

Prior Expert Testimony

My prior testimony is in: Lakisha-Neil Lorax v Las Vegas Metropolitan Police Department, TASER International, et al, Las Vegas, NV; People v Engman, Rancho Cucamonga, CA; Budd Lee v Metro Government of Nashville, TASER International, et al, Nashville, TN; Kenneth Fletcher v Deputy Van Dyne, et al, Muskingum County, OH; Paul Burke v City of Santa Monica, et al, Santa Monica, CA; People v Krist Wiggins, Fontana, CA; Coronial Inquest, Galeano, NSW, Australia; Batchan v City of Vernon, et al, Los Angeles, CA; Sattilaro v Lindemeyer and Gregg, Virginia Beach, VA; State oIndiana v Christopher Duncan, Logansport, IN; People v Clifford Albert Scott, Jr, San Luis Obipso, CA; Preston v Boyer, Seattle, WA.



Donald M Dawes, MD.                                          1/28/21

CONFIDENTIAL DOCUMENT                                    COR 02986

# EXHIBIT L

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS  )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED,             )
                                  )
            PLAINTIFF,            )
                                  )
      VS.                         ) CASE NO. 5:19-CV-02083-JGB
                                  )
RIVERSIDE COUNTY, RIVERSIDE       )
SHERIFF'S DEPARTMENT,             )
SHERIFF-CORONER CHAD BIANCO AND   )
DOES 1-10,                        )
                                  )
            DEFENDANTS.           )
_____)


VIDEO CONFERENCE DEPOSITION OF JEFFREY NOBLE

TAKEN ON

MONDAY, APRIL 5, 2021


MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4                                      )
   TRACY ALVES, INDIVIDUALLY AND AS    )
5  SUCCESSOR IN INTEREST FOR KEVIN R.  )
   NIEDZIALEK, DECEASED,               )
6                                      )
                  PLAINTIFF,           )
7                                      )
       VS.                             ) CASE NO. 5:19-CV-02083
8                                      )            JGB
   RIVERSIDE COUNTY, RIVERSIDE         )
9  SHERIFF'S DEPARTMENT,               )
   SHERIFF-CORONER CHAD BIANCO AND     )
10 DOES 1-10,                          )
                                       )
11                DEFENDANTS.          )
   _____)

12

13

14

15

16          VIDEO CONFERENCE DEPOSITION OF JEFFREY NOBLE,

17 taken on behalf of the Defendants, utilizing ZOOM Cloud

18 platform to host all participants from their respective

19 locations, commencing at 9:57 A.M., Monday, April 5, 2021,

20 before Melinda S. Womelsdorf, Certified Shorthand Reporter,

21 License No. 13124, for the State of California, pursuant to

22 Notice.

23

24

25

                                                        2

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS
     SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:
 4
         THE LAW OFFICES OF JOHN BURTON
 5       BY:  KENNEDY HELM, ESQ.
              JOHN BURTON, ESQ.
 6       128 North Fair Oaks Avenue
         Pasadena, California 91103
 7       (626) 449-8300
         jb@johnburtonlaw.com
 8       (Appearing via ZOOM Video Conference)

 9   For the Defendants, COUNTY OF RIVERSIDE:

10       MANNING & KASS
         ELLROD, RAMIREZ, TRESTER, LLP
11       BY:  TONY M. SAIN, ESQ.
         801 S. Figueroa Street
12       15th Floor
         Los Angeles, California 90017
13       (213) 624-6900
         tms@manningllp.com
14       (Appearing via ZOOM Video Conference)

15

16

17

18

19

20

21

22

23

24

25
                                                          3
```

```
 1                      I N D E X

 2  WITNESS

 3  JEFFREY NOBLE
                                             PAGE
 4
          Examination by Mr. Sain              5
 5

 6

 7                    E X H I B I T S

 8

 9  NUMBER              DESCRIPTION          PAGE

10   1 - Notice of Deposition Plaintiff's      5
         Expert Jeffrey Noble
11
     2 - Plaintiff Tracy Alves' Designation of 7
12       Expert Witnesses Pursuant to
         Fed.R.CIV.P.26(a)(2)
13
     3 - Expert Report of Jeffrey Noble        8
14       Report

15   4 - Curriculum Vitae of Jeffrey Noble     9

16

17

18

19

20

21

22

23

24

25
                                                 4
```

1              SAN BERNARDINO, CALIFORNIA

2              MONDAY, APRIL 5, 2021

3                  AT 9:57 A.M.

4

5              JEFFREY NOBLE,

6         Having been first duly sworn, was

7         examined and testified as follows:

8

9                  EXAMINATION

10

11   BY MR. SAIN:

12       Q    Good morning, sir.  Would you state your full

13   name for the record?

14       A    Jeff Noble.

15       Q    As a preliminary matter, I'll be attaching as

16   Exhibit 1 to this deposition the Deposition Notice and

17   Request for Production.

18            If we could show that briefly to the witness.

19            (Exhibit 1 was marked for identification

20            by the Certified Shorthand Reporter and

21            a copy is attached hereto.)

22       MR. SAIN:  And if we could scroll down a few more

23   pages, please.

24   BY MR. SAIN:

25       Q    Chief Noble, have you seen this document

                                                        5

1   records, documents, recordings, and evidence that we

2   just identified on the record and based on your

3   background, training, education, and experience, you

4   formed certain opinions in this case pertaining to

5   police practices; is that true?

6       A    Yes.

7       Q    And how many opinions have you formed

8   pertaining to police practices in this case?

9       A    I think there's three broad opinions.

10      Q    Okay.  At this time, I would ask that you

11  please state for the record all the opinions that you

12  formed in connection with this case.

13      A    So my initial opinion is that the initial use

14  of force and the two Taser applications and handcuffing

15  of Mr. Niedzialek by Deputies Gomez and Keeney was

16  consistent with generally accepted police practices and

17  objectively reasonable.

18          My second opinion is that the use of force by

19  Deputies Gomez and Keeney by holding Mr. Niedzialek in a

20  prone position after he had been handcuffed was

21  inconsistent with generally accepted police practices,

22  objectively unreasonable, and disregarded the known risk

23  to Mr. Niedzialek's health, safety, and welfare.

24          And my third broad opinion is that the

25  Riverside Sheriff's Department had a policy, practice,

                                                        48

1    Q    Okay.  So would it be fair to say that, in

2    terms of your views of the incident events in this case,

3    that all of the uses of force up to the time that the

4    handcuffs are finally secured on Mr. Niedzialek -- that

5    all of them were consistent with generally accepted

6    practices -- police practices for the use of force?

7    A    Yes.

8    Q    In terms of Mr. Niedzialek's fast advances

9    toward the deputies both before the first Taser

10   discharge and before the second, would you agree that

11   those constituted charging behavior?  Like charges?

12   A    I -- I -- certainly, the first one, I think

13   that that's a fair terminology.  I mean, he -- he

14   suddenly ran toward them, stopped short, and confronted

15   them, yes.

16   Q    Okay.  In your report, you begin your opinions

17   at page 10; is that correct?

18   A    Yes.

19   Q    So you have a fact summary that begins at 9,

20   and then at page 10, beginning at paragraph 20, your

21   report begin, and they continue through the remainder of

22   the document; is that correct?

23   A    Yes.

24   Q    Would it be accurate to say that none of

25   your -- your opinions in this case have anything to do

87

1    with what caused Mr. Niedzialek to die?

2         A    Well, no.  I'm not a medical expert.  I can't

3    tell what his cause of death was.

4         Q    Fair enough.

5              So, for example, if someone were to ask you

6    whether or not it was the deputy restraint or

7    positioning that caused his death, that is a question

8    that you don't have the expertise to answer; is that

9    true?

10        A    I'm sorry.  Can you repeat the question?

11        MR. SAIN:  Can we read that back, please?

12             (The record was read.)

13        THE WITNESS:  Yeah, I don't have the expertise to

14   tell you what medically caused his death.

15   BY MR. SAIN:

16        Q    At page 13 of your report, paragraph 34, you

17   state -- and I will quote -- "The deputies then placed

18   their knees on Mr. Niedzialek's back and pulled at his

19   arms to hold him down and apply handcuffs while

20   Mr. Niedzialek was kicking his feet.  The use of force

21   by the deputies to apply handcuffs to Mr. Niedzialek was

22   consistent with generally accepted practices and

23   objectively reasonable," end of quote.

24             That's your opinion in this case?

25        A    Yes.

                                                        88

 1    don't tell them that having someone in a prone position

 2    restrains their breathing because it doesn't," end

 3    quote.  Correct?

 4          A    Yes.

 5          Q    When you conducted your analysis of this case,

 6    did you evaluate whether or not you had formed any

 7    opinions or did you reach any conclusions as to whether

 8    or not the actions of Deputy Gomez or the actions of

 9    Deputy Keeney had violated the policies or procedures of

10    Riverside County Sheriff's Department?

11          A    Did I evaluate that?

12          Q    Yes, sir.

13          A    No.

14          Q    Okay.  So would it be accurate to say that you

15    have no opinions in this case as to whether or not the

16    acts or omissions of either Deputy Keeney or Deputy

17    Gomez violated any policies or procedures of the

18    Riverside County Sheriff's Department?  Is that

19    accurate?

20          A    Well, I'd have to look at -- I don't currently

21    have any opinions, no.  I'd have to look at their

22    policy.

23          Q    Thank you.

24               Based on your review of the evidence in this

25    case, were you able to determine where -- specifically

                                                              97

1    don't know.

2    BY MR. SAIN:

3        Q    I'm not asking about your medical expertise,

4    Chief Noble.

5             I'm asking if, in terms of the police

6    community, as you describe it, adopting this recovery

7    position policy that you believe is a generally accepted

8    practice, is there a single scientific or medical study

9    that you can identify that the agencies relied upon to

10   determine that this position, prone positioning, causes

11   or contributes to asphyxia?

12       MR. HELM:  Objection --

13       MR. SAIN:  -- is there a single scientific --

14       THE REPORTER:  I'm sorry.  I didn't get the answer

15   or the objection.

16       MR. SAIN:  He said no.

17           Go ahead.

18       MR. HELM:  I said objection.  Exceeds the scope of

19   his expertise as a police practices expert.

20       MR. SAIN:  Can you state your answer again, please?

21       THE WITNESS:  No.

22   BY MR. SAIN:

23       Q    Thank you.

24           Chief Noble, I've asked you a number of

25   questions, and I think you've been very forthright with

                                                        105

```
 1  State of California   )
                          )  SS.
 2  County of_____)

 3

 4          I, Jeffrey Noble, say I have read the

 5  foregoing video conference deposition and declare under

 6  penalty of perjury that my answers as indicated are true

 7  and correct.

 8

 9

10  _____
           (DATE)
11

12

13

14                              _____
                                        (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25
                                                         109
```

1  State of California     )
                           )  SS.
2  County of San Bernardino)

3

4            I, MELINDA WOMELSDORF, Certified Shorthand

5  Reporter, License No. 13124, for the State of

6  California, do hereby certify:

7            That, prior to being examined, the witness

8  named in the foregoing video conference deposition, to

9  wit, Jeffrey Noble, was by me duly sworn to testify the

10 truth, the whole truth and nothing but the truth;

11           That said video conference deposition was

12 taken down by me in shorthand at the time and place

13 therein named and thereafter reduced to computer-aided

14 transcription under my direction;

15           That the foregoing transcript, as typed, is

16 a true record of the said proceedings.

17           I further certify that I am not interested

18 in the event of the action.

19           Witness my hand this 29th day of April,

20 2021.

21

22

23           MELINDA WOMELSDORF, CSR. NO. 13124

24

25

                                                      110

# EXHIBIT M



January 29, 2021

Laboratory Number 200382

Reference:            Tracy Alves

Case Name:            Alves v. City of Riverside

Date of Incident:     July 29, 2019

      This report was prepared pursuant to Federal Rule of Civil Procedure 26. Should a party seek my deposition in this matter, I will make myself available as feasible and request that the party coordinate with defense counsel to facilitate such deposition.

## BIOMECHANICAL ANALYSIS

### INTRODUCTION

      On July 29, 2019, an incident involving Deputy Keeney, Deputy Gomez and Mr. Kevin Niedzialek occurred at Sage Canyon Apartments located at 42200 Moraga Rd, Temecula, CA 92591. The purpose of this analysis is to determine the body position of the deputies and Mr. Niedzialek at the time of the incident and restraint and to analyze the pattern of injury.

### BACKGROUND:FACTUAL SUMMARY

*      This summary is provided for convenience and does not necessarily itemize every single fact relied upon by this expert in the formation of my opinions and conclusions in this matter.  It is based on my review of the records and materials identified herein below.  I do not contend to have direct personal knowledge of the incident facts.*

2421 Palm Drive, Signal Hill, CA 90755   Tel: 562-427-VGEL (8435)   Fax: 562-427-8434
www.vglabs.com

CONFIDENTIAL DOCUMENT
COR 03254



Laboratory Number 200382
Page 25

facing the front porch of Unit 22D, there were two trees located in the dirt area on either side of the walkway as seen in Figure 1. The blue chair located in the front porch of Unit 22D had possible blood on it. There was a pool of possible blood at the base of the tree where Mr. Niedzialek came to rest after the incident.



Figure 1

It was reported that Deputy Keeney is 6 feet 1 inches tall and weighs approximately 180 pounds. Deputy Gomez is 5 feet 2.5 inches tall and weighs approximately 135 pounds.

The incident reconstruction animation timeline (Exhibit A) of the incident was reviewed. It consisted of the body-worn camera recording of Deputy Gomez and a witness recording.

CONFIDENTIAL DOCUMENT

COR 03278



- At 9:50.333, Deputy Keeney took his right leg off the left upper arm of Mr. Niedzialek and was sitting on his feet. His right hand was holding Mr. Niedzialek's arms and left hand was on Mr. Niedzialek's left upper shoulder.

- Deputy Gomez asked Mr. Niedzialek his name at 10:28.467 and he moved his head at 10:32.433.

- At 11:59.033, Deputy Keeney checked on Mr. Niedzialek's breathing and took his left hand off the left upper shoulder of Mr. Niedzialek.

- At 12:11.667, Deputies rolled Mr. Niedzialek onto his back and Deputy Gomez checked his pulse at 12:15.833.

- The paramedics arrived at 14:15.500 and Deputy Keeney started chest compressions at 14:53.967.

### *Research, Analysis and Conclusions*

1.  Witness statements, testimonies and physical evidence indicate that Mr. Niedzialek caused the disarray inside Unit 27A, pounded on the tree, and exhibited erratic behavior. Based on the body-worn camera recording, testimonies, witness statements and the submitted evidence, Mr. Niedzialek was charging and facing Deputy Keeney when he was TASER-ed. The distance between Deputy Keeney and Mr. Niedzialek was approximately 3 feet when he was TASER-ed.

2.  Post handcuffing, Mr. Niedzialek's head was to his left side with his right cheek touching the ground and he was able to move his head during and after the handcuffs were placed.

3.  After placing the handcuffs, Deputy Gomez and Deputy Keeney immediately changed positions and took their knees off Mr. Niedzialek's torso.



lateral torso while handcuffing him. Immediately after the handcuffs were placed, Deputy Keeney changed his position and removed his knee off the left torso and put it on the left upper shoulder for approximately 1 minute and 30 seconds. Deputy Keeney was crouched or squatting on toes near full flexion at this time. The mean force transferred to Mr. Niedzialek's left upper shoulder during a squat is approximately 0.39 times body weight and is approximately 70 lb [2]. <u>The force on the back was so minimal during this time that Mr. Niedzialek was able to roll to his left and his chest was exposed</u>. After that, Deputy Keeney lifted his knee off the left upper shoulder and hovered over the left upper arm at which point there was almost negligible downward force exerted on Mr. Niedzialek's back.

b.  At no point in time did Deputy Gomez place both knees on Mr. Niedzialek's torso. Review of the testimonial evidence indicated that Deputy Gomez hovered her right knee over Mr. Niedzialek's shoulder blade while trying to retrieve the handcuffs for approximately 30 seconds.

3.  Research studies indicated no significant differences in the cardiac output in the prone maximal restraint position (PMRP) with 50 lb and 100 lb of weight added to the back compared to prone and supine positioning [3].

a.  During a prone maximal restraint position, the subjects are placed in the prone position with arms handcuffed and ankles bound. The knees are then flexed and the ankles are secured to the handcuffs. Mr. Niedzialek was restrained in a prone position and the body-worn camera recording shows that he was <u>not</u> in a prone maximal restraint position. In other words, his hips, knees and ankles were not secured and they were instead free to move. Mr. Niedzialek was seen kicking,



bucking, and flailing his legs while the deputies were trying to restrain him. The restraint during the subject incident is less restrictive than the research study: and the research study found no terminal effects.

b. In the above study, 100 lb of weight was added to the subject's back for three minutes and no significant differences in the cardiac output were noted in the restraint subjects. Based on the testimonial evidence, body camera recording and the research data, the maximum force transmitted to Mr. Niedzialek's back during post handcuff restraint is significantly less than 100 lb.

4. Post handcuff restraint, several visible breaths were identified on the incident reconstruction animation timeline. The breaths are identified by the displacement of the torso.

5. Based on the review of the evidence and research, the weight transmitted to the back of Mr. Niedzialek during the prone restraint is well within the risk level of injury potential and does not support a risk of restraint asphyxia.

**Exhibits-Attachments**

I participated in the creation of an incident reconstructive timeline in consultation with a forensic incident reconstruction expert, a forensic pathology expert, and a medical doctor with expertise in asphyxia studies. I have reviewed that timeline demonstrative and it accurately reflects the incident evidence that I have reviewed, as well as accurately illustrating the opinions I have formed in this case. I reserve the right to reference it at trial and incorporate it here by reference.

COR 03286



Laboratory Number 200382
Page 34

### References

1. Kroll et al., Applied force during prone restraint, Is officer weight a factor? Am J Forensic Med Pathol • Volume 40, Number 1, March 2019

2. Pollard et al., Forces and Moments on the Knee During Kneeling and Squatting, Journal of Applied Biomechanics, 2011, 27, 233-241.

3. Savaser et al., The effect of the prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures, J Forensic Leg Med, 2013 Nov; 20(8):991-5.

Respectfully submitted,

Swathi Kode

Swathi Kode, Ph.D.
Biomechanical Engineer

Reviewed by:

Paul Guthorn

Paul S. Guthorn, MSME
Professional Mechanical Engineer – M28649
Professional Metallurgical Engineer – MT1845

# EXHIBIT N



SHERIFF-CORONER
# Riverside County Sheriff's Department ADMINISTRATOR
## *Chad Bianco, Sheriff-Coroner-Public Administrator*

2020 JAN -2  AM 10: 54

### Coroner-Public Administrator
800 South Redlands Avenue • Perris • California • 92570
www.riversidesheriff.org

Mark A. Fajardo, M.D.
Chief Forensic Pathologist

## AUTOPSY PROTOCOL

**NAME OF DECEDENT:**  NIEDZIALEK, KEVIN    **FILE NUMBER:**  2019-09235

**FINAL DIAGNOSES:**

I.  Decedent status post death in hospital with cardiorespiratory arrest while being taken into custody including the deployment of an electroconductive device and reports of the decedent being positive for methamphetamine.

    A.  Decedent status post harvesting procedure including heart, lungs, liver and kidneys.

    B.  Multiple scattered cutaneous injuries including laceration to the head; no skull fractures or intracranial trauma appreciated.

    C.  Extensively softened and swollen brain consistent with "respirator brain"; presumptive anoxic insult.

II.  Please refer to formal toxicology report.



EXHIBIT 3
Deponent Fajardo, M
Date 8-21-20 Rptr. 13124
WWW.DEPOBOOKPRODUCTS.COM

**CAUSE OF DEATH:**   ACUTE METHAMPHETAMINE TOXICITY

**OTHER SIGNIFICANT CONDITION:**  APPLICATION OF RESTRAINT MANEUVERS

"I hereby certify that I, Mark A. Fajardo, M.D., Chief Forensic Pathologist, have performed an autopsy on the body of Kevin Niedzialek, on the 6th day of August 2019, commencing at 9:15 a.m., in the mortuary of the Office of the Riverside County Sheriff-Coroner."

**External Examination:** (Body worn camera footage was reviewed on August 2nd, at 1100 hours, at the Perris Forensic Center.  The organ harvesting procedure witnessed by myself including Deputy Coroner Wendy Shurick, Forensic Technician Frank Almendariz, and lead investigator Robert Navarrete from RSO-CHU which commenced at 1800 hours at Inland Valley Medical Center.)

Law Enforcement Use Only
Not for Public Release

CONFIDENTIAL DOCUMENT

NIEDZIALEK, KEVIN/2019-09235 (2)

The body is received in a sealed body bag bearing the seal number 053214 which is subsequently broken at 9:15 a.m. Upon opening the body bag, the body is found to be that of a well-developed, well-nourished, Caucasian appearing male, measuring 74" in length and weighing 161 pounds (decedent is status post an organ harvesting procedure). The subject's general appearance is consistent with the stated age. The decedent is unclothed. The body has been refrigerated and is cool to the touch. Rigor mortis is 2+ in the jaws, neck, and upper and lower extremities. Livor mortis is present in a posterior dependent distribution, with relative sparing of the weight-bearing areas, and does not blanch to palpation. The body is unembalmed. The decedent is identified by a Coroner's tag affixed to the right great toe bearing the decedent's name.

The subject is normocephalic. There are injuries to the head to be described further below. The scalp hair is normally distributed, dark brown, measuring up to 1" in length. There is facial hair in a normal distribution measuring up to 1/4" in length. The facial features appear symmetrical and normally formed. The corneae are clear. The irides are blue. The pupils are round and regular measuring 0.4 cm bilaterally. The conjunctivae are pink and moist and there are no conjunctival petechial hemorrhages. There is no scleral icterus. Arcus senilis is not seen. The nose is normally formed and has an intact bony and cartilaginous structure. The nostrils are patent and are free of hemorrhage or discharge. The ears are symmetrical and show no hemorrhage or discharge. The teeth are natural and are in a good state of repair. The oral mucus membranes are pink and moist and show no evidence of trauma of petechial hemorrhage. No foreign material or blood is present in the mouth. The neck is symmetrical, normally formed and atraumatic. There is no palpable crepitance or hypermobility of the neck.

The chest is symmetrical and normally formed. There are scattered contusions to be described further below. No palpable crepitance or bony deformity is present over the chest wall with the exception of medical intervention. The abdomen is relatively flat. There are contusions to the right lateral abdominal region to be described further below. No masses are palpated. The external genitalia are those of a normally developed apparently circumcised adult male. Both testicles are present within the scrotal sac. The pubic hair pattern is normal. The anus is closed and atraumatic.

The upper extremities are symmetrical, normally formed and involved with traumatic injuries to be described further below. Multiple needle marks are appreciated consistent with medical intervention to be described further below. Upon receipt of the body the hands are not enclosed in paper or plastic bags. Examination of the fingernails reveal them to be thin and translucent and are neatly trimmed and closely kept.

The lower extremities are symmetrical, normally formed, and involved with traumatic injuries to be described further below. The toenails are slightly thickened but otherwise neatly trimmed and closely kept. The soles of the feet are moderately calloused.

Law Enforcement Use Only
Not for Public Release

CONFIDENTIAL DOCUMENT

COR 000569

NIEDZIALEK, KEVIN/2019-09235 (3)

The posterior trunk shows a normal symmetrical external contour. There are injuries to be described further below.

**SCARS AND DISTINGUISHING MARKS:**   There is a large scar overlying the right clavicle measuring up to 8" in rough dimension.

**EVIDENCE OF THERAPEUTIC INTERVENTION:** An endotracheal tube is present within the oropharynx. A Foley catheter is present within the urethra. A blood pressure cuff is present around the right biceps area. A fecal collection device is noted. There is a central line noted to the right inguinal region. There is an IV site present to the right mid forearm, the right lower forearm, and the left biceps region. As previously stated the decedent is status post an organ harvesting procedure with a large midline incision extending from the base of the neck to the pubic symphysis.

**EVIDENCE OF EXTERNAL TRAUMA:** Present immediately adjacent to the lateral aspects of the right eyebrow region is a somewhat vertically oriented laceration measuring up to 1 1/4" in dimension. It extends into the underlying soft tissues but does not penetrate through them. There is no associated skull fracture. Present to the mid upper forehead region is a grouping of superficial lacerations numbering approximately three, individually measuring from 1/4" to 3/4" in dimension. These primarily involve the epidermis. Present to the right pectoral region is a contusion measuring 1/4" with a larger area located inferior and medial measuring 1 1/4" in dimension. Present to the extensor aspect and medial measuring 1 1/4" in dimension. Present to the extensor aspects of the right hand including the metacarpals and proximal and distal interphalangeal joints of primarily the second, third and fourth digits are multiple abrasions numbering approximately six, individually measuring from 1/4" to 3/4". There is a larger contusion noted to the base of the thumb measuring 1" x 2" in dimension. There is a paired linear pressure-type abrasion located to the flexor right wrist measuring 1 1/2" in dimension most consistent with the application of a restraining device (handcuffs). There is a laceration noted to the base of the thumb involving the thenar prominence measuring 1/2" primarily involving the epidermis. Present to the right lateral torso in the mid axillary line is a horizontally oriented contusion measuring 1" vertically by 4" horizontally. There is contusion noted overlying the right kneecap area measuring 1 1/4" in dimension. There are multiple scattered abrasions noted to the metatarsals and prominent aspects of the great toe and second and third toes with the abrasions numbering approximately six, ranging in size from 1/4" to 1" in dimension. Present to the left upper chest region is a pair of contusions individually measuring 3/4". There is a larger contusion located superior and lateral to the left nipple area measuring 1 1/2" x 2 1/2" in dimension.   There is scattered contusions located inferior and medial numbering approximately three, individually measuring from 1/2" to 3/4". There are scattered contusions numbering approximately four involving the left elbow ranging in size from 1/2" to 3/4". There is a larger scrape-like abrasion involving the extensor aspects of the left forearm measuring 3/8" in width by up to 2 1/2" in length. There is a single abrasion noted to the extensor aspects of the left wrist measuring 1/2" with an abraded contusion noted to the ulnar extensor aspects of the left wrist area

Law Enforcement Use Only
Not for Public Release

NIEDZIALEK, KEVIN/2019-09235 (4)

measuring 1 1/2" in greatest dimension. A larger contusion is noted to the radial aspect of the left wrist measuring 1 x 1 1/2" in dimension. A larger contusion is noted to the left kneecap measuring 1 1/2" in dimension with smaller contusions located inferior individually measuring 3/4" and numbering two. Scattered multiple abrasions, numbering approximately ten, are noted on the prominent features of the left foot including the toes and forefoot ranging in size from 1/4" to 1" in dimension. Present to the left upper buttocks region is an obliquely oriented linear abrasion measuring 2". Two smaller contusions are noted to the right upper buttocks area individually measuring from 1/4" to 3/4".

**EVIDENCE OF INTERNAL TRAUMA:** The posterior neck region is explored including exposure of the musculature overlying the scapular regions bilaterally and no trauma is identified. Upon reflection of the scalp, minimal subgaleal hemorrhage is appreciated involving the anterior right temporalis muscle for distances up to approximately 3 cm corresponding to the aforementioned laceration to the right lateral orbital soft tissues. Similarly, there are two to three minimal contusions noted to the mid forehead region measuring in size from 0.5 to 1.5 cm corresponding to the aforementioned minimal lacerations to the forehead area. No other evidence of internal trauma is appreciated.

<u>**Internal Examination:**</u>

**OPENING INCISION AND BODY CAVITIES:** The standard Y-shaped thoracoabdominal incision reveals a subcutaneous fat thickness of 1/4" at midabdominal level. The pleural, pericardial, and peritoneal cavities are smooth and shiny and reveal approximately 100 cc of serous fluid within the residual cavity. The internal organs, including the heart, lungs, liver and kidneys have been previously harvested.

**NECK ORGANS:** The hyoid bone and laryngeal cartilages are intact and normally formed. No fractures are identified. There is no evidence of hemorrhage in the strap muscles or soft tissues of the neck. The carotid sheaths and anterior cervical spine are without obvious abnormalities.

**CARDIOVASCULAR SYSTEM:** The heart has been harvested.

**RESPIRATORY SYSTEM:** The lungs have been harvested.

**GASTROINTESTINAL SYSTEM:** The esophagus is normally formed, patent and shows a smooth, pink-tan mucosa. The stomach is normally formed. It contains 50 cc of dark green liquid gastric contents with no readily identifiable particulate food matter or pill residue appreciated. No ethanol-like odor is noted. The gastric mucosa is pink-tan and shows a typical rugal pattern. No localized erosion, ulceration, or mass lesion is evident. The duodenum, small intestine, appendix, and colon are grossly normal.

Law Enforcement Use Only
Not for Public Release

NIEDZIALEK, KEVIN/2019-09235 (5)

**PANCREAS:** The pancreas is normal in size and configuration. Sectioning reveals a uniform, tan, lobulated parenchyma.

**HEPATOBILIARY SYSTEM:** The liver has been harvested.

**GENITOURINARY SYSTEM:** The kidneys have been harvested. The bladder is devoid of urine with a urine sample obtained from the Foley catheter bag. The bladder mucosa is smooth, light pink-tan. The prostate and testes are unremarkable to inspection and palpation.

**LYMPHORETICULAR SYSTEM:** The spleen weighs 130 grams. It is normally formed. The capsule is thin, smooth, and shiny. The cut surface is firm, red-purple and shows a typical follicular pattern without evidence of fibrosis or neoplasia. The thymus is atrophic. Lymph nodes throughout the body are small and inconspicuous.

**ENDOCRINE SYSTEM:** The thyroid is symmetrical and normally formed. Sectioning reveals a uniform, firm, red-brown, colloid parenchyma. The adrenals have been harvested with the kidneys. The pituitary is grossly unremarkable.

**SKELETAL SYSTEM:** There is no gross evidence of skeletal fracture or deformity.

**HEAD:** Reflection of the scalp confirms the subgaleal hemorrhage as previously described. The skull is intact and normal in thickness. The dura is smooth and shiny. There is no dural neomembrane or sinus thrombosis. No subdural hemorrhage is present. Removal of the dura reveals no evidence of skull fracture.

The brain weighs 1630 grams. The leptomeninges are thin and transparent. There is minimal subarachnoid hemorrhage at the base of the brain structures. The superficial blood vessels are fine and patent. The vessels at the base of the brain are free of atherosclerosis. The circle of Willis appears normally formed but is distorted upon extraction of the brain. The cranial nerves are intact. The dorsal surface of the brain presents a symmetrical appearance with a normal convolutional pattern although there is marked flattening of the gyri and narrowing of the sulci secondary to generalized cerebral edema. There is no evidence of subfalcial herniation. The base of the brain does show uncal and tonsillar herniation and there is extensive artifact introduced secondary to extraction of the brain which is markedly softened secondary to "respirator brain". The brainstem and cerebellum show the usual external configuration. There is no localized external softening or contusion of the brain although the brain is markedly softened in general as a result of the presumed anoxic insult. The brain is submitted for formal neuropathologic consultation.

**ASSISTANTS:** Staci Rzepka.

**SPECIMENS FOR PATHOLOGY:** Representative sections of the residual organs are retained.

Law Enforcement Use Only
Not for Public Release

COR 000572

NIEDZIALEK, KEVIN/2019-09235 (6)

**SPECIMENS FOR TOXICOLOGY:** Vitreous, gastric, and urine from Foley catheter bag.

**POSTMORTEM RADIOGRAPHS:** Postmortem radiographs are obtained.

**PHOTOGRAPHS:** Photographs are by Ashley Scott from RSO Forensics.

**DIAGRAMS:** Diagrams are by Dr. Fajardo.

**POLICE WITNESSES:** Ted Gonzales from RSO-CHU, Ryan Deanne from RSO-CHU, and Ashley Scott from RSO Forensics'.

**MICROSCOPIC DESCRIPTION:** Microscopic examination is deferred.


_Mark A. Fajardo, M.D._
Mark A. Fajardo, M.D.
Chief Forensic Pathologist

12/27/19
Date

MAF/cm
MAF 12/27/2019

Law Enforcement Use Only,
Not for Public Release

CONFIDENTIAL DOCUMENT                    COR 000573

# EXHIBIT O

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4  TRACY ALVES, AN INDIVIDUAL   ) CASE NO.: 19-CV-02083-JGB
    AND AS SUCCESSOR IN INTEREST )                 (SHKx)
 5  FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
 6                               )
                                 )
 7                  PLAINTIFF,)
                                 )
 8       VS.                     )
                                 )
 9  RIVERSIDE COUNTY, RIVERSIDE  )
    SHERIFF'S DEPARTMENT,        )
10  SHERIFF-CORONER CHAD BIANCO, )
    DEPUTY SONIA GOMEZ, DEPUTY   )
11  BRIAN KEENEY, AND DOES 3-10, )
                                 )
12                  DEFENDANTS.)
    _____)
13

14

15          DEPOSITION OF THEODORE CHAN, M.D.

16               FRIDAY, APRIL 23, 2021

17

18

19

20

21  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
22  REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
    1244 West Edgewood Circle
23  Coeur d'Alene, Idaho 83815
    (661) 775-8299
24

25  FILE NO. 21268
```
                                                        1

1    DEPOSITION OF THEODORE CHAN, M.D., A

2    WITNESS, TAKEN ON BEHALF OF PLAINTIFF,

3    VIA VIDEOCONFERENCE, COMMENCING AT

4    10:00 A.M., ON FRIDAY, APRIL 23, 2021,

5    BEFORE ROSA I. GUZMAN, CSR NO. 12024,

6    PURSUANT TO NOTICE OF TAKING DEPOSITION.

7                          * * *

8  APPEARANCES OF COUNSEL:

9  FOR PLAINTIFF:    HELM LAW OFFICE, PC
                     BY:  T. KENNEDY HELM, IV, ESQ.
10                   644 40TH STREET
                     SUITE 305
11                   OAKLAND, CALIFORNIA 94609
                     (510) 350-7517
12

13  FOR DEFENDANTS:   MANNING & KASS
                      ELLROD, RAMIREZ, TRESTER, LLP
14                    BY:  TONY M. SAIN, ESQ.
                      801 SOUTH FIGUEROA STREET
15                    15TH FLOOR
                      LOS ANGELES, CALIFORNIA 90017
16                    (213) 624-6900

17

18

19

20

21

22

23

24

25
                                                    2

**Ron Fernicola & Associates**

```
1                        I N D E X

2   WITNESS              EXAMINATION              PAGE

3   THEODORE CHAN, M.D.   BY MR. HELM               4

4                        BY MR. SAIN               86

5

6

7                     E X H I B I T S

8                     (None offered.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                                  3
```

**Ron Fernicola & Associates**

1
2                    THEODORE CHAN, M.D.,
3    a witness herein, having first been duly administered
4    the oath, deposed and testified as follows:
5
6                         EXAMINATION
7    BY MR. HELM:
8        Q    Good morning, Dr. Chan.
9        A    Good morning.
10       Q    Maybe you could lean in a little bit because
11   you are kind of back --
12       A    Yes, sorry.  My wife and I share our home
13   office, and she teaches.  She's in class four days but
14   not Friday.  So I'm in my daughter's bedroom -- so my
15   daughter's bedroom slash my office.  So I apologize.
16       Q    No worries.  I can see you now.
17            So how many times have you been deposed before?
18   This is not your first rodeo; right?
19       A    No.
20       Q    How many times have you been deposed?
21       A    Probably 20 to 30 times.
22       Q    Okay.  So are you comfortable forgoing the
23   standard admonition?
24       A    Yes.
25       Q    Great.  Okay.  And have you been retained

                                                    4

1      don't want to misquote you.

2            So your opinion is that "Mr. Niedzialek's death

3      was not caused or contributed to by positional restraint

4      or compression asphyxia as a result of the manner in

5      which he was restrained by law enforcement officers"?

6      Is that your opinion in this case?

7         A    That is, yes.  That's one of my opinions.  I

8      think in the letter I also touch on whether or not the

9      conducted energy device, or conducted energy weapon,

10     played any role in his death, in his cardiac arrest.

11        Q    And with respect to the tasing, you understand

12     he was tased twice; right?

13        A    Yes.

14        Q    And that was after he had been running around

15     and had suffered a wound to his head.

16             You understand that; right?

17        A    Yes.

18        Q    And so would you expect that, to some degree,

19     those tasings would've elevated his need for oxygen?

20             MR. SAIN:  Vague as to time.  Argumentative.

21     Incomplete hypothetical as phrased.  Calls for

22     speculation.

23             THE WITNESS:  Well, what do you mean by

24     "elevated his need for oxygen"?

25        Q    BY MR. HELM:  What don't you understand about

                                                              8

**Ron Fernicola & Associates**

1    Argumentative.

2          THE WITNESS:  What do you mean by "maximal

3    ventilatory capacity"?

4      Q    BY MR. HELM:  To improve his ability to

5    breathe.

6          MR. SAIN:  Same objections.

7          THE WITNESS:  I think -- I mean, when I look at

8    the video, there's no decrement in his ability to

9    ventilate, and that's borne out by some of the

10   subsequent medical records and that he was probably

11   struggling to try to get out of the restraint.

12     Q    BY MR. HELM:  So you think he was struggling to

13   get out of the restraint and not to get in a position on

14   his side to breathe better; is that right?

15     A    Yes.

16     Q    You are familiar with the term "recovery

17   position," aren't you?

18     A    Yes.

19     Q    And that's either on your side or sitting up?

20     A    Well, that's been described, but the term

21   "recovery," I don't agree with because, if you look in

22   the literature, that has been reported in restraint on

23   seated, side, supine positions.

24     Q    So you would disagree that the recovery

25   position, either on your side or sitting up, improves

44

**Ron Fernicola & Associates**

1  your ability to breathe?

2      A    Based on our studies that we've done, there's

3  no indication that being prone would impact your ability

4  to breathe or result in hypoxia or asphyxia.  And

5  studies done by others, not just our investigative

6  group.  And in fact, on the epidemiologic studies that

7  have been done, they have not been shown to show that

8  prone restraint puts anyone at greater risk of sudden

9  death.

10     Q    Right.  But those studies are not replicating

11 the conditions of Mr. Niedzialek's incident.  Would you

12 agree?

13          MR. SAIN:  Vague as to the term "those

14 studies."

15          THE WITNESS:  I disagree.

16     Q    BY MR. HELM:  But in your studies, you never

17 have somebody who is high on methamphetamine and that's

18 been tased twice and who is suffering a head wound.

19          MR. SAIN:  Vague as to the term "studies."

20 Which studies?

21          THE WITNESS:  So as I mentioned at the last

22 answer, I was talking about the epidemiologic studies in

23 the latter part of my answer, and those studies clearly

24 included those factors in a number of cases.

25     Q    BY MR. HELM:  Okay.  Did you measure

45

**Ron Fernicola & Associates**

1   And again, this would be, I'm assuming, for Mr. Englert

2   that these are visible breaths.  There may be breathing

3   that he's not able to detect on the video, but yes.

4       Q    BY MR. HELM:  And so that would be a

5   respiratory rate of five; right?

6       A    Yes, based on your calculation.

7       Q    Right.  And so Mr. Englert in his time line

8   states that at 11:13, that's the last visible breath.

9   And would you agree with that?

10          MR. SAIN:  Document speaks for itself.

11          THE WITNESS:  Well, I don't have the video in

12   front of me.  He's clearly reducing the number of

13   visible breaths -- or that he can detect on the video.

14   So there's, I'm assuming, a reduction in that.

15       Q    BY MR. HELM:  So do you recall in the video,

16   the composite video, at about 12:09 -- and this is about

17   four minutes 50 seconds after handcuffing -- that

18   Deputy Gomez removes her hand from his back and you can

19   clearly see the imprint of her hand on his back?  Do you

20   remember that?

21       A    Yes.

22       Q    And Mr. Englert's time line in slide 70 says

23   that the handprint on the back shows that blood is

24   possibly not perfusing.  Would you agree?

25       A    Yes.

53

**Ron Fernicola & Associates**

1    Q    And so in this study, you state, towards the

2    end, quote, "The study did not attempt to duplicate

3    exact field conditions under which restraint-condition

4    deaths have occurred.  Although many such deaths have

5    occurred on gurney mattresses or cushioned car seats in

6    the field, some deaths have occurred while persons were

7    in the restraint position on the ground.  In addition,

8    these individuals may have been subjected to forceful

9    apprehension during which pressure may have been exerted

10   on their backs while they were in the restraint

11   position.  What effects these differences may have

12   remain to be determined."

13         Do those differences still remain to be

14   determined in your view?

15   A    Well, again, this study was done almost 25

16   years ago.  It was the first of its kind, and it really

17   refuted prior work that was the basis upon the idea of

18   positional restraint asphyxia.  So even those authors

19   have said that our study really had changed the thinking

20   on prone restraint.

21         Now, since that, obviously, we've done studies

22   looking at weight force and that sort of thing and

23   understanding the basic physiology.  So I think some of

24   those factors have been discounted now.  You know, we'd

25   have to go over specific ones.

63

1              I would also say that there are other

2      investigative groups that have studied psychological

3      stress of pursuit and struggle, and really, their

4      findings are very much consistent with our findings.  So

5      I think from a science standpoint, you know, we've taken

6      a look at that and not just our group but a lot of other

7      groups.

8          Q    So those studies that involve pursuit that you

9      just mentioned -- do those also have a component like

10     yours where the person is prone and cuffed behind the

11     back?

12         A    Yes.

13         Q    And weight is applied as well?

14         A    I can't recall.  Some of them, I do believe

15     did.  But again, these were other investigators, all

16     very consistent, no demonstration of hypoxia, no

17     demonstration of hypoventilation.

18         Q    And were the subjects of these studies also

19     made to struggle?

20         A    I believe some of them did, yes.  Because there

21     was a pursuit and struggle; right?  One of those studies

22     was specific to that.

23         Q    And which study was that that you are referring

24     to?

25         A    I believe it was done by Schmidt and Snowden.

64

1    Argumentative.  Asked and answered.  Cumulative.

2              THE WITNESS:  Again, not having that article in

3    front of me and understanding the context, I don't

4    really think I could comment on that at this point other

5    than the comments I've already made previously.

6        Q    BY MR. HELM:  And so the epidemiological

7    studies that you rely on -- just tell me that one more

8    time so I can look them up.

9        A    Sure.  I think they are in the letter, but it

10   was Lasoff, Hall, Bozeman, I think.  I can't remember

11   exactly.  There may be one more.  Like I said, there was

12   one name I couldn't remember.

13       Q    Okay.

14       A    I definitely cited at least a couple of them.

15       Q    All right.  And so your opinion in this case is

16   whatever the deputies did had no effect on

17   Mr. Niedzialek in terms of causing cardiac arrest.  Is

18   that accurate?

19       A    That is not accurate.

20       Q    So did they do some things that had an effect

21   on him having a cardiac arrest?

22       A    Again, as written in my letter, I don't think

23   Mr. Niedzialek died because of this notion of positional

24   restraint asphyxia or the way he was restrained caused

25   him to asphyxiate.

                                                        80

```
 1      Q    Right.

 2      A    Now -- go ahead.

 3           MR. SAIN:  Were you done?

 4      Q    BY MR. HELM:  Were you finished?

 5      A    Yes.  Well, let me -- yes.

 6      Q    Right.  So that's an indirect way of saying the

 7  deputies did not cause his cardiac arrest.  Would you

 8  agree?

 9      A    No.  They are two different statements.  Again,

10  let me try to clarify this.  I don't think he died

11  because of positional restraint asphyxia or how the

12  officers restrained him caused him to be unable to

13  breathe and asphyxiate and die from that.

14      Q    Okay.

15      A    Now, in terms of -- yeah, so I think that's

16  what I'm saying.  But I don't think I'm saying what

17  you're saying.  Does that make sense?

18      Q    Well, I mean, so you're saying the prone

19  restraint didn't cause his cardiac arrest; right?

20      A    Right.

21      Q    And --

22      A    The prone restraint didn't cause asphyxia that

23  led to cardiac arrest.

24      Q    Right.  But the prone restraint could've caused

25  the cardiac arrest, could it not?
```

81

**Ron Fernicola & Associates**

1    A    I wouldn't say "cause."  So, you know, I think

2   Mr. Niedzialek -- he's on methamphetamine.  He's

3   agitated.  He's physiologically excited, you know,

4   active, and altered; and any exertion that he has

5   increases his own catecholamines production, which you

6   know, as you know, methamphetamine is a

7   catecholaminergic drug -- all of which could lead to a

8   cardiac arrest -- right? -- not related to prone

9   restraint at all?

10   Q    Right.  But at the same time, you have no

11  opinion on what caused Mr. Niedzialek's death.  Is that

12  accurate?

13   A    Only as what I just testified to and documented

14  in my letter.

15   Q    Right.  And in your letter, the conclusion, as

16  I read before, is "It's my opinion that Mr. Niedzialek's

17  death was not caused or contributed to by positional

18  restraint or compression asphyxia as a result of the

19  manner in which he was restrained by law enforcement

20  officers."

21   A    Correct.

22   Q    That's your opinion in this case?

23   A    Yes.  You know, as I mentioned, there's a --

24  you know, I did comment on the CEW as well.

25   Q    Right.  And so would it be accurate to say then

82

**Ron Fernicola & Associates**

1    that, in your view, the position that Mr. Niedzialek was

2    in -- prone, handcuffed, with both deputies holding him

3    down -- had no interference with his pump-handle action

4    or bucket-handle action?  Is that accurate?

5        A    So what I would say is, you know, a number of

6    things.  So in reviewing the case, it looks like

7    Mr. Niedzialek is breathing.  He's clearly breathing.

8    It's not impacting his ability to breathe at a level

9    that would put him at risk for asphyxiation.  And I

10   think that's borne out sort of on the basic scientific

11   research we've done but also looking at this particular

12   case and the data from Mr. Niedzialek including the

13   videos and the descriptions of the incident and the data

14   that we have in this case, in his case.

15       Q    Right.  So that I understand, then, holding

16   Mr. Niedzialek in that prone position, with his hands

17   cuffed behind his back, did not interfere with the

18   pump-handle action; right?

19           MR. SAIN:  Asked and answered.  Cumulative.

20   We're at the badgering point now.

21           THE WITNESS:  So to answer your question, as

22   we've shown in the study, there are some decreases in

23   pulmonary function volumes, as we discussed, but they're

24   similar to being laying on your back.  And so what I

25   would say is it did not interfere with his breathing to

                                                        83

**Ron Fernicola & Associates**

```
 1                    EXAMINATION
 2  BY MR. SAIN:
 3       Q    Doctor, what's your recollection of how much
 4  time passes from when the last Taser discharge is
 5  applied to Mr. Niedzialek until he is placed into
 6  handcuffs?
 7       A    As I recall, it's about half a minute or maybe
 8  40 seconds.
 9       Q    In any of your experience or medical studies,
10  was there ever any evidence that a Taser discharge would
11  still cause someone to suffer an increased need for
12  oxygen and increased ventilation 35 to 40 seconds after
13  that discharge was over?
14       A    Well, there's no evidence that there would be a
15  need for increased oxygen.  Now, you know, some case
16  studies show people increase their ventilation as a
17  response.
18       Q    More than 30 seconds after the discharge is
19  over?
20       A    I don't recall specific studies, but it was a
21  very short amount of time.
22            MR. SAIN:  Thank you.  No further questions.
23            MR. HELM:  Thank you, Doctor.
24            THE WITNESS:  Okay.  Just one -- we can do this
25  off the record.  Do I send you an invoice or send it
```

86

**Ron Fernicola & Associates**

```
 1   STATE OF CALIFORNIA    )
                            )  SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4           I declare under penalty of perjury under the

 5   laws of the State of California that I have read the

 6   foregoing transcript; I have made any corrections,

 7   additions, or deletions that I was desirous of making in

 8   order to render the within transcript true and correct;

 9   and

10           IN WITNESS WHEREOF, I have hereunto subscribed

11   my name this _____ day of _____, 20____,

12   at _____, California.

13

14           _____

15                   THEODORE CHAN, M.D.

16

17

18

19

20

21

22

23

24

25
                                                            90
```

1  STATE OF CALIFORNIA     )
                           )  SS.
2  COUNTY OF LOS ANGELES   )

3

4          I, ROSA I. GUZMAN, CERTIFIED SHORTHAND

5  REPORTER NO. 12024, DECLARE:

6          THAT PRIOR TO BEING EXAMINED, THE WITNESS

7  NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

8  ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE

9  TRUTH, AND NOTHING BUT THE TRUTH;

10          THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT

11  THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN

12  BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY

13  DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE

14  FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF

15  MY SHORTHAND NOTES SO TAKEN.

16          I FURTHER DECLARE THAT I AM NEITHER COUNSEL

17  FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

18  ANYWISE INTERESTED IN THE OUTCOME THEREOF.

19          I DECLARE UNDER PENALTY OF PERJURY UNDER THE

20  LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

21  TRUE AND CORRECT.

22          IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

23  MY NAME THIS 10TH DAY OF MAY, 2021.

24

25          _____
            ROSA I. GUZMAN, CSR NO. 12024

91

**Ron Fernicola & Associates**

# EXHIBIT P

1  John Burton, State Bar No. 86029
   jb@JohnBurtonLaw.com
2  MATT SAHAK State Bar No. 310624
   ms@johnburtonlaw.com
3  THE LAW OFFICES OF JOHN BURTON
   128 North Fair Oaks Avenue
4  Pasadena, California  91103

5  Telephone:  (626) 449-8300
   Facsimile:  (626) 449-8197
6
7  Attorneys for Plaintiff  Tracy Alves, Individually and as
   Successor in Interest for Kevin R. Niedzialek, Deceased,

8
9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11  TRACY ALVES, Individually and as        Case No.    19-CV-2083
12  Successor in Interest for KEVIN R.
    NIEDZIALEK, deceased,                   DECLARATION OF SUCCESSOR IN
13                                          INTEREST
             Plaintiff,
14                                          [Cal. Civ. Proc. Code § 377.32]
        v.
15
    RIVERSIDE COUNTY, et al.,
16
             Defendants.
17

18

19

20      Tracy Alves declares under penalty of perjury as follows:

21      1.    I am the sister and sole heir of the decedent, Kevin Niedzalek. I am filing

22  this declaration pursuant to Cal. Civ. Code § 377.32 to commence this wrongful

23  death and survival action as the decedent's successor in interest.

24      2.    The decedent died as the result of personal injuries sustained on July 29,

25  2019, during an encounter with Riverside County deputy sheriffs. I believe that the

26  estate has a cause of action based on actions of the deputies that caused his death.

27      3.    No proceeding is now pending in California for administration of the

28  decedent's estate.

- 1 -

1   4.  I am the successor in interest to the decedent pursuant to Cal. Civ. Proc.

2 Code § 377.11. The decedent never married and has no issue. Both our parents are

3 deceased. We have no other siblings. Accordingly, I am his sole heir.

4   5.  No other person has a superior right to commence the action or

5 proceeding or to be substituted for the decedent in the pending action or proceeding.

6   6.  A copy of the certified death certificate is attached hereto as Exhibit A.

7   I declare under penalty of perjury pursuant to the laws of California and the

8 United States that the foregoing is true and correct. Executed October 28, 2019, at

9 Pasadena, California.

Tracy Alves

- 2 -

11/27/2019

**EXHIBIT A**

11/27/2019

Case 5:19-cv-02083-JGB-SHK   Document 59-3   Filed 05/17/21   Page 217 of 322   Page ID
Case 5:19-cv-02083-JGB-SHK   Document   Filed 10/30/19   Page 4 of 4   Page ID #:23
#:780

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF RIVERSIDE
### RIVERSIDE, CALIFORNIA

**CERTIFICATE OF DEATH**

STATE FILE NUMBER: 3052019163976          LOCAL REGISTRATION NUMBER: 3201933010155

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | KEVIN |
| 2. MIDDLE | ROBERT |
| 3. LAST (Family) | NIEDZIALEK |
| 6. DATE OF BIRTH | 07/30/2019 |
| 7. AGE | 34 |
| 8. DATE OF DEATH | 07/30/2019 |
| 4. BIRTH STATE/FOREIGN COUNTRY | PA |
| 11. MARITAL STATUS | NEVER MARRIED |
| 13. EDUCATION | ASSOCIATE |
| 15. DECEDENT'S RACE | CAUCASIAN |
| 17. USUAL OCCUPATION | SUBSTANCE ABUSE COUNSELOR |
| KIND OF BUSINESS | COUNSELING |
| 19. YEARS IN OCCUPATION | 4 |
| RESIDENCE | 32897 MONTE DR |
| CITY | TEMECULA |
| COUNTY | RIVERSIDE | ZIP CODE | 92592 | YEARS IN COUNTY | 7 | STATE | CA |
| INFORMANT'S NAME, RELATIONSHIP | TRACY ALVES, SISTER |
| INFORMANT'S MAILING ADDRESS | 32897 MONTE DR, TEMECULA, CA 92592 |
| SURVIVING SPOUSE—FIRST | (blank) |
| FATHER/PARENT—FIRST | ROBERT | MIDDLE | MICHAEL | LAST | NIEDZIALEK | BIRTH STATE | UNK |
| MOTHER/PARENT—FIRST | MARGARET | MIDDLE | ANN | LAST | BARRON | BIRTH STATE | PA |
| DISPOSITION DATE | 08/14/2019 |
| PLACE OF FINAL DISPOSITION | RESIDENCE OF TRACY ALVES, 32897 MONTE DR, TEMECULA, CA 92592 |
| TYPE OF DISPOSITION | CR/RES |
| SIGNATURE OF EMBALMER | NOT EMBALMED |
| NAME OF FUNERAL ESTABLISHMENT | INLAND MEMORIAL |
| LICENSE NUMBER | FD282 |
| SIGNATURE OF LOCAL REGISTRAR | CAMERON KAISER, MD | DATE | 08/14/2019 |

| Place of Death | |
|---|---|
| 101. PLACE OF DEATH | INLAND VALLEY MEDICAL CENTER |
| 102. IF HOSPITAL, SPECIFY ONE | X ER/OP |
| 103. COUNTY | RIVERSIDE |
| FACILITY ADDRESS | 36485 INLAND VALLEY DRIVE |
| CITY | WILDOMAR |

| Cause of Death | |
|---|---|
| IMMEDIATE CAUSE | PENDING |
| DATE OF DEATH | 2019-08235 |
| WAS CORONER CONTACTED | X YES |
| AUTOPSY PERFORMED | X YES |
| USED IN DETERMINING CAUSE | X YES |

| Coroner's Use | |
|---|---|
| 116. SIGNATURE AND TITLE OF CERTIFIER | |
| MANNER OF DEATH | X Pending Investigation |
| 135. LOCATION OF INJURY | |
| 136. SIGNATURE OF CORONER / DEPUTY CORONER | WENDY M. SHURICK |
| 137. DATE | 08/14/2019 |
| 138. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | WENDY M. SHURICK, DEPUTY CORONER |

STATE REGISTRAR: *01500010042960933*

---

### CERTIFIED COPY OF VITAL RECORD

**STATE OF CALIFORNIA**
**COUNTY OF RIVERSIDE** } SS

This is a true and exact reproduction of the document officially registered and placed on file by the Riverside University Health System, Department of Public Health

DATE ISSUED **Aug 20, 2019**

Dr. Cameron Kaiser, M.D., County Health Officer
RIVERSIDE COUNTY, CALIFORNIA

*001732261*

This copy is not valid unless prepared on an engraved border, displaying the date, seal, and signature of the Registrar.



**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

11/27/2019

# EXHIBIT Q

```
1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4     TRACY ALVES, Individually and    )
      as Successor in Interest for     )
5     KEVIN R. NIEDZIALEK, deceased,   )
                                       )
6                    Plaintiff,        )
                                       )
7           VS.                        )   No.
                                       )   19-CV-2083-JGB-SHK
8     RIVERSIDE COUNTY, RIVERSIDE      )
      SHERIFF'S DEPARTMENT,            )
9     SHERIFF-CORONER CHAD BIANCO,     )
      DEPUTY SONIA GOMEZ, DEPUTY       )
10    BRIAN KEENEY, and DOES 3-10,     )
                                       )
11                   Defendants.       )
      _____)
12

13

14

15

16                    DEPOSITION OF:

17                     CHAD BIANCO

18                    APRIL 27, 2021

19

20

21
      RON FERNICOLA & ASSOCIATES
22    CERTIFIED SHORTHAND REPORTERS
      REPORTED BY:  KELLY R. BATES, CSR 10802
23    1244 Edgewood Circle
      Coeur d'Alene, Idaho 83815
24    (661) 775-8299

25    FILE NO. 21273
                                                           1
```

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    TRACY ALVES, Individually and    )
     as Successor in Interest for     )
5    KEVIN R. NIEDZIALEK, deceased,   )
                                      )
6                    Plaintiff,       )
                                      )
7       VS.                           )  No.
                                      )  19-CV-2083-JGB-SHK
8    RIVERSIDE COUNTY, RIVERSIDE      )
     SHERIFF'S DEPARTMENT,            )
9    SHERIFF-CORONER CHAD BIANCO,     )
     DEPUTY SONIA GOMEZ, DEPUTY       )
10   BRIAN KEENEY, and DOES 3-10,     )
                                      )
11                   Defendants.      )
     _____)

12

13

14

15

16        Deposition of CHAD BIANCO, taken on

17        behalf of the Plaintiff, conducted virtually

18        via Zoom, commencing at 10:00 a.m., April 27,

19        2021, before Kelly R. Bates, CSR 10802,

20        pursuant to Notice.

21

22

23

24

25
                                                          2

1

2                          A P P E A R A N C E S

3

4       FOR THE PLAINTIFF:

5           LAW OFFICES OF JOHN BURTON
            BY:   JOHN BURTON, Esq.
6                 (Present via Zoom)
            128 North Fair Oaks Avenue
7           Pasadena, California  91103
            (626) 449-8300
8
            HELM LAW OFFICE
9           BY:   T. KENNEDY HELM, IV, Esq.
                  (Present via Zoom)
10          644 40th Street
            Suite 305
11          Oakland, California  94609
            (510) 350-7517
12

13

        FOR THE DEFENDANTS:
14
            MANNING & KASS, ELLROD, RAMIREZ, TRESTER
15          BY:   TONY SAIN, Esq.
                  (Present via Zoom)
16                     and
                   GARROS CHAN, Esq.
17                (Present via Zoom)
            801 South Figueroa Street
18          15th Floor
            Los Angeles, California  90017-3012
19          (213) 624-6900

20

        ALSO PRESENT:
21
                Tracy Alves
22

23

24

25
                                                          3

**Ron Fernicola & Associates**

1              CHAD BIANCO,

2         having been first duly sworn, was

3         examined and testified as follows:

4

5              EXAMINATION

6    BY MR. BURTON:

7        Q.   Good morning, Sheriff Bianco.   Thank you for

8    making yourself available.

9        A.   Good morning.

10       Q.   Because we have a two-hour time limit, which I, of

11   course, will honor, I sort of intend to go straight

12   through, you know, unless you need a break or anybody else

13   does, we can take a brief one.

14       A.    I will definitely -- I will pre warn you, I will

15   definitely have to do that because the amount of water I

16   drink per day -- there is no way I can go that long

17   without a break.

18       Q.   Okay.   Why don't we plan on about a -- no more

19   than a 5-minute break.

20       A.    That's fine.

21       Q.   Okay.   We'll work that in.

22            Can you state your full and complete name for the

23   record.

24       A.    Chad Bianco.   I'll spell it.   C-h-a-d B-i-a-n-c-i.

25       Q.   Do you have a middle name?

                                                        5

**Ron Fernicola & Associates**

1     A.   I can't say that I specifically discussed this

2     with Dr. Fajardo.  I don't think I did.  I don't think so.

3     Q.   You obviously appeared at the coroner's review for

4     this case.  I'm thinking that's some time late -- second

5     half at least of 2019 after all the investigations were

6     done.  You said that you could -- you can't recall what

7     actually was said in regard to that incident, but you

8     could testify about how the discussions generally go.

9     Could you do that, please.

10    A.   Yes.  In any case the reviews were presented with

11    a very brief synopsis of the decedent -- age and that type

12    of thing.  We're presented a synopsis of the entire

13    incident from start to finish -- start of law enforcement

14    until finish.  We're presented with the findings of the

15    autopsy and the findings of toxicology.  If there's any

16    discussion about any of those topics, then that would take

17    place at that time too.

18    Q.   Do you have any independent recollection, as you

19    sit here today, of any of that discussion in regards to

20    the Niedzialek case?

21    A.   No.

22    Q.   The manner of death was given as homicide;

23    correct?

24    A.   I believe at the time this was completed it was --

25    it would have been considered a homicide.

                                                          38

**Ron Fernicola & Associates**

1    Q.   That was a decision that you made; correct?

2    A.   It was a decision that was -- that was a

3    conclusion that would have been determined by the

4    coroner's bureau as it relates to the circumstances

5    surrounding it.  Our practice is to relay that to me and

6    then me either agreeing with it or not based on those

7    particular practices at the time.

8    Q.   Well, the fact that the autopsy report --

9    ultimately, the death certificate states that the manner

10   of death is homicide.  That would indicate that you

11   accepted that determination; correct?

12   A.   I would have accepted -- it states that I would

13   have accepted the manner of homicide based on the findings

14   of the coroner's bureau and the procedures and practices

15   that we had at the time as it as a pathological definition

16   in reference to homicide.  Not necessarily criminal or

17   causation.

18   Q.   Well, homicide -- I mean I'm a lawyer.  I know

19   that homicide is not the crime.  Crimes are like murder

20   and manslaughter which have additional elements that have

21   to be satisfied.  What is your definition of homicide for

22   the purpose of your function as the Riverside County

23   Coroner?

24   A.   At the time of this review, the practice of

25   determining homicide from -- our coroner's bureau, you

39

**Ron Fernicola & Associates**

1   know, oddly enough has a different definition of homicide

2   as it relates to lack of causation and law enforcement

3   being present.  It has been our practice over the last 20

4   years that any time law enforcement is present and playing

5   any type of arrest part or control part while or during a

6   person is deceased, rather than call it something else,

7   it's labeled as a homicide.  Whereas, if it involves other

8   people, but not necessarily caused by another person -- in

9   my line outside of the coroner's bureau, I would

10  specifically go by the definition inside.  It's more along

11  the lines of a totality of the circumstances without

12  causation.

13      Q.   Well, are you saying that -- well, can you just

14  state in the simplest, most straightforward form that you

15  can what the operative definition of homicide is as a

16  manner of death in the last half of 2019 when you

17  determined that to be the manner of his death.  What was

18  your working definition?

19          MR. SAIN:  Asked and answered.

20          THE WITNESS:  It would be that law enforcement was

21  present and played some type of physical interaction,

22  whether it be handcuffing, holding.  Something like that.

23  You know, some type of a struggle.  Regardless of

24  causation, if there was another person involved, then that

25  would be ruled a homicide regardless of the level of cause

40

1   or activity or involvement that they had.

2   BY MR. BURTON:

3       Q.   Have you ever heard the definition of homicide is

4   death at the hands of another?

5       A.   I have.

6       Q.   Is that the definition that you use as a Coroner

7   of Riverside County?

8           MR. SAIN:   Asked and answered.

9           THE WITNESS:   Not necessarily a word for word

10  definition.   At the time -- this was in the later half of

11  '19.   It was in the forensic pathologist's realm -- there

12  is a split opinion of the use of homicide.   The opinion

13  that we have had or the position that we have had for the

14  last 20 years revolves around not the specific Webster's

15  Dictionary version of homicide.   It involves another

16  person and whether or not it was caused by that other

17  person.   That's how it was ruled at the time.   It would

18  have been ruled as a homicide because there was another

19  person present and some type of activity that involved

20  them.

21  BY MR. BURTON:

22      Q.   Drug overdose is an accidental death.   Would you

23  agree with that?

24      A.   It could be either.   It could be that or suicide.

25      Q.   Of course.   Yeah.   I'm sorry.   Thank you.   I

41

1    agreed to it.  It throws me off right there.  Regardless

2    of all of that, that is the cause of death.  I can without

3    question tell you that I have never physically put pen to

4    paper or pen to keyboard and wrote that.  I have agreed to

5    it.  When I determined that, I used the totality of the

6    circumstances of this case which would have been the taser

7    and the cuffing of the decedent.  My understanding of what

8    you're asking of me is -- him being held in a prone

9    restraint in my head doesn't exist.  He was handcuffed,

10   and he happened to be prone.  When that happens, quite

11   honestly in most -- any case, the safest place for the

12   deputies, the safest place for him and the people around

13   him would be to leave him where he was handcuffed and that

14   is in a prone position.

15   BY MR. BURTON:

16       Q.   Where did you acquire this information that that's

17   the safest place for the subject in restraints to be held?

18       A.   In 28 years of either being physically involved in

19   it or in training programs.  In literature.  I guess my

20   belief is in my line of work, that's common knowledge.

21       Q.   Well, let me invite your attention to Exhibit 2,

22   which is put out by the National Law Enforcement

23   Technology Center.

24            (Plaintiff's Exhibit 2 was marked for

25            identification by the Certified

                                                        45

```
 1            Shorthand Reporter.)

 2   BY MR. BURTON:

 3       Q.   Have you ever seen this document before?  It was

 4   published some time ago.

 5       A.   It appears it was published in 1995.  I saw it

 6   this morning when it was sent to me by either your

 7   office -- I believe it was your office.

 8       Q.   Okay.  Is that the first time you think you've

 9   seen it?

10       A.   I know it's the first time I've seen it.

11       Q.   Okay.  It refers on page 3 starting on the top

12   right to New York's Police Department guidelines to

13   preventing deaths in custody.  It says -- this is 1995.

14   Quote, "As soon as the subject is handcuffed, get him off

15   his stomach.  Turn him on his side or place him in a

16   seated position."

17            Do you see that?

18       A.   I see that.

19       Q.   Had you ever heard that in your 28 years in law

20   enforcement?

21       A.   I guess that goes back to what I said about the 28

22   years in law enforcement.  As a deputy -- as a young

23   patrol deputy, I do remember initially being told of

24   instances of -- I don't know of the exact words like

25   "positional asphyxiation" from someone being on their
```

46

**Ron Fernicola & Associates**

1   stomach, but as related in this article in 1995, it would

2   have been around the same time or after that.  We were

3   also told and learned of medical studies that said that

4   that was not the case, and that being on their stomach had

5   not necessarily anything to do with that.  I don't know

6   if -- to me I don't see how this would -- NYPD in 1995

7   would be relevant because my understanding, and what we

8   have been taught over the last 28 years, is that was not

9   necessarily -- in 1995 that was not necessarily true.

10      Q.   Well, after you became Sheriff, would it be fair

11   to say that you instituted some reforms in your

12   department?

13      A.   I will not say that I instituted reforms.  I will

14   say that I changed quite a number of things.  I don't know

15   if I would use the word "reform."

16      Q.   Well, one of the things you changed, if I

17   understand this correctly, is the Sheriff's department

18   didn't have a policy manual.  It had a collection of

19   orders that were compiled to provide policy.  You replaced

20   that with a comprehensive policy manual so everything

21   would be organized in one place.

22          Would you agree with that?

23          MR. SAIN:  Rule 26.  Relevance.  Vague as to time.

24   Subsequent remedial measures.

25          THE WITNESS:  I guess my description of that would
                                                            47

**Ron Fernicola & Associates**

1    that positional asphyxia is the cause of death," unquote.

2          Have you heard that before from IACP?

3      A.   No.

4      Q.   Do you agree with it?

5      A.   Not necessarily.  Well, I guess I agree that

6    that's what they wrote there, but I think I could probably

7    agree and disagree with it.

8      Q.   Well, so you -- let me just be a little more

9    precise.  Thank you for pointing out the ambiguity in my

10   question.

11         Do you agree with their recommendation that

12   restrained individuals be placed on their side to aid in

13   breathing?

14     A.   Not necessarily.

15     Q.   Would you agree that there is, let's say, some

16   medical evidence that not putting restrained individuals

17   on their side or in a sitting position can contribute to

18   in-custody deaths, and there's some evidence that you

19   mentioned that says it doesn't make any difference?

20         MR. SAIN:  That's compound as phrased.

21         THE WITNESS:  My understanding and position would

22   be that the medical studies that were are aware of would

23   have come after that fact and would be more relevant to

24   not necessarily affecting that issue rather than that

25   opinion that was formed before.

                                                        50

**Ron Fernicola & Associates**

1   BY MR. BURTON:

2       Q.   What I'm getting at, Sheriff Bianco -- thank you

3   for your answer -- is in connection with this issue of

4   whether, let's say, restrained individuals should be

5   placed on their sides or not to aid in breathing, do you

6   think that the scientific medical evidence is clear on

7   that or would you characterize it as disputed?

8       A.   I guess my characterization would be that it is

9   disputed.  However, the more relevant and the more

10  information would be that it was settled that it did not

11  cause -- that it does not contribute.

12      Q.   Well, have you ever considered that it might be a

13  better practice to err on the side of safety and place

14  individuals on their sides to aid in breathing --

15          MR. SAIN:  Objection -- I thought you were done.

16          MR. BURTON:  I don't know why you thought I was

17  done since I was right in the middle of --

18          MR. SAIN:  Well, it sounded like it.  It's

19  argumentive.  He can answer the question.

20          MR. BURTON:  Could I have the fragment -- let me

21  just start over again.

22      Q.   Have you as the Sheriff of Riverside County ever

23  considered that if the evidence is in conflict over the

24  effect of the benefits of placing a handcuffed individual

25  on his or her side to aid in breathing after handcuffing,   51

**Ron Fernicola & Associates**

1    that it would be the best policy for your department to

2    err on the side of safety by having deputies place

3    restrained individuals on their side?

4         MR. SAIN:  Assumes facts not in evidence.

5    Misstates prior testimony.

6         THE WITNESS:  That was a very long question.  I

7    think there was actually two in there.  I will try and get

8    them answered.

9         My position as Sheriff is -- I'm 100 percent

10   mostly concerned with safety of not only that person

11   involved, but the deputies involved and the bystanders

12   involved.  It is my understanding that the overwhelming

13   evidence -- medical evidence or studies show that position

14   does not play a part in that or turning them on their side

15   to help them to breathe.  That's not necessarily relevant.

16   The absolute safest place for any subject, especially a

17   combative subject, is handcuffed on their stomach being

18   controlled in that position based on the amount of

19   resistance that they are displaying.

20   BY MR. BURTON:

21      Q.   Did your watching of Deputy Gomez's video of what

22   happened to Mr. Niedzialek in this case cause you to

23   rethink that position?

24      A.   Me watching the video was pretty much an exact --

25   that video, I think, is a supportive document of exactly

                                                        52

**Ron Fernicola & Associates**

1          MR. SAIN:   Rule 26.   Relevance.

2          THE WITNESS:   No.

3   BY MR. BURTON:

4     Q.    Is it your position that you disagree with that

5   proposed policy?

6     A.    Yes.   It's my position that placing them in a

7   different position doesn't necessarily assist them in

8   breathing.

9     Q.    Now, you mentioned that in part that's based on

10  your 28 years of experience with the department.   Has your

11  department undertaken any sort of study or investigation

12  of this issue of whether a person when restrained should

13  be put in a position that would assist breathing such as

14  placement on the side?

15         MR. SAIN:   Objection.   Misstates testimony.   Also

16  mentioned studies.

17         THE WITNESS:   I guess I don't really -- I was

18  confused by your question.   Whether we have taken a part

19  or whether we have searched out -- I know that my training

20  bureau is constantly involved in keeping us up to date in

21  practices.   If your -- I believe your question was did we

22  do a study, and I would say that would be no.   Are we

23  actively researching those types of things, then I would

24  say yes.

25  ///

                                                           55

**Ron Fernicola & Associates**

1   the application of restraints, it might be an indication

2   that he or she is in jeopardy and requires immediate

3   medical attention to avoid cardiac arrest."

4        Do you agree with that?

5   A.   I would agree with that sentence or combination of

6   sentences, yes.

7   Q.   Do you know whether your deputies are trained in

8   that?

9   A.   I would say that's a combination of yes, they are

10  trained in something similar to that, but reading that and

11  saying that, that seems pretty common sense-ish.

12  Q.   Well, did your deputies in the Niedzialek incident

13  follow this?

14  A.   In my understanding they did.

15        (Plaintiff's Exhibit 6 was marked for

16        identification by the Certified

17        Shorthand Reporter.)

18  BY MR. BURTON:

19  Q.   The last exhibit I want to show you is Exhibit 6.

20  This is a Berkeley policy enacted relatively recently.   I

21  know you're not Berkeley.

22        MR. SAIN:  Is it 4/21?

23        MR. BURTON:  It's 2020, February 24.  It's a

24  Lexipol.  I understand how Lexipol works.  They provide

25  sort of a menu of options and the department picks it and

57

**Ron Fernicola & Associates**

```
 1   the department can tweak the language in the way that it
 2   wants.  This is a Lexipol statute policy.  I invite your
 3   attention to page 3.  I've got this highlighted.  Quote,
 4   "If the person being handcuffed is on the ground or in a
 5   prone position, officers should, as soon as possible,
 6   place the person in an upright sitting position or on
 7   their side for respiratory recovery and to mitigate the
 8   potential for positional asphyxia," unquote.
 9           Is it correct that you do not agree with that
10   policy?
11           MR. SAIN:  Rule 26.  Relevance.  Subsequent
12   remedial measures post incident.
13           THE WITNESS:  It would be my position that I
14   definitely could not say that based on that one sentence
15   that I agree with that sentence that's in their policy.  I
16   would not have that in our policy for the major reason
17   being that the medical studies that we are aware of
18   contradict that.  Knowing that the safest place for a
19   person is on their belly for not only them, but the
20   deputies and the surrounding possible personnel witnesses,
21   I would not agree with that.
22   BY MR. BURTON:
23      Q.  Do you know when you were working out -- your
24   department was working out the new policy manual with
25   Lexipol, whether this policy or something like it was
```

58

```
1   STATE OF _____)
                                         ) ss.
2   COUNTY OF _____)

3

4

5

6       I, the undersigned, say that I have read the

7   foregoing deposition, and I declare, under penalty of

8   perjury, that the foregoing is a true and correct

9   transcript of my testimony contained therein.

10      Executed this _____ day of _____,

11  20_____, at _____, _____.

12                      (City)                 (State)

13

14

15

16

17              _____

18                      CHAD BIANCO

19

20

21

22

23

24

25                                                      64
```

```
 1   STATE OF CALIFORNIA     )
                             ) ss.
 2   COUNTY OF LOS ANGELES   )

 3

 4

 5       I, KELLY R. BATES, CSR No. 10802, certify:

 6       That the foregoing deposition of CHAD BIANCO was

 7   taken before me at the time and place therein set forth,

 8   at which time the witness was placed under oath by me;

 9       That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13       That the foregoing deposition is a true record

14   as reported by me of the testimony and all objections

15   made at the time of the examination;

16       IN WITNESS WHEREOF, I have subscribed my name

17   this _____ day of _____, 20____.

18

19

20                       _____

21                            KELLY R. BATES, CSR 10802

22

23

24

25                                                        65
```

**Ron Fernicola & Associates**

# EXHIBIT R

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

A.      Background of Positional Asphyxia Allegations in General.

By way of background, positional or restraint asphyxia is a term that was initially used to describe the deaths of individuals who were found in body positions that compromised respiratory function.  Most commonly, these cases involved individuals in whom their position led to obstruction of the upper airway (such as from extreme head-neck hyperflexion) and who were alcohol intoxicated (to the point of being unable to remove themselves from the lethal position).  In none of these original cases was the individual restrained in the prone position by law enforcement.[1]

In the late 1980s, the term positional asphyxia was then applied as a cause of death in reports of sudden deaths that occurred to persons who were being restrained while in custody.  Proponents of this theory argued that individuals placed in the hobble position (hobble or prone restraint position in which individuals are placed prone on their stomach with wrists handcuffed behind the back and ankles secured to the handcuffs – a position some proponents of this theory reference as a "hogtie" even though such terminology is not used by law enforcement to describe the hobble position) were unable to breathe because, the proponents contended, the position caused chest wall and abdominal restriction that prevented adequate expansion or ventilation of the lungs and subsequently led to asphyxiation.

The theory of positional asphyxia as applied to custody restraint was largely based on the work of Dr. Reay, et al., who studied 10 healthy subjects after exercise and found delayed recovery of blood oxygen levels and heart rate in the hobble position.[2]

B.      Scientific Positional Asphyxia Medical Studies.

Since Dr. Reay's study, multiple research investigations have been conducted that have now refuted the original findings.  With my colleagues, I conducted a more comprehensive study investigating the effects of body position on respiratory function after exertion: this peer-reviewed study was published in the Annals of Emergency Medicine and reviewed in subsequent articles published in the medical literature.[3,4, 5]

In our study involving 15 human volunteers, we studied respiratory function in the sitting, supine (laying on the back), prone (laying on the stomach), and hobble position. While we found a slight progressive decrease in pulmonary function (the amount of air movement in the lungs), these changes were within normal range.  Accordingly, we found no evidence of decreased blood oxygen levels or increased carbon dioxide levels (to suggest inadequate ventilation) in the hobble position.  These findings have been confirmed by other independent investigators who found no significant decrease in blood oxygen levels in individuals placed in similar restraint positions.[6,7]  In other words, we have found no scientific evidence supporting the proponents' notion that a restraint position in a prone, chest-down, or prone hobbled position causes or contributes to asphyxiation or associated death.

CONFIDENTIAL DOCUMENT                                                    COR 02827

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

As a result of this evidence, Dr. Reay, one of the chief proponents of the positional asphyxia theory with prone restraint, has written that "the hog-tied prone position should be viewed as not producing significant physiologic respiratory compromise, and it does not produce any serious or life-threatening respiratory effects".[8]  Moreover, large epidemiologic studies of over 1000 police restraint cases found no association between prone positioning and death or asphyxiation.[9,10]

Force is often utilized by law enforcement personnel to restrain individuals.  Some have argued that additional weight force applied to the torso could compress the chest and abdomen.

Restraint, compressive, or mechanical asphyxia refers to the notion that this additional weight force applied during restraint causes respiratory compromise to an individual that can lead to asphyxiation: such as by placing body weight on a prone subject's back while the subject is flat chest-down on a hard surface.

However, we have conducted multiple studies on human volunteers investigating the effect of weight force on persons who were restrained.  In our initial study, we found no evidence of hypoxia (decrease in oxygen levels) or hypoventilation (increase in carbon dioxide levels) in human subjects on whom moderate amounts of weight were placed on their back in the prone restraint position.[11]  In our subsequent study, we placed up to 225 pounds of weight force on human subjects in the prone restraint position and found no life-threatening abnormalities in ventilation.[12]

These results are consistent with other investigators who have conducted similar weight force studies on the prone restraint position and found no evidence of hypoxia to indicate risk for asphyxiation.[13]  Moreover, additional modelling research on the role of restraint weight force on respiratory and pulmonary function also indicate little risk for asphyxiation.[14,15]

### C.    Studies on Conductive Energy Devices (CEDs)

CEDs are a type of so-called less lethal weapons widely used by law enforcement also known as neuromuscular incapacitating devices (NIDs) or electronic control weapons (ECWs).  The TASER is the most prominent CED currently available in this country. The TASER delivers a high-voltage, low frequency/low-amperage electrical impulse via either probe-dart or drive-stun/contact mode.  In the probe mode, the weapon fires barbs at a subject and delivers an electrical impulse across those barbs after making contact. This impulse results in a transient neuromuscular incapacitation (NMI) to the subject, as well as the sensation of pain.  In the drive-stun mode, the electrical impulse is delivered by direct contact of the weapon on the subject, as opposed to barbs, and delivers a painful stimulus, with less or no neuromuscular incapacitation.

10

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

Numerous studies have now been conducted to evaluate the physiologic effects and safety of the TASER device.  My research group has conducted a number of these studies, which have found no evidence of electrocardiographic changes, cardiac or heart injuries, respiratory compromise, or significant metabolic disturbances associated with the device.[16,17,18,19,20]  Moreover, our findings have been replicated by other investigators who have also demonstrated no significant inherently deleterious physiologic effects in human subjects under laboratory testing or the field setting.[21,22,23,24,25,26]

Thus, based on my research studies, as well as the current literature and medical research studies on the TASER, the device does <u>not</u> cause cardiac damage, does not result in significant long-term physiologic impairment, and does not inherently place an individual at risk for death.

       C.     Case-Specific Conclusions (Niedzialek).

In Mr. Niedzialek's case, during his relatively short struggle with officers and restraint in the prone position, he was at times actively resisting, vocalizing, and appeared to be breathing.  At times, he was moving such that some portions of his body were not fully prone on the ground.  Accordingly, it does not appear that Mr. Niedzialek's restraint was causing significant respiratory or ventilatory compromise to put him at risk for asphyxiation.

Officers did have contact with Mr. Niedzialek's torso while restraining him.  Some force may have been applied with this contact, but these times appear to be very brief and limited both in terms of duration and amount.  Accordingly, it does not appear that Mr. Niedzialek suffered any significant compressive forces to his torso that would have led to any respiratory compromise or risk for asphyxiation.

Moreover, medical and autopsy records do not demonstrate that Mr. Niedzialek suffered ventilatory respiratory compromise to put him at risk for asphyxiation.  There was no evidence of significant compression of his torso, no sequelae of increased intrathoracic or intraabdominal pressure, and no findings of significant traumatic injury to the interior torso from forced compression.

Officers did discharge a CED on Mr. Niedzialek twice during their interaction with him, while he was still upright.  After both discharges, Mr. Niedzialek appeared to be awake, verbalizing, and moving for some time afterwards, indicating that the use of the CED did not result in any fatal cardiac events.

In conclusion, **it is my opinion that Mr. Niedzialek's death was not caused or contributed to by positional, restraint or compression asphyxiation** as a result of the manner in which he was restrained by law enforcement officers.  In addition, the use of the CED did not cause any fatal cardiac event or death.

CONFIDENTIAL DOCUMENT                                        COR 02829

*Theodore C. Chan, MD, FACEP*
*1627 Bahia Vista Way*
*La Jolla, CA  92037*
*tcchan@ucsd.edu*

**6.      Fees & Prior Testimony.**

In accordance with the Rules of Civil Procedure, my compensation for services rendered in association with this case are $500/hour, including travel time and expenses.

Prior cases in which I have provided testimony over the past four years are: *Abrego v. City of Los Angeles*, 2016; *Mears v. City of Los Angeles*, 2017; *Salazar v. San Bernardino*, 2017; *Sexton v. Phillips, et al., Cape May, New Jersey*, 2017; *Lopez v. City of Inglewood*, 2017-18; *Hernandez v. City of Los Angeles*, 2018; *Landeros v. Elk Grove*, 2019; and *Hagood (Lovett) v. Kern County*, 2020.

Should you have any further questions, please do not hesitate to contact me at any time.

Sincerely,

Theodore C. Chan, MD
Professor and Chair
Department of Emergency Medicine
University of California San Diego

CONFIDENTIAL DOCUMENT                    COR 02830

# EXHIBIT S

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3

4 TRACY ALVES, AN INDIVIDUAL ) CASE NO.: 19-CV-02083-JGB
  AND AS SUCCESSOR IN INTEREST )     (SHKx)
5 FOR KEVIN R. NIEDZIALEK,  )
  DECEASED,       )
6              )
               )
7        PLAINTIFF,)
               )
8    VS.       )
               )
9 RIVERSIDE COUNTY, RIVERSIDE )
  SHERIFF'S DEPARTMENT,   )
10 SHERIFF-CORONER CHAD BIANCO, )
  DEPUTY SONIA GOMEZ, DEPUTY  )
11 BRIAN KEENEY, AND DOES 3-10, )
              )
12       DEFENDANTS.)
  _____)

13

14

15    DEPOSITION OF MICHAEL GRAHAM, M.D.

16     THURSDAY, APRIL 15, 2021

17

18

19

20

21 RON FERNICOLA & ASSOCIATES
  CERTIFIED SHORTHAND REPORTERS
22 REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
  1244 West Edgewood Circle
23 Coeur d'Alene, Idaho 83815
  (661) 775-8299
24

25 FILE NO. 21256

                     1

1    DEPOSITION OF MICHAEL GRAHAM, M.D., A

2    WITNESS, TAKEN ON BEHALF OF PLAINTIFF,

3    VIA VIDEOCONFERENCE, COMMENCING AT

4    10:00 A.M., ON THURSDAY, APRIL 15, 2021,

5    BEFORE ROSA I. GUZMAN, CSR NO. 12024,

6    PURSUANT TO NOTICE OF TAKING DEPOSITION.

7                        * * *

8  APPEARANCES OF COUNSEL:

9  FOR PLAINTIFF:    HELM LAW OFFICE, PC
                     BY:  T. KENNEDY HELM, IV, ESQ.
10                   644 40TH STREET
                     SUITE 305
11                   OAKLAND, CALIFORNIA 94609
                     (510) 350-7517
12

13  FOR DEFENDANTS:   MANNING & KASS
                      ELLROD, RAMIREZ, TRESTER, LLP
14                    BY:  TONY M. SAIN, ESQ.
                      801 SOUTH FIGUEROA STREET
15                    15TH FLOOR
                      LOS ANGELES, CALIFORNIA 90017
16                    (213) 624-6900

17

18

19

20

21

22

23

24

25
                                                    2

1

2                      MICHAEL GRAHAM, M.D.,

3    a witness herein, having first been duly administered

4    the oath, deposed and testified as follows:

5

6                         EXAMINATION

7    BY MR. HELM:

8        Q    Good morning, Dr. Graham.

9        A    Good afternoon.

10       Q    Good afternoon.  You're in St. Louis; right?

11   My name is Kennedy Helm.  I'm one of the attorneys for

12   the Plaintiff, Tracy Alves, and I'm going to be going

13   through your report with you.

14           Do you have a copy of it in front of you?

15       A    I do.

16       Q    Okay.  Great.  So I'm sure you've testified

17   numerous times before in deposition; is that right?

18       A    I have.

19       Q    Okay.  Are you comfortable with the standard

20   admonition?  Do you want me to go through any of them?

21       A    No, I think we're good.

22       Q    We're good.  Okay.  Great.  So I'll ask you a

23   question, and then if you don't understand it, please

24   let me know, and I'll rephrase.

25           All right?

                                                    4

**Ron Fernicola & Associates**

1  restraint played a role in his death?  Is that what

2  you're saying?

3      A     The specific restraint technique, I don't think

4  did.  So I don't think this is an asphyxia.  I don't

5  think this is Taser causing the death or any other thing

6  that you can predict, you know, may cause death in a way

7  that you can anticipate.  Whether there is a general

8  increase in susceptibility of dying because of forcible

9  restraint just across the board, that is what I'm not

10 sure about.

11     Q     What's your understanding of why the coroner

12 here certified the death as a homicide?

13            MR. SAIN:  Misstates testimony.  Argumentative.

14            THE WITNESS:  There are a couple of ways, if

15 you look across the country, how these deaths are

16 certified.  Some people certify them as homicide because

17 you have other people involved, and those people are

18 acting in a volitional manner.  Other people consider

19 these accidents because the main cause of the death is

20 not the restraint itself; it's the methamphetamine

21 toxicity in that the death in this situation was not

22 reasonably foreseeable and predictable.

23            I mean, I think either one is fine.  A lot of

24 it depends upon what office you're in, kind of what the

25 custom is there, and kind of the way you were trained

33

1   and your philosophy about it.  But either one is

2   acceptable.

3       Q    BY MR. HELM:  So you would have certified the

4   manner of death as accident; is that right?

5       A    I would have, yes.  And that's the way we do

6   them here.  But I certainly, you know, wouldn't squawk

7   about the "homicide."

8       Q    So you have no reason to dispute the coroner's

9   certifying the manner as homicide; is that right?

10      A    I think so.  I don't know that it's a yes-or-no

11  answer, and you have to know the back story as to manner

12  of death and that either one is acceptable.

13           Yeah, I mean, it's not the way I would do it.

14  So in that case I disagree with them.  But again, that's

15  probably more of a philosophical or a custom issue as

16  opposed to some scientific issue.

17      Q    Now, in Dr. Fajardo's deposition -- I just want

18  to read you a passage out of it and then ask you some

19  questions about it.

20           So this is at page 115, line 17, and I'm going

21  to go to 116, line 21:

22           "QUESTION:  Now, you said that the way

23           that methamphetamine ingestion alone

24           kills someone, generally, is that it

25           causes cardiac arrest.  It disorganizes

34

**Ron Fernicola & Associates**

1 there's 200 pounds applied, there's 200 pounds applied.

2 But certainly there's more force over a narrow area than

3 a large one, yes.

4    Q   BY MR. HELM: Right. I mean, there's more

5 force exerted over a smaller area than over a larger

6 area; right?

7    A   Everything being equal, if you apply the same

8 amount of pressure over a narrow area, the force will be

9 greater than over a wide area, at least on a per, let's

10 say, square-centimeter basis. The overall weight,

11 though, is the same. Two hundred pounds is 200 pounds

12 whether I put it over a narrow area or large area. When

13 you look at it applied to the whole area, it's still the

14 same weight.

15    Q   And you say later on in the same paragraph two,

16 "The evidence does not indicate that pressure sufficient

17 to induce compression asphyxia was applied to

18 Mr. Niedzialek's chest. The lack of facial, including

19 conjunctival, petechiae weighs against a diagnosis of

20 compression asphyxia."

21       So can you have asphyxia without petechiae?

22    A   You can have asphyxia. Certain types, you can,

23 yeah. If you're talking about enough pressure where the

24 pressure inside the chest goes up to the point where you

25 compromise return of blood to the heart, then you almost

57

**Ron Fernicola & Associates**

1   always have one.

2       Q     But you can't have asphyxia without petechiae;

3   right?

4       A     You can, sure.

5       Q     Aren't petechiae more common with a neck

6   restraint?

7       A     On a case by case -- well, if you have pressure

8   great enough to increase your intra-chest pressure

9   enough, again, to impede venous return, you almost

10  always have petechiae.  Those situations are very

11  infrequent, though.  Like "the car falling off the jack"

12  type scenario.

13          With neck-restraint holds, the presence of

14  petechiae will depend upon how quickly you can compress

15  the carotid arteries.  If you compress them very

16  efficiently, very quickly, you may not see any.  In many

17  cases of neck compression, you get the jugular veins

18  compressed before the carotid arteries.  Then you tend

19  to see the petechiae.  That's a lot more common

20  situation neck compression than the big chest

21  compressions.  And so absolute number, you know, kind of

22  gives you one answer; relative numbers gives a different

23  answer.

24      Q     And so at page 28, then we get to your opinion.

25  And this is the opinion that you express in this report,

58

1    anything that would support the necessity or that you

2    would improve any outcomes by rolling them off their

3    bellies.  The one thing, again, that I think is probably

4    most dangerous would be to put them on their backs.

5         Q    BY MR. HELM:  And why is that?

6         A    Because if they do have an arresting and happen

7    to aspirate or regurgitate, you're already in bad shape.

8    That's a big risk for the aspirating of gastric

9    contents.  If you are on your belly or your side, it's

10   not.

11        Q    In the cases that you worked on where there was

12   an allegation of asphyxia, in those cases was the person

13   prone?

14        A    I think all but one.

15        Q    Why do you think that there are so many

16   allegations of asphyxia in situations where excited

17   delirium is, in your view, the cause of death?

18             MR. SAIN:  Rule 26 relevance.

19             THE WITNESS:  I think it's kind of two

20   roadways.  One is that these deaths have been recognized

21   for decades, and people rightly ask the question "Why?

22   Why are they dying under the circumstances of

23   restraint?"  And what I found over the years is that

24   people make the mistake of saying, "Well, the last thing

25   that was being done to them must be the cause of it."

                                                        67

**Ron Fernicola & Associates**

1    And so when you go back -- and primarily in the
2  early 80's, people were hog-tied.  That was the way they
3  restrained everybody.  And people said, "Well, gee, this
4  is why they're dying."  Well, they quit hog-tying them,
5  and then they started using pepper stray, and people
6  said, "Oh, it's the pepper spray."  And then they quit
7  using pepper spray, and the electronic-controlled
8  devices came in, and people said, "Gee, it must be
9  electronic-controlled devices."
10    And so the trend is that whatever the preferred
11  restraint technique of the era is -- that tends to get
12  blamed.  And what all of these cases have in common is
13  this excited-delirium-looking syndrome.
14    The other road which kind of starts back in the
15  80's was with the work done by Don Reay in Seattle,
16  where Don was pretty interested in custody deaths as
17  well as asphyxias, and he said, "Could this be the
18  hog-tie position?"  And he did a couple of studies that
19  were published that suggested some abnormalities, and I
20  think people somewhat overreacted to them and said, "Oh,
21  yeah, this proves it that it's this prone position with
22  hog-tying."
23    And then when people looked closely at the work
24  that Don did, they found out basically that he was
25  wrong.  And in fact, he admitted that after, you know, a

68

**Ron Fernicola & Associates**

1  number of years later.  And then better studies were

2  done and showed that the prone position really is a

3  neutral position.

4          MR. HELM:  All right.  I have nothing further.

5          MR. SAIN:  I have just a few clarifiers.

6

7                    EXAMINATION

8  BY MR. SAIN:

9     Q    Dr. Graham, Mr. Helm asked you some questions

10  about points in time when you believed that

11  Mr. Niedzialek was engaged in regular breathing.

12          Do you remember that subject matter?

13     A    Regular or irregular?

14     Q    Regular, normal breathing.

15     A    Yes.

16     Q    Was it your observation that up through the

17  point when the last knee comes off Mr. Niedzialek, that,

18  up through that point in time, Mr. Niedzialek was still

19  engaged in regular-slash-normal breathing?

20     A    As I recall, yes.

21     Q    At what point, after the last knee came off

22  Mr. Niedzialek, was it your observation that his

23  breathing switched from regular, normal breathing to

24  irregular breathing?

25     A    It was shortly before he became unresponsive.

69

**Ron Fernicola & Associates**

```
1  STATE OF CALIFORNIA    )
                          )  SS.
2  COUNTY OF LOS ANGELES  )

3

4          I declare under penalty of perjury under the

5  laws of the State of California that I have read the

6  foregoing transcript; I have made any corrections,

7  additions, or deletions that I was desirous of making in

8  order to render the within transcript true and correct;

9  and

10         IN WITNESS WHEREOF, I have hereunto subscribed

11  my name this _____ day of _____, 20____,

12  at _____, California.

13

14         _____
                MICHAEL GRAHAM, M.D.
15

16

17

18

19

20

21

22

23

24

25                                                      78
```

1  STATE OF CALIFORNIA     )
                           )  SS.
2  COUNTY OF LOS ANGELES   )

3

4           I, ROSA I. GUZMAN, CERTIFIED SHORTHAND

5  REPORTER NO. 12024, DECLARE:

6           THAT PRIOR TO BEING EXAMINED, THE WITNESS

7  NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

8  ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE

9  TRUTH, AND NOTHING BUT THE TRUTH;

10          THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT

11 THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN

12 BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY

13 DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE

14 FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF

15 MY SHORTHAND NOTES SO TAKEN.

16          I FURTHER DECLARE THAT I AM NEITHER COUNSEL

17 FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

18 ANYWISE INTERESTED IN THE OUTCOME THEREOF.

19          I DECLARE UNDER PENALTY OF PERJURY UNDER THE

20 LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

21 TRUE AND CORRECT.

22          IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

23 MY NAME THIS 10TH DAY OF MAY, 2021.

24

25          _____
            ROSA I. GUZMAN, CSR NO. 12024

79

**Ron Fernicola & Associates**

# EXHIBIT T

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, AN INDIVIDUAL   ) CASE NO.: 19-CV-02083-JGB
    AND AS SUCCESSOR IN INTEREST )                    (SHKx)
5   FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
6                                )
                                 )
7                     PLAINTIFF,)
                                 )
8        VS.                     )
                                 )
9   RIVERSIDE COUNTY, RIVERSIDE  )
    SHERIFF'S DEPARTMENT,        )
10  SHERIFF-CORONER CHAD BIANCO, )
    DEPUTY SONIA GOMEZ, DEPUTY   )
11  BRIAN KEENEY, AND DOES 3-10, )
                                 )
12                   DEFENDANTS.)
    _____)
13

14

15       DEPOSITION OF SERGEANT SEAN VICKERS, P.M.K.

16              THURSDAY, DECEMBER 3, 2020

17

18

19

20

21  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
22  REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
    1244 West Edgewood Circle
23  Coeur d'Alene, Idaho 83815
    (661) 775-8299
24

25  FILE NO. 20486
                                                        1

```
 1        DEPOSITION OF SERGEANT SEAN VICKERS, P.M.K.,

 2        A WITNESS, TAKEN ON BEHALF OF PLAINTIFF, VIA

 3        VIDEOCONFERENCE, COMMENCING AT 10:01 A.M.,

 4        ON THURSDAY, DECEMBER 3, 2020, BEFORE ROSA

 5        I. GUZMAN, CSR NO. 12024, PURSUANT TO

 6        NOTICE OF TAKING DEPOSITION.

 7                          * * *

 8   APPEARANCES OF COUNSEL:

 9   FOR PLAINTIFF:    THE LAW OFFICES OF JOHN BURTON
                       BY:  JOHN BURTON, ESQ.
10                     128 NORTH FAIR OAKS AVENUE
                       PASADENA, CALIFORNIA 91103
11                     (626) 449-8300

12                         - and -

13                     HELM LAW OFFICE, PC
                       BY:  T. KENNEDY HELM, IV
14                     644 40TH STREET
                       SUITE 305
15                     OAKLAND, CALIFORNIA 94609
                       (510) 350-7517

16

17   FOR DEFENDANTS:   MANNING & KASS
                       ELLROD, RAMIREZ, TRESTER, LLP
18                     BY:  TONY M. SAIN, ESQ.
                           GARROS CHAN, ESQ.
19                     801 SOUTH FIGUEROA STREET
                       15TH FLOOR
20                     LOS ANGELES, CALIFORNIA 90017
                       (213) 624-6900

21

22

23

24

25
                                                        2
```

**Ron Fernicola & Associates**

```
 1
 2               SERGEANT SEAN VICKERS, P.M.K.
 3   the witness herein, having first been duly administered
 4   the oath, deposed and testified as follows:
 5
 6                       EXAMINATION
 7   BY MR. BURTON:
 8       Q    Good morning, Sergeant Vickers.  Thank you for
 9   joining us today.
10       A    Good morning.
11       Q    Have you ever had your deposition taken before?
12       A    No, I have not.
13       Q    I'm sure you've had the opportunity to review
14   the nature of these proceedings with counsel for the
15   County of Riverside.  Just very briefly, I'm going to be
16   asking you a series of questions.  The questions are
17   asked of you not as an individual but as a
18   representative of your employer, which I understand to
19   be the County of Riverside and the Riverside Sheriff's
20   Department.  So you will be speaking not only
21   individually but also in a way that binds the
22   Department, and that's pursuant to a Notice that listed
23   a series of topics that you've been designated as their
24   person most knowledgeable to talk to us about.
25               So the rule is, I think, that if we ask a
```

5

1    they should be releasing that pressure with the

2    subject's compliance.

3        Q    That would be pressure to the back if the

4    subject were in a prone position?

5        A    It would be pressure anywhere on their body,

6    based on their compliance with our commands.

7        Q    Is there any training given that the subject

8    should be taken off of their chest?

9            MR. SAIN:  Vague as to time.

10       Q    BY MR. BURTON:  Well, let me address that.

11   We're talking about in connection with this directive,

12   which was in effect in July of 2019, where deputies who

13   were provided this directive trained that leaving a

14   subject on his or her chest or in a prone position can

15   impair the breathing of the subject and caution should

16   be used not to do that.

17       A    The training that they're provided would -- we

18   don't tell them that having someone in a prone position

19   restrains their breathing because it doesn't.  We just

20   tell them if the person is in compliance and they're no

21   longer resistive or assaultive and it's safe to do so,

22   that they release that pressure.  The policy also states

23   that they have to ask for medical personnel to respond

24   to provide them any treatment that would be necessary.

25       Q    So do you consider yourself an expert on body

                                                        38

**Ron Fernicola & Associates**

1          Can you see this okay?

2     A     Yes.

3     Q     And I hear this be sometimes called "hobble

4     restraints."  Do you use that expression?

5     A     Yes.

6          (Plaintiff's Exhibit No. 15 was marked for

7          identification by the reporter and is included

8          herewith.)

9     Q     BY MR. BURTON:  Now, no hobble restraint was

10    used in this case; so I don't want to go down a rabbit

11    hole on this.  But the Riverside Sheriff's Department --

12    and again, we're talking about we did not see -- I'm

13    showing you this because we did not see a prior

14    corresponding policy on this, but I just had a couple

15    questions about it.

16          Are deputies routinely provided with hobble

17    restraints and training on how to use them in effect in

18    July of 2019?

19    A     Yes, some deputies may have been provided them

20    or purchased them on their own from our store here at

21    the Training Center.

22    Q     It didn't happen in this case, but you know,

23    sometimes hobble restraints are used to do a restraint

24    that some people refer to as a "hog tie."  Some people

25    object to that terminology.  Does your department

                                                        72

1    authorize tying somebody's feet together and then tying

2    the cord to the handcuffs?

3        A    No, we do not.

4        Q    Now, I did this before, and I'll do it again.

5    Parenthetically, that's good you don't authorize that,

6    in my opinion.

7            The guidelines for the use of leg restraints

8    which are in effect now with the DSM -- and I don't have

9    any evidence they weren't in effect before, but it

10   really doesn't matter because they weren't used here.

11           But the reason I'm asking is I'm seeing

12   306.6.1, subject D:  "Hobble suspects may be transported

13   in a sheriff's unit.  When it is safe, the restrained

14   person should be seated in an upright position."

15           This is just referring to placement in the

16   vehicle; is that correct?

17           MR. SAIN:  Objection.

18           Rule 26.  Relevance.  Exceeds the scope of the

19   designation.

20           THE WITNESS:  Yes, this is specific to being

21   placed in the sheriff's unit.

22       Q    BY MR. BURTON:  And that would be the same in

23   Sections F and G.  "G," for example, says, "The deputy

24   should ensure that the person does not roll onto and

25   remain on his or her stomach."

73

```
 1   STATE OF CALIFORNIA    )
                            )  SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4           I declare under penalty of perjury under the

 5   laws of the State of California that I have read the

 6   foregoing transcript; I have made any corrections,

 7   additions, or deletions that I was desirous of making in

 8   order to render the within transcript true and correct;

 9   and

10           IN WITNESS WHEREOF, I have hereunto subscribed

11   my name this _____ day of _____, 20____,

12   at _____, California.

13

14           _____

15                   SERGEANT SEAN VICKERS

16

17

18

19

20

21

22

23

24

25                                                          83
```

```
 1 │ STATE OF CALIFORNIA    )
   │                        )  SS.
 2 │ COUNTY OF LOS ANGELES  )
   │
 3 │
   │
 4 │        I, ROSA I. GUZMAN, CERTIFIED SHORTHAND
   │
 5 │ REPORTER NO. 12024, DECLARE:
   │
 6 │        THAT PRIOR TO BEING EXAMINED, THE WITNESS
   │
 7 │ NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY
   │
 8 │ ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE
   │
 9 │ TRUTH, AND NOTHING BUT THE TRUTH;
   │
10 │        THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT
   │
11 │ THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN
   │
12 │ BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY
   │
13 │ DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE
   │
14 │ FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF
   │
15 │ MY SHORTHAND NOTES SO TAKEN.
   │
16 │        I FURTHER DECLARE THAT I AM NEITHER COUNSEL
   │
17 │ FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN
   │
18 │ ANYWISE INTERESTED IN THE OUTCOME THEREOF.
   │
19 │        I DECLARE UNDER PENALTY OF PERJURY UNDER THE
   │
20 │ LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS
   │
21 │ TRUE AND CORRECT.
   │
22 │        IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED
   │
23 │ MY NAME THIS 10TH DAY OF JANUARY, 2021.
   │
24 │
   │
25 │                    _____
   │                    ROSA I. GUZMAN, CSR NO. 12024
```

84

**Ron Fernicola & Associates**

# EXHIBIT U

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, AN INDIVIDUAL   ) CASE NO.: 19-CV-02083-JGB
    AND AS SUCCESSOR IN INTEREST )               (SHKx)
5   FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
6                                )
                                 )
7                   PLAINTIFF,)
                                 )
8        VS.                     )
                                 )
9   RIVERSIDE COUNTY, RIVERSIDE  )
    SHERIFF'S DEPARTMENT,        )
10  SHERIFF-CORONER CHAD BIANCO, )
    DEPUTY SONIA GOMEZ, DEPUTY   )
11  BRIAN KEENEY, AND DOES 3-10, )
                                 )
12                  DEFENDANTS.)
    _____)

13

14

15          DEPOSITION OF ROBERT FONZI

16           THURSDAY, APRIL 22, 2021

17

18

19

20

21  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
22  REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
    1244 West Edgewood Circle
23  Coeur d'Alene, Idaho 83815
    (661) 775-8299
24

25  FILE NO. 21264A

                                              1

1      DEPOSITION OF ROBERT FONZI, A WITNESS,

2      TAKEN ON BEHALF OF PLAINTIFF, VIA

3      VIDEOCONFERENCE, COMMENCING AT

4      10:04 A.M., ON THURSDAY, APRIL 22, 2021,

5      BEFORE ROSA I. GUZMAN, CSR NO. 12024,

6      PURSUANT TO NOTICE OF TAKING DEPOSITION.

7                      * * *

8 APPEARANCES OF COUNSEL:

9 FOR PLAINTIFF:   LAW OFFICES OF DALE K. GALIPO
                    BY:  DALE K. GALIPO, ESQ.
10               21800 BURBANK BOULEVARD
                    SUITE 310
11               WOODLAND HILLS, CALIFORNIA 91367
                    (818) 347-3333

12

13               HELM LAW OFFICE
                    BY:  T. KENNEDY HELM, IV, ESQ.
14               644 40TH STREET
                    SUITE 305
15               OAKLAND, CALIFORNIA 94609
                    (510) 350-7517

16

17 FOR DEFENDANTS:   MANNING & KASS
                    ELLROD, RAMIREZ, TRESTER, LLP
18               BY:  GARROS CHAN, ESQ.
                    801 SOUTH FIGUEROA STREET
19               15TH FLOOR
                    LOS ANGELES, CALIFORNIA 90017
20               (213) 624-6900

21

22

23

24

25

                                              2

1

2                          ROBERT FONZI,

3    the witness herein, having first been duly administered

4    the oath, deposed and testified as follows:

5

6                          EXAMINATION

7    BY MR. GALIPO:

8        Q    Good morning, Bob.

9        A    Good morning, Mr. Galipo.

10       Q    Are you able to hear me okay so far?

11       A    I am.  If I don't, I'll let you know.

12       Q    Okay.  Thank you.  And likewise, if you don't

13   understand any of my questions for any reason, will you

14   let me know that?

15       A    Yes, sir.

16       Q    I plan on going a total of two hours, and I'm

17   going to try and go about an hour and take a short break

18   and then finish up, but if you need to take a break at

19   any time before that, just let me know, and we'll take a

20   break.

21            Okay?

22       A    Yes, I will.  Thank you.

23       Q    You're welcome.  I may ask you a few questions

24   about your report as we go along.  Do you have a copy of

25   your report handy that you can look at?

                                                          4

**Ron Fernicola & Associates**

1    already indicated and what's indicated in just the

2    materials.

3        Q    Did you ask any of the attorneys working for

4    the County of Riverside in this case whether any such

5    materials exist?

6        A    I have not.

7            MR. GALIPO:  Okay.  I promised I'd be two

8    hours.  We're just about there.  Garros, did you have

9    any questions of Mr. Fonzi today?

10           MR. CHAN:  Yeah.  Are you done with your set of

11   questions?

12           MR. GALIPO:  I am, yes.

13           MR. CHAN:  Okay.  I'll make it brief.

14           MR. GALIPO:  Sure.

15

16                      EXAMINATION

17   BY MR. CHAN:

18       Q    Mr. Fonzi, I only have a few questions with

19   respect to the recovery position which has been

20   discussed during this deposition.  And is it to your

21   knowledge that officers who are trained in the recovery

22   position -- that they should place a suspect in a

23   recovery position from a prone position in every

24   encounter?

25       A    They are not mandated or required in every

                                                           77

1    encounter, no.

2        Q    Are you aware of any agency, law enforcement

3    agency, that makes it mandatory for a officer to place

4    an individual, a suspect, from the prone position to a

5    recovery position?

6        A    As a mandatory requirement, no.

7        Q    Okay.

8        A    Not in every case.

9        Q    How many -- and I don't know if you may know

10   this or not.  How many law enforcement agencies are

11   there throughout the country in the United States of

12   America?

13       A    Oh, gosh.  I think there's over 17,000.

14       Q    And of those 17,000, law enforcement agencies,

15   are you aware if any of these agencies require that a

16   suspect be placed from a prone position to a recovery

17   position?

18           MR. GALIPO:  I'm going to object to the

19   question as vague and calls for speculation.

20           THE WITNESS:  There are some agencies who have

21   policies that indicate a recovery position.  Once

22   they're prone, they are to be placed in recovery

23   position.  There are some agencies that have that as a

24   policy.

25       Q    BY MR. CHAN:  Do you know or could estimate how

                                                              78

**Ron Fernicola & Associates**

1   many agencies have such a policy as you described just

2   now?

3           MR. GALIPO:  Calls for speculation.

4           THE WITNESS:  I could not.

5       Q    BY MR. CHAN:  Are you aware if there are any

6   national regulations or requirements for officers or

7   deputies to place a individual or suspect from a prone

8   position to a recovery position for every time that

9   suspect is in a prone position?

10          MR. GALIPO:  Objection.

11          Overly broad.

12          THE WITNESS:  There is no --

13          MR. GALIPO:  Let me just finish my objection.

14   I'm sorry, Bob.

15          THE WITNESS:  It's okay.

16          MR. GALIPO:  It's overly broad, and it calls

17   for speculation.

18          THE WITNESS:  Is there a -- if I understand and

19   remember the question correctly, is there a mandatory

20   requirement nationally with respect to placing somebody

21   from a prone to a recovery in every situation?  No,

22   there's no mandatory requirement nationally.

23      Q    BY MR. CHAN:  Okay.  And from your knowledge

24   and from your training that you were provided, as well

25   as your expertise with respect to recovery position,

79

**Ron Fernicola & Associates**

1    when should an officer place an individual from a prone

2    position to a recovery position?

3         A    Well, of course predicated on circumstances.

4    If the officer or deputy believes that they don't have

5    the ability to monitor their breathing or their pulse,

6    then of course they would roll them into a recovery

7    position.  If the deputy or officer believes that an

8    individual is not breathing or has a pulse, a recovery

9    position would be appropriate.  It would certainly

10   depend on the circumstances.

11            Simply laying on your stomach with hands behind

12   your back, there's no medical evidence or science or

13   research by which law enforcement has been provided to

14   be definitive with respect to a mandatory requirement to

15   roll them over.

16            MR. GALIPO:  I'll make a belated objection to

17   the last response as calling for speculation and lacking

18   foundation.

19        Q    BY MR. CHAN:  All right.  Would you agree with

20   me that law enforcement officers are trained to use the

21   recovery position when they observe or spot a medical

22   problem related to that suspect's breathing?

23            MR. GALIPO:  Objection.

24            Leading and overly broad.

25            THE WITNESS:  Yes, they are trained to utilize

                                                          80

```
 1   STATE OF CALIFORNIA    )
                            )  SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4            I declare under penalty of perjury under the

 5   laws of the State of California that I have read the

 6   foregoing transcript; I have made any corrections,

 7   additions, or deletions that I was desirous of making in

 8   order to render the within transcript true and correct;

 9   and

10            IN WITNESS WHEREOF, I have hereunto subscribed

11   my name this _____ day of _____, 20____,

12   at _____, California.

13

14            _____
                        ROBERT FONZI
15

16

17

18

19

20

21

22

23

24

25                                                      83
```

```
 1   STATE OF CALIFORNIA    )
                            )   SS.
 2   COUNTY OF LOS ANGELES  )

 3

 4            I, ROSA I. GUZMAN, CERTIFIED SHORTHAND

 5   REPORTER NO. 12024, DECLARE:

 6            THAT PRIOR TO BEING EXAMINED, THE WITNESS

 7   NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

 8   ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE

 9   TRUTH, AND NOTHING BUT THE TRUTH;

10            THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT

11   THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN

12   BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY

13   DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE

14   FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF

15   MY SHORTHAND NOTES SO TAKEN.

16            I FURTHER DECLARE THAT I AM NEITHER COUNSEL

17   FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

18   ANYWISE INTERESTED IN THE OUTCOME THEREOF.

19            I DECLARE UNDER PENALTY OF PERJURY UNDER THE

20   LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

21   TRUE AND CORRECT.

22            IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

23   MY NAME THIS 12TH DAY OF MAY, 2021.

24

25                    _____
                           ROSA I. GUZMAN, CSR NO. 12024
```

84

**Ron Fernicola & Associates**

# EXHIBIT V

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| TRACY ALVES, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK, DECEASED,<br><br>                PLAINTIFF,<br><br>     VS.<br><br>RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO AND DOES 1-10,<br><br>                DEFENDANTS.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>) CASE NO. 5:19-CV-02083-JGB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEO CONFERENCE DEPOSITION OF

DANIEL WOHLGELERNTER, M.D.

TAKEN ON

WEDNESDAY, APRIL 14, 2021

MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
    TRACY ALVES, INDIVIDUALLY AND AS  )
5   SUCCESSOR IN INTEREST FOR KEVIN R. )
    NIEDZIALEK, DECEASED,             )
6                                     )
                   PLAINTIFF,         )
7                                     )
         VS.                          ) CASE NO. 5:19-CV-02083
8                                     )              JGB
    RIVERSIDE COUNTY, RIVERSIDE       )
9   SHERIFF'S DEPARTMENT,             )
    SHERIFF-CORONER CHAD BIANCO AND   )
10  DOES 1-10,                        )
                                      )
11                 DEFENDANTS.        )
    _____)

12

13

14

15

16          VIDEO CONFERENCE DEPOSITION OF DANIEL

17   WOHLGELERNTER, M.D., taken on behalf of the Defendants,

18   utilizing ZOOM Cloud platform to host all participants from

19   their respective locations, commencing at 3:02 P.M.,

20   Wednesday, April 14, 2021, before Melinda S. Womelsdorf,

21   Certified Shorthand Reporter, License No. 13124, for the

22   State of California, pursuant to Notice.

23

24

25
                                                        2

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS
     SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:
 4
          THE LAW OFFICES OF JOHN BURTON
 5        BY:  JOHN BURTON, ESQ.
               KENNEDY HELM, ESQ.
 6        128 North Fair Oaks Avenue
          Pasadena, California 91103
 7        (626) 449-8300
          jb@johnburtonlaw.com
 8        (Appearing via ZOOM Video Conference)

 9   For the Defendants, COUNTY OF RIVERSIDE:

10        MANNING & KASS
          ELLROD, RAMIREZ, TRESTER, LLP
11        BY:  TONY M. SAIN, ESQ.
          801 S. Figueroa Street
12        15th Floor
          Los Angeles, California 90017
13        (213) 624-6900
          tms@manningllp.com
14        (Appearing via ZOOM Video Conference)

15

16

17

18

19

20

21

22

23

24

25
                                                          3
```

1          SAN BERNARDINO, CALIFORNIA

2          WEDNESDAY, APRIL 14, 2021

3               AT 3:02 P.M.

4

5          DANIEL WOHLGELERNTER, M.D.,

6          Having been first duly sworn, was

7          examined and testified as follows:

8

9                  EXAMINATION

10

11   BY MR. SAIN:

12       Q    All right.  Good afternoon, Doctor.

13       A    Good afternoon.

14       Q    How do I pronounce your last name, sir?

15       A    Wohlgelernter.

16       Q    All right.  I'm going to practice that, but I

17   apologize in advance if I mangle it.

18       A    You can call me Dr. Dan.

19       Q    I appreciate that.  That's very kind of you.

20       A    Uh-huh.

21       Q    As a preliminary matter I'll be attaching as

22   Exhibit 1 the deposition notice for this witness.  The

23   parties have agreed pursuant to Rule 29 that this

24   deposition may proceed via ZOOM.  Also, in this

25   particular case, the court has ordered that such may

                                                        5

1    Mr. Niedzialek at any time; correct?

2        A    Correct.

3        Q    You weren't able to measure his, you know,

4    cardiac electrical activity, his blood oxygen, his PH,

5    you weren't able to take any of these measurements

6    yourself; correct?

7        A    Correct.

8        Q    And would it also be true that you have never

9    visited the scene of the incident?  The location in this

10   case being of the vicinity of 42200 Moraga Road in

11   Temecula, California.

12            Have you ever been to the incident scene?

13       A    No.

14       Q    Never been there?

15       A    Not to my knowledge.  I've been to Temecula,

16   but I don't think I've been to the location of this --

17   of the episode.

18       Q    Fair enough.

19            And prior to forming your opinions in this

20   case, did you yourself interview any witnesses?

21       A    No.

22       Q    And prior to forming your opinions in this

23   case, did you physically examine the body of Kevin

24   necessary?

25       A    No.

                                                    65

State of California   )
                      )  SS.
County of_____)


          I, Daniel Wohlgelernter, M.D., say I have

read the foregoing video conference deposition and

declare under penalty of perjury that my answers as

indicated are true and correct.




_____
      (DATE)




                              _____
                                      (SIGNATURE)


                                                      112

```
 1   State of California     )
                             )  SS.
 2   County of San Bernardino)

 3

 4           I, MELINDA WOMELSDORF, Certified Shorthand

 5   Reporter, License No. 13124, for the State of

 6   California, do hereby certify:

 7           That, prior to being examined, the witness

 8   named in the foregoing video conference deposition, to

 9   wit, Daniel Wohlgelernter, M.D., was by me duly sworn to

10   testify the truth, the whole truth and nothing but the

11   truth;

12           That said video conference deposition was

13   taken down by me in shorthand at the time and place

14   therein named and thereafter reduced to computer-aided

15   transcription under my direction;

16           That the foregoing transcript, as typed, is

17   a true record of the said proceedings.

18           I further certify that I am not interested

19   in the event of the action.

20           Witness my hand this 17th day of April,

21   2021.

22

23                           _____
                             MELINDA WOMELSDORF, CSR. NO. 13124
24

25
                                                          113
```

# EXHIBIT W

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| TRACY ALVES, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK, DECEASED,<br><br>          PLAINTIFF,<br><br>     VS.<br><br>RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO AND DOES 1-10,<br><br>          DEFENDANTS.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CASE NO. 5:19-CV-02083-JGB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |


VIDEO CONFERENCE DEPOSITION OF

DR. MICHAEL FREEMAN

TAKEN ON

WEDNESDAY, APRIL 28, 2021




MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
  TRACY ALVES, INDIVIDUALLY AND AS   )
5  SUCCESSOR IN INTEREST FOR KEVIN R. )
  NIEDZIALEK, DECEASED,              )
6                                    )
            PLAINTIFF,               )
7                                    )
      VS.                            ) CASE NO. 5:19-CV-02083
8                                    )           JGB
  RIVERSIDE COUNTY, RIVERSIDE        )
9  SHERIFF'S DEPARTMENT,             )
  SHERIFF-CORONER CHAD BIANCO AND    )
10  DOES 1-10,                        )
                                     )
11           DEFENDANTS.             )
  _____)

12

13

14

15

16         VIDEO CONFERENCE DEPOSITION OF DR. MICHAEL

17  FREEMAN, taken on behalf of the Defendants, utilizing ZOOM

18  Cloud platform to host all participants from their

19  respective locations, commencing at 12:01 P.M., Wednesday,

20  April 28, 2021, before Melinda S. Womelsdorf, Certified

21  Shorthand Reporter, License No. 13124, for the State of

22  California, pursuant to Notice.

23

24

25

                                                          2

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS
     SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:
 4
          THE LAW OFFICES OF JOHN BURTON
 5        BY:  KENNEDY HELM, ESQ.
          128 North Fair Oaks Avenue
 6        Pasadena, California 91103
          (626) 449-8300
 7        jb@johnburtonlaw.com
          (Appearing via ZOOM Video Conference)
 8
     For the Defendants, COUNTY OF RIVERSIDE:
 9
          MANNING & KASS
10        ELLROD, RAMIREZ, TRESTER, LLP
          BY:  TONY M. SAIN, ESQ.
11        801 S. Figueroa Street
          15th Floor
12        Los Angeles, California 90017
          (213) 624-6900
13        tms@manningllp.com
          (Appearing via ZOOM Video Conference)
14

15

16

17

18

19

20

21

22

23

24

25
                                                          3
```

```
 1              SAN BERNARDINO, CALIFORNIA

 2              WEDNESDAY, APRIL 28, 2021

 3                  AT 12:01 P.M.

 4

 5              DR. MICHAEL FREEMAN,

 6          Having been first duly sworn, was

 7          examined and testified as follows:

 8

 9                  EXAMINATION

10

11

12  BY MR. SAIN:

13      Q    Pursuant to the court's order, this deposition

14  is proceeding by way of electronic means, including

15  ZOOM.

16          Sir, would you please state your full name?

17      A    Yes.  Michael Freeman, middle initial D.

18      Q    And are you able to hear me okay?

19      A    Yeah, I can hear you just fine.

20      Q    Okay.  I'm going to ask that you speak in the

21  loudest voice that you can, because I will tell you that

22  you're coming across on the audio a little bit quiet.

23      A    Okay.  I can try to put in some AirPods and

24  see if that helps.

25      Q    That -- that would be appreciated.  Because,
```

                                                                5

1    Road in Temecula, California?

2         A    I did not.

3         Q    Prior to forming your opinions in this case,

4    did you ever physically examine or autopsy the body of

5    Kevin Niedzialek?

6         A    I did not.

7         Q    Prior to forming any of your opinions in this

8    case, did you ever physically examine or inspect in

9    person any of the physical evidence as opposed to

10   documentary evidence?

11        A    I did not.

12        Q    I have read both of your reports in their

13   entirety, and I want you to understand that my question

14   now is not asking you to just tell me your whole report,

15   but if you could boil down for me what your core

16   opinions are, I would appreciate it.

17             So what are the core opinions that you

18   anticipate offering at the time of trial?

19        MR. HELM:  Objection.  Vague.  Calls for a

20   narrative.

21        THE WITNESS:  My core opinion is that -- is that

22   Mr. Niedzialek was subjected to three possible or, we'll

23   say, even four possible causes of death.  And two of the

24   causes are un-related to restraint, which is excited

25   delirium and methamphetamine toxicity.  And two of them

                                                          67

1    State of California    )
                           )   SS.
2    County of_____)

3

4            I, Dr. Michael Freeman, say I have read the

5    foregoing video conference deposition and declare under

6    penalty of perjury that my answers as indicated are true

7    and correct.

8

9

10   _____
            (DATE)
11

12

13

14                              _____
                                      (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25

                                                         113

```
 1  State of California    )
                           )  SS.
 2  County of San Bernardino)

 3

 4           I, MELINDA WOMELSDORF, Certified Shorthand

 5  Reporter, License No. 13124, for the State of

 6  California, do hereby certify:

 7           That, prior to being examined, the witness

 8  named in the foregoing video conference deposition, to

 9  wit, Dr. Michael Freeman, was by me duly sworn to

10  testify the truth, the whole truth and nothing but the

11  truth;

12           That said video conference deposition was

13  taken down by me in shorthand at the time and place

14  therein named and thereafter reduced to computer-aided

15  transcription under my direction;

16           That the foregoing transcript, as typed, is

17  a true record of the said proceedings.

18           I further certify that I am not interested

19  in the event of the action.

20           Witness my hand this 11th day of May, 2021.

21

22

23           MELINDA WOMELSDORF, CSR. NO. 13124

24

25
```

114

# EXHIBIT X



**SAINT LOUIS
UNIVERSITY**

1402 South Grand Blvd. R517
St. Louis, MO 63104
Phone 314-977-7841
Fax 314-977-7843
www.slu.edu

Division of Forensic Pathology
Department of Pathology

School of Medicine

January 28, 2021

Tony Sain
Manning & Kass, Ellrod, Ramirez, Trester
15th Floor at 801 Tower
801 South Figueroa Street
Los Angeles, CA 90017-3012

Re: Kevin Niedzialek

Dear Mr. Sain:

At your request I reviewed records (including photographs, video and audio) pertaining to Kevin Niedzialek (DOB 9/20/84).

My opinions are based upon my education, training and experience. My opinions are stated to a reasonable degree of medical certainty unless otherwise specified. My general opinions regarding deaths temporally related to law enforcement apprehension and representative scientific literature forming the bases of these opinions can be found in the following scientific article, including the scientific literature cited in this publication (Graham MA, Investigation of Deaths Temporally Associated with Law Enforcement Apprehension, Acad Forensic Pathol 2014: 4(3): 366-389). A copy of my curriculum vitae and a list of testimony I have given as a consultant accompany this report.

My professional time is compensated at $500/hour plus expenses.

A list of the information available for my review follows in this report. Times cited in the records of various agencies may differ due to time sources that are not synchronized. Appended to this report is a list of references pertinent to the evaluation of deaths temporally related to law enforcement custody.

Tony Sain
January 28, 2021
Re: Kevin Niedzialek
Page 27

Nearly all ED patients who come to the attention of law enforcement personnel will be restrained, most of them forcibly. Sudden death is occasionally temporally associated with the forcible restraint of a person exhibiting signs of ED. The restraint (use of force) techniques employed during the apprehension and control of Mr. Niedzialek would not be expected to cause or contribute to the death of an otherwise healthy adult.

The role, if any, of forcible restraint in the pathogenesis of ED fatalities is not clear. Although a variety of restraint devices/techniques have been used in some of these fatalities, no proven contribution of these devices/techniques to death has been established in most cases. Although studies have not demonstrated over-representation of any particular forcible restraint technique among ED fatalities, some role in lethality for forcible restraint, in general, especially if the pursuit and exertion during restraint cause or significantly contribute to metabolic perturbations above and beyond those directly consequent to ED in the absence of such activities, cannot be excluded.

2.      Mr. Niedzialek was in the prone position, had pressure applied to his back and shoulders and was handcuffed during portions of the restraint. The weight of the current scientific information does not support the contention that being restrained in the prone position, handcuffed, hobbled, hogtied or have pressure applied to the back during the typical course of forcible restraint leads to clinically significant respiratory or cardiovascular compromise and/or death. The evidence does not indicate that pressure sufficient to induce compression asphyxia was applied to Mr. Niedzialek's chest. The lack of facial (including conjunctival) petechiae weighs against a diagnosis of compression asphyxia. Mr. Niedzialek's actions (combative behavior) after being restrained and after pressure had been removed from his torso exclude the occurrence of ultimately lethal asphyxia prior to this time.

3.      A TASER ECD was deployed in the probe (dart) mode and the darts were energized two times (5 seconds each). The ECD functioned as designed and caused muscular contraction in Mr. Niedzialek resulting in some degree of incapacitation. No serious injury was sustained by Mr. Niedzialek when he fell to the ground. He recovered from each discharge quickly and continued to carry out volitional activity after ECD use ceased. The ECD darts did not penetrate his chest. There is no evidence of ECD-induced ventricular tachycardia or ventricular fibrillation.

4.      The blunt force injuries (contusions, abrasions, lacerations and ECD dart penetrations) are consistent with the history of Mr. Niedzialek being injured

CONFIDENTIAL DOCUMENT                                    COR 03198

Tony Sain
January 28, 2021
Re: Kevin Niedzialek
Page 28

prior to the arrival of the deputies and also during the physical struggle as described by law enforcement personnel and depicted on the videos of the incident. These injuries did not result in any physiologic derangement that would cause or contribute to his death.

## Summary

In summary, it is my opinion to a reasonable degree of medical certainty that Mr. Niedzialek's death was consequent to ED that was induced by methamphetamine and was not specifically caused or contributed to by restraint-related asphyxia or discharge of an ECD. I would certify the cause of death as "Methamphetamine-induced excited delirium temporally associated with forcible restraint." The manner of death is "accident." I do not believe the deputies' actions played any significant causal role in Mr. Niedzialek's death.

## Exhibits & Consultation

I have reviewed a demonstrative forensic incident reconstructive timeline, prepared by Rod Englert in consultation with myself, a biomechanical expert, and an emergency medicine physician with expertise in asphyxial studies. Based on the evidence I have reviewed, it is my opinion that the facts depicted in this timeline demonstrative are accurate, and the timeline accurately illustrates facts pertaining to my opinions. Other than this demonstrative and/or select materials listed above, I do not anticipate offering any exhibits for publication at trial.

Thank you for referring this matter to me. Please do not hesitate to contact me if I can be of further assistance.

Sincerely,

Michael Graham, M.D.
Professor of Pathology

# EXHIBIT Y

1               UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, AN INDIVIDUAL   ) CASE NO.: 19-CV-02083-JGB
    AND AS SUCCESSOR IN INTEREST )                    (SHKx)
5   FOR KEVIN R. NIEDZIALEK,     )
    DECEASED,                    )
6                                )
                                 )
7                    PLAINTIFF,)
                                 )
8        VS.                     )
                                 )
9   RIVERSIDE COUNTY, RIVERSIDE  )
    SHERIFF'S DEPARTMENT,        )
10  SHERIFF-CORONER CHAD BIANCO, )
    DEPUTY SONIA GOMEZ, DEPUTY   )
11  BRIAN KEENEY, AND DOES 3-10, )
                                 )
12                   DEFENDANTS.)
    _____)
13

14

15          DEPOSITION OF RICHARD CLARK, M.D.

16              THURSDAY, APRIL 22, 2021

17

18

19

20

21  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
22  REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
    1244 West Edgewood Circle
23  Coeur d'Alene, Idaho 83815
    (661) 775-8299
24

25  FILE NO. 21264

                                                        1

1     DEPOSITION OF RICHARD CLARK, M.D., A

2     WITNESS, TAKEN ON BEHALF OF PLAINTIFF,

3     VIA VIDEOCONFERENCE, COMMENCING AT

4     1:03 P.M., ON THURSDAY, APRIL 22, 2021,

5     BEFORE ROSA I. GUZMAN, CSR NO. 12024,

6     PURSUANT TO NOTICE OF TAKING DEPOSITION.

7             * * *

8  APPEARANCES OF COUNSEL:

9  FOR PLAINTIFF:   HELM LAW OFFICE, PC
                    BY:  T. KENNEDY HELM, IV, ESQ.
10                644 40TH STREET
                    SUITE 305
11                OAKLAND, CALIFORNIA 94609
                    (510) 350-7517

12

13  FOR DEFENDANTS:  MANNING & KASS
                    ELLROD, RAMIREZ, TRESTER, LLP
14                BY:  GARROS CHAN, ESQ.
                    801 SOUTH FIGUEROA STREET
15                15TH FLOOR
                    LOS ANGELES, CALIFORNIA 90017
16                (213) 624-6900

17

18

19

20

21

22

23

24

25

                                    2

```
 1        DEPOSITION OF RICHARD CLARK, M.D., A

 2        WITNESS, TAKEN ON BEHALF OF PLAINTIFF,

 3        VIA VIDEOCONFERENCE, COMMENCING AT

 4        1:03 P.M., ON THURSDAY, APRIL 22, 2021,

 5        BEFORE ROSA I. GUZMAN, CSR NO. 12024,

 6        PURSUANT TO NOTICE OF TAKING DEPOSITION.

 7                          * * *

 8   APPEARANCES OF COUNSEL:

 9   FOR PLAINTIFF:    HELM LAW OFFICE, PC
                       BY:  T. KENNEDY HELM, IV, ESQ.
10                     644 40TH STREET
                       SUITE 305
11                     OAKLAND, CALIFORNIA 94609
                       (510) 350-7517
12

13   FOR DEFENDANTS:   MANNING & KASS
                       ELLROD, RAMIREZ, TRESTER, LLP
14                     BY:  GARROS CHAN, ESQ.
                       801 SOUTH FIGUEROA STREET
15                     15TH FLOOR
                       LOS ANGELES, CALIFORNIA 90017
16                     (213) 624-6900

17

18

19

20

21

22

23

24

25
                                                    2
```

**Ron Fernicola & Associates**

```
 1                         I N D E X

 2    WITNESS              EXAMINATION              PAGE

 3    RICHARD CLARK, M.D.   BY MR. HELM               4

 4

 5

 6                       E X H I B I T S

 7                       (None offered.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                                     3
```

**Ron Fernicola & Associates**

1

2                          RICHARD CLARK, M.D.,

3     a witness herein, having first been duly administered

4     the oath, deposed and testified as follows:

5

6                               EXAMINATION

7     BY MR. HELM:

8         Q    Good afternoon, Dr. Clark.

9         A    Good afternoon.

10        Q    My name is Kennedy Helm, and I'm one of the

11    attorneys for the plaintiff in this matter, Tracy Alves,

12    and as you know, this case is about the death of her

13    brother, Kevin Niedzialek.  I know people have issues

14    pronouncing his last name; so I'll just call him "Kevin"

15    if that's okay with you.

16        A    Yes, sir, that's fine.

17        Q    Okay.  So how many times have you had your

18    deposition taken before?

19        A    I would say about 50 or 75.

20        Q    So are you okay with forgoing the usual

21    admonitions at the beginning of a deposition?  I'm sure

22    you've heard them many times; right?

23        A    Yes, sir, I'm okay with that.

24        Q    Okay.  Great.  Now, you're in San Diego; right?

25        A    Yes, sir.

                                                          4

1    you look at my report, I try and clarify this -- to say

2    that Kevin, for instance, was suffering from

3    methamphetamine intoxication rather than taking the next

4    step and saying, "Oh, he was in excited delirium, and

5    that's why he died."

6         We know that methamphetamine intoxication kills

7    people.  We know that.  I've seen that over and over

8    again.  I don't have to make a diagnosis of excited

9    delirium to know that a methamphetamine level of .7 can

10   lead to somebody acting paranoid, can lead to somebody

11   committing suicide, can lead to somebody having

12   irregular heartbeats and that that, coupled with a

13   struggle, can cause the perfect storm to go into cardiac

14   arrest.

15        And so my opinion is that he was suffering from

16   methamphetamine intoxication coupled with a struggle

17   that led to a condition that led to cardiac arrest.

18        Q    Okay.  I asked that because you do mention

19   excited delirium several times in your report.

20        A    I do.

21        Q    And so I'm just trying to figure out are you

22   going to -- are you relying on excited delirium at all

23   in terms of formulating your opinion?

24        A    No.  I'm relying on methamphetamine

25   intoxication.

                                                        46

**Ron Fernicola & Associates**

1      Q    I'm looking at --

2      A    He could -- I'm sorry to interrupt you.  But he

3  could well have been suffering from what other people

4  would call excited delirium and what you and Dr. Di Maio

5  and the book may call excited delirium, but again, you

6  could easily argue with me if I said, "Yes, he was in

7  excited delirium," and you would say, "Well, what

8  grounds do you have to say that?"  And I'd have to talk

9  about his behavior and stuff that's talked about in the

10  book that you have.  But what I know with 100-percent

11  certainty that he was suffering from was methamphetamine

12  intoxication.

13      Q    All right.  So then I was going to ask you a

14  lot of questions about excited delirium, but it sounds

15  like you're not opining that excited delirium caused his

16  death.  Is that accurate?

17      A    That's correct.

18      Q    So you won't be testifying at trial about

19  excited delirium as a cause of death; right?

20      A    No, sir.  I'm going to specifically talk about

21  methamphetamine intoxication coupled with a struggle.

22      Q    And in terms of being coupled with a struggle,

23  are you also going to talk about his oxygenation?

24      A    Well, do we know what his oxygenation was?  I

25  don't think anybody ever measured that.

                                                    47

**Ron Fernicola & Associates**

1    could've been even lower in the field.

2         Q     So then just so that I'm clear, your opinion is

3    that he was on methamphetamine, he was involved in this

4    struggle, he had a catecholamine surge, and you think he

5    had metabolic acidosis and then all of that contributed

6    to him having a cardiac arrest?  Is that, in essence,

7    your opinion?

8         A     I think that's well put, Mr. Helm.  That's

9    correct.

10        Q     Okay.  And the cardiac arrest -- I guess what

11   I'm not clear about is in terms of -- so this was not a

12   straight -- strike that.

13             Was this a straight meth overdose?

14        A     Well, you and I have already talked about that.

15        Q     Yeah.

16        A     And you asked me that before, and I said no.

17        Q     Okay.

18        A     Because his level is high, but it's not high

19   enough that I would expect it to cause, by itself,

20   cardiac arrest.

21        Q     All right.

22        A     So the answer would be no.  I can't tell you

23   that he didn't take a lot of methamphetamine, more than

24   he normally does, but I do not think the methamphetamine

25   killed him by itself.

                                                    54

**Ron Fernicola & Associates**

1    subdue him?  How do we get him to calm down?"

2            You try talking to him, but he's under the

3    influence of this drug that's made him very paranoid.  A

4    lot of times they won't calm down.  And if the police

5    were given darts of Valium in the field that they could

6    shoot instead of Tasers, which is impossible to do under

7    the current rules of the DEA in the United States -- I

8    mean, that's what I do.  I sedate these people with

9    medicine in the ED as fast as I can because I know that

10   struggling, in this type of situation, can lead to

11   cardiac arrest.

12           And honestly -- I'm not a police expert; so I

13   don't know what they can do.  I'm sure they learn how to

14   talk, they learn how to do nonlethal things to these

15   people, but to me, it's a very difficult situation.

16      Q    BY MR. HELM:  So would it be accurate to say

17   that you don't believe the deputies, from a medical

18   standpoint, did anything to contribute to

19   Mr. Niedzialek's cardiac arrest?

20           MR. CHAN:  Objection.

21           Vague.  Misstates testimony.

22           THE WITNESS:  Well, they put handcuffs on him,

23   you know.  And most of us -- if I got handcuffs on me,

24   I'm not going to be kicking people or, let's say,

25   kicking the ground or hitting my head or rolling around

                                                          61

**Ron Fernicola & Associates**

1   as hard as I can.  I mean, you could say that the fact

2   that they restrained him at all and that he struggled

3   against that restraint led to this.  But I mean, they

4   didn't -- in my opinion, from what I saw in the video,

5   they didn't hold him down to the point where he was --

6   he couldn't breathe.  That's my opinion.  But again, I

7   haven't been asked to -- I'm not an expert in that.  But

8   I did not see anything that the police did that led to

9   his cardiac arrest.

10      Q    BY MR. HELM:  And so just hypothetically, if,

11   let's say, at the moment he was handcuffed, the deputies

12   did roll him on his side or sat him up, do you think

13   that would have improved his outcome here?

14          MR. CHAN:  Objection.

15          Speculation.  Assumes facts not in evidence.

16   Incomplete hypothetical.

17          THE WITNESS:  I don't know, Mr. Helm.  You

18   know, you'd love to feel like if every one of these

19   situations worked the right way and if they had just sat

20   him up, everything would have been fine.  I don't know.

21   Because we know how much of a struggle there was before

22   this.  We know he didn't look good when they first found

23   him, and we know that he had a significant

24   methamphetamine concentration.  So I just don't know.

25      Q    BY MR. HELM:  Do you have any opinion about

                                                    62

1       Outside the scope of this expert's designation.

2   Calls for speculation.

3       THE WITNESS:  You did a pretty good job going

4   over with me the time line and the respiratory numbers

5   earlier.  I don't know that I can comment outside of

6   what we have already discussed.

7       Q    BY MR. HELM:  Okay.  And so do you have any

8   opinions about the coroner's determination or the

9   pathologist's determination of the manner of death or

10  anything like that?

11      MR. CHAN:  Objection.

12      Exceeds the scope of this expert's designation.

13      THE WITNESS:  Anything specific you want to ask

14  me about that, Mr. Helm, I'm happy to talk about it, but

15  are you asking me if I disagree with his opinion?

16      Q    BY MR. HELM:  Yeah, do you disagree with the

17  manner of death?

18      MR. CHAN:  Same objection.

19      THE WITNESS:  You mean the cause of death that

20  he said was due to methamphetamine intoxication?

21      Q    BY MR. HELM:  Well, so the cause of death he

22  said was acute methamphetamine intoxication; right?

23      A    Correct.

24      Q    And then other significant contributing factors

25  were the restraint maneuvers by the police; right?

65

**Ron Fernicola & Associates**

1      A    So if I were to characterize what I think he

2    meant by saying that, he would probably -- and I can't

3    remember if he did in his deposition -- he would

4    probably elaborate and say, "Well, it was the struggle

5    against the restraint that he was doing in that

6    situation."  I don't think he meant that the restraint

7    itself was a contributing factor but the restraint

8    coupled with the struggle.

9      Q    I mean, you don't do pathological work; right?

10   Pathology work.

11     A    No, sir.

12     Q    Okay.  Could we just go off the record for a

13   couple of minutes.  I'm just going to check to see if I

14   have anything else.

15     A    Sure.

16     Q    Three minutes.

17     A    Sounds good.

18          (A short break was taken.)

19     Q    BY MR. HELM:  So Dr. Clark, thank you for your

20   time.  And would it be accurate to say we've covered all

21   the opinions that you are going to give in this case?

22     A    Yes, sir.

23     Q    Great.  Could we go off the record just for

24   second.

25          (A discussion was held off the record.)

66

**Ron Fernicola & Associates**

```
 1  STATE OF CALIFORNIA    )
                           )  SS.
 2  COUNTY OF LOS ANGELES  )

 3

 4          I declare under penalty of perjury under the

 5  laws of the State of California that I have read the

 6  foregoing transcript; I have made any corrections,

 7  additions, or deletions that I was desirous of making in

 8  order to render the within transcript true and correct;

 9  and

10          IN WITNESS WHEREOF, I have hereunto subscribed

11  my name this _____ day of _____, 20____,

12  at _____, California.

13

14         _____
                    RICHARD CLARK, M.D.
15

16

17

18

19

20

21

22

23

24

25
                                                        70
```

**Ron Fernicola & Associates**

```
1  STATE OF CALIFORNIA     )
                           )  SS.
2  COUNTY OF LOS ANGELES   )

3

4           I, ROSA I. GUZMAN, CERTIFIED SHORTHAND

5  REPORTER NO. 12024, DECLARE:

6           THAT PRIOR TO BEING EXAMINED, THE WITNESS

7  NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

8  ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE

9  TRUTH, AND NOTHING BUT THE TRUTH;

10          THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT

11 THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN

12 BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY

13 DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE

14 FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF

15 MY SHORTHAND NOTES SO TAKEN.

16          I FURTHER DECLARE THAT I AM NEITHER COUNSEL

17 FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

18 ANYWISE INTERESTED IN THE OUTCOME THEREOF.

19          I DECLARE UNDER PENALTY OF PERJURY UNDER THE

20 LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

21 TRUE AND CORRECT.

22          IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

23 MY NAME THIS 23RD DAY OF APRIL, 2021.

24

25 _____
                                                        71
```

# EXHIBIT Z

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, Individully,    )  CASE NO.:
    and as Successor in Interest )
5   for KEVIN R. NIEDZIALEK,     )  19-CV-2083-JGB-SHK
    deceased,                    )
6                                )
                  Plaintiff,     )
7                                )
        VS.                      )
8                                )
    RIVERSIDE COUNTY,            )
9   RIVERSIDE SHERIFF'S          )
    DEPARTMENT, SHERIFF-CORONER  )
10  CHAD BIANCO, DEPUTY SONIA    )
    GOMEZ, DEPUTY KEENEY, and    )
11  DOES 3-10,                   )
                                 )
12                DEFENDANTS.    )
    _____)
13

14         DEPOSITION OF DONALD M. DAWES, M.D.

15              ZOOM VIDEOCONFERENCE

16              FRIDAY, APRIL 9, 2021

17

18

19

20  RON FERNICOLA & ASSOCIATES
    CERTIFIED SHORTHAND REPORTERS
21  REPORTED BY:  LESLIE A. TOLEDO, CSR NO. 8345
    1244 West Edgewood Circle
22  Coeur d'Alene, Idaho 83815
    (661) 775-8299
23

24  FILE NO. 21248

25
                                                        1

1   DEPOSITION OF DONALD M. DAWES, M.D., TAKEN

2   ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

3   COMMENCING AT 9:58 A.M., AND ENDING AT 11:53 A.M., ON

4   FRIDAY, APRIL 9, 2021, BEFORE LESLIE A. TOLEDO,

5   CSR NO. 8345, PURSUANT TO SUBPOENA.

6                              * * *

7   APPEARANCES OF COUNSEL:

8   FOR PLAINTIFF:      THE LAW OFFICES OF JOHN BURTON
                        BY:  JOHN BURTON, ESQ. - VIA ZOOM
9                       128 NORTH FAIR OAKS AVENUE
                        PASADENA, CALIFORNIA 91103
10                      (626) 449-8300

11                      HELM LAW OFFICE
                        BY:  T. KENNEDY HELM, ESQ. - VIA ZOOM
12                      644 40TH STREET
                        SUITE 305
13                      OAKLAND, CALIFORNIA 94609
                        (510) 350-7517

14

15  FOR DEFENDANTS:     MANNING & KASS, ELLROD, RAMIREZ,
                        TRESTER, LLP
16                      BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                        801 S. FIGUEROA ST.
17                      FIFTEENTH FLOOR
                        LOS ANGELES, CALIFORNIA 90017
18                      (213) 978-8100
                        tms@manningllp.com
19

20

21

22

23

24

25
                                                        2

```
 1                      I N D E X

 2   WITNESS                              PAGE

 3   DONALD M. DAWES, M.D.

 4   EXAMINATION BY MR. BURTON              4

 5   EXAMINATION BY MR. SAIN               62

 6

 7

 8                  E X H I B I T S

 9               (None offered.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                              3
```

**Ron Fernicola & Associates**

1          FRIDAY, APRIL 9, 2021; VIA ZOOM VIDEOCONFERENCE

2                          9:58 A.M.

3

4                       DONALD M. DAWES, M.D.,

5     the witness herein, having first been duly administered

6     the oath, testified remotely as follows:

7

8                         EXAMINATION

9     BY MR. BURTON:

10        Q.   Good morning, Doctor.  Thank you for your timely

11    appearance on Zoom.

12        A.   Good morning.

13        Q.   Could you just state your complete name for the

14    record, please.

15        A.   Donald Murray Dawes.

16        Q.   And I understand that you're a medical doctor

17    certified in emergency medicine; is that correct?

18        A.   That's correct.

19        Q.   And I understand that you've had your deposition

20    taken in the capacity of an expert witness on multiple

21    occasions?

22        A.   I have.

23        Q.   Is there anything about this procedure that

24    you're uncertain about or you need clarification of

25    before we go forward?

4

1   it, but you're ruling out certain proposed causes of

2   death; correct?

3      A.   That's correct, sir.

4      Q.   But you're not attributing this cardiac

5   arrest -- he was in cardiac arrest when -- you would

6   agree he was in cardiac arrest when the paramedics found

7   him; correct?

8      A.   Yes, sir.

9      MR. SAIN:  Compound.

10      Q.   BY MR. BURTON:  And so you're not offering an

11   opinion, as an expert witness or medical doctor in this

12   case, as to what the cause of that cardiac arrest is; is

13   that correct?

14      A.   That's correct, sir, I'm not offering an opinion

15   on the cause of death in this case.

16      Q.   But you are offering opinions to rule out

17   certain causes of death; would that be correct?

18      A.   A specific cause of death, yes, sir.

19      Q.   Now, I'd like to invite your attention to your

20   report.  You have a summary of the facts of the case, and

21   I'd like to just ask you about a few of the facts.

22      Before I do, it's correct that you've conducted

23   and published research on the physiological effects of --

24   I call them, "Taser devices"; can we use that term?

25      A.   You can use that term.

                                                                            12

1      Q.   Okay.  That are now manufactured by Axon

2   Corporation, previously, Taser International.  You've

3   conducted research and published results on that;

4   correct?

5      A.   Yes, sir.

6      Q.   And would you consider yourself an expert on the

7   physiological effects of Tasers?

8      A.   Yes, sir.

9      Q.   And you can -- your opinion, if I understand it,

10   is ruling out the two five-second Taser applications that

11   Mr. Niedzialek received during this incident, as having

12   any sort of substantial contribution to the death of

13   Mr. Niedzialek; is that correct?

14      A.   My opinion is that the two, five-second

15   exposures, did not substantially contribute to the death

16   of the decedent, correct.

17      Q.   Would you agree that the two five-second

18   exposures did contribute marginally -- and we can talk

19   about the exact numbers -- but did marginally increase

20   Mr. Niedzialek's lactate level, and therefore, acidosis?

21           MR. SAIN:  Objection.  Calls for speculation,

22   incomplete hypothetical.

23           THE WITNESS:  Sorry, can you repeat the

24   question, Mr. Burton?

25      Q.   BY MR. BURTON:  Sure.  I mean, you don't say in

                                                              13

**Ron Fernicola & Associates**

1    Q.   So for the purpose of your opinion in this case,

2    are you using this data as what likely would have

3    happened to Mr. Niedzialek's blood acid as a result of

4    the two five-second Taser exposures?

5    A.   I think that's fair to make that comparison.

6    Q.   So we talked about the PH, and then, similarly,

7    the lactate level in his blood went from, let's say, at

8    least of a person at rest, from 1.30 to 5.49.  That's

9    just a similar way to measure metabolic acidosis;

10   correct?

11   A.   Yes, sir.

12   Q.   So neither of those are profound changes that

13   could explain a PEA cardiac arrest; would you agree with

14   that?

15   A.   I would agree with that.

16   Q.   And that's the essence of your opinion in this

17   case; correct?

18   A.   That effect would not be substantial in --

19   contribute substantially to his PEA arrest, yes.

20   Q.   Through any of the available mechanisms,

21   including acidosis; correct?

22   A.   Sorry, could you rephrase that?  I want to make

23   sure I'm answering your question precisely.

24   Q.   Well, you're saying that the two five-second

25   Taser discharges did not contribute substantially to the

                                                        50

**Ron Fernicola & Associates**

1    of using the kitchen sink to use a layperson's word, you

2    might give them bicarb to see if it helps, but it's not

3    standard ACLS algorithm.

4           Usually, where, if it's a known kidney dialysis

5    patient, that you might think preexisting acidosis caused

6    it, that you might try that more readily, or if there's a

7    toxicology reason for it, you might try the bicarbonate

8    for a toxicology reason.

9        Q.   You don't give them, like, an oxygen mask or

10   cannula?

11       A.   Oh, we do.  But there's no -- that's actually --

12   unless they're hypoxic, it's often considered -- well, I

13   would say that's an area of debate in medicine, because

14   some people believe that hyper-oxygenation can cause more

15   injury, particularly with brain resuscitation.

16          So that's a pretty open-ended question and I'm

17   not on the cutting edge of the research, as a community

18   ER doc on that.

19       Q.   Thank you.  So you also have your patients in

20   certain positions in their bed; correct, when they're in

21   your ER?

22       A.   Patients are almost always supine in the ER.

23   Face up.

24       Q.   Why don't you have them prone?

25       A.   It's hard to work -- hard to monitor their

                                                      60

**Ron Fernicola & Associates**

1  airway when they're prone.  As I'm sure you've heard and

2  most of us have become familiar with during this last

3  year, that sometimes patients are placed prone for

4  ventilatory reasons under certain circumstances.

5     Q.   Well, those are people with COVID or some kind

6  of pneumonia; correct?

7     A.   Or ARDs, or certain body habituses.  Sometimes

8  it's felt that they get better ventilation, morbidly

9  obese people, prone, but that is an area outside of my

10 expertise.  I usually let intensivists make those calls.

11    Q.   But the standard of care for an ER doc, is to

12 have the patient supine on his or her back; correct?

13       MR. SAIN:  Rule 26 relevance, argumentative.

14       THE WITNESS:  They're usually on their back.  I

15 don't know that there's necessarily a standard of care

16 thing.  I think some of it's practicality.

17    Q.   BY MR. BURTON:  Now, just a couple things and

18 then I'll be done a little early.  You talk a little bit

19 in your opinion about, you know, whether police should be

20 rolling people on their side after handcuffing.  You

21 don't say it that directly, one way or another?

22    A.   Okay.  I was going to say I don't remember that.

23    Q.   Yeah.  Do you intend to offer any opinions in

24 this case about what police should or shouldn't do after

25 handcuffing a -- for you, it would be a patient -- but

                                                        61

1   that it was statistically significant, but it was --

2   relative to the other causes, it was only modest.

3       Q.   And did you describe that effects, the Taser

4   electrical effect, on acidosis or PH, did you describe

5   that as insubstantial?

6       A.   Are we talking about related to the case here or

7   in the study?

8       Q.   Talking about the study.

9       A.   In the study, it was -- I think, it was very

10  small compared -- it was three to four-fold difference

11  between the, for example, the exertion, the fighting

12  component, and the Taser's component.

13      Q.   So from a medical perspective, according to your

14  studies, does Taser electricity have a medically relevant

15  contribution to PH or acidosis?

16          MR. BURTON:   I'm going to object.   I don't

17  understand what "medically relevant" means in this

18  context.

19          THE WITNESS:   So I think it has to be related to

20  the specific question.   So in this case, I would say,

21  "No," it does not have a substantial contribution.

22      Q.   BY MR. SAIN:   There were some questions

23  Mr. Burton asked you about paramedics being able to tell

24  the difference between regular breathing and agonal

25  breathing.   Do you remember those questions?

63

1          (Signature page to the deposition of

2                Donald M. Dawes, M.D.)

3

4                    --oOo--

5       I hereby certify under the penalty of perjury that I

6   have read the foregoing transcript.

7       Corrections, if any, were noted by me, and the same

8   is now a true and correct transcript of my testimony.

9       Executed this _____day of _____,

10  2021, at _____.

11

12

13                  _____

14                  DONALD M. DAWES, M.D.

15

16

17

18

19

20

21

22

23

24

25
                                                        70

1

2

3                    REPORTER'S CERTIFICATE

4

5      I, Leslie A. Toledo, CSR #8345, a certified shorthand

6   reporter licensed by the State of California, do hereby

7   certify:

8      That prior to being examined, the witness named in

9   the foregoing deposition, DONALD M. DAWES, M.D., stated

10  to testify to the truth, the whole truth, and nothing but

11  the truth;

12     That the said deposition, taken down by me in

13  stenotype, was thereafter reduced to typewriting by

14  computer-aided transcription under my direction and is a

15  true record of the testimony given and of any changes

16  made by the deponent.

17     I further certify that I am not in any way

18  interested in the outcome of this action and that I am

19  not related to any of the parties thereto.

20     Witness my hand this day     of            , 2021.

21

22                        _____

23                        LESLIE A. TOLEDO, CSR #8345

24

25
                                                          72