1  Eugene P. Ramirez, Esq. (State Bar No. 134865)
    *epr@manningllp.com*
2  Tony M. Sain, Esq. (State Bar No. 251626)
    *tms@manningllp.com*
3  Garros Chan, Esq. (State Bar No. 320561)
    *gxc@manningllp.com*
4  **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**
5  801 S. Figueroa St, 15th Floor
   Los Angeles, California 90017-3012
6  Telephone: (213) 624-6900
   Facsimile: (213) 624-6999
7
8  Attorneys for Defendants COUNTY OF
   RIVERSIDE, RIVERSIDE SHERIFF'S
   DEPARTMENT, SHERIFF-CORONER CHAD
9  BIANO, DEPUTY GOMEZ and DEPUTY
   KEENEY
10

11             **UNITED STATES DISTRICT COURT**

12    **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

| | |
|---|---|
| 14  TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased, | Case No. 5:19-CV-02083-JGB(SHKx) *[Hon. Jesus G. Bernal; Magistrate Judge Shashi H. Kewalramani]* |
| 16           Plaintiff, | **STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT** |
| 17           v. | |
| 18  RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO and DOES 1-10, | |
| 20           Defendants. | [Filed Concurrently with Defendants' Motion for Summary Judgment; Attorney Declaration; Notice of Lodging; and (Proposed) Order] |
| | Date:  June 21, 2021 Time: 9:00 a.m. Ctrm: 1 (Riverside) |
| | Action filed: October 30, 2019 Trial Date:  September 14, 2021 |

27  TO PLAINTIFF TRACY ALVES, Individually and as Successor in Interest for

28  KEVIN R. NIEDZIALEK, deceased, AND TO HER ATTORNEYS OF RECORD:

In accordance with C.D. Cal. Local Rule 56-1 and Section 12 of this Court's Standing Order of November 18, 2019 (Doc. 11), defendants COUNTY OF RIVERSIDE, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANO, DEPUTY GOMEZ and DEPUTY KEEN submit the following statement of uncontroverted facts and conclusions of law in support of their motion for summary judgment, or partial summary judgment, in this action.

The following uncontroverted facts apply to all federal and state claims.

## STATEMENT OF FACTS

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | **A. Niedzialek's History Of Drug Abuse.** | |
| 1. | Until about 2 years prior to the incident at issue in this case, Niedzialek had been a recovering and relapsing drug addict, including abuse of methamphetamine. However, for about 1 ½ to 2 years leading up to the incident, Niedzialek had been completely sober from drugs and alcohol.  Then, circa July 2019, Niedzialek relapsed and began abusing drugs, including methamphetamine. | Ex. C, FAC, ¶ 12. Ex. D, Aispuro dep., 46:21-47:8, 48:3-22, 51:9-14, 54:10-19, 55:5-7; Ex. E, Czuczka dep., 53:19-23, 89:3-15; Ex. F, Earnest dep., 57:20-25, 58:1-16, 58:21-59:5, 75:8-20, 75:24-76:5, 77:12-22; Ex. G, Graff dep., 43:8-10, 44:21-23, 67:23-68:10. |

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 2. | When he relapsed, Niedzialek was staying temporarily with a friend at Apartment 27A in a complex located at 42200 Moraga Road in Temecula, California. | Ex. C, FAC, ¶ 13; Ex. E, Czuczka dep., 20:22-24, 85:10-13, 88:19-25. |
| 3. | During the early afternoon of July 29, 2019, before any contact with any Riverside County Sheriff Department ("RCSD") deputies that day, Niedzialek sustained a large laceration on his head, apparently while inside the apartment.  The origin of this bloody head injury is unclear. | Ex. 3, FAC, ¶ 13. |
| | **B. Reports To Sheriff's Dept.** | |
| 4. | Starting shortly after 2:10 p.m., RCSD dispatch received several 9-1-1 calls from Niedzialek's neighbors: who reported noises, yelling and other actions by an unarmed man with a bloody head wound. | Ex. C, FAC, ¶ 14. |
| 5. | The subject was reportedly wearing pajama pants with no shirt, and was bleeding from the head. | Ex. C, FAC, ¶ 14. |

3

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | **C. Initial Contact.** | |
| 6. | Shortly after 2:30 p.m., Riverside County Sheriff Deputies Deputy Brian Keeney and Deputy Sonia Gomez arrived separately at the apartment complex, and they approached the scene from different directions. | Ex. C, FAC, ¶¶ 3, 5, 15; Ex. H, Keeney Dep., 4:14-16, 60:5-8; Ex. I, Gomez dep., 8:24-9:2, 78:3-9. |
| 7. | Deputy Keeney was not wearing a body worn camera ("BWC"). | Ex. C, FAC, ¶ 15. |
| 8. | When Deputy Keeney first saw Niedzialek and his head injury, he requested medical to respond to the location: before any force was used. | Ex. H, Keeney dep., 52:2-14, 54:22-55:4, 61:23-62:9. |
| 9. | Deputy Gomez activated her body-worn camera and shortly thereafter located Deputy Keeney encountering Niedzialek. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 00.00.000-05:41.000 (15:18:05-15:23:45); Ex. C, FAC, ¶ 15. |
| 10. | At that time, Niedzialek had a visible bleeding head wound, and he was speaking incoherently while sitting on the ground near one of the apartments. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 05:47.833 (15:23:45-15:23:58). |

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 11. | When Deputy Gomez walked up to Deputy Keeney and Niedzialek and she saw Niedzialek's head injury, she also immediately requested a medical response. | Ex. A, composite video; Ex. B, Englert timeline power point and composite video 5:53.833 (15:23:58); Ex. I, Gomez dep., 86:9-15, 86:22-87:9. |
| | **D. 1st TASER Discharge.** | |
| 12. | Despite deputy commands, Niedzialek then stood and abruptly advanced toward Deputy Keeney. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:54.500 (15:23:59). |
| 13. | While charging toward Deputy Keeney, Niedzialek reached around to the back of his waistband. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:54.667 (15:23:59). |
| 14. | Believing Niedzialek was about to attack Deputy Keeney, Deputy Gomez raised her TASER and aimed it at Niedzialek. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:55.267 (15:24:00); Ex. I, Gomez dep., 115:20-116:3. |
| 15. | For a split-second, Niedzialek then paused his charge toward Deputy Keeney. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:55.333 (15:24:00). |

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 16. | However, Niedzialek then resumed his quick advance on Deputy Keeney. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:56.467 (15:24:01). |
| 17. | Believing that Niedzialek was threatening harm to Deputy Keeney, Deputy Gomez deployed her TASER in dart mode: striking him in the right bicep and right side of his ribcage. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:56.733 (15:24:01); Ex. I, Gomez dep., 91:20-92:1; Ex. J, Fajardo dep., 59:24-61:4. |
| 18. | In response, Niedzialek then fell forward to the ground. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 5:56.967-5:57.867 (15:24:01-15:24:02.) |
| | **E. 2nd TASER Discharge.** | |
| 19. | Deputy Keeney then moved in to try to restrain Niedzialek; but as the suspect sat up, Deputy Keeney retreated and he tried to use verbal commands and words to calm Niedzialek down. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:03.433 (15:24:08); Ex. H, Keeney dep., 64:8-25. |
| 20. | Throughout this period, the deputies gave Niedzialek numerous | Ex. A, composite video; Ex. B, Englert Forensic Incident |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | commands to calm down, to turn around and put his hands behind his back, to lie down and to get on his stomach. Niedzialek did not comply with these commands. | Timeline Demonstrative 6:09.333 (15:24:14)-6:38.733 (15:24:43); Ex. H, Keeney dep., 65:8-14;  Ex. I, Gomez dep., 89:20-90:12, 90:21-91:3. |
| 21. | After moving to his knees, Niedzialek then stood back up and again charged at Deputy Keeney. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:38.733 (15:24:43). |
| 22. | Perceiving the suspect to be threatening Deputy Keeney again, Deputy Gomez then pulled the trigger on her TASER device a second time.  This sent a second 5-second discharge of low-amperage electricity through Niedzialek's skeletal muscles: again causing temporary neuromuscular incapacitation ("NMI"). | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:39.167 (15:24:44); Ex. I, Gomez dep., 88:1-25, 115:8-15; Ex. K, Dawes report, pp 4-5. |
| 23. | As a result, Niedzialek again fell forward into the ground, landing near some dirt and a tree. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:39.233 (15:24:44). |

7

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | **F. Hands-On Restraint.** | |
| 24. | Both RCSD deputies then moved in to try to restrain Niedzialek on the ground. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:40.900 (15:24:45). |
| 25. | While trying to gain control of Niedzialek's left arm, at times, Deputy Keeney placed his right knee on or near Niedzialek's left shoulder blade. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:43.967 (15:24:48). |
| 26. | While trying to gain control of Niedzialek's right arm, and to keep him from getting up, Deputy Gomez retrieved her handcuffs. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 6:52.300 (15:24:57). |
| 27. | Throughout this period, while Niedzialek was partially prone on the ground before handcuffing, Niedzialek actively resisted the deputies' restraint efforts: pulling his arms away from the deputies, lifting his hips and stomach off of the ground, rolling toward his side, and kicking. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:06.400 (15:25:11); Ex. H, Keeney dep., 27:11-13, 55:9-15, 64:17-25; Ex. I, Gomez dep., 88:1-21, 93:2-8, 96:13-18. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 28. | At one point during this period, Deputy Keeney lifted his right knee off Niedzialek's left side near the mid-back or shoulder area. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:07.867 (15:25:12). |
| 29. | During this pre-cuffing period, at one point, Niedzialek lifted his head and shoulders up off the ground while still kicking. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:15.567 (15:25:20). |
| 30. | After about 35 seconds of struggle, Deputy Gomez was finally able to secure both of Niedzialek's hands behind his back in her handcuffs. | Ex. A, composite video; Ex. B, Englert timeline power point and composite video 6:43.967-7:19.567 (15:24:48-15:25:24). |
| 31. | After Niedzialek was handcuffed, Deputy Gomez then made a second call for medical aid to come to the scene: this was the third call for medical help, but the first post-TASERing. | Ex. E, Gomez dep., 94:24-95:14. |
| 32. | Notably, for any and all of the deputies' uses of force or restraint that occurred prior to handcuffing completion, plaintiff concedes that such were consistent with standard | Ex. L, Noble dep., 48:10-17, 87:1-7, 87:8-15, 88:16-25, 97:14-22. |

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | police practices for the reasonable use of force. | |
| **G. Post-Handcuff Restraint.** | | |
| 33. | Despite being in handcuffs, Niedzialek continued what the deputies perceived as his active physical resistance: bucking, rolling his right abdomen off the ground, and kicking and flailing his legs. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:21.867 (15:25:26); Ex. H, Keeney dep., 27:11-16, 51:8-10; Ex. I, Gomez dep., 94:9-12, 96:13-18; 96:19-98:5, 117:15-24. |
| 34. | In response, at one point, Deputy Keeney removed his right knee from Niedzialek's back/shoulder area. Instead, Deputy Keeney crouched by Niedzialek's left shoulder with his right knee over, not on, the subject. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:25.833 (15:25:30). |
| 35. | Despite this, Niedzialek kicked and flailed his legs towards the deputies and he was bucking and he was rolling – raising his left hip off the ground in a manner the deputies perceived as further active resistance. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:26.700 (15:25:31), 7:26.767 (15:25:31), 7:26.900 (15:25:31); Ex. I, Keeney dep., 41:16-42:6, 51:8-10. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 36. | At this point, Deputy Gomez sat on her heels.  Her left knee was on the ground and her right knee was approximately perpendicular to the ground. She did not place any of her knees on the subject at any time. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:26.700-7:27.633 (15:25:31-15:25:32); Ex. I, Gomez dep., 95:15-97:6. |
| 37. | When a cuffed Niedzialek then rolled to his left side, Deputy Keeney placed his right knee on the subject's left shoulder to try to prevent the subject from kicking. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:40.700 (15:25:45); Ex. H, Keeney dep., 67:9-13. |
| 38. | During this time, Deputy Keeney crouched with his left knee up and his right knee touching Niedzialek's mid-back or shoulder area. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:40.933 (15:25:45); Ex. H, Keeney dep., 93:8-18. |
| 39. | Throughout this period, Niedzialek continued moving in a manner the deputies construed as resistance: bending his knees, lifting his hips and kicking his legs as though trying to escape custody – which concerned the deputies as a potential public safety threat. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:45.333 (15:25:50) -7:50.967 (15:25:55); Ex. H, Keeney dep., 93:19-94:7; Ex. I, Gomez dep., 96:19-97:14, 117:15-118:8. |

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 40. | While Niedzialek continued to move in this manner, Deputy Keeney held Niedzialek's left, cuffed wrist while his right knee remained on the subject's left shoulder. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 8:57:200 (15:27:02). |
| 41. | However, as Niedzialek's movements decreased, after about 1 minutes and 18 seconds of struggle, Deputy Keeney lifted his right knee from Niedzialek's left shoulder. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:40.700 -8:58:767 (15:25:45-15:27:03). |
| 42. | At this point, Niedzialek was grunting and breathing loudly. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 9:01:500 (15:27:06). |
| 43. | Deputy Keeney's right knee was then over, not on, Niedzialek. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 9:01:500 (15:27:06). |
| 44. | When Deputy Keeney moved his right knee off of Niedzialek's left shoulder at this point, there were no further knees placed on the subject's body for the remainder of the restraint. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 9:50:633 (15:27:55); Ex. H, Keeney dep., 27:23-28:3; Ex. I, Gomez dep., 95:15-25. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 45. | At this point, the deputies continued to restrain Niedzialek.  Deputy Keeney held the subject by placing his right hand on the subject's cuffed hands and his left hand on the subject's left shoulder blade. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 10:07:167 (15:28:12); Ex. H, Keeney dep., 27:23-28:3. |
| 46. | Deputy Gomez continued to restrain Niedzialek by placing her right hand on the mid-back of the subject, between the shoulder blades. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 10:07:167 (15:28:12). |
| 47. | Deputy Keeney weighed about 180 pounds on the incident date.  Deputy Gomez weighed about 135 pounds that day.  Niedzialek was about 6 feet two inches tall and weighed about 162 pounds. | Ex. M, Kode report, p. 25; Ex. N, Fajardo Autopsy report, p. 2. |
| 48. | At this point, while Deputy Keeney held the subject with a hand by the left shoulder and a hand on the cuffed hands at the subject's lower back, and Deputy Keeney held the subject with a single hand on his mid-back, and when neither deputy was kneeling, sitting, or laying on | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 10:10:233 (15:28:15); 10:20:867 (15:28:25); 10:23.267 (15:28:28); 10:26.933 (15:28:31); 10:32.567 (15:28:37); |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | the subject, Niedzialek was visibly breathing. | 10:38.867 (15:28:43); 10:53.167 (15:28:58); 11:02.833 (15:29:07); 11:13.900 (15:29:18). |
| 49. | About 4 minutes and 40 seconds after the handcuffs were connected, and about 3 minutes after the last moment when any knee was on the subject, Deputy Keeney observed that Niedzialek might no longer be breathing. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 7:19.567 (15:25:24), 8:58.767 (15:27:03), 11:59.033 (15:30:04). |
| 50. | At this point, Deputy Gomez removed her hand from Niedzialek's back. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:09.700 (15:30:14). |
| 51. | At that moment, there was a hand print on Niedzialek's back, indicating that blood was possibly not profusing. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:09.700 (15:30:04); Ex. O, Chan dep., 53:15-25. |
| 52. | In order to check the subject's medical status, the deputies then rolled Niedzialek onto his back. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:11.667 (15:30:16). |

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

14

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 53. | Deputy Gomez then checked Niedzialek's pulse. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:15.833 (15:30:20). |
| 54. | Deputy Gomez stated that she detected that Niedzialek had a slow pulse. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:26.100 (15:30:31). |
| 55. | Deputy Keeney did not render CPR to Niedzialek before paramedics arrived because he saw Niedzialek breathing and Deputy Gomez indicated that Niedzialek had a pulse.  According to their training, CPR was not appropriate under these circumstances. | Ex. H, Keeney dep., 25:16-21; 32:14-25; Ex. I, Gomez dep., 60:20-61:13. |
| 56. | About 2 minutes after the subject was flipped to a supine position, paramedic LaRusso then arrived at Niedzialek's location in the apartment complex. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 12:11.667 (15:30:16)- 14:23.333 (15:32:28). |
| 57. | LaRusso quickly determined that Niedzialek was not breathing, and | Ex. A, composite video; Ex. B, Englert Forensic Incident |

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | she instructed the deputies to begin CPR. | Timeline Demonstrative 14:32.067 (15:32:37). |
| 58. | Prior to this moment, both Deputy Keeney and Deputy Gomez were unaware that Niedzialek had any urgent or life-threatening medical problems. | Ex. H, Keeney dep., 32:22-25, 89:20-90:4, 90:10-15; Ex. I, Gomez dep., 60:20-61:13, 100:22-24, 101:7-14, 102:19-25. |
| 59. | Deputy Keeney then began CPR with EMS until the subject was transported from the scene. | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative 14:53.967 (15:32:58). |
| 60. | However, Niedzialek later died, on July 30, 2019. | Ex. P, death certificate [Doc. 5]. |
| 61. | Niedzialek's heart and lungs were harvested for organ donation. Typically, damaged, injured, or diseased organs are not harvested for donation. | Ex. J, Fajardo dep., 66:1-22, 69:5-20, 74:6-75:5, 150:7-151:2. |
| | **H. Deputy Training.** | |
| 62. | Both Deputy Gomez and Deputy Keeney received the following training as law enforcement officers: | Ex. H, Keeney dep., 92:7-17; Ex. I, Gomez dep.,  38:24-39:1, 39:13-22, 48:25-50:3. |

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

16

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | that even for subjects suspected of experiencing excited delirium, even if a suspect was handcuffed, the safest position – for both the subject and the officer – is for the subject to be restrained in a prone position. Once restrained effectively, their training was to request medical aid to the scene. | |
| 63. | Neither of the defendant deputies was ever trained that certain restraint positions, such as prone positioning, may be more dangerous or risky to subjects' health than others. | Ex. H, Keeney dep., 91:22-92:6, 92:18-24; Ex. I, Gomez dep., 50:4-16, 51:5-16, 52:3-53:22. |
| 64. | Neither deputy was trained that placing a restrained subject on their side, a so-called "recovery position," was advisable.  Rather, both deputies were trained that prone restraint has no negative impacts on a subject's breathing. | Ex. H, Keeney dep., 38:8-12, 39:5-21; Ex. I, Gomez dep., 50:21-51:4; |
| 65. | RCSD has a Training Bureau that is responsible for keeping the Department's deputies up to date | Ex. Q, Bianco dep., 55:9-25. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | with the latest techniques, tactics, and issues affecting law enforcement. | |
| 66. | Although in the early 1990s, RCSD was aware of a possible risk from prone restraint called "positional asphyxia," in the late 1990s and ever since, RCSD is aware that multiple medical studies have debunked the theory of positional asphyxia. | Ex. O, Chan dep., 63:13-64:7; Ex. Q, Bianco dep., 45:21-47:9; Ex. R, Chan report, pp. 9-10; Ex. S, Graham dep. 67:15-69:3. |
| 67. | Notably, the author of the medical study that started the concern about positional asphyxia, Dr. Reay, later admitted that he was wrong about positional asphyxia. | Ex. O, Chan dep., 63:13-64:7; Ex. R, Chan report, pp. 9-10; Ex. S, Graham dep. 67:15-69:3. |
| 68. | RCSD is aware that, from the late 1990s to the present, multiple medical studies have proved that prone restraint poses no medical risk to the restrained subjects, and causes no impairment to breathing. | Ex. O, Chan dep., 63:13-64:7; Ex. Q, Bianco dep., 50:15-51:11, 57:19-58:21; Ex. R, Chan report, pp. 9-10; Ex. S, Graham dep. 67:15-69:3; Ex. T, Vickers dep. 38:10-24. |
| 69. | The safety of subjects is a top concern of the RCSD, along with the | Ex. Q, Bianco dep., 51:22-52:19. 60:5-61:4. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | safety of the public and safety of its law enforcement officers. | |
| 70. | In light of the decades of medical research known to RCSD about prone restraint, showing that it is safe and does not cause or contribute to asphyxia, RCSD trains its deputies, including the defendants, that the safest position – for the subject, the deputy, and the public – for a person to be restrained is in the prone, cuffed position. | Ex. Q, Bianco dep., 57:19-58:21. |
| 71. | RCSD does not train its deputies on the use of rear-connected hobble restraints or "hog-ties"; and no such restraint was used during this incident. | Ex. T, Vickers dep., 72:22-73:3. |
| 72. | RCSD does not train its deputies to roll restrained persons into an on-the-side (or "recovery" or "rescue") position because, based on the Training Bureau's research, such a position is less safe for all involved than the prone position. | Ex. Q, Bianco dep., 57:19-58:21. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 73. | For those police agencies that have adopted a recovery position policy, plaintiff's police practices expert Noble cannot identify any scientific or medical study upon which such agencies relied in determining that prone positioning causes or contributes to asphyxia or that a recovery position was medically necessary. | Ex. L, Noble dep., 105:5-21; Ex. U, Fonzi dep., 77:18-78:24; 79:5-80:15.[1] |
| | **I. Forensic Facts.** | |
| 74. | Mark A. Fajardo M.D. ("Dr. Fajardo"), the chief forensic pathologist and medical examiner at the County of Riverside, conducted the autopsy of Niedzialek.  He is the only expert in this case who has actually examined decedent's body. | Ex. J, Fajardo dep., 10:6-19, 52:16-21; Ex. V, Wohlgelernter dep., 65:22-25; Ex. W, Freeman dep., 67:3-6. |
| 75. | While Niedzialek was on methamphetamine and involved in a | Ex. J, Fajardo dep., 28:22-29:13, 78:15-20, 83:7-11, 87:22-88:2, |

[1] The parties dispute whether the use of a "recovery position" is the national standard.  The defense contends it is used by other agencies only where circumstances lead the officers to have a concern about the suspect's breathing, so that such could be monitored, and not that a "recovery position" is used in all prone restraint cases.

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
|  | struggle, had a catecholamine surge and metabolic acidosis, which all contributed to Niedzialek having a cardiac arrest, the <u>only</u> proximate cause of Niedzialek's death was 0.757 mg/L of methamphetamine. | 148:20-23; Ex. X, Graham report, p. 28; Ex. Y, Clark dep., 46:15-25, 47:13-21, 54:2-9. |
| 76. | Niedzialek's only external injuries were to his head and scrapes, none of which caused or contributed to his death. | Ex. J, Fajardo dep., 76:13-77:1; 145:24-146:2. |
| 77. | There were no internal injuries that caused or contributed to Niedzialek's death. | Ex. J, Fajardo dep., 75:16-22. |
| 78. | Dr. Fajardo ruled out asphyxia as the cause or a contributor toward Niedzialek's death; because he found no evidence consistent with asphyxia. | Ex. J, Fajardo dep., 83:12-16; 149:1-17; Ex. X, Graham report, p. 28. |
| 79. | Dr. Fajardo ruled out any deputy action as a proximate cause of death – including TASERs and restraint. | Ex. J, Fajardo dep., 81:14-82:5 , 141:20-142:1, 151:18-152:7. |
| 80. | According to Dr. Fajardo, the methamphetamine that Niedzialek ingested was enough by itself to | Ex. J, Fajardo dep., 44:3-11, 45:22-46:1, 142:2-6; Ex. Y, Clark dep., 65:21-66:8. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | cause his death. This is because Niedzialek had more than 3 times the minimum toxic amount of meth in his system. | |
| 81. | Niedzialek's manner of death was officially listed by the County Sheriff as a "homicide"; at the time the pathological definition of "homicide" was that another person was present- regardless of the level of cause or activity or involvement of that person. | Ex. J, Fajardo dep., 31:11-17, 106:11-13; Ex. Q, Bianco dep., 38:18-25; 39:8-17; 40:13-41:20; Ex. S, Graham dep., 33:11-34:16.[2] |
| 82. | The restraint (use of force) techniques employed during the apprehension and control of Niedzialek by the deputies would not be expected to cause or contribute to the death of an otherwise healthy adult. | Ex. O, Chan dep., 8:2-10, 80:20-25, 81:6-13, 82:15-21; Ex. R, Chan report, p. 11; Ex. X, Graham report, p. 27. |
| 83. | Regarding the use of the TASER devices, there is no evidence in this case that any TASER electricity | Ex. A, composite video; Ex. B, Englert Forensic Incident Timeline Demonstrative |

---

[2] Defendants' retained pathology expert would have classified the manner of death here as an accident.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | directly reached Niedzialek's heart or lungs, or significantly contributed to any cardiac arrest – particularly in light of the fact that Niedzialek went unresponsive about 5 minutes after he was last tased. | 6:39.167 (15:24:44)-11:59.033 (15:30:04); Ex. O, Chan dep., 8:2-10, 86:9-21; Ex. R, Chan report, p. 11. |
| 84. | There is no evidence of TASER-induced ventricular tachycardia or ventricular fibrillation. | Ex. X, Graham report, p. 27. |
| 85. | Numerous studies have been conducted to evaluate the physiologic effects and safety of the TASER device. | Ex. R, Chan report, p. 11; Ex. Z, Dawes dep., 12:22-13:5. |
| 86. | Such peer-reviewed research group has conducted a number of these studies, which have found no evidence of electrocardiographic changes, cardiac or heart injuries, respiratory compromise, or significant metabolic disturbances associated with the device. | Ex. R, Chan report, p. 11. |
| 87. | The findings of such research group have been replicated by other investigators who have also | Ex. R, Chan report, p. 11.; Ex. Z, Dawes dep., 12:22-13:5. |

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | demonstrated no significant inherently deleterious physiologic effects in human subjects under laboratory testing or the field setting. | |
| 88. | Based on such research studies, as well as the current literature and medical research studies on the TASER, the device does not cause cardiac damage, does not result in significant long-term physiologic impairment, and does not inherently place an individual at risk for death. | Ex. R, Chan report, p. 11. |
| 89. | TASER effects on metabolic acidosis are temporary and not sufficient to be fatal or significantly contribute to death. | Ex. Z, Dawes dep., 50:6-19, 63:13-21. |
| 90. | Delay from last TASER discharge to Niedzialek's unresponsiveness is over 5 minutes – too long to be a significant contributor either to oxygen need or directly via electrical effects. | Ex. O, Chan dep., 86:3-21. |
| 91. | Under certain circumstances, such as Covid, subjects are placed prone for | Ex. Z, Dawes dep., 60:19-61:10. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | better ventilation. | |
| 92. | Niedzialek was in the prone position, had pressure applied to his back and shoulders and was handcuffed during portions of the restraint. | Ex. X, Graham report, p. 27. |
| 93. | However, the weight of the current scientific information does not support the contention that being restrained in the prone position, handcuffed, hobbled, hogtied or have pressure applied to the back during the typical course of forcible restraint leads to clinically significant respiratory or cardiovascular compromise and/or death. | Ex. O, Chan dep., 44:24-45:9; Ex. Q, Bianco dep., 50:15-51:11, 51:22-52:19; Ex. R, Chan report, pp. 9-10; Ex. X, Graham report, p. 27. |
| 94. | The evidence does not indicate that pressure sufficient to induce compression asphyxia was applied to Mr. Niedzialek's chest. | Ex. M, Kode report, pp. 32-34; Ex. X, Graham report, p. 27. |
| 95. | The lack of facial (including conjunctival) petechiae weighs against a diagnosis of compression asphyxia. | Ex. J, Fajardo dep., 36:5-21; Ex. S, Graham dep., 57:15-58:23; Ex. X, Graham report, p. 27. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| 96. | Mr. Niedzialek's actions (combative behavior) after being restrained and after pressure had been removed from his torso exclude the occurrence of ultimately lethal asphyxia prior to this time. | Ex. O, Chan dep., 82:25-83:14; Ex. X, Graham report, p. 27. |
| 97. | Nothing the deputies did led to Niedzialek's cardiac arrest. | Ex. J, Fajardo dep., 151:8-15; Ex. O, Clark dep., 61:16-62:9; Ex. R, Chan report, p. 11. |
| 98. | Immediately after the handcuffs were placed on Niedzialek, Deputy Keeney was crouched or squatting on his toes near full flexion when he put his right knee on Niedzialek's left upper shoulder for approximately 1 minute and 30 seconds. | Ex. M, Kode report, pp. 30, 32. |
| 99. | The mean force transferred to Niedzialek's left upper shoulder by Deputy Keeney's right knee during this squat was approximately 70 pounds, so minimal that Niedzialek was able to roll to his left. | Ex. M, Kode report, pp. 32, 33. |
| 100. | The weight transmitted to the back | Ex. M, Kode report, pp. 33, 34. |

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ

| Dfts' Fact No. | Defendants' Uncontroverted Fact | Supporting Evidence |
|---|---|---|
| | of Mr. Niedzialek by Deputy Keeney's knee during the prone restraint was well within the risk level of injury potential and does not support a risk of restraint asphyxia. | |
| 101. | Officers are not mandated nor required in every encounter to place a subject in a recovery position from a prone position. | Ex. U, Fonzi dep., 77:18-78:8. |
| 102. | While some law enforcement agencies have a policy that a prone suspect is to be placed in a recovery position, there is no mandatory requirement nationally to place someone from a prone position to a recovery position in every situation. | Ex. U, Fonzi dep., 78:9-79:22. |
| 103. | If an officer believes that they do not have the ability to monitor a subject's breathing or pulse, or if the officer believes that the subject is not breathing or has no pulse, then placing the subject from a prone position to a recovery position would be appropriate. | Ex. U, Fonzi dep., 79:23-80:15. |

**CONCLUSIONS OF LAW**

1.      Defendants Deputy Keeney and Deputy Gomez are entitled to judgment on plaintiff's first cause of action under 42 U.S.C. § 1983 for excessive force.  The force used by these deputies before Niedzialek was handcuffed- the initial use of force, two TASER applications, and the handcuffing- were objectively reasonable. The force used after Niedzialek was handcuffed and in a prone position- Deputy Keeney's use of his hand and a knee on Niedzialek, and Deputy Gomez's use of a hand on Niedzialek- was also objectively reasonable.  None of the force used by the deputies was a cause of Niedzialek's injuries and death.  The deputies are entitled to qualified immunity as their prone positioning of Niedzialek followed their training.

2.      Defendants Deputy Keeney and Deputy Gomez are entitled to judgment on plaintiff's first claim under 42 U.S.C. § 1983 for deliberate indifference to Niedialek's need for medical care and treatment.  Both Deputy Keeney and Deputy Gomez, upon their first contact with Niedzialek and observing his obvious head injury, immediately called for medical aid.  Deputy Gomez made a second call for medical aid for Niedzialek after the TASER applications.  Deputies Keeney and Gomez were unaware of the further urgent medical need of Niedzialek until paramedics arrived on the scene.  The deputies are entitled to qualified immunity as to their not rendering CPR to Niedzialek based on their training that CPR should not be given to a subject who is breathing and has a pulse.

3.      Defendants County of Riverside, Riverside County Sheriff's Department, and Sheriff Bianco are entitled to judgment on plaintiff's first claim 42 U.S.C. § 1983 for municipal liability (*Monell*).  As there is no evidence of a constitutional violation by Deputy Keeney or Deputy Gomez, defendants County of Riverside, Riverside County Sheriff's Department, and Sheriff Bianco are not liable under *Monell*.

Further, under the uncontroverted facts, the policy and training of defendants
County of Riverside, Riverside County Sheriff's Department, and Sheriff Bianco as
to prone positioning was not deliberately indifference to constitutional rights.

4.      Defendants are entitled to judgment on plaintiff's second cause of action for
violation of the Bane Act (Cal. Civ. Code section 52.1).  It is undisputed that the
force used by Deputy Keeney and Deputy Gomez was reasonable and consistent
with standard police practices and their training.  If Deputy Keeney and Deputy
Gomez are not liable, the County of Riverside, Riverside County Sheriff's
Department, and Sheriff Bianco are not vicariously liable.

5.      Defendants are entitled to judgment on plaintiff's third cause of action for
Assault and Battery.  For the same reasons that plaintiff's first claim under 42 U.S.C.
§ 1983 for excessive force fails, *supra*, the state claim for assault and battery also
fails.  If Deputy Keeney and Deputy Gomez are not liable, the County of Riverside,
Riverside County Sheriff's Department, and Sheriff Bianco are not vicariously
liable.

6.      Defendants are entitled to judgment on plaintiff's fourth cause of action for
Police Negligence.  Under the uncontroverted facts, asphyxia was not the proximate
cause of, nor a contributing factor toward, Niedzialek's death.  Further, the specific
manner of restraint of Niedzialek by Deputy Keeney and Deputy Gomez did not
cause any compression asphyxia nor his death.  If Deputy Keeney and Deputy
Gomez are not liable, the County of Riverside, Riverside County Sheriff's
Department, and Sheriff Bianco are not vicariously liable.
///
///
///

1   7.      Defendants are entitled to summary judgment in this action.

2

3   DATED:  May 17, 2021            **MANNING & KASS**
                                    **ELLROD, RAMIREZ, TRESTER LLP**
4

5

6                                  By:  _____/s/ Tony M. Sain_____
7                                       Eugene P. Ramirez, Esq.
8                                       Tony M. Sain, Esq.
                                        Garros Chan, Esq.
9                                       Attorneys for Defendants
10                                      COUNTY OF RIVERSIDE, RIVERSIDE
                                        SHERIFF'S DEPARTMENT, SHERIFF-
11                                      CORONER CHAD BIANO, DEPUTY
                                        GOMEZ and DEPUTY KEENEY
12

13

14

15  G:\docsdata\EPR\Alves, Tracy v. COR 4410-59742\Pleadings\MSJ\MSJ.002.SUFCOL.02.docx

16

17

18

19

20

21

22

23

24

25

26

27

28

STMT. OF UNCONTROVERTED FACTS & CONCLS. OF LAW RE: DEFTS' MSJ