Eugene P. Ramirez, Esq. (State Bar No. 134865)
  *epr@manningllp.com*
Tony M. Sain, Esq. (State Bar No. 251626)
  *tms@manningllp.com*
Garros Chan, Esq. (State Bar No. 320561)
  *gxc@manningllp.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants,
COUNTY OF RIVERSIDE (erroneously named as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, and DEPUTY BRIAN KEENEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3-10,<br><br>Defendants. | Case No. 5:19-CV-02083-JGB(SHKx)<br>*[Hon. Jesus G. Bernal, District Judge; Hon. Shashi H. Kewalramani, Magistrate Judge]*<br><br>**NOTICE OF MOTION AND DEFENDANTS' MOTION TO EXCLUDE SCIENTIFIC OPINIONS OF PLAINTIFFS' CARDIOLOGY EXPERT MICHAEL FREEMAN, PH.D. [DAUBERT MOTION]; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF ATTORNEY TONY M. SAIN IN SUPPORT**<br><br>[(Proposed) Order Submitted Concurrently]<br><br>Date:  June 21, 2021<br>Time:  9:00 a.m.<br>Ctrm:  1 (Riverside)<br><br>Action filed: October 30, 2019<br>Trial Date:   September 14, 2021 |

1

TO PLAINTIFF TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased, AND TO HER ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on the 21st day of June, 2021, at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 1 of the above-captioned Court, located at The George E. Brown Jr. Federal Building & Courthouse, 3470 Twelfth Street, Riverside, California 92501-3000, defendants COUNTY OF RIVERSIDE, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY GOMEZ and DEPUTY KEENEY ("defendants") will move this Court for an order to exclude the opinions and testimony of plaintiff's cardiology expert, Michael Freeman, Ph.D. ("Dr. Freeman"), both at trial and in conjunction with defendants' Motion for Summary Judgment.

Specifically, defendants seek exclusion of all of Dr. Freeman's testimony and opinions regarding the cause of death of decedent and on asphyxia (in particular restraint/compressive asphyxia).

This motion is made on the grounds that Dr. Freeman lacks the requisite qualifications to opine on cause of death, that his opinions lack adequate evidentiary support pursuant to *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579 (1993), and that his opinions constitute nothing more than speculation.  Therefore, Dr. Freeman cannot state said opinions to a reasonable degree of scientific probability.  As such, his opinions are inadmissible under Fed. R. Evid. 702.

This motion is based on the attached memorandum of points and authorities, declaration of attorney Tony M. Sain and attached exhibits, the proposed order submitted concurrently as a separate document, all the pleadings, records, and files in this action, and upon such further oral and documentary evidence as may be presented upon the hearing of this motion.

///

///

///

2

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on May 10, 2021.

DATED: May 17, 2021

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**


By: ____*/s/ Tony M. Sain*____
Eugene P. Ramirez, Esq.
Tony M. Sain, Esq.
Garros Chan, Esq.
Attorneys for Defendants,
COUNTY OF RIVERSIDE (erroneously named as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, and DEPUTY BRIAN KEENEY

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES.............................................. 1

1.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................. 1

2.    A DAUBERT MOTION MAY BE FILED IN CONJUNTION WITH A MOTION FOR SUMMARY JUDGMENT. .................................................. 1

3.    SUMMARY OF RELEVANT EXPERT OPINIONS OF FREEMAN............ 2

4.    THE COURT SHOULD EXCLUDE FREEMAN'S OPINIONS RE DECEDENT'S CAUSE OF DEATH. ................................................................ 2

      A.    The *Daubert* Threshold for Expert Opinion Evidence. ......................... 2

      B.    Freeman Lacks The Qualifications To Render Such Opinions. ............. 3

Expert opinions are properly excluded if the *Daubert* standard is not met. *See* ........ 3

      C.    Freeman Lacks Evidentiary Support For His Opinions.......................... 5

5.    CONCLUSION. ............................................................................................. 8

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

i

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

# TABLE OF AUTHORITIES

**Page**

## CASES

*Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828 (9th Cir. 2011)........................3

*Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994) ...........................................2

*Daubert v. Merrell Dow Pharms*, 43 F.3d 1311 (9th Cir. 1995)................................6

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)...........................passim

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...............................................4, 6, 7

*Guam v. Reyes*, 879 F.2d 646 (9th Cir. 1988) ...........................................................7

*Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825 (9th Cir. 2001) .............3

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998 (9th Cir. 2004) .......5

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F.Supp.2d 1021 (C.D. Cal. 2013) .................................................................................3

*In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) .........2

*In Re Midland National Life Insurance Co. Annuity Sales Practices Litigation v. Allinaz Life Insurance Company of North America*, 686 F.3d 1115 (9th Cir. 2010) .....................................................................................................1

*Kennedy v. Southern Cal. Edison Co.*, 268 F.3d 763 (9th Cir. 2001) ........................7

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)..............................................2, 5

*Lajoie v. Thompson*, 217 F.3d 663 (9th Cir. 1999) ..................................................4, 7

*Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007) .......................3, 7

*Lineaweaver v. Plant Insulation Co.*, 31 Cal.App.4th 1409 (1995)...........................7

*Lust v. Merrell Dow Pharm., Inc.*, 89 F. 3d 594 (9th Cir. 1996) ...............................3

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001) ..............3

*Rutherford v. Owens-Illinois*, 16 Cal.4th 953 (1997)................................................6

*Saelzler v. Advanced Group 400*, 25 Cal.4th 763 (2001)...........................................6

*Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187 (9th Cir. 2007)..............................5

*U.S. v. Various Slot Machines on Guam*, 658 F.2d 697 (9th Cir. 1981)....................4

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

**OTHER AUTHORITIES**

CACI 430 ............................................................................................................. 6

**RULES**

Fed. R. Evid. Rule 702 ................................................................................ 2, 3, 5

DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants seek to exclude all of the opinions and testimony of plaintiff's expert, Michael Freeman, Ph.D. ("Dr. Freeman") in this action, both at trial and in conjunction with the filing of defendants' motion for summary judgment, as his opinions regard causation of death and asphyxia and he lacks qualification to opine on either.

Specifically, Dr. Freeman is not qualified to offer opinions on asphyxia, and cause of death because: (1) he is not a forensic pathologist; (2) he has never conducted a solo autopsy; (3) he possesses no medical degree from an American medical school; (4) he is not board certified by any American medical board in asphyxia, forensic pathology, or any other medical specialty (including epidemiology); (5) he is not and he has never been a licensed physician in any state in the United States of America; (6) he never examined decedent's body; (7) he has never conducted or participated in any lab studies on the effects of restraint on asphyxia/breathing; and (8) all the "medical examiner" positions on his resume are honorary and did not involve him determining cause of death.

Additionally, the weight of the evidence does not support Dr. Freeman's opinions. His opinions should thus be excluded from evidence.

### 2. A DAUBERT MOTION MAY BE FILED IN CONJUNTION WITH A MOTION FOR SUMMARY JUDGMENT.

"[A] *Daubert* motion connected to a pending summary judgment motion may be effectively dispositive of a motion for summary judgment.' [citations]." *In Re Midland National Life Insurance Co. Annuity Sales Practices Litigation v. Allinaz Life Insurance Company of North America*, 686 F.3d 1115, 1119 (9th Cir. 2010); citing *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F. 3d 594, 597 (9th Cir. 1996) (holding that although a *Daubert* motion was dispositive, the abuse of discretion

standard still applies). "[P]rior to ruling on summary judgment motion, '[t]he trial judge must ensure that any and all scientific testimony or evidence admitted is not relevant, but reliable.'" *In re Live Concert Antitrust Litigation*, 863 F. Supp. 2d 966, 971 (C.D. Cal. 2012) (parentheticals omitted), citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

Defendants seek to exclude the scientific opinions and testimony of Dr. Freeman because he lacks qualification to render an expert opinion on cause of death and asphyxia, and his opinions lack evidentiary support and are stated as speculation under the *Daubert* standard of admissibility. Defendants seek exclusion of Dr. Freeman's testimony and opinions both at trial and in conjunction with the filing of defendants' motion for summary judgment as the same are unreliable.

## 3. SUMMARY OF RELEVANT EXPERT OPINIONS OF FREEMAN.

Dr. Freeman has testified that he will offer the opinion that, with a reasonable degree of medical certainty, Niedzialek's death was due to restraint tactics resulting in death by asphyxia with a contributing factor being lack of timely resuscitation efforts. [Ex. A, Freeman Report, p. 15].

## 4. THE COURT SHOULD EXCLUDE FREEMAN'S OPINIONS RE DECEDENT'S CAUSE OF DEATH.

### A. The *Daubert* Threshold for Expert Opinion Evidence.

Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid, Rule 702 also provides that a witness may be qualified as an expert if "the testimony is based on sufficient facts or data." "Where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question…, the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). If the testimonial evidence fails in this regard, the expert opinion is

2

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

inadmissible. *Id.*

In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F.Supp.2d 1021,1026 (C.D. Cal. 2013); (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The offering party must prove admissibility. *Lust v. Merrell Dow Pharm., Inc.*, 89 F. 3d 594, 598 (9th Cir. 1996). The offering party must show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion. *Daubert*, 509 U.S. at 592-93.

## B.    Freeman Lacks The Qualifications To Render Such Opinions.

Expert opinions are properly excluded if the *Daubert* standard is not met. *See Lash v. Hollis*, 2007 U.S. Dist. LEXIS 3633, *12 (E.D. Mo. 2007) (plaintiff's expert opinion on the effects of TASER ECD deployments was excluded under *Daubert* because the court found plaintiff was not qualified to testify as an expert due to his lack of familiarity with TASER devices and his reliance on only one scholarly article on the effects of TASER ECD deployments).

An expert must stay "within the reasonable confines of his subject area." *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001)) (emphasis added). "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue. [Citations]." *Ralston, supra.*, 275 F.3d at 970.

"Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *see Daubert*, 509 U.S. at 590. "In the context of a motion for summary judgment, an expert must back up his opinion with specific facts." *Guidroz*,

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

254 F.3d at 831; *U.S. v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981).

Medical expert testimony regarding causation must be stated to a reasonable degree of medical certainty. *See: Lajoie v. Thompson*, 217 F.3d 663, 667.fn.4 (9th Cir. 1999). Expert testimony is not admissible if it too wide a reach exists between the expert's opinion and the evidentiary record. *See: General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Dr. Freeman is not qualified to testify not to render opinions as to cause of death of decedent nor on asphyxia (in particular restraint/compressive asphyxia).

Dr. Freeman is not a licensed physician in any state in the United States of America. [Ex. B, Freeman dep., 19:8-16.] Dr. Freeman possesses no medical degree from an American medical school. [Ex. B, Freeman dep., 18:12-15] Dr. Freeman is not board certified in asphyxia, forensic pathology, or any other medical specialty (including epidemiology) from any medical board in this country. [Ex. B, Freeman dep., 20:1-3, 20:13-15, 20:20-23, 20:24-21:2, 21:22-25, 55:16-18, 58:6-7, 58:14-15.]

Dr. Freeman testified that he is not a forensic pathologist. [Ex. B, Freeman dep., 20:13-21:1] Dr. Freeman never examined the decedent's body in this case. [Ex. B, Freeman dep., 67:3-6.] Dr. Freeman has never conducted a solo autopsy examination. [Ex. B, Freeman dep., 27:1-4, 28:25-29:3.] All of his "medical examiner" positions are honorary. [Ex. B, Freeman dep., 26:1-6, 27:1-15, 28:6-12.] Dr. Freeman has never conducted or participated in any lab studies on the effects of restraint on asphyxia/breathing. [Ex. B, Freeman dep., 38:15-18.]

Essentially, Dr. Freeman possesses no medical license, certification, nor experience when he attempts to opine as the cause of death of decedent. Dr. Freeman's lack of any qualifications underscores his inability to provide any testimony as an expert at trial or in opposition to defendants' motion for summary judgment, as said testimony would be purely speculative without any scientific foundation.

4

DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN

**C.      Freeman Lacks Evidentiary Support For His Opinions.**

Additionally, under *Daubert*, an expert's opinion is inadmissible for unreliability where it is contrary to or unsupported by the weight of the evidence.

To elaborate, under Federal Rule of Evidence 702, expert opinion testimony is *only* admissible in federal court:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (l) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, in applying Rule 702, the trial court exercises its discretion regarding the admissibility of expert-technical evidence by performing a "'gatekeeping role...to all expert testimony....'" *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004); *see Daubert, supra,* 509 U.S. at 590-592.  In this regard, it is the trial judge's role as gatekeeper to screen such testimony for relevance and reliability: that is, to make an assessment as to whether the reasoning and methodology underlying the expert testimony is scientifically valid and can be properly applied to the facts at issue.  *Daubert, supra*, 509 U.S. at 591-593.  "And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question..., the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., supra,* 526 U.S. at 149.  If not, the expert opinion is inadmissible.  *Id*.

In addition to being reliable, expert testimony must also be *relevant* in order to be admissible.  *Daubert,* 509 U.S. at 589. Whether testimony is relevant depends on whether the testimony can properly be applied to assist the trier of fact in understanding and deciding *facts at issue*. *Id*. at 589, 591; *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191-1192 (9th Cir. 2007).  Thus, **to meet the relevance**

5

**standard, expert testimony must be "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"** *Id*. (emphasis added); *see also Daubert v. Merrell Dow Pharms*, 43 F.3d 1311, 1320 (9th Cir. 1995) (in assessing relevance, the court must look to the governing substantive legal standard, and applying California's substantial factor causation standard).

Furthermore, the offering party must show by a preponderance of the evidence that (1) the expert is qualified to render the opinion; and (2) the opinion offered has **adequate factual and scientific support for that opinion**. *See: Daubert*, 509 U.S. at 588-90; *Joiner, supra*, 522 U.S. at 146 (holding that a court may exclude expert opinion where it deems that the expert's opinion is *not* sufficiently supported by the facts or evidence upon which the expert relies in support of that opinion). In other words, expert testimony is *not* admissible if it is speculative. *Id.* ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *cf. Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 771 (2001) ("proof of causation cannot be based on mere speculation, conjecture and inferences drawn from other inferences to reach a conclusion unsupported by any real evidence, or on an expert's opinion based on inferences, speculation and conjecture"; applying a standard similar to *Daubert*).

Where an expert opinion bears primarily on issues of causation of injury, California law (the substantive law applicable here regarding causation as to plaintiffs' state-law claims) requires that a plaintiff establish substantial factor causation by "a reasonable medical probability based upon competent expert testimony that the defendant's conduct contributed to plaintiff's injury." *Rutherford v. Owens-Illinois*, 16 Cal.4th 953, 977 (1997) (summarizing part of the substantial factor causation standard); *see* Judicial Council of Cal. Civ. Jury Instructions, CACI 430.   However, in evaluating whether...[a factor] was a substantial factor in causing...[the injury at issue], the standard should be...is there a reasonable medical probability...that the defendant's conduct contributed to plaintiff's injury."

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

6

*Lineaweaver v. Plant Insulation Co.*, 31 Cal.App.4th 1409, 1416 (1995).  Thus, "[w]hile there are many *possible* causes of any injury, a *possible* cause only becomes *probable* when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was the result of its action." *Id*. (emphasis added). Therefore, under the legal causation standard, a force "which plays only a 'negligible,' 'infinitesimal,' or 'theoretical' part in bringing about an injury, damage or loss is not a substantial factor...." *Kennedy v. Southern Cal. Edison Co.*, 268 F.3d 763 (9th Cir. 2001).

Similarly, under federal claim proximate causation standards, to be considered as evidence, medical expert testimony regarding causation must be stated to a reasoanble degree of medical certainty.  *See Lajoie, supra,* 217 F.3d at 667. fn. 4; *Guam v. Reyes*, 879 F.2d 646, 649 (9th Cir. 1988).

As a result, expert opinions are properly excluded if the *Daubert* standard is not satisfied.  *See, e.g., Lash, supra,* 2007 U.S. Dist. LEXIS 3633, at *12. (plaintiff's expert opinion on the effects of TASER ECD deployments was excluded under *Daubert* because the court found plaintiff was not qualified to testify as an expert due to his lack of familiarity with TASER devices and his reliance on only one scholarly article on the effects of TASER ECD deployments).

In other words, to be admissible under *Daubert*, **an expert opinion must have adequate factual and scientific support**: <u>**where the gap between the data-evidence and the expert opinion is too great, the opinion can only be viewed as speculation or conjecture that cannot help the trier of fact, and it is thus inadmissible**</u>. *See: Joiner, supra*, 522 U.S. at 146; *Daubert*, 509 U.S. at 588-590.

Here, Dr. Freeman never examined Mr. Niedzialek and he is not a forensic pathologist or licensed physician; as explained above, he is thus not in a position to contradict the findings of the medical examiner.  The medical examiner here found no evidence that asphyxia caused or contributed to Niedzialek's death. [Ex. C, Fajardo dep., 149:1-17]  There was no noted damage to the lungs and review of the incident

DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN

video showed the subject to be breathing for some time after any deputy had any knees or meaningful body weight on him.  [Ex. C, Fajardo dep., 74:25-75:1, 152:8-15; Ex. D, Englert Forensic Incident Timeline Demonstrative, 10:10:233 (15:28:15); 10:20:867 (15:28:25); 10:23.267 (15:28:28); 10:26.933 (15:28:31); 10:32.567 (15:28:37); 10:38.867 (15:28:43); 10:53.167 (15:28:58); 11:02.833 (15:29:07); 11:13.900 (15:29:18).]  As a result, the medical examiner excluded any deputy action as a proximate cause of Niedzialek's death.  [Ex. C, Fajardo dep., 81:14-82:5]  Rather, the medical examiner found that the sole proximate cause of Niedzialek's death was acute methamphetamine toxicity.  [Ex. C, Fajardo dep., 78:15-20, 148:20-23]

Furthermore, Dr. Freeman has never done any lab tests to contradict the numerous peer-reviewed lab tests and epidemiological studies showing that prone restraint, does not impair breathing or lead to/cause asphyxiation.  [Ex. B, Freeman dep., 38:15-18; Ex. E, Chan dep., 44:24-45:9.]

As such, medical researcher Dr. Freeman cannot support with any admissible evidence his opinion that asphyxiation was the cause of death here: an opinion contrary to all of the autopsy findings.  Therefore, Dr. Freeman's unsupported medical causation opinions are inadmissible under *Daubert*.

**5.    CONCLUSION.**

Based on the foregoing, defendants respectfully request that this exclude the testimony and opinions of Michael Freeman, Ph.D. regarding cause of death, asphyxia (in particular restraint/compressive asphyxia), and all other scientific opinions rendered in his Rule 26(a) Expert Report and at deposition, both at trial and in conjunction with defendants' Motion for Summary Judgment.

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

DATED: May 17, 2021            **MANNING & KASS
                               ELLROD, RAMIREZ, TRESTER LLP**


By: _____/s/ Tony M. Sain_____
      Eugene P. Ramirez, Esq.
      Tony M. Sain, Esq.
      Garros Chan, Esq.
Attorneys for Defendants,
COUNTY OF RIVERSIDE (erroneously
named as separate parties as COUNTY OF
RIVERSIDE and RIVERSIDE SHERIFF'S
DEPARTMENT), SHERIFF-CORONER
CHAD BIANCO, DEPUTY SONIA
GOMEZ, and DEPUTY BRIAN KEENEY

9

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

# DECLARATION OF TONY M. SAIN

I, Tony M. Sain, state and declare as follows:

1.      I am an attorney at law duly authorized to practice before all the courts of the State of California and in all of the United States District Courts within California, and the United States Court of Appeals for the Ninth Circuit.  I am a partner in the law firm of Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record herein for Defendants COUNTY OF RIVERSIDE (erroneously named as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT; herein after as the "County") and SHERIFF-CORONER CHAD BIANCO (collectively herein after as "Defendants"), and I am the lead trial attorney for this matter.  If called and sworn as a witness to testify, I am competent to testify and would testify from my own personal knowledge as to the facts set forth in this declaration, except as to those matters that are stated on information and belief.

2.      This declaration is made in support of the defendants' motion to exclude the opinions of plaintiff's expert Michael Freeman, M.D., at the time of trial and in connection with defendants' motion for summary judgment or partial summary judgment.

3.      Attached hereto as Exhibit A and incorporated by reference herein is a true and correct copy of the pertinent portions of the report of plaintiff's expert Michael Freeman, M.D., in this action, dated February 1, 2021.

4.      Attached hereto as Exhibit B and incorporated by reference herein is a true and correct copy of the pertinent portions of the deposition of plaintiffs' expert Michael Freeman, M.D., taken in this action on April 28, 2021.

5.      Attached hereto as Exhibit C and incorporated by reference herein is a true and correct copy of the pertinent portions of the deposition of Medical Examiner Mark Fajardo, M.D., taken in this action on August 21, 2020.

6.      A DVD containing a copy of the Englert Forensic Incident Timeline Demonstrative (an interactive PowerPoint) referred to as Exhibit D in this motion,

10

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

was previously lodged with the Court in connection with defendants' motion for summary judgment or partial summary judgment on May 17, 2021, as Exhibit B. The Englert Forensic Incident Timeline Demonstrative was also previously produced with defendants' second supplemental disclosures on February 8, 2021 (Ex. 1 following COR 03098).

7.      Attached hereto as Exhibit E and incorporated by reference herein is a true and correct copy of the pertinent portions of the deposition of defendants' expert Theodore Chan, M.D., taken in this action on April 23, 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 17, 2021, at Los Angeles, California.

/s/ Tony M. Sain
Tony M. Sain, Esq.

G:\docsdata\EPR\Alves, Tracy v. COR 4410-59742\Trial Documents\MIL\Daubert.MIL.003.Freeman Opinions.docx

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

**DEFTS' MTN. TO EXCLUDE OPINIONS OF PLTF'S EXPERT DR. FREEMAN**

# EXHIBIT A



# Forensic Research + Analysis

February 1, 2021

John Burton
128 North Fair Oaks Avenue
Pasadena, California 91103

RE: *Alves v Riverside County, Riverside sheriff's department, Sheriff-coroner Chad Bianco, Deputy Sonia Gomez, Deputy Brain Keeney, and Does 3-10*

Decedent: Kevin Niedzialek
Date of Incident: 7/29/2019
Date of Death: 7/30/19 (34 years old)
Date of Birth: 9/20/1984

Dear Mr. Burton,

I am in receipt of your correspondence regarding Kevin Niedzialek and the circumstances of his death, which occurred while he was in a delusional and agitated state, and after aggressive restraint tactics were used on him by law enforcement personnel from Riverside Sheriff's office. The purpose of this report is to provide my conclusions regarding the potential causes of sudden death acting on Mr. Niedzialek immediately prior to his death, and which of the potential causes were the most probable cause (or causes) of his death.

As described in the autopsy report by Dr. Mark Fajardo (forensic pathology), the Riverside County Coroner concluded that the manner of Mr. Niedzialek's death was a homicide, although it was primarily attributed to acute methamphetamine toxicity, with the application of restraint maneuvers as a significant condition associated with the death.

The purpose of this report is to provide my analysis regarding the various potential causes of cardiopulmonary arrest acting on Mr. Niedzialek at the time that he became unresponsive, and which of the potential causes were the most probable cause (or causes) of his death.

In addition to my review of relevant materials, I have performed an extensive literature review and research on the risk of methamphetamine intoxication as a cause of death at the levels identified in

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 2 of 17

Mr. Niedzialek, when other competing causes, including aggressive physical restraint tactics and TASER shocks, are present as well.

In this report I will demonstrate Dr. Fajardo's conclusion that Mr. Niedzialek's death was primarily attributable to the toxic effects of methamphetamine is not supported by any valid scientific or medical evidence, and is speculative.

Further, I will demonstrate that there is evidence that the most probable cause of Mr. Niedzialek's death the use of aggressive restraint tactics by Riverside County law enforcement personnel which resulted in a cardiopulmonary arrest triggered by restraint-related asphyxia. There are no alternative explanations for his death that are unrelated to the actions of the Riverside County police personnel that are more than *slightly* probable.

My methods and opinions in this case pertain to the fields of forensic medicine and epidemiology. Forensic medicine refers to the intersection of medicine and law, and in particular medicolegal investigation of causation. Epidemiology is defined as the scientific study of the cause of disease, injury, and death in populations, including prevalence, risk, and incidence in specific populations. The scientific field that dictates how probabilities may be inferred from epidemiologic data and methods and how the inferences can be used to assess the cause of injury, disease, or death in individuals in a legal setting is forensic epidemiology. Forensic epidemiology provides the scientific basis for the evaluation of specific causation, to the extent that probability or likelihood of causation may be evaluated. The methods applied in this report are consistent with those outlined in the Reference Guide on Epidemiology, from the Reference Manual on Scientific Evidence, published by the Federal Judicial Center and the National Academies of Science (3rd Edition, 2011), as well as in the text Forensic Epidemiology: Principles and Practice, published by Elsevier (2016).

***My qualifications to provide opinions concerning the matters herein are as follows:***
I am a medicolegal consultant, with expertise in the fields of forensic medicine and forensic epidemiology. I hold the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden), a doctor of philosophy (Ph.D.) in public health with a major focus in epidemiology from Oregon State University, and a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences (UK), and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK). I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, am an affiliate medical examiner with the Allegheny County Medical Examiner's office, a fellow of the Pathology section of the American Academy of Forensic Sciences

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 3 of 17

(AAFS) and the American College of Epidemiology (ACE), and the vice-chair of the standards board for medicolegal death investigation for the AAFS. I am the chair of the subcommittee for research at the Faculty of Forensic and Legal Medicine of the Royal College of Physician (UK). I am a US Fulbright fellow, having held a 3-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State (2017-20).

I serve as a tenured Associate Professor of Forensic Medicine at Maastricht University, and a Joint Clinical Professor of Psychiatry and Public Health and Preventive Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and medical causation. I have also held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark from 2005-2017.

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals and have published approximately 220 scientific papers, abstracts, book chapters and books, including the recent text for Elsevier, Forensic Epidemiology: Principles and Practice (2016). My scientific publications have been cited by other authors of peer-reviewed publications approximately 2,800 times. Specific to the facts of the present investigation, I have an extensive education, practical investigational experience, and research background into restraint-related related death. Please see my CV for further details.

I have provided testimony in more than 350 civil and criminal trials in state and Federal courts throughout the United States, Canada, Australia, and Europe.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 4 of 17

### ***Background Facts:***

At or around 14:12 on July 29, 2019, Riverside Sheriff's Department received multiple calls reporting a man with a bloody head wound yelling and pounding on doors in the common area of an apartment complex located at 42200 Moraga Road, Temecula California.

Deputies Brian Keeney and Sonia Gomez (whose body camera was reviewed to recreate the event timeline) arrived on scene around 14:28. Kevin Niedzialek was first observed sitting on the ground, shirtless, and his face was covered with blood.[1] He repeatedly yelled, "I'm here, I'm here, I'm here," and "Please, please, please" to Deputy Keeney.

Mr. Niedzialek then stood up and approached Deputy Keeney. See screenshot below.



Deputy Gomez aimed her TASER at Mr. Niedzialek and fired, making good contact in his flesh with both darts, and tased him for 5 seconds,[2] causing Mr. Niedzialek to fall to the ground. After the TASER shock cycle was finished, Deputy Keeney approached Mr. Niedzialek and attempted to manually restrain his legs, as he yelled and kicked his feet. Deputy Keeney stepped back from Mr.

---

[1] The timestamp of the body camera does not match the time of the events. The first time the body camera has a visual of Mr. Niedzialek is at 15:23:52 on the camera timestamp, which is estimated to be approximately 14:29

[2] Gomez video, timestamp 15:24:02

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 5 of 17

Niedzialek and said, "Relax buddy."[3] Mr. Niedzialek sat upright on the ground, crossed legged, as he continued to yell.

Deputy Gomez told Mr. Niedzialek to, "Turn around, put your hands behind your back."[4] Mr. Niedzialek put his hands behind his back laid down supine (face up). The deputies told him to get on his stomach, but Mr. Niedzialek stood up and again began to approach Deputy Keeney.

Deputy Gomez, whose TASER darts were still in Mr. Niedzialek's skin, then issued another shock cycle lasting 5 seconds.[5] Mr. Niedzialek fell forward head-first onto the root of a tree. See screenshot below.



The deputies were then able to pin Mr. Niedzialek prone by Deputy Keeney putting his right knee on Mr. Niedzialek's left shoulder and right hand on his back, as he kicked his legs, while Deputy Gomez used her hands to pin his left shoulder and back. After he was handcuffed, Deputy Gomez called for an ambulance.

---

[3] Gomez video, timestamp 15:24:11
[4] Gomez video, timestamp 15:24:33
[5] Gomez video, timestamp 15:24:44

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 6 of 17

While prone, handcuffed, and still pinned down by the deputies, Mr. Niedzialek continued to slowly occasionally kick his legs and attempt to roll over, telling the deputies to stop.[6]

Mr. Niedzialek became subdued, no longer kicking his legs, yelling, or attempting to roll over. Deputy Keeley noted, "I think he's falling asleep."[7]

Mr. Niedzialek was bleeding on the root of the tree upon which he struck his head when falling (an image of the blood covered root is depicted below). He already had a bloody headwound prior to the call. He did not respond when the deputies asked him for his name.



From Deputy Gomez's body camera, the waistband of Mr. Niedzialek's underwear can be seen perhaps making very small, short, up-and-down movements, which may indicate that he was breathing to some extent.[8] There were no breath sounds or other movement indicating respiration, however. The last time the waistband movement was seen is at timestamp 15:29:26 on Deputy Gomez's body camera.

---

[6] Gomez video, timestamp 15:25:46
[7] Gomez video, timestamp 15:27:06
[8] Gomez video, timestamp 15:29:07

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021

page 7 of 17


The officers flipped Mr. Niedzialek onto his back, still handcuffed.[9] His eyes and mouth were open, and Deputy Gomez immediately used her right index and middle fingers to check for a carotid pulse.[10] Initially, she told Deputy Keeney that she couldn't feel a pulse, and then she switched hands and said, "No, there is, it's very low."[11]

One and a half minutes later, Deputy Gomez suggested sitting Mr. Niedzialek up, to which Deputy Keeney responded, "I don't think he has any blood that's aspirated or anything," and the officers left Mr. Niedzialek laying on the ground, handcuffed and supine.[12]

The paramedics arrived and Deputy Gomez told them that Mr. Niedzialek had a faint pulse, was tased twice, and that the blood on his head was from before they arrived. The paramedic on the scene, Lisa La Russo, said, "Is he breathing? He's not breathing, guys."[13] She then checked his vitals and stated, "He's got agonal respirations," and began resuscitation 2 seconds later.[14]

The officers removed Mr. Niedzialek's handcuffs.[15] The first reading of his vitals showed that he had Pulseless Electrical Activity (PEA), a type of electrical heart activity that cannot be shocked to re-establish normal cardiac rhythm. Repeated rhythm checks every 2-4 minutes revealed he was still in PEA until after 8 minutes of resuscitation, when the defibrillator indicated fibrillation. His cardiac rhythm then went into sinus tachycardia about 8 minutes later. He was given intravenous and intraosseous fluids, and an orotracheal tube was inserted. He was given two 0.1 mg/mL boluses of epinephrine, and naloxone (opioid overdose reversal medication), but his status was unchanged.

Mr. Niedzialek was loaded into the ambulance about 19 minutes after the paramedics arrived, and was taken to Inland Valley Medical Center, arriving 14 minutes later. He had sustained a diffuse anoxic brain injury, and his neurologic exam was consistent with brain death. The next day, 7/30/19, the time of death was called at 19:00, at which time his organs were harvested.

*Autopsy report:*
On August 2, 2019 at 9:15, Mr. Niedzialek's autopsy was conducted by Dr. Mark Fajardo (forensic pathology).[16] In addition to the autopsy, Deputy Dawna Wimsatt performed a coroner review.

---

[9] Gomez video, timestamp 15:30:16
[10] Gomez video, timestamp 15:30:20
[11] Gomez video, timestamp 15:30:30
[12] Case Gomez video, timestamp 15:32:05
[13] Gomez video, timestamp 15:32:24
[14] Gomez video, timestamp 15:32:55
[15] Gomez video, timestamp 15:34:18
[16] Complete report coroner and autopsy

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021

page 8 of 17


The external examination revealed multiple lacerations on Mr. Niedzialek's head and forehead, of varying degrees of depth, but none penetrating into the deeper soft tissues. There were contusions and abrasions scattered on his torso and limbs. Internal examination revealed minimal subgaleal hemorrhage over the right temporalis muscle, corresponding with a laceration of his right eyebrow region. No skull fractures or intracranial trauma were found, though his brain was swollen and soft, consistent with "respirator brain."

The toxicology results using antemortem blood drawn on 7/29/19 at 15:29 revealed methamphetamine (0.757 mg/L) and amphetamine (0.097 mg/L).

Dr. Fajardo concluded that Mr. Niedzialek's cause of death was acute methamphetamine toxicity, and that other significant conditions included application of restraint maneuvers. The coroner's report ruled the manner of death a homicide.

*Medical and other records reviewed for history*
Autopsy Report
34 Amended Complaint
AMR Paramedic Report
Autopsy Photos
Hospital photos - in situ, and organs donated
Complete rpt coroner and autopsy
Defendant's composite video edited at beginning
Dep. Gomez initial report 072919
Initial hospitalization records
Inland valley MC routine echo rpt
Organ transplant hospitalization records
TASER download
Deposition of Mark Fajardo taken on August 21, 2020
Deposition of Sonia Gomez, taken on December 17, 2020
Deposition of Brian Keeney, taken on December 18, 2020
Deposition of Lisa La Russo, taken on November 24, 2020

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021

page 9 of 17

### *Analysis and opinions*

**Injury causation methods**

In evaluating the most likely cause of Mr. Niedzialek's death, the plausible causes or risk factors for sudden death can be placed in 2 categories: the risks attributable to the actions of the officers (including mechanical obstruction of respiration and multiple TASER shocks), and the risk attributable to the condition present in Mr. Niedzialek and unrelated to the actions of the police officers, and described in the autopsy report (methamphetamine intoxication). There are no other apparent causes of sudden death for Mr. Niedzialek identified at autopsy or in any of the reviewed records.

The investigation of the cause of an injury is different than for a disease, primarily because there is typically a close temporal association between the suspected cause of death and the first signs of injury. There are systematic methods for assessing questions of injury and death causation in a medicolegal setting that have been described extensively in the peer-reviewed literature. Most simply put, an injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred.

The analysis is accomplished via the application of expertise and knowledge from several disciplines depending on the source and type of injury, nearly always including medicine and epidemiology.[1–3]

*Note: citation numbers in brackets [] refer to the bibliography at the end of this report, as opposed to the footnotes, which are superscript numbers.*

In a death investigation involving an autopsy the pathologist identifies, describes, and diagnoses observed conditions, but the determination of the cause of a death in the absence of a condition that is nearly always fatal (*i.e.* gunshot wound to the head) is made via comparison of competing risks of sudden death acting on the individual at the time of the death.[4]

The generally accepted methods for assessing injury and death causation are simply described as a 3-step process based on the Bradford-Hill criteria,[5] which has been extensively described in the peer-reviewed literature, and been deemed generally accepted by US Courts, and described as part of case law in the United States.[6–8]

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 10 of 17

The three fundamental elements of an injury causation analysis in the context of a death investigation are as follows:

1) **Plausibility:** whether the injury mechanism had the potential to cause the death (general causation), and if known, the magnitude of that potential (risk of death);

2) **Temporality:** the degree of temporal proximity between the injury mechanism and the death; and

3) **Alternative explanations**: whether there is a more likely alternative explanation for the death or fatal injury occurring at the same point in time, versus the investigated cause (also known as a differential etiology). This alternative or competing cause of death or fatal injury is quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.


**Analysis of the most probable cause of Mr. Niedzialek's death**

In the following section of this report is a discussion and analysis of the most probable cause of Mr. Niedzialek's death within the context of the 3-step causal analysis process described above. This process is accomplished by first enumerating the potential causes of death acting on Mr. Niedzialek and assessing which are *plausible* causes of death, and if so, what *risks* are associated with the plausible causes. The next step in assessing causality is temporality; for the present analysis this consists of a description of the timeframe during which the plausible risk factors for death would have acted on Mr. Niedzialek between the initiation of the restraint by deputies Keeney and Gomez and the time of his cardiopulmonary arrest. The last step of the analysis consists of a quantitative comparison of the magnitude of the risks presented by each of the plausible causes of death (*i.e.* differential etiology).

*Step 1: Potential causes of Mr. Niedzialek's death*

Based on the fact pattern surrounding Mr. Niedzialek's death and Dr. Fajardo's autopsy findings and report, the list of proposed probable causes of death for Mr. Niedzialek is as follows:

- Restraint related
    - Asphyxia due to chest compression
    - TASER shocks
- Non-restraint related
    - Acute methamphetamine toxicity

The following discussion addresses the plausibility of these potential causes, and, when known or knowable, the risks associated with them:

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 11 of 17

### ***Restraint-related causes***

#### *Asphyxia due to chest compression*

As seen on the video footage taken from the body camera of Deputy Gomez, and the bystander footage taken from across the courtyard, Mr. Niedzialek was subjected to forceful, prone restraint, with two officers pinning him to the ground while he was handcuffed behind his back. These actions carried a high risk of restricting, to some degree, Mr. Niedzialek's ability to breath.

Asphyxia is defined as a lack of oxygen (*i.e.* hypoxia) caused by an interruption in breathing, and is known as a trigger of cardiac dysrhythmia and arrest.[9] Compression of the neck, chest, and abdomen during physical restraint is a well-recognized mechanism for causing asphyxiation, due to restricted inspiration.[10] Positional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint (*i.e.* handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe. The terms compression and position are sometimes used interchangeably when referring to the circumstances of asphyxial death.

The restraint used on Mr. Niedzialek by deputies Keeney and Gomez after he was handcuffed, prone, and in an obvious panicked and excited state, was focused on his upper back and shoulders, thus limiting the movement of chest and diaphragm and ability to breathe an adequate breath. Given the vigorous activity that immediately preceded the arrest (*i.e.* screaming, running, and resisting the officers), and the additional TASER shocks (discussed further below), Mr. Niedzialek had an increased need for oxygen. Deputy Keeney's statement that Mr. Niedzialek had "fallen asleep" less than 2 minutes after such strenuous activity defies common sense.

When the deputies turned Mr. Niedzialek on his back and realized that he was nonresponsive, Deputy Gomez checked for his pulse in his throat, and reported finding a weak pulse. Two more minutes went by as the deputies waited for the paramedics, during which time neither deputy re-checked Mr. Niedzialek's pulse, monitored his breathing (which was not apparent), or placed him in a recovery position. When Deputy Gomez suggested sitting him upright, Deputy Keeney dismissed the idea by claiming that he didn't appear to have aspirated blood.

The deputies' use of aggressive and compressive restraint on Mr. Niedzialek, followed by the failure to evaluate or resuscitated him after he suffered a cardiopulmonary arrest, greatly increased the probability that Mr. Niedzialek would not survive his encounter with the Riverside County deputies. These actions and inactions serve as a highly plausible cause of the cardiopulmonary arrest that resulted in Mr. Niedzialek's death.

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021

page 12 of 17


<u>Electrical shock from electronic control device (TASER)</u>
In the process of arrest, Mr. Niedzialek was tased two times. Both TASER cycles lasted the pre-programmed 5 seconds and were discharged within 45 seconds of each another.

Electronic control devices, most commonly called TASERs, are designed to incapacitate an individual using an electric shock or shocks. The models used by law enforcement personnel typically have projectiles, connected to the device via thin wires, so that the electric shock can be administered at a distance. The introduction of an electrical current into the human body is a highly plausible and well-established mechanism for producing dysrhythmias, and thus it is unsurprising that law enforcement use of TASER has been associated with over 630 deaths between 2001-2014.[11]

While some studies have reported that TASER use has little or no impact on cardiac or respiratory function, virtually all of these papers were funded by the company that makes and sells TASER devices. This issue was highlighted in a 2011 paper in which researchers found that papers funded by TASER were 18 times more likely to conclude that the devices are "safe" as compared with studies that were not funded by the company.[11] In contrast, studies that have not been funded by TASER have reported a number of adverse effects from TASER deployment, including dysrhythmias and associated cardiac arrest when the darts are fired into the chest near the heart (which was not a factor in Mr. Niedzialek's death). [12]

The studies that conclude that TASER is a safe restraint technique fail to adequately recreate the events that typically lead to TASER shocks: the studies are of healthy volunteers in controlled environments, which does not even slightly resemble the real life circumstances of a person tased by police, often including a subject with mental illness, drug use, concurrent restraint (i.e. multiple officers' bodyweight), *multiple* TASER shocks, and vigorously fighting and resisting arrest.[13,14]

Ordinarily, a TASER shock carries a very low risk of cardiac arrest when used by law enforcement, but this was not the case for Mr. Niedzialek, however. At the time the TASER was used on Mr. Niedzialek he was in delirious and highly excited state; he was screaming, hyperventilating, confused, and bleeding from his head. The use of the TASER increases the need for oxygen in a tased individual, in direct relationship to the duration and number of applications. Combined with the positional asphyxia factors described above, the use of the TASER followed by the prone restraint is a plausible contributing cause of Mr. Niedzialek's cardiopulmonary arrest and death.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 13 of 17

### ***Non-restraint-related cause***

#### ***Acute methamphetamine toxicity***

Mr. Niedzialek was found to have an antemortem blood concentration (taken 7/29/19 at 15:29) of methamphetamine of 0.757 mg/L. Methamphetamine is a stimulant that is primarily consumed illegally as "crystal meth," or simply "meth," in a powder form that can be smoked, injected, or ingested orally. Use of the drug is highly prevalent; there were 42 tons of crystal meth consumed in the US in 2010, and in 2013 1.2 million Americans used the drug.[15]

In contrast with opiates, however, crystal meth has a relatively low hospitalization and death rate; there were 103,000 emergency room visits associated with meth use in 2011, and in the same year there were ~2,700 deaths attributed, at least in part, to meth exposure, resulting in a death rate of 1 in 444 relative to the number of people taking the drug annually (the deaths were not all necessarily due to methamphetamine toxicity, however). As the typical dose of meth ranges from 10 to 40 mg, this means that there are at least 11,340 doses available per pound of meth, (assuming a 40 mg dose), 22.7 million doses per ton of meth, and thus a total of 953 million doses of meth consumed in the US in 2010 alone.[16] A comparison of the number of doses to the number of deaths each year yields a risk of 1 death per 353,000 doses of methamphetamine.[17] While no illicit drug use is considered "safe" (and thus any level in the body is considered "toxic"), the risk of death from a single dose of methamphetamine is exceedingly small.

There is no evidence that supports an inference that the very small amount of methamphetamine in Mr. Niedzialek's blood (0.757 mg/L) was even a *plausible* cause of his death in the absence of the violent restraint. The level of methamphetamine assayed in Mr. Niedzialek's antemortem blood sample is less than what is commonly found in recreational users, based on National Highway Traffic Safety Administration information.[16] Other studies have described non-lethal blood concentrations in recreational methamphetamine users of as high as 9.3 mg/L (more than 12 times greater than the level found in Mr. Niedzialek's blood).[18] While methamphetamine deaths have been recorded with blood levels as low as 0.05 mg/L this information is essentially useless in the present investigation. There is extensive overlap between what are only *possibly* fatal levels and common recreational blood concentrations of methamphetamine.

Given the exceedingly low per-dose risk of death associated with methamphetamine use, there is no reason to believe that simply because Mr. Niedzialek had methamphetamine in his blood that *might* be fatal, that the cause of his death was a result of methamphetamine toxicity. Methamphetamine isn't like cyanide or some other poison, which is invariably the cause of death when it is found in a decedent. Like alcohol, most of the time that amphetamine is present in a

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 14 of 17

decedent it is *not* the cause of death. Thus, at the levels found in Mr. Niedzialek blood shortly before he died, methamphetamine toxicity was a highly unlikely cause of his death*, in the absence of the restraint-related death risk*. It is certainly appropriate to consider the methamphetamine as a contributing factor to Mr. Niedzialek's death, as the drug produced actions that greatly increased his need for oxygen at the time of his prone restraint.

### Step 2: The timing of events leading to Mr. Niedzialek's death

The table below and on the following page was created after reviewing the body camera footage and audio of Deputy Gomez, and the bystander footage taken from across the courtyard. Deputies Keeney and Gomez were the first on scene to interact with and attempt to restrain Mr. Niedzialek.

The table begins when the deputies first contacted Mr. Niedzialek. The first column is the timestamp from the overall interaction, beginning at 00:00 when Deputy Gomez's body camera sees Mr. Niedzialek, the second column is the timestamp beginning when he is handcuffed, prone, and pinned by the deputies, and the third column is a brief description of the event.

| Time since police contact | Time since handcuffed, restrained, prone | Action |
|---|---|---|
| 00:00 | | Niedzialek visible from Gomez body camera, he is shirtless, and his head is covered in blood |
| 00:08 | | Niedzialek approaches Keeney |
| 00:11 | | Niedzialek TASED 5 seconds |
| 00:48 | | Niedzialek puts hands behind back, lays down |
| 00:52 | | Niedzialek stands up to approach Keeney |
| 00:53 | | Niedzialek TASED 5 seconds, he falls face-first into the root of a tree |
| 00:57 | | Officers pin Niedzialek prone, while he kicks |
| 01:32 | 00:00 | Niedzialek handcuffed, prone, pinned by Keeney's knee and Gomez's hands |
| 01:38 | 00:06 | Gomez calls an ambulance |
| 03:16 | 01:44 | Keeney says, "I think he's falling asleep" |
| 04:44 | 03:12 | Gomez asks Niedzialek for his name, he does not respond |
| 05:35 | 04:03 | Last breath Niedzialek can be seen taking |
| 06:25 | 04:53 | Officers flip Niedzialek over |

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021

page 15 of 17

| 06:39 | 05:07 | Gomez checks for a pulse, doesn't feel one, then states, "No, it is, there is, it's very low" |
| 08:14 | 06:42 | Gomez says, "Should we try to sit him up?", but the officers do not sit him up |
| 08:24 | 06:52 | Paramedics arrive on scene |
| 08:33 | 07:01 | Paramedics evaluate Niedzialek, "He's not breathing" |
| 09:04 | 07:32 | Resuscitation efforts begin |

The last breath Mr. Niedzialek possibly took occurred 4 minutes after he was handcuffed and prone on the ground, while deputies Keeney and Gomez using their hands and/or knee to pin his shoulders and upper back to the ground. When they turned him onto his back still handcuffed about a minute later, he was unresponsive, and reportedly had a weak pulse. Two more minutes passed as the deputies waited for the paramedics, during which time neither deputy attempted to re-evaluate Mr. Niedzialek while he was unresponsive and not breathing. As a result of their inaction, Mr. Niedzialek had no effective cardiopulmonary function for at least 3½ minutes prior to receiving CPR from EMS personnel, and possibly significantly longer. My understanding is that plaintiff's cardiology expert, Dr. Daniel Wohlgelertner, will provide further analysis on this issue.

***Step 3: Alternative causes/ differential etiology of the most probable cause of Mr. Niedzialek's death***
Based on the above discussion, the only proposed non-restraint-related cause of Mr. Niedzialek's death was the risk presented by the low level of methamphetamine in his blood, which carried <1 in 350,000 risk.

In comparison with the risk due to the meth presence, the risk of death from the police actions and inactions was exceedingly high; the risk of death due to chest compression, as well as multiple TASER shocks increasing the need for oxygen, greatly increased Mr. Niedzialek's risk of asphyxia-related cardiopulmonary arrest. The failure by the deputies to adequately attempt to evaluate Mr. Niedzialek for the need for resuscitation greatly contributed to the inefficacy of the EMT resuscitation efforts before irreversible brain damage occurred.


***Conclusions:***
Based on the preceding analysis, it is my opinion that Mr. Niedzialek's death was primarily a result of the use of aggressive restraint tactics by the Riverside Police Department personnel, resulting in death by asphyxia. A contributing factor to his death was the lack of timely resuscitation efforts.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 16 of 17

Because Mr. Niedzialek's death was due to the intentional actions of others, I agree with the coroner's conclusion that the manner of death is homicide. While there is no doubt that the methamphetamine in Mr. Niedzialek's system and his associated agitation greatly increased his need for oxygen (as did the multiple TASER shocks), these conditions required the addition of the prone restraint to result in the potentially deadly circumstances that resulted in Mr. Niedzialek's death.

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, FAAFS, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences

John Burton, Esq.


RE: *Alves v Riverside County, et al.*

February 1, 2021


page 17 of 17


### *References*

1. Freeman MD, Zeegers M. Principles and applications of forensic epidemiology in the medicolegal setting. Law, Probab Risk. 2015;14:269–78.

2. Koehler SA, Freeman MD. Forensic epidemiology: A method for investigating and quantifying specific causation. Forensic Sci Med Pathol. 2014;10:217–22.

3. Freeman MD, Kohles SS. An evaluation of applied biomechanics as an adjunct to systematic specific causation in forensic medicine. Wiener Medizinische Wochenschrift. 2011;161:458–68.

4. Meilia PDI, Freeman MD, Herkutanto, Zeegers MP. A review of causal inference in forensic medicine. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:313–20.

5. Reference Manual on Scientific Evidence, Third Edition l Federal Judicial Center [Internet]. [cited 2021 Jan 25]. Available from: https://www.fjc.gov/content/reference-manual-scientific-evidence-third-edition-1

6. Etherton v Owner Insurance Company. U.S. District Court of Appeals. 10th Circuit. Case no. 14-1164.

7. 35 F Supp. 3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance Company, a Michigan Insurance Company, Defendant. Civil Action No. 10-cv-00892-PAB-KLM.

8. Freeman MD, Centeno CJ, Kohles SS. A Systematic Approach to Clinical Determinations of Causation in Symptomatic Spinal Disk Injury Following Motor Vehicle Crash Trauma. PM R. 2009;1:951–6.

9. Clark RE, Christlier I, Sanmarco M, Diaz-Perez R, Dammann JF. Relationship of Hypoxia to Arrhythmia and Cardiac Conduction Hemorrhage: Experimental Study. Circulation. 1963;27:742–7.

10. Colville-Ebeling B, Freeman M, Banner J, Lynnerup N. Autopsy practice in forensic pathology - Evidence-based or experience-based? A review of autopsies performed on victims of traumatic asphyxia in a mass disaster. J Forensic Leg Med. Elsevier Ltd; 2014;22:33–6.

11. 634 Taser-Related Deaths in the United States Since 2001. Electron. Village. 2014.

12. Zipes DP. TASER electronic control devices can cause cardiac arrest in humans. Circulation. 2014;129:101–11.

13. Strote J, Hutson HR. Taser use in restraint-related deaths. Prehospital Emerg Care. 2006;10:447–50.

14. Strote J, Hutson HR. TASER study results do not reflect real-life restraint situations. Am J Emerg Med. Elsevier Inc.; 2009;27:747.

15. Patterson E. Methamphetamine history and statistics. Am. Addict. Centers. 2018.

16. Couper F, Logan B. Human Performance Drug Fact Sheets - NHTSA. 2004;102.

17. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92.

18. Logan BK, Flinger CL, Haddix T. Cause and manner of death in fatalities involving methamphetamine. J Forensic Sci. 1998;43:28–34.

# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED, )
                                 )
              PLAINTIFF,         )
                                 )
     VS.                         ) CASE NO. 5:19-CV-02083-JGB
                                 )
RIVERSIDE COUNTY, RIVERSIDE      )
SHERIFF'S DEPARTMENT,            )
SHERIFF-CORONER CHAD BIANCO AND  )
DOES 1-10,                       )
                                 )
              DEFENDANTS.        )
_____)


VIDEO CONFERENCE DEPOSITION OF

DR. MICHAEL FREEMAN

TAKEN ON

WEDNESDAY, APRIL 28, 2021




MELINDA S. WOMELSDORF, C.S.R. NO. 13124

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TRACY ALVES, INDIVIDUALLY AND AS )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED, )
)
                    PLAINTIFF, )
)
        VS. ) CASE NO. 5:19-CV-02083
) JGB
RIVERSIDE COUNTY, RIVERSIDE )
SHERIFF'S DEPARTMENT, )
SHERIFF-CORONER CHAD BIANCO AND )
DOES 1-10, )
)
                    DEFENDANTS. )
_____)

VIDEO CONFERENCE DEPOSITION OF DR. MICHAEL

FREEMAN, taken on behalf of the Defendants, utilizing ZOOM

Cloud platform to host all participants from their

respective locations, commencing at 12:01 P.M., Wednesday,

April 28, 2021, before Melinda S. Womelsdorf, Certified

Shorthand Reporter, License No. 13124, for the State of

California, pursuant to Notice.

2

APPEARANCES:


For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS
SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:

    THE LAW OFFICES OF JOHN BURTON
    BY:  KENNEDY HELM, ESQ.
    128 North Fair Oaks Avenue
    Pasadena, California 91103
    (626) 449-8300
    jb@johnburtonlaw.com
    (Appearing via ZOOM Video Conference)

For the Defendants, COUNTY OF RIVERSIDE:

    MANNING & KASS
    ELLROD, RAMIREZ, TRESTER, LLP
    BY:  TONY M. SAIN, ESQ.
    801 S. Figueroa Street
    15th Floor
    Los Angeles, California 90017
    (213) 624-6900
    tms@manningllp.com
    (Appearing via ZOOM Video Conference)

3

SAN BERNARDINO, CALIFORNIA

WEDNESDAY, APRIL 28, 2021

AT 12:01 P.M.


DR. MICHAEL FREEMAN,

Having been first duly sworn, was

examined and testified as follows:


EXAMINATION



BY MR. SAIN:

Q    Pursuant to the court's order, this deposition is proceeding by way of electronic means, including ZOOM.

Sir, would you please state your full name?

A    Yes.  Michael Freeman, middle initial D.

Q    And are you able to hear me okay?

A    Yeah, I can hear you just fine.

Q    Okay.  I'm going to ask that you speak in the loudest voice that you can, because I will tell you that you're coming across on the audio a little bit quiet.

A    Okay.  I can try to put in some AirPods and see if that helps.

Q    That -- that would be appreciated.  Because,

5

Q   So that is a -- United Kingdom, that's a British, a foreign organization; correct?

A   That is correct.

Q   It is not an American organization; correct?

A   That's correct, too.

Q   Okay.  Now, in terms of your medical background, looking at your CV -- and if I'm reading this correctly, and if I'm not, please let me know.

You obtained your medical doctor's degree from a university in Sweden; is that correct?

A   That is.

Q   Okay.  So did you ever obtain a medical doctor's degree from any US medical institution or medical school?

A   No.

Q   Okay.  And in looking at your CV, does it document all of your medical professional positions, licensure, board certifications other than the one that you mentioned about the Royal College?  Are all of those things documented in your CV, Exhibit 4?

A   Yes.

Q   So -- and please correct me if I'm wrong, I didn't see on here you being licensed to practice medicine in Oregon.  Was that omitted?

A   No.  I've never taken a license to practice

18

allopathic medicine in Oregon.  I think it's -- on my -- my CV I was licensed as a chiropractor going back 35 years, which was my original training.

However, when I did my medical training, I never went on to take a license because I never practiced medicine.  I work as a medical scientist, not a clinician.

Q    So you have never been a licensed physician in the state of Oregon; is that correct?

A    Licensed medical physician.  That's correct.

Q    Have you ever been a licensed medical physician in the state of California?

A    I have not.

Q    Have you ever been a licensed medical physician in any United States state or territory?

A    No.

Q    Now, you mentioned the phrase -- I think you said the equivalent of board certification.

What's your understanding of what board certification means here in the United States?

A    Board certification typically refers to an AMA certified board subspecialty.

Q    AMA would be?

A    American Medical Association.

Q    Thank you.

19

So are you board certified by any specialty of the American Medical Association?

A    No.

Q    Are you familiar with the American Board of Pathology?

A    I am.

Q    What does the American Board of Pathology do according to your understanding?

A    That is the AMA certification for pathologists who have completed a three-year residency.  And I've taken their -- their boards in pathology, general pathology, or clinical and anatomical pathology.

Q    Have you ever been board certified by the American Board of Pathology?

A    Nope.

Q    So you've never been board certified by the American Board of Pathology in clinical pathology; is that correct?

A    That's correct.

Q    You have never been board certified by the American Board of Pathology in anatomic pathology; is that correct?

A    It is.

Q    You have never been board certified by the American Board of Pathology in forensic pathology; is

20

that correct?

A    It is.

Q    Are you familiar with the term "forensic pathology"?

A    I am.

Q    What is your understanding of that term?

A    Forensic pathologists is a -- pathologist -- medicolegal -- particular medicolegal autopsy.

(Audio disruption.)

BY MR. SAIN:

Q    Sir, I'm sorry.  Your entire answer cut out. Could you say or answer again, please?

What's your understanding of --

A    Sure.

Q    -- what forensic pathology is?

A    Can you hear me now?

Q    Yes, sir.

A    Forensic pathology is the discipline of medicolegal investigation of death via autopsy and typically is associated with the investigation of sudden death or death under suspicion circumstances.

Q    And so in terms of American, United States based organizations, you have no board certifications in forensic pathology; is that correct?

A    That's correct.

21

Q    Okay.  So in that section on page five under activities and honors, it says that from 2007 to 2009 you were a quote "special deputy sheriff forensics" end quote, in Clackamas county, Oregon.

Was that one of the honorary roles?

A    Yes.  That was not a paid role.

Q    Okay.  And in that honorary role, what did you do?

A    Primarily worked on investigation of the vehicular homicide investigations.

Q    Could you elaborate?  What does that entail?

A    That means that I was on call if there was a suspected vehicular homicide, somebody died, and it was suspected somebody was intoxicated, for example, or was doing something that was considered reckless at the time of the crash.

I would be called to the scene.  I would evaluate the scene evidence.  I would examine the decedent at the scene.  And then I would prepare an analysis of some aspect that I was asked to look at.

Typically -- typically, it would be associated with kinematics or biomechanics as far who might have been driving at the time of the crash.  But it also might have been more straightforward, just looking at the cause of the injury.

26

Q    In your role as an honorary deputy medical examiner from 2000 to 2005 at Clackamas county, did you ever perform any autopsy exams?

A    No.  My autopsy training came after that.

Q    Under that same header, under activities and honors, it states that from 2000 to 2005 you were a quote "deputy medical examiner" end quote in Marion county, Oregon.

Was that also an honorary role?

A    Yes.

Q    So 2007 to 2009, honorary deputy medical examiner of Clackamas county, 2002 to 2005 honorary deputy medical examiner of Marion county; is that correct?

A    Yes.

Q    And what did you do in that role as an honorary medical deputy medical examiner in Marion county?

A    Not very much.  Most of my work was in Clackamas county or in Washington county.  But in Marion county, I probably got called out maybe once a year.

Q    For?

A    Fatal crash investigation.  Come to the scene, evaluate the decedent, evaluate the kinematics or biomechanics that resulted in the death.

27

Q    And in your role as an honorary deputy medical examiner from 2000 to 2005 at Marion county, did you ever perform any autopsies?

A    No.  That all occurred before I had my training in forensic pathology.

Q    Under the header "activities and honors" on your CV, it states that from 1999 to 2006 you were quote "a consultant forensic trauma epidemiologist," end quote.  At Oregon State Police Medical Examiner Division.

Was that also an honorary role?

A    It was.

Q    And what did you do in that role?

A    Same thing I did for the other agencies.  It was all sort of blended together, if you will.  So I would be called out, typically to a crash scene.  There were a couple of none-crash-related deaths that I was consulted on that I vaguely recall.  But they all involved some sort of reconstruction of scene evidence.  And performed the same sort of -- same sort of tasks that I did for -- at the county level.

I also did continuing education for the medical examiner's office.  I gave a number of lectures for them for continuing education.

Q    In your role as honorary consultant forensic

28

trauma epidemiologist for the Oregon state police, did you perform any autopsy exams?

A    I did not.

Q    In terms of activities and honors, would it be accurate to say that the three I just listed, your honorary deputy medical examiner role at Clackamas, your honorary deputy medical examiner role at Marion, your honorary consultant trauma epidemiologist at Oregon state police -- would it be accurate to say that in terms of the section, activities and honors, those are the only three that have anything whatsoever to do with forensic pathology?  Is that accurate?

A    No.  I would not say that's correct.  My Fulbright fellowship actually covered forensic pathology as part of the instructional course.

I am -- let's see.  I am vice chair of the American Academy of Forensic Sciences Standards Board because of my -- my standing in the pathology section. And as a Vice President on the evaluation of medicolegal death investigation standard, which will become an ANSI standard, A-N-S-I, for the United States.

I am the research subcommittee chair for the Faculty, Forensic and Legal Medicine which in part has a forensic pathology membership.

Q    Let me ask --

29

asphyxia.

Q    What item number was that in the book chapter section?

A    Number two.

Q    So that's my page 15, item number two. According to you, it also deals with asphyxia.

Anything else that you've authored peer-reviewed that pertains to asphyxia?

A    Offhand, not that I can think of that primarily refers to asphyxia.

Q    Okay.  And would it be accurate to say that each of those four items you just identified, asphyxia does not appear anywhere in the title?

A    Yeah.  That's true.

Q    Have you ever yourself conducted any laboratory studies on the effects of restraint on subjects or pertaining to asphyxia?

A    No.  God, no.

Q    On your CV does the word "asphyxia" appear anywhere on that document?

A    I don't know.  I haven't -- I haven't looked with that in mind.

Q    I will represent to you, Doctor, that I could not find it anywhere on Exhibit 4.

A    Okay.  All right.  I don't have any reason to

38

acidosis?

A    No.  I would agree that the effects of methamphetamine may contribute to increased levels of acidosis.

Q    Would you agree that in some cases high levels of methamphetamine can cause cardiac arrest?

A    In some cases, yes.  I mean, would I say that that -- cardiac arrest is how lethal doses of methamphetamine kill people is it affects the cardiac rhythm for sure.  I mean, where you're talking about more than ten milligrams per -- per milliliter.

Q    Now, you yourself are not a toxicologist; correct?

A    No.  I'm trained in toxicology, I'm not a toxicologist.

Q    So you're not board certified in toxicology medicine?

A    That's correct.

Q    Okay.  Do you have any kind of understanding as to what the lethal range of methamphetamine ingestion is?

A    Yeah.  I have extensive understanding of that issue as I've described it in the literature.

Q    Which is what?

A    Well, there have been very low levels that

55

would not put myself out as -- in other words, the discipline of neurology, as far as it relates to the human body, I have a lot of expertise and training in, but not in the medical discipline of neurology.  They are two different things, if that makes sense.

Q    So you're not a board-certified neurologist?

A    I am not.

Q    Are you an expert in neuro pathology?

A    No.

Q    And you already said that you are not an expert in toxicology; true?

A    No.  I have expertise in toxicology; I'm not a toxicologist.

Q    So you're not board-certified in toxicology?

A    That's correct.  Two different things.

Q    Are you a professional psychologist, psychiatrist or licensed mental health care counselor?

A    I am not.

Q    Are you an expert on Taser electrical engineering or mechanics?

A    What was the last one?

Q    Are you an expert on Taser electrical engineering or mechanics?

A    I have experience with Taser, but I would not consider myself a quote, expert in Taser.

58

Road in Temecula, California?

A   I did not.

Q   Prior to forming your opinions in this case, did you ever physically examine or autopsy the body of Kevin Niedzialek?

A   I did not.

Q   Prior to forming any of your opinions in this case, did you ever physically examine or inspect in person any of the physical evidence as opposed to documentary evidence?

A   I did not.

Q   I have read both of your reports in their entirety, and I want you to understand that my question now is not asking you to just tell me your whole report, but if you could boil down for me what your core opinions are, I would appreciate it.

So what are the core opinions that you anticipate offering at the time of trial?

MR. HELM:  Objection.  Vague.  Calls for a narrative.

THE WITNESS:  My core opinion is that -- is that Mr. Niedzialek was subjected to three possible or, we'll say, even four possible causes of death.  And two of the causes are un-related to restraint, which is excited delirium and methamphetamine toxicity.  And two of them

67

State of California   )
                      )  SS.
County of_____)


          I, Dr. Michael Freeman, say I have read the foregoing video conference deposition and declare under penalty of perjury that my answers as indicated are true and correct.


_____
       (DATE)




                              _____
                                    (SIGNATURE)

113

State of California       )
                          )   SS.
County of San Bernardino)



          I, MELINDA WOMELSDORF, Certified Shorthand

Reporter, License No. 13124, for the State of

California, do hereby certify:

          That, prior to being examined, the witness

named in the foregoing video conference deposition, to

wit, Dr. Michael Freeman, was by me duly sworn to

testify the truth, the whole truth and nothing but the

truth;

          That said video conference deposition was

taken down by me in shorthand at the time and place

therein named and thereafter reduced to computer-aided

transcription under my direction;

          That the foregoing transcript, as typed, is

a true record of the said proceedings.

          I further certify that I am not interested

in the event of the action.

          Witness my hand this 11th day of May, 2021.


          _____

          MELINDA WOMELSDORF, CSR. NO. 13124

114

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS    )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED,               )
                                    )
                PLAINTIFF,          )
                                    )
        VS.                         ) CASE NO. 5:19-CV-02083-JGB
                                    )
RIVERSIDE COUNTY, RIVERSIDE         )
SHERIFF'S DEPARTMENT,               )
SHERIFF-CORONER CHAD BIANCO AND     )
DOES 1-10,                          )
                                    )
                DEFENDANTS.         )
_____)


DEPOSITION OF MARK A. FAJARDO, M.D.

TAKEN ON

FRIDAY, AUGUST 21, 2020


MELINDA S. WOMELSDORF, C.S.R. NO. 13124

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS   )
SUCCESSOR IN INTEREST FOR KEVIN R. )
NIEDZIALEK, DECEASED,              )
                                   )
                  PLAINTIFF,       )
                                   )
     VS.                           ) CASE NO. 5:19-CV-02083
                                   )           JGB
RIVERSIDE COUNTY, RIVERSIDE        )
SHERIFF'S DEPARTMENT,              )
SHERIFF-CORONER CHAD BIANCO AND    )
DOES 1-10,                         )
                                   )
                  DEFENDANTS.      )
_____)


        DEPOSITION OF MARK A. FAJARDO, M.D., taken on

behalf of the Defendants, at 800 S. Redlands, Perris, CA,

mfajardo@riversidesheriff.org, commencing at 2:24 P.M.,

Friday, August 21, 2020, before Melinda S. Womelsdorf,

Certified Shorthand Reporter, License No. 13124, for the

State of California, pursuant to Notice.

2

APPEARANCES:

For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:

        THE LAW OFFICES OF JOHN BURTON
        BY:  JOHN BURTON, ESQ.
             KENNEDY HELM, ESQ.
        128 North Fair Oaks Avenue
        Pasadena, California 91103
        (626) 449-8300
        jb@johnburtonlaw.com
        (Appearing via ZOOM Video Conference)

For the Defendants, COUNTY OF RIVERSIDE:

        MANNING & KASS
        ELLROD, RAMIREZ, TRESTER, LLP
        BY:  TONY M. SAIN, ESQ.
             GARROS CHAN, ESQ.
        801 S. Figueroa Street
        15th Floor
        Los Angeles, California 90017
        (213) 624-6900
        tms@manningllp.com

3

PERRIS, CALIFORNIA

FRIDAY, AUGUST 21, 2020

AT 2:24 PM


MARK A. FAJARDO, M.D.,

Having been first duly sworn, was

examined and testified as follows:


EXAMINATION


BY MR. SAIN:

Q    Sir, would you please state your full name?

A    Mark Fajardo, M-A-R-K, F-A-J-A-R-D-O.

Q    Good morning.  It's good to see you again, Dr. Fajardo.

A    Good afternoon.

Q    Good afternoon.  Thank you.  And it's good to see you again, Dr. Fajardo.

At this time, since we have a number of people who, pursuant to a Rule 29 stipulation, are appearing via remote deposition means, via ZOOM specifically, I'd like to ask everyone who is appearing in this case at this deposition to identify themselves for the record, please.

MR. BURTON:  John Burton for the plaintiff.

5

7-BBB is the right foot, showing the abrasions.

Q    So then if you would take the three photos that we pulled from Exhibit 6, let's start with 7-CC.

A    CCC?

Q    Are we up to three Cs?

A    Yes.

Q    So 7-CCC.  And then tell us what is shown in 7CCC.

A    That is a heart as it's removed from the decedent, displaying it's just fine.

Q    So in 7-CCC, we see Kevin N.'s heart when it was harvested?

A    That's correct.

Q    Okay.  Next up would be 7-DDD.

A    7-DDD.

Q    And what's shown in 7-DDD?

A    The lungs.

Q    So 7-DDD would show Kevin N.'s lungs as they appeared when they were harvested?

A    Correct.

Q    Is there anything abnormal that was documented in 7-DDD?

A    Not at all.

Q    So those lungs are perfectly healthy?

74

A    Yes.

Q    And then 7-EEE would be the last one.  What's documented in that photo?

A    Same thing with the lungs.  So 7-DDD are the back of the lungs, and 7-EEE is the front of the lungs.

Q    So on how many occasions have you performed an autopsy after someone's organs were harvested?

A    Probably upwards of 20 cases, I would think.

Q    Okay.  And in your experience would organs be harvested if they had some sort of damage or defect or abnormality?

A    Not at all.

Q    Why not?

A    Well, you don't want to put a bad organ into somebody who desperately needs an organ.

Q    Okay.  And in terms of Exhibit 5, which were the exterior autopsy photos, and Exhibit 7, which were the pre-organ harvest photos, do any of those photos document any injuries, wounds, defects, or abnormalities that you believe played a proximate causal role in Kevin N.'s death?

A    No.

Q    So in terms of your autopsy in this case, did you determine what the proximate causal role of death was?

75

Q   So, for example, can you say, based on your personal knowledge, your experience, your expertise, or as a result of your examination, one way or the other whether or not that blunt force trauma injury to the head was caused by any law enforcement officer?

A   I cannot.

Q   For all you know, it could have been caused before law enforcement ever contacted Kevin N.; is that right?

A   That's correct.

Q   Other than that head injury, did you observe any other injuries, wounds, defects, or abnormalities during your examination of Kevin N.'s interior?

A   No.

Q   In terms of the findings of your autopsy examination, did you determine what the proximate cause of Kevin N.'s death was?

A   Yes.

Q   What was that?

A   Acute methamphetamine toxicity.

Q   And in that context, what does the word "acute" mean?

A   It means a -- more close in time to the individual's death versus chronic, indicating a prolonged use of a drug or medication.

78

beating or you stop breathing.  More likely than not, again, a greater probability, it was his heart that did not beat as it should and then fell into what is called a fatal arrhythmia.  In other words, his heart became disorganized.

And part of that, not just the methamphetamine, but the physical exertion, the pain associated with being taken into custody, the application of the Taser, results in increased heart rate, increased blood pressure, increased cardiac requirements, and then ultimately contributing in some fashion as to why his heart developed that fatal arrhythmia.

Q   Based on your autopsy examination or otherwise, did you determine that the application of a Taser device to Kevin N. was a proximate cause of his death?

A   So, no, it was not.

Q   Based on your autopsy examination of Kevin N. or otherwise, did you determine that restraint maneuvers were the proximate cause of his death?

A   No, they were not.

Q   Based on your autopsy examination or otherwise, did you determine that anything that any law enforcement officers may have done with Kevin N. was a

81

proximate cause of his death?

A    No.

Q    So nothing that the officers did was a proximate cause of his death?

A    Correct.

Q    We talked earlier about asphyxia.  If Kevin N. had died as a result of asphyxia, what would you have expected to see in his body?

A    Kind of the same thing that we see here. Basically asphyxia, meaning not enough oxygen to the body to supply its requirements.  That can happen if your heart stops beating.  Obviously your body is not going to get the oxygen that it requires.

So almost the same thing that we see.  The anoxic insult, the changes to the brain that we see.

Q    So would it be accurate to say that the difference between an asphyxial death and -- respirator brain I think is what you called it -- would be that, in asphyxial death, the lack of oxygen intake would cause the death, whereas any other way, the cardiac arrest would cause the death and cause the brain injury -- the anoxic injury?

A    Correct.

Q    Okay.  So it's really which comes first?

A    Yes.

82

if it's more likely, but probable that some level of acidosis was present at the time because of his agitated state.

Q   Okay.  And can you say to a reasonable degree of medical probability that it was more likely than not that the acidosis was the proximate cause of his death?

A   Yeah.  So, yes, I can render an opinion.  The answer is no.  That was not the cause.

Q   All right.  In your report which we attached as Exhibit 3, did you list all of the factors that you believe were the proximate cause or the cause of death for Kevin N.?

A   I'm sorry.  Once again?

Q   Sure.

In your autopsy report which we attached as Exhibit 3, did you list all of the factors that you believe were the proximate cause or the cause of death for Kevin N.?

A   Yes.

Q   And in terms of the proximate cause, the cause of death, the moving force that caused Kevin N.'s death, what did you find that cause of death to be?

A   Acute methamphetamine toxicity.

Q   Anything else?

A   No.

148

Q    And anywhere in your report or autopsy findings, do you identify any asphyxia as the proximate cause, the cause of death, for Kevin N.?

A    No.

Q    Anywhere in your autopsy report or findings, do you identify asphyxia as a contributing factor toward Kevin N.'s death?

A    No.

Q    Did you find any evidence that Kevin N. had asphyxiated before the cardiac arrest?

A    No.

Q    Did you find any evidence that Kevin N. had asphyxiated at all?

A    No.

Q    Would it be accurate to say that you found no evidence that Kevin N. had died as a result of asphyxia?

A    Correct.

Q    Mr. Burton asked you some questions about the paramedic report of the cardiac rhythm.

Based on your review of the video, would it be accurate to say that Kevin N. was not hooked up to a cardiac monitor until after he was in the supine position?

A    Correct.

Q    So would it be accurate, then, to say that, in

149

This happened, obviously, way before that.

That's why I asked to review the footage. That's why I did the posterior back dissection. To ensure that that did not compromise his ability to breathe.

And so in my expert medical opinion, the answer is, no, it did not.

Q   So in terms of the deputies' restraint of Kevin N., based on your review of the video, based on your forensic exam, based on your associated investigation, your opinion is that his -- neither compression nor his position nor anything about the restraint impaired his breathing enough to cause him to die?

A   In and of itself, that is correct.

Q   Okay.  Since you have conducted your autopsy exam, since you've completed your report, formed all your opinions, is there any additional evidence that you've reviewed, other than what you've documented in that report, that you have considered in connection with this case?

A   No.

Q   Okay.  Other than the bystander witness video you viewed today?

A   Correct.

152

State of California   )
                      )  SS.
County of_____)


         I, Mark A. Fajardo, M.D., say I have read the foregoing deposition and declare under penalty of perjury that my answers as indicated are true and correct.



_____
        (DATE)




                              _____
                                      (SIGNATURE)

156

State of California      )
                         )  SS.
County of San Bernardino)


               I, MELINDA WOMELSDORF, Certified Shorthand

Reporter, License No. 13124, for the State of

California, do hereby certify:

               That, prior to being examined, the witness

named in the foregoing deposition, to wit, Mark A.

Fajardo, M.D., was by me duly sworn to testify the

truth, the whole truth and nothing but the truth;

               That said deposition was taken down by me

in shorthand at the time and place therein named and

thereafter reduced to computer-aided transcription under

my direction;

               That the foregoing transcript, as typed, is

a true record of the said proceedings.

               I further certify that I am not interested

in the event of the action.

               Witness my hand this 9th day of September,

2020.


_____
MELINDA WOMELSDORF, CSR. NO. 13124

157

# EXHIBIT D

# MANNING & KASS
# ELLROD, RAMIREZ, TRESTER LLP
### ATTORNEYS AT LAW

**CONFIDENTIAL
DOCUMENT**

**EXHIBIT B IN
SUPPORT OF
SUMMARY
JUDGMENT
FILED 05/17/21**

**ALVES v. COUNTY OF RIVERSIDE**
**Case No. 5:19-CV-02083-JGB (SHKx)**
**ENGLERT FORENSIC
INCIDENT TIMELINE
BATE STAMP NO.
COR 03098**

# EXHIBIT E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, AN INDIVIDUAL ) CASE NO.: 19-CV-02083-JGB
AND AS SUCCESSOR IN INTEREST )              (SHKx)
FOR KEVIN R. NIEDZIALEK,     )
DECEASED,                    )
                             )
                             )
                  PLAINTIFF,)
                             )
       VS.                   )
                             )
RIVERSIDE COUNTY, RIVERSIDE  )
SHERIFF'S DEPARTMENT,        )
SHERIFF-CORONER CHAD BIANCO, )
DEPUTY SONIA GOMEZ, DEPUTY   )
BRIAN KEENEY, AND DOES 3-10, )
                             )
                  DEFENDANTS.)
_____)


DEPOSITION OF THEODORE CHAN, M.D.

FRIDAY, APRIL 23, 2021


RON FERNICOLA & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
REPORTED BY:  ROSA I. GUZMAN, CSR NO. 12024
1244 West Edgewood Circle
Coeur d'Alene, Idaho 83815
(661) 775-8299


FILE NO. 21268

1

**Ron Fernicola & Associates**

DEPOSITION OF THEODORE CHAN, M.D., A WITNESS, TAKEN ON BEHALF OF PLAINTIFF, VIA VIDEOCONFERENCE, COMMENCING AT 10:00 A.M., ON FRIDAY, APRIL 23, 2021, BEFORE ROSA I. GUZMAN, CSR NO. 12024, PURSUANT TO NOTICE OF TAKING DEPOSITION.

* * *

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:     HELM LAW OFFICE, PC
                   BY:  T. KENNEDY HELM, IV, ESQ.
                   644 40TH STREET
                   SUITE 305
                   OAKLAND, CALIFORNIA 94609
                   (510) 350-7517

FOR DEFENDANTS:   MANNING & KASS
                   ELLROD, RAMIREZ, TRESTER, LLP
                   BY:  TONY M. SAIN, ESQ.
                   801 SOUTH FIGUEROA STREET
                   15TH FLOOR
                   LOS ANGELES, CALIFORNIA 90017
                   (213) 624-6900

2

THEODORE CHAN, M.D.,

a witness herein, having first been duly administered

the oath, deposed and testified as follows:


EXAMINATION

BY MR. HELM:

Q    Good morning, Dr. Chan.

A    Good morning.

Q    Maybe you could lean in a little bit because you are kind of back --

A    Yes, sorry.  My wife and I share our home office, and she teaches.  She's in class four days but not Friday.  So I'm in my daughter's bedroom -- so my daughter's bedroom slash my office.  So I apologize.

Q    No worries.  I can see you now.

So how many times have you been deposed before? This is not your first rodeo; right?

A    No.

Q    How many times have you been deposed?

A    Probably 20 to 30 times.

Q    Okay.  So are you comfortable forgoing the standard admonition?

A    Yes.

Q    Great.  Okay.  And have you been retained

4

Argumentative.

THE WITNESS:  What do you mean by "maximal ventilatory capacity"?

Q    BY MR. HELM:  To improve his ability to breathe.

MR. SAIN:  Same objections.

THE WITNESS:  I think -- I mean, when I look at the video, there's no decrement in his ability to ventilate, and that's borne out by some of the subsequent medical records and that he was probably struggling to try to get out of the restraint.

Q    BY MR. HELM:  So you think he was struggling to get out of the restraint and not to get in a position on his side to breathe better; is that right?

A    Yes.

Q    You are familiar with the term "recovery position," aren't you?

A    Yes.

Q    And that's either on your side or sitting up?

A    Well, that's been described, but the term "recovery," I don't agree with because, if you look in the literature, that has been reported in restraint on seated, side, supine positions.

Q    So you would disagree that the recovery position, either on your side or sitting up, improves

44

your ability to breathe?

A    Based on our studies that we've done, there's no indication that being prone would impact your ability to breathe or result in hypoxia or asphyxia.  And studies done by others, not just our investigative group.  And in fact, on the epidemiologic studies that have been done, they have not been shown to show that prone restraint puts anyone at greater risk of sudden death.

Q    Right.  But those studies are not replicating the conditions of Mr. Niedzialek's incident.  Would you agree?

MR. SAIN:  Vague as to the term "those studies."

THE WITNESS:  I disagree.

Q    BY MR. HELM:  But in your studies, you never have somebody who is high on methamphetamine and that's been tased twice and who is suffering a head wound.

MR. SAIN:  Vague as to the term "studies." Which studies?

THE WITNESS:  So as I mentioned at the last answer, I was talking about the epidemiologic studies in the latter part of my answer, and those studies clearly included those factors in a number of cases.

Q    BY MR. HELM:  Okay.  Did you measure

45

STATE OF CALIFORNIA      )
                         )  SS.
COUNTY OF LOS ANGELES    )


        I declare under penalty of perjury under the laws of the State of California that I have read the foregoing transcript; I have made any corrections, additions, or deletions that I was desirous of making in order to render the within transcript true and correct; and

        IN WITNESS WHEREOF, I have hereunto subscribed my name this _____ day of _____, 20____, at _____, California.


                    _____
                         THEODORE CHAN, M.D.

90

STATE OF CALIFORNIA        )
                          )   SS.
COUNTY OF LOS ANGELES      )

         I, ROSA I. GUZMAN, CERTIFIED SHORTHAND

REPORTER NO. 12024, DECLARE:

         THAT PRIOR TO BEING EXAMINED, THE WITNESS

NAMED IN THE FOREGOING DEPOSITION WAS BY ME DULY

ADMINISTERED THE OATH TO TESTIFY TO THE TRUTH, THE WHOLE

TRUTH, AND NOTHING BUT THE TRUTH;

         THAT SAID DEPOSITION WAS TAKEN BEFORE ME AT

THE TIME AND PLACE THEREIN SET FORTH AND WAS TAKEN DOWN

BY ME IN SHORTHAND AND THEREAFTER TRANSCRIBED UNDER MY

DIRECTION AND SUPERVISION, AND I HEREBY DECLARE THAT THE

FOREGOING TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPT OF

MY SHORTHAND NOTES SO TAKEN.

         I FURTHER DECLARE THAT I AM NEITHER COUNSEL

FOR NOR RELATED TO ANY PARTY TO SAID ACTION NOR IN

ANYWISE INTERESTED IN THE OUTCOME THEREOF.

         I DECLARE UNDER PENALTY OF PERJURY UNDER THE

LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS

TRUE AND CORRECT.

         IN WITNESS WHEREOF, I HAVE HEREUNTO SUBSCRIBED

MY NAME THIS 10TH DAY OF MAY, 2021.


                          _____
                          ROSA I. GUZMAN, CSR NO. 12024

91

**Ron Fernicola & Associates**