# EXHIBIT 2

# In The Matter Of:

*TRACY ALVES v.*
*RIVERSIDE COUNTY*

---

*SONIA M. GOMEZ*
*December 17, 2020*

---

*Ron Fernicola & Associates*
*"Transcripts You Can Trust"*
*1244 West Edgewood Circle*
*Coeur d'Alene, Idaho 83815*

Original File GOMEZS.TXT
**Min-U-Script® with Word Index**

1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4  TRACY ALVES, AN INDIVIDUAL   )  CASE NO.: 19-CV-2083-JGB
   AND AS SUCCESSOR IN INTEREST )               (SHKx)
5  FOR KEVIN R. NIEDZIALEK,     )
   DECEASED,                    )
6                               )
                PLAINTIFF,      )
7                               )
       VS.                      )
8                               )
   RIVERSIDE COUNTY, RIVERSIDE  )
9  SHERIFF'S DEPARTMENT,        )
   SHERIFF-CORONER CHAD BIANCO, )
10 DEPUTY SONIA GOMEZ, DEPUTY   )
   BRIAN KEENEY, AND DOES 3-10, )
11                              )
                DEFENDANTS.     )
12 _____)

13

14          DEPOSITION OF DEPUTY SONIA M. GOMEZ

15              ZOOM VIDEOCONFERENCE

16            THURSDAY, DECEMBER 17, 2020

17

18

19

20

21
   RON FERNICOLA & ASSOCIATES
22 CERTIFIED SHORTHAND REPORTERS
   REPORTED BY: LESLIE A. TOLEDO, CSR NO. 8345
23 1244 West Edgewood Circle
   Coeur d'Alene, Idaho 83815
24 (661) 775-8299

25 FILE NO. 20513
                                                        1

1   DEPOSITION OF DEPUTY SONIA M. GOMEZ, A DEFENDANT, TAKEN

2   ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

3   COMMENCING AT 10:02 A.M., AND ENDING AT 3:26 P.M., ON

4   THURSDAY, DECEMBER 17, 2020, BEFORE LESLIE A. TOLEDO,

5   CSR NO. 8345, PURSUANT TO SUBPOENA.

6                              * * *

7   APPEARANCES OF COUNSEL:

8   FOR PLAINTIFF:      THE LAW OFFICES OF JOHN BURTON
                        BY:  JOHN BURTON, ESQ. - VIA ZOOM
9                       128 NORTH FAIR OAKS AVENUE
                        PASADENA, CALIFORNIA 91103
10                      (626) 449-8300

11                           - and -

12                      HELM LAW OFFICES, PC
                        BY:  T. KENNEDY HELM, IV - VIA ZOOM
13                      644 40TH STREET
                        SUITE 305
14                      OAKLAND, CALIFORNIA 94609
                        (510) 350-7517

15

16  FOR DEFENDANTS:     MANNING & KASS
                        ELROD, RAMIREZ, TRESTER, LLP
17                      BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                        BY:  GARROS CHAN, ESQ. - VIA ZOOM
18                      801 SOUTH FIGUEROA STREET
                        FIFTEENTH FLOOR
19                      LOS ANGELES, CALIFORNIA 90017
                        (213) 624-6900
20                      TMS@MANNINGLLP.COM

21  ALSO PRESENT:       DEPUTY BRIAN L. KEENEY - VIA ZOOM

22

23

24

25
                                                              2

**Ron Fernicola & Associates**

```
 1                    I N D E X

 2   WITNESS                              PAGE

 3   DEPUTY SONIA M. GOMEZ

 4   EXAMINATION BY MR. BURTON              4

 5   EXAMINATION BY MR. SAIN             113

 6

 7

 8                E X H I B I T S

 9   NO.          DESCRIPTION            PAGE

10   18           Training Records         17

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                              3
```

**Ron Fernicola & Associates**

1      THURSDAY, DECEMBER 17, 2020; VIA ZOOM VIDEOCONFERENCE

2                          10:02 A.M.

3

4                    DEPUTY SONIA M. GOMEZ,

5      the witness herein, having first been duly administered

6      the oath, testified remotely as follows:

7

8                        EXAMINATION

9      BY MR. BURTON:

10         Q.   Good morning, Deputy Gomez.  I can kind of --

11     make sure we keep our voice up, because we have to do

12     things a little differently to make sure we get a good

13     record on Zoom.

14              Have you ever had your deposition taken before?

15              I'm sorry?

16         A.   No.

17         Q.   I think that's an example.  Okay.  Could we

18     start by, could you state your complete name for the

19     record, please?

20         A.   Sonia Gomez.

21         Q.   Do you have a middle name?

22         A.   Sonia Maria Gomez.

23         Q.   And are you currently a deputy sheriff with the

24     County of Riverside?

25         A.   Yes.

                                                          4

**Ron Fernicola & Associates**

1    the X2 in 2016.  That would be March of 2016.  So I know

2    it's a while, it's hard to remember.

3            But were you trained at that time that if

4    confronted with a suspect who is exhibiting signs of

5    excited or agitated delirium, the use of the Taser could

6    increase the risk of death or great bodily injury?

7        A.   I don't recall.  I know it's talked about, but I

8    don't recall exactly.

9        Q.   Do you recall whether you were trained that when

10   a Taser is being used on a person who might be exhibiting

11   signs of agitated or excited delirium, that the object

12   was to get the person into restraints as quickly as

13   possible and to minimize the length of time of the

14   struggle?

15       A.   I know when someone is experiencing -- if we

16   assume that they're experiencing excited delirium, our

17   priority is to secure the subject and request medical

18   assistance immediately.

19       Q.   So let's now, if we could, shift topics from the

20   Taser to excited delirium, or agitated delirium.  These

21   are phrases that are used sometimes to describe a

22   condition that law enforcement officers sometimes

23   encounter in the field.

24           Have you been trained in these concepts,

25   agitated or excited delirium?

38

**Ron Fernicola & Associates**

1    A.    Yes, I have been trained about it.

2    Q.    Do you recall whether you were trained about it

3    when you were in the academy?

4    A.    Possibly, I don't -- I don't recall.

5    Q.    When do you recall first being trained about it?

6    A.    I don't recall the exact date, but I do know

7    that I was trained on it.

8    Q.    Now, besides the academy training you had, and

9    what we've talked about as transition school, you've had

10   regular additional training from your department;

11   correct?

12   A.    Yes.

13   Q.    And that could be on a variety of topics.  We've

14   covered a couple of them.  For example, the Taser X26 and

15   the Taser X2.  Have you had any additional training

16   specifically on agitated or excited delirium?

17   A.    I've had CIT training, which is Crisis

18   Intervention Training.  I've had two courses in that,

19   which is 16-hour courses, one in 2011 and one in 2015.

20   And it talks about people with mental illness, mental

21   health, and I believe excited delirium was introduced in

22   that course.

23   Q.    Maybe -- let's see if we can find that on

24   Exhibit 18, if that's okay?  So the first one you said

25   was in 2011?

39

1    be some combination of the two; is that correct?

2         A.   That's correct.

3         Q.   And so is it possible for you as a responding

4    deputy to diagnose whether it's a mental illness, whether

5    it's drugs, or whether it's a combination when you

6    initially encounter the person, and you don't know any

7    history, no one has told you he's been smoking meth or

8    whatever?

9         A.   I don't understand the question.

10        Q.   Well, I think what I'm getting at is, whether,

11   when you encounter somebody like that and you don't know

12   how they got that way, it could be mental illness, it

13   could be drugs, or it would be a combination, whether how

14   they got that way would make any difference in how you

15   would deal with them, or you would -- according to your

16   CIT training, deal with them the same way regardless?

17        A.   Yes.  When dealing with anyone with mental

18   illness or maybe under the influence, our job is to make

19   sure -- secure them, make sure they're safe, and others

20   are safe, so we can safely find out what's going on with

21   them.

22             And if, in the course of that, force is used,

23   assess their medical need, and then if they do need

24   medical assistance, get medical help.

25        Q.   And in regards to safely restraining them, were

48

1    you trained in either of these two CIT courses that a

2    person who is in a state of excited or agitated delirium,

3    is more susceptible to an in-custody and arrest-related

4    death, while being taken into custody than other people?

5              MR. SAIN:  Assumes facts.

6              THE WITNESS:  I was trained that whenever we

7    encounter somebody experiencing excited delirium, secure

8    them as safe as possible to make sure they're not a

9    threat to themselves or others, and request medical help

10   immediately.

11       Q.   BY MR. BURTON:  Now, once -- were you trained at

12   any point in your career, that once a person is

13   restrained, and if they're in a state of excited or

14   agitated delirium, that they should be put in a position

15   where they can breathe?

16             MR. SAIN:  Vague and unintelligible.

17             THE WITNESS:  Once someone is secured, we'll put

18   them in a position that's safe for ourselves as well and

19   them.  And once we feel like it's safe, we'll request

20   medical help -- medical help immediately.

21       Q.   BY MR. BURTON:  Right now, I'm focused on a

22   person who has been put into handcuffs.  Have you ever

23   been trained that once the person is restrained in

24   handcuffs, if possible, they should be put into a --

25   what's called a "recovery position"?

49

1      A.   We keep them where at the time, whenever they're

2  handcuffed, keep them in a position that we feel safe for

3  ourselves and for them as well.

4      Q.   Well, have you been trained that certain

5  positions for them, for the people who are being

6  restrained who are in excited delirium or agitated

7  delirium, that certain positions are more dangerous than

8  other positions?

9      A.   No.

10     Q.   Well, your answer was that you were trained to

11  keep them in a position that was safe for them.

12     A.   Yes.

13     Q.   What were you trained about what positions are

14  safe and what positions are not safe?

15     A.   All the positions that we are trained on have

16  been considered safe.

17     Q.   Have you ever heard in your training, in this

18  context, general context, the phrase, "recovery

19  position"?

20     A.   I don't recall.

21     Q.   Have you ever been trained that when somebody is

22  in handcuffs and is under control, and if they're in a

23  state of excited or agitated delirium, that it would be

24  safer to have them on their side or sitting up, rather

25  than on their chest?

50

**Ron Fernicola & Associates**

1          MR. SAIN:  Assumes facts.

2          THE WITNESS:  From our understanding, being in

3     the prone position doesn't affect their breathing, and

4     doesn't state that we have to put them on their side.

5          Q.   BY MR. BURTON:  So you've never been trained --

6     this is your testimony -- that after somebody who has

7     been in an agitated or excited state, is in handcuffs,

8     that it's preferable to put them on their side, or

9     sitting them up, rather than leaving them on their chest;

10    is that correct?

11         MR. SAIN:  Asked and answered.

12         THE WITNESS:  That's correct.  We don't have to

13    put them on their side.  If we still feel the need that

14    they need to be proned on their chest, then for safety

15    reasons, then we'll keep them there, but we have not been

16    trained where we have to put them on their side.

17         Q.   BY MR. BURTON:  Well, you keep --

18         A.   Excuse me.  I wasn't finished.  The only time

19    that was said was when we, at one point, was able to use

20    a carotid restraint, and that was only to assist them and

21    help them to their feet.  But we no longer use the

22    carotid restraint, so therefore, that doesn't exist

23    anymore.

24         Q.   In your entire career -- I'm sorry, you keep

25    sort of changing my question a little bit.  I'm not

                                                      51

**Ron Fernicola & Associates**

1   talking about what you have to do.  It's a little more

2   nuanced than that.

3          Have you ever been trained that when dealing

4   with a person who might be in a state of excited or

5   agitated delirium, and the person is restrained, and is

6   handcuffed behind his back in a prone position, that when

7   feasible, it is preferable to put that person on his

8   side, or sit him up rather than leaving him prone?

9          MR. SAIN:  Asked and answered twice.

10          THE WITNESS:  When dealing with excited

11   delirium, we are told to secure the person, make sure

12   they are safe from themselves and from others, and

13   request medical assistance immediately.  And as far as

14   putting them on their side, we have not been trained that

15   we need to put them on their side.

16      Q.  BY MR. BURTON:  Well, you keep saying you've not

17   been trained that you need to put them on their side, but

18   have you been trained that, when feasible, it's

19   preferable to put them on their side?

20          MR. SAIN:  Same objections.

21          THE WITNESS:  We don't have to put them on their

22   side.

23      Q.  BY MR. BURTON:  I get that.  You've said that,

24   like, four or five times.  But have you been trained, yes

25   or no, that, when feasible, it's preferable to put them

52

**Ron Fernicola & Associates**

1    us in certain ways, but in certain -- every situation is

2    different where we might not be put in that specific way

3    that we were trained, and you just have to work with --

4    work with what you have, and -- until you overcome the

5    resistance.

6        Q.    I understand that situations vary.  But I also

7    understand that police officers are given certain

8    techniques, and methods, and tools to use to deal with

9    different situations that you are likely to encounter in

10   the field.  And is one of those tools that you're given,

11   using your body weight on the back of a prone suspect to

12   hold the person down while he's being put in handcuffs?

13       A.    We have to use whatever force necessary to

14   overcome the resistance.

15       Q.    Have you been trained that once the person is in

16   handcuffs, and safely restrained, that all the body

17   weight should be taken off the person's back?

18       A.    We're trained to as -- once they stop resisting,

19   but sometimes subjects have been known to play possum and

20   pop right back up and surprise us.  Sometimes we have to

21   maintain some pressure just to make sure they know that

22   we're there and so they don't just pop up on us.

23       Q.    Well, were you ever trained in these restraint

24   classes or any other classes or training that you've had

25   as a deputy sheriff, that holding a person down on their

65

**Ron Fernicola & Associates**

1    correspond to?

2        A.   Priority one call is an emergency, and priority

3    two is an emergency as well, but not as much as a one.  A

4    one is -- how do I explain? -- like, it's urgent.  And

5    then two is priority.  Three and four are less

6    priorities.  They're not as urgent and need to be handled

7    right away.

8        Q.   What priority was this call initially?

9        A.   This call was a priority two.

10       Q.   How was it dispatched to you?  In other words,

11   what were you told was the problem that you were

12   responding to?

13       A.   When I got the call, they told me to stand by

14   for priority two, 415 disturbance, and then they gave me

15   the address, and said there was -- reporting party called

16   in stating there was a -- there was a male pounding on

17   the doors and screaming.

18       Q.   And what you said, 415, and I understand what

19   that means, but for other people reading this transcript,

20   that means that corresponds to the California Penal Code

21   provision for disturbing the peace; is that correct?

22       A.   Correct.

23       Q.   So when you got the call and you were responding

24   to it, how did this decision to ask for backup come

25   about?

79

1    Keeney must have been arriving, because then I heard --

2    well, I called into the apartment to see if anybody was

3    in there, nobody answered.  Then I heard Officer Keeney

4    on the radio, I believe he asked what was my location,

5    and I came back out into the common area, and then I saw

6    him, he saw me.

7         He started walking towards me, and then he

8    stopped, and I believe that's when he went on the radio

9    to confirm the apartment address that the subject was in

10   front of.  So he put it out that he was out with the

11   subject.  I start walking towards Officer Keeney, and

12   that's when I hear shouting going on.  I walk over.

13        And as I'm standing there, like, probably, like,

14   12 feet from the porch of 22D, Officer Keeney is also

15   standing in front of the porch, about, like, 15 feet

16   away, talking to the subject.

17        Q.   Okay.  Could I just stop you there?

18        A.   Sure.

19        Q.   I know where you're going, but I'd like to just

20   stop.  Because seeing this on the video, and I know it's

21   just different, you know, looking at a camera than,

22   obviously, what you saw being there.  It just looks like

23   when you first saw Deputy Keeney -- I mean, to me

24   watching the video -- it looks like when you first saw

25   Deputy Keeney there, he was already talking to

83

1   Mr. Niedzialek.

2           But the way you described it right there, you

3   saw Mr. Keeney before he turned and started talking to

4   Mr. Niedzialek; is that correct?

5       A.   I believe I saw him right before he came in

6   contact with him.  He was walking on the common area,

7   walking towards me, and then when I saw him and I

8   estimated a second or two, and that's when he looked to

9   his right, and he started talking to the subject.

10      Q.   And that was -- we see he's right in an alcove

11  outside the door of a unit.  That unit was 22D?

12      A.   Yes.

13      Q.   So is it correct that you and Deputy Keeney did

14  not have an opportunity to communicate with each other

15  before he started communicating with Mr. Niedzialek?

16      A.   Correct.  Officer Keeney got there, started

17  talking to the subject.  And I came in from southeast of

18  him, and -- well, he was trying to talk to the subject.

19      Q.   BY MR. BURTON:  And we see what Mr. Niedzialek

20  was doing at the time, and we can hear him.  You right

21  away saw that he had a bloody wound on his head; correct?

22      A.   Yes.

23      Q.   Had you ever been trained that a head trauma can

24  cause erratic or irrational behavior?

25      A.   I don't recall.

84

1    first time that you tried to speak to him after the

2    handcuffing; correct?

3         A.   Yes, I believe so.

4         Q.   And he didn't respond at all to you; correct?

5         A.   Correct.

6         Q.   Well, did you think that because he didn't

7    respond at all, there might be something wrong with him

8    at that point?

9         A.   It was then that's when I think Officer Keeney,

10   a few seconds later, turned him over to check.

11        Q.   Now, when Officer Keeney turned him over, did

12   you look at his face, not Keeney's face, but

13   Mr. Niedzialek's face?

14        A.   I did, and then that's when I felt for a pulse.

15        Q.   But did you see that his eyes were opened?

16        A.   I believe they were.

17        Q.   And that's when I was asking you before about

18   pupils being fixed and dilated.  Did it seem like -- like

19   his eyes were open and his pupils were fixed and dilated?

20        A.   I didn't focus too much on his eyes.  I saw his

21   eyes were open, and I went and felt for a pulse.

22        Q.   And then we hear what you're saying, which is

23   that you thought you felt a pulse; correct?

24        A.   Yes, I felt a pulse.

25        Q.   As you sit here today -- and I don't want to pry

100

**Ron Fernicola & Associates**

1   how else to explain it.

2       Q.   And you're saying that his respirations seemed

3   deep and even, like, 15 to 20 times a minute?  That's

4   kind of a normal rate.

5       A.   He just -- his pulse -- like I said, it just

6   seemed low and faint.  I don't know how to explain it

7   what I felt, but that's how it felt.

8       Q.   So when AMR arrived, he was still in handcuffs;

9   correct?

10      A.   Yes, when AMR arrived, he still had handcuffs

11  on.

12      Q.   And Paramedic LaRusso asked for the handcuffs to

13  be removed?

14      A.   Yes.

15      Q.   And do you know who did that?

16      A.   I believe it -- it was Officer Keeney or the

17  other deputy, Bowman.  I'm not certain who took them off.

18      Q.   And Officer Bowman, he arrived after

19  Mr. Niedzialek was in handcuffs, but before the

20  paramedics got there; correct?

21      A.   Correct.

22      Q.   And then you suggested that he check the unit,

23  which I thought you said 22D, but maybe -- or 27?

24      A.   27A.

25      Q.   27D, I thought is what you said, but if you said

104

1    27D, that's fine.  But to check that unit that had an

2    open door and make sure there was no one injured in there

3    because you had seen the blood?

4        A.    Correct, when Officer Bowman arrived on the

5    scene, I told him to go clear apartment 27A.

6        Q.    And then he came back after the paramedics were

7    there.  Do you recall that?

8        A.    He came back, and then he went to his car, and

9    when he came back, the paramedics were there.

10       Q.    So then after the handcuffs were removed by one

11   of the male deputies, the paramedics, EMTs, were treating

12   Mr. Niedzialek with the assistance of deputies.  Did you

13   do any CPR or assist in the treatment in any way?

14       A.    No.

15       Q.    And then you stood by.  At one point, you talked

16   to a witness; correct?

17       A.    Yes, later on, I talked to a witness, which was

18   the reporting party -- one of the reporting parties.

19       Q.    Right, and we have that on your video.  And you

20   also spoke to your sergeant when he came out; correct?

21       A.    Correct.

22       Q.    And who was that sergeant?

23       A.    Sergeant Gaskins.

24       Q.    And then at one point, you turned off your

25   camera; correct?

                                                        105

1  position with a hand on him after he became calm?

2      A.   Just in case he were to play possum and get back

3  up, and at the same time, I'm able to tell if he's still

4  breathing.

5      Q.   Prior to the time that Kevin Niedzialek has

6  become calm, is there anything that you observed him

7  doing that you believed was a crime?

8      A.   No, I did not hear him cry.

9      Q.   I'm sorry.  Maybe you didn't hear me.  Up to the

10  point in time when Kevin Niedzialek became calm, is there

11  anything that you saw him do that you believed was a

12  crime?

13      A.   Oh, a crime.  Well, I was there for a 415

14  disturbance.  He was disturbing the peace.

15      Q.   Anything that he did with you at the scene that

16  you observed that you believed may have constituted a

17  crime?

18      A.   In relation to myself, no.

19      Q.   In relation to either you or Deputy Keeney, is

20  there anything that you observed Kevin Niedzialek do at

21  the scene that you believe may have violated the law?

22      A.   148 PC, he was not complying and resisting.

23      Q.   Anything else?

24      A.   Not that I can think of right now.

25      Q.   Did you sustain any injuries as a result of your

119

REPORTER'S CERTIFICATE

I, Leslie A. Toledo, CSR #8345, a certified shorthand reporter licensed by the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition, SONIA M. GOMEZ, stated to testify to the truth, the whole truth, and nothing but the truth;

That the said deposition, taken down by me in stenotype, was thereafter reduced to typewriting by computer-aided transcription under my direction and is a true record of the testimony given and of any changes made by the deponent.

I further certify that I am not in any way interested in the outcome of this action and that I am not related to any of the parties thereto.

Witness my hand this day 31st of December 2020.

_Leslie A. Toledo_
LESLIE A. TOLEDO, CSR #8345

126