1  **LAW OFFICES OF DALE K. GALIPO**
   Dale K. Galipo (SBN 144074)
2  E-mail: dalekgalipo@yahoo.com
   Hang D. Le (SBN 293450)
3  E-mail: hlee@galipolaw.com
   21800 Burbank Blvd., Suite 310
4  Woodland Hills, CA 91367
   Tel: (818) 347-3333; Fax: (818) 347-4118
5
   JOHN BURTON, State Bar No. 86029
6  jb@johnburtonlaw.com
   **THE LAW OFFICES OF JOHN BURTON**
7  128 North Fair Oaks Avenue
   Pasadena, California 91103
8  Telephone: (626) 449-8300
   Facsimile: (626) 449-8197
9
   T. KENNEDY HELM, IV, State Bar No. 282319
10 kennedy@helmlawoffice.com
   **HELM LAW OFFICE, PC**
11 644 40th Street, Suite 305
   Oakland, California 94609
12 Telephone: (510) 350-7517
   Facsimile: (510) 350-7359
13
   Attorneys for Plaintiff Tracy Alves, Individually and as
14 Successor In Interest for Kevin R. Niedzialek, Deceased

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18 TRACY ALVES, Individually and as          Case No. 5:19-cv-02083-JGB (SHKx)
19 Successor in Interest for KEVIN R.
   NIEDZIALEK, deceased,                      *Honorable Jesus G. Bernal*
20                                            *Mag. Judge Shashi H. Kewalramani*
                  Plaintiff,
21
              vs.                             **DECLARATION OF MICHAEL D.**
22                                            **FREEMAN, MEDDR, PHD, MPH,**
   RIVERSIDE COUNTY, RIVERSIDE               **FAAFS, IN OPPOSITION TO**
23 COUNTY SHERIFF'S                          **DEFENDANTS' MOTION FOR**
   DEPARTMENT, SHERIFF-                       **SUMMARY JUDGMENT AND**
24 CORONER CHAD BIANCO,                      **DEFENDANTS'** ***DAUBERT*** **MOTION**
   DEPUTY SONIA GOMEZ, DEPUTY                **TO EXCLUDE OPINIONS OF**
25 BRIAN KEENEY, and DOES 3–10,              **PLAINTIFF'S EXPERT WITNESS DR.**
                                              **MICHAEL FREEMAN, MEDDR,**
26                                            **PHD, MSCFMS, MPH, FAAFS, FACE**
                  Defendants.
27

28

I, Michael D. Freeman, Med.Dr., declare under penalty of perjury as follows:

1.    Plaintiff retained me as an expert. I submit this declaration in opposition to Defendants' motions to exclude my testimony and for summary judgment.

2.    I am a medicolegal consultant, with expertise in the fields of forensic medicine and forensic epidemiology. I hold the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden); a doctor of philosophy (Ph.D.) in public health with a major focus in epidemiology from Oregon State University; a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University; a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences (UK); and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK). I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, am an affiliate medical examiner with the Allegheny County Medical Examiner's office, a fellow of the Pathology section of the American Academy of Forensic Sciences (AAFS) and the American College of Epidemiology (ACE), and the vice-chair of the standards board for medicolegal death investigation for the AAFS. I have the equivalent of an American Medical Association board certification in forensic medicine with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK) and am the chair of the subcommittee for research there as well. I am a U.S. Fulbright fellow, having held a 3-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State (2017-20).

3.    I serve as a tenured Associate Professor of Forensic Medicine at Maastricht University, and a Joint Clinical Professor of Psychiatry and Public Health and Preventive Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and medical causation. I have also held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic

1  Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark from

2  2005–2017.

3      4.    I serve or have served as an associate editor or editorial board member of

4  14 scientific peer-reviewed journals and have published approximately 220 scientific

5  papers, abstracts, book chapters and books, including the recent text for Elsevier,

6  *Forensic Epidemiology: Principles and Practice* (2016). My scientific publications have been

7  cited by other authors of peer-reviewed publications approximately 2,800 times.

8  Specific to the facts of the present investigation, I have an extensive education,

9  practical investigational experience, and research background into restraint-related

10  death. Last year the peer-reviewd journal Forensic Science, Medicine and Pathology

11  published *The role of restraint in fatal excited delirium: a research synthesis and pooled analysis*, an

12  article I wrote with my colleagues Ellen Strömmer, Wendy Leith, and Maurice Zeegers.

13  Forensic Sci Med Pathol. 2020 Dec;16(4):680-692. Exhibit A is my current CV.

14      5.    I was retained to offer opinions regarding Kevin Niedzialek's death. In

15  forming my opinions in this case, I have reviewed the materials listed at page 8 of my

16  report, including: (1) Mr. Niedzialek's autopsy report; (2) the Amended Complaint; (3)

17  the AMR Paramedic Report; (4) Mr. Niedzialek's autopsy photos; (5) Hospital

18  photos—in situ, and organs donated; (6) Complete autopsy and coroner's reports; (7)

19  Defendants' composite video; (8) Deputy Sonia Gomez's initial report, dated July 29,

20  2019; (9) Mr. Niedzialek's initial hospitalization records; (10) Inland Valley MC routine

21  echo report; (11) Organ transplant hospitalization records; (12) TASER download; (13)

22  Deposition of Dr. Fajardo, taken on August 21, 2020; (14) Deposition of Deputy

23  Gomez, taken on December 17, 2020; (15) Deposition of Deputy Brian Keeney, taken

24  on December 18, 2020; (16) Deposition of Paramedic Lisa La Russo, taken on

25  November 24, 2020.

26      6.    Based on my review of these materials, I prepared a report and a rebuttal

27  report, attached hereto as Exhibits B and C, respectively.

28

7.      In evaluating the most likely cause of Mr. Niedzialek's death, the plausible causes or risk factors for sudden death can be placed in two categories: the risks attributable to the actions of the officers (including mechanical obstruction of respiration and multiple Taser shocks), and the risk attributable to the condition present in Mr. Niedzialek unrelated to the actions of the police officers, and described in the autopsy report, his head wound, agitated state and methamphetamine intoxication. There are no other apparent causes of sudden death for Mr. Niedzialek identified at autopsy or in any of the reviewed records.

8.      The investigation of the cause of an injury is different than for a disease, primarily because there is typically a close temporal association between the suspected cause of death and the first signs of injury.  An injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred.

9.      In a death investigation involving an autopsy, the pathologist identifies, describes, and diagnoses observed conditions, but the determination of the cause of a death in the absence of a condition that is nearly always fatal (e.g., gunshot wound to the head) is made via comparison of competing risks of sudden death acting on the individual at the time of the death.

10.     The generally accepted methods for assessing injury and death causation are simply described as a three-step process based on the Bradford-Hill criteria, which has been extensively described in the peer-reviewed literature, and has been deemed generally accepted by U.S. Courts, and described as part of case law in the United States.  *See Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center (cited Jan 25, 2021; available at: https://www.fjc.gov/content/reference-manual-scientific-evidence-third-edition-1); *see also Etherton v. Owners Insurance Co.*, No. 14-1164, 829 F. 3d 1209 (10th Cir. 2016); *Etherton v. Owners Insurance Co.*, 35 F. Supp. 3d 1360 (D. Colo. 2014).

11.     The three fundamental elements of an injury causation analysis in the context of a death investigation are as follows:

    a.  Plausibility: whether the injury mechanism had the potential to cause the death (general causation), and if known, the magnitude of that potential (risk of death);

    b.  Temporality: the degree of temporal proximity between the injury mechanism and the death; and

    c.  Alternative explanations: whether there is a more likely alternative explanation for the death or fatal injury occurring at the same point in time, versus the investigated cause (also known as a differential etiology). This alternative or competing cause of death or fatal injury is quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.

12.     <u>Step 1</u>: Potential causes of Mr. Niedzialek's death.  Based on the fact pattern surrounding Mr. Niedzialek's death and Dr. Fajardo's autopsy findings and report, the list of proposed causes of death for Mr. Niedzialek is as follows:

    a.  Restraint Related

        i.  Asphyxia due to chest compression

        ii.  Taser shocks

    b.  Non-restraint related

        i.  Acute methamphetamine toxicity

13. <u>Asphyxia due to chest compression</u>.  As seen on the video footage taken from the body camera of Deputy Gomez, and the bystander footage taken from across the courtyard, Mr. Niedzialek was subjected to forceful, prone restraint, with two officers pinning him to the ground while he was handcuffed behind his back. These actions carried a high risk of restricting, to some degree, Mr. Niedzialek's ability to breathe.

14.     Asphyxia is defined as a lack of oxygen (i.e. hypoxia) caused by an interruption in breathing, and is known as a trigger of cardiac dysrhythmia and arrest.

Compression of the neck, chest, and abdomen during physical restraint is a well-recognized mechanism for causing asphyxiation, due to restricted inspiration. Positional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint (i.e. handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits the ability to breathe. The terms compression and position are sometimes used interchangeably when referring to the circumstances of asphyxial death.

15.    The restraint used on Mr. Niedzialek by deputies Keeney and Gomez after he was handcuffed, prone, and in an obvious panicked and excited state, was focused on his upper back and shoulders, thus limiting the movement of chest and diaphragm and ability to breathe an adequate breath. Given the vigorous activity that immediately preceded the handcuffing, and the two five-second Taser discharges (discussed further below), Mr. Niedzialek had an increased need for oxygen. Deputy Keeney's statement that Mr. Niedzialek had "fallen asleep" less than 2 minutes after such strenuous activity defies common sense.

16.    The deputies' use of aggressive and compressive restraint on Mr. Niedzialek, followed by their failure to evaluate or use CPR after he suffered a cardiac arrest, greatly increased the probability that Mr. Niedzialek would not survive his encounter with the Riverside County deputies. These actions and inactions serve as a highly plausible cause of the cardiac arrest that resulted in Mr. Niedzialek's death.

17.    Electrical shock from electronic control device (TASER).  Ordinarily, a TASER shock carries a very low risk of cardiac arrest when used by law enforcement in a location other than the anterior chest. At the time the TASER was used on Mr. Niedzialek he was in delirious and highly excited state; he was screaming, hyperventilating, confused, and bleeding from his head. The use of the TASER increases the need for oxygen in a tased individual, in direct relationship to the duration and number of applications. Combined with the positional asphyxia factors described

above, the use of the TASER followed by the prone restraint is a plausible contributing

cause of Mr. Niedzialek's cardiopulmonary arrest and death.

18.    <u>Non-restraint-related cause: Acute methamphetamine toxicity.</u>  There is

no evidence that supports an inference that the relatively small amount of

methamphetamine in Mr. Niedzialek's blood (0.757 mg/L) was even a plausible cause

of his death in the absence of the violent restraint. The level of methamphetamine

assayed in Mr. Niedzialek's antemortem blood sample is less than what is commonly

found in recreational users, based on National Highway Traffic Safety Administration

information. Other studies have described non-lethal blood concentrations in

recreational methamphetamine users of as high as 9.3 mg/L (more than 12 times

greater than the level found in Mr. Niedzialek's blood). While methamphetamine

deaths have been recorded with blood levels as low as 0.05 mg/L this information is

essentially useless in the present investigation. There is extensive overlap between what

are only possibly fatal levels and common recreational blood concentrations of

methamphetamine.

19.    Methamphetamine has a relatively low hospitalization and death rate;

there were 103,000 emergency room visits associated with its use in 2011, and in the

same year there were ~2,700 deaths attributed, at least in part, to methamphetamine

exposure, resulting in a death rate of 1 in 444 relative to the number of people taking

the drug annually (the deaths were not all necessarily due to methamphetamine toxicity,

however). As the typical dose of meth ranges from 10 to 40 mg, this means that there

are at least 11,340 doses available per pound of meth, (assuming a 40 mg dose), 22.7

million doses per ton of meth, and thus a total of 953 million doses of meth consumed

in the US in 2010 alone. A comparison of the number of doses to the number of

deaths each year yields a risk of 1 death per 353,000 doses of methamphetamine. While

no illicit drug use is considered "safe" (and thus any level in the body is considered

"toxic"), the risk of death from a single dose of methamphetamine is exceedingly small.

20.      Given the exceedingly low per-dose risk of death associated with methamphetamine use, there is no reason to believe that simply because Mr. Niedzialek had methamphetamine in his blood that might be fatal, that the cause of his death was a result of methamphetamine toxicity. Methamphetamine is not like cyanide or some other poison, which is invariably the cause of death when it is found in a decedent. Like alcohol, most of the time that methamphetamine is present in a decedent it is not the cause of death. Thus, at the levels found in Mr. Niedzialek blood shortly before he died, methamphetamine toxicity was a highly unlikely cause of his death, in the absence of the restraint-related death risk. It is certainly appropriate to consider the methamphetamine as a contributing factor to Mr. Niedzialek's death, as the drug produced actions that greatly increased his need for oxygen at the time of his prone restraint.

21.      Step 2: According to Defendants' timeline, the last breath Mr. Niedzialek possibly took occurred 4 minutes after he was handcuffed and prone on the ground, while deputies Keeney and Gomez used their hands and/or knee to pin his shoulders and upper back to the ground. When they turned him onto his back still handcuffed about a minute later, he was unresponsive, and reportedly had a weak pulse. Two more minutes passed as the deputies waited for the paramedics, during which time neither deputy attempted to re-evaluate Mr. Niedzialek while he was unresponsive and not breathing. As a result of their inaction, Mr. Niedzialek had no effective cardiopulmonary function for at least 3½ minutes prior to receiving CPR from EMS personnel, and possibly significantly longer.

22.      Step 3: Alternative causes/ differential etiology of the most probable cause of Mr. Niedzialek's death:  Based on the above discussion, the only proposed non-restraint-related cause of Mr. Niedzialek's death was the risk presented by the low level of methamphetamine in his blood, which carried <1 in 350,000 risk. In comparison with the risk due to the meth presence, the risk of death from the police actions and inactions was exceedingly high; the risk of death due to chest compression,

DECLARATION OF DR. MICHAEL D. FREEMAN IN OPPO. DEFS.' MSJ & DAUBERT MOTION.

as well as multiple TASER shocks increasing the need for oxygen, greatly increased Mr. Niedzialek's risk of asphyxia-related cardiopulmonary arrest. The failure by the deputies to adequately evaluate Mr. Niedzialek for the need for resuscitation greatly contributed to the inability of the EMT resuscitation efforts before irreversible brain damage occurred.

23.     Based on the preceding analysis, it is my opinion, to a reasonable medical and scientific probability, that Mr. Niedzialek's death was primarily a result of the use of aggressive restraint tactics by the Riverside Sheriff's Department personnel, resulting in death by asphyxia. A contributing factor to his death was the lack of timely resuscitation efforts.

24.     Because Mr. Niedzialek's death was due to the intentional actions of others, I agree with the coroner's conclusion that the manner of death is homicide. While there is no doubt that the methamphetamine in Mr. Niedzialek's system and his associated agitation greatly increased his need for oxygen (as did the two five-second TASER shocks), these conditions required the addition of the prone restraint to result in the potentially deadly circumstances that resulted in Mr. Niedzialek's death.

25.     Dr. Graham has opined that Mr. Niedzialek's death was due, at least in part, to Excited Delirium Syndrome (ExDS), also known as agitated delirium AgDS. Excited delirium syndrome is a diagnostic term used to describe a person who is agitated and delirious, usually paired with aggressive behavior, pain tolerance, extreme physical strength, and hyperthermia.  Often people with alleged fatal ExDS have recently ingested a stimulant drug (i.e., methamphetamine or cocaine) and/or are mentally ill.  Because of the erratic behavior, law enforcement is called to contain and restrain the individual, which is typically met with resistance (because of the agitation and delirium), leading to an escalation of restraint techniques such as TASER shocks, extensive restraint via manhandling, hog- or hobble-tying, the use of blunt force, and sedation, ultimately culminating in the death of the individual.  There are no findings at

1    autopsy that indicate ExDS as a cause of death, and if drugs are found in the toxicology

2    screen, they are typically stimulants, and at recreational, rather than overdose, levels.

3        26.    The diagnosis of ExDS is highly controversial when it is named as the

4    primary cause of death in cases in which there is a history of restraint at the time of

5    death.  The symptoms of ExDS (agitation and delirium) are triggers for use of force

6    and restraint by law enforcement, and use of force by law enforcement can be

7    associated with increased risk of death due to positional/compression asphyxia.

8    Asphyxial or restraint-related deaths *can* exhibit signs of the mechanism of death, such

9    as fractured ribs, neck structures, petechia of the eye and neck muscles, but these

10    finding are often not present.

11        27.    ExDS is not a term defined in the International Classification of Diseases

12    (ICD-9, ICD-10), or the Diagnostic and Statistical Manual of Mental Disorders (DSM-

13    5), and there is no standard definition or ExDS and no definitive tests or signs to

14    indicate the diagnosis as a cause of death, and thus the use of the term is entirely

15    subjective.  Previous studies attempting to classify, define, and estimate risk factors for

16    ExDS have been limited to case reports and case series.

17        In a recently published peer-reviewed article, my colleagues and I created a

18    database of all individual (rather than grouped) ExDS and AgDS cases that have been

19    described in the scientific literature using the National Library of Medicine search

20    engine PubMed and OVID Medline, as well as "grey literature" available in Google

21    Scholar searches using the relevant search terms. The results of the study indicated that

22    a diagnosis of ExDS and potentially fatal restraint are inextricably interwoven, and that

23    in the absence of aggressive restraint (i.e. manhandling, hog-tying, handcuffing), there is

24    no evidence that ExDS is a stand-alone fatal condition. These findings are relevant and

25    applicable to the circumstances of Mr. Niedzialek's death.

26        28.    When deputies Gomez and Keeney arrived on scene, Mr. Niedzialek was

27    obviously in a medical and mental health crisis: he was bleeding from his head, half-

28    clothed, screaming, hyperventilating, panicked, and possibly hallucinating. The deputies

1   tased him twice, then handcuffed him, and used their hands and knees against his

2   shoulders and upper back to pin him to the ground, preventing him from rolling onto

3   his side. The circumstances of Mr. Niedzialek's cardiopulmonary arrest therefore most

4   closely resemble the ExDS database profile of a person who was handcuffed and

5   manhandled, meaning his risk of death was between 7.4 and 50 times greater due to the

6   forms of restraint used on him, regardless of the drugs in his system. While

7   Mr. Niedzialek's behavior that led to the restraint can be reasonably be described as a

8   state of "excited delirium," there is no indication that, absent the aggressive restraint

9   techniques and lack of resuscitation, he was at any risk of sudden death.

10       29.    Contrary to Dr. Richard Clark's frankly bizarre assertion that ExDS can

11   cause intentional death by suicide from running onto a freeway, or "dancing at a party,"

12   in the entire body of scientific literature, there has never been a case of a person

13   suiciding from, nor dying while dancing at party due to ExDS. The vast majority of

14   individual ExDS deaths described in the literature (84%) occur while in the custody of

15   law enforcement, and nearly all (98%) involve restraint. The aggressive restraint tactics

16   the deputies used on Mr. Niedzialek, the lack of a recovery position, combined with his

17   immediate history of vigorous exertion as well as the fact that his pulse and breathing

18   were not monitored by the deputies and resuscitation efforts were not commenced for

19   >3 minutes after he obviously stopped breathing, only served to substantially increase

20   the risk of death from the effects of the restraint.

21       30.    Drs. Chan and Graham have claimed that the restraint duration as well as

22   the medical literature provided evidence that it was not possible that the observed

23   restraint caused or contributed to Mr. Niedzialek's death.  The claim is as speculative as

24   it sounds on the surface, and lacks a valid basis in science, medicine, or the specific

25   facts.

26       31.    In a study cited by Dr. Theodore Chan (which he co-authored) in

27   support of his opinions, he claimed that he demonstrated using "Up to 225 pounds of

28   weight force on human subjects in prone restraint position…found no life-threatening

abnormalities in ventilation." In essence, Dr. Chan concluded that since he and his colleagues failed to kill a healthy volunteer during an experiment that in no way replicated the circumstances in which Mr. Niedzialek suffered a cardiopulmonary arrest, that this stands as certain evidence that Mr. Niedzialek's death was unrelated to the aggressive restraint tactics being used on him at the time that his heart stopped. To suggest that his study provides any understanding of what happened to Mr. Niedzialek, and more importantly what could not have happened to Mr. Niedzialek, as Dr. Chan has done, is not only scientifically invalid, it is a patently disingenuous comparison.

32.    Deputy Gomez's body camera shows that just preceding Mr. Niedzialek's cardiopulmonary arrest, he was handcuffed, and Deputy Keeney twisted his hand further and applies downward pressure on Mr. Niedzialek's lower back, while at the same time the deputy's knee pressed on Mr. Niedzialek's left shoulder and upper back. At the same time Deputy Gomez also used her hands to hold Mr. Niedzialek down by pressing down on his right shoulder and upper back area. Prior to these events, Mr. Niedzialek had been screaming, likely hallucinating, hyperventilating, bleeding from his head, and had been tased twice. In contrast, the volunteer in Dr. Chan's physiological studies, as demonstrated by an illustration in the paper cited by Dr. Chan, is not panicked, breathless, methamphetamine intoxicated, tased, injured, or manually restrained.

33.    To even suggest that the circumstances of Dr. Chan's experiment, in which the safety of the volunteers is the paramount concern of the researchers, not only duplicated the death risk of Mr. Niedzialek's restraint circumstances, but demonstrated to any degree of scientific certainly or validity that the risk was zero, is the height of junk science methods, and patently absurd.

34.    Ordinarily, a TASER shock has a very low risk of causing cardiac arrest when used by law enforcement. This fact in no way is an indication that an observed cardiac arrest occurring in close temporal proximity to a TASER shock must be unrelated to it. At the time of the TASER shock Mr. Niedzialek was screaming,

hyperventilating, bleeding from a head wound, and in an obvious state of mental health crisis. In addition to the potential for dysrhythmia (when deployed on the torso and near the heart), the use of a TASER can increase the need for oxygen. Thus the 2 TASER cycles increased Mr. Niedzialek's need to breath unencumbered, and made the restraint-related restriction of his breathing more deadly.

35.     Dr. Chan also relies for his opinion on epidemiologic studies with regard to arrests and prone versus supine handcuffing, but these epidemiologic studies lack the statistical power from which to draw any conclusions as to the risk of death associated with prone position with handcuffs versus supine or any other position. Therefore, these epidemiologic studies carry no reliability certainly from which to draw the inference that being in the prone position and having weight on the back does not increase the risk of positional asphyxia and potentially of cardio pulmonary arrest.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 29th day of May 2021 at Lake Oswego_____, Oregon.

_Michael D Freeman_

Michael D. Freeman, Med.Dr., Ph.D., MPH, MFFLM, FAAFS