# EXHIBIT B



February 1, 2021

John Burton
128 North Fair Oaks Avenue
Pasadena, California 91103

RE: *Alves v Riverside County, Riverside sheriff's department, Sheriff-coroner Chad Bianco, Deputy Sonia Gomez, Deputy Brain Keeney, and Does 3-10*

Decedent: Kevin Niedzialek
Date of Incident: 7/29/2019
Date of Death: 7/30/19 (34 years old)
Date of Birth: 9/20/1984

Dear Mr. Burton,

I am in receipt of your correspondence regarding Kevin Niedzialek and the circumstances of his death, which occurred while he was in a delusional and agitated state, and after aggressive restraint tactics were used on him by law enforcement personnel from Riverside Sheriff's office. The purpose of this report is to provide my conclusions regarding the potential causes of sudden death acting on Mr. Niedzialek immediately prior to his death, and which of the potential causes were the most probable cause (or causes) of his death.

As described in the autopsy report by Dr. Mark Fajardo (forensic pathology), the Riverside County Coroner concluded that the manner of Mr. Niedzialek's death was a homicide, although it was primarily attributed to acute methamphetamine toxicity, with the application of restraint maneuvers as a significant condition associated with the death.

The purpose of this report is to provide my analysis regarding the various potential causes of cardiopulmonary arrest acting on Mr. Niedzialek at the time that he became unresponsive, and which of the potential causes were the most probable cause (or causes) of his death.

In addition to my review of relevant materials, I have performed an extensive literature review and research on the risk of methamphetamine intoxication as a cause of death at the levels identified in

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 2 of 17

Mr. Niedzialek, when other competing causes, including aggressive physical restraint tactics and TASER shocks, are present as well.

In this report I will demonstrate Dr. Fajardo's conclusion that Mr. Niedzialek's death was primarily attributable to the toxic effects of methamphetamine is not supported by any valid scientific or medical evidence, and is speculative.

Further, I will demonstrate that there is evidence that the most probable cause of Mr. Niedzialek's death the use of aggressive restraint tactics by Riverside County law enforcement personnel which resulted in a cardiopulmonary arrest triggered by restraint-related asphyxia. There are no alternative explanations for his death that are unrelated to the actions of the Riverside County police personnel that are more than *slightly* probable.

My methods and opinions in this case pertain to the fields of forensic medicine and epidemiology. Forensic medicine refers to the intersection of medicine and law, and in particular medicolegal investigation of causation. Epidemiology is defined as the scientific study of the cause of disease, injury, and death in populations, including prevalence, risk, and incidence in specific populations. The scientific field that dictates how probabilities may be inferred from epidemiologic data and methods and how the inferences can be used to assess the cause of injury, disease, or death in individuals in a legal setting is forensic epidemiology. Forensic epidemiology provides the scientific basis for the evaluation of specific causation, to the extent that probability or likelihood of causation may be evaluated. The methods applied in this report are consistent with those outlined in the Reference Guide on Epidemiology, from the Reference Manual on Scientific Evidence, published by the Federal Judicial Center and the National Academies of Science (3rd Edition, 2011), as well as in the text Forensic Epidemiology: Principles and Practice, published by Elsevier (2016).

**_My qualifications to provide opinions concerning the matters herein are as follows:_**
I am a medicolegal consultant, with expertise in the fields of forensic medicine and forensic epidemiology. I hold the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden), a doctor of philosophy (Ph.D.) in public health with a major focus in epidemiology from Oregon State University, and a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences (UK), and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK). I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, am an affiliate medical examiner with the Allegheny County Medical Examiner's office, a fellow of the Pathology section of the American Academy of Forensic Sciences

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 3 of 17

(AAFS) and the American College of Epidemiology (ACE), and the vice-chair of the standards board for medicolegal death investigation for the AAFS. I am the chair of the subcommittee for research at the Faculty of Forensic and Legal Medicine of the Royal College of Physician (UK). I am a US Fulbright fellow, having held a 3-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State (2017-20).

I serve as a tenured Associate Professor of Forensic Medicine at Maastricht University, and a Joint Clinical Professor of Psychiatry and Public Health and Preventive Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and medical causation. I have also held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark from 2005-2017.

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals and have published approximately 220 scientific papers, abstracts, book chapters and books, including the recent text for Elsevier, <u>Forensic Epidemiology: Principles and Practice</u> (2016). My scientific publications have been cited by other authors of peer-reviewed publications approximately 2,800 times. Specific to the facts of the present investigation, I have an extensive education, practical investigational experience, and research background into restraint-related related death. Please see my CV for further details.

I have provided testimony in more than 350 civil and criminal trials in state and Federal courts throughout the United States, Canada, Australia, and Europe.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 4 of 17

**Background Facts:**

At or around 14:12 on July 29, 2019, Riverside Sheriff's Department received multiple calls reporting a man with a bloody head wound yelling and pounding on doors in the common area of an apartment complex located at 42200 Moraga Road, Temecula California.

Deputies Brian Keeney and Sonia Gomez (whose body camera was reviewed to recreate the event timeline) arrived on scene around 14:28. Kevin Niedzialek was first observed sitting on the ground, shirtless, and his face was covered with blood.[1] He repeatedly yelled, "I'm here, I'm here, I'm here," and "Please, please, please" to Deputy Keeney.

Mr. Niedzialek then stood up and approached Deputy Keeney. See screenshot below.



Deputy Gomez aimed her TASER at Mr. Niedzialek and fired, making good contact in his flesh with both darts, and tased him for 5 seconds,[2] causing Mr. Niedzialek to fall to the ground. After the TASER shock cycle was finished, Deputy Keeney approached Mr. Niedzialek and attempted to manually restrain his legs, as he yelled and kicked his feet. Deputy Keeney stepped back from Mr.

---

[1] The timestamp of the body camera does not match the time of the events. The first time the body camera has a visual of Mr. Niedzialek is at 15:23:52 on the camera timestamp, which is estimated to be approximately 14:29
[2] Gomez video, timestamp 15:24:02

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 5 of 17

Niedzialek and said, "Relax buddy."[3] Mr. Niedzialek sat upright on the ground, crossed legged, as he continued to yell.

Deputy Gomez told Mr. Niedzialek to, "Turn around, put your hands behind your back."[4] Mr. Niedzialek put his hands behind his back laid down supine (face up). The deputies told him to get on his stomach, but Mr. Niedzialek stood up and again began to approach Deputy Keeney.

Deputy Gomez, whose TASER darts were still in Mr. Niedzialek's skin, then issued another shock cycle lasting 5 seconds.[5] Mr. Niedzialek fell forward head-first onto the root of a tree. See screenshot below.



The deputies were then able to pin Mr. Niedzialek prone by Deputy Keeney putting his right knee on Mr. Niedzialek's left shoulder and right hand on his back, as he kicked his legs, while Deputy Gomez used her hands to pin his left shoulder and back. After he was handcuffed, Deputy Gomez called for an ambulance.

---

[3] Gomez video, timestamp 15:24:11
[4] Gomez video, timestamp 15:24:33
[5] Gomez video, timestamp 15:24:44

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 6 of 17

While prone, handcuffed, and still pinned down by the deputies, Mr. Niedzialek continued to slowly occasionally kick his legs and attempt to roll over, telling the deputies to stop.[6]

Mr. Niedzialek became subdued, no longer kicking his legs, yelling, or attempting to roll over. Deputy Keeley noted, "I think he's falling asleep."[7]

Mr. Niedzialek was bleeding on the root of the tree upon which he struck his head when falling (an image of the blood covered root is depicted below). He already had a bloody headwound prior to the call. He did not respond when the deputies asked him for his name.



From Deputy Gomez's body camera, the waistband of Mr. Niedzialek's underwear can be seen perhaps making very small, short, up-and-down movements, which may indicate that he was breathing to some extent.[8] There were no breath sounds or other movement indicating respiration, however. The last time the waistband movement was seen is at timestamp 15:29:26 on Deputy Gomez's body camera.

---

[6] Gomez video, timestamp 15:25:46
[7] Gomez video, timestamp 15:27:06
[8] Gomez video, timestamp 15:29:07

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 7 of 17

The officers flipped Mr. Niedzialek onto his back, still handcuffed.[9] His eyes and mouth were open, and Deputy Gomez immediately used her right index and middle fingers to check for a carotid pulse.[10] Initially, she told Deputy Keeney that she couldn't feel a pulse, and then she switched hands and said, "No, there is, it's very low."[11]

One and a half minutes later, Deputy Gomez suggested sitting Mr. Niedzialek up, to which Deputy Keeney responded, "I don't think he has any blood that's aspirated or anything," and the officers left Mr. Niedzialek laying on the ground, handcuffed and supine.[12]

The paramedics arrived and Deputy Gomez told them that Mr. Niedzialek had a faint pulse, was tased twice, and that the blood on his head was from before they arrived. The paramedic on the scene, Lisa La Russo, said, "Is he breathing? He's not breathing, guys."[13] She then checked his vitals and stated, "He's got agonal respirations," and began resuscitation 2 seconds later.[14]

The officers removed Mr. Niedzialek's handcuffs.[15] The first reading of his vitals showed that he had Pulseless Electrical Activity (PEA), a type of electrical heart activity that cannot be shocked to re-establish normal cardiac rhythm. Repeated rhythm checks every 2-4 minutes revealed he was still in PEA until after 8 minutes of resuscitation, when the defibrillator indicated fibrillation. His cardiac rhythm then went into sinus tachycardia about 8 minutes later. He was given intravenous and intraosseous fluids, and an orotracheal tube was inserted. He was given two 0.1 mg/mL boluses of epinephrine, and naloxone (opioid overdose reversal medication), but his status was unchanged.

Mr. Niedzialek was loaded into the ambulance about 19 minutes after the paramedics arrived, and was taken to Inland Valley Medical Center, arriving 14 minutes later. He had sustained a diffuse anoxic brain injury, and his neurologic exam was consistent with brain death. The next day, 7/30/19, the time of death was called at 19:00, at which time his organs were harvested.

*Autopsy report:*
On August 2, 2019 at 9:15, Mr. Niedzialek's autopsy was conducted by Dr. Mark Fajardo (forensic pathology).[16] In addition to the autopsy, Deputy Dawna Wimsatt performed a coroner review.

---

[9] Gomez video, timestamp 15:30:16
[10] Gomez video, timestamp 15:30:20
[11] Gomez video, timestamp 15:30:30
[12] Case Gomez video, timestamp 15:32:05
[13] Gomez video, timestamp 15:32:24
[14] Gomez video, timestamp 15:32:55
[15] Gomez video, timestamp 15:34:18
[16] Complete report coroner and autopsy

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 8 of 17

The external examination revealed multiple lacerations on Mr. Niedzialek's head and forehead, of varying degrees of depth, but none penetrating into the deeper soft tissues. There were contusions and abrasions scattered on his torso and limbs. Internal examination revealed minimal subgaleal hemorrhage over the right temporalis muscle, corresponding with a laceration of his right eyebrow region. No skull fractures or intracranial trauma were found, though his brain was swollen and soft, consistent with "respirator brain."

The toxicology results using antemortem blood drawn on 7/29/19 at 15:29 revealed methamphetamine (0.757 mg/L) and amphetamine (0.097 mg/L).

Dr. Fajardo concluded that Mr. Niedzialek's cause of death was acute methamphetamine toxicity, and that other significant conditions included application of restraint maneuvers. The coroner's report ruled the manner of death a homicide.

*Medical and other records reviewed for history*
Autopsy Report
34 Amended Complaint
AMR Paramedic Report
Autopsy Photos
Hospital photos - in situ, and organs donated
Complete rpt coroner and autopsy
Defendant's composite video edited at beginning
Dep. Gomez initial report 072919
Initial hospitalization records
Inland valley MC routine echo rpt
Organ transplant hospitalization records
TASER download
Deposition of Mark Fajardo taken on August 21, 2020
Deposition of Sonia Gomez, taken on December 17, 2020
Deposition of Brian Keeney, taken on December 18, 2020
Deposition of Lisa La Russo, taken on November 24, 2020

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 9 of 17

### *Analysis and opinions*

**Injury causation methods**
In evaluating the most likely cause of Mr. Niedzialek's death, the plausible causes or risk factors for sudden death can be placed in 2 categories: the risks attributable to the actions of the officers (including mechanical obstruction of respiration and multiple TASER shocks), and the risk attributable to the condition present in Mr. Niedzialek and unrelated to the actions of the police officers, and described in the autopsy report (methamphetamine intoxication). There are no other apparent causes of sudden death for Mr. Niedzialek identified at autopsy or in any of the reviewed records.

The investigation of the cause of an injury is different than for a disease, primarily because there is typically a close temporal association between the suspected cause of death and the first signs of injury. There are systematic methods for assessing questions of injury and death causation in a medicolegal setting that have been described extensively in the peer-reviewed literature. Most simply put, an injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred.

The analysis is accomplished via the application of expertise and knowledge from several disciplines depending on the source and type of injury, nearly always including medicine and epidemiology.[1–3]

*Note: citation numbers in brackets [] refer to the bibliography at the end of this report, as opposed to the footnotes, which are superscript numbers.*

In a death investigation involving an autopsy the pathologist identifies, describes, and diagnoses observed conditions, but the determination of the cause of a death in the absence of a condition that is nearly always fatal (*i.e.* gunshot wound to the head) is made via comparison of competing risks of sudden death acting on the individual at the time of the death.[4]

The generally accepted methods for assessing injury and death causation are simply described as a 3-step process based on the Bradford-Hill criteria,[5] which has been extensively described in the peer-reviewed literature, and been deemed generally accepted by US Courts, and described as part of case law in the United States.[6–8]

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 10 of 17

The three fundamental elements of an injury causation analysis in the context of a death investigation are as follows:

1) **Plausibility:** whether the injury mechanism had the potential to cause the death (general causation), and if known, the magnitude of that potential (risk of death);
2) **Temporality:** the degree of temporal proximity between the injury mechanism and the death; and
3) **Alternative explanations**: whether there is a more likely alternative explanation for the death or fatal injury occurring at the same point in time, versus the investigated cause (also known as a differential etiology). This alternative or competing cause of death or fatal injury is quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.


**Analysis of the most probable cause of Mr. Niedzialek's death**
In the following section of this report is a discussion and analysis of the most probable cause of Mr. Niedzialek's death within the context of the 3-step causal analysis process described above. This process is accomplished by first enumerating the potential causes of death acting on Mr. Niedzialek and assessing which are *plausible* causes of death, and if so, what *risks* are associated with the plausible causes. The next step in assessing causality is temporality; for the present analysis this consists of a description of the timeframe during which the plausible risk factors for death would have acted on Mr. Niedzialek between the initiation of the restraint by deputies Keeney and Gomez and the time of his cardiopulmonary arrest. The last step of the analysis consists of a quantitative comparison of the magnitude of the risks presented by each of the plausible causes of death (*i.e.* differential etiology).

***Step 1: Potential causes of Mr. Niedzialek's death***
Based on the fact pattern surrounding Mr. Niedzialek's death and Dr. Fajardo's autopsy findings and report, the list of proposed probable causes of death for Mr. Niedzialek is as follows:

- Restraint related
    - Asphyxia due to chest compression
    - TASER shocks
- Non-restraint related
    - Acute methamphetamine toxicity

The following discussion addresses the plausibility of these potential causes, and, when known or knowable, the risks associated with them:

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 11 of 17

### **_Restraint-related causes_**

*Asphyxia due to chest compression*
As seen on the video footage taken from the body camera of Deputy Gomez, and the bystander footage taken from across the courtyard, Mr. Niedzialek was subjected to forceful, prone restraint, with two officers pinning him to the ground while he was handcuffed behind his back. These actions carried a high risk of restricting, to some degree, Mr. Niedzialek's ability to breath.

Asphyxia is defined as a lack of oxygen (*i.e.* hypoxia) caused by an interruption in breathing, and is known as a trigger of cardiac dysrhythmia and arrest.[9] Compression of the neck, chest, and abdomen during physical restraint is a well-recognized mechanism for causing asphyxiation, due to restricted inspiration.[10] Positional asphyxia, in the context of restraint, typically refers to increased difficulty with breathing that is associated with the use of restraint (*i.e.* handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe. The terms compression and position are sometimes used interchangeably when referring to the circumstances of asphyxial death.

The restraint used on Mr. Niedzialek by deputies Keeney and Gomez after he was handcuffed, prone, and in an obvious panicked and excited state, was focused on his upper back and shoulders, thus limiting the movement of chest and diaphragm and ability to breathe an adequate breath. Given the vigorous activity that immediately preceded the arrest (*i.e.* screaming, running, and resisting the officers), and the additional TASER shocks (discussed further below), Mr. Niedzialek had an increased need for oxygen. Deputy Keeney's statement that Mr. Niedzialek had "fallen asleep" less than 2 minutes after such strenuous activity defies common sense.

When the deputies turned Mr. Niedzialek on his back and realized that he was nonresponsive, Deputy Gomez checked for his pulse in his throat, and reported finding a weak pulse. Two more minutes went by as the deputies waited for the paramedics, during which time neither deputy re-checked Mr. Niedzialek's pulse, monitored his breathing (which was not apparent), or placed him in a recovery position. When Deputy Gomez suggested sitting him upright, Deputy Keeney dismissed the idea by claiming that he didn't appear to have aspirated blood.

The deputies' use of aggressive and compressive restraint on Mr. Niedzialek, followed by the failure to evaluate or resuscitated him after he suffered a cardiopulmonary arrest, greatly increased the probability that Mr. Niedzialek would not survive his encounter with the Riverside County deputies. These actions and inactions serve as a highly plausible cause of the cardiopulmonary arrest that resulted in Mr. Niedzialek's death.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 12 of 17

*Electrical shock from electronic control device (TASER)*
In the process of arrest, Mr. Niedzialek was tased two times. Both TASER cycles lasted the pre-programmed 5 seconds and were discharged within 45 seconds of each another.

Electronic control devices, most commonly called TASERs, are designed to incapacitate an individual using an electric shock or shocks. The models used by law enforcement personnel typically have projectiles, connected to the device via thin wires, so that the electric shock can be administered at a distance. The introduction of an electrical current into the human body is a highly plausible and well-established mechanism for producing dysrhythmias, and thus it is unsurprising that law enforcement use of TASER has been associated with over 630 deaths between 2001-2014.[11]

While some studies have reported that TASER use has little or no impact on cardiac or respiratory function, virtually all of these papers were funded by the company that makes and sells TASER devices. This issue was highlighted in a 2011 paper in which researchers found that papers funded by TASER were 18 times more likely to conclude that the devices are "safe" as compared with studies that were not funded by the company.[11] In contrast, studies that have not been funded by TASER have reported a number of adverse effects from TASER deployment, including dysrhythmias and associated cardiac arrest when the darts are fired into the chest near the heart (which was not a factor in Mr. Niedzialek's death). [12]

The studies that conclude that TASER is a safe restraint technique fail to adequately recreate the events that typically lead to TASER shocks: the studies are of healthy volunteers in controlled environments, which does not even slightly resemble the real life circumstances of a person tased by police, often including a subject with mental illness, drug use, concurrent restraint (i.e. multiple officers' bodyweight), *multiple* TASER shocks, and vigorously fighting and resisting arrest.[13,14]

Ordinarily, a TASER shock carries a very low risk of cardiac arrest when used by law enforcement, but this was not the case for Mr. Niedzialek, however. At the time the TASER was used on Mr. Niedzialek he was in delirious and highly excited state; he was screaming, hyperventilating, confused, and bleeding from his head. The use of the TASER increases the need for oxygen in a tased individual, in direct relationship to the duration and number of applications. Combined with the positional asphyxia factors described above, the use of the TASER followed by the prone restraint is a plausible contributing cause of Mr. Niedzialek's cardiopulmonary arrest and death.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 13 of 17

### *Non-restraint-related cause*

#### *Acute methamphetamine toxicity*

Mr. Niedzialek was found to have an antemortem blood concentration (taken 7/29/19 at 15:29) of methamphetamine of 0.757 mg/L. Methamphetamine is a stimulant that is primarily consumed illegally as "crystal meth," or simply "meth," in a powder form that can be smoked, injected, or ingested orally. Use of the drug is highly prevalent; there were 42 tons of crystal meth consumed in the US in 2010, and in 2013 1.2 million Americans used the drug.[15]

In contrast with opiates, however, crystal meth has a relatively low hospitalization and death rate; there were 103,000 emergency room visits associated with meth use in 2011, and in the same year there were ~2,700 deaths attributed, at least in part, to meth exposure, resulting in a death rate of 1 in 444 relative to the number of people taking the drug annually (the deaths were not all necessarily due to methamphetamine toxicity, however). As the typical dose of meth ranges from 10 to 40 mg, this means that there are at least 11,340 doses available per pound of meth, (assuming a 40 mg dose), 22.7 million doses per ton of meth, and thus a total of 953 million doses of meth consumed in the US in 2010 alone.[16] A comparison of the number of doses to the number of deaths each year yields a risk of 1 death per 353,000 doses of methamphetamine.[17] While no illicit drug use is considered "safe" (and thus any level in the body is considered "toxic"), the risk of death from a single dose of methamphetamine is exceedingly small.

There is no evidence that supports an inference that the very small amount of methamphetamine in Mr. Niedzialek's blood (0.757 mg/L) was even a *plausible* cause of his death in the absence of the violent restraint. The level of methamphetamine assayed in Mr. Niedzialek's antemortem blood sample is less than what is commonly found in recreational users, based on National Highway Traffic Safety Administration information.[16] Other studies have described non-lethal blood concentrations in recreational methamphetamine users of as high as 9.3 mg/L (more than 12 times greater than the level found in Mr. Niedzialek's blood).[18] While methamphetamine deaths have been recorded with blood levels as low as 0.05 mg/L this information is essentially useless in the present investigation. There is extensive overlap between what are only *possibly* fatal levels and common recreational blood concentrations of methamphetamine.

Given the exceedingly low per-dose risk of death associated with methamphetamine use, there is no reason to believe that simply because Mr. Niedzialek had methamphetamine in his blood that *might* be fatal, that the cause of his death was a result of methamphetamine toxicity. Methamphetamine isn't like cyanide or some other poison, which is invariably the cause of death when it is found in a decedent. Like alcohol, most of the time that amphetamine is present in a

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 14 of 17

decedent it is *not* the cause of death. Thus, at the levels found in Mr. Niedzialek blood shortly before he died, methamphetamine toxicity was a highly unlikely cause of his death*, in the absence of the restraint-related death risk*. It is certainly appropriate to consider the methamphetamine as a contributing factor to Mr. Niedzialek's death, as the drug produced actions that greatly increased his need for oxygen at the time of his prone restraint.

***Step 2: The timing of events leading to Mr. Niedzialek's death***
The table below and on the following page was created after reviewing the body camera footage and audio of Deputy Gomez, and the bystander footage taken from across the courtyard. Deputies Keeney and Gomez were the first on scene to interact with and attempt to restrain Mr. Niedzialek.

The table begins when the deputies first contacted Mr. Niedzialek. The first column is the timestamp from the overall interaction, beginning at 00:00 when Deputy Gomez's body camera sees Mr. Niedzialek, the second column is the timestamp beginning when he is handcuffed, prone, and pinned by the deputies, and the third column is a brief description of the event.

| Time since police contact | Time since handcuffed, restrained, prone | **Action** |
|---|---|---|
| 00:00 | | Niedzialek visible from Gomez body camera, he is shirtless, and his head is covered in blood |
| 00:08 | | Niedzialek approaches Keeney |
| 00:11 | | Niedzialek TASED 5 seconds |
| 00:48 | | Niedzialek puts hands behind back, lays down |
| 00:52 | | Niedzialek stands up to approach Keeney |
| 00:53 | | Niedzialek TASED 5 seconds, he falls face-first into the root of a tree |
| 00:57 | | Officers pin Niedzialek prone, while he kicks |
| 01:32 | 00:00 | Niedzialek handcuffed, prone, pinned by Keeney's knee and Gomez's hands |
| 01:38 | 00:06 | Gomez calls an ambulance |
| 03:16 | 01:44 | Keeney says, "I think he's falling asleep" |
| 04:44 | 03:12 | Gomez asks Niedzialek for his name, he does not respond |
| 05:35 | 04:03 | Last breath Niedzialek can be seen taking |
| 06:25 | 04:53 | Officers flip Niedzialek over |

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 15 of 17

| 06:39 | 05:07 | Gomez checks for a pulse, doesn't feel one, then states, "No, it is, there is, it's very low" |
| --- | --- | --- |
| 08:14 | 06:42 | Gomez says, "Should we try to sit him up?", but the officers do not sit him up |
| 08:24 | 06:52 | Paramedics arrive on scene |
| 08:33 | 07:01 | Paramedics evaluate Niedzialek, "He's not breathing" |
| 09:04 | 07:32 | Resuscitation efforts begin |

The last breath Mr. Niedzialek possibly took occurred 4 minutes after he was handcuffed and prone on the ground, while deputies Keeney and Gomez using their hands and/or knee to pin his shoulders and upper back to the ground. When they turned him onto his back still handcuffed about a minute later, he was unresponsive, and reportedly had a weak pulse. Two more minutes passed as the deputies waited for the paramedics, during which time neither deputy attempted to re-evaluate Mr. Niedzialek while he was unresponsive and not breathing. As a result of their inaction, Mr. Niedzialek had no effective cardiopulmonary function for at least 3½ minutes prior to receiving CPR from EMS personnel, and possibly significantly longer. My understanding is that plaintiff's cardiology expert, Dr. Daniel Wohlgelertner, will provide further analysis on this issue.

**Step 3: Alternative causes/ differential etiology of the most probable cause of Mr. Niedzialek's death**
Based on the above discussion, the only proposed non-restraint-related cause of Mr. Niedzialek's death was the risk presented by the low level of methamphetamine in his blood, which carried <1 in 350,000 risk.

In comparison with the risk due to the meth presence, the risk of death from the police actions and inactions was exceedingly high; the risk of death due to chest compression, as well as multiple TASER shocks increasing the need for oxygen, greatly increased Mr. Niedzialek's risk of asphyxia-related cardiopulmonary arrest. The failure by the deputies to adequately attempt to evaluate Mr. Niedzialek for the need for resuscitation greatly contributed to the inefficacy of the EMT resuscitation efforts before irreversible brain damage occurred.

**<u>Conclusions:</u>**
Based on the preceding analysis, it is my opinion that Mr. Niedzialek's death was primarily a result of the use of aggressive restraint tactics by the Riverside Police Department personnel, resulting in death by asphyxia. A contributing factor to his death was the lack of timely resuscitation efforts.

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 16 of 17

Because Mr. Niedzialek's death was due to the intentional actions of others, I agree with the coroner's conclusion that the manner of death is homicide. While there is no doubt that the methamphetamine in Mr. Niedzialek's system and his associated agitation greatly increased his need for oxygen (as did the multiple TASER shocks), these conditions required the addition of the prone restraint to result in the potentially deadly circumstances that resulted in Mr. Niedzialek's death.

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, FAAFS, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences

John Burton, Esq.

RE: *Alves v Riverside County, et al.*

February 1, 2021

page 17 of 17

**_References_**
1. Freeman MD, Zeegers M. Principles and applications of forensic epidemiology in the medicolegal setting. Law, Probab Risk. 2015;14:269–78.
2. Koehler SA, Freeman MD. Forensic epidemiology: A method for investigating and quantifying specific causation. Forensic Sci Med Pathol. 2014;10:217–22.
3. Freeman MD, Kohles SS. An evaluation of applied biomechanics as an adjunct to systematic specific causation in forensic medicine. Wiener Medizinische Wochenschrift. 2011;161:458–68.
4. Meilia PDI, Freeman MD, Herkutanto, Zeegers MP. A review of causal inference in forensic medicine. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:313–20.
5. Reference Manual on Scientific Evidence, Third Edition l Federal Judicial Center [Internet]. [cited 2021 Jan 25]. Available from: https://www.fjc.gov/content/reference-manual-scientific-evidence-third-edition-1
6. Etherton v Owner Insurance Company. U.S. District Court of Appeals. 10th Circuit. Case no. 14-1164.
7. 35 F Supp. 3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance Company, a Michigan Insurance Company, Defendant. Civil Action No. 10-cv-00892-PAB-KLM.
8. Freeman MD, Centeno CJ, Kohles SS. A Systematic Approach to Clinical Determinations of Causation in Symptomatic Spinal Disk Injury Following Motor Vehicle Crash Trauma. PM R. 2009;1:951–6.
9. Clark RE, Christlier I, Sanmarco M, Diaz-Perez R, Dammann JF. Relationship of Hypoxia to Arrhythmia and Cardiac Conduction Hemorrhage: Experimental Study. Circulation. 1963;27:742–7.
10. Colville-Ebeling B, Freeman M, Banner J, Lynnerup N. Autopsy practice in forensic pathology - Evidence-based or experience-based? A review of autopsies performed on victims of traumatic asphyxia in a mass disaster. J Forensic Leg Med. Elsevier Ltd; 2014;22:33–6.
11. 634 Taser-Related Deaths in the United States Since 2001. Electron. Village. 2014.
12. Zipes DP. TASER electronic control devices can cause cardiac arrest in humans. Circulation. 2014;129:101–11.
13. Strote J, Hutson HR. Taser use in restraint-related deaths. Prehospital Emerg Care. 2006;10:447–50.
14. Strote J, Hutson HR. TASER study results do not reflect real-life restraint situations. Am J Emerg Med. Elsevier Inc.; 2009;27:747.
15. Patterson E. Methamphetamine history and statistics. Am. Addict. Centers. 2018.
16. Couper F, Logan B. Human Performance Drug Fact Sheets - NHTSA. 2004;102.
17. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92.
18. Logan BK, Flinger CL, Haddix T. Cause and manner of death in fatalities involving methamphetamine. J Forensic Sci. 1998;43:28–34.