# EXHIBIT C



# Forensic Research + Analysis

March 15, 2021

John Burton
128 North Fair Oaks Avenue
Pasadena, CA 91103

RE: *Alves v Riverside County, Riverside sheriff's department, Sheriff-coroner Chad Bianco, Deputy Sonia Gomez, Deputy Brian Keeney, and Does 3-10*

Decedent: Kevin Niedzialek
Date of Death: 7/30/2019 (34 years old)
Date of Birth: 9/20/1984

Dear Mr. Burton,

I am in receipt of your further correspondence regarding Mr. Niedzialek's death. I have reviewed the opinions provided by the defendant's experts Dr. Theodore Chan (emergency medicine), Dr. Donald Dawes (emergency medicine, TASER consultant), Dr. Richard Clark (toxicology), and Dr. Michael Graham (pathology), regarding the cause of Mr. Niedzialek's death.

All four experts have opined that Mr. Niedzialek **was not** the victim of a homicide at the hands of Riverside law enforcement; rather, they opine that Mr. Niedzialek died of "Excited Delirium" as a sequalae of methamphetamine toxicity, and that the effects of the TASER on Mr. Niedzialek did not in any way contribute to his risk of death. As I describe in this report, these opinions are lacking in scientific, medical, and factual validity.

This report is divided into three sections: the first is a brief summary of my conclusions regarding the manner and cause of Mr. Niedzialek's death as previously described in my February 1, 2021 report in this matter. The second section summarizes the opinions held by Drs. Chan, Dawes, Clark, and Graham, and the third section addresses the scientific validity of those opinions.

As I have already described my areas of expertise and qualifications in my prior report, I will not repeat them here.

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 2 of 11

### Summary of opinions from my February 1, 2021 report

Mr. Niedzialek's death was primarily a result of the use of aggressive restraint tactics by the Riverside Police Department personnel, resulting in death by asphyxia. A contributing factor to his death was the lack of timely resuscitation efforts. There is no evidence that the level of methamphetamine in Mr. Niedzialek's blood presented anything more than a trivial risk of death in the absence of the aggressive restraint forces. The two TASER shocks issued to Mr. Niedzialek during arrest most likely had the effect of increasing his need for oxygen, which exacerbated the asphyxial effects of the restraint forces. Mr. Niedzialek's death was due to the intentional actions of others, and therefore the manner of death is homicide.

### Dr. Chan's opinions

Dr. Chan concluded that Mr. Niedzialek's death was not caused or contributed to by the restraint nor the TASER use on him. Specifically, Dr. Chan opined that:

1) Studies conducted by Dr. Chan and his colleagues which found no "*life-threatening abnormalities in ventilation*" when weight was applied to the back of restrained volunteers served as certain evidence that Mr. Niedzialek's death could not have been caused by the aggressive restraint tactics used on him.
2) Studies conducted by Dr. Chan and his colleagues of TASER shocks applied to volunteers found no "*no significant inherently deleterious physiologic effects*" from the shocks, and thus Mr. Niedzialek's death could not have been caused or contributed to by the use of TASER on him.

### Dr. Dawes' opinions

Dr. Dawes concluded that the TASER use on Mr. Niedzialek did not cause or contribute to his death. His reasoning for this conclusion is as follows:

1) The position of the TASER probes in Mr. Niedzialek's flesh were not in high-risk locations (*i.e.* on the chest, proximate to the heart) for inducing a cardiac dysrhythmia.
2) Because Mr. Niedzialek's cardiac rhythm was pulseless electrical activity (PEA), which is not an "electrically-induced dysrhythmia," the TASER could not have contributed to his cardiopulmonary arrest.
3) The level of methamphetamine in his toxicology report likely caused a "*catecholamine storm,*" which can induce cardiac arrest (the relationship of such an arrest to PEA not addressed).
4) Mr. Niedzialek's breathing pattern was consistent with an excited delirium (ExDS) death, which has been "*frequently described*" to be "*respiratory rather than cardiac,*" because an

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 3 of 11

> ExDS death is often preceded by dysfunctional respiratory bellows, leading to acidosis in a "downward spiral" leading to cardiac arrest.

### *Dr. Clark's opinions*

Dr. Clark opined that Mr. Niedzialek's death was due to excited delirium (ExDS), and was related to the recreational level of methamphetamine in his blood found when he arrived at the emergency department. On the subject of ExDS, Dr. Clark stated the following:

1) Both ExDS and methamphetamine toxicity separately and together can cause sudden death.
2) Death due to ExDS is not well understood, but is thought to be related to electrolyte abnormalities, hyperthermia, and elevated adrenaline, which can lead to cardiac arrest.
3) The moments that preceded Mr. Niedzialek's cardiopulmonary arrest were consistent with ExDS, and therefore "*likely resulted in metabolic acidosis of the blood and possible electrolyte abnormalities*" which increased his susceptibility to the effects of methamphetamine, leading to his cardiopulmonary arrest.

### *Dr. Graham's opinions*

Dr. Graham concluded that Mr. Niedzialek's behavior on the day of his cardiopulmonary arrest was consistent with ExDS, and that the restraint and TASER shocks did not cause or contribute to his death, therefore the manner of Mr. Niedzialek's death is "*accident.*" Dr. Graham further stated:

1) ExDS and methamphetamine toxicity separately and together can cause sudden death.
2) The mechanism of ExDS death is not known, but it is thought to be related to the central nervous system, or cardiac dysfunction, metabolic abnormality, catecholamine toxicity, or post-exertional hypokalemia. Dr. Graham opined that multiple fatal ExDS pathways probably exist, although he did not indicate evidence of any of the pathways occurring in Mr. Niedzialek.
3) Restraint has not been shown to cause or contribute to death "*in most cases.*" There was insufficient force used on Mr. Niedzialek to cause respiratory or cardiovascular compromise.
4) The TASER shocks did not affect Mr. Niedzialek's cardiac function.

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 4 of 11

**Analysis of the defense experts' opinions:**
In the following discussion is an evaluation of the validity of the 3 substantive exculpatory defense theories expressed by Drs. Chan, Dawes, Clark, and Graham regarding the cause of Mr. Niedzialek's death, which are as follows: 1) death was due to excited delirium and methamphetamine, 2) the restraint didn't or couldn't have contributed to the death, and 3) the TASER shocks did not contribute to the death.

1) *Mr. Niedzialek's death was due to excited delirium, which was also related to his use of methamphetamine.*

Drs. Dawes, Clark, and Graham all opined that Mr. Niedzialek's death was due, at least in part, to Excited Delirium Syndrome (ExDS). Dr. Michael Fajardo (forensic pathology), who performed the autopsy on Mr. Niedzialek did not mention this diagnosis in his report. The claim, for which no evidence of any kind exists in this case, has been demonstrated as scientifically invalid in the most current and comprehensive analysis of the topic in the peer-reviewed literature.

Excited delirium syndrome (ExDS, also known as agitated delirium, AgDS) is a diagnostic term used to describe a person who is agitated and delirious, usually paired with aggressive behavior, pain tolerance, extreme physical strength, and hyperthermia. Often people with alleged fatal ExDS have recently ingested a stimulant drug (*i.e.* meth or cocaine) and/or are mentally ill. Because of the erratic behavior, law enforcement is called to contain and restrain the individual, which is typically met with resistance (because of the agitation and delirium), leading to an escalation of restraint techniques such as TASER shocks, extensive restraint via manhandling, hog- or hobble-tying, the use of blunt force, and sedation, ultimately culminating in the death of the individual. There are no findings at autopsy that indicate ExDS as a cause of death, and if drugs are found in the toxicology screen, they are typically stimulants, and at recreational, rather than overdose, levels.

The diagnosis of ExDS is highly controversial when it is named as the primary cause of death in cases in which there is a history of restraint at the time of death. The symptoms of ExDS (agitation and delirium) are triggers for use of force and restraint by law enforcement, and use of force by law enforcement can be associated with increased risk of death due to positional/compression asphyxia. Asphyxial or restraint-related deaths *can* exhibit signs of the mechanism of death, such as fractured ribs, neck structures, petechiae of the eye and neck muscles, but these findings are often not present.

ExDS is not a term defined in the International Classification of Diseases (ICD-9, ICD-10), or the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), and there is no standard definition

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 5 of 11

of ExDS and no definitive tests or signs to indicate the diagnosis as a cause of death, and thus the use of the term is entirely subjective. Previous studies attempting to classify, define, and estimate risk factors for ExDS have been limited to case reports and case series.

In a recently published peer-reviewed article, my colleagues and I created a database of all individual (rather than grouped) ExDS and AgDS cases that have been described in the scientific literature using the National Library of Medicine search engine PubMed and OVID Medline, as well as "grey literature" available in Google Scholar searches using the relevant search terms.[1]

We found a total of 1,342 studies which were initially reviewed, resulting in the identification of 61 articles describing individual cases of ExDS or AgDS, amounting to 168 total cases. The cases were reviewed, and available information was harvested for diagnoses (ExDS vs. AgDS), the type of authority present (law enforcement, paramedic, etc.), demographics (age, sex, race), use of force (not mutually exclusive: none, unknown, handcuff, hog/hobble-tie, manhandle, TASER, sedation, other), drug intoxication (not mutually exclusive: none, unknown, cocaine, alcohol, marijuana, stimulants, other), mental health diagnosis, and outcome (died or survived).

Most cases involved men ($n$=161, 95.8%), and law enforcement personnel were the first responders on scene in two thirds of the cases ($n$=111, 66.1%). A quarter of the cases involved a person with a known mental illness ($n$=42, 25.0%), most cases involved drug use ($n$=147, 86.3%), and force was used in most cases ($n$=138, 81.5%).

Cases that resulted in death were nearly 10 times more likely than survived cases to be diagnosed as ExDS (rather than AgDS). Fatal cases were also more likely to have used restraint (at least 90% of cases) than survived cases (at least 68% of cases). Cases were more likely to be fatal when law enforcement was the first responder on scene. The odds of fatality were 7.4 times greater when a person was manhandled, 10.7 times greater when they were handcuffed, and 50 times greater if a person was hog- or hobble-tied. Fatal cases were also more likely to have cocaine and/or alcohol, while survived cases more commonly involved other stimulants, marijuana, and other drug use (*i.e.* opioids, mushrooms, hallucinogenic drugs, etc.).

**The results of the study indicated that a diagnosis of ExDS and potentially fatal restraint are inextricably interwoven, and that in the absence of aggressive restraint (*i.e.* manhandling, hog-tying, handcuffing), there is no evidence that ExDS is a stand-alone fatal condition.** These findings are relevant and applicable to the circumstances of Mr. Niedzialek's death.

When deputies Gomez and Keeney arrived on scene, Mr. Niedzialek was obviously in a medical and mental health crisis: he was bleeding from his head, half-clothed, screaming, hyperventilating,

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 6 of 11

panicked, and possibly hallucinating. The deputies tased him twice, then handcuffed him, and used their hands and knees against his shoulders and upper back to pin him to the ground, as he fought against their restraint. The circumstances of Mr. Niedzialek's cardiopulmonary arrest therefore most closely resemble the ExDS database profile of a person who was handcuffed and manhandled, meaning his risk of death was between 7.4 and 50 times greater due to the forms of restraint used on him, regardless of the drugs in his system. While Mr. Niedzialek's behavior that led to the restraint can be reasonably be described as a state of "excited delirium," there is no indication that, absent the aggressive restraint techniques and lack of resuscitation, he was at **any** risk of sudden death.

Contrary to Dr. Clark's frankly bizarre assertion that ExDS can cause intentional death by suicide from running onto a freeway, or "dancing at a party," in the entire body of scientific literature, there has never been a case of a person suiciding from, nor dying while dancing at party due to ExDS. The vast majority of individual ExDS deaths described in the literature (84%) occur while in the custody of law enforcement, and nearly all (98%) involve restraint.

The aggressive restraint tactics the deputies used on Mr. Niedzialek, the lack of a recovery position, combined with his immediate history of vigorous exertion as well as the fact that his pulse and breathing were not monitored by the deputies and resuscitation efforts were not commenced for >3 minutes after he obviously stopped breathing, only served to substantially increase the risk of death from the effects of the restraint.

*2) The aggressive restraint tactics used on him could not have caused Mr. Niedzialek's death because of the results of volunteer studies*

In support of this opinion Drs. Chan and Graham claimed that the restraint duration as well as the medical literature provided evidence that it was not *possible* that the observed restraint caused or contributed to Mr. Niedzialek's death. The claim is as speculative as it sounds on the surface, and lacks a valid basis in science, medicine, or the specific facts.

In support of his opinion, Dr. Chan cited to a study (which he co-authored) that he claimed demonstrated that using *"Up to 225 pounds of weight force on human subjects in the prone restraint position… found no life-threatening abnormalities in ventilation."* In essence, Dr. Chan concluded that since he and his colleagues failed to kill a healthy volunteer during an experiment that in no way replicated the circumstances in which Mr. Niedzialek suffered a cardiopulmonary arrest, that this stands as certain evidence that Mr. Niedzialek's death was unrelated to the aggressive restraint tactics being used on him at the time that his heart stopped.

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 7 of 11

The following excerpt from the above-mentioned ExDS literature review describes the lack of scientific validity of the studies Dr. Chan cited to (and co-authored:[1]

> *"In an attempt to demonstrate that restraint is not the most likely cause of death in fatal ExDS, a group of authors published several experimental studies aimed at proving the theory that restraint-related chest compression does not restrict respiration or cardiac output [2–5]. The studies were conducted in controlled environments with healthy volunteer subjects who, in some instances, had up to 210 pounds of weight placed on their back, while they lay prone and hog- or hobble-tied. The authors concluded that there were no clinical (much less potentially fatal) effects from prone restraint regardless of additional weight. They generalized their conclusions to real-world deaths occurring under circumstances of aggressive restraint, casting doubt as to whether any degree of restraint could result in compression-related asphyxia. The authors did not comment on the fact that none of their volunteers were subjected to the typical circumstances in which real-world ExDS deaths occur: likely aggressive restraint applied by multiple law enforcement personnel to a possibly frantic and/or actively resisting individual, who may be intoxicated and already subjected to multiple TASER shocks. Interestingly, the authors responsible for the experimental restraint studies include the same authors who manufactured an artificially low ExDS mortality rate of <10%. The authors fail to note the obvious contradiction in their hypotheses: they claim that ExDS is a condition with a purported fatality rate of <10% due to an unknown inexorable cardiac pathophysiologic event, yet they also claim that addition of chest compression of up to 210 lbs. in such a fragile individual cannot possibly contribute to the risk of death based on an experimental study of chest compression in healthy people."*

To suggest that his study provides any understanding of what happened to Mr. Niedzialek, and more importantly *what couldn't have happened to Mr. Niedzialek,* as Dr. Chan has done is not only scientifically invalid, it is a patently disingenuous comparison.

To demonstrate, the image on the next page is a screenshot from Deputy Gomez's body camera just preceding Mr. Niedzialek's cardiopulmonary arrest. He is already handcuffed, and Deputy Keeney twists his hand further and applies downward pressure on Mr. Niedzialek's lower back, while at the same time the deputy's knee presses on Mr. Niedzialek's left shoulder and upper back, while Deputy Gomez also uses her hands to hold Mr. Niedzialek down by pressing down on his right shoulder and upper back area. Prior to these events, Mr. Niedzialek had been screaming, hallucinating, hyperventilating, bleeding from his head, and had been tased twice.

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 8 of 11



**Screenshot from Deputy Gomez's bodycam**

In contrast, the image of a volunteer who is not panicked and breathless, methamphetamine intoxicated, tased, injured, and manually restrained is from the paper describing Dr. Chan's volunteer experiment.



**Illustration from the paper cited by Dr. Chan**

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 9 of 11


To even suggest that the circumstances of Dr. Chan's experiment, in which the safety of the volunteers is the paramount concern of the researchers, not only duplicated the death risk of Mr. Niedzialek's restraint circumstances, but demonstrated to any degree of scientific certainly or validity that the risk ***was zero,*** is the height of junk science methods, and patently absurd.


*3) The use of the TASER on Mr. Niedzialek did not cause or contribute to his cardiac arrest or death.*

Ordinarily, a TASER shock has a very low risk of causing cardiac arrest when used by law enforcement. This fact in no way is an indication that an observed cardiac arrest occurring in close temporal proximity to a TASER shock must be unrelated to it. At the time of the TASER shock Mr. Niedzialek was screaming, hyperventilating, bleeding from a head wound, and in an obvious state of mental health crisis. In addition to the potential for dysrhythmia (when deployed on the torso and near the heart), the use of a TASER can increase the need for oxygen, as I noted in my earlier report.[6] Thus the 2 TASER cycles increased Mr. Niedzialek's need to breath unencumbered, and made the restraint-related restriction of his breathing more deadly.


*Miscellaneous comments*
It's worth noting that Dr. Dawes' works for TASER international, owns stock in the company, has testified in lawsuits defending the company against wrongful death claims, and has been paid by TASER international to publish studies touting the safety of the devices.[7,8] This is not information that is concealed; Dr. Dawes' LinkedIn profile lists TASER International as a place of work. This is an important point to note, as a 2011 study found that studies funded by TASER were 18 times more likely to conclude that the devices are "safe" compared with studies that were not funded by the company.[9]

Across all four defense experts, (Chan, Clark, Dawes, and Graham), there were 208 citations, 26 of which were repeated by either the same or another expert, for a total of 182 cited individual papers, articles, and book chapters. Dr. Graham cited to a graduate student's master's degree thesis twice in his report.

Fifty-eight of the studies were on the topic of TASER or other CEW devices. I was unable to locate 6 of the TASER studies, and of the remaining 53 articles, 29 (55%) were either studies funded by, or involved researchers who were paid by TASER or Axon international (the new name for TASER International). In 13 of the 53 studies **(25%)** the authors failed to acknowledge potential conflicts of interest in the study topic (even though they had previously received compensation from TASER),

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 10 of 11

and only 10 (19%) disclosed no conflicts of interest, or conflicts of interest unrelated to TASER or Axon International.

Dr. Graham included a remarkable 154 citations in support of the opinions in his 4 page report without specifying how the papers and opinions were related. Closer examination revealed that 5 of the citations were duplicates and 2 were written in French. The topics of the papers ranged from reasonably relevant, such as TASER-related literature (42 citations), restraint asphyxia (18 citations), use of force (11 citations), and custody injury/death (10 citations), to utterly irrelevant, including suicide by cop (3 citations), sickle cell anemia (10 citations), pepper spray (22 citations), and animal bites (1 citation). Not a single one of the papers demonstrated that the degree and duration of restraint occurring in the circumstances surrounding Mr. Niedzialek's death could not, should not, or even possibly did not contribute to his death.

**Conclusions;**
None of the opinions provided by Drs. Chan, Clark, Dawes or Graham alter my conclusion that Mr. Niedzialek died as the result of aggressive restraint tactics, resulting in death by asphyxia, and that the lack of timely resuscitation efforts contributed to his death.

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, MFFLM, DLM, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Member, Faculty of Forensic and Legal Medicine, Royal College of Physicians (UK)
Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences

John Burton, Esq.

RE: *Alves v Riverside County et al.*

March 15, 2021

page 11 of 11

**Citations:**
1. Strömmer EMF, Leith W, Zeegers MP, Freeman MD. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. Forensic Sci Med Pathol. Forensic Science, Medicine and Pathology; 2020;16:680–92.
2. Chan TC, Vilke GM, Neuman T, Clausen JL. Restraint position and positional asphyxia. Ann Emerg Med. 1997;30:578–86.
3. Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM. Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol. 2004;25:185–9.
4. Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci. 2007;52:171–5.
5. Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, et al. The effect of the prone maximal restraint position with and without weight force on cardiac output and other hemodynamic measures. J Forensic Leg Med. Elsevier Ltd; 2013;20:991–5.
6. Jauchem JR, Seaman RL, Klages CM. Physiological effects of the TASER® C2 conducted energy weapon. Forensic Sci Med Pathol. 2009;5:330.
7. Dawes DM, Ho JD, Cole JB, Reardon RF, Lundin EJ, Terwey KS, et al. Effect of an electronic control device exposure on a methamphetamine- intoxicated animal model. Acad Emerg Med. 2010;17:436–43.
8. Dawes DM, Ho JD, Moore JC, Miner JR. An evaluation of two conducted electrical weapons and two probe designs using a swine comparative cardiac safety model. Forensic Sci Med Pathol. 2013;9:333–42.
9. Azadani PN, Tseng ZH, Ermakov S, Marcus GM, Lee BK. Funding source and author affiliation in TASER research are strongly associated with a conclusion of device safety. Am Heart J. Mosby, Inc.; 2011;162:533–7.