Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
hlee@galipolaw.com
**LAW OFFICES OF DALE K. GALIPO**
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333/Fax: (818) 347-4118

JOHN BURTON, State Bar No. 86029
jb@johnburtonlaw.com
**THE LAW OFFICES OF JOHN BURTON**
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 449-8300/Fax: (626) 440-8198

T. KENNEDY HELM, IV, State Bar No. 282319
kennedy@helmlawoffice.com
**HELM LAW OFFICE, PC**
644 40th Street, Suite 305
Oakland, California 94609
Tel: (510) 350-7517/Fax: (510) 350-7359

Attorneys for Plaintiff Tracy Alves, Individually and as Successor In Interest for Kevin R. Niedzialek, Deceased

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased,

Plaintiff,

vs.

RIVERSIDE COUNTY, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3–10,

Defendants.

Case No. 5:19-cv-02083-JGB (SHKx)

*Honorable Jesus G. Bernal*
*Mag. Judge Shashi H. Kewalramani*

**PLAINTIFF'S DECLARATION OF JEFFREY NOBLE IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE HIS TESTIMONY AND FOR SUMMARY JUDGMENT**

Date: June 21, 2021
Time: 9:00 a.m.
Crtrm: 1

I, Jeffrey Noble, hereby declare under penalty of perjury as follows:

1.      I am an expert in police practices retained by Plaintiff, and submit this declaration in opposition to Defendants' motions to exclude my testimony and for summary judgment.

2.      I was a police officer for 28 years. I retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department. As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses over 70 square miles with a population of over 218,000. I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention. The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

3.      In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police. My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

4.      As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

5.      My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures. My CV is attached as Exhibit A..

6.      I was retained in this case to offer my opinions on standard police practices and training in relation to the in-custody death of Kevin Niedzialek. In forming my opinions, I have reviewed the materials listed at pages 4–8 of my report, including: (1) Plaintiff's Amended Complaint; (2) Defendants' Answer to Plaintiff's First Amended Complaint; (3) Autopsy Report; (4) Incident Reports; (5) Coroner Investigation; (6) Toxicology Report; (7) Autopsy Photographs; (8) Photographs at Hospital; (9) Photographs of Donated Organs; (10) AMR Report; (11) Death Certificate; (12) Deposition of Sonia Gomez; (13) Transcription of Radio Communications; (14) Transcription of BWCs; (15) CAD Log; (16) Gomez Interview; (17) Gomez Training Records; (17) Deposition of Brian Keeney; (18) Keeney Training Records; (19) Deposition of Angelina Aispuro; (20) Deposition of Carey Czuczka; (21) Deposition of Dr. Mark Fajardo; (22) Deposition of Lisa La Russo; (23) Deposition of Eric Mireless; (24) Deposition of Jared Swindle; (25) Deposition of Sean Vickers and exhibits thereto; (26) Audio Recordings of : dispatch radio, radio, initial briefing, PSAP-911, and witness interviews; (27) Videos of: Bowman BWC, Cramer BWC, Reynolds BWC, Gaskins BWC, Witness Video, Gomez BWC, bystander videos, and Defendants' Composite Video; (28) Supplemental Reports; (29) TASER Download; (30) Inland Valley Medical Center records; (31) AMR Paramedic Report; (32) DA Letter Charging Decision for: Deputy Gomez, Deputy Keeney; (33) Transcription of: radio 1, radio 2,

BWC Gomez, BWC Bowman, BWC Cramer, BWC Gaskin, witness interviews, Deputy Gomez interview; (34) Aerial Map of Incident Location; (35) Scene Photos; (36) Dispatch Log; (37) Critical Incident Log; (38) Model Policies of: Berkeley Police Department, DOJ Bulletin—"Positional Asphyxia-Sudden Death" (June 1995), IACP Model Policy – Excited Delirium (April 2017), IACP Concepts and Issue Paper – Excited Delirium (April 2017), IACP Policy Center—"The Prone Restraint – Still a Bad Idea" (Spring 1998), National Institute of Justice—Special Panel Review of Excited Delirium (December 2011); and (39) Riverside County Sheriff's Department Policy Manual.

7.      Based on my review of these materials, I prepared a report, attached as Exhibit B. I attest under penalty of perjury pursuant to the laws of the United States that its contents are true and correct. Citations to the documents referenced below are in my report, in many cases with hyperlinks. I incorporate those citations here.

8.      It is generally accepted in policing that, under certain circumstances, restraint techniques, including physically holding a subject down, can constitute a use of force. Moreover, Officers are responsible for the health, safety and welfare of people in their custody and must protect them from known risks of harm. Officers learn that they can, when appropriate, put a subject into a prone (face down) position on the ground to facilitate handcuffing or to secure the individual. However, it is well known and generally accepted that keeping handcuffed individuals in the prone position after handcuffing can negatively affect the subject's breathing and cause or contribute to positional asphyxia. It is generally accepted in policing that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject.

9.      It is also generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, intoxication, or a combination, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation. Compounding the risk is that people who are in such a state of "excited" or "agitated" "delirium," while frequently

not involved in any significant criminal activity, nevertheless are not responsive to "officer presence" and verbal commands that are effective to gain compliance without the use of force in most other situations. Officers not infrequently have to use devices such as Tasers and wrestle the subject into restraints. The altercation itself further increases the demand for oxygen and increases the risk of positional asphyxiation from a prone restraint.

10.     Importantly, it is also generally accepted that the oxygen deficit that can result in positional asphyxia does not preclude speech. As an article first published in 2015 by Calibre Press—one of the largest publishers of police media, if not the largest publisher of police media, in the United States—explained, the idea that someone can breathe because they are speaking is a "major misconception" and "perhaps one of the most lethal misconceptions in . . . law enforcement."

11.     As an industry, policing has known about the risks of positional asphyxia for over thirty years. In 1988, four doctors published an article describing that keeping individuals "prone, handcuffed, 'and hog-tied'" had negatively affected their ability to recover "peripheral oxygen saturation and heart rate" when compared to individuals "at rest" and "during exercise." The authors, writing in the American Journal of Medical Pathology, contended that "the physiological effects produced by positional restraint should be recognized in deaths where such measures are used." This was followed, several years later, by an article in the same journal reporting a case study of three in-custody deaths "attributed to positional asphyxia." Early research focused particularly on the risks of keeping a "hog-tied" individual—that is, someone who is handcuffed behind their back with their legs bound at the ankles and connected to their wrists such that their legs are bent with their feet brought to a position near their buttocks—but it was quickly recognized that handcuffed individuals were at heightened risk of positional asphyxia even when they were not hog-tied.

12.     This issue was brought into the forefront of police policymaking in the early 1990s, after a 16-year-old died after being restrained by San Diego Police

Department officers. A police task force surveyed the medical literature and hundreds of police agencies around the country before issuing a series of recommendations, including "[o]nce an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia."

13.     The International Association of Chiefs of Police—the world's oldest and largest professional policing organization—endorsed this directive in 1993, writing, "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible." In 1995, the United States Department of Justice provided a bulletin that stated, "[A]s soon as the suspect is handcuffed, get him off his stomach." Any failure to do so, the bulletin made clear, could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject respon[ds] to the oxygen deficiency by struggling, and the officers respond to the subject's struggling by putting more weight on their back, which further compromises the subject's breathing. In 1998, the International Association of Chiefs of Police wrote, "during the past decade police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position." In 2001, the Department of Justice advised police agencies to "develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia." In the 2015 consent decree with the City of Ferguson, the Department of Justice required the adoption of procedures and training that "[m]inimiz[e] the risk of positional asphyxia" and instruct officers to "use restraint techniques that do not compromise a subject's breathing." A 2017 textbook on policing, *Police in America*, states that "positional asphyxia occurs when a person's body position prevents normal and adequate

breathing," and that this "[u]sually" occurs "when the subject is face down with hands secured behind the back." In short, concerns about positional asphyxia and the corresponding directive to avoid keeping handcuffed individuals in the prone position had become generally accepted in policing by at least the turn of the century. Today, many police agencies around the United States have policies explicitly restricting the use of prone restraint; those policies overwhelmingly direct officers to avoid keeping handcuffed individuals in the prone position for any extended period of time.

- Berkeley Police Department, Handcuffing and Restraints, Policy 302 ("If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia.);

- Albuquerque Police Department, Use of Force, SOP 2-52 at 5, ("In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so.");

- Charlotte-Mecklenburg Police Department, Directive 500-003, ("Avoid placing a subject in a position that is likely to contribute to positional asphyxia . . . control restraints while lying on back/stomach should be avoided.");

- Denver Police Department, Operations Manual, Force Related Policies, 105.01(5)(e), ("[O]fficers will immediately cease applying body weight to an individual's back, head, neck, or abdomen once the individual is restrained and other control tactics may reasonably be utilized other than body weight. As soon as possible after an individual has been handcuffed, the individual should be turned onto his/her side or allowed to sit up, so long as the individual's actions no longer place officers at risk of imminent injury. Officers will make all reasonable efforts to ensure that the individual is not left in a prone position for longer than absolutely necessary to gain control over the resisting individual.");

- Detroit Police Department, Use of Force, 304.2-7, Duty to Report/Render Aid, ("Restrained subjects should be placed in an upright or seated position to avoid Positional Asphyxia which can lead to death, when a subject's body position interferes with breathing.");

- Indianapolis Police Department, General Order 8.1, Prisoner Handling, Transportation and Escape, ("A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death. 1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. 2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible.");

- New Orleans Police Department, Operations Manual, Chapter 1.3.1.1, Handcuffing and Restraint Devices, ("If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied. If the subject continues to struggle, *do not* sit, lie or kneel on the subject's back." (emphasis in original));

- New York Police Department, Patrol Guide, Use of Force, 221-02, ("Avoid actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe. . . . Position the subject to promote fee breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side.");

- Metropolitan Police Department (Washington, D.C.), General Order 901.07, Use of Force, ("In order to avoid asphyxiation, members shall …[p]osition the individual in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods.…Members are prohibited from: Placing a person in a prone position (i.e., lying face down) for a prolonged period of time … except during exigent circumstances. Prisoners shall be

DECLARATION OF JEFFREY NOBLE IN OPPOSITION TO DEFENDANTS' MSJ & *DAUBERT* MOTION

carefully monitored while in a prone position as a prone position may be a contributing

factor to cause a prisoner to suffocate, also referred to as positional asphyxiation.").

Many other agencies do not have specific policies, but officers are still expected to

mitigate the risks of positional asphyxia by not keeping subjects in the prone position

after handcuffing.

14.    The IACP developed a Model Policy in 2017 that was accompanied by a

Concepts and Issues Paper on Excited Delirium. That policy directed that, "When

restrained, officers should position the subject in a manner that will assist breathing,

such as placement on his or her side, and avoid pressure to the chest, neck or head.

Officers should not attempt to control continued resistance or exertion by pinning the

subject to the ground or against a solid object, using their body weight. Officers should

check the subject's pulse and respiration on a continuous basis until transferred to EMS

personnel. Officers shall ensure the airway is unrestricted and be prepared to

administer CPR or an automated external defibrillator (AED) if the subject becomes

unconscious. Following a struggle, the subject should be showing normal signs of

physical exertion such as heavy breathing. However, if the subject becomes calm and

breathing is not labored during or after the application of restraints, it might be an

indication that he or she is in jeopardy and requires immediate medical attention to

avoid cardiac arrest."

15.    As mentioned above, it is also well known and generally accepted in

policing that there are certain factors that exacerbate the risk of positional asphyxia.

The 1995 DOJ bulletin, for example, identified certain factors that "appear to be

associated most often with" in-custody deaths, including "cocaine-induced excited

delirium," "[d]rug and acute alcohol intoxication," "[v]iolent struggle," and

"unresponsiveness of subject during or immediately after a struggle." A 2017 policing

textbook described positional asphyxia risk factors that include drug induced

"psychosis," "preexisting physical conditions," and "pressure on the abdomen" that

can result from officers "holding a person down in the prone position." In 2019, Police

1    Magazine, a police-oriented publication, published an article titled *How to Prevent*

2    *Positional Asphyxia*, which identified positional asphyxia as "a potential danger of some

3    common physical restraint techniques," and explained that "positional asphyxia is not

4    just about the position of the subject's body. There are precipitating factors that make

5    positional asphyxia deadly. These factors include intoxication due to alcohol, drug use,

6    obesity, psychiatric illnesses, and physical injury," as well as "predisposing medical

7    conditions" and "violent struggle." The article instructs officers that they should "avoid

8    the use of prone restraint techniques" when feasible and "[o]nce the suspect is

9    handcuffed, get them off the face-down position."

10        16.    Finally, California Peace Officers Standards and Training (POST), the

11    state organization that sets minimum standards for police training in the State of

12    California, identifies that positional asphyxia, or body positioning that restricts

13    breathing, could lead to inadequate breathing and potential respiratory arrest. Attached

14    as Exhibit C is the section from POST Learning Domain 34 (First Aid & CPR) entitled

15    "Respiratory Emergencies" that trains California police officers on "positional

16    asphyxia" and to put unconscious people like Mr. Niedzialek in a "recovery position."

17        17.    There are four specific factors that, officers learn, can indicate that a

18    subject is particularly susceptible to the risks of positional asphyxia.

19        a.  First, officers learn that positional asphyxia results when a subject cannot

20        take in sufficient oxygen over time to sustain themselves. For that reason,

21        indications that a subject is becoming oxygen deprived indicate a

22        particular susceptibility to positional asphyxia. It is generally accepted in

23        policing that officers must take seriously and should never ignore a

24        subject's statements that they cannot breathe.

25        b.  Second, officers are taught that pre-existing health conditions can

26        exacerbate the risk of positional asphyxia. Here, Mr. Niedzialek had an

27        obvious head wound and therefore could have a concussion.

28

c.  Third, officers are taught that intoxication and substance abuse can exacerbate the risk of positional asphyxia. Deputy Gomez acknowledged that she believed Mr. Niedzialek may be under the influence of a drug.

d.  Fourth, officers are taught that excited delirium can exacerbate the risk of positional asphyxia. Indeed, Riverside Sheriff Department training materials state, "Excited Delirium: Warning! The typical excited delirium death involves subject slipping into a state of sudden tranquility, either during or after the struggle and restraint, followed by cardiac arrest." Deputy Gomez's BWC demonstrates Mr. Niedzialek flailing after he was handcuffed progressed  to the absence of movement within a minute.

18.  Standard police practices and training direct officers to avoid keeping handcuffed individuals in the prone position after handcuffing.

19.  Standard police practices and training direct officers to move a prone, handcuffed, subject onto their side or to sit them up, otherwise known as a "recovery position," as soon as possible in order to allow the subject to breathe freely and minimize the risks of positional asphyxia. There is a generally accepted practice in policing to move an arrestee into a recovery position rather than to hold the arrestee in a prone position to minimize the risks of sudden death due to positional asphyxia.

20.  Standard police practices and training teach officers that applying weight or pressure to a prone subject magnifies the risk of positional asphyxia and directs officers to remove weight from the subject as soon as possible to allow the subject to breathe freely.

21.  Twenty-two seconds after he was handcuffed, Mr. Niedzialek appeared to try to roll onto his left shoulder, but the deputies pushed him back into a prone position. Mr. Niedzialek stopped moving his legs 46 seconds after he was handcuffed. Thereafter, he made no noticeable movement, aside from possible, extremely shallow breaths. Both Deputy Keeney and Deputy Gomez testified that they did not allow Mr. Niedzialek to roll onto his side, claiming he may have been trying to assault the

1  deputies or to escape, neither of which was a reasonable possibility with the handcuffs
2  attached and both deputies in good positions to control.

3      22.    Deputy Keeney and Deputy Gomez acted contrary to standard police
4  practices and training when they would not allow Niedzialek to roll onto his side,
5  despite Niedzialek being in handcuffs and both deputies in good positions to control
6  Niedzialek.

7      23.    Three minutes and 11 seconds after cuffing, Deputy Gomez asked
8  Mr.  Niedzialek his name and Mr. Niedzialek did not respond. He had stopped trying
9  to speak over 2 minutes earlier, and Deputy Keeney even wondered aloud whether he
10  had "fallen asleep."

11      24.    It appears on video that Deputy Keeney had his right knee on
12  Mr.Niedzialek's upper back for 2 minutes and 22 seconds after Mr. Niedzialek was
13  handcuffed. After Deputy Keeney finally lifted his knee off Mr. Niedzialek's back, the
14  deputies continued to hold him in a prone position. In all, the deputies held
15  Mr. Niedzialek in a prone position for 4 minutes and 50 seconds before Deputy
16  Keeney said to turn him over and they rolled him onto his back. While Deputy Gomez
17  believed she felt a weak pulse, after first saying there was no pulse, the paramedic
18  immediately recognized on her arrival that Mr. Niedzialek was not breathing and CPR
19  was initiated. That took place 6 minutes and 48 seconds after Mr. Niedzialek stopped
20  moving.

21      25.    Deputy Keeney and Deputy Gomez acted contrary to standard police
22  practices and training when they held Mr. Niedzialek down in a prone position with
23  pressure applied to his back for over 4 minutes and 50 seconds after he was
24  handcuffed.

25      26.    A reasonable police officer would have recognized that Mr. Niedzialek
26  appeared to be suffering from excited or agitated delirium, but was not otherwise
27  involved in any criminal activity. The deputies knew that Mr. Niedzialek had been
28  acting bizarrely, he had a head wound and was very bloody, he had been knocking on

apartment doors asking for help, a reporting party told the dispatcher that

Mr. Niedzialek maybe having a psychiatric meltdown, he was rapidly repeating "please"

to the deputies when they approached him, he suddenly went to his feet and moved

toward Deputy Keeney, prompting Deputy Gomez to use her Taser, which in turn

caused Mr. Niedzialek to fall to the ground. He was able to get to his feet and was

Tased and fell a second time before the deputies wrestled him into handcuffs. A

reasonable police officer acting pursuant to standard police practices and training

would have known to immediately place Mr. Niedzialek into a recovery position once

the handcuffs were applied by rolling him onto his side or sitting him up to facilitate his

breathing.

27.    Deputy Keeney and Deputy Gomez testified they had never been trained

that certain positions were dangerous, that they needed to turn someone in handcuffs

who was agitated on his or her side, or that they needed to move a handcuffed person

from a prone position off their chest. They could recall no training on a "recovery

position," aside from a reference to the discontinued carotid hold.

28.    Moreover, Mr. Niedzialek was not suspected of committing a violent

crime, but was believed to be suffering a mental health crisis, or was under the

influence of a drug, or both. He did not possess a weapon and he had been handcuffed

with his hands behind his back. Mr. Niedzialek could not escape or harm the officers in

handcuffs. Especially after he stopped moving, no reasonable police officer would have

considered him a threat that required the ongoing us of force by holding him in a prone

position. Instead, any reasonable officer would have recognized that Mr. Niedzialek

needed to be taken into custody for medical help to address his possible mental-health

concern, his possible drug use, and his obvious head injury. Simply put, reasonable

officers would have known they were there to help Mr. Niedzialek, not to arrest him,

and that he needed to be placed in a recovery position immediately after handcuffing.

29.    Finally, a reasonable officer acting pursuant to standard police practices

and training would have initiated CPR once Mr. Niedzialek became unresponsive.

30.     As discussed above, there is a generally accepted practice in policing to move an arrestee into a recovery position rather than to hold the arrestee in a prone position to minimize the risks of sudden death due to positional asphyxia.

31.     Both Deputy Gomez and Deputy Keeney testified that they had not received any such training, nor did they have a department policy that directed them to move an arrestee into a recovery position particularly when they have struggled with a person who was obviously impaired due to drugs or alcohol, or who may be suffering a mental-health crisis.

32.     The Riverside Sheriff's Department person most knowledgeable, Sergeant Sean Vickers, testified that not only did his Department not have a policy or training on positional asphyxia, or a requirement to move an arrestee from the prone position into a recovery position as soon as possible. Ignoring national standards, Sgt Vickers said the Department does not have policies or training in positional asphyxia because he does not "believe that someone being on their stomach inhibits their ability to breathe," and "We don't tell them that having someone in a prone position restrains their breathing because it doesn't."

33.     The Riverside County Sheriff's Department's alleged conclusion that prone restraint does not interfere with a subject's ability to breathe is contrary to contemporary training and practice by the large majority of police agencies in this county, contrary to the Department of Justice, contrary to Federal Consent Decrees, and contrary to IACP.

34.     The Riverside Sheriff's Department failed to implement training or policy directing its deputies to do a very minimal, non-invasive task—moving prone, handcuffed, arrestees into a recovery position as soon as it is safe to do—that may indeed save a life. The department's failure to train its deputies to do so is so contrary to generally accepted police practices and creates a foreseeable risk of death or serious injury to persons in their custody that could otherwise be avoided.

-13-

5:19-cv-02083-JGB (SHKx)

1    I declare under penalty of perjury that the foregoing is true and correct, and that

2    this was executed this 29 day of May 2021 at Rancho Santa Margarita, California.

3

4    _____

5                    Jeffrey Noble

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JEFFREY NOBLE IN OPPOSITION TO DEFENDANTS' MSJ & *DAUBERT* MOTION