# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-02083-JGB (SHKx) |
| | ) | |
| RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3-10, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of plaintiff's counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at the Westminster Police Department for nine months.

 a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of Police with the Irvine Police Department, located in southern California.  As a Deputy Chief, I was directly responsible for all police operations including Patrol, Traffic, Criminal Investigations, Emergency Management, Crime Prevention, DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square miles with a population of over 218,000.  I served in a wide range of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs, Emergency Management and Crime Prevention.  The Irvine Police Department had over 200 police officers and over 100 civilian employees during my employment with the department.

 b.      In April 2014, I was hired by the Westminster, California Police Department as an interim Deputy Chief of Police.  My employment with the Westminster Police Department was by means of a temporary contract, and I was asked to review the department's Internal Affairs unit; department policies relating to Internal

1

Affairs investigations, discipline and police officer conduct; conduct department audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.      As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.      I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California. I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.      As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption. For example:

a.      In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.      I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations. For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department. In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.      I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

2

d.      I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio, Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.      I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.      I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.      I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.      In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.      I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures.  Those articles are listed in my attached resume.

j.      I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.      I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.    As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.    In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.    My experience, training and background are more fully described in my attached resume.

7.    My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.    I reviewed the following material in making my opinions:

- Amended Complaint
- Answer of Defendants County of Riverside, Riverside Sheriff's Department, Sheriff-Corner Chad Bianco, Deputy Sonia Gomez, and Deputy Brian Keeney to Plaintiffs' First Amended Complaint: Demand for Jury Trial
- Notice of Rejection of Amended Complaint
- Autopsy Report (COR000560-577)
- Incident Report- - Autopsy Witness (COR 000553-555)
- Incident Report (COR 000556-577)
- Incident Report (COR 000578-580)
- Coroner Investigation (COR 000581-583)
- Coroner Investigation (COR 000584-585)
- Coroner Investigation (COR 000586)
- Coroner Investigation (COR 000587)
- Autopsy Report (COR 000588-593)
- Toxicology Report (COR 00594-596)
- Autopsy Photographs (COR 000597-598)
- Autopsy Photographs (COR 000599-600)
- Autopsy Photographs (COR 000639-652)
- Photographs at Hospital (COR 000653-706)
- Photographs Donated Organ (COR 000707-709)
- Photographs in Hospital (COR 000738-740)
- AMR Report (COR 002134-2155)
- Death Certificate
- Deposition of Sonia Gomez

4

- o Transcription of Radio (COR 000011-30)
- o Transcription of BWC (COR 000055-67)
- o Transcription of BWC (COR 000069-71)
- o CAD Log (COR 000304-306)
- o Gomez Interview (COR000308-323)
- o Gomez Training Records (COR 002189-2196)
- Deposition of Brian Keeney
  - o Keeney Training Records (COR 002197-2205)
- Deposition of Angelina Aispuro
- Deposition of Carey Czuczka
- Deposition of Dr. Mark Fajardo
- Deposition of Lisa LaRusso
- Deposition of Eric Mireless
- Deposition of Jared Swindle
- Deposition of Sean Vickers
  - o Exhibit 1 – Vickers CV
  - o Exhibit 2 – DOJ Bulletin Positional Asphyxia
  - o Exhibit 3 – IACP Exited Delirium Model Policy
  - o Exhibit 4 – Taser
  - o Exhibit 5 – Field Manual Mentally Ill
  - o Exhibit 6 – Policy 439 Interacting with Mentally Disturbed
  - o Exhibit 7 – Directive 12-037 Detentions
  - o Exhibit 8 – First Page CIT Power Point
  - o Exhibit 9 – First Page 5150 Power Point
  - o Exhibit 10 – First Page CIT Power Point
  - o Exhibit 11 – First Page De-Escalation Power Point
  - o Exhibit 12 – Excited Delirium Power Point Slides
  - o Exhibit 13 – Policy 214 Administrative Communications
  - o Exhibit 14 – Policy 300 Use of Force
  - o Exhibit 15 – Policy 306.6 Application of Leg Restraint
  - o Exhibit 16 – Policy 414 Medical Aid
- Audio Recordings
  - o COR 000010 Dispatch Radio 1
  - o COR 000031 RADIO 2
  - o COR 000053 Initial Briefing
  - o COR 000001 PSAP-911
  - o COR 000391 Int. with T. Alves
  - o COR 000401 Int with RP1 Jared Swindle
  - o COR 000411 Int with RP2 Eric Mireles 080119
  - o COR 000425 Initial Call to Angie for Interview
  - o COR 000429 Int Angelina Aispura
  - o COR 000464 Int. with Cary Czuck
  - o COR 0000497 Int. with B. Graf

5

- o COR 000518 Int with ex roommate Aaron Earnest
- o COR 000542 Int with Chart Nurse
- o COR 000545 Int with ICU Doctor
- o COR 000307 Int with Deputy Gomez
- o COR 000364 Int of Robert and Tracy Alves
- o COR 000390 Message from T. Alves
- Videos
  - o COR 000074 Dep Bowman BWC Int with RP Wife
  - o COR 000075 Dep Bowman BWC Int with J. Swindle
  - o COR 000076 Dep Bowman BWC Woman Looking for Dog
  - o COR 000087 Dep Cramer BWC
  - o COR 000091 Dep Reynolds BWC with Paramedics
  - o COR 000092 Dep Reynolds BWC in Hospital
  - o COR 000093 Sgt Gaskins BWC on Scene - Copy
  - o COR 000098 Witness Video IMG_7767
  - o COR 000054 Dep Gomez BWC First Resp to Incident
  - o COR 000068 Dep Gomez BWC with Eric Mireles
  - o COR 000072 Dep Bowman BWC in Damaged Apt
  - o COR 000073 Dep Bowman BWC with RP Wife
  - o Bystander 1
  - o Bystander 2
  - o Defendants Composite Video
- 095 RCSD Consent to Search Equipment
- 096 Supp Rpt by Deputy Reynolds Supp Rpt Niedzialek at Hospital
- 097 Supp Rpt by Inv. Trudeau Notification and Response
- 098 Supp Rpt by Gasparini Cell phone downloads
- 099 Supp Rpt Franchville Collection of Fingernail Scraping
- 100 Supp Rpt by Deputy Cramer Initial response Int Wit M. Lubedi
- 101 Supp Rpt by Cpl. Miller Initial response scene control
- 102 Supp Rpt by Navarrete Notification and Response
- 103 Supp Rpt by Inv. Trudeau BWC footage
- 104 Supp Rpt by Inv. Trudeau Medical Records and Search Warrants
- 105 Supp Rpt by Inv Dickey Review of Gomez BWC
- 106 Supp Rpt by Inv. Dickey Request for parole records
- 107 Supp Rpt by Inv. Dickey Prior past LE Contacts & Reports
- 108 TASER Download
- 109 Inland Valley MC from 072919 to 073019
- 110 Inland Valley MC from 073119 to 080219
- 111 Inland Valley MC Routine Echo Rpt
- 112 AMR Paramedic Report
- 113 Tort Claim
- 114 COR Tort Claim Rejection Letter
- 115 Amended Tort Claim

- 116 COR Rejection Amended Tort Claim
- 121 DA Letter Charging Decision Dep Gomez
- 122 DA Letter Charging Decision Dep Keeney
- 002 PSAP 911 Transcript
- 004 TRANSCRIPT OF RADIO 1
- 006 TRANSCRIPT OF RADIO 2
- 012 Deputy Gomez BWC Response to Incident
- 014 TRANSCRIPT OF BWC Gomez with RP ERIC MIRELES
- 020 TRANSCRIPT ALL BWC BOWMAN
- 022 Transcript of Deputy Cramer's BWC
- 028 TRANSCRIPT BWC GASKINS
- 030 Aerial Map
- 031 Scene Photos
- 032 Supp Rpt Navarrete RSO dispatch recordings and log
- 033 Dispatch Log
- 034 CAD Log
- 036 TRANSCRIPT DEP GOMEZ-INTERVIEW
- 037 Supp Rpt Navarrete Int Deputy Gomez
- 039 TRANSCRIPT ROBERT AND TRACY ALVES
- 040 Supp Rpt Gasparini Int Robert and Tracy Alves
- 044 TRANSCRIPT TRUDEAU-ALVES
- 046 TRANSCRIPT SWINDLE-INTERVIEW
- 047 Supp Rpt Gasparini Int RP Jared Swindle
- 049 TRANSCRIPT ERIC MIRELES-INTERVIEW
- 050 Supp Rpt Gasparini Int Eric Mireles
- 052 TRANSCRIPT INITIAL CALL ANGIE AISPURO
- 054 TRANSCRIPT AISPURO-INTERVIEW
- 055 Supp Rpt Gasparini Int Angelina Aispuro
- 057 TRANSCRIPT CAREY CZUCKA INT TRANSCRIPT
- 058 Supp Rpt Gasparini Int Carey Czuczka
- 059 Supp Rpt Cornett Int Carey Czuzka and Brenden Graff
- 061 TRANSCRIPT INTERVIEW OF BRENDEN GRAFF
- 062 Supp Rpt Gasparini Int Brenden Graff
- 064 TRANSCRIPT AARON ERNEST-INTERVIEW
- 065 Narrative Rpt Gasparini Int Aaron Ernest
- 067 TRANSCRIPT CHART NURSE INLAND VALLEY INTERVIEW
- 69 Transcript of ICU Dr. Ngad
- 070 Observer Rpt re Autopsy  by Inv. Deanne
- 071 Complete Rpt Coroner Protocol by Det Trudeau
- 072 Coroner Finding Rpt
- 073 Coroner Inv. Rpt by Deputy Coroner D. Winsatt
- 074 Coroner Inv. Narrative Rpt by Deputy Coroner D. Wimsatt

7

- 075 Coroner Inv. Rpt by Deputy Coroner W. Shurick
- 076 Coroner Inv. Rpt by Deputy Coroner K. Ramirez
- 077 Autopsy Report
- 078 Toxicology Reports
- 079 Autopsy Photos - Chain of Custody
- 080 Autopsy Photos - Exterior
- 081 Autopsy Photos - Interior
- 082 Photos - Decedent in Hospital
- 083 Photos - Organs Donated
- 085 Dep. Gomez Initial report 072919
- 086 Supp Rpt by Dep. Keeney's Supp Rpt
- 087 Supp Rpt by Dep. Bowmen Supp Rpt
- 088 Critical Incident Log
- 089 Supp Rpt by Detective Franchville Scene
- 090 RCSD Permission to Search Apt 27A
- 091 RCSD Forensic Services Request
- 092 BW Photos of Niedzialek in Hospital and Ventilator
- 093 Supp Rpt by Sgt, Gaskins Initial Response Supervisor
- 094 Supp Rpt Gasparini Cell phone downloads
- Plaintiff's Objections and Responses to Defendant County of Riverside's Interrogatories (Set One)
- Plaintiff's Tracy Alves' Objections and Responses to Defendant County of Riverside's Request of Production of Documents (Set One)
- Plaintiff's Supplemental Response to Defendants' Requests for Production of Documents
- Model Policies
  - Berkeley Police Department Policy 302
  - DOJ Bulletin, "Positional Asphyxia-Sudden Death (June 1995)
  - IACP Model Policy – Excited Delirium (April 2017)
  - IACP Concepts and Issues Paper – Excited Delirium (April 2017)
  - IACP Policy Center, "The Prone Restraint – Still a Bad Idea." (Spring 1998)
  - National Institute of Justice, Special Panel Review of Excited Delirium (December 2011)
- Riverside County Sheriff's Department Policy Manual

9.    At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.    My professional charges for this litigation work is an hourly fee of $295 plus expenses including all travel time. My fees for deposition and trial testimony are $2,950 per calendar day or any portion thereof, plus travel time and expenses.

11.   The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 30 years of professional law enforcement experience and scholarship.

**Summary of Incident**

12.   Mr. Niedzialek was temporarily residing at 42200 Moraga Road, Apartment 27A, in the City of Temecula, California.  In the past, Mr. Niedzialek had struggled with substance abuse but he had been sober the last two years of his life.  Mr. Niedzialek apparently relapsed a few days before his death by using methamphetamine.  In the early afternoon of July 29, 2019, Mr. Niedzialek sustained a large laceration on his head, apparently while he was inside his apartment.  It is unclear how Mr. Niedzialek became injured, but he may have had an accident or was the victim of an assault and battery.  The wound, though bloody and severe enough to require immediate medical attention, was not life-threatening and did not cause his death.

13.   At about 2:10 PM, the Riverside Sheriff's Department dispatch received 911 calls from neighbors who reported noises, yelling and other actions by an unarmed man with a bloody head wound. Deputies Keeney and Gomez were dispatched to respond.  The dispatcher sent a computer message to the responding deputies that the person appeared psychologically disturbed.  The man was reportedly wearing pajama pants with no shirt and was bleeding from the head.

14.   Shortly after 2:30 PM, Deputies Keeney and Gomez arrived separately at the apartment complex.  They parked in different areas and approached the scene from different directions.  Deputy Keeney was not wearing a body camera, but Deputy Gomez activated her body-worn camera (BWC), which captured video.  Deputy Gomez's BWC video, along with cell phone video from a bystander, provide a record of events.

15.   Deputy Keeney found Mr. Niedzialek in the apartment complex covered in blood from his head wound, sitting on a porch with his back against a wall.  Mr. Niedzialek was not wearing a shirt and was obviously not armed with any weapons.  Mr. Niedzialek was highly agitated and incoherent and both deputies could see that Mr. Niedzialek was irrational and needed immediate medical attention.  There was no apparent crime, but Mr. Niedzialek needed to be medically evaluated and possibly involuntarily committed to a mental health facility.

16.   Mr. Niedzialek suddenly jumped to his feet and ran toward Deputy Keeney, stopping abruptly with his hands at his side a few steps from the deputy.  He yelled, "Wait, wait, wait, wait" and then moved toward Deputy Keeney.  As Deputy Keeney backed up, Deputy Gomez fired her Taser at Mr. Niedzialek.  Both of the Taser darts struck Mr. Niedzialek on his right side and the Taser worked as intended.  Mr. Niedzialek stiffened

immediately and fell forward onto the ground.

17.     Deputy Keeney advanced to handcuff Mr. Niedzialek who was squirming in the dirt.  The five-second taser application ended before Deputy Keeney applied handcuffs. Mr. Niedzialek began to kick his feet, so Deputy Keeney backed away.  Mr. Niedzialek rose to his feet and moved toward Deputy Keeney, so Deputy Gomez activated her Taser a second time and Mr. Niedzialek again stiffened and fell forward landing on the ground. The deputies handcuffed Mr. Niedzialek's wrists behind his back without any apparent difficulty.

18.     Instead of moving Mr. Niedzialek from a prone position on the ground to a recovery position, the deputies held Mr. Niedzialek face down on the ground.  At least once Mr. Niedzialek try to roll himself onto his left side, but Deputy Keeney rolled him back onto his chest and held him down.  Deputy Keeney did not take his knee off Mr. Niedzialek's back for 2 ½ minutes, and the deputies continued to hold Mr. Niedzialek in a prone position.  Deputy Gomez made the first attempt to check Mr. Niedzialek's condition three minutes after he was handcuffed, asking, "Hey buddy, can you tell us your name?" Although Mr. Niedzialek was unresponsive, the deputies continued to hold him down on his chest for another minute and 45 seconds before they finally rolled him over.

19.     The paramedics arrived about 2:45 PM.  They found Mr. Niedzialek handcuffed, not breathing, pulseless and in cardiac arrest. The paramedics began CPR.  The paramedics were able to resuscitate Mr. Niedzialek and transported him to the hospital, but he was declared brain dead the next day.  He was kept alive until his organs could be harvested and donated.

**The Initial Use of Force of Two Taser Applications and Handcuffing of Mr. Niedzialek by Deputies Gomez and Keeney was Consistent with Generally Accepted Police Practices and Objectively Reasonable**

20.     Deputies Gomez and Keeney were dispatched to 42200 Moraga Road, Apartment 27A, in the City of Temecula.  The dispatcher radioed the deputies that, "RP heard subject screaming in the apartment below location. RP had visual of a male pounding on the door, attempting to get inside."  The deputies had access to updated information in the in-car computer system as they were driving to the apartment complex.  The call information included information that the reporting party believed the subject was having a psychiatric meltdown, no weapons had been seen, the subject was bleeding from the head and the subject was described as a male, white, adult, 6' 2" tall, 30-40 years old, wearing pajama bottoms and no shirt.[1]

---

[1] COR 000304.

21.    Upon her arrival, Deputy Gomez spoke briefly with Mr. Swindle, one of the individuals who had called 911, and who was on his balcony directly above apartment 27A.[2] Deputy Gomez radioed the dispatcher that the door to the apartment was open and there was blood on the ground, the dispatcher radioed, "We just got a call from the resident at Apartment 22D, [Mr. Mireless] 2-2-D, David, advising the subject is currently on his porch still bleeding from the head and advising he's been a 242'd [battered] by the police."[3]  (There is no evidence that Mr. Niedzialek was contacted by any police officer prior to the deputies' arrival. This appears to be a delusion).

22.    Deputy Keeney approached the apartment building and encountered Mr. Niedzialek who was seated on the porch in front of Apartment 22D, a short distance from Deputy Gomez who was at Apartment 27A.  As Deputy Gomez moved toward Mr. Niedzialek's location, he can be heard yelling, Okay, okay."[4]  Deputy Gomez's body worn camera shows Mr. Niedzialek seated on the porch, leaning against the exterior wall of the apartment.  Mr. Niedzialek has an obvious head wound and there is a significant amount of blood on his face and chest.[5]

23.    Mr. Niedzialek is rapidly repeating "Please" to the deputies.  Deputy Keeney said, "It's alright" and "Calm down" to Mr. Niedzialek, while Deputy Gomez radioed the dispatched to stage medical.[6]  Almost simultaneously, Mr. Niedzialek gets to his feet and moves quickly at Deputy Keeney.  As he does so, Deputy Gomez, who had already drawn her Taser, points the Taser in Mr. Niedzialek's direction.[7]  Mr. Niedzialek came to a stop within a couple of feet of Deputy Keeney, but then continued to move in Deputy Keeney's direction.  Deputy Keeney retreated a couple of steps and as Mr. Niedzialek continued to move toward Deputy Keeney, Deputy Gomez discharged her Taser at Mr. Niedzialek.[8]

24.    The Taser appeared to be effective as Mr. Niedzialek's body tensed up and he fell to the ground, landing on his stomach.[9]  Deputy Keeney moved forward to control Mr. Niedzialek, but the 5 second application of the Taser expired before Deputy Keeney gained control.  Mr. Niedzialek began kicking his feet causing Deputy Keeney to back away.[10]

---

[2] Defendants Composite Video at 3:10.
[3] Transcription of Radio Communications.
[4] Defendants Composite Video at 5:39.
[5] Defendants Composite Video at 5:48.
[6] Defendants Composite Video at 5:53.
[7] Defendants Composite Video at 5:55.
[8] Defendants Composite Video at 5:57.
[9] Defendants Composite Video at 5:58.
[10] Defendants Composite Video at 6:03.

25.    Deputy Keeney told Mr. Niedzialek, "Relax buddy," and Mr. Niedzialek replied, "Okay, okay, I'm here."[11]  Mr. Niedzialek moved into a sitting position and began repeating, "Wait."  As Deputy Keeney was putting on gloves, Deputy Gomez told Mr. Niedzialek, "Calm down.  Calm down or you'll get it again.  Calm down, calm down."[12]  At this point a witness begins to video the incident with a cell phone and that video provides a view of Mr. Niedzialek seated on the ground.[13]

26.    Deputy Gomez told Mr. Niedzialek, "Turn around.  Put your hands behind your back, put your hands behind your back" as Mr. Niedzialek was turning his body from facing Deputy Gomez to facing Deputy Keeney.[14]  Mr. Niedzialek laid on his back. Deputy Gomez told him to lay on his stomach.[15]  Mr. Niedzialek got to his feet and began to move toward Deputy Keeney. Deputy Gomez activated her Taser by pulling the trigger to provide power to the darts that were still connected to Mr. Niedzialek's body from the first Taser application.[16]  The Taser appeared to be effective as Mr. Niedzialek's body tenses and he fell to the ground.[17]  Deputy Keeney placed his knee on Mr. Niedzialek's back to hold him down and the deputies handcuffed Mr. Niedzialek.[18]  Mr. Niedzialek kicked his legs while the deputies were handcuffing him, but both of the deputies are at Mr. Niedzialek's upper body and neither deputy is struck by Mr. Niedzialek.  On video, the deputies do not seem to have any significant difficulty applying the handcuffs.

27.    Deputy Gomez said Mr. Niedzialek was acting irrationally and she believed his behavior could be due to mental illness, drugs, or a combination.[19]

*Police Officer Training*

28.    Police officers are trained that the U.S. Supreme Court in its landmark decision *Graham v. Connor* held that to determine whether the force used to affect a particular seizure is reasonable, one must balance the nature and quality of the intrusion on the individual's rights against the countervailing government interests at stake.  This balancing test is achieved by the application of what the Court labeled the objective reasonableness test. The factors to be considered include: 1.) The severity of the crime, 2.) Whether the suspect poses an immediate threat to the safety of the officers or others, and 3.) Whether the suspect is actively resisting or attempting to evade arrest by flight.

---

[11] Defendants Composite Video at 6:07.
[12] Defendants Composite Video at 6:23.
[13] These videos are combined in the Defendants Composite Video.
[14] Defendants Composite Video at 6:30.
[15] Defendants Composite Video at 6:34.
[16] Defendants Composite Video at 6:39.
[17] Defendants Composite Video at 6:40.
[18] Defendants Composite Video at 7:18.
[19] Gomez deposition at 47-48.

29.   Whether one's actions were objectively reasonable cannot be considered in a vacuum, but must be considered in relation to the totality of the circumstances. The standard for evaluating the unreasonable use of force reflects deference to the fact that peace officers are often forced to make split-second judgments in tense circumstances concerning the amount of force required. The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

30.   Police officers are trained and prepared to assess dangerous situations and respond accordingly. Police officers are trained that for their force to be reasonable the level and manner of force must be proportional to the level of resistance and threat with which they are confronted. Proportionality is best understood as a range of permissible conduct based on the totality of the circumstances, rather than a set of specific, sequential, predefined force tactics arbitrarily paired to specified types or levels of resistance or threat.

31.   Whether or not the suspect poses an immediate threat to the safety of the officer or others is the most important of the *Graham* factors. There must be objective factors to justify an immediate threat, as a simple statement by an officer that he fears for his safety or the safety of others is insufficient. There is no requirement that a police officer wait until a suspect harms another to confirm that a serious threat of harm exists, but merely a subjective fear or a hunch will not justify the use of force by police.

*Opinions Related to Use of Taser and Handcuffing*

32.   Here, a reasonable police officer would believe that although no crime was apparent Mr. Niedzialek nevertheless presented an immediate threat based on the totality of the circumstances. The deputies had responded to a suspicious circumstance call and were confronted by Mr. Niedzialek who had an obvious head wound, was very bloody, it had been reported that he had been banging on apartment doors, he was rapidly repeating "please" when approached by the deputies and he suddenly rushed toward Deputy Keeney in what a reasonable police officer could perceive to be a threatening manner. Thus, Deputy Gomez's initial use of her Taser was consistent with generally accepted police practices and was objectively reasonable.

33.   After he was Tased the first time, Mr. Niedzialek did not comply with the deputies' direction and instead rose to his feet and quickly moved toward Deputy Keeney. Deputy Gomez activated her Taser and Mr. Niedzialek fell to the ground. Based on the totality of the circumstances, Deputy Gomez's second use of her Taser was consistent with generally accepted police practices and was objectively reasonable.

34.   The deputies then placed their knees on Mr. Niedzialek's back and pulled at his arms to hold him down and apply handcuffs while Mr. Niedzialek was kicking his feet. The use

of force by the deputies to apply handcuffs to Mr. Niedzialek was consistent with generally accepted practices and objectively reasonable.

**The Use of Force by Deputies Gomez and Keeney by Holding Mr. Niedzialek in a Prone Position After He Had Been Handcuffed was Inconsistent With Generally Accepted Police Practices and Objectively Unreasonable and Disregarded the Known Risk to Mr. Niedzialek's Health, Safety and Welfare**

35.    It is generally accepted in policing that, under certain circumstances, restraint techniques, including physically holding a subject down, can constitute a use of force.[20] Moreover, Officers are responsible for the health, safety and welfare of people in their custody and must protect them from known risks of harm. Officers learn that they can, when appropriate, put a subject into a prone (face down) position on the ground to facilitate handcuffing or to secure the individual.  However, it is well known and generally accepted that keeping handcuffed individuals in the prone position after handcuffing can negatively affect the subject's breathing and cause or contribute to positional asphyxia.[21]  It is generally accepted in policing that the risks of asphyxiation are magnified when officers apply weight or pressure to a handcuffed, prone subject.

36.    It is also generally accepted that subjects who appear to be in an agitated or excited state, usually due to mental illness, intoxication, or a combination, and are acting delirious or irrational, have a significantly elevated need for oxygen and are therefore more susceptible to positional asphyxiation.  Compounding the risk is that people who are in such a state of "excited" or "agitated" "delirium," while frequently not involved in any significant criminal activity, nevertheless are not responsive to "officer presence" and verbal commands that are effective to gain compliance without the use of force in most other situations.  Officers not infrequently have to use devices such as Tasers and wrestle the subject into restraints.  The altercation itself further increases the demand for oxygen and increases the risk of positional asphyxiation from a prone restraint.

37.    Importantly, it is also generally accepted that the oxygen deficit that can result in positional asphyxia does not preclude speech.  As an article first published in 2015 by Calibre Press—one of the largest publishers of police media, if not *the* largest publisher of police media, in the United States—explained, the idea that someone can breathe

---

[20] Seth W. Stoughton, Jeffrey J. Noble, Geoffrey P. Alpert, Evaluating Police Uses of Force 195-96, 202-03 (2020).

[21] Some commentators have distinguished between "positional asphyxia" and "compression asphyxia" on technical grounds. In technical usage, positional asphyxia is typically used to refer to situations in which the subject's respiration (breathing) is compromised by the positioning of the subject's body, while compression asphyxia is typically used to refer to situations where weight or pressure on the subject can mechanically limit the subject's respiration. Both positional asphyxia and compression asphyxia are types of mechanical asphyxia, a phrase that refers to some mechanical interference with normal breathing. Commentators also sometimes use the phrase "restraint asphyxia" to refer to a combination of separate factors that, *in toto*, can contribute to mechanical asphyxia. As an industry, however, policing has generally adopted less technical terminology, often using "positional asphyxia" in a somewhat generalized way to refer to a combination of mechanical factors that can inhibit a restrained subject's breathing.

14

because they are speaking is a "major misconception" and "perhaps one of the **most lethal** misconceptions in . . . law enforcement."[22]

38.     As an industry, policing has known about the risks of positional asphyxia for over thirty years.  In 1988, four doctors published an article describing that keeping individuals "prone, handcuffed, 'and hog-tied'" had negatively affected their ability to recover "peripheral oxygen saturation and heart rate" when compared to individuals "at rest" and "during exercise."[23]  The authors, writing in the American Journal of Medical Pathology, contended that "the physiological effects produced by positional restraint should be recognized in deaths where such measures are used."[24]  This was followed, several years later, by an article in the same journal reporting a case study of three in-custody deaths "attributed to positional asphyxia."[25]  Early research focused particularly on the risks of keeping a "hog-tied" individual—that is, someone who is handcuffed behind their back with their legs bound at the ankles and connected to their wrists such that their legs are bent with their feet brought to a position near their buttocks—but it was quickly recognized that handcuffed individuals were at heightened risk of positional asphyxia even when they were not hog-tied.[26]

39.     This issue was brought into the forefront of police policymaking in the early 1990s, after a 16-year-old died after being restrained by San Diego Police Department officers.  A police task force surveyed the medical literature and hundreds of police agencies around the country before issued a series of recommendations, including "[o]nce an individual has been controlled and handcuffed, the officer should roll the subject onto his/her side, or into a sitting position as soon as possible to reduce the risk of positional asphyxia."[27]

---

[22] Steve Cole, *Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe"*, Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ (emphasis in original).

[23] Donald T. Reay *et al.*, *Effects of Positional Restraint on Oxygen Saturation and Heart Rate Following Exercise*, 9 AM. J. FORENSIC MED. & PATHOLOGY 16 (1988).

[24] *Id*.

[25] Donald T. Reay, *et al.*, *Positional Asphyxia During Law Enforcement Transport*, 13 AM. J. FORENSIC MED. & PATHOLOGY 90 (1992). Later articles disputed the degree of risk posed by positional asphyxia and criticized the methodology of earlier research, but such research suffered from its own methodological flaws. Specifically, later research was based on experiments involved healthy, non-obese, and usually younger, individuals without preexisting health conditions who were not under the influence of drugs or alcohol and who did not violently struggle with officers. Such study participants are not, of course, representative of the at-risk population with whom the police interact. Indeed, there is good reason to think that a researcher proposing an experimental study involving individuals from the relevant population would be denied approval on ethical grounds because such research would be too dangerous. Additionally, experimental studies generally did not try to replicate field conditions. As one such study acknowledged, "It is possible that a combination of factors, including underlying medical condition, intoxication, agitation, delirium, and struggle as well as body position, may result in respiratory compromise that would not be detected by our study." Theodore C. Chan, *et al.*, *Restraint Position and Positional Asphyxia*, 30 ANNALS OF EMERGENCY MEDICINE 578, 585 (1997).

[26] See, e.g., Ronald L. O'Halloran & Janice G. Frank, *Asphyxial Death During Prone Restraint Revisited; A Report of 21 Cases*, 21 AM. J. FORENSIC MED. & PATHOLOGY 39, 48 (2000).

[27] SAN DIEGO POLICE DEP'T, FINAL REPORT OF THE CUSTODY DEATH TASK FORCE (1992).

40.    The International Association of Chiefs of Police—the world's oldest and largest professional policing organization—endorsed this directive in 1993, writing, "when it is necessary to use the weight of several officers in order to subdue an individual for handcuffing, the arrestee should be freed from that weight as soon as possible in order to allow him to breathe freely. In order to facilitate the individual's breathing, he should also be rolled onto his side or into a sitting position as soon as possible."[28]  In 1995, the United States Department of Justice provided a bulletin that stated, "[A]s soon as the suspect is handcuffed, get him off his stomach."[29]  Any failure to do so, the bulletin made clear, could create a "vicious cycle of suspect resistance and officer restraint" in which the handcuffed, prone subject's breathing becomes labored as they begin to experience an oxygen deficit, the subject responses to the oxygen deficiency by struggling, and the officers respond to the subject's struggling by putting more weight on their back, which further compromises the subject's breathing.[30]  In 1998, the International Association of Chiefs of Police wrote, "during the past decade police departments have been repeatedly warned not to permit the restraint of prisoners in the prone position."[31]  In 2001, the Department of Justice advised police agencies to "develop use of force policies that address . . . particular use of force issues such as . . . positional asphyxia."[32]  In the 2015 consent decree with the City of Ferguson, the Department of Justice required the adoption of procedures and training that "[m]inimiz[e] the risk of positional asphyxia" and instruct officers to "use restraint techniques that do not compromise a subject's breathing."[33]  A 2017 textbook on policing, *Police in America*, states that "positional asphyxia occurs when a person's body position prevents normal and adequate breathing," and that this "[u]sually" occurs "when the subject is face down with hands secured behind the back."[34]  In short, concerns about positional asphyxia and the corresponding directive to avoid keeping handcuffed individuals in the prone position had become generally accepted in policing by at least the turn of the century.

41.    Today, many police agencies around the United States have policies explicitly restricting the use of prone restraint; those policies overwhelmingly direct officers to avoid keeping

---

[28] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, TRAINING KEY NO. 429, CUSTODY DEATH SYNDROME (1993).

[29] United States Department of Justice, National Institute of Justice, *Positional Asphyxia—Sudden Death*, June 1995, https://bit.ly/36o4lXc.

[30] *Id.*

[31] International Association of Chiefs of Police, *The Prone Restraint–Still A Bad Idea*, 10 POL'Y REV. 1,2 (1998).

[32] UNITED STATES DEP'T OF JUSTICE, PRINCIPLES FOR PROMOTING POLICE INTEGRITY 4 (2001).

[33] Consent Decree at 41, United States v. City of Ferguson, No. 4:16-cv-00180 (E.D. Mo. Apr. 19, 2016), https://bit.ly/3mp0VZZ. In the 2016 consent decree with the City of Cleveland, the Department of Justice required officers to be trained in and to follow protocols related to "the risks of positional asphyxia," specifically in "using restraint techniques that do not impair the subject's respiration" following the use of pepper spray or electronic control weapons. Settlement Agreement at 17, 19, United States v. City of Cleveland, No. 1:15-cv-01046-SO (N.D. Ohio June 12, 2015), https://bit.ly/3fUBo8n.

[34] STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

handcuffed individuals in the prone position for any extended period of time.[35]  Many other agencies do not have specific policies, but officers are still expected to mitigate the risks of positional asphyxia by not keeping subjects in the prone position after handcuffing.

42.    The IACP developed a Model Policy in 2017 that was accompanied by a Concepts and Issues Paper on Excited Delirium.  That policy directed that, "When restrained, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck or head.  Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.  Officers should check the subject's pulse and respiration on a continuous basis until transferred to EMS personnel. Officers shall ensure the airway is unrestricted and be prepared to administer CPR or an

---

[35] *See, e.g.*, Berkeley Police Department, Handcuffing and Restraints, Policy 302 ("If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia.), Albuquerque Police Department, Use of Force, SOP 2-52 at 5, https://bit.ly/33wYrRJ ("In situations when the individual is forced into a face down position, officers shall release pressure/weight from the individual and position the individual on their side or sit them up as soon as they are restrained and it is safe to do so."), Charlotte-Mecklenburg Police Department, Directive 500-003, https://bit.ly/3mp7uM7 ("Avoid placing a subject in a position that is likely to contribute to positional asphyxia . . . control restraints while lying on back/stomach should be avoided."); Denver Police Department, Operations Manual, Force Related Policies, 105.01(5)(e), https://bit.ly/3lmIq77 ("[O]fficers will immediately cease applying body weight to an individual's back, head, neck, or abdomen once the individual is restrained and other control tactics may reasonably be utilized other than body weight. As soon as possible after an individual has been restrained, the individual should be turned onto his/her side or allowed to sit up, so long as the individual's actions no longer place officers at risk of imminent injury. Officers will make all reasonable efforts to ensure that the individual is not left in a prone position for longer than absolutely necessary to gain control over the resisting individual."); Detroit Police Department, Use of Force, 304.2-7, Duty to Report/Render Aid, https://bit.ly/2HR7h59 ("Restrained subjects should be placed in an upright or seated position to avoid Positional Asphyxia which can lead to death, when a subject's body position interferes with breathing."); Indianapolis Police Department, General Order 8.1, Prisoner Handling, Transportation and Escape, https://bit.ly/2HQFFx0 ("A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death. 1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. 2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible."); New Orleans Police Department, Operations Manual, Chapter 1.3.1.1, Handcuffing and Restraint Devices, https://bit.ly/3lokG2u ("If a subject has been placed on his or her stomach, turn him or her on the side or in a seated position as soon as handcuffs are properly applied. If the subject continues to struggle, *do not* sit, lie or kneel on the subject's back." (emphasis in original)); New York Police Department, Patrol Guide, Use of Force, 221-02, https://on.nyc.gov/37ixnXG ("Avoid actions which may result in chest compression, such as sitting, kneeling, or standing on a subject's chest or back, thereby reducing the subject's ability to breathe. . . . Position the subject to promote fee breathing, as soon as safety permits, by sitting the person up or turning the person onto his/her side."); Metropolitan Police Department (Washington, D.C.), General Order 901.07, Use of Force, https://bit.ly/3moUnum ("In order to avoid asphyxiation, members shall …[p]osition the individual in a manner to allow free breathing once the subject has been controlled and placed under custodial restraint using handcuffs or other authorized methods.…Members are prohibited from: Placing a person in a prone position (i.e., lying face down) for a prolonged period of time … except during exigent circumstances. Prisoners shall be carefully monitored while in a prone position as a prone position may be a contributing factor to cause a prisoner to suffocate, also referred to as positional asphyxiation.").

automated external defibrillator (AED) if the subject becomes unconscious. Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest."

43.  As mentioned above, it is also well known and generally accepted in policing that there are certain factors that exacerbate the risk of positional asphyxia. The 1995 DOJ bulletin, for example, identified certain factors that "appear to be associated most often with" in-custody deaths, including "cocaine-induced excited delirium," "[d]rug and acute alcohol intoxication," "[v]iolent struggle," and "unresponsiveness of subject during or immediately after a struggle."[36] A 2017 policing textbook described positional asphyxia risk factors that include drug-induced "psychosis," "preexisting physical conditions," and "pressure on the abdomen" that can result from officers "holding a person down in the prone position."[37] In 2019, *Police Magazine*, a police-oriented publication, published an article titled *How to Prevent Positional Asphyxia*, which identified positional asphyxia as "a potential danger of some common physical restraint techniques," and explained that "positional asphyxia is not just about the position of the subject's body. There are precipitating factors that make positional asphyxia deadly. These factors include intoxication due to alcohol, drug use, obesity, psychiatric illnesses, and physical injury," as well as "predisposing medical conditions" and "violent struggle."[38] The article instructs officers that they should "avoid the use of prone restraint techniques" when feasible and "[o]nce the suspect is handcuffed, get them off the face-down position."[39]

44.  Indeed, California Peace Officers Standards and Training (POST), the state organization that sets minimum standards for police training in the State of California, identifies that positional asphyxia, or body positioning that restricts breathing, could lead to inadequate breathing and potential respiratory arrest.[40]

45.  There are four specific factors that, officers learn, can indicate that a subject is particularly susceptible to the risks of positional asphyxia.

a.  First, officers learn that positional asphyxia results when a subject cannot take in sufficient oxygen over time to sustain themselves. For that reason, indications that a subject is becoming oxygen deprived indicate a particular susceptibility to positional asphyxia. It is generally accepted in policing that officers must take

---

[36] *Id.*

[37] *Id.*

[38] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU.

[39] *Id.*

[40] POST LD 34 at 5-7. https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_34_V-6.1.pdf

seriously and should never ignore a subject's statements that they cannot breathe.[41]

b.  Second, officers are taught that pre-existing health conditions can exacerbate the risk of positional asphyxia.[42]  Here, Mr. Niedzialek had an obvious head wound and therefore could have a concussion.

c.  Third, officers are taught that intoxication and substance abuse can exacerbate the risk of positional asphyxia.[43]  Deputy Gomez acknowledged that she believed Mr. Niedzialek may be under the influence of a drug.

d.  Fourth, officers are taught that excited delirium can exacerbate the risk of positional asphyxia.[44]  Indeed, Riverside Sheriff Department training materials state, "Excited Delirium: Warning!  The typical excited delirium death involves subject slipping into a state of sudden tranquility, either during or after the struggle and restraint, followed by cardiac arrest."[45]  Deputy Gomez's BWC demonstrates Mr. Niedzialek moving his legs after he was handcuffed to the absence of any movement.

46.  In this case, Mr. Niedzialek was moving his legs for 46 seconds after he was handcuffed.[46]  Thereafter, he made no noticeable movement.[47]  22 seconds after he was handcuffed, Mr. Niedzialek appeared to try to roll onto his left shoulder, but the deputies pushed him back into a prone position.[48]  Both Deputy Keeney[49] and Deputy Gomez[50] said they did not allow Mr. Niedzialek to roll onto his side, supposedly because he may be trying to assault the deputies or to escape, neither of which was a reasonable possibility with the handcuffs attached and both deputies in good positions to control.

47.  Three minutes and 11 seconds after cuffing, Deputy Gomez asked Mr. Niedzialek for his name and Mr. Niedzialek did not respond.[51]  He had stopped trying to speak over 2

---

[41] See, e.g., Steve Cole, Screaming Their Last Breath: Why First Responders Must Never Ignore the Words "I Can't Breathe", Dec. 11, 2015, reprinted Jun. 2, 2020, https://bit.ly/37kTnRJ

[42] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[43] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[44] Lawrence E. Heiskell, *How to Prevent Positional Asphyxia*, POLICE Mag. (Sept. 9, 2019), https://bit.ly/3fQqKPU; STEVEN G. BRANDL, POLICE IN AMERICA 252 (2018).

[45] COR 02635.

[46] Defendants Composite Video at 7:18.

[47] Defendants Composite Video at 8:04.

[48] Defendants Composite Video at 7:40.

[49] Keeney deposition at 42.

[50] Gomez deposition at 97.

[51] Defendants Composite Video at 10:29.

minutes earlier,[52] and Deputy Keeney even wondered aloud whether he had "fallen asleep."[53]

48.     It appears on video that Deputy Keeney had his right knee on Mr. Niedzialek's upper back for 2 minutes and 22 seconds after Mr. Niedzialek was handcuffed. After Deputy Keeney finally lifted his knee off Mr. Niedzialek's back, the deputies continued to hold him in a prone position. In all, the deputies held Mr. Niedzialek in a prone position for 4 minutes and 50 seconds before Deputy Keeney said to turn him over and they rolled him onto his back.[54]  While Deputy Gomez believed she felt a weak pulse, the paramedic immediately recognized on her arrival that Mr. Niedzialek was not breathing. When there was no pulse CPR was initiated. That took place 6 minutes and 48 seconds after Mr. Niedzialek stopped moving.[55]

49.     A reasonable police officer would have recognized that Mr. Niedzialek was likely suffering from excited delirium.  The deputies knew that Mr. Niedzialek had been acting bizarrely, he had a head wound and was very bloody, he had been knocking on apartment doors, the reporting party told the dispatcher that Mr. Niedzialek maybe having a psychiatric meltdown, he was rapidly repeating "please" to the deputies when they approached him, he suddenly went to his feet and moved toward Deputy Keeney causing Deputy Gomez to use her Taser which in turn caused Mr. Niedzialek to fall to the ground, he was able to get to his feet and was Tased second time before the deputies struggled to get him handcuffed.  Regardless, in these circumstances a reasonable police officer would have known to immediately place Mr. Niedzialek into a recovery position once the handcuffs were applied by rolling him onto his side or sitting him up to facilitate his breathing.

50.     While any reasonable police officer would have placed Mr. Niedzialek into a recovery position immediately after he had been handcuffed, both Deputy Keeney and Deputy Gomez claimed they had never been trained that certain positions were dangerous,[56] that they needed to put someone who was agitated or in an excited state on their side,[57] or that they needed to move a handcuffed person from a prone position off their chest,[58] and they do not recall any training on a "recovery position,"[59] aside from a reference to the carotid hold.  Instead, they are trained to monitor the person's breathing,[60] or as Deputy Keeney stated, to detain, control and then call medical.[61]

---

[52] Defendants Composite Video at 8:02.
[53] Defendants Composite Video at 9:02.
[54] Defendants Composite Video at 12:08.
[55] Defendants Composite Video at 14:52.
[56] Gomez deposition at 50.  Keeney deposition at 39.
[57] Gomez deposition at 51 and 65-66.  Keeney deposition at 92.
[58] Keeney deposition at 38.
[59] Gomez deposition at 50.
[60] Gomez deposition at 54.
[61] Keeney deposition at 50.

51.    Moreover, Mr. Niedzialek was not suspected of committing a violent crime, but believed to be suffering a mental health crisis, or was under the influence of a drug or both.  He did not possess a weapon and he had been handcuffed with his hands behind his back. Mr. Niedzialek could not escape or harm the officers in handcuffs. Especially after he stopped moving no reasonable police officer would have considered him a threat that required the ongoing us of force by holding him in a prone position.  Instead, any reasonable officer would have recognized that Mr. Niedzialek needed to be taken into custody for medical help to address his possible mental health concern, his possible drug use, and his obvious head injury.  Simply put, a reasonable officer would have known they were there to help Mr. Niedzialek, not to arrest him, and that he needed to be placed in a recovery position immediately after handcuffing.

**The Riverside Sheriff's Department Has A Policy, Practice, or Custom of Ignoring Generally Accepted Police Practices and Failed to Provide Training or Policies to Avoid the Sudden Deaths of Prisoners in Their Custody Due to Positional Asphyxia**

52.    As discussed above, there is a generally accepted practice in policing to move an arrestee into a recovery position rather than to hold the arrestee in a prone position to minimize the risks of sudden death due to positional asphyxia.

53.    Both Deputy Gomez and Deputy Keeney testified that they had not received any such training, nor did they have a department policy, that directed them to move an arrestee into a recovery position particularly when they have struggled with a person who was obviously impaired due to drugs or alcohol, or who may be suffering a mental health crisis.

54.    The Sheriff's Department person most knowledgeable, Sergeant Vickers, testified that not only did the department not have a policy or training on positional asphyxia, or a requirement to move an arrestee from the prone position into a recovery position as soon as possible, but ignoring national standards he said the department does not have policies or training in positional asphyxia because he does not "believe that someone being on their stomach inhibits their ability to breathe,"[62] and "We don't tell them that having someone in a prone position restrains their breathing because it doesn't."[63]

---

[62] Vickers deposition at 75.
[63] Vickers deposition at 38.

55.     The Riverside Sheriff's Department failure to train its deputies to move proned, handcuffed, prisoners to a recovery position as soon as it is safe to do so is contrary to generally accepted police practices and creates a risk of death or serious injury to persons in their custody that could otherwise be avoided.

_____          _____1/14/21_____

Jeffrey J. Noble                                                    Date

22