Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Hang D. Le (SBN 293450)
hlee@galipolaw.com
**LAW OFFICES OF DALE K. GALIPO**
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333/Fax: (818) 347-4118

JOHN BURTON, State Bar No. 86029
jb@johnburtonlaw.com
**THE LAW OFFICES OF JOHN BURTON**
128 North Fair Oaks Avenue
Pasadena, California 91103
Tel: (626) 449-8300/Fax: (626) 440-8198

T. KENNEDY HELM, IV, State Bar No. 282319
kennedy@helmlawoffice.com
**HELM LAW OFFICE, PC**
644 40th Street, Suite 305
Oakland, California 94609
Tel: (510) 350-7517/Fax: (510) 350-7359

Attorneys for Plaintiff Tracy Alves, Individually and as Successor In Interest for Kevin R. Niedzialek, Deceased

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>RIVERSIDE COUNTY, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3–10,<br><br>Defendants. | Case No. 5:19-cv-02083-JGB (SHKx)<br><br>*Honorable Jesus G. Bernal*<br>*Mag. Judge Shashi H. Kewalramani*<br><br>**PLAINTIFF'S DECLARATION OF DANIEL WOHLGELERTNER, M.D., IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE HIS TESTIMONY AND FOR SUMMARY JUDGMENT**<br><br>Date: June 21, 2021<br>Time: 9:00 a.m.<br>Crtrm: 1 |

Daniel Wohlgelernter, M.D., declare under penalty of perjury as follows:

1. I am an expert witness for Plaintiff. I submit this declaration in opposition to Defendants' motions to exclude my testimony and for summary judgment.

2. I have been a physician for 44 years. I graduated from Yale University School of Medicine in 1977 with highest honors. After graduation, I interned and completed my residency at Yale-New Haven Hospital in Internal Medicine. I was subsequently appointed Chief Resident and Instructor in Medicine at Yale-New Haven Hospital/Yale University School of Medicine. I then completed a fellowship in cardiology at Yale-New Haven Hospital.

3. I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death. I am certified by the American Board of Internal Medicine, the American Board of Internal Medicine-Cardiovascular, and American Board of Internal Medicine-Interventional Cardiology. I have served as the director of the ICU and CCU at Providence-St. John's Hospital in Santa Monica, California. I am currently the Section Chief of Cardiology at Providence-St. John's. My current CV is attached as Exhibit A.

4. I was retained to offer opinions regarding Kevin Niedzialek's cardiac arrest, which was reversed, but not until after he sustained too much anoxic brain injury to survive. In forming my opinions in this case, I have reviewed the materials listed at page 2 of my report: (1) Plaintiff's Amended Complaint and Answer; (2) AMR Paramedic Report; (3) Autopsy Photos; (4) Coroner & Autopsy complete reports; (5) Defendants' composite video; (6) July 29, 2019 Initial Report by Deputy Sonia Gomez; (7) Initial Hospitalization Records of Kevin Niedzialek; (8) Inland Valley MC Routine Echo Report; (9) Organ Transplant Hospitalization Records; (10) Photos of Kevin Niedzialek in the hospital; (11) Photos of donated organs of Kevin Niedzialek; (12) TASER download; (13) Deposition Transcript of Mark A. Fajardo, M.D. (medical examiner); (14) Deposition Transcript of Lisa La Russo (paramedic); (15) Deposition

Transcript of Jesus Raygoza (EMT); (16) Deposition Transcript of Deputy Sonia Gomez; and (17) Deposition Transcript of Deputy Brian Keeney.

5. Based on my review of these materials, I prepared a report, Exhibit B. I then reviewed Defendants' medical expert reports, and prepared a rebuttal report, Exhibits C. I attest to the truth of the contents of those reports under penalty of perjury pursuant to the laws of the United States.

6. As stated in those reports, it is my opinion, with a reasonable degree of medical certainty, that Kevin Niedzialek was deprived of adequate oxygen due to restraint/compression asphyxia, a form of mechanical obstruction of respiration, secondary to the compressive force applied to his torso when the deputies held him down on his chest, handcuffed behind his back, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing the PEA cardiac arrest documented at the scene by Paramedic La Russo.

7. Cardiac arrest refers to the moment the heart stops contracting spontaneously, and therefore stops circulating oxygenated blood throughout the body. If not reversed quickly death is inevitable. Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to the form of cardiac arrest in which the electrocardiogram shows an electrical heart rhythm that should produce a pulse, but does not. The rhythm strips obtained by Paramedic La Russo from the cardiac monitor at the time of Mr. Niedzialek's cardiac arrest demonstrated PEA.

8. The following medical literature is informative regarding PEA cardiac arrest: 2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest." *Circulation*. 12 (24 Suppl) IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

9. As is documented by cardiology literature, PEA is most frequently caused by hypoxemia, which is low oxygen levels, or by hypovolemia, which is inadequate circulating blood volume. "Hypoxia, secondary to respiratory failure, is probably the

most common cause of PEA, with respiratory insufficiency accompanying 40–50% of PEA cases." Emedicine.medscape.com/article/161080-overview#a6-updated 11/20/17.

10. Based on the sequence of events depicted in the composite video, my review of the literature and my extensive experience as a cardiologist during which I have witnessed many cardiac arrests, it is my opinion that the only plausible cause of PEA cardiac arrest in Mr. Niedzialek was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia. No other cause of PEA is possible here.

11. I reject any hypothesis that Mr. Niedzialek's cardiac arrest resulted directly from a methamphetamine overdose. Aside from the reasons stated in Dr. Freeman's expert report, which addresses the frequency of such overdoses and levels involved, PEA is incompatible with a methamphetamine overdose, which overstimulates the heart. Were methamphetamine the cause of the cardiac arrest, the paramedic's cardiac monitor would have showed ventricular tachycardia (too rapid a rhythm) or ventricular fibrillation (chaotic electrical discharges). Methamphetamine, even at lethal levels of intoxication, does not cause PEA. As stated above, the only acceptable pathophysiologic explanation of PEA in this case is hypoxia/hypoxemia due to asphyxia.

12. The medical examiner who performed the autopsy, Dr. Fajardo, acknowledged in his deposition testimony that methamphetamine toxicity would be associated with ventricular tachycardia or ventricular fibrillation rather than PEA, and that PEA is consistent with asphyxia as the cause of death. Dr. Fajardo was not familiar with the paramedic's finding of PEA.

13. Both Dr. Fajardo and I agree that Mr. Niedzialek was in a state of high oxygen demand due to the stimulatory effects of methamphetamine, his delirious state, the pain secondary to the two Taser applications, the pre-existing traumatic injuries to his skull and face, the hard falls to the ground, and the fight-or-flight reaction to the confrontation with law enforcement. While Mr. Niedzialek's physiology was in a state

of heightened oxygen demand his oxygen supply was compromised due to his being held prone on his chest by both deputies with his hands cuffed behind his back. The resulting impairment of his breathing in conjunction with the heightened requirement for oxygen created a lethal oxygen supply-oxygen demand imbalance that resulted in hypoxia and PEA cardiac arrest.

14. It is my opinion to a reasonable degree of medical probability that had the deputies moved Mr. Niedzialek into a recovery position, either on his side or sitting up, after handcuffing was complete, while waiting for the paramedics who were already summoned, this cardiac arrest would not have occurred and therefore the anoxic brain injury that caused Mr. Niedzialek's death would not have developed.

15. I opine that the wound Mr. Niedzialek sustained to his head prior to the deputies' arrival did not correlate with a traumatic brain injury of significance, a conclusion that Dr. Fajardo reached based on his physical examination of the brain tissues. Mr. Niedzialek would have survived this wound with no residual injuries other than perhaps a scar. The impact to his head that caused this wound, however, may have resulted in a concussion that would help to explain the highly delirious state in which he was found by the deputies.

16. At the time Deputy Gomez first reported that she felt a weak pulse (BWC 15:30:18), which followed her statement that there was no pulse, the BWC video clearly shows Mr. Niedzialek's eyes to be open, and his pupils fixed and dilated. He was not breathing. Given his subsequent course and particularly the extent of the anoxic brain injury, it is highly unlikely that Mr. Niedzialek had any pulse when he was rolled over.

17. The phenomenon of first responders and even medical professionals claiming to feel a pulse when none is present, especially among people with less training who find themselves in stressful situations like this one, is well documented in the literature. In fact, they are feeling their own pulse.

18. The moaning sounds and occasional breaths Mr. Niedzialek appeared to take after he otherwise stopped moving do not indicate that his heart was still

circulating blood to his brain. Respiratory functions can continue after a cardiac arrest. "Agonal breathing" can be observed for several minutes after a cardiac arrest. Given Mr. Niedzialek's medical course post-resuscitation, and particularly the extent of his anoxic brain injury in light of Paramedic La Russo's direction that CPR be commenced immediately, mitigating further brain injury until spontaneous circulation was restored, strongly suggests that the cardiac arrest happened between the time Mr. Niedzialek stopped moving (BWC 15:26:10) and when Deputy Keeney commented he was "falling asleep" (BWC 15:27:08). It is highly unlikely that the cardiac arrest occurred shortly before the paramedics' arrival.

19. Had CPR been initiated shortly after the cardiac arrest, Mr. Niedzialek's outcome would have been much better. The BWC video shows that Mr. Niedzialek stopped moving about 45 seconds after handcuffing (BWC 15:25:26 to 15:26:10). Yet he was not rolled over until more than four minutes later (BWC 15:30:18), and even then the deputies failed to initiate CPR during the next two minutes. Paramedic La Russo initiated CPR (and then turned the responsibility for chest compressions over to Deputy Keeney) at 15:32:55. The agonal breathing that followed this cardiac arrest, combined with the fact that resuscitation efforts ultimately succeeded confirm my opinion, to a reasonable degree of medical probability, that had the deputies commenced CPR approximately 5 to 6 minutes sooner, around the time that Deputy Keeney made the comment about Mr. Niedzialek "falling asleep," oxygenated blood would have continued to circulate to Mr. Niedzialek's brain prior to the paramedic's arrival and the anoxic brain injury would have been minimized.

20. Notably, Mr. Niedliazek's heart, even after going through all of this, was deemed suitable for transplant, and is in fact keeping someone alive today. That eliminates pre-existing cardiac pathology, such as cardiomyopathy, as a cause of this cardiac arrest.

21. I disagree with Dr. Chan's opinion that Mr. Niedzialek's death was not caused or contributed to by positional, restraint, or compression asphyxia as a result of

the manner in which Mr. Niedzialek was restrained by Deputies Gomez and Keeney. The studies that Dr. Chan cites do not replicate real-world conditions, in that these studies use healthy volunteers with a known testing endpoint; not a real-life struggle involving a person already in a compromised physiological state with an elevated need for oxygen.

22. Agitated individuals like Mr. Niedzialek are in a state of heightened oxygen demand and may have some element of pre-existing metabolic acidosis, that is an elevated blood acid level measured as a lowering of blood pH. Crucial here is the fact that the natural antidote to acidosis is oxygen. Acidotic individuals tend to hyperventilate. This natural process of compensatory respiratory alkalosis can be inhibited by restraint in the prone position, and may exacerbate these conditions via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to pulseless electrical activity (PEA) and asystolic cardiac arrest. Human studies to replicate these conditions cannot be performed ethically.

23. Data from trials involving healthy subjects in a controlled situation cannot be applied to an uncontrolled situation such as with Mr. Niedzialek, an agitated and delirious individual under the influence of methamphetamine, with a head injury of unknown severity, and who had been Tased twice, fallen twice, and then was wrestled into handcuffs. Unlike the study subjects, Mr. Niedzialek had a higly elevated need for oxygen as a result of increased oxygen demand and therefore required restricted ventilatory function to have respiratory compensation for metabolic acidosis.

24. There are published trials from groups other than those Dr. Chan referred to where studies show significant decreases in ventilatory capacity among participants held in a prone position.[1]

---

[1] *See, e.g.,* John Parkes & Ray Carson, *Sudden death during restraint: do some positions affect lung function?*, 48 MED. SCI. & L. 137 (2008).

25. I disagree with the opinion of Michael Graham, M.D., concerning Mr. Niedzialek's cause of death. Excited delirium is not recognized among cardiologists as a cause of cardiac arrest. Dr. Graham does not explain the physiological mechanism that he contends caused this cardiac arrest.

26. With specific attention to PEA cardiac arrest, which is a type of cardiac arrest in the case of Mr. Niedzialek, there is no mention in any text or journal article that excited delirium can produce this clinical event.

27. Cardiac arrest leaves no visible signs on autopsy. Dr. Graham is a pathologist, not a clinician, and does not have any experience taking care of patients before, during or after cardiac arrest. In this case, we must look to clinical history rather than a physical examination of the remains, to determine the mechanism of death. Here, the clinical history includes the video evidence, the EKG findings, and the laboratory studies. The videos demonstrate that Mr. Niedzialek suffered cardiac arrest during prone restraint because his breathing was impaired at a time when he needed maximal ventilatory effort to maintain oxygen supply-demand balance and to provide respiratory compensation for metabolic acidosis. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to Mr. Niedzialek's need for higher levels of oxygen and possible development of some element of metabolic acidosis. Prone restraint with compressive force to his thorax resulted in the inability for his cardiorespiratory system to maintain oxygen and acid-based balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest.

28. If hypothetically, excited delirium caused Mr. Niedzialek's cardiac arrest, the paramedics would have recorded a heart rhythm of Ventricular Tachycardia (VT) or Ventricular Fibrillation (VF), but not Pulseless Electrical Activity (PEA).

29. I disagree with Dr. Donald Dawes' opinion that Mr. Niedzialek was breathing normally before he was rolled over. Normal breathing with normal respiratory effort stops immediately after cardiac arrest, but agonal breathing, which is

ineffective in maintaining oxygenation and acid-base balance, can continue for several minutes. Mr. Niedzialek had agonal breathing, not normal respiratory effort, before he was rolled over.

30. I disagree with Dr. Dawes' opinion that metabolic acidosis may have caused Mr. Niedzialek's PEA. Mr. Niedzialek's PEA was caused by hypoxia secondary to respiratory failure, and respiratory insufficiency accompanies 40–50% of PEA cases. Metabolic acidosis may have been a secondary contributing cause to the PEA cardiac arrest. The methamphetamine, Taser applications, physical exertion and struggle, contributed to Mr. Niedzialek's need for higher oxygen levels and possible development of some element of metabolic acidosis. However, the prone restraint with compressive force to Mr. Niedzialek's thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis cause his PEA cardiac arrest.

31. I disagree that Mr. Niedzialek was "severely acidotic" on arrival to the hospital, given the length of time Mr. Niedzialek had no respirations or pulse. His pH was 7.19, which is somewhat acidotic as normal pH ranges around 7.35 to 7.45. While severe acidosis can trigger a cardiac arrest, that is not the case at this level. Regardless, the hospital measurement is not an accurate measurement of what Mr. Niedzialek's pH was before the cardiac arrest, as his extensive cardiac downtime would have increased his blood acid, lowering the pH. A pH of 7.19 is what we would expect to find after prolonged cardiac arrest in a person with a normal pH before the arrest. The elevated lactic acid level resulted from the cardiac arrest as well. Even if we were to assume that Mr. Niedzialek was acidotic to some degree, which is not unlikely, that is all the more reasons he needed to be put into a position where he could breathe without obstruction or restriction, so that his acidosis could be mitigated by respiratory compensation, with reduction of $CO_2$ levels.

32. Were Mr. Niedzialek experiencing metabolic-acidosis from the methamphetamine and hyperactivity, its effect would have been minimized by the

deputies placing him into a recovery position immediately upon handcuffing, to allow respiratory compensation to correct the acid-base imbalance. However, in this case, the most likely cause of metabolic acidosis is the cardiac arrest itself, with cessation of circulation and accumulation of lactic acid.

33. If Mr. Niedzialek's cardiac arrest had been caused by a methamphetamine-induced catecholamine storm, then Mr. Niedzialek's presenting heart rhythm would have been VF (ventricular fibrillation), not PEA. Here, Mr. Niedzialek had a presenting heart rhythm of PEA. He did not have a presenting heart rhythm of VF. Dr. Fajardo, in his deposition testimony, acknowledged that methamphetamine toxicity causing cardiac arrest would be expected to be associated with ventricular tachycardia or ventricular fibrillation, rather than PEA. Dr. Fajardo agrees that PEA is seen with asphyxia as the cause of death.

34. It is unlikely that Mr. Niedzialek's PEA arrest was caused by hemorrhagic shock from Mr. Niedzialek's head wounds. If Mr. Niedzialek had experienced PEA from loss of blood, the paramedics would not been able to revive him as they did. It is far more likely that the cause of Mr. Niedzialek's PEA was hypoxia.

35. Mr. Niedzialek's head trauma could not have caused the brain changes seen on his brain scan on the second day at the hospital. Mr. Niedzialek suffered precisely the sort of severe anoxic brain injury that we typically see after sustained loss of circulation due to cardiac arrest. The head trauma was significant enough to cause a concussion and possibly altered behavior, but not significant enough to cause anatomic or structural changes of the brain.

36. PEA due to hypoxia is frequently reversed, as shown here by the paramedic's ability to get Mr. Niedzialek's heart beating in normal sinus rhythm. Mr. Niedzialek experienced too much hypoxic brain injury because he went about six minutes without CPR before the paramedics arrived. The BWC video demonstrates that Mr. Niedzialek is obviously not in cardiac arrest immediately after he is handcuffed. Cardiac arrest most likely occurred between the time Mr. Niedzialek visibly

stopped moving (BWC 15:26:10) and when Deputy Keeney said he was "falling asleep" (BWC 15:27:08). Any subsequent breaths apparent on the video are agonal. Paramedic La Russo started CPR at 15:32:55. Thus, CPR was started as long as 6 minutes after cardiac arrest. The amount of Mr. Niedzialek's anoxic brain injury correlates with that amount of cardiac down time.

37. It is my opinion that Mr. Niedzialek's PEA cardiac arrest was not caused by his fighting and struggling with the deputies. While the fighting and struggling, pain from the head injury, and pain from the TASER application set the stage, we do not expect to see PEA cardiac arrest due to fighting and struggling without the element of asphyxia. Because of the prior struggle and pain experienced, it was necessary to place Mr. Niedzialek in a recovery position after handcuffing so he could breathe adequately. The cause of the PEA cardiac arrest was the lack of adequate ventilation after handcuffing, not what happened before.

38. While the struggle with law enforcement, drug use, and TASER applications likely created an element of metabolic acidosis, breathing is the body's primary antidote to metabolic acidosis. This process is called respiratory compensation, or compensatory respiratory alkalosis. Had Mr. Niedzialek been placed in a recovery position to facilitate his breathing, the metabolic acidosis would have been corrected by respiratory compensation. Toxic effects of methamphetamine would lead to an irregular heart rhythm of VT of VF, not PEA.

39. There is no single "mechanism of the sudden death syndrome." Each case has to be examined on its own facts, as I have done with this case. Mr. Niedzialek had PEA, not VT of VF; consequently, excited delirium causing cardiac arrest via these mechanisms can be ruled out. His body temperature was normal.

40. Dr. Richard Clark's statement that "Many times, once a person deteriorates from rapid irregular heart rate (ventricular tachycardia or fibrillation) into cardiac arrest, they go into slower 'agonal' or pre-death rhythm and cannot be resuscitated, even when witnessed in front of paramedics" does not make sense

medically. Cardiologists classify VF as cardiac arrest, as there are no heart contractions to cause blood circulation. Agonal respiration or agonal breathing is defined as an abnormal pattern of breathing and brainstem reflex that is characterized by gasping and labored breathing in a dying patient or patient post cardiac arrest. Agonal refers to breathing, not cardiac rhythm, which we would call bradycardia (slow heart rate). Over time VF degenerates to asystole (flatline), not PEA. While there is no way to tell whether Mr. Niedzialek was in bradycardia from hypoxia before he had PEA, the fact that he was resuscitated by paramedics tends to disprove Dr. Clark's hypothesis.

41. The paramedics were able to successfully resuscitate Mr. Niedzialek. The metabolic acidosis could have been ameliorated by placing Mr. Niedzialek into a recovery position, allowing adequate ventilatory effort, and enabling respiratory compensation of metabolic acidosis.

42. In sum, it is my opinion, with a reasonable degree of medical certainty, that Mr. Niedzialek's death was due to restraint/compressive asphyxia, with mechanical obstruction of respiration, secondary to compressive force applied to his torso by the police officers with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing PEA cardiac arrest. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to Mr. Niedzialek's need for higher levels of oxygen, and possible development of some element of metabolic acidosis. Prone restraint with compressive force to his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest. Regardless of the mechanism responsible for triggering Mr. Niedzialek's PEA cardiac arrest, the restriction on breathing is fundamental. Allowing Mr. Niedzialek to breathe without restriction—in other words using a recovery position rather than a prone restraint—would have dramatically improved the outcome.

I declare under penalty of perjury that the foregoing is true and correct, and that this was executed this 28th day of May 2021 at \_\_\_Los Angeles\_\_\_, California.

_Daniel Wohlgelernter_

Daniel Wohlgelernter, MD, FACC