# EXHIBIT B

DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA.  90067
_____
phone (310) 729-2202
Fax (310) 492-9793
Email: drdan@iheartdrdan.com

February 1, 2021

John Burton
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California 91103

RE:  Alves v. County of Riverside
KEVIN R. NIEDZIALEK, decedent
Date of Birth: 09/20/1984 -- Date of Death: 7/30/2019 (34 years old)

Dear Mr. Burton:

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the director of the ICU and CCU at Providence- St. John's Hospital in Santa Monica, CA, and in my current position as Section Chief of Cardiology at Providence-St. John's.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of pathophysiology of cardiac arrest and the specific type of cardiac arrest known as PEA (pulseless electrical activity).  The knowledge base that I utilize has been formed by my 35 years of clinical practice and experience,  and my previous and ongoing review of clinical and experimental literature.

On October 28, 2020,  I was retained as an expert to review relevant materials and provide expert opinion on this matter, date of incident, July 29, 2019, and to consider and to render expert opinion on whether the restraining process was contributory to Mr. Kevin Niedzialek's death, and to address alternative opinions and theories regarding the cause of death. I also address three subsidiary issues: whether Deputy Gomez felt a pulse, whether breathing may have continued after the cardiac arrest, and the extent to which an earlier commencement of CPR would have likely affected the outcome.

I have reviewed the following materials:

*amended complaint and answer; AMR paramedic report; autopsy photos; complete report- Coroner & autopsy; defendants composite video; Deputy Gomez- initial report- 7/29/19; initial hospitalization records; Inland Valley MC routine echo report;  organ transplant hospitalization records; photos- decedent in hospital; photos- organs donated;  TASER download.

*deposition transcripts: Dr. Fajardo- coroner- medical examiner; Lisa La Russo (Paramedic); Jesus Raygoza (EMT); Deputies Gomez and Keeney (deputies who restrained Decedent).

1

PERTINENT MEDICAL HISTORY:

Kevin  Niedzialek had a prior history of intermittent substance abuse. For the last two years of his life he reportedly lived clean and sober, but, apparently, he relapsed a few days before his death by using methamphetamine.   When the relapse happened, Kevin was staying temporarily with a friend he knew from recovery meetings, at Apartment 27A in a complex located in Temecula, California.  This incident occurred in the afternoon on July 29, 2019 at the apartment complex in Temecula. Kevin Niedzialek sustained a bloody head injury of unknown source, though there is no indication that someone else inflicted it .   Starting shortly after 2:10 p.m., Riverside Sheriff's Department  (RSD) dispatch received several 911 calls from neighbors who reported noises, yelling, and other actions by an unarmed man with a bloody head wound. The dispatcher wrote on the dispatch log sent to the deputies' car computer terminals that the man sounded incoherent and appeared psychologically disturbed.   Shortly after 2:30 p.m., RSD deputies Keeney and Gomez arrived separately at the apartment complex. They parked in different areas, and approached the scene from different directions. Deputy Keeney was not wearing a camera, but Deputy Gomez activated her body-worn camera, which captured video that provides a record of events. I viewed a copy that included video taken by a neighbor capturing a different angle. When necessary  I refer to the times in red in the upper left of the BWC video.

Deputy Gomez' initial report provided the following narrative, which is consistent with the BWC video, but does not reflect the passage of time between events :

I believed Deputy Keeney was in imminent danger I immediately pulled out my taser and pointed it at Niedzialek. Niedzialek then paused for a second and then lunged and tried to grab Deputy Keeney. Deputy Keeney raised his left hand to stop Niedzialek from getting to close to him. I feared Deputy Keeney was in danger and about get assaulted, so I deployed the taser.

The taser made good contact with Niedzialek body causing his body to fully lock up and fall to the ground. Niedzialek then rolled onto his back before Deputy Keeney could place handcuffs on him and began to kick at Deputy Keeney. I gave Niedzialek several commands to turn and lay on his stomach and place his hands behind his back.

Niedzialek did not comply and sat up and just stared at Deputy Keeney. Niedzialek immediately stood up and walked towards Deputy Keeney. I feared Deputy Keeney was about to get assaulted, so I arced the taser again and Niedzialek's body fully locked up and he fell to the ground face down. Deputy Keeney quickly grabbed Niedzialek's left arm and I grabbed his right arm that he had underneath his torso and placed it behind his back. Deputy Keeney then placed Niedzialek's left arm behind his back and I cuffed him without further incident. Due to Niedzialek prior injuries prior to my arrival and him being tased I advised AMR to roll in.

Deputy Bowman arrived on scene and cleared apartment #27A. When Niedzialek seemed calmed we turned him over onto his back. Niedzialek did not appear to be breathing. I checked for a pulse and felt a low faint pulse. AMR arrived on scene and Deputy Keeney began compressions on Niedzialek. Once Cal Fire arrived, they took over with compressions. Once they had a pulse, they transported Niedzialek to Inland Valley Hospital and Deputy Reynolds followed the AMR unit.

Review of the video from the scene discloses that after the handcuffs were applied deputies Keeney and Gomez continued to hold Kevin Niedzialek (KN) down on his chest, his legs flailing, until all such movement ends after about 45 seconds. During this time KN tried to roll himself onto his left side, putting himself into a recovery position, but Deputy Keeney rolled him back on his chest and held him down. Two-and-a-half minutes after cuffing, well after KN stopped showing any movement other than possible breathing (discussed below), Deputy Keeney finally took his knee off KN's back. With both deputies still holding him down, Deputy Gomez made the first attempt to check KN's condition three minutes after cuffing, asking: "Hey buddy, can you tell us your name?" KN was unresponsive. The deputies continued to hold KN down on his chest. After another one minute and 45 seconds the deputies rolled KN over.  His eyes were open and his pupils fixed and dilated. He was not breathing. KN had been on his chest, held down, for almost five minutes after handcuffing.

AMR paramedics arrived about 2:45 p.m. They found KN handcuffed, supine and in cardiac arrest, with no pulse or respiration.

The following is the EMS narrative report from the incident:

"Arrived on scene of apartment complex.  Found RSO on scene in dirt area by a tree.  Officer kneeling on patient, stating he was tased due to being combative.  Patient with blood all over face; large laceration on left temporal area and above forehead.  Per RSO, patient was running around complex banging on doors yelling and talking to self.  Unknown how patient received injuries.   Per RSO when they came in contact with him he started to go after them and they tased him.  Taser still in right bicep and right hip area.  Upon quick evaluation patient found to not be breathing and pulseless.   CPR started then turned over to RSO deputy to continue CPR   Partner established airway and started BVM/OPA  ( BVM= Bag-valve-mask;   OPA = OROPHARYNGEAL AIRWAY).  Patient placed on cardiac monitor.  Patient in PEA at rate of about 30.  "

KN remained in PEA cardiac arrest from 2:45 PM (14:45) until 14:56 when he developed atrial fibrillation, and then at 15:04 normal sinus rhythm was restored;  however,  KN remained comatose.

KN was transported to IVM- Inland Valley Medical Center where life support measures were continued.  He was evaluated by the neurologist,  Dr. Uddin,  on 7/30/19.   Dr. Uddin's consultation note provided the following assessment:

Chief Complaint/Reason for Consultation
Possibility of brain death.
History of Present Illness
This neurology consult was called in at 830 on 7/30/2019 by intensivist. The question for me was that whether the patient is brain dead or not.
Second MRI was already done and the intensivist communicated the finding with me of generalized cerebral edema and impending brainstem herniation.
I reviewed the code sheet from EMS he was in pulseless electrical activity documented for 8 minutes and afterward he converted into A fib.
The initial CT scan was negative but today in the morning when the CT scan was done it shows blurring of gray-white matter junction generalized edema and herniation of the brainstem.

Assessment: Examined the patient the examination as documented above
I have personally reviewed both the CT scan from yesterday and from today.

The cerebral edema is generalized; there is stagnation of blood the basal cisterns are not
there; this radiological picture is not compatible with life
Along with that clinical examination is also not compatible with life.
At this point I feel comfortable declaring the patient brain-dead
Recommend withdrawal of life support.

Addendum by Ngab, Tarik A MD on July 30, 2019 19:15 PDT

Time of death 19:00 7/30/2019

Patient is clinically brain dead

Unresponsive, pupils are fixed and dilated
No corneal reflexes
Absence of occulocephalic reflex
Absence of gag reflex
Absence of motor response to stimuli in all extremities
Discussed with Dr. Uddin Neurology. Agreed with assessment

KN's Family agreed to go ahead with Organ Donation.

On 07/31/19, the decision was made that KN would be maintained on ventilatory support for organ
harvesting by the OneLegacy organ procurement group.  On 8/02/19, KN was transferred to the
operating room with OneLegacy staff and anesthesiologist for organ procurement.

The Riverside County Sheriff's Department Coroner's office reviewed KN's medical records and
laboratory studies.

The following are excerpts from the Coroner's report:

On 01/21/2020, a Coroner's Review was conducted on behalf of Riverside County Sheriff-
Coroner Chad Bianco in the matter of the death of Kevin Niedzialek.

After the facts were presented, Sheriff- Coroner Bianco certified the cause, manner, and mode of
death.

The cause of death was determined to be: Acute Methamphetamine Toxicity, with other
significant conditions of Application of Restraint Maneuvers.

The manner of death has been classified as: Homicide.

The mode of death has been determined to be: Illicit drug overdose while being taken into
custody of law enforcement.

Toxicology analysis was performed, with blood specimen obtained on 7/29/19:
Methamphetamine blood level was 0.757 mg/L.

<u>REVIEW OF PERTINENT DEPOSITION TESTIMONY:</u>

    1)  DEPOSITION OF DR. FAJARDO--- CORONER
Page 45,  line 22-25: Q So in your opinion from a forensic pathology
perspective, a person who shows a methamphetamine level
of .2 milligrams per liter or above is in the lethal
range of methamphetamine concentration?
Page 46,  line 1:  A That is correct.

Page 115,  lines 17-25: Q Okay. Now, you said that the way that
methamphetamine ingestion alone kills someone generally
is that it -- it causes cardiac arrest. It disorganizes
the heart rhythm; correct?
A Correct.
Q And so that disorganized heart rhythm would
appear on an EKJ as ventricular fibrillation; correct?
A Well, first it goes to v-tach, ventricular
tachycardia, then to ventricular fibrillation, then to
Page 116, lines 1-5:
asystole.
Q And so that's what we would expect to see in a
person who died as a result of methamphetamine toxicity;
correct?
A If they were hooked up to an EKG machine, yes.
Page 118, lines 10-17:
Q Okay. So have you ever seen pulseless
electrical activity present in somebody who has been
asphyxiated?
A Yes.
Q Okay. And so pulseless electrical activity
would be consistent with asphyxiation; correct?
A It wouldn't be inconsistent. Let's put it
that way.
Page 120,  lines 7-13:
Q Okay. So would you expect that the pain and
the muscle contractions of the Taser and the -- also the
fall would -- would -- would create a reaction in
Mr. Niedzialek that would elevate his need for oxygen?
MR. SAIN: Objection. Incomplete hypothetical.
Calls for speculation as phrased.
THE WITNESS: Yes, absolutely.
Page 121,  lines 12-18:
Q So Mr. Niedzialek, in this case, had the
following factors that increased his need for oxygen: A
high dose of methamphetamine, the pain of the Taser
application, the fall, and also potentially
catecholamines from a flight-fight response with the

confrontation with the officers; correct?

A Correct.

Page 123, lines 5-13:

Q Let me back up.

So when he was down on his chest -- he fell
down on his chest. And then the deputies got on his
back while he was on his chest. And we see that in the
video. The -- both videos actually.

Do you think that was an optimal position for
him to be in to breathe?

MR. SAIN: Argumentative. Misstates evidence.

THE WITNESS: No, it's not.

    2)  DEPOSITION OF DEPUTY GOMEZ

Page 50,  lines 21-25:

Q. Have you ever been trained that when somebody is
22 in handcuffs and is under control, and if they're in a
23 state of excited or agitated delirium, that it would be
24 safer to have them on their side or sitting up, rather
25 than on their chest?

Page 51,  lines 2-4

2 THE WITNESS: From our understanding, being in
3 the prone position doesn't affect their breathing, and
4 doesn't state that we have to put them on their side.

Page 65, lines 15-25

Q. Have you been trained that once the person is in
16 handcuffs, and safely restrained, that all the body
17 weight should be taken off the person's back?
18 A. We're trained to as -- once they stop resisting,
19 but sometimes subjects have been known to play possum and
20 pop right back up and surprise us. Sometimes we have to
21 maintain some pressure just to make sure they know that
22 we're there and so they don't just pop up on us.
23 Q. Well, were you ever trained in these restraint
24 classes or any other classes or training that you've had
25 as a deputy sheriff, that holding a person down on their

Page 66, lines 1-5

chest after they've been handcuffed behind their back,
2 can be dangerous, especially if they're in an agitated or
3 excited state?
4 MR. SAIN: Asked and answered.
    5  THE WITNESS: No.

It is my opinion, with a reasonable degree of medical certainty, that KN's death was due to
restraint/compressive asphyxia with mechanical obstruction of respiration,  secondary to compressive
force applied to his torso by the police officers with resultant respiratory compromise and subsequent
development of hypoxia/hypoxemia causing PEA cardiac arrest.

Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not. The AED rhythm strips obtained at the time of the cardiac arrest demonstrated PEA.

The following medical literature is informative regarding PEA cardiac arrest: 2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest". Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia. "Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases." emedicine.medscape.com/article/161080-overview#a6-updated 11/20/17.

In reviewing the literature and as confirmed by my extensive experience as a cardiologist, the only plausible and possible cause of PEA cardiac arrest in KN was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia. No other cause of PEA is plausible or relevant in the case of KN.

I totally reject the contention that the cause of the sudden cardiac arrest and death in KN was a methamphetamine overdose. Aside from the reasons stated in Dr. Michael Freeman's expert report, which addresses the frequency of such overdoses and levels involved, the undeniable fact that the cardiac rhythm at the time the Paramedic confirmed cardiac arrest was PEA is incompatible with the theory that methamphetamine was the culprit. The hypothesis that methamphetamine caused the cardiac arrest would only be plausible if the cardiac monitor that confirmed this cardiac arrest showed ventricular tachycardia or ventricular fibrillation. Methamphetamine, even at lethal levels of intoxication, does NOT cause PEA. The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia due to asphyxia.

The coroner, Dr. Fajardo, in his deposition testimony, acknowledged that methamphetamine toxicity causing cardiac arrest would be expected to be associated with ventricular tachycardia or ventricular fibrillation, rather than PEA. He agreed that PEA is seen with asphyxia as the cause of death.

Dr. Fajardo agreed that KN was in a state of high oxygen demand, due to the stimulatory effects of methamphetamine, and the pain secondary to the TASER applications as well as the traumatic injury to his skull and face, the fall to the ground, plus the fight-or-flight reaction to the confrontation with law enforcement. Dr. Fajardo admitted that at the same time that KN's physiology was in a state of heightened oxygen demand, his oxygen supply was potentially compromised due to his being on his chest, with both deputies applying compressive force to his back. This restraint asphyxia in conjunction with the heightened requirement for oxygen created a lethal oxygen supply-oxygen demand imbalance for KN, with resultant hypoxia and subsequent PEA cardiac arrest.

In sum, it is my opinion to a reasonable degree of medical probability that had the two deputies moved KN into a recovery position, either on his side or sitting up, after the handcuffing was complete at 15:25:26 on the BWC, while waiting for the paramedics that Deputy Gomez had summoned, this cardiac arrest would not have occurred. Therefore, the anoxic brain injury that caused KN's death would not have occurred.

7

I agree with Dr. Fajardo's conclusion that the head wound, although bloody, did not correlate with a traumatic brain injury of significance. Accordingly, KN would have survived this episode with no residual injuries other than perhaps a scar from the head wound.

I have the following secondary opinions:

First, Deputy Gomez reports that she thought she felt a weak pulse after the deputies rolled KN over at 15:30:18. The BWC video, however, shows clearly that at that time KN's eyes were open and his pupils fixed and dilated. He was not breathing. Given his subsequent course and particularly the extent of the anoxic brain injury it is highly unlikely that KN had any pulse when he was rolled over. The phenomenon of first responders and even medical professionals who believe they feel a pulse when none is present, especially people with less training who find themselves in stressful situations like this one, is well documented in the literature. In fact, they are feeling their own pulse. That is why paramedics and EMTs are trained to rely on cardiac monitors rather than palpitation when a patient is unresponsive.

Second, the moaning sounds and occasional breaths KN appears to take after he otherwise stopped moving do not indicate that his heart was still circulating blood to the brain. Certain respiratory functions can continue for a short period of time after a cardiac arrest, and agonal breathing can be observed up to several minutes post-cardiac arrest. Given KN's medical course post-resuscitation, and particularly the extent of his anoxic brain injury despite the fact that Paramedic La Russo directed CPR be commenced immediately, mitigating further brain injury until she restored spontaneous circulation, makes it highly likely that the cardiac arrest happened around the time KN stopped moving (15:26:10) and likely before Deputy Keeney made a comment about him "falling asleep," (15:27:08). It is highly unlikely that the cardiac arrest occurred shortly before the paramedic's arrival.

Third, had CPR been initiate sooner, the outcome would have been much better. The BWC video shows that KN stopped moving about 45 seconds after cuffing. (15:25:26 to 15:26:10). Yet he was not rolled over until 15:30:18, over four minutes later, and even then the deputies did not initiate CPR. Paramedic La Russo initiated CPR (and then turned responsibility for chest compressions over to Deputy Keeney) at 15:32:55.   In my opinion, to a reasonable degree of medical probability, had the deputies commenced CPR approximately 5 to 6 minutes sooner, around the time that Deputy Keeney made the comment about KN "falling asleep," oxygenated blood would have continued to circulate to KN's brain prior to the paramedic's arrival and the anoxic brain injury would have been minimized.

Underscoring my opinions is the fact that KN's heart, even after going through all this, was deemed suitable for transplant, and is in fact keeping someone alive today.

Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

/s/ Daniel Wohlgelernter, MC, FACC

DANIEL WOHLGELERNTER, MD, FACC