# EXHIBIT C

DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA. 90067

phone (310) 729-2202
Fax (310) 492-9793
Email: drdan@iheartdrdan.com

March 14, 2021

John Burton
THE LAW OFFICES OF JOHN BURTON
128 North Fair Oaks Avenue
Pasadena, California 91103

RE: Alves v. County of Riverside
KEVIN R. NIEDZIALEK, decedent
Date of Birth: 09/20/1984 -- Date of Death: 7/30/2019 (34 years old)

Dear Mr. Burton:

Subsequent to my submission of my opinion report pertaining to this matter, I have received and reviewed the following documents: Defendants' expert reports- received 2/9/2021: Theodore Chan, MD; Richard Clark, M.D.; Donald Dawes, MD; Michael Graham, MD.

I offer this report in rebuttal to the opinions expressed by the defendants' experts.

<u>Regarding opinions of Dr. Chan:</u>

Dr. Chan states that " we have found no scientific evidence supporting the proponents' notion that a restraint position in a prone, chest-down, or prone hobbled position causes or contributes to asphyxiation or associated death". He adds the following comment: we have conducted multiple studies on human volunteers investigating the effect of weight force on persons who were restrained. In our initial study, we found no evidence of hypoxia (decrease in oxygen levels) or hypoventilation (increase in carbon dioxide levels) in human subjects on whom moderate amounts of weight were placed on their back in the prone restraint position. In our subsequent study, we placed up to 225 pounds of weight force on human subjects in the prone restraint position and found no life-threatening abnormalities in ventilation." Dr. Chan concludes : "it is my opinion that Mr. Niedzialek's death was not caused or contributed to by positional, restraint or compression asphyxiation as a result of the manner in which he was restrained by law enforcement officers."

The studies that Dr. Chan cites do not replicate real-world conditions, in that these studies use healthy volunteers with a known testing endpoint; not a real-life struggle involving a person already in a compromised physiological state with an elevated need for oxygen. The experimental settings in the studies cited by Dr. Chan have attempted to reproduce the impact of prone restraint; however, these experiments were performed on healthy volunteers. By contrast, agitated individuals, like KEVIN R. NIEDZIALEK (KN), are in a state of heightened oxygen demand and may have some element of preexisting metabolic acidosis. Restraint in the prone position may exacerbate these conditions via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to

pulseless electrical activity (PEA) and asystolic cardiac arrest. Several studies mentioned by Dr. Chan have focused on attempts to replicate prone restraint situations to assess an individual's capacity for ventilation under these conditions. These experimental, controlled models are limited by their inability to replicate real-world conditions and the uncontrolled situations in which prone restraint would ordinarily be applied. Most subjects in these experiments were healthy and not in a "fight-or-flight" state that would most likely occur during a confrontation with law enforcement officers. Data from trials involving healthy subjects in a controlled situation cannot be applied to an uncontrolled situation such as with KN who was high on methamphetamine, had sustained a head injury of unknown severity, was multiply TASED, and involved in intense physical activity and, consequently, had an elevated need for oxygen, as a result of increased oxygen demand, and had need for unrestricted ventilatory function so as to have proper respiratory compensation for metabolic acidosis.

In addition, published trials from other groups identified significant decreases in lung capacity among participants held in a prone position. Parkes reported an average 24% drop in FVC (forced vital capacity) and a 27% drop in FEV1 (forced expired volume in one second) in a cohort of 14 healthy volunteers positioned in prone restraint. These findings were described as "significant." One participant in this study experienced a 57% drop in FEV1. The summary of this article states the following: "Small but significant numbers of people die during restraint following violent incidents. We used a repeated measures design to compare lung function in four restraint positions with a standing control position. Participants restrained flat on the floor, prone or supine, showed non-significant reductions in forced vital capacity (FVC) and forced expiratory volume FEV1 compared with the standing control position. Participants restrained face down with the body weight of the restraining persons pressed on their upper torso and/or in a flexed restraint position showed a significant reduction in lung function (mean reductions in FVC of 23.8% and 27.4% respectively). Some, but not all, prone restraint positions show significant restriction of lung function."
( Parkes J. Sudden death during restraint: do some positions affect lung function? Med Sci Law 2008; 48:137–141)

Regarding opinions of Dr. Graham :

Dr. Graham opines that the Cause of death was "consequent to Excited Delirium that was induced by methamphetamine and was not specifically caused or contributed to by restraint-related asphyxia or TASER."

Excited Delirium is not something that cardiologists recognize as a cause of cardiac arrest. With specific attention to PEA cardiac arrest, which was the type of cardiac arrest in the case of KN, there is no mention in any text or journal article that excited delirium can produce this clinical event.

I note that Dr. Graham is a pathologist, and not a clinician, and he has no experience actually taking care of patients, before or after cardiac arrest. There is nothing in this autopsy to explain how or why KN died. Cardiac arrest leaves no visible sign on autopsy. We have to look at the clinical history to determine the mechanism of death; the clinical history in this case includes the video evidence, as well as the EKG findings, and laboratory studies. The videos demonstrate that KN suffered cardiac arrest during prone restraint because his breathing was impaired at a time of elevated need for oxygen, and at a time when he needed maximal ventilatory effort to maintain oxygen supply-demand balance and to provide for respiratory compensation for metabolic acidosis. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to KN's need for higher levels of oxygen, and possible development of some element of metabolic acidosis. Prone restraint with compressive force to

2

his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest.

If, hypothetically, Excited Delirium caused KN's cardiac arrest, the paramedics would have recorded a heart rhythm of Ventricular Tachycardia (VT) or Ventricular Fibrillation (VF), but not Pulseless Electrical Activity (PEA).

Regarding opinions of Dr. Dawes:

1) Dr. Dawes opines that KN can be seen "breathing" before he was rolled over.
My rebuttal: Normal breathing with normal respiratory effort stops immediately after cardiac arrest, but agonal breathing, which is ineffective in maintaining oxygenation and acid-base balance, can continue for several minutes. KN had agonal breathing, but did not have normal respiratory effort before he was rolled over.

2) Dr. Dawes believes that "Metabolic acidosis may have caused PEA".
My rebuttal: PEA is caused most frequently by hypoxia secondary to respiratory failure, with respiratory insufficiency accompanying 40–50% of PEA cases. Metabolic acidosis may have been a secondary contributing cause to the PEA cardiac arrest. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to KN's need for higher levels of oxygen, and possible development of some element of metabolic acidosis. Prone restraint with compressive force to his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest. Regardless of the mechanism responsible for triggering the PEA cardiac arrest in this case, or in any other given restraint case, the restriction on breathing is fundamental to each of them, so in that sense these are all properly classified as asphyxiation, and allowing the subject to breathe without restriction, in other words using a recovery position rather than a prone restraint, would dramatically improve the outcome.

3) Dr. Dawes claims that KN was "severely acidotic on arrival to the hospital (his was pH 7.19, and lactic acid of 29.7)"

My rebuttal: I disagree that this level is "severely" acidotic, given the length of time that KN had no respirations or pulse. Normal pH ranges around 7.35 to 7.45. While severe acidosis can trigger a cardiac arrest, that is not the case at this level. Regardless, the hospital measurement is not an accurate measurement of what his pH was before the arrest. A pH of 7.19 is what you would expect to find after prolonged cardiac arrest even in a person with a normal pH before the arrest. Even if we are to assume that KN was acidotic to some degree, which is not unlikely, that's all the more reason he needed to be put into a position where he could breathe without obstruction or restriction, so that his acidosis could be mitigated by respiratory compensation, with reduction of $CO_2$ levels. The elevated Lactic acid level resulted from the cardiac arrest.

4) Dr. Dawes opines that KN had a "profound, mostly self-induced, metabolic acidosis".
My rebuttal: If metabolic-acidosis was from the methamphetamine and hyperactivity, its effect would have been minimized by Deputies putting him into recovery position immediately upon handcuffing, to allow respiratory compensation to correct the acid-base imbalance.

In this case, the most likely cause of metabolic acidosis is the cardiac arrest itself, with cessation of circulation and accumulation of lactic acid.

5) Dr. Dawes suggests that "A 'fatal' level of meth can cause a 'catecholamine storm' and can induce cardiac arrest."

My rebuttal: KN's presenting heart rhythm would have been VF (ventricular fibrillation), not PEA, if methamphetamine-induced catecholamine storm was the cause of the cardiac arrest. The coroner, Dr. Fajardo, in his deposition testimony, acknowledged that methamphetamine toxicity causing cardiac arrest would be expected to be associated with ventricular tachycardia or ventricular fibrillation, rather than PEA. He agreed that PEA is seen with asphyxia as the cause of death.

6) Dr. Dawes believes that the PEA arrest was possibly due to hemorrhagic shock, insofar as KN was bleeding profusely & scalp wounds can lead to exasanguination.

My rebuttal: Hypovolemia can cause PEA, but the far more likely cause of PEA here is hypoxia because if KN had lost enough blood to have PEA, the paramedics would not have been able to revive him.

7) Dr. Dawes opines that "We can't separate out the brain changes that occurred by the second day as being caused by hypoxic injury. These changes could have occurred from whatever head trauma caused the laceration and his head injury alone could have been a fatal injury regardless of his cardiac arrest."

My rebuttal: I disagree that head trauma caused the brain changes seen on brain scan on the second day. It's inconceivable that Dr. Dawes, an ER doctor, could reach such a conclusion. What KN suffered was precisely the sort of severe anoxic brain injury that we typically see after sustained loss of circulation due to cardiac arrest. I agree with Drs. Graham and Fajardo who concluded that the head trauma was significant enough to cause a concussion and possibly altered behavior, but not significant enough to cause anatomic or structural changes of the brain.

8) Dr. Dawes propounds: "It should be noted that the rate of survival with a good neurological recovery for PEA cardiac arrest is abysmal at 5% overall. Patients who have a PEA cardiac arrest almost universally have a poor outcome."

My rebuttal: I completely disagree with this claim. PEA due to hypoxia is frequently reversed, as shown here by the paramedics' ability to get KN's heart beating in a normal sinus rhythm. KN experienced too much hypoxic brain injury because he went about six minutes without any CPR before the paramedics arrived. The video evidence demonstrates that KN is fully handcuffed at 15:25:26, and he is obviously not in cardiac arrest at that time as he continued kicking his feet and trying to turn on his side to breathe. The cardiac arrest most likely occurred between the time KN visibly stopped moving, around 15:26:10, and when Deputy Keeney said he was "falling asleep" at 15:27:08. Any subsequent breaths apparent on the video are agonal. Paramedic LaRusso started CPR at 15:32:55, before turning chest compressions over to Deputy Kenney. Thus CPR started as long as 6 minutes after cardiac arrest. The amount of the patient's anoxic brain injury correlates with that amount of down time.

Regarding opinions of Dr. Clark:

1) Dr. Clark declares that: The cause of KN's cardiac arrest was his "fighting and struggling with the officers prior to his cardiac arrest." .

My rebuttal: The "fighting and struggling," along with the two taser applications, set the stage, but we don't expect to see PEA cardiac arrests in people who are involved in fighting and struggling without asphyxiation at the end. KN needed to be put in a recovery position after handcuffing, to breathe adequately after fighting and struggling, and having been subjected to the two taser applications. The cause of the cardiac arrest was the lack of adequate ventilation after handcuffing, not what happened before.

2) Dr. Clark states: "His struggle against the officers, coupled with his agitated activity and drug use, likely resulted in metabolic acidosis of his blood and possible electrolyte abnormalities, conditions that caused his heart to be more susceptible to the toxic effects of meth that he was using that day, and most likely leading to an irregular heart rhythm and cardiac arrest."

My rebuttal: I agree that the struggle, drug use (and TASER) likely created an element of metabolic acidosis. As Dr. Dawes explains, and as has been discussed previously in this report, breathing is the body's antidote to metabolic acidosis. This process is called respiratory compensation. Had KN been placed in a recovery position to facilitate his breathing, the metabolic acidosis would have been corrected by respiratory compensation. Toxic effects of methamphetamine would lead to an irregular heart rhythm of VT or VF, not PEA.

3) Dr. Clark proposes that "The mechanism of the sudden death syndrome is unclear but has been suggested to be from an irregular heart rhythm resulting from some combination of effects that can include electrolyte ( chemical) abnormalities in the blood, elevated body temperature, and elevated adrenaline levels in the body ( caused to be released into the body by the drug). These effects act synergistically with the drug on the body. The electrolyte abnormalities most common in patients with these excited delirium states and extreme struggles are elevations in potassium, and increased acidity of the blood (metabolic acidosis). Both electrolyte disorders can cause the heart to be more susceptible to potentially lethal irregular rhythms, such as ventricular tachycardia or fibrillation".

My rebuttal: There is not a single "mechanism of the sudden death syndrome." Each case has to be examined on its own facts, as I have done with this case. KN had PEA, not VT or VF; consequently, Excited Delirium causing cardiac arrest via these mechanisms can be ruled out. His body temperature was normal.

4) Dr. Clark remarks that "Many times, once a person deteriorates from the rapid irregular heart rate (ventricular tachycardia or fibrillation) into cardiac arrest, they go into a slower "agonal" or pre-death rhythm and cannot be resuscitated, even when it's witnessed in front of paramedics."

My rebuttal: Cardiologists classify VF as cardiac arrest, as there are no heart contractions to cause blood circulation, so this statement by Dr. Clark makes no sense medically. Agonal respiration or agonal breathing is defined as an abnormal pattern of breathing and brainstem reflex that is characterized by gasping and labored breathing in a dying patient or patient post cardiac arrest. ,Agonal refers to breathing, not cardiac rhythm, which we would call bradycardia (slow heart rate). Over time VF degenerates to asystole, not PEA. KN could have been in bradycardia from the hypoxia before he had

5

PEA. There is no way to tell. The fact that he was resuscitated by paramedics tends to disprove Clark's hypothesis.

5) Dr. Clark suggests that "Difficulty in resuscitation may result from a high potassium level in the blood or a metabolic acidosis (low pH of blood) caused by the agitation and struggle or convulsion and can be complicated by the effects of the drug."

My rebuttal: Paramedics did successfully resuscitate KN. The Metabolic acidosis could have been ameliorated by KN being in a recovery position, allowing adequate ventilatory effort, and enabling respiratory compensation of metabolic acidosis.

It is my opinion, with a reasonable degree of medical certainty, that KN's death was due to restraint/compressive asphyxia with mechanical obstruction of respiration, secondary to compressive force applied to his torso by the police officers with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing PEA cardiac arrest. Metabolic acidosis may have been a secondary contributing factor to the PEA arrest. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to KN's need for higher levels of oxygen, and possible development of some element of metabolic acidosis. Prone restraint with compressive force to his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest. Regardless of the mechanism responsible for triggering the PEA cardiac arrest in this case, or in any other given restraint case, the restriction on breathing is fundamental to each of them, so in that sense these are all properly classified as asphyxiation, and allowing the subject to breathe without restriction, in other words using a recovery position rather than a prone restraint, would dramatically improve the outcome.

Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

*Daniel Wohlgelernter*

DANIEL WOHLGELERNTER, MD, FACC