Eugene P. Ramirez, Esq. (State Bar No. 134865)
 *epr@manningllp.com*
Tony M. Sain, Esq. (State Bar No. 251626)
 *tms@manningllp.com*
Garros Chan, Esq. (State Bar No. 320561)
 *gxc@manningllp.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants,
COUNTY OF RIVERSIDE (erroneously named as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, and DEPUTY BRIAN KEENEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased, <br><br> Plaintiffs, <br><br> v. <br><br> RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, DEPUTY BRIAN KEENEY, and DOES 3-10, <br><br> Defendants. | Case No. 5:19-CV-02083-JGB(SHKx) <br> *[Hon. Jesus G. Bernal, District Judge; Hon. Shashi H. Kewalramani, Magistrate Judge]* <br><br> **[MOTION IN LIMINE NO. 4]** <br><br> **NOTICE OF MOTION AND MOTION *IN LIMINE* BY DEFENDANTS TO EXCLUDE FACTS UNKNOWN TO DEFENDANT DEPUTIES INCLUDING BUT NOT LIMITED TO SO-CALLED "RECOVERY" POSITION TRAINING; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF GARROS CHAN** <br><br> [*Proposed Order filed concurrently*] <br><br> Date: August 23, 2021 <br> Time: 9:00 a.m. <br> Crtrm.: 1 (Riverside) |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

1    PLEASE TAKE NOTICE THAT on August 23, 2021, at 9:00 a.m., or as soon
2    thereafter as the matter may be heard, in Courtroom 1 of the above-captioned court,
3    located at 3470 Twelfth Street, Riverside, California 92501, Defendants, COUNTY
4    OF RIVERSIDE (erroneously named as separate parties as COUNTY OF
5    RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-
6    CORONER CHAD BIANO, DEPUTY GOMEZ and DEPUTY KEENEY
7    ("Defendants") will move *in limine* for an order to exclude from trial any and all
8    expert opinions, argument, and/or reference before the jury, and from admission into
9    evidence, of: all evidence of so-called "recovery" position training or related risks
10   taught by other law enforcement agencies other than the Riverside County Sheriff's
11   Department, and/or alleged positional asphyxia "risks" that were not provided in
12   training or otherwise to the Defendant Deputies.

13       This motion is made pursuant to Fed. R. Evid. 401 *et seq.* on the grounds that
14   testimony, evidence, or argument regarding the issues identified above would be
15   irrelevant, unduly prejudicial, unduly consume time, and confuse the issues in this
16   matter.

17       This motion is based on the attached memorandum of points and authorities,
18   all pleadings, records, and files in this action, and upon such further oral and
19   documentary evidence as may be presented at the hearing on this motion. This motion
20   is made following the conference of counsel which took place on July 10, 2021.

21   DATED: July 26, 2021          **MANNING & KASS**
                                    **ELLROD, RAMIREZ, TRESTER LLP**
22

23

24                                 By:      */s/ Garros Chan*
25                                      Tony M. Sain, Esq.
26                                      Garros Chan, Esq.
                                        Attorneys for Defendants,
27                                      COUNTY OF RIVERSIDE, et al.
28

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.  INTRODUCTION AND SUMMARY OF ARGUMENT

This Court should exclude all evidence of so-called "recovery" position training or related risks taught by law enforcement agencies other than the Riverside County Sheriff's Department ("RSCD"), and/or alleged positional asphyxia "risks" that were not provided in training or otherwise to the Defendant Deputies.

Pursuant to *Graham v. Connor*, 490 U.S. 386 (1989), the alleged "risks" of positional asphyxia and "recovery" position training was indisputably unknown to Defendant Deputies and thus cannot be considered in any analysis of the reasonableness of their restraint/force.  Thus, such evidence is irrelevant to the instant matter and, even if it was relevant, would unduly prejudice Defendants, confuse the issues, and unduly consume time.

### 2.  FACTS NOT KNOWN TO THE DEFENDANT DEPUTIES AT THE TIME OF THE INCIDENT CANNOT BE CONSIDERED IN THE REASONABLENESS ANALYSIS.

"[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 396-397 (1989) (citations omitted).

The reasonableness of an officer's use of force/seizure can only be adjudged based on facts and circumstances known to the force-using officer *at the time the force was used*: facts unknown to the officer cannot play any role in the reasonableness analysis.  *Id.* at 396.  "We assess the reasonableness of force 'from the perspective of a reasonable officer on the scene,' *using the facts known to the officer at the time*…." *Brown v. Trejo*, 818 Fed. Appx. 599, 602 (9th Cir., Jun. 9, 2020) (emphasis added). "The '"reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' [Citation]. The court therefore considers *the facts known to Defendants at*

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

1  *the time of the incident*." *Halbert v. Cnty. of San Diego*, 2010 U.S. Dist. LEXIS
2  30563, *25 (S.D. Cal., Mar. 30, 2010) (emphasis added).

3     In this vein, the U.S. Supreme Court holds that "judges should be cautious
4  about second-guessing a police officer's assessment, made on the scene, of the danger
5  presented by a particular situation." *See Ryburn v. Huff*, 565 U.S. 469, 477 (2012)
6  (reversing the Ninth Circuit and ordering summary judgment for the officers where,
7  "with the benefit of hindsight and calm deliberation,...[the lower court had] concluded
8  that it was unreasonable for [the officers] to fear that violence was imminent").

9     "[A]fter-the-fact analysis violates the fundamental precept of *Graham*; namely,
10 'the "reasonableness" of a particular use of force must be judged from the perspective
11 of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'
12 [Citation]." *Forrester v. City of San Diego*, 25 F.3d 804, 808, fn.4 (9th Cir. 1994).
13 "Information gained after the fact cannot be relied upon in analyzing the propriety of
14 the officers' conduct." *Scott v. Henrich*, 700 F.Supp. 498, 505 (D. Mont. 1988) *aff'd
15 by Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994).  "Information acquired by an officer
16 after he uses force is not relevant in the excessive force analysis, which requires
17 consideration of whether the force would have been reasonable given the information
18 that was available to the officer at the time of the incident—and not with 'the 20/20
19 vision of hindsight.'" *M.R. v. City of Azusa*, 2014 U.S. Dist. LEXIS 204804, *3 (C.D.
20 Cal., Oct. 1, 2014).  *See, also*, *Baldridge v. City of Santa Rosa*, 1999 U.S. Dist. LEXIS
21 1414, at *20-21 (N.D. Cal. Feb. 9, 1999 (holding that it was irrelevant that the
22 decedent was unarmed as his actions alone "could cause a reasonable officer to fear
23 imminent and serious physical harm."); *Sherrod v. Berry*, 856 F.2d 802, 805-807 (7th
24 Cir. 2008 (whether a gun was found at the scene is irrelevant to a determination of
25 whether an officer acted reasonably under the circumstances); *Rippey v. Dopp*, 19
26 Fed.Appx. 702, 703 (9th Cir. 2001) (citing *Sherrod* and declining to reverse the
27 exclusion of the suspect being unarmed); *Barnes v. City of Pasadena*, 508 Fed. Appx.
28 663, 665 (9th Cir. 2013) ("Even if an issue of fact existed about the presence of a gun,

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
Attorneys at Law

the determinative issue was whether the officers reasonably believed [suspect] had a gun and posed an immediate threat to safety.")  California law also holds that officers' seizure-related conduct can only be adjudged with facts and information actually known to them at the time of the seizure.  *Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 632; *Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 514; *Martinez v. County of L.A.* (1996) 47 Cal.App.4th 334, 343; *Koussaya v. City of Stockton*, 54 Cal.App.5th 909, 934.

Here, neither Deputy Keeney nor Deputy Gomez were aware of any practice or training requirement that *all* secured prone-restrained subjects are supposed to be moved into an on-the-side "recovery" position in every case and in every circumstance.  Rather, their training was that moving someone off of a prone position would only be appropriate in association with a carotid/neck restraint: which was never applied here and which restraint is no longer permitted.

Both Deputy Gomez and Deputy Keeney received the following training as law enforcement officers: that even for subjects suspected of experiencing excited delirium, even if a suspect was handcuffed, the safest position – for both the subject and the officer – is for the subject to be restrained in a prone position.  Once restrained effectively, their training was to request medical aid to the scene.  (Exh. A, Keeney Depo., 92:7-17; Exh. B, Gomez Depo.,  38:24-39:1, 39:13-22, 48:25-50:3.)

Neither of the Defendant Deputies was ever trained that certain restraint positions, such as prone positioning, may be more dangerous or risky to subjects' health than others.  (Exh. A, 91:22-92:6, 92:18-24; Exh. B, 50:4-16, 51:5-16, 52:3-53:22.)  Further, neither deputy was trained that placing a restrained subject on their side, a so-called "recovery" position, was advisable.  Rather, both deputies were trained that the prone restraint has no negative impacts on a subject's breathing.  (Exh. A, 38:8-12, 39:5-21; Exh. B, 50:21-51:4.)

In light of the decades of medical research known to RCSD about prone restraint, showing that it is safe and does not cause or contribute to asphyxia, RCSD

trains its deputies, including the defendants, that the safest position – for the subject, the deputy, and the public – for a person to be restrained is in the prone, cuffed position. (Ex. C, Bianco Depo., 57:19-58:21.) RCSD does not train its deputies to roll restrained persons into an on-the-side (or "recovery" or "rescue") position because, based on the Training Bureau's research, such a position is less safe for all involved than the prone position. (*Id.*)

It is undisputed in this case that neither Deputy Keeney nor Deputy Gomez were aware of any practice or training requirement that *all* secured prone-restrained subjects are supposed to be moved into an on-the-side "recovery" position. Rather, their training was that moving someone off of a prone position would only be appropriate in association with a carotid/neck restraint: which was never applied here and which restraint is no longer permitted. Thus, because Deputy Keeney and Deputy Gomez were not aware of any practice or training that would have caused them to move Kevin Niedzialek into a "recovery" position at the time the force was used, such facts cannot play a role in the reasonableness analysis in this matter and should be excluded.

## 3.   EVIDENCE OF "RECOVERY" POSITION TRAINING IS IRRELEVANT.

Pursuant to Fed. R. Evid. 401, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; *and* the fact is of consequence in determining the action." (Emphasis added.) As discussed above, evidence of "recovery" position training is irrelevant to the use of force reasonable analysis in this matter because it is undisputed that Deputy Keeney and Deputy Gomez did not receive and were not aware of any such training at the time of the incident.

Beyond the actions of Defendant Deputies in this matter, evidence of recovery position training is also irrelevant because Plaintiff's police practices expert, Jeffrey Noble, cannot identify a single scientific or medical study finding that prone

positioning causes or contributes to asphyxia, which could have caused other agencies to adopt a "recovery" position policy.  (Exh. D, Noble Depo., 105:5-21.)

Despite being unable to identify any scientific or medical studies supporting "recovery" position policies, Mr. Noble holds the opinion that holding Mr. Niedzialek in a prone position after he had been handcuffed was inconsistent with generally accepted police practices, objectively unreasonable, and disregarded the known risk to Mr. Niedzialek's health, safety, and welfare.  (*Id.* at 48:18-23.)  However, Mr. Noble admits that he cannot offer an opinion as to whether the acts or omissions of either Deputy Keeney or Deputy Gomez violated any policies or procedures of RCSD.  (*Id.* at 97:14-22.)

The policies of other law enforcement agencies are irrelevant to this matter.  Plaintiff cannot produce evidence that there is an actual basis for differing policies involving "recovery" positioning; therefore, such differing policies have no bearing on the subject incident.  What is at issue is what was known by the Defendant Deputies at the time of the incident, not outside knowledge and/or policies.  Thus, evidence of "recovery" position training should be excluded.

Furthermore, RCSD cannot be held liable for alleged negligence in its training, supervision, hiring, supervision or discipline of its officers.  *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 840 (9th Cir. 1996) (a public entity could not be held directly liable for negligence where officers broke into a home and tortured residents); *Heflin v. County of Los Angeles*, 438 Fed. Appx. 596, 597 (9th Cir. 2011) (public entity could not be held directly liable under California law for negligent hiring, supervision, or training of one of its Sheriff's deputies); *Molieri v. County of Marin*, 2012 U.S. Dist. LEXIS 53128, *17 (N.D. Cal. 2012) (holding that, under California law, there can be no negligence liability regarding pre-seizure retention, supervision, training, or discipline of police officers because there is no statutory basis for such a duty of care by the public entity).  Thus, any opinion alleging RCSD's training and policies are deficient are legally irrelevant, absent of deliberate indifference to constitutional

1  rights violations sufficient to support *Monell* liability, of which there is no evidence

2  in this matter.  Specifically, RCSD made its decision based on best science available

3  to it, so it cannot be said to have acted with deliberate indifference, especially where

4  there are no national standards for peace officers to always roll a suspect on their side

5  after being placed under arrest.  Such irrelevant evidence should be excluded.

6  **4.    EVIDENCE OF "RECOVERY" POSITION TRAINING IS UNDULY**

7  **PREJUDICIAL, WILL CONFUSE ISSUES IN THIS MATTER, AND**

8  **WILL UNDULY CONSUME TIME.**

9      As discussed above, it is unduly prejudicial to bring in evidence of police

10  procedures and training that differ from those that were used in the subject matter.  It

11  is well-established law that the assessment of a claim of excessive force is in light of

12  the facts and circumstances in each particular incident.  *Graham*, 490 U.S. at 396;

13  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court (judge or jury) cannot

14  apply this standard mechanically.").

15      Further, to add to such a fact-specific analysis for police policies and

16  procedures that are irrelevant to the issue at hand would more than likely confuse the

17  jury when their analysis is to be focused on what the Defendant Deputies knew at the

18  time at the use of force.  Introducing opinions on which police policies and procedures

19  are preferable (and based on no scientific or medical studies) obscures the focus of

20  the analysis on the Defendant Deputies' *actual* knowledge and training.

21      Because such information is irrelevant, prejudicial, and likely to confuse the

22  jury, allowing it to be heard would unduly consume a significant and finite amount of

23  time in this trial.  Thus, this information should be excluded.

24  **5.    CONCLUSION.**

25      Defendants respectfully request that his Court grant this motion *in limine* in its

26  entirety and exclude from trial any and all expert opinions, argument, and/or reference

27  before the jury, and from admission into evidence, of: all evidence of so-called

28  "recovery" position training or related risks taught by law enforcement agencies other

1 than the Riverside County Sheriff's Department, and/or alleged positional asphyxia

2 "risks" that were not provided in training or otherwise to the Defendant Deputies.

3

4 DATED: July 26, 2021          **MANNING & KASS**

5                               **ELLROD, RAMIREZ, TRESTER LLP**

6

7                               By:     */s/ Garros Chan*
                                     _____
8                                    Tony M. Sain, Esq.

                                     Garros Chan, Esq.
9                                    Attorneys for Defendants,

                                     COUNTY OF RIVERSIDE (erroneously
10                                   named as separate parties as COUNTY OF

11                                   RIVERSIDE and RIVERSIDE SHERIFF'S

                                     DEPARTMENT), SHERIFF-CORONER
12                                   CHAD BIANCO, DEPUTY SONIA

13                                   GOMEZ, and DEPUTY BRIAN KEENEY

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **DECLARATION OF GARROS CHAN**

I, Garros Chan, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am an attorney with Manning & Kass, Ellrod, Ramirez, Trester LLP, attorneys of record for Defendants COUNTY OF RIVERSIDE (erroneously named as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY SONIA GOMEZ, and DEPUTY BRIAN KEENEY (collectively herein after as "Defendants").  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.     I make this declaration in support of Defendants' motion in limine.

3.     Attached hereto as Exhibit "A" and incorporated by reference herein is a true and correct copy of excerpts from the deposition transcript of Deputy Brian L. Keeney, which has been redacted due to size.

4.     Attached hereto as Exhibit "B" and incorporated by reference herein is a true and correct copy of excerpts from the deposition transcript of Deputy Sonia M. Gomez, which has been redacted due to size.

5.     Attached hereto as Exhibit "C" and incorporated by reference herein is a true and correct copy of excerpts from the deposition transcript of Sherriff-Coroner Chad Bianco, which has been redacted due to size.

6.     Attached hereto as Exhibit "D" and incorporated by reference herein is a true and correct copy of excerpts from the deposition transcript of Jeffrey Noble, which has been redacted due to size.

///
///
///
///

1    I declare under penalty of perjury under the laws of the United States of

2 America that the foregoing is true and correct.

3    Executed on July 26, 2021, at Los Angeles, California.

4

5                                                   */s/ Garros Chan*

6                                                   Garros Chan, Esq.

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   TRACY ALVES, AN INDIVIDUAL   )  CASE NO.: 19-CV-2083-JGB
     AND AS SUCCESSOR IN INTEREST )                   (SHKx)
 5   FOR KEVIN R. NIEDZIALEK,     )
     DECEASED,                    )
 6                                )
                   PLAINTIFF,     )
 7                                )
         VS.                      )
 8                                )
     RIVERSIDE COUNTY, RIVERSIDE  )
 9   SHERIFF'S DEPARTMENT,        )
     SHERIFF-CORONER CHAD BIANCO, )
10   DEPUTY SONIA GOMEZ, DEPUTY   )
     BRIAN KEENEY, AND DOES 3-10, )
11                                )
                   DEFENDANTS.    )
12   _____ )

13

14        DEPOSITION OF DEPUTY BRIAN L. KEENEY

15             ZOOM VIDEOCONFERENCE

16           FRIDAY, DECEMBER 18, 2020

17

18

19

20

21
     RON FERNICOLA & ASSOCIATES
22   CERTIFIED SHORTHAND REPORTERS
     REPORTED BY: LESLIE A. TOLEDO, CSR NO. 8345
23   1244 West Edgeowwd Circle
     Coeur d'Alene, Idaho 83815
24   (661) 775-8299

25   FILE NO: 20518
                                                    1
```

```
1   DEPOSITION OF DEPUTY BRIAN L. KEENEY, A DEFENDANT, TAKEN

2   ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

3   COMMENCING AT 10:00 A.M., AND ENDING AT 2:15 P.M., ON

4   FRIDAY, DECEMBER 18, 2020, BEFORE LESLIE A. TOLEDO,

5   CSR NO. 8345, PURSUANT TO SUBPOENA.

6                            * * *

7   APPEARANCES OF COUNSEL:

8   FOR PLAINTIFF:       THE LAW OFFICES OF JOHN BURTON
                         BY:  JOHN BURTON, ESQ. - VIA ZOOM
9                        128 NORTH FAIR OAKS AVENUE
                         PASADENA, CALIFORNIA 91103
10                       (626) 449-8300

11                           - and -

12                       HELM LAW OFFICES, PC
                         BY:  T. KENNEDY HELM, IV - VIA ZOOM
13                       644 40TH STREET
                         SUITE 305
14                       OAKLAND, CALIFORNIA 94609
                         (510) 350-7517

15

16  FOR DEFENDANTS:      MANNING & KASS
                         ELROD, RAMIREZ, TRESTER, LLP
17                       BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                         BY:  GARROS CHAN, ESQ. - VIA ZOOM
18                       801 SOUTH FIGUEROA STREET
                         FIFTEENTH FLOOR
19                       LOS ANGELES, CALIFORNIA 90017
                         (213) 624-6900
20                       TMS@MANNINGLLP.COM

21

22

23

24

25
                                                             2
```

1      FRIDAY, DECEMBER 18, 2020; VIA ZOOM VIDEOCONFERENCE

2                          10:00 A.M.

3

4                    DEPUTY BRIAN L. KEENEY,

5      the witness herein, having first been duly administered

6      the oath, testified remotely as follows:

7

8                          EXAMINATION

9      BY MR. BURTON:

10         Q.   Good morning, sir.  Could you please state your

11     complete name for the record?

12         A.   Brian, B-r-i-a-n, Lee, L-e-e, Keeney,

13     K-e-e-n-e-y.

14         Q.   Are you currently a Riverside County deputy

15     sheriff?

16         A.   Yes.

17         Q.   Have you ever had a deposition taken before?

18         A.   No.

19         Q.   I understand that you were on the Zoom yesterday

20     during Deputy Gomez's deposition; is that correct?

21         A.   Yes.

22         Q.   And I'm sure you've had an opportunity to

23     discuss these proceedings with your counsel, which I

24     don't want to ask about.  Just very briefly, let me know

25     if I've phrased a question in a way that presents any

                                                        4

1    and the officer, the other student, walking up and

2    practicing going through how to control the arm, how to

3    place the knee across the shoulder, how to handcuff.

4           And I, personally, myself, both in the academy

5    and during these classes, have been in the prone position

6    for an extended amount of time, both unhandcuffed and

7    handcuffed.

8        Q.   And again, my question was:  Were you given any

9    training, either in the academy or during these refresher

10   courses, that after you put somebody in handcuffs in a

11   prone position, to move them off their chest?

12       A.   No.

13       Q.   I'm sorry, did you answer or are you thinking?

14   I just --

15           MR. SAIN:  He answered.

16       Q.   BY MR. BURTON:  The answer was, "No"?  It's just

17   sometimes it's hard to pick it up.

18       A.   We can defer to the court reporter for a read

19   back.

20           MR. BURTON:  Yeah, could I just get the question

21   and answer read back, please.

22               (The record was read back.)

23       Q.   BY MR. BURTON:  So you mentioned that during

24   this training, you had a lot of experience in the role of

25   the suspect, the person getting handcuffed in a prone

                                                        38

 1  position.  And that during your experience doing this,

 2  you never had trouble breathing; is that correct?

 3      A.   I have never had any trouble breathing in the

 4  prone position.

 5      Q.   So has anybody from your department told you

 6  anything to the effect of, while a healthy person might

 7  not have any difficulty breathing while in a prone

 8  position, handcuffed, with officers holding him down to

 9  one degree or another, a person who is in a state of

10  agitated or excited delirium, or who is under the

11  influence of a stimulant drug, or who had just been in a

12  fight with officers, and has lots of adrenaline going and

13  so on, they might experience a negative effect from being

14  held on their chest?

15          So after they're handcuffed, when it's safe to

16  do so, they should be rolled onto their side, or sat up,

17  or at least taken off their chest in some position.  Did

18  you ever get any instructions, generally, along those

19  lines?

20      A.   My training and experience is, there has been no

21  difficulties while breathing in the prone position.

22      Q.   Well, do you include in your experience what

23  happened to Mr. Niedzialek?

24          MR. SAIN:  Vague as phrased.

25          THE WITNESS:  I don't understand.

                                                    39

**Ron Fernicola & Associates**

1   people from your department, or the district attorney's

2   office, or the coroner's office, but not including

3   counsel, about this case?

4       A.   I guess I don't understand, "conversations."

5       Q.   Well, did anybody who falls into one of those

6   categories, an investigator, let's say, a superior from

7   the sheriff's department, an investigator from the

8   coroner's office, or an investigator/attorney from the

9   district attorney's office, speak to you about this case,

10   other than those three conversations with Investigator

11   Trudeau?

12       A.   I mean, I spoke with the sergeant on scene.  I

13   spoke with the deputies who were present on scene.

14       Q.   So is that everyone?

15           MR. SAIN:  Counsel?

16           MR. BURTON:  Okay.  Thank you.  I have no

17   further questions at this time.

18           MR. SAIN:  All right.  Deputy Keeney, just a few

19   clarifications.

20                         EXAMINATION

21   BY MR. SAIN:

22       Q.   This mechanism of communication sometimes is

23   fallible, so I'm not sure I heard your answers to a few

24   of Mr. Burton's questions.  Mr. Burton was asking you

25   about, in general, whether or not you've received any

91

**Ron Fernicola & Associates**

1    training that restraining someone in the prone position

2    may affect or impair breathing.

3            Is that anything that you've been trained on,

4    that restraining someone in a prone position may impair

5    breathing?

6       A.   No.

7       Q.   And Mr. Burton was asking questions about

8    whether or not you received any training, that someone

9    with excited delirium, or with symptoms of excited

10   delirium, might have a higher risk of death in

11   association with restraint?  Have you ever received any

12   training to that effect?  In other words -- sorry -- go

13   ahead.

14      A.   What I recall from the portion of excited

15   delirium is that, again, our responsibility is to try and

16   contain the subject, but to have medical respond as soon

17   as possible.

18      Q.   Fair enough.  I think the thrust of Mr. Burton's

19   questions was trying to determine if, as a part of your

20   training, someone had ever said to you that someone with

21   excited delirium might be in greater danger from being

22   restrained than other people?  Is that something that

23   somebody said to you in training or not?

24      A.   I don't recall it being covered.

25      Q.   And similarly, I think Mr. Burton was asking

92

**Ron Fernicola & Associates**

1          (Signature page to the deposition of

2              Deputy Brian L. Keeney.)

3

4                      --oOo--

5      I hereby certify under the penalty of perjury that I

6  have read the foregoing transcript.

7      Corrections, if any, were noted by me, and the same

8  is now a true and correct transcript of my testimony.

9      Executed this _____day of _____,

10  2021, at _____.

11

12

13                    _____

14                    DEPUTY BRIAN L. KEENEY

15

16

17

18

19

20

21

22

23

24

25
                                                        97

1

2

3                    REPORTER'S CERTIFICATE

4

5       I, Leslie A. Toledo, CSR #8345, a certified shorthand

6   reporter licensed by the State of California, do hereby

7   certify:

8       That prior to being examined, the witness named in

9   the foregoing deposition, BRIAN L. KEENEY, stated to

10  testify to the truth, the whole truth, and nothing but

11  the truth;

12      That the said deposition, taken down by me in

13  stenotype, was thereafter reduced to typewriting by

14  computer-aided transcription under my direction and is a

15  true record of the testimony given and of any changes

16  made by the deponent.

17      I further certify that I am not in any way

18  interested in the outcome of this action and that I am

19  not related to any of the parties thereto.

20      Witness my hand this day     of            , 2020.

21

22                          _____

                            LESLIE A. TOLEDO, CSR #8345
23

24

25
                                                            99

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    TRACY ALVES, AN INDIVIDUAL    )  CASE NO.: 19-CV-2083-JGB
     AND AS SUCCESSOR IN INTEREST )                   (SHKx)
5    FOR KEVIN R. NIEDZIALEK,       )
     DECEASED,                      )
6                                   )
                    PLAINTIFF,      )
7                                   )
         VS.                        )
8                                   )
     RIVERSIDE COUNTY, RIVERSIDE   )
9    SHERIFF'S DEPARTMENT,          )
     SHERIFF-CORONER CHAD BIANCO, )
10   DEPUTY SONIA GOMEZ, DEPUTY    )
     BRIAN KEENEY, AND DOES 3-10,  )
11                                  )
                    DEFENDANTS.     )
12   _____)

13

14            DEPOSITION OF DEPUTY SONIA M. GOMEZ

15                    ZOOM VIDEOCONFERENCE

16             THURSDAY, DECEMBER 17, 2020

17

18

19

20

21
     RON FERNICOLA & ASSOCIATES
22   CERTIFIED SHORTHAND REPORTERS
     REPORTED BY: LESLIE A. TOLEDO, CSR NO. 8345
23   1244 West Edgewood Circle
     Coeur d'Alene, Idaho 83815
24   (661) 775-8299

25   FILE NO. 20513
                                                              1

```
 1   DEPOSITION OF DEPUTY SONIA M. GOMEZ, A DEFENDANT, TAKEN

 2   ON BEHALF OF PLAINTIFF, VIA ZOOM VIDEOCONFERENCE,

 3   COMMENCING AT 10:02 A.M., AND ENDING AT 3:26 P.M., ON

 4   THURSDAY, DECEMBER 17, 2020, BEFORE LESLIE A. TOLEDO,

 5   CSR NO. 8345, PURSUANT TO SUBPOENA.

 6                             * * *

 7   APPEARANCES OF COUNSEL:

 8   FOR PLAINTIFF:      THE LAW OFFICES OF JOHN BURTON
                         BY:  JOHN BURTON, ESQ. - VIA ZOOM
 9                       128 NORTH FAIR OAKS AVENUE
                         PASADENA, CALIFORNIA 91103
10                       (626) 449-8300

11                           - and -

12                       HELM LAW OFFICES, PC
                         BY:  T. KENNEDY HELM, IV - VIA ZOOM
13                       644 40TH STREET
                         SUITE 305
14                       OAKLAND, CALIFORNIA 94609
                         (510) 350-7517
15

16   FOR DEFENDANTS:     MANNING & KASS
                         ELROD, RAMIREZ, TRESTER, LLP
17                       BY:  TONY M. SAIN, ESQ. - VIA ZOOM
                         BY:  GARROS CHAN, ESQ. - VIA ZOOM
18                       801 SOUTH FIGUEROA STREET
                         FIFTEENTH FLOOR
19                       LOS ANGELES, CALIFORNIA 90017
                         (213) 624-6900
20                       TMS@MANNINGLLP.COM

21   ALSO PRESENT:       DEPUTY BRIAN L. KEENEY - VIA ZOOM

22

23

24

25
                                                             2
```

```
 1     THURSDAY, DECEMBER 17, 2020; VIA ZOOM VIDEOCONFERENCE

 2                      10:02 A.M.

 3

 4               DEPUTY SONIA M. GOMEZ,

 5   the witness herein, having first been duly administered

 6   the oath, testified remotely as follows:

 7

 8                      EXAMINATION

 9   BY MR. BURTON:

10     Q.   Good morning, Deputy Gomez.  I can kind of --

11   make sure we keep our voice up, because we have to do

12   things a little differently to make sure we get a good

13   record on Zoom.

14          Have you ever had your deposition taken before?

15          I'm sorry?

16     A.   No.

17     Q.   I think that's an example.  Okay.  Could we

18   start by, could you state your complete name for the

19   record, please?

20     A.   Sonia Gomez.

21     Q.   Do you have a middle name?

22     A.   Sonia Maria Gomez.

23     Q.   And are you currently a deputy sheriff with the

24   County of Riverside?

25     A.   Yes.
```

4

1  the X2 in 2016.  That would be March of 2016.  So I know

2  it's a while, it's hard to remember.

3          But were you trained at that time that if

4  confronted with a suspect who is exhibiting signs of

5  excited or agitated delirium, the use of the Taser could

6  increase the risk of death or great bodily injury?

7      A.   I don't recall.  I know it's talked about, but I

8  don't recall exactly.

9      Q.   Do you recall whether you were trained that when

10 a Taser is being used on a person who might be exhibiting

11 signs of agitated or excited delirium, that the object

12 was to get the person into restraints as quickly as

13 possible and to minimize the length of time of the

14 struggle?

15     A.   I know when someone is experiencing -- if we

16 assume that they're experiencing excited delirium, our

17 priority is to secure the subject and request medical

18 assistance immediately.

19     Q.   So let's now, if we could, shift topics from the

20 Taser to excited delirium, or agitated delirium.  These

21 are phrases that are used sometimes to describe a

22 condition that law enforcement officers sometimes

23 encounter in the field.

24          Have you been trained in these concepts,

25 agitated or excited delirium?

38

**Ron Fernicola & Associates**

1     A.   Yes, I have been trained about it.

2     Q.   Do you recall whether you were trained about it

3  when you were in the academy?

4     A.   Possibly, I don't -- I don't recall.

5     Q.   When do you recall first being trained about it?

6     A.   I don't recall the exact date, but I do know

7  that I was trained on it.

8     Q.   Now, besides the academy training you had, and

9  what we've talked about as transition school, you've had

10  regular additional training from your department;

11  correct?

12     A.   Yes.

13     Q.   And that could be on a variety of topics.  We've

14  covered a couple of them.  For example, the Taser X26 and

15  the Taser X2.  Have you had any additional training

16  specifically on agitated or excited delirium?

17     A.   I've had CIT training, which is Crisis

18  Intervention Training.  I've had two courses in that,

19  which is 16-hour courses, one in 2011 and one in 2015.

20  And it talks about people with mental illness, mental

21  health, and I believe excited delirium was introduced in

22  that course.

23     Q.   Maybe -- let's see if we can find that on

24  Exhibit 18, if that's okay?  So the first one you said

25  was in 2011?

                                                    39

**Ron Fernicola & Associates**

1    be some combination of the two; is that correct?

2        A.   That's correct.

3        Q.   And so is it possible for you as a responding

4    deputy to diagnose whether it's a mental illness, whether

5    it's drugs, or whether it's a combination when you

6    initially encounter the person, and you don't know any

7    history, no one has told you he's been smoking meth or

8    whatever?

9        A.   I don't understand the question.

10       Q.   Well, I think what I'm getting at is, whether,

11   when you encounter somebody like that and you don't know

12   how they got that way, it could be mental illness, it

13   could be drugs, or it would be a combination, whether how

14   they got that way would make any difference in how you

15   would deal with them, or you would -- according to your

16   CIT training, deal with them the same way regardless?

17       A.   Yes.  When dealing with anyone with mental

18   illness or maybe under the influence, our job is to make

19   sure -- secure them, make sure they're safe, and others

20   are safe, so we can safely find out what's going on with

21   them.

22            And if, in the course of that, force is used,

23   assess their medical need, and then if they do need

24   medical assistance, get medical help.

25       Q.   And in regards to safely restraining them, were

48

1  you trained in either of these two CIT courses that a

2  person who is in a state of excited or agitated delirium,

3  is more susceptible to an in-custody and arrest-related

4  death, while being taken into custody than other people?

5       MR. SAIN:  Assumes facts.

6       THE WITNESS:  I was trained that whenever we

7  encounter somebody experiencing excited delirium, secure

8  them as safe as possible to make sure they're not a

9  threat to themselves or others, and request medical help

10 immediately.

11    Q.   BY MR. BURTON:  Now, once -- were you trained at

12 any point in your career, that once a person is

13 restrained, and if they're in a state of excited or

14 agitated delirium, that they should be put in a position

15 where they can breathe?

16      MR. SAIN:  Vague and unintelligible.

17      THE WITNESS:  Once someone is secured, we'll put

18 them in a position that's safe for ourselves as well and

19 them.  And once we feel like it's safe, we'll request

20 medical help -- medical help immediately.

21    Q.   BY MR. BURTON:  Right now, I'm focused on a

22 person who has been put into handcuffs.  Have you ever

23 been trained that once the person is restrained in

24 handcuffs, if possible, they should be put into a --

25 what's called a "recovery position"?

49

**Ron Fernicola & Associates**

1    A.   We keep them where at the time, whenever they're

2  handcuffed, keep them in a position that we feel safe for

3  ourselves and for them as well.

4    Q.   Well, have you been trained that certain

5  positions for them, for the people who are being

6  restrained who are in excited delirium or agitated

7  delirium, that certain positions are more dangerous than

8  other positions?

9    A.   No.

10    Q.   Well, your answer was that you were trained to

11  keep them in a position that was safe for them.

12    A.   Yes.

13    Q.   What were you trained about what positions are

14  safe and what positions are not safe?

15    A.   All the positions that we are trained on have

16  been considered safe.

17    Q.   Have you ever heard in your training, in this

18  context, general context, the phrase, "recovery

19  position"?

20    A.   I don't recall.

21    Q.   Have you ever been trained that when somebody is

22  in handcuffs and is under control, and if they're in a

23  state of excited or agitated delirium, that it would be

24  safer to have them on their side or sitting up, rather

25  than on their chest?

50

1          MR. SAIN:  Assumes facts.

2          THE WITNESS:  From our understanding, being in

3   the prone position doesn't affect their breathing, and

4   doesn't state that we have to put them on their side.

5       Q.  BY MR. BURTON:  So you've never been trained --

6   this is your testimony -- that after somebody who has

7   been in an agitated or excited state, is in handcuffs,

8   that it's preferable to put them on their side, or

9   sitting them up, rather than leaving them on their chest;

10  is that correct?

11         MR. SAIN:  Asked and answered.

12         THE WITNESS:  That's correct.  We don't have to

13  put them on their side.  If we still feel the need that

14  they need to be proned on their chest, then for safety

15  reasons, then we'll keep them there, but we have not been

16  trained where we have to put them on their side.

17      Q.  BY MR. BURTON:  Well, you keep --

18      A.  Excuse me.  I wasn't finished.  The only time

19  that was said was when we, at one point, was able to use

20  a carotid restraint, and that was only to assist them and

21  help them to their feet.  But we no longer use the

22  carotid restraint, so therefore, that doesn't exist

23  anymore.

24      Q.  In your entire career -- I'm sorry, you keep

25  sort of changing my question a little bit.  I'm not

51

1  talking about what you have to do.  It's a little more

2  nuanced than that.

3          Have you ever been trained that when dealing

4  with a person who might be in a state of excited or

5  agitated delirium, and the person is restrained, and is

6  handcuffed behind his back in a prone position, that when

7  feasible, it is preferable to put that person on his

8  side, or sit him up rather than leaving him prone?

9          MR. SAIN:  Asked and answered twice.

10          THE WITNESS:  When dealing with excited

11  delirium, we are told to secure the person, make sure

12  they are safe from themselves and from others, and

13  request medical assistance immediately.  And as far as

14  putting them on their side, we have not been trained that

15  we need to put them on their side.

16      Q.  BY MR. BURTON:  Well, you keep saying you've not

17  been trained that you need to put them on their side, but

18  have you been trained that, when feasible, it's

19  preferable to put them on their side?

20          MR. SAIN:  Same objections.

21          THE WITNESS:  We don't have to put them on their

22  side.

23      Q.  BY MR. BURTON:  I get that.  You've said that,

24  like, four or five times.  But have you been trained, yes

25  or no, that, when feasible, it's preferable to put them

52

**Ron Fernicola & Associates**

1  on their side?

2           MR. SAIN:  Same objections.

3           THE WITNESS:  No.  If we monitor them and

4  they're fine in the prone position, and we feel safe

5  leaving them there, they can stay there until we need to

6  get them up.

7      Q.   BY MR. BURTON:  When were you trained that?

8      A.   During my training.

9      Q.   I mean, can you point to any -- I, mean we've

10 had, you know, the academy, transition school, CIT, Taser

11 training.  I'm sure you've had other training that's

12 detailed on Exhibit 18.

13          I mean, do you know what training you got, that

14 particular training?

15     A.   Yes.  We've had arrest and control and technical

16 communications training, even in the academy, learning

17 how to properly restrain subjects.

18     Q.   And any other training where you specifically

19 got that training?

20     A.   We were trained in the training to keep them in

21 the position that you feel necessary for their safety and

22 for our safety.

23     Q.   Now, you mentioned in your prior answer a few

24 answers ago, that it was okay to leave them on their

25 chest as long as you, the deputies, monitored them.  Do

                                                      53

1      (Signature page to the deposition of

2           Deputy Sonia M. Gomez.)

3

4                --OOO--

5      I hereby certify under the penalty of perjury that I

6  have read the foregoing transcript.

7      Corrections, if any, were noted by me, and the same

8  is now a true and correct transcript of my testimony.

9      Executed this _____day of _____,

10  2021, at _____.

11

12

13                    _____

14                    DEPUTY SONIA M. GOMEZ

15

16

17

18

19

20

21

22

23

24

25                                                    124

1

2

3                    REPORTER'S CERTIFICATE

4

5        I, Leslie A. Toledo, CSR #8345, a certified shorthand

6    reporter licensed by the State of California, do hereby

7    certify:

8        That prior to being examined, the witness named in

9    the foregoing deposition, SONIA M. GOMEZ, stated to

10   testify to the truth, the whole truth, and nothing but

11   the truth;

12       That the said deposition, taken down by me in

13   stenotype, was thereafter reduced to typewriting by

14   computer-aided transcription under my direction and is a

15   true record of the testimony given and of any changes

16   made by the deponent.

17       I further certify that I am not in any way

18   interested in the outcome of this action and that I am

19   not related to any of the parties thereto.

20       Witness my hand this day      of            , 2020.

21

22       _____

23       LESLIE A. TOLEDO, CSR #8345

24

25
                                                        126

**Ron Fernicola & Associates**

# EXHIBIT C

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3

4   TRACY ALVES, Individually and    )
    as Successor in Interest for     )
5   KEVIN R. NIEDZIALEK, deceased,   )
                                     )
6                  Plaintiff,        )
                                     )
7            VS.                     )   No.
                                     )   19-CV-2083-JGB-SHK
8   RIVERSIDE COUNTY, RIVERSIDE      )
    SHERIFF'S DEPARTMENT,            )
9   SHERIFF-CORONER CHAD BIANCO,     )
    DEPUTY SONIA GOMEZ, DEPUTY       )
10  BRIAN KEENEY, and DOES 3-10,     )
                                     )
11                 Defendants.       )
    _____)

12

13

14

15

16                 DEPOSITION OF:

17                  CHAD BIANCO

18                 APRIL 27, 2021

19

20

21

    RON FERNICOLA & ASSOCIATES
22  CERTIFIED SHORTHAND REPORTERS
    REPORTED BY:  KELLY R. BATES, CSR 10802
23  1244 Edgewood Circle
    Coeur d'Alene, Idaho 83815
24  (661) 775-8299

25  FILE NO. 21273

                                                      1

1     UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3

4  TRACY ALVES, Individually and )
   as Successor in Interest for  )
5  KEVIN R. NIEDZIALEK, deceased, )
                )
6        Plaintiff,  )
                )
7    VS.          ) No.
                ) 19-CV-2083-JGB-SHK
8  RIVERSIDE COUNTY, RIVERSIDE  )
   SHERIFF'S DEPARTMENT,     )
9  SHERIFF-CORONER CHAD BIANCO,  )
   DEPUTY SONIA GOMEZ, DEPUTY   )
10 BRIAN KEENEY, and DOES 3-10,  )
                )
11       Defendants.  )
  _____)

12

13

14

15

16    Deposition of CHAD BIANCO, taken on

17    behalf of the Plaintiff, conducted virtually

18    via Zoom, commencing at 10:00 a.m., April 27,

19    2021, before Kelly R. Bates, CSR 10802,

20    pursuant to Notice.

21

22

23

24

25
                       2

```
 1

 2                    A P P E A R A N C E S

 3

 4        FOR THE PLAINTIFF:

 5            LAW OFFICES OF JOHN BURTON
             BY:  JOHN BURTON, Esq.
 6                (Present via Zoom)
             128 North Fair Oaks Avenue
 7           Pasadena, California  91103
             (626) 449-8300
 8
             HELM LAW OFFICE
 9           BY:  T. KENNEDY HELM, IV, Esq.
                  (Present via Zoom)
10           644 40th Street
             Suite 305
11           Oakland, California  94609
             (510) 350-7517
12

13

14        FOR THE DEFENDANTS:

15            MANNING & KASS, ELLROD, RAMIREZ, TRESTER
             BY:  TONY SAIN, Esq.
16                (Present via Zoom)
                      and
17             GARROS CHAN, Esq.
                  (Present via Zoom)
18           801 South Figueroa Street
             15th Floor
19           Los Angeles, California  90017-3012
             (213) 624-6900
20

21        ALSO PRESENT:

22             Tracy Alves

23

24

25
                                              3
```

```
 1                          CHAD BIANCO,
 2                 having been first duly sworn, was
 3                 examined and testified as follows:
 4
 5                          EXAMINATION
 6   BY MR. BURTON:
 7      Q.   Good morning, Sheriff Bianco.  Thank you for
 8   making yourself available.
 9      A.   Good morning.
10      Q.   Because we have a two-hour time limit, which I, of
11   course, will honor, I sort of intend to go straight
12   through, you know, unless you need a break or anybody else
13   does, we can take a brief one.
14      A.   I will definitely -- I will pre warn you, I will
15   definitely have to do that because the amount of water I
16   drink per day -- there is no way I can go that long
17   without a break.
18      Q.   Okay.  Why don't we plan on about a -- no more
19   than a 5-minute break.
20      A.   That's fine.
21      Q.   Okay.  We'll work that in.
22           Can you state your full and complete name for the
23   record.
24      A.   Chad Bianco.  I'll spell it.  C-h-a-d B-i-a-n-c-i.
25      Q.   Do you have a middle name?
```

5

**Ron Fernicola & Associates**

1    the application of restraints, it might be an indication

2    that he or she is in jeopardy and requires immediate

3    medical attention to avoid cardiac arrest."

4         Do you agree with that?

5    A.   I would agree with that sentence or combination of

6    sentences, yes.

7    Q.   Do you know whether your deputies are trained in

8    that?

9    A.   I would say that's a combination of yes, they are

10   trained in something similar to that, but reading that and

11   saying that, that seems pretty common sense-ish.

12   Q.   Well, did your deputies in the Niedzialek incident

13   follow this?

14   A.   In my understanding they did.

15        (Plaintiff's Exhibit 6 was marked for

16        identification by the Certified

17        Shorthand Reporter.)

18   BY MR. BURTON:

19   Q.   The last exhibit I want to show you is Exhibit 6.

20   This is a Berkeley policy enacted relatively recently.   I

21   know you're not Berkeley.

22        MR. SAIN:  Is it 4/21?

23        MR. BURTON:  It's 2020, February 24.  It's a

24   Lexipol.  I understand how Lexipol works.  They provide

25   sort of a menu of options and the department picks it and

57

**Ron Fernicola & Associates**

1  the department can tweak the language in the way that it

2  wants.  This is a Lexipol statute policy.  I invite your

3  attention to page 3.  I've got this highlighted.  Quote,

4  "If the person being handcuffed is on the ground or in a

5  prone position, officers should, as soon as possible,

6  place the person in an upright sitting position or on

7  their side for respiratory recovery and to mitigate the

8  potential for positional asphyxia," unquote.

9        Is it correct that you do not agree with that

10 policy?

11       MR. SAIN:  Rule 26.  Relevance.  Subsequent

12 remedial measures post incident.

13       THE WITNESS:  It would be my position that I

14 definitely could not say that based on that one sentence

15 that I agree with that sentence that's in their policy.  I

16 would not have that in our policy for the major reason

17 being that the medical studies that we are aware of

18 contradict that.  Knowing that the safest place for a

19 person is on their belly for not only them, but the

20 deputies and the surrounding possible personnel witnesses,

21 I would not agree with that.

22 BY MR. BURTON:

23    Q.   Do you know when you were working out -- your

24 department was working out the new policy manual with

25 Lexipol, whether this policy or something like it was

**Ron Fernicola & Associates**

1  STATE OF _____)
                                    ) ss.
2  COUNTY OF _____)

3

4

5

6     I, the undersigned, say that I have read the

7  foregoing deposition, and I declare, under penalty of

8  perjury, that the foregoing is a true and correct

9  transcript of my testimony contained therein.

10    Executed this _____ day of _____,

11  20____, at _____, _____.

12                     (City)                (State)

13

14

15

16

17            _____

18                     CHAD BIANCO

19

20

21

22

23

24

25
                                                        64

**Ron Fernicola & Associates**

```
 1  STATE OF CALIFORNIA    )
                           ) ss.
 2  COUNTY OF LOS ANGELES  )

 3

 4

 5      I, KELLY R. BATES, CSR No. 10802, certify:

 6      That the foregoing deposition of CHAD BIANCO was

 7  taken before me at the time and place therein set forth,

 8  at which time the witness was placed under oath by me;

 9      That the testimony of the witness and all

10  objections made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13      That the foregoing deposition is a true record

14  as reported by me of the testimony and all objections

15  made at the time of the examination;

16      IN WITNESS WHEREOF, I have subscribed my name

17  this _____ day of _____, 20____.

18

19

20                    _____

21                         KELLY R. BATES, CSR 10802

22

23

24

25
                                                       65
```

Ron Fernicola & Associates

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


TRACY ALVES, INDIVIDUALLY AND AS    )
SUCCESSOR IN INTEREST FOR KEVIN R.  )
NIEDZIALEK, DECEASED,               )
                                    )
                PLAINTIFF,          )
                                    )
        VS.                         ) CASE NO. 5:19-CV-02083-JGB
                                    )
RIVERSIDE COUNTY, RIVERSIDE         )
SHERIFF'S DEPARTMENT,               )
SHERIFF-CORONER CHAD BIANCO AND     )
DOES 1-10,                          )
                                    )
                DEFENDANTS.         )
_____)


VIDEO CONFERENCE DEPOSITION OF JEFFREY NOBLE

TAKEN ON

MONDAY, APRIL 5, 2021




MELINDA S. WOMELSDORF, C.S.R. NO. 13124

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4                                    )
   TRACY ALVES, INDIVIDUALLY AND AS  )
5  SUCCESSOR IN INTEREST FOR KEVIN R. )
   NIEDZIALEK, DECEASED,             )
6                                    )
                 PLAINTIFF,          )
7                                    )
        VS.                          ) CASE NO. 5:19-CV-02083
8                                    )              JGB
   RIVERSIDE COUNTY, RIVERSIDE       )
9  SHERIFF'S DEPARTMENT,             )
   SHERIFF-CORONER CHAD BIANCO AND   )
10 DOES 1-10,                        )
                                     )
11               DEFENDANTS.         )
   _____)

12

13

14

15

16         VIDEO CONFERENCE DEPOSITION OF JEFFREY NOBLE,

17  taken on behalf of the Defendants, utilizing ZOOM Cloud

18  platform to host all participants from their respective

19  locations, commencing at 9:57 A.M., Monday, April 5, 2021,

20  before Melinda S. Womelsdorf, Certified Shorthand Reporter,

21  License No. 13124, for the State of California, pursuant to

22  Notice.

23

24

25

                                                            2

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs, TRACY ALVES, INDIVIDUALLY AND AS
     SUCCESSOR IN INTEREST FOR KEVIN R. NIEDZIALEK:
 4
          THE LAW OFFICES OF JOHN BURTON
 5        BY:  KENNEDY HELM, ESQ.
               JOHN BURTON, ESQ.
 6        128 North Fair Oaks Avenue
          Pasadena, California 91103
 7        (626) 449-8300
          jb@johnburtonlaw.com
 8        (Appearing via ZOOM Video Conference)

 9   For the Defendants, COUNTY OF RIVERSIDE:

10        MANNING & KASS
          ELLROD, RAMIREZ, TRESTER, LLP
11        BY:  TONY M. SAIN, ESQ.
          801 S. Figueroa Street
12        15th Floor
          Los Angeles, California 90017
13        (213) 624-6900
          tms@manningllp.com
14        (Appearing via ZOOM Video Conference)

15

16

17

18

19

20

21

22

23

24

25
                                                              3
```

1                       I N D E X

2    WITNESS

3    JEFFREY NOBLE
                                                 PAGE
4
              Examination by Mr. Sain              5
5

6

7                     E X H I B I T S

8

9    NUMBER              DESCRIPTION            PAGE

10     1 - Notice of Deposition Plaintiff's      5
              Expert Jeffrey Noble
11
       2 - Plaintiff Tracy Alves' Designation of  7
12            Expert Witnesses Pursuant to
              Fed.R.CIV.P.26(a)(2)
13
       3 - Expert Report of Jeffrey Noble         8
14            Report

15     4 - Curriculum Vitae of Jeffrey Noble      9

16

17

18

19

20

21

22

23

24

25

                                                   4

```
 1                  SAN BERNARDINO, CALIFORNIA

 2                  MONDAY, APRIL 5, 2021

 3                    AT 9:57 A.M.

 4

 5                  JEFFREY NOBLE,

 6          Having been first duly sworn, was

 7          examined and testified as follows:

 8

 9                    EXAMINATION

10

11  BY MR. SAIN:

12     Q    Good morning, sir.  Would you state your full

13  name for the record?

14     A    Jeff Noble.

15     Q    As a preliminary matter, I'll be attaching as

16  Exhibit 1 to this deposition the Deposition Notice and

17  Request for Production.

18          If we could show that briefly to the witness.

19          (Exhibit 1 was marked for identification

20          by the Certified Shorthand Reporter and

21          a copy is attached hereto.)

22     MR. SAIN:  And if we could scroll down a few more

23  pages, please.

24  BY MR. SAIN:

25     Q    Chief Noble, have you seen this document
```

1   records, documents, recordings, and evidence that we

2   just identified on the record and based on your

3   background, training, education, and experience, you

4   formed certain opinions in this case pertaining to

5   police practices; is that true?

6        A    Yes.

7        Q    And how many opinions have you formed

8   pertaining to police practices in this case?

9        A    I think there's three broad opinions.

10       Q    Okay.  At this time, I would ask that you

11  please state for the record all the opinions that you

12  formed in connection with this case.

13       A    So my initial opinion is that the initial use

14  of force and the two Taser applications and handcuffing

15  of Mr. Niedzialek by Deputies Gomez and Keeney was

16  consistent with generally accepted police practices and

17  objectively reasonable.

18            My second opinion is that the use of force by

19  Deputies Gomez and Keeney by holding Mr. Niedzialek in a

20  prone position after he had been handcuffed was

21  inconsistent with generally accepted police practices,

22  objectively unreasonable, and disregarded the known risk

23  to Mr. Niedzialek's health, safety, and welfare.

24            And my third broad opinion is that the

25  Riverside Sheriff's Department had a policy, practice,

48

1       Q    Okay.  So would it be fair to say that, in

2   terms of your views of the incident events in this case,

3   that all of the uses of force up to the time that the

4   handcuffs are finally secured on Mr. Niedzialek -- that

5   all of them were consistent with generally accepted

6   practices -- police practices for the use of force?

7       A    Yes.

8       Q    In terms of Mr. Niedzialek's fast advances

9   toward the deputies both before the first Taser

10  discharge and before the second, would you agree that

11  those constituted charging behavior?  Like charges?

12      A    I -- I -- certainly, the first one, I think

13  that that's a fair terminology.  I mean, he -- he

14  suddenly ran toward them, stopped short, and confronted

15  them, yes.

16      Q    Okay.  In your report, you begin your opinions

17  at page 10; is that correct?

18      A    Yes.

19      Q    So you have a fact summary that begins at 9,

20  and then at page 10, beginning at paragraph 20, your

21  report begin, and they continue through the remainder of

22  the document; is that correct?

23      A    Yes.

24      Q    Would it be accurate to say that none of

25  your -- your opinions in this case have anything to do

                                                        87

1    with what caused Mr. Niedzialek to die?

2         A    Well, no.  I'm not a medical expert.  I can't

3    tell what his cause of death was.

4         Q    Fair enough.

5              So, for example, if someone were to ask you

6    whether or not it was the deputy restraint or

7    positioning that caused his death, that is a question

8    that you don't have the expertise to answer; is that

9    true?

10        A    I'm sorry.  Can you repeat the question?

11        MR. SAIN:  Can we read that back, please?

12             (The record was read.)

13        THE WITNESS:  Yeah, I don't have the expertise to

14   tell you what medically caused his death.

15   BY MR. SAIN:

16        Q    At page 13 of your report, paragraph 34, you

17   state -- and I will quote -- "The deputies then placed

18   their knees on Mr. Niedzialek's back and pulled at his

19   arms to hold him down and apply handcuffs while

20   Mr. Niedzialek was kicking his feet.  The use of force

21   by the deputies to apply handcuffs to Mr. Niedzialek was

22   consistent with generally accepted practices and

23   objectively reasonable," end of quote.

24             That's your opinion in this case?

25        A    Yes.

                                                      88

1    don't tell them that having someone in a prone position

2    restrains their breathing because it doesn't," end

3    quote.  Correct?

4         A    Yes.

5         Q    When you conducted your analysis of this case,

6    did you evaluate whether or not you had formed any

7    opinions or did you reach any conclusions as to whether

8    or not the actions of Deputy Gomez or the actions of

9    Deputy Keeney had violated the policies or procedures of

10   Riverside County Sheriff's Department?

11        A    Did I evaluate that?

12        Q    Yes, sir.

13        A    No.

14        Q    Okay.  So would it be accurate to say that you

15   have no opinions in this case as to whether or not the

16   acts or omissions of either Deputy Keeney or Deputy

17   Gomez violated any policies or procedures of the

18   Riverside County Sheriff's Department?  Is that

19   accurate?

20        A    Well, I'd have to look at -- I don't currently

21   have any opinions, no.  I'd have to look at their

22   policy.

23        Q    Thank you.

24             Based on your review of the evidence in this

25   case, were you able to determine where -- specifically

                                                          97

1   don't know.

2   BY MR. SAIN:

3        Q    I'm not asking about your medical expertise,

4   Chief Noble.

5             I'm asking if, in terms of the police

6   community, as you describe it, adopting this recovery

7   position policy that you believe is a generally accepted

8   practice, is there a single scientific or medical study

9   that you can identify that the agencies relied upon to

10  determine that this position, prone positioning, causes

11  or contributes to asphyxia?

12       MR. HELM:  Objection --

13       MR. SAIN:  -- is there a single scientific --

14       THE REPORTER:  I'm sorry.  I didn't get the answer

15  or the objection.

16       MR. SAIN:  He said no.

17            Go ahead.

18       MR. HELM:  I said objection.  Exceeds the scope of

19  his expertise as a police practices expert.

20       MR. SAIN:  Can you state your answer again, please?

21       THE WITNESS:  No.

22  BY MR. SAIN:

23       Q    Thank you.

24            Chief Noble, I've asked you a number of

25  questions, and I think you've been very forthright with

                                                        105

1  State of California   )
                         )  SS.
2  County of_____)

3

4         I, Jeffrey Noble, say I have read the

5  foregoing video conference deposition and declare under

6  penalty of perjury that my answers as indicated are true

7  and correct.

8

9

10 _____
              (DATE)
11

12

13

14                            _____
                                        (SIGNATURE)
15

16

17

18

19

20

21

22

23

24

25

                                                          109

```
 1   State of California    )
                            )  SS.
 2   County of San Bernardino)

 3

 4              I, MELINDA WOMELSDORF, Certified Shorthand

 5   Reporter, License No. 13124, for the State of

 6   California, do hereby certify:

 7              That, prior to being examined, the witness

 8   named in the foregoing video conference deposition, to

 9   wit, Jeffrey Noble, was by me duly sworn to testify the

10   truth, the whole truth and nothing but the truth;

11              That said video conference deposition was

12   taken down by me in shorthand at the time and place

13   therein named and thereafter reduced to computer-aided

14   transcription under my direction;

15              That the foregoing transcript, as typed, is

16   a true record of the said proceedings.

17              I further certify that I am not interested

18   in the event of the action.

19              Witness my hand this 29th day of April,

20   2021.

21

22

23              MELINDA WOMELSDORF, CSR. NO. 13124

24

25

                                                        110
```