Eugene P. Ramirez, Esq. (State Bar No. 134865)
  *epr@manningllp.com*
Tony M. Sain, Esq. (State Bar No. 251626)
  *tms@manningllp.com*
Garros Chan, Esq. (State Bar No. 320561)
  *gxc@manningllp.com*
**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**
801 S. Figueroa St, 15th Floor
Los Angeles, California 90017-3012
Telephone: (213) 624-6900
Facsimile: (213) 624-6999

Attorneys for Defendants COUNTY OF RIVERSIDE (erroneously served as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY GOMEZ and DEPUTY KEENEY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in Interest for KEVIN R. NIEDZIALEK, deceased,<br><br>    Plaintiff,<br><br>v.<br><br>RIVERSIDE COUNTY, RIVERSIDE SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO and DOES 1-10,<br><br>    Defendants. | Case No. 5:19-CV-02083-JGB(SHKx)<br>*[Hon. Jesus G. Bernal; Magistrate Judge Shashi H. Kewalramani]*<br><br>**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEAL FOR THE NINTH CIRCUIT** |

    NOTICE IS HEREBY GIVEN that Defendants COUNTY OF RIVERSIDE, SHERIFF-CORONER CHAD BIANCO, DEPUTY GOMEZ, and DEPUTY KEENEY ("Defendants") hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Order of the District Court filed on August 5, 2021 [Dkt. 109] denying, in part, Defendants' motion for summary judgment, including the

1 denial of qualified immunity.  A true and correct copy of the District Court's order is
2 attached as Exhibit A.

4 DATED: September 2, 2021   **MANNING & KASS**
   **ELLROD, RAMIREZ, TRESTER LLP**

By: /s/ Tony M. Sain
Tony M. Sain, Esq.
Garros Chan, Esq.
Attorneys for Defendants COUNTY OF RIVERSIDE (erroneously served as separate parties as COUNTY OF RIVERSIDE and RIVERSIDE SHERIFF'S DEPARTMENT), SHERIFF-CORONER CHAD BIANCO, DEPUTY GOMEZ and DEPUTY KEENEY

# EXHIBIT A

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 19-2083 JGB (SHKx)** | Date | August 5, 2021 |
|---|---|---|---|
| Title | *Tracy Alves v. Riverside County, et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:   Order (1) GRANTING-IN-PART and DENYING-IN-PART Defendants' Motion for Summary Judgment (Dkt. No. 59); (2) DENYING Defendants' Motions in Limine (Dkt. Nos. 61, 62, 63); and (3) VACATING the August 16, 2021 hearing. (IN CHAMBERS)

Before the Court are a motion for summary judgment and three motions in limine filed by Defendant County of Riverside (the "County"), and Defendants Chad Bianco, Sonia Gomez, Brian Keeney (collectively, "Individual Defendants"). ("Motion," Dkt. No. 59; "Motions in Limine," Dkt. Nos. 61-63.)  The Court finds these matters appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  Upon consideration of the papers filed, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion, DENIES the Motions in Limine, and VACATES the August 16, 2021 hearing.

### I. BACKGROUND

This is a Section 1983 case arising out of the death of Decedent Kevin R. Niedzialek brought by his successor in interest, Plaintiff Tracy Alves.  On October 30, 2019, Plaintiff filed her complaint against Defendants, which she amended on July 17, 2020. ("Complaint," Dkt. No. 1; "FAC," Dkt. No. 34.)

On May 17, 2021, Defendants filed the Motion along with the following documents:

- Statement of Undisputed Facts ("DSUF" Dkt. No. 59-4);
- Declaration of Tony M. Sain ("Sain Declaration," Dkt. No. 59-2);

- Exhibits to the Sain Declaration (Dkt. Nos. 59-3);

On May 17, 2021 Defendants also filed the Motions in Limine.

On May 31, 2021, Plaintiff opposed the Motion. ("Opposition," Dkt. No. 66.) In support of the Opposition, Plaintiff submitted the following documents:

- Statement of Genuine Dispute of Material Facts and Additional Disputed Facts ("PSUF," Dkt. No. 66-18);
- Declaration of Kennedy Helm ("Helm Declaration," Dkt. No. 66-1);
- Exhibits to the Helm Declaration (Dkt Nos. 66-2 – 66-17).

On May 31, 2021, Plaintiff also opposed the Motions in Limine. (Dkt. Nos. 67-69.) In support of her oppositions to the Motions in Limine, Plaintiff also filed:

- Declaration of Michael Freeman ("Freeman Declaration," Dkt. No. 70);
- Declaration of Jeffrey Noble ("Noble Declaration," Dkt. No. 71);
- Exhibits to the Noble Declaration (Dkt. Nos. 71-1 – 71-3);
- Declaration of Daniel Wohlgelernter ("Wohlgelernter Declaration," Dkt. No. 72);
- Exhibits to the Wohlgelernter Declaration (Dkt. Nos. 72-1 – 72-3);

On June 7, 2021, Defendants replied to the Opposition. ("Reply," Dkt. No. 75.) In support of the Reply, Defendants submitted the following documents:

- Reply to Plaintiff's Statement of Material Facts ("PSUF Reply," Dkt. No. 76);
- Reply to Plaintiff's Statement of Additional Disputed Facts ("DSUF Reply," Dkt. No. 77);
- Evidentiary Objections ("Defendants' Objections," Dkt. Nos. 78, 79).

## II.   FACTS

### A. Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted. They are "admitted to exist without controversy" for purposes of the Motion. See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

Prior to the incident at issue in this case, Decedent Kevin R. Niedzialek struggled with sustenance abuse, including an addiction to methamphetamine. (DSUF Reply ¶ 1.) In July 2019, after two years of sobriety, Decedent relapsed and began using methamphetamine once again. (Id.) That month, Decedent was staying temporarily with a friend in an apartment complex located on Moraga Road in Temecula, California. (Id. ¶ 2.)

In the early afternoon of July 29, 2019, Decedent sustained a large laceration on his head, apparently while inside of the apartment complex. (Id. ¶ 3.) It is unclear how this head injury was sustained, but the parties agree it predated the encounter between Decedent and the Riverside County Sheriff Department ("RCSD"). (Id.) Shortly after 2:10 p.m., RCSD dispatch received several 911 calls from Decedent's neighbors. (Id. ¶ 4.) The callers reported that an unarmed man with a bloody head wound was yelling and making noises. (Id.) The man was reportedly wearing pajama pants with no shirt and was bleeding from his head. (Id. ¶ 5.)

Shortly after 2:30 p.m., RCSD Deputies Defendants Brian Keeney and Sonia Gomez arrived separately at Decedent's apartment complex. (Id. ¶ 6.) Defendants Keeney and Gomez approached the scene separately and from different directions. (Id.) Defendant Keeney was not wearing a body worn camera. (Id. ¶ 7.) Defendant Gomez activated her body worn camera immediately before encountering Defendant Keeney and Decedent. (Id. ¶ 9.)

Upon seeing Decedent, Defendant Keeney requested medical personnel respond to the location. (Id. ¶ 8.) At this time, Decedent was bleeding from his head, speaking incoherently, and sitting on the ground near one of the apartment units. (Id. ¶ 10.) As Defendant Gomez approached the scene, she, too, requested medical attention for Decedent. (Id. ¶ 11.)

Despite commands to the contrary, Decedent abruptly stood up and abruptly advanced toward Defendant Keeney. (Id. ¶ 12.) While advancing towards Defendant Keeney, Decedent reached around to the back of his waistband. (Id. ¶ 13.) Defendant Gomez believed Decedent would attack Defendant Keeney, so she raised her taser and aimed it at Decedent. (Id. ¶ 14.) Decedent very briefly paused, but then resumed his charge at Defendant Keeney. (Id. ¶¶ 15-16.) Believing that Decedent was threatening harm to Defendant Keeney, Defendant Gomez deployed her taser in dart mode, striking Decedent in the right bicep and on the right side of his ribcage. (Id. ¶ 17.) Decedent fell to the ground. (Id. ¶ 18.)

As Decedent was lying on the ground, Defendant Keeney moved closer to try to restrain him, but as Decedent began to sit up, Defendant Keeney retreated and yelled commands instead. (Id. ¶ 19.) Throughout this period, the deputies gave Decedent commands to put his hands behind his back and lie down. (Id. ¶ 20.)

Decedent rose from the ground and again charged at Defendant Keeney. (Id. ¶ 21.) Perceiving a threat to Defendant Keeney, Defendant Gomez used her taser on Decedent a second time. (Id. ¶ 22.) As a result of being tased, Decedent fell forward into the ground, landing near some dirt and a tree. (Id. ¶ 23.)

Both Defendants Keeney and Gomez then moved to attempt to restrain Decedent on the ground. (Id. ¶ 24.) While trying to gain control of Decedent's right arm, and to keep him from getting up, Defendant Gomez retrieved her handcuffs. (Id. ¶ 26.) Throughout this period, Decedent was face down prone on the ground, kicking or flailing his legs. (Id. ¶ 27.) Defendant Keeney had his knee on Decedent's back. (Id. ¶ 28.) During this pre-cuffing period, at one point

Decedent lifted his head and shoulders up off the ground while still kicking or flailing his legs. (Id. ¶ 29.)

After about 35 seconds of struggle, Defendant Gomez was finally able to secure both of Decedent's hands behind his back in her handcuffs. (Id. ¶ 30.) After Decedent was handcuffed, Deputy Gomez then made a second call for medical aid to come to the scene: this was the third call for medical help, but the first post-TASER call. (Id. ¶ 31.) Plaintiff takes no issue with Defendants Gomez and Keeney's use of force before handcuffing Decedent. (Id. ¶ 32.)

Despite being in handcuffs, Decedent continued what the deputies perceived as his active physical resistance: bucking, rolling his right abdomen off the ground, and kicking and flailing his legs. (Id. ¶ 33.)[1] At one point, Defendant Keeney removed his right knee from Decedent's back. (Id. ¶ 34.) Despite this, Decedent kicked and flailed his legs and appeared to be attempting to roll—raising his left hip off the ground in a manner the deputies perceived as further active resistance. (Id. ¶ 35.)[2] When Decedent then rolled to his left side, Defendant Keeney placed his right knee on Decedent's left shoulder to try to prevent Decedent from kicking. (Id. ¶ 36.) During this time, Defendant Keeney's right knee was touching Decedent's mid-back or shoulder area. (Id. ¶ 38.) Throughout this period, Decedent continued moving in a manner the deputies construed as resistance: bending his knees, lifting his hips, and kicking his legs as though trying to escape custody. (Id. ¶ 39.)[3]

After about one minute and 18 seconds of struggle, Decedent's movements stopped, and Defendant Keeney lifted his knee. (Id. ¶ 41.) At this point, Decedent was making noises which Defendants characterize as "grunting" and Plaintiff characterizes as "moaning." (Id. ¶ 42.) The parties dispute whether Defendant Keeney's knee was applying pressure to Decedent's back at this time and the body camera footage does not provide a clear answer. (Id. ¶¶ 43-45.) Defendant Gomez continued to restrain Decedent by placing her right hand between Decedent's shoulder blades. (Id. ¶ 46.)

On the day of the incident, Defendant Keeney weighed about 180 pounds; Defendant Gomez weighed about 135 pounds; and Decedent was 6'2" and weighed about 162 pounds. (Id. ¶ 47.)

About 4 minutes and 40 second after Decedent was handcuffed, Defendant Keeney observed that Decedent might no longer be breathing. (Id. ¶ 49.) At this point, Defendant Gomez removed her hand from Decedent's back. (Id. ¶ 50.) Defendants Keeney and Gomez rolled Decedent onto his back. (Id. ¶ 52.) Defendant Gomez then checked Decedent's pulse.

---

[1] Plaintiff disputes that Decedent's actions were active resistance. However, she does not dispute that his actions appeared to Defendants Keeney and Gomez to be active resistance.

[2] Same.

[3] Plaintiff objects only to the reasonableness of Defendants' belief.

(Id. ¶ 53.)  Defendant Gomez stated that she detected a slow pulse.  (Id. ¶ 54.)[4]  Neither Defendant Keeney nor Gomez performed CPR on Decedent before paramedics arrived because they believed they saw Decedent breathing and Defendant Gomez had indicated Decedent had a pulse.  (Id. ¶ 55.)  According to their training, CPR was not appropriate under those circumstances.  (Id.)

About two minutes after Decedent was flipped into a supine (face up) position, paramedic LaRusso arrived on scene.  (Id. ¶ 56.)  LaRusso quickly determined that Decedent was not breathing, and she instructed the deputies to begin CPR.  (Id. ¶ 57.)  Prior to this moment, neither Defendant Keeney nor Defendant Gomez were aware that Decedent had any urgent or life-threatening medical problems.  (Id. ¶ 58.)[5]  Defendant Keeney performed CPR until Decedent was transported from the scene.  (Id. ¶ 59.)

Decedent died the following day, on July 30, 2019.  (Id. ¶ 60.)  Decedent's heart and lungs were harvested for organ donation.  (Id. ¶ 61.)  Typically, damaged, injured, or diseased organs are not harvested for donation.  (Id.)

Both Deputy Defendants received the following training as law enforcement officers: that even for subjects suspected of experiencing excited delirium, even if a suspect was handcuffed, the safest position—for both the subject and the officer—is for the subject to be restrained in a prone position.  (Id. ¶ 62.)[6]  Once restrained effectively, their training was to request medical aid to the scene.  (Id.)

The Riverside County Sheriff's Department ("RCSD") has a Training Bureau that is responsible for keeping the Department's deputies up to date with the latest techniques, tactics, and issues affecting law enforcement.  (Id. ¶ 65.)  The parties sharply disagree on whether this training is medically and scientifically accurate, but it is undisputed that RCSD trains its deputies that the safest position for a person to be restrained is in the cuffed, prone position.  (Id. ¶ 70.)  RCSD does not train its deputies on the use of rear-connected hobble restraints or "hog-ties"; and no such restraint was used during this incident.  (Id. ¶ 71.)  Defendants claim that RCSD does not train its deputies to roll restrained persons into an on-the-side position.  (Id. ¶ 72.)

Mark A. Fajardo M.D. ("Dr. Fajardo"), the chief forensic pathologist and medical examiner at the County of Riverside, conducted Decedent's autopsy.  (Id. ¶ 74.)  Dr. Fajardo

---

[4] Plaintiff disputes that such a pulse was actually detected, instead arguing that Defendant Gomez felt a "phantom pulse."

[5] Plaintiff claims Decedent's moaning did not indicate his heart was still circulating blood to his brain—but this does not rebut this fact.

[6] Plaintiff disputes this by claiming "it is well-known and generally accepted in policing" that keeping subjects prone can contribute to asphyxia, citing her expert Jeffrey Noble.  Though, as discussed below, the Court will accept Mr. Noble as a police practices expert, his testimony does not actually contradict Defendants' testimony about the contents of their training.

concluded that Decedent was not asphyxiated. (Id. ¶ 78.) There were no internal injuries that caused or contributed to Decedent's death. (Id. ¶ 77.) Dr. Fajardo also ruled out deputy action as a proximate cause of death—including tasers and restraint. (Id. ¶ 79.) According to Dr. Fajardo, Decedent's death was caused by methamphetamine; Dr. Fajardo concluded that Decedent had more than three times the minimum toxic amount of meth in his system. (Id. ¶ 80.)[7]

## B. Evidentiary Objections

In addition to Defendants' Motions in Limine, which are discussed below, both Plaintiff and Defendant make several evidentiary objections.

Plaintiff objects to almost every undisputed fact contained in the DSUF. (See Plaintiff's Evidentiary Objections.) Many of these objections are unnecessary. For example, DSUF paragraphs 10-30 are moment-by-moment descriptions of the encounter between Decedent and Defendants Gomez and Keeney supported by Defendant's Exhibit A, video footage from Defendant Gomez's body-worn camera; as well as a timeline compiled by Defendants' expert. (DSUF ¶¶ 10-30.) Instead of disputing Defendant's characterization of this encounter, Plaintiff objects to each undisputed fact on the grounds that expert testimony will not assist the trier of fact. (Plaintiff's Evidentiary Objections ¶¶ 10-30.) Plaintiff's objection to the Englert Forensic Incident Timeline is noted, but the body-worn camera footage is a sufficient factual basis for all undisputed facts which occurred during the encounter between Defendants Gomez and Keeney and Decedent.

Plaintiff's evidentiary objections to the above-described facts are DENIED. All other evidentiary objections are DENIED as moot.

## III.   MOTIONS IN LIMINE

Defendants' Motions in Limine all seek to exclude the opinions of Plaintiff's experts. The Court assesses each individually under the Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) standard.

Fed. R. Evid. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." In assessing whether a particular expert theory or technique is admissible, courts assess "[w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (quoting Daubert, 509 U.S. at 592-94). Additionally, the party offering expert opinion must show by a preponderance of the evidence that: (1) the expert is qualified to render their opinions; and

---

[7] Plaintiff disputes Dr. Fajardo's opinions, but it is undisputed that these are Dr. Fajardo's opinions.

(2) the opinions are adequately factually and scientifically supported.  Daubert, 509 U.S. at 592-93.

### A. Police Practices Expert Jeffrey Noble

Defendants first move to exclude the opinions and testimony of Plaintiff's police practices expert Jeffrey Noble—both at trial and in conjunction with their Motion. (Dkt. No. 61.) Specifically, Defendants seek to exclude Mr. Noble's opinions that: (1) "The defendant deputies' post-handcuffing use of force on a prone individual violated generally accepted police practices," and (2) "The County's policies, practices, and customs ignore generally accepted police practices as to positional asphyxia." (Id.) Defendants argue that Mr. Noble's opinions "are unreliable; they are lacking in evidentiary support and stated as speculation under the Daubert standard of admissibility." (Id. 1.)[8]

Plaintiff provides significant evidence in support of Mr. Noble's opinions. In particular, having established that Mr. Noble is qualified to opine on these topics—something Defendants do not dispute—she identifies two scientific studies relied upon by Mr. Noble as well as news articles from reputable sources which post-date Mr. Noble's report and support his opinions. (Dkt. No. 71 p. 5.) She also identifies Mr. Noble's ample citation to the record. (Id.) The Court is persuaded by Plaintiff's citations. Mr. Noble's opinions appear factually and scientifically supported; Defendants' remaining disputes with Mr. Noble's testimony go to its weight and not its admissibility.

### B. Cardiology Expert Daniel Wohlgelernter, M.D.

Defendants also move to exclude the opinions and testimony of Plaintiff's expert Dr. Daniel Wohlgelernter, M.D., both at trial and in conjunction with the Motion. (Dkt. No. 62.) Defendants specifically seek to exclude "all of Dr. Wohlgelernter's opinions regarding breathing studies, asphyxia, and the cause of Kevin Niedzialek's death" because "Dr. Wohlgelernter lacks the requisite qualifications to opine on breathing studies, asphyxia, and cause of death, that his opinions lack adequate evidentiary support," and "that his opinions constitute nothing more than speculation." (Id.) Defendants argue that because Dr. Wohlgelernter is a cardiologist, he is not qualified to opine on matters related to asphyxia and breathing.

Plaintiff first characterizes Dr. Wohlgelernter's qualifications. Dr. Wohlgelernter is not just a board-certified cardiologist—he is also a board-certified internist and the former director of the coronary-care unit (CCU) at Providence-St. John's Hospital in Santa Monica. (Dkt. No. 72 p. 4.) Plaintiff also argues that Dr. Wohlgelernter's expertise in internal medicine qualifies him

---

[8] Defendants also argue that because the reasonableness of Defendants Keeney and Gomez's behavior is judged on circumstances known to them at the time, Mr. Noble's opinions on practices unknown to Defendants Keeney and Gomez are inadmissible. (Dkt. No. 61 p. 5.) This argument ignores Plaintiff's Monell claims against Riverside County, which may be liable for unconstitutional policies regardless of the knowledge of Defendants Keeney and Gomez.

to discuss relevant literature on breathing studies and asphyxia, noting that he has also "performed about 250 postmortem analyses of cause of death." (Id. 5.) The Court agrees with Plaintiff that Dr. Wohlgelernter's qualifications far exceed the Rule 702 standard, which "contemplates a broad conception of expert qualifications." Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotations omitted).

Dr. Wohlgelernter's opinions also appear to have significant evidentiary support given their reliance on differential diagnosis. "A whole sub-body of Daubert law has developed with respect to the reliability, and admissibility, of differential diagnosis. Differential diagnosis is 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'" Clausen v. M/V NEW CARISSA, 339 F.3d 1049, 1057 (9th Cir. 2003), as amended on denial of reh'g (Sept. 25, 2003) (quoting Stedman's Medical Dictionary 474 (26th ed. 1995)). Differential diagnosis from Dr. Wohlgelernter is particularly relevant to the determination of this action because Defendants claim that Decedent's death was caused by a heart attack—a claim Dr. Wohlgelernter is more than qualified to assess. The Court finds Dr. Wohlgelernter's opinions are adequately supported under the relevant standards.

### C. Cardiology Expert Michael Freeman, Ph.D.

Finally, Defendants move to exclude the opinions and testimony of Plaintiff's expert Dr. Michael Freeman, Ph.D., both at trial and for the purposes of the Motion. (Dkt. No. 63.) Defendants seek to exclude "all of Dr. Freeman's testimony and opinions regarding the cause of death of decedent and on asphyxia (in particular restraint/compressive asphyxia)" on the grounds that "Dr. Freeman lacks the requisite qualifications to opine on cause of death, that his opinions lack adequate evidentiary support," and "that his opinions constitute nothing more than speculation." (Id.)

Defendants argue Dr. Freeman is unqualified to opine on asphyxia because:

(1) he is not a forensic pathologist; (2) he has never conducted a solo autopsy; (3) he possesses no medical degree from an American medical school; (4) he is not board certified by any American medical board in asphyxia, forensic pathology, or any other medical specialty (including epidemiology); (5) he is not and he has never been a licensed physician in any state in the United States of America; (6) he never examined decedent's body; (7) he has never conducted or participated in any lab studies on the effects of restraint on asphyxia/breathing; and (8) all the 'medical examiner' positions on his resume are honorary and did not involve him determining cause of death.

(Dkt. No. 63 p. 1.)

Plaintiff first proffers Dr. Freeman's qualifications. She notes that "Dr. Freeman holds the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden); a Ph.D. in public health with a major focus in epidemiology from Oregon

State University; a master of public health in epidemiology and biostatistics, also from Oregon State University; a master's degree in forensic medical sciences with the Academy of Forensic Medical Sciences (UK); and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK)." (Dkt. No. 70 p. 2.) Dr. Freeman is also "a U.S. Fulbright fellow, having held a three-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State from 2017 to 2020." (Id. 5.) Though Dr. Freeman is not a licensed physician in the United States, he clearly has relevant educational experiences which qualify him to offer certain medical opinions.

Plaintiff also argues that Dr. Freeman's opinions are based on "the same case-related materials that Defendants' experts reviewed" plus "relevant peer-reviewed studies," including his own article "The role of restraint in fatal excited delirium: a research synthesis and pooled analysis." (Id. 7.) Plaintiff also notes that Dr. Freeman's methods—forensic epidemiology and the Bradford-Hill criteria—are reliable and generally accepted methods for determining causation. See Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1235 n. 4 (9th Cir. 2017) ("The Bradford Hill methodology refers to a set of criteria that are well accepted in the medical field for making causal judgments.") The court finds Dr. Freeman qualified and his opinions adequately supported by the relevant standards. Defendants' objections to Dr. Freeman's testimony are considered as objections regarding the weight, not admissibility, of his testimony. See Silva v. Chung, 2019 WL 2195201, at *2 (D. Haw. May 21, 2019); see also Williams v. Daszko, 2018 WL 2684314, at *1 (E.D. Cal. June 5, 2018) (rejecting challenge to medical expert on basis that the expert did not physically examine patient). All of Defendants' Motions in Limine are therefore DENIED.

### IV.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying the portions of the pleadings and record that it believes demonstrate the absence of an issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Id. at 325. Instead, the moving party need only prove there is an absence of evidence to support the nonmoving party's case. Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. Celotex, 477 U.S. at 324. The non-moving party must make an affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "This burden is

not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## V. DISCUSSION

### A. Section 1983 Claims Against Defendants Keeney and Gomez

Defendants first seek summary judgment on Plaintiff's Section 1983 claims against Defendants Keeney and Gomez for excessive force and deliberate indifference to Decedent's medical needs. (Motion 1.) The Court DENIES summary judgment on Plaintiff's excessive force claim and GRANTS summary judgment on Plaintiff's deliberate indifference to medical needs claim.

#### 1. Plaintiff's Excessive Force Claim

Section 1983 creates a cause of action against any person who, while acting under color of state law, causes another to be deprived of a federally protected constitutional right. 42 U.S.C. § 1983. Claims that law enforcement officers have used excessive force in the course of an arrest or other seizure are Fourth Amendment claims, and are thus "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989). The reasonableness of a particular use of force is judged from the perspective of a reasonable officer on scene. Graham, 490 U.S. at 396. Additionally, the type and quantity of an officer's use of force is balanced against: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (citing 490 U.S. at 396.)

However, Section 1983 claims brought against individuals acting under color of law must contend with qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Though use of the two-step outlined in Saucier v. Katz, 533 U.S. 194 (2001)—(1) assess whether a constitutional right has been violated; (2) assess whether that right was clearly established at the time of the relevant incident—"should not be regarded as an inflexible requirement," it is nonetheless "often appropriate." Pearson v. Callahan, 555 U.S. 223, 227, 236 (2009).

Defendants claim no underlying rights violations occurred: first, because the force used on Decedent was "objectively reasonable," and second, because Deputy Defendants did not cause Decedent's death. (Motion 12-18.)  Plaintiff claims that none of the force used before Decedent was handcuffed was excessive. (Opposition 8.)  She does not challenge Deputy Defendants' use of a taser on Decedent, nor does she challenge force used in order to handcuff Decedent. (Id.)  However, Plaintiff claims that once Decedent was cuffed and therefore restrained, Decedent no longer posed a threat to the safety of Deputy Defendants, and therefore the lethal force used was unconstitutional. (Id.)

Of course, Plaintiff and Defendant sharply disagree on whether Deputy Defendants' force was lethal.  And whether the force used was deadly is central, not ancillary, to this case.  "The intrusiveness of a seizure by means of deadly force is unmatched."  Graham, 490 U.S. at 396.  And deadly force is reasonable only "if the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officers or others."  Scott v. Heinrich, 39 F.3d 912, 914 (9th Cir. 1994) (quoting Tennessee v. Garner, 471 U.S. 1 (1985)).

The Court finds that there exists a material factual dispute over Decedent's cause of death—whereas Defendants assert Decedent died because he used a fatal amount of methamphetamine, Plaintiff argues Decedent's death was caused by asphyxiation due to being held in the prone position by Defendants Keeney and Gomez.  Accordingly, construing all facts in the light most favorable to Plaintiff, a reasonable jury could find that Deputy Defendants' force was lethal, and that also, after Decedent was cuffed, neither Deputy Defendant had probable cause to believe Decedent posed a significant threat of death or serious injury.  Therefore, a reasonable jury could find a violation of the Fourth Amendment here.

Applying Saucier's second step, Defendants Keeney and Gomez are not entitled to qualified immunity on Plaintiff's Section 1983 excessive force claim.  In order to for law enforcement officers to violate a "clearly established" right, "[t]he contours of the right must be sufficiently clear that a reasonable [officer] would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Though Section 1983 plaintiffs need not point to circumstances where "the very action in question has previously been held unlawful," prior cases tend to show "the light of pre-existing law" which might make unlawfulness apparent.  See Anderson, 483 U.S. at 640 (1987).

Plaintiff cites sufficient authority to argue that the unlawfulness of Deputy Defendants' actions was apparent at the time they encountered Decedent. (Opposition 15-16.)  She cites Drummond v. City of Anaheim, 343 F.3d 1052, 1059 (9th Cir. 2003) for the proposition that "any reasonable person . . . should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." (Opposition 15.)  In addition to Drummond, Plaintiff cites at least four other Ninth Circuit cases in which the court of appeals assessed the reasonableness of officers using their body weird on suspects in the prone position.

In contrast, Defendants argue that where law enforcement officers rely on departmental policy regarding the use of force—even if such force is unconstitutional—this reliance is reasonable and entitles officers to qualified immunity under the law. (Motion 15.) In support, they cite Way v. County of Ventura, 445 F.3d 1157 (9th Cir. 2006), in which the court of appeals held that officers following a jail's official policy had acted reasonably. But Defendants' proposed rule goes too far. Qualified immunity's reasonableness inquiry cannot be supplanted by an inquiry into whether force was pursuant to or violative of policy. To be sure, it appears undisputed that, at the time they encountered Decedent, Defendants Keeney and Gomez were subjectively unaware that holding someone prone and cuffed could be lethal. After all, RCSD alleges it trains its deputies that the safest way for a person to be restrained is in the cuffed, prone position. (DSUF Reply ¶ 70.) But officers' subjective awareness is not the relevant standard— "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." See Graham, 490 U.S. at 397. Qualified immunity is not proper for the excessive force claim here.

### 2. Plaintiff's Claim for Deliberate Indifference to Medical Needs

There is a second Section 1983 claim in dispute: Plaintiff's claim that Deputy Defendants were deliberately indifferent to Decedent's medical needs. Claims of deliberate indifference to an arrestee's medical needs are also Fourth Amendment claims which rely on reasonableness. Tatum v. City and County of San Francisco, 441 F.3d 1090, 1098 (9th Cir. 2006). The Due Process Clause of the Fourteenth Amendment may also be violated when police officers violate their duty to seek necessary medical help for detainees and place a person "in a more dangerous position than the one in which they found him." Penilla v. City of Huntington Park, 115 F.3d 707, 710 (9th Cir. 1997).

Plaintiff's deliberate indifference claim is based on three contentions: first, that "Mr. Niedzialek needed to be placed in a recovery position immediately after handcuffing to recuperate from the combined effects of his drug intoxication and delirium"; second, that the "deputies' prone restraint after handcuffing put Mr. Niedzialek in a more dangerous position"; and third, that Deputy Defendants failed to properly render CPR. (Opposition 11-12.)

However, there is no genuine dispute of material fact regarding whether such actions constituted deliberate indifference or the unreasonable denial of medical care. Both Deputy Defendants immediately requested medical attention for Decedent as soon as they arrived on the scene, and Defendant Gomez once again requested medical attention for Decedent as soon as he was handcuffed. (DSUF ¶¶ 8, 9-11, 31.) As soon as Deputy Defendants suspected Decedent was no longer breathing, they flipped him to his back and checked for a pulse; they did not render CPR because Defendant Gomez believed she had detected a pulse. (Id. ¶¶ 49-52.) The Court has "found no authority suggesting that the due process clause establishes an affirmative duty on the part of police officers to render CPR in any and all circumstances." Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986). Indeed, as other courts have held, "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of

the Fourth Amendment, even if the officer did not administer CPR." Tatum, 441 F.3d at 1099 (9th Cir. 2006). The same is true about Plaintiff's first and second contentions. Summary judgment is granted for Defendants on this claim.

### B. Monell Claim

Defendants also move for summary judgment on Plaintiff's Monell claim against the County of Riverside, RCSD, and Sheriff Bianco. (Motion 19.)[9] Under Section 1893, "local governments are responsible only for 'their own illegal acts.'" Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)). Vicarious liability does not attach. See City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-695 (1978)). Under Monell, 436 U.S. at 692, liability attaches to a municipality or other local government only where "the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."

However, "[a]lthough a constitutional violation must result from 'official municipal policy,' such a policy need not be expressly adopted by a municipality. It is sufficient that the constitutional violation occurred pursuant to a 'longstanding practice or custom.'" Christie, 176 F.3d at 1235. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996). A claim may also be based on a "policy of inaction," including "failure to implement procedural safeguards to prevent constitutional violations," though to make this showing the plaintiff must show, in addition to a constitutional violation, that the policy of inaction amounted to "deliberate indifference" to the plaintiff's constitutional right. Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012); see also Long v. Cty. of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006) (an unconstitutional policy "can be one of action or inaction.").

Plaintiff here alleges a specific policy affirmatively adopted by the municipality: The County of Riverside trains its deputies to restrain suspects in the prone position in a way Plaintiff alleges constitutes unconstitutional deadly force. (Opposition 19.) Defendants admit that the County trains officers to restrain suspects in the prone position, but argue that "[t]here is no evidence that the County's policy on prone positioning was deliberately indifferent to constitutional rights," because, after studying the issue, the County concluded "the prone position was the safest method of restraint." (Motion 20.)

Whether the prone position is a safe method of restraint is a genuine factual dispute between the parties. Accordingly, summary judgment on Plaintiff's Monell claim is improper.

---

[9] Plaintiff argues in her Opposition that "Sheriff Bianco is individually liable" under her Monell claims. (Opposition 22.) However, as the Opposition is not itself a Motion for Summary Judgment and the Court finds summary judgment inappropriate as to Plaintiff's Monell claim, there is no reason for the Court to assess this argument.

### C. Bane Act Claims

The necessary elements for a Bane Act claim are "(1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." Lawrence v. City and County of San Francisco, 258 F. Supp. 3d 977, 994-995 (N.D. Cal. 2017); see also Cal. Civil Code § 52.1(b)-(c). "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." Austin B. v. Escondido Union School Dist., 149 Cal. App. 4th 860, 883 (2007).

Defendants argue the Court should grant summary judgment on Plaintiff's Bane Act claim because there is no evidence which might show that Decedent was threatened, intimidated, or coerced. (Motion 22-23.) Additionally, Bane Act violations require "specific intent to violate the arrestee's right to freedom from unreasonable seizure," Reese v. Cty. of Sacramento, 888 F.3d 1030, 1043-45 (9th Cir. 2018), and no Defendant demonstrated specific intent here. (Motion 23.)

In response, Plaintiff cites B.B. v. Cty. of Los Angeles, 25 Cal. App. 5th 115, 129-33 (2018), rev'd on other grounds by B.B. v. Cty. of Los Angeles, 10 Cal. 5th 1 (2020), arguing that the cases have similar facts. (Opposition 23.) However, B.B. did not hold that any time defendants have acted deliberately, Bane Act liability is appropriate. Instead, the court in that case held that plaintiffs "presented sufficient evidence to create a triable issue as to whether Defendants subjected Burley to excessive force with the specific intent to interfere with his Fourth Amendment rights," and accordingly, "the trial court erred in granting summary adjudication." B.B., 25 Cal. App. 5th at 134 (emphasis added).

Though, as discussed above, a rational trier of fact could find that Deputy Defendants acted unreasonably and therefore unconstitutionally, there are no facts which suggest Deputy Defendants acted with the specific intent to interfere with Decedents' rights or attempted to threaten him. Summary judgment is granted on this claim.

### D. Battery and Police Negligence Claims

Defendants finally seek summary judgment on Plaintiff's state tort law claims. (Motion 23-25.) They first argue that because Plaintiff's battery claim is a counterpart of her Fourth Amendment excessive force claim, the Court should impose corresponding liability. (Id. 23.) However, as discussed above, the Court denies summary judgment on Plaintiff's Section 1983 excessive force claim. Accordingly, summary judgment as to battery is inappropriate as well.

Defendants make the same arguments for summary judgment on Plaintiff's police negligence claim. (Id. 24.) Defendants also claim that the standard for police negligence is

subjective, and "it is what [Deputy Defendants] actually knew that counts. For this reason, because plaintiff cannot use facts unknown to the deputies to state a valid seizure-related negligence claim against them, this claim fails for this reason as well." (Motion 24.)

Defendants are wrong on the law. As Plaintiff identifies, "California negligence law regarding the use of deadly force overall is broader than federal Fourth Amendment law." Tabares v. City of Huntington Beach, 988 F.3d 1119, 1125 (9th Cir. 2021) (citing Villegas ex rel. C.V. v. City of Anaheim, 828 F.3d 1252, 1257 n.6 (9th Cir. 2016). And it is not the law that an officer's subjective intent—no matter how objectively unreasonable—can upend the reasonableness inquiries of the Fourth Amendment. Summary judgment is inappropriate on this claim as well.

## VI. CONCLUSION

For the reasons above, the Court GRANTS-IN-PART and DENIES-IN-PART Defendants' Motion and DENIES Defendants' Motions in Limine. Defendants' Motion is GRANTED as to Plaintiff's claims: (1) that Defendants were deliberately indifferent to Decedent's medical needs in violation of 42 U.S.C. § 1983; and (2) brought under the Bane Act. The Motion is DENIED in all other respects. The August 16, 2021 hearing is VACATED.

**IT IS SO ORDERED.**