UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

TRACY ALVES, Individually and as       )
Successor in interest for KEVIN R.     )
NIEDZIALEK, deceased,                   )
                                        )
                    Plaintiff,          )
                                        )
          vs.                           )   No. EDCV 19-2083-JGB
                                        )
RIVERSIDE COUNTY, RIVERSIDE             )      Jury Trial Day 2
COUNTY SHERIFF'S DEPARTMENT,            )        AM Session
SHERIFF-CORONER CHAD BIANCO,            )
                                        )
                    Defendants.         )
_____)


REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Wednesday, March 29, 2023

9:21 a.m.


PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

                 LAW OFFICES OF DALE K. GALIPO
                 BY:  **DALE GALIPO**
                 21800 Burbank Boulevard, Suite 310
                 Woodland Hills, California 91367

                 LAW OFFICES OF JOHN BURTON
                 BY:  **JOHN BURTON**
                 128 North Fair Oaks Avenue
                 Pasadena, California 91103

                 HELM LAW OFFICE, PC
                 BY:  **KENNEDY HELM**
                 644 40th Street, Suite 305
                 Oakland, California, 94609




For the Defendants:

                 LEWIS BRISBOIS BISGAARD & SMITH, LLP
                 BY:  **TONY SAIN**
                    **TORI BAKKEN**
                 633 West 5th Street, Suite 4000
                 Los Angeles, California 90071

I N D E X

WITNESSES                                                        PAGE


**JEFF NOBLE**
DIRECT EXAMINATION BY MR. BURTON                                   5
CROSS-EXAMINATION BY MR. SAIN                                     52
REDIRECT EXAMINATION BY MR. BURTON                               84
RECROSS-EXAMINATION BY MR. SAIN                                   89


**BRIAN KEENEY**
DIRECT EXAMINATION BY MR. GALIPO                                  92


            EXHIBITS                    ADMITTED
              150                          18

WEDNESDAY, MARCH 29, 2023; RIVERSIDE, CALIFORNIA

-o0o-

THE CLERK:  Calling Case No. EDCV 19-2083-JB, Tracy Alves v. Riverside County, et al.

Would counsel please make your appearances.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain, with me Associate Attorney Tori Bakken on behalf of Defendant Sheriff Chad Bianco and the County of Riverside.

THE COURT:  Good morning.

Mr. Galipo, are you prepared to call your first witness?

MR. GALIPO:  Yes, we are.  And Mr. John Burton will be taking that witness, Mr. Jeff Noble.

THE COURT:  Very well.  Have him come forward.

Good morning to you, ladies and gentlemen.

THE CLERK:  If you could please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  Have a seat.  And if you can

please state your full name and spell your last name for the record.

THE WITNESS: Jeff Noble, N-O-B-L-E.

THE COURT: You may proceed.

**DIRECT EXAMINATION**

BY MR. BURTON:

Q. Good morning. Good morning, Mr. Noble.

A. Good morning.

Q. I understand you're here today as a retained expert witness for the plaintiff, Tracy Alves; is that correct?

A. Yes, sir.

Q. Is this something that you do professionally now that you're retired from law enforcement?

A. Yes.

Q. And do you charge for your services?

A. Yes.

Q. Could you explain your rate structure for the jury, please.

A. In this case, I'm billing $295 an hour for review of material and $2,950 per calendar day for testimony.

Q. How long have you been doing this expert witness work?

A. Over 15 years.

Q. Do you testify for both plaintiffs, that is people who are suing law enforcement, and for defendants, that is law enforcement agencies and their members?

A.    Yes.  So I've been retained probably well over 300 times, and about half my cases are for the defense, defending police officers and their agencies, and the other half is for plaintiffs.

Q.    Do you sometimes turn down cases?

A.    Often.

Q.    And I know there's different reasons in different cases, but generally why do you turn down cases?

A.    You know, sometimes it's just simply I don't have the time or capacity to handle those cases.  Other times I just disagree with the -- you know, the attorney who brings me the case, you know, I disagree with what their position is.

Q.    So what is your background to doing this kind of work?

A.    So I was a police officer in the City of Irvine for about 28 and a half years.  I started in 1984 as an officer, worked through the ranks as a sergeant, a lieutenant, commander, and the last two years of my career, I was the deputy chief of police.  So I worked in pretty much all facets of the police agency.  I did pretty much everything except handle a K9 or ride a motorcycle.  I was on our SWAT team, I worked undercover narcotics, was a detective.  I worked in our training unit as a sergeant for a period of time.  I worked internal affairs for about three and a half years where we investigate allegations of misconduct against our own officers.  So I had a wide variety of experiences in my 28 and a half years there.

I have a bachelor's degree from Cal State, Long Beach in criminal justice with an emphasis on administration.  I have a law degree from Western State University.  I am a licensed attorney in California, but I've never really practiced law. I've been licensed since the early '90s.  When I retired from Irvine, I went -- I was hired by the City of Westminster, which is nearby, on a part-time interim basis because at that time the Westminster Police Department had undergone a number of internal issues that related to their policies and procedures. They had allegations of discrimination against their own officers of people of color.  They had a number of issues.  So I was brought in, along with some other individuals, to help oversee that agency for a period of time and to train some of their managers, to review their policies and internal affairs. So I did that on a part-time interim basis for about -- about a year.

I've been working as an expert witness.  I started actually when I was still working in Irvine.  So I've been doing that for well over 15 years.  I've written about 30 articles in various policing journals, a couple academic journals, on policing issues and policing procedures.  I've authored two textbooks, one on internal affairs, how to conduct an internal affairs investigation, and the second on use of force.  That -- the second textbook was published by New York University Press in 2020.  So I've written quite a bit in

addition to my -- my working in the field.

Q.    Just a couple follow-up questions.  I know Irvine's been a rapidly growing city.  How big was it when you left as the deputy chief?

A.    So when I left, the population, about 220,000, and we had a little over 200 police officers.

Q.    Then when you went to Westminster, were you actually the acting chief of police?

A.    No, I was a deputy chief.

Q.    How big was that department?

A.    They had 80 and 90 officers, a smaller city.

Q.    Thank you.  Now, you mentioned training.  What is the role of training in police administration police work?

A.    So in policing, we call it a three-legged stool.  So we look at three things: one is training, one is policy, and the third is supervision.  And the purpose of training is to -- equipped our officers to handle situations in the field because in policing, often police officers respond to calls by themselves or simply with another police officer, most often there's not a supervisor there, and officers need to be able to respond to emergency situations, and they need to make critical decisions.  They do things like -- you know, they're equipped with force implements, like batons and TASERs and pepper sprays and guns, and they have the ability to detain, arrest people, take their freedoms away from them.  So we engage in quite a

bit of training to help officers understand what the rules are and how procedurally to go about different acts in policing and what our expectations are, and we combine that with policies, which are the rules, you know, of certain things, and we obviously can't create a policy for everything where training is much more broad, and we follow that with supervision to ensure that our -- our officers are performing in a way that meets the organization's expectations.

Q.   So if we drill down a little bit on this concept of training, is one of the purposes of training to give the officers or the deputies the rules, the knowledge, the ability to maximize their own safety when they're in the field doing law enforcement work?

A.   Oh, of course.

Q.   We call that officer safety; is that correct?

A.   Yes.

Q.   What about the safety of the people that they come in contact with?

A.   Well, certainly we're concerned about that as well.  We want our officers to be safe, but we also want the community to be safe.

Q.   Is one of the overriding values in law enforcement in California and the United States the sanctity of life?

A.   Of course.

Q.   Would that go for all life?

A.   Yes, whether it's the officer's life or a community member's life.

Q.   Now, what specific materials did you review in preparation for your expert work in this particular case?  Well, before I get to that, let me ask just one more question.

You understand we're here in a case involving a young man, 34, who died -- at least he had a cardiac arrest, he was revived, and then died in the hospital during the course of police restraints.  You understand that to be the overall situation here, correct?

A.   Yes.

Q.   Have you worked, just speaking very generally, on that kind of scenario before?

A.   Oh, yes, at least ten -- ten other cases I've had.

Q.   To your knowledge, is this a widespread issue in law enforcement generally?

        MR. SAIN:  Objection.  Vague.

        THE COURT:  Sustained.

        MR. BURTON:  I'm sorry?

        THE COURT:  Sustained.

BY MR. BURTON:

Q.   Did you, for example, work on what's become known as the George Floyd case?

        MR. SAIN:  Objection.  Relevance.  Argumentative.

        THE COURT:  Sustained.  I mean overruled.

You can answer that.

THE WITNESS:  I did.

BY MR. BURTON:

Q.   And would that be one of the ten that you were mentioning?

A.   Yes.

Q.   So is there -- well, I'll move on.

So in terms of asking questions -- I'm sorry.

In terms of reviewing information to prepare for your testimony here today, regarding this case in particular, can you just give us maybe not reading every single item but an overview of what you reviewed?

A.   So I was provided the -- the police reports completed by the deputies.  They were interviewed within their own agency. I reviewed those interviews.  There were depositions.  And there were -- one -- Officer Garcia (sic) had a body -- was wearing a body-worn camera vid -- camera, so there's video from her camera.  And there was also video from a neighbor, a resident in the area, that depicted part of the scene.

Q.   Now, just before we go into any further, there were a few statements that were made late in the day yesterday afternoon about this case.  And before we look at the video and discuss your opinions about it, I just wanted to bring some of these statements to your attention.  There was a representation made that after Mr. Niedzialek was handcuffed behind his back by the deputies, which occurred on the video, that there was continued

resisting after that cuffing while he was being held in the prone restraint.  That was said yesterday.  Is there training specifically on that point nationally for police officers?

A.    Yes.

Q.    And what is that training?

A.    So when an individual is taken into custody, particularly an individual who may be agitated, like in this case, acting incoherently, and they've been tased, they may be -- and they're taken into a prone position, there may be some leg movement, there may be some squirming around, and police officers aren't mind readers, so they really don't know whether that's resistive behavior or behavior that's caused by the individual because they're having difficulty breathing.  So the training -- you know, the training is consistent in that when a person is taken to the ground, once they're -- once they're controlled, once they're handcuffed, that we move them into what's called a recovery position.  And that's simply by rolling them on their side or sitting them up to facilitate their breathing.

Q.    Now, another statement that was made during this opening statement yesterday was that prone restraint does not affect breathing at all.  Is that how police officers in the United States are trained?

A.    So it's not how police officers are trained.  To the contrary, police officers are trained, while there may be some

medical dispute -- and I'm not a physician, I'm not a doctor, I can't, you know, render opinions on that -- but how police officers are trained is that -- despite these disagreements, that people need to be moved into a recovery position to facilitate their breathing for a couple of reasons.

So first, we want to be able to facilitate their breathing, and we believe that by being in a prone position, regardless of whether somebody has some weight on your back, that it makes it more difficult for an individual to breathe and have that exchange of oxygen.  But we also want to roll them on their side or sit them up so we can properly monitor the person.  So if you're in a prone position, it's difficult to see whether they're having that oxygen exchange, whether their -- you know, their chest is, you know, moving and they're breathing, and to be able to see their face clearly.  So there's two primary reasons why we want to put somebody on their side or sit them up.

Q.    Now, it was said during this opening statement yesterday that the Riverside Sheriff's Department trains its deputies to keep people on their prone position even after they've been handcuffed because it's tactically unsound to sit them up or roll them on their side.  I'd like to ask, Mr. Noble, from the perspective of national police training standards, tactically, is it feasible for two trained deputies to be able to hold one person who's in handcuffs safely on their side or seated after

handcuffing?

MR. SAIN:  Assumes facts not in evidence.  Incomplete hypothetical.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  So the -- the policies of the Riverside County Sheriff's Department are out of step with the policies and training of police officers all across the country.  By leaving them in a prone position, we -- there is a risk of their inability to have that oxygen exchange, breathe properly, you can't monitor somebody effectively.  And it's very easy to roll somebody up into a seated position, particularly with two deputies, who is handcuffed.  And like in this case, they're not wearing a shirt, they're wearing some boxers where their pants have been pulled down slightly to the point that, you know, a reasonable officer would not believe that they're armed.  And, in fact, the deputies acted consistently with the belief that the -- Mr. Niedzialek was not armed, and they never conducted a pat-down search.  You can see that in the video.

So the two deputies, you simply, you know, roll him into a seated position, and you have one deputy on each arm, you can put him in wrist locks if it becomes combative, or you can simply put him on his side and you take his upper leg and pull it behind him and have one deputy simply hold his ankle. And when your foot is behind you like that and somebody's

holding your ankle, you really can't kick or move around. But with two deputies, it's really pretty easy to put somebody in a seated or on their side position without concern that they're going to somehow become a flight risk or a danger because, again, the person is handcuffed and they've been searched or -- or there's a reasonable belief that they have no weapons.

BY MR. BURTON:

Q.    Now, another thing that came up during this opening statement yesterday was even after a person who's let's say been agitated and been active is handcuffed and then becomes still, that they should still be left -- held on their chest because they might be I think the expression was "playing possum."  Is that consistent with law enforcement training?

A.    So again, the law enforcement training is as soon as you get them controlled, that you move them immediately into a recovery position.  So there's always possibilities that somebody could just be laying still, you know -- you know, feigning something and waiting to make an attack.

You know, there's a difference between a risk and a threat.  So a risk generally talks about anything that's possible.  We can all dream up possibilities.  And could poss -- could something happen?  Of course.  But that's different from a threat.  And we only use a level of force in response to a threat.  Somebody who is laying perfectly still, is it possible they're playing possum?  Well, it's possible,

but it's certainly not likely.  And even if they were, there's really nothing they can do.  Again, they've been handcuffed, they're not wearing a shirt, they don't have any weapons, there's two deputies present.  So, you know, even if it is possible that this person might, you know, want to start kicking or trying to fight, he's really not capable of doing that.

Q.   So let me ask another question related.  A person is let's say, like Mr. Niedzialek, agitated and active and is put into handcuffs and remains agitated and active for a period of time, like in this case 40 seconds, and then all of a sudden becomes still.  Are -- as a national standard, are police officers given training how to respond in that situation?

A.   Well, that -- that sudden change in behavior is really a red flag.  I mean, you have somebody who's agitated, who is acting out, and then they suddenly become quiet and still.  You know, that would raise a concern in any reasonable police officer, you know, *I really need to monitor this person.  I absolutely need to get him in a recovery position and take a close look and expedite the paramedics as best I can because this person is likely in medical crisis.*

        This case is in -- is -- you know, you have to look at the facts of each specific case, but in this case, the officers were responding to a man who was bloodied, who was possibly in the midst of a mental health crisis and some sort

of psychological event.  When they arrive, they see Mr. Niedzialek acting in a bizarre manner.  He's agitated, he's making statements that are incoherent.  He -- you know, he charges at the officers, a TASER is used against him twice.  He falls to the ground twice, you know, striking his body.

So, you know, a reasonable officer in these circumstances would be looking at this situation, you know, more as a medical call, someone who was either under the influence of drugs or in the midst of a mental health crisis or both.  And there's no evidence that he had somehow committed a crime other than when he, you know, moved toward the officers.

And we know that is true in the officer's mind because Officer Keeney called for paramedics right away before he ever made contact.  I mean, before -- once he saw Mr. Niedzialek, he called for paramedics.  And then independently when Officer Gomez -- or Deputy Gomez arrived, she made the same call.  She also called for paramedics and asked for them to stage.  "Staging" simply means that, you know, you want to get the paramedics close to the scene, but you don't want them to actually come into the scene yet until it's secured, until the person is secured and it's safe.  But you want to get them as close as you can so when you need them once it is safe, they can get, you know, that last little distance.  And that's what she requested, which was the appropriate thing to do.

And then as soon as within a couple seconds after he was handcuffed, Deputy Gomez radioed to have the paramedics respond to the scene, which, again, is the absolute right thing to do.

Q.   Which means don't stage anymore but actually come to where we are?

A.   Right, yeah.

Q.   Okay.  Thank you.

MR. BURTON:  So we're about to show the video, which we believe is in evidence by stipulation, Your Honor.  It's Exhibit 120.  It was shown by -- at least in part by the defense during the opening.

THE COURT:  Stipulated?

MR. SAIN:  No objection.

MR. BURTON:  Okay.  So we need --

THE COURT:  Exhibit 120 is received.  You may play it.

MR. BURTON:  I'm sorry?  I'm sorry, I misspoke, Your Honor.  It's 150.

THE COURT:  150 is received.  And you may play it.

(Defendants' Exhibit No. 150 was admitted.)

MR. BURTON:  Thank you.  And just a few comments because it's done by stipulation, that this was -- was prepared by the defense, but the plaintiff agrees to it, and it has been altered from the original in that when that -- as the witness

referred to the -- the bystander video, it's -- it's added so we get two views at a certain point.  It's all the Officer Gomez -- or Deputy Gomez body camera, but there's a bit where we also get the side view.

THE COURT:  Okay.  Agreed, Mr. Sain?

MR. SAIN:  I'm sorry, I didn't hear part of that statement.

THE COURT:  So he's saying it's both the officer's body-worn camera and the bystander video.

MR. SAIN:  That is correct, Your Honor.  The officer -- Deputy Gomez's body-worn camera video is synchronized with the cellphone video from witness Kathryn Vasquez, who we anticipate will be testifying next week.

THE COURT:  Very well.

MR. BURTON:  So we'll see that second camera.

THE COURT:  So just play it.  Don't explain any more.

MR. BURTON:  Okay.  And then the time is one hour off.  I just wanted to point that out.  It's 1226, not -- or 1229, not 1329 -- 1529.  It's 1429, not 1529.  Okay.  Thank you.  So we'll play it from the beginning.  And it's going to be about 11 minutes.

(Video played.)

MR. BURTON:  Okay.  For the record, I stopped it at 16:16 on the timer, which was when the handcuffs were taken off.

BY MR. BURTON:

Q.   I have some follow-up questions for you, Mr. Noble.  So at the beginning, we see Officer -- I'm sorry -- Deputy Gomez use this device, the TASER.  Can you just explain to the jury, without going into too much detail, exactly what the -- what the TASER does and what its purpose is?

A.   So a TASER is a less lethal device that works in a couple ways.  The primary method to use a TASER is to point it and shoot it at somebody, and it expels two darts that are connected by thin wires to the actual unit.  And when those darts make connection with the human body, if the spread of the dart is appropriate, there needs to be -- if the darts are too close together, it's not that effective, but if the spread is effective, the TASER will automatically go for five seconds. And it will -- the goal of the TASER is to create what is called neuromuscular incapacitation or NMI.  And what that causes somebody's body to do is it makes you lock up so you can't control your limbs and you fall down.  And officers are trained that they can actually handcuff somebody while the TASER is being activated.  So we call it cuffing under power. So you can actually go up and grab somebody's hand, even though they're being tased, you will not be tased, and you can handcuff the person and take them into custody.

          And that's the way that the TASER was used in this situation, it was used the dart mode.  And there's a second way

to use a TASER.  It's -- there's little metal probes at the end of the -- of the device, and if you touch somebody, it's called a drive stun, D-R-I-V-E.  And that -- in that configuration, it essentially just causes pain.  It doesn't create neuromuscular incapacitation.  Unless there's already been some -- the darts deployed and one of the darts is embedded in the body, then it will -- you can complete the circuit and get that by put -- by touching them with the probes, but that's not what happened here.

What happened here was they -- Deputy Gomez fired the darts, and you see him lock up the first time and go to the ground, and when she -- the second time, she didn't fire a second set of darts, the darts were still embedded in him, so she simply pulled the trigger, and that's when we see him go to the ground the second time.

Q.   And do you have any -- any comments or opinions about the use of the TASER in these circumstances?

A.   Yeah, I think the officers behaved exactly as a reasonable officer would be trained to, is -- in this situation, a TASER is -- is the appropriate device.  This is sort of a textbook tasing.  It was -- TASERs often are ineffective.  They don't -- you don't -- you don't get a dart, both darts in, you know, a dart may get hung up on clothing, it just doesn't work, but this was textbook.  It worked both times, particularly the second time.  You really see him lock up with his arms in front

of his body and go straight to the ground.  So both -- the TASER worked and the decision to use the TASER were both appropriate.

Q.    Now, afterwards, especially after the second tasing, both deputies moved in quickly and got him in handcuffs in about 40 seconds.  Do you have an opinion about that?

A.    Yes.  They -- you know, they really did a good job.  The first time you see that by the time Keeney is able to move in, you know, he starts kicking his legs around a little bit and they're not able to get him cuffed.  But the second time, Keeney is on him quickly, he grabs his left arm, puts him in a rear wrist lock, moving his arm behind his back.  Again, kind of a textbook control hold.  Mr. Niedzialek is laying on his right arm, so Deputy Gomez has a little bit of effort to get his arm out from underneath his body, but she's able to do so, and they place him in cuffs, in handcuffs.  And they do so quickly, which is important.  They get -- they get him handcuffed in about 40 seconds, which is, you know, again, very consistent with how a police officer would be trained.  That's what you want to do, and they were able to accomplish that, and they truly did a good job on that part.

Q.    So up to the point in this incident, as shown on -- on this video, to the point where the handcuffing is complete and we hear that, it's at 7:20 on the video, and then the -- right after that, I think within two seconds, Deputy Gomez

broadcasts, *Can you have medical respond?* which is don't have them stage, have them come to us, as you said.  So up to that point, was everything that you saw these deputies do according to national standards of police training?

A.   Yeah.  Everything they did was consistent with generally accepted police practices across the country.  So, you know, they responded on someone who was either in the midst of a mental health crisis or on drugs or a combination.  They made contact with him.  He's acting in an agitated and bizarre way.  He's incoherent.  He rushes at the officers.  The use of force of both TASERs is consistent with generally accepted police practices.  Their handcuffing is consistent.  The fact that Keeney quickly asked for paramedics to respond, even before the first contact, was the right thing to do, that Gomez arrived at that, you know, decision independently.  So she also recognized that's the right thing to do.  And then two seconds after he's handcuffed, she's calling for the paramedics.  You know, this is a man who is very bloodied and, you know, who has gone through a lot and had these TASER applications, which also causes stress on the body, in combination of whatever happened to him before to cause his obvious injuries, you want the paramedics there as quick as you can.

       So all of those things were consistent with generally accepted police practices.

Q.   Now, at about -- after the handcuffing, did they -- did

they keep him on his chest?

A.   They did.

Q.   And is that consistent with generally accepted police practices?

A.   No.  That's -- that's where they deviated from generally accepted police practices.

Q.   Okay.  We'll talk more about that.  20 seconds after he's handcuffed, I could show it to you if you need to, but he appears to try to roll onto his left shoulder off his chest. Do you recall that?

A.   Yes.

Q.   And that the deputies push him down flat again.  Do you have an opinion on -- on training issues in regard to that?

A.   So we train people that -- well, we train our officers that, you know, certainly somebody can still be resistive when they're handcuffed in a situation like this, but they also could be, you know, moving in order to facilitate their breathing.  And it's common for people who are having difficulty breathing to roll onto their side.  So we let officers know that -- that both of those things are possible. And that's why we train them to put them on -- put the person on their side quickly to better facilitate their breathing and to do it in a manner that's controlled.  So, you know, both deputies can get behind him, holding his hands.  So even if he's kicking his legs, they're -- they're behind his back.  You

can't possibly be kicked.  And, again, this is a situation he's handcuffed, he's not wearing a shirt, his pants do not present any evidence of him having a weapon.  They were obviously not concerned.  They didn't pat him down.  So there's no -- there's no indication of weapons.  There's -- you know, it's not like there's a crowd of -- of hostile people around that may cause a problem for the deputies.  None of those things are true here.

Q.   Now, at what's the eight-minute mark on the tape, which is about 40 to 45 seconds after the handcuffs were on, Kevin appears to stop moving, at least his legs stop moving, which is where the camera's trained.  Do you have an opinion on what the officers should have done at that point?

A.   Well, they should have already put him in a recovery position, but certainly, you know, 45 seconds after he's being handcuffed, he becomes motionless, he's not saying anything, he's not verbalizing, he's not moving, then that -- you know, that should absolutely be a red flag for somebody who you know has gone through a lot of medical issues, that you know you've called the paramedics for, to get the person into that recovery position.

Q.   Now, at 9:03 on the video -- we don't need to play it -- we hear Deputy Keeney whisper, *I think he's falling asleep.*  Do you recall that?

A.   Yes.

Q.   And -- and do you have an opinion on that?

A.    Yeah.    That's -- that's kind of absurd.    I mean, you know, you just fought with this individual.    People don't just fall asleep; they go unconscious.    And, you know, obviously another big red flag that he's recognizing that he's not moving, he's -- he's motionless, he's not verbalizing anything, and he's dramatically changing from where he's agitated to he's completely calm.    So those are another training issue that we provide to our officers, that when that happens, that's a signal that this person may be -- their breathing may be compromised.

Q.    Now, up to the point, which is three minutes -- more than three minutes after handcuffing, where Deputy Gomez asks Mr. Niedzialek his name -- you recall that, correct?

A.    Yes.

Q.    Yeah.    Up to that point, do you see any effort by the deputies to monitor Mr. Niedzialek while he's in handcuffs?

A.    No.    What -- what you see is Gomez remains in her position to the right side of his body, Keeney's got his, you know, knee on him or -- or over him, and he's just sitting there.    He's facedown.    His head is turned toward Keeney, but you don't see them leaning down, you know, to, you know, take a close look, you don't see them, you know, making efforts to try and visualize whether this person's chest is moving in a manner consistent with breathing.    And that's -- again, that's why you want to put them in that recovery position so it's easier to

see those things.

Q.    Then does Mr. Niedzialek respond to Deputy Gomez when -- when she tries to talk to him?

A.    No.

Q.    And what's the significance of that?

A.    You know, these are just more red flags.  So he's perfectly calm, you know, he's not doing -- he's not moving, he's not speaking, and now it's been three minutes.  He hasn't moved for, you know, three minutes or, you know, close to three minutes.  Again, put him in that recovery position.

Q.    Then a minute and a half later, Deputy Keeney sort of removes his left hand and right knee and looks at Mr. Niedzialek's face.  Do you recall that?

A.    Yes.

Q.    Is that the first time that you see the deputies deliberately looking at his face?

A.    Yes.

Q.    And why would deputies be trained to look at a subject's face?

A.    Well, you want to -- again, you're looking for basic signs of life.  Is their heart beating?  Are they breathing?  Are they -- you know, are they taking in breaths?  Is their chest rising?  You know, are there injuries that may be preventing them from being able to breathe?  You know, do they have a clear airway?  Those are the just basic first aid types of

things.

Q.   And so then they roll him over onto his back.  That's about four minutes and 50 seconds after handcuffing.  Is that when they should have rolled him over or should they have rolled him sooner than that?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   When should they have rolled him over?

A.   As soon as they got him controlled.  Once they got him in handcuffs, he should've been on his side or sitted up -- seated up.

Q.   Now, there was some talk on the -- on the opening statement yesterday about Deputy Keeney giving CPR.  Are police officers, law enforcement officers in California trained on CPR, and specifically chest compressions?

A.   Yes.  So in California all police officers are certified through an organization called POST.  It's the California State Peace Officer Standards and Training.  And to graduate from a police academy, you have to successfully pass tests on a number of learning domains.  One of those learning domains is first aid, and that includes a component on CPR.

Q.   So did you see the paramedic here, Lisa LaRusso, give instructions to Mr. -- to Officer --

THE COURT:  Counsel, don't testify.  We have no

evidence that the paramedic's name was that.  So have the witness testify or have some other evidence as to what the name is.

MR. BURTON:  Thank you, Your Honor.

BY MR. BURTON:

Q.   So did you see the -- the paramedic ask the -- Deputy Keeney to apply CPR?

A.   Yes.

Q.   And then Deputy Keeney did apply CPR, correct?

A.   Yes.

Q.   And then did you see Deputy Keeney stop applying CPR?

MR. SAIN:  Objection.  Still leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. BURTON:

Q.   And was that consistent with training?

A.   No.  Police officers are trained that when you initiate CPR, there's only three reasons that would cause you to stop. One is exhaustion, two is that you've been directed by a medical professional to stop, or third is you're relieved by somebody else.

Q.   Thank you.  That's it for my review of the tape.  Maybe we can take it off of here.

So, Mr. Noble, you mentioned police practices and standards.  Did you put together some materials that -- that

contain the national police standards on the questions that we were discussing?

A.   Yes.  I wrote an expert report for this case.  And in part of that report was I prepared some materials or referred to materials regarding the standards in policing about that recovery position, about positional asphyxia, yes.

Q.   So -- and you brought those materials with you?

A.   I brought some of them, yes.

Q.   And I think they've also been marked for identification as exhibits in this case.  There was some mention yesterday of a study by a forensic pathologist, medical examiner who does autopsies named Donald Reay.  Are you familiar with Dr. Reay?

A.   I've read the studies, yes.

Q.   Okay.  And what is your understanding of who Dr. Reay is?

A.   Dr. Reay is a pathologist, he's a medical examiner up in King County, Washington, which is the Seattle area.  That's my understanding of him.

Q.   And -- and how did law enforcement -- now, you're not a doctor, you've said that, but how did law enforcement react to Dr. Reay's initial publications?

A.   So he initially -- his first publication was in '88, and the second one, he did some case studies in '92.  And in 1992 the International Association of Chiefs of Police, which is a national policing organization that reviews policing issues, holds seminars, develops model policies, develops a lot of

training, they took a look at these early studies and, you know, provided some training to policing as early as 1992 that -- about the importance of once a person is secured -- so you can put a person in a prone position if you're struggling with them.  And you need to do what you need to do in order to get the person contained and in custody, but once they're in custody, that you need to move them into what's called this recovery position, on your side or seated up, to better facilitate their breathing and to better -- more effectively monitor the person.

Q.   So before the IACP came out with that advice to law enforcement agencies throughout the United States in 1992, are you aware of a study by a law enforcement agency on this question of -- of custody deaths?

A.   Yes.

Q.   And what study is that?

A.   So also in 1992, the San Diego Police Department was noticing, you know, people dying who were, you know, in this -- in a prone position or in a -- you know, in a prone position and they are hog-tied with their feet tied up and connected to their wrists, which were behind their back, that there was a number of individuals who were dying.  So they also did a study, and they came to similar conclusions that -- that the best remedy for this -- or the strategy for -- in policing is, again, once they're in custody, get them into that recovery

position.

Q.   And did you -- in forming your opinions here today, did you rely on the San Diego study?

A.   Yes.

MR. BURTON:  And that's been marked for identification, Your Honor, as Exhibit 20.

BY MR. BURTON:

Q.   And I think this is Document No. 3 in front of you.  Do you have it there?

A.   I do.

Q.   And I'd like to just invite your attention to page 11 and Paragraph No. 2 under "Use of Force Issues."  Do you see that?

A.   Yes.

Q.   Okay.  And could you read that paragraph for the jury, please.

THE COURT:  That exhibit is not into evidence.  So you first must move it into evidence before it can be read or alluded to in substance.

MR. BURTON:  So I would move Exhibit 20 into evidence, Your Honor.

MR. SAIN:  Objection.  Hearsay and relevance.

THE COURT:  And this is the expert report?

MR. BURTON:  No, no.  This is the --

THE COURT:  Oh, the San Diego study.

MR. BURTON:  The San Diego study.

THE COURT:  So what is your argument that it is not hearsay?

MR. BURTON:  Well, it's -- it's -- it's proof of what the national standard is.  And we can redact it to just the relevant portions.

THE COURT:  Mr. Sain.

MR. SAIN:  Your Honor, may we approach?

THE COURT:  Yes.

(Sidebar conference as follows:)

MR. SAIN:  Your Honor, I'm going to add to my objection that there's no foundation and that this is prejudicial under Rule 403.  Mr. Burton just stated that its only relevance as a San Diego Police Department study is that it's evidence of the national standard.  That doesn't even pass the smell test.  This is one agency's recommendations that were studied, not the national standard.  Certainly not any mandate by any court in California, not by POST, or anything else.

THE COURT:  Okay.  So when you are conducting a direct examination of your own expert witness, you cannot elicit statements of hearsay.  So unless that document is received into evidence, then he cannot speak what's in the document.  He can state that he relied on it.  He can generally describe it, but he can't quote it.  Do you understand?

MR. BURTON:  Yes.  I would just -- you know, things like "smell test," we don't need to talk like --

THE COURT:  Right.

MR. BURTON:  -- this between the two of us.

THE COURT:  Right.

MR. BURTON:  It's unprofessional.

This particular study was cited with approval by the IACP and adopted by the IACP, which I think Mr. --

THE COURT:  Well, you can elicit that if he knows that, right?  But it doesn't mean it's admissible.  It doesn't mean it's not hearsay.

MR. BURTON:  Okay.  So we can paraphrase it?

THE COURT:  No.  You can't -- you can say do you know whether or not the San Diego study was considered and adopted by this national organization?  If he says, "Yes, I know," and it was, then that's fine.  That's not quoting from the study.

MR. BURTON:  Okay.

THE COURT:  Okay?

MR. BURTON:  Okay.  So I'll do the best I can with -- and follow, you know, the rulings.

THE COURT:  Okay.  Right now that exhibit is not in evidence, and you can't read from it or have him read from it and testify to it.

MR. BURTON:  Okay.

THE COURT:  Okay?

MR. BURTON:  Thank you, Your Honor.

MR. SAIN:  Thank you, Your Honor.

(Sidebar concluded.)

BY MR. BURTON:

Q.    So, Mr. Noble, let's go back.  So after Dr. Reay came out with his studies, which, as you said, caught people's attention, and then there was the San Diego study, did you base your opinion on the fact that the San Diego study methodologically surveyed agencies throughout the United States?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.    How did the San Diego study perform -- collect information?

A.    They contacted other police agencies to see if they had similar experiences.

Q.    And was that throughout the United States?

A.    Yes.

Q.    And did they conclude with a recommendation about what should be done with people who were restrained in the prone position after they were handcuffed?

A.    Yes.  They came to that same conclusion that they should be moved in -- onto their side or sat up to promote their breathing.

Q.    And then you mentioned -- and I think it's -- I have this as Document No. 4.  It's been marked for identification as

Exhibit 21, marked for identification only.  This is the IACP -- you described the IACP.  Would you describe the IACP as an organization that sets national standards for police agencies?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.    What is the role of the IACP in police standards for agencies throughout the United States?

A.    So the IACP doesn't mandate standards.  They don't have that authority.  But rather, it's a collective of policing individuals, mostly managers and chiefs and sheriffs, not only across the country but internationally as well.  And they do a lot of -- they do a lot of training, they produce a lot of training materials, they create what's called "Model Policies" to help agencies develop their policies.  So while they don't mandate that you act in a certain way, they provide a lot of training and a lot of materials that police departments across the country use to train their own officers and to be consistent with other agencies across the country.

Q.    Are you a member?

A.    I am.

Q.    How long have you been a member?

A.    Oh, I've been a member for close to 30 years.  I'm a --

after 20 years you become a lifetime member and they stop

charging you dues and --

Q.    Now, to turn back to this Exhibit 21, this 1992 publication, did -- did you take into account when you formulated your opinions in this case that the IACP indicated a general awareness of a problem of people dying when being taken into custody?

A.    Yes.  So they produced a training key on that very issue, and they talked about those prior studies.

Q.    So they talked specifically about the San Diego Police Department study; is that correct?

A.    They did.

Q.    And did they also talk about Dr. Reay's work?

A.    Yes.

Q.    And did they conclude on page -- just inviting your attention to page 5.  Did they conclude with a recommendation as to what -- I'm sorry, page 4 -- with a recommendation as to what departments should train?

A.    Yes.  Again, they came to the same conclusion, that once a person is in custody, to facilitate their breathing, that they should be rolled on their side or sat up.

Q.    Thank you.  Now, I'd like to invite your attention to Document No. 5 in your stack there, which has been marked for identification as Exhibit No. 22.

          And can you describe what the National Law Enforcement Technology Center is?

A.   So the United States Department of Justice is the main agency in the federal government for policing issues.  And then as part of the national -- or the Department of Justice, they have what's called the National Institute of Justice programs that does a lot of the research arm for the -- for the Department of Justice.  And then that group forms other groups, like this technology center.  And, again, what they do is they do research at a federal level to help policing -- you know, to forward policing to be -- address issues that may come up in -- in policing.  And, again, this is what helps set the standard in policing, these types of studies.

Q.   What is the title of this particular publication?

A.   "Positional Asphyxia—Sudden Death."

Q.   And do they talk about this idea of the basic physiology of a struggle?

A.   Yes.

Q.   And what do they say about that?

A.   Well, they make, you know, some basic points about, you know, that when you're -- the human body, when you're involved in a struggle, that the body will undergo some reactions, and particularly if the person is overweight or they're on drugs or they're having some other kind of issues, that they may react adversely to the struggle.

Q.   And do they make a recommendation as to what to do once the handcuffing is complete?

A.   Yeah.   Their -- again, their recommendation is very simple and very direct.   As soon as a person is handcuffed, get them off their stomach.

Q.   Now, I'd like to invite your attention to Document No. 6, which is marked as Plaintiff's Exhibit 23.   This is a policy review by the International Association of Chiefs of Police.   This is the IACP we were talking about earlier.   This is from 1998.   And did you also rely on this in reaching your opinions?

A.   Yes.

Q.   Okay.   And what is this policy review called?

A.   The prone position still a bad idea -- or "The Prone Restraint—Still a Bad Idea."

Q.   Okay.   And do you know whether this came out after there was criticism of Reay's studies?

A.   So what happened during this time period is because there were a number of deaths, then there were a number of lawsuits associated with those deaths.   And one of those lawsuits, Dr. Reay was called as a witness and testified.   And there was some dispute, some countervailing evidence from another medical expert that -- that disputed his -- his research.

And so what this article does is say, you know, look, there is some dispute about whether or not this position impacts a person's breathing to the extent that it may cause a person's death, but from a law enforcement perspective, our training hasn't changed.   And that's what IACP looks at this

as, not as a medical expert, but, you know, how should the -- in the policing world, how should we act?  And so this -- this article came out and said, look, there -- you know, to be sort of alerting law enforcement, look, there's some -- there is some dispute out there among the medical experts, but the risks far outweigh the -- the -- you know, this minimal police action that needs to be taken to prevent a death.  And that action is simply rolling them on their side or sitting them up.  So you don't need any special training or special equipment.  So this article is saying despite this -- this dispute, we should continue with the recovery position.

Q.    Okay.  And if we look at page 3 of Exhibit 23, the last paragraph, is that a fair summary of how this IACP bulletin ends?

A.    Yes.

Q.    Now, I'd like to invite your attention to Exhibit Number -- it's marked for us Number 26.  It would be Number 7 in your stack.  It indicates it's a settlement agreement with the City of Cleveland.  And can you explain why you included this in your report?

        MR. SAIN:  Relevance.  Hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  So in policing there's not, you know, a rule book out there.  So, you know -- and I always like -- if you're going to build a bridge over a certain span, you know,

there's all sorts of building codes out there you can go to and say, *Okay, well, what's the strength of the bridge?  What does it need to withstand?*  And, you know, mathematically they can figure it out.  There's no similar rule book in policing.  So we look to groups like the IACP or the Police Executive Research Forum or the Department of Justice to help us understand and know what the standard of care is and know what we should be -- how we should be behaving in policing.

But really in the last 20, 25 years, we've looked to what's called consent decrees.  So a consent decree is when the federal government through the Department of Justice has conducted an investigation on a particular police agency because of a belief of some level of wrongdoing that relates to their policies and procedures.  And they enter in some level of litigation, and then the city will agree to -- to a settlement where there will be oversight for the police department where their training, their policies, their procedures will all be reviewed, recommendations will be made, that they may need to make changes.  And all of this is overseen by a federal -- a federal court judge to make sure that these agencies are acting appropriately.

So what we've seen over the last 20 years is that, you know, a lot of large agencies have undergone these consent decrees and they've developed policies and recommendations through the consent decrees that really form the standard of

care for policing across the country because all police agencies, we look at these consent decrees, say, *Well, you know, what's the standard?  What is this oversight group recommending, and what's the judge approving?*  And if that's what they're approving in, you know, Seattle or Los Angeles or Cleveland or Ferguson or Philadelphia, then we should be behaving the same way.

Q.   And so why did you include this -- this City of Cleveland consent decree?

A.   Well, I included the City of Cleveland and the City of Ferguson because they're both consent decrees, so they both met the criteria of, you know, having an oversight agency looking at them and a federal court judge approving them.  And both of these settlement agreements recommended that both those agencies include policies on positional asphyxia.

Q.   So Exhibit 26 would be Cleveland, and that has a reference to positional asphyxia and not using a restraint technique that would impair a subject's ability to breathe on page 17; is that correct?

          MR. SAIN:  Objection.  Leading.  Hearsay.

          THE COURT:  Sustained.

BY MR. BURTON:

Q.   Well, let me ask you to refer to Exhibit 17 -- to page 17 of Exhibit 26, the Cleveland agreement.  And what did that have to do with -- with your opinion?

A.    Again, there's a portion of that agreement where it says, "Understanding the risk of positional asphyxia, and using restraint techniques that do not impair the subject's respiration following an ECW application."  "ECW" stands for electronic control weapon, which is a TASER.

Q.    And then the same for Exhibit 25, which is the -- the Ferguson decree.  What did -- and again, I'm referring to page 37.  What did that have to do with your opinion today?

A.    So again, it was recommending to the Ferguson Police Department that they develop a policy to "minimize the risk of positional asphyxia and the need to use restraint techniques that do not compromise a subject's breathing."

Q.    Now, you also brought a number of -- of police department policies; is that correct?

A.    Yes.  I wanted -- I wanted to look at a number of policies from across the country of agencies that actually not just had training but actually had written policies on positional asphyxia.

Q.    Can you just sort of explain -- I know you kind of touched on this earlier -- the difference between policies and training?

A.    So we provide a lot of training.  Not all of our training makes its way into policies, but we want to train our officers so they can respond to situations in the field because they're often, you know, in the middle of the night, no supervisor, no

opportunity to look for a book or a manual, and they need to be able to respond based on their own knowledge to a wide variety of circumstances.  So that's -- that's why we train.

Policies, we develop policies to control our officers' behaviors, and, you know, that sets the standard.  So sometimes you'll have -- you know, you don't want a policy manual that's 12 volumes thick because nobody could understand all that.  So you want to -- you know, you limit your policies, but your training may be much more robust than your policies.

Q.   So Exhibit No. 32 is the Indianapolis Police Department. And why did you include -- I invite your attention to page 2. Why did you include this particular policy?

A.   Because they gave a definition in their policy of positional asphyxia, and they gave specific requirements to put the individuals in that recovery position once they've been restrained.

Q.   And this was, I believe, 2015?

A.   Yes.

Q.   Yes.  So you also included the City of New York Police Department.  That's a pretty big agency, correct?

A.   Yeah.  New York Police Department has about 30,000 officers, so it's the largest agency in the country.

Q.   And this is a 2016 policy.  And why did you include that? And I invite your attention to page 2.

A.   Yeah.  Again, this is a policy that was, you know, in 2016

that said the same thing.  You know, "Position the person to promote free breathing, as soon as safety permits," when the person is in custody, "sit the person up or turn them onto their side."

Q.    Now, Exhibit 35 is from 2017.  That's District of Columbia.  And I invite your attention to the page marked 10 of 15.  And why did you include this policy?

A.    Yeah, again, to show the consistency of these policies across the country.  Their policy, again, is consistent in that once a person is restrained, that you put them in that recovery position.  And then they went a step further and said if you're transporting a person, that you can't put them in the backseat of a police car in a prone position, that that's prohibited.

Q.    Now, Exhibit No. 33 is also from 2015.  It was revised in 2017.  This is the New Orleans Police Department.  And I invite your attention to page 2.  Do they address this problem of a subject who's being restrained becoming suddenly sort of calm or tranquil?

A.    Yeah.  So they did -- in their policy, they not only talk about the positional asphyxia and the need to put somebody in the recovery position, but they add in a definition of "sudden tranquility," when somebody suddenly becomes calm and alerts officers that that could be a red flag that their breathing is compromised.

Q.    And so looking at page 4 of 10, what does the policy of

the New Orleans Police Department require?

A.    It says, "If a subject has been placed on his or her stomach, turn him or her on their side in a seated position as soon as the handcuffs are properly applied."

Q.    And, in your opinion, is that the national standard today?

A.    Yes.

Q.    Was that the national standard in July of 2019 when Mr. Niedzialek was handcuffed?

A.    Yes.

Q.    Now, we just have a couple more here.  We can just go through these very quickly.  Exhibit 31 is Detroit.  What does Detroit say about this?

A.    So Detroit, you know, similarly says that restrained positions, it talks about, "Positional asphyxia that can lead to death," and they need to "be placed in an upright or seated position."

Q.    And then Denver is Exhibit 30.  Could you address that just quickly?

A.    Yeah, again, Denver's policy is consistent that they need to be placed in the recovery position.

Q.    And to get the West Coast involved, Berkeley, and Exhibit 281.

A.    Yeah.  So the Berkeley Police Department, their policy was in 2020, also recommended -- or requires that recovery position.

Q.    Now, the final one I have is the IACP from 2018 -- I'm sorry, 2017 back to the IACP.  For some reason I misplaced it.  There it is.  Sorry.  That's Exhibit 280, should be Number 16.

So this would be the most recent pronouncement by the IACP after all this controversy and all these studies that have been referred to.  And I invite your attention to page 2.  What is the IACP's position?  And this would be the IACP's current position, correct?

A.    Yeah.  So this --

MR. SAIN:  Objection.  Relevance.  Subsequent remedial measures.

MR. BURTON:  Well, it's 2017.

THE COURT:  So it's overruled.

You can answer.

THE WITNESS:  Yeah, so this was a -- you know, this was an IACP "Model Policy."  Again, they produce what's called "Model Policies" to help agencies write their policies.  And in the "Model Policy" in 2017, again, they put a -- provisions in that would require officers to put somebody into that recovery position.

BY MR. BURTON:

Q.    And that would be immediately after handcuffing?

A.    Yes.

Q.    And did you, in your review, see any policy that existed at the time in Riverside, not talking about existing policy,

but policy that existed in 2019, that required officers to put people like Kevin Niedzialek on their side or in a seated position so they could breathe better after handcuffing?

A.   No, they didn't have a policy.

Q.   And did you see anything that was provided to you in their training that said that they trained deputies, you know, once you get people in handcuffs, sit them up or put them on their side?

A.   No.  Their individual who testified on behalf of their training specifically said that their training was to leave them in a prone position.

          MR. BURTON:  And can I have just one moment, Your Honor, please?

          THE COURT:  You may.

                    (Counsel confer.)

BY MR. BURTON:

Q.   I just want to finish with one last quick line.  There are certain risk factors, would you agree it's in your report, that -- that raise the risk that somebody is going to have an adverse reaction if their breathing is impaired that officers are trained on?  Would you agree with that?

          MR. SAIN:  Objection.  Leading.  Exceeds the scope.

          THE COURT:  Sustained as to leading.

BY MR. BURTON:

Q.   Are there risk factors that officers should look for?

A.     Yes.

Q.     Okay.  Can you explain that, please.

A.     So the risk factors are, you know, things like if the person is obese or overweight, that their stomach, that additional weight could create some compression and impact them, that if they're -- and we call it "excited delirium." Sometimes it's referred to as "agitated delirium."  When somebody's acting out in a way that it's obvious that they're agitated, that they may be in the midst of a mental health crisis or on drugs or both, and they're acting in a bizarre way, that that may be an additional risk factor.

You know, so we look at those types of things.  And certainly compression to the back.  So if you've got somebody in a prone position, you know, we don't want them in a prone position, simply left in a prone position, but if you put your knee on their back or put weight on their back, that that adds to it.  And, again, you can put your knee on their back or put weight on their back when you're trying to get them handcuffed, but once they're secured, then you need to remove that weight because it creates some compression, and that may exacerbate the -- the concern.

Q.     And did you see in your review of the materials any evidence that the County of Riverside trains its deputies in risk factors?

A.     No.

Q.   Are they -- is the national standard to consider tasing an additional risk factor?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Are there any other risk factors that you didn't testify to?

A.   Well, there are.  It's about use of force in general.  So whether it be a baton, a TASER, you know, a violent confrontation that would increase the individual's heart rate, you know, or put them under stress, those are all risk factors.

Q.   Did you -- did you see any evidence that -- that these deputies or deputies in Riverside generally are -- are trained on risk factors for sudden death due to restraint?

A.   No.

Q.   Just the last thing I'd like to ask you.  These terms, and they came up during closing yesterday, "restraint asphyxia," "positional" --

THE COURT:  Yesterday was opening, not closing.

MR. BURTON:  I'm sorry.  Thank you, Your Honor. Thank you.

BY MR. BURTON:

Q.   During opening yesterday there was "restraint asphyxia," "positional asphyxia," "compression asphyxia."  From a police perspective, you know, based on the kind of materials you

reviewed, what do those terms mean?

A.   So, you know, the medical field kind of differentiates those kinds of terms, whether it's "compression" or "restraint" or "positional."  In policing we need to stick to the basics. We need to train a lot of officers on what it is they should do in a certain circumstance, so we make it simple.  If they're in a prone position, once they get them cuffed, get them in that recovery.  You know, so whether it's positional asphyxia, compression asphyxia, restraint asphyxia, you know, we don't try and differentiate those terms for officers.  We simply train them what it is we -- what -- what the behavior is we're looking at and what the protocol is to deal with that behavior.

         MR. BURTON:  Thank you, Your Honor.  Thank you, Your Honor.  Nothing further.

         THE COURT:  All right.  Let's take a recess at this time.  Ladies and gentlemen, we'll take a break of about 15 minutes.  During that break you are to keep an open mind, do not talk about this case with anyone, including amongst yourselves, do not let anybody else talk to you about it, and do not in any way try to learn about this case.  We'll be in recess for about 15 minutes.

                   (Out of the presence of the jury:)

         THE COURT:  You can step down, sir.

                        (Recess)

         THE COURT:  Mr. Sain, would you like to

cross-examine?

MR. SAIN:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Noble, you remain under oath.  Do you understand that?

THE WITNESS:  Yes, sir.

THE COURT:  Proceed.

MR. SAIN:  Thank you.

**CROSS-EXAMINATION**

BY MR. SAIN:

Q.   Good morning, Mr. Noble.

A.   Good morning.

Q.   Your understanding is that you were retained only as a police practices expert on behalf of plaintiffs in this case, true?

A.   Yes.

Q.   And you charge 295 an hour to plaintiff for your expert services; is that correct?

A.   Yes.

Q.   You're paid a flat fee of $2,950 per day just to testify here today, true?

A.   Yes.

Q.   As part of your services as a police practices expert, you're paid to testify, true?

A.   Yes.

Q.   You've been a police practices consultant for about

15 years?

A.    Yes.

Q.    In those California cases where you've testified as an expert on police practices, about 55 to 60 percent of the time, you've testified on behalf of plaintiffs, true?

A.    I've never broken it down just to California.  My cases are all over the country.  So I -- off the top of my head, I couldn't tell you what California looks like.

Q.    Would looking at your deposition testimony refresh your memory on that question?

A.    It may.

Q.    I'd like to direct your attention to your deposition in this case, page 40, lines 24 through 41, line 5.

A.    I'm sorry, what page?

Q.    Yes, sir.  That would be page 40, line 24 through 41, line 5.  If you could read that silently to yourself, and then I'll ask you some questions.

A.    Okay.

Q.    Does that refresh your recollection that in California cases where you've testified as an expert on police practices, about 55 to 60 percent of the time you've testified on behalf of plaintiffs?

A.    Back in 2021 when I gave this deposition, yes.

Q.    The last time you served as a law enforcement officer was in 2014, true?

A.    Yes.

Q.    You retired from the Irvine Police Department in July 2012
and then went back to the Westminster Police Department for
about nine months until 2014.  Does that sound about right?

A.    Yes.

Q.    Those were the only two law enforcement agencies for which
you've ever served, correct?

A.    Yes.

Q.    When you retired your last ranked position was as deputy
chief, correct?

A.    Yes.

Q.    So as deputy chief, you reported to the chief of police,
correct?

A.    Yes.

Q.    So you were the number two guy at those two agencies; is
that correct?

A.    Yes.

Q.    And at Irvine you were the deputy chief of police for a
department that served a population of just over 200,000
people; is that right?

A.    Yes.

Q.    And when you left the Irvine Police Department, you had
about 200 sworn officers under your command; is that right?

A.    Yes.

Q.    At Westminster you had even less.  It was you said 80 to

90 on direct, correct?

A.    Yes.

Q.    And what was the size of the Westminster city population total, ballpark?

A.    Boy, I don't remember.  Probably 80, 90,000 people, somewhere in there.  I don't know.

Q.    So those were both smaller agencies for smaller cities; is that fair to say?

A.    I don't know what you mean.

Q.    That's all right.  You spent a total of seven years on patrol as an officer and supervisor back in the 1990s; is that true?

A.    Yes, that's about right.

Q.    The last time you yourself ever had to prone restrain someone in the field as an officer was back in the early 2000s; is that true?

A.    That's probably true.

Q.    Now, you mentioned earlier that you've been a licensed attorney since about 1994; is that true?

A.    Yes.

Q.    But you were never a district attorney prosecuting crimes; is that true?

A.    Yeah, I never practiced law.

Q.    You never appeared as a trial lawyer in any criminal or civil case; is that true?

A.    Yeah, that's true.

Q.    You've never litigated a police civil rights case; is that true?

A.    True.

Q.    "Yes" or "no," if someone were to ask you whether or not some act or omission was negligent, you would be unable to answer that question, true?

         MR. BURTON:  I'm going to object, Your Honor.  I don't think he should be testifying as to legal standards.

         THE COURT:  Sustained.

BY MR. SAIN:

Q.    On direct exam here today, you said that agencies, quote, "can't create a policy for everything," end quote.  That was your testimony today, yes?

A.    Yes.

Q.    In terms of your experience as a police practices consultant, you understand what a Monell claim is, correct?

A.    Yes.

Q.    You understand that a Monell claim is about proving that a municipality, like a county, did something that was unconstitutional, correct?

         MR. BURTON:  Objection, Your Honor.  I believe it calls for a legal conclusion.  And the Court is going to address --

         THE COURT:  I'll let that question for informational

purposes go.  So overruled.

THE WITNESS:  Yes, I'm aware of what a Monell is.

BY MR. SAIN:

Q.    From a police practices consultant perspective only.  I'm not asking you for legal conclusions; I'm asking you in terms of your evaluation of what is or is not consistent with standard police practices.  You understand that's what I'm asking you?

A.    Yes.

Q.    Okay.  So from that perspective, your understanding is that in order to find a Monell violation, one must examine whether or not the public entity has a public -- has a policy, practice, or custom that is deliberately indifferent to the preservation of constitutional rights and that such violation is the moving force that causes the damages?  That's your understanding of what that is, correct?

A.    Yes.

Q.    From that same perspective, you understand that if someone were to ask you whether or not some specific act or omission was deliberately indifferent, you would be unable to answer that question, true?

A.    Well, I may be able to answer that question.  I mean, you know, the definition of "deliberate indifference" is turning a blind eye, you know, ignoring a standard of care.  So it depends on the question, depends on how it's phrased, and

depends on what it's about.

MR. SAIN:  Your Honor, I'd like permission to read from Mr. Noble's deposition, page 55, lines 5 through 17.

MR. BURTON:  One moment, please.

I would object.  This reads the objection that --

THE COURT:  Hold on.  So what is the basis for your objection?

MR. BURTON:  Calls for a legal conclusion.

THE COURT:  Well, it's not impeaching because this is about negligence, not deliberate indifference.

MR. SAIN:  Fair enough, Your Honor.  I'll move on.

BY MR. SAIN:

Q.    Mr. Noble, have you ever been a medical doctor?

A.    No.

Q.    Are you an expert in medical causation?

A.    No.

Q.    Are you an expert in toxicology medicine?

A.    No.

Q.    Are you an expert on the medical issues of narcotics and human physiology?

A.    No.

Q.    Are you an expert in forensic pathology?

A.    No.

Q.    Do you have any degrees associated with anatomy or biology?

A.   No.

Q.   Do you have any degrees or training in biomechanics?

A.   No.

Q.   Are you qualified to render testimony on medical issues, like a subject's range of motion, mobility, or physical limits?

A.   No.

Q.   Are you an expert in biomechanics?

A.   No.

Q.   Are you an expert in mechanical engineering?

A.   No.

Q.   Are you an expert in electrical engineering?

A.   No.

Q.   Now, you attended the basic TASER course several years ago, true?

A.   Yes.

Q.   But your TASER certificate -- certificate from Axon has long since expired, true?

A.   Yeah, they're only good for about a year or two years.

Q.   Have you yourself ever deployed a TASER device as a law enforcement officer in the field?

A.   No.

Q.   Are you an expert on the medical effects of a TASER device on a human being?

A.   No.

Q.   Do you have any degrees in forensic psychology?

A.   No.

Q.   Have you ever been a homicide detective?

A.   No.

Q.   Have you ever worked as a homicide investigator?

A.   No.

Q.   Now, you stated earlier that you're familiar with the California Commission on Peace Officer Standards and Training, or POST, and its learning domains; is that correct?

A.   Yes.

Q.   Have you ever been employed by POST or served as a POST staff member?

A.   No.

Q.   Isn't it true that you have not been a consultant for POST since 2004?

A.   Yeah, since about 2004, yeah.

Q.   Have you ever participated in drafting any of POST's specific learning domains?

A.   No.

Q.   Turning to the Kevin Niedzialek incident of July 29, 2019, did you yourself ever personally witness at the scene the events in -- in person?

A.   No.

Q.   Before forming your opinions in this case, did you ever conduct any inspections of the incident scene or location?

A.   No.

Q.   Before forming your opinions in this case, you reviewed the entire composite incident video; is that true?

A.   Yes.

Q.   Before forming your opinions, you also reviewed the autopsy report, the toxicology results, and the deposition of Medical Examiner Dr. Mark Fajardo; is that true?

A.   I believe so, yes.

Q.   Before forming your opinions, you also reviewed the deposition of the incident officers, Deputies Brian Keeney and Sonia Gomez; is that true?

A.   Yes.

Q.   Before forming your opinions in this case, you also reviewed the deposition of the person most knowledgeable, or PMK, witness for the Riverside County Sheriff's Department on training, then Sergeant Sergeant Vickers -- Sean Vickers? Excuse me.

A.   Yes.

Q.   Before today have you also reviewed the deposition testimony of Sheriff Chad Bianco?

A.   I don't think so.

Q.   Let's discuss some terms according to your understanding in police practices.  You would agree that the term "prone" means faced downward on the ground, yes?

A.   Yes.  Well, it could be the ground or another object, but yes, generally facedown.

Q.    Thank you.  And you would agree that the term "supine"
means faceup on the ground or some other flat surface, correct?

A.    Yes.

Q.    Now, you mentioned earlier that there was a study that you
were aware of about the hog-tie position.  You would agree that
in policing, the hog-tie is where a person is bound by the
ankles with some kind of strap or device that's then connected
to the handcuffs behind the back?  You would agree that's true,
correct?

A.    Yes.

Q.    And after reviewing the evidence in this case, you also
agree that there was no hog-tie that was used during the
incident with Mr. Niedzialek, true?

A.    Yeah, that's true.

Q.    Now, in terms of your understanding of how police
practices work and how police investigations work, you would
agree that in your experience, when it comes to witness
accounts, it's possible for one officer or witness to see
something that another officer or witness does not see, even
though they're at the same place at the same time, true?

A.    Yeah, it's possible.

Q.    Just because two officers or two witnesses have slightly
different recollections or accounts of an incident event, that
doesn't automatically mean one of those persons is being
untruthful or lying, correct?

11:11

11:11

11:11

11:11

11:12

A.    Not automatically, no.

Q.    In law enforcement there are occasions when officers at the scene have a different perspective than the camera of an incident video, true?

A.    Yes.

Q.    Sometimes the camera captures something that the officer did not see at the time, true?

A.    Yes, that's possible.

Q.    Sometimes the officer sees or experiences things that the camera did not capture, true?

A.    Also true.

Q.    In your experience, even when a camera captures an incident event, because it's a two-dimensional perspective and you can get that fish-eye lensing effect, sometimes the video does not necessarily show everything that people at the scene would have observed, true?

A.    Yeah, it's certainly possible.

Q.    Now, regarding a suspect's conduct, the term "escalation" means that the threat from the suspect is getting greater, true?

A.    Yes.

Q.    A suspect taking a fighting stance or making a fist, making a verbal threat of harm, moving toward the officer rapidly, or producing a weapon, those are all some of the examples of escalation by a suspect, true?

A.    Yes.

Q.    Regarding an officer's force, escalation means that the officer is using a higher level of force, true?

A.    Yes.

Q.    Now, the term "de-escalation," that term means use of techniques to avoid using force by creating time and distance, trying to slow an incident down through communication in a way that hopefully will lead to the individual complying with the officer's commands.  You agree that that's true, yes?

A.    Yeah, that's the goal of de-escalation.

Q.    And your review is that de-escalation is trying to slow things down, talking lower and slower, essentially trying to talk someone into handcuffs without using force, if you can, correct?

A.    That's part of it.

Q.    Do you agree that in order for de-escalation by an officer to be effective, there ultimately needs to be some level of cooperation by the subject, true?

A.    Yes.

Q.    Now, under standard police procedures, you agree that if there is an active fight, officers are not going to engage in de-escalation when they're fighting with someone, true?

A.    Well, every situation is unique.  I mean, if they're actively fighting, no, I wouldn't expect them to -- you know, to speak in de-escalation-type terms.  But if there's a lull or

an opportunity for them to create time and distance -- because time and distance is also part of de-escalation -- they may do that.  So it just depends on the facts.

Q.    You agree that de-escalation is not a cure-all because there are times when de-escalation simply won't work, true?

A.    That's true.

Q.    Under standard police practices, officers are trained that an officer's response is dictated by the subject's actions, true?

A.    You're going to have to slow down.  I got lost on that one.

Q.    That's okay.  I'll slow down for you.  Under standard police practices, officers are trained that an officer's response is dictated by the subject's actions, true?

A.    In part, yes.

Q.    You agree that the term "low" or "non-deadly levels of force" include things like soft hands and hand controls, true?

A.    Yes.

Q.    "Yes" or "no," "restraint" is where you're actually putting hands on the subject and physically controlling the subject in some way, correct?

A.    Yes.

Q.    "Yes" or "no," under standard police practices, as a general rule, officers are trained that they are authorized to use low, non-deadly force when, from the perspective of a

reasonable officer, it is objectively reasonable under the totality of the circumstances to use that force to overcome resistance, effect an arrest, or prevent an escape?  That's how they're trained, true?

A.    That's part of how they're trained.

Q.    According to standard police practices, you agree that totality of the circumstances includes everything that was reported to the officer leading up to their use of force or restraint or other conduct, true?

A.    Yeah, those things known by the officer, that the officer was actually aware of.

Q.    Totality of the circumstances would include things that the officer him or herself actually observed at the scene leading up to their use of force or restraint or other conduct, true?

A.    Yes.

Q.    Totality of the circumstances could include prior threatening conduct by the suspect, true?

A.    Anything the officer was aware of.

Q.    So that's a "yes"?

A.    If the officer -- so you said it could include prior threatening behavior.  If the officer was not aware of it, then no; if he was aware of it, then yes.

Q.    Thank you.  On direct exam, you agree that officers are trained that, quote, "Someone could be resistive while

handcuffed," end quote, true?

A.    Yes.

Q.    And on the video, we can see that after Mr. Niedzialek is in handcuffs, that the deputies' hands were on Mr. Niedzialek's torso or back; is that true?

A.    At times, yes.

Q.    After reviewing the deputies' testimony, you're aware that both deputies have testified in this case that they monitored Mr. Niedzialek's breathing by sight, by hearing, and by touching his torso, his back?  Isn't that the state of their testimony?

A.    I believe so.

Q.    On direct exam today, you stated that "monitoring" -- or excuse me.  Under direct exam today, you stated that, "Officers are trained to monitor breathing by watching the rise and fall of their chest."  Do you remember saying that today?

A.    Yes.

Q.    And you stated on direct exam that, "Officers are trained to monitor breathing by ensuring that the airway is clear," true?

A.    Yes.

Q.    Isn't the state of the deputies' testimony in this case that they did both of those things?

A.    Well, they couldn't see his chest rise and fall because he was in a prone position.  You know, so their statements are

that they were able to monitor it, but you can -- you can monitor but not nearly as effectively as you can monitor if they're on their side or seated up.

Q.   You reviewed -- have you reviewed the testimony of Paramedic Lisa LaRusso?

A.   I believe so.

Q.   Didn't she testify in this case that when she came upon Mr. Niedzialek, his airway was clear and unobstructed?

A.   Yes.

Q.   Now, going back to some of the standards, the rules of the game here, you would agree that under standard police practices, TASER darts are considered to be an intermediate level of force, true?

A.   Yes.

Q.   "Yes" or "no," officers are trained that a TASER device is considered to be a nonlethal weapon, true?

A.   No.  It's a less lethal weapon.

        MR. SAIN:  One moment, Your Honor.

BY MR. SAIN:

Q.   "Yes" or "no," in general, under standard police practices, officers are authorized to use TASER darts, intermediate non-deadly force when, from the perspective of a reasonable peace officer under the totality of the circumstances known to that officer, it is objectively reasonable for the officer to use that force to overcome a

threat of harm to that officer or to others.  That's the rule they're trained on, yes?

A.    Yes.

Q.    Under standard police practices, as a general rule, officers are trained that they are authorized to use deadly force when an officer perceives an immediate threat of death or serious bodily injury to themselves or others, or to prevent the escape of a dangerous fleeing felon, true?

A.    Yes.

Q.    According to standard police practices and training, deadly force is force that, at the time the force is deployed, is substantially likely to cause death or serious bodily injury, true?

A.    Yes.

Q.    Under standard police practices, in evaluating an officer's use of force, facts that the officer learns after the use of force are irrelevant in determining whether the use of force was objectively reasonable from a police practices perspective, true?

A.    Yes.

Q.    "Yes" or "no," under standard police practices, in some cases it's possible for an officer's use of force to be justified even if after the fact we learn that he was mistaken, true?

A.    Yes.

Q.    Under standard police practices, officers are trained that pre-assaultive behavior by a subject can include a person taking a fighting stance, making a fist, making verbal threats, presenting a weapon, cues that may indicate the subject has an intent to assault the officer, true?

A.    Yes.

Q.    Under standard police practices, a subject who is advancing quickly or charging at an officer could constitute pre-assaultive behavior, true?

A.    Yes.

Q.    According to standard police practices, under certain circumstances, pre-assaultive behavior may be considered a threat to the officers, true?

A.    Yes.

Q.    Such conduct could also constitute assaultive behavior, yes?

A.    If -- if an assault occurs, yes.

Q.    Under standard police practices, one of the Graham factors for evaluating the reasonableness of the officer's use of force is the presence of a threat to the officer or others, true?

A.    Well, it's one factor.  It's whether there's a presence of an immediate threat, but there's more to it than that.

Q.    Active resistance, according to standard police practices, active resistance is where someone is actively engaged in some level of physical resistance, such as by pushing or kicking or

threatening, true?

A.    Yes.

Q.    "Yes" or "no," depending on the level of resistance, officers are trained that active resistance can be perceived as a threat to the officers or others, true?

A.    It's possible.

Q.    In your policing experience, there have been occasions where a suspect was initially presented as being unarmed and then produced a weapon, true?

A.    Yes.

Q.    Under standard police practices, officers are trained to treat a suspect as being potentially armed until they can search the suspect and confirm that the suspect is unarmed, true?

A.    Yes.

Q.    Under standard police practices, in general, when dealing with an armed or dangerous suspect, the first priority of the officer is to make the situation safe by securing the suspect, true?

A.    Depending on the circumstances, yes.

Q.    "Yes" or "no," under standard police practices, officers are trained that as long as the force is proportional to the threat, if a mentally ill suspect presents as an immediate threat, the officer is authorized to use force on that suspect where, from the perspective of a reasonable peace officer under

the totality of the circumstances, such force is objectively reasonable?  That's how officers are trained, true?

A.    Yes.

Q.    Under standard police practices, officers are trained that citizens have a legal duty to refrain from resisting arrest or evading detention by a peace officer, true?

A.    As long as the arrest or detention is lawful, yes.

Q.    Depending on the facts of a particular case, in general, under standard police practices, if an officer issues lawful commands and gives the subject adequate time to comply, and the subject fails to comply with those commands, officers are trained that the subject may have violated California Penal Code Section 148 for resisting or obstructing a police officer, true?

A.    Depending on the circumstances.

Q.    So that's a "yes," depending?

A.    It's depending, yes.

Q.    Okay.  Depending on the facts of a particular case, in general, under standard police practices, if a person actually causes physical harm to an on-duty police officer who is conducting an investigation or lawful duties, that subject could be in violation of Penal Code Section 243 for battery on a peace officer, true?

A.    True.

Q.    "Yes" or "no," attempted battery on a peace officer could

also be a crime, true?

A.   Yes.

Q.   According to your report, when the deputies initially contacted Mr. Niedzialek, under the totality of the circumstances, he presented an immediate threat to the deputies when Mr. Niedzialek advanced on them, true?

A.   Yes.

Q.   Based on your evaluation of the facts, you agree that there were two separate advances by Mr. Niedzialek at Deputy Keeney, true?

A.   Yes.

Q.   According to your report, when Mr. Niedzialek suddenly rushed at Deputy Keeney, both before the first TASER and again before the second TASER, a reasonable officer would perceive those rushes as Mr. Niedzialek acting in a threatening manner, true?

A.   Yes.

Q.   In fact, in direct exam today, you described that as a "charge," true?

A.   Yes.

Q.   Under standard police practices, it was reasonable for the deputies to perceive both of those advances as threatening, true?

A.   Yes.

Q.   You agree that Deputy Gomez's first initial TASER dart

deployment at Mr. Niedzialek was consistent with standard police practices for the use of force, true?

A.   Yes.

Q.   You agree that Deputy Gomez's second TASER trigger pull discharge was also consistent with standard police practices for the reasonable use of force, true?

A.   Yes.

Q.   You agree that the officers used restraint force to get Mr. Niedzialek into handcuffs and that such restraint force was also consistent with generally accepted practices for the use of force, correct?

A.   Yes.

Q.   True or false, in your review of the incident events here, all of the uses of force up to the time the handcuffs were finally secured on Mr. Niedzialek were consistent with standard police practices for use of force; true or false?

A.   True.

Q.   "Yes" or "no," at page 13 of your report, paragraph 34, you agree that the use of knees on Mr. Niedzialek's back and pulling his arms to hold him down for handcuffing while the subject was kicking, you agree that such use of force was consistent with generally accepted police practices for the reasonable use of force, true?

A.   Yes.

Q.   Based on your review of the evidence, you were unable to

determine the amount of contact or the weight of any knee placements on Mr. Niedzialek at any point, true?

A.    True.

Q.    You were unable to tell from the video whether or not Deputy Gomez ever had any knees on Mr. Niedzialek, true?

A.    It appears she did during the handcuffing process, but I can't say definitively.

            MR. SAIN:  One moment, Your Honor.

            Your Honor, permission to read from page 98 of Mr. Noble's deposition, lines 9 through 12?

            THE COURT:  You may read it.

BY MR. SAIN:

Q.    "QUESTION:  And you said earlier that you were unable to tell from the video whether or not Deputy Gomez ever had any knees on Mr. Niedzialek; is that true?

            "ANSWER:  Yeah, I think that's true."

            Mr. Noble, "yes" or "no," in your opinion, the initial TASER deployments and everything done by the deputies up to handcuffing being completed, you agree that that was all consistent with standard police practices for the reasonable use of force, true?

A.    Yes.

Q.    Based on your experience as a law enforcement officer, in light of Mr. Niedzialek charging at Deputy Keeney and the facts of this incident, you agree that there was probable cause to

arrest Mr. Niedzialek, true?

A.   Yes.

Q.   Both deputies have testified that during their prone post-cuffing restraint of Mr. Niedzialek, neither one of them put their full body weight on him, correct?

A.   That's what they said.

Q.   Now, on direct exam you stated that the deputies told the paramedics to come directly to their location, not to stage, as soon as the cuffs went on; is that your understanding?

A.   Yes.

Q.   In your review of the video just today, after the handcuffs were on, isn't it true that you heard Eric Mireles, that neighbor at the door, come out and say words to the effect that the subject, Mr. Niedzialek, had, quote, "scared the shit out of my family," end quote?

A.   I don't remember what he said.  He may have.  I don't know.

Q.   On direct you testified that officers are not mind readers, true?

A.   Yes.

Q.   You testified that it was at least possible that Mr. Niedzialek was playing possum after the cuffs were on, true?

A.   It's possible.

Q.   On direct you testified that an officer, quote, "can put a

person into a prone position if you're struggling with them," end quote.  That's what you said, right?

A.   Struggling with them in order to get them into handcuffs, yes.

Q.   Now, you testified that you are not an expert in medical causation, true?

A.   True.

Q.   You have never participated in or authored any peer-reviewed studies of the effects of restraint on people's ability to breathe or oxygenate, correct?

A.   True.

Q.   Are you an expert on medical studies related to the effects of restraint on breathing?

A.   No.

Q.   If someone were to ask you whether or not deputy restraint or deputy positioning caused Mr. Niedzialek's death, do you have the expertise to answer that question?

A.   No.

Q.   None of your opinions in this case have anything to do with what caused Mr. Niedzialek to die, true?

A.   True.

Q.   Do you have any specific recollection of anything in the medical examiner's testimony or report that indicated that Mr. Niedzialek died as a result of asphyxia?

         MR. BURTON:  I'm going to object, Your Honor.  Beyond

the scope.  It calls for hearsay.  I mean, it's --

THE COURT:  Sustained.

MR. SAIN:  I'll move on.  Thank you, Your Honor.

BY MR. SAIN:

Q.   Now, you've testified extensively about your understanding from a police practices perspective about the writings of Dr. Donald Reay, R-E-A-Y, yes?

A.   Yes.

Q.   In fact, at one point in your report, you just cite to Dr. Reay in support of the proposition that officers were trained that prone restraint can cause positional asphyxia, yes?

A.   I think what I said in my report, because I cited to a lot of studies, and -- that Reay was the first one to bring this issue forward.  He studied it as, you know, a hog-tie, but he's the one that brought it forward and then it followed on from there.

Q.   Are you aware, sir, that Dr. Reay, after reviewing the medical studies published by Drs. Chan and Vilke, has recanted that opinion and stated that he was incorrect about the association between prone restraint and positional asphyxia?

A.   No, I'm not aware of that.

Q.   Now, you talked about a number of other agencies.  In police practices, does the San Diego Police Department set mandatory policing standards for other law enforcement

Q.   agencies?

A.   No.

Q.   How about New Orleans?

A.   No.

Q.   New York Police Department?

11:30

A.   No.

Q.   Detroit?

A.   No.

Q.   Denver?

A.   No.

11:30

Q.   Berkeley?

A.   No.

Q.   On direct you admitted that the International Association of Chiefs of Police, or IACP, Model Policies and recommendations are not mandatory for any police agency; is

11:30

that true?

A.   True.

Q.   "Yes" or "no," in policing there's no rule book out there as to what the police officer is supposed to do?  That's what you said on direct, right?

11:31

A.   Yes.

Q.   You also said that in your review of the New York PD policies that New York Police Department officers are trained that they should move a subject into the recovery position, in your words, quote, "as soon as safety permits," end quote; is

11:31

that correct?

A.    That's the way their policy was written, yes.

Q.    And you would agree that under standard police practices, the officer on the scene is the one who has to adjudge to evaluate when safety permits, yes?

A.    No, it -- it would be a reasonable police officer.  You always look at that in the standard because, you know, anyone on the scene can always just justify their opinion and say, *You know, it's my opinion; therefore, it's okay*.  But we, in fact, do go back and -- and assess our officer's decisionmaking process.

Q.    That wasn't my question, sir.  You're not expecting officers to radio out to somebody else and say, *Hey, is it safe to put this person in a recovery position?*  They have to rely on what they see right then in front of them, true?

A.    Based on their training and experience, yes.

Q.    Okay.  Now, you said that you reviewed the testimony of a now Lieutenant Sean Vickers.  According to the PMK, Sean Vickers, the Riverside County Sheriff's Department training, he has testified that based on their research, the training bureau's research, "The Department does not agree that a recovery position is always medically necessary."  That's the state of his testimony, yes?

          MR. BURTON:  Objection.  Calls for hearsay.

          THE COURT:  Overruled.

THE WITNESS:  As having testified, yes.

BY MR. SAIN:

Q.    Okay.  In fact, he's also testified that, "The Sheriff's Department's training bureau trains its deputies that when they are handcuffing a resisting suspect, the deputy should keep the suspect in a prone position, even after that resistance has ended for safety reasons."  That's the sum of his testimony, yes?

A.    That's what he said.

Q.    Now, "yes" or "no," you agree that in evaluating an officer's use of force or restraint or medical treatment, you agree that we don't factor in facts that were unknown to the involved officers at the time, true?

A.    True.

Q.    And you have agreed that all the officers who were involved with this incident, Deputy Keeney and Deputy Gomez, have testified that up to the time of the incident, they were never trained that when restraining a subject, they were supposed to put that subject into a recovery position in every single case, even when there's not a medical emergency.  That's not how they were trained, right?

A.    That's what they said.

Q.    In reviewing Lieutenant Vickers' testimony, you agree that according to the Department's evaluation of the information that they had received, without airway obstruction, prone

positioning, according to the Sheriff's Department, does not impair a subject's ability to breathe.  That's their understanding based on their research, true?

A.    That's what they claim, yes.

Q.    Regarding the police community, as you described it on your direct exam, adopting what you believe is the recovery position statement, in your deposition, was there even a single scientific or medical study that you were able to identify that these agencies relied upon to determine that prone positioning causes or contributes to asphyxia?

A.    Well, I cited to -- all the documents we talked about today were all in my report.  So I don't remember whether you asked me anything about those studies in my deposition, I just don't recall, but they were all in my report.

Q.    I didn't ask you about the police studies; I asked you about scientific and medical studies.  In your deposition, when I asked you about whether or not this recovery position rule, as you state it, was supported by any medical or scientific study, at the time that I asked you, were you -- were you not unable to provide a single example of a single scientific or medical study that supported what you were saying?

A.    It's possible.

Q.    Can you tell us whether or not there's any peer-reviewed medical study that you're aware of that shows that officer prone restraint causes or contributes to asphyxial death?

A.   Yeah, no, I don't review medical studies and peer-reviewed medical journals.  I'm not a doctor.

Q.   The sum of Sergeant or now Lieutenant Sean Vickers' testimony is that the training bureau evaluated the available medical evidence, including peer-reviewed published medical studies for 20 years' worth of time, and determined that prone restraint was safe for subjects.  That's the sum of his testimony, correct?

A.   I think the sum of his testimony is they did not believe that positional asphyxia was a thing, and they felt that they didn't need to train to it.

Q.   Based on 20 years of medical research that they reviewed, correct?

A.   Yeah, I -- I don't recall his testimony clearly enough to tell you that.

Q.   Fair enough.  True or false, you have no opinions in this case as to whether or not the acts or omissions of Deputy Keeney or Deputy Gomez violated any policies or procedures of the Riverside County Sheriff's Department; true or false?

A.   Yeah, they didn't have any policies or procedures requiring them to put him in a recovery position, so no.

          MR. SAIN:  No further questions.

          THE COURT:  Any redirect?

          MR. BURTON:  Thank you, Your Honor.

///

**REDIRECT EXAMINATION**

BY MR. BURTON:

Q.   Mr. Noble, this concept of de-escalation, it's generally accepted, I think, within police and society generally that when police officers are able to use time, distance, verbal skills to de-escalate a situation and avoid using force, the data is a preferable outcome during a -- and speaking very generally -- during a confrontation with a person.  Would you agree with that?

11:36

MR. SAIN:  Objection.  Leading.

11:37

THE COURT:  Overruled.

THE WITNESS:  Yeah, of course.  We always prefer what we call talking somebody into handcuffs.  We'd always prefer, you know, to complete our -- our goal without having to use force.

11:37

BY MR. BURTON:

Q.   And before the first tasing on this video, when we see Deputy Gomez walking up and -- and seeing Deputy Keeney, do you see him using appropriate de-escalation tactics?

A.   I wasn't critical of any of his tactics up until after the handcuffing.

11:37

Q.   And de-escalation, of course, is -- you would agree, you were asked on cross -- requires cooperation from the subject?  It's a two-way street, correct?

A.   Yes.

11:37

Q.   And is it correct that officers are trained that when dealing with someone who is in an agitated, delirious, mentally ill state, that they may not process reality, and, therefore, it's difficult to use de-escalation tactics?

MR. SAIN:  Objection.  Compound, exceeds the scope of the cross, and leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Well, what are the obstacles to de-escalation?

MR. SAIN:  Incomplete hypothetical.  Vague.

THE COURT:  Overruled.

You can answer that.

THE WITNESS:  So with de-escalation, again, it's about talking to somebody, talking lower and slower, generally trying to calm a situation down, creating time and distance, using cover depending on the situation.  When somebody is mentally ill or intoxicated on drugs or alcohol or a combination, we generally train to give them more time than maybe somebody who just committed a bank robbery, you know, because, you know, we know that they're impaired, we know that their decisionmaking process is -- is, you know, likely going to be slower.  So our goal in those types of situations is -- when we can, and you can't always.  So if somebody suddenly attacks you or something, you deal with the incident, but when you can, you want to give those types of individuals more time.

BY MR. BURTON:

Q.    Now, are officers trained that when an incident -- an individual has these risk factors that we talked about that we see in Mr. Niedzialek, that after handcuffing and he's kept prone rather than moved into a recovery position or sat up, that that can have deadly consequences?  Are officers trained that?

MR. SAIN:  Exceeds the scope of cross.  Asked and answered.  Cumulative.

THE COURT:  It's vague.  Which officers?  What department?

BY MR. BURTON:

Q.    Well, I mean, you were asked about deadly force, correct?

A.    Yes.

Q.    And so are officers trained that it can be deadly force to hold someone prone who has risk factors after they've been handcuffed?

MR. SAIN:  Incomplete hypothetical.  Relevance.

THE COURT:  Again, which department?  Each department trains its officers differently.  So which department are you talking about?  Are you talking about everyone in the whole country?

MR. BURTON:  I'm talking about the national standard that he's been testifying to for training officers.

THE COURT:  Okay.  So ask about that.  Does the

national standard provide that...

BY MR. BURTON:

Q.    -- provide that officers are trained that keeping someone on their chest after handcuffing who displays these risk factors is applying a potentially deadly amount of force?

MR. SAIN:  Objection.  Calls for a legal conclusion as phrased.  Calls for speculation.  Exceeds the scope of his qualifications.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  So I don't think police officers are explicitly trained that holding somebody down in that manner would be deadly force.  Rather, they are trained that -- that a likely consequence of holding somebody down like that is that they may die, and, therefore, you need to get them in that recovery position to prevent that consequence.

BY MR. BURTON:

Q.    Now, you were asked about your testimony about the officer saying they thought that Mr. Niedzialek might be playing possum.  Did you testify on direct that that was highly unlikely?

A.    Yes.

Q.    And why is that highly unlikely?

A.    Again, based on the totality of the circumstances that the officers knew.  They knew that they were responding to a possible mental health call where somebody had a serious head

injury.  When they arrive it's -- it's obvious to any reasonable police officer that, in fact, he has a serious head injury.  You could see him covered with blood, that he's acting in this bizarre and incoherent manner, that he is, you know, tasered twice, where he's locked up and falls to the ground essentially face first, that could, you know, add to his injuries.  You know, they knew that this was, you know, a medical emergency.  That's why Deputy Keeney called for paramedics right away.  That's why Gomez did independently, and that's why Gomez called, you know, a couple seconds after he was handcuffed, to get the paramedics in there.  So all those things.

Q.   Now, finally, you were asked about now Lieutenant Vickers' testimony that the County of Riverside affirmatively trains deputies to keep people on their chest who are -- after -- who are displaying these -- these risk factors after handcuffing --

          MR. SAIN:  Misstates the testimony.

          THE COURT:  If you want to finish your question, you can.

          MR. BURTON:  Thank you, Your Honor.

BY MR. BURTON:

Q.   In regards to the Vickers testimony that was brought to your attention during the cross-examination, which I won't attempt to paraphrase, was that consistent or inconsistent with the national standard for training police officers to which you

are aware in your review?

A.    It's inconsistent.

Q.    Why?

A.    Well, they're an outlier.  You know, they're the only agency I've ever heard of that trains that way.  And we've gone through the training from the national organizations, the consent decrees, the other agencies that have policies.  It's inconsistent with all those things.

         MR. BURTON:  Excuse me.  One moment.

         Thank you, Your Honor.

         THE COURT:  Do you have any recross?

         MR. SAIN:  Yes, Your Honor.

                    **RECROSS-EXAMINATION**

BY MR. SAIN:

Q.    Mr. Noble, would you agree that the state of the deputies' testimony in this case is that they were unaware of any life-threatening medical emergency for Mr. Niedzialek until seconds before they flipped him onto his supine back?

         MR. BURTON:  Objection.  Beyond the scope.

         THE COURT:  Overruled.

         THE WITNESS:  I don't recall.

BY MR. SAIN:

Q.    You testified just a moment ago on redirect exam that officers are not trained that prone restraint constitutes deadly force, correct?

A.    Yeah, I don't think they're explicitly told that it causes deadly force, like, in the context of, you know, shooting somebody or using deadly force but rather that it's likely to cause death, and, therefore, you need to take certain actions to prevent that.  But it is a use of force that could cause death.  So, I guess, technically it would fall in that category.

Q.    Isn't it true that the training on positional asphyxia for officers is that for the position to lead to asphyxia, there has to be obstruction of the airway?

A.    No, no.  My understanding of the training is that it's not that the airway will somehow become restricted.  In fact, there's training that, you know, if people are talking, that -- that it's about the flow of oxygen, the ability to bring in an appropriate volume of air and ex -- exhale it.  So, you know, somebody can actually be talking, so their airway wouldn't be necessarily obstructed, but it's the -- the positioning itself.

Q.    You cited earlier in response to Mr. Burton's question that you agree that before the handcuffing was completed, the deputies engaged in de-escalation techniques, correct?

A.    Yeah, I did not criticize their de-escalation.  I mean, you know, look, we can nitpick and say they could have said things a little better or a little different, but I'm not criticizing them.

Q.    So you believe that their de-escalation efforts were

consistent with standard police practices for reasonable officer conduct?

A.    Yeah.    I believe their actions all the way up until the point where Mr. Niedzialek was handcuffed were consistent with generally accepted police practices.

MR. SAIN:    Thank you.    No further questions, Your Honor.

THE COURT:    Mr. Noble, you're excused.    Thank you.

THE WITNESS:    Thank you.

MR. BURTON:    Thank you, Your Honor.

THE COURT:    So, Mr. Burton or Mr. Galipo, do you --

MR. GALIPO:    Yes.    We'd like to call Brian Keeney, please.

Are we going to go until about 12:00, Your Honor?

THE COURT:    Yes.

THE CLERK:    Would you please raise your right hand. Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:    Yes.

THE CLERK:    Thank you.    Please have a seat.    And if you can state your full name and spell your last name for the record.

THE WITNESS:    Brian, B-R-I-A-N, Lee, L-E-E, Keeney, K-E-E-N-E-Y.

THE COURT:  Proceed.

MR. GALIPO:  Thank you.

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Good morning, Deputy Keeney.  Are you okay, comfortable, or getting there?

A.   Chair is a little slippery.

Q.   Okay.  All right.  Are you ready to try to answer a few questions?

A.   Yes.

Q.   All right.  How long have you been a law enforcement officer?

A.   Currently, 21 years.

Q.   And were those all with the Riverside County Sheriff's Department?

A.   Yes.

Q.   Has all of your training as a law enforcement officer been from the Riverside County Sheriff's Department?

A.   Yes.

Q.   Have you ever been trained on restraint asphyxia?

A.   Although I don't recall the phrase "restraint asphyxia," we were trained to protect the nose and the mouth to make sure people were breathing.

Q.   Were you ever trained on positional asphyxia?

A.   Again -- again, I don't recall the phrase "positional

asphyxia," but we were trained to make sure that the nose and mouth were clear to make sure the person was breathing.

Q.   Well, let me be a little more clear.  Were you ever trained that having someone chest down for an extended period of time and applying weight to their neck or back could restrict their ability to breathe?

A.   No.

Q.   Were you ever trained that after someone is handcuffed to put them in a recovery position, specifically seated up or on their side?

A.   When it's safe to do so or if that person is experiencing a life-threatening medical emergency.

Q.   Were you trained to put someone in a recovery position after they're handcuffed?

A.   Yes, when it's safe to do so or if that person is experiencing a life-threatening medical emergency.

Q.   And where is that training?  Is there a policy on the recovery position that we could look at?

A.   I don't know.

Q.   Do you know if there's specific written training materials from the Sheriff's Department we can look at on the recovery position?

A.   In regards to the training -- excuse me -- the recovery position, we were taught that during the academy.

Q.   No, I'm talking about -- let's take after the academy, the

21 years you've been with the Riverside Sheriff's Department, are there any training materials that you're aware of that we can look at here that shows that the training to put someone in a recovery position after they're handcuffed?

A.    I don't know.

Q.    And you're saying that you had a general understanding during the academy to put someone in a recovery position when it's safe to do so?

A.    Yes.

Q.    And who determines whether it's safe to do so?

A.    The deputies on scene.

Q.    And were you explained why in the academy you should put them in a recovery position when it's safe to do so?

A.    To move the person.

Q.    To do what?

A.    To move the person.

Q.    To move them.  Do you recall any discussion that it might put them in a better position to breathe?

A.    No.

Q.    Do you recall any discussion that sitting them up or putting them on their side might enable you to better evaluate their face and front of their body to see if they're having any medical distress?

A.    If we were to move someone to that position, we would be able to see that they would have injuries to their stomach or

to their face.

Q.   But were you ever trained by the Riverside Sheriff's Department that you should, after handcuffing someone and after it's safe to do so, sit them up so you can better assess their condition?

A.   Yes.

Q.   And are there any training materials in writing that you're aware of in that regard?

A.   I don't know.

Q.   Any written policy that you're aware of in that regard?

A.   I don't know.

Q.   And you said that you believe at the time of this incident that you should put someone in a recovery position when it's safe to do so; was that your testimony?

A.   Yes.

Q.   Have you seen the video of this incident?

A.   Yes.

Q.   How many times have you watched it?

A.   More than 15.

Q.   Okay.  When was the last time you've seen it?

A.   This morning.

Q.   Okay.  Now, was, based on your review of the video and your recollection of this incident, the decedent put in a recovery position within 30 seconds after he was handcuffed?

A.   No.

Q.   Was he put in a recovery position within 60 seconds after he was handcuffed?

A.   No.

Q.   Would you at least agree from watching the video, approximately 60 to 90 seconds after he was handcuffed, he stopped moving?

A.   Yes.

Q.   Okay.  So going forward now, after the time he stopped moving, in the 30 seconds after he stopped moving, was he put in a recovery position?

A.   No.

Q.   In the 60 seconds after he stopped moving, was he put in a recovery position?

A.   No.

Q.   In the 120 seconds after he stopped moving, was he put in the recovery position?

A.   No.

Q.   How about 150 seconds after he stopped moving, was he put in a recovery position?

A.   I believe it was four minutes before he was moved to his back.

Q.   Four minutes after he stopped moving.  So if I'm just doing general math, 60 seconds in a minute, four minutes, that's 240 seconds?

A.   Yes.

Q.   Let me ask you this.  And I'm mindful of the time because we're going to break in about seven minutes.  At any time before the decedent was handcuffed, did he verbally threaten to harm you?

A.   No.

Q.   Did he verbally threaten to harm Deputy Gomez?

A.   No.

Q.   Did you ever see a weapon in either one of his hands?

A.   No.  He had clenched hands.

Q.   Did you ever see a knife, a gun, any weapon on him?

        MR. SAIN:  Asked and answered.

        THE COURT:  Sustained.

        MR. GALIPO:  And when I say "on him," if I can clarify, Your Honor...

BY MR. GALIPO:

Q.   Not just his hands, but anywhere on his person, did you see any weapon?

A.   No.

Q.   Did he ever touch you, actually touch you at any time before he was tased?

A.   Yes.  After Mr. Niedzialek ran towards my right, I pivoted towards my right, and he continued to come forward towards me. I raised my left arm towards his chest, and before Deputy Gomez deployed the TASER, he reached both of his arms up towards my left arm and tried to grab onto my left arm.

Q.   Was there physical contact?

A.   Minimal but yes.

Q.   Minimal.  And you saw that he was injured, correct?

A.   Yes.

Q.   Bleeding from the face and head?

A.   Yes.

Q.   You realized, I'm sure very shortly, that he was going through some type of mental health crisis; is that fair?

A.   I could only assume.

Q.   Based on him repeating the same word multiple times, things of that nature?

A.   He could also be under the influence of a controlled substance.

Q.   Or both, correct, based on your training?

A.   Yes.

Q.   Okay.  So he's tased the first time, he gets up, and then at some point he's tased again, correct?

A.   Yes.

Q.   In between the tases, did he touch you at all?

A.   No.

Q.   And so now, after the second tasing, he goes chest down, correct?

A.   Yes.

Q.   And your impression was the tasing at least was effective; is that fair?

A.    Mr. Niedzialek was able to fight through the effects of the TASER.  They run for five seconds, and he was able to work through that, not incapacitating him to the full five seconds. I wasn't able to handcuff him the first time that he fell to the ground.

Q.    Right.  But you were at least aware that the probes had appeared to strike him?

A.    Yes.

Q.    And he was shirtless?

A.    Yes.

Q.    No shoes?

A.    Yes.

Q.    And would you agree that your initial assessment when you saw him was he was in need of immediate medical attention?

        MR. SAIN:  Objection.  Vague.

        THE COURT:  Overruled.

        THE WITNESS:  Yes, I radioed for the dispatch to call for the paramedics.

BY MR. GALIPO:

Q.    And also, based on your training, you know that if someone's tased, they need medical attention just for being tased, correct?

A.    I believe the old -- at the time it may have been that the person was transported to the hospital to have the probes removed.

Q.   So that would be a second reason to get him medical attention, right?  I mean, you have the head injury, you have the under-the-influence issue, the excited agitated state, and the tasing, all collectively reasons to get him medical attention; is that fair?

A.   Yes.

Q.   So you knew as of the time he was handcuffed that he had an injury and was medically compromised; is that also fair, based on your training?

        MR. SAIN:  Objection.  Vague.

        THE COURT:  Define "medically compromised."

        MR. GALIPO:  Sure.

BY MR. GALIPO:

Q.   You knew he was physically injured?

A.   Yes.

Q.   Now, after he was handcuffed and chest down and stopped moving for the period we just discussed, you said approximately four minutes before you turned him over; is that correct?

A.   Correct.

Q.   And I just want to be clear on this.  Is the reason that you kept him chest down for approximately four minutes after he stopped moving is because that's what you were trained to do by your department?

A.   Based on his previous aggressive behavior trying to come at me two times and his ability to work through the TASER, if I

allowed him to stand back up and continue the fight or to get into a position to get one of my weapons or Deputy Gomez's weapons, it causes a -- an officer safety issue and a safety issue with the public.

Q.   My specific question, you told us you were not trained to put someone in a recovery position after they're handcuffed, correct?

          MR. SAIN:  Misstates prior testimony.

BY MR. GALIPO:

Q.   Unless it's safe to do so; is that what you said?

A.   Unless it's safe to do so or if the person is experiencing a life-threatening medical emergency.

Q.   I see.  So was your training with your department in not automatically putting someone in a recovery position after they're handcuffed part of the reason you kept him chest down?

A.   I don't understand the question.

Q.   Is part of the reason you kept him chest down for four minutes because that's how you were trained?

A.   No.  It's an officer safety issue, like I explained previously about his demeanor and his aggression towards me and his ability to fight through the TASER deployments.

Q.   And that's what you thought during the four minutes he laid there without moving at all after he was handcuffed?

A.   I don't understand that question.

Q.   You thought when he was laying there motionless for four

minutes and he was handcuffed that he was still wanting to fight you?

A.   The potential is there, even though someone plays like they're, you know, possum, that they can still have the ability to continue the fight.  If you roll someone onto their side, they can kick you, they can tuck their knee, they can stand up to their feet, they can continue that assault.  So being that someone is not moving does not mean that they're not going to continue that fight or that aggression.

MR. GALIPO:  Can I ask one last question before our lunch break, Your Honor?

THE COURT:  You may.

BY MR. GALIPO:

Q.   So what I'm getting at, were you trained by your department to keep them chest down even after they're handcuffed, even after they stop moving because it may be an officer safety issue?

A.   Yes.

MR. GALIPO:  Thank you, Your Honor.  We can take our lunch break.

THE COURT:  Ladies and gentlemen, we'll be at our lunch break.  Let's be back at 1:15.  Remember that during that time, you are to keep an open mind until the end of the case. You are not to talk about this case with anybody, including amongst yourselves.  You are not to let anybody else talk to

you about it.  And do not try to learn or do any research about any facet of the case.  Have a good lunch.  We'll be back at 1:15.

                    (Out of the presence of the jury:)

          THE COURT:  Deputy Keeney, you may step down, sir.    12:02

                         (Lunch recess)

                              -o0o-

CERTIFICATE OF OFFICIAL REPORTER


        I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.



                        DATED THIS 29TH DAY OF MARCH, 2023



                        /s/ PHYLLIS A. PRESTON

                        _____

                        PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                         FEDERAL OFFICIAL COURT REPORTER

## $

**$2,950** [2] - 5:20, 52:19
**$295** [1] - 5:19

## '

**'88** [1] - 30:21
**'90s** [1] - 7:5
**'92** [1] - 30:22

## /

**/s** [1] - 104:18

## 1

**10** [2] - 45:6, 45:25
**11** [2] - 19:21, 32:11
**12** [2] - 44:7, 75:10
**120** [3] - 18:11, 18:16, 96:15
**1226** [1] - 19:18
**1229** [1] - 19:19
**128** [1] - 2:7
**12:00** [1] - 91:14
**13** [1] - 74:18
**1329** [1] - 19:19
**1429** [1] - 19:19
**148** [1] - 72:13
**15** [7] - 5:22, 7:19, 45:7, 51:17, 51:21, 53:1, 95:19
**150** [5] - 3:14, 18:19, 18:20, 18:21, 96:18
**1529** [2] - 19:19
**16** [1] - 47:3
**16:16** [1] - 19:24
**17** [4] - 42:18, 42:23, 58:3
**18** [1] - 3:14
**19-2083-JB** [1] - 4:3
**19-2083-JGB** [1] - 1:10
**1984** [1] - 6:15
**1990s** [1] - 55:11
**1992** [5] - 30:22, 31:2, 31:12, 31:17, 37:2
**1994** [1] - 55:19
**1998** [1] - 39:8
**1:15** [2] - 102:22, 103:3

## 2

**2** [6] - 1:11, 32:12, 44:11, 44:24, 45:16, 47:6
**20** [8] - 24:7, 32:6, 32:19, 36:25, 41:9,

41:22, 83:6, 83:12
**200** [2] - 8:6, 54:23
**200,000** [1] - 54:19
**2000s** [1] - 55:15
**2004** [2] - 60:14, 60:15
**2012** [1] - 54:2
**2014** [2] - 53:25, 54:4
**2015** [2] - 44:17, 45:14
**2016** [2] - 44:23, 44:25
**2017** [5] - 45:5, 45:15, 47:2, 47:12, 47:18
**2018** [1] - 47:1
**2019** [3] - 46:7, 48:1, 60:19
**2020** [2] - 7:25, 46:24
**2021** [1] - 53:23
**2023** [3] - 1:17, 4:1, 104:15
**21** [4] - 36:1, 37:2, 92:13, 94:1
**21800** [1] - 2:5
**22** [1] - 37:23
**220,000** [1] - 8:5
**23** [2] - 39:5, 40:12
**24** [2] - 53:13, 53:15
**240** [1] - 96:24
**243** [1] - 72:22
**25** [2] - 41:9, 43:6
**26** [3] - 40:17, 42:16, 42:24
**28** [3] - 6:15, 6:25, 104:7
**280** [1] - 47:3
**281** [1] - 46:22
**29** [3] - 1:17, 4:1, 60:19
**295** [1] - 52:16
**29TH** [1] - 104:15

## 3

**3** [2] - 32:8, 40:12
**30** [5] - 7:19, 36:24, 46:17, 95:24, 96:9
**30,000** [1] - 44:21
**300** [1] - 6:1
**305** [1] - 2:10
**31** [1] - 46:11
**310** [1] - 2:5
**32** [1] - 44:10
**33** [1] - 45:14
**34** [2] - 10:7, 74:18
**3470** [1] - 1:23
**35** [1] - 45:5
**37** [1] - 43:8

## 4

**4** [3] - 35:25, 37:16, 45:25

**40** [6] - 16:11, 22:6, 22:18, 25:9, 53:13, 53:15
**4000** [1] - 2:16
**403** [1] - 33:12
**40th** [1] - 2:10
**41** [2] - 53:13, 53:15
**45** [2] - 25:9, 25:14

## 5

**5** [6] - 3:6, 37:15, 37:22, 53:13, 53:16, 58:3
**50** [1] - 28:3
**52** [1] - 3:6
**55** [3] - 53:4, 53:21, 58:3
**5th** [1] - 2:16

## 6

**6** [1] - 39:4
**60** [6] - 53:4, 53:21, 96:1, 96:5, 96:12, 96:23
**633** [1] - 2:16
**644** [1] - 2:10

## 7

**7** [1] - 40:17
**753** [1] - 104:7
**7:20** [1] - 22:24

## 8

**80** [3] - 8:11, 54:25, 55:5
**84** [1] - 3:7
**8701** [1] - 104:20
**89** [1] - 3:7

## 9

**9** [1] - 75:10
**90** [3] - 8:11, 55:1, 96:5
**90,000** [1] - 55:5
**90071** [1] - 2:17
**91103** [1] - 2:8
**91367** [1] - 2:5
**92** [1] - 3:9
**92501** [1] - 1:23
**94609** [1] - 2:10
**98** [1] - 75:9
**9:03** [1] - 25:21
**9:21** [1] - 1:18

## A

**a.m** [1] - 1:18
**ability** [10] - 8:24, 9:11, 42:18, 77:10, 82:2, 90:14, 93:6, 100:25, 101:21, 102:4
**able** [18] - 8:20, 13:6, 13:15, 13:24, 22:8, 22:10, 22:15, 22:20, 27:24, 44:2, 57:22, 68:1, 82:8, 84:5, 94:25, 99:1, 99:2, 99:4
**ABOVE** [1] - 104:10
**ABOVE-ENTITLED** [1] - 104:10
**absolute** [1] - 18:3
**absolutely** [2] - 16:19, 25:17
**absurd** [1] - 26:1
**academic** [1] - 7:20
**academy** [5] - 28:20, 93:24, 93:25, 94:7, 94:12
**accepted** [9] - 23:6, 23:11, 23:24, 24:3, 24:6, 74:10, 74:22, 84:4, 91:5
**accomplish** [1] - 22:20
**according** [11] - 23:3, 61:21, 66:6, 69:10, 70:11, 70:23, 73:3, 73:12, 80:18, 81:24, 82:1
**account** [1] - 37:3
**accounts** [2] - 62:18, 62:23
**act** [4] - 36:17, 40:2, 56:6, 57:19
**acted** [1] - 14:17
**acting** [10] - 8:8, 12:7, 16:16, 17:2, 23:9, 41:20, 49:8, 49:10, 73:15, 88:3
**action** [2] - 40:6, 40:7
**actions** [4] - 65:8, 65:14, 90:4, 91:3
**activated** [1] - 20:20
**active** [7] - 15:10, 16:9, 16:10, 64:21, 70:23, 70:24, 71:4
**actively** [2] - 64:24, 70:24
**acts** [2] - 9:2, 83:17
**actual** [1] - 20:10
**add** [3] - 33:10, 45:21, 88:6

**added** [1] - 19:1
**addition** [1] - 8:1
**additional** [3] - 49:5, 49:11, 50:2
**address** [4] - 38:9, 45:16, 46:17, 56:24
**adds** [1] - 49:16
**adequate** [1] - 72:10
**adjudge** [1] - 80:4
**administration** [2] - 7:2, 8:13
**admissible** [1] - 34:8
**ADMITTED** [1] - 3:14
**admitted** [2] - 18:21, 79:13
**adopted** [2] - 34:6, 34:12
**adopting** [1] - 82:6
**advanced** [1] - 73:6
**advances** [2] - 73:9, 73:22
**advancing** [1] - 70:8
**adverse** [1] - 48:20
**adversely** [1] - 38:23
**advice** [1] - 31:11
**affairs** [4] - 6:22, 7:14, 7:22, 7:23
**affect** [1] - 12:21
**affirmatively** [1] - 88:14
**afternoon** [1] - 11:20
**afterwards** [1] - 22:4
**agencies** [23] - 5:25, 6:3, 31:12, 35:7, 35:14, 36:4, 36:9, 36:16, 36:20, 41:20, 41:23, 42:2, 42:15, 43:16, 47:17, 54:6, 54:15, 55:7, 56:12, 78:23, 79:1, 82:9, 89:7
**agency** [11] - 6:19, 7:13, 11:13, 31:13, 38:2, 41:12, 42:12, 44:20, 44:22, 79:15, 89:5
**agency's** [1] - 33:15
**aggression** [2] - 101:20, 102:9
**aggressive** [1] - 100:24
**agitated** [12] - 12:7, 15:10, 16:9, 16:10, 16:15, 17:2, 23:9, 26:6, 49:7, 49:9, 85:2, 100:3
**ago** [2] - 59:14, 89:23
**agree** [36] - 41:15, 48:18, 48:21, 61:22, 62:1, 62:5, 62:8,

62:12, 62:17, 64:9, 64:16, 64:20, 65:4, 65:16, 66:6, 66:24, 68:11, 73:8, 73:25, 74:4, 74:8, 74:19, 74:21, 75:19, 75:25, 80:3, 80:21, 81:10, 81:12, 81:23, 84:9, 84:22, 89:15, 90:19, 96:4, 99:13
**agreed** [2] - 19:5, 81:15
**agreement** [3] - 40:18, 42:24, 43:1
**agreements** [1] - 42:14
**agrees** [1] - 18:24
**aid** [2] - 27:25, 28:22
**air** [1] - 90:15
**airway** [7] - 27:25, 67:19, 68:8, 81:25, 90:10, 90:12, 90:16
**al** [1] - 4:4
**alcohol** [1] - 85:17
**alerting** [1] - 40:4
**alerts** [1] - 45:22
**allegations** [2] - 6:23, 7:10
**allowed** [1] - 101:1
**alluded** [1] - 32:18
**altered** [1] - 18:25
**Alves** [2] - 4:4, 5:10
**ALVES** [1] - 1:7
**AM** [1] - 1:11
**amount** [2] - 75:1, 87:5
**anatomy** [1] - 58:24
**AND** [3] - 104:5, 104:8, 104:10
**Angeles** [2] - 2:17, 42:5
**ankle** [2] - 14:24, 15:1
**ankles** [1] - 62:7
**ANSWER** [1] - 75:16
**answer** [9] - 11:1, 14:5, 47:14, 56:7, 57:20, 57:22, 77:17, 85:12, 92:8
**answered** [2] - 86:9, 97:11
**anticipate** [1] - 19:13
**APPEARANCES** [1] - 2:1
**appearances** [1] - 4:5
**appeared** [2] - 55:24, 99:7
**application** [1] - 43:4
**applications** [1] - 23:19
**applied** [1] - 46:4

**apply** [2] - 29:7, 29:9
**applying** [3] - 29:11, 87:5, 93:5
**approach** [1] - 33:7
**appropriate** [6] - 17:25, 20:12, 21:20, 22:3, 84:19, 90:15
**appropriately** [1] - 41:21
**approval** [1] - 34:5
**approving** [3] - 42:4, 42:5, 42:13
**area** [2] - 11:18, 30:16
**argument** [1] - 33:1
**argumentative** [2] - 10:24, 87:8
**arm** [9] - 14:21, 22:11, 22:12, 22:14, 22:15, 38:5, 97:23, 97:25
**armed** [4] - 14:17, 14:18, 71:12, 71:17
**arms** [3] - 21:25, 74:20, 97:24
**arrest** [6] - 8:24, 10:7, 66:3, 72:5, 72:7, 76:1
**arrive** [2] - 17:1, 88:1
**arrived** [2] - 17:16, 23:14
**article** [3] - 39:21, 40:3, 40:10
**articles** [1] - 7:20
**asleep** [2] - 25:22, 26:3
**asphyxia** [27] - 30:6, 42:15, 42:17, 43:2, 43:11, 43:18, 44:14, 45:20, 46:14, 50:17, 50:23, 50:24, 51:8, 51:9, 77:24, 78:11, 78:21, 82:10, 83:10, 90:8, 90:9, 92:20, 92:21, 92:24, 93:1
**asphyxial** [1] - 82:25
**Asphyxia—Sudden** [1] - 38:13
**assault** [3] - 70:5, 70:17, 102:7
**assaultive** [4] - 70:2, 70:9, 70:12, 70:15
**assess** [2] - 80:10, 95:4
**assessment** [1] - 99:13
**associate** [1] - 4:11
**associated** [2] - 39:17, 58:24
**Association** [2] - 30:23, 79:13
**association** [2] - 39:6,

78:21
**assume** [1] - 98:9
**assumes** [1] - 14:2
**attack** [1] - 15:18
**attacks** [1] - 85:24
**attempt** [1] - 88:24
**attempted** [1] - 72:25
**attended** [1] - 59:13
**attention** [18] - 11:23, 32:11, 35:5, 37:15, 37:21, 39:4, 40:16, 44:11, 44:24, 45:6, 45:16, 47:6, 53:12, 88:23, 99:14, 99:21, 100:2, 100:5
**attorney** [5] - 4:11, 6:11, 7:4, 55:19, 55:21
**authored** [2] - 7:22, 77:8
**authority** [1] - 36:11
**authorized** [4] - 65:24, 68:21, 69:5, 71:24
**automatically** [4] - 20:14, 62:24, 63:1, 101:14
**autopsies** [1] - 30:12
**autopsy** [1] - 61:5
**available** [1] - 83:4
**Avenue** [1] - 2:7
**avoid** [2] - 64:6, 84:6
**aware** [16] - 31:13, 57:2, 62:5, 66:11, 66:19, 66:22, 66:23, 67:7, 78:18, 78:22, 82:24, 89:1, 94:2, 95:8, 95:10, 99:6
**awareness** [1] - 37:5
**Axon** [1] - 59:16

**B**

**bachelor's** [1] - 7:1
**background** [1] - 6:13
**backseat** [1] - 45:12
**bad** [1] - 39:11
**Bad** [1] - 39:12
**Bakken** [1] - 4:11
**BAKKEN** [1] - 2:16
**ballpark** [1] - 55:4
**bank** [1] - 85:19
**base** [1] - 35:5
**based** [16] - 44:2, 50:25, 73:8, 74:25, 75:23, 80:16, 80:20, 82:3, 83:12, 87:23, 95:22, 98:10, 98:14, 99:20, 100:9, 100:24
**basic** [5] - 27:20, 27:25, 38:14, 38:18,

59:13
**basics** [1] - 51:4
**basis** [3] - 7:7, 7:15, 58:6
**baton** [1] - 50:9
**batons** [1] - 8:23
**battery** [2] - 72:22, 72:25
**Beach** [1] - 7:1
**beating** [1] - 27:21
**become** [5] - 10:22, 15:4, 16:16, 36:25, 90:12
**becomes** [5] - 14:22, 15:10, 16:11, 25:15, 45:22
**becoming** [1] - 45:17
**beginning** [2] - 19:20, 20:3
**behalf** [6] - 4:7, 4:11, 48:9, 52:13, 53:5, 53:21
**behaved** [1] - 21:18
**behaving** [2] - 41:8, 42:7
**behavior** [11] - 12:12, 16:14, 51:11, 51:12, 66:22, 70:2, 70:9, 70:12, 70:15, 100:24
**behaviors** [1] - 44:5
**behind** [8] - 11:24, 14:24, 14:25, 22:12, 24:24, 24:25, 31:21, 62:8
**belief** [3] - 14:18, 15:6, 41:13
**Berkeley** [3] - 46:21, 46:23, 79:11
**BERNAL** [1] - 1:5
**best** [3] - 16:20, 31:24, 34:17
**better** [8] - 24:22, 31:8, 31:9, 48:3, 90:23, 94:18, 94:21, 95:4
**between** [5] - 15:19, 34:2, 43:20, 78:21, 98:19
**beyond** [2] - 77:25, 89:19
**BIANCO** [1] - 1:12
**Bianco** [2] - 4:12, 61:19
**big** [4] - 8:3, 8:10, 26:4, 44:20
**billing** [1] - 5:19
**biology** [1] - 58:25
**biomechanics** [2] - 59:2, 59:7
**BISGAARD** [1] - 2:15

**bit** [6] - 7:25, 9:1, 9:9, 19:3, 22:9, 22:14
**bizarre** [4] - 17:2, 23:9, 49:10, 88:4
**bleeding** [1] - 98:5
**blind** [1] - 57:24
**blood** [1] - 88:3
**bloodied** [2] - 16:24, 23:18
**bodily** [2] - 69:7, 69:12
**body** [17] - 11:15, 11:16, 17:5, 19:3, 19:9, 19:11, 20:11, 20:17, 21:6, 22:1, 22:15, 23:20, 26:18, 38:19, 38:20, 76:5, 94:22
**body-worn** [3] - 11:16, 19:9, 19:11
**book** [4] - 40:24, 41:4, 44:1, 79:18
**Boulevard** [1] - 2:5
**bound** [1] - 62:6
**boxers** [1] - 14:14
**boy** [1] - 55:5
**break** [6] - 51:16, 51:17, 97:2, 102:11, 102:20, 102:22
**breathe** [9] - 13:9, 14:10, 27:24, 42:18, 48:3, 77:10, 82:2, 93:6, 94:18
**breathing** [26] - 12:13, 12:19, 12:22, 13:5, 13:7, 13:15, 24:18, 24:19, 24:22, 26:9, 26:24, 27:21, 31:9, 35:23, 37:19, 39:23, 43:12, 45:2, 45:23, 48:20, 67:9, 67:15, 67:19, 77:13, 92:23, 93:2
**breaths** [1] - 27:22
**Brian** [3] - 61:9, 91:12, 91:24
**BRIAN** [2] - 3:9, 91:24
**bridge** [2] - 40:25, 41:2
**bring** [3] - 11:22, 78:14, 90:14
**brings** [1] - 6:11
**BRISBOIS** [1] - 2:15
**broad** [1] - 9:6
**broadcasts** [1] - 23:1
**broken** [1] - 53:6
**brought** [6] - 7:12, 30:7, 30:8, 43:13, 78:16, 88:22
**build** [1] - 40:25
**building** [1] - 41:1

**bulletin** [1] - 40:13
**Burbank** [1] - 2:5
**bureau** [2] - 81:4, 83:4
**bureau's** [1] - 80:21
**Burton** [4] - 4:7, 4:16, 33:12, 91:11
**BURTON** [68] - 2:6, 2:7, 3:6, 3:7, 5:6, 10:19, 10:21, 11:3, 15:7, 18:9, 18:15, 18:18, 18:22, 19:15, 19:17, 19:23, 20:1, 28:8, 29:4, 29:5, 29:15, 32:5, 32:7, 32:19, 32:23, 32:25, 33:3, 33:24, 34:2, 34:4, 34:10, 34:15, 34:17, 34:22, 34:24, 35:2, 35:11, 36:7, 42:22, 47:12, 47:21, 48:12, 48:16, 48:24, 50:5, 50:20, 50:22, 51:13, 56:8, 56:22, 58:4, 58:8, 77:25, 80:24, 83:24, 84:2, 84:16, 85:8, 86:1, 86:12, 86:23, 87:2, 87:16, 88:20, 88:21, 89:9, 89:19, 91:10
**Burton's** [1] - 90:18
**BY** [51] - 2:4, 2:7, 2:9, 2:15, 3:6, 3:6, 3:7, 3:7, 3:9, 5:6, 10:21, 11:3, 15:7, 20:1, 28:8, 29:5, 29:15, 32:7, 35:2, 35:11, 36:7, 42:22, 47:21, 48:16, 48:24, 50:5, 50:22, 52:9, 56:11, 57:3, 58:12, 68:19, 75:12, 78:4, 81:2, 84:2, 84:16, 85:8, 86:1, 86:12, 87:2, 87:16, 88:21, 89:14, 89:22, 92:4, 97:15, 99:19, 100:13, 101:9, 102:13
**bystander** [2] - 19:1, 19:9

**C**

**Cal** [1] - 7:1
**calendar** [1] - 5:20
**CALIFORNIA** [3] - 1:2, 4:1, 104:6
**California** [18] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17, 7:4, 9:23, 28:15, 28:17, 28:18, 33:17, 53:3, 53:6,

53:8, 53:19, 60:7, 72:12
**calm** [5] - 26:7, 27:7, 45:17, 45:22, 85:15
**camera** [11] - 11:16, 11:17, 19:3, 19:9, 19:11, 19:15, 63:3, 63:6, 63:10, 63:12
**camera's** [1] - 25:11
**cannot** [2] - 33:19, 33:21
**capable** [1] - 16:6
**capacity** [1] - 6:10
**capture** [1] - 63:10
**captures** [2] - 63:6, 63:12
**car** [1] - 45:13
**cardiac** [1] - 10:7
**care** [3] - 41:7, 42:1, 57:24
**career** [1] - 6:17
**Case** [1] - 4:3
**case** [39] - 5:19, 6:11, 10:4, 10:6, 10:23, 11:9, 11:21, 12:7, 14:13, 16:11, 16:22, 16:23, 30:3, 30:10, 30:22, 37:4, 51:18, 51:20, 52:13, 53:13, 55:25, 56:2, 60:23, 61:1, 61:12, 62:11, 67:8, 67:22, 68:7, 72:8, 72:18, 77:19, 81:20, 83:17, 89:16, 102:23, 102:24, 103:2
**cases** [10] - 6:2, 6:5, 6:7, 6:8, 6:10, 10:14, 53:3, 53:6, 53:20, 69:22
**category** [1] - 90:7
**caught** [1] - 35:4
**causation** [2] - 58:15, 77:6
**caused** [3] - 12:12, 77:16, 77:20
**causes** [9] - 20:17, 21:4, 23:20, 57:15, 72:20, 82:10, 82:25, 90:1, 101:3
**cellphone** [1] - 19:12
**center** [2] - 37:25, 38:7
**CENTRAL** [2] - 1:2, 104:6
**certain** [8] - 9:4, 19:2, 36:17, 40:25, 48:18, 51:6, 70:11, 90:4
**certainly** [7] - 9:19, 16:1, 24:15, 25:14,

33:16, 49:13, 63:17
**CERTIFICATE** [1] - 104:1
**certificate** [2] - 59:16
**certified** [1] - 28:17
**CERTIFY** [1] - 104:6
**CHAD** [1] - 1:12
**Chad** [2] - 4:12, 61:19
**chair** [1] - 92:7
**Chan** [1] - 78:19
**change** [1] - 16:14
**changed** [1] - 39:25
**changes** [1] - 41:19
**changing** [1] - 26:6
**charge** [3] - 5:15, 52:16, 73:19
**charges** [1] - 17:4
**charging** [3] - 37:1, 70:8, 75:24
**chest** [19] - 13:14, 15:11, 24:1, 24:9, 26:23, 27:22, 28:16, 67:16, 67:24, 87:4, 88:15, 93:4, 97:23, 98:21, 100:16, 100:21, 101:15, 101:17, 102:15
**chief** [8] - 6:17, 8:4, 8:8, 8:9, 54:10, 54:12, 54:18
**Chiefs** [2] - 30:23, 79:14
**chiefs** [2] - 36:12, 39:6
**circuit** [1] - 21:7
**circumstance** [1] - 51:6
**circumstances** [14] - 17:7, 21:17, 44:3, 66:2, 66:7, 66:12, 66:17, 68:24, 70:12, 71:20, 72:1, 72:15, 73:5, 87:23
**cite** [1] - 78:9
**cited** [4] - 34:5, 78:13, 82:11, 90:18
**cities** [1] - 55:7
**citizens** [1] - 72:5
**city** [4] - 8:3, 8:11, 41:15, 55:3
**City** [7] - 6:14, 7:6, 40:19, 42:8, 42:10, 44:19
**civil** [2] - 55:25, 56:2
**claim** [3] - 56:17, 56:19, 82:4
**clarify** [1] - 97:14
**clear** [6] - 27:25, 67:19, 68:8, 93:2, 93:3, 100:20
**clearly** [2] - 13:15,

83:14
**clenched** [1] - 97:9
**CLERK** [5] - 4:3, 4:20, 4:25, 91:16, 91:21
**Cleveland** [6] - 40:19, 42:6, 42:8, 42:10, 42:16, 42:24
**close** [7] - 16:20, 17:19, 17:22, 20:13, 26:21, 27:9, 36:24
**closing** [2] - 50:17, 50:19
**clothing** [1] - 21:23
**coast** [1] - 46:21
**Code** [2] - 72:13, 72:22
**CODE** [1] - 104:7
**codes** [1] - 41:1
**collect** [1] - 35:12
**collective** [1] - 36:11
**collectively** [1] - 100:4
**color** [1] - 7:11
**Columbia** [1] - 45:6
**combative** [1] - 14:22
**combination** [3] - 23:8, 23:20, 85:18
**combine** [1] - 9:3
**comfortable** [1] - 92:5
**command** [1] - 54:23
**commander** [1] - 6:16
**commands** [3] - 64:9, 72:10, 72:11
**comments** [2] - 18:22, 21:16
**Commission** [1] - 60:7
**committed** [2] - 17:10, 85:19
**common** [1] - 24:18
**communication** [1] - 64:7
**community** [3] - 9:20, 10:1, 82:5
**complete** [4] - 21:7, 22:23, 38:25, 84:14
**completed** [3] - 11:12, 75:19, 90:19
**completely** [1] - 26:7
**comply** [2] - 72:10, 72:11
**complying** [1] - 64:8
**component** [1] - 28:22
**composite** [1] - 61:2
**compound** [1] - 85:5
**compression** [6] - 49:5, 49:13, 49:20, 50:24, 51:3, 51:9
**compressions** [1] - 28:16
**compromise** [1] -

43:12
**compromised** [4] - 26:10, 45:24, 100:8, 100:11
**concept** [2] - 9:9, 84:3
**concern** [3] - 15:3, 16:17, 49:21
**concerned** [2] - 9:19, 25:4
**conclude** [3] - 35:18, 37:14, 37:15
**concluded** [1] - 35:1
**conclusion** [5] - 35:21, 37:18, 56:23, 58:8, 87:6
**conclusions** [2] - 31:23, 57:5
**condition** [1] - 95:5
**conduct** [8] - 7:22, 60:24, 63:18, 66:9, 66:14, 66:18, 70:15, 91:2
**conducted** [2] - 14:19, 41:12
**conducting** [2] - 33:18, 72:21
**confer** [1] - 48:15
**CONFERENCE** [1] - 104:11
**conference** [1] - 33:9
**configuration** [1] - 21:3
**confirm** [1] - 71:13
**CONFORMANCE** [1] - 104:11
**confrontation** [2] - 50:10, 84:8
**connected** [3] - 20:10, 31:20, 62:7
**connection** [1] - 20:11
**consent** [8] - 41:10, 41:23, 41:25, 42:2, 42:9, 42:11, 89:7
**consequence** [2] - 87:13, 87:15
**consequences** [1] - 86:6
**consider** [1] - 50:1
**considered** [4] - 34:12, 68:12, 68:16, 70:12
**consistency** [1] - 45:8
**consistent** [23] - 12:14, 15:13, 22:19, 23:5, 23:11, 23:12, 23:23, 24:3, 26:24, 29:16, 36:20, 45:9, 46:19, 57:6, 74:1, 74:5, 74:10, 74:15, 74:22, 75:20, 88:24,

91:1, 91:4
**consistently** [1] - 14:17
**constitute** [2] - 70:8, 70:15
**constitutes** [1] - 89:24
**constitutional** [1] - 57:14
**consultant** [4] - 52:25, 56:17, 57:4, 60:13
**contact** [6] - 9:18, 17:14, 23:9, 23:14, 75:1, 98:1
**contacted** [2] - 35:14, 73:4
**contain** [1] - 30:1
**contained** [1] - 31:6
**context** [1] - 90:2
**continue** [5] - 40:11, 101:1, 102:5, 102:7, 102:9
**continued** [2] - 11:25, 97:22
**contrary** [1] - 12:25
**contributes** [2] - 82:10, 82:25
**control** [4] - 20:18, 22:13, 43:5, 44:4
**controlled** [5] - 12:16, 15:15, 24:23, 28:10, 98:12
**controlling** [1] - 65:20
**controls** [1] - 65:17
**controversy** [1] - 47:5
**cooperation** [2] - 64:18, 84:23
**CORONER** [1] - 1:12
**CORRECT** [1] - 104:8
**correct** [45] - 5:10, 9:15, 10:10, 19:10, 26:13, 29:9, 37:10, 42:19, 43:14, 44:20, 47:8, 52:17, 54:7, 54:10, 54:13, 54:16, 55:1, 56:17, 56:21, 57:16, 60:8, 62:2, 62:9, 62:25, 64:14, 65:21, 74:11, 76:5, 77:10, 80:1, 83:8, 83:13, 84:24, 85:1, 86:13, 89:25, 90:20, 98:3, 98:14, 98:17, 98:22, 99:22, 100:18, 100:19, 101:7
**counsel** [3] - 4:5, 28:25, 48:15
**countervailing** [1] - 39:19
**country** [11] - 14:8,

23:6, 36:13, 36:19, 36:20, 42:1, 43:16, 44:22, 45:9, 53:7, 86:22
**COUNTY** [2] - 1:11, 1:11
**County** [10] - 4:4, 4:12, 14:7, 49:23, 61:14, 80:19, 83:19, 88:14, 92:14, 92:18
**county** [2] - 30:16, 56:20
**couple** [7] - 7:20, 8:2, 13:5, 18:1, 20:7, 46:10, 88:10
**course** [7] - 9:14, 9:24, 10:8, 15:22, 59:13, 84:12, 84:22
**court** [3] - 33:17, 41:20, 42:13
**COURT** [78] - 1:1, 4:9, 4:13, 4:18, 5:4, 10:18, 10:20, 10:25, 14:4, 18:13, 18:16, 18:20, 19:5, 19:8, 19:14, 19:16, 28:7, 28:25, 29:13, 32:16, 32:22, 32:24, 33:1, 33:6, 33:8, 33:18, 34:1, 34:3, 34:7, 34:11, 34:16, 34:19, 34:23, 35:10, 36:6, 40:22, 42:21, 47:13, 48:14, 48:23, 50:4, 50:19, 51:15, 51:23, 51:25, 52:3, 52:6, 56:10, 56:25, 58:6, 58:9, 75:11, 78:2, 80:25, 83:23, 84:11, 85:7, 85:11, 86:10, 86:19, 86:25, 87:9, 88:18, 89:11, 89:20, 91:8, 91:11, 91:15, 92:1, 97:12, 99:16, 100:11, 102:12, 102:21, 103:5, 104:5, 104:21
**Court** [5] - 1:22, 1:22, 4:22, 56:23, 91:18
**cover** [1] - 85:16
**covered** [1] - 88:3
**CPR** [7] - 28:14, 28:16, 28:22, 29:7, 29:9, 29:11, 29:18
**create** [7] - 9:5, 20:15, 21:4, 36:15, 49:5, 56:13, 65:1
**creates** [1] - 49:20
**creating** [2] - 64:6, 85:15

**crime** [2] - 17:11, 73:1
**crimes** [1] - 55:21
**criminal** [2] - 7:2, 55:24
**crisis** [6] - 16:21, 16:25, 17:9, 23:8, 49:10, 98:8
**criteria** [1] - 42:12
**critical** [2] - 8:21, 84:20
**criticism** [1] - 39:14
**criticize** [1] - 90:21
**criticizing** [1] - 90:24
**cross** [5] - 52:1, 84:23, 85:6, 86:8, 88:23
**CROSS** [2] - 3:6, 52:8
**cross-examination** [1] - 88:23
**CROSS-EXAMINATION** [2] - 3:6, 52:8
**cross-examine** [1] - 52:1
**crowd** [1] - 25:6
**CSR** [2] - 1:21, 104:20
**cues** [1] - 70:4
**cuffed** [2] - 22:10, 51:7
**cuffing** [3] - 12:1, 20:20, 76:4
**cuffs** [3] - 22:16, 76:9, 76:22
**cumulative** [1] - 86:9
**cure** [1] - 65:4
**cure-all** [1] - 65:4
**current** [1] - 47:7
**custody** [9] - 12:6, 20:23, 31:6, 31:7, 31:14, 31:25, 37:6, 37:19, 45:3
**custom** [1] - 57:13

**D**

**D-R-I-V-E** [1] - 21:3
**Dale** [1] - 4:6
**DALE** [2] - 2:4, 2:4
**damages** [1] - 57:15
**danger** [1] - 15:4
**dangerous** [2] - 69:8, 71:17
**dart** [5] - 20:12, 20:25, 21:22, 21:23, 73:25
**darts** [11] - 20:9, 20:11, 20:12, 21:5, 21:6, 21:11, 21:13, 21:22, 68:12, 68:21
**data** [1] - 84:7
**DATED** [1] - 104:15

**DAY** [1] - 104:15
**de** [19] - 64:5, 64:10, 64:11, 64:16, 64:22, 64:25, 65:2, 65:4, 65:5, 84:3, 84:6, 84:19, 84:22, 85:4, 85:9, 85:13, 90:20, 90:21, 90:25
**de-escalate** [1] - 84:6
**de-escalation** [17] - 64:5, 64:10, 64:11, 64:16, 64:22, 65:2, 65:4, 65:5, 84:3, 84:19, 84:22, 85:4, 85:9, 85:13, 90:20, 90:21, 90:25
**de-escalation-type** [1] - 64:25
**deadly** [13] - 65:16, 65:25, 68:22, 69:5, 69:11, 86:6, 86:13, 86:15, 87:5, 87:12, 89:25, 90:2, 90:3
**deal** [2] - 51:12, 85:24
**dealing** [2] - 71:16, 85:2
**Death** [1] - 38:13
**death** [10] - 39:24, 40:7, 46:15, 50:14, 69:6, 69:12, 77:16, 82:25, 90:4, 90:6
**deaths** [3] - 31:14, 39:16, 39:17
**deceased** [1] - 1:8
**decedent** [2] - 95:23, 97:3
**decision** [2] - 22:2, 23:15
**decisionmaking** [2] - 80:10, 85:21
**decisions** [1] - 8:22
**decree** [3] - 41:10, 42:9, 43:7
**decrees** [6] - 41:10, 41:24, 41:25, 42:2, 42:11, 89:7
**defendant** [1] - 4:11
**defendants** [1] - 5:24
**Defendants** [2] - 1:13, 2:14
**Defendants'** [1] - 18:21
**defending** [1] - 6:2
**defense** [3] - 6:2, 18:12, 18:24
**define** [1] - 100:11
**definition** [3] - 44:13, 45:21, 57:23
**definitively** [1] - 75:7
**degree** [2] - 7:1, 7:3

**degrees** [3] - 58:24, 59:2, 59:25
**deliberate** [2] - 57:23, 58:10
**deliberately** [3] - 27:16, 57:13, 57:20
**delirious** [1] - 85:2
**delirium** [2] - 49:6, 49:7
**demeanor** [1] - 101:20
**Denver** [2] - 46:17, 79:9
**Denver's** [1] - 46:19
**DEPARTMENT** [1] - 1:11
**department** [18] - 7:8, 8:10, 31:17, 33:13, 41:16, 43:13, 45:15, 46:23, 54:19, 82:1, 86:11, 86:19, 86:20, 93:21, 100:23, 101:13, 102:15
**Department** [27] - 13:19, 14:7, 37:10, 38:1, 38:3, 38:6, 41:6, 41:11, 43:10, 44:10, 44:20, 44:21, 46:1, 54:2, 54:3, 54:22, 61:14, 78:24, 79:5, 79:23, 80:19, 80:21, 83:19, 92:15, 92:18, 94:1, 95:3
**department's** [1] - 81:4
**Department's** [1] - 81:24
**departments** [2] - 36:18, 37:17
**depicted** [1] - 11:18
**deployed** [4] - 21:6, 59:19, 69:11, 97:24
**deployment** [1] - 74:1
**deployments** [2] - 75:18, 101:21
**deposition** [12] - 53:9, 53:12, 53:23, 58:3, 61:5, 61:9, 61:13, 61:18, 75:10, 82:7, 82:13, 82:16
**depositions** [1] - 11:14
**Deputies** [1] - 61:9
**deputies** [33] - 9:11, 11:13, 11:25, 13:19, 13:24, 14:13, 14:17, 14:20, 15:2, 16:4, 22:5, 23:3, 24:12, 24:24, 25:7, 26:16, 27:15, 27:18, 48:6, 49:23, 50:13, 67:8,

73:3, 73:5, 73:22, 75:18, 76:3, 76:7, 81:4, 88:15, 90:20, 94:11
**deputies'** [4] - 67:4, 67:7, 67:22, 89:15
**Deputy** [33] - 17:16, 19:3, 19:11, 20:3, 21:10, 22:14, 22:25, 25:22, 26:12, 27:2, 27:11, 28:14, 29:9, 29:11, 73:9, 73:13, 73:25, 74:4, 75:5, 75:14, 75:24, 81:16, 83:17, 83:18, 84:18, 88:8, 92:5, 97:6, 97:23, 101:2, 103:5
**deputy** [13] - 6:17, 8:4, 8:9, 14:21, 14:24, 18:2, 29:6, 54:9, 54:12, 54:18, 77:15, 77:16, 81:5
**describe** [3] - 33:23, 36:2, 37:24
**described** [3] - 36:2, 73:18, 82:5
**despite** [2] - 13:3, 40:10
**detail** [1] - 20:5
**detain** [1] - 8:24
**detective** [2] - 6:21, 60:2
**detention** [2] - 72:6, 72:7
**determine** [2] - 75:1, 82:9
**determined** [1] - 83:6
**determines** [1] - 94:10
**determining** [1] - 69:17
**Detroit** [4] - 46:11, 46:12, 46:13, 79:7
**develop** [3] - 36:16, 43:10, 44:4
**developed** [1] - 41:24
**develops** [2] - 30:25
**deviated** [1] - 24:5
**device** [8] - 20:4, 20:7, 21:2, 21:20, 59:19, 59:22, 62:7, 68:15
**dictated** [2] - 65:8, 65:14
**die** [2] - 77:20, 87:14
**died** [3] - 10:7, 10:8, 77:24
**Diego** [11] - 31:17, 32:3, 32:24, 32:25, 33:13, 34:12, 35:5, 35:6, 35:12, 37:9, 78:24

**difference** [2] - 15:19, 43:20
**different** [7] - 6:7, 9:2, 15:23, 62:23, 63:3, 90:23
**differentiate** [1] - 51:10
**differentiates** [1] - 51:2
**differently** [1] - 86:20
**difficult** [3] - 13:9, 13:12, 85:4
**difficulty** [2] - 12:13, 24:19
**dimensional** [1] - 63:13
**DIRECT** [4] - 3:6, 3:9, 5:5, 92:3
**direct** [17] - 33:19, 39:2, 53:12, 55:1, 56:12, 66:24, 67:13, 67:14, 67:18, 73:18, 76:7, 76:18, 76:25, 79:13, 79:20, 82:6, 87:19
**directed** [1] - 29:19
**directly** [1] - 76:8
**disagree** [2] - 6:10, 6:12
**disagreements** [1] - 13:3
**discharge** [1] - 74:5
**discrimination** [1] - 7:10
**discuss** [2] - 11:21, 61:21
**discussed** [1] - 100:17
**discussing** [1] - 30:2
**discussion** [2] - 94:17, 94:20
**dispatch** [1] - 99:17
**displaying** [1] - 88:16
**displays** [1] - 87:4
**dispute** [5] - 13:1, 39:19, 39:22, 40:5, 40:10
**disputed** [1] - 39:20
**distance** [6] - 17:24, 64:6, 65:1, 65:2, 84:5, 85:15
**distress** [1] - 94:23
**DISTRICT** [5] - 1:1, 1:2, 1:5, 104:5, 104:6
**district** [2] - 45:5, 55:21
**District** [1] - 1:22
**DIVISION** [1] - 1:3
**DIVISION-**

**RIVERSIDE** [1] - 1:3
**DO** [1] - 104:6
**doctor** [4] - 13:1, 30:19, 58:13, 83:2
**document** [6] - 32:8, 33:20, 33:22, 35:25, 37:22, 39:4
**documents** [1] - 82:11
**domains** [4] - 28:21, 60:8, 60:17
**Donald** [2] - 30:12, 78:7
**done** [4] - 18:23, 25:12, 35:19, 75:18
**door** [1] - 76:13
**down** [27] - 6:5, 6:8, 9:9, 14:15, 14:19, 20:18, 24:12, 25:4, 26:21, 51:23, 53:6, 64:7, 64:12, 65:10, 65:12, 74:20, 85:15, 87:11, 87:13, 93:4, 98:21, 100:16, 100:21, 101:15, 101:17, 102:15, 103:5
**downward** [1] - 61:23
**Dr** [11] - 30:12, 30:14, 30:15, 30:20, 35:3, 37:12, 39:18, 61:6, 78:7, 78:10, 78:18
**drafting** [1] - 60:16
**dramatically** [1] - 26:6
**dream** [1] - 15:21
**drill** [1] - 9:9
**drive** [1] - 21:3
**Drs** [1] - 78:19
**drugs** [5] - 17:9, 23:8, 38:21, 49:10, 85:17
**due** [1] - 50:14
**dues** [1] - 37:1
**during** [19] - 10:8, 12:20, 13:18, 15:8, 18:12, 39:15, 50:17, 50:23, 51:17, 62:12, 75:6, 76:3, 84:7, 84:8, 88:23, 93:24, 94:7, 101:22, 102:22
**duties** [1] - 72:21
**duty** [2] - 72:5, 72:20
**dying** [3] - 31:18, 31:22, 37:5

**E**

**early** [4] - 7:5, 31:1, 31:2, 55:15
**easier** [1] - 26:25
**EASTERN** [1] - 1:3
**easy** [2] - 14:11, 15:2

**ECW** [2] - 43:4
**EDCV** [1] - 4:3
**eDCV** [1] - 1:10
**effect** [3] - 63:14, 66:3, 76:13
**effective** [4] - 20:13, 20:14, 64:17, 98:24
**effectively** [3] - 14:11, 31:9, 68:2
**effects** [4] - 59:22, 77:9, 77:13, 99:1
**effort** [2] - 22:14, 26:15
**efforts** [2] - 26:22, 90:25
**eight** [1] - 25:8
**eight-minute** [1] - 25:8
**either** [3] - 17:8, 23:7, 97:8
**electrical** [1] - 59:11
**electronic** [1] - 43:5
**elicit** [2] - 33:20, 34:7
**embedded** [2] - 21:6, 21:13
**emergency** [7] - 8:21, 81:20, 88:8, 89:17, 93:12, 93:16, 101:12
**emphasis** [1] - 7:2
**employed** [1] - 60:10
**enable** [1] - 94:21
**end** [7] - 21:1, 56:13, 67:1, 76:15, 77:2, 79:25, 102:23
**ended** [1] - 81:7
**ends** [1] - 40:14
**enforcement** [24] - 5:13, 5:24, 5:25, 9:13, 9:22, 10:16, 15:13, 15:14, 28:15, 30:18, 30:19, 31:12, 31:13, 37:25, 39:24, 40:4, 53:24, 54:6, 59:20, 63:2, 75:23, 78:25, 92:11, 92:17
**engage** [2] - 8:25, 64:21
**engaged** [2] - 70:24, 90:20
**engineering** [2] - 59:9, 59:11
**ensure** [1] - 9:7
**ensuring** [1] - 67:19
**enter** [1] - 41:14
**entire** [1] - 61:2
**ENTITLED** [1] - 104:10
**entity** [1] - 57:12
**equipment** [1] - 40:9
**equipped** [2] - 8:17,

8:22
**Eric** [1] - 76:12
**escalate** [1] - 84:6
**escalation** [21] - 63:18, 63:25, 64:2, 64:5, 64:10, 64:11, 64:16, 64:22, 64:25, 65:2, 65:4, 65:5, 84:3, 84:19, 84:22, 85:4, 85:9, 85:13, 90:20, 90:21, 90:25
**escape** [2] - 66:3, 69:8
**especially** [1] - 22:4
**essentially** [3] - 21:4, 64:12, 88:6
**et** [1] - 4:4
**evading** [1] - 72:6
**evaluate** [2] - 80:5, 94:21
**evaluated** [1] - 83:4
**evaluating** [3] - 69:15, 70:19, 81:10
**evaluation** [3] - 57:6, 73:8, 81:24
**event** [3] - 17:1, 62:23, 63:13
**events** [2] - 60:21, 74:13
**evidence** [18] - 14:2, 17:10, 18:10, 25:3, 29:1, 29:2, 32:16, 32:17, 32:20, 33:14, 33:21, 34:20, 39:19, 49:23, 50:12, 62:11, 74:25, 83:5
**ex** [1] - 90:15
**exacerbate** [1] - 49:20
**exactly** [2] - 20:5, 21:18
**exam** [9] - 56:12, 66:24, 67:13, 67:14, 67:18, 73:18, 76:7, 82:6, 89:23
**EXAMINATION** [10] - 3:6, 3:6, 3:7, 3:7, 3:9, 5:5, 52:8, 84:1, 89:13, 92:3
**examination** [2] - 33:19, 88:23
**examine** [2] - 52:1, 57:11
**examiner** [3] - 30:11, 30:15, 61:6
**examiner's** [1] - 77:23
**example** [2] - 10:22, 82:20
**examples** [1] - 63:25
**exceeds** [4] - 48:22, 85:5, 86:8, 87:7
**except** [1] - 6:19

**exchange** [3] - 13:10, 13:13, 14:10
**excited** [2] - 49:6, 100:3
**excuse** [4] - 61:16, 67:14, 89:9, 93:23
**excused** [1] - 91:8
**Executive** [1] - 41:5
**exhale** [1] - 90:15
**exhaustion** [1] - 29:19
**exhibit** [2] - 32:16, 34:19
**Exhibit** [22] - 18:11, 18:16, 18:21, 32:6, 32:19, 36:1, 37:2, 37:23, 39:5, 40:12, 40:16, 42:16, 42:23, 42:24, 43:6, 44:10, 45:5, 45:14, 46:11, 46:17, 46:22, 47:3
**EXHIBITS** [1] - 3:14
**exhibits** [1] - 30:10
**existed** [2] - 47:24, 48:1
**existing** [1] - 47:25
**expect** [1] - 64:24
**expectations** [2] - 9:3, 9:8
**expecting** [1] - 80:12
**expedite** [1] - 16:20
**expels** [1] - 20:9
**experience** [6] - 56:16, 62:17, 63:12, 71:7, 75:23, 80:16
**experiences** [3] - 6:25, 35:15, 63:9
**experiencing** [3] - 93:11, 93:16, 101:11
**expert** [24] - 5:9, 5:21, 7:17, 10:4, 30:3, 32:22, 33:19, 39:20, 40:1, 52:13, 52:16, 52:22, 53:4, 53:20, 58:15, 58:17, 58:19, 58:22, 59:7, 59:9, 59:11, 59:22, 77:5, 77:12
**expertise** [1] - 77:17
**experts** [1] - 40:5
**expired** [1] - 59:17
**explain** [6] - 5:17, 19:16, 20:4, 40:19, 43:19, 49:2
**explained** [2] - 94:12, 101:19
**explicitly** [2] - 87:11, 90:1
**expression** [1] - 15:12
**extended** [1] - 93:4
**extensively** [1] - 78:5

**extent** [1] - 39:23
**eye** [2] - 57:24, 63:14

**F**

**face** [8] - 13:15, 27:13, 27:16, 27:19, 88:6, 94:22, 95:1, 98:5
**faced** [1] - 61:23
**facedown** [2] - 26:20, 61:25
**facet** [1] - 103:2
**facets** [1] - 6:18
**faceup** [1] - 62:2
**facilitate** [7] - 12:18, 13:5, 13:6, 24:17, 24:22, 31:9, 37:19
**fact** [10] - 14:17, 23:12, 35:6, 69:23, 73:18, 78:9, 80:9, 81:3, 88:2, 90:12
**factor** [4] - 49:11, 50:2, 70:21, 81:12
**factors** [12] - 48:18, 48:25, 49:3, 49:24, 50:6, 50:11, 50:14, 70:18, 86:3, 86:16, 87:5, 88:16
**facts** [9] - 14:2, 16:23, 65:3, 69:16, 72:8, 72:18, 73:8, 75:24, 81:12
**fails** [1] - 72:11
**fair** [7] - 40:13, 55:8, 83:16, 98:8, 98:25, 100:5, 100:8
**Fair** [2] - 2:7, 58:11
**Fajardo** [1] - 61:6
**fall** [5] - 20:18, 26:2, 67:15, 67:24, 90:6
**falling** [1] - 25:22
**falls** [2] - 17:5, 88:5
**false** [4] - 74:13, 74:16, 83:16, 83:19
**familiar** [2] - 30:12, 60:6
**family** [1] - 76:15
**far** [1] - 40:6
**FCRR** [2] - 1:21, 104:20
**feasible** [1] - 13:24
**FEDERAL** [2] - 104:4, 104:21
**federal** [7] - 1:22, 38:2, 38:8, 41:11, 41:19, 41:20, 42:13
**fee** [1] - 52:19
**feet** [2] - 31:20, 102:7
**feigning** [1] - 15:18
**fell** [1] - 99:4

**felon** [1] - 69:8
**felt** [1] - 83:10
**Ferguson** [4] - 42:6, 42:11, 43:7, 43:9
**few** [3] - 11:19, 18:22, 92:8
**field** [7] - 8:1, 8:17, 9:12, 43:24, 51:2, 55:15, 59:20
**fight** [8] - 16:6, 64:21, 99:1, 101:1, 101:21, 102:2, 102:5, 102:9
**fighting** [4] - 63:22, 64:22, 64:24, 70:3
**figure** [1] - 41:4
**final** [1] - 47:1
**finally** [2] - 74:15, 88:13
**fine** [1] - 34:14
**finish** [2] - 48:17, 88:18
**fire** [1] - 21:12
**fired** [1] - 21:10
**first** [18] - 4:14, 13:6, 21:11, 22:8, 23:14, 27:15, 27:25, 28:21, 30:21, 32:17, 71:17, 73:13, 73:25, 78:14, 84:17, 88:6, 98:16, 99:4
**fish** [1] - 63:14
**fish-eye** [1] - 63:14
**fist** [2] - 63:22, 70:3
**five** [3] - 20:14, 99:2, 99:3
**flag** [4] - 16:15, 25:17, 26:4, 45:23
**flags** [1] - 27:6
**flat** [3] - 24:12, 52:19, 62:2
**fleeing** [1] - 69:8
**flight** [1] - 15:4
**flipped** [1] - 89:18
**flow** [1] - 90:14
**Floyd** [1] - 10:23
**follow** [4] - 8:2, 9:6, 20:2, 34:18
**follow-up** [2] - 8:2, 20:2
**followed** [1] - 78:16
**following** [1] - 43:4
**follows** [1] - 33:9
**foot** [1] - 14:25
**FOR** [2] - 104:5
**force** [52] - 7:24, 8:23, 15:23, 23:10, 32:12, 50:8, 57:15, 64:2, 64:3, 64:6, 64:13, 65:17, 65:25, 66:2, 66:8, 66:14, 68:13,

68:22, 68:25, 69:6, 69:11, 69:16, 69:17, 69:18, 69:22, 70:19, 71:22, 71:24, 72:1, 74:2, 74:6, 74:8, 74:9, 74:11, 74:14, 74:16, 74:21, 74:23, 75:21, 81:11, 84:6, 84:15, 86:13, 86:15, 87:5, 87:12, 89:25, 90:2, 90:3, 90:5
**FOREGOING** [1] - 104:8
**forensic** [3] - 30:11, 58:22, 59:25
**form** [1] - 41:25
**FORMAT** [1] - 104:10
**forming** [6] - 32:2, 60:23, 61:1, 61:4, 61:8, 61:12
**forms** [1] - 38:6
**formulated** [1] - 37:4
**Forum** [1] - 41:6
**forward** [6] - 4:18, 38:9, 78:15, 78:16, 96:8, 97:22
**fought** [1] - 26:2
**foundation** [1] - 33:11
**four** [9] - 28:3, 96:20, 96:22, 96:23, 100:18, 100:21, 101:17, 101:22, 101:25
**free** [1] - 45:2
**freedoms** [1] - 8:25
**front** [4] - 21:25, 32:8, 80:15, 94:22
**full** [4] - 5:1, 76:5, 91:22, 99:3

**G**

**Galipo** [3] - 4:6, 4:14, 91:11
**GALIPO** [17] - 2:4, 2:4, 3:9, 4:6, 4:16, 91:12, 92:2, 92:4, 97:13, 97:15, 99:19, 100:12, 100:13, 101:9, 102:10, 102:13, 102:19
**game** [1] - 68:11
**Garcia** [1] - 11:15
**general** [10] - 37:5, 50:8, 65:24, 68:20, 69:4, 71:16, 72:8, 72:19, 94:6, 96:23
**generally** [20] - 6:8, 10:12, 10:16, 15:20, 23:5, 23:11, 23:23,

24:3, 24:5, 33:22, 50:13, 61:25, 74:10, 74:22, 84:3, 84:4, 84:8, 85:14, 85:18, 91:5
**gentlemen** [3] - 4:19, 51:16, 102:21
**George** [1] - 10:23
**given** [1] - 16:13
**goal** [4] - 20:15, 64:10, 84:14, 85:22
**God** [2] - 4:23, 91:19
**Gomez** [23] - 17:16, 18:2, 19:3, 20:3, 21:10, 22:14, 22:25, 23:14, 26:12, 26:17, 27:2, 61:10, 75:5, 75:14, 81:16, 83:18, 84:18, 88:9, 88:10, 97:6, 97:23
**Gomez's** [4] - 19:11, 73:25, 74:4, 101:2
**government** [2] - 38:2, 41:11
**grab** [2] - 20:21, 97:25
**grabs** [1] - 22:11
**graduate** [1] - 28:19
**Graham** [1] - 70:18
**greater** [1] - 63:19
**ground** [10] - 12:15, 17:5, 21:12, 21:15, 22:1, 61:23, 61:24, 62:2, 88:5, 99:5
**group** [2] - 38:6, 42:3
**groups** [2] - 38:6, 41:5
**growing** [1] - 8:3
**guess** [1] - 90:6
**gun** [1] - 97:10
**guns** [1] - 8:24
**guy** [1] - 54:15

**H**

**half** [6] - 6:2, 6:3, 6:15, 6:23, 6:25, 27:11
**hand** [5] - 4:21, 20:21, 27:12, 65:17, 91:16
**handcuff** [3] - 20:19, 20:23, 99:4
**handcuffed** [36] - 11:24, 12:16, 13:21, 14:13, 15:5, 15:10, 16:2, 18:2, 22:18, 23:17, 24:8, 24:16, 25:2, 25:15, 35:20, 39:2, 46:8, 49:18, 67:1, 86:17, 88:11, 91:4, 93:8, 93:14, 94:4, 95:24, 96:2, 96:5, 97:3, 100:7,

100:16, 101:6, 101:15, 101:23, 102:1, 102:16
**handcuffing** [19] - 14:1, 22:23, 23:12, 23:25, 26:12, 28:3, 38:25, 47:22, 48:3, 74:20, 75:6, 75:19, 81:5, 84:21, 86:4, 87:4, 88:16, 90:19, 95:3
**handcuffs** [18] - 13:25, 16:10, 19:24, 22:5, 22:16, 25:9, 26:16, 28:11, 46:4, 48:7, 62:8, 64:13, 67:4, 74:9, 74:14, 76:12, 77:3, 84:13
**handle** [3] - 6:10, 6:19, 8:17
**hands** [7] - 24:24, 65:17, 65:20, 67:4, 97:8, 97:9, 97:16
**harm** [5] - 63:23, 69:1, 72:20, 97:4, 97:6
**head** [6] - 26:20, 53:7, 87:25, 88:2, 98:5, 100:2
**health** [6] - 16:25, 17:9, 23:8, 49:9, 87:25, 98:8
**hear** [3] - 19:6, 22:24, 25:22
**heard** [2] - 76:12, 89:5
**hearing** [1] - 67:9
**hearsay** [8] - 32:21, 33:2, 33:20, 34:9, 40:21, 42:20, 78:1, 80:24
**heart** [2] - 27:21, 50:10
**HELD** [1] - 104:9
**held** [2] - 12:1, 15:11
**Helm** [1] - 4:7
**HELM** [2] - 2:9, 2:9
**help** [8] - 4:23, 7:12, 9:1, 36:16, 38:8, 41:6, 47:17, 91:19
**helps** [1] - 38:10
**HEREBY** [1] - 104:6
**herself** [1] - 66:13
**higher** [1] - 64:3
**highly** [2] - 87:19, 87:22
**Hills** [1] - 2:5
**hired** [1] - 7:6
**hog** [5] - 31:20, 62:5, 62:6, 62:12, 78:15
**hog-tie** [4] - 62:5, 62:6, 62:12, 78:15

**hog-tied** [1] - 31:20
**hold** [6] - 13:24, 14:24, 22:13, 58:6, 74:20, 86:16
**holding** [4] - 15:1, 24:24, 87:11, 87:13
**holds** [1] - 30:25
**homicide** [2] - 60:2, 60:4
**Honor** [35] - 4:6, 4:10, 18:10, 18:19, 19:10, 29:4, 32:6, 32:20, 33:7, 33:10, 34:24, 34:25, 48:13, 50:20, 51:13, 51:14, 52:2, 56:8, 56:22, 58:2, 58:11, 68:18, 75:8, 75:9, 77:25, 78:3, 83:24, 88:20, 89:10, 89:12, 91:7, 91:10, 91:14, 102:11, 102:19
**Honor..** [1] - 97:14
**HONORABLE** [1] - 1:5
**hopefully** [1] - 64:8
**hospital** [2] - 10:8, 99:24
**hostile** [1] - 25:6
**hour** [3] - 5:19, 19:17, 52:16
**human** [4] - 20:11, 38:19, 58:20, 59:23
**hung** [1] - 21:23
**hypothetical** [3] - 14:3, 85:10, 86:18

## I

**IACP** [18] - 31:11, 34:6, 36:2, 36:8, 36:10, 37:4, 39:7, 39:25, 40:13, 41:5, 47:1, 47:2, 47:5, 47:16, 79:14
**IACP's** [2] - 47:7
**idea** [2] - 38:14, 39:11
**Idea** [1] - 39:12
**identification** [5] - 30:9, 32:6, 35:25, 36:1, 37:23
**identify** [1] - 82:8
**ignoring** [1] - 57:24
**ill** [3] - 71:23, 85:3, 85:17
**immediate** [5] - 69:6, 70:22, 71:23, 73:5, 99:14
**immediately** [2] - 15:15, 47:22
**impact** [1] - 49:5

**impacts** [1] - 39:23
**impair** [3] - 42:18, 43:3, 82:2
**impaired** [2] - 48:20, 85:20
**impeaching** [1] - 58:9
**implements** [1] - 8:23
**importance** [1] - 31:3
**important** [1] - 22:17
**impression** [1] - 98:24
**IN** [3] - 104:5, 104:9, 104:10
**inability** [1] - 14:10
**incapacitating** [1] - 99:3
**incapacitation** [2] - 20:16, 21:5
**incident** [19] - 22:22, 60:19, 60:24, 61:2, 61:9, 62:13, 62:23, 63:4, 63:13, 64:7, 74:13, 75:25, 81:16, 81:17, 85:24, 86:2, 95:12, 95:16, 95:23
**include** [11] - 42:8, 42:15, 44:11, 44:12, 44:23, 45:7, 65:17, 66:12, 66:17, 66:21, 70:2
**included** [3] - 40:19, 42:10, 44:19
**includes** [2] - 28:22, 66:7
**including** [3] - 51:18, 83:5, 102:24
**incoherent** [3] - 17:3, 23:10, 88:4
**incoherently** [1] - 12:8
**incomplete** [3] - 14:2, 85:10, 86:18
**inconsistent** [3] - 88:24, 89:2, 89:8
**incorrect** [1] - 78:20
**increase** [1] - 50:10
**independently** [3] - 17:16, 23:15, 88:9
**Indianapolis** [1] - 44:10
**indicate** [1] - 70:4
**indicated** [2] - 37:4, 77:23
**indicates** [1] - 40:18
**indication** [1] - 25:5
**indifference** [2] - 57:23, 58:10
**indifferent** [2] - 57:13, 57:20
**individual** [8] - 12:6, 12:7, 12:13, 13:9, 26:2, 48:9, 64:8,

86:3
**individual's** [1] - 50:10
**Individually** [1] - 1:7
**individuals** [5] - 7:12, 31:22, 36:12, 44:15, 85:25
**ineffective** [1] - 21:21
**influence** [3] - 17:9, 98:12, 100:3
**information** [3] - 11:8, 35:13, 81:24
**informational** [1] - 56:25
**initial** [4] - 30:20, 73:25, 75:18, 99:13
**initiate** [1] - 29:17
**injured** [2] - 98:3, 100:14
**injuries** [4] - 23:21, 27:23, 88:7, 94:25
**injury** [6] - 69:7, 69:13, 88:1, 88:3, 100:2, 100:8
**inspections** [1] - 60:24
**institute** [1] - 38:4
**instructions** [1] - 28:24
**intent** [1] - 70:5
**interest** [1] - 1:7
**interim** [2] - 7:7, 7:15
**intermediate** [2] - 68:12, 68:22
**internal** [5] - 6:22, 7:9, 7:14, 7:22, 7:23
**International** [3] - 30:23, 39:6, 79:13
**internationally** [1] - 36:13
**interviewed** [1] - 11:13
**interviews** [1] - 11:14
**intoxicated** [1] - 85:17
**investigate** [1] - 6:23
**investigation** [3] - 7:23, 41:12, 72:21
**investigations** [1] - 62:16
**investigator** [1] - 60:4
**invite** [9] - 32:11, 37:21, 39:4, 40:16, 44:11, 44:24, 45:6, 45:15, 47:6
**inviting** [1] - 37:14
**involved** [4] - 38:19, 46:21, 81:13, 81:16
**involving** [1] - 10:6
**irrelevant** [1] - 69:17
**Irvine** [6] - 6:14, 7:6,

7:18, 54:2, 54:18, 54:22
**Irvine's** [1] - 8:2
**IS** [2] - 104:8, 104:10
**issue** [9] - 10:15, 26:7, 37:7, 78:15, 100:3, 101:3, 101:4, 101:19, 102:17
**issues** [13] - 7:9, 7:11, 7:21, 24:13, 25:18, 30:24, 32:12, 38:2, 38:9, 38:22, 58:19, 59:4, 72:9
**item** [1] - 11:10
**itself** [1] - 90:17

## J

**JEFF** [1] - 3:5
**Jeff** [2] - 4:17, 5:3
**JESUS** [1] - 1:5
**job** [2] - 22:7, 22:21
**John** [2] - 4:7, 4:16
**JOHN** [2] - 2:6, 2:7
**journals** [3] - 7:20, 7:21, 83:2
**JUDGE** [1] - 1:5
**judge** [3] - 41:20, 42:4, 42:13
**JUDICIAL** [1] - 104:11
**July** [3] - 46:7, 54:2, 60:19
**jury** [5] - 5:17, 20:4, 32:14, 51:22, 103:4
**Jury** [1] - 1:11
**JURY** [1] - 1:15
**justice** [2] - 7:2, 38:4
**Justice** [5] - 38:1, 38:3, 38:6, 41:6, 41:11
**justified** [1] - 69:23
**justify** [1] - 80:8

## K

**K-E-E-N-E-Y** [1] - 91:25
**K9** [1] - 6:19
**Kathryn** [1] - 19:12
**KEENEY** [1] - 3:9
**Keeney** [23] - 17:13, 22:8, 22:11, 23:13, 25:22, 26:20, 27:11, 28:14, 29:7, 29:9, 29:11, 61:9, 73:10, 73:13, 75:24, 81:16, 83:18, 84:18, 88:8, 91:12, 91:24, 92:5, 103:5
**Keeney's** [1] - 26:18

**keep** [7] - 13:20, 24:1, 51:17, 81:5, 88:15, 102:15, 102:23
**keeping** [1] - 87:3
**KENNEDY** [1] - 2:9
**Kennedy** [1] - 4:7
**kept** [4] - 86:4, 100:21, 101:15, 101:17
**Kevin** [3] - 25:9, 48:2, 60:19
**KEVIN** [1] - 1:7
**key** [1] - 37:7
**kick** [2] - 15:1, 102:6
**kicked** [1] - 25:1
**kicking** [5] - 16:6, 22:9, 24:25, 70:25, 74:21
**kind** [9] - 6:13, 10:13, 22:12, 26:1, 38:22, 43:19, 50:25, 51:2, 62:7
**kinds** [1] - 51:3
**king** [1] - 30:16
**knee** [6] - 26:18, 27:12, 49:16, 49:17, 75:1, 102:6
**knees** [3] - 74:19, 75:5, 75:15
**knife** [1] - 97:10
**knowledge** [3] - 9:11, 10:15, 44:2
**knowledgeable** [1] - 61:13
**known** [3] - 10:22, 66:10, 68:24
**knows** [1] - 34:7

## L

**ladies** [3] - 4:19, 51:16, 102:21
**laid** [1] - 101:23
**large** [1] - 41:23
**largest** [1] - 44:22
**LaRusso** [2] - 28:23, 68:5
**last** [14] - 5:1, 6:17, 17:23, 40:12, 41:9, 41:22, 48:17, 50:16, 53:24, 54:9, 55:14, 91:22, 95:20, 102:10
**late** [1] - 11:20
**law** [27] - 5:13, 5:24, 7:3, 7:4, 9:13, 9:22, 10:15, 15:13, 15:14, 28:15, 30:18, 30:19, 31:11, 31:13, 37:24, 39:24, 40:4, 53:24, 54:6, 55:23, 59:19, 63:2, 75:23, 78:25,

92:11, 92:17
**LAW** [3] - 2:4, 2:6, 2:9
**lawful** [3] - 72:7, 72:9, 72:21
**lawsuits** [2] - 39:16, 39:17
**lawyer** [1] - 55:24
**laying** [4] - 15:17, 15:24, 22:13, 101:25
**lead** [3] - 46:14, 64:8, 90:9
**leading** [12] - 28:6, 29:12, 35:9, 36:5, 42:20, 48:22, 48:23, 50:3, 66:8, 66:14, 84:10, 85:6
**leaning** [1] - 26:21
**learn** [3] - 51:20, 69:23, 103:1
**learning** [4] - 28:21, 60:8, 60:17
**learns** [1] - 69:16
**least** [8] - 10:7, 10:14, 18:11, 25:10, 76:21, 96:4, 98:24, 99:6
**leave** [1] - 48:10
**leaving** [1] - 14:9
**Lee** [1] - 91:24
**LEE** [1] - 91:24
**left** [11] - 8:3, 8:5, 15:11, 22:11, 24:9, 27:12, 49:15, 54:22, 97:23, 97:25
**leg** [2] - 12:9, 14:23
**legal** [6] - 56:9, 56:23, 57:5, 58:8, 72:5, 87:6
**legged** [1] - 8:14
**legs** [3] - 22:9, 24:25, 25:10
**lensing** [1] - 63:14
**less** [3] - 20:7, 54:25, 68:17
**lethal** [2] - 20:7, 68:17
**level** [9] - 15:23, 38:8, 41:13, 41:14, 64:3, 64:17, 68:13, 70:25, 71:3
**levels** [1] - 65:16
**LEWIS** [1] - 2:15
**licensed** [3] - 7:3, 7:5, 55:18
**Lieutenant** [4] - 80:18, 81:23, 83:3, 88:13
**lieutenant** [1] - 6:16
**life** [9] - 9:23, 9:25, 10:1, 10:2, 27:21, 89:17, 93:12, 93:16, 101:12
**life-threatening** [4] -

89:17, 93:12, 93:16, 101:12
**lifetime** [1] - 36:25
**light** [1] - 75:24
**likely** [6] - 16:1, 16:21, 69:12, 85:21, 87:13, 90:3
**limbs** [1] - 20:18
**limit** [1] - 44:8
**limits** [1] - 59:5
**line** [4] - 48:17, 53:13, 53:15, 53:16
**lines** [3] - 53:13, 58:3, 75:10
**Lisa** [2] - 28:23, 68:5
**litigated** [1] - 56:2
**litigation** [1] - 41:15
**LLP** [1] - 2:15
**location** [2] - 60:24, 76:8
**lock** [4] - 20:17, 21:11, 21:25, 22:12
**locked** [1] - 88:5
**locks** [1] - 14:22
**look** [22] - 8:15, 11:21, 16:20, 16:22, 26:21, 27:18, 31:1, 39:21, 40:3, 40:4, 40:12, 41:5, 42:2, 43:15, 44:1, 48:25, 49:12, 80:7, 90:22, 93:18, 93:21, 94:3
**looked** [1] - 41:9
**looking** [7] - 17:7, 27:16, 27:20, 42:12, 45:25, 51:12, 53:9
**looks** [3] - 27:12, 39:25, 53:8
**Los** [2] - 2:17, 42:5
**lost** [1] - 65:10
**low** [2] - 65:16, 65:25
**lower** [2] - 64:12, 85:14
**lull** [1] - 64:25
**lunch** [4] - 102:11, 102:20, 102:22, 103:2
**Lunch** [1] - 103:6
**lying** [1] - 62:25

## M

**main** [1] - 38:1
**man** [3] - 10:7, 16:24, 23:18
**managers** [2] - 7:14, 36:12
**mandate** [3] - 33:16, 36:10, 36:17
**mandatory** [2] - 78:25,

79:15
**manner** [6] - 17:2, 24:23, 26:23, 73:15, 87:11, 88:4
**manual** [2] - 44:1, 44:7
**MARCH** [2] - 4:1, 104:15
**March** [1] - 1:17
**mark** [1] - 25:8
**Mark** [1] - 61:6
**marked** [8] - 30:9, 32:5, 35:25, 36:1, 37:22, 39:5, 40:17, 45:6
**material** [1] - 5:20
**materials** [12] - 10:3, 29:25, 30:4, 30:5, 30:7, 36:15, 36:18, 49:22, 50:25, 93:20, 94:2, 95:7
**math** [1] - 96:23
**mathematically** [1] - 41:3
**MATTER** [1] - 104:10
**maximize** [1] - 9:12
**mean** [16] - 10:25, 16:15, 17:14, 26:1, 34:8, 34:9, 51:1, 55:9, 57:22, 62:24, 64:23, 78:1, 86:13, 90:21, 100:2, 102:8
**means** [7] - 17:18, 18:5, 61:23, 62:2, 63:19, 64:2, 64:5
**measures** [1] - 47:11
**mechanical** [1] - 59:9
**medical** [44] - 13:1, 16:21, 17:8, 23:1, 25:18, 29:20, 30:11, 30:15, 39:19, 40:1, 40:5, 51:2, 58:13, 58:15, 58:19, 59:4, 59:22, 61:6, 77:5, 77:12, 77:23, 78:19, 81:11, 81:20, 82:8, 82:16, 82:18, 82:21, 82:24, 83:1, 83:2, 83:5, 83:12, 88:8, 89:17, 93:12, 93:16, 94:23, 99:14, 99:21, 100:1, 100:4, 101:12
**medically** [3] - 80:22, 100:8, 100:11
**medicine** [1] - 58:17
**meets** [1] - 9:8
**member** [5] - 36:21, 36:23, 36:24, 36:25, 60:11
**member's** [1] - 10:2

**members** [1] - 5:25
**memory** [1] - 53:10
**mental** [6] - 16:25, 17:9, 23:8, 49:9, 87:25, 98:8
**mentally** [3] - 71:23, 85:2, 85:17
**mention** [1] - 30:10
**mentioned** [5] - 8:12, 29:24, 35:24, 55:18, 62:4
**mentioning** [1] - 11:4
**met** [1] - 42:11
**metal** [1] - 21:1
**method** [1] - 20:8
**methodologically** [1] - 35:7
**middle** [1] - 43:25
**midst** [4] - 16:25, 17:9, 23:7, 49:9
**might** [5] - 15:12, 16:5, 87:18, 94:17, 94:21
**mind** [5] - 12:11, 17:12, 51:17, 76:18, 102:23
**mindful** [1] - 97:1
**minimal** [3] - 40:6, 98:2, 98:3
**minimize** [1] - 43:10
**minute** [3] - 25:8, 27:11, 96:23
**minutes** [18] - 19:21, 26:11, 26:12, 27:8, 27:9, 27:10, 28:3, 51:17, 51:21, 96:20, 96:22, 96:23, 97:2, 100:18, 100:21, 101:18, 101:22, 102:1
**Mireles** [1] - 76:12
**misconduct** [1] - 6:24
**misplaced** [1] - 47:2
**misspoke** [1] - 18:18
**misstates** [2] - 88:17, 101:8
**mistaken** [1] - 69:23
**mobility** [1] - 59:5
**mode** [1] - 20:25
**model** [6] - 30:25, 36:15, 47:16, 47:17, 47:18, 79:14
**moment** [6] - 48:12, 58:4, 68:18, 75:8, 89:9, 89:23
**Monell** [4] - 56:17, 56:19, 57:2, 57:11
**monitor** [10] - 13:11, 14:11, 16:18, 26:16, 31:10, 67:15, 67:19,

68:1, 68:2
**monitored** [1] - 67:8
**monitoring** [1] - 67:13
**months** [1] - 54:4
**morning** [12] - 4:6, 4:9, 4:10, 4:13, 4:19, 5:7, 5:8, 52:10, 52:11, 92:5, 95:21
**most** [3] - 8:19, 47:4, 61:13
**mostly** [1] - 36:12
**motion** [1] - 59:5
**motionless** [3] - 25:15, 26:5, 101:25
**motorcycle** [1] - 6:20
**mouth** [2] - 92:22, 93:2
**move** [15] - 11:6, 12:16, 15:1, 15:15, 22:8, 31:7, 32:17, 32:19, 58:11, 78:3, 79:24, 94:14, 94:16, 94:17, 94:24
**moved** [7] - 13:4, 17:11, 22:5, 27:9, 35:22, 86:5, 96:20
**movement** [1] - 12:10
**moving** [23] - 13:14, 22:12, 24:17, 25:10, 25:16, 26:4, 26:23, 27:7, 57:15, 63:23, 96:6, 96:9, 96:12, 96:15, 96:18, 96:22, 100:17, 100:22, 101:23, 102:8, 102:16
**MR** [134] - 3:6, 3:6, 3:7, 3:7, 3:9, 4:6, 4:10, 4:16, 5:6, 10:17, 10:19, 10:21, 10:24, 11:3, 14:2, 15:7, 18:9, 18:14, 18:15, 18:18, 18:22, 19:6, 19:10, 19:15, 19:17, 19:23, 20:1, 28:6, 28:8, 29:4, 29:5, 29:12, 29:15, 32:5, 32:7, 32:19, 32:21, 32:23, 32:25, 33:3, 33:7, 33:10, 33:24, 34:2, 34:4, 34:10, 34:15, 34:17, 34:22, 34:24, 34:25, 35:2, 35:9, 35:11, 36:5, 36:7, 40:21, 42:20, 42:22, 47:10, 47:12, 47:21, 48:12, 48:16, 48:22, 48:24, 50:3, 50:5, 50:20, 50:22, 51:13, 52:2,

52:7, 52:9, 56:8, 56:11, 56:22, 57:3, 58:2, 58:4, 58:8, 58:11, 58:12, 68:18, 68:19, 75:8, 75:12, 77:25, 78:3, 78:4, 80:24, 81:2, 83:22, 83:24, 84:2, 84:10, 84:16, 85:5, 85:8, 85:10, 86:1, 86:8, 86:12, 86:18, 86:23, 87:2, 87:6, 87:16, 88:17, 88:20, 88:21, 89:9, 89:12, 89:14, 89:19, 89:22, 91:6, 91:10, 91:12, 92:2, 92:4, 97:11, 97:13, 97:15, 99:15, 99:19, 100:10, 100:12, 100:13, 101:8, 101:9, 102:10, 102:13, 102:19
**multiple** [1] - 98:10
**municipality** [1] - 56:20
**must** [2] - 32:17, 57:11

## N

**N-O-B-L-E** [1] - 5:3
**name** [7] - 5:1, 26:13, 29:1, 29:2, 91:22
**named** [1] - 30:12
**narcotics** [2] - 6:21, 58:19
**National** [1] - 37:24
**national** [19] - 13:23, 16:12, 23:4, 30:1, 30:24, 33:4, 33:14, 33:16, 34:13, 36:3, 38:3, 38:4, 46:5, 46:7, 50:1, 86:23, 87:1, 88:25, 89:6
**nationally** [1] - 12:3
**nature** [1] - 98:11
**nearby** [1] - 7:7
**nearly** [1] - 68:2
**necessarily** [2] - 63:15, 90:17
**necessary** [1] - 80:22
**neck** [1] - 93:5
**need** [29] - 8:20, 8:21, 13:4, 16:18, 16:19, 17:22, 18:15, 24:8, 25:21, 31:5, 31:7, 33:25, 40:9, 41:3, 41:18, 43:11, 44:1, 45:20, 46:15, 46:19, 49:19, 51:4, 51:5,

83:11, 87:14, 90:4, 99:14, 99:21
**needs** [3] - 20:12, 40:7, 64:17
**negligence** [1] - 58:10
**negligent** [1] - 56:6
**neighbor** [2] - 11:17, 76:13
**neuromuscular** [2] - 20:16, 21:4
**never** [9] - 7:4, 14:18, 53:6, 55:21, 55:23, 55:24, 56:2, 77:8, 81:18
**New** [9] - 7:24, 44:19, 44:21, 45:15, 46:1, 79:3, 79:5, 79:22, 79:23
**next** [1] - 19:13
**NIEDZIALEK** [1] - 1:8
**Niedzialek** [39] - 11:24, 14:18, 16:9, 17:2, 17:15, 22:13, 26:13, 26:16, 27:2, 46:8, 48:2, 60:19, 62:13, 67:3, 68:8, 73:4, 73:6, 73:9, 73:12, 73:15, 74:1, 74:9, 74:15, 75:2, 75:5, 75:15, 75:24, 76:1, 76:4, 76:14, 76:22, 77:20, 77:24, 86:4, 87:18, 89:17, 91:4, 97:21, 99:1
**Niedzialek's** [5] - 27:13, 67:4, 67:9, 74:19, 77:16
**night** [1] - 43:25
**nine** [1] - 54:4
**nitpick** [1] - 90:22
**NMI** [1] - 20:16
**NOBLE** [1] - 3:5
**Noble** [14] - 4:17, 5:3, 5:7, 13:22, 20:2, 29:24, 35:3, 52:3, 52:10, 58:13, 75:17, 84:3, 89:15, 91:8
**Noble's** [2] - 58:3, 75:10
**nobody** [1] - 44:7
**non** [3] - 65:16, 65:25, 68:22
**non-deadly** [3] - 65:16, 65:25, 68:22
**none** [2] - 25:7, 77:19
**nonlethal** [1] - 68:16
**North** [1] - 2:7
**nose** [2] - 92:22, 93:1
**nothing** [4] - 4:23, 16:2, 51:14, 91:19

**noticing** [1] - 31:18
**number** [10] - 7:8, 7:11, 28:20, 31:22, 39:16, 43:13, 43:15, 54:15, 78:23
**Number** [4] - 40:17, 47:3

## O

**Oakland** [1] - 2:10
**Oaks** [1] - 2:7
**oath** [1] - 52:3
**obese** [1] - 49:4
**object** [4] - 56:8, 58:5, 61:24, 77:25
**objection** [23] - 10:17, 10:24, 18:14, 28:6, 29:12, 32:21, 33:11, 35:9, 36:5, 42:20, 47:10, 48:22, 50:3, 56:22, 58:5, 58:7, 80:24, 84:10, 85:5, 87:6, 89:19, 99:15, 100:10
**objectively** [4] - 66:1, 68:24, 69:18, 72:1
**observed** [2] - 63:16, 66:13
**obstacles** [1] - 85:9
**obstructed** [1] - 90:17
**obstructing** [1] - 72:13
**obstruction** [2] - 81:25, 90:10
**obvious** [3] - 23:21, 49:8, 88:1
**obviously** [3] - 9:5, 25:3, 26:3
**occasions** [2] - 63:2, 71:7
**occurred** [1] - 11:25
**occurs** [1] - 70:17
**OF** [10] - 1:2, 1:15, 2:4, 2:6, 104:1, 104:6, 104:8, 104:11, 104:15
**OFFICE** [1] - 2:9
**officer** [68] - 6:14, 6:15, 8:19, 9:15, 11:15, 14:16, 16:18, 17:6, 17:13, 19:2, 19:11, 20:3, 21:19, 22:19, 28:19, 28:24, 53:24, 55:11, 55:15, 59:20, 62:18, 62:19, 63:6, 63:9, 63:23, 64:3, 64:16, 66:1, 66:8, 66:10, 66:13, 66:19, 66:21, 66:22,

68:23, 68:24, 68:25, 69:1, 69:6, 69:16, 70:5, 70:8, 70:20, 71:18, 71:24, 71:25, 72:6, 72:9, 72:13, 72:20, 72:23, 72:25, 73:14, 75:23, 76:25, 79:19, 80:4, 80:6, 82:24, 87:17, 88:2, 91:2, 92:12, 92:17, 101:3, 101:19, 102:17
**Officer** [2] - 17:16, 60:7
**officer's** [12] - 10:1, 17:12, 19:8, 64:2, 64:9, 65:8, 65:13, 69:16, 69:22, 70:19, 80:10, 81:11
**officers** [88] - 6:3, 6:24, 7:11, 8:6, 8:11, 8:17, 8:18, 8:20, 9:1, 9:7, 9:11, 9:20, 12:3, 12:11, 12:22, 12:24, 12:25, 13:3, 14:8, 16:12, 16:24, 17:4, 17:11, 20:18, 21:18, 23:10, 24:14, 24:20, 25:12, 26:8, 28:15, 28:17, 29:17, 36:19, 43:23, 44:22, 45:23, 47:19, 48:1, 48:20, 48:25, 51:5, 51:10, 54:23, 61:9, 62:22, 63:2, 64:21, 65:7, 65:13, 65:24, 66:24, 67:14, 67:18, 68:15, 68:21, 69:5, 70:1, 70:13, 71:4, 71:5, 71:11, 71:21, 72:2, 72:4, 72:11, 74:8, 76:18, 78:10, 79:23, 80:13, 81:13, 81:15, 84:5, 85:1, 86:2, 86:6, 86:10, 86:15, 86:20, 86:24, 87:3, 87:10, 87:24, 88:25, 89:24, 90:9
**officers'** [1] - 44:5
**OFFICES** [2] - 2:4, 2:6
**Official** [1] - 1:22
**OFFICIAL** [3] - 104:1, 104:4, 104:21
**often** [5] - 6:6, 8:18, 8:19, 21:21, 43:25
**old** [1] - 99:23
**omission** [2] - 56:6, 57:19
**omissions** [1] - 83:17
**on-duty** [1] - 72:20

**once** [16] - 12:15, 12:16, 17:14, 17:23, 28:10, 31:3, 31:6, 31:25, 37:18, 38:24, 44:15, 45:10, 48:6, 49:19, 51:7
**one** [39] - 7:22, 8:15, 9:10, 9:22, 10:5, 11:4, 11:15, 13:24, 14:21, 14:24, 19:17, 21:6, 28:21, 29:19, 30:22, 33:15, 39:17, 47:1, 48:12, 48:17, 57:11, 58:4, 62:18, 62:24, 65:11, 68:18, 70:18, 70:21, 75:8, 76:4, 78:9, 78:14, 78:16, 80:4, 89:9, 97:8, 101:2, 102:10
**open** [2] - 51:17, 102:23
**opening** [7] - 12:20, 13:18, 15:8, 18:12, 28:13, 50:19, 50:23
**opinion** [12] - 22:6, 24:13, 25:11, 25:25, 35:6, 42:25, 43:8, 46:5, 75:17, 78:20, 80:8, 80:9
**opinions** [13] - 11:22, 13:2, 21:16, 32:2, 37:4, 39:8, 60:23, 61:1, 61:4, 61:8, 61:12, 77:19, 83:16
**opportunity** [2] - 44:1, 65:1
**order** [5] - 24:17, 31:5, 57:11, 64:16, 77:3
**organization** [4] - 28:18, 30:24, 34:13, 36:3
**organization's** [1] - 9:8
**organizations** [1] - 89:6
**original** [1] - 18:25
**Orleans** [3] - 45:15, 46:1, 79:3
**outcome** [1] - 84:7
**outlier** [1] - 89:4
**outweigh** [1] - 40:6
**overall** [1] - 10:9
**overcome** [2] - 66:2, 68:25
**overriding** [1] - 9:22
**overruled** [12] - 10:25, 14:4, 29:13, 40:22, 47:13, 57:1, 80:25, 84:11, 85:11, 87:9, 89:20, 99:16

**oversee** [1] - 7:13
**overseen** [1] - 41:19
**oversight** [3] - 41:16, 42:3, 42:12
**overview** [1] - 11:11
**overweight** [2] - 38:21, 49:4
**own** [7] - 6:24, 7:10, 9:12, 11:13, 33:19, 36:19, 44:2
**oxygen** [4] - 13:10, 13:13, 14:10, 90:14
**oxygenate** [1] - 77:10

**P**

**page** [20] - 32:11, 37:14, 37:15, 37:16, 40:12, 42:18, 42:23, 43:8, 44:11, 44:24, 45:6, 45:16, 45:25, 47:6, 53:13, 53:14, 53:15, 58:3, 74:18, 75:9
**PAGE** [2] - 3:3, 104:10
**paid** [2] - 52:19, 52:23
**pain** [1] - 21:4
**pants** [2] - 14:15, 25:2
**paragraph** [4] - 32:12, 32:14, 40:13, 74:18
**paramedic** [3] - 28:23, 29:6, 68:5
**paramedic's** [1] - 29:1
**paramedics** [14] - 16:20, 17:13, 17:15, 17:17, 17:19, 18:2, 23:13, 23:17, 23:22, 25:19, 76:8, 88:9, 88:11, 99:18
**paraphrase** [2] - 34:10, 88:24
**part** [15] - 7:7, 7:15, 11:18, 18:11, 19:6, 22:21, 30:3, 38:3, 52:22, 64:15, 65:2, 65:15, 66:5, 101:15, 101:17
**part-time** [2] - 7:7, 7:15
**participated** [2] - 60:16, 77:8
**particular** [8] - 10:4, 11:9, 34:5, 38:12, 41:12, 44:12, 72:8, 72:18
**particularly** [4] - 12:6, 14:12, 21:24, 38:21
**Pasadena** [1] - 2:8
**pass** [2] - 28:20, 33:14
**pat** [2] - 14:19, 25:4

**pat-down** [1] - 14:19
**pathologist** [2] - 30:11, 30:15
**pathology** [1] - 58:22
**patrol** [1] - 55:11
**PC** [1] - 2:9
**PD** [1] - 79:22
**Peace** [1] - 60:7
**peace** [6] - 28:19, 68:23, 71:25, 72:6, 72:23, 72:25
**peer** [4] - 77:9, 82:23, 83:1, 83:5
**peer-reviewed** [4] - 77:9, 82:23, 83:1, 83:5
**Penal** [2] - 72:12, 72:22
**people** [21] - 5:23, 7:11, 8:24, 9:17, 13:4, 13:20, 24:14, 24:18, 25:6, 26:2, 31:18, 35:19, 37:5, 48:2, 48:7, 54:20, 55:5, 63:15, 88:15, 90:13, 92:23
**people's** [2] - 35:4, 77:9
**pepper** [1] - 8:23
**per** [2] - 5:20, 52:19
**perceive** [2] - 73:14, 73:22
**perceived** [1] - 71:4
**perceives** [1] - 69:6
**percent** [2] - 53:4, 53:21
**perfectly** [2] - 15:24, 27:7
**perform** [1] - 35:12
**performing** [1] - 9:7
**period** [6] - 6:22, 7:13, 16:10, 39:15, 93:4, 100:17
**permission** [2] - 58:2, 75:9
**permits** [3] - 45:2, 79:25, 80:5
**person** [43] - 12:15, 13:12, 13:25, 15:5, 15:9, 16:5, 16:8, 16:18, 16:21, 17:21, 20:23, 24:21, 25:19, 26:9, 31:3, 31:4, 31:6, 31:10, 37:19, 38:21, 39:2, 45:1, 45:3, 45:10, 45:12, 49:4, 60:21, 61:13, 62:6, 70:2, 72:19, 77:1, 80:14, 84:8, 93:2, 93:11, 93:15,

94:14, 94:16, 97:16, 99:24, 101:11
**person's** [3] - 26:23, 39:23, 39:24
**personally** [1] - 60:20
**persons** [1] - 62:24
**perspective** [13] - 13:23, 39:24, 50:25, 57:4, 57:10, 57:18, 63:3, 63:13, 65:25, 68:22, 69:19, 71:25, 78:6
**Philadelphia** [1] - 42:6
**phrase** [2] - 92:21, 92:25
**phrased** [2] - 57:25, 87:7
**PHYLLIS** [4] - 1:21, 104:4, 104:18, 104:20
**physical** [4] - 59:5, 70:25, 72:20, 98:1
**physically** [2] - 65:20, 100:14
**physician** [1] - 13:1
**physiology** [2] - 38:14, 58:20
**pivoted** [1] - 97:21
**place** [2] - 22:16, 62:20
**placed** [3] - 46:2, 46:15, 46:20
**placements** [1] - 75:2
**plaintiff** [4] - 4:7, 5:10, 18:24, 52:16
**Plaintiff** [2] - 1:9, 2:3
**plaintiff's** [1] - 39:5
**plaintiffs** [5] - 5:23, 6:4, 52:13, 53:5, 53:22
**play** [5] - 18:16, 18:20, 19:16, 19:20, 25:21
**played** [1] - 19:22
**playing** [4] - 15:12, 15:25, 76:22, 87:18
**plays** [1] - 102:3
**PMK** [2] - 61:14, 80:18
**point** [15] - 12:3, 14:15, 19:2, 19:18, 20:8, 22:22, 22:23, 23:3, 25:12, 26:11, 26:15, 75:2, 78:9, 91:4, 98:17
**points** [1] - 38:18
**police** [112] - 6:2, 6:14, 6:18, 7:8, 8:6, 8:8, 8:13, 8:18, 8:19, 10:9, 11:12, 12:3, 12:10, 12:22, 12:24, 12:25, 13:2, 13:23,

14:8, 16:12, 16:17, 22:19, 23:4, 23:6, 23:11, 23:24, 24:3, 24:6, 28:14, 28:17, 28:20, 29:17, 29:24, 30:1, 31:17, 33:13, 35:14, 36:3, 36:8, 36:18, 39:6, 40:6, 41:12, 41:16, 42:1, 43:13, 45:13, 45:15, 46:23, 50:24, 52:13, 52:22, 52:25, 53:4, 53:20, 54:12, 54:18, 56:2, 56:16, 57:4, 57:7, 61:22, 62:15, 62:16, 64:20, 65:7, 65:13, 65:23, 66:6, 68:11, 68:20, 69:4, 69:10, 69:15, 69:18, 69:21, 70:1, 70:7, 70:11, 70:18, 70:23, 71:11, 71:16, 71:21, 72:4, 72:9, 72:13, 72:19, 72:20, 73:21, 74:2, 74:5, 74:16, 74:22, 75:20, 78:6, 78:24, 79:15, 79:19, 80:3, 80:6, 82:5, 82:15, 84:4, 84:5, 87:10, 88:2, 88:25, 91:1, 91:5
**Police** [15] - 30:23, 37:9, 41:5, 43:9, 44:10, 44:19, 44:21, 46:1, 54:2, 54:3, 54:22, 78:24, 79:5, 79:14, 79:23
**policies** [29] - 7:9, 7:14, 9:3, 14:6, 14:7, 30:25, 36:15, 36:16, 41:14, 41:17, 41:24, 42:15, 43:14, 43:15, 43:17, 43:20, 43:23, 44:4, 44:8, 44:9, 45:8, 47:17, 79:14, 79:23, 83:18, 83:20, 89:7
**policing** [27] - 7:20, 7:21, 8:14, 8:18, 9:2, 30:5, 30:24, 31:2, 31:24, 36:11, 38:2, 38:8, 38:9, 38:10, 38:11, 40:2, 40:23, 41:4, 41:8, 42:1, 51:4, 62:6, 71:7, 78:25, 79:18
**policy** [27] - 8:15, 9:5, 39:5, 39:10, 43:10, 44:6, 44:12, 44:13, 44:23, 44:25, 45:7, 45:9, 45:19, 45:25,

46:19, 46:23, 47:16, 47:18, 47:24, 47:25, 48:1, 48:4, 56:13, 57:12, 80:2, 93:17, 95:10
**population** [3] - 8:5, 54:19, 55:3
**portion** [1] - 43:1
**portions** [1] - 33:5
**position** [81] - 6:12, 12:9, 12:17, 13:4, 13:7, 13:12, 13:20, 14:9, 14:12, 14:21, 15:3, 15:16, 16:19, 25:14, 25:20, 26:17, 26:25, 27:10, 30:6, 31:4, 31:8, 31:19, 32:1, 35:20, 39:11, 39:22, 40:11, 44:15, 45:1, 45:11, 45:13, 45:21, 46:3, 46:16, 46:20, 46:25, 47:7, 47:8, 47:20, 48:3, 48:11, 49:14, 49:15, 51:7, 54:9, 62:5, 67:25, 77:1, 79:24, 80:14, 80:22, 81:6, 81:19, 82:7, 82:17, 83:21, 86:5, 87:15, 90:9, 93:9, 93:13, 93:18, 93:22, 93:24, 94:4, 94:7, 94:13, 94:18, 94:24, 95:13, 95:24, 96:1, 96:10, 96:13, 96:16, 96:19, 101:2, 101:6, 101:14
**positional** [19] - 30:6, 42:15, 42:17, 43:2, 43:11, 43:17, 44:14, 45:20, 46:14, 50:18, 50:24, 51:4, 51:8, 78:11, 78:21, 83:10, 90:8, 92:24, 92:25
**Positional** [1] - 38:13
**positioning** [4] - 77:16, 82:1, 82:9, 90:17
**positions** [1] - 46:14
**poss** [1] - 15:22
**possibilities** [2] - 15:16, 15:21
**possible** [15] - 15:21, 15:25, 16:5, 24:20, 62:18, 62:21, 63:8, 63:17, 69:22, 71:6, 76:21, 76:24, 82:22, 87:25
**possibly** [2] - 16:25, 25:1
**possum** [5] - 15:13,

15:25, 76:22, 87:19, 102:4
**POST** [6] - 28:18, 33:17, 60:8, 60:10, 60:13
**post** [1] - 76:4
**POST's** [1] - 60:16
**post-cuffing** [1] - 76:4
**potential** [1] - 102:3
**potentially** [2] - 71:12, 87:5
**power** [1] - 20:20
**practice** [1] - 57:13
**practiced** [2] - 7:4, 55:23
**practices** [50] - 23:6, 23:12, 23:24, 24:4, 24:6, 29:24, 52:13, 52:22, 52:25, 53:4, 53:20, 56:16, 57:4, 57:7, 61:22, 62:16, 65:7, 65:13, 65:23, 66:6, 68:12, 68:21, 69:4, 69:10, 69:15, 69:18, 69:21, 70:1, 70:7, 70:11, 70:18, 70:23, 71:11, 71:16, 71:21, 72:4, 72:9, 72:19, 73:21, 74:2, 74:5, 74:10, 74:16, 74:22, 75:20, 78:6, 78:24, 80:3, 91:1, 91:5
**pre** [3] - 70:2, 70:9, 70:12
**pre-assaultive** [3] - 70:2, 70:9, 70:12
**prefer** [2] - 84:12, 84:13
**preferable** [1] - 84:7
**prejudicial** [1] - 33:12
**preparation** [1] - 10:3
**prepare** [1] - 11:8
**prepared** [3] - 4:14, 18:23, 30:4
**presence** [4] - 51:22, 70:20, 70:21, 103:4
**present** [3] - 4:8, 16:4, 25:2
**presented** [2] - 71:8, 73:5
**presenting** [1] - 70:4
**presents** [1] - 71:23
**preservation** [1] - 57:14
**PRESIDING** [1] - 1:5
**press** [1] - 7:25
**PRESTON** [4] - 1:21, 104:4, 104:18, 104:20

**pretty** [4] - 6:18, 6:19, 15:2, 44:20
**prevent** [5] - 40:7, 66:3, 69:7, 87:15, 90:5
**preventing** [1] - 27:23
**previous** [1] - 100:24
**previously** [1] - 101:20
**primary** [2] - 13:16, 20:8
**priority** [1] - 71:17
**probable** [1] - 75:25
**probes** [4] - 21:1, 21:8, 99:6, 99:24
**problem** [3] - 25:7, 37:5, 45:16
**procedurally** [1] - 9:2
**procedures** [7] - 7:9, 7:21, 41:14, 41:17, 64:20, 83:18, 83:20
**proceed** [3] - 5:4, 52:6, 92:1
**PROCEEDINGS** [2] - 1:15, 104:9
**process** [4] - 75:6, 80:11, 85:3, 85:21
**produce** [2] - 36:14, 47:16
**produced** [2] - 37:7, 71:9
**producing** [1] - 63:24
**professional** [1] - 29:20
**professionally** [1] - 5:12
**programs** [1] - 38:4
**prohibited** [1] - 45:13
**promote** [2] - 35:22, 45:2
**prone** [33] - 12:2, 12:9, 12:21, 13:7, 13:12, 13:20, 14:9, 31:4, 31:19, 35:19, 39:11, 45:13, 48:11, 49:14, 49:15, 51:7, 55:14, 61:22, 67:25, 76:3, 77:1, 78:11, 78:21, 81:6, 81:25, 82:9, 82:25, 83:6, 86:5, 86:16, 89:24
**Prone** [1] - 39:11
**pronouncement** [1] - 47:4
**proof** [1] - 33:3
**properly** [3] - 13:11, 14:10, 46:4
**proportional** [1] - 71:22
**proposition** [1] -

78:10
**prosecuting** [1] - 55:21
**protect** [1] - 92:22
**protocol** [1] - 51:12
**provide** [6] - 26:8, 36:17, 43:22, 82:20, 87:1, 87:3
**provided** [3] - 11:12, 31:2, 48:5
**proving** [1] - 56:19
**provisions** [1] - 47:18
**psychological** [1] - 17:1
**psychology** [1] - 59:25
**public** [3] - 57:12, 101:4
**publication** [3] - 30:21, 37:3, 38:12
**publications** [1] - 30:20
**published** [3] - 7:24, 78:19, 83:5
**pull** [2] - 14:24, 74:4
**pulled** [2] - 14:15, 21:14
**pulling** [1] - 74:20
**purpose** [2] - 8:16, 20:6
**purposes** [2] - 9:10, 57:1
**PURSUANT** [1] - 104:7
**push** [1] - 24:12
**pushing** [1] - 70:25
**put** [45] - 13:16, 14:22, 14:23, 15:2, 16:9, 21:7, 24:21, 25:13, 26:25, 27:10, 29:25, 31:4, 44:14, 45:10, 45:12, 45:20, 47:18, 47:19, 48:1, 48:7, 49:15, 49:16, 49:17, 50:11, 76:5, 76:25, 80:14, 81:19, 83:21, 93:9, 93:13, 94:3, 94:7, 94:12, 94:18, 95:13, 95:23, 96:1, 96:9, 96:12, 96:15, 96:18, 101:6
**puts** [1] - 22:11
**putting** [3] - 65:20, 94:21, 101:14

## Q

**qualifications** [1] - 87:8
**qualified** [1] - 59:4

**QUESTION** [1] - 75:13
**questions** [8] - 8:2, 11:7, 20:2, 30:1, 53:17, 83:22, 91:6, 92:9
**quick** [2] - 23:22, 48:17
**quickly** [8] - 22:5, 22:11, 22:17, 23:13, 24:22, 46:11, 46:18, 70:8
**quiet** [1] - 16:16
**quite** [2] - 7:25, 8:25
**quote** [11] - 33:23, 56:12, 56:13, 66:25, 67:1, 76:14, 76:15, 76:25, 77:2, 79:25
**quoting** [1] - 34:14

## R

**radio** [1] - 80:13
**radioed** [2] - 18:2, 99:17
**raise** [4] - 4:20, 16:17, 48:19, 91:16
**raised** [1] - 97:23
**ran** [1] - 97:21
**range** [1] - 59:5
**ranked** [1] - 54:9
**ranks** [1] - 6:16
**rapidly** [2] - 8:3, 63:24
**rate** [2] - 5:17, 50:10
**rather** [4] - 36:11, 86:5, 87:12, 90:3
**reached** [1] - 97:24
**reaching** [1] - 39:8
**react** [2] - 30:19, 38:22
**reaction** [1] - 48:20
**reactions** [1] - 38:20
**read** [9] - 30:13, 32:14, 32:17, 34:20, 53:16, 58:2, 75:9, 75:11
**readers** [2] - 12:11, 76:19
**reading** [1] - 11:10
**reads** [1] - 58:5
**ready** [1] - 92:8
**reality** [1] - 85:3
**realized** [1] - 98:7
**really** [12] - 7:4, 12:11, 15:1, 15:2, 16:2, 16:6, 16:14, 16:18, 21:25, 22:7, 41:9, 41:25
**REALTIME** [1] - 104:4
**rear** [1] - 22:12
**reason** [5] - 47:2,

100:1, 100:20, 101:15, 101:17
**reasonable** [20] - 14:16, 15:6, 16:17, 17:6, 21:18, 66:1, 68:23, 68:25, 69:18, 71:25, 72:2, 73:14, 73:21, 74:6, 74:23, 75:20, 80:6, 88:2, 91:1
**reasonableness** [1] - 70:19
**reasons** [6] - 6:7, 13:5, 13:16, 29:18, 81:7, 100:4
**Reay** [10] - 30:12, 30:14, 30:15, 35:3, 39:18, 78:7, 78:10, 78:14, 78:18
**REAY** [1] - 78:7
**Reay's** [3] - 30:20, 37:12, 39:14
**recanted** [1] - 78:19
**received** [4] - 18:16, 18:20, 33:21, 81:25
**recent** [1] - 47:4
**recess** [4] - 51:15, 51:21, 51:24, 103:6
**recognized** [1] - 23:15
**recognizing** [1] - 26:4
**recollection** [3] - 53:19, 77:22, 95:23
**recollections** [1] - 62:23
**recommendation** [5] - 35:18, 37:15, 37:16, 38:24, 39:1
**recommendations** [4] - 33:15, 41:18, 41:24, 79:15
**recommended** [2] - 42:14, 46:24
**recommending** [2] - 42:4, 43:9
**record** [3] - 5:2, 19:23, 91:23
**recovery** [45] - 12:17, 13:4, 15:16, 16:19, 25:13, 25:19, 26:25, 27:10, 30:6, 31:8, 31:25, 40:11, 44:15, 45:10, 45:21, 46:20, 46:24, 47:19, 51:8, 79:24, 80:14, 80:22, 81:19, 82:6, 82:17, 83:21, 86:5, 87:15, 93:9, 93:13, 93:18, 93:21, 93:23, 94:4, 94:7, 94:13, 95:13, 95:24, 96:1, 96:10,

96:13, 96:16, 96:19, 101:6, 101:14
**recross** [1] - 89:11
**RECROSS** [2] - 3:7, 89:13
**RECROSS-EXAMINATION** [2] - 3:7, 89:13
**red** [5] - 16:15, 25:17, 26:4, 27:6, 45:23
**redact** [1] - 33:4
**REDIRECT** [2] - 3:7, 84:1
**redirect** [2] - 83:23, 89:23
**refer** [1] - 42:23
**reference** [1] - 42:16
**referred** [4] - 19:1, 30:4, 47:6, 49:7
**referring** [1] - 43:7
**refrain** [1] - 72:5
**refresh** [2] - 53:9, 53:19
**regard** [3] - 24:13, 95:8, 95:10
**regarding** [5] - 11:9, 30:5, 63:18, 64:2, 82:5
**regardless** [1] - 13:8
**regards** [2] - 88:22, 93:23
**REGULATIONS** [1] - 104:11
**related** [3] - 7:9, 16:8, 77:12
**relates** [1] - 41:13
**relevance** [6] - 10:24, 32:21, 33:13, 40:21, 47:10, 86:18
**relevant** [1] - 33:5
**relied** [2] - 33:22, 82:9
**relieved** [1] - 29:20
**rely** [3] - 32:3, 39:8, 80:14
**remain** [1] - 52:3
**remains** [2] - 16:10, 26:17
**remedial** [1] - 47:11
**remedy** [1] - 31:24
**remember** [5] - 55:5, 67:16, 76:16, 82:12, 102:22
**remove** [1] - 49:19
**removed** [1] - 99:25
**removes** [1] - 27:12
**render** [2] - 13:2, 59:4
**repeating** [1] - 98:10
**report** [14] - 30:3, 30:4, 32:22, 40:20, 48:18, 61:5, 73:3,

73:12, 74:18, 77:23, 78:9, 78:13, 82:12, 82:14
**REPORTED** [1] - 104:9
**reported** [2] - 54:12, 66:8
**Reporter** [1] - 1:22
**REPORTER** [3] - 104:1, 104:5, 104:21
**REPORTER'S** [1] - 1:15
**reports** [1] - 11:12
**representation** [1] - 11:23
**requested** [1] - 17:24
**require** [2] - 46:1, 47:19
**required** [1] - 48:1
**requirements** [1] - 44:14
**requires** [2] - 46:24, 84:23
**requiring** [1] - 83:21
**Research** [1] - 41:6
**research** [8] - 38:5, 38:8, 39:20, 80:20, 80:21, 82:3, 83:12, 103:1
**resident** [1] - 11:18
**resistance** [7] - 66:3, 70:23, 70:24, 70:25, 71:3, 71:4, 81:6
**resisting** [4] - 12:1, 72:5, 72:13, 81:5
**resistive** [3] - 12:12, 24:15, 66:25
**respiration** [1] - 43:4
**respond** [9] - 8:18, 8:21, 16:13, 18:3, 23:1, 23:13, 27:2, 43:24, 44:2
**responded** [1] - 23:7
**responding** [2] - 16:24, 87:24
**response** [4] - 15:24, 65:8, 65:14, 90:18
**restrain** [1] - 55:14
**restrained** [5] - 35:19, 44:16, 45:10, 45:17, 46:13
**restraining** [1] - 81:18
**restraint** [27] - 12:2, 12:21, 42:17, 43:3, 43:11, 50:14, 50:17, 50:23, 51:3, 51:9, 65:19, 66:9, 66:14, 74:8, 74:9, 76:4, 77:9, 77:13, 77:15, 78:11, 78:21, 81:11,

82:25, 83:7, 89:24, 92:20, 92:21
**restraints** [1] - 10:9
**Restraint—Still** [1] - 39:12
**restrict** [1] - 93:6
**restricted** [1] - 90:12
**result** [1] - 77:24
**results** [1] - 61:5
**retained** [3] - 5:9, 6:1, 52:12
**retired** [4] - 5:13, 7:5, 54:2, 54:9
**review** [16] - 5:19, 7:14, 10:3, 29:22, 39:6, 39:10, 47:24, 49:22, 64:11, 74:13, 74:25, 76:11, 79:22, 83:1, 89:1, 95:22
**reviewed** [17] - 11:11, 11:14, 41:18, 51:1, 61:1, 61:4, 61:8, 61:13, 61:18, 68:4, 77:9, 80:17, 82:23, 83:1, 83:5, 83:12
**reviewing** [5] - 11:8, 62:11, 67:7, 78:18, 81:23
**reviews** [1] - 30:24
**revised** [1] - 45:14
**revived** [1] - 10:8
**ride** [1] - 6:20
**rights** [2] - 56:2, 57:14
**rise** [2] - 67:15, 67:24
**rising** [1] - 27:23
**risk** [20] - 14:9, 15:4, 15:19, 15:20, 43:2, 43:10, 48:18, 48:19, 48:25, 49:3, 49:11, 49:24, 50:2, 50:6, 50:11, 50:14, 86:3, 86:16, 87:4, 88:16
**risks** [1] - 40:5
**RIVERSIDE** [4] - 1:3, 1:11, 4:1
**Riverside** [15] - 4:4, 4:12, 13:19, 14:6, 47:25, 49:23, 50:13, 61:14, 80:19, 83:19, 88:14, 92:14, 92:18, 94:1, 95:2
**riverside** [2] - 1:16, 1:23
**robbery** [1] - 85:19
**robust** [1] - 44:9
**role** [2] - 8:12, 36:8
**roll** [8] - 13:10, 13:22, 14:12, 14:20, 24:9, 24:19, 28:2, 102:5
**rolled** [4] - 28:4, 28:5,

28:9, 37:20
**rolling** [2] - 12:18, 40:8
**rule** [7] - 40:24, 41:4, 65:24, 69:1, 69:4, 79:18, 82:17
**Rule** [1] - 33:12
**rules** [4] - 9:1, 9:4, 9:11, 68:10
**rulings** [1] - 34:18
**run** [1] - 99:2
**rushed** [1] - 73:13
**rushes** [2] - 23:10, 73:15

## S

**safe** [16] - 9:20, 9:21, 17:21, 17:23, 71:18, 80:13, 83:7, 93:11, 93:15, 94:8, 94:10, 94:13, 95:4, 95:14, 101:10, 101:11
**safely** [1] - 13:25
**safety** [11] - 9:12, 9:15, 9:17, 45:2, 79:25, 80:5, 81:7, 101:3, 101:19, 102:17
**SAIN** [54] - 2:15, 3:6, 3:7, 4:10, 10:17, 10:24, 14:2, 18:14, 19:6, 19:10, 28:6, 29:12, 32:21, 33:7, 33:10, 34:25, 35:9, 36:5, 40:21, 42:20, 47:10, 48:22, 50:3, 52:2, 52:7, 52:9, 56:11, 57:3, 58:2, 58:11, 58:12, 68:18, 68:19, 75:8, 75:12, 78:3, 78:4, 81:2, 83:22, 84:10, 85:5, 85:10, 86:8, 86:18, 87:6, 88:17, 89:12, 89:14, 89:22, 91:6, 97:11, 99:15, 100:10, 101:8
**Sain** [4] - 4:10, 19:5, 33:6, 51:25
**San** [11] - 31:17, 32:3, 32:24, 32:25, 33:13, 34:12, 35:5, 35:6, 35:12, 37:9, 78:24
**sanctity** [1] - 9:23
**sat** [3] - 35:22, 37:20, 86:5
**saw** [4] - 17:14, 23:3, 98:3, 99:14
**scared** [1] - 76:14

scenario [1] - 10:13
scene [12] - 11:18, 17:19, 17:20, 18:3, 60:20, 60:24, 63:3, 63:15, 66:13, 80:4, 80:8, 94:11
scientific [4] - 82:8, 82:16, 82:18, 82:20
scope [6] - 48:22, 78:1, 85:5, 86:8, 87:7, 89:19
Sean [4] - 61:15, 80:18, 83:3
search [2] - 14:19, 71:13
searched [1] - 15:5
seat [2] - 4:25, 91:21
seated [11] - 13:25, 14:12, 14:21, 15:3, 28:11, 31:8, 46:3, 46:15, 48:2, 68:3, 93:9
Seattle [2] - 30:16, 42:5
second [15] - 7:23, 7:24, 19:15, 20:25, 21:12, 21:13, 21:15, 21:25, 22:4, 22:10, 30:22, 73:14, 74:4, 98:21, 100:1
seconds [24] - 16:11, 18:1, 20:14, 22:6, 22:18, 22:25, 23:16, 24:7, 25:9, 25:14, 28:3, 88:10, 89:18, 95:24, 96:1, 96:5, 96:9, 96:12, 96:15, 96:18, 96:23, 96:24, 99:2, 99:3
SECTION [1] - 104:7
Section [2] - 72:13, 72:22
secured [5] - 17:21, 31:3, 49:19, 74:15
securing [1] - 71:18
see [41] - 13:13, 13:15, 14:19, 17:1, 19:15, 20:3, 21:11, 21:14, 21:25, 22:8, 26:15, 26:17, 26:20, 26:22, 27:1, 27:15, 28:23, 29:6, 29:11, 32:12, 35:14, 47:24, 48:5, 49:22, 50:12, 62:18, 62:19, 63:7, 67:3, 67:24, 80:15, 84:17, 84:19, 86:4, 88:3, 94:22, 94:25, 97:8, 97:10, 97:17, 101:13

seeing [1] - 84:18
sees [1] - 63:9
seminars [1] - 30:25
separate [1] - 73:9
sergeant [4] - 6:16, 6:22, 61:15, 83:3
Sergeant [1] - 61:15
serious [4] - 69:7, 69:12, 87:25, 88:2
served [4] - 53:24, 54:7, 54:19, 60:10
services [3] - 5:15, 52:17, 52:22
Session [1] - 1:11
set [3] - 21:13, 38:10, 78:24
sets [2] - 36:3, 44:5
settlement [3] - 40:18, 41:15, 42:14
seven [2] - 55:10, 97:2
several [1] - 59:13
SHERIFF [1] - 1:12
Sheriff [2] - 4:12, 61:19
Sheriff's [9] - 13:19, 14:7, 61:14, 80:19, 83:19, 92:14, 92:18, 94:1, 95:2
sheriff's [3] - 81:3, 82:1, 93:21
SHERIFF'S [1] - 1:11
SHERIFF-CORONER [1] - 1:12
sheriffs [1] - 36:12
shirt [3] - 14:14, 16:3, 25:2
shirtless [1] - 99:9
shit [1] - 76:14
shoes [1] - 99:11
shoot [1] - 20:9
shooting [1] - 90:2
shortly [1] - 98:7
should've [1] - 28:11
shoulder [1] - 24:9
show [4] - 18:9, 24:8, 45:8, 63:15
shown [2] - 18:11, 22:22
shows [2] - 82:24, 94:3
sic [1] - 11:15
side [24] - 12:18, 13:11, 13:17, 13:22, 13:25, 14:23, 15:3, 19:4, 24:19, 24:22, 26:18, 28:11, 31:8, 35:22, 37:20, 40:8, 45:4, 46:3, 48:2, 48:8, 68:3, 93:10, 94:21, 102:5

Sidebar [1] - 33:9
sidebar [1] - 35:1
sight [1] - 67:9
signal [1] - 26:9
significance [1] - 27:5
signs [1] - 27:20
silently [1] - 53:16
similar [3] - 31:23, 35:15, 41:4
similarly [1] - 46:13
simple [2] - 39:1, 51:6
simply [12] - 6:9, 8:19, 12:17, 14:20, 14:23, 14:24, 17:18, 21:14, 40:8, 49:15, 51:10, 65:5
single [5] - 11:10, 81:20, 82:7, 82:20
sit [6] - 13:11, 13:17, 13:21, 45:3, 48:7, 95:4
sitted [1] - 28:11
sitting [4] - 12:18, 26:19, 40:8, 94:20
situation [12] - 10:10, 16:13, 17:7, 20:25, 21:19, 24:16, 25:1, 64:23, 71:18, 84:6, 85:15, 85:16
situations [4] - 8:17, 8:21, 43:24, 85:22
size [1] - 55:3
skills [1] - 84:6
slightly [2] - 14:15, 62:22
slippery [1] - 92:7
slow [4] - 64:7, 64:11, 65:10, 65:12
slower [3] - 64:12, 85:14, 85:22
smaller [3] - 8:11, 55:7
smell [2] - 33:15, 33:25
SMITH [1] - 2:15
society [1] - 84:4
soft [1] - 65:17
solemnly [2] - 4:21, 91:17
someone [26] - 17:8, 23:7, 55:15, 56:5, 57:18, 64:13, 64:22, 66:25, 70:24, 77:15, 85:2, 86:16, 87:3, 93:4, 93:8, 93:13, 94:3, 94:7, 94:24, 95:3, 95:13, 101:6, 101:14, 102:3, 102:5, 102:8
sometimes [7] - 6:5,

6:9, 44:6, 49:7, 63:6, 63:9, 63:14
somewhere [1] - 55:6
Sonia [1] - 61:10
soon [8] - 15:14, 18:1, 28:10, 39:2, 45:2, 46:4, 76:9, 79:25
sooner [1] - 28:5
sorry [11] - 10:19, 11:7, 18:18, 19:6, 20:3, 37:16, 47:2, 47:3, 50:20, 53:14
sort [6] - 16:25, 21:20, 27:11, 40:3, 43:19, 45:17
sorts [1] - 41:1
sound [1] - 54:4
span [1] - 40:25
speaking [3] - 10:12, 27:8, 84:7
special [2] - 40:9
specific [8] - 10:3, 16:23, 44:14, 57:19, 60:17, 77:22, 93:20, 101:5
specifically [5] - 12:3, 28:16, 37:9, 48:10, 93:9
speculation [1] - 87:7
spell [2] - 5:1, 91:22
spent [1] - 55:10
sprays [1] - 8:23
spread [2] - 20:11, 20:13
squirming [1] - 12:10
stack [2] - 37:22, 40:18
staff [1] - 60:11
stage [4] - 17:18, 18:5, 23:2, 76:8
staging [1] - 17:18
stance [2] - 63:22, 70:3
stand [2] - 101:1, 102:6
standard [47] - 16:12, 33:4, 33:14, 33:16, 38:10, 41:7, 41:25, 42:3, 44:5, 46:5, 46:7, 50:1, 57:7, 57:24, 64:20, 65:7, 65:12, 65:23, 66:6, 68:11, 68:20, 69:4, 69:10, 69:15, 69:21, 70:1, 70:7, 70:11, 70:18, 70:23, 71:11, 71:16, 71:21, 72:4, 72:9, 72:19, 73:21, 74:1, 74:5, 74:15, 75:20, 80:3, 80:7,

86:23, 87:1, 88:25, 91:1
standards [12] - 13:23, 23:4, 28:19, 29:25, 30:1, 30:5, 36:3, 36:8, 36:10, 56:9, 68:10, 78:25
Standards [1] - 60:7
stands [1] - 43:4
start [1] - 16:5
started [2] - 6:15, 7:17
starts [1] - 22:9
state [12] - 5:1, 7:3, 28:18, 33:22, 67:10, 67:22, 80:23, 82:18, 85:3, 89:15, 91:22, 100:3
State [1] - 7:1
statement [7] - 12:20, 12:21, 13:18, 15:9, 19:7, 28:14, 82:7
statements [5] - 11:20, 11:23, 17:3, 33:20, 67:25
STATES [4] - 1:1, 104:5, 104:7, 104:12
States [8] - 1:22, 9:23, 12:23, 31:12, 35:8, 35:16, 36:9, 38:1
STENOGRAPHICALLY [1] - 104:9
stenojag@aol.com [1] - 1:24
step [4] - 14:7, 45:11, 51:23, 103:5
stick [1] - 51:4
still [13] - 7:18, 15:11, 15:17, 15:24, 16:12, 16:16, 21:13, 24:15, 29:12, 39:11, 102:1, 102:4
stipulated [1] - 18:13
stipulation [2] - 18:10, 18:23
stomach [4] - 39:3, 46:3, 49:4, 94:25
stool [1] - 8:14
stop [7] - 25:10, 29:11, 29:18, 29:20, 36:25, 102:16
stopped [10] - 19:23, 96:6, 96:8, 96:9, 96:12, 96:15, 96:18, 96:22, 100:16, 100:22
straight [1] - 22:1
strap [1] - 62:7
strategy [1] - 31:24
street [1] - 84:24
Street [3] - 1:23, 2:10,

2:16
**strength** [1] - 41:2
**stress** [2] - 23:20, 50:11
**strike** [1] - 99:7
**striking** [1] - 17:5
**structure** [1] - 5:17
**struggle** [3] - 38:15, 38:20, 38:23
**struggling** [3] - 31:4, 77:1, 77:3
**studied** [2] - 33:16, 78:15
**studies** [17] - 30:13, 30:22, 31:1, 35:4, 37:8, 38:11, 39:14, 47:5, 77:9, 77:12, 78:14, 78:19, 82:13, 82:15, 82:16, 83:1, 83:6
**study** [20] - 30:11, 31:13, 31:16, 31:23, 32:3, 32:24, 32:25, 33:13, 34:5, 34:12, 34:14, 35:5, 35:6, 35:12, 37:10, 62:4, 82:8, 82:19, 82:21, 82:24
**stun** [1] - 21:3
**subject** [18] - 45:17, 46:2, 64:18, 65:20, 65:21, 70:2, 70:4, 70:7, 72:10, 72:11, 72:12, 72:21, 74:21, 76:14, 79:24, 81:18, 81:19, 84:23
**subject's** [8] - 27:18, 42:18, 43:3, 43:12, 59:5, 65:8, 65:14, 82:2
**subjects** [1] - 83:7
**subsequent** [1] - 47:10
**substance** [2] - 32:18, 98:13
**substantially** [1] - 69:12
**successfully** [1] - 28:20
**Successor** [1] - 1:7
**sudden** [4] - 16:11, 16:14, 45:21, 50:14
**suddenly** [5] - 16:16, 45:17, 45:22, 73:12, 85:23
**suing** [1] - 5:24
**Suite** [3] - 2:5, 2:10, 2:16
**sum** [4] - 81:7, 83:3, 83:7, 83:9

**summary** [1] - 40:13
**supervision** [2] - 8:16, 9:6
**supervisor** [3] - 8:20, 43:25, 55:11
**supine** [2] - 62:1, 89:18
**support** [1] - 78:10
**supported** [2] - 82:18, 82:21
**supposed** [2] - 79:19, 81:19
**surface** [1] - 62:2
**surveyed** [1] - 35:7
**suspect** [14] - 63:19, 63:22, 63:25, 66:18, 71:8, 71:12, 71:13, 71:17, 71:18, 71:23, 71:24, 81:5, 81:6
**suspect's** [1] - 63:18
**sustained** [13] - 10:18, 10:20, 10:25, 28:7, 35:10, 36:6, 42:21, 48:23, 50:4, 56:10, 78:2, 85:7, 97:12
**SWAT** [1] - 6:20
**swear** [2] - 4:21, 91:17
**sworn** [1] - 54:23
**synchronized** [1] - 19:12

**T**

**tactically** [2] - 13:21, 13:23
**tactics** [3] - 84:19, 84:20, 85:4
**talks** [2] - 15:20, 46:14
**tape** [2] - 25:8, 29:22
**tased** [8] - 12:8, 20:22, 97:20, 98:16, 98:17, 99:21, 99:22
**TASER** [33] - 17:4, 20:4, 20:6, 20:7, 20:8, 20:14, 20:15, 20:20, 20:24, 21:1, 21:17, 21:19, 22:2, 23:19, 43:5, 50:9, 59:13, 59:16, 59:19, 59:22, 68:12, 68:15, 68:21, 73:13, 73:14, 73:25, 74:4, 75:18, 97:24, 99:2, 100:25, 101:21
**tasered** [1] - 88:5
**TASERs** [3] - 8:23, 21:21, 23:11
**tases** [1] - 98:19
**tasing** [7] - 21:21, 22:4, 50:1, 84:17,

98:21, 98:24, 100:4
**taught** [1] - 93:24
**team** [1] - 6:20
**technically** [1] - 90:6
**technique** [1] - 42:17
**techniques** [4] - 43:3, 43:11, 64:6, 90:20
**technology** [2] - 37:25, 38:7
**ten** [3] - 10:14, 11:4
**term** [6] - 61:22, 62:1, 63:18, 64:5, 65:16
**terms** [11] - 11:7, 11:8, 50:16, 51:1, 51:3, 51:10, 56:16, 57:5, 61:21, 62:15, 64:25
**test** [2] - 33:15, 33:25
**testified** [18] - 39:18, 48:9, 53:3, 53:5, 53:20, 53:21, 67:8, 76:3, 76:18, 76:21, 76:25, 77:5, 78:5, 80:20, 81:1, 81:3, 81:17, 89:23
**testify** [9] - 5:23, 28:25, 29:2, 34:21, 50:6, 52:19, 52:23, 68:7, 87:19
**testifying** [3] - 19:13, 56:9, 86:24
**testimony** [28] - 4:21, 5:20, 11:9, 53:9, 56:14, 59:4, 61:19, 67:7, 67:11, 67:22, 68:4, 77:23, 80:17, 80:23, 81:7, 81:23, 83:4, 83:8, 83:9, 83:14, 87:17, 88:14, 88:17, 88:22, 89:16, 91:17, 95:14, 101:8
**tests** [1] - 28:20
**textbook** [4] - 7:24, 21:20, 21:24, 22:13
**textbooks** [1] - 7:22
**THAT** [3] - 104:6, 104:7, 104:10
**that..** [1] - 87:1
**THE** [106] - 4:3, 4:9, 4:13, 4:18, 4:20, 4:24, 4:25, 5:3, 5:4, 10:18, 10:20, 10:25, 11:2, 14:4, 14:6, 18:13, 18:16, 18:20, 19:5, 19:8, 19:14, 19:16, 28:7, 28:25, 29:13, 29:14, 32:16, 32:22, 32:24, 33:1, 33:6, 33:8, 33:18, 34:1, 34:3, 34:7, 34:11, 34:16, 34:19,

34:23, 35:10, 36:6, 40:22, 40:23, 42:21, 47:13, 47:15, 48:14, 48:23, 50:4, 50:19, 51:15, 51:23, 51:25, 52:3, 52:5, 52:6, 56:10, 56:25, 57:2, 58:6, 58:9, 75:11, 78:2, 80:25, 81:1, 83:23, 84:11, 84:12, 85:7, 85:11, 85:13, 86:10, 86:19, 86:25, 87:9, 87:10, 88:18, 89:11, 89:20, 89:21, 91:8, 91:9, 91:11, 91:15, 91:16, 91:20, 91:21, 91:24, 92:1, 97:12, 99:16, 99:17, 100:11, 102:12, 102:21, 103:5, 104:5, 104:6, 104:7, 104:8, 104:9, 104:10, 104:11, 104:12
**themselves** [2] - 8:19, 69:7
**therefore** [4] - 80:9, 85:3, 87:14, 90:4
**they've** [8] - 12:8, 13:20, 15:5, 16:2, 30:9, 41:24, 44:15, 86:16
**thick** [1] - 44:7
**thin** [1] - 20:10
**third** [2] - 8:16, 29:20
**THIS** [1] - 104:15
**threat** [14] - 15:20, 15:23, 15:24, 63:19, 63:23, 69:1, 69:6, 70:13, 70:20, 70:22, 71:5, 71:23, 71:24, 73:5
**threaten** [2] - 97:3, 97:6
**threatening** [9] - 66:18, 66:22, 71:1, 73:15, 73:22, 89:17, 93:12, 93:16, 101:12
**threats** [1] - 70:3
**three** [9] - 6:23, 8:14, 8:15, 26:11, 26:12, 27:8, 27:9, 29:18
**three-legged** [1] - 8:14
**throughout** [4] - 31:12, 35:7, 35:16, 36:9
**tie** [4] - 62:5, 62:6, 62:12, 78:15
**tied** [2] - 31:20

**timer** [1] - 19:24
**TITLE** [1] - 104:7
**title** [1] - 38:12
**TO** [1] - 104:7
**today** [15] - 5:9, 11:9, 32:2, 43:8, 46:5, 52:20, 56:12, 56:14, 61:18, 67:13, 67:14, 67:16, 73:18, 76:11, 82:12
**together** [2] - 20:13, 29:25
**TONY** [1] - 2:15
**Tony** [1] - 4:10
**took** [1] - 31:1
**top** [1] - 53:7
**TORI** [1] - 2:16
**Tori** [1] - 4:11
**torso** [2] - 67:5, 67:10
**total** [2] - 55:4, 55:10
**totality** [8] - 66:2, 66:7, 66:12, 66:17, 68:23, 72:1, 73:4, 87:23
**touch** [4] - 21:2, 97:19, 98:19
**touched** [1] - 43:19
**touching** [2] - 21:8, 67:10
**toward** [3] - 17:11, 26:20, 63:23
**towards** [6] - 97:21, 97:22, 97:23, 97:24, 101:20
**toxicology** [2] - 58:17, 61:5
**Tracy** [2] - 4:3, 5:10
**TRACY** [1] - 1:7
**train** [12] - 7:13, 24:14, 24:21, 36:19, 37:17, 43:23, 44:3, 51:5, 51:11, 83:11, 85:18
**trained** [57] - 12:23, 12:24, 12:25, 13:3, 13:24, 20:19, 21:19, 22:19, 25:11, 27:18, 28:15, 29:17, 48:6, 48:21, 50:13, 65:7, 65:13, 65:24, 66:4, 66:5, 66:25, 67:15, 67:18, 68:15, 69:2, 69:5, 70:1, 71:4, 71:11, 71:22, 72:2, 72:4, 72:12, 78:11, 79:23, 81:18, 81:21, 85:1, 86:2, 86:6, 86:15, 87:3, 87:11, 87:12, 89:24, 92:20, 92:22, 92:24, 93:1, 93:4, 93:8, 93:13,

95:2, 100:22, 101:5, 101:18, 102:14

**Training** [1] - 60:7

**training** [65] - 6:21, 8:12, 8:13, 8:15, 8:16, 9:1, 9:5, 9:10, 12:2, 12:5, 12:14, 13:23, 14:8, 15:13, 15:14, 16:13, 23:4, 24:13, 26:7, 28:19, 29:16, 31:1, 31:2, 36:14, 36:15, 36:18, 37:7, 39:25, 40:9, 41:17, 43:17, 43:21, 43:22, 44:9, 48:6, 48:10, 59:2, 61:15, 69:10, 80:16, 80:19, 80:20, 81:4, 83:4, 86:24, 88:25, 89:6, 90:8, 90:11, 90:13, 92:17, 93:17, 93:20, 93:23, 94:2, 94:3, 95:7, 98:14, 99:20, 100:9, 101:13

**trains** [6] - 13:19, 49:23, 81:4, 86:20, 88:14, 89:5

**tranquil** [1] - 45:18

**tranquility** [1] - 45:22

**TRANSCRIPT** [3] - 1:15, 104:8, 104:10

**transported** [1] - 99:24

**transporting** [1] - 45:12

**treat** [1] - 71:12

**treatment** [1] - 81:11

**Trial** [1] - 1:11

**trial** [1] - 55:24

**TRIAL** [1] - 1:15

**tried** [1] - 97:25

**tries** [1] - 27:3

**trigger** [2] - 21:14, 74:4

**true** [107] - 17:12, 25:7, 52:14, 52:20, 52:23, 53:5, 53:25, 55:12, 55:16, 55:17, 55:19, 55:22, 55:25, 56:1, 56:3, 56:4, 56:7, 57:21, 59:14, 59:17, 60:13, 61:2, 61:6, 61:10, 62:8, 62:13, 62:14, 62:20, 63:4, 63:7, 63:10, 63:11, 63:16, 63:20, 63:25, 64:3, 64:9, 64:18, 64:22, 65:5, 65:6, 65:9, 65:14, 65:17, 66:4, 66:9,

66:15, 66:18, 67:1, 67:5, 67:20, 68:13, 68:16, 69:8, 69:13, 69:19, 69:24, 70:5, 70:9, 70:13, 70:20, 71:1, 71:5, 71:9, 71:14, 71:19, 72:2, 72:6, 72:14, 72:23, 72:24, 73:1, 73:6, 73:10, 73:16, 73:19, 73:23, 74:2, 74:6, 74:13, 74:16, 74:17, 74:23, 75:2, 75:3, 75:5, 75:15, 75:16, 75:21, 76:1, 76:12, 76:19, 76:23, 77:6, 77:7, 77:11, 77:20, 77:21, 79:16, 79:17, 80:15, 81:13, 81:14, 82:3, 83:16, 83:19, 90:8

**TRUE** [1] - 104:8

**truly** [1] - 22:21

**truth** [6] - 4:22, 4:23, 91:18, 91:19

**try** [6] - 24:9, 26:22, 51:10, 51:20, 92:8, 103:1

**trying** [7] - 16:6, 49:18, 64:7, 64:11, 64:12, 85:15, 100:24

**tuck** [1] - 102:6

**turn** [5] - 6:5, 6:8, 37:2, 45:3, 46:3

**turned** [2] - 26:20, 100:18

**turning** [2] - 57:23, 60:19

**Twelfth** [1] - 1:23

**twice** [3] - 17:4, 17:5, 88:5

**two** [24] - 6:17, 7:22, 13:16, 13:24, 14:12, 14:20, 15:2, 16:4, 19:2, 20:9, 22:25, 23:16, 29:19, 34:2, 54:6, 54:15, 59:18, 62:22, 63:13, 73:9, 84:24, 100:25

**two-dimensional** [1] - 63:13

**two-way** [1] - 84:24

**type** [2] - 64:25, 98:8

**types** [5] - 27:25, 38:11, 49:12, 85:22, 85:25

**U**

**ultimately** [1] - 64:17

**unable** [6] - 56:6, 57:20, 74:25, 75:4, 75:13, 82:20

**unarmed** [2] - 71:8, 71:13

**unaware** [1] - 89:16

**unconscious** [1] - 26:3

**unconstitutional** [1] - 56:21

**under** [35] - 17:8, 20:20, 32:12, 33:12, 50:11, 52:3, 54:23, 64:20, 65:7, 65:12, 65:23, 66:1, 67:14, 68:11, 68:20, 68:23, 69:4, 69:15, 69:21, 70:1, 70:7, 70:11, 70:18, 71:11, 71:16, 71:21, 71:25, 72:4, 72:9, 72:19, 73:4, 73:21, 80:3, 98:12, 100:3

**under-the-influence** [1] - 100:3

**undercover** [1] - 6:20

**undergo** [1] - 38:20

**undergone** [2] - 7:8, 41:23

**underneath** [1] - 22:15

**unique** [1] - 64:23

**unit** [2] - 6:21, 20:10

**UNITED** [3] - 104:5, 104:7, 104:12

**uNITED** [1] - 1:1

**United** [8] - 1:22, 9:23, 12:22, 31:12, 35:7, 35:16, 36:9, 38:1

**university** [2] - 7:3, 7:25

**unknown** [1] - 81:12

**unless** [4] - 21:5, 33:20, 101:10, 101:11

**unlikely** [2] - 87:20, 87:22

**unobstructed** [1] - 68:8

**unprofessional** [1] - 34:4

**unsound** [1] - 13:21

**untruthful** [1] - 62:25

**up** [48] - 8:2, 12:18, 13:11, 13:17, 13:21, 14:12, 15:8, 15:21, 20:2, 20:17, 20:21, 21:11, 21:23, 21:25, 22:22, 23:2, 26:11, 26:15, 28:11, 28:12,

30:15, 31:8, 31:20, 35:22, 37:20, 38:9, 40:8, 45:3, 48:7, 50:17, 66:8, 66:14, 68:3, 74:14, 75:19, 81:17, 84:18, 84:20, 86:5, 88:5, 91:3, 93:9, 94:20, 95:4, 97:24, 98:16, 101:1, 102:6

**upper** [1] - 14:23

**upright** [1] - 46:15

**uses** [1] - 74:14

**V**

**vague** [5] - 10:17, 85:10, 86:10, 99:15, 100:10

**values** [1] - 9:22

**variety** [2] - 6:25, 44:2

**various** [1] - 7:20

**Vasquez** [1] - 19:13

**verbal** [3] - 63:23, 70:3, 84:5

**verbalizing** [2] - 25:16, 26:5

**verbally** [2] - 97:3, 97:6

**Vickers** [5] - 61:15, 80:18, 80:19, 88:22

**Vickers'** [3] - 81:23, 83:3, 88:13

**vid** [1] - 11:16

**video** [25] - 11:16, 11:17, 11:21, 11:25, 14:19, 18:9, 19:1, 19:9, 19:11, 19:12, 19:22, 22:23, 22:24, 25:21, 61:2, 63:4, 63:14, 67:3, 75:4, 75:14, 76:11, 84:17, 95:16, 95:22, 96:4

**view** [1] - 19:4

**views** [1] - 19:2

**Vilke** [1] - 78:19

**violated** [2] - 72:12, 83:18

**violation** [3] - 57:11, 57:14, 72:22

**violent** [1] - 50:9

**visualize** [1] - 26:23

**volume** [1] - 90:15

**volumes** [1] - 44:7

**vs** [1] - 1:10

**W**

**waiting** [1] - 15:18

**walking** [1] - 84:18

**Washington** [1] - 30:16

**watched** [1] - 95:18

**watching** [2] - 67:15, 96:4

**ways** [1] - 20:8

**weapon** [10] - 25:3, 43:5, 63:24, 68:16, 68:17, 70:4, 71:9, 97:8, 97:10, 97:17

**weapons** [5] - 15:6, 16:3, 25:5, 101:2, 101:3

**wearing** [5] - 11:16, 14:14, 16:3, 25:2

**WEDNESDAY** [1] - 4:1

**Wednesday** [1] - 1:17

**week** [1] - 19:13

**weight** [8] - 13:8, 49:5, 49:16, 49:18, 49:19, 75:1, 76:5, 93:5

**west** [1] - 46:21

**West** [1] - 2:16

**western** [1] - 7:3

**Westminster** [6] - 7:6, 7:8, 8:7, 54:3, 54:25, 55:3

**whisper** [1] - 25:22

**whole** [3] - 4:23, 86:21, 91:18

**wide** [2] - 6:24, 44:2

**widespread** [1] - 10:15

**wires** [1] - 20:10

**WITH** [1] - 104:11

**withstand** [1] - 41:3

**witness** [15] - 4:15, 4:17, 5:10, 5:21, 7:17, 18:25, 19:12, 29:2, 33:19, 39:18, 60:20, 61:14, 62:17, 62:18, 62:19

**WITNESS** [18] - 4:24, 5:3, 11:2, 14:6, 29:14, 40:23, 47:15, 52:5, 57:2, 81:1, 84:12, 85:13, 87:10, 89:21, 91:9, 91:20, 91:24, 99:17

**witnesses** [1] - 62:22

**WITNESSES** [1] - 3:3

**Woodland** [1] - 2:5

**word** [1] - 98:10

**words** [2] - 76:13, 79:25

**works** [1] - 20:7

**world** [1] - 40:2

**worn** [3] - 11:16, 19:9, 19:11

**worth** [1] - 83:6

**wrist** [2] - 14:22, 22:12
**wrists** [1] - 31:21
**write** [1] - 47:17
**writing** [1] - 95:7
**writings** [1] - 78:6
**written** [6] - 7:19, 7:25, 43:17, 80:2, 93:20, 95:10
**wrongdoing** [1] - 41:13
**wrote** [1] - 30:3

## Y

**year** [2] - 7:16, 59:18
**years** [17] - 5:22, 6:15, 6:17, 6:23, 6:25, 7:19, 36:24, 36:25, 41:9, 41:22, 53:1, 55:10, 59:13, 59:18, 83:12, 92:13, 94:1
**years'** [1] - 83:6
**yesterday** [10] - 11:20, 12:2, 12:21, 13:18, 15:9, 28:14, 30:10, 50:17, 50:19, 50:23
**York** [6] - 7:24, 44:19, 44:21, 79:5, 79:22, 79:23
**young** [1] - 10:6
**yourself** [4] - 53:16, 55:14, 59:19, 60:20
**yourselves** [2] - 51:19, 102:25