UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| TRACY ALVES, Individually and as Successor in interest for KEVIN R. NIEDZIALEK, deceased,<br><br>                    Plaintiff,<br><br>          vs.<br><br>RIVERSIDE COUNTY, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO,<br><br>                    Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)  No. EDCV 19-2083-JGB<br>)<br>)     Jury Trial Day 3<br>)        AM Session<br>)<br>)<br>)<br>) |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Thursday, March 30, 2023

9:14 a.m.

PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

            LAW OFFICES OF DALE K. GALIPO
            BY:  **DALE GALIPO**
            21800 Burbank Boulevard, Suite 310
            Woodland Hills, California 91367

            LAW OFFICES OF JOHN BURTON
            BY:  **JOHN BURTON**
            128 North Fair Oaks Avenue
            Pasadena, California 91103

            HELM LAW OFFICE, PC
            BY:  **KENNEDY HELM**
            644 40th Street, Suite 305
            Oakland, California, 94609




For the Defendants:

            LEWIS BRISBOIS BISGAARD & SMITH, LLP
            BY:  **TONY SAIN**
               **TORI BAKKEN**
            633 West 5th Street, Suite 4000
            Los Angeles, California 90071

I N D E X


WITNESSES                                                    PAGE


**DR. DANIEL WOHLGELERNTER**
DIRECT EXAMINATION BY MR. BURTON                              5
CROSS-EXAMINATION BY MR. SAIN                                 39
REDIRECT EXAMINATION BY MR. BURTON                           60
RECROSS-EXAMINATION BY MR. SAIN                              71


**SONIA GOMEZ**
DIRECT EXAMINATION BY MR. GALIPO (RESUMED)                    74

THURSDAY, MARCH 30, 2023; RIVERSIDE, CALIFORNIA

-o0o-

(In the presence of the jury:)

THE CLERK:  Calling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please make your appearances.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain on behalf of Defendant Sheriff Chad Bianco and Defendant Riverside County.  With me, my associate, Trial Counsel Tori Bakken.

THE COURT:  Good morning.

And good morning to you, ladies and gentlemen.  As you remember, when we broke yesterday, Deputy Gomez was on the stand.  We're going to interrupt that testimony.  She'll resume later.  But because of scheduling concerns, the plaintiff will call another witness right now.  It's strictly just because of conflicts with time and stuff like that.

So you should evaluate the testimony just as if any other witness, as if Deputy Gomez had already concluded.  You should evaluate Deputy Gomez's testimony the same way you would with any other witness.  So this sort of mini interruption is primarily only because of scheduling issues.

So Mr. Galipo.

MR. GALIPO:  Yes, Your Honor, this will be Mr. Burton's witness as well.

THE COURT:  Very well.

MR. BURTON:  Good morning, Your Honor.  And thank you very much for allowing us to call Dr. Daniel Wohlgelernter out of order.

THE COURT:  Very well.  Have him come forward.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Daniel Wohlgelernter, W-O-H-L-G-E-L-E-R-N-T-E-R.

**DIRECT EXAMINATION**

BY MR. BURTON:

Q.  Good morning.  Good morning, Doctor.

A.  Good morning.

Q.  And I know we've had this conversation before.  Around the office when you get paged, so people don't massacre your name,

it's Dr. Dan, right?

A.   Yes.

Q.   Okay.  But I think -- I think here formality dictates I try to get it right with Wohlgelernter.

So I understand you're here as a plaintiff's retained expert witness on medical issues?   09:17

A.   Yes.

Q.   And can you just start by telling us what your -- what your fee is for testifying?

A.   $6,000 for today's trial testimony.   09:17

Q.   And did you also charge us to consult with us on the case and prepare -- help us prepare the case?

A.   Yes.

Q.   And did you write two reports?

A.   Yes.   09:17

Q.   That were turned over to the other side?

A.   Yes.

Q.   So one was an initial report; is that correct?

A.   Yes.

Q.   And the other -- after the other side did their expert reports, did we ask you to do a rebuttal?   09:17

A.   Yes.

Q.   And did you do that?

A.   Yes.

Q.   And so do you have those reports in front of you today?   09:18

A.   Yes.

Q.   Okay.  So why don't we start by telling us a little bit about your background in medicine.

A.   Yes.  I went to Yale University School of Medicine in New Haven, Connecticut.  I received my MD degree in 1977.  I did all of my postgraduate training at the medical school, and that included residency in the field of internal medicine.  Internal medicine is the area of medicine that deals with the diagnosis and treatment of conditions affecting the internal organs, like the heart, the lungs, the digestive system, the endocrine glands.  And then I did specialty training in the field of cardiology, which deals with the diagnosis and treatment of conditions affecting the heart and major blood vessels.

Q.   Do you have any board certifications?

A.   Yes.  I'm board certified in the field of internal medicine and also in the field of cardiology.

Q.   So you're what somebody might call a heart specialist?

A.   Yes.

Q.   And were you asked by us in this case to determine why Kevin Niedzialek's heart stopped beating?

A.   Yes.

Q.   And is that right in your -- in your ballpark, right in your lane?

A.   Yes.

Q.   So before we get to why Kevin Niedzialek's heart stopped

beating, can you just give us a few fundamentals that we -- will help us to understand your testimony about the heart? Did he, for example, have a healthy heart?

A.   Well, the -- he never had any history of heart problems before the incident on July 30th, 2019. At autopsy there was evidence that he had some enlargement of the heart, but he didn't have any blocked arteries, didn't have any evidence of prior heart attack, didn't have any problems with his heart valves.

Q.   And what happened to his heart?

A.   His heart stopped. He had what we call a cardiac arrest.

Q.   But after -- after he died, what happened to his heart?

A.   So he was resuscitated successfully after his cardiac arrest. The paramedics resuscitated him. And he was brought to the hospital. Unfortunately, he had severe irreversible brain damage and was declared brain-dead. And then the family agreed for him to serve as an organ donor. And his heart was taken as a donor heart and was transplanted into an individual who needed a heart transplant.

Q.   Do -- in terms of organ donations, are -- are diseased hearts used for organ donations?

A.   No.

Q.   So would that indicate to you that his heart was free of disease?

A.   It was a healthy heart, healthy enough to be serving as a

donor for someone else.

Q.   So in terms of what we need to know to understand your opinions, can you just explain a little bit about the structure of the heart and how it works?

A.   Yes.  So I'm not certain what has been covered so far, but just in terms of some of the basics, there's a difference between the term "heart attack" and the term "cardiac arrest." Those two are often confused.  Heart attack is when there's a blocked artery that impairs the blood flow to a portion of the heart and causes damage to the heart.  Cardiac arrest is when the heart stops.  Now, sometimes a heart attack can lead to a cardiac arrest, but not every cardiac arrest is due to a heart attack.

So in this particular case with Kevin Niedzialek, Kevin did not have a heart attack.  He did not have blocked arteries.  He had a cardiac arrest.  His heart stopped because of things that happened, and we'll get into that.  So I wanted to make that clear.  We're talking about cardiac arrest, the heart's stopping.  And, of course, if the heart stops, it means no blood is going to the organs that need blood because the blood carries oxygen and the other nutrients that all the other organs in the body need to survive.  If the heart stops, then the body dies, unless there is resuscitation in a timely fashion.

So I think two important parts of understanding the

heart are understanding the heart as a muscle and the heart as an electrical organ.  The heart is a muscle.  I think everybody is comfortable in understanding and is familiar with.  The heart pumps.  There are four chambers in the heart, and there's one major pumping chamber called the "left ventricle," and that pumps blood throughout the body.

Now, to have the heart beat in a rhythmic fashion, there is a biological electrical current that flows through the heart.  And there is actually electrical wiring, not like the wiring in this building, but it's biological tissue that carries electrical current.  So for the heart to function, there has to be intact electrical current in a coordinated fashion, and then there has to be a muscle that's functioning and capable of responding to that electrical current.  So if the current isn't functioning and doesn't stimulate the heart, the heart stops.  If the current is going through the heart but the muscle is damaged or not capable of functioning, then the heart stops as well.  So there can be an electrical problem or there can be a muscle problem.  And we're going to get into that in more detail in -- as we discuss some of the specifics of what happened.

Q.   Well, it was mentioned during opening statement a couple days ago that Mr. Niedzialek was found in PEA.  I understand that's a heart arrhythmia.  Can you explain a little bit about what a normal rhythm is and what the arrhythmias are?

A.    Yes.   So we talked about the electrical aspect of the heart and the muscle aspect of the heart.   So this term, "PEA," stands for pulseless electrical activity.   And we're going to use that term, I think, repeatedly.   So what does that mean, this PEA?   PEA is a form of cardiac arrest.   Cardiac arrest is, again, when the heart stops.   In this type of cardiac arrest, there is electrical activity that's organized and should be enough to maintain the heart function, but the person is pulseless because the heart muscle is not functioning.   So here's where the electrical system is still functioning, but the muscle is not functioning.   That's pulseless electrical activity.

Now, there are other types of cardiac arrest where the primary problem is that the electrical system goes wacko, that there's an electrical storm and now all of a sudden there isn't organized electrical activity.   There's just this kind of crazy frenzy and the heart doesn't get the electrical stimulation, and that's why the heart stops.   And that's the type of rhythm and cardiac arrest where people have to do the electric shock defibrillation that you've seen, you know, either in real life or on, you know, TV shows.   That's a shockable rhythm, that's ventricular fibrillation.   That's not what happened here.   Here we had electrical current, so they didn't need to shock, but it was the muscle that was not functioning.

Q.   So just a couple other terms.  I've heard of ventricular tachycardia.  Can you explain what that is?

A.   Yes.  So we talked about the ventricle, the left ventricle, the major pumping chamber.  So there are abnormal rhythms that can occur there that can lead to cardiac arrest.  One I just mentioned, ventricular fibrillation, where the electrical system goes haywire and the ventricles just can't function, and that's a cardiac arrest.  And the only way you get out of that is with the paddles and the shock.

Ventricular tachycardia is a prelude to ventricular fibrillation in most cases.  So it's where the heart electrical rhythm is beating way too fast, it's making the heart beat way too fast, and it's originating in the wrong spot, and that can cause the heart to fail and can cause cardiac arrest.  That's also something that will respond to an electrical shock.

Again, that's not what happened here.  Here we're talking about pulseless electrical activity.  There was nothing that required a shock.  The paramedics didn't have to use a shock to get Kevin's heart back.  It was a muscle problem, and the muscle of the heart wasn't functioning for reasons that we'll discuss in more detail.

Q.   So sometimes ventricular tachycardia is called "VT" or "V-tach"?

A.   Yes.

Q.   And then can ventricular tachycardia let's say develop

into ventricular fibrillation?

A.    Yes.

Q.    That's sort of a natural progression?

A.    Yes.

Q.    And so ventricular fibrillation, I've seen that referred to as "V-fib" or "VT" (sic)?

A.    Yes.

Q.    And then on the other hand, a much different kind of arrhythmia is pulseless electrical activity or PEA, correct?

A.    Correct.

Q.    And then there's also an arrhythmia, and I know there's others, but I think just one more for the purpose of this case, that's called asystole?

A.    Yes.

Q.    And can you explain what asystole is?

A.    So asystole is known by the lay term "flatline," which is actually a good description because there's no electrical activity.  And then, of course, if there's no electrical activity, that means there is no muscle activity.  So asystole is flatlined.  Again, that is cardiac arrest.  And that's death unless there is successful resuscitation in a -- in a very timely fashion.

Q.    And then what's a normal heart rhythm called?

A.    So the normal heart rhythm is called normal sinus rhythm. The sinus node is a little spot in the top of the right side of

the heart, which is basically kind of the -- if you think about a symphony orchestra and the conductor -- I'm not actually into that kind of music, but we're all familiar with it.  So the symphony, the orchestra responds to the conductor.  The conductor waves his or her baton, and the orchestra all plays.  So the sinus node is the conductor of the electrical current.  It waves a baton and then electrical current flows throughout the heart in an organized, synchronized way, and that's called normal sinus rhythm.

Q.   So let's talk about this case.  And what in particular did you review?

A.   So I reviewed hospital records from Inland Valley Medical Center where Kevin was taken after the cardiac arrest and the resuscitation by the paramedics.  I reviewed the coroner's report and the autopsy report, including photos that were taken.  I reviewed the paramedics' report, the paramedics who came to the scene and resuscitated Kevin.  I reviewed the report from Deputy Gomez.  I reviewed the composite video that included body-worn camera video footage as well as footage taken from a -- the person who happened to be on the scene and recorded some of what happened.  And reviewed information regarding the TASER applications.  And I reviewed the complaint that was offered on behalf of the plaintiff.

Q.   And that was all for your initial report?

A.   Yes.

Q.    So let's take your initial report that you have in front of you first.

A.    Yes.

Q.    And based on that review, before we get into your opinions, could you just describe for the jury the general medical course that this patient took according to the records that you reviewed?

A.    Yes.  I should add that, since we're talking about my initial report and the materials that I reviewed, I also reviewed deposition transcripts from Dr. Fajardo, the coroner-medical examiner; from Paramedic Lisa LaRusso; from an EMT, Jesus Reygoza; and also the depositions of Deputies Gomez and Keeney.

            So in terms of the pertinent medical history --

            THE WITNESS:  And I am referring to my report with your permission --

            THE COURT:  Yes.

            THE WITNESS:  -- Your Honor.  Yeah.

            So Kevin had a prior history of intermittent substance abuse.  For the last two years of his life, he reportedly lived clean and sober, but apparently he relapsed a few days before his death by using methamphetamine.  At that time he was staying temporarily with a friend that he knew from recovery meetings in an apartment complex in Temecula.

            On the afternoon of July 29, 2019, Kevin sustained a

bloody head injury.  It's not clear, wasn't clear then, to this day it's not clear how he suffered that head injury.  And at or about that time, Riverside Sheriff's Department was contacted, received 911 calls from neighbors who reported hearing noises and yelling and an unarmed man with a bloody head wound, who was Kevin, who was running around.  And the dispatcher sent information to the deputies and said that this man, Kevin, sounded incoherent and that he appeared psychologically disturbed.

The sheriff deputies, Keeney and Gomez, arrived separately at the apartment complex.  They approached the scene from different directions.  Deputy Gomez activated her body-worn camera, which captured video that provided a record of events.  I had opportunity to view that video.  And then there was an encounter between the deputies and Kevin, and TASERs had to be used to try to subdue Kevin.  And, ultimately, Kevin was put into a prone position, meaning lying on his belly, lying on -- facedown, and he was handcuffed with his hands -- with his hands behind him.  And Deputy Keeney was placing -- had his knee on Kevin's back.  As I said, he was handcuffed with hands behind his back.  And at some point, Kevin, who initially was agitated and yelling and having to be pushed down, stopped responding.  And from the video, it appears that he was no longer breathing.  And at that point, he eventually was turned over on his back.

The paramedics arrived.  They realized that Kevin was not breathing.  They started CPR, external massage, and they did a monitor, which showed that Kevin had PEA, as we discussed, pulseless electrical activity.  He had a heart rhythm, but he had no pulse.  And the CPR was continued.  The paramedics started giving Kevin air with a bag where they were blowing oxygen into his lungs.  And they gave him medications to help stimulate the heart to recover function.  And, ultimately, they restored pulse, they restored a normal rhythm and a normal blood pressure.  And at that point, Kevin was transported to Inland Valley Medical Center.

His heart was functioning; however, his brain was not functioning.  And he was evaluated carefully, including CT scan of the brain, EEG, and then MRI.  He was seen by a neurologist, a brain specialist, who determined that Kevin essentially was brain-dead, and he recommended withdrawal of life support.  The family agreed to go ahead with organ donation.  And at that point, Kevin was transferred to the operating room, and his organs were harvested.  And as we mentioned before, his heart was taken and served as a donor heart for someone else who needed a -- a heart transplant.

Q.   Thank you.  What was, according to the medical records you reviewed and based on your experience, the cause of Kevin's brain injury?

A.   As a result of the cardiac arrest and the fact that the

heart wasn't pumping and there was no blood flow to the brain for a period of several minutes, there was irreversible brain injury.  We call that anoxic encephalopathy, which basically means the heart -- the -- hasn't pumped blood to the brain. The brain is very sensitive to any deprivation or interruption of blood supply and oxygen.  And as a result, the brain tissue is irreversibly damaged.

Q.    Is this something that, in your practice, unfortunately, you've seen as a somewhat common consequence of cardiac arrest when resuscitation is not accomplished in a timely manner?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.    Is anoxic encephalopathy something you've seen before?

A.    Yes.

Q.    And can you explain?

A.    Well, as a cardiologist, you know, I focus on trying to keep people's hearts healthy and preventing cardiac arrest, but, unfortunately, there are people that have serious heart issues or have complications due to other problems that lead to a cardiac arrest.  And as a cardiologist, in my career, I've been called on many occasions to see such patients.  And I've seen people like Kevin where there was successful resuscitation, where the heart was beating, there was normal rhythm and normal blood pressure, but there had been

irreversible brain damage because of the cardiac arrest.

Q.    So just to sum up your opinion on -- on what led to Kevin's demise or Mr. Niedzialek's demise, first, he had a documented cardiac arrest, correct?

A.    Yes.                                                                                    09:39

Q.    PEA cardiac arrest?

A.    Yes.

Q.    So while he's in PEA, no blood is flowing to his brain, correct?

A.    Correct.                                                                                09:39

Q.    And is one of the purposes of chest compressions and CPR to mechanically keep blood flowing for someone who doesn't have a pulse who is in cardiac arrest?

A.    Yes.  And also part of that was providing oxygen by a bag that was, you know, placed over Kevin's face to breathe and to        09:40 push oxygen into his lungs.

Q.    So both pushing oxygen into his lungs with the mask and pushing oxygenated blood into his brain with the external chest compressions, correct?

A.    Yes.                                                                                    09:40

Q.    And based on the medical records you reviewed, that did not happen, at least in a sufficient quantity or soon enough, to prevent Mr. Niedzialek from suffering irreversible brain damage?

A.    Correct.                                                                                09:40

Q.   Now, we know that he had this external head injury.  Did you see any evidence in the records that you reviewed that the head injury had anything to do with the brain damage that led to his -- his death?

A.   No.  There was no evidence that the head injury had any role in causing his brain injury.

Q.   So there's also been some talk in this case that because maybe he was not allowed to breathe freely at some point in the incident, that that inability to breathe caused the brain injury.  Is that your opinion?

A.   Yes.

Q.   And is that because of the cardiac arrest?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   How -- how did his lack of breathing lead to the anoxic brain injury?

A.   So the heart needs a continuous supply of oxygenated blood for that muscle to function.  The oxygenated blood carries oxygen, which is fuel for the muscle to contract.  It also carries other nutrients.  And if there is not enough oxygen in the bloodstream, then the heart muscle can stop functioning. And as a result of Kevin being in this facedown, prone position, restrained, he was not able to get enough oxygen in his system.  And as a result, his heart stopped functioning.

He still had enough oxygen to keep that electrical rhythm functioning, but the muscle, which needs more oxygen, wasn't able to function, and that's how he had the cardiac arrest.

Q.    And do we call that -- what do we call that?

A.    So the cardiac arrest, as we mentioned, is pulseless electrical activity, PEA.  The process that led to the PEA is what we call "restraint asphyxia" or "prone-restraint asphyxia."  "Asphyxia" meaning interruption in the supply of oxygen.  "Prone" meaning facedown position, because that limits the ability to have full expansion of the chest and the lungs.  And "restrain" means when the individual is forcibly kept in that position, in the prone position, because the natural response of an individual is to try to get out of that position, to try to move to the side or to sit up so that there can be better expansion of the lungs and getting the full amount of oxygen into the lungs and thereby into the bloodstream.

Q.    Are there other consequences to -- cardiac consequences to having a restraint on the ability to breathe other than this lack of oxygen?

A.    Yes.

Q.    And by the way, do you call this lack of oxygen/adequate oxygen hypoxia?

A.    Yes.

Q.    So besides this lack of oxygen or hypoxia, what are the

other consequences?

A.   So one of the things that happens when someone is strenuously exercising, and that can be a normal structured exercise or it can be in a situation like happened with Kevin on -- on this particular day.  He was agitated, he was running around and had a head injury, and then had the encounter with law officers, was tased twice, which is -- can cause some pain, and then fell facedown on the -- on the pavement, that anxiety, agitation, stress, pain pumps up your oxygen consumption.  I mean, it's like driving your car 120 miles an hour.  You're using up fuel a lot more than if you're just kind of idled, you know, in your driveway.

And you're also building up acid in the bloodstream. Because if you don't have enough rest for the muscles and if your heart is beating fast and you're strenuously exercising and moving around, there is buildup of acid in the -- in the body, what we call lactic acid.  The same reason that if we -- you know, unless you're a trained athlete, if you start running up 50 stairs, eventually you're going to get pain in your legs and you're going to get tired and you have to stop and catch your breath.  And a lot of that is because your muscles have developed an acid buildup because it's exceeded the ability of the fuel that the muscles get to meet the metabolic demands.

So in such a situation, there's buildup of acid, and the body has to have a proper balance between what we call

"acid molecules" and "base molecules."  And if there's too much acid, that affects the function of organs, including the heart. And one of the ways that we compensate for buildup of acid is by hyperventilating, respiratory compensation, breathing hard the way you would if you had just run a mile, you know, running away from, you know, some dog that was trying to bite you, and after you're finally cleared, you know, of the situation, you're catching your breath.  You're blowing -- you're getting oxygen, but you're also blowing off extra acid because there's acid, carbon dioxide that builds up in the body and the lungs are able to clear that up.

So if you're not able to breathe with full respirations, there's also a buildup of acid, and that's called metabolic acidosis.  And that also can contribute and be causative for PEA cardiac arrest.

Q.   So can you -- now with this general background and analysis of what happened, can you tell us your opinion as to what caused Kevin Niedzialek's PEA cardiac arrest on July 29th, 2019?

A.   Yes.  I mean, we had -- before the encounter with Deputies Keeney and Gomez, Kevin was running around.  That's why people called 911.  There's this guy running around and making a lot of noise.  So he obviously was active.  And then at some point after the encounter, he's unresponsive, not breathing, and cardiac arrest.  So how do we get from active Kevin running

around making noise to Kevin not breathing, not moving.

So it's my opinion that Kevin being in the prone-restrained position, pressure applied to his back, he's not able to get into a recovery position to breathe more fully, that he developed hypoxia, inadequate oxygen. He was -- he had big-time oxygen needs. He had been active and running around. He's been, you know, in this encounter. He was tased, fell to the ground, has a bleeding head wound. His body wants a lot of oxygen. And now he's in a position where he's not getting enough oxygen because he can't breathe fully. So he has that big oxygen debt, his oxygen levels drop, and at the same time, his acid levels build up, and that's -- that's a lethal combo. Not enough oxygen and too much acid can lead to pulseless electrical activity, and that's what happened here.

Q. Can you exclude other causes of his cardiac arrest?

A. Yes. Having reviewed all the records and all the testimony, I don't see that there's any other plausible explanation for his cardiac arrest.

Q. Well, why wasn't it just simply a question of him taking too much methamphetamine?

A. Well, the methamphetamine is an issue because methamphetamine revs up the metabolism, can create agitation, and that's certainly part of what was going on with Kevin. So the methamphetamine meant that Kevin was in a situation where he needed a lot more oxygen. The methamphetamines revved up

his metabolism, raised his heart rate, blood pressure.  There's hyperactivity.  So methamphetamine is part of the problem, but the methamphetamine alone didn't cause cardiac arrest.  Kevin had methamphetamine on board when he was running around and so forth.  He didn't have a cardiac arrest then.  He only had a cardiac arrest when he was prone restrained, couldn't breathe adequately, can't keep up the oxygen that his body needs, can't blow off the acid that his body has accumulated.  So that's what caused the cardiac arrest.

Q.   Well, is it -- it's hypothetically possible for someone to take too much methamphetamine and have a cardiac arrest as a result, correct?

A.   Yes.

Q.   And what is the mechanism of that kind of cardiac arrest?

A.   So if it's purely methamphetamine, then we're talking about an entirely different mechanism of cardiac arrest. Methamphetamine is a stimulant.  It's adrenaline.  It's speed. It creates electrical havoc.  It overstimulates the heart and overstimulates the electrical system.  And then you will get ventricular tachycardia or ventricular fibrillation because of that overstimulation of the electrical system and getting an electrical storm that causes the cardiac arrest.  That's not what happened here.

          We know that because when the paramedics arrived, the first thing they did is hooked up Kevin to the monitor, and

they didn't see ventricular tachycardia or ventricular fibrillation.  They didn't shock him, which you would do if those were the rhythm problems.  They saw pulseless electrical activity.  Methamphetamine by itself does not cause PEA.  If methamphetamine is the culprit, it's going to cause cardiac arrest via ventricular tachycardia or ventricular fibrillation, the electrical storm.

Kevin's case, we didn't have an electrical storm.  His electrical activity was still intact.  It was muscle paralysis of the heart because he didn't have enough oxygen and he had buildup of acid.

Q.    So it was suggested during this opening that maybe he had some rhythm like ventricular fibrillation, but over time, it degenerated into PEA.  Do you have an opinion on that?

A.    Yes.  That is science fiction.  That doesn't happen.  You don't go from ventricular fibrillation, which is electrical storm, to an organized electrical rhythm.  That never happens.  So that's not possible.

Q.    You do go from ventricular fibrillation if it's untreated to asystole, correct?

A.    Yes.

Q.    I mean, because everybody is eventually asystolic, correct?

A.    Yes.  Asystole, again, is flatline.  So if you have that electrical storm, causes a cardiac arrest, if you're not

shocked back into regular rhythm, ultimately, it will be flatline, but you don't go from ventricular fibrillation to organized electrical activity, PEA.  Again, that's what we saw here was organized electrical activity, PEA.  That could not have been a consequence of ventricular fibrillation.  It doesn't go that way.

Q.    Now, according to the medical records you reviewed, Mr. Niedzialek was in cardiac arrest, PEA cardiac arrest. Let's just assume he was in ventricular fibrillation but it had degenerated to flatline, like it would over time.  Could he then have been resuscitated?

A.    Well, if it was ventricular fibrillation at the time of the paramedics' arrival, then the way you resuscitate is by using the paddles and doing an electric shock.  If it's ventricular fibrillation and the paramedics didn't get there until it had further degenerated into asystole, flatline, the chances of being able to successfully resuscitate at that point are minimal, approaching zero.

Q.    Now, I'd like -- you left -- you made three other sort of subsidiary opinions in your initial report that I would like to cover very quickly now that we've covered your main opinion. The first is this indication by Deputy Gomez that she felt a pulse.  Do you have an opinion on that?

A.    Yes.  I don't believe there was a pulse at that time. It's known that people ex -- whether they're police officers or

even paramedics or doctors, can mistakenly feel a pulse, and what they're actually feeling is their own pulse from their fingertips when they're checking, whether it's the carotid arteries or other arteries.  But given the information, given the video footage, it was not at all feasible or possible that Kevin had an actual pulse at that time.

Q.   And this phenomenon, is it sometimes called a phantom pulse?

A.   Yes.

Q.   And this is well-recognized in medicine, correct?

A.   Yes.

Q.   And is there training that you're aware of that CPR should be administered even when a first responder thinks there might be a pulse?

MR. SAIN:  Objection.  Vague as to his training.

THE COURT:  Yeah, he didn't say "his training," he said "training."

But it's vague so re-ask the question.  Sustained.

BY MR. BURTON:

Q.   Well, do you train first responders on how to react to cardiac arrest?

A.   I'm not part of an official teaching panel for first responders.

Q.   Okay.  But do you teach emergency room physicians on responding to emergency -- to cardiac arrest?

A.    Yes.

Q.    And do you discuss this concept of the phantom pulse?

A.    Yes.

Q.    Now, there's a second subsidiary opinion that you have about the fact that some people have noticed, and I think we can see it if we look closely in the video, that Kevin Niedzialek maybe appears to take some breaths after he becomes unresponsive and stops kicking his legs.  Did you have an opinion on that?                                                    09:56

A.    Yes.                                                          09:57

Q.    And what is that opinion?

A.    Well, there's a phenomenon, well-known and that I've personally witnessed many times.  It's called agonal breathing. And that is that even after there's a cardiac arrest, the person may still have some breathing activity.  It's typically slow and fairly shallow, and it looks labored.  That's how they gave it the -- the name "agonal breathing" because it's agonal, as in agony, because it's not a pleasant-looking situation, but it's kind of this gasp, you know.  But it's -- doesn't mean that there's normal, physiologic type of breathing.  It's just kind of the dying gasps of someone, and it doesn't efficiently bring in oxygen or blow off acid.                                09:57  09:58

Q.    And how long can agonal breathing continue after a cardiac arrest?

A.    It can continue for several minutes.                         09:58

Q.   Now, I'd like to invite your attention to Exhibit 150.

MR. BURTON:  Could we have the -- this is the composite video.

THE COURT:  You may play it.  Do you have a certain time frame in mind?

MR. BURTON:  Yes.  I was going to start at --

THE CLERK:  Your computer is not plugged in.

MR. HELM:  Now it's plugged in.

THE COURT:  Ask to confer, counsel.  If you want to confer with your counsel, you must ask to confer.

MR. BURTON:  I apologize, Your Honor.  I just -- was not conferring, I just misplaced my time line.

THE COURT:  So you can have a moment.

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. BURTON:  We can start the video at 12:03:93 -- or 12:04, basically.

(Video played.)

BY MR. BURTON:

Q.   We stopped it at 13:32.  Did you see any agonal breaths?

A.   Yes, I saw one, I think, yeah.

Q.   Was that right toward the end?

A.   Yes.

Q.   And in the minute or so before that, was he breathing?

A.   No.

Q.   And so was that breath at the end, is there any doubt in your mind that that was an agonal breath?

A.   No doubt.

Q.   Okay.  Can you explain?

A.   Well, we see Kevin is completely unresponsive.  He's got that eyes wide open stare.  And there's no movement of his chest.  You would expect that, particularly after having been prone restrained, that he's put on his back, that he can now catch his breath.  He's not taking deep breaths at all.  And you see towards the end one kind of shallow, you know, breath, and that's classical for an agonal breath.

Q.   And that, as you said, could happen minutes after the cardiac arrest?

A.   Yes.

Q.   And is it your opinion in this case that, in fact, was minutes after the cardiac arrest?

A.   Yes.

Q.   Can you say exactly when the cardiac arrest happened in this case?

A.   Not exactly, but I think when Kevin initially was agitated and moving, you know, became unresponsive, and when the deputy said -- Deputy Keeney said, *I think he's falling asleep*, I think right around that time is when he had his cardiac arrest.

Q.   And is that then consistent with the history you looked at of him being resuscitated and having the extensive anoxic brain

injury?

A.   Yes.

Q.   Now, your third opinion is on had CPR been initiated sooner.  What was your opinion on that?

A.   Well, my opinion is that, as we know, when there is cardiac arrest, every moment counts.  The earlier that we restore circulation and ventilation, the more likely we are to prevent irreversible brain damage.  So had there been CPR started as soon as there was evidence of cardiac arrest, if there hadn't been that delay, then -- and we know that when the paramedics arrived, they were able to successfully resuscitate him.  So had resuscitation measures been applied earlier, it is my opinion that Kevin would not have suffered the extensive irreversible brain injury that led to his having brain death.

Q.   Thank you.  Now, I'd like to turn from your -- your initial report to -- very quickly because we do have limited time -- to your rebuttal opinions.  You were provided the reports of the defense medical experts, correct?

A.   Yes.

Q.   And you wrote a second report specifically addressing some of the issues that they raised?

A.   Yes.

Q.   And one was a Dr. Chan?

A.   Yes.

Q.   And what was -- what was your response to Dr. Chan's

position?

A.    Yes.  So Dr. Chan said, and I'm quoting from him, "We have found no scientific evidence supporting the proponent's notion that a restraint position in a prone chest down or prone hobbled position causes or contributes to asphyxiation or associated death," unquote.

So my comment and response and rebuttal to Dr. Chan is that the studies that Dr. Chan refers to do not replicate the real-world conditions of the type of encounter and the type of incident that happened with Kevin on July 30th, 2019.  The studies that Dr. Chan refers to are controlled studies done in a laboratory with volunteers, who are healthy, where there's a defined end point.  It's not a struggle; they're not on methamphetamine; they haven't been tased; they don't have a head injury; they haven't fallen to the ground; and they also know that the scientists doing the study are not going to continue putting them in this position until cardiac arrest. So that's an entirely different situation.

Those volunteers are not in a situation where they've used up a lot of oxygen and their body is needing to replenish oxygen and that they build up acid and they really need to be able to breathe and compensate.  It's an entirely different situation.  You cannot compare Kevin's situation to these controlled studies and healthy volunteers.

So Dr. Chan's opinion that Kevin's death was not

caused or contributed to by the positional restraint in the prone position is based on studies that are not applicable to what happened to Kevin.

Obviously, no one can do studies that would show the situation where Kevin was in.  That wouldn't be ethical.  You wouldn't tell somebody, *Here, let me give you methamphetamine. Let me, you know, hit you on the head.  And then I'm going to tase you, throw you down, and now you're going to be in a restrained position.  And I won't even tell you when we're finished, you know, so no guarantees that you won't have a cardiac arrest.*  Nobody is going to do a study like that.

So the studies are all controlled, volunteers, healthy.  They know it's going to end before they're injured. So Dr. Chan is basing his opinions on these studies that are not relevant.  It's apples versus oranges.

Kevin was in a situation, as we discussed, where he's, you know, accumulated a huge oxygen debt because he's been running around, he's on methamphetamine, he's been injured, he's been tased, so he really needs to be able to breathe to get the oxygen in there and to blow off the acid. So Dr. Chan's conclusions that the restraint had nothing to do with it, it defies the reality of what you've seen on the video, defies the reality of what we see in this situation, and it's based on studies that are irrelevant and actually totally misleading in terms of their conclusions.

Q.   Well, in those studies -- I mean, there's several of them and they all have their differences, but generally they obtain a baseline of -- of lung ventilation using different pulmonary function tests, like how much air is going in and out of the lungs, correct?

A.   Yes.

Q.   And for a baseline, they use generally a sitting position, correct?

A.   Sitting or standing.

Q.   Because that's when your lungs work the best?

A.   Yes.

Q.   And then did each of those studies find some degree of diminution of lung function in the prone position?

A.   Yes.  And this is an important point.  So what Dr. Chan is saying is those studies did not show that oxygen levels dropped, but those very same studies, if you look at the data, show that all of the individuals had decreases in lung capacity.  So their oxygen levels didn't drop yet.  A, they were healthy; B, they didn't have the methamphetamine, the tase, and everything else that applied for Kevin.  So they didn't come in with an oxygen debt, and it wasn't, you know, the type of confrontation that's going to increase oxygen requirement, but they did have decreased lung function.  All the studies that have been done, even the studies that Dr. Chan has cited, show that prone restraint, particularly if there's,

you know, a pressure applied to keep the person in the prone position, particularly if they're handcuffed with hands behind the back, all those studies show that there are decreases in lung function.  You cannot have normal breathing when you're in that position.

Q.    Thank you.  Now, regarding the opinions of Dr. Graham, a pathologist, what -- what was your rebuttal to that?

A.    So Dr. Graham, who is a pathologist, he's not a clinical doctor who takes care of people.  So he gave the opinion that Kevin's death was due to a condition called "excited delirium."  Delirium is, you know, a state of severe agitation, and this term, "excited delirium," I will tell you that the cardiology community internationally does not accept this term and does not use it as a cause of cardiac arrest.  It's not accepted as a cause, and that's true of the American Medical Association as well.

So this excited delirium is, you know, an entity that has been created, and it's often discussed in situations where there is death in encounters with law enforcement and where the person who died, you know, had methamphetamine or cocaine on board.

So as I said before, I acknowledge that the methamphetamine was a problem for Kevin.  It increased his oxygen demand, probably contributed to acid buildup, but the methamphetamine didn't cause the cardiac arrest.  And I know

that for two reasons.  One, is if it were the methamphetamine or this excited delirium, it would have caused the cardiac arrest via ventricular tachycardia or ventricular fibrillation. We know that's not what Kevin had.  The other thing is, again, the cardiology community -- I'm not talking about just my opinion, I'm talking about internationally recognized cardiology literature -- does not accept excited delirium as a cause of death.

Q.    Thank you.  Now, there's also a Dr. Dawes who gave an opinion in this case regarding -- well, what was your answer to Dr. Dawes?

A.    So Dr. Dawes is an emergency medicine physician.  So he mentions that -- that Kevin was still breathing.  And once Kevin loses responsiveness, when Officer Keeney says, you know, *I think he's falling asleep*, you don't see evidence that he's breathing.  You don't see that his chest is moving.  And when he's rolled over, he's clearly not breathing.  We've discussed it.  He had that agonal breath.  And Dr. Dawes says that metabolic acidosis may have caused the pulseless electrical activity.  I agree that metabolic acidosis was probably a component along with the oxygen deficiency, we've talked about that, but whether -- regardless of the mechanism, whether you're focused more on the acid or more on the oxygen, the restriction on breathing is fundamental to both of them because if you're able to breathe normally, you're able to bring in

oxygen and blow off acid.  Kevin wasn't in the position where he could breathe normally to bring in oxygen and blow off acid.

And -- yeah, then Dr. Dawes also said that Kevin had a self-induced metabolic acidosis.  And so yes, the methamphetamine contributed to it and the hyperactivity.  The other aspects, the struggle, the confrontation, tased, Dr. Dawes doesn't mention.  But, again, either way, if there was metabolic acidosis, had Kevin been in a position where he could have been doing normal breathing, that metabolic acidosis would have been compensated for and would not have been causative of a cardiac arrest.

Q.   Thank you.  And, finally, the opinion of Dr. Richard Clark, what was your rebuttal to that?

A.   Yes, Dr. Clark is a toxicologist.  He admits that methamphetamine was not the cause of death, that -- that methamphetamine would cause death through ventricular tachycardia or ventricular fibrillation, and that was not the case here.  Dr. Clark mentions that sometimes people can go from ventricular fibrillation into a slower what he called agonal rhythm and that that's what happened here.  Well, agonal rhythm is not a -- is not a cardiology term.  I mean, I'm not -- there's agonal breathing, but there's no such thing as agonal rhythm.

So what we do know is that Kevin had PEA.  And as we mentioned before, ventricular fibrillation doesn't go to PEA.

Ventricular fibrillation is an electrical storm.  It doesn't go from that electrical storm into organized electrical activity. If it's -- continues, it will end up with flatline, which is where -- no activity at all.

Q.   Thank you.  And you mentioned, you know, your credentials. Have you worked on other cases, without going into details about the other cases, but have you worked on other restraint cases?

A.   Yes.

Q.   Okay.  Can you just estimate about how many?

A.   I think it's about ten cases that I've been referred that involve death or serious injury in situations where someone was apprehended by law enforcement.

Q.   And, again, without going into detail, in each of those cases, were you asked to do a review similar to the one you did in this case and render an opinion on what was the cause of the cardiac arrest?

A.   Yes.

Q.   Thank you.

        MR. BURTON:  Nothing further, Your Honor.  Thank you.

        THE COURT:  Thank you.  Mr. Sain.

        MR. SAIN:  Thank you, Your Honor.

        Good morning, ladies and gentlemen.

**CROSS-EXAMINATION**

BY MR. SAIN:

Q.    Good morning, Dr. Dan.

A.    Good morning.

Q.    Your current profession is as a physician specializing in cardiology and internal medicine; is that correct?

A.    Yes.                                                                          10:17

Q.    And you charge about $4,800 for a half day of trial testimony; is that right?

A.    Yes.

Q.    In your role as an expert witness, you're paid to testify; is that correct?                                                                        10:17

A.    Yes.

Q.    When you've testified as a medical expert, almost all of those cases have been in civil matters, true?

A.    Yes.

Q.    In those civil cases where you've testified as a medical    10:17
expert for about ten years, about 85 percent of the time you were testifying for plaintiffs; is that true?

A.    Yes.  That was back 30 years ago.  Now it's 40 percent plaintiff, 60 percent defense.

Q.    Didn't you testify at your deposition that that percentage    10:17
was true until about 2005?

A.    Yes.

Q.    Now, out of those civil cases where you testified as a medical expert, at least two were cases where you testified on behalf of plaintiffs who were suing law enforcement; is that    10:17

correct?

A.    Yes.

Q.    Have you ever testified as an expert on behalf of a law enforcement officer or agency?

A.    I've never been asked to.

Q.    Now, you yourself, have you ever been a law enforcement officer?

A.    No.

Q.    Ever made an arrest, investigated a crime, restrained a subject in the field?

A.    No.

Q.    Ever been to a police academy?

A.    No.

Q.    Ever been employed by any law enforcement agency as a homicide detective?

A.    No.

Q.    Would you agree that you are not an expert in law enforcement tactics, policies, procedures, or policies?

A.    Yes, I do agree.

Q.    Okay.  Would you agree that you have no idea whether law enforcement officers generally are trained to distinguish agonal breathing from regular breathing?

A.    Well, I'm not familiar with the -- the details of the training of the law enforcement officers.

Q.    You would agree with what I just said then?

A.    Yes.

Q.    And obviously, in your general understanding, you're aware that generally, typically law enforcement officers are not medical doctors like you, right?

A.    I agree.

Q.    Now, just to go over some of your opinions and make sure I understand them, you have no opinions in this case as to whether or not Mr. Niedzialek caused or created a threat to either of the deputies during the incident; is that true?

A.    Correct.

Q.    And you have no opinion about anything that happened before the deputies restrained Mr. Niedzialek; is that true?

A.    True.

Q.    And you are offering no opinions in this case as to whether or not the restraint force or the procedures or the tactics used on Mr. Niedzialek were unreasonable; is that true?

A.    That's true.

Q.    Now, all of the medical opinions that you form in this case are from the beginning of the restraint going forward; is that true?

A.    True.

Q.    Now, you said, in response to Mr. Burton's question, that as part of the materials you reviewed in preparing your opinions, you reviewed the entirety of the composite incident video; is that true?

A.   True.

Q.   And that you also reviewed the autopsy report and the deposition testimony of the medical examiner, the forensic pathologist who conducted the autopsy of Mr. Niedzialek, Dr. Mark Fajardo; is that true?

A.   Yes.

Q.   Now, having reviewed all of that evidence and all of that testimony from Dr. Fajardo, you are aware that he found no evidence of any internal injuries or defects other than the head trauma to Mr. Niedzialek; is that true?

A.   True.

Q.   And you agree that the -- Mr. Niedzialek's head injury did not cause or contribute to his death, true?

A.   True.

Q.   Now, you're aware that Dr. Fajardo has also testified that none of the interior injuries or defects that he observed for Mr. Niedzialek either caused or contributed to his death; you're aware of that, right?

A.   Yes.

Q.   In fact, according to Dr. Fajardo's autopsy exam, other than some abrasions -- which is another word for scrapes -- contusions -- another word for bruises -- lacerations -- another word for small tears in the skin -- other than those, Dr. Fajardo found no exterior injuries -- exterior injuries or defects on Mr. Niedzialek; isn't that true?

A.    True.

Q.    And he also testified that none of the exterior injuries or defects that he observed either caused or contributed to Mr. Niedzialek's death; is that true?

A.    Yes.

Q.    Now, on the particular incident date, July 29th, 2019, you were never a witness to any part of the incident; is that true?

A.    That's true.

Q.    Prior to forming your opinions in this case, you never visited the scene, right?

A.    That's true.

Q.    You yourself never took any measurements at the scene, true?

A.    True.

Q.    Before forming your opinions in this case, the only incident witness statements you reviewed were the depositions of the two deputies, right?

A.    Correct.

Q.    You yourself never interviewed any incident witnesses, correct?

A.    Correct.

Q.    And before forming your opinions in this case, did you yourself ever physically examine or autopsy Mr. Niedzialek?

A.    No.

Q.    Now, if I heard you correctly, you stated that you believe

that oxygen deprivation caused the death by cardiac arrest.  Is that, my understanding, correct?

A.    Yes.

Q.    Okay.  But you would agree that the primary job of a cardiologist is to keep people alive, right?

A.    Yes.

Q.    Out of approximately 25,000 patients that you've treated over your career, you've only done a postmortem analysis to determine a cause of death about 1 percent of the time, true?

A.    Of my own patients, yes.  I mean, I am involved in peer review where I will be involved in review of deaths relating to other physicians' --

Q.    Your --

A.    -- patients.

Q.    Sorry.  I didn't mean to interrupt you.

A.    No.

Q.    My apologies, sir.  Your understanding is that an autopsy or autopsy exam is when a forensic pathologist conducts a hands-on exam of the human body in order to determine the proximate cause of death for a decedent and any contributing factors; that's what an autopsy is, yes?

A.    Yes.

Q.    Have you yourself ever performed an autopsy to determine a cause of death?

A.    No.

Q.    I'm sorry?

A.    No.

Q.    You agree that a forensic pathologist is a doctor with specialized training in determining the cause of death, particularly where there are issues related to litigation, true?

A.    Yes.

Q.    You agree that it's a forensic pathologist's job to determine cause of death, yes?

A.    Well, it's not exclusively the forensic pathologist's job. Other physicians armed with the information can look at the clinical materials and the records and offer opinions regarding cause of death.

        MR. SAIN:  Your Honor, I'd like permission to read from the doctor's deposition, page 66, line 1 through 4.

        MR. BURTON:  No objection.

        THE COURT:  You can read it.

BY MR. SAIN:

Q.    "And you testified earlier that a forensic pathologist's job is to determine cause of death; is that correct?"

A.    Yes.

Q.    "ANSWER:  Yes."

        Have you yourself ever been a forensic pathologist?

A.    No.

Q.    Do you have any medical board certifications in forensic

pathology?

A.   No.

Q.   Do you have any medical board certifications in any pathology?

A.   No.

Q.   You agree that in medicine the term "excluded" means to rule out or to negate something as being a causal factor, right?

A.   Yes.

Q.   Isn't it true that in this case Dr. Fajardo, a forensic pathologist, has testified that he excluded or ruled out asphyxia as a cause of death for Mr. Niedzialek?

A.   Yes.

Q.   That's true, right?

A.   Yes.

Q.   Now, at your deposition we talked a little bit about the composite incident video.  Do you remember that?

A.   Yes.

Q.   All right.  And in your deposition, isn't it true that you testified twice that you believe that Mr. Niedzialek suffered a cardiac arrest at about the 15-minute-and-26-second mark of the composite video?

A.   Yes.

Q.   Isn't it true that the last time any of the deputies had a knee on Mr. Niedzialek was at about the 9-minute-and-50-second

mark?

A.    Yes.

Q.    That's after the *I think he's falling asleep* comment, correct?

A.    Yes.                                                                      10:25

Q.    So according to you, Mr. Niedzialek had a cardiac arrest about five minutes after there were no more knees on him, right?

A.    He was still in a prone-restraint position.

Q.    That wasn't my question, sir.  According to you, the                     10:25
testimony you just gave right now, Mr. Niedzialek had a cardiac arrest more than five minutes after the last knee was on him, true?

A.    True.

Q.    Now, in general, you agree that if you have a restrained                 10:25
person who has no impairment to their breathing, that restraint by itself cannot cause cardiac arrest, true?

A.    True.

Q.    And no recording that you reviewed in this case shows that Mr. Niedzialek ever stated while he's being restrained that he     10:25
can't breathe or any words to that effect, true?

A.    True.

Q.    For all the movements you observed Mr. Niedzialek make during this prone restraint, you are unable to rule out that he was trying to escape custody, true?                                        10:26

A.    I'm sorry, could you repeat the question?

Q.    Absolutely.

A.    Yeah.

Q.    I'll try to go slower so I don't get smoke off the court reporter's hands.

10:26

For all the movements you observed Mr. Niedzialek make during the -- the prone restraint, you are unable to rule out that he was trying to escape custody, true?

A.    True.

Q.    Now, have you ever been a biomechanical engineer?

10:26

A.    No.

Q.    Are you an expert in biomechanics or the science of human movement?

A.    No.

Q.    Now, you testified earlier about Mr. Niedzialek's brain injury.  Do you remember that testimony?

10:26

A.    Yes.

Q.    You're aware that the specialty of medicine that deals with the brain is neurology, correct?

A.    Yes.

10:26

Q.    Have you ever been a neurologist?

A.    No.

Q.    You're aware that there's a subspecialty in pathology that deals with diseases and injuries and death associated with the brain called neuropathology, correct?

10:26

A.    Yes.

Q.    Have you ever been a neuropathologist?

A.    No.

Q.    True or false, in terms of when there's a death by asphyxia, you do not know one way or the other whether or not hypoxic brain injury will always be present; isn't that true?

A.    True.

Q.    Now, in summary, you've opined in this case that the lab studies done by Dr. Chan are unreliable because, in your opinion, they did not replicate real-world conditions.  That's what you just said on direct, yes?

A.    Yes.

Q.    All right.  Now, you're aware of the term "epidemiology," correct?

A.    Yes.

Q.    And, in essence, epidemiology is the medical study of large numbers of real-world cases to determine patterns of causation of death or injury or disease, correct?

A.    Yes.

Q.    Are you aware that Dr. Chan's studies on the effects of prone restraint on breathing included epidemiological studies?

A.    Yes.

Q.    Are you -- have you ever been an epidemiologist?

A.    No.

Q.    Have you done -- well, strike that.

Now, you're aware that there's a process called "peer review" where doctors like yourself want to do some sort of medical study or put out a paper on some theory they have or some effect they're studying, whatnot.  They can submit that to other doctors in their field who can review that paper and determine if its results are factually correct.  You're aware of that process, correct?

A.   Yes.

Q.   And you're aware that Dr. Chan's studies and the results thereof were all peer-reviewed, correct?

A.   I'm not specifically aware of that.  I'm not denying it.

Q.   Fair enough.  Have you yourself done any peer-reviewed published medical studies on the effect of restraint on breathing?

A.   No.

Q.   And you -- if I heard you correctly, on direct exam you agreed that Dr. Chan's studies showed that the oxygen level from prone restraint never dropped; isn't that true?

A.   True.

Q.   Now, a pulmonologist is a physician who specializes in treating conditions affecting the lungs and the respiratory system, correct?

A.   Yes.

Q.   Have you ever been a pulmonologist?

A.   No.

Q.   Now, turning back to peer review, virtually all of the peer-reviewed articles that you yourself published were about cardiology, the study of the heart, yes?

A.   Yes.

Q.   Were any of the peer-reviewed articles that you've authored or published been about studies of people suffering from asphyxia?

A.   No.

Q.   Have you ever participated in or authored any studies pertaining to restraint and asphyxia?

A.   No.

Q.   Would it be accurate to say that none of the lectures you've ever given pertain primarily to asphyxia studies; is that accurate?

A.   That's accurate, yes.

Q.   And you've never testified in a court of law as an expert on asphyxia, true?

A.   Correct.

Q.   Turning to some of your other opinions.  You agree that in sufficiently large quantities, methamphetamine can have toxic or fatal effects on cardiovascular or heart-related physiology and metabolism, correct?

A.   Yes.

Q.   And you agree that a drug overdose occurs when someone has died as a result of toxicity from the drug they took, correct?

A.    Yes.

Q.    According to medical studies you've reviewed, the low end of the toxic range for methamphetamine would be about 0.100 milligrams per liter, correct?

A.    Yes.

Q.    And "yes" or "no," Mr. Niedzialek's meth level for this incident was measured at 0.757 milligrams per liter?

A.    Yes.

Q.    So Mr. Niedzialek's meth level would have been about seven times that lowest toxic range for meth, true?

A.    True.

Q.    Now, have you ever testified in a court of law as an expert on toxicology?

A.    No.

Q.    Are you board certified in toxicology?

A.    No.

Q.    Are you an expert in toxicology medicine?

A.    No.

Q.    You agree that in the medical field, you understand the term "proximate cause" to refer to an act or process whose direct, natural, and uninterrupted consequence is death, correct?

          MR. BURTON:  Well, I would object, Your Honor.  It's calling for legal conclusion.

          MR. SAIN:  I just said "medical field," Your Honor.

THE COURT:  Overruled.

BY MR. SAIN:

Q.    So I'll ask the question again.  You agree that in the medical field, you understand the term "proximate cause of death" to refer to an act or process whose direct, natural, and uninterrupted consequence is death, true?

A.    True.

Q.    "Yes" or "no," from a medical perspective, a contributing factor toward death is something that played some causal role in the death, true?

A.    True.

Q.    From a medical perspective, a contributory cause is not necessarily a proximate cause.  Those are different things, true?

A.    True.

Q.    Now, here Medical Examiner Fajardo has testified that the only proximate cause of Mr. Niedzialek's death was acute methamphetamine toxicity, true?

A.    True.

Q.    Now, true or false, someone who has not used meth for about two years, who made it about two years sober, that person would not be described as a chronic user, true?

A.    True.

Q.    And are you aware that the witnesses who knew Mr. Niedzialek have testified that all the way up to July 2019,

the month he died, Mr. Niedzialek had gone almost two full years without using meth or drugs?

A.    Yes.

Q.    Now, going to the heart rhythms here, you mentioned that asystole is the absence of cardiac electrical activity, essentially a flatline, right?

A.    Yes.

Q.    And did you see any evidence that Mr. Niedzialek experienced asystole during our incident?

A.    No.

Q.    Now, you gave a lot of testimony about the cardiac rhythms in this case, but did you yourself ever have a cardiac monitor connected to Mr. Niedzialek at any time?

A.    No.

Q.    You yourself never took Mr. Niedzialek -- excuse me.  Let me try that again.  My apologies.  You yourself never took Mr. Niedzialek's pulse at the scene, true?

A.    True.

Q.    You weren't there, never even touched him, true?

A.    I was not there.

Q.    In your review of the incident video, isn't it true that from the time that Mr. Niedzialek is flipped supine onto his back, about four minutes passed until he's connected to a cardiac monitor by the paramedics?

A.    Yes.

Q.   Isn't it true that before the paramedics arrived on the scene and connected him to a heart monitor, we don't know what his cardiac rhythm was during the prone restraint; isn't that true?

A.   True.

Q.   And we don't know what it was during that four minutes until he was connected to a cardiac monitor, true?

A.   True.

Q.   In fact, on direct exam isn't it true that you said that you cannot say exactly when Mr. Niedzialek's cardiac arrest occurred during this incident; isn't that true?

A.   True.

Q.   Now, is there any evidence that you reviewed that either deputy was aware of Mr. Niedzialek suffering any cardiac arrest before paramedics arrived on the scene?

A.   No.

Q.   You mentioned that -- on direct that you saw the paramedics supplying an air bag to Mr. Niedzialek to help him breathe?

A.   Yes.

Q.   And are you aware that the testimony in this case from the paramedic is that there was no obstruction to Mr. Niedzialek's airway at any time?

A.   Yes.

Q.   So that's true?

A.   Yes.

Q.   Let's talk about metabolic acidosis a little bit.  If I understood your testimony correctly, and please correct me if I'm wrong, your understanding is that metabolic acidosis is where there's an accumulation of acids in the body due to some sort of metabolic dysfunction.  Does that basically sum it up?

A.   Yes.

Q.   Dysfunction is when something's going wrong?

A.   Yes.

Q.   And if I understood you correctly, where the acid or pH level drops below 7, one would expect a fatal outcome solely on the basis of metabolic acidosis, true?

A.   Yes.

Q.   By itself metabolic acidosis can cause death, true?

A.   Yes.

Q.   In some cases, metabolic acidosis can cause cardiac arrest, true?

A.   True.

Q.   "Yes" or "no," in some cases, extreme exertion by a person can cause death by metabolic acidosis, true?

A.   True.

Q.   Now, on direct you said that strenuous exercise, like Mr. Niedzialek running around, can lead to an acid buildup, which can, in turn, affect the heart muscle and cause PEA, true?

A.    True.

Q.    And on direct you stated that you believe that methamphetamine contributed to an acid buildup for Mr. Niedzialek or contributed to his metabolic acidosis, true?

A.    True.

Q.    "Yes" or "no," struggling against restraint is a form of physical exertion as well, true?

A.    Yes.

Q.    You agree that metabolic acidosis can cause cardiac PEA by acid-based interference with the heart muscle contraction process, true?

A.    True.

Q.    And you agree that, although it's rare, by itself metabolic acidosis can cause PEA-related cardiac arrest, true?

A.    True.

Q.    "Yes" or "no," methamphetamine abuse can create a hypermetabolic state and metabolic acidosis, true?

A.    True.

Q.    One of the potential causes of potentially fatal metabolic acidosis can be methamphetamine abuse, true?

A.    True.

Q.    And you're aware that Mr. Niedzialek's pH or acid level here was measured in the area of 7.19, correct?

A.    That was at the hospital, yes.

Q.    And you agree that Mr. Niedzialek's methamphetamine

ingestion and his struggle could have been factors that led to the metabolic acidosis as well, true?

A.    Yes.

Q.    And you agree that methamphetamine can also contribute to metabolic acidosis, true?

A.    Yes.

Q.    Now, did you yourself ever take any measurements of Mr. Niedzialek's oxygenation or breathing at the scene?

A.    I was not there, no.

Q.    You mentioned TASERs briefly.  Are you an expert on TASER electrical engineering or mechanics?

A.    No.

Q.    Have you ever participated in any studies on the medical effects or electrical effects of TASERs on the human body?

A.    No.

Q.    Have you ever testified in court as an expert on TASER medical effects?

A.    No.

Q.    Are you an expert on the medical effects of TASERs on humans?

A.    No.

Q.    "Yes" or "no," is it your opinion that TASER electricity directly affected Mr. Niedzialek's heart?

A.    No.

Q.    From the last moment in time when Mr. Niedzialek was

tasered all the way up to the moment in time when he may have suffered a cardiac arrest, more than five minutes passed, true?

A.    True.

Q.    "Yes" or "no," you agree that the time line is accurate when it states that after Mr. Niedzialek was turned over into a supine position, he had at least one more breath, true?

A.    True.

            MR. SAIN:  No further questions.

            THE COURT:  Thank you.

            Mr. Burton.

            MR. BURTON:  Thank you.

                    **REDIRECT EXAMINATION**

BY MR. BURTON:

Q.    Let's talk about Dr. Fajardo a minute, the medical examiner.  You did read his autopsy report, correct?

A.    Yes.

Q.    And did he classify the death as a homicide?

A.    Yes.

Q.    Okay.  And --

            MR. SAIN:  Objection.  Misstates testimony.

            MR. BURTON:  I'm sorry?

            THE COURT:  That wasn't citing testimony.  Overruled. The answer is recorded.

BY MR. BURTON:

Q.    Does the autopsy report state that the manner of this

death was homicide?

A.   Yes.

Q.   And in the medical profession, is that understood to be death at the hands of another?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   What does "homicide" mean in the medical profession?

A.   Well, I think it's a legal definition, not a medical definition.  I understand it as death at the hands of an individual.

Q.   So Dr. Fajardo listed the police restraints as a contributing factor in this death, correct?

A.   Yes.

MR. SAIN:  Objection.  Misstates testimony.

THE COURT:  Overruled.

THE WITNESS:  The answer was "yes."

BY MR. BURTON:

Q.   Yeah.  Of course, he did.

Now, you read Dr. Fajardo's deposition, correct?

A.   Yes.

Q.   And Dr. Fajardo was specifically asked, "Well, if this was a methamphetamine overdose death, what would you expect the presenting rhythm to be?"  Do you remember that?

A.   Yes.

Q.   And what did he say?

A.   Ventricular tachycardia or ventricular fibrillation.

Q.   And do you recall that Dr. Fajardo was asked that if this was a -- an asphyxial death, what he would expect the presenting cardiac rhythm to be?

A.   He did say in response to a question about PEA being consistent with asphyxiation, he said it wouldn't be inconsistent.

Q.   Now, there was a question about the time that you said the cardiac arrest occurred.  And I'd like you to look at the monitor, which has the Exhibit 150 on it.  And there are actually two times given on 150, correct?  There's a time in the upper left corner and a time in the lower right corner?

A.   Yes.

Q.   And so do you recall which time you were referring to when you identified when the cardiac arrest occurred?

A.   The upper left corner.

Q.   So let's go back to that.  Let's go back to around nine minutes on the timer.  We've been using the timer on the lower right, not the upper left.  So why don't we just stop here.

          MR. BURTON:  And why don't you run it a minute.

                    (Video played.)

          MR. BURTON:  Okay.  Stop it there.

BY MR. BURTON:

Q.   So the time in the upper left is 15:27:09?

A.   Yes.

Q.   And was that what you were referring to?

MR. SAIN:  Objection.  Leading.

BY MR. BURTON:

Q.   Well, let me ask it this way.  And I'll withdraw the question.

Is this the point when you thought the cardiac arrest occurred, around this time?

A.   Well, I testified I wasn't sure exactly when the cardiac arrest occurred.  So I think it's around this time or subsequent to this.

Q.   And I hear some moaning sounds from Mr. Niedzialek.  Are moaning sounds consistent with agonal breaths?

A.   Yes.

Q.   Now, when you read Dr. Clark's report and -- did he say that -- that, in his opinion, the methamphetamine level that Mr. Niedzialek had was a recreational dose?

A.   Yes.

Q.   And that he -- in his opinion, this death was not due strictly to methamphetamine, a lethal level of methamphetamine, correct?

A.   That is correct.

Q.   Now -- and you agree with that; is that correct?

A.   Yes.

Q.   And the reason you, as a cardiologist, agree with it, does

that have to do with the presenting rhythm?

A.    Exactly.

Q.    And to the extent that Dr. Fajardo says that this was a methamphetamine overdose, do you agree or disagree with Dr. Fajardo on that?

A.    Well, I --

MR. SAIN:  Lacks foundation.

THE WITNESS:  -- agree that there were --

THE COURT:  Overruled.  Okay.  Hold on.

THE WITNESS:  I'm sorry, Your Honor.

THE COURT:  It's overruled.  You can answer.

THE WITNESS:  I agree that Mr. Niedzialek had elevated methamphetamine blood levels, but I do not agree that methamphetamine was the cause of death.

BY MR. BURTON:

Q.    And is that based on the presenting heart rhythm?

A.    Yes.

Q.    Did you see any evidence when you looked at -- at Dr. Fajardo's deposition that -- that he had considered what the presenting heart rhythm was when he reached his opinion?

A.    No.

Q.    What did he in his deposition believe that the presenting heart rhythm was?

A.    Well, I know that he said that methamphetamine would cause ventricular tachycardia or ventricular fibrillation.

Q.    And that -- and that PEA was consistent with asphyxia?

A.    Yes.

Q.    Okay.  Now, I'd like to show you a point in the video because you were being asked if you can tell when the cardiac arrest occurred.  And I'd like to go to 12:09.  This is using the time on the lower right rather than the upper left that you had used.  Okay.  Okay.  This is right before they roll him over?

A.    Yes.

Q.    And I think we see Deputy Gomez take her hand off of him.  So I'd like you to look at that.

(Video played.)

MR. BURTON:  Okay.  And stop.

BY MR. BURTON:

Q.    What do you see there?

A.    Well, I see the imprint of the deputy's hand on Kevin's skin.

Q.    Does that have any significance to you as a cardiologist?

A.    Yes.

Q.    Can you explain, please.

A.    Well, two things.  One is that that confirms that Kevin has had a cardiac arrest because if you have normal blood flow, you will get -- the blood will fill in those handprints.  So this is indicative of absent blood flow, consistent with a cardiac arrest.  The other is that that's consistent with

significant pressure being applied to the skin and to the back by the hand.

Q.   Now, I'd like to turn to the acidosis a minute.  All of us as human beings, we try to maintain a healthy -- what's called an acid-base balance in our blood, correct?

A.   Yes.

Q.   And that's measured by something called the pH?

A.   Yes.

Q.   And if we're all doing pretty well here, we're right around 7.34, correct?

A.   7.34 to 7.44, that range.

Q.   And then if we hold our breath, like let's say swim a couple laps under water in the pool like I used to be able to do when I was a kid, what's going to happen to our -- our blood pH?

A.   Well, it may drop a little bit because you're not clearing out the carbon dioxide.  So, you know, they'll -- it'll drop a bit.  And then when you get out of the pool, you're breathing and correcting off and blowing off that carbon dioxide and correcting and normalizing the pH.

Q.   So let's talk about another activity that affects our acid-blood balance.  In my younger days, I used to go to the gym and I could actually press weights, and I would feel that burn and get that lactic acid.  And -- and what's that doing to my pH?

A.    Well, when you're doing that strenuous exercise, hopefully you're also breathing normally.  And when we exercise, we typically breathe at a faster and deeper rate.  So you're blowing off acid at the same time that your muscles are creating acid.  So your pH should remain in the same range.

10:48

Q.    So if a -- if a body's blood acid is getting out of whack, that generally means that their pH is -- is dropping, correct?

A.    Yes.

Q.    And that means that the blood acid relative to the base, to the alkaline, is rising, correct?

10:48

A.    Correct.

Q.    And so what is the body's mechanism for dealing with that?

A.    So the primary mechanism is what we call "respiratory compensation," meaning that in response to build -- a buildup of metabolic acids, the body, through the respiratory system, compensates by the lungs blowing off carbon dioxide, which is another source of acid buildup.  So it's balancing out the acid buildup.  There's a -- from the muscles, there's a buildup of lactic acid, and the lungs are compensating by blowing off carbon dioxide, which is another form of acid, to help correct the acid-base balance.

10:48

10:49

Q.    So if somebody is let's say a little acidotic or becoming acidotic, do you want them to breathe deeply?

A.    Yes.

Q.    Why?

10:49

A.   Because, again, that's how you compensate.  The lungs compensate by deeper breathing, more rapid breathing to blow off that carbon dioxide, which is another source of acid.

Q.   So if a person is acidotic because they've been exercising, running around, what is the consequence of restricting their breathing?

A.   So then you have uncorrected metabolic acidosis because the lungs are not able to do that respiratory compensation.  So then you have a progressive buildup of acid, and that's a condition called "metabolic acidosis."  And that can contribute to the development of PEA cardiac arrest.

Q.   So whether this was caused by hypoxia or uncorrected acidosis, the common denominator is a lack of -- of unrestricted respiration?

A.   Exactly.

Q.   Now, what's a tripod position?

A.   A tripod position is a recovery position.  I think we've all done that at some point.  If we've been playing basketball or running and you've just kind of exhausted yourself -- you actually see it even in professional athletes.  They'll be over on the side and they'll be leaning over with their hands kind of on their legs, and you see that they're, you know, taking deep breaths.  So it's a recovery position.

Q.   And so is that kind of like when you're standing similar to being in a seated position?

A.   Yes.

Q.   And so -- and that's to open up the lungs and have the most unrestricted breathing?

A.   Yes.

Q.   So that would compensate both for hypoxia, the lack of adequate oxygen going to organs like the heart, and also it would help to keep the -- the acidosis under control, correct?

MR. SAIN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Well, what -- what would be the effect of that?

A.   So as we said, the tripod position is a recovery position, and that allows the lungs to replenish oxygen and also to compensate for acid buildup by blowing off carbon dioxide.

MR. BURTON:  Can I have one moment, Your Honor?

THE COURT:  You may.

BY MR. BURTON:

Q.   Just a last question.  We showed you the handprint.  And this was before he was taken out of the prone position.  Does this handprint confirm your opinion that he had the cardiac arrest while he was in the prone position?

A.   Yes.

Q.   And is that -- is that similar to the situation you have in the other ten cases that you're involved in?

A.   Yes.

MR. BURTON:  Thank you, Your Honor.

THE COURT:  Thank you.

Mr. Sain.

MR. SAIN:  Thank you, Your Honor.

THE COURT:  How much do you have?

MR. SAIN:  Max 15 minutes, Your Honor.

THE COURT:  Let's take a break then.

We'll be in recess for about 15 minutes, ladies and gentlemen.  Remember what I told you before.  Please keep an open mind about the case.  Do not talk about the case with anyone, including amongst yourselves, do not let anybody else talk to you about it, and do not in any way try to learn about this case.  We'll be back in 15 minutes.

(Out of the presence of the jury:)

THE COURT:  You may step down, Doctor.

THE WITNESS:  Thank you, Your Honor.

(Recess)

(In the presence of the jury:)

THE COURT:  Be seated, please.

Doctor, you understand you're still under oath?

THE WITNESS:  Yes.  Thank you, Your Honor.

THE COURT:  Mr. Sain.

MR. SAIN:  Thank you, Your Honor.

I'd like to show to the witness Admitted Exhibit 150, please.  And if we could cue it up to the roughly

9-minute-and-45-second mark.

(Video played.)

MR. SAIN:  Stop there.

**RECROSS-EXAMINATION**

BY MR. SAIN:

Q.   Doctor, just a few minutes ago, you agreed that the last time that Deputy Keeney ever had a knee on him was at the roughly 9-minute-and-50-second mark, true?

A.   Yes.

Q.   And when you were talking about that time, you were talking about the run time in the bottom right-hand corner, true?

A.   Yes.

Q.   And then I asked you specifically, isn't it true that you estimated that the time that Mr. Niedzialek went into cardiac arrest was about five minutes after this point in time; isn't that what you said on my cross-exam?

A.   I did say that, yes.

Q.   Now, I know you're not a pulmonologist, but as a medical physician --

MR. SAIN:  You can take that down.

BY MR. SAIN:

Q.   As a medical physician, you understand that the way that we breathe is that human beings take in oxygen, process it, they breathe out carbon dioxide, yes?

A.    Yes.

Q.    And you're aware of the measurement called "end-tidal," T-I-D-A-L, "CO2" or carbon dioxide, yes?

A.    Yes.

Q.    What is end-tidal CO2?

A.    So that's measuring the carbon dioxide levels in the expired air that is breathed out by the individual.

Q.    That's a measurement that is taken at hospitals generally when you have a person suffering a medical emergency?

A.    Yes.

Q.    That was a measurement that was taken from Mr. Niedzialek, true?

A.    True.

Q.    And you agree that normally when somebody dies as a result of an inability to breathe, you'd expect them to see a high amount, to show a high amount of end-tidal CO2, true?

A.    Yes.

Q.    You're aware, based on your review of the records here, that Mr. Niedzialek's end-tidal CO2 was less than 100, true?

A.    Yes.

Q.    Now, you were talking earlier about Dr. Richard Clark, the toxicologist's testimony, and isn't it true that his opinion is that it was a combination of methamphetamine plus toxic amounts of methamphetamine plus Mr. Niedzialek's exertion that caused metabolic acidosis that caused the death; isn't that his

opinion in this case?

A.    Yes.

Q.    And you agree that methamphetamine plus exertion such as resistance can cause fatal metabolic acidosis, true?

A.    True.

Q.    And you agree that during this incident, Mr. Niedzialek was engaging in exertion and struggle before he suffered cardiac arrest, true?

A.    True.

Q.    You agree that he was engaging in struggle and exertion while he was experiencing prone restraint, true?

A.    True.

MR. SAIN:  No further questions.

THE COURT:  Thank you, Doctor.  You're excused. Thank you for being here.

THE WITNESS:  Thank you.

THE COURT:  Mr. Burton or Mr. Galipo.

MR. GALIPO:  Yes.  Thank you.  We would like to recall Deputy Gomez, please.

THE COURT:  Very well.

THE CLERK:  Please stand and raise your right hand. Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE CLERK:  Thank you.  Please have a seat.  And if you can please state your full name for the record.

THE WITNESS:  Sonia Maria Gomez.

MR. GALIPO:  May I proceed, Your Honor?

THE COURT:  You may.

**DIRECT EXAMINATION (Resumed)**

BY MR. GALIPO:

Q.   Good morning, Deputy Gomez.

A.   Good morning.

Q.   So when you first observed the decedent, did he appear to be agitated to you?

A.   Yes, he did.

Q.   Did he appear to be acting irrationally?

A.   Yes, he did.

Q.   And you have had some training on excited delirium; is that true?

A.   Yes.

Q.   The X2 TASER that you used to tase the decedent, do you know how many volts there are per discharge?

A.   I believe 1,400 volts.

Q.   Okay.  1,400 volts?

A.   Yes.

Q.   And is it your understanding that when someone is in a state of excited delirium, you should request medic -- for medical immediately?

A.    Yes.  Based on my training, if someone's suspected to be experiencing excited delirium, we're to request medical attention immediately.

Q.    Now, at some point after the decedent was handcuffed, would you agree he stopped moving?

A.    After he was handcuffed, he still continued to roll and buck and kick his legs for 45 seconds, about 45 seconds, and he still continued to breathe until paramedics arrived.

Q.    We're going to get to that in a second.  Right now I think my question was did he stop moving at some point?

A.    At some point he did seem to calm down and slowed down his movements.

Q.    Well, you've seen the video, haven't you?

A.    Yes.

Q.    How many times have you watched it?

A.    Quite a few times.

Q.    Doesn't he stop moving about 45 seconds or so after you handcuff him?

A.    After he's handcuffed, yes.  He continued to buck and roll for 45 seconds, and then he did stop moving.

Q.    Okay.  And I think you've already told us that you did not have training with the Riverside Sheriff's Department that someone who's trying to turn or lift up in a prone position might be trying to breathe?  You never had that training; is that a fair statement?

A.    True.

Q.    So would you at least agree that when he stopped moving, from your perspective, he had calmed down?

A.    When he stopped moving, I just assumed that he has calmed down and he was no longer going to try to resist anymore and thought that he's not going to get away from us anymore.

Q.    Right.  And that would be about 45 seconds after he was handcuffed, when he stopped moving, that's when you thought he had calmed down; is that fair?

        MR. SAIN:  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    And did you immediately put him in some type of other position once he stopped moving and calmed down?

A.    No, he was still in the prone position.

Q.    Now, at some point you tried to say something to him, correct?

A.    Yes, I did ask him his name.

Q.    Okay.  And you -- you mistakenly thought it might be Eric?

A.    Yes.

Q.    But you weren't sure?

A.    No.

Q.    So that's one of the reasons you asked him his name?

A.    Yes.

Q.   But you also wanted to just see if you can get some dialogue going?

A.   Yes.

Q.   And understanding that he stopped moving about 45 seconds after you handcuffed him, when did you ask him his name?

A.   I think it was about two minutes, about two minutes after, I asked him for his name.

Q.   Okay.  About two minutes after he stopped moving is when you asked him for his name?

A.   Yes.

Q.   And would it be fair to say that from the time he stopped moving to the time you asked him his name, he had remained not moving during that time period?

A.   He was -- I could still see that he was still breathing after I asked him his name.

Q.   No.  My question may not have been very clear.  From the time he stopped moving, which you say was approximately 45 seconds after he was handcuffed, from that time --

THE COURT:  Mr. Galipo, I think she's thinking that there's movement in breathing.

MR. GALIPO:  I see.  Fair enough, Your Honor.  May I ask another question?

THE COURT:  You may.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.   Aside from the breathing you're talking about, which I'll ask you about in a moment, did you see him moving his arms or legs or turning during this time period from the 45 seconds after you handcuffed him up to the time you asked him his name?

A.   No.

Q.   And why did you wait two minutes or over two minutes to ask him his name?

A.   I know at the time -- or speaking right now, two minutes seems like a lot of time, but while you're there and your adrenaline is going, time seems to be going quick.  It didn't seem like two minutes.  You know, I was conversing with my partner, you know, and then that's -- once everything seemed to calm down, that's when I finally decided to ask him his name.

Q.   Okay.  And I think -- did you ask him his name --

        MR. GALIPO:  I think the -- maybe we can turn to Exhibit 150, please, and go to the area of 10:28 on the timer on the bottom right.  Okay.  If you can just play it for a short time.

                    (Video played.)

        MR. GALIPO:  Can you stop it, please.

BY MR. GALIPO:

Q.   Okay.  That's your voice, right, asking for his name?

A.   Yes.

Q.   And obviously he's chest down at this point?

A.   Yes.

Q.    And he had been --

        MR. GALIPO:  You can keep that up if it's possible.

Oh.  Sorry.

BY MR. GALIPO:

Q.    And he was -- whose hand is that, if you know, appears to    11:25

be on part of the decedent's body?

A.    That would be Deputy Keeney's.

Q.    Okay.  You had your hand on another position, correct?

A.    Yes.

Q.    Where was your hand?    11:25

A.    My right hand was placed on his back.

Q.    I see.  Do you know when you finally lifted your hand off

his back whether there was any mark left on his back?

A.    At the time I didn't see it, but after reviewing the

video, I did see my hand mark.    11:25

Q.    Okay.  And are you aware from, you know, reviewing the

video in this case that the decedent was handcuffed at about

7:19 on this counter?

A.    I don't understand the question.

Q.    Okay.  You've seen this composite video before, right, in    11:26

reviewing the case?

A.    Yes.

Q.    And you see the counter on the bottom right?

A.    Yes.

Q.    Okay.  Were -- were you aware that when the counter was at    11:26

about 7:19 is when the handcuffing was complete?  Or you're not sure?

A.    I'm not sure.  I believe so.

Q.    Okay.

MR. GALIPO:  Can we just go to that really quickly.  Just play about a -- a short snippet for the deputy to see.

(Video played.)

MR. GALIPO:  Okay.  A little bit back.  Go ahead.

(Video played.)

MR. GALIPO:  Stop it.

BY MR. GALIPO:

Q.    Did you see that that was the time frame that the handcuffing was complete?

A.    Yes.

Q.    All right.  And I think that's at approximately 7:20, is that fair, on the counter?

A.    I would say.

Q.    Okay.

MR. GALIPO:  And can we go to 7:47.  Maybe just start at 7:45, please.  That's fine.

(Video played.)

MR. GALIPO:  Stop.

BY MR. GALIPO:

Q.    Do you recall the decedent saying "need help" and "get me up" at about 7:47?

A.    At the time I did not.  I was speaking to my partner, but reviewing the camera, now I -- I hear it.

Q.    Now you hear that.  Are you trained on the concept of situational awareness?

A.    Yes.

Q.    All right.  You're supposed to be aware of what's going on around you?  Generally is that the concept?

A.    Yes.

Q.    Including what the suspect is doing?

A.    Yes.

          MR. GALIPO:  And can we go to about 7:50.  Just keep playing from here.

                    (Video played.)

          MR. GALIPO:  We can stop.

BY MR. GALIPO:

Q.    Okay.  Is this about the time where he stops moving his arms and legs?

A.    I believe so.

Q.    And this is about 8:04, 8:05; is that fair?

A.    Yes.

Q.    Okay.  And then --

          MR. GALIPO:  Can we move forward then again to the 10:25 where I think you asked him his name.

                    (Video played.)

          MR. GALIPO:  Stop.

BY MR. GALIPO:

Q.   And did you notice the blood around his face and head as he was laying on the ground?

A.   Yes.

Q.   And you had seen the injury before?

A.   When I first came in contact with him, I did notice that he did have blood on his face.

Q.   Okay.  So would it be correct that from the time he went down after your second tasing to the time that you asked him his name, he was essentially chest down during that time frame?

A.   Yes.

Q.   And if my math is right, if he was handcuffed at 7:19, so this would be over three minutes later after he was handcuffed that you asked him his name; is that true?

A.   I believe about two and a half minutes.

Q.   Okay.  Now -- well, two and a half minutes from when he stopped moving, correct?

A.   Yes.

Q.   Okay.  And did you get any response to asking him his name?

A.   No.

Q.   And did you then immediately turn him over or sit him up to see what was going on with him?

A.   No.

Q.   You wrote a report at some point.  We were talking about

that at the end of the day yesterday, correct?

A.   Yes.

Q.   And the exhibit book may still be open.  I think it's Exhibit 180.

A.   Yes.

Q.   Is that your report?

A.   Yes, it is.

Q.   And I apologize because yesterday I couldn't find the right spot.  So I found it now.  About midway down on line 19 -- and this would be on page 5.  If you can turn to that page, please.

A.   I'm there.

Q.   Okay.  The second sentence says, "When Niedzialek seemed calm -- calmed, we turned him over on his back."  Do you see that?

A.   Yes.

Q.   Okay.  You just told me that he appeared calm when he stopped moving at eight minutes on the counter, correct?

A.   Yes.

Q.   So when you wrote in your report that when he appeared calm, you turned him over on his back, would you agree there was some timing between him appearing calm when he stopped moving and finally turning him over?

A.   Well, when somebody immediately -- after they've been done fighting us, just because they calm down right away doesn't

mean we're going to turn them over right away.  They can sometimes -- what we like to say, playing possum, they can fake that their -- let their guard -- so we can let our guard down. So then thinking, *Okay, you know what, they're not going to fight us no more, let's turn them over, get them up*, and then the fight can again ensue and continue.  So sometimes we keep them down, even though they are calm, still keep them down in that position for not only his safety, for our safety, and the public's safety.  And it's not until we decide that it's finally safe to move them in a position where he can get up that we'll move them.

Q.    But when you said, "When he seemed calm, we turned him over on his back" in your report, that's not exactly accurate, is it?

A.    I would say it is for the fact that we waited until he was calm enough for where we were comfortable that he wasn't going to fight us no more, and then we turned him on his back.

Q.    Okay.  And then when he was turned on his back --

        MR. GALIPO:  And if we can go to that part of the --

BY MR. GALIPO:

Q.    And by the way, for the record, we stopped it at 10:32 on the counter in the bottom right.  And he was eventually turned over I think around 12:09, more than a minute and a half after you asked him his name.  Does that seem about right?

A.    Yes.

Q.   And now we're at 12:08.  Is that your right hand that's on his back?

A.   Yes.

MR. GALIPO:  And can we play just a little, please.

(Video played.)

MR. GALIPO:  Can we -- can we go back just a little first.

(Video played.)

MR. GALIPO:  Stop it when you can see his face, please.  Stop it.  Okay.

BY MR. GALIPO:

Q.   This is at 12:13.  And this -- obviously, we're seeing this from your body-worn camera; is that correct?

A.   Yes.

Q.   So this is about the angle you would have had at this point in time?

A.   Yes.

Q.   And when he was turned over, did you look at some point at his face?

A.   I did see his face.

Q.   Okay.  And were you looking when you turned him over to see if he appeared to be breathing?

A.   Yes, I did, and that's why I immediately went in to check for a pulse.

Q.   Okay.  Did he appear to be breathing when you turned him

over?

A.    It seemed like he did take a breath right when we turned him over, but to confirm, I wanted to go in, and that's why I immediately went to check for a pulse.  And then even a minute after, it seemed like he did take a breath.

Q.    A minute later?

A.    Yes.

Q.    So you're saying about 60 seconds passed and then he took one breath?

A.    Well, I saw his mouth open as if he was taking a breath.

Q.    And just so I'm clear, you're saying this is about a -- 60 seconds or a minute after he was turned over?

A.    Yes.

Q.    Okay.  In your report that we were just looking at, after you reference on line 20 that you turned him over on his back, the next sentence you say is, "Niedzialek did not appear to be breathing."  Do you see that sentence in your report?

A.    Yes.

Q.    Would it be fair to say when you turned him over, before you took a pulse, he did not appear to be breathing?

A.    His breathing was slow and I wasn't sure, so, therefore, I went in to check for a pulse.

Q.    But you, even in your deposition, indicated that you wrote this report, including what you thought were the important and relevant facts?

A.    Yes.

Q.    While they were still fresh in your mind?

A.    Yes.

Q.    And would you at least agree with me that you wrote in your report when you turned him over he "did not appear to be breathing"?

A.    Yes, I did write that.

Q.    Now, let's talk just for a moment about the pulse.  How many times did you take his pulse?

A.    Just when I immediately turned him over, I went to check for it.  I didn't feel one so then I went to check again, and that's when I felt a low faint pulse.

Q.    Okay.  So when you turned him over and you took the pulse the first time, where did you take it from?  What part of his body?

A.    From his neck.

Q.    Okay.  And were you wearing gloves at the time?

A.    Yes.

Q.    And at first did you think you felt a pulse?

A.    At first I did not feel a pulse, but then when I repositioned to check, that's when I felt a low faint pulse.

Q.    Okay.  And is that why you said initially, *I don't have a pulse*?

A.    Yes.

Q.    And then Deputy Keeney says, *No pulse?*  And you say, *No*

*pulse.*  Do you remember that?

A.    I believe so.

Q.    And then you're saying you checked again?

A.    Yes.

Q.    And how much time passed from the first time you checked    11:37
to the second?

A.    Maybe like a second or two.

Q.    Okay.  You still had your gloves on?

A.    Yes.

Q.    And which part of his body did you check?  The same part    11:38
or another part?

A.    Yes, same part, around his neck.

Q.    Okay.  And how long did you have your hand or finger
against his neck at that point, the second time you checked?

A.    For a few seconds until I could feel a pulse.    11:38

Q.    It took a few seconds to -- to feel a pulse?

A.    About say like a second or two.

Q.    Okay.  And then you say, *No, there is.  It's very low.*
*It's very low.  Whew, it's very low.*  Do you remember saying
that?    11:38

A.    I know I said, *It's very low and faint.*

        MR. GALIPO:  Okay.  Can we just play this portion,
please, starting at 12:13.

                    (Video played.)

        MR. GALIPO:  Okay.  Stop it.    11:39

BY MR. GALIPO:

Q.   So this is at about 12:30 where you take his pulse, right? Maybe a few seconds before?

A.   Yes.

Q.   And you had already at least acknowledged that you wrote in your report that when you turned him over, he didn't appear to be breathing, correct?

A.   Yes.

Q.   And would you at least agree with me that there was some period of time from this point until the paramedics actually got to him?

A.   Yes.

Q.   Okay.  So how many additional times did you check his pulse before the paramedics got to him since you felt it was very low?

A.   That was the only time I checked his pulse.

Q.   Why didn't you check it again just to make sure he still had a pulse?

A.   I don't know.

Q.   So would you at least agree with me for the next minute or two neither yourself nor Deputy Keeney tried to check his pulse again?

A.   No, we didn't.

Q.   You do have training with respect to CPR?

A.   Yes.

Q.   And would it be fair to say if someone's not breathing and has no pulse, your training is to provide CPR to that person?

A.   If the person is not breathing and doesn't have a pulse, then that's when we perform CPR.

Q.   Okay.  But it's your testimony, and I think you said this in your deposition, if they're not breathing but still have a pulse, then your understanding is you don't need to perform CPR?

A.   Just from my training, my understanding, as long as they have a pulse, we do not perform CPR.

Q.   Right.  Which is why I'm wondering why you didn't recheck his pulse because obviously if the pulse stopped, then you'd have to start CPR right away based on your training, true?

A.   Yes.

Q.   And am I understanding you correctly that you think he took one breath about a minute after you checked his pulse?

A.   He seemed to open his mouth and appeared that he was taking air in.

        MR. GALIPO:  We can take this down.  Thank you.

BY MR. GALIPO:

Q.   Okay.  So I just want to make sure I have this correct from your perspective.  After you turned him over and you took his pulse, about a minute later, you saw his mouth appear to open?

A.   Yes.

Q.    And appear to possibly take a breath?

A.    Yes.

Q.    And this is just one time you saw this, correct?

A.    That his mouth opened?  Yes.

Q.    Lastly, I want to talk to you about your training just so we could verify some points.  You said you did have some training on excited delirium, true?

A.    Yes.

Q.    And do you recall stating in your deposition that you don't recall the term "recovery position" ever being mentioned in your training?

A.    The time we had -- the recovery position was used when we had somebody in the carotid restraint, which we no longer use. And it was to remove them -- after it was applied, to remove them on their buttocks.  Another time we can kind of use the recovery position is when we have been in training with each other, and our arrest and control techniques, when you're on the floor playing suspect or whatever not, then they'll say, *Okay*, they'll tell us -- our instructor's like, *Hey, get in the recovery position*.  So then that's when you get back up in the seated or the standing position.

Q.    My question was do you recall being asked if you heard the term "recovery position" in your training at the time of your deposition?

A.    Yes, when using the carotid, yes.

Q.   Were you trained after someone was prone and handcuffed and stopped moving to put them in a recovery position right away?

A.   If somebody was fighting us, being combative, and we're taking them to the ground, we have to put them in handcuffs and in the prone position, we're trained that only move them when we feel it's safe to move them into recovery position to move them.

Q.   Okay.  So would it be a fair statement that you were not trained to put them in a recovery position immediately after they're handcuffed?

A.   If somebody's -- who has been fighting us, no, I'm not going to move them right away.  They leave it at -- it's up to us if we feel safe enough for them to be placed into recovery position so we can move them to the unit or get them medical assistance.

Q.   Okay.  And you were not trained to put them in a recovery position even if they stop moving; is that also a correct statement?

          MR. SAIN:  Vague as phrased as to "stop moving."

          THE COURT:  Sustained.

BY MR. GALIPO:

Q.   If they're -- if they stop resisting and stop moving their arms and legs?

A.   If we feel that it's safe and they are no longer going to

fight us, then that's when we can move them into -- get them standing up or seated position.

Q.    In fact, you were trained to keep them chest down, true?

MR. SAIN:  Vague.  Incomplete hypothetical.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.    After someone being handcuffed prone, weren't you trained to keep them prone?

MR. SAIN:  Same objections.

THE COURT:  Overruled.

BY MR. GALIPO:

Q.    You may answer.

A.    I forgot the question.

Q.    Okay.  Weren't you trained that after you handcuff someone in a prone position to keep them prone?

MR. SAIN:  Vague as to time.  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  We can keep them in the prone position as long as we feel it's safe for the public.  Especially if they're fighting us, yes, we're going to keep them in the prone position.  We're trained that the prone position is a safe position for someone to be in.  And I'm not going to move somebody out of the prone position if they were just fighting with us.  I'm not going to immediately move them out of the

prone position where they can then again regain and start trying to fight or escape.  I'm not going to do that.  Until I feel it's safe, then that's when I'll move them out of the prone position.

BY MR. GALIPO:

Q.    And that's based on your training, correct?

A.    Yes.

Q.    And you were also trained even if the person stops moving and resisting for some period of time, let's say two or three minutes, still, based on your training, you don't need to put them in a recovery position; is that fair?

        MR. SAIN:  Incomplete hypothetical.

        THE COURT:  Overruled.

        THE WITNESS:  Yeah, like we'll move them out of that position once we feel it's safe to move them out of that position.

BY MR. GALIPO:

Q.    In fact, based on your training, you were trained that prone restraint does not affect breathing, correct?  That's part of your training?

A.    When someone is placed in the prone restraint, we're taught that they're still able to breathe okay.

Q.    Who told you that, by the way?

A.    Based on my training.

Q.    But who in particular from the department told you that

when someone is in a prone position after they're handcuffed, they're still able to breathe?

A.    Just from the training that I've been to.

Q.    Do you recall the names of any people that stated that?

A.    I don't remember the instructors.

Q.    And so are you trained that after someone's handcuffed and they're in a prone position, even if they stop resisting, it's okay to hold them down to the ground for some period of time because it won't affect their breathing?

        MR. SAIN:  Incomplete hypothetical.  Asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  We won't move anybody out of the prone position until I said -- we feel it's safe to do so.

BY MR. GALIPO:

Q.    You keep giving that answer.  Did anyone tell you that's the answer that you should give no matter what the question?

A.    No.

Q.    Try to focus on my question, if you can.  Were you trained that if someone is prone or chest down and handcuffed and not resisting, even if they're being held down with some body weight, that does not affect their breathing?

A.    We were trained that if someone is in the prone position, it would not affect their breathing.  And we apply pressure to let them know that, *Hey, we're -- we're there, don't try to*

*move up or get up*, especially if they were just fighting us. We just barely -- like for me, I just have their hand on there just to let them know that I'm there, and if you're going to try to pop up, I'm going to keep you from getting up.

Q.   Okay.  So the training you have that it doesn't affect their breathing, that's even if you're using some pressure or weight to hold them down; is that fair?

A.   Well, I'm not going to apply pressure where I know that it might stop them from breathing.  I just apply just enough just to let them know that I'm there.  And we are trained that the prone position does not affect their breathing.

Q.   Okay.  And I take -- I take it that part of the reason why -- in this case, after he was handcuffed and after he stopped moving, the reason that you kept him in a prone position for some period of time after that was based on your training; is that a fair statement?

A.   From my training and experience, yes.  If somebody was combative with us, I'm going to wait until either more officers come before I can move that person into a recovery position or medics were on the way.  Sometimes instead of getting them up, moving them and risk getting into another fight with them, paramedics were on the way, they were going to be right there, we could hear them.  So we're just going to sit there and wait. They're not in any danger, they're -- from my training, the prone position is not going to affect their breathing.

Q.   Okay.  How many times in your training sessions -- strike that.

What form of training did you hear that, that someone being in a chest down, prone position after being handcuffed, even if they stop resisting and some weight's applied to hold them down, that won't affect their breathing?  Was it a classroom?  What was it?

A.   We go to arrest and control techniques.  And it's like every two years we go and get trained.

Q.   That's where you learned that?

A.   Yes.

Q.   Anywhere else?

A.   The academy.

Q.   All your training though, I think you told us, was from the Riverside Sheriff's Department?

A.   Yes.

Q.   Were you trained that some people who are in a state of agitated or excited delirium may be more at risk to being held down prone after they're handcuffed?

A.   We're trained when experien -- come in contact with somebody who is experiencing excited delirium, is to secure the person and call medical ASAP.

Q.   So you're not trained that putting them in a prone position can put them at risk?

A.   I was trained that the prone position doesn't put anybody

at risk.

Q.   Through your Sheriff's Department?

A.   Through my training, yes.

Q.   And that would be, based on your training, no matter how long they're in a prone position, it wouldn't matter, based on your training?

A.   Yes.

Q.   Okay.  So referring to page 50 of your deposition --

MR. GALIPO:  I don't know if the Court has a copy of that.  Yes?  Page 50, Your Honor.  I'd like to read lines 17 through 20.

MR. SAIN:  Your Honor, this is unaccepted hearsay.  She's not a party.

MR. GALIPO:  Goes to impeachment.

MR. SAIN:  It's not contradiction.

THE COURT:  Say that again.  50 --

MR. GALIPO:  Page 50, lines 17 through 20.

THE COURT:  This is the wrong depo.  Sorry.  What are the lines again?

MR. GALIPO:  17 through 20.

MR. SAIN:  Objection.  She's not a party and this is not contradictory.

THE COURT:  Overruled.  You can read it.

BY MR. GALIPO:

Q.   "QUESTION:  Have you ever heard in your training in this

context, general context, the phrase 'recovery position'?

"ANSWER:  I don't recall."

Do you recall that question and answer now at the time of your deposition?

A.   Yes.

Q.   In fact, part of your training was to not only keep them in a prone position after they're handcuffed and after they stop resisting but to keep some pressure on them as well; is that a fair statement?

A.   When they're in the prone restraint, if we need to just place a hand on them just to let them know that, *Hey, we're still there*, just so they don't try to get up and regain in a fight, so yes.

Q.   That is a correct statement?

A.   Yes.

Q.   And you have no training about getting them off their chest or taking body weight off them; is that also a fair statement?

A.   We only use whatever force necessary to overcome any resistance.

Q.   I think we talked about this, but you would agree that the decedent calmed down and stopped resisting at about the eight-minute mark, about 45 seconds, I think you said, after he was handcuffed, correct?

A.   Yes.

Q.    How long was it from that point until he was turned over;
if you know?

A.    I believe it was four minutes after he was tased.

Q.    Four minutes after --

A.    Or -- yes, six minutes after he was tased that we turned
him over.

Q.    Okay.  And you're talking about the second tasing when he
went chest down?

A.    Yes.

Q.    I was asking from about the time he stopped resisting,
which I think would be at about the eight-minute mark until you
turned him over, do you know how much time that was?

A.    I think about four minutes.

Q.    About four minutes.  And during that four minutes, was, in
your opinion, he resisting at all?

A.    Eventually, he did stop moving, but, like I said,
sometimes they like to play possum, let us put our guard down,
and sometimes if we do decide to move them up, they might try
to again regain and try to fight us or try to escape.  So
sometimes we might keep them down a little bit longer.

Q.    And this playing possum concept, is that something you
learned in training?

A.    My training and experience.  There's been situations where
we thought this person wasn't -- he was done fighting, we did
remove -- stand them up, decide to move them to the unit, and

as we walked them to the unit, they started to go limp, we picked them up, they -- we walk them to the unit, they start trying to kick us, trying to bite us, trying to head-butt us. They'll do anything to try to escape sometimes. So sometimes it is safe until we get maybe enough deputies there where we can move them. So sometimes it's better to wait until we have more deputies as well.

Q. Well, I guess -- well, even when Deputy Bowman arrived, you still didn't turn him over at that point, true?

A. When Deputy Bowman arrived, that's when we did move him on his back.

Q. Oh, I thought that you had Deputy Bowman go to the apartment?

A. Yes. And the apartment was not too far away. So if anything did happen, Deputy Bowman would have been right there within a second.

Q. No. What I'm getting at is when Deputy Bowman arrived, nobody said, *Hey, will you help us turn him over or sit him up?* Someone said -- told Deputy Bowman to go to the apartment; isn't that true?

A. Yes, I did tell Deputy Bowman to clear the apartment.

Q. In fact, at that point you said he had calmed down. You mentioned that to Deputy Bowman?

A. Yes.

Q. So just so I'm clear on this possum concept, was that

something in your training, when you went to these Riverside training sessions, did they tell you, *Look, even if you handcuff someone and they're prone, chest down, they stop resisting, stop moving, keep them in that position for some period of time because they could be playing possum*?

A.   No, they train -- because every situation is different. So they train you that you decide, it's at your discretion -- every call is different.  So it's at your discretion when it's safe to move that person.

Q.   And you did give an interview or a statement in this case, correct?

A.   Yes.

Q.   When was that in relation to the incident?  Was it like a couple days, two or three days later?

A.   I believe so.

Q.   Have you reviewed that recently?

A.   Yes.

Q.   Who was asking you the questions?  Did you understand them to be detectives?

A.   I believe one of them was and one was a deputy.

Q.   Were they from the Riverside Sheriff's County, from your department?

A.   Yes.

Q.   Okay.  So you were being asked questions by people from your department related to this incident?

A.    Yes.

Q.    And at the time of your interview, did you know that this person had died?

A.    Yes.

Q.    Did they ask you any questions at all in your interview about the prone restraint?

A.    Not that I can recall.

MR. GALIPO:  Thank you.  That's all I have, Your Honor.

THE COURT:  Let's take a lunch recess at this time, ladies and gentlemen.  We'll be in lunch until about 1:15. Remember, keep an open mind, don't talk about the case, don't try to learn about the case in any way.  We'll be back at 1:15.

(Out of the presence of the jury:)

THE COURT:  You may step down, Deputy.

MR. GALIPO:  Your Honor, this afternoon can you let us know about your thoughts on Dr. Freeman, whether we need to call him in our case-in-chief or we can reserve for rebuttal?

THE COURT:  Right after lunch.

MR. GALIPO:  Thank you so much.

MR. SAIN:  Your Honor, may I be heard on that before you rule?

THE COURT:  Okay.  You can be heard on that.

(Lunch recess)

-o0o-

CERTIFICATE OF OFFICIAL REPORTER


        I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.




                         DATED THIS 30TH DAY OF MARCH, 2023




                         /s/ PHYLLIS A. PRESTON

                         _____

                         PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                           FEDERAL OFFICIAL COURT REPORTER

**$**

$4,800 [1] - 40:6
$6,000 [1] - 6:10

**'**

'recovery [1] - 99:1

**/**

/s [1] - 104:18

**0**

0.100 [1] - 53:4
0.757 [1] - 53:7

**1**

1 [2] - 45:9, 46:15
1,400 [2] - 74:20, 74:21
100 [1] - 72:19
10:25 [1] - 81:23
10:28 [1] - 78:16
10:32 [1] - 84:21
120 [1] - 22:10
128 [1] - 2:7
12:03:93 [1] - 30:16
12:04 [1] - 30:17
12:08 [1] - 85:1
12:09 [2] - 65:5, 84:23
12:13 [2] - 85:12, 88:23
12:30 [1] - 89:2
13:32 [1] - 30:20
15 [3] - 70:6, 70:8, 70:13
15-minute-and-26-second [1] - 47:21
150 [5] - 30:1, 62:11, 62:12, 70:24, 78:16
15:27:09 [1] - 62:25
17 [3] - 98:10, 98:17, 98:20
180 [1] - 83:4
19 [1] - 83:10
19-2083-JGB [2] - 1:10, 4:4
1977 [1] - 7:5
1:15 [2] - 103:11, 103:13

**2**

20 [4] - 86:15, 98:11, 98:17, 98:20
2005 [1] - 40:21
2019 [6] - 8:5, 15:25, 23:19, 33:10, 44:6,

54:25
2023 [3] - 1:17, 4:1, 104:15
21800 [1] - 2:5
25,000 [1] - 45:7
28 [1] - 104:7
29 [1] - 15:25
29th [2] - 23:18, 44:6

**3**

3 [1] - 1:11
30 [3] - 1:17, 4:1, 40:18
305 [1] - 2:10
30th [2] - 8:5, 33:10
30TH [1] - 104:15
310 [1] - 2:5
3470 [1] - 1:23
39 [1] - 3:6

**4**

4 [1] - 46:15
40 [1] - 40:18
4000 [1] - 2:16
40th [1] - 2:10
45 [9] - 75:7, 75:17, 75:20, 76:7, 77:4, 77:18, 78:3, 99:23

**5**

5 [2] - 3:6, 83:10
50 [5] - 22:19, 98:8, 98:10, 98:16, 98:17
5th [1] - 2:16

**6**

60 [4] - 3:7, 40:19, 86:8, 86:12
633 [1] - 2:16
644 [1] - 2:10
66 [1] - 46:15

**7**

7 [1] - 57:11
7.19 [1] - 58:23
7.34 [2] - 66:10, 66:11
7.44 [1] - 66:11
71 [1] - 3:7
74 [1] - 3:9
753 [1] - 104:7
7:19 [3] - 79:18, 80:1, 82:12
7:20 [1] - 80:15
7:45 [1] - 80:20
7:47 [2] - 80:19, 80:25
7:50 [1] - 81:11

**8**

85 [1] - 40:16
8701 [1] - 104:20
8:04 [1] - 81:19
8:05 [1] - 81:19

**9**

9-minute-and-45-second [1] - 71:1
9-minute-and-50-second [2] - 47:25, 71:8
90071 [1] - 2:17
911 [2] - 16:4, 23:22
91103 [1] - 2:8
91367 [1] - 2:5
92501 [1] - 1:23
94609 [1] - 2:10
9:14 [1] - 1:18

**A**

a.m [1] - 1:18
ability [3] - 21:10, 21:19, 22:22
able [15] - 20:24, 21:3, 23:11, 23:12, 24:4, 27:17, 32:11, 33:22, 34:19, 37:25, 66:13, 68:8, 94:22, 95:2
abnormal [1] - 12:4
ABOVE [1] - 104:10
ABOVE-ENTITLED [1] - 104:10
abrasions [1] - 43:21
absence [1] - 55:5
absent [1] - 65:24
absolutely [1] - 49:2
abuse [3] - 15:20, 58:16, 58:20
academy [2] - 41:12, 97:13
accept [2] - 36:13, 37:7
accepted [1] - 36:14
accomplished [1] - 18:10
according [7] - 15:6, 17:22, 27:7, 43:20, 48:6, 48:10, 53:2
accumulated [2] - 25:8, 34:17
accumulation [1] - 57:5
accurate [5] - 52:12, 52:14, 52:15, 60:4, 84:13
acid [42] - 22:13,

22:16, 22:17, 22:22, 22:24, 23:1, 23:2, 23:3, 23:9, 23:10, 23:13, 24:12, 24:13, 25:8, 26:11, 29:22, 33:21, 34:20, 36:24, 37:23, 38:1, 38:2, 57:10, 57:23, 58:3, 58:10, 58:22, 66:5, 66:22, 66:24, 67:4, 67:5, 67:6, 67:9, 67:17, 67:19, 67:20, 67:21, 68:3, 68:9, 69:14
acid-base [2] - 66:5, 67:21
acid-based [1] - 58:10
acid-blood [1] - 66:22
acidosis [26] - 23:14, 37:19, 37:20, 38:4, 38:8, 38:9, 57:2, 57:4, 57:12, 57:14, 57:16, 57:20, 58:4, 58:9, 58:14, 58:17, 58:20, 59:2, 59:5, 66:3, 68:7, 68:10, 68:13, 69:7, 72:25, 73:4
acidotic [3] - 67:22, 67:23, 68:4
acids [2] - 57:5, 67:15
acknowledge [1] - 36:22
acknowledged [1] - 89:5
act [2] - 53:20, 54:5
acting [1] - 74:13
activated [1] - 16:12
active [3] - 23:23, 23:25, 24:6
activity [22] - 11:3, 11:7, 11:12, 11:16, 12:17, 13:9, 13:18, 13:19, 17:4, 21:6, 24:14, 26:4, 26:9, 27:3, 27:4, 29:15, 37:20, 39:2, 39:4, 55:5, 66:21
actual [1] - 28:6
acute [1] - 54:17
add [1] - 15:8
additional [1] - 89:13
addressing [1] - 32:20
adequate [1] - 69:6
adequately [1] - 25:7
administered [1] - 28:13
admits [1] - 38:14
admitted [1] - 70:24
adrenaline [2] - 25:17,

78:10
affect [9] - 57:24, 94:19, 95:9, 95:22, 95:24, 96:5, 96:11, 96:25, 97:6
affected [1] - 59:23
affecting [3] - 7:9, 7:13, 51:21
affects [2] - 23:2, 66:21
afternoon [2] - 15:25, 103:16
agency [2] - 41:4, 41:14
agitated [5] - 16:22, 22:5, 31:20, 74:11, 97:18
agitation [3] - 22:9, 24:22, 36:11
ago [3] - 10:23, 40:18, 71:6
agonal [14] - 29:13, 29:17, 29:23, 30:20, 31:2, 31:11, 37:18, 38:20, 38:22, 38:23, 41:22, 63:13
agony [1] - 29:18
agree [38] - 37:20, 41:17, 41:19, 41:20, 41:25, 42:5, 43:12, 45:4, 46:3, 46:8, 47:6, 48:15, 52:19, 52:24, 53:19, 54:3, 58:9, 58:13, 58:25, 59:4, 60:4, 63:23, 63:25, 64:4, 64:8, 64:12, 64:13, 72:14, 73:3, 73:6, 73:10, 75:5, 76:2, 83:21, 87:4, 89:9, 89:20, 99:21
agreed [4] - 8:17, 17:17, 51:17, 71:6
ahead [2] - 17:17, 80:8
air [5] - 17:6, 35:4, 56:18, 72:7, 90:18
airway [1] - 56:23
al [1] - 4:5
alive [1] - 45:5
alkaline [1] - 67:10
allowed [1] - 20:8
allowing [1] - 5:6
allows [1] - 69:13
almost [2] - 40:12, 55:1
alone [1] - 25:3
ALVES [1] - 1:7
Alves [1] - 4:5
AM [1] - 1:11
American [1] - 36:15

**amount** [3] - 21:16, 72:16
**amounts** [1] - 72:23
**analysis** [2] - 23:17, 45:8
**AND** [3] - 104:5, 104:8, 104:10
**Angeles** [1] - 2:17
**angle** [1] - 85:15
**anoxic** [4] - 18:3, 18:14, 20:16, 31:25
**ANSWER** [2] - 46:22, 99:2
**answer** [8] - 37:10, 60:23, 61:17, 64:11, 93:12, 95:16, 95:17, 99:3
**answered** [2] - 76:10, 95:11
**anxiety** [1] - 22:8
**apartment** [6] - 15:24, 16:11, 101:13, 101:14, 101:19, 101:21
**apologies** [2] - 45:17, 55:16
**apologize** [2] - 30:11, 83:8
**appear** [9] - 74:10, 74:13, 85:25, 86:16, 86:20, 87:5, 89:6, 90:23, 91:1
**appearances** [1] - 4:6
**APPEARANCES** [1] - 2:1
**appeared** [5] - 16:8, 83:17, 83:20, 85:22, 90:17
**appearing** [1] - 83:22
**apples** [1] - 34:15
**applicable** [1] - 34:2
**applications** [1] - 14:22
**applied** [7] - 24:3, 32:12, 35:20, 36:1, 66:1, 91:14, 97:5
**apply** [3] - 95:24, 96:8, 96:9
**apprehended** [1] - 39:13
**approached** [1] - 16:11
**approaching** [1] - 27:18
**area** [3] - 7:8, 58:23, 78:16
**armed** [1] - 46:11
**arms** [3] - 78:2, 81:17, 92:24
**arrest** [87] - 8:11,

8:14, 9:7, 9:10, 9:12, 9:16, 9:18, 11:5, 11:6, 11:13, 11:19, 12:5, 12:8, 12:14, 13:20, 14:13, 17:25, 18:9, 18:18, 18:21, 19:1, 19:4, 19:6, 19:13, 20:12, 21:3, 21:5, 23:15, 23:18, 23:25, 24:15, 24:18, 25:3, 25:5, 25:6, 25:9, 25:11, 25:14, 25:16, 25:22, 26:6, 26:25, 27:8, 28:21, 28:25, 29:14, 29:24, 31:13, 31:16, 31:18, 31:23, 32:6, 32:9, 33:17, 34:11, 36:14, 36:25, 37:3, 38:11, 39:17, 41:9, 45:1, 47:21, 48:6, 48:12, 48:17, 56:10, 56:14, 57:17, 58:14, 60:2, 62:10, 62:16, 63:7, 63:10, 65:5, 65:22, 65:25, 68:11, 69:21, 71:16, 73:8, 91:17, 97:8
**arrhythmia** [3] - 10:24, 13:9, 13:11
**arrhythmias** [1] - 10:25
**arrival** [1] - 27:13
**arrived** [10] - 16:10, 17:1, 25:24, 32:11, 56:1, 56:15, 75:8, 101:8, 101:10, 101:17
**arteries** [4] - 8:7, 9:16, 28:4
**artery** [1] - 9:9
**articles** [2] - 52:2, 52:5
**ASAP** [1] - 97:22
**aside** [1] - 78:1
**asleep** [3] - 31:22, 37:15, 48:3
**aspect** [2] - 11:1, 11:2
**aspects** [1] - 38:6
**asphyxia** [10] - 21:7, 21:8, 47:12, 50:5, 52:7, 52:10, 52:13, 52:17, 65:1
**asphyxial** [1] - 62:4
**asphyxiation** [2] - 33:5, 62:7
**assistance** [1] - 92:16
**associate** [1] - 4:13
**associated** [2] - 33:6, 49:24

**association** [1] - 36:15
**assume** [1] - 27:9
**assumed** [1] - 76:4
**asystole** [9] - 13:13, 13:15, 13:16, 13:19, 26:20, 26:24, 27:16, 55:5, 55:9
**asystolic** [1] - 26:22
**athlete** [1] - 22:18
**athletes** [1] - 68:20
**attack** [6] - 8:8, 9:7, 9:8, 9:11, 9:13, 9:15
**attention** [2] - 30:1, 75:3
**authored** [2] - 52:6, 52:9
**autopsy** [12] - 8:5, 14:15, 43:2, 43:4, 43:20, 44:23, 45:17, 45:18, 45:21, 45:23, 60:15, 60:25
**Avenue** [1] - 2:7
**aware** [22] - 28:12, 42:2, 43:8, 43:15, 43:18, 49:18, 49:23, 50:13, 50:20, 51:1, 51:6, 51:9, 51:11, 54:24, 56:14, 56:21, 58:22, 72:2, 72:18, 79:16, 79:25, 81:6
**awareness** [1] - 81:4

## B

**background** [2] - 7:3, 23:16
**bag** [3] - 17:6, 19:14, 56:18
**Bakken** [1] - 4:13
**BAKKEN** [1] - 2:16
**balance** [4] - 22:25, 66:5, 66:22, 67:21
**balancing** [1] - 67:17
**ballpark** [1] - 7:22
**barely** [1] - 96:2
**base** [4] - 23:1, 66:5, 67:9, 67:21
**based** [17] - 15:4, 17:23, 19:21, 34:2, 34:24, 58:10, 64:16, 72:18, 75:1, 90:13, 94:6, 94:10, 94:18, 94:24, 96:15, 98:4, 98:5
**baseline** [2] - 35:3, 35:7
**basics** [1] - 9:6
**basing** [1] - 34:14
**basis** [1] - 57:12

**basketball** [1] - 68:18
**baton** [2] - 14:5, 14:7
**beat** [2] - 10:7, 12:12
**beating** [5] - 7:20, 8:1, 12:12, 18:24, 22:15
**became** [1] - 31:21
**becomes** [1] - 29:7
**becoming** [1] - 67:22
**beginning** [1] - 42:19
**behalf** [5] - 4:8, 4:12, 14:23, 40:25, 41:3
**behind** [3] - 16:19, 16:21, 36:2
**beings** [2] - 66:4, 71:24
**belly** [1] - 16:18
**below** [1] - 57:11
**BERNAL** [1] - 1:5
**best** [1] - 35:10
**better** [2] - 21:15, 101:6
**between** [4] - 9:7, 16:15, 22:25, 83:22
**BIANCO** [1] - 1:12
**Bianco** [1] - 4:12
**big** [2] - 24:6, 24:11
**big-time** [1] - 24:6
**biological** [2] - 10:8, 10:10
**biomechanical** [1] - 49:10
**biomechanics** [1] - 49:12
**BISGAARD** [1] - 2:15
**bit** [9] - 7:2, 9:3, 10:24, 47:16, 57:2, 66:16, 66:18, 80:8, 100:20
**bite** [2] - 23:6, 101:3
**bleeding** [1] - 24:8
**blocked** [3] - 8:7, 9:9, 9:15
**blood** [28] - 7:13, 9:9, 9:20, 9:21, 10:6, 17:10, 18:1, 18:4, 18:6, 18:25, 19:8, 19:12, 19:18, 20:18, 20:19, 25:1, 64:13, 65:22, 65:23, 65:24, 66:5, 66:14, 66:22, 67:6, 67:9, 82:2, 82:7
**bloodstream** [3] - 20:22, 21:17, 22:13
**bloody** [2] - 16:1, 16:5
**blow** [6] - 25:8, 29:22, 34:20, 38:1, 38:2, 68:2
**blowing** [8] - 17:7, 23:8, 23:9, 66:19, 67:4, 67:16, 67:19,

69:14
**board** [7] - 7:14, 7:15, 25:4, 36:21, 46:25, 47:3, 53:15
**body** [22] - 9:22, 9:23, 10:6, 14:19, 16:13, 22:17, 22:25, 23:10, 24:8, 25:7, 25:8, 33:20, 45:19, 57:5, 59:14, 67:15, 79:6, 85:13, 87:15, 88:10, 95:21, 99:17
**body's** [2] - 67:6, 67:12
**body-worn** [3] - 14:19, 16:13, 85:13
**book** [1] - 83:3
**bottom** [4] - 71:11, 78:17, 79:23, 84:22
**Boulevard** [1] - 2:5
**bowman** [1] - 101:8
**Bowman** [7] - 101:10, 101:12, 101:15, 101:17, 101:19, 101:21, 101:23
**brain** [28] - 8:16, 17:12, 17:14, 17:15, 17:16, 17:24, 18:1, 18:2, 18:4, 18:5, 18:6, 19:1, 19:8, 19:18, 19:23, 20:3, 20:6, 20:9, 20:17, 31:25, 32:8, 32:14, 49:15, 49:19, 49:25, 50:6
**brain-dead** [2] - 8:16, 17:16
**break** [1] - 70:7
**breath** [16] - 22:21, 23:8, 31:1, 31:2, 31:9, 31:10, 31:11, 37:18, 60:6, 66:12, 86:2, 86:5, 86:9, 86:10, 90:16, 91:1
**breathe** [23] - 19:15, 20:8, 20:9, 21:19, 23:12, 24:4, 24:10, 25:6, 33:22, 34:20, 37:25, 38:2, 48:21, 56:19, 67:3, 67:23, 71:24, 71:25, 72:15, 75:8, 75:24, 94:22, 95:2
**breathed** [1] - 72:7
**breathing** [53] - 16:24, 17:2, 20:16, 23:4, 23:24, 24:1, 29:13, 29:15, 29:17, 29:20, 29:23, 30:24, 36:4, 37:13, 37:16, 37:17,

37:24, 38:9, 38:22, 41:22, 48:16, 50:21, 51:14, 59:8, 66:18, 67:2, 68:2, 68:6, 69:3, 77:14, 77:20, 78:1, 85:22, 85:25, 86:17, 86:20, 86:21, 87:6, 89:7, 90:1, 90:3, 90:6, 94:19, 95:9, 95:22, 95:24, 96:6, 96:9, 96:11, 96:25, 97:6

**breaths** [5] - 29:7, 30:20, 31:9, 63:13, 68:23
**briefly** [1] - 59:10
**bring** [3] - 29:22, 37:25, 38:2
**BRISBOIS** [1] - 2:15
**broke** [1] - 4:16
**brought** [1] - 8:14
**bruises** [1] - 43:22
**buck** [2] - 75:7, 75:19
**build** [3] - 24:12, 33:21, 67:14
**building** [2] - 10:10, 22:13
**builds** [1] - 23:10
**buildup** [15] - 22:16, 22:22, 22:24, 23:3, 23:13, 26:11, 36:24, 57:23, 58:3, 67:14, 67:17, 67:18, 68:9, 69:14
**Burbank** [1] - 2:5
**burn** [1] - 66:24
**Burton** [3] - 4:8, 60:10, 73:17
**BURTON** [34] - 2:6, 2:7, 3:6, 3:7, 5:5, 5:21, 18:13, 20:15, 28:19, 30:2, 30:6, 30:11, 30:16, 30:19, 39:20, 46:16, 53:23, 60:11, 60:13, 60:21, 60:24, 61:7, 61:18, 62:21, 62:23, 62:24, 63:4, 64:15, 65:13, 65:14, 69:10, 69:15, 69:17, 70:1
**Burton's** [2] - 5:3, 42:22
**butt** [1] - 101:3
**buttocks** [1] - 91:15
**BY** [49] - 2:4, 2:7, 2:9, 2:15, 3:6, 3:6, 3:7, 3:7, 3:9, 5:21, 18:13, 20:15, 28:19, 30:19, 39:25, 46:18, 54:2, 60:13, 60:24, 61:7,

61:18, 62:24, 63:4, 64:15, 65:14, 69:10, 69:17, 71:5, 71:22, 74:7, 76:13, 77:25, 78:21, 79:4, 80:11, 80:23, 81:15, 82:1, 84:20, 85:11, 89:1, 90:20, 92:22, 93:6, 93:11, 94:5, 94:17, 95:15, 98:24

## C

**CALIFORNIA** [3] - 1:2, 4:1, 104:6
**California** [6] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17
**calm** [10] - 75:11, 78:13, 83:14, 83:17, 83:21, 83:22, 83:25, 84:7, 84:12, 84:16
**calmed** [7] - 76:3, 76:4, 76:9, 76:15, 83:14, 99:22, 101:22
**camera** [4] - 14:19, 16:13, 81:2, 85:13
**cannot** [4] - 33:23, 36:4, 48:17, 56:10
**capable** [2] - 10:14, 10:17
**capacity** [1] - 35:18
**captured** [1] - 16:13
**car** [1] - 22:10
**carbon** [10] - 23:10, 66:17, 66:19, 67:16, 67:20, 68:3, 69:14, 71:25, 72:3, 72:6
**cardiac** [93] - 8:11, 8:13, 9:7, 9:10, 9:12, 9:16, 9:18, 11:5, 11:6, 11:13, 11:19, 12:5, 12:8, 12:14, 13:20, 14:13, 17:25, 18:9, 18:18, 18:21, 19:1, 19:4, 19:6, 19:13, 20:12, 21:3, 21:5, 21:18, 23:15, 23:18, 23:25, 24:15, 24:18, 25:3, 25:5, 25:6, 25:9, 25:11, 25:14, 25:16, 25:22, 26:5, 26:25, 27:8, 28:21, 28:25, 29:14, 29:23, 31:13, 31:16, 31:18, 31:23, 32:6, 32:9, 33:17, 34:11, 36:14, 36:25, 37:2, 38:11, 39:17, 45:1, 47:21, 48:6, 48:11, 48:17, 55:5, 55:11,

55:12, 55:24, 56:3, 56:7, 56:10, 56:14, 57:16, 58:9, 58:14, 60:2, 62:5, 62:10, 62:16, 63:7, 63:9, 65:4, 65:22, 65:25, 68:11, 69:20, 71:15, 73:8
**cardiologist** [5] - 18:17, 18:21, 45:5, 63:25, 65:18
**cardiology** [8] - 7:12, 7:16, 36:12, 37:5, 37:7, 38:21, 40:4, 52:3
**cardiovascular** [1] - 52:21
**care** [1] - 36:9
**career** [2] - 18:21, 45:8
**carefully** [1] - 17:13
**carotid** [3] - 28:3, 91:13, 91:25
**carries** [4] - 9:21, 10:11, 20:19, 20:21
**Case** [1] - 4:4
**case** [35] - 6:11, 6:12, 7:19, 9:14, 13:12, 14:10, 20:7, 26:8, 31:15, 31:19, 37:10, 38:18, 39:16, 42:7, 42:14, 42:19, 44:9, 44:15, 44:22, 47:10, 48:19, 50:8, 55:12, 56:21, 70:10, 70:13, 73:1, 79:17, 79:21, 96:13, 102:10, 103:12, 103:13, 103:18
**case-in-chief** [1] - 103:18
**cases** [14] - 12:11, 39:6, 39:7, 39:8, 39:11, 39:15, 40:13, 40:15, 40:23, 40:24, 50:17, 57:16, 57:19, 69:24
**catch** [2] - 22:20, 31:9
**catching** [1] - 23:8
**causal** [2] - 47:7, 54:9
**causation** [1] - 50:18
**causative** [2] - 23:15, 38:11
**caused** [13] - 20:9, 23:18, 25:9, 34:1, 37:2, 37:19, 42:8, 43:17, 44:3, 45:1, 68:12, 72:24, 72:25
**causes** [6] - 9:10, 24:15, 25:22, 26:25,

33:5, 58:19
**causing** [1] - 20:6
**Center** [2] - 14:13, 17:11
**CENTRAL** [2] - 1:2, 104:6
**certain** [2] - 9:5, 30:4
**certainly** [1] - 24:23
**CERTIFICATE** [1] - 104:1
**certifications** [3] - 7:14, 46:25, 47:3
**certified** [2] - 7:15, 53:15
**CERTIFY** [1] - 104:6
**CHAD** [1] - 1:12
**Chad** [1] - 4:12
**chamber** [2] - 10:5, 12:4
**chambers** [1] - 10:4
**Chan** [9] - 32:23, 33:2, 33:7, 33:8, 33:11, 34:14, 35:14, 35:24, 50:9
**Chan's** [6] - 32:25, 33:25, 34:21, 50:20, 51:9, 51:17
**chances** [1] - 27:17
**charge** [2] - 6:11, 40:6
**check** [10] - 85:23, 86:4, 86:22, 87:10, 87:11, 87:21, 88:10, 89:13, 89:17, 89:21
**checked** [5] - 88:3, 88:5, 88:14, 89:16, 90:16
**checking** [1] - 28:3
**chest** [14] - 19:11, 19:18, 21:10, 31:7, 33:4, 37:16, 78:24, 82:10, 93:3, 95:20, 97:4, 99:17, 100:8, 102:3
**chief** [1] - 103:18
**chronic** [1] - 54:22
**circulation** [1] - 32:7
**cited** [1] - 35:25
**citing** [1] - 60:22
**civil** [3] - 40:13, 40:15, 40:23
**Clark** [4] - 38:13, 38:14, 38:18, 72:21
**Clark's** [1] - 63:15
**classical** [1] - 31:11
**classify** [1] - 60:17
**classroom** [1] - 97:7
**clean** [1] - 15:21
**clear** [9] - 9:18, 16:1, 16:2, 23:11, 77:16, 86:11, 101:21,

101:25
**cleared** [1] - 23:7
**clearing** [1] - 66:16
**clearly** [1] - 37:17
**CLERK** [7] - 4:4, 5:9, 5:14, 5:16, 30:7, 73:21, 74:1
**clinical** [2] - 36:8, 46:12
**closely** [1] - 29:6
**CO2** [4] - 72:3, 72:5, 72:16, 72:19
**cocaine** [1] - 36:20
**CODE** [1] - 104:7
**combative** [2] - 92:4, 96:18
**combination** [1] - 72:23
**combo** [1] - 24:12
**comfortable** [2] - 10:3, 84:16
**comment** [2] - 33:7, 48:3
**common** [2] - 18:9, 68:13
**community** [2] - 36:13, 37:5
**compare** [1] - 33:23
**compensate** [6] - 23:3, 33:22, 68:1, 68:2, 69:5, 69:14
**compensated** [1] - 38:10
**compensates** [1] - 67:16
**compensating** [1] - 67:19
**compensation** [3] - 23:4, 67:14, 68:8
**complaint** [1] - 14:22
**complete** [2] - 80:1, 80:13
**completely** [1] - 31:5
**complex** [2] - 15:24, 16:11
**complications** [1] - 18:20
**component** [1] - 37:21
**composite** [6] - 14:18, 30:3, 42:24, 47:17, 47:22, 79:20
**compressions** [2] - 19:11, 19:19
**computer** [1] - 30:7
**concept** [5] - 29:2, 81:3, 81:7, 100:21, 101:25
**concerns** [1] - 4:18
**concluded** [1] - 4:22
**conclusion** [1] - 53:24

**conclusions** [2] - 34:21, 34:25
**condition** [2] - 36:10, 68:10
**conditions** [5] - 7:9, 7:13, 33:9, 50:10, 51:21
**conducted** [1] - 43:4
**conductor** [4] - 14:2, 14:4, 14:5, 14:6
**conducts** [1] - 45:18
**confer** [3] - 30:9, 30:10
**CONFERENCE** [1] - 104:11
**conferring** [1] - 30:12
**confirm** [2] - 69:20, 86:3
**confirms** [1] - 65:21
**conflicts** [1] - 4:20
**CONFORMANCE** [1] - 104:11
**confrontation** [2] - 35:22, 38:6
**confused** [1] - 9:8
**connected** [4] - 55:13, 55:23, 56:2, 56:7
**Connecticut** [1] - 7:5
**consequence** [5] - 18:9, 27:5, 53:21, 54:6, 68:5
**consequences** [3] - 21:18, 22:1
**considered** [1] - 64:19
**consistent** [6] - 31:24, 62:7, 63:13, 65:1, 65:24, 65:25
**consult** [1] - 6:11
**consumption** [1] - 22:9
**contact** [2] - 82:6, 97:20
**contacted** [1] - 16:3
**context** [2] - 99:1
**continue** [4] - 29:23, 29:25, 33:17, 84:6
**continued** [4] - 17:5, 75:6, 75:8, 75:19
**continues** [1] - 39:3
**continuous** [1] - 20:18
**contract** [1] - 20:20
**contraction** [1] - 58:10
**contradiction** [1] - 98:15
**contradictory** [1] - 98:22
**contribute** [4] - 23:14, 43:13, 59:4, 68:10
**contributed** [7] - 34:1,

36:24, 38:5, 43:17, 44:3, 58:3, 58:4
**contributes** [1] - 33:5
**contributing** [3] - 45:20, 54:8, 61:13
**contributory** [1] - 54:12
**control** [3] - 69:7, 91:17, 97:8
**controlled** [3] - 33:11, 33:24, 34:12
**contusions** [1] - 43:22
**conversation** [1] - 5:24
**conversing** [1] - 78:11
**coordinated** [1] - 10:12
**copy** [1] - 98:9
**corner** [4] - 62:13, 62:17, 71:11
**coroner** [1] - 15:11
**CORONER** [1] - 1:12
**coroner's** [1] - 14:14
**coroner-medical** [1] - 15:11
**CORRECT** [1] - 104:8
**correct** [70] - 6:18, 13:9, 13:10, 19:4, 19:9, 19:10, 19:19, 19:25, 25:12, 26:20, 26:23, 28:10, 32:18, 35:5, 35:8, 40:4, 40:10, 41:1, 42:10, 44:18, 44:20, 44:21, 45:2, 46:20, 48:4, 49:19, 49:25, 50:14, 50:18, 51:6, 51:7, 51:10, 51:22, 52:18, 52:22, 52:25, 53:4, 53:22, 57:3, 58:23, 60:15, 61:13, 61:20, 62:12, 63:21, 63:22, 63:23, 66:5, 66:10, 67:7, 67:10, 67:11, 67:20, 69:7, 76:18, 79:8, 82:8, 82:17, 83:1, 83:18, 85:13, 89:7, 90:21, 91:3, 92:18, 94:6, 94:19, 99:14, 99:24, 102:11
**correcting** [2] - 66:19, 66:20
**correctly** [5] - 44:25, 51:16, 57:3, 57:10, 90:15
**counsel** [4] - 4:6, 4:13, 30:9, 30:10
**counter** [6] - 79:18, 79:23, 79:25, 80:16, 83:18, 84:22

**counts** [1] - 32:6
**county** [1] - 102:21
**County** [2] - 4:5, 4:13
**COUNTY** [2] - 1:11, 1:11
**couple** [4] - 10:22, 12:1, 66:13, 102:14
**course** [4] - 9:19, 13:18, 15:6, 61:19
**court** [4] - 49:4, 52:16, 53:12, 59:16
**COURT** [53] - 1:1, 4:10, 4:14, 5:4, 5:8, 15:17, 18:12, 20:14, 28:16, 30:4, 30:9, 30:13, 30:15, 39:21, 46:17, 54:1, 60:9, 60:22, 61:6, 61:16, 64:9, 64:11, 69:9, 69:16, 70:2, 70:5, 70:7, 70:15, 70:19, 70:22, 73:14, 73:17, 73:20, 74:5, 76:11, 77:19, 77:23, 92:21, 93:5, 93:10, 93:18, 94:13, 95:12, 98:16, 98:18, 98:23, 103:10, 103:15, 103:19, 103:23, 104:5, 104:21
**Court** [5] - 1:22, 1:22, 5:11, 73:23, 98:9
**cover** [1] - 27:21
**covered** [2] - 9:5, 27:21
**CPR** [12] - 17:2, 17:5, 19:11, 28:12, 32:3, 32:8, 89:24, 90:2, 90:4, 90:8, 90:10, 90:13
**crazy** [1] - 11:17
**create** [2] - 24:22, 58:16
**created** [2] - 36:18, 42:8
**creates** [1] - 25:18
**creating** [1] - 67:5
**credentials** [1] - 39:5
**crime** [1] - 41:9
**CROSS** [2] - 3:6, 39:24
**cross** [1] - 71:17
**cross-exam** [1] - 71:17
**CROSS-EXAMINATION** [2] - 3:6, 39:24
**CSR** [2] - 1:21, 104:20
**CT** [1] - 17:13
**cue** [1] - 70:25

**culprit** [1] - 26:5
**current** [10] - 10:8, 10:11, 10:12, 10:14, 10:15, 10:16, 11:23, 14:6, 14:7, 40:3
**custody** [2] - 48:25, 49:8

**D**

**DALE** [2] - 2:4, 2:4
**Dale** [1] - 4:7
**damage** [6] - 8:16, 9:10, 19:1, 19:24, 20:3, 32:8
**damaged** [2] - 10:17, 18:7
**dan** [2] - 6:1, 40:1
**danger** [1] - 96:24
**DANIEL** [1] - 3:5
**Daniel** [2] - 5:6, 5:18
**data** [1] - 35:16
**date** [1] - 44:6
**DATED** [1] - 104:15
**Dawes** [6] - 37:9, 37:11, 37:12, 37:18, 38:3, 38:7
**DAY** [1] - 104:15
**days** [5] - 10:23, 15:22, 66:22, 102:14
**dead** [2] - 8:16, 17:16
**dealing** [1] - 67:12
**deals** [4] - 7:8, 7:12, 49:18, 49:24
**death** [45] - 13:20, 15:22, 20:4, 32:14, 33:6, 33:25, 36:10, 36:19, 37:8, 38:15, 38:16, 39:12, 43:13, 43:17, 44:4, 45:1, 45:9, 45:20, 45:24, 46:4, 46:9, 46:13, 46:20, 47:12, 49:24, 50:4, 50:18, 53:21, 54:5, 54:6, 54:9, 54:10, 54:17, 57:14, 57:20, 60:17, 61:1, 61:4, 61:10, 61:13, 61:23, 62:4, 63:19, 64:14, 72:25
**deaths** [1] - 45:11
**debt** [3] - 24:11, 34:17, 35:21
**deceased** [1] - 1:8
**decedent** [7] - 45:20, 74:10, 74:18, 75:4, 79:17, 80:24, 99:22
**decedent's** [1] - 79:6
**decide** [4] - 84:9, 100:18, 100:25,

102:7
**decided** [1] - 78:13
**declared** [1] - 8:16
**decreased** [1] - 35:23
**decreases** [2] - 35:17, 36:3
**deep** [2] - 31:9, 68:23
**deeper** [2] - 67:3, 68:2
**deeply** [1] - 67:23
**defects** [4] - 43:9, 43:16, 43:25, 44:3
**defendant** [2] - 4:12
**Defendants** [2] - 1:13, 2:14
**defense** [2] - 32:18, 40:19
**defibrillation** [1] - 11:20
**deficiency** [1] - 37:21
**defies** [2] - 34:22, 34:23
**defined** [1] - 33:13
**definition** [2] - 61:9, 61:10
**degenerated** [3] - 26:14, 27:10, 27:16
**degree** [2] - 7:5, 35:12
**delay** [1] - 32:10
**delirium** [12] - 36:10, 36:11, 36:12, 36:17, 37:2, 37:7, 74:15, 74:24, 75:2, 91:7, 97:18, 97:21
**demand** [1] - 36:24
**demands** [1] - 22:23
**demise** [2] - 19:3
**denominator** [1] - 68:13
**denying** [1] - 51:11
**department** [4] - 94:25, 98:2, 102:22, 102:25
**DEPARTMENT** [1] - 1:11
**Department** [3] - 16:3, 75:22, 97:15
**depo** [1] - 98:18
**deposition** [15] - 15:10, 40:20, 43:3, 46:15, 47:16, 47:19, 61:20, 64:19, 64:22, 86:23, 90:6, 91:9, 91:24, 98:8, 99:4
**depositions** [2] - 15:12, 44:16
**deprivation** [2] - 18:5, 45:1
**Deputies** [2] - 15:12, 23:20
**deputies** [9] - 16:7,

16:10, 16:15, 42:9, 42:12, 44:17, 47:24, 101:5, 101:7
**Deputy** [22] - 4:16, 4:22, 4:23, 14:18, 16:12, 16:19, 27:22, 31:22, 65:10, 71:7, 73:19, 74:8, 79:7, 87:25, 89:21, 101:10, 101:12, 101:15, 101:17, 101:19, 101:21, 101:23
**deputy** [6] - 31:21, 56:14, 80:6, 101:8, 102:20, 103:15
**deputy's** [1] - 65:16
**describe** [1] - 15:5
**described** [1] - 54:22
**description** [1] - 13:17
**detail** [3] - 10:20, 12:21, 39:14
**details** [2] - 39:6, 41:23
**detective** [1] - 41:15
**detectives** [1] - 102:19
**determine** [8] - 7:19, 45:9, 45:19, 45:23, 46:9, 46:20, 50:17, 51:6
**determined** [1] - 17:15
**determining** [1] - 46:4
**develop** [1] - 12:25
**developed** [2] - 22:22, 24:5
**development** [1] - 68:11
**diagnosis** [2] - 7:8, 7:12
**dialogue** [1] - 77:2
**dictates** [1] - 6:3
**died** [5] - 8:12, 36:20, 52:25, 55:1, 103:3
**dies** [2] - 9:23, 72:14
**difference** [1] - 9:6
**differences** [1] - 35:2
**different** [9] - 13:8, 16:12, 25:16, 33:18, 33:22, 35:3, 54:13, 102:6, 102:8
**digestive** [1] - 7:10
**diminution** [1] - 35:13
**dioxide** [10] - 23:10, 66:17, 66:19, 67:16, 67:20, 68:3, 69:14, 71:25, 72:3, 72:6
**direct** [8] - 50:11, 51:16, 53:21, 54:5, 56:9, 56:17, 57:22,

58:2
**DIRECT** [4] - 3:6, 3:9, 5:20, 74:6
**directions** [1] - 16:12
**directly** [1] - 59:23
**disagree** [1] - 64:4
**discharge** [1] - 74:19
**discretion** [2] - 102:7, 102:8
**discuss** [3] - 10:20, 12:21, 29:2
**discussed** [4] - 17:4, 34:16, 36:18, 37:17
**disease** [2] - 8:24, 50:18
**diseased** [1] - 8:20
**diseases** [1] - 49:24
**dispatcher** [1] - 16:6
**distinguish** [1] - 41:21
**DISTRICT** [5] - 1:1, 1:2, 1:5, 104:5, 104:6
**District** [1] - 1:22
**disturbed** [1] - 16:9
**DIVISION** [1] - 1:3
**DIVISION-RIVERSIDE** [1] - 1:3
**DO** [1] - 104:6
**doctor** [6] - 36:9, 46:3, 70:15, 70:20, 71:6, 73:14
**Doctor** [1] - 5:22
**doctor's** [1] - 46:15
**doctors** [4] - 28:1, 42:4, 51:2, 51:5
**documented** [1] - 19:4
**dog** [1] - 23:6
**donation** [1] - 17:17
**donations** [2] - 8:20, 8:21
**done** [9] - 33:11, 35:24, 45:8, 50:9, 50:25, 51:12, 68:18, 83:24, 100:24
**donor** [4] - 8:17, 8:18, 9:1, 17:20
**dose** [1] - 63:17
**doubt** [2] - 31:1, 31:3
**down** [36] - 16:23, 33:4, 34:8, 70:15, 71:21, 75:11, 76:3, 76:5, 76:9, 76:15, 78:13, 78:24, 82:9, 82:10, 83:9, 83:25, 84:3, 84:7, 90:19, 93:3, 95:8, 95:20, 95:21, 96:7, 97:4, 97:6, 97:19, 99:22, 100:8, 100:17, 100:20, 101:22,

102:3, 103:15
**DR** [1] - 3:5
**Dr** [47] - 5:6, 6:1, 15:10, 32:23, 32:25, 33:2, 33:7, 33:8, 33:11, 33:25, 34:14, 34:21, 35:14, 35:24, 36:6, 36:8, 37:9, 37:11, 37:12, 37:18, 38:3, 38:7, 38:12, 38:14, 38:18, 40:1, 43:5, 43:8, 43:15, 43:20, 43:24, 47:10, 50:9, 50:20, 51:9, 51:17, 60:14, 61:12, 61:20, 61:22, 62:3, 63:15, 64:3, 64:5, 64:19, 72:21, 103:17
**driveway** [1] - 22:12
**driving** [1] - 22:10
**drop** [4] - 24:11, 35:18, 66:16, 66:17
**dropped** [2] - 35:16, 51:18
**dropping** [1] - 67:7
**drops** [1] - 57:11
**drug** [2] - 52:24, 52:25
**drugs** [1] - 55:2
**due** [5] - 9:12, 18:20, 36:10, 57:5, 63:19
**during** [14] - 10:22, 26:12, 42:9, 48:24, 49:7, 55:9, 56:3, 56:6, 56:11, 73:6, 77:13, 78:3, 82:10, 100:14
**dying** [1] - 29:21
**dysfunction** [2] - 57:6, 57:8

## E

**EASTERN** [1] - 1:3
**EDCV** [1] - 4:4
**eDCV** [1] - 1:10
**EEG** [1] - 17:14
**effect** [4] - 48:21, 51:4, 51:13, 69:11
**effects** [6] - 50:20, 52:21, 59:14, 59:17, 59:19
**efficiently** [1] - 29:21
**eight** [3] - 83:18, 99:23, 100:11
**eight-minute** [2] - 99:23, 100:11
**either** [7] - 11:21, 38:7, 42:9, 43:17, 44:3, 56:13, 96:18
**electric** [2] - 11:20,

27:14
**electrical** [50] - 10:2, 10:8, 10:9, 10:11, 10:12, 10:14, 10:18, 11:1, 11:3, 11:7, 11:10, 11:11, 11:14, 11:15, 11:16, 11:17, 11:23, 12:7, 12:11, 12:15, 12:17, 13:9, 13:17, 13:18, 14:6, 14:7, 17:4, 21:1, 21:6, 24:14, 25:18, 25:19, 25:21, 25:22, 26:3, 26:7, 26:8, 26:9, 26:16, 26:17, 26:25, 27:3, 27:4, 37:19, 39:1, 39:2, 55:5, 59:11, 59:14
**electricity** [1] - 59:22
**elevated** [1] - 64:13
**emergency** [4] - 28:24, 28:25, 37:12, 72:9
**employed** [1] - 41:14
**EMT** [1] - 15:12
**encephalopathy** [2] - 18:3, 18:14
**encounter** [6] - 16:15, 22:6, 23:20, 23:24, 24:7, 33:9
**encounters** [1] - 36:19
**end** [12] - 30:22, 31:1, 31:10, 33:13, 34:13, 39:3, 53:2, 72:2, 72:5, 72:16, 72:19, 83:1
**end-tidal** [4] - 72:2, 72:5, 72:16, 72:19
**endocrine** [1] - 7:10
**enforcement** [10] - 36:19, 39:13, 40:25, 41:4, 41:6, 41:14, 41:18, 41:21, 41:24, 42:3
**engaging** [2] - 73:7, 73:10
**engineer** [1] - 49:10
**engineering** [1] - 59:11
**enlargement** [1] - 8:6
**ensue** [1] - 84:6
**entirely** [3] - 25:16, 33:18, 33:22
**entirety** [1] - 42:24
**ENTITLED** [1] - 104:10
**entity** [1] - 36:17
**epidemiological** [1] - 50:21
**epidemiologist** [1] -

50:23
**epidemiology** [2] - 50:13, 50:16
**Eric** [1] - 76:20
**escape** [5] - 48:25, 49:8, 94:2, 100:19, 101:4
**especially** [2] - 93:20, 96:1
**essence** [1] - 50:16
**essentially** [3] - 17:15, 55:6, 82:10
**estimate** [1] - 39:10
**estimated** [1] - 71:15
**et** [1] - 4:5
**ethical** [1] - 34:5
**evaluate** [2] - 4:21, 4:23
**evaluated** [1] - 17:13
**events** [1] - 16:14
**eventually** [5] - 16:25, 22:19, 26:22, 84:22, 100:16
**evidence** [12] - 8:6, 8:7, 20:2, 20:5, 32:9, 33:3, 37:15, 43:7, 43:9, 55:8, 56:13, 64:18
**ex** [1] - 27:25
**exactly** [7] - 31:18, 31:20, 56:10, 63:9, 64:2, 68:15, 84:13
**exam** [6] - 43:20, 45:18, 45:19, 51:16, 56:9, 71:17
**EXAMINATION** [10] - 3:6, 3:6, 3:7, 3:7, 3:9, 5:20, 39:24, 60:12, 71:4, 74:6
**examine** [1] - 44:23
**examiner** [4] - 15:11, 43:3, 54:16, 60:15
**example** [1] - 8:3
**exceeded** [1] - 22:22
**excited** [11] - 36:10, 36:12, 36:17, 37:2, 37:7, 74:15, 74:24, 75:2, 91:7, 97:18, 97:21
**exclude** [1] - 24:15
**excluded** [2] - 47:6, 47:11
**exclusively** [1] - 46:10
**excuse** [1] - 55:15
**excused** [1] - 73:14
**exercise** [4] - 22:4, 57:22, 67:1, 67:2
**exercising** [3] - 22:3, 22:15, 68:5
**exertion** [6] - 57:19,

58:7, 72:24, 73:3, 73:7, 73:10
**exhausted** [1] - 68:19
**Exhibit** [5] - 30:1, 62:11, 70:24, 78:16, 83:4
**exhibit** [1] - 83:3
**expansion** [2] - 21:10, 21:15
**expect** [5] - 31:7, 57:11, 61:23, 62:4, 72:15
**experien** [1] - 97:20
**experience** [3] - 17:23, 96:17, 100:23
**experienced** [1] - 55:9
**experiencing** [3] - 73:11, 75:2, 97:21
**expert** [15] - 6:6, 6:20, 40:9, 40:12, 40:16, 40:24, 41:3, 41:17, 49:12, 52:16, 53:13, 53:17, 59:10, 59:16, 59:19
**experts** [1] - 32:18
**expired** [1] - 72:7
**explain** [7] - 9:3, 10:24, 12:2, 13:15, 18:16, 31:4, 65:20
**explanation** [1] - 24:18
**extensive** [2] - 31:25, 32:13
**extent** [1] - 64:3
**exterior** [3] - 43:24, 44:2
**external** [3] - 17:2, 19:18, 20:1
**extra** [1] - 23:9
**extreme** [1] - 57:19
**eyes** [1] - 31:6

## F

**face** [6] - 19:15, 82:2, 82:7, 85:9, 85:19, 85:20
**facedown** [4] - 16:18, 20:23, 21:9, 22:8
**fact** [10] - 17:25, 29:5, 31:15, 43:20, 56:9, 84:15, 93:3, 94:18, 99:6, 101:22
**factor** [3] - 47:7, 54:9, 61:13
**factors** [2] - 45:21, 59:1
**facts** [1] - 86:25
**factually** [1] - 51:6
**fail** [1] - 12:14

**faint** [3] - 87:12, 87:21, 88:21
**Fair** [1] - 2:7
**fair** [15] - 51:12, 75:25, 76:9, 77:11, 77:21, 80:16, 81:19, 86:19, 90:1, 92:9, 94:11, 96:7, 96:16, 99:9, 99:17
**fairly** [1] - 29:16
**Fajardo** [13] - 15:10, 43:5, 43:8, 43:15, 43:24, 47:10, 54:16, 60:14, 61:12, 61:22, 62:3, 64:3, 64:5
**Fajardo's** [3] - 43:20, 61:20, 64:19
**fake** [1] - 84:2
**fallen** [1] - 33:15
**falling** [3] - 31:22, 37:15, 48:3
**false** [2] - 50:4, 54:20
**familiar** [3] - 10:3, 14:3, 41:23
**family** [2] - 8:16, 17:17
**far** [2] - 9:5, 101:14
**fashion** [4] - 9:24, 10:7, 10:13, 13:22
**fast** [3] - 12:12, 12:13, 22:15
**faster** [1] - 67:3
**fatal** [4] - 52:21, 57:11, 58:19, 73:4
**FCRR** [2] - 1:21, 104:20
**feasible** [1] - 28:5
**FEDERAL** [2] - 104:4, 104:21
**federal** [1] - 1:22
**fee** [1] - 6:9
**fell** [2] - 22:8, 24:7
**felt** [5] - 27:22, 87:12, 87:19, 87:21, 89:14
**few** [7] - 8:1, 15:22, 71:6, 75:16, 88:15, 88:16, 89:3
**fib** [1] - 13:6
**fibrillation** [23] - 11:22, 12:6, 12:11, 13:1, 13:5, 25:20, 26:2, 26:6, 26:13, 26:16, 26:19, 27:2, 27:5, 27:9, 27:12, 27:15, 37:3, 38:17, 38:19, 38:25, 39:1, 62:2, 64:25
**fiction** [1] - 26:15
**field** [9] - 7:7, 7:11, 7:15, 7:16, 41:10, 51:5, 53:19, 53:25,

54:4
**fight** [8] - 84:5, 84:6, 84:17, 93:1, 94:2, 96:21, 99:13, 100:19
**fighting** [7] - 83:25, 92:4, 92:12, 93:21, 93:24, 96:1, 100:24
**fill** [1] - 65:23
**finally** [6] - 23:7, 38:12, 78:13, 79:12, 83:23, 84:10
**fine** [1] - 80:20
**finger** [1] - 88:13
**fingertips** [1] - 28:3
**finished** [1] - 34:10
**first** [14] - 15:2, 19:3, 25:25, 27:22, 28:13, 28:20, 28:22, 74:10, 82:6, 85:7, 87:14, 87:19, 87:20, 88:5
**five** [4] - 48:7, 48:12, 60:2, 71:16
**flatline** [7] - 13:16, 26:24, 27:2, 27:10, 27:16, 39:3, 55:6
**flatlined** [1] - 13:20
**flipped** [1] - 55:22
**floor** [1] - 91:18
**flow** [4] - 9:9, 18:1, 65:22, 65:24
**flowing** [2] - 19:8, 19:12
**flows** [2] - 10:8, 14:7
**focus** [2] - 18:17, 95:19
**focused** [1] - 37:23
**footage** [3] - 14:19, 28:5
**FOR** [2] - 104:5
**force** [2] - 42:15, 99:19
**forcibly** [1] - 21:11
**FOREGOING** [1] - 104:8
**forensic** [9] - 43:3, 45:18, 46:3, 46:8, 46:10, 46:19, 46:23, 46:25, 47:10
**forgot** [1] - 93:13
**form** [5] - 11:5, 42:18, 58:6, 67:20, 97:3
**formality** [1] - 6:3
**FORMAT** [1] - 104:10
**forming** [3] - 44:9, 44:15, 44:22
**forth** [1] - 25:5
**forward** [3] - 5:8, 42:19, 81:22
**foundation** [1] - 64:7
**four** [8] - 10:4, 55:23,

56:6, 100:3, 100:4, 100:13, 100:14
**frame** [3] - 30:5, 80:12, 82:10
**free** [1] - 8:23
**freely** [1] - 20:8
**Freeman** [1] - 103:17
**frenzy** [1] - 11:17
**fresh** [1] - 87:2
**friend** [1] - 15:23
**front** [2] - 6:25, 15:1
**fuel** [3] - 20:20, 22:11, 22:23
**full** [6] - 5:16, 21:10, 21:15, 23:12, 55:1, 74:2
**fully** [2] - 24:4, 24:10
**function** [11] - 10:11, 11:8, 12:8, 17:8, 20:19, 21:3, 23:2, 35:4, 35:13, 35:23, 36:4
**functioning** [13] - 10:13, 10:15, 10:17, 11:9, 11:10, 11:11, 11:25, 12:20, 17:12, 17:13, 20:22, 20:25, 21:2
**fundamental** [1] - 37:24
**fundamentals** [1] - 8:1

## G

**GALIPO** [56] - 2:4, 2:4, 3:9, 4:7, 5:2, 30:14, 73:18, 74:4, 74:7, 76:13, 77:21, 77:24, 77:25, 78:15, 78:20, 78:21, 79:2, 79:4, 80:5, 80:8, 80:10, 80:11, 80:19, 80:22, 80:23, 81:11, 81:14, 81:15, 81:22, 81:25, 82:1, 84:19, 84:20, 85:4, 85:6, 85:9, 85:11, 88:22, 88:25, 89:1, 90:19, 90:20, 92:22, 93:6, 93:11, 94:5, 94:17, 95:15, 98:9, 98:14, 98:17, 98:20, 98:24, 103:8, 103:16, 103:20
**Galipo** [4] - 4:7, 5:1, 73:17, 77:19
**gasp** [1] - 29:19
**gasps** [1] - 29:21
**general** [5] - 15:5, 23:16, 42:2, 48:15, 99:1

**generally** [7] - 35:2, 35:7, 41:21, 42:3, 67:7, 72:8, 81:7
**gentlemen** [4] - 4:15, 39:23, 70:9, 103:11
**given** [4] - 28:4, 52:13, 62:12
**glands** [1] - 7:11
**gloves** [2] - 87:17, 88:8
**God** [2] - 5:12, 73:24
**GOMEZ** [1] - 3:9
**Gomez** [12] - 4:16, 4:22, 14:18, 15:12, 16:10, 16:12, 23:21, 27:22, 65:10, 73:19, 74:3, 74:8
**Gomez's** [1] - 4:23
**Graham** [2] - 36:6, 36:8
**ground** [5] - 24:8, 33:15, 82:3, 92:5, 95:8
**guarantees** [1] - 34:10
**guard** [3] - 84:3, 100:17
**guess** [1] - 101:8
**guy** [1] - 23:22
**gym** [1] - 66:23

## H

**half** [4] - 40:6, 82:15, 82:16, 84:23
**hand** [17] - 5:9, 13:8, 65:10, 65:16, 66:2, 71:11, 73:21, 79:5, 79:8, 79:10, 79:11, 79:12, 79:15, 85:1, 88:13, 96:2, 99:11
**handcuff** [3] - 75:18, 93:14, 102:3
**handcuffed** [24] - 16:18, 16:21, 36:2, 75:4, 75:6, 75:19, 76:8, 77:5, 77:18, 78:4, 79:17, 82:12, 82:13, 92:1, 92:11, 93:7, 95:1, 95:6, 95:20, 96:13, 97:4, 97:19, 99:7, 99:24
**handcuffing** [2] - 80:1, 80:13
**handcuffs** [1] - 92:5
**handprint** [2] - 69:18, 69:20
**handprints** [1] - 65:23
**hands** [9] - 16:19, 16:21, 36:2, 45:19, 49:5, 61:4, 61:10,

68:21
**hands-on** [1] - 45:19
**hard** [1] - 23:4
**harvested** [1] - 17:19
**haven** [1] - 7:5
**havoc** [1] - 25:18
**haywire** [1] - 12:7
**head** [14] - 16:1, 16:2, 16:5, 20:1, 20:3, 20:5, 22:6, 24:8, 33:15, 34:7, 43:10, 43:12, 82:2, 101:3
**head-butt** [1] - 101:3
**healthy** [9] - 8:3, 8:25, 18:18, 33:12, 33:24, 34:13, 35:19, 66:4
**hear** [5] - 63:12, 81:2, 81:3, 96:23, 97:3
**heard** [7] - 12:1, 44:25, 51:16, 91:22, 98:25, 103:21, 103:23
**hearing** [1] - 16:4
**hearsay** [1] - 98:12
**heart** [90] - 7:10, 7:13, 7:17, 7:20, 7:25, 8:2, 8:3, 8:4, 8:6, 8:8, 8:10, 8:11, 8:12, 8:17, 8:18, 8:19, 8:23, 8:25, 9:4, 9:7, 9:8, 9:10, 9:11, 9:12, 9:15, 9:16, 9:19, 9:22, 10:1, 10:2, 10:4, 10:7, 10:9, 10:11, 10:15, 10:16, 10:18, 10:24, 11:2, 11:6, 11:8, 11:9, 11:17, 11:18, 12:11, 12:12, 12:14, 12:19, 12:20, 13:23, 13:24, 14:1, 14:8, 17:4, 17:8, 17:12, 17:19, 17:20, 17:21, 18:1, 18:4, 18:19, 18:24, 20:18, 20:22, 20:25, 22:15, 23:2, 25:1, 25:18, 26:10, 52:3, 52:21, 55:4, 56:2, 57:24, 58:10, 59:23, 64:16, 64:20, 64:23, 69:6
**heart's** [1] - 9:19
**heart-related** [1] - 52:21
**hearts** [2] - 8:21, 18:18
**held** [2] - 95:21, 97:18
**HELD** [1] - 104:9
**Helm** [1] - 4:8
**HELM** [3] - 2:9, 2:9,

30:8
**help** [10] - 5:12, 6:12, 8:2, 17:8, 56:18, 67:20, 69:7, 73:24, 80:24, 101:18
**HEREBY** [1] - 104:6
**high** [2] - 72:15, 72:16
**Hills** [1] - 2:5
**history** [4] - 8:4, 15:14, 15:19, 31:24
**hit** [1] - 34:7
**hobbled** [1] - 33:5
**Hold** [1] - 64:9
**hold** [4] - 66:12, 95:8, 96:7, 97:5
**homicide** [4] - 41:15, 60:17, 61:1, 61:8
**Honor** [27] - 4:7, 4:11, 5:2, 5:5, 15:18, 30:11, 30:14, 39:20, 39:22, 46:14, 53:23, 53:25, 64:10, 69:15, 70:1, 70:4, 70:6, 70:16, 70:21, 70:23, 74:4, 77:21, 98:10, 98:12, 103:9, 103:16, 103:21
**HONORABLE** [1] - 1:5
**hooked** [1] - 25:25
**hopefully** [1] - 67:1
**hospital** [3] - 8:15, 14:12, 58:24
**hospitals** [1] - 72:8
**hour** [1] - 22:10
**huge** [1] - 34:17
**human** [5] - 45:19, 49:12, 59:14, 66:4, 71:24
**humans** [1] - 59:20
**hyperactivity** [2] - 25:2, 38:5
**hypermetabolic** [1] - 58:17
**hyperventilating** [1] - 23:4
**hypothetical** [4] - 93:4, 93:17, 94:12, 95:10
**hypothetically** [1] - 25:10
**hypoxia** [5] - 21:23, 21:25, 24:5, 68:12, 69:5
**hypoxic** [1] - 50:6

## I

**idea** [1] - 41:20
**identified** [1] - 62:16
**idled** [1] - 22:11

**immediately** [10] - 74:25, 75:3, 76:14, 82:22, 83:24, 85:23, 86:4, 87:10, 92:10, 93:25
**impairment** [1] - 48:16
**impairs** [1] - 9:9
**impeachment** [1] - 98:14
**important** [3] - 9:25, 35:14, 86:24
**imprint** [1] - 65:16
**IN** [3] - 104:5, 104:9, 104:10
**inability** [2] - 20:9, 72:15
**inadequate** [1] - 24:5
**incident** [17] - 8:5, 20:9, 33:10, 42:9, 42:24, 44:6, 44:7, 44:16, 44:19, 47:17, 53:7, 55:9, 55:21, 56:11, 73:6, 102:13, 102:25
**included** [3] - 7:7, 14:19, 50:21
**including** [6] - 14:15, 17:13, 23:2, 70:11, 81:9, 86:24
**incoherent** [1] - 16:8
**incomplete** [4] - 93:4, 93:16, 94:12, 95:10
**inconsistent** [1] - 62:8
**increase** [1] - 35:22
**increased** [1] - 36:23
**indicate** [1] - 8:23
**indicated** [1] - 86:23
**indication** [1] - 27:22
**indicative** [1] - 65:24
**individual** [5] - 8:18, 21:11, 21:13, 61:11, 72:7
**Individually** [1] - 1:7
**individuals** [1] - 35:17
**induced** [1] - 38:4
**information** [4] - 14:21, 16:7, 28:4, 46:11
**ingestion** [1] - 59:1
**initial** [6] - 6:18, 14:24, 15:1, 15:9, 27:20, 32:16
**initiated** [1] - 32:3
**injured** [2] - 34:13, 34:19
**injuries** [6] - 43:9, 43:16, 43:24, 44:2, 49:24
**injury** [20] - 16:1, 16:2, 17:24, 18:3, 20:1,

20:3, 20:5, 20:6, 20:10, 20:17, 22:6, 32:1, 32:14, 33:15, 39:12, 43:12, 49:16, 50:6, 50:18, 82:5
**Inland** [2] - 14:12, 17:11
**instead** [1] - 96:20
**instructor's** [1] - 91:19
**instructors** [1] - 95:5
**intact** [2] - 10:12, 26:9
**interest** [1] - 1:7
**interference** [1] - 58:10
**interior** [1] - 43:16
**intermittent** [1] - 15:19
**internal** [6] - 7:7, 7:9, 7:15, 40:4, 43:9
**internationally** [2] - 36:13, 37:6
**interrupt** [2] - 4:17, 45:15
**interruption** [3] - 4:24, 18:5, 21:8
**interview** [3] - 102:10, 103:2, 103:5
**interviewed** [1] - 44:19
**investigated** [1] - 41:9
**invite** [1] - 30:1
**involve** [1] - 39:12
**involved** [3] - 45:10, 45:11, 69:24
**irrationally** [1] - 74:13
**irrelevant** [1] - 34:24
**irreversible** [6] - 8:15, 18:2, 19:1, 19:23, 32:8, 32:14
**irreversibly** [1] - 18:7
**IS** [2] - 104:8, 104:10
**issue** [1] - 24:21
**issues** [5] - 4:25, 6:6, 18:20, 32:21, 46:5
**it'll** [1] - 66:17
**itself** [4] - 26:4, 48:17, 57:14, 58:13

## J

**Jesus** [1] - 15:12
**JESUS** [1] - 1:5
**job** [4] - 45:4, 46:8, 46:10, 46:20
**JOHN** [2] - 2:6, 2:7
**John** [1] - 4:8
**JUDGE** [1] - 1:5
**JUDICIAL** [1] - 104:11
**July** [6] - 8:5, 15:25,

23:18, 33:10, 44:6, 54:25
**Jury** [1] - 1:11
**jury** [5] - 4:3, 15:5, 70:14, 70:18, 103:14
**JURY** [1] - 1:15

## K

**Keeney** [9] - 15:13, 16:10, 16:19, 23:21, 31:22, 37:14, 71:7, 87:25, 89:21
**Keeney's** [1] - 79:7
**keep** [24] - 18:18, 19:12, 21:1, 25:7, 36:1, 45:5, 69:7, 70:9, 79:2, 81:11, 84:6, 84:7, 93:3, 93:8, 93:15, 93:19, 93:21, 95:16, 96:4, 99:6, 99:8, 100:20, 102:4, 103:12
**KENNEDY** [1] - 2:9
**Kennedy** [1] - 4:8
**kept** [2] - 21:11, 96:14
**KEVIN** [1] - 1:7
**Kevin** [51] - 7:20, 7:25, 9:14, 9:15, 14:13, 14:17, 15:19, 15:25, 16:6, 16:7, 16:15, 16:16, 16:17, 16:22, 17:1, 17:3, 17:6, 17:10, 17:15, 17:18, 18:23, 20:23, 22:4, 23:18, 23:21, 23:25, 24:1, 24:2, 24:23, 24:24, 25:3, 25:25, 28:6, 29:6, 31:5, 31:20, 32:13, 33:10, 34:3, 34:5, 34:16, 35:20, 36:23, 37:4, 37:13, 37:14, 38:1, 38:3, 38:8, 38:24, 65:21
**Kevin's** [10] - 12:19, 16:20, 17:23, 19:3, 19:15, 26:8, 33:23, 33:25, 36:10, 65:16
**kick** [2] - 75:7, 101:3
**kicking** [1] - 29:8
**kid** [1] - 66:14
**kind** [13] - 11:16, 13:8, 14:1, 14:3, 22:11, 25:14, 29:19, 29:21, 31:10, 68:19, 68:21, 68:24, 91:15
**knee** [4] - 16:20, 47:25, 48:12, 71:7
**knees** [1] - 48:7

**known** [3] - 13:16, 27:25, 29:12

**L**

**lab** [1] - 50:8
**laboratory** [1] - 33:12
**labored** [1] - 29:16
**lacerations** [1] - 43:22
**lack** [6] - 20:16, 21:20, 21:22, 21:25, 68:13, 69:5
**lacks** [1] - 64:7
**lactic** [3] - 22:17, 66:24, 67:19
**ladies** [4] - 4:15, 39:23, 70:8, 103:11
**lane** [1] - 7:23
**laps** [1] - 66:13
**large** [2] - 50:17, 52:20
**LaRusso** [1] - 15:11
**last** [7] - 5:17, 15:20, 47:24, 48:12, 59:25, 69:18, 71:6
**lastly** [1] - 91:5
**LAW** [3] - 2:4, 2:6, 2:9
**law** [13] - 22:7, 36:19, 39:13, 40:25, 41:3, 41:6, 41:14, 41:17, 41:20, 41:24, 42:3, 52:16, 53:12
**lay** [1] - 13:16
**laying** [1] - 82:3
**lead** [6] - 9:11, 12:5, 18:20, 20:16, 24:13, 57:23
**leading** [5] - 18:11, 20:13, 61:5, 63:3, 69:8
**leaning** [1] - 68:21
**learn** [2] - 70:12, 103:13
**learned** [2] - 97:10, 100:22
**least** [8] - 19:22, 40:24, 60:6, 76:2, 87:4, 89:5, 89:9, 89:20
**leave** [1] - 92:13
**lectures** [1] - 52:12
**led** [5] - 19:2, 20:3, 21:6, 32:14, 59:1
**left** [9] - 10:5, 12:3, 27:19, 62:13, 62:17, 62:20, 62:25, 65:6, 79:13
**legal** [2] - 53:24, 61:9
**legs** [7] - 22:19, 29:8, 68:22, 75:7, 78:3,

81:17, 92:24
**less** [1] - 72:19
**lethal** [2] - 24:12, 63:20
**level** [7] - 51:17, 53:6, 53:9, 57:11, 58:22, 63:16, 63:20
**levels** [6] - 24:11, 24:12, 35:15, 35:18, 64:13, 72:6
**LEWIS** [1] - 2:15
**life** [3] - 11:21, 15:20, 17:16
**lift** [1] - 75:23
**lifted** [1] - 79:12
**likely** [1] - 32:7
**limited** [1] - 32:16
**limits** [1] - 21:9
**limp** [1] - 101:1
**line** [5] - 30:12, 46:15, 60:4, 83:10, 86:15
**lines** [3] - 98:10, 98:17, 98:19
**Lisa** [1] - 15:11
**listed** [1] - 61:12
**liter** [2] - 53:4, 53:7
**literature** [1] - 37:7
**litigation** [1] - 46:5
**lived** [1] - 15:21
**LLP** [1] - 2:15
**look** [7] - 29:6, 35:16, 46:11, 62:10, 65:11, 85:18, 102:2
**looked** [2] - 31:24, 64:18
**looking** [3] - 29:18, 85:21, 86:14
**looks** [1] - 29:16
**Los** [1] - 2:17
**loses** [1] - 37:14
**low** [8] - 53:2, 87:12, 87:21, 88:18, 88:19, 88:21, 89:15
**lower** [3] - 62:13, 62:19, 65:6
**lowest** [1] - 53:10
**lunch** [3] - 103:10, 103:11, 103:19
**Lunch** [1] - 103:24
**lung** [5] - 35:3, 35:13, 35:17, 35:23, 36:4
**lungs** [17] - 7:10, 17:7, 19:16, 19:17, 21:10, 21:15, 21:16, 23:10, 35:5, 35:10, 51:21, 67:16, 67:19, 68:1, 68:8, 69:2, 69:13
**lying** [2] - 16:17, 16:18

**M**

**main** [1] - 27:21
**maintain** [2] - 11:8, 66:4
**major** [3] - 7:13, 10:5, 12:4
**man** [2] - 16:5, 16:7
**manner** [2] - 18:10, 60:25
**MARCH** [2] - 4:1, 104:15
**March** [1] - 1:17
**Maria** [1] - 74:3
**mark** [9] - 43:5, 47:21, 48:1, 71:1, 71:8, 79:13, 79:15, 99:23, 100:11
**mask** [1] - 19:17
**massacre** [1] - 5:25
**massage** [1] - 17:2
**materials** [3] - 15:9, 42:23, 46:12
**math** [1] - 82:12
**matter** [3] - 95:17, 98:4, 98:5
**MATTER** [1] - 104:10
**matters** [1] - 40:13
**max** [1] - 70:6
**MD** [1] - 7:5
**mean** [11] - 11:4, 22:10, 23:20, 26:22, 29:19, 35:1, 38:21, 45:10, 45:15, 61:8, 84:1
**meaning** [4] - 16:17, 21:8, 21:9, 67:14
**means** [7] - 9:19, 13:19, 18:4, 21:11, 47:6, 67:7, 67:9
**meant** [1] - 24:24
**measured** [3] - 53:7, 58:23, 66:7
**measurement** [3] - 72:2, 72:8, 72:11
**measurements** [2] - 44:12, 59:7
**measures** [1] - 32:12
**measuring** [1] - 72:6
**mechanically** [1] - 19:12
**mechanics** [1] - 59:11
**mechanism** [5] - 25:14, 25:16, 37:22, 67:12, 67:13
**medic** [1] - 74:24
**medical** [42] - 6:6, 7:6, 15:6, 15:11, 15:14, 17:22, 19:21, 27:7, 32:18, 36:15, 40:12,

40:15, 40:24, 42:4, 42:18, 43:3, 46:25, 47:3, 50:16, 51:3, 51:13, 53:2, 53:19, 53:25, 54:4, 54:8, 54:12, 54:16, 59:13, 59:17, 59:19, 60:14, 61:3, 61:8, 61:9, 71:19, 71:23, 72:9, 74:25, 75:2, 92:15, 97:22
**Medical** [2] - 14:12, 17:11
**medications** [1] - 17:7
**medicine** [12] - 7:3, 7:4, 7:7, 7:8, 7:16, 28:10, 37:12, 40:4, 47:6, 49:18, 53:17
**medics** [1] - 96:20
**meet** [1] - 22:23
**meetings** [1] - 15:24
**mention** [1] - 38:7
**mentioned** [11] - 10:22, 12:6, 17:19, 21:5, 38:25, 39:5, 55:4, 56:17, 59:10, 91:10, 101:23
**mentions** [2] - 37:13, 38:18
**metabolic** [26] - 22:23, 23:14, 37:19, 37:20, 38:4, 38:8, 38:9, 57:2, 57:4, 57:6, 57:12, 57:14, 57:16, 57:20, 58:4, 58:9, 58:14, 58:17, 58:19, 59:2, 59:5, 67:15, 68:7, 68:10, 72:25, 73:4
**metabolism** [3] - 24:22, 25:1, 52:22
**meth** [5] - 53:6, 53:9, 53:10, 54:20, 55:2
**methamphetamine** [43] - 15:22, 24:20, 24:21, 24:22, 24:24, 25:2, 25:3, 25:4, 25:11, 25:15, 25:17, 26:4, 26:5, 33:14, 34:6, 34:18, 35:19, 36:20, 36:23, 36:25, 37:1, 38:5, 38:15, 38:16, 52:20, 53:3, 54:18, 58:3, 58:16, 58:20, 58:25, 59:4, 61:23, 63:16, 63:20, 64:4, 64:13, 64:14, 64:24, 72:23, 72:24, 73:3
**methamphetamines**

[1] - 24:25
**midway** [1] - 83:9
**might** [7] - 7:17, 28:13, 75:24, 76:20, 96:9, 100:18, 100:20
**mile** [1] - 23:5
**miles** [1] - 22:10
**milligrams** [2] - 53:4, 53:7
**mind** [5] - 30:5, 31:2, 70:10, 87:2, 103:12
**mini** [1] - 4:24
**minimal** [1] - 27:18
**minute** [13] - 30:24, 60:14, 62:21, 66:3, 84:23, 86:4, 86:6, 86:12, 89:20, 90:16, 90:23, 99:23, 100:11
**minutes** [33] - 18:2, 29:25, 31:12, 31:16, 48:7, 48:12, 55:23, 56:6, 60:2, 62:19, 70:6, 70:8, 70:13, 71:6, 71:16, 77:6, 77:8, 78:6, 78:8, 78:11, 82:13, 82:15, 82:16, 83:18, 94:10, 100:3, 100:4, 100:5, 100:13, 100:14
**misleading** [1] - 34:25
**misplaced** [1] - 30:12
**misstates** [2] - 60:20, 61:15
**mistakenly** [2] - 28:1, 76:20
**moaning** [2] - 63:12, 63:13
**molecules** [2] - 23:1
**moment** [8] - 30:13, 30:14, 32:6, 59:25, 60:1, 69:15, 78:2, 87:8
**monitor** [7] - 17:3, 25:25, 55:12, 55:24, 56:2, 56:7, 62:11
**month** [1] - 55:1
**morning** [14] - 4:7, 4:10, 4:11, 4:14, 4:15, 5:5, 5:22, 5:23, 39:23, 40:1, 40:2, 74:8, 74:9
**most** [2] - 12:11, 69:3
**mouth** [4] - 86:10, 90:17, 90:23, 91:4
**move** [23] - 21:14, 81:22, 84:10, 84:11, 92:6, 92:7, 92:13, 92:15, 93:1, 93:23, 93:25, 94:3, 94:14, 94:15, 95:13, 96:1,

96:19, 100:18, 100:25, 101:6, 101:10, 102:9
**movement** [3] - 31:6, 49:13, 77:20
**movements** [3] - 48:23, 49:6, 75:12
**moving** [31] - 22:16, 24:1, 31:21, 37:16, 75:5, 75:10, 75:17, 75:20, 76:2, 76:4, 76:8, 76:15, 77:4, 77:8, 77:12, 77:13, 77:17, 78:2, 81:16, 82:17, 83:18, 83:23, 92:2, 92:18, 92:20, 92:23, 94:8, 96:14, 96:21, 100:16, 102:4
**MR** [125] - 3:6, 3:6, 3:7, 3:7, 3:9, 4:7, 4:11, 5:2, 5:5, 5:21, 18:11, 18:13, 20:13, 20:15, 28:15, 28:19, 30:2, 30:6, 30:8, 30:11, 30:14, 30:16, 30:19, 39:20, 39:22, 39:25, 46:14, 46:16, 46:18, 53:23, 53:25, 54:2, 60:8, 60:11, 60:13, 60:20, 60:21, 60:24, 61:5, 61:7, 61:15, 61:18, 62:21, 62:23, 62:24, 63:3, 63:4, 64:7, 64:15, 65:13, 65:14, 69:8, 69:10, 69:15, 69:17, 70:1, 70:4, 70:6, 70:23, 71:3, 71:5, 71:21, 71:22, 73:13, 73:18, 74:4, 74:7, 76:10, 76:13, 77:21, 77:24, 77:25, 78:15, 78:20, 78:21, 79:2, 79:4, 80:5, 80:8, 80:10, 80:11, 80:19, 80:22, 80:23, 81:11, 81:14, 81:15, 81:22, 81:25, 82:1, 84:19, 84:20, 85:4, 85:6, 85:9, 85:11, 88:22, 88:25, 89:1, 90:19, 90:20, 92:20, 92:22, 93:4, 93:6, 93:9, 93:11, 93:16, 94:5, 94:12, 94:17, 95:10, 95:15, 98:9, 98:12, 98:14, 98:15, 98:17, 98:20, 98:21, 98:24, 103:8, 103:16, 103:20, 103:21

**MRI** [1] - 17:14
**muscle** [19] - 10:1, 10:2, 10:13, 10:17, 10:19, 11:2, 11:9, 11:11, 11:24, 12:19, 12:20, 13:19, 20:19, 20:20, 20:22, 21:2, 26:9, 57:24, 58:10
**muscles** [5] - 22:14, 22:21, 22:23, 67:4, 67:18
**music** [1] - 14:3
**must** [1] - 30:10

## N

**name** [22] - 5:16, 5:17, 5:25, 29:17, 74:2, 76:19, 76:24, 77:5, 77:7, 77:9, 77:12, 77:15, 78:4, 78:7, 78:13, 78:14, 78:22, 81:23, 82:10, 82:14, 82:20, 84:24
**names** [1] - 95:4
**natural** [4] - 13:3, 21:12, 53:21, 54:5
**necessarily** [1] - 54:13
**necessary** [1] - 99:19
**neck** [3] - 87:16, 88:12, 88:14
**need** [10] - 9:2, 9:20, 9:22, 11:24, 33:21, 80:24, 90:7, 94:10, 99:10, 103:17
**needed** [3] - 8:19, 17:21, 24:25
**needing** [1] - 33:20
**needs** [5] - 20:18, 21:2, 24:6, 25:7, 34:19
**negate** [1] - 47:7
**neighbors** [1] - 16:4
**neurologist** [2] - 17:14, 49:21
**neurology** [1] - 49:19
**neuropathologist** [1] - 50:2
**neuropathology** [1] - 49:25
**never** [13] - 8:4, 26:17, 41:5, 44:7, 44:9, 44:12, 44:19, 51:18, 52:16, 55:15, 55:16, 55:19, 75:24
**new** [1] - 7:4
**next** [2] - 86:16, 89:20
**Niedzialek** [41] - 9:14, 10:23, 19:23, 27:8,

29:7, 42:8, 42:12, 42:16, 43:4, 43:10, 43:17, 43:25, 44:23, 47:12, 47:20, 47:25, 48:6, 48:11, 48:20, 48:23, 49:6, 54:25, 55:1, 55:8, 55:13, 55:15, 55:22, 56:14, 56:18, 57:23, 58:4, 59:25, 60:5, 63:12, 63:17, 64:12, 71:15, 72:11, 73:6, 83:13, 86:16
**NIEDZIALEK** [1] - 1:8
**Niedzialek's** [19] - 7:20, 7:25, 19:3, 23:18, 43:12, 44:4, 49:15, 53:6, 53:9, 54:17, 55:17, 56:10, 56:22, 58:22, 58:25, 59:8, 59:23, 72:19, 72:24
**nine** [1] - 62:18
**nobody** [2] - 34:11, 101:18
**node** [2] - 13:25, 14:6
**noise** [2] - 23:23, 24:1
**noises** [1] - 16:4
**none** [3] - 43:16, 44:2, 52:12
**normal** [14] - 10:25, 13:23, 13:24, 14:9, 17:9, 17:10, 18:24, 18:25, 22:3, 29:20, 36:4, 38:9, 65:22
**normalizing** [1] - 66:20
**normally** [4] - 37:25, 38:2, 67:2, 72:14
**North** [1] - 2:7
**nothing** [5] - 5:12, 12:17, 34:21, 39:20, 73:24
**notice** [2] - 82:2, 82:6
**noticed** [1] - 29:5
**notion** [1] - 33:3
**numbers** [1] - 50:17
**nutrients** [2] - 9:21, 20:21

## O

**Oakland** [1] - 2:10
**Oaks** [1] - 2:7
**oath** [1] - 70:20
**object** [1] - 53:23
**objection** [10] - 18:11, 20:13, 28:15, 46:16, 60:20, 61:5, 61:15, 63:3, 69:8, 98:21

**objections** [1] - 93:9
**observed** [5] - 43:16, 44:3, 48:23, 49:6, 74:10
**obstruction** [1] - 56:22
**obtain** [1] - 35:2
**obviously** [6] - 23:23, 34:4, 42:2, 78:24, 85:12, 90:12
**occasions** [1] - 18:22
**occur** [1] - 12:5
**occurred** [6] - 56:11, 62:10, 62:16, 63:8, 63:10, 65:5
**occurs** [1] - 52:24
**OF** [10] - 1:2, 1:15, 2:4, 2:6, 104:1, 104:6, 104:8, 104:11, 104:15
**offer** [1] - 46:12
**offered** [1] - 14:23
**offering** [1] - 42:14
**office** [1] - 5:25
**OFFICE** [1] - 2:9
**officer** [2] - 41:4, 41:7
**Officer** [1] - 37:14
**officers** [6] - 22:7, 27:25, 41:21, 41:24, 42:3, 96:18
**OFFICES** [2] - 2:4, 2:6
**OFFICIAL** [3] - 104:1, 104:4, 104:21
**Official** [1] - 1:22
**official** [1] - 28:22
**often** [2] - 9:8, 36:18
**once** [4] - 37:13, 76:15, 78:12, 94:15
**one** [27] - 6:18, 10:5, 12:6, 13:12, 19:11, 22:2, 23:3, 30:14, 30:21, 31:10, 32:23, 34:4, 37:1, 39:15, 50:5, 57:11, 58:19, 60:6, 65:21, 69:15, 76:24, 86:9, 87:11, 90:16, 91:3, 102:20
**open** [8] - 31:6, 69:2, 70:10, 83:3, 86:10, 90:17, 90:24, 103:12
**opened** [1] - 91:4
**opening** [2] - 10:22, 26:12
**operating** [1] - 17:18
**opined** [1] - 50:8
**opinion** [31] - 19:2, 20:10, 23:17, 24:2, 26:14, 27:21, 27:23, 29:4, 29:9, 29:11, 31:15, 32:3, 32:4,

32:5, 32:13, 33:25, 36:9, 37:6, 37:10, 38:12, 39:16, 42:11, 50:10, 59:22, 63:16, 63:19, 64:20, 69:20, 72:22, 73:1, 100:15
**opinions** [16] - 9:3, 15:5, 27:20, 32:17, 34:14, 36:6, 42:6, 42:7, 42:14, 42:18, 42:24, 44:9, 44:15, 44:22, 46:12, 52:19
**opportunity** [1] - 16:14
**oranges** [1] - 34:15
**orchestra** [3] - 14:2, 14:4, 14:5
**order** [2] - 5:7, 45:19
**organ** [5] - 8:17, 8:20, 8:21, 10:2, 17:17
**organized** [7] - 11:7, 11:16, 14:8, 26:17, 27:3, 27:4, 39:2
**organs** [6] - 7:9, 9:20, 9:22, 17:19, 23:2, 69:6
**originating** [1] - 12:13
**outcome** [1] - 57:11
**overcome** [1] - 99:19
**overdose** [3] - 52:24, 61:23, 64:4
**overruled** [11] - 54:1, 60:22, 61:16, 64:9, 64:11, 76:11, 93:10, 93:18, 94:13, 95:12, 98:23
**overstimulates** [2] - 25:18, 25:19
**overstimulation** [1] - 25:21
**own** [2] - 28:2, 45:10
**oxygen** [47] - 9:21, 17:7, 18:6, 19:14, 19:16, 19:17, 20:20, 20:21, 20:24, 21:1, 21:2, 21:9, 21:16, 21:20, 21:23, 21:25, 22:9, 23:9, 24:5, 24:6, 24:9, 24:10, 24:11, 24:13, 24:25, 25:7, 26:10, 29:22, 33:20, 33:21, 34:17, 34:20, 35:15, 35:18, 35:21, 35:22, 36:24, 37:21, 37:23, 38:1, 38:2, 45:1, 51:17, 69:6, 69:13, 71:24
**oxygen/adequate** [1] - 21:22
**oxygenated** [3] -

19:18, 20:18, 20:19
**oxygenation** [1] - 59:8

**P**

**paddles** [2] - 12:9, 27:14
**page** [6] - 46:15, 83:10, 83:11, 98:8, 98:10, 98:17
**PAGE** [2] - 3:3, 104:10
**paged** [1] - 5:25
**paid** [1] - 40:9
**pain** [3] - 22:7, 22:9, 22:19
**panel** [1] - 28:22
**paper** [2] - 51:3, 51:5
**paralysis** [1] - 26:10
**paramedic** [2] - 15:11, 56:22
**paramedics** [18] - 8:14, 12:18, 14:14, 14:16, 17:1, 17:6, 25:24, 27:15, 28:1, 32:11, 55:24, 56:1, 56:15, 56:18, 75:8, 89:10, 89:14, 96:22
**paramedics'** [2] - 14:16, 27:13
**part** [16] - 19:14, 24:23, 25:2, 28:22, 42:23, 44:7, 79:6, 84:19, 87:14, 88:10, 88:11, 88:12, 94:20, 96:12, 99:6
**participated** [2] - 52:9, 59:13
**particular** [5] - 9:14, 14:10, 22:5, 44:6, 94:25
**particularly** [4] - 31:7, 35:25, 36:2, 46:5
**partner** [2] - 78:12, 81:1
**parts** [1] - 9:25
**party** [2] - 98:13, 98:21
**Pasadena** [1] - 2:8
**passed** [4] - 55:23, 60:2, 86:8, 88:5
**pathologist** [7] - 36:7, 36:8, 43:4, 45:18, 46:3, 46:23, 47:11
**pathologist's** [3] - 46:8, 46:10, 46:19
**pathology** [3] - 47:1, 47:4, 49:23
**patient** [1] - 15:6
**patients** [4] - 18:22, 45:7, 45:10, 45:14

**patterns** [1] - 50:17
**pavement** [1] - 22:8
**PC** [1] - 2:9
**PEA** [25] - 10:23, 11:2, 11:5, 13:9, 17:3, 19:6, 19:8, 21:6, 23:15, 23:18, 26:4, 26:14, 27:3, 27:4, 27:8, 38:24, 38:25, 57:24, 58:9, 58:14, 62:6, 65:1, 68:11
**PEA-related** [1] - 58:14
**peer** [7] - 45:10, 51:1, 51:10, 51:12, 52:1, 52:2, 52:5
**peer-reviewed** [4] - 51:10, 51:12, 52:2, 52:5
**people** [14] - 5:25, 11:19, 18:19, 18:23, 23:21, 27:25, 29:5, 36:9, 38:18, 45:5, 52:6, 95:4, 97:17, 102:24
**people's** [1] - 18:18
**per** [3] - 53:4, 53:7, 74:19
**percent** [4] - 40:16, 40:18, 40:19, 45:9
**percentage** [1] - 40:20
**perform** [3] - 90:4, 90:7, 90:10
**performed** [1] - 45:23
**period** [8] - 18:2, 77:13, 78:3, 89:10, 94:9, 95:8, 96:15, 102:5
**permission** [2] - 15:16, 46:14
**person** [18] - 11:8, 14:20, 29:15, 36:1, 36:20, 48:16, 54:21, 57:19, 68:4, 72:9, 90:2, 90:3, 94:8, 96:19, 97:22, 100:24, 102:9, 103:3
**personally** [1] - 29:13
**perspective** [4] - 54:8, 54:12, 76:3, 90:22
**pertain** [1] - 52:13
**pertaining** [1] - 52:10
**pertinent** [1] - 15:14
**pH** [8] - 57:10, 58:22, 66:7, 66:15, 66:20, 66:25, 67:5, 67:7
**phantom** [2] - 28:7, 29:2
**phenomenon** [2] - 28:7, 29:12

**photos** [1] - 14:15
**phrase** [1] - 99:1
**phrased** [1] - 92:20
**PHYLLIS** [4] - 1:21, 104:4, 104:18, 104:20
**physical** [1] - 58:7
**physically** [1] - 44:23
**physician** [5] - 37:12, 40:3, 51:20, 71:20, 71:23
**physicians** [2] - 28:24, 46:11
**physicians'** [1] - 45:12
**physiologic** [1] - 29:20
**physiology** [1] - 52:21
**picked** [1] - 101:2
**place** [1] - 99:11
**placed** [4] - 19:15, 79:11, 92:14, 94:21
**placing** [1] - 16:20
**plaintiff** [4] - 4:8, 4:18, 14:23, 40:19
**Plaintiff** [2] - 1:9, 2:3
**plaintiff's** [1] - 6:5
**plaintiffs** [2] - 40:17, 40:25
**plausible** [1] - 24:17
**play** [6] - 30:4, 78:17, 80:6, 85:4, 88:22, 100:17
**played** [14] - 30:18, 54:9, 62:22, 65:12, 71:2, 78:19, 80:7, 80:9, 80:21, 81:13, 81:24, 85:5, 85:8, 88:24
**playing** [6] - 68:18, 81:12, 84:2, 91:18, 100:21, 102:5
**plays** [1] - 14:5
**pleasant** [1] - 29:18
**pleasant-looking** [1] - 29:18
**plugged** [2] - 30:7, 30:8
**plus** [3] - 72:23, 72:24, 73:3
**point** [26] - 16:21, 16:24, 17:10, 17:18, 20:8, 23:23, 27:17, 33:13, 35:14, 63:7, 65:3, 68:18, 71:16, 76:17, 78:24, 82:25, 85:16, 85:18, 88:14, 89:10, 100:1, 101:9, 101:22
**points** [1] - 91:6

**police** [3] - 27:25, 41:12, 61:12
**policies** [2] - 41:18
**pool** [2] - 66:13, 66:18
**pop** [1] - 96:4
**portion** [2] - 9:9, 88:22
**position** [76] - 16:17, 20:24, 21:9, 21:12, 21:14, 24:3, 24:4, 24:9, 33:1, 33:4, 33:5, 33:17, 34:2, 34:9, 35:7, 35:13, 36:2, 36:5, 38:1, 38:8, 48:9, 60:6, 68:16, 68:17, 68:23, 68:25, 69:12, 69:19, 69:21, 75:23, 76:15, 76:16, 79:8, 84:8, 84:10, 91:10, 91:12, 91:16, 91:20, 91:21, 91:23, 92:2, 92:6, 92:7, 92:10, 92:15, 92:18, 93:2, 93:15, 93:19, 93:22, 93:23, 93:24, 94:1, 94:4, 94:11, 94:15, 94:16, 95:1, 95:7, 95:14, 95:23, 96:11, 96:15, 96:19, 96:25, 97:4, 97:24, 97:25, 98:5, 99:7, 102:4
**position'** [1] - 99:1
**positional** [1] - 34:1
**possible** [4] - 25:10, 26:18, 28:5, 79:2
**possibly** [1] - 91:1
**possum** [5] - 84:2, 100:17, 100:21, 101:25, 102:5
**postgraduate** [1] - 7:6
**postmortem** [1] - 45:8
**potential** [1] - 58:19
**potentially** [1] - 58:19
**practice** [1] - 18:8
**prelude** [1] - 12:10
**prepare** [2] - 6:12
**preparing** [1] - 42:23
**presence** [4] - 4:3, 70:14, 70:18, 103:14
**present** [2] - 4:9, 50:6
**presenting** [6] - 61:24, 62:5, 64:1, 64:16, 64:20, 64:22
**PRESIDING** [1] - 1:5
**press** [1] - 66:23
**pressure** [10] - 17:10, 18:25, 24:3, 25:1, 36:1, 66:1, 95:24, 96:6, 96:8, 99:8
**PRESTON** [4] - 1:21,

104:4, 104:18, 104:20
**pretty** [1] - 66:9
**prevent** [2] - 19:23, 32:8
**preventing** [1] - 18:18
**primarily** [2] - 4:25, 52:13
**primary** [3] - 11:14, 45:4, 67:13
**problem** [6] - 10:18, 10:19, 11:14, 12:19, 25:2, 36:23
**problems** [4] - 8:4, 8:8, 18:20, 26:3
**procedures** [2] - 41:18, 42:15
**proceed** [1] - 74:4
**PROCEEDINGS** [2] - 1:15, 104:9
**process** [7] - 21:6, 51:1, 51:7, 53:20, 54:5, 58:11, 71:24
**profession** [3] - 40:3, 61:3, 61:8
**professional** [1] - 68:20
**progression** [1] - 13:3
**progressive** [1] - 68:9
**prone** [56] - 16:17, 20:23, 21:7, 21:9, 21:12, 24:3, 25:6, 31:8, 33:4, 34:2, 35:13, 35:25, 36:1, 48:9, 48:24, 49:7, 50:21, 51:18, 56:3, 69:19, 69:21, 73:11, 75:23, 76:16, 92:1, 92:6, 93:7, 93:8, 93:15, 93:19, 93:21, 93:22, 93:24, 94:1, 94:4, 94:19, 94:21, 95:1, 95:7, 95:13, 95:20, 95:23, 96:11, 96:14, 96:25, 97:4, 97:19, 97:23, 97:25, 98:5, 99:7, 99:10, 102:3, 103:6
**prone-restrained** [1] - 24:3
**prone-restraint** [2] - 21:7, 48:9
**proper** [1] - 22:25
**proponent's** [1] - 33:3
**provide** [1] - 90:2
**provided** [2] - 16:13, 32:17
**providing** [1] - 19:14
**proximate** [5] - 45:20, 53:20, 54:4, 54:13,

54:17
**psychologically** [1] - 16:8
**public** [1] - 93:20
**public's** [1] - 84:9
**published** [3] - 51:13, 52:2, 52:6
**pulmonary** [1] - 35:3
**pulmonologist** [3] - 51:20, 51:24, 71:19
**pulse** [41] - 17:5, 17:9, 19:13, 27:23, 27:24, 28:1, 28:2, 28:6, 28:8, 28:14, 29:2, 55:17, 85:24, 86:4, 86:20, 86:22, 87:8, 87:9, 87:12, 87:13, 87:19, 87:20, 87:21, 87:23, 87:25, 88:1, 88:15, 88:16, 89:2, 89:14, 89:16, 89:18, 89:21, 90:2, 90:3, 90:7, 90:10, 90:12, 90:16, 90:23
**pulseless** [10] - 11:3, 11:9, 11:11, 12:17, 13:9, 17:4, 21:5, 24:13, 26:3, 37:19
**pumped** [1] - 18:4
**pumping** [3] - 10:5, 12:4, 18:1
**pumps** [3] - 10:4, 10:6, 22:9
**purely** [1] - 25:15
**purpose** [1] - 13:12
**purposes** [1] - 19:11
**PURSUANT** [1] - 104:7
**push** [1] - 19:16
**pushed** [1] - 16:23
**pushing** [2] - 19:17, 19:18
**put** [12] - 16:17, 31:8, 51:3, 76:14, 92:2, 92:5, 92:10, 92:17, 94:10, 97:24, 97:25, 100:17
**putting** [2] - 33:17, 97:23

**Q**

**quantities** [1] - 52:20
**quantity** [1] - 19:22
**QUESTION** [1] - 98:25
**questions** [5] - 60:8, 73:13, 102:18, 102:24, 103:5
**quick** [1] - 78:10
**quickly** [3] - 27:21,

32:16, 80:5
**quite** [1] - 75:16
**quoting** [1] - 33:2

**R**

**raise** [2] - 5:9, 73:21
**raised** [2] - 25:1, 32:21
**range** [4] - 53:3, 53:10, 66:11, 67:5
**rapid** [1] - 68:2
**rare** [1] - 58:13
**rate** [2] - 25:1, 67:3
**rather** [1] - 65:6
**re** [1] - 28:18
**re-ask** [1] - 28:18
**reached** [1] - 64:20
**react** [1] - 28:20
**read** [7] - 46:14, 46:17, 60:15, 61:20, 63:15, 98:10, 98:23
**real** [4] - 11:21, 33:9, 50:10, 50:17
**real-world** [3] - 33:9, 50:10, 50:17
**reality** [2] - 34:22, 34:23
**realized** [1] - 17:1
**really** [3] - 33:21, 34:19, 80:5
**REALTIME** [1] - 104:4
**reason** [4] - 22:17, 63:25, 96:12, 96:14
**reasons** [3] - 12:20, 37:1, 76:24
**rebuttal** [6] - 6:21, 32:17, 33:7, 36:7, 38:13, 103:18
**received** [2] - 7:5, 16:4
**recently** [1] - 102:16
**recess** [4] - 70:8, 70:17, 103:10, 103:24
**recheck** [1] - 90:11
**recognized** [2] - 28:10, 37:6
**recommended** [1] - 17:16
**record** [4] - 5:17, 16:13, 74:2, 84:21
**recorded** [2] - 14:21, 60:23
**recording** [1] - 48:19
**records** [9] - 14:12, 15:6, 17:22, 19:21, 20:2, 24:16, 27:7, 46:12, 72:18
**recover** [1] - 17:8

**recovery** [17] - 15:24, 24:4, 68:17, 68:23, 69:12, 91:10, 91:12, 91:16, 91:20, 91:23, 92:2, 92:7, 92:10, 92:14, 92:17, 94:11, 96:19
**recreational** [1] - 63:17
**RECROSS** [2] - 3:7, 71:4
**RECROSS-EXAMINATION** [2] - 3:7, 71:4
**REDIRECT** [2] - 3:7, 60:12
**refer** [2] - 53:20, 54:5
**reference** [1] - 86:15
**referred** [2] - 13:5, 39:11
**referring** [4] - 15:15, 62:15, 63:2, 98:8
**refers** [2] - 33:8, 33:11
**regain** [3] - 94:1, 99:12, 100:19
**regarding** [4] - 14:22, 36:6, 37:10, 46:12
**regardless** [1] - 37:22
**regular** [2] - 27:1, 41:22
**REGULATIONS** [1] - 104:11
**relapsed** [1] - 15:21
**related** [4] - 46:5, 52:21, 58:14, 102:25
**relating** [1] - 45:11
**relation** [1] - 102:13
**relative** [1] - 67:9
**relevant** [2] - 34:15, 86:25
**remain** [1] - 67:5
**remained** [1] - 77:12
**remember** [9] - 4:16, 47:17, 49:16, 61:24, 70:9, 88:1, 88:19, 95:5, 103:12
**remove** [3] - 91:14, 100:25
**render** [1] - 39:16
**repeat** [1] - 49:1
**repeatedly** [1] - 11:4
**replenish** [2] - 33:20, 69:13
**replicate** [2] - 33:8, 50:10
**report** [25] - 6:18, 14:15, 14:16, 14:18, 14:24, 15:1, 15:9, 15:15, 27:20, 32:16, 32:20, 43:2, 60:15,

60:25, 63:15, 82:25, 83:6, 83:20, 84:13, 86:14, 86:17, 86:24, 87:5, 89:6
**reported** [1] - 16:4
**REPORTED** [1] - 104:9
**reportedly** [1] - 15:21
**REPORTER** [3] - 104:1, 104:5, 104:21
**Reporter** [1] - 1:22
**reporter's** [1] - 49:5
**REPORTER'S** [1] - 1:15
**reports** [4] - 6:14, 6:21, 6:25, 32:18
**repositioned** [1] - 87:21
**request** [2] - 74:24, 75:2
**required** [1] - 12:18
**requirement** [1] - 35:23
**reserve** [1] - 103:18
**residency** [1] - 7:7
**resist** [1] - 76:5
**resistance** [2] - 73:4, 99:20
**resisting** [10] - 92:23, 94:9, 95:7, 95:21, 97:5, 99:8, 99:22, 100:10, 100:15, 102:4
**respect** [1] - 89:24
**respiration** [1] - 68:14
**respirations** [1] - 23:13
**respiratory** [5] - 23:4, 51:21, 67:13, 67:15, 68:8
**respond** [1] - 12:15
**responder** [1] - 28:13
**responders** [2] - 28:20, 28:23
**responding** [3] - 10:14, 16:23, 28:25
**responds** [1] - 14:4
**response** [7] - 21:13, 32:25, 33:7, 42:22, 62:6, 67:14, 82:19
**responsiveness** [1] - 37:14
**rest** [1] - 22:14
**restore** [1] - 32:7
**restored** [2] - 17:9
**restrain** [1] - 21:11
**restrained** [9] - 20:24, 24:3, 25:6, 31:8, 34:9, 41:9, 42:12, 48:15, 48:20

**restraint** [26] - 21:7, 21:19, 33:4, 34:1, 34:21, 35:25, 39:7, 42:15, 42:19, 48:9, 48:16, 48:24, 49:7, 50:21, 51:13, 51:18, 52:10, 56:3, 58:6, 73:11, 91:13, 94:19, 94:21, 99:10, 103:6
**restraints** [1] - 61:12
**restricting** [1] - 68:6
**restriction** [1] - 37:24
**result** [7] - 17:25, 18:6, 20:23, 20:25, 25:12, 52:25, 72:14
**results** [2] - 51:6, 51:9
**resume** [1] - 4:17
**Resumed** [1] - 74:6
**RESUMED** [1] - 3:9
**resuscitate** [3] - 27:13, 27:17, 32:11
**resuscitated** [5] - 8:13, 8:14, 14:17, 27:11, 31:25
**resuscitation** [6] - 9:23, 13:21, 14:14, 18:10, 18:24, 32:12
**retained** [1] - 6:5
**review** [10] - 14:11, 15:4, 39:15, 45:11, 51:2, 51:5, 52:1, 55:21, 72:18
**reviewed** [28] - 14:12, 14:14, 14:16, 14:17, 14:18, 14:21, 14:22, 15:7, 15:9, 15:10, 17:23, 19:21, 20:2, 24:16, 27:7, 42:23, 42:24, 43:2, 43:7, 44:16, 48:19, 51:10, 51:12, 52:2, 52:5, 53:2, 56:13, 102:16
**reviewing** [4] - 79:14, 79:16, 79:21, 81:2
**revs** [1] - 24:22
**revved** [1] - 24:25
**Reygoza** [1] - 15:12
**rhythm** [26] - 10:25, 11:19, 11:22, 12:12, 13:23, 13:24, 14:9, 17:5, 17:9, 18:25, 21:1, 26:3, 26:13, 26:17, 27:1, 38:20, 38:21, 38:23, 56:3, 61:24, 62:5, 64:1, 64:16, 64:20, 64:23
**rhythmic** [1] - 10:7
**rhythms** [3] - 12:5, 55:4, 55:11
**Richard** [2] - 38:12,

72:21
**right-hand** [1] - 71:11
**rising** [1] - 67:10
**risk** [4] - 96:21, 97:18, 97:24, 98:1
**RIVERSIDE** [4] - 1:3, 1:11, 4:1
**Riverside** [7] - 4:5, 4:12, 16:3, 75:22, 97:15, 102:1, 102:21
**riverside** [2] - 1:16, 1:23
**role** [3] - 20:6, 40:9, 54:9
**roll** [3] - 65:7, 75:6, 75:19
**rolled** [1] - 37:17
**room** [2] - 17:18, 28:24
**roughly** [2] - 70:25, 71:8
**rule** [4] - 47:7, 48:24, 49:7, 103:22
**ruled** [1] - 47:11
**run** [3] - 23:5, 62:21, 71:11
**running** [13] - 16:6, 22:5, 22:18, 23:5, 23:21, 23:22, 23:25, 24:6, 25:4, 34:18, 57:23, 68:5, 68:19

## S

**safe** [11] - 84:10, 92:7, 92:14, 92:25, 93:20, 93:22, 94:3, 94:15, 95:14, 101:5, 102:9
**safety** [3] - 84:8, 84:9
**SAIN** [39] - 2:15, 3:6, 3:7, 4:11, 18:11, 20:13, 28:15, 39:22, 39:25, 46:14, 46:18, 53:25, 54:2, 60:8, 60:20, 61:5, 61:15, 63:3, 64:7, 69:8, 70:4, 70:6, 70:23, 71:3, 71:5, 71:21, 71:22, 73:13, 76:10, 92:20, 93:4, 93:9, 93:16, 94:12, 95:10, 98:12, 98:15, 98:21, 103:21
**Sain** [4] - 4:11, 39:21, 70:3, 70:22
**saw** [7] - 26:3, 27:3, 30:21, 56:17, 86:10, 90:23, 91:3
**scan** [1] - 17:13
**scene** [9] - 14:17,

14:20, 16:11, 44:10, 44:12, 55:17, 56:2, 56:15, 59:8
**scheduling** [2] - 4:18, 4:25
**school** [2] - 7:4, 7:6
**science** [2] - 26:15, 49:12
**scientific** [1] - 33:3
**scientists** [1] - 33:16
**scrapes** [1] - 43:21
**seat** [1] - 74:1
**seated** [5] - 5:14, 68:25, 70:19, 91:21, 93:2
**second** [11] - 29:4, 32:20, 75:9, 82:9, 83:13, 88:6, 88:7, 88:14, 88:17, 100:7, 101:16
**seconds** [14] - 75:7, 75:17, 75:20, 76:7, 77:4, 77:18, 78:3, 86:8, 86:12, 88:15, 88:16, 89:3, 99:23
**SECTION** [1] - 104:7
**secure** [1] - 97:21
**see** [35] - 18:22, 20:2, 24:17, 26:1, 29:6, 30:20, 31:5, 31:10, 34:23, 37:15, 37:16, 55:8, 64:18, 65:10, 65:15, 65:16, 68:20, 68:22, 72:15, 77:1, 77:14, 77:21, 78:2, 79:12, 79:14, 79:15, 79:23, 80:6, 80:12, 82:23, 83:14, 85:9, 85:20, 85:22, 86:17
**seeing** [1] - 85:12
**seem** [3] - 75:11, 78:11, 84:24
**self** [1] - 38:4
**self-induced** [1] - 38:4
**sensitive** [1] - 18:5
**sent** [1] - 16:6
**sentence** [3] - 83:13, 86:16, 86:17
**separately** [1] - 16:11
**serious** [2] - 18:19, 39:12
**serve** [1] - 8:17
**served** [1] - 17:20
**serving** [1] - 8:25
**Session** [1] - 1:11
**sessions** [2] - 97:1, 102:2
**seven** [1] - 53:9
**several** [3] - 18:2, 29:25, 35:1

**severe** [2] - 8:15, 36:11
**shallow** [2] - 29:16, 31:10
**sheriff** [1] - 16:10
**SHERIFF** [1] - 1:12
**Sheriff** [1] - 4:12
**sheriff's** [2] - 98:2, 102:21
**Sheriff's** [3] - 16:3, 75:22, 97:15
**SHERIFF'S** [1] - 1:11
**SHERIFF-CORONER** [1] - 1:12
**shock** [8] - 11:20, 11:24, 12:9, 12:15, 12:18, 12:19, 26:2, 27:14
**shockable** [1] - 11:22
**shocked** [1] - 27:1
**short** [2] - 78:18, 80:6
**show** [8] - 34:4, 35:15, 35:17, 35:25, 36:3, 65:3, 70:24, 72:16
**showed** [3] - 17:3, 51:17, 69:18
**shows** [2] - 11:21, 48:19
**sic** [1] - 13:6
**side** [5] - 6:16, 6:20, 13:25, 21:14, 68:21
**significance** [1] - 65:18
**significant** [1] - 66:1
**similar** [3] - 39:15, 68:24, 69:23
**simply** [1] - 24:19
**sinus** [4] - 13:24, 13:25, 14:6, 14:9
**sit** [4] - 21:14, 82:22, 96:23, 101:18
**sitting** [2] - 35:7, 35:9
**situation** [14] - 22:4, 22:24, 23:7, 24:24, 29:18, 33:18, 33:19, 33:23, 34:5, 34:16, 34:23, 69:23, 102:6
**situational** [1] - 81:4
**situations** [3] - 36:18, 39:12, 100:23
**six** [1] - 100:5
**skin** [3] - 43:23, 65:17, 66:1
**slow** [2] - 29:16, 86:21
**slowed** [1] - 75:11
**slower** [2] - 38:19, 49:4
**small** [1] - 43:23
**SMITH** [1] - 2:15
**smoke** [1] - 49:4

**snippet** [1] - 80:6
**sober** [2] - 15:21, 54:21
**solely** [1] - 57:11
**solemnly** [2] - 5:10, 73:22
**someone** [22] - 9:1, 17:20, 19:12, 22:2, 25:10, 29:21, 39:12, 52:24, 54:20, 74:23, 75:23, 92:1, 93:7, 93:14, 93:23, 94:21, 95:1, 95:20, 95:23, 97:3, 101:19, 102:3
**something's** [1] - 57:8
**sometimes** [13] - 9:11, 12:22, 28:7, 38:18, 84:2, 84:6, 96:20, 100:17, 100:18, 100:20, 101:4, 101:6
**somewhat** [1] - 18:9
**Sonia** [1] - 74:3
**SONIA** [1] - 3:9
**soon** [2] - 19:22, 32:9
**sooner** [1] - 32:4
**sorry** [7] - 45:15, 46:1, 49:1, 60:21, 64:10, 79:3, 98:18
**sort** [5] - 4:24, 13:3, 27:19, 51:2, 57:6
**sounded** [1] - 16:8
**sounds** [2] - 63:12, 63:13
**source** [2] - 67:17, 68:3
**speaking** [2] - 78:8, 81:1
**specialist** [2] - 7:17, 17:15
**specialized** [1] - 46:4
**specializes** [1] - 51:20
**specializing** [1] - 40:3
**specialty** [2] - 7:11, 49:18
**specifically** [4] - 32:20, 51:11, 61:22, 71:14
**specifics** [1] - 10:20
**speed** [1] - 25:17
**spell** [1] - 5:16
**spot** [3] - 12:13, 13:25, 83:9
**stairs** [1] - 22:19
**stand** [3] - 4:17, 73:21, 100:25
**standing** [4] - 35:9, 68:24, 91:21, 93:2
**stands** [1] - 11:3
**stare** [1] - 31:6
**start** [9] - 6:8, 7:2,

22:18, 30:6, 30:16, 80:19, 90:13, 94:1, 101:2
**started** [4] - 17:2, 17:6, 32:9, 101:1
**starting** [1] - 88:23
**state** [7] - 5:16, 36:11, 58:17, 60:25, 74:2, 74:24, 97:17
**statement** [9] - 10:22, 75:25, 92:9, 92:19, 96:16, 99:9, 99:14, 99:18, 102:10
**statements** [1] - 44:16
**STATES** [4] - 1:1, 104:5, 104:7, 104:12
**States** [1] - 1:22
**states** [1] - 60:5
**stating** [1] - 91:9
**staying** [1] - 15:23
**STENOGRAPHICALLY** [1] - 104:9
**stenojag@aol.com** [1] - 1:24
**step** [2] - 70:15, 103:15
**still** [23] - 11:10, 21:1, 26:9, 29:15, 37:13, 48:9, 70:20, 75:6, 75:8, 76:16, 77:14, 83:3, 84:7, 87:2, 88:8, 89:17, 90:6, 94:10, 94:22, 95:2, 99:12, 101:9
**stimulant** [1] - 25:17
**stimulate** [2] - 10:15, 17:8
**stimulation** [1] - 11:18
**stop** [28] - 20:22, 22:20, 62:20, 62:23, 65:13, 71:3, 75:10, 75:17, 75:20, 78:20, 80:10, 80:22, 81:14, 81:25, 85:9, 85:10, 88:25, 92:18, 92:20, 92:23, 95:7, 96:9, 97:5, 99:8, 100:16, 102:3, 102:4
**stopped** [25] - 7:20, 7:25, 8:11, 9:16, 16:23, 20:25, 30:20, 75:5, 76:2, 76:4, 76:8, 76:15, 77:4, 77:8, 77:11, 77:17, 82:17, 83:18, 83:22, 84:21, 90:12, 92:2, 96:14, 99:22, 100:10
**stopping** [1] - 9:19
**stops** [10] - 9:11, 9:19, 9:22, 10:16, 10:18,

11:6, 11:18, 29:8, 81:16, 94:8
**storm** [8] - 11:15, 25:22, 26:7, 26:8, 26:17, 26:25, 39:1, 39:2
**Street** [3] - 1:23, 2:10, 2:16
**strenuous** [2] - 57:22, 67:1
**strenuously** [2] - 22:3, 22:15
**stress** [1] - 22:9
**strictly** [2] - 4:19, 63:20
**strike** [2] - 50:25, 97:1
**structure** [1] - 9:3
**structured** [1] - 22:3
**struggle** [5] - 33:13, 38:6, 59:1, 73:7, 73:10
**struggling** [1] - 58:6
**studies** [27] - 33:8, 33:11, 33:24, 34:2, 34:4, 34:12, 34:14, 34:24, 35:1, 35:12, 35:15, 35:16, 35:24, 36:3, 50:9, 50:20, 50:21, 51:9, 51:13, 51:17, 52:6, 52:9, 52:13, 53:2, 59:13
**study** [5] - 33:16, 34:11, 50:16, 51:3, 52:3
**studying** [1] - 51:4
**stuff** [1] - 4:20
**subdue** [1] - 16:16
**subject** [1] - 41:10
**submit** [1] - 51:4
**subsequent** [1] - 63:11
**subsidiary** [2] - 27:20, 29:4
**subspecialty** [1] - 49:23
**substance** [1] - 15:20
**successful** [2] - 13:21, 18:23
**successfully** [3] - 8:13, 27:17, 32:11
**Successor** [1] - 1:7
**sudden** [1] - 11:15
**suffered** [5] - 16:2, 32:13, 47:20, 60:2, 73:7
**suffering** [4] - 19:23, 52:6, 56:14, 72:9
**sufficient** [1] - 19:22
**sufficiently** [1] - 52:20
**suggested** [1] - 26:12

**suing** [1] - 40:25
**Suite** [3] - 2:5, 2:10, 2:16
**sum** [2] - 19:2, 57:6
**summary** [1] - 50:8
**supine** [2] - 55:22, 60:6
**supply** [3] - 18:6, 20:18, 21:8
**supplying** [1] - 56:18
**support** [1] - 17:16
**supporting** [1] - 33:3
**supposed** [1] - 81:6
**survive** [1] - 9:22
**suspect** [2] - 81:9, 91:18
**suspected** [1] - 75:1
**sustained** [8] - 15:25, 18:12, 20:14, 28:18, 61:6, 69:9, 92:21, 93:5
**swear** [2] - 5:10, 73:22
**swim** [1] - 66:12
**symphony** [2] - 14:2, 14:4
**synchronized** [1] - 14:8
**system** [9] - 7:10, 11:10, 11:14, 12:7, 20:25, 25:19, 25:21, 51:22, 67:15

**T**

**tach** [1] - 12:23
**tachycardia** [11] - 12:2, 12:10, 12:22, 12:25, 25:20, 26:1, 26:6, 37:3, 38:17, 62:2, 64:25
**tactics** [2] - 41:18, 42:16
**tase** [3] - 34:8, 35:20, 74:18
**tased** [7] - 22:7, 24:7, 33:14, 34:19, 38:6, 100:3, 100:5
**TASER** [5] - 14:22, 59:10, 59:16, 59:22, 74:18
**tasered** [1] - 60:1
**TASERs** [4] - 16:16, 59:10, 59:14, 59:19
**tasing** [2] - 82:9, 100:7
**taught** [1] - 94:22
**teach** [1] - 28:24
**teaching** [1] - 28:22
**tears** [1] - 43:23
**techniques** [2] -

91:17, 97:8
**Temecula** [1] - 15:24
**temporarily** [1] - 15:23
**ten** [3] - 39:11, 40:16, 69:24
**term** [14] - 9:7, 11:2, 11:4, 13:16, 36:12, 36:13, 38:21, 47:6, 50:13, 53:20, 54:4, 91:10, 91:23
**terms** [7] - 8:20, 9:2, 9:6, 12:1, 15:14, 34:25, 50:4
**testified** [17] - 40:12, 40:15, 40:23, 40:24, 41:3, 43:15, 44:2, 46:19, 47:11, 47:20, 49:15, 52:16, 53:12, 54:16, 54:25, 59:16, 63:9
**testify** [2] - 40:9, 40:20
**testifying** [2] - 6:9, 40:17
**testimony** [21] - 4:17, 4:21, 4:23, 5:10, 6:10, 8:2, 24:17, 40:7, 43:3, 43:8, 48:11, 49:16, 55:11, 56:21, 57:3, 60:20, 60:22, 61:15, 72:22, 73:22, 90:5
**tests** [1] - 35:4
**THAT** [3] - 104:6, 104:7, 104:10
**THE** [83] - 4:4, 4:10, 4:14, 5:4, 5:8, 5:9, 5:13, 5:14, 5:15, 5:16, 5:18, 15:15, 15:17, 15:18, 18:12, 20:14, 28:16, 30:4, 30:7, 30:9, 30:13, 30:15, 39:21, 46:17, 54:1, 60:9, 60:22, 61:6, 61:16, 61:17, 64:8, 64:9, 64:10, 64:11, 64:12, 69:9, 69:16, 70:2, 70:5, 70:7, 70:15, 70:16, 70:19, 70:21, 70:22, 73:14, 73:16, 73:17, 73:20, 73:21, 73:25, 74:1, 74:3, 74:5, 76:11, 76:12, 77:19, 77:23, 92:21, 93:5, 93:10, 93:18, 93:19, 94:13, 94:14, 95:12, 95:13, 98:16, 98:18, 98:23, 103:10,

103:15, 103:19, 103:23, 104:5, 104:6, 104:7, 104:8, 104:9, 104:10, 104:11, 104:12
**theory** [1] - 51:3
**thereby** [1] - 21:16
**therefore** [1] - 86:21
**thereof** [1] - 51:10
**they've** [3] - 33:19, 68:4, 83:24
**thinking** [2] - 77:19, 84:4
**thinks** [1] - 28:13
**third** [1] - 32:3
**THIS** [1] - 104:15
**thoughts** [1] - 103:17
**threat** [1] - 42:8
**three** [4] - 27:19, 82:13, 94:9, 102:14
**throughout** [2] - 10:6, 14:7
**throw** [1] - 34:8
**Thursday** [1] - 1:17
**THURSDAY** [1] - 4:1
**tidal** [4] - 72:2, 72:5, 72:16, 72:19
**TIDAL** [1] - 72:3
**timely** [3] - 9:23, 13:22, 18:10
**timer** [3] - 62:19, 78:16
**timing** [1] - 83:22
**tired** [1] - 22:20
**tissue** [2] - 10:10, 18:6
**TITLE** [1] - 104:7
**TO** [1] - 104:7
**today** [1] - 6:25
**today's** [1] - 6:10
**Tony** [1] - 4:11
**TONY** [1] - 2:15
**took** [11] - 15:6, 44:12, 52:25, 55:15, 55:16, 86:8, 86:20, 87:13, 88:16, 90:16, 90:22
**top** [1] - 13:25
**Tori** [1] - 4:13
**TORI** [1] - 2:16
**totally** [1] - 34:24
**touched** [1] - 55:19
**toward** [2] - 30:22, 54:9
**towards** [1] - 31:10
**toxic** [4] - 52:20, 53:3, 53:10, 72:23
**toxicity** [2] - 52:25, 54:18
**toxicologist** [1] - 38:14

**toxicologist's** [1] - 72:22
**toxicology** [3] - 53:13, 53:15, 53:17
**Tracy** [1] - 4:4
**TRACY** [1] - 1:7
**train** [3] - 28:20, 102:6, 102:7
**trained** [22] - 22:18, 41:21, 81:3, 92:1, 92:6, 92:10, 92:17, 93:3, 93:7, 93:14, 93:22, 94:8, 94:18, 95:6, 95:19, 95:23, 96:10, 97:9, 97:17, 97:20, 97:23, 97:25
**training** [44] - 7:6, 7:11, 28:12, 28:15, 28:16, 28:17, 41:24, 46:4, 74:15, 75:1, 75:22, 75:24, 89:24, 90:2, 90:9, 90:13, 91:5, 91:7, 91:11, 91:16, 91:23, 94:6, 94:10, 94:18, 94:20, 94:24, 95:3, 96:5, 96:16, 96:17, 96:24, 97:1, 97:3, 97:14, 98:3, 98:4, 98:6, 98:25, 99:6, 99:16, 100:22, 100:23, 102:1, 102:2
**TRANSCRIPT** [3] - 1:15, 104:8, 104:10
**transcripts** [1] - 15:10
**transferred** [1] - 17:18
**transplant** [2] - 8:19, 17:21
**transplanted** [1] - 8:18
**transported** [1] - 17:11
**trauma** [1] - 43:10
**treated** [1] - 45:7
**treating** [1] - 51:21
**treatment** [2] - 7:9, 7:12
**Trial** [1] - 1:11
**trial** [3] - 4:13, 6:10, 40:6
**TRIAL** [1] - 1:15
**tried** [2] - 76:17, 89:21
**tripod** [3] - 68:16, 68:17, 69:12
**TRUE** [1] - 104:8
**true** [120] - 36:15, 40:13, 40:17, 40:21, 42:9, 42:12, 42:13, 42:16, 42:17, 42:20, 42:21, 42:25, 43:1,

43:5, 43:10, 43:11, 43:13, 43:14, 43:25, 44:1, 44:4, 44:7, 44:8, 44:11, 44:13, 44:14, 45:9, 46:6, 47:10, 47:14, 47:19, 47:24, 48:13, 48:14, 48:17, 48:18, 48:21, 48:22, 48:25, 49:8, 49:9, 50:4, 50:6, 50:7, 51:18, 51:19, 52:17, 53:10, 53:11, 54:6, 54:7, 54:10, 54:11, 54:14, 54:15, 54:18, 54:19, 54:20, 54:22, 54:23, 55:17, 55:18, 55:19, 55:21, 56:1, 56:4, 56:5, 56:7, 56:8, 56:9, 56:11, 56:12, 56:25, 57:12, 57:14, 57:17, 57:18, 57:20, 57:21, 57:25, 58:1, 58:4, 58:5, 58:7, 58:11, 58:12, 58:14, 58:15, 58:17, 58:18, 58:20, 58:21, 59:2, 59:5, 60:2, 60:3, 60:6, 60:7, 71:8, 71:12, 71:14, 72:12, 72:13, 72:16, 72:19, 72:22, 73:4, 73:5, 73:8, 73:9, 73:11, 73:12, 74:16, 76:1, 82:14, 90:13, 91:7, 93:3, 101:9, 101:20
**truth** [6] - 5:11, 5:12, 73:23, 73:24
**try** [18] - 6:4, 16:16, 21:13, 21:14, 49:4, 55:16, 66:4, 70:12, 76:5, 95:19, 95:25, 96:4, 99:12, 100:18, 100:19, 101:4, 103:13
**trying** [10] - 18:17, 23:6, 48:25, 49:8, 75:23, 75:24, 94:2, 101:3
**turn** [11] - 32:15, 57:24, 66:3, 75:23, 78:15, 82:22, 83:10, 84:1, 84:5, 101:9, 101:18
**turned** [24] - 6:16, 16:25, 60:5, 83:14, 83:21, 84:12, 84:17, 84:18, 84:22, 85:18, 85:21, 85:25, 86:2, 86:12, 86:15, 86:19,

87:5, 87:10, 87:13, 89:6, 90:22, 100:1, 100:5, 100:12
**turning** [4] - 52:1, 52:19, 78:3, 83:23
**TV** [1] - 11:21
**Twelfth** [1] - 1:23
**twice** [2] - 22:7, 47:20
**two** [27] - 6:14, 9:8, 9:25, 15:20, 37:1, 40:24, 44:17, 54:21, 55:1, 62:12, 65:21, 77:6, 77:8, 78:6, 78:8, 78:11, 82:15, 82:16, 88:7, 88:17, 89:21, 94:9, 97:9, 102:14
**type** [7] - 11:6, 11:19, 29:20, 33:9, 35:22, 76:14
**types** [1] - 11:13
**typically** [3] - 29:15, 42:3, 67:3

**U**

**ultimately** [3] - 16:16, 17:9, 27:1
**unable** [2] - 48:24, 49:7
**unaccepted** [1] - 98:12
**unarmed** [1] - 16:5
**uncorrected** [2] - 68:7, 68:12
**under** [3] - 66:13, 69:7, 70:20
**understood** [3] - 57:3, 57:10, 61:3
**unfortunately** [3] - 8:15, 18:8, 18:19
**uninterrupted** [2] - 53:21, 54:6
**unit** [4] - 92:15, 100:25, 101:1, 101:2
**uNITED** [1] - 1:1
**UNITED** [3] - 104:5, 104:7, 104:12
**United** [1] - 1:22
**university** [1] - 7:4
**unless** [3] - 9:23, 13:21, 22:18
**unquote** [1] - 33:6
**unreasonable** [1] - 42:16
**unreliable** [1] - 50:9
**unresponsive** [4] - 23:24, 29:8, 31:5, 31:21
**unrestricted** [2] -

68:14, 69:3
**untreated** [1] - 26:19
**up** [41] - 19:2, 21:14, 22:9, 22:11, 22:13, 22:19, 23:10, 23:11, 24:12, 24:22, 24:25, 25:7, 25:25, 33:20, 33:21, 39:3, 54:25, 57:6, 60:1, 69:2, 70:25, 75:23, 78:4, 79:2, 80:25, 82:22, 84:5, 84:10, 91:20, 92:13, 93:2, 96:1, 96:4, 96:20, 99:12, 100:18, 100:25, 101:2, 101:18
**upper** [5] - 62:13, 62:17, 62:20, 62:25, 65:6
**user** [1] - 54:22

**V**

**V-fib** [1] - 13:6
**v-tach** [1] - 12:23
**vague** [5] - 28:15, 28:18, 92:20, 93:4, 93:16
**Valley** [2] - 14:12, 17:11
**valves** [1] - 8:9
**ventilation** [2] - 32:7, 35:3
**ventricle** [3] - 10:5, 12:3, 12:4
**ventricles** [1] - 12:7
**ventricular** [34] - 11:22, 12:1, 12:6, 12:10, 12:22, 12:25, 13:1, 13:5, 25:20, 26:1, 26:6, 26:13, 26:16, 26:19, 27:2, 27:5, 27:9, 27:12, 27:15, 37:3, 38:16, 38:17, 38:19, 38:25, 39:1, 62:2, 64:25
**verify** [1] - 91:6
**versus** [1] - 34:15
**vessels** [1] - 7:13
**via** [2] - 26:6, 37:3
**video** [32] - 14:18, 14:19, 16:13, 16:14, 16:23, 28:5, 29:6, 30:3, 30:16, 30:18, 34:23, 42:25, 47:17, 47:22, 55:21, 62:22, 65:3, 65:12, 71:2, 75:13, 78:19, 79:15, 79:17, 79:20, 80:7, 80:9, 80:21, 81:13,

81:24, 85:5, 85:8, 88:24
**view** [1] - 16:14
**virtually** [1] - 52:1
**visited** [1] - 44:10
**voice** [1] - 78:22
**volts** [3] - 74:19, 74:20, 74:21
**volunteers** [4] - 33:12, 33:19, 33:24, 34:12
**vs** [1] - 1:10
**VT** [2] - 12:22, 13:6

**W**

**W-O-H-L-G-E-L-E-R-N-T-E-R** [1] - 5:19
**wacko** [1] - 11:14
**wait** [4] - 78:6, 96:18, 96:23, 101:6
**waited** [1] - 84:15
**walk** [1] - 101:2
**walked** [1] - 101:1
**wants** [1] - 24:8
**watched** [1] - 75:15
**water** [1] - 66:13
**waves** [2] - 14:5, 14:7
**ways** [1] - 23:3
**wearing** [1] - 87:17
**weight** [3] - 95:22, 96:7, 99:17
**weight's** [1] - 97:5
**weights** [1] - 66:23
**well-known** [1] - 29:12
**well-recognized** [1] - 28:10
**West** [1] - 2:16
**whack** [1] - 67:6
**whatnot** [1] - 51:4
**whew** [1] - 88:19
**whole** [2] - 5:11, 73:23
**wide** [1] - 31:6
**wiring** [2] - 10:9, 10:10
**WITH** [1] - 104:11
**withdraw** [1] - 63:5
**withdrawal** [1] - 17:16
**witness** [9] - 4:19, 4:22, 4:24, 5:3, 6:6, 40:9, 44:7, 44:16, 70:24
**WITNESS** [18] - 5:13, 5:15, 5:18, 15:15, 15:18, 61:17, 64:8, 64:10, 64:12, 70:16, 70:21, 73:16, 73:25, 74:3, 76:12, 93:19, 94:14, 95:13
**witnessed** [1] - 29:13

**WITNESSES** [1] - 3:3
**witnesses** [2] - 44:19, 54:24
**Wohlgelernter** [3] - 5:6, 5:18, 6:4
**WOHLGELERNTER** [1] - 3:5
**wondering** [1] - 90:11
**Woodland** [1] - 2:5
**word** [3] - 43:21, 43:22, 43:23
**words** [1] - 48:21
**works** [1] - 9:4
**world** [3] - 33:9, 50:10, 50:17
**worn** [3] - 14:19, 16:13, 85:13
**wound** [2] - 16:5, 24:8
**write** [2] - 6:14, 87:7
**wrote** [6] - 32:20, 82:25, 83:20, 86:23, 87:4, 89:5

**X**

**X2** [1] - 74:18

**Y**

**Yale** [1] - 7:4
**years** [7] - 15:20, 40:16, 40:18, 54:21, 55:2, 97:9
**yelling** [2] - 16:5, 16:22
**yesterday** [3] - 4:16, 83:1, 83:8
**younger** [1] - 66:22
**yourself** [15] - 41:6, 44:12, 44:19, 44:23, 45:23, 46:23, 51:2, 51:12, 52:2, 55:12, 55:15, 55:16, 59:7, 68:19, 89:21
**yourselves** [1] - 70:11

**Z**

**zero** [1] - 27:18