UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

|  |  |  |
|---|---|---|
| TRACY ALVES, Individually and as Successor in interest for KEVIN R. NIEDZIALEK, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. EDCV 19-2083-JGB |
| RIVERSIDE COUNTY, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, | ) ) ) | Jury Trial Day 4 |
| Defendants. | ) ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Friday, March 31, 2023

9:20 a.m.

PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

            LAW OFFICES OF DALE K. GALIPO
            BY:  **DALE GALIPO**
            21800 Burbank Boulevard, Suite 310
            Woodland Hills, California 91367

            LAW OFFICES OF JOHN BURTON
            BY:  **JOHN BURTON**
            128 North Fair Oaks Avenue
            Pasadena, California 91103

            HELM LAW OFFICE, PC
            BY:  **KENNEDY HELM**
            644 40th Street, Suite 305
            Oakland, California, 94609


For the Defendants:

            LEWIS BRISBOIS BISGAARD & SMITH, LLP
            BY:  **TONY SAIN**
               **TORI BAKKEN**
            633 West 5th Street, Suite 4000
            Los Angeles, California 90071

I N D E X

WITNESSES                                                        PAGE


**LISA LA RUSSO**
DIRECT EXAMINATION BY MR. BURTON                                  5
CROSS-EXAMINATION BY MS. BAKKEN                                   24
REDIRECT EXAMINATION BY MR. BURTON                               33
RECROSS-EXAMINATION BY MS. BAKKEN                                36


**CHAD BIANCO**
DIRECT EXAMINATION BY MR. SAIN                                   37

FRIDAY, MARCH 31, 2023; RIVERSIDE, CALIFORNIA

-o0o-

(In the presence of the jury:)

THE CLERK:  Calling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please make your appearances.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain with Tori Bakken on behalf of Defendant Sheriff Chad Bianco and the Defendant Riverside County.

THE COURT:  Good morning.

MR. GALIPO:  Your Honor, with the Court's permission, we would like to call Paramedic Lisa La Russo.  She'll be a brief witness, and she's on duty and is here subject to a subpoena.

THE COURT:  Very well.  So as before, ladies and gentlemen, good morning.  We're going to take a witness out of order, which means we're going to temporarily interrupt Sheriff Bianco's testimony and take another witness.  It's only due to scheduling reasons.  So there's no other significance other than that.  You should weigh the testimony just the same.

So call your witness.

MR. BURTON:  Thank you, Your Honor.  The plaintiff is calling Paramedic Lisa La Russo.

THE CLERK:  If you can please raise your right hand. Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

**PLAINTIFF'S WITNESS, LISA LA RUSSO**

THE CLERK:  Thank you.  If you can please have a seat.  And if you can please state your full name and spell your last name for the record.

THE WITNESS:  My name is Lisa Christine La Russo.  My last name spelling, capital L, small A, space, capital R, U-S-S-O.

**DIRECT EXAMINATION**

BY MR. BURTON:

Q.   Good morning.  Good morning, Paramedic La Russo, and thank you for coming today.  I understand that you're actually on duty as we're speaking?

A.   Yes.

Q.   So we'll try to get you out of here as quickly as possible.  How long have you been a paramedic?

A.   33 years.

Q.   Who do you work for?

A.   American Medical Response.

Q.    Did you work for AMR on July 19th, 2019, when this incident occurred?

A.    Yes, I did.

Q.    Can you just explain very briefly for the jury what a paramedic is and what an EMT is?

A.    A paramedic provides advanced life support, which could include medications, cardiac interpretation, defibrillation, advanced airways, and so forth.  EMT is basic life support. They do, like, bandages, they assist the paramedic, they can do oxygen therapy, but it's very on the basic side.  That's the best I can probably state it.

Q.    So when you are on duty, as you were on April -- I'm sorry -- July 19th, 2019 -- do you typically work with an EMT?

A.    I do.

Q.    And do you remember the EMT who was with you at that time?

A.    It was Jesse Raygoza.

Q.    And I think we see him in the video as we've -- we've all met you in the video.  So just to cut right to the chase, we understand that you were on duty on July 19th in an ambulance that was owned by your employer, AMR, American Medical Response.  You did prepare a report based on this incident; is that correct?

A.    Yes.

Q.    And if I could invite your attention, there are some books.  There's one that's Volume I.  I'm not sure that's

Volume I in front of you. It might be to your -- to your left.
Is there one that says "Volume I"? And there's an exhibit that
is marked Exhibit 1 for identification. So it should be the
first tab there.

A. I'm not quite sure where to go.

THE COURT: Mr. Galvez, can you help.

BY MR. BURTON:

Q. Should be Tab 1, Volume I.

A. This would be Tab 1, but there's a CD there.

Q. Oh, maybe those are the defense exhibits.

A. Okay. I've found it.

Q. Okay. So it's three-hole punched. You can either leave
it in there and flip through it or pull it out if that's easier
for you. But this is a report that you prepared after this
incident, correct?

A. Yes.

Q. And it's been marked Exhibit 1 for identification. And
I'm sure there's exceptions to this, but essentially you
prepare one of these after every call; would that be correct?

A. Yes.

Q. And then that becomes part of the patient's medical
record?

A. Yes.

Q. And so when you -- when you do these, you try to be as
complete/accurate as possible?

A.    Yes.

Q.    Thank you.  So have you had a chance to -- to review Exhibit 1 before testifying here today to refresh your recollection?

A.    Yes.

Q.    And did it refresh your recollection?

A.    Yes.

Q.    Were you also provided an opportunity to look at the video of this incident?

A.    Yes, I was.

Q.    And did you -- did you look at it?

A.    Yes.

Q.    And did that also refresh your recollection?

A.    Yes.

Q.    And you also had your deposition taken earlier in this litigation?

A.    I did.

Q.    And did you have a chance to take a look at the testimony you had given?

A.    Yes.

Q.    So -- so even though this incident happened almost four years ago now, is it -- are the details pretty accurate and pretty fresh in your mind?

A.    Yes.

Q.    Okay.  Thank you.  So let's just go through it very --

hopefully very methodically and quickly.  I understand that you were with EMT Raygoza and you were somewhere waiting -- just waiting for a call; would that be correct?

A.   Yes.

Q.   Okay.  And then what happened?

A.   Once we received the call on the MDT, we went responding to it.

Q.   And did you respond I think you call it Code 3, lights and sirens, quickly as possible?

A.   Yes.

Q.   And what details did you have when responding to the call?

A.   The details that we were given on the MDT was individual down that was tased.

Q.   Were you ever told to stage or wait before going into the scene where the patient was?

A.   No.

Q.   And so then what happened?

A.   We responded to the call.  I'm not sure what the question is.

Q.   Okay.  Well, so you drove to the location you were given?

A.   Yes.

Q.   Okay.  And so once you got to the location, what did you do?

A.   We parked close by where the deputy's vehicle was and we proceeded to walk around the apartment complex.

Q.   And did you -- did you bring anything with you?

A.   Yes.  We brought our gurney, our red medical bag, our monitor, and oxygen.

Q.   And then did you seem to have any problem finding the deputies and the patient?

A.   No, we did not.

Q.   So when you got to the patient, can you describe what -- from your perspective -- we've seen it on video, but can you describe from your perspective what happened when you got to the patient?

A.   Once we arrived, we were pulling our gear up and I was kind of briefly looking over at him, and the deputy had advised me that he had a faint pulse.  And subsequently I -- you know, I repeated what she had said.  And then once I looked over, I could tell that he was not adequately breathing and so forth. And that's when I started realizing the patient was in acute distress at that point.  And we started respond -- you know, quickly started to get moving basically and providing his airway and breathing and CPR.

Q.   Okay.  So let's sort of break that down.  When you looked at him, you said something to the effect of, *Hey, he's not breathing*?

A.   I asked -- I looked down and said, *He doesn't look like he's breathing*, I believe is what I said.

Q.   And did you later determine that there were some agonal

breaths?

A.    Yes.

Q.    And you put that in your report, correct?

A.    Yes.

Q.    And can you explain what agonal breaths are?    09:29

A.    Agonal breaths occur at times even when they're -- there's no pulse.  It's just the body's response to -- they're just still looking like they're having breaths.  People mistake them for breathing and it's -- their just mouth is moving still like they're taking a breath and then just stopping.  There's really    09:29 no good air exchange occurring at that time.  It's -- we call it agonal because there's really no effective breathing going on.

Q.    And did you personally observe any agonal breathing in this patient?    09:30

A.    Yes.

Q.    Now, was the first thing that you did after you saw that he was not breathing effectively, did you take a pulse?

A.    Yes.

Q.    And why did you do that first?    09:30

A.    Well, we see that -- that he's not breathing and I delegated to my partner to start grabbing the equipment to help him breathe, and then I subsequently check a pulse to see if he had a pulse so we can initiate CPR immediately.

Q.    And was there a pulse?    09:30

A.    No.

Q.    Now, there's been some testimony that -- that one of the deputies may have thought there was a pulse.  Have -- and you know because that was explained to you.  Have you been trained about a concept of phantom pulse?

A.    Yes.  We -- I've always been the -- we always discuss it when we teach EMTs specifically that there's a chance, because of your adrenaline, you can feel a pulse sometimes in your fingers.  So when you are checking for one, you need to maintain your fingers there for a longer period of time just to make sure it's not your pulse that you're feeling, that it's actually the patient's pulse.

Q.    So after you determined there was no pulse and no effective breathing, nothing but -- but some agonal breathing, can you describe what you and your EMT, Raygoza, were doing?

A.    I delegated to him to go ahead and place an airway as well as ventilate the patient.  And then I started CPR and then asked the deputy to come over and continue CPR so then I can progress onto putting him on the cardiac monitor.  And then we progressed from there.

Q.    So just -- what do you mean by "CPR"?

A.    Compressions and ventilation.  So the ventilations were being done by my partner, and then the compressions where you put your hands on their chest and you provide the compressions for the heart, and it's basically basic AHA cardiac, you know,

CPR.  I'm not sure what you're looking for.  I'm sorry.

Q.   Okay.  Well, according to your training, why do you do that?

A.   We wanted to continue what potential oxygenations occur that's still present in the blood, and so we circulate it throughout the body by doing compressions.  And the compressions will allow the blood to circulate to other organs and hopefully reduce the death of other organs, including the heart, if we can continue to oxygenate that -- those organs.

Q.   And would that include the brain?

A.   Yes.

Q.   And so you started the CPR, and then you asked the deputy to take over so you could be free to put on the -- the pads from the cardiac monitor?

A.   Yes.

Q.   And then you did that.  Did you ask the deputy to stop the CPR?

A.   When I went to put the pads on the patient, I told him to move his hands so I could put them down, and then I expected them to continue CPR afterwards, but he moved away, so I had asked him to come back and continue.

Q.   And then once the pads were on him -- and there's specific locations where you're supposed to put those pads, correct?

A.   Correct.

Q.   Then could you look at the monitor and see what was going

on?

A.    Yes.

Q.    And the monitor tells you what -- is it correct it tells you what the electrical activity is in the heart?

A.    Yes.

Q.    Because you already knew the heart wasn't beating because you had determined there was no pulse, correct?

A.    Yes.

Q.    And so when you looked at the monitor, what did you see?

A.    I saw electrical activity that was not producing a pulse at that time.

Q.    Was it the sort of organized electrical activity that the system usually produces but not enough to produce a pulse or was it this chaotic fibrillation then?

A.    No.  It was -- it was actually electrical activity that was consistent with what you would think would generate a pulse.  If it was fibrillating, then it would just be erratic rhythm where we would actually defibrillate the person with electrical activity.  But this had its own electrical activity so we don't defibrillate that.

Q.    So it was already somewhat organized, correct?

A.    Yes, it was organized electrical activity that was not generating a pulse.

Q.    And did you -- did you chart that in your report?

A.    Yes.

Q.   And so what do you call that?

A.   PEA.

Q.   So that's pulseless electrical activity?

A.   Yes.

Q.   Any doubt in your mind that when you got to this patient and you got this reading from your monitor that it was pulseless electrical activity?

A.   I have no doubt.

Q.   And why is this important?  I mean, what if it was actually fibrillating instead of pulseless electrical activity?

A.   The treatment varies for PEA.  It's just compressions and then just medications whereas if a heart is fibrillating, then we actually use electrical activity to stop the heart and hope it regenerates into a pulse-type rhythm.  Basically -- I know you see a lot of TV where they show, like, asystole and people are shocking that.  We don't shock asystole; we actually shock V-fib, which is fibrillation that's erratic rhythm on the monitor, and then we actually stop it and hope it restarts the heart.

          If it's PEA, in this particular case, it has a form of electrical activity.  It's just not enough to conduct the heart to actually pump effectively, so there's no pumping action of the heart.  It's just -- just going through the motions is what it is.  That's the difference.

Q.   And so I know you're doing everything as quickly as you

can, but -- you know, following your training.  How long do you think it took from the time you got there until the time you looked at the monitor and saw that he was in PEA?

A.    Based on the times of getting on scene and the monitor-generated time, I'd say within about two minutes.

Q.    And is time of the essence when you're in this situation?

A.    Yes.

Q.    And why is that?

A.    The longer the patient is not circulating blood through the body, the less chance of revival.

Q.    Is it also true the more chance of an anoxic injury to an organ like the brain?

A.    Yes.

Q.    So -- so you've got the -- the pads on so you know not to shock, right?

A.    Right.

Q.    Because you've got PEA.  And you've got the deputy doing chest compressions, you've got your assistant getting him breathing, and then did -- were you able to do some other assessments of the patient?

A.    Just a quick assessment.  I was -- I was told on scene that there was possibly drugs involved so I did do a quick pupil check to see if there was a potential for opioid; however, it's hard to tell sometimes if they've been down a long period of time because then their pupils get dilated if

they've been long down, even if it's an opioid overdose.  So I did have a quick pupillary check, saw they were dilated.  And then other than that, I was pretty much just doing the procedures I was required to do.

Q.   Well, if I could invite your attention to page 3 of your report.  You have -- you have some detailed findings there, "Assessment Summary."  Do you see that?

A.   Yes.

Q.   Okay.  And so did you fill that out?

A.   Yes.

Q.   Okay.  And so what did you put under "skin"?

A.   "Ashen," "cool," and then "normal moisture."

Q.   So let's just go through those one at a time.  So was his skin ashen?

A.   Yes.

Q.   Okay.  And can you describe what -- what that means?

A.   It's a grayish tone.  You get a grayish tone, sometimes a little blue.  It's kind of a combination of both.  And pale.  It's a combination of all of those together.  It's not, like, super blue like cyanotic would be, like very blue.  It's kind of like in between that.

Q.   What does -- as a paramedic, in your training, what does "ashen" indicate to you?

A.   Poor circulation and poor oxygenation.

Q.   And then you also wrote "cool."  What does that mean?

A.    Also poor circulation.  They're not getting blood flow well to the capillaries, which your capillaries will then -- you have warm blood going to your capillaries and usually the temperature of the body, you'll feel warm unless they're hypothermic for some particular reason.  So he was cool, so the circulation was not going through his body well.

Q.    So it felt like he had lower than a normal body temperature?

A.    Yes.

Q.    You're not using a thermometer or anything, you're just going by hand?

A.    Yes.

Q.    Okay.  And then he wasn't particularly sweaty?

A.    No.

Q.    Okay.  And so that was his skin.  Then we know he was unresponsive.  You wrote that here.  And then there's something about the eyes you wrote.  Can you read what you wrote there?

A.    "Non-reactive" and "5 millimeter."

Q.    Sometimes we hear this expression "fixed and dilated."  Is that the same thing?

A.    Yes.

Q.    And so what did that indicate to you when you saw that?

A.    That he was hypoxic, not receiving oxygen to the brain.

Q.    Now, let's go to the next page, which is 4.  And can you describe -- I don't want to go through every line and

everything, but could you just sort of tell the jury what you're recording here, what this means?

A.    This is a summary of blood pressure, heart rate, SpO2, which means pulse ox, respiratory rate, and end-tidal CO2.

Q.    And so you recorded it regularly from when you first started getting the measurements till you transported him?

A.    Until we got to the hospital.

Q.    And so could you just generally explain what -- what this shows, give us an overview?

A.    So basically we're looking at the level of responsiveness. The most important part is whether they had a heart rate, what their EKG stated, if they had oxygen flow.  At this case, when they're in cardiac arrest, we don't put them on pulse ox because it won't register.  If there's any type of respiratory rate, if not, then we're showing that we're mechanically providing oxygenation through a bag valve mask.  And then the end-tidal CO2 is to -- there's a couple components of that that we use for reading.  And that's, one, to check on the compressions and making sure the compressions are being effective and we're actually circulating; and, two, also making sure that we're actually providing a good patent airway and we're getting good ventilations.

Q.    So what did the end CO2 in this particular case tell you?

A.    Initially, when he was in cardiac arrest, the compressions that we were seeing here, when we see that it's at 22, as long

as our compression rates are good, it should maintain over 15

is what our goal/standard is. And then once the patient

returns a spontaneous circulation and has a pulse, it usually

typically will spike up. And in this case, it spiked up

significantly, which indicated that he was down for a

substantial time for hypoxia, because typically that high

usually some -- appears -- most likely it will appear in

patients that have had a hypoxic or a respiratory rest phase or

failure prior to cardiac. So when we have patients that have

cardiac arrest and we get resuscitated, typically we'll see

them bounce up to like 60s and the 50s. And then as we

continue to ventilate and they circulate, it'll stabilize back

into the 35, 45 range.

In this particular case, he bounced up into the 90s. Typically I'll see that in a patient that has opioid overdose, that was down for a long period of time, like respiratory failure, hanging, strangulations, anywhere where it started with a hypoxia event, then went into cardiac. And those are sometimes hard to get those numbers down in the field.

Q. Now, what eventually happened to this patient before you transferred care? Can you just describe that?

A. Which --

Q. Well, I mean -- I mean, take it from there. Did you actually restore a spontaneous circulation?

A. Yes, we did get a pulse back on scene. He did end up

having occasional, like -- again, those agonal breaths returned.  They weren't effective, so we continued to ventilate him through the tube that I placed on scene.

Q.    You actually put a tube down his throat --

A.    Yes.

Q.    -- to get air in?

A.    Yes.

Q.    And so you continued to ventilate him and you put him -- firefighters showed up to help you, correct?

A.    Yes.

Q.    So then you got him into this gurney that you had brought?

A.    Yes.

Q.    And the whole time you're still working on him, right?

A.    Yes.  We're -- we stopped CPR because he had a pulse, but we had to continue to maintain an airway and ventilate him because he was not breathing on his own.

Q.    And I see there was an IV?

A.    Yes.

Q.    So what was the IV doing?

A.    So we started -- I originally tried to do what they call a peripheral IV in the arm.  That didn't work, so I did an IO, was an intraosseous needle into the leg.  And so that's where I gave all the medications during the cardiac arrest.  And then once we got him loaded, I then went back to doing IVs on both arms so that way we can give him fluid and continue to

resuscitate if we needed to.

Q.   Now, your job as a paramedic in this situation is, number one, try to keep the patient alive; would that be correct?

A.   Yes.

Q.   There's -- I think medically the term is etiology.  I might be using it wrong.  But some people want to find out, *Well, why did he go into cardiac arrest?*  Was that your primary concern?

A.   No.  Our primary -- what we do look at is differentials.  And based on what people tell us and what we see, we do try to come up with an idea of what is going on with the patient so we can treat them effectively and then take them to the correct hospital based on the fact there's specialty centers.  So there is a -- we don't diagnose in the field.  We just use what information that we gather as a way of trying to treat the patient appropriately.

Q.   So no one in the field told you that he had been on his chest for five and a half minutes before they flipped him over?

A.   No.

Q.   For example.  And -- and you did see that there was a head injury, correct?

A.   Yes.

Q.   So did that -- and you mentioned this differential.  Did you think, *Well, maybe* -- although you don't know -- *maybe there's some relationship between this head injury and the*

*cardiac arrest*?

A.   Yes.

        MS. BAKKEN:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. BURTON:

Q.   Well, what -- what did the -- what impact did the head injury have on your differential?

A.   That was one of a couple issues that I saw and determined that it was severe enough that we needed to take steps into potentially having a head trauma or some type of situation where they would need to go to a specialty center once we got pulses back.  Initially, we're working on the cardiac part, making sure we can get a pulse back.  And then after that, we go into those differentials because there's trauma centers and non-trauma centers, and if it ended up being -- like in head trauma, you can have bleeds in the brain.  And that can cause problems.  And so we don't have a way of diagnosing that in the field, so we can only assume that we have a potential head trauma patient that has caused some of this.  We don't know.  We -- we were told there was maybe drug involvement.  We don't know what that would have been.  So we're just looking at all the different situationals -- situations that are going on on scene and trying to make the best decisions for the patient and the -- and the best outcome we can get for him.

Q.   And so you actually took out your cellphone and called a

base hospital, correct?

A.   Yes.

Q.   And then you made a decision as to which hospital to rush him to, correct?

A.   Yes.                                                                    09:48

Q.   And then once you got to the hospital, he still had spontaneous circulation?

A.   Yes.

Q.   Had he regained consciousness?

A.   No.                                                                     09:48

Q.   And then you transferred care, correct?

A.   Yes.

        MR. BURTON:  Excuse me one second, Your Honor.

        THE COURT:  Yes.

        MR. BURTON:  Thank you, Your Honor.                                 09:48

        THE COURT:  Ms. Bakken.

        MS. BAKKEN:  Thank you.

                     **CROSS-EXAMINATION**

BY MS. BAKKEN:

Q.   Good morning, Paramedic La Russo.                                      09:49

A.   Good morning.

Q.   You had said that you reviewed your deposition in preparation for your testimony today; is that correct?

A.   Yes, I read over it.  There's a lot of pages.

Q.   In reviewing it, did you come across anything that you                 09:49

wanted to correct to make it more accurate?

A.    Not that I saw.

Q.    On the date of this incident, who was your employer?

A.    American Medical Response.

Q.    So you were not an employee of the County of Riverside or the Riverside Sheriff's Department; is that true?

A.    That is true.

Q.    How long had you been employed by AMR at the time of this incident?

A.    What year was it?

Q.    2019.

A.    Okay.  Just trying to remember.  So about 30 years roughly.  I'm trying to do math in my head.

Q.    Sure.  What was your position at that time?

A.    Paramedic.

Q.    And when were you first certified as a paramedic?

A.    December of 1989.

Q.    Do you hold the same position with them now?

A.    Yes.

Q.    Are you a forensic pathologist?

A.    No.

Q.    Is determining the cause of death something that you do as a paramedic?

A.    No.

Q.    In this particular case, did you ever determine a cause of

death?

A.   No.

Q.   Have you had any training in how a TASER affects the human body?

A.   I would say no.                                              09:50

Q.   Do you consider yourself to be an expert on the effects of a TASER on the human body?

A.   No.

Q.   You were dispatched to respond to this incident, correct?

A.   Yes.                                                         09:50

Q.   And the initial call was for a person down due to a TASER with Riverside sheriffs present at the scene, correct?

A.   Yes.

Q.   "Person down" does not mean the same thing as a person unresponsive, correct?                                             09:50

A.   Correct.

Q.   A person down usually just means someone that needs help, correct?

A.   Yes.  Yes.

Q.   I'm -- thank you.  Sorry, I think we spoke over each other   09:51 a little bit.

A.   I'm sorry.

Q.   You responded Code 3 with lights and sirens to this incident, true?

A.   Yes.                                                         09:51

Q.   And it took you about three minutes to arrive?

A.   Based on the -- yeah, I believe it was around three minutes.

Q.   You arrived at about 2:42 in the afternoon, correct?

A.   Yes.

Q.   And you were told by dispatch that it was safe for you to respond, true?

A.   There was nothing in the CAD that said to stage, so it was assumed to be clear.

Q.   You were able to go straight from your ambulance to Mr. Niedzialek, true?

A.   Yes.

Q.   When you arrived at the location, you brought a gurney, a cardiac monitor, oxygen, and IVs with you to aid Mr. Niedzialek, correct?

A.   Yes.

Q.   When you first saw Mr. Niedzialek, he was positioned supine, or on his back, right?

A.   Yes.

Q.   Mr. Niedzialek was still handcuffed when you arrived at the scene?

A.   Yes.

Q.   You did not observe how Mr. Niedzialek was put into the supine, handcuffed position, true?

A.   True.

Q.    Did you ever see any deputy restraining Mr. Niedzialek?

A.    No.

Q.    Did you ever see any deputy use any force on Mr. Niedzialek?

A.    No.

Q.    You never saw any deputy place any body weight on Mr. Niedzialek, correct?

A.    Initially, when I got there, based on the angle, it looked like his knee was around his chest area, the officer; however, I think when I got around there, he was standing up, so I don't know if his knee was on him, it was just close to him.  I don't know the difference because I was too far away to see.

Q.    So you don't know if there was any body weight on him, correct?

A.    I do not know at this point.

Q.    Did you ever see the female deputy touching Mr. Niedzialek at any point?

A.    No.

Q.    The male deputy assisted you in providing CPR to Mr. Niedzialek, correct?

A.    Correct.

Q.    And you had said that at one point you told him to move and then to come back, correct?

A.    Yes.

Q.    And when you told him to come back to continue CPR, he did

so, true?

A.    Yes.

Q.    At the scene a deputy had told you that they found a faint pulse, correct?

A.    Yes.

Q.    You were trained on the phantom pulse phenomenon that you discussed with plaintiff's counsel in your formal EMT training, correct?

A.    No.  It's training that we've learned -- I actually believe they brought it up when I was in -- going through paramedic school is the first time I'd heard about it.

Q.    Okay.  So you learned about that concept in paramedic school?

A.    Yes.

Q.    Are you aware of whether either deputy ever attended paramedic school?

A.    No.

Q.    You would have no way of telling whether or not the female deputy did, in fact, feel a pulse at this incident, correct?

A.    I'm sorry, state that again.

Q.    Sure.  You would not have any way of knowing whether or not the female deputy did, in fact, feel a pulse at this incident?

A.    Correct.

Q.    That pulse check by the deputy took place prior to your

arrival, true?

A.    True.

Q.    Do you know if the deputies are trained at all on the difference between normal or regular breathing and agonal breathing?

A.    I have no idea what they get trained.

Q.    "Yes" or "no," when you first arrived, you observed Mr. Niedzialek and he was breathing, correct?

A.    I know you're asking for a "yes" or "no," but breathing is -- you need to address it as whether it's an effective breathing or not effective breathing.  He was not effectively breathing.

Q.    As far as any form of breathing, you did observe him breathing upon arrival, correct?

A.    Yes.

Q.    In your report you listed the cause of injury as "assault," correct?

A.    Correct.

Q.    You made this entry in reference to Mr. Niedzialek's head injury that you observed?

A.    Correct.

Q.    When you made that entry, were you reaching any conclusion that the cause of Mr. Niedzialek's injury was assault by the deputies?

A.    No.

Q.   In your report you also input the mechanism of injury as "blunt," correct?

A.   Correct.

Q.   "Blunt" was in reference to the injury that Mr. Niedzialek had seemed to sustain before the incident with the deputies, correct?

A.   No.  The injuries, we did not know how he sustained them, whether they were before or when he fell.  I wasn't aware of either where -- which time he got the head injuries.

Q.   You didn't know one way or the other, correct?

A.   Correct.

Q.   In your report you also input that Mr. Niedzialek suffered from a cardiac arrest before your arrival, correct?

A.   Yes.

Q.   You never witnessed Mr. Niedzialek suffer from a cardiac arrest?

A.   No.

Q.   Do you have any way of knowing when that cardiac arrest took place?

A.   No.

Q.   There can be multiple causes of cardiac arrest, correct?

A.   Correct.

Q.   In this incident you had said that you thought the cardiac arrest could have been caused by a drug overdose, true?

A.   True.

Q.   Additionally, in your report you input the primary symptom "respiratory arrest," true?

A.   Correct.  Could I elaborate on that?  On that -- on the computer we're not given, like, "cardiac arrest" as -- in that specific box, and that's the closest that we can -- even if it's any kind of cardiac arrest, we always have to put "respiratory arrest" first.

Q.   You had answered some questions about end-tidal CO2 by opposing counsel, correct?

A.   Yes.

Q.   You had said that one of the events consistent with end-tidal CO2 that you saw could have been drug overdose, correct?

A.   Yes.

Q.   When you intubated Mr. Niedzialek, you had no trouble accessing his airway, correct?

A.   Correct.

Q.   You never observed any obstructions with his airway?

A.   No.

Q.   Did you ever observe any petechiae for this patient?

A.   No.

Q.   Part of your practice as a paramedic is to include the word "asphyxia" in your report if you believe that asphyxia is connected with the medical condition of the patient, true?

A.   True.

Q.   Anywhere in your report regarding this patient did you include the word "asphyxia"?

A.   No.

Q.   Thank you.

        MS. BAKKEN:  Actually, can I have one moment, Your Honor?

        THE COURT:  You may.

        MS. BAKKEN:  I have nothing further.

        THE COURT:  Very well.  Mr. Burton.

        MR. BURTON:  Thank you, Your Honor.

                          **REDIRECT EXAMINATION**

BY MR. BURTON:

Q.   Paramedic La Russo, do you recall one of the deputies telling you that he thought there was a drug overdose?

A.   Yes.

Q.   And drug overdose is kind of vague.  What -- what kind of drug overdose were you concerned about and trying to rule out here?

        MS. BAKKEN:  Objection.  Relevance.

        THE COURT:  Overruled.

        THE WITNESS:  An opioid overdose will cause potential hypoxia and cardiac arrest.

BY MR. BURTON:

Q.   And, unfortunately -- and we all now know this word that I didn't even know a little while ago: "fentanyl."  Is that

something that you encounter from time to time in -- in your work?

MS. BAKKEN:  Objection.  Relevance.

THE COURT:  I'll let it go.  Overruled.

You can answer that.

THE WITNESS:  Fentanyl overdoses are actually quite common.

BY MR. BURTON:

Q.   And that's -- that's an opioid overdose, correct?

A.   Yes.

Q.   In the old days, maybe it would be heroin?

A.   Yes.

Q.   And what does an opioid overdose do to the system from a paramedic's point of view if you're responding to an overdose?

A.   I'm sorry, repeat again.

Q.   Sure.  If you're responding to what you think is an opioid overdose, if you're evaluating a patient, what does the opioid overdose do?

A.   It can cause them to go into respiratory failure and subsequently go into cardiac arrest.

Q.   And is that what you were referring to in your analysis of this case when you said "ruling out a drug overdose"?

MS. BAKKEN:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Well, what were you referring to when you said "ruling out a possible drug overdose"?

A.   I was ruling out opioid involvement in the overdose because we can use Narcan to reverse that.

Q.   And, in fact, you gave this patient some Narcan just to be safe, correct?

A.   Yes.

Q.   And that's to reverse an opioid overdose, correct?

A.   Yes.

Q.   Okay.  And have you responded to -- to patients on methamphetamine?

A.   Yes.

Q.   And do they present differently than patients on opioid overdoses?

A.   Yes.

Q.   And just without going into much detail because this is my last question, but could you just describe how?

A.   How a methamphetamine overdose looks like?

Q.   Yeah.

A.   They typically are very excited, their heart rate is very elevated, their blood pressure could be elevated, they speak really quickly.  They're just very anxious.

        MR. BURTON:  Thank you.  I have nothing further, Your Honor.

        THE COURT:  Thank you.  Any recross?

MS. BAKKEN:  Yes, briefly.

**RECROSS-EXAMINATION**

BY MS. BAKKEN:

Q.    In your experience, is it ever possible that meth can cause hypoxia?

A.    Honestly, it's hard to say because we don't really see them -- if they're in cardiac arrest, it's hard to determine if it was a methamphetamine situation.  If they're conscious, usually we can tell the difference on what they're using or at least one of the things they could be using.

Q.    So sometimes it's hard to tell, but it is possible?

A.    Yes.

Q.    Is it possible that methamphetamine can cause cardiac arrest as well?

A.    I'm sure it could.  Any drug can, yeah.

Q.    Does Narcan reverse a meth overdose?

A.    No.

Q.    Thank you.

        MS. BAKKEN:  I have nothing further.

        THE COURT:  You're excused.  Thank you very much.

        THE WITNESS:  Thank you.

        THE COURT:  So we can resume the examination of Sheriff Bianco.

        THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the

cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

**WITNESS, CHAD BIANCO**

THE CLERK:  Thank you.  Please state your name for the record.

THE WITNESS:  Chad Bianco.

THE COURT:  Proceed.

MR. SAIN:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. SAIN:

Q.   Good morning, Sheriff.

MR. SAIN:  And good morning, ladies and gentlemen.

THE WITNESS:  Good morning.

BY MR. SAIN:

Q.   Generally speaking, what is the job description of the Riverside County Sheriff?

A.   Generally speaking?

Q.   Yes.

A.   I guess in general terms, I am the elected Sheriff-Coroner and Public Administrator of Riverside County.  So with that comes the overall running of the Sheriff's Department, which includes our patrol function, which is the unincorporated area of the County.  It also involves 17 contract cities that we provide law enforcement services for and then one contract law

enforcement service with one of our tribes.

In a custodial situation, we are responsible for all of the jails in the County.  We have five jails, about 4,000 inmates at any given time.  Any court situation, we are responsible for the security and the running of our Superior Court system.  So there are deputies inside the jail that act as bailiffs and as security for all of our court proceedings for -- for criminal court and for civil court.

The Public Administrator is responsible for all deaths of indigent people, that their estates are not controlled by family members or by wills or by trusts.  That is taken over by the Public Administrator, and all of their assets are managed and sold or distributed to either family or charity or sold.

The Coroner's Bureau is a separate entity of the Sheriff's Department, but that was combined by law.  Historically, before 2004, there was a separate elected coroner that ran the Coroner's Bureau.  The state law changed and left it up to counties to decide whether or not they wanted to combine government agencies, and Riverside County combined the agencies of coroner and sheriff.  It's -- it's actually a very good operational combination because the -- the work that the deputy coroners do is hand in hand with our investigators in any type of death investigation.

Obviously, those are -- the medical exams are run by

doctors.  They are forensic pathologists, so they're specialized -- highly specialized field in medicine that is just dealing with dead people and determining cause of death, whether it be injury or whether it be sickness or whatever the case may be.

As the Sheriff, I oversee all of that.  Now, obviously, there are -- there is a chain of command.  There is a structure that -- that operates like any -- like any business would do, but ultimately I am responsible for all of those agencies.

Q.   Does that include making sure that the community that you police is safe, that the people are safe?

A.   Well, that's for the -- in the terms of law enforcement, that's primarily my main function.  With Riverside County being so large, we're the second largest sheriff's department in the state or the fifth largest in the country, and overall law enforcement we're, depending on month, we fluctuate between 20 and 22 -- 20 and 22nd largest law enforcement agencies in the country.  And it is my -- well, I state this often and from the very beginning, that our goal for the Riverside County Sheriff's Department is to provide the best service to the residents of Riverside County that any law enforcement agency can.

Q.   Is part of that duty to make sure that your deputies are enforcing the law?

A.    That would be part of it.  There are many aspects of that. There are -- there are many aspects of law enforcement that don't involve law enforcement that we interact with the public, and it is -- it is our belief and it is our mission that all of those things encompassed will be done on a daily basis better than the day before to make us the best we can be.

Q.    Is part of that duty to preserve the constitutional and legal rights of people that you are interacting with, including suspects or subjects that you're arresting or detaining?

A.    Yes, it certainly is.  The office of Sheriff is a constitutional officer.  I swear on oath to the Constitution of the United States, the Constitution of the State of California, and to uphold those rights for our citizens, for our residents. And that is the oath that every deputy sheriff takes.

So in the law enforcement world -- and I could venture to say in any -- in any position, the sanctity of life is more important than anything.  The investigation of life and the investigation as far as we are concerned of death is by far the absolute most important thing that we can do.  And leading up to that is how our interactions with people, our -- our response to people, our response to situations, the security and the safety of life and the security and safety of the residents that we are dealing with, as a whole, that doesn't -- I didn't separate between victim or suspect.  It's the people that we are coming in contact with, their constitutional rights

are more important than anything.

Q.    How many deputies do you supervise at the Riverside County Sheriff's Department?

A.    Deputies, we have roughly around 3,700.  We have 4,000 -- just over 4,000 total employees, but deputy-wise it's roughly around 36- to 3,800.

Q.    And what's the chain of command at your Sheriff's Department from you going down?

A.    I'm ultimately the head of the Sheriff's Department.  I have an undersheriff who reports directly to me, and there is only one of those.  Just a slight notation, in 2019 when I took office, I did not have an undersheriff.  I eliminated that rank or I did not fill that rank because I didn't want there being -- I was new to the position and I didn't want that layer of filter to be there.  I wanted to be more involved, more engaged.  I wanted all of the information coming to me rather than filtering it through someone else.  So I left that position vacant for a little bit over a year.

        Currently, we have an undersheriff.  Below the undersheriff are three assistant sheriffs.  There is an assistant sheriff for patrol; there is an assistant sheriff for corrections; and there is an assistant sheriff for administration.  Administration would cover our Internal Affairs; it would cover our training and education; it would cover the Coroner's Bureau; it covers courts; those entities

that do not involve patrol or the jails.

Underneath the assistant sheriffs are seven chiefs. The chiefs have various responsibilities between patrol, corrections, courts, and -- and patrol support, which is like SWAT team and bomb teams and those things that aren't directly related to a patrol response, but they -- they assist or they help with patrol.

Underneath the chiefs are our captains. We have 25 captains and -- 26 captains. And our captains are the heads of bureaus and stations, effectively like a chief -- a chief of police. The City of Riverside, just to throw it out there, has a chief of police. Our captains are equivalent to what that chief of police would be. So the chief of police of a contract city of Moreno Valley is one of our captains. They also head our jails. They head our special -- our special enforcement bureaus, our narcotics, our drugs, our gangs. There is also a captain that runs the Coroner's Bureau, and it's -- they're basically leaders of organizations themselves. As we combine them all into one, it becomes the Sheriff's Department.

Underneath the captain is a lieutenant. We have roughly about 78 lieutenants, and they operate underneath lieutenant -- or underneath captains that divide their area of responsibility into sections, and then a lieutenant is responsible for a section.

And then it goes down to sergeants. We have a couple

hundred, couple hundred investigators, and then deputy sheriffs.

Q.   Thank you, sir.  And briefly again, when did you become Sheriff of the Riverside County Sheriff's Department?

A.   The actual election -- I became the sheriff in 2018, November of 2018, but I was actually sworn in as Sheriff January 6th of 2019.

Q.   At the time you were elected Sheriff, how long had you been a law enforcement officer?

A.   I had been a law enforcement officer my entire career.  It had been 25 years.

Q.   And I believe you may have said this yesterday, but just to make sure it was clear, when you went through the police academy, where did you go through that academy?

A.   I went through the San Bernardino County Sheriff's Academy.  In the early '90s were -- were major budget issues and law enforcement agencies were not hiring.  So if you wanted to get into the profession, you had to do it yourself.  I was actually the first academy of San Bernardino County that did not have a deputy in it.  It was all pre-service and then we had four police agencies that were from Ontario.  But I put myself through San Bernardino's academy.  The day -- upon graduation, I was hired by the Riverside County Sheriff's Department.

Q.   At the academy did you learn basic policing procedures,

tactics, techniques?

A.    Yes.  It's an extensive -- I mean, it can be live-in.  It wasn't for me.  I lived at home.  But it is a six-month-long training program that's an all-day affair.

Q.    Did that include arrest and control techniques?

A.    It includes everything from arrest and control to how to interact with the public, basic first aid.  We're trained in weapons.  We're trained in tactics, basic -- basic working knowledge of laws and how that affects patrol and how that affects our job.  It's a crash course basically on being a law enforcement officer.

Q.    Did that academy training include when you are authorized under the law to use various types of force as a law enforcement officer?

A.    Absolutely.  Part of the training that we learn is uses of force and what is called a continuum of force, which is the escalation of -- from your appearance to -- up and to the use of potential deadly force.  And along that way, between all of those different exercises of uses of force, there's different legal requirements of when you can do that.

Q.    Did that training include how to restrain someone in a prone position?

A.    Yes, it did.  As part of your arresting procedure training, your arresting tactics training, you're learned how to handcuff, you're learned how to control people with your

body, you're learned how to -- you learn how to counteract actions from someone else.  It's -- I don't want to tell you they teach you how to be a wrestler or an MMA person, but you're learning those body techniques and weight techniques and leverage techniques to use to your advantage to someone -- particularly if they are bigger than you or if they are trained in those types of things, you can overcome it.

But you're trained how to position people, how to position your body so that you can effectively manage a handcuffing situation for the least amount of potential of injury to either yourself or to the person that you're arresting.

Q.   When you were going through the San Bernardino County Sheriff's Department Academy, for various uses of force, including prone restraint, if there were risks associated with that particular use of force, did they cover those risks with you as a deputy trainee?

A.    Yes.  If there was either potential for risk or injury to you or the person that you're arresting or that you're encountering, obviously those risks are talked about and you're learning how to mitigate those -- those risks.

Q.    At any point in time while you were going through the San Bernardino County Sheriff's Department training, were you ever trained that there was any risk that prone restraint might cause someone to asphyxiate even if their airway was

unobstructed?

A.   No.  We were absolutely not trained that.  We were trained -- the only thing that we -- you're really trained about the prone position is that's the -- that is the most effective, safest way for you to restrain someone that is especially combative and that -- we were never told -- never trained that it would cause any type of breathing or obstruction.

Q.   How many years did you personally work as a patrol officer before you promoted in rank?

A.   Roughly about seven years before I promoted to investigator.

Q.   And what were the ranks you were promoted to before becoming elected to Sheriff?

A.   I was a deputy for that time, investigator, sergeant, and lieutenant.

Q.   But the people of the County of Riverside trusted you to be their chief law enforcement officer?

A.   They did.

Q.   Are you familiar with the California Commission on Peace Officer Standards and Training or POST?

A.   Yes.

Q.   Do you have any POST certificates?

A.   I do.  I have a -- I have all of the POST certificates that you can -- that you can obtain.  POST is the -- the

overall governing body of peace officers training.  It's California Peace Officers Standards of Training.  That is -- that's what controls all of our training.  They decide what training we can have, what training we can't have.  And all of the training that -- even now that we -- that we would like to train our deputies, we have to have that approved through POST.

Throughout the process of my career, you obtain a basic POST, which you get that when you graduate from the academy.  I have an -- then I obtained an Intermediate POST, then a Supervisory POST, then a Management POST, and I currently have the Executive POST Certificate, which only comes from someone that is the head of a police agency, and then there's -- there's certain training and time requirements that go into that, but only -- only the head of an agency can acquire that certificate.

Q.   You mentioned that POST has some mandates or requirements for training by law enforcement agencies here in California. Are there occasions when POST, instead of having a mandate, has only a recommendation?

A.   Yes.  There are -- there are many mandates that law enforcement officers are required to -- to obtain for training. So POST requires certain training requirements that you cannot get out of and you cannot veer from.  For instance, shooting. We cannot -- we cannot lessen the required amount of -- of firearms training that POST requires.  They require that we

have 24 hours of mandated POST training every two years, and that's a minimum.  And within that time frame, there are certain -- certain sections of that mandatory that are -- that are required.  The rest are optional up to the -- up to the agency.  And they're -- they have a list of suggested requirements -- or not -- of suggested trainings that you can utilize for that 24-hour period, or agencies can -- based on their individual needs, can use whatever training that they want or that they feel necessary for each individual jurisdiction.

Q.    If -- in your understanding, if a -- if POST issues a recommendation, is that something that a law enforcement agency is obligated to follow?

A.    No, it is not.  It's a -- it's a recommendation or a suggestion.  There -- there are a lot of -- I think I explained this yesterday.  There are a lot of small law enforcement agencies that don't have training bureaus.  They don't have the available personnel to have a completely separate training bureau section of officers or section of personnel that is solely responsible for training everybody else.

          And so with that, they -- they throw recommendations, they give -- along with their requirements, they give recommendations because they know that -- especially the smaller agencies, they don't have the ability or the time or the -- really the revenue, the resources to come up with that

training on their own.  So the state will do it for them and then they just pull from that and do it.

The larger agencies, particularly ourselves, we have an entire training and education bureau.  We have an academy that we run.  So ours is a regional training academy that trains everyone else.  We train all of our County law enforcement officers.  We even train officers and deputies from other counties that come to our training academy to train.  So we were -- we are definitely different than most law enforcement agencies in that we have that massive training and education bureau.

Q.    Now, you discussed your supervision of the Coroner's Bureau yesterday.  Is the Coroner's Bureau the division at Riverside County Sheriff's Department that oversees cause of death investigations?

A.    Yes.  Ultimately, the Coroner's Bureau, that's -- that is their entire job is death.  That -- their -- it is death investigation that they -- that they are involved with, the human body.  Now, in combination of that is the patrol side of that where we are -- when a person dies, we are trying to determine who caused that person to die, but the actual death investigation of that person is done by the Coroner's Bureau.

Q.    And the Coroner's Bureau is responsible for determining what the cause of death was?

A.    Yes, that is true.

Q.   And under state law or local ordinance, are you, as the Sheriff, required to be a medical doctor in order to be the coroner to oversee the Coroner's Bureau?

A.   No.   There is no requirement for me to have any type of medical training or education.  It has never been that way.  So even before they combined from before 2004, it was just an elected position and anyone could be the coroner.  Part of the reason why they combined that is because there were -- with the Public Administrator's office and with the investigation of -- of dead people, typically a lot of times there is no one else around.  There were -- there was a lot of criminal activity going on with the theft of people's property and -- and things like that.  And so that is why they combined -- the option was to combine with the law enforcement agency, which was the county sheriff for all counties, and that made law enforcement overseeing that bureau, which technically -- and it did what was intended, but it eliminated that opportunity for outside theft and crimes that were going on at the time.

Q.   So I'm going to get into some things where I suspect we know the answers, but let's just do them as "yes"/"no" to make sure that everyone is clear on this.  Are you yourself a medical doctor?

A.   I am not.

Q.   Are you a forensic pathologist?

A.   I am not.

Q.   Are you yourself doing any autopsies or anything like that in the cause of death investigations by the Coroner's Bureau?

A.   Absolutely not.  I have -- throughout my career and even as Sheriff, I have watched autopsies, but that is as an observer only outside through glass.  I do not -- I do not participate in an autopsy.  That is only our forensic pathologist.

Q.   You said yesterday, correct me if I'm wrong, that there are forensic pathologists, doctors at the Coroner's Bureau that you ultimately supervise?

A.   That is correct.  In the chain of command, those doctors -- the doctors would respond -- or in their chain of command, there are -- there are forensic pathologists.  We have a chief pathologist that oversees all of them, and then that chief reports to or responds to that captain of the Coroner's Bureau that oversees the entire operation of the Coroner's Bureau, not just the medical part but the investigations part and the public administrator part.  So the doctor, the chief pathologist would answer to the captain, who then up the chain of command ultimately comes to me.

Q.   So when it comes to the medical conclusions, the medical findings of any forensic pathologist, including the chief pathologist, at the Coroner's Bureau for your department, do you, as Sheriff, ever tell them what medical conclusions or findings they are supposed to or required to reach?

A.    Absolutely not.  Just the nature of the investigation is their medical evaluation that is determining the cause of death.  I have absolutely no way to do that.  I have -- everything that I would do would be a guess.  It is his responsibility or hers, it is their responsibility to come up with that cause of death.  Their entire investigation -- which that doctor's investigation is not just their autopsy.  They take into account all of the information from whether it's a crime scene or whether it's an accident scene or whether it's an unattended death, they take in all of that information, combine that with their information that they receive from the medical exam, and then they combine that based on their training and experience and come up with that cause of death.

Q.    Now, you mentioned a Coroner's Review Board.  Typically, is that a process for -- just "yes" or "no" on this one.  Is that a process for overseeing this cause of death investigation by the bureau?

A.    That is our process, yes.

Q.    Okay.  And who typically sits on the Coroner's Review Board?

A.    The Coroner's Review Board -- and this is a -- our Coroner's Review Board is unique throughout the state.  We are the only ones that -- that do this type of inquiry.

So our Coroner's Review Board for any type of death that involves any interaction or death in the presence of law

enforcement, we conduct a Coroner's Review Board.  The Coroner's Review Board is managed by me.  I am the head of that board.  Sometimes there -- it is a designee.  So if I am unavailable for that review process, it would be someone sitting in my place, either my undersheriff or my assistant sheriff, who is also in char -- over the Coroner's Bureau.

Under that would be -- on that board in that room is our captain, all of the doctors that are involved in the autopsies that we're going over at the time for this Coroner Review Board, the investigators, the head investigators that are involved in any type of investigation that's going on with the board.  We have someone from our -- not our -- someone from the laboratory that is providing the results of toxicology results.  We have -- I mentioned all of the doctors.  And then we have our Grand Jury.

So the Grand Jury is present, we present or the doctors and the Coroner's Bureau presents this entire case. Anyone at the -- in this hearing or in this board meeting can ask questions.  Particularly, it's for the Grand Jury, so the Grand Jury is seeing everything that happened that we were doing that we know.  And then at the end of that, questions are answered, if there are any.  And at the end of that meeting or at the end of that -- that review process, that is when I or my designee, if it happened to be one of the others, would certify the manner, the cause, and the mode of death.

Q.    And very briefly, why bother with that process?  Why bother with the Coroner's Review Board process for a cause of death investigation involving law enforcement?

A.    It's -- those investigations or the Coroner's Review Board are only for law enforcement, and it is 100 percent a -- a way for law enforcement and our Grand Jury, who has the power of subpoena, the power of investigation over us and anyone else for that matter, but it is a complete transparent review and explanation of these deaths.  So it's -- basically, it's a transparency issue that we are completely open and honest and we don't want there -- we don't want there ever being any type of allegations or misconceptions that somehow something was covered up or we were -- we were not doing what we should have been doing.  It's a -- it's a thorough process that the state has recognized as being one of the best.

Q.    "Yes" or "no," in your role as Sheriff, would you ever overrule one of your doctors' conclusions as to cause of death?

A.    I would never do that.

Q.    "Yes" or "no," in your role as Sheriff, would you ever overrule one of your subordinates' recommendations on manner of death?

A.    I would not do that.

Q.    Yesterday, under response to Mr. Galipo's questioning, you identified the five manners of death you're familiar with with this process as being "homicide," "suicide," "accident,"

"natural," and "undetermined"; is that correct?

A.    That's correct.

Q.    So as it relates to determining manner of death as part of the Coroner's Review Board process, is that a criminal term, a pathology term, or something else?

A.    It is -- it is very specifically a forensic pathologist term.  It has absolutely nothing to do with criminality.  It has absolutely nothing to do with causal.  It has absolutely nothing to do with determining who or what was responsible. It -- for a criminal or for a civil action.  It is specifically that forensics pathologist's view of his investigation and his conclusion of that investigation, or her.

Q.    "Yes" or "no," at the Riverside County Sheriff's Department, does assigning something a homicide manner of death mean that the department has concluded that law enforcement officers caused someone to die?

A.    It certainly does not mean that, and our investigation process -- our criminal investigation process completely disregards the actual finding of the Coroner in determining -- in what they determine who was responsible, how it was responsible, or if it was actually a homicide, meaning that they may call something a homicide where the forensic pathologist may not.  It may be a homicide that was a heart attack.  It may be a criminal.  It may be a -- just a -- it was an accident, but it's determined to be a homicide because

something else was happening in the Coroner's Bureau.

So the criminal investigation and the forensic pathologist investigation and the use of those two terms are completely separate and they do not intertwine.

Q.   So just to make sure I'm clear and understand this, at your department, if the autopsy investigation determined that law enforcement officers were present for some physical struggle with a person, but the Coroner's investigation revealed that the person then died as a result of drugs and not because of anything the officers did, even if the officers were not the cause of death, would your department still categorize that manner of death as a homicide?

MR. GALIPO:  Objection.  Leading.

THE COURT:  Sustained.

BY MR. SAIN:

Q.   In circumstances where there is no determination that officers caused the death but officers were present, according to your understanding, what manner of death would that be categorized at at your Coroner's review process?

A.   There are some variables that go into that, but specifically, if -- if law enforcement had any type of physical contact, whether they handcuffed them, whether they were walking with them, they were escorting them, they were touching them, if that was the case, if that involved in -- either immediately or soon surrounding that -- that death, that would

be -- our current forensic pathologist would label that as a homicide.

Q.   Even if the deputies had no causal role in the death?

A.   Yes.  That's -- personally, that's -- it's hard from a law enforcement perspective, my perspective to get into the forensic pathologist world, but yes, even if they played absolutely no part in it, it would still be -- they could still possibly rule it as a homicide.

Q.   For the Coroner's review process for Kevin Niedzialek, the manner of death was determined to be a homicide?

A.   Ye -- no.  The manner of death -- I'm sorry, I confused myself with cause.  The manner of death, yes.

Q.   And by certifying that manner of death for Mr. Niedzialek as a homicide, were you trying to say that you concluded that officers -- that Deputies Keeney or Gomez played any causal role in his death?

A.   No.  It has absolutely nothing to do with that.  It's specifically in the forensic pathology world of cause of death and manner of death, and it plays no role.  And it plays no relationship or bearing to -- to the deputies.  They did not.

Q.   Now, yesterday in response to Mr. Galipo's questions, you mentioned that as part of this particular Coroner's Review Board for Mr. Niedzialek, you reviewed the incident video, you reviewed witness statements, you reviewed the autopsy report, the autopsy photographs, all of that package; is that correct?

A.    That is correct.

Q.    And did doctors recommend to you a cause of death for Mr. Niedzialek?

A.    Yes.

Q.    And you certified their recommendation?

A.    Yes.

Q.    And what was the cause of death that you certified for Mr. Niedzialek?

A.    I don't know why I drew a blank, but I want to say acute -- acute methamphetamine toxicity.

Q.    Now, as a result of the Coroner's Review Board process for Kevin Niedzialek, were there any other significant conditions that were certified in the death investigation?

A.    Yes.

Q.    In your department, what does that phrase, "other significant conditions," mean?

A.    Other significant conditions, it only says "other significant conditions" because that is the required form that we're using.  It doesn't say "other conditions" or "other" anything else.  It specifically uses those words.

        For our purposes and for the direction of our chief pathologist for our doctors is that anything else that they can think of that involved in that process, that involved in that -- in the -- in the time surrounding that person's death would be listed in other circumstances.  Yes, the form actually

says "other significant circumstances," but it's "other circumstances."  And the reason being is our chief pathologist, Dr. Fajardo, does not want the appearance or anything left out that appears that we are ignoring something.  We're not ignoring -- in this particular case, the TASER; in this particular case was the restraint techniques of the deputies. And that was the handcuffing and the -- the use of the TASER. And those would be noted in any death investigation that we had that involved any of those types of -- of restraints.

Q.   In this particular case, what were the other significant conditions listed for Mr. Niedzialek?

A.   The restraint maneuvers were certainly one, and right now I can't recall what the -- I know there were others and I can't recall them.

Q.   Fair enough.  In your understanding, does listing something like "restraint maneuvers" and "other significant conditions," does that indicate, either by the doctors or from your perspective, that those other significant conditions played any causal role in the death?

A.   It specifically does not indicate that.

Q.   So when you certified in the death of Mr. Niedzialek that other significant conditions included the application of restraint maneuvers, were you saying or certifying that deputy restraint maneuvers played some role in causing Mr. Niedzialek's death?

A.    No, absolutely not.

Q.    Were you saying or certifying by labeling this as a homicide that you believe that the deputies caused him to die?

A.    No.

Q.    Were you saying or certifying that you believe that the deputies murdered him?

        MR. GALIPO:  I'm going to object, Your Honor.  This is leading.

        THE COURT:  Sustained.

BY MR. SAIN:

Q.    After completing your Coroner's review investigation as the Sheriff, did you determine whether or not the deputies played any causal role in his death?

A.    Yes.

Q.    And what was your conclusion in that regard?

        MR. GALIPO:  I'm going to object.  It lacks foundation from a medical perspective.

        THE COURT:  So, yeah, it's a little bit vague also. So can you specify the question.

        MR. SAIN:  Sure.

BY MR. SAIN:

Q.    I'm asking about the results of the Coroner's review process that you certified.  Did that process result in a conclusion as to whether or not the deputies played any causal role in Mr. Niedzialek's death?

MR. GALIPO:  I'll object as calls for speculation and lacks foundation as to the doctor's conclusions.

THE COURT:  Which he certified.

MR. GALIPO:  I apologize?

THE COURT:  Which he certified.

MR. GALIPO:  Yes.  I still -- even though I understand he certified, there's nothing stated as to what the doctor's conclusions or basis for his conclusions are.

THE COURT:  So I'll overrule it.  He can ask -- he can answer.

BY MR. SAIN:

Q.    So I'll ask it again.  Based on your Coroner's review process for Mr. Niedzialek, based on the information relayed to you by the doctors, by the investigators, the packet that you reviewed, in evaluating the issue of whether Deputy Keeney or Deputy Gomez played any causal role in Mr. Niedzialek's death, did you reach a conclusion?

A.    I did reach a conclusion.

Q.    And what was the conclusion you certified on that issue?

A.    The conclusion was that they did not play any role in the cause of his death.  Their actions and restraint maneuvers did not cause any role in his death.

Q.    In reviewing this Coroner's Review Board packet, this information as part of the death investigation for Mr. Niedzialek, was there any evidence that you reviewed that

showed that Mr. Niedzialek had experienced any asphyxiation at
any time?

MR. GALIPO:  Again, I'm going to object.  This lacks
foundation and calls for speculation.

THE COURT:  Overruled.

THE WITNESS:  There was nothing to indicate that he
suffered any type of asphyxiation or respiratory failure.

BY MR. SAIN:

Q.   Now, you've talked a great deal both today and yesterday
about what the training bureau is and what the training bureau
does.  Very briefly, what's the command structure for the
training bureau?

A.   Through my administration, obviously us, then the captain
oversees the training and education bureau.  There are three --
two lieutenants that are separated between the actual physical
training and the -- the research and the training arrangement.
And then there are approximately six sergeants that -- that
help facilitate that.  And then there are many deputies and
investigators that -- that work doing the actual work.

Q.   As the super -- strike that.  Do you supervise the
training bureau's work?

A.   I wouldn't say that I supervise it.  Ultimately, I'm
responsible for the direction or -- or the approval of certain
out-of-the-ordinary things, but I don't play a direct
supervisory role in it.

Q.   Is it your expectation that in researching to determine and identify best practices, the ones you just talked about earlier today for your department, is it your expectation that the training bureau is going to look at peer-reviewed medical studies in order to determine best practices?

A.   Yes.  On my initial formation of this bureau and the -- and the increasing staff level of this bureau, it was -- it was a very direct and ongoing statement or direction from me that our ultimate goal has to be providing the absolute best training and even gathering resources, if that training requires it, to provide the best training and education for our deputies so we are doing the absolute best practices for -- for safety, for abiding by the law, for providing the best service. It's -- and it involves every aspect that they can think of. That would be medical, that would be physical, that would be other agencies, that would be -- it's across the world. Anything that has anything to do with the topic at hand, any and all information that they can gather on that is brought together, and then we determine best practices.

Q.   "Yes" or "no," is being a doctor a requirement for being hired as a sheriff's deputy at your department?

A.   No.

Q.   "Yes" or "no," is being a paramedic a requirement for being a sheriff's deputy at your department?

A.   No.

Q.    "Yes" or "no," is being an emergency medical technician or EMT a requirement for being a deputy at your department?

A.    No.

Q.    Are you aware of any deputies at your department who are licensed physicians?

A.    No.

Q.    Aware of any who are licensed paramedics?

A.    I -- we do have a couple of paramedics that have come out of military and come into our service, and they maintain -- there's only a couple, but they maintain their paramedic training.

Q.    So why is it that as part of the training bureau's research your expectation is that they're going to look at peer-reviewed medical studies?

A.    Obviously, in cases just like this, we want -- we want all of the medical information that is available that we can possibly obtain to determine whether something is safe, whether something is not safe, or it's something that we should or should not be doing in our -- in our normal day-to-day work.

Q.    Mr. Galipo asked you about the International Association of Chiefs of Police or IACP.  What's your understanding of what that organization is?

            THE COURT:  Before we get into that, let's take our morning recess, Mr. Sain.

            MR. SAIN:  Yes, sir.

THE COURT:  Ladies and gentlemen, we'll be in recess for about 15 minutes.  Please keep an open mind.  Do not talk about this case.  Do not try to learn about this case.  We'll be in recess for about 15 minutes.

MR. SAIN:  Thank you, Your Honor.

(Out of the presence of the jury:)

THE COURT:  You may step down, Sheriff.

(Recess)

(In the presence of the jury:)

THE COURT:  Be seated, please.

Sheriff, you remain under oath.  You understand that?

THE WITNESS:  Yes, sir.

THE COURT:  Proceed, Mr. Sain.

MR. SAIN:  Thank you, Your Honor.

BY MR. SAIN:

Q.   Before the break we were discussing the IACP.  What is that?

A.    It's an association.  The name of it is Association of International -- International Association of Chiefs of Police, and it's a paid organization where you pay for membership into basically that organization, which is either law enforcement members or heads of law enforcement members.  It says "chiefs of police" but anyone can be a member.  We're a member of -- not only as individuals -- I'm an individual member, but we're also a member as a department member.

Q.   Are you still a member?

A.   Individually, I am not, but as a department, we are.

Q.   What about the New York Police Department?  Are you a member of that department?

A.   No.

Q.   What about New Orleans?

A.   No.

Q.   Kentucky?

A.   No.

Q.   LAPD?

A.   No.

Q.   LA Sheriff's?

A.   No.

Q.   Are any other organizations, whether it's IACP, NYPD, San Francisco, Berkeley, any other law enforcement-related organization other than POST, are their recommendations, their model policies, or whatever they want to call them, is that something that in your understanding your deputies are obligated or required to follow?

A.   No, absolutely not.

Q.   We talked about POST, and you said before the break that there's a difference between what POST mandates and what they require.  Do you remember that testimony?

A.   Yes.

Q.   Now, when POST does issue recommendations, are departments

like yours expected to follow those recommended policies verbatim, word for word?

A.    No.

Q.    Are they expected to follow them at all?

A.    No.

Q.    Is discretion left up to the agency as to whether or not to adopt one of their recommendations?

A.    Yes, that's exactly right.

Q.    Why?

A.    As I explained earlier, there -- there are not many large agencies.  And the majority of agencies are small that don't have the personnel.  So they are acting as an entity to provide that assistance, to provide that -- that direction if that's what you so choose.

Q.    Now, you mentioned yesterday that Lexipol also has some model policy language, and I think you said before the break that you, as a law enforcement agency and a Sheriff, are not required to adopt that model language; is that correct?

A.    That is correct.

Q.    But when you took over as Sheriff, because I think you said yesterday you wanted to reorganize the existing policies, you got the Lexipol framework and started pouring your policies into that framework to make them more searchable; is that correct?

A.    Yes.  My opinion is they form the perfect searchable

engine for -- for our process.

Q.   And when did you do that Lexipol policy sort of reorganization at your department?

A.   It started initially after my swearing in.  That's when we -- that's when we pursued to purchase the product and to implement it.  Our research and development team then took it upon themselves -- or at my direction, that's what their job was to do was to combine all of our policies, procedures, department manuals into the Lexipol system so we would have an easy -- easily searchable database.

Q.   This incident occurred in July 2019.  At that point had you been in the Sheriff's role for about six months?

A.   Yes.

Q.   And at that point, how long had it been since you initiated this sort of Lexipol revision of your policies?

A.   It would have been several months.

Q.   By the time that we reached the date of the incident, had any Lexipol-inspired use of force policies been implemented to your knowledge?

A.   No.

Q.   By the time of our incident, were any of your deputies mandated by you to follow any Lexipol-provided or recommended or inspired use of force or restraint policies?

A.   No.

Q.   Does looking at Lexipol model policies give anyone a fair

example of what the Sheriff's Department here requires its deputies to do?

MR. GALIPO:  I'm going to object to the question as vague as phrased.

THE COURT:  Sustained.

BY MR. SAIN:

Q.   Are there going to be differences between what Lexipol recommends and what you require your deputies to do in your Sheriff's Department policies?

A.   Yes.

Q.   So unless it's in your department policies, it's not going to govern what your officers are expected to do?

MR. GALIPO:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  That is correct.

MR. SAIN:  One moment, Your Honor.

BY MR. SAIN:

Q.   There were a number of questions by Mr. Galipo yesterday about the recovery position and your department's policies and training and mandates.  As part of your training bureau's research and as part of its development of training policies and procedures for your deputies, is it your expectation as Sheriff that they are going to look at federal laws, state laws and try to determine what officers are legally mandated to do when it comes to use of force or restraint?

A.    Of course.

Q.    And to the best of your knowledge, as of July 2019, were there any federal, state laws, or provisions that prohibited or restricted law enforcement officers from keeping a suspect restrained in a prone position?

MR. GALIPO:  I'm going to object.  This calls for a legal conclusion as phrased.

THE COURT:  Sustained.

BY MR. SAIN:

Q.    As of that date, was the training that your department provided to deputies, did it train deputies that there existed some federal or state legal prohibition on the use of prone restraint on subjects?

A.    No, we did not teach that.

Q.    Why did you not teach that?

A.    Because, to our knowledge, to my knowledge, there was not -- there is not a prohibition of using the prone restraint. And actually all of the research that we have regarding that particular restraint is that it is certainly not dangerous and it is by far the safest place for all involved when we're taking someone into custody.

Q.    As of July 2019, based on the training bureau's research, was your training bureau teaching your deputies up to that point in time that deputies were required to move a prone restrained subject out of a prone position immediately as soon

as they are handcuffed?

A.   No, we did not teach that.

Q.   Was your department training deputies at that time to move a prone restrained subject, who was no longer resisting, out of the prone position as soon as the resistance stops?

A.   No, we would not teach that.

Q.   Was there any rule that you're aware of that your training bureau was teaching to deputies that they were obligated in every circumstance to immediately move a prone restrained subject out of the prone position once they're handcuffed or once they stopped resisting?

A.   No.

Q.   Why weren't you training them that?

A.   Well, it's not true, for one.  And as I stated before, it's -- especially with a combative person, that is hands down common knowledge, almost common sense in the law enforcement world that the safest place for someone that is resisting is on their stomach.  They pose the least threat to themselves, the least threat to us, the least threat to surrounding people, and the least threat of being able to get up and get away.

Q.   Was your training bureau teaching -- up to July 2019, was your training bureau teaching deputies at your department that there was any kind of legal requirement that deputies move a prone restrained subject out of the prone position as soon as they are handcuffed or as soon as they stop resisting?

A.    No, there is no legal requirement.  We did not train that.

Q.    Now, you talked a little bit yesterday in response to Mr. Galipo's questions about sometimes there is a split in how things are evaluated between some parts of the community and medicine or policing and so forth.  Do you remember talking about that yesterday?

A.    I think so, yes.

Q.    So if your training bureau discovers that there's some sort of disagreement in the medical community or some sort of disagreement in the law enforcement community about what the best policing practices are supposed to be, how does your department go about deciding which practice to follow?

A.    If it's split and it's -- and it is going both ways, then we will err on the side of caution or we will err -- if it's outside of physical, we will err on the side of residents.

Q.    To your knowledge, in terms of what you knew personally or what the training bureau was teaching or telling you, up to July 2019, was there any split in the medical community or the law enforcement community about the safety of prone restraint when the subject's airway was unobstructed?

A.    There was no -- there was no split.

Q.    Now, one of the core contentions that Mr. Noble was making while you were here is that once a prone restrained subject is under control, once they're handcuffed, and certainly once the resistance stops, no matter what else has happened or is

happening, that person should be moved immediately into a recovery position.  Do you remember that testimony?

A.    Yes.

Q.    Is that something that your department trains its deputies to do?

A.    Absolutely not.

Q.    Why not?

A.    Quite frankly, it's completely irresponsible and it defies -- it defies police logic and common sense.  There is -- just because someone calms down does not mean that it's over.  And someone that has shown a propensity of violence and a propensity to resist does not mean that they give up just because the handcuffs go on.  It means we give up when the handcuffs go on, but we have to monitor them, we have to make sure that they're still in our custody, that they still cannot fight, that they still cannot resist.

         And I know there's -- there's been a lot of use of the word "possum."  And "possum" is heavily emphasized by -- by counsel and it was mentioned by some of the other people up here.  That's a very, very tiny part of the whole thing.  Yes, they could be trying to lull you into a sense of -- of unawareness or not paying attention to take advantage of you, but the bigger reality is that you put them in -- you raise somebody that's combative that's trying to get away, you raise them off of that prone position and you seat them or you put

them on their side or you put them on their knees or any other position, you're giving them the opportunity to get away and the opportunity to get up.  So it only takes -- you can be from your knees to your feet in a split second.  And then you can either run or you can fight, you can kick.  And to put somebody, to raise somebody immediately out of that prone position that's fighting with you and then hurry and put them on their seat and back up, you're just giving them the opportunity to jump back up.  And it might not be at that second because you -- we have to be situationally aware.  We have to be aware of everything that's going on around us.  So you're not going to stare at them the entire time.  As soon as you take your eyes off of them or you're engaged in another conversation and you have that divided attention, you're giving them the opportunity to use that to bolt or to attack you.

So it is completely irresponsible to say that a combative fighting person, as soon as you handcuff them, they should be moved into a different position, that gives them that advantage to do it again.

Q.   According to the training that you yourself received at the San Bernardino County Sheriff's Department during your academy days, were you ever trained that there was some point during an incident when a person should be moved out of the prone restraint position?

A.   Yes.

Q.    And what was that point?

A.    There -- there are several points.  One, you obviously have to move them.  We can't leave them there always.  They have to be transported either for medical attention to a gurney, to -- even to get someone to look at them.  You may have to transport them to your vehicle so you can take them to jail or a hospital, whatever the case may be.  So there is always that potential of movement.  So you have to safely be able to put yourself in a position of advantage, usually with more people, that you can move them.  And it may not be safer, but at least if there is an altercation, you're going to be able to overcome that.

        But in addition to that, if you -- it's impossible to render aid to someone that's on their stomach.  So if you're going to do CPR, you can't do that while they're on their stomach.  So if you're going to render any type of aid, you have to move them over, you have to roll them on their side or on their back to do that, to provide that attention.

Q.    Is that the training that your own Sheriff's Department provides to its deputies as well?

A.    Yes.

Q.    When you were at the River -- or excuse me.  When you were at the San Bernardino County Sheriff's Department, were you ever trained that officers should move a prone restrained subject out of the prone position when the officers still

believed it was unsafe to do so?

A.   No.

Q.   At your department, all the way up through July 2019, as far as you know, was your department training deputies that they should move a prone restrained subject out of the prone position even if they believed it was unsafe to do so?

11:20

A.   Absolutely not.

Q.   At your department, were you training deputies up to July 2019 that they should move a prone restrained subject out of the prone position even if they still perceived the subject as a threat or potential threat?

11:21

A.   No.

Q.   Now, you were here in the courtroom when both deputies testified about their incident perceptions; is that correct?

A.   Yes.

11:21

Q.   Both deputies testified that they did not believe it was safe for Mr. Niedzialek to be moved out of the prone position until just seconds before they did actually flip him out of the prone position; is that correct?

A.   Yes.

11:21

Q.   At that point they testified that they believed that it was safe when they first started to suspect he was having a medical problem; is that correct?

        MR. GALIPO:   I'm going to object as leading.

        THE COURT:   Sustained.

11:21

BY MR. SAIN:

Q. At what point, according to the testimony that you understood and reviewed, did the deputies testify that they believed it was first safe to move Mr. Niedzialek out of the prone position?

MR. GALIPO: I'm going to object as irrelevant to his evaluation of the trial testimony.

THE COURT: Sustained.

MR. SAIN: Goes to his state of mind, Your Honor.

BY MR. SAIN:

Q. Did you evaluate in this case whether or not you believed that the deputies complied with your department's policies for enforcing the law and preserving constitutional rights?

A. Yes.

MR. GALIPO: Objection. Vague as to point in time.

THE COURT: Overruled.

THE WITNESS: Yes.

BY MR. SAIN:

Q. And before you heard the trial testimony, were you aware of what the deputies did in terms of when they considered it to be safe to move Mr. Niedzialek out of the prone position?

A. Yes.

Q. And what was your understanding, as you're evaluating this incident, as to when the deputies felt it was safe to move him out of the prone position?

MR. GALIPO:  Again, I'll object as to vague as to point in time that he had this information.

MR. SAIN:  I said, "During the investigation."

THE COURT:  Overruled.

THE WITNESS:  It's actually a two-prong.  When they turned him over, it's a combination of not only was it safe to do so or relatively safe to do so, but they were turning him over to get a better -- to get a better view and observe him.  So it was a combination of both at that time that he was turned over.

BY MR. SAIN:

Q.  Based on your review of this incident, was there any point in time before a few seconds before he was turned into the supine position, before a few seconds before they reported seeing a suspected medical problem, was there any point in time, based on your investigation, that the deputies perceived him as being safe to turn out of the prone position?

MR. GALIPO:  I apologize, Your Honor.  But again, I don't know if this is before depositions were taken.  I don't know when in his investigation this question is referring to time-wise.

THE COURT:  I guess at -- now, right?  Based on -- well, re-ask the question.

MR. SAIN:  Sure.

BY MR. SAIN:

Q.   As part of your investigation of this incident, not talking about the civil case, not talking about what happened in court, talking about your investigation of this incident as part of your -- you said you conducted an administrative investigation over this incident, correct?

A.   Yes.

Q.   As part of your investigation, were you aware at what point during the incident the deputies first felt it was safe to move Mr. Niedzialek out of the prone position?

A.   Yes.

Q.   And at what point of the incident did they feel it was safe to do that?

A.   When they -- when they turned him over.

Q.   That was the same point in time when they first perceived him as having a medical problem?

        MR. GALIPO:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. SAIN:

Q.   Was that the first -- the same point in time as they first perceived him as having a medical problem?

        MR. GALIPO:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. SAIN:

Q.   At what point in time did the deputies, according to your investigation, first suspect that Mr. Niedzialek might be

having a life-threatening medical problem?

MR. GALIPO:  I'm going to object.  This calls for speculation, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Second or seconds before they turned him over.

BY MR. SAIN:

Q.    Now, you were here in court when we played the video for Deputy Gomez, correct?

A.    Yes.

Q.    And about what time was it on the run time, the recording, when they first began to look at him as though they were suspecting he was having a medical problem?

A.    I can't specifically say what time it was on that.

Q.    Fair enough.  Now, in evaluating as part of your investigation as to whether or not Deputy Keeney and Deputy Gomez acted appropriately, meaning that they acted consistent with your department's training and policies and procedures for upholding the law, for preserving constitutional rights, for protecting the life, even of restrained subjects, given what you reviewed, including all of the incident video, all of the autopsy evidence, from the point in time that handcuffs go on Mr. Niedzialek all the way up to the point in time when paramedics arrived on the scene, is there anything, based on your investigation, that you found that the deputies did that

was inappropriate?

A.    No.

Q.    Plaintiffs have suggested that, according to standard police practices, the deputies should have either flipped him over sooner or rendered medical aid sooner.  Do you agree with that contention?

A.    I do not agree with that.

Q.    Why not?

A.    As I explained before, the -- the safest place for him is there.  They were monitoring his breathing.  They saw him breathing.  They -- there was -- there was no opportunity for him to hurt himself or to hurt them.  He was relatively calm. By moving him, standing him up, sitting him up, whatever it was, you're running the risk of agitating him again and then causing this to happen all over again.

Q.    Now, you mentioned yesterday that the training bureau has conducted research that, from your perspective, means that prone restraint is safe, yes?

        MR. GALIPO:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. SAIN:

Q.    Did you testify yesterday about the training bureau's research regarding the safety of prone restraint?

A.    Yes.

Q.    What's your understanding of what that research has shown?

A.   All of the research that we have done, which is compiling all the information that is available to us, is that prone restraint in and of itself without an obstruction of the airway poses no threat to someone's breathing.

Q.   As part of your role, either as a supervisor before becoming Sheriff or since you became Sheriff, are you aware of any change over time in the research by the training bureau as to the effects or potential effects of prone restraint on breathing?

A.   No.

Q.   Now, you mentioned yesterday that you were aware of a doctor by the name of Dr. Donald Reay?

A.   Yes.

Q.   As part of your role as Sheriff or as part of your role as a supervisor leading up to the incident, what was your knowledge about Dr. Reay?

A.   My knowledge of Dr. Reay was that he was one of the first doctors in the mid '90s to come up with his hypothesis that placing people in this prone position was causing the -- the influx or the -- the increase in deaths in police custody of people that were under the influence of methamphetamine or other type of drug.  My understanding was that he was the doctor responsible for that.

Q.   And in light of your knowledge of that, does the department at this time consider that to be a risk of something

that could harm restrained subjects?

A.    No, because shortly after he came out with that hypothesis, there were other doctors that actually did research.  His was just a thought.  And they actually did the research, and he actually came out and recanted and said that he was wrong and said that his -- his position in his paper was -- was not accurate.  So the medical studies that proved that it was not true, that's really where we are today.  There's nothing that has proved anything otherwise.

Q.    From the 2000s forward, so for the entirety of this millennium, based on the training bureau's research, are you aware of any medical study that indicates that prone restraint without any airway obstruction causes someone to die?

A.    No, I'm not.

Q.    From the training bureau's research, from the 2000s all the way up to today, are you aware of any medical study that indicates that prone restraint without airway obstruction is going to fatally or harmfully impair someone's breathing?

A.    No.

Q.    Based on your training bureau's research, from 2000s all the way up to today, from your perspective as a law enforcement supervisor, is there any risk of asphyxia or death for prone restraint if there's no airway obstruction?

A.    No.

Q.    You mentioned that there was some studies that Dr. Reay,

according to your understanding, reviewed and caused him to recant.  What's your understanding of those studies?

A.    Specifically, I can't remember the doctor's name, but I believe there were two doctors.  Vilke may have been one of them.  But they conducted studies, and I believe I -- I mentioned this yesterday, that where they used real -- real people under varying circumstances of age, weight, physical fitness, ability, and put them through stationary exercises, they put them through physical exercises where there was resisting, where they were -- they were told to resist, the restraint, and the handcuffing techniques.  They handcuffed people, they didn't handcuff people; they used weight on their back, they didn't use weight on their back.  So they conducted many, many different types of -- of real-world people experiments to determine whether or not people had airway obstruction -- or not airway obstructions -- whether or not their ability to breathe was influenced in that situation.

           During those tests, they were obviously monitored. They had equipment set up to -- hooked up to them where they were monitoring the -- the oxygen levels and the -- the breathing, and that's -- it was shown, that's what they'd shown was that it didn't affect them.  It didn't affect the subjects that were being examined.

Q.    Based on the training bureau's research, what's your understanding, in terms of maintaining officer and public

safety, of the safest position to restrain a subject in who has been combative with officers?

A.   It's three-prong.  It's not just the residents and the -- and the officers; it's the person that's involved.  The absolute safest place for them is flat on their stomach, handcuffed.

Q.   Now, there was some discussion yesterday about excited delirium.  As part of your law enforcement career, are you familiar with that term?

A.   Yes.

Q.   In your law enforcement experience -- obviously, you're not a doctor.  I'm not asking you a medical question.  I just want to know what your understanding is, as a law enforcement officer, what is excited delirium?

A.   This is -- this is my opinion and my knowledge and my experience is the term was first heard by me in the '90s when this started happening because we knew that -- well, methamphetamine is absolutely horrible.  And as methamphetamine in the late '80s and the early '90s, mid '90s was -- it was -- it was across the country.  It was the number one biggest problem.  So for law enforcement, we experience it on a day-to-day basis.

          MR. GALIPO:  I apologize, Your Honor.  I'm going to object as nonresponsive to his understanding of excited delirium.

THE COURT:  Sustained.

BY MR. SAIN:

Q.   Sheriff, just to focus my question a little bit and to respond to the Court's ruling, in terms of what excited delirium is, what's your understanding of what it is, not its negative effects, but what is it?

A.   Excited delirium is a -- is a condition of a person where they -- they obviously are -- they are excited.  They are usually seeing things.  They are delirious.  It goes with the -- with the term.  They could be hallucinating.  There is -- excited delirium in my training is specifically involving someone that may be experiencing hypothermia right before death.  They believe that they're just so hot, they -- they start taking off their clothes, they will be completely naked. They're just completely out of it.

Q.   And at your Sheriff's Department, leading up to the date of the incident, does your department train deputies to recognize signs and symptoms of excited delirium?

A.   I don't think we specifically use "excited delirium," but the -- the overall general symptoms, signs and symptoms, yes, of course, we do.

Q.   And at your department, when deputies see the signs or symptoms consistent with excited delirium, are they trained on how to respond with the subject?

A.   Yes.

Q.    According to their training leading up to the date of the incident, what are deputies expected to do when they see someone that they believe is experiencing excited delirium as you just defined it?

A.    So excited delirium and severely under the influence of methamphetamine are very, very similar, but the initial -- what they are trained is as soon as they see someone or come in contact with anyone that they believe that is experiencing that, medical is to be summoned right away.  After that you try and do everything that you can to calm them.  More than likely, they're not going to listen to you.  You may not even be able to understand what they're saying, but you have to -- you -- you don't want to agitate them more by your actions, so you try and remain calm, you try and talk in a normal tone of voice, you try and avoid being threatening, and you do everything that you can to -- eventually, you're going to have to get hold of them.  You're going to have to restrain them if they won't allow themselves to be strained -- to be restrained so you can get them medical attention.

Q.    Whether it's by your own training or research that you're aware of that your training bureau has done, does prone restraint have any kind of causal connection to excited delirium from a law enforcement perspective?

        MR. GALIPO:  I'm going to object as vague and --

        THE COURT:  Yeah, I don't understand the question.

MR. SAIN:  Sure.

THE COURT:  Any connection?

BY MR. SAIN:

Q.    I'm trying to understand what law enforcement officers understand in terms of causal linkage.  Obviously, you're not a doctor.  No one is suggesting that.  But in terms of what you understand, your training, and/or in terms of what the training bureau research has revealed, have they found any causal linkage, any evidence of causal linkage between prone restraint and excited delirium?

A.    No.

Q.    Are you aware of any risk that holding someone in a prone restraint position can somehow cause someone to experience excited delirium?

A.    No.

Q.    Are you aware of any risk that holding someone in a prone restraint position can somehow make excited delirium worse?

A.    No.

Q.    In your review of the incident facts as part of your investigation of this case, did you any -- did you see any signs or symptoms from Mr. Niedzialek that -- that you would have expected the deputies to recognize as consistent with excited delirium?

A.    No.  I -- it -- from my initial glance at the -- at the video, even before I saw him, it was -- it was apparent that

this was methamphetamine.

Q.   Based on your department's policies and training regarding how deputies are supposed to respond if a subject is experiencing excited delirium, from your perspective as a supervisor, is there anything that department -- excuse me -- that Deputy Keeney or Deputy Gomez did that would have violated your department's policies, procedures, or training for handling subjects with excited delirium?

A.   No.

Q.   Now, you said earlier that when it comes to your training bureau, you would prefer to err on the side of caution if there's any kind of split in the sources of authority your training bureau has uncovered, correct?

A.   Yes.

Q.   So plaintiffs are suggesting that there is some sort of split in authority and that the recovery position should be used just out of an abundance of caution once a person is either under control in cuffs or stops resisting.  Why not from your perspective adopt that rule just out of an abundance of caution?

A.   Because essentially they're coming up with -- the difference of opinion is from 1995 that was proven wrong.  So technically there is no difference of opinion.  So coming up with a policy -- you're randomly just coming up with a policy then since that's been proven incorrect.  You're going to

randomly come up with a policy that says take someone out of that prone position immediately upon handcuffing and put them in a seated or a side position.  That is completely discounting their safety, the officers' safety, and the surrounding -- the surrounding maybe observers' safety, completely discounting that safe situation and putting them in a situation that now you may have to engage them again physically or they may be able to get away.  And the safety of all three people involved, three groups, the suspect or the subject, the deputy, and the surrounding people, is completely discounted if you come up with that policy.  It's a random policy.

Q.   Sir, does your department have a policy for protecting the safety of suspects during transport?

A.   Yes.

Q.   Does that policy require suspects being transported to be placed in seat belts even when they are in rear handcuffs?

A.   Yes, everyone is placed in a seat belt.

Q.   Does your suspect transport policy include a warning to officers about the risks of cranial cerebral blunt force trauma?

A.   The policy?

Q.   Yeah.

A.   No.

Q.   Does your subject transport policy include a warning to deputies about the risks of cervical spinal blunt force trauma?

MR. GALIPO:  I'm going to object as irrelevant, Your Honor.

THE COURT:  Yeah, I don't see the relevance of this, so sustained.

BY MR. SAIN:

Q.   If your policy doesn't specifically state a warning about the risks of cranial cerebral blunt force trauma, how do you prevent subjects from being -- receiving head injuries when they're being transported?

MR. GALIPO:  Objection.  Vague and irrelevant.

THE COURT:  Sustained.

BY MR. SAIN:

Q.   According to your training, are you required by any authority to list a medical term in your training when teaching your deputies how to avoid the risks of that medical condition?

A.   No.

MR. GALIPO:  Objection.  Vague as phrased.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. SAIN:

Q.   There's been testimony in this case that the deputies do not specifically remember hearing the phrase "positional asphyxia" in their training.  Did you hear that testimony?

A.   Yes.

Q.   Assume for the moment that that's correct.  Assume for the

moment that there's no training that these deputies ever received in any academy or any sheriff's department training or any policy or procedure that ever uses those words, "positional asphyxia."  Does your department, given your understanding of what positional asphyxia is, provide training to mitigate those risks?

11:41

A.    Yes.

Q.    How so?

A.    Our deputies are trained that any time they take someone into custody, any time they are observing someone that is in our custody or in our care, they are to observe, monitor, and maintain at all times that that person is breathing.

11:41

Q.    Now, Mr. Galipo yesterday invoked the George Floyd case with you.  Are you familiar with the basic details of the George Floyd case?

11:41

A.    Yes.

Q.    Is the Niedzialek incident, in your mind, in any way similar to the George Floyd case?

A.    Not at all.

Q.    Why not?

11:41

A.    I said this yesterday.  That was appalling.  The George Floyd case was disgusting to every law enforcement professional in that his -- that specifically -- and we all watched a knee be placed on his neck for that period of time that caused his death.

11:42

As related to this case, it has absolutely nothing to do with it.  There was -- our -- our deputies are completely -- and they have been for years, have been instructed that we don't touch the neck.  We don't do anything with the neck.  We don't obstruct airways.  And there is nothing in this particular case that even remotely shows that they had anything to do with a physical touching of his airway.  They actually made sure that he had an airway, that his airway was not obstructed, and that he was breathing.  The two cases are absolutely completely separate.

Q.   Going back to your policy review, leading up to July 2019, you said that that policy review was ongoing at that time; is that correct?

A.   Yes.  Our -- quite frankly, it's still going.  We're a very large department and we are constantly making changes to policies.

Q.   Up to July 2019, up to the incident date, as part of that policy review, was there anything about your use of force or restraint policies that you determined needed to be revised?

A.   I don't believe so.

Q.   If there had been some sort of change that was needed, given the state of that policy review at that time, would you have learned about that need before the incident date?

A.   Yes.

Q.   But you did not so learn?

A.   No.

MR. SAIN:  Just a moment, Your Honor, if I may.

THE COURT:  You may.

MR. SAIN:  I'd like to call up, if I may, Exhibit 150.  And let's cue it up to the roughly 6:45 mark.

BY MR. SAIN:

Q.   I'm going to play a segment of this video and then ask you some questions.  This was the video that -- or videos that you reviewed as part of your investigation into this incident as a supervisor.

(Video played.)

MR. SAIN:  Stop there.

BY MR. SAIN:

Q.   Based on reviewing that video, would you agree with the deputies that the amount of time that passed from when Mr. Niedzialek fell prone until he was handcuffed was about 34 seconds?

MR. GALIPO:  Objection.  Leading and cumulative.

THE COURT:  Sustained on both grounds.

BY MR. SAIN:

Q.   As to this portion of the video, is there anything that you've seen up to the point of handcuffing that you believe the deputies did that was inappropriate in light of your policies, training, and procedures for the reasonable use of force and restraint?

A.   No.

MR. SAIN:  Next segment, please.

(Video played.)

MR. SAIN:  Stop here.

BY MR. SAIN:

Q.   Stopping at about the 8:05 mark, is there anything about this portion of the incident, based on your review of the incident facts, that you believe the deputies did that is inconsistent with your department's policies for the reasonable use of force or medical care or restraint?

A.   No.

MR. SAIN:  Next segment, please.

(Video played.)

MR. SAIN:  Stop here.

BY MR. SAIN:

Q.   Stopping about the 9:55 mark, based on your investigation, did you determine whether or not this was the last time that Deputy Keeney ever had a knee on Mr. Niedzialek's back?

A.   Yes.

Q.   And was this the last time?

A.   Yes.

Q.   Showing you up to this segment, is there anything up to this point that, from your perspective as a supervisor, Deputy Keeney or Deputy Gomez did that was inconsistent with your department's policies, training, or procedures for the

reasonable use of force, medical care, or restraint?

A.    No.

Q.    Is there anything the deputies did during this portion that appeared to you to be a violation of your department's training, policies, or procedures regarding monitoring the safety of Mr. Niedzialek?

A.    No.

          MR. SAIN:   Next segment, please.

                    (Video played.)

          MR. SAIN:   Stop there.

BY MR. SAIN:

Q.    Stopping at about the 12:02 mark on the composite incident video, Exhibit 150.   Based on your investigation into this incident, at what point did the deputies first begin to suspect that Mr. Niedzialek was having a life-threatening medical problem?

          MR. GALIPO:   Objection.   Calls for speculation as phrased.

          THE COURT:   Sustained.

BY MR. SAIN:

Q.    Did you form an understanding as part of your investigation as to whether or not and at what point the deputies ever began to suspect that Mr. Niedzialek might be having a life-threatening medical problem?

A.    Yes.

Q.    And at what point was that based on your investigation?

A.    Within seconds of Deputy Keeney moving to that position that you see there.

Q.    The position we see at 12:02?

A.    Yes.

Q.    In your training as a law enforcement officer and the training that the training bureau at your department provides, are your deputies trained on how to monitor the safety of a subject in their custody?

A.    Yes.

Q.    And what are they trained to do?

A.    You're -- you're basically trained -- especially breathing, you're trained if they are in a prone position, you are to maintain control of them.  We would prefer that you didn't back up.  If circumstances present that you have to move, you can, but we would prefer that you and we train that you keep a hand on them so they know that you're there.  We don't want them thinking that you're gone so they try and bolt or they -- or they start to struggle again.  So you maintain a presence with them, you maintain control of them, and then exactly how Deputy Keeney did it here, and even Deputy Gomez, you -- by placing a hand on them, you are not only feeling the rise and fall of their back, their chest cavity, you're also monitoring their face, you're monitoring their breathing, their nose, their mouth, if you can see that, and you're feeling that

they're breathing.  So it's a combination of everything in that they are trained to make sure that that person is breathing.

Q.   And up to this point of the incident video, up to the 12:02 mark, is there anything that you observed the deputies doing that was inconsistent with that training as to how deputies should monitor the safety and breathing of restrained subjects?

A.   No.  They both -- they both did it correctly.

Q.   At any point in your review of the incident video up to this point, did you see any signs that Mr. Niedzialek had stopped breathing?

A.   No.

MR. SAIN:  Next segment.

(Video played.)

MR. SAIN:  Stop there.

BY MR. SAIN:

Q.   Stopping at 12:29.  Is there anything that, in your investigation, indicated that it was safe for the deputies to move Mr. Niedzialek out of the prone position before the time that they did so here?

A.   No.

Q.   Why not?

A.   There was -- they were -- they were completely monitoring him, his safety, and there would have been no reason to -- to move him over.

Q.   What was it about the situation, if anything, that, from your perspective, made it unsafe to move Mr. Niedzialek out of the prone position until this point in time?

A.   It's a totality of the circumstances.  It is completely apparent that he was on methamphetamine.  It was that -- my experience, their years of experience, this is something we deal with all the time.  They are -- someone that is that under the influence of methamphetamine -- and I have to clarify that it is not just used methamphetamine.  Someone that is in this condition has more than likely been up for days.  They are completely unpredictable.  They are resistant to pain.  They are resistant to -- to restraints.  They are -- you can't reason with them.  There is no reasoning ability.  So the potential for struggle and the potential for fight is extremely high.

     If they are calm and if they are safe, there is absolutely no reason to move them into a position that is going to cause agitation, that is going to cause you to have to go hands on again.  And by monitoring his breathing and by leaving him there in a calm situation, there's -- there was no reason to move him over.

Q.   Based on the video that you reviewed up to this point, did you see Deputy Gomez conduct a pulse check?

A.   Yes.

Q.   In terms of your department's training for what is

required of officers when they provide medical care to subjects in their custody, is there anything up to this point that you believe was inconsistent with your department's policies, training, or procedures for the reasonable provision of medical care?

A.    No.

MR. SAIN:  And, Your Honor, I'll be done in three minutes.

THE COURT:  Okay.

MR. SAIN:  Thank you, Your Honor.

BY MR. SAIN:

Q.    Now, you watched the video yesterday all the way up to the point in time when the paramedics arrived, correct?

A.    Yes.

Q.    Was there anything that you saw up to the point in time when the paramedics arrived as part of your investigation that you determined that the deputies did that violated your department's policies, training, or procedures for the reasonable use of force, the reasonable use of restraint, or the reasonable provision of medical care?

A.    No.

Q.    Plaintiffs have suggested that Deputy Gomez or Deputy Keeney should have started CPR before the paramedics arrived. Is that consistent with your understanding of what the training requires?

A.    No.

Q.    Why not?

A.    Even the testimony from the paramedic this morning, you don't do CPR if there is a pulse.  If they are breathing, they will have a pulse.  If you find a pulse, they have a pulse.  And you don't want to interrupt or shock the heart with compressions and cause that to fail.  So by monitoring breathing, by checking, and her -- her determining that he had a pulse, that is exactly what they -- that is exactly what they should have done.  And it is -- it is -- really it's medically imprudent to start CPR on someone that does not need it.

Q.    As a supervisor, as a person who oversees the administrative investigation of this incident, the cause of death investigation of this incident, was part of your role in that investigation to determine whether or not Deputy Keeney or Deputy Gomez violated any of the constitutional or legal rights of Mr. Niedzialek from your perspective?

A.    Yes.

Q.    And as a result of that investigation, did you find that Deputy Keeney or Deputy Gomez violated any of Mr. Niedzialek's legal or constitutional rights during this incident?

A.    No.

        MR. SAIN:  No further questions.

        THE COURT:  Thank you.

        Ladies and gentlemen, we'll break for lunch, as I

stated yesterday -- I mean we'll break for the day, as I stated yesterday.  So you will return on Tuesday at 8:45.  Don't come on Monday because there won't be a trial.  I will be doing other things.  So Tuesday, come back on Tuesday at 8:45 and we'll resume.

11:59

Until then, you know exactly what I'm about to say.  Do not talk about this case with anybody, keep an open mind, do not try to learn about this case in any way.  Have a good weekend.  We'll see you back here on Tuesday.

(Out of the presence of the jury:)

12:00

THE COURT:  You may step down, Sheriff.

MR. SAIN:  Your Honor?

THE COURT:  Yes.

MR. SAIN:  If I may.  Just checking our time.

THE COURT:  Okay.  So the plaintiffs have used seven and a half hours, more or less, and the defendants have used five and a half hours.

12:00

MR. SAIN:  Thank you, Your Honor.

THE COURT:  See you on Tuesday.

MR. SAIN:  Have a good weekend, Your Honor.

12:00

THE COURT:  You too.

(Proceedings adjourned.)

-o0o-

CERTIFICATE OF OFFICIAL REPORTER


        I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.



                        DATED THIS 31ST DAY OF MARCH, 2023




                        /s/ PHYLLIS A. PRESTON

                        _____

                        PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                          FEDERAL OFFICIAL COURT REPORTER

**'**

'80s [1] - 85:19
'90s [5] - 43:16, 82:18, 85:16, 85:19

**/**

/s [1] - 103:18

**1**

1 [5] - 7:3, 7:8, 7:9, 7:17, 8:3
100 [1] - 54:5
128 [1] - 2:7
12:02 [3] - 96:12, 97:4, 98:4
12:29 [1] - 98:17
15 [3] - 20:1, 65:2, 65:4
150 [2] - 94:5, 96:13
17 [1] - 37:24
19-2083-JGB [2] - 1:10, 4:4
1989 [1] - 25:17
1995 [1] - 89:22
19th [3] - 6:1, 6:13, 6:19

**2**

20 [2] - 39:17, 39:18
2000s [3] - 83:10, 83:15, 83:20
2004 [2] - 38:17, 50:6
2018 [2] - 43:5, 43:6
2019 [14] - 6:1, 6:13, 25:11, 41:11, 43:7, 68:11, 70:2, 70:22, 71:21, 72:18, 76:3, 76:9, 93:11, 93:17
2023 [3] - 1:17, 4:1, 103:15
21800 [1] - 2:5
22 [2] - 19:25, 39:18
22nd [1] - 39:18
24 [2] - 3:6, 48:1
24-hour [1] - 48:7
25 [2] - 42:8, 43:11
26 [1] - 42:9
28 [1] - 103:7
2:42 [1] - 27:4

**3**

3 [3] - 9:8, 17:5, 26:23
3,700 [1] - 41:4
3,800 [1] - 41:6
30 [1] - 25:12
305 [1] - 2:10

**31** [2] - 1:17, 4:1
310 [1] - 2:5
31ST [1] - 103:15
33 [2] - 3:7, 5:23
34 [1] - 94:17
3470 [1] - 1:23
35 [1] - 20:13
36 [2] - 3:7, 41:6
37 [1] - 3:9

**4**

4 [2] - 1:11, 18:24
4,000 [3] - 38:3, 41:4, 41:5
4000 [1] - 2:16
40th [1] - 2:10
45 [1] - 20:13

**5**

5 [2] - 3:6, 18:18
50s [1] - 20:11
5th [1] - 2:16

**6**

60s [1] - 20:11
633 [1] - 2:16
644 [1] - 2:10
6:45 [1] - 94:5
6th [1] - 43:7

**7**

753 [1] - 103:7
78 [1] - 42:21

**8**

8701 [1] - 103:20
8:05 [1] - 95:6
8:45 [2] - 102:2, 102:4

**9**

90071 [1] - 2:17
90s [1] - 20:14
91103 [1] - 2:8
91367 [1] - 2:5
92501 [1] - 1:23
94609 [1] - 2:10
9:20 [1] - 1:18
9:55 [1] - 95:16

**A**

a.m [1] - 1:18
abiding [1] - 63:13
ability [4] - 48:24, 84:8, 84:17, 99:13
able [7] - 16:19, 27:10,

71:20, 75:9, 75:12, 87:11, 90:8
ABOVE [1] - 103:10
ABOVE-ENTITLED [1] - 103:10
absolute [4] - 40:19, 63:9, 63:12, 85:5
absolutely [18] - 44:15, 46:2, 51:3, 52:1, 52:3, 55:7, 55:8, 57:7, 57:17, 60:1, 66:20, 73:6, 76:7, 85:18, 93:1, 93:10, 99:17
abundance [2] - 89:17, 89:19
academy [14] - 43:14, 43:16, 43:19, 43:22, 43:25, 44:12, 45:14, 47:9, 49:4, 49:5, 49:8, 74:22, 92:2
accessing [1] - 32:16
accident [3] - 52:9, 54:25, 55:25
according [9] - 13:2, 56:17, 74:20, 77:2, 79:24, 81:3, 84:1, 87:1, 91:13
account [1] - 52:8
accurate [3] - 8:22, 25:1, 83:7
acquire [1] - 47:15
act [1] - 38:6
acted [2] - 80:17
acting [1] - 67:12
action [2] - 15:23, 55:10
actions [3] - 45:2, 61:21, 87:13
activity [13] - 14:4, 14:10, 14:12, 14:15, 14:19, 14:22, 15:3, 15:7, 15:10, 15:13, 15:21, 50:11
actual [5] - 43:5, 49:21, 55:19, 62:15, 62:19
acute [3] - 10:16, 58:10
addition [1] - 75:13
additionally [1] - 32:1
address [1] - 30:10
adequately [1] - 10:15
adjourned [1] - 102:22
administration [3] - 41:23, 62:13
administrative [2] - 79:4, 101:13
administrator [1] - 51:18

Administrator [3] - 37:21, 38:9, 38:12
administrator's [1] - 50:9
adopt [3] - 67:7, 67:18, 89:19
adrenaline [1] - 12:8
advanced [2] - 6:6, 6:8
advantage [4] - 45:5, 73:22, 74:19, 75:9
advised [1] - 10:12
affair [1] - 44:4
Affairs [1] - 41:24
affect [2] - 84:22
affects [3] - 26:3, 44:9, 44:10
afternoon [1] - 27:4
afterwards [1] - 13:20
age [1] - 84:7
agencies [15] - 38:20, 38:21, 39:10, 39:18, 43:17, 43:21, 47:17, 48:7, 48:17, 48:24, 49:3, 49:10, 63:16, 67:11
agency [8] - 39:22, 47:12, 47:14, 48:5, 48:12, 50:14, 67:6, 67:17
agitate [1] - 87:13
agitating [1] - 81:14
agitation [1] - 99:18
ago [2] - 8:22, 33:25
agonal [8] - 10:25, 11:5, 11:6, 11:12, 11:14, 12:14, 21:1, 30:4
agree [3] - 81:5, 81:7, 94:14
AHA [1] - 12:25
ahead [1] - 12:16
aid [5] - 27:14, 44:7, 75:14, 75:16, 81:5
air [2] - 11:11, 21:6
airway [17] - 10:19, 12:16, 19:21, 21:15, 32:16, 32:18, 45:25, 72:20, 82:3, 83:13, 83:17, 83:23, 84:15, 84:16, 93:7, 93:8
airways [2] - 6:8, 93:5
al [1] - 4:5
alive [1] - 22:3
all-day [1] - 44:4
allegations [1] - 54:12
allow [2] - 13:7, 87:18
almost [2] - 8:21, 71:16
altercation [1] - 75:11
ALVES [1] - 1:7

Alves [1] - 4:5
ambulance [2] - 6:19, 27:10
American [3] - 5:25, 6:20, 25:4
amount [3] - 45:10, 47:24, 94:15
AMR [3] - 6:1, 6:20, 25:8
analysis [1] - 34:21
AND [3] - 103:5, 103:8, 103:10
Angeles [1] - 2:17
angle [1] - 28:8
anoxic [1] - 16:11
answer [3] - 34:5, 51:19, 61:10
answered [2] - 32:8, 53:22
answers [1] - 50:20
anxious [1] - 35:22
apartment [1] - 9:25
apologize [3] - 61:4, 78:18, 85:23
appalling [1] - 92:21
apparent [2] - 88:25, 99:5
appear [1] - 20:7
appearance [2] - 44:17, 59:3
appearances [1] - 4:6
APPEARANCES [1] - 2:1
appeared [1] - 96:4
application [1] - 59:22
appropriately [2] - 22:16, 80:17
approval [1] - 62:23
approved [1] - 47:6
April [1] - 6:12
area [3] - 28:9, 37:23, 42:22
arm [1] - 21:21
arms [1] - 21:25
arrangement [1] - 62:16
arrest [21] - 19:13, 19:24, 20:10, 21:23, 22:7, 23:1, 31:13, 31:16, 31:18, 31:21, 31:24, 32:2, 32:4, 32:6, 32:7, 33:22, 34:20, 36:7, 36:14, 44:5, 44:6
arresting [5] - 40:9, 44:23, 44:24, 45:12, 45:19
arrival [3] - 30:1, 30:14, 31:13
arrive [1] - 27:1

**arrived** [9] - 10:11, 27:4, 27:13, 27:20, 30:7, 80:24, 100:13, 100:16, 100:23
**ashen** [3] - 17:12, 17:14, 17:23
**aspect** [1] - 63:14
**aspects** [2] - 40:1, 40:2
**asphyxia** [7] - 32:23, 33:2, 83:22, 91:23, 92:4, 92:5
**asphyxiate** [1] - 45:25
**asphyxiation** [2] - 62:1, 62:7
**assault** [2] - 30:17, 30:23
**assessment** [2] - 16:21, 17:7
**assessments** [1] - 16:20
**assets** [1] - 38:12
**assigning** [1] - 55:14
**assist** [2] - 6:9, 42:6
**assistance** [1] - 67:13
**assistant** [7] - 16:18, 41:20, 41:21, 41:22, 42:2, 53:5
**assisted** [1] - 28:19
**associated** [1] - 45:15
**association** [1] - 65:18
**Association** [3] - 64:20, 65:18, 65:19
**assume** [3] - 23:18, 91:25
**assumed** [1] - 27:9
**asystole** [2] - 15:15, 15:16
**attack** [2] - 55:24, 74:15
**attended** [1] - 29:15
**attention** [7] - 6:24, 17:5, 73:22, 74:14, 75:4, 75:18, 87:19
**authority** [3] - 89:12, 89:16, 91:14
**authorized** [1] - 44:12
**autopsies** [3] - 51:1, 51:4, 53:9
**autopsy** [6] - 51:6, 52:7, 56:6, 57:24, 57:25, 80:22
**available** [3] - 48:18, 64:16, 82:2
**Avenue** [1] - 2:7
**avoid** [2] - 87:15, 91:15
**aware** [16] - 29:15, 31:8, 64:4, 64:7,

71:7, 74:10, 74:11, 77:19, 79:7, 82:6, 82:11, 83:12, 83:16, 87:21, 88:12, 88:16

## B

**bag** [2] - 10:2, 19:16
**bailiffs** [1] - 38:7
**BAKKEN** [14] - 2:16, 3:6, 3:7, 23:3, 24:17, 24:19, 33:5, 33:8, 33:19, 34:3, 34:23, 36:1, 36:3, 36:19
**Bakken** [2] - 4:12, 24:16
**bandages** [1] - 6:9
**base** [1] - 24:1
**based** [25] - 6:21, 16:4, 22:10, 22:13, 27:2, 28:8, 48:7, 52:12, 61:12, 61:13, 70:22, 78:12, 78:16, 78:22, 80:24, 83:11, 83:20, 84:24, 89:2, 94:14, 95:7, 95:16, 96:13, 97:1, 99:22
**basic** [9] - 6:8, 6:10, 12:25, 43:25, 44:7, 44:8, 47:8, 92:14
**basis** [3] - 40:5, 61:8, 85:22
**bearing** [1] - 57:20
**beating** [1] - 14:6
**became** [2] - 43:5, 82:6
**become** [1] - 43:3
**becomes** [2] - 7:21, 42:19
**becoming** [2] - 46:14, 82:6
**began** [2] - 80:12, 96:23
**begin** [1] - 96:14
**beginning** [1] - 39:20
**behalf** [2] - 4:8, 4:12
**belief** [1] - 40:4
**below** [1] - 41:19
**belt** [1] - 90:17
**belts** [1] - 90:16
**Berkeley** [1] - 66:15
**BERNAL** [1] - 1:5
**Bernardino** [6] - 43:15, 43:19, 45:13, 45:23, 74:21, 75:23
**Bernardino's** [1] - 43:22
**best** [15] - 6:11, 23:23, 23:24, 39:21, 40:6, 54:15, 63:2, 63:5,

63:9, 63:11, 63:12, 63:13, 63:19, 70:2, 72:11
**better** [3] - 40:5, 78:8
**between** [12] - 17:21, 22:25, 30:4, 39:17, 40:24, 42:3, 44:18, 62:15, 66:22, 69:7, 72:4, 88:9
**Bianco** [3] - 4:12, 36:23, 37:7
**BIANCO** [3] - 1:12, 3:9, 37:4
**Bianco's** [1] - 4:22
**bigger** [2] - 45:6, 73:23
**biggest** [1] - 85:20
**BISGAARD** [1] - 2:15
**bit** [5] - 26:21, 41:18, 60:18, 72:2, 86:3
**blank** [1] - 58:9
**bleeds** [1] - 23:16
**blood** [7] - 13:5, 13:7, 16:9, 18:1, 18:3, 19:3, 35:21
**blue** [3] - 17:18, 17:20
**blunt** [5] - 31:2, 31:4, 90:19, 90:25, 91:7
**board** [10] - 52:14, 53:2, 53:3, 53:7, 53:10, 53:12, 53:18, 54:2, 54:4, 57:23
**Board** [8] - 52:20, 52:21, 52:22, 52:24, 53:1, 55:4, 58:11, 61:23
**body** [14] - 13:6, 16:10, 18:4, 18:6, 18:7, 26:4, 26:7, 28:6, 28:13, 45:1, 45:4, 45:9, 47:1, 49:19
**body's** [1] - 11:7
**bolt** [2] - 74:15, 97:18
**bomb** [1] - 42:5
**books** [1] - 6:25
**bother** [2] - 54:1, 54:2
**Boulevard** [1] - 2:5
**bounce** [1] - 20:11
**bounced** [1] - 20:14
**box** [1] - 32:5
**brain** [4] - 13:10, 16:12, 18:23, 23:16
**break** [6] - 10:20, 65:16, 66:21, 67:16, 101:25, 102:1
**breath** [1] - 11:10
**breathe** [2] - 11:23, 84:17
**breathing** [40] - 10:15,

10:19, 10:22, 10:24, 11:9, 11:12, 11:14, 11:18, 11:21, 12:14, 16:19, 21:16, 30:4, 30:5, 30:8, 30:9, 30:11, 30:12, 30:13, 30:14, 46:7, 81:10, 81:11, 82:4, 82:9, 83:18, 84:21, 92:12, 93:9, 97:13, 97:24, 98:1, 98:2, 98:6, 98:11, 99:19, 101:4, 101:8
**breaths** [5] - 11:1, 11:5, 11:6, 11:8, 21:1
**brief** [1] - 4:17
**briefly** [6] - 6:4, 10:12, 36:1, 43:3, 54:1, 62:11
**bring** [1] - 10:1
**BRISBOIS** [1] - 2:15
**brought** [5] - 10:2, 21:11, 27:13, 29:10, 63:18
**budget** [1] - 43:16
**Burbank** [1] - 2:5
**Bureau** [18] - 38:15, 38:18, 41:25, 42:17, 49:13, 49:16, 49:22, 49:23, 50:3, 51:2, 51:9, 51:16, 51:17, 51:23, 53:6, 53:17, 56:1
**bureau** [25] - 48:19, 49:4, 49:11, 50:16, 52:17, 62:10, 62:12, 62:14, 63:4, 63:6, 63:7, 70:23, 71:8, 71:21, 71:22, 72:8, 72:17, 81:16, 82:7, 87:21, 88:8, 89:11, 89:13, 97:7
**bureau's** [9] - 62:21, 64:12, 69:20, 70:22, 81:22, 83:11, 83:15, 83:20, 84:24
**bureaus** [3] - 42:10, 42:16, 48:17
**Burton** [2] - 4:8, 33:9
**BURTON** [16] - 2:6, 2:7, 3:6, 3:7, 5:1, 5:16, 7:7, 23:5, 24:13, 24:15, 33:10, 33:12, 33:23, 34:8, 34:25, 35:23
**business** [1] - 39:8
**BY** [52] - 2:4, 2:7, 2:9, 2:15, 3:6, 3:6, 3:7, 3:7, 3:9, 5:16, 7:7,

23:5, 24:19, 33:12, 33:23, 34:8, 34:25, 36:3, 37:11, 37:15, 56:15, 60:10, 60:21, 61:11, 62:8, 65:15, 69:6, 69:17, 70:9, 77:1, 77:10, 77:18, 78:11, 78:25, 79:18, 79:23, 80:7, 81:21, 86:2, 88:3, 91:5, 91:12, 91:20, 94:6, 94:13, 94:20, 95:5, 95:15, 96:11, 96:20, 98:16, 100:11

## C

**CAD** [1] - 27:8
**CALIFORNIA** [3] - 1:2, 4:1, 103:6
**California** [10] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17, 40:12, 46:20, 47:2, 47:17
**calm** [5] - 81:12, 87:10, 87:14, 99:16, 99:20
**calms** [1] - 73:10
**cannot** [6] - 47:22, 47:23, 47:24, 73:15, 73:16
**capillaries** [3] - 18:2, 18:3
**capital** [2] - 5:13
**captain** [6] - 42:17, 42:20, 51:15, 51:19, 53:8, 62:13
**captains** [7] - 42:8, 42:9, 42:12, 42:14, 42:22
**cardiac** [25] - 6:7, 12:19, 12:25, 13:14, 19:13, 19:24, 20:9, 20:10, 20:18, 21:23, 22:7, 23:1, 23:12, 27:14, 31:13, 31:15, 31:18, 31:21, 31:23, 32:4, 32:6, 33:22, 34:20, 36:7, 36:13
**care** [8] - 20:21, 24:11, 92:11, 95:10, 96:1, 100:1, 100:5, 100:20
**career** [4] - 43:10, 47:7, 51:3, 85:8
**Case** [1] - 4:4
**case** [28] - 15:20, 19:12, 19:23, 20:4, 20:14, 25:25, 34:22, 39:5, 53:17, 56:24, 59:5, 59:6, 59:10, 65:3, 75:7, 77:11,

79:2, 88:20, 91:21, 92:13, 92:15, 92:18, 92:22, 93:1, 93:6, 102:7, 102:8
**cases** [2] - 64:15, 93:9
**categorize** [1] - 56:11
**categorized** [1] - 56:19
**causal** [11] - 55:8, 57:3, 57:15, 59:19, 60:13, 60:24, 61:16, 87:22, 88:5, 88:8, 88:9
**caused** [8] - 23:19, 31:24, 49:21, 55:16, 56:17, 60:3, 84:1, 92:24
**causes** [2] - 31:21, 83:13
**causing** [3] - 59:24, 81:15, 82:19
**caution** [4] - 72:14, 89:11, 89:17, 89:20
**cavity** [1] - 97:23
**CD** [1] - 7:9
**cellphone** [1] - 23:25
**center** [1] - 23:11
**centers** [3] - 22:13, 23:14, 23:15
**CENTRAL** [2] - 1:2, 103:6
**cerebral** [2] - 90:19, 91:7
**certain** [5] - 47:13, 47:22, 48:3, 62:23
**certainly** [5] - 40:10, 55:17, 59:12, 70:19, 72:24
**CERTIFICATE** [1] - 103:1
**certificate** [2] - 47:11, 47:15
**certificates** [2] - 46:23, 46:24
**certified** [10] - 25:16, 58:5, 58:7, 58:13, 59:21, 60:23, 61:3, 61:5, 61:7, 61:19
**certify** [1] - 53:24
**CERTIFY** [1] - 103:6
**certifying** [4] - 57:13, 59:23, 60:2, 60:5
**cervical** [1] - 90:25
**Chad** [2] - 4:12, 37:7
**CHAD** [3] - 1:12, 3:9, 37:4
**chain** [5] - 39:7, 41:7, 51:11, 51:12, 51:19
**chance** [5] - 8:2, 8:18, 12:7, 16:10, 16:11

**change** [2] - 82:7, 93:21
**changed** [1] - 38:18
**changes** [1] - 93:15
**chaotic** [1] - 14:14
**char** [1] - 53:6
**charity** [1] - 38:13
**chart** [1] - 14:24
**chase** [1] - 6:18
**check** [6] - 11:23, 16:23, 17:2, 19:18, 29:25, 99:23
**checking** [3] - 12:9, 101:8, 102:14
**chest** [5] - 12:24, 16:18, 22:18, 28:9, 97:23
**chief** [12] - 42:10, 42:12, 42:13, 46:18, 51:14, 51:15, 51:18, 51:22, 58:21, 59:2
**Chiefs** [2] - 64:21, 65:19
**chiefs** [4] - 42:2, 42:3, 42:8, 65:22
**choose** [1] - 67:14
**Christine** [1] - 5:12
**circulate** [3] - 13:5, 13:7, 20:12
**circulating** [2] - 16:9, 19:20
**circulation** [6] - 17:24, 18:1, 18:6, 20:3, 20:24, 24:7
**circumstance** [1] - 71:9
**circumstances** [7] - 56:16, 58:25, 59:1, 59:2, 84:7, 97:15, 99:4
**cities** [1] - 37:24
**citizens** [1] - 40:13
**City** [1] - 42:11
**city** [1] - 42:14
**civil** [3] - 38:8, 55:10, 79:2
**clarify** [1] - 99:8
**clear** [4] - 27:9, 43:13, 50:21, 56:5
**CLERK** [5] - 4:4, 5:3, 5:9, 36:24, 37:5
**close** [2] - 9:24, 28:11
**closest** [1] - 32:5
**clothes** [1] - 86:14
**CO2** [5] - 19:4, 19:17, 19:23, 32:8, 32:12
**CODE** [1] - 103:7
**Code** [2] - 9:8, 26:23
**combative** [5] - 46:6, 71:15, 73:24, 74:17,

85:2
**combination** [7] - 17:18, 17:19, 38:22, 49:19, 78:6, 78:9, 98:1
**combine** [6] - 38:20, 42:18, 50:14, 52:11, 52:12, 68:8
**combined** [5] - 38:16, 38:20, 50:6, 50:8, 50:13
**coming** [6] - 5:18, 40:25, 41:16, 89:21, 89:23, 89:24
**command** [6] - 39:7, 41:7, 51:11, 51:13, 51:20, 62:11
**Commission** [1] - 46:20
**common** [4] - 34:7, 71:16, 73:9
**community** [6] - 39:11, 72:4, 72:9, 72:10, 72:18, 72:19
**compiling** [1] - 82:1
**complete** [1] - 54:8
**complete/accurate** [1] - 7:25
**completely** [16] - 48:18, 54:10, 55:18, 56:4, 73:8, 74:16, 86:14, 86:15, 90:3, 90:5, 90:10, 93:2, 93:10, 98:23, 99:4, 99:11
**completing** [1] - 60:11
**complex** [1] - 9:25
**complied** [1] - 77:12
**components** [1] - 19:17
**composite** [1] - 96:12
**compression** [1] - 20:1
**compressions** [11] - 12:22, 12:23, 12:24, 13:6, 13:7, 15:11, 16:18, 19:19, 19:24, 101:7
**computer** [1] - 32:4
**concept** [2] - 12:5, 29:12
**concern** [1] - 22:8
**concerned** [2] - 33:17, 40:18
**concluded** [2] - 55:15, 57:14
**conclusion** [9] - 30:22, 55:12, 60:15, 60:24, 61:17, 61:18, 61:19, 61:20, 70:7

**conclusions** [6] - 51:21, 51:24, 54:17, 61:2, 61:8
**condition** [4] - 32:24, 86:7, 91:15, 99:10
**conditions** [9] - 58:12, 58:16, 58:17, 58:18, 58:19, 59:11, 59:17, 59:18, 59:22
**conduct** [3] - 15:21, 53:1, 99:23
**conducted** [4] - 79:4, 81:17, 84:5, 84:13
**CONFERENCE** [1] - 103:11
**CONFORMANCE** [1] - 103:11
**confused** [1] - 57:11
**connected** [1] - 32:24
**connection** [2] - 87:22, 88:2
**conscious** [1] - 36:8
**consciousness** [1] - 24:9
**consider** [2] - 26:6, 82:25
**considered** [1] - 77:20
**consistent** [6] - 14:16, 32:11, 80:17, 86:23, 88:22, 100:24
**constantly** [1] - 93:15
**Constitution** [2] - 40:11, 40:12
**constitutional** [7] - 40:7, 40:11, 40:25, 77:13, 80:19, 101:16, 101:21
**contact** [3] - 40:25, 56:22, 87:8
**contention** [1] - 81:6
**contentions** [1] - 72:22
**continue** [9] - 12:18, 13:4, 13:9, 13:20, 13:21, 20:12, 21:15, 21:25, 28:25
**continued** [2] - 21:2, 21:8
**continuum** [1] - 44:16
**contract** [3] - 37:24, 37:25, 42:13
**control** [7] - 44:5, 44:6, 44:25, 72:24, 89:18, 97:14, 97:20
**controlled** [1] - 38:11
**controls** [1] - 47:3
**conversation** [1] - 74:14
**cool** [3] - 17:12, 17:25, 18:5

**core** [1] - 72:22
**coroner** [6] - 38:17, 38:21, 50:3, 50:7, 53:9, 55:19
**CORONER** [1] - 1:12
**Coroner** [1] - 37:20
**Coroner's** [29] - 38:15, 38:18, 41:25, 42:17, 49:12, 49:13, 49:16, 49:22, 49:23, 50:3, 51:2, 51:9, 51:15, 51:16, 51:23, 52:19, 52:21, 52:22, 52:24, 53:1, 53:6, 53:17, 55:4, 56:1, 58:11, 60:11, 60:22, 61:12, 61:23
**coroner's** [8] - 52:14, 53:2, 54:2, 54:4, 56:8, 56:19, 57:9, 57:22
**coroners** [1] - 38:23
**correct** [75] - 6:22, 7:15, 7:19, 9:3, 11:3, 13:23, 13:24, 14:3, 14:7, 14:21, 21:9, 22:3, 22:12, 22:21, 24:1, 24:4, 24:11, 24:23, 25:1, 26:9, 26:12, 26:15, 26:16, 26:18, 27:4, 27:15, 28:7, 28:14, 28:20, 28:21, 28:23, 29:4, 29:8, 29:19, 29:24, 30:8, 30:14, 30:17, 30:18, 30:21, 31:2, 31:3, 31:6, 31:10, 31:11, 31:13, 31:21, 31:22, 32:3, 32:9, 32:13, 32:16, 32:17, 34:9, 35:6, 35:8, 51:8, 51:11, 55:1, 55:2, 57:25, 58:1, 67:18, 67:19, 67:24, 69:15, 76:14, 76:19, 76:23, 79:5, 80:9, 89:13, 91:25, 93:13, 100:13
**CORRECT** [1] - 103:8
**corrections** [2] - 41:22, 42:4
**correctly** [1] - 98:8
**counsel** [4] - 4:6, 29:7, 32:9, 73:19
**counteract** [1] - 45:1
**counties** [3] - 38:19, 49:8, 50:15
**country** [3] - 39:16, 39:19, 85:20
**County** [21] - 4:5,

4:13, 25:5, 37:17, 37:21, 38:20, 39:14, 39:20, 39:22, 41:2, 43:4, 43:15, 43:19, 43:23, 45:13, 45:23, 46:17, 49:14, 55:13, 74:21, 75:23
**COUNTY** [2] - 1:11, 1:11
**county** [4] - 37:24, 38:3, 49:6, 50:15
**couple** [6] - 19:17, 23:8, 42:25, 43:1, 64:8, 64:10
**course** [3] - 44:10, 70:1, 86:21
**court** [6] - 38:4, 38:7, 38:8, 79:3, 80:8
**COURT** [60] - 1:1, 4:10, 4:14, 4:19, 7:6, 23:4, 24:14, 24:16, 33:7, 33:9, 33:20, 34:4, 34:24, 35:25, 36:20, 36:22, 37:8, 56:14, 60:9, 60:18, 61:3, 61:5, 61:9, 62:5, 64:23, 65:1, 65:7, 65:10, 65:13, 69:5, 69:14, 70:8, 76:25, 77:8, 77:16, 78:4, 78:22, 79:17, 79:22, 80:4, 81:20, 86:1, 87:25, 88:2, 91:3, 91:11, 91:18, 94:3, 94:19, 96:19, 100:9, 101:24, 102:11, 102:13, 102:15, 102:19, 102:21, 103:5, 103:21
**Court** [5] - 1:22, 1:22, 5:5, 37:1, 38:6
**Court's** [1] - 86:4
**court's** [1] - 4:15
**courtroom** [1] - 76:13
**courts** [2] - 41:25, 42:4
**cover** [4] - 41:23, 41:24, 41:25, 45:16
**covered** [1] - 54:13
**covers** [1] - 41:25
**CPR** [16] - 10:19, 11:24, 12:17, 12:18, 12:21, 13:1, 13:12, 13:17, 13:20, 21:14, 28:19, 28:25, 75:15, 100:23, 101:4, 101:11
**cranial** [2] - 90:19, 91:7

**crash** [1] - 44:10
**crime** [1] - 52:9
**crimes** [1] - 50:18
**criminal** [7] - 38:8, 50:11, 55:4, 55:10, 55:18, 55:24, 56:2
**criminality** [1] - 55:7
**CROSS** [2] - 3:6, 24:18
**CROSS-EXAMINATION** [2] - 3:6, 24:18
**CSR** [2] - 1:21, 103:20
**cue** [1] - 94:5
**cuffs** [1] - 89:18
**cumulative** [1] - 94:18
**current** [1] - 57:1
**custodial** [1] - 38:2
**custody** [7] - 70:21, 73:15, 82:20, 92:10, 92:11, 97:9, 100:2
**cut** [1] - 6:18
**cyanotic** [1] - 17:20

**D**

**daily** [1] - 40:5
**DALE** [2] - 2:4, 2:4
**Dale** [1] - 4:7
**dangerous** [1] - 70:19
**database** [1] - 68:10
**date** [7] - 25:3, 68:17, 70:10, 86:16, 87:1, 93:17, 93:23
**DATED** [1] - 103:15
**DAY** [1] - 103:15
**day-to-day** [2] - 64:19, 85:22
**days** [3] - 34:11, 74:22, 99:10
**dead** [2] - 39:3, 50:10
**deadly** [1] - 44:18
**deal** [2] - 62:9, 99:7
**dealing** [2] - 39:3, 40:23
**death** [57] - 13:8, 25:22, 26:1, 38:24, 39:3, 40:18, 49:15, 49:17, 49:21, 49:24, 51:2, 52:3, 52:6, 52:10, 52:13, 52:16, 52:24, 52:25, 53:25, 54:3, 54:17, 54:21, 54:24, 55:3, 55:14, 56:11, 56:12, 56:17, 56:18, 56:25, 57:3, 57:10, 57:11, 57:12, 57:13, 57:16, 57:18, 57:19, 58:2, 58:7, 58:13, 58:24, 59:8,

59:19, 59:21, 59:25, 60:13, 60:25, 61:16, 61:21, 61:22, 61:24, 83:22, 86:13, 92:25, 101:14
**deaths** [3] - 38:10, 54:9, 82:20
**deceased** [1] - 1:8
**December** [1] - 25:17
**decide** [2] - 38:19, 47:3
**deciding** [1] - 72:12
**decision** [1] - 24:3
**decisions** [1] - 23:23
**defendant** [2] - 4:12, 4:13
**defendants** [1] - 102:16
**Defendants** [2] - 1:13, 2:14
**defense** [1] - 7:10
**defibrillate** [2] - 14:18, 14:20
**defibrillation** [1] - 6:7
**defies** [2] - 73:9
**defined** [1] - 87:4
**definitely** [1] - 49:9
**delegated** [2] - 11:22, 12:16
**delirious** [1] - 86:9
**delirium** [18] - 85:8, 85:14, 85:25, 86:5, 86:7, 86:11, 86:18, 86:19, 86:23, 87:3, 87:5, 87:23, 88:10, 88:14, 88:17, 88:23, 89:4, 89:8
**department** [39] - 37:22, 39:15, 51:23, 55:15, 56:6, 56:11, 58:15, 63:3, 63:21, 63:24, 64:2, 64:4, 65:25, 66:2, 66:4, 68:3, 68:9, 69:1, 69:9, 69:11, 70:10, 71:3, 71:22, 72:12, 73:4, 75:19, 76:3, 76:4, 76:8, 82:25, 86:16, 86:17, 86:22, 89:5, 90:12, 92:2, 92:4, 93:15, 97:7
**Department** [16] - 25:6, 38:16, 39:21, 41:3, 41:8, 41:9, 42:19, 43:4, 43:24, 45:14, 45:23, 49:14, 55:14, 66:3, 74:21, 75:23
**DEPARTMENT** [1] - 1:11

**department's** [11] - 69:19, 77:12, 80:18, 89:2, 89:7, 95:9, 95:25, 96:4, 99:25, 100:3, 100:18
**departments** [1] - 66:25
**deposition** [2] - 8:15, 24:22
**depositions** [1] - 78:19
**Deputies** [1] - 57:15
**deputies** [72] - 10:5, 12:3, 30:3, 30:24, 31:5, 33:13, 38:6, 39:24, 41:2, 41:4, 47:6, 49:7, 57:3, 57:20, 59:6, 60:3, 60:6, 60:12, 60:24, 62:18, 63:12, 64:4, 66:18, 68:21, 69:2, 69:8, 69:22, 70:11, 70:23, 70:24, 71:3, 71:8, 71:22, 71:23, 73:4, 75:20, 76:4, 76:8, 76:13, 76:16, 77:3, 77:12, 77:20, 77:24, 78:16, 79:8, 79:24, 80:25, 81:4, 86:17, 86:22, 87:2, 88:22, 89:3, 90:25, 91:15, 91:21, 92:1, 92:9, 93:2, 94:15, 94:23, 95:8, 96:3, 96:14, 96:23, 97:8, 98:4, 98:6, 98:18, 100:17
**Deputy** [20] - 61:15, 61:16, 80:9, 80:16, 89:6, 95:18, 95:23, 95:24, 97:2, 97:21, 99:23, 100:22, 101:15, 101:16, 101:20
**deputy** [27] - 10:12, 12:18, 13:12, 13:16, 16:17, 28:1, 28:3, 28:6, 28:16, 28:19, 29:3, 29:15, 29:19, 29:22, 29:25, 38:23, 40:14, 41:5, 43:1, 43:20, 45:17, 46:15, 59:23, 63:21, 63:24, 64:2, 90:9
**deputy's** [1] - 9:24
**deputy-wise** [1] - 41:5
**describe** [7] - 10:7, 10:9, 12:15, 17:16, 18:25, 20:21, 35:17
**description** [1] - 37:16

**designee** [2] - 53:3, 53:24
**detail** [1] - 35:16
**detailed** [1] - 17:6
**details** [4] - 8:22, 9:11, 9:12, 92:14
**detaining** [1] - 40:9
**determination** [1] - 56:16
**determine** [14] - 10:25, 25:25, 36:7, 49:21, 55:20, 60:12, 63:1, 63:5, 63:19, 64:17, 69:24, 84:15, 95:17, 101:15
**determined** [8] - 12:13, 14:7, 23:8, 55:25, 56:6, 57:10, 93:19, 100:17
**determining** [8] - 25:22, 39:3, 49:23, 52:2, 55:3, 55:9, 55:19, 101:8
**development** [2] - 68:6, 69:21
**diagnose** [1] - 22:14
**diagnosing** [1] - 23:17
**die** [4] - 49:21, 55:16, 60:3, 83:13
**died** [1] - 56:9
**dies** [1] - 49:20
**difference** [7] - 15:24, 28:12, 30:4, 36:9, 66:22, 89:22, 89:23
**differences** [1] - 69:7
**different** [6] - 23:22, 44:19, 49:9, 74:18, 84:14
**differential** [2] - 22:23, 23:7
**differentials** [2] - 22:9, 23:14
**differently** [1] - 35:13
**dilated** [3] - 16:25, 17:2, 18:19
**DIRECT** [4] - 3:6, 3:9, 5:15, 37:10
**direct** [2] - 62:24, 63:8
**direction** [5] - 58:21, 62:23, 63:8, 67:13, 68:7
**directly** [2] - 41:10, 42:5
**disagreement** [2] - 72:9, 72:10
**discounted** [1] - 90:10
**discounting** [2] - 90:3, 90:5
**discovers** [1] - 72:8
**discretion** [1] - 67:6

discuss [1] - 12:6
discussed [2] - 29:7, 49:12
discussing [1] - 65:16
discussion [1] - 85:7
disgusting [1] - 92:22
dispatch [1] - 27:6
dispatched [1] - 26:9
disregards [1] - 55:19
distress [1] - 10:17
distributed [1] - 38:13
DISTRICT [5] - 1:1, 1:2, 1:5, 103:5, 103:6
District [1] - 1:22
divide [1] - 42:22
divided [1] - 74:14
division [1] - 49:13
DIVISION [1] - 1:3
DIVISION-RIVERSIDE [1] - 1:3
DO [1] - 103:6
doctor [8] - 50:2, 50:22, 51:18, 63:20, 82:12, 82:23, 85:12, 88:6
doctor's [4] - 52:7, 61:2, 61:8, 84:3
doctors [14] - 39:1, 51:9, 51:12, 53:8, 53:14, 53:17, 58:2, 58:22, 59:17, 61:14, 82:18, 83:3, 84:4
doctors' [1] - 54:17
Donald [1] - 82:12
done [7] - 12:23, 40:5, 49:22, 82:1, 87:21, 100:7, 101:10
doubt [2] - 15:5, 15:8
down [19] - 9:13, 10:20, 10:23, 13:19, 16:24, 17:1, 20:5, 20:16, 20:19, 21:4, 26:11, 26:14, 26:17, 41:8, 42:25, 65:7, 71:15, 73:10, 102:11
Dr [5] - 59:3, 82:12, 82:16, 82:17, 83:25
drew [1] - 58:9
drove [1] - 9:20
drug [10] - 23:20, 31:24, 32:12, 33:14, 33:16, 33:17, 34:22, 35:2, 36:15, 82:22
drugs [3] - 16:22, 42:16, 56:9
due [2] - 4:22, 26:11
during [9] - 21:23, 74:21, 74:23, 78:3, 79:8, 84:18, 90:13,

96:3, 101:21
duty [6] - 4:17, 5:19, 6:12, 6:19, 39:24, 40:7

# E

early [2] - 43:16, 85:19
easier [1] - 7:13
easily [1] - 68:10
EASTERN [1] - 1:3
easy [1] - 68:10
EDCV [1] - 4:4
eDCV [1] - 1:10
education [6] - 41:24, 49:4, 49:11, 50:5, 62:14, 63:11
effect [1] - 10:21
effective [7] - 11:12, 12:14, 19:20, 21:2, 30:10, 30:11, 46:5
effectively [6] - 11:18, 15:22, 22:12, 30:11, 42:10, 45:9
effects [4] - 26:6, 82:8, 86:6
either [15] - 7:12, 29:15, 31:9, 38:13, 45:11, 45:18, 53:5, 56:24, 59:17, 65:21, 74:5, 75:4, 81:4, 82:5, 89:18
EKG [1] - 19:12
elaborate [1] - 32:3
elected [5] - 37:20, 38:17, 43:8, 46:14, 50:7
election [1] - 43:5
electrical [12] - 14:4, 14:10, 14:12, 14:15, 14:19, 14:22, 15:3, 15:7, 15:10, 15:13, 15:21
elevated [2] - 35:21
eliminated [2] - 41:12, 50:17
emergency [1] - 64:1
emphasized [1] - 73:18
employed [1] - 25:8
employee [1] - 25:5
employees [1] - 41:5
employer [2] - 6:20, 25:3
EMT [8] - 6:5, 6:8, 6:13, 6:15, 9:2, 12:15, 29:7, 64:2
EMTs [1] - 12:7
encompassed [1] - 40:5

encounter [1] - 34:1
encountering [1] - 45:20
end [9] - 19:4, 19:17, 19:23, 20:25, 32:8, 32:12, 53:21, 53:22, 53:23
end-tidal [4] - 19:4, 19:17, 32:8, 32:12
ended [1] - 23:15
enforcement [49] - 37:25, 38:1, 39:13, 39:17, 39:18, 39:22, 40:2, 40:3, 40:15, 42:15, 43:9, 43:10, 43:17, 44:11, 44:14, 46:18, 47:17, 47:21, 48:12, 48:16, 49:7, 49:10, 50:14, 50:15, 53:1, 54:3, 54:5, 54:6, 55:15, 56:7, 56:21, 57:5, 65:21, 65:22, 66:15, 67:17, 70:4, 71:16, 72:10, 72:19, 83:21, 85:8, 85:11, 85:13, 85:21, 87:23, 88:4, 92:22, 97:6
enforcement-related [1] - 66:15
enforcing [2] - 39:25, 77:13
engage [1] - 90:7
engaged [2] - 41:16, 74:13
engine [1] - 68:1
entire [7] - 43:10, 49:4, 49:17, 51:16, 52:6, 53:17, 74:12
entirety [1] - 83:10
entities [1] - 41:25
ENTITLED [1] - 103:10
entity [2] - 38:15, 67:12
entry [2] - 30:19, 30:22
equipment [2] - 11:22, 84:19
equivalent [1] - 42:12
err [4] - 72:14, 72:15, 89:11
erratic [2] - 14:17, 15:17
escalation [1] - 44:17
escorting [1] - 56:23
especially [4] - 46:6, 48:23, 71:15, 97:12
essence [1] - 16:6
essentially [2] - 7:18,

89:21
estates [1] - 38:10
et [1] - 4:5
etiology [1] - 22:5
evaluate [1] - 77:11
evaluated [1] - 72:4
evaluating [4] - 34:17, 61:15, 77:23, 80:15
evaluation [2] - 52:2, 77:7
event [1] - 20:18
events [1] - 32:11
eventually [2] - 20:20, 87:16
evidence [3] - 61:25, 80:22, 88:9
exactly [5] - 67:8, 97:21, 101:9, 102:6
exam [1] - 52:12
EXAMINATION [10] - 3:6, 3:6, 3:7, 3:7, 3:9, 5:15, 24:18, 33:11, 36:2, 37:10
examination [1] - 36:22
examined [1] - 84:23
example [2] - 22:20, 69:1
exams [1] - 38:25
exceptions [1] - 7:18
exchange [1] - 11:11
excited [20] - 35:20, 85:7, 85:14, 85:24, 86:4, 86:7, 86:8, 86:11, 86:18, 86:19, 86:23, 87:3, 87:5, 87:22, 88:10, 88:14, 88:17, 88:23, 89:4, 89:8
excuse [3] - 24:13, 75:22, 89:5
excused [1] - 36:20
executive [1] - 47:11
exercises [3] - 44:19, 84:8, 84:9
exhibit [1] - 7:2
Exhibit [5] - 7:3, 7:17, 8:3, 94:5, 96:13
exhibits [1] - 7:10
existed [1] - 70:11
existing [1] - 67:21
expectation [4] - 63:1, 63:3, 64:13, 69:22
expected [6] - 13:19, 67:1, 67:4, 69:12, 87:2, 88:22
experience [8] - 36:4, 52:13, 85:11, 85:16, 85:21, 88:13, 99:6
experienced [1] - 62:1

experiencing [4] - 86:12, 87:3, 87:8, 89:4
experiments [1] - 84:15
expert [1] - 26:6
explain [3] - 6:4, 11:5, 19:8
explained [4] - 12:4, 48:15, 67:10, 81:9
explanation [1] - 54:9
expression [1] - 18:19
extensive [1] - 44:2
extremely [1] - 99:14
eyes [2] - 18:17, 74:13

# F

face [1] - 97:24
facilitate [1] - 62:18
fact [4] - 22:13, 29:19, 29:22, 35:5
facts [2] - 88:19, 95:8
fail [1] - 101:7
failure [4] - 20:9, 20:17, 34:19, 62:7
faint [2] - 10:13, 29:3
Fair [1] - 2:7
fair [3] - 59:15, 68:25, 80:15
Fajardo [1] - 59:3
fall [1] - 97:23
familiar [4] - 46:20, 54:24, 85:9, 92:14
family [2] - 38:11, 38:13
far [6] - 28:12, 30:13, 40:18, 70:20, 76:4
fatally [1] - 83:18
FCRR [2] - 1:21, 103:20
FEDERAL [2] - 103:4, 103:21
federal [4] - 1:22, 69:23, 70:3, 70:12
feet [1] - 74:4
fell [2] - 31:8, 94:16
felt [3] - 18:7, 77:24, 79:8
female [3] - 28:16, 29:18, 29:22
fentanyl [1] - 33:25
Fentanyl [1] - 34:6
few [2] - 78:13, 78:14
fib [1] - 15:17
fibrillating [3] - 14:17, 15:10, 15:12
fibrillation [2] - 14:14, 15:17
field [5] - 20:19, 22:14,

22:17, 23:18, 39:2
**fifth** [1] - 39:16
**fight** [3] - 73:16, 74:5, 99:14
**fighting** [2] - 74:7, 74:17
**fill** [2] - 17:9, 41:13
**filter** [1] - 41:15
**filtering** [1] - 41:17
**findings** [3] - 17:6, 51:22, 51:25
**fingers** [2] - 12:9, 12:10
**firearms** [1] - 47:25
**firefighters** [1] - 21:9
**first** [22] - 7:4, 11:17, 11:20, 19:5, 25:16, 27:17, 29:11, 30:7, 32:7, 43:19, 44:7, 76:22, 77:4, 79:8, 79:14, 79:19, 79:25, 80:12, 82:17, 85:16, 96:14
**fitness** [1] - 84:8
**five** [4] - 22:18, 38:3, 54:24, 102:17
**fixed** [1] - 18:19
**flat** [1] - 85:5
**flip** [2] - 7:13, 76:18
**flipped** [2] - 22:18, 81:4
**flow** [2] - 18:1, 19:12
**Floyd** [4] - 92:13, 92:15, 92:18, 92:22
**fluctuate** [1] - 39:17
**fluid** [1] - 21:25
**focus** [1] - 86:3
**follow** [6] - 48:13, 66:19, 67:1, 67:4, 68:22, 72:12
**following** [1] - 16:1
**FOR** [2] - 103:5
**force** [19] - 28:3, 44:13, 44:16, 44:18, 44:19, 45:14, 45:16, 68:18, 68:23, 69:25, 90:19, 90:25, 91:7, 93:18, 94:24, 95:10, 96:1, 100:19
**FOREGOING** [1] - 103:8
**forensic** [13] - 25:20, 39:1, 50:24, 51:6, 51:9, 51:13, 51:22, 55:6, 55:22, 56:2, 57:1, 57:6, 57:18
**forensics** [1] - 55:11
**form** [6] - 15:20, 30:13, 58:18, 58:25, 67:25, 96:21

**formal** [1] - 29:7
**FORMAT** [1] - 103:10
**formation** [1] - 63:6
**forth** [3] - 6:8, 10:15, 72:5
**forward** [1] - 83:10
**foundation** [3] - 60:17, 61:2, 62:4
**four** [2] - 8:21, 43:21
**frame** [1] - 48:2
**framework** [2] - 67:22, 67:23
**Francisco** [1] - 66:15
**frankly** [2] - 73:8, 93:14
**free** [1] - 13:13
**fresh** [1] - 8:23
**FRIDAY** [1] - 4:1
**Friday** [1] - 1:17
**front** [1] - 7:1
**full** [1] - 5:10
**function** [2] - 37:23, 39:14

## G

**Galipo** [4] - 4:7, 64:20, 69:18, 92:13
**GALIPO** [30] - 2:4, 2:4, 4:7, 4:15, 56:13, 60:7, 60:16, 61:1, 61:4, 61:6, 62:3, 69:3, 69:13, 70:6, 76:24, 77:6, 77:15, 78:1, 78:18, 79:16, 79:21, 80:2, 81:19, 85:23, 87:24, 91:1, 91:10, 91:17, 94:18, 96:17
**Galipo's** [3] - 54:23, 57:21, 72:3
**Galvez** [1] - 7:6
**gangs** [1] - 42:16
**gather** [2] - 22:15, 63:18
**gathering** [1] - 63:10
**gear** [1] - 10:11
**general** [2] - 37:20, 86:20
**generally** [3] - 19:8, 37:16, 37:18
**generate** [1] - 14:16
**generated** [1] - 16:5
**generating** [1] - 14:23
**gentlemen** [4] - 4:20, 37:13, 65:1, 101:25
**George** [4] - 92:13, 92:15, 92:18, 92:21
**given** [8] - 8:19, 9:12, 9:20, 32:4, 38:4,

80:20, 92:4, 93:22
**glance** [1] - 88:24
**glass** [1] - 51:5
**goal** [2] - 39:20, 63:9
**goal/standard** [1] - 20:2
**God** [2] - 5:6, 37:2
**Gomez** [11] - 57:15, 61:16, 80:9, 80:17, 89:6, 95:24, 97:21, 99:23, 100:22, 101:16, 101:20
**govern** [1] - 69:12
**governing** [1] - 47:1
**government** [1] - 38:20
**grabbing** [1] - 11:22
**graduate** [1] - 47:8
**graduation** [1] - 43:23
**Grand** [5] - 53:15, 53:16, 53:19, 53:20, 54:6
**grayish** [2] - 17:17
**great** [1] - 62:9
**grounds** [1] - 94:19
**groups** [1] - 90:9
**guess** [3] - 37:20, 52:4, 78:22
**gurney** [4] - 10:2, 21:11, 27:13, 75:5

## H

**half** [3] - 22:18, 102:16, 102:17
**hallucinating** [1] - 86:10
**hand** [8] - 5:3, 18:11, 36:24, 38:23, 63:17, 97:17, 97:22
**handcuff** [3] - 44:25, 74:17, 84:12
**handcuffed** [10] - 27:20, 27:24, 56:22, 71:1, 71:10, 71:25, 72:24, 84:11, 85:6, 94:16
**handcuffing** [5] - 45:10, 59:7, 84:11, 90:2, 94:22
**handcuffs** [4] - 73:13, 73:14, 80:22, 90:16
**handling** [1] - 89:8
**hands** [4] - 12:24, 13:19, 71:15, 99:19
**hanging** [1] - 20:17
**hard** [6] - 16:24, 20:19, 36:6, 36:7, 36:11, 57:4
**harm** [1] - 83:1

**harmfully** [1] - 83:18
**head** [17] - 22:20, 22:25, 23:6, 23:10, 23:15, 23:18, 25:13, 30:19, 31:9, 41:9, 42:14, 42:15, 47:12, 47:14, 53:2, 53:10, 91:8
**heads** [2] - 42:9, 65:22
**hear** [2] - 18:19, 91:23
**heard** [3] - 29:11, 77:19, 85:16
**hearing** [2] - 53:18, 91:22
**heart** [14] - 12:25, 13:9, 14:4, 14:6, 15:12, 15:13, 15:19, 15:22, 15:23, 19:3, 19:11, 35:20, 55:23, 101:6
**heavily** [1] - 73:18
**HELD** [1] - 103:9
**HELM** [2] - 2:9, 2:9
**Helm** [1] - 4:8
**help** [8] - 5:6, 7:6, 11:22, 21:9, 26:17, 37:2, 42:7, 62:18
**HEREBY** [1] - 103:6
**heroin** [1] - 34:11
**high** [2] - 20:6, 99:15
**highly** [1] - 39:2
**Hills** [1] - 2:5
**himself** [1] - 81:12
**hired** [2] - 43:23, 63:21
**hiring** [1] - 43:17
**historically** [1] - 38:17
**hold** [2] - 25:18, 87:16
**holding** [2] - 88:12, 88:16
**hole** [1] - 7:12
**home** [1] - 44:3
**homicide** [12] - 54:25, 55:14, 55:21, 55:22, 55:23, 55:25, 56:12, 57:2, 57:8, 57:10, 57:14, 60:3
**honest** [1] - 54:10
**honestly** [1] - 36:6
**Honor** [25] - 4:7, 4:11, 4:15, 5:1, 24:13, 24:15, 33:6, 33:10, 35:24, 37:9, 60:7, 65:5, 65:14, 69:16, 77:9, 78:18, 80:3, 85:23, 91:2, 94:2, 100:7, 100:10, 102:12, 102:18, 102:20
**HONORABLE** [1] - 1:5

**hooked** [1] - 84:19
**hope** [2] - 15:13, 15:18
**hopefully** [2] - 9:1, 13:8
**horrible** [1] - 85:18
**hospital** [6] - 19:7, 22:13, 24:1, 24:3, 24:6, 75:7
**hot** [1] - 86:13
**hours** [3] - 48:1, 102:16, 102:17
**human** [3] - 26:3, 26:7, 49:19
**hundred** [2] - 43:1
**hurry** [1] - 74:7
**hurt** [2] - 81:12
**hypothermia** [1] - 86:12
**hypothermic** [1] - 18:5
**hypothesis** [2] - 82:18, 83:3
**hypoxia** [4] - 20:6, 20:18, 33:22, 36:5
**hypoxic** [2] - 18:23, 20:8

## I

**IACP** [3] - 64:21, 65:16, 66:14
**idea** [2] - 22:11, 30:6
**identification** [2] - 7:3, 7:17
**identified** [1] - 54:24
**identify** [1] - 63:2
**ignoring** [2] - 59:4, 59:5
**immediately** [7] - 11:24, 56:25, 70:25, 71:9, 73:1, 74:6, 90:2
**impact** [1] - 23:6
**impair** [1] - 83:18
**implement** [1] - 68:6
**implemented** [1] - 68:18
**important** [5] - 15:9, 19:11, 40:17, 40:19, 41:1
**impossible** [1] - 75:13
**imprudent** [1] - 101:11
**IN** [3] - 103:5, 103:9, 103:10
**inappropriate** [2] - 81:1, 94:23
**incident** [44] - 6:2, 6:21, 7:15, 8:9, 8:21, 25:3, 25:9, 26:9,

26:24, 29:19, 29:23, 31:5, 31:23, 57:23, 68:11, 68:17, 68:21, 74:23, 76:14, 77:24, 78:12, 79:1, 79:3, 79:5, 79:8, 79:11, 80:21, 82:15, 86:17, 87:2, 88:19, 92:17, 93:17, 93:23, 94:9, 95:7, 95:8, 96:12, 96:14, 98:3, 98:9, 101:13, 101:14, 101:21
**include** [10] - 6:7, 13:10, 32:22, 33:2, 39:11, 44:5, 44:12, 44:21, 90:18, 90:24
**included** [1] - 59:22
**includes** [2] - 37:23, 44:6
**including** [5] - 13:8, 40:8, 45:15, 51:22, 80:21
**inconsistent** [4] - 95:9, 95:24, 98:5, 100:3
**incorrect** [1] - 89:25
**increase** [1] - 82:20
**increasing** [1] - 63:7
**indicate** [5] - 17:23, 18:22, 59:17, 59:20, 62:6
**indicated** [2] - 20:5, 98:18
**indicates** [2] - 83:12, 83:17
**indigent** [1] - 38:10
**individual** [4] - 9:12, 48:8, 48:9, 65:24
**individually** [1] - 66:2
**Individually** [1] - 1:7
**individuals** [1] - 65:24
**influence** [3] - 82:21, 87:5, 99:8
**influenced** [1] - 84:17
**influx** [1] - 82:20
**information** [11] - 22:15, 41:16, 52:8, 52:10, 52:11, 61:13, 61:24, 63:18, 64:16, 78:2, 82:2
**initial** [4] - 26:11, 63:6, 87:6, 88:24
**initiate** [1] - 11:24
**initiated** [1] - 68:15
**injuries** [3] - 31:7, 31:9, 91:8
**injury** [12] - 16:11, 22:21, 22:25, 23:7, 30:16, 30:20, 30:23,

31:1, 31:4, 39:4, 45:11, 45:18
**inmates** [1] - 38:4
**input** [3] - 31:1, 31:12, 32:1
**inquiry** [1] - 52:23
**inside** [1] - 38:6
**inspired** [2] - 68:18, 68:23
**instance** [1] - 47:23
**instead** [2] - 15:10, 47:18
**instructed** [1] - 93:3
**intended** [1] - 50:17
**interact** [2] - 40:3, 44:7
**interacting** [1] - 40:8
**interaction** [1] - 52:25
**interactions** [1] - 40:20
**interest** [1] - 1:7
**intermediate** [1] - 47:9
**Internal** [1] - 41:23
**International** [3] - 64:20, 65:19
**interpretation** [1] - 6:7
**interrupt** [2] - 4:21, 101:6
**intertwine** [1] - 56:4
**intraosseous** [1] - 21:22
**intubated** [1] - 32:15
**investigation** [47] - 38:24, 40:17, 40:18, 49:18, 49:22, 50:9, 52:1, 52:6, 52:7, 52:16, 53:11, 54:3, 54:7, 55:11, 55:12, 55:17, 55:18, 56:2, 56:3, 56:6, 56:8, 58:13, 59:8, 60:11, 61:24, 78:3, 78:16, 78:20, 79:1, 79:3, 79:5, 79:7, 79:25, 80:16, 80:25, 88:20, 94:9, 95:16, 96:13, 96:22, 97:1, 98:18, 100:16, 101:13, 101:14, 101:15, 101:19
**investigations** [4] - 49:15, 51:2, 51:17, 54:4
**investigator** [2] - 46:12, 46:15
**investigators** [6] - 38:23, 43:1, 53:10, 61:14, 62:19
**invite** [2] - 6:24, 17:5
**invoked** [1] - 92:13

**involve** [2] - 40:3, 42:1
**involved** [12] - 16:22, 41:15, 49:18, 53:8, 53:11, 56:24, 58:23, 59:9, 70:20, 85:4, 90:8
**involvement** [2] - 23:20, 35:3
**involves** [3] - 37:24, 52:25, 63:14
**involving** [2] - 54:3, 86:11
**IO** [1] - 21:21
**irrelevant** [3] - 77:6, 91:1, 91:10
**irresponsible** [2] - 73:8, 74:16
**IS** [2] - 103:8, 103:10
**issue** [4] - 54:10, 61:15, 61:19, 66:25
**issues** [3] - 23:8, 43:16, 48:11
**it'll** [1] - 20:12
**itself** [1] - 82:3
**IV** [3] - 21:17, 21:19, 21:21
**IVs** [2] - 21:24, 27:14

**J**

**jail** [2] - 38:6, 75:7
**jails** [4] - 38:3, 42:1, 42:15
**January** [1] - 43:7
**Jesse** [1] - 6:16
**JESUS** [1] - 1:5
**job** [5] - 22:2, 37:16, 44:10, 49:17, 68:7
**John** [1] - 4:8
**JOHN** [2] - 2:6, 2:7
**JUDGE** [1] - 1:5
**JUDICIAL** [1] - 103:11
**July** [12] - 6:1, 6:13, 6:19, 68:11, 70:2, 70:22, 71:21, 72:18, 76:3, 76:9, 93:11, 93:17
**jump** [1] - 74:9
**jurisdiction** [1] - 48:10
**jury** [6] - 4:3, 6:4, 19:1, 65:6, 65:9, 102:10
**Jury** [6] - 1:11, 53:15, 53:16, 53:19, 53:20, 54:6
**JURY** [1] - 1:15

**K**

**Keeney** [11] - 57:15, 61:15, 80:16, 89:6,

95:18, 95:24, 97:2, 97:21, 100:23, 101:15, 101:20
**keep** [4] - 22:3, 65:2, 97:17, 102:7
**keeping** [1] - 70:4
**KENNEDY** [1] - 2:9
**Kennedy** [1] - 4:8
**Kentucky** [1] - 66:8
**Kevin** [2] - 57:9, 58:12
**KEVIN** [1] - 1:7
**kick** [1] - 74:5
**kind** [9] - 10:12, 17:18, 17:20, 32:6, 33:16, 71:23, 87:22, 89:12
**knee** [4] - 28:9, 28:11, 92:23, 95:18
**knees** [2] - 74:1, 74:4
**knowing** [2] - 29:21, 31:18
**knowledge** [11] - 44:9, 68:19, 70:2, 70:16, 71:16, 72:16, 82:16, 82:17, 82:24, 85:15

**L**

**LA** [3] - 3:5, 5:8, 66:12
**label** [1] - 57:1
**labeling** [1] - 60:2
**laboratory** [1] - 53:13
**lacks** [3] - 60:16, 61:2, 62:3
**ladies** [4] - 4:19, 37:13, 65:1, 101:25
**language** [2] - 67:16, 67:18
**LAPD** [1] - 66:10
**large** [3] - 39:15, 67:10, 93:15
**larger** [1] - 49:3
**largest** [3] - 39:15, 39:16, 39:18
**last** [5] - 5:11, 5:13, 35:17, 95:17, 95:20
**late** [1] - 85:19
**law** [56] - 37:25, 38:16, 38:18, 39:13, 39:16, 39:18, 39:22, 39:25, 40:2, 40:3, 40:15, 43:9, 43:10, 43:17, 44:10, 44:13, 46:18, 47:17, 47:20, 48:12, 48:16, 49:6, 49:9, 50:1, 50:14, 50:15, 52:25, 54:3, 54:5, 54:6, 55:15, 56:7, 56:21, 57:4, 63:13, 65:21, 65:22, 66:15, 67:17, 70:4, 71:16,

72:10, 72:19, 77:13, 80:19, 83:21, 85:8, 85:11, 85:13, 85:21, 87:23, 88:4, 92:22, 97:6
**LAW** [3] - 2:4, 2:6, 2:9
**laws** [4] - 44:9, 69:23, 70:3
**layer** [1] - 41:14
**leaders** [1] - 42:18
**leading** [15] - 23:3, 34:23, 40:19, 56:13, 60:8, 69:13, 76:24, 79:16, 79:21, 81:19, 82:15, 86:16, 87:1, 93:11, 94:18
**learn** [6] - 43:25, 44:15, 45:1, 65:3, 93:25, 102:8
**learned** [6] - 29:9, 29:12, 44:24, 44:25, 45:1, 93:23
**learning** [2] - 45:4, 45:21
**least** [7] - 36:10, 45:10, 71:18, 71:19, 71:20, 75:11
**leave** [2] - 7:12, 75:3
**leaving** [1] - 99:19
**left** [5] - 7:1, 38:18, 41:17, 59:3, 67:6
**leg** [1] - 21:22
**legal** [8] - 40:8, 44:20, 70:7, 70:12, 71:23, 72:1, 101:16, 101:21
**legally** [1] - 69:24
**less** [2] - 16:10, 102:16
**lessen** [1] - 47:24
**level** [2] - 19:10, 63:7
**levels** [1] - 84:20
**leverage** [1] - 45:5
**LEWIS** [1] - 2:15
**Lexipol** [9] - 67:15, 67:22, 68:2, 68:9, 68:15, 68:18, 68:22, 68:25, 69:7
**Lexipol-inspired** [1] - 68:18
**Lexipol-provided** [1] - 68:22
**licensed** [2] - 64:5, 64:7
**lieutenant** [4] - 42:20, 42:22, 42:23, 46:16
**lieutenants** [2] - 42:21, 62:15
**life** [9] - 6:6, 6:8, 40:16, 40:17, 40:22, 80:1, 80:20, 96:15,

96:24

**life-threatening** [3] - 80:1, 96:15, 96:24
**light** [2] - 82:24, 94:23
**lights** [2] - 9:8, 26:23
**likely** [3] - 20:7, 87:10, 99:10
**line** [1] - 18:25
**linkage** [3] - 88:5, 88:9
**LISA** [2] - 3:5, 5:8
**Lisa** [3] - 4:16, 5:2, 5:12
**list** [2] - 48:5, 91:14
**listed** [3] - 30:16, 58:25, 59:11
**listen** [1] - 87:11
**listing** [1] - 59:15
**litigation** [1] - 8:16
**live** [1] - 44:2
**live-in** [1] - 44:2
**lived** [1] - 44:3
**LLP** [1] - 2:15
**loaded** [1] - 21:24
**local** [1] - 50:1
**location** [3] - 9:20, 9:22, 27:13
**locations** [1] - 13:23
**logic** [1] - 73:9
**look** [11] - 8:8, 8:11, 8:18, 10:23, 13:25, 22:9, 63:4, 64:13, 69:23, 75:5, 80:12
**looked** [6] - 10:14, 10:20, 10:23, 14:9, 16:3, 28:8
**looking** [6] - 10:12, 11:8, 13:1, 19:10, 23:21, 68:25
**looks** [1] - 35:18
**Los** [1] - 2:17
**lower** [1] - 18:7
**lull** [1] - 73:21
**lunch** [1] - 101:25

## M

**main** [1] - 39:14
**maintain** [9] - 12:10, 20:1, 21:15, 64:9, 64:10, 92:12, 97:14, 97:19, 97:20
**maintaining** [1] - 84:25
**major** [1] - 43:16
**majority** [1] - 67:11
**male** [1] - 28:19
**manage** [1] - 45:9
**managed** [2] - 38:13, 53:2
**management** [1] -

47:10

**mandate** [1] - 47:18
**mandated** [3] - 48:1, 68:22, 69:24
**mandates** [4] - 47:16, 47:20, 66:22, 69:20
**mandatory** [1] - 48:3
**maneuvers** [5] - 59:12, 59:16, 59:23, 59:24, 61:21
**manner** [11] - 53:25, 54:20, 55:3, 55:14, 56:12, 56:18, 57:10, 57:11, 57:12, 57:13, 57:19
**manners** [1] - 54:24
**manuals** [1] - 68:9
**March** [1] - 1:17
**MARCH** [2] - 4:1, 103:15
**mark** [5] - 94:5, 95:6, 95:16, 96:12, 98:4
**marked** [2] - 7:3, 7:17
**mask** [1] - 19:16
**massive** [1] - 49:10
**math** [1] - 25:13
**MATTER** [1] - 103:10
**matter** [2] - 54:8, 72:25
**MDT** [2] - 9:6, 9:12
**mean** [13] - 12:21, 15:9, 17:25, 20:23, 26:14, 44:2, 55:15, 55:17, 58:16, 73:10, 73:12, 102:1
**meaning** [2] - 55:21, 80:17
**means** [7] - 4:21, 17:16, 19:2, 19:4, 26:17, 73:13, 81:17
**measurements** [1] - 19:6
**mechanically** [1] - 19:15
**mechanism** [1] - 31:1
**medical** [44] - 7:21, 10:2, 32:24, 38:25, 50:2, 50:5, 50:22, 51:17, 51:21, 51:24, 52:2, 52:12, 60:17, 63:4, 63:15, 64:1, 64:14, 64:16, 72:9, 72:18, 75:4, 76:23, 78:15, 79:15, 79:20, 80:1, 80:13, 81:5, 83:7, 83:12, 83:16, 85:12, 87:9, 87:19, 91:14, 91:15, 95:10, 96:1, 96:15, 96:24, 100:1, 100:4, 100:20

**Medical** [3] - 5:25, 6:20, 25:4
**medically** [2] - 22:5, 101:10
**medications** [3] - 6:7, 15:12, 21:23
**medicine** [2] - 39:2, 72:5
**meeting** [2] - 53:18, 53:22
**member** [7] - 65:23, 65:24, 65:25, 66:1, 66:4
**members** [3] - 38:11, 65:22
**membership** [1] - 65:20
**mentioned** [11] - 22:23, 47:16, 52:14, 53:14, 57:22, 67:15, 73:19, 81:16, 82:11, 83:25, 84:6
**met** [1] - 6:18
**meth** [2] - 36:4, 36:16
**methamphetamine** [13] - 35:11, 35:18, 36:8, 36:13, 58:10, 82:21, 85:18, 87:6, 89:1, 99:5, 99:8, 99:9
**methodically** [1] - 9:1
**mid** [2] - 82:18, 85:19
**might** [6] - 7:1, 22:6, 45:24, 74:9, 79:25, 96:23
**military** [1] - 64:9
**millennium** [1] - 83:11
**millimeter** [1] - 18:18
**mind** [6] - 8:23, 15:5, 65:2, 77:9, 92:17, 102:7
**minimum** [1] - 48:2
**minutes** [7] - 16:5, 22:18, 27:1, 27:3, 65:2, 65:4, 100:8
**misconceptions** [1] - 54:12
**mission** [1] - 40:4
**mistake** [1] - 11:8
**mitigate** [2] - 45:21, 92:5
**MMA** [1] - 45:3
**mode** [1] - 53:25
**model** [4] - 66:17, 67:16, 67:18, 68:25
**moisture** [1] - 17:12
**moment** [5] - 33:5, 69:16, 91:25, 92:1, 94:2
**Monday** [1] - 102:3

**monitor** [15] - 10:3, 12:19, 13:14, 13:25, 14:3, 14:9, 15:6, 15:18, 16:3, 16:5, 27:14, 73:14, 92:11, 97:8, 98:6
**monitor-generated** [1] - 16:5
**monitored** [1] - 84:18
**monitoring** [8] - 81:10, 84:20, 96:5, 97:24, 98:23, 99:19, 101:7
**month** [2] - 39:17, 44:3
**months** [2] - 68:12, 68:16
**Moreno** [1] - 42:14
**morning** [14] - 4:7, 4:10, 4:11, 4:14, 4:20, 5:17, 24:20, 24:21, 37:12, 37:13, 37:14, 64:24, 101:3
**most** [5] - 19:11, 20:7, 40:19, 46:4, 49:9
**motions** [1] - 15:24
**mouth** [2] - 11:9, 97:25
**move** [22] - 13:19, 28:22, 70:24, 71:3, 71:9, 71:23, 75:3, 75:10, 75:17, 75:24, 76:5, 76:9, 77:4, 77:21, 77:24, 79:9, 97:16, 98:19, 98:25, 99:2, 99:17, 99:21
**moved** [5] - 13:20, 73:1, 74:18, 74:23, 76:17
**movement** [1] - 75:8
**moving** [4] - 10:18, 11:9, 81:13, 97:2
**MR** [107] - 3:6, 3:7, 3:9, 4:7, 4:11, 4:15, 5:1, 5:16, 7:7, 23:5, 24:13, 24:15, 33:10, 33:12, 33:23, 34:8, 34:25, 35:23, 37:9, 37:11, 37:13, 37:15, 56:13, 56:15, 60:7, 60:10, 60:16, 60:20, 60:21, 61:1, 61:4, 61:6, 61:11, 62:3, 62:8, 64:25, 65:5, 65:14, 65:15, 69:3, 69:6, 69:13, 69:16, 69:17, 70:6, 70:9, 76:24, 77:1, 77:6, 77:9, 77:10, 77:15, 77:18, 78:1, 78:3,

78:11, 78:18, 78:24, 78:25, 79:16, 79:18, 79:21, 79:23, 80:2, 80:7, 81:19, 81:21, 85:23, 86:2, 87:24, 88:1, 88:3, 91:1, 91:5, 91:10, 91:12, 91:17, 91:20, 94:2, 94:4, 94:6, 94:12, 94:13, 94:18, 94:20, 95:2, 95:4, 95:5, 95:12, 95:14, 95:15, 96:8, 96:10, 96:11, 96:17, 96:20, 98:13, 98:15, 98:16, 100:7, 100:10, 100:11, 101:23, 102:12, 102:14, 102:18, 102:20
**MS** [13] - 3:6, 3:7, 23:3, 24:17, 24:19, 33:5, 33:8, 33:19, 34:3, 34:23, 36:1, 36:3, 36:19
**multiple** [1] - 31:21
**murdered** [1] - 60:6

## N

**naked** [1] - 86:14
**name** [8] - 5:10, 5:11, 5:12, 5:13, 37:5, 65:18, 82:12, 84:3
**Narcan** [3] - 35:4, 35:5, 36:16
**narcotics** [1] - 42:16
**natural** [1] - 55:1
**nature** [1] - 52:1
**necessary** [1] - 48:9
**neck** [3] - 92:24, 93:4
**need** [5] - 12:9, 23:11, 30:10, 93:23, 101:11
**needed** [4] - 22:1, 23:9, 93:19, 93:21
**needle** [1] - 21:22
**needs** [2] - 26:17, 48:8
**negative** [1] - 86:6
**never** [7] - 28:6, 31:15, 32:18, 46:6, 50:5, 54:18
**new** [1] - 41:14
**New** [2] - 66:3, 66:6
**next** [5] - 18:24, 95:2, 95:12, 96:8, 98:13
**Niedzialek** [42] - 27:11, 27:15, 27:17, 27:20, 27:23, 28:1, 28:4, 28:7, 28:16, 28:20, 30:8, 31:4, 31:12, 31:15, 32:15,

57:9, 57:13, 57:23, 58:3, 58:8, 58:12, 59:11, 59:21, 61:13, 61:25, 62:1, 76:17, 77:4, 77:21, 79:9, 79:25, 80:23, 88:21, 92:17, 94:16, 96:6, 96:15, 96:23, 98:10, 98:19, 99:2, 101:17

**NIEDZIALEK** [1] - 1:8

**Niedzialek's** [7] - 30:19, 30:23, 59:25, 60:25, 61:16, 95:18, 101:20

**Noble** [1] - 72:22

**non** [2] - 18:18, 23:15

**non-reactive** [1] - 18:18

**non-trauma** [1] - 23:15

**nonresponsive** [1] - 85:24

**normal** [5] - 17:12, 18:7, 30:4, 64:19, 87:14

**North** [1] - 2:7

**nose** [1] - 97:25

**notation** [1] - 41:11

**noted** [1] - 59:8

**nothing** [16] - 5:6, 12:14, 27:8, 33:8, 35:23, 36:19, 37:2, 55:7, 55:8, 55:9, 57:17, 61:7, 62:6, 83:9, 93:1, 93:5

**November** [1] - 43:6

**number** [3] - 22:2, 69:18, 85:20

**numbers** [1] - 20:19

**NYPD** [1] - 66:14

## O

**Oakland** [1] - 2:10

**Oaks** [1] - 2:7

**oath** [3] - 40:11, 40:14, 65:11

**object** [13] - 60:7, 60:16, 61:1, 62:3, 69:3, 70:6, 76:24, 77:6, 78:1, 80:2, 85:24, 87:24, 91:1

**objection** [14] - 23:3, 33:19, 34:3, 34:23, 56:13, 69:13, 77:15, 79:16, 79:21, 81:19, 91:10, 91:17, 94:18, 96:17

**obligated** [3] - 48:13, 66:19, 71:8

**observe** [6] - 11:14, 27:23, 30:13, 32:20, 78:8, 92:11

**observed** [4] - 30:7, 30:20, 32:18, 98:4

**observer** [1] - 51:5

**observers'** [1] - 90:5

**observing** [1] - 92:10

**obstruct** [1] - 93:5

**obstructed** [1] - 93:9

**obstruction** [6] - 46:8, 82:3, 83:13, 83:17, 83:23, 84:16

**obstructions** [2] - 32:18, 84:16

**obtain** [4] - 46:25, 47:7, 47:21, 64:17

**obtained** [1] - 47:9

**obviously** [10] - 38:25, 39:7, 45:20, 62:13, 64:15, 75:2, 84:18, 85:11, 86:8, 88:5

**occasional** [1] - 21:1

**occasions** [1] - 47:18

**occur** [2] - 11:6, 13:4

**occurred** [2] - 6:2, 68:11

**occurring** [1] - 11:11

**OF** [10] - 1:2, 1:15, 2:4, 2:6, 103:1, 103:6, 103:8, 103:11, 103:15

**OFFICE** [1] - 2:9

**office** [3] - 40:10, 41:12, 50:9

**officer** [11] - 28:9, 40:11, 43:9, 43:10, 44:11, 44:14, 46:9, 46:18, 84:25, 85:14, 97:6

**Officer** [1] - 46:21

**officers** [22] - 47:1, 47:21, 48:19, 49:7, 55:16, 56:7, 56:10, 56:17, 57:15, 69:12, 69:24, 70:4, 75:24, 75:25, 85:2, 85:4, 88:4, 90:19, 100:1

**Officers** [1] - 47:2

**officers'** [1] - 90:4

**OFFICES** [2] - 2:4, 2:6

**Official** [1] - 1:22

**OFFICIAL** [3] - 103:1, 103:4, 103:21

**often** [1] - 39:19

**old** [1] - 34:11

**once** [15] - 9:6, 9:22, 10:11, 10:14, 13:22, 20:2, 21:24, 23:11, 24:6, 71:10, 71:11,

72:23, 72:24, 89:17

**one** [38] - 6:25, 7:2, 7:19, 12:2, 12:9, 17:13, 19:18, 22:3, 22:17, 23:8, 24:13, 28:22, 31:10, 32:11, 33:5, 33:13, 36:10, 37:25, 38:1, 41:11, 42:14, 42:19, 50:10, 52:15, 53:24, 54:15, 54:17, 54:20, 59:12, 67:7, 69:16, 71:14, 72:22, 75:2, 82:17, 84:4, 85:20, 88:6

**ones** [2] - 52:23, 63:2

**ongoing** [2] - 63:8, 93:12

**Ontario** [1] - 43:21

**open** [3] - 54:10, 65:2, 102:7

**operate** [1] - 42:21

**operates** [1] - 39:8

**operation** [1] - 51:16

**operational** [1] - 38:22

**opinion** [4] - 67:25, 85:15, 89:22, 89:23

**opioid** [11] - 16:23, 17:1, 20:15, 33:21, 34:9, 34:13, 34:16, 34:17, 35:3, 35:8, 35:13

**opportunity** [7] - 8:8, 50:17, 74:2, 74:3, 74:9, 74:15, 81:11

**opposing** [1] - 32:9

**option** [1] - 50:13

**optional** [1] - 48:4

**order** [3] - 4:21, 50:2, 63:5

**ordinance** [1] - 50:1

**ordinary** [1] - 62:24

**organ** [1] - 16:12

**organization** [4] - 64:22, 65:20, 65:21, 66:16

**organizations** [2] - 42:18, 66:14

**organized** [3] - 14:12, 14:21, 14:22

**organs** [3] - 13:7, 13:8, 13:9

**originally** [1] - 21:20

**Orleans** [1] - 66:6

**otherwise** [1] - 83:9

**ourselves** [1] - 49:3

**out-of-the-ordinary** [1] - 62:24

**outcome** [1] - 23:24

**outside** [3] - 50:17, 51:5, 72:15

**overall** [4] - 37:22, 39:16, 47:1, 86:20

**overcome** [2] - 45:7, 75:12

**overdose** [19] - 17:1, 20:15, 31:24, 32:12, 33:14, 33:16, 33:17, 33:21, 34:9, 34:13, 34:14, 34:17, 34:18, 34:22, 35:2, 35:3, 35:8, 35:18, 36:16

**overdoses** [2] - 34:6, 35:14

**overrule** [3] - 54:17, 54:20, 61:9

**overruled** [8] - 33:20, 34:4, 62:5, 69:14, 77:16, 78:4, 80:4, 91:18

**oversee** [2] - 39:6, 50:3

**overseeing** [2] - 50:16, 52:16

**oversees** [5] - 49:14, 51:14, 51:16, 62:14, 101:12

**overview** [1] - 19:9

**own** [5] - 14:19, 21:16, 49:1, 75:19, 87:20

**owned** [1] - 6:20

**ox** [2] - 19:4, 19:13

**oxygen** [6] - 6:10, 10:3, 18:23, 19:12, 27:14, 84:20

**oxygenate** [1] - 13:9

**oxygenation** [2] - 17:24, 19:16

**oxygenations** [1] - 13:4

## P

**package** [1] - 57:25

**packet** [2] - 61:14, 61:23

**pads** [5] - 13:13, 13:18, 13:22, 13:23, 16:14

**PAGE** [2] - 3:3, 103:10

**page** [2] - 17:5, 18:24

**pages** [1] - 24:24

**paid** [1] - 65:20

**pain** [1] - 99:11

**pale** [1] - 17:18

**paper** [1] - 83:6

**paramedic** [21] - 4:16, 5:2, 5:17, 5:22, 6:5, 6:6, 6:9, 17:22, 22:2, 24:20, 25:15, 25:16, 25:23, 29:11, 29:12,

29:16, 32:22, 33:13, 63:23, 64:10, 101:3

**paramedic's** [1] - 34:14

**paramedics** [6] - 64:7, 64:8, 80:24, 100:13, 100:16, 100:23

**parked** [1] - 9:24

**part** [35] - 7:21, 19:11, 23:12, 32:22, 39:24, 40:1, 40:7, 44:15, 44:23, 50:7, 51:17, 51:18, 55:3, 57:7, 57:22, 61:24, 64:12, 69:20, 69:21, 73:20, 79:1, 79:4, 79:7, 80:15, 82:5, 82:14, 85:8, 88:19, 93:17, 94:9, 96:21, 100:16, 101:14

**participate** [1] - 51:6

**particular** [12] - 15:20, 18:5, 19:23, 20:14, 25:25, 45:16, 57:22, 59:5, 59:6, 59:10, 70:19, 93:6

**particularly** [4] - 18:13, 45:6, 49:3, 53:19

**partner** [2] - 11:22, 12:23

**parts** [1] - 72:4

**Pasadena** [1] - 2:8

**passed** [1] - 94:15

**patent** [1] - 19:21

**pathologist** [14] - 25:20, 50:24, 51:7, 51:14, 51:19, 51:22, 51:23, 55:6, 55:23, 56:3, 57:1, 57:6, 58:22, 59:2

**pathologist's** [1] - 55:11

**pathologists** [3] - 39:1, 51:9, 51:13

**pathology** [2] - 55:5, 57:18

**patient** [24] - 9:15, 10:5, 10:7, 10:10, 10:16, 11:15, 12:17, 13:18, 15:5, 16:9, 16:20, 20:2, 20:15, 20:20, 22:3, 22:11, 22:16, 23:19, 23:23, 32:20, 32:24, 33:1, 34:17, 35:5

**patient's** [2] - 7:21, 12:12

**patients** [4] - 20:8, 20:9, 35:10, 35:13

**patrol** [10] - 37:23, 41:21, 42:1, 42:3, 42:4, 42:6, 42:7, 44:9, 46:9, 49:19
**pay** [1] - 65:20
**paying** [1] - 73:22
**PC** [1] - 2:9
**PEA** [5] - 15:2, 15:11, 15:20, 16:3, 16:17
**Peace** [2] - 46:20, 47:2
**peace** [1] - 47:1
**peer** [2] - 63:4, 64:14
**peer-reviewed** [2] - 63:4, 64:14
**people** [27] - 11:8, 15:15, 22:6, 22:10, 38:10, 39:3, 39:12, 40:8, 40:20, 40:21, 40:24, 44:25, 45:8, 46:17, 50:10, 71:19, 73:19, 75:10, 82:19, 82:21, 84:7, 84:12, 84:14, 84:15, 90:8, 90:10
**people's** [1] - 50:12
**perceived** [4] - 76:10, 78:16, 79:14, 79:20
**percent** [1] - 54:5
**perceptions** [1] - 76:14
**perfect** [1] - 67:25
**period** [5] - 12:10, 16:25, 20:16, 48:7, 92:24
**peripheral** [1] - 21:21
**permission** [1] - 4:15
**person** [23] - 14:18, 26:11, 26:14, 26:17, 45:3, 45:11, 45:19, 49:20, 49:21, 49:22, 56:8, 56:9, 71:15, 73:1, 74:17, 74:23, 85:4, 86:7, 89:17, 92:12, 98:2, 101:12
**person's** [1] - 58:24
**personally** [4] - 11:14, 46:9, 57:4, 72:16
**personnel** [3] - 48:18, 48:19, 67:12
**perspective** [14] - 10:8, 10:9, 57:5, 59:18, 60:17, 81:17, 83:21, 87:23, 89:4, 89:19, 95:23, 99:2, 101:17
**petechiae** [1] - 32:20
**phantom** [2] - 12:5, 29:6
**phase** [1] - 20:8
**phenomenon** [1] -

29:6
**photographs** [1] - 57:25
**phrase** [2] - 58:15, 91:22
**phrased** [4] - 69:4, 70:7, 91:17, 96:18
**PHYLLIS** [4] - 1:21, 103:4, 103:18, 103:20
**physical** [8] - 56:7, 56:21, 62:15, 63:15, 72:15, 84:7, 84:9, 93:7
**physically** [1] - 90:7
**physicians** [1] - 64:5
**place** [9] - 12:16, 28:6, 29:25, 31:19, 53:5, 70:20, 71:17, 81:9, 85:5
**placed** [4] - 21:3, 90:16, 90:17, 92:24
**placing** [2] - 82:19, 97:22
**plaintiff** [2] - 4:8, 5:1
**Plaintiff** [2] - 1:9, 2:3
**plaintiff's** [1] - 29:7
**PLAINTIFF'S** [1] - 5:8
**plaintiffs** [4] - 81:3, 89:15, 100:22, 102:15
**play** [3] - 61:20, 62:24, 94:7
**played** [13] - 57:6, 57:15, 59:19, 59:24, 60:13, 60:24, 61:16, 80:8, 94:11, 95:3, 95:13, 96:9, 98:14
**plays** [2] - 57:19
**point** [37] - 10:17, 28:15, 28:17, 28:22, 34:14, 45:22, 68:11, 68:14, 70:24, 74:22, 75:1, 76:21, 77:2, 77:15, 78:2, 78:12, 78:15, 79:8, 79:11, 79:14, 79:19, 79:24, 80:22, 80:23, 94:22, 95:23, 96:14, 96:22, 97:1, 98:3, 98:9, 98:10, 99:3, 99:22, 100:2, 100:13, 100:15
**points** [1] - 75:2
**police** [12] - 39:12, 42:11, 42:12, 42:13, 43:13, 43:21, 47:12, 65:23, 73:9, 81:4, 82:20
**Police** [3] - 64:21,

65:19, 66:3
**policies** [25] - 66:17, 67:1, 67:21, 67:22, 68:8, 68:15, 68:18, 68:23, 68:25, 69:9, 69:11, 69:19, 69:21, 77:12, 80:18, 89:2, 89:7, 93:16, 93:19, 94:23, 95:9, 95:25, 96:5, 100:3, 100:18
**policing** [3] - 43:25, 72:5, 72:11
**policy** [18] - 67:16, 68:2, 89:24, 90:1, 90:11, 90:12, 90:15, 90:18, 90:21, 90:24, 91:6, 92:3, 93:11, 93:12, 93:18, 93:22
**poor** [3] - 17:24, 18:1
**portion** [3] - 94:21, 95:7, 96:3
**pose** [1] - 71:18
**poses** [1] - 82:4
**position** [49] - 25:14, 25:18, 27:24, 40:16, 41:14, 41:18, 44:22, 45:8, 45:9, 46:4, 50:7, 69:19, 70:5, 70:25, 71:5, 71:10, 71:24, 73:2, 73:25, 74:2, 74:7, 74:18, 74:24, 75:9, 75:25, 76:6, 76:10, 76:17, 76:19, 77:5, 77:21, 77:25, 78:14, 78:17, 79:9, 82:19, 83:6, 85:1, 88:13, 88:17, 89:16, 90:2, 90:3, 97:2, 97:4, 97:13, 98:19, 99:3, 99:17
**positional** [3] - 91:22, 92:3, 92:5
**positioned** [1] - 27:17
**possible** [7] - 5:22, 7:25, 9:9, 35:2, 36:4, 36:11, 36:13
**possibly** [3] - 16:22, 57:8, 64:17
**possum** [2] - 73:18
**POST** [20] - 46:21, 46:23, 46:24, 46:25, 47:6, 47:8, 47:9, 47:10, 47:11, 47:16, 47:18, 47:22, 47:25, 48:1, 48:11, 66:16, 66:21, 66:22, 66:25
**potential** [12] - 13:4, 16:23, 23:18, 33:21, 44:18, 45:10, 45:18, 75:8, 76:11, 82:8,

99:14
**potentially** [1] - 23:10
**pouring** [1] - 67:22
**power** [2] - 54:6, 54:7
**practice** [2] - 32:22, 72:12
**practices** [6] - 63:2, 63:5, 63:12, 63:19, 72:11, 81:4
**pre** [1] - 43:20
**pre-service** [1] - 43:20
**prefer** [3] - 89:11, 97:14, 97:16
**preparation** [1] - 24:23
**prepare** [2] - 6:21, 7:19
**prepared** [1] - 7:14
**presence** [6] - 4:3, 52:25, 65:6, 65:9, 97:20, 102:10
**present** [9] - 4:9, 13:5, 26:12, 35:13, 53:16, 56:7, 56:17, 97:15
**presents** [1] - 53:17
**preserve** [1] - 40:7
**preserving** [2] - 77:13, 80:19
**PRESIDING** [1] - 1:5
**pressure** [2] - 19:3, 35:21
**PRESTON** [4] - 1:21, 103:4, 103:18, 103:20
**pretty** [3] - 8:22, 8:23, 17:3
**prevent** [1] - 91:8
**primarily** [1] - 39:14
**primary** [3] - 22:7, 22:9, 32:1
**problem** [10] - 10:4, 76:23, 78:15, 79:15, 79:20, 80:1, 80:13, 85:21, 96:16, 96:24
**problems** [1] - 23:17
**procedure** [2] - 44:23, 92:3
**procedures** [11] - 17:4, 43:25, 68:8, 69:22, 80:18, 89:7, 94:24, 95:25, 96:5, 100:4, 100:18
**proceed** [2] - 37:8, 65:13
**proceeded** [1] - 9:25
**proceedings** [2] - 38:7, 102:22
**PROCEEDINGS** [2] - 1:15, 103:9
**process** [21] - 47:7,

52:15, 52:16, 52:18, 53:4, 53:23, 54:1, 54:2, 54:14, 54:25, 55:4, 55:18, 56:19, 57:9, 58:11, 58:23, 60:23, 61:13, 68:1
**produce** [1] - 14:13
**produces** [1] - 14:13
**producing** [1] - 14:10
**product** [1] - 68:5
**profession** [1] - 43:18
**professional** [1] - 92:22
**program** [1] - 44:4
**progress** [1] - 12:19
**progressed** [1] - 12:20
**prohibited** [1] - 70:3
**prohibition** [2] - 70:12, 70:17
**promoted** [3] - 46:10, 46:11, 46:13
**prone** [50] - 44:22, 45:15, 45:24, 46:4, 70:5, 70:12, 70:17, 70:24, 70:25, 71:4, 71:5, 71:9, 71:10, 71:24, 72:19, 72:23, 73:25, 74:6, 74:24, 75:24, 75:25, 76:5, 76:9, 76:10, 76:17, 76:19, 77:5, 77:21, 77:25, 78:17, 79:9, 81:18, 81:23, 82:2, 82:8, 82:19, 83:12, 83:17, 83:22, 87:21, 88:9, 88:12, 88:16, 90:2, 94:16, 97:13, 98:19, 99:3
**prong** [2] - 78:5, 85:3
**propensity** [2] - 73:11, 73:12
**property** [1] - 50:12
**protecting** [2] - 80:20, 90:12
**proved** [2] - 83:7, 83:9
**proven** [2] - 89:22, 89:25
**provide** [9] - 12:24, 37:25, 39:21, 63:11, 67:12, 67:13, 75:18, 92:5, 100:1
**provided** [3] - 8:8, 68:22, 70:11
**provides** [3] - 6:6, 75:20, 97:7
**providing** [7] - 10:18, 19:16, 19:21, 28:19, 53:13, 63:9, 63:13
**provision** [2] - 100:4,

100:20
**provisions** [1] - 70:3
**public** [5] - 40:3, 44:7, 50:9, 51:18, 84:25
**Public** [3] - 37:21, 38:9, 38:12
**pull** [2] - 7:13, 49:2
**pulling** [1] - 10:11
**pulse** [35] - 10:13, 11:7, 11:18, 11:23, 11:24, 11:25, 12:3, 12:5, 12:8, 12:11, 12:12, 12:13, 14:7, 14:10, 14:13, 14:17, 14:23, 15:14, 19:4, 19:13, 20:3, 20:25, 21:14, 23:13, 29:4, 29:6, 29:19, 29:22, 29:25, 99:23, 101:4, 101:5, 101:9
**pulse-type** [1] - 15:14
**pulseless** [3] - 15:3, 15:7, 15:10
**pulses** [1] - 23:12
**pump** [1] - 15:22
**pumping** [1] - 15:22
**punched** [1] - 7:12
**pupil** [1] - 16:23
**pupillary** [1] - 17:2
**pupils** [1] - 16:25
**purchase** [1] - 68:5
**purposes** [1] - 58:21
**PURSUANT** [1] - 103:7
**pursued** [1] - 68:5
**put** [22] - 11:3, 12:24, 13:13, 13:18, 13:19, 13:23, 17:11, 19:13, 21:4, 21:8, 27:23, 32:6, 43:21, 73:23, 73:25, 74:1, 74:5, 74:7, 75:9, 84:8, 84:9, 90:2
**putting** [2] - 12:19, 90:6

**Q**

**questioning** [1] - 54:23
**questions** [8] - 32:8, 53:19, 53:21, 57:21, 69:18, 72:3, 94:8, 101:23
**quick** [3] - 16:21, 16:22, 17:2
**quickly** [6] - 5:21, 9:1, 9:9, 10:18, 15:25, 35:22
**quite** [4] - 7:5, 34:6,

73:8, 93:14

**R**

**raise** [5] - 5:3, 36:24, 73:23, 73:24, 74:6
**ran** [1] - 38:18
**random** [1] - 90:11
**randomly** [2] - 89:24, 90:1
**range** [1] - 20:13
**rank** [3] - 41:12, 41:13, 46:10
**ranks** [1] - 46:13
**rate** [5] - 19:3, 19:4, 19:11, 19:15, 35:20
**rates** [1] - 20:1
**rather** [1] - 41:16
**Raygoza** [3] - 6:16, 9:2, 12:15
**re** [1] - 78:23
**re-ask** [1] - 78:23
**reach** [3] - 51:25, 61:17, 61:18
**reached** [1] - 68:17
**reaching** [1] - 30:22
**reactive** [1] - 18:18
**read** [2] - 18:17, 24:24
**reading** [2] - 15:6, 19:18
**real** [3] - 84:6, 84:14
**real-world** [1] - 84:14
**reality** [1] - 73:23
**realizing** [1] - 10:16
**really** [8] - 11:10, 11:12, 35:22, 36:6, 46:3, 48:25, 83:8, 101:10
**REALTIME** [1] - 103:4
**rear** [1] - 90:16
**reason** [7] - 18:5, 50:8, 59:2, 98:24, 99:13, 99:17, 99:20
**reasonable** [7] - 94:24, 95:9, 96:1, 100:4, 100:19, 100:20
**reasoning** [1] - 99:13
**reasons** [1] - 4:23
**Reay** [4] - 82:12, 82:16, 82:17, 83:25
**recant** [1] - 84:2
**recanted** [1] - 83:5
**receive** [1] - 52:11
**received** [3] - 9:6, 74:20, 92:2
**receiving** [2] - 18:23, 91:8
**recess** [4] - 64:24, 65:1, 65:4, 65:8

**recognize** [2] - 86:18, 88:22
**recognized** [1] - 54:15
**recollection** [3] - 8:4, 8:6, 8:13
**recommend** [1] - 58:2
**recommendation** [4] - 47:19, 48:12, 48:14, 58:5
**recommendations** [6] - 48:21, 48:23, 54:20, 66:16, 66:25, 67:7
**recommended** [2] - 67:1, 68:22
**recommends** [1] - 69:8
**record** [3] - 5:11, 7:22, 37:6
**recorded** [1] - 19:5
**recording** [2] - 19:2, 80:11
**recovery** [3] - 69:19, 73:2, 89:16
**recross** [1] - 35:25
**RECROSS** [2] - 3:7, 36:2
**RECROSS-EXAMINATION** [2] - 3:7, 36:2
**red** [1] - 10:2
**REDIRECT** [2] - 3:7, 33:11
**reduce** [1] - 13:8
**reference** [2] - 30:19, 31:4
**referring** [3] - 34:21, 35:1, 78:20
**refresh** [3] - 8:3, 8:6, 8:13
**regained** [1] - 24:9
**regard** [1] - 60:15
**regarding** [5] - 33:1, 70:18, 81:23, 89:2, 96:5
**regenerates** [1] - 15:14
**regional** [1] - 49:5
**register** [1] - 19:14
**regular** [1] - 30:4
**regularly** [1] - 19:5
**REGULATIONS** [1] - 103:11
**related** [3] - 42:6, 66:15, 93:1
**relates** [1] - 55:3
**relationship** [2] - 22:25, 57:20
**relatively** [2] - 78:7, 81:12

**relayed** [1] - 61:13
**relevance** [3] - 33:19, 34:3, 91:3
**remain** [2] - 65:11, 87:14
**remember** [7] - 6:15, 25:12, 66:23, 72:5, 73:2, 84:3, 91:22
**remotely** [1] - 93:6
**render** [2] - 75:14, 75:16
**rendered** [1] - 81:5
**reorganization** [1] - 68:3
**reorganize** [1] - 67:21
**repeat** [1] - 34:15
**repeated** [1] - 10:14
**report** [12] - 6:21, 7:14, 11:3, 14:24, 17:6, 30:16, 31:1, 31:12, 32:1, 32:23, 33:1, 57:24
**REPORTED** [1] - 103:9
**reported** [1] - 78:14
**Reporter** [1] - 1:22
**REPORTER** [3] - 103:1, 103:5, 103:21
**REPORTER'S** [1] - 1:15
**reports** [2] - 41:10, 51:15
**require** [4] - 47:25, 66:23, 69:8, 90:15
**required** [12] - 17:4, 47:21, 47:24, 48:4, 50:2, 51:25, 58:18, 66:19, 67:18, 70:24, 91:13, 100:1
**requirement** [6] - 50:4, 63:20, 63:23, 64:2, 71:23, 72:1
**requirements** [6] - 44:20, 47:13, 47:16, 47:22, 48:6, 48:22
**requires** [5] - 47:22, 47:25, 63:11, 69:1, 100:25
**research** [19] - 62:16, 64:13, 68:6, 69:21, 70:18, 70:22, 81:17, 81:23, 81:25, 82:1, 82:7, 83:4, 83:5, 83:11, 83:15, 83:20, 84:24, 87:20, 88:8
**researching** [1] - 63:1
**residents** [5] - 39:22, 40:13, 40:23, 72:15, 85:3
**resist** [3] - 73:12,

73:16, 84:10
**resistance** [2] - 71:5, 72:25
**resistant** [2] - 99:11, 99:12
**resisting** [6] - 71:4, 71:11, 71:17, 71:25, 84:10, 89:18
**resources** [2] - 48:25, 63:10
**respiratory** [8] - 19:4, 19:14, 20:8, 20:16, 32:2, 32:7, 34:19, 62:7
**respond** [8] - 9:8, 10:17, 26:9, 27:7, 51:12, 86:4, 86:24, 89:3
**responded** [3] - 9:18, 26:23, 35:10
**responding** [4] - 9:6, 9:11, 34:14, 34:16
**responds** [1] - 51:15
**Response** [3] - 5:25, 6:21, 25:4
**response** [7] - 11:7, 40:21, 42:6, 54:23, 57:21, 72:2
**responsibilities** [1] - 42:3
**responsibility** [3] - 42:23, 52:5
**responsible** [12] - 38:2, 38:5, 38:9, 39:9, 42:24, 48:20, 49:23, 55:9, 55:20, 55:21, 62:23, 82:23
**responsiveness** [1] - 19:10
**rest** [2] - 20:8, 48:4
**restarts** [1] - 15:18
**restore** [1] - 20:24
**restrain** [4] - 44:21, 46:5, 85:1, 87:17
**restrained** [13] - 70:5, 70:25, 71:4, 71:9, 71:24, 72:23, 75:24, 76:5, 76:9, 80:20, 83:1, 87:18, 98:6
**restraining** [1] - 28:1
**restraint** [32] - 45:15, 45:24, 59:6, 59:12, 59:16, 59:23, 59:24, 61:21, 68:23, 69:25, 70:13, 70:17, 70:19, 72:19, 74:24, 81:18, 81:23, 82:3, 82:8, 83:12, 83:17, 83:23, 84:11, 87:22, 88:9, 88:13, 88:17, 93:19,

94:25, 95:10, 96:1, 100:19

**restraints** [2] - 59:9, 99:12

**restricted** [1] - 70:4

**result** [4] - 56:9, 58:11, 60:23, 101:19

**results** [3] - 53:13, 53:14, 60:22

**resume** [2] - 36:22, 102:5

**resuscitate** [1] - 22:1

**resuscitated** [1] - 20:10

**return** [1] - 102:2

**returned** [1] - 21:2

**returns** [1] - 20:3

**revealed** [2] - 56:9, 88:8

**revenue** [1] - 48:25

**reverse** [3] - 35:4, 35:8, 36:16

**review** [23] - 8:2, 52:14, 53:2, 53:4, 53:10, 53:23, 54:2, 54:4, 54:8, 56:19, 57:9, 57:22, 60:11, 60:22, 61:12, 78:12, 88:19, 93:11, 93:12, 93:18, 93:22, 95:7, 98:9

**Review** [8] - 52:19, 52:21, 52:22, 52:24, 53:1, 55:4, 58:11, 61:23

**reviewed** [13] - 24:22, 57:23, 57:24, 61:15, 61:25, 63:4, 64:14, 77:3, 80:21, 84:1, 94:9, 99:22

**reviewing** [3] - 24:25, 61:23, 94:14

**revised** [1] - 93:19

**revision** [1] - 68:15

**revival** [1] - 16:10

**rhythm** [3] - 14:18, 15:14, 15:17

**rights** [7] - 40:8, 40:13, 40:25, 77:13, 80:19, 101:16, 101:21

**rise** [1] - 97:23

**risk** [7] - 45:18, 45:24, 81:14, 82:25, 83:22, 88:12, 88:16

**risks** [9] - 45:15, 45:16, 45:20, 45:21, 90:19, 90:25, 91:7, 91:15, 92:6

**River** [1] - 75:22

**Riverside** [18] - 4:5, 4:13, 25:5, 25:6, 26:12, 37:17, 37:21, 38:20, 39:14, 39:20, 39:22, 41:2, 42:11, 43:4, 43:23, 46:17, 49:14, 55:13

**RIVERSIDE** [4] - 1:3, 1:11, 4:1

**riverside** [2] - 1:16, 1:23

**role** [18] - 54:16, 54:19, 57:3, 57:16, 57:19, 59:19, 59:24, 60:13, 60:25, 61:16, 61:20, 61:22, 62:25, 68:12, 82:5, 82:14, 101:14

**roll** [1] - 75:17

**room** [1] - 53:7

**roughly** [6] - 25:13, 41:4, 41:5, 42:21, 46:11, 94:5

**rule** [4] - 33:17, 57:8, 71:7, 89:19

**ruling** [4] - 34:22, 35:1, 35:3, 86:4

**run** [4] - 38:25, 49:5, 74:5, 80:11

**running** [3] - 37:22, 38:5, 81:14

**runs** [1] - 42:17

**rush** [1] - 24:3

**RUSSO** [2] - 3:5, 5:8

**Russo** [6] - 4:16, 5:2, 5:12, 5:17, 24:20, 33:13

## S

**safe** [20] - 27:6, 35:6, 39:12, 64:17, 64:18, 76:17, 76:22, 77:4, 77:21, 77:24, 78:6, 78:7, 78:17, 79:8, 79:12, 81:18, 90:6, 98:18, 99:16

**safely** [1] - 75:8

**safer** [1] - 75:10

**safest** [6] - 46:5, 70:20, 71:17, 81:9, 85:1, 85:5

**safety** [15] - 40:22, 63:13, 72:19, 81:23, 85:1, 90:4, 90:5, 90:8, 90:13, 96:6, 97:8, 98:6, 98:24

**Sain** [3] - 4:11, 64:24, 65:13

**SAIN** [66] - 2:15, 3:9,

4:11, 37:9, 37:11, 37:13, 37:15, 56:15, 60:10, 60:20, 60:21, 61:11, 62:8, 64:25, 65:5, 65:14, 65:15, 69:6, 69:16, 69:17, 70:9, 77:1, 77:9, 77:10, 77:18, 78:3, 78:11, 78:24, 78:25, 79:18, 79:23, 80:7, 81:21, 86:2, 88:1, 88:3, 91:5, 91:12, 91:20, 94:2, 94:4, 94:6, 94:12, 94:13, 94:20, 95:2, 95:4, 95:5, 95:12, 95:14, 95:15, 96:8, 96:10, 96:11, 96:20, 98:13, 98:15, 98:16, 100:7, 100:10, 100:11, 101:23, 102:12, 102:14, 102:18, 102:20

**San** [8] - 43:15, 43:19, 43:22, 45:13, 45:22, 66:14, 74:21, 75:23

**sanctity** [1] - 40:16

**saw** [13] - 11:17, 14:10, 16:3, 17:2, 18:22, 23:8, 25:2, 27:17, 28:6, 32:12, 81:10, 88:25, 100:15

**scene** [12] - 9:15, 16:4, 16:21, 20:25, 21:3, 23:23, 26:12, 27:21, 29:3, 52:9, 80:24

**scheduling** [1] - 4:23

**school** [3] - 29:11, 29:13, 29:16

**searchable** [3] - 67:23, 67:25, 68:10

**seat** [5] - 5:10, 73:25, 74:8, 90:16, 90:17

**seated** [2] - 65:10, 90:3

**second** [5] - 24:13, 39:15, 74:4, 74:10, 80:5

**seconds** [6] - 76:18, 78:13, 78:14, 80:5, 94:17, 97:2

**SECTION** [1] - 103:7

**section** [3] - 42:24, 48:19

**sections** [2] - 42:23, 48:3

**security** [4] - 38:5, 38:7, 40:21, 40:22

**see** [31] - 6:17, 11:21,

11:23, 13:25, 14:9, 15:15, 16:23, 17:7, 19:25, 20:10, 20:15, 21:17, 22:10, 22:20, 28:1, 28:3, 28:12, 28:16, 36:6, 86:22, 87:2, 87:7, 88:20, 91:3, 97:3, 97:4, 97:25, 98:10, 99:23, 102:9, 102:19

**seeing** [4] - 19:25, 53:20, 78:15, 86:9

**seem** [1] - 10:4

**segment** [6] - 94:7, 95:2, 95:12, 95:22, 96:8, 98:13

**sense** [3] - 71:16, 73:9, 73:21

**separate** [6] - 38:15, 38:17, 40:24, 48:18, 56:4, 93:10

**separated** [1] - 62:15

**sergeant** [1] - 46:15

**sergeants** [2] - 42:25, 62:17

**service** [5] - 38:1, 39:21, 43:20, 63:13, 64:9

**services** [1] - 37:25

**set** [1] - 84:19

**seven** [3] - 42:2, 46:11, 102:15

**several** [2] - 68:16, 75:2

**severe** [1] - 23:9

**severely** [1] - 87:5

**SHERIFF** [1] - 1:12

**Sheriff** [25] - 4:12, 36:23, 37:12, 37:17, 37:20, 39:6, 40:10, 43:4, 43:6, 43:8, 46:14, 50:2, 51:4, 51:24, 54:16, 54:19, 60:12, 65:7, 67:17, 67:20, 69:23, 82:6, 82:14, 102:11

**sheriff** [11] - 4:21, 38:21, 40:14, 41:21, 41:22, 43:5, 50:15, 53:6, 65:11, 86:3

**Sheriff's** [17] - 25:6, 38:16, 39:21, 41:3, 41:7, 41:9, 42:19, 43:4, 43:15, 43:23, 45:14, 49:14, 55:13, 66:12, 68:12, 74:21, 75:23

**sheriff's** [10] - 37:22, 39:15, 45:23, 63:21, 63:24, 69:1, 69:9,

75:19, 86:16, 92:2

**SHERIFF'S** [1] - 1:11

**Sheriff-Coroner** [1] - 37:20

**SHERIFF-CORONER** [1] - 1:12

**sheriffs** [4] - 26:12, 41:20, 42:2, 43:2

**shock** [4] - 15:16, 16:15, 101:6

**shocking** [1] - 15:16

**shooting** [1] - 47:23

**shortly** [1] - 83:2

**show** [1] - 15:15

**showed** [2] - 21:9, 62:1

**showing** [2] - 19:15, 95:22

**shown** [4] - 73:11, 81:25, 84:21

**shows** [2] - 19:9, 93:6

**sickness** [1] - 39:4

**side** [8] - 6:10, 49:19, 72:14, 72:15, 74:1, 75:17, 89:11, 90:3

**significance** [1] - 4:23

**significant** [9] - 58:12, 58:16, 58:17, 58:18, 59:1, 59:10, 59:16, 59:18, 59:22

**significantly** [1] - 20:5

**signs** [5] - 86:18, 86:20, 86:22, 88:21, 98:10

**similar** [2] - 87:6, 92:18

**sirens** [2] - 9:9, 26:23

**sits** [1] - 52:19

**sitting** [2] - 53:5, 81:13

**situation** [12] - 16:6, 22:2, 23:10, 36:8, 38:2, 38:4, 45:10, 84:17, 90:6, 99:1, 99:20

**situationally** [1] - 74:10

**situationals** [1] - 23:22

**situations** [2] - 23:22, 40:21

**six** [3] - 44:3, 62:17, 68:12

**six-month-long** [1] - 44:3

**skin** [3] - 17:11, 17:14, 18:15

**slight** [1] - 41:11

**small** [3] - 5:13, 48:16, 67:11

**smaller** [1] - 48:24
**SMITH** [1] - 2:15
**sold** [2] - 38:13, 38:14
**solely** [1] - 48:20
**solemnly** [2] - 5:4, 36:25
**someone** [31] - 26:17, 41:17, 44:21, 45:2, 45:5, 45:25, 46:5, 47:12, 53:4, 53:12, 55:16, 70:21, 71:17, 73:10, 73:11, 75:5, 75:14, 83:13, 86:12, 87:3, 87:7, 88:12, 88:13, 88:16, 90:1, 92:9, 92:10, 99:7, 99:9, 101:11
**sometimes** [8] - 12:8, 16:24, 17:17, 18:19, 20:19, 36:11, 53:3, 72:3
**somewhat** [1] - 14:21
**somewhere** [1] - 9:2
**soon** [8] - 56:25, 70:25, 71:5, 71:24, 71:25, 74:12, 74:17, 87:7
**sooner** [2] - 81:5
**sorry** [7] - 6:13, 13:1, 26:20, 26:22, 29:20, 34:15, 57:11
**sort** [9] - 10:20, 14:12, 19:1, 68:2, 68:15, 72:9, 89:15, 93:21
**sources** [1] - 89:12
**space** [1] - 5:13
**speaking** [3] - 5:19, 37:16, 37:18
**special** [2] - 42:15
**specialized** [2] - 39:2
**specialty** [2] - 22:13, 23:11
**specific** [2] - 13:22, 32:5
**specifically** [14] - 12:7, 55:6, 55:10, 56:21, 57:18, 58:20, 59:20, 80:14, 84:3, 86:11, 86:19, 91:6, 91:22, 92:23
**specify** [1] - 60:19
**speculation** [4] - 61:1, 62:4, 80:3, 96:17
**spell** [1] - 5:10
**spelling** [1] - 5:13
**spike** [1] - 20:4
**spiked** [1] - 20:4
**spinal** [1] - 90:25
**split** [7] - 72:3, 72:13, 72:18, 72:21, 74:4,

89:12, 89:16
**SpO2** [1] - 19:3
**spontaneous** [3] - 20:3, 20:24, 24:7
**stabilize** [1] - 20:12
**staff** [1] - 63:7
**stage** [2] - 9:14, 27:8
**standard** [1] - 81:3
**Standards** [2] - 46:21, 47:2
**standing** [2] - 28:10, 81:13
**stare** [1] - 74:12
**start** [4] - 11:22, 86:14, 97:19, 101:11
**started** [13] - 10:16, 10:17, 10:18, 12:17, 13:12, 19:6, 20:17, 21:20, 67:22, 68:4, 76:22, 85:17, 100:23
**state** [17] - 5:10, 6:11, 29:20, 37:5, 38:18, 39:16, 39:19, 49:1, 50:1, 52:22, 54:14, 69:23, 70:3, 70:12, 77:9, 91:6, 93:22
**State** [1] - 40:12
**statement** [1] - 63:8
**statements** [1] - 57:24
**STATES** [4] - 1:1, 103:5, 103:7, 103:12
**States** [2] - 1:22, 40:12
**stationary** [1] - 84:8
**stations** [1] - 42:10
**STENOGRAPHICAL LY** [1] - 103:9
**stenojag@aol.com** [1] - 1:24
**step** [2] - 65:7, 102:11
**steps** [1] - 23:9
**still** [17] - 11:8, 11:9, 13:5, 21:13, 24:6, 27:20, 56:11, 57:7, 61:6, 66:1, 73:15, 73:16, 75:25, 76:10, 93:14
**stomach** [4] - 71:18, 75:14, 75:16, 85:5
**stop** [9] - 13:16, 15:13, 15:18, 71:25, 94:12, 95:4, 95:14, 96:10, 98:15
**stopped** [3] - 21:14, 71:11, 98:11
**stopping** [5] - 11:10, 95:6, 95:16, 96:12, 98:17
**stops** [3] - 71:5, 72:25, 89:18

**straight** [1] - 27:10
**strained** [1] - 87:18
**strangulations** [1] - 20:17
**Street** [3] - 1:23, 2:10, 2:16
**strike** [1] - 62:20
**structure** [2] - 39:8, 62:11
**struggle** [3] - 56:8, 97:19, 99:14
**studies** [6] - 63:5, 64:14, 83:7, 83:25, 84:2, 84:5
**study** [2] - 83:12, 83:16
**subject** [16] - 4:17, 70:25, 71:4, 71:10, 71:24, 72:23, 75:25, 76:5, 76:9, 76:10, 85:1, 86:24, 89:3, 90:9, 90:24, 97:9
**subject's** [1] - 72:20
**subjects** [9] - 40:9, 70:13, 80:20, 83:1, 84:22, 89:8, 91:8, 98:7, 100:1
**subordinates'** [1] - 54:20
**subpoena** [2] - 4:18, 54:7
**subsequently** [3] - 10:13, 11:23, 34:20
**substantial** [1] - 20:6
**Successor** [1] - 1:7
**suffer** [1] - 31:15
**suffered** [2] - 31:12, 62:7
**suggested** [4] - 48:5, 48:6, 81:3, 100:22
**suggesting** [2] - 88:6, 89:15
**suggestion** [1] - 48:15
**suicide** [1] - 54:25
**Suite** [3] - 2:5, 2:10, 2:16
**summary** [2] - 17:7, 19:3
**summoned** [1] - 87:9
**super** [2] - 17:20, 62:20
**Superior** [1] - 38:5
**supervise** [4] - 41:2, 51:10, 62:20, 62:22
**supervision** [1] - 49:12
**supervisor** [7] - 82:5, 82:15, 83:22, 89:5, 94:10, 95:23, 101:12
**supervisory** [2] -

47:10, 62:25
**supine** [3] - 27:18, 27:24, 78:14
**support** [3] - 6:6, 6:8, 42:4
**supposed** [4] - 13:23, 51:25, 72:11, 89:3
**surrounding** [6] - 56:25, 58:24, 71:19, 90:4, 90:5, 90:10
**suspect** [9] - 40:24, 50:19, 70:4, 76:22, 79:25, 90:9, 90:18, 96:14, 96:23
**suspected** [1] - 78:15
**suspecting** [1] - 80:13
**suspects** [3] - 40:9, 90:13, 90:15
**sustain** [1] - 31:5
**sustained** [17] - 23:4, 31:7, 34:24, 56:14, 60:9, 69:5, 70:8, 76:25, 77:8, 79:17, 79:22, 81:20, 86:1, 91:4, 91:11, 94:19, 96:19
**SWAT** [1] - 42:5
**swear** [3] - 5:4, 36:25, 40:11
**swearing** [1] - 68:4
**sweaty** [1] - 18:13
**sworn** [1] - 43:6
**symptom** [1] - 32:1
**symptoms** [5] - 86:18, 86:20, 86:23, 88:21
**system** [4] - 14:13, 34:13, 38:6, 68:9

---

**T**

**tab** [3] - 7:4, 7:8, 7:9
**tactics** [3] - 44:1, 44:8, 44:24
**tased** [1] - 9:13
**TASER** [5] - 26:3, 26:7, 26:11, 59:5, 59:7
**teach** [6] - 12:7, 45:3, 70:14, 70:15, 71:2, 71:6
**teaching** [6] - 70:23, 71:8, 71:21, 71:22, 72:17, 91:14
**team** [2] - 42:5, 68:6
**teams** [1] - 42:5
**technically** [2] - 50:16, 89:23
**technician** [1] - 64:1
**techniques** [7] - 44:1, 44:5, 45:4, 45:5,

59:6, 84:11
**temperature** [2] - 18:4, 18:8
**temporarily** [1] - 4:21
**term** [8] - 22:5, 55:4, 55:5, 55:7, 85:9, 85:16, 86:10, 91:14
**terms** [11] - 37:20, 39:13, 56:3, 72:16, 77:20, 84:25, 86:4, 88:5, 88:6, 88:7, 99:25
**testified** [3] - 76:14, 76:16, 76:21
**testify** [2] - 77:3, 81:22
**testifying** [1] - 8:3
**testimony** [15] - 4:22, 4:24, 5:4, 8:18, 12:2, 24:23, 36:25, 66:23, 73:2, 77:2, 77:7, 77:19, 91:21, 91:23, 101:3
**tests** [1] - 84:18
**THAT** [3] - 103:6, 103:7, 103:10
**THE** [85] - 4:4, 4:10, 4:14, 4:19, 5:3, 5:7, 5:9, 5:12, 7:6, 23:4, 24:14, 24:16, 33:7, 33:9, 33:20, 33:21, 34:4, 34:6, 34:24, 35:25, 36:20, 36:21, 36:22, 36:24, 37:3, 37:5, 37:7, 37:8, 37:14, 56:14, 60:9, 60:18, 61:3, 61:5, 61:9, 62:5, 62:6, 64:23, 65:1, 65:7, 65:10, 65:12, 65:13, 69:5, 69:14, 69:15, 70:8, 76:25, 77:8, 77:16, 77:17, 78:4, 78:5, 78:22, 79:17, 79:22, 80:4, 80:5, 81:20, 86:1, 87:25, 88:2, 91:3, 91:11, 91:18, 91:19, 94:3, 94:19, 96:19, 100:9, 101:24, 102:11, 102:13, 102:15, 102:19, 102:21, 103:5, 103:6, 103:7, 103:8, 103:9, 103:10, 103:11, 103:12
**theft** [2] - 50:12, 50:18
**themselves** [4] - 42:18, 68:7, 71:18, 87:18

therapy [1] - 6:10
thermometer [1] - 18:10
they've [2] - 16:24, 17:1
thinking [1] - 97:18
THIS [1] - 103:15
thorough [1] - 54:14
threat [7] - 71:18, 71:19, 71:20, 76:11, 82:4
threatening [4] - 80:1, 87:15, 96:15, 96:24
three [9] - 7:12, 27:1, 27:2, 41:20, 62:14, 85:3, 90:8, 90:9, 100:7
three-hole [1] - 7:12
three-prong [1] - 85:3
throat [1] - 21:4
throughout [4] - 13:6, 47:7, 51:3, 52:22
throw [2] - 42:11, 48:21
tidal [4] - 19:4, 19:17, 32:8, 32:12
time-wise [1] - 78:21
tiny [1] - 73:20
TITLE [1] - 103:7
TO [1] - 103:7
today [8] - 5:18, 8:3, 24:23, 62:9, 63:3, 83:8, 83:16, 83:21
together [2] - 17:19, 63:19
tone [3] - 17:17, 87:14
Tony [1] - 4:11
TONY [1] - 2:15
took [8] - 16:2, 23:25, 27:1, 29:25, 31:19, 41:11, 67:20, 68:6
topic [1] - 63:17
Tori [1] - 4:12
TORI [1] - 2:16
total [1] - 41:5
totality [1] - 99:4
touch [1] - 93:4
touching [3] - 28:16, 56:23, 93:7
toxicity [1] - 58:10
toxicology [1] - 53:13
TRACY [1] - 1:7
Tracy [1] - 4:4
train [8] - 47:6, 49:6, 49:7, 49:8, 70:11, 72:1, 86:17, 97:16
trained [23] - 12:4, 29:6, 30:3, 30:6, 44:7, 44:8, 45:6, 45:8, 45:24, 46:2,

46:3, 46:7, 74:22, 75:24, 86:23, 87:7, 92:9, 97:8, 97:11, 97:12, 97:13, 98:2
trainee [1] - 45:17
training [101] - 13:2, 16:1, 17:22, 26:3, 29:7, 29:9, 41:24, 44:4, 44:12, 44:15, 44:21, 44:24, 45:23, 47:1, 47:3, 47:4, 47:5, 47:13, 47:17, 47:21, 47:22, 47:25, 48:1, 48:8, 48:17, 48:18, 48:20, 49:1, 49:4, 49:5, 49:8, 49:10, 50:5, 52:13, 62:10, 62:12, 62:14, 62:16, 62:21, 63:4, 63:10, 63:11, 64:11, 64:12, 69:20, 69:21, 70:10, 70:22, 70:23, 71:3, 71:7, 71:13, 71:21, 71:22, 72:8, 72:17, 74:20, 75:19, 76:4, 76:8, 80:18, 81:16, 81:22, 82:7, 83:11, 83:15, 83:20, 84:24, 86:11, 87:1, 87:20, 87:21, 88:7, 89:2, 89:7, 89:10, 89:13, 91:13, 91:14, 91:23, 92:1, 92:2, 92:5, 94:24, 95:25, 96:5, 97:6, 97:7, 98:5, 99:25, 100:4, 100:18, 100:24
Training [2] - 46:21, 47:2
trainings [1] - 48:6
trains [2] - 49:6, 73:4
TRANSCRIPT [3] - 1:15, 103:8, 103:10
transferred [2] - 20:21, 24:11
transparency [1] - 54:10
transparent [1] - 54:8
transport [4] - 75:6, 90:13, 90:18, 90:24
transported [4] - 19:6, 75:4, 90:15, 91:9
trauma [8] - 23:10, 23:14, 23:15, 23:16, 23:19, 90:20, 90:25, 91:7
treat [2] - 22:12, 22:15
treatment [1] - 15:11
trial [3] - 77:7, 77:19, 102:3

Trial [1] - 1:11
TRIAL [1] - 1:15
tribes [1] - 38:1
tried [1] - 21:20
trouble [1] - 32:15
TRUE [1] - 103:8
true [19] - 16:11, 25:6, 25:7, 26:24, 27:7, 27:11, 27:24, 27:25, 29:1, 30:1, 30:2, 31:24, 31:25, 32:2, 32:24, 32:25, 49:25, 71:14, 83:8
trusted [1] - 46:17
trusts [1] - 38:11
truth [6] - 5:5, 5:6, 37:1, 37:2
try [12] - 5:21, 7:24, 22:3, 22:10, 65:3, 69:24, 87:9, 87:13, 87:14, 87:15, 97:18, 102:8
trying [10] - 22:15, 23:23, 25:12, 25:13, 33:17, 49:20, 57:14, 73:21, 73:24, 88:4
tube [2] - 21:3, 21:4
Tuesday [5] - 102:2, 102:4, 102:9, 102:19
turn [1] - 78:17
turned [5] - 78:6, 78:9, 78:13, 79:13, 80:5
turning [1] - 78:7
TV [1] - 15:15
Twelfth [1] - 1:23
two [8] - 16:5, 19:20, 48:1, 56:3, 62:15, 78:5, 84:4, 93:9
two-prong [1] - 78:5
type [14] - 15:14, 19:14, 23:10, 38:24, 46:7, 50:4, 52:23, 52:24, 53:11, 54:11, 56:21, 62:7, 75:16, 82:22
types [4] - 44:13, 45:7, 59:9, 84:14
typically [9] - 6:13, 20:4, 20:6, 20:10, 20:15, 35:20, 50:10, 52:14, 52:19

**U**

U-S-S-O [1] - 5:14
ultimate [1] - 63:9
ultimately [6] - 39:9, 41:9, 49:16, 51:10, 51:20, 62:22
unattended [1] - 52:10

unavailable [1] - 53:4
unawareness [1] - 73:22
uncovered [1] - 89:13
under [12] - 17:11, 44:13, 50:1, 53:7, 54:23, 65:11, 72:24, 82:21, 84:7, 87:5, 89:18, 99:7
underneath [5] - 42:2, 42:8, 42:20, 42:21, 42:22
undersheriff [5] - 41:10, 41:12, 41:19, 41:20, 53:5
understood [1] - 77:3
undetermined [1] - 55:1
unfortunately [1] - 33:24
unincorporated [1] - 37:23
unique [1] - 52:22
uNITED [1] - 1:1
UNITED [3] - 103:5, 103:7, 103:12
United [2] - 1:22, 40:12
unless [2] - 18:4, 69:11
unobstructed [2] - 46:1, 72:20
unpredictable [1] - 99:11
unresponsive [2] - 18:16, 26:15
unsafe [3] - 76:1, 76:6, 99:2
up [67] - 10:11, 20:4, 20:11, 20:14, 20:25, 21:9, 22:11, 23:15, 28:10, 29:10, 38:19, 40:20, 44:17, 48:4, 48:25, 51:19, 52:5, 52:13, 54:13, 67:6, 70:23, 71:20, 71:21, 72:17, 73:12, 73:13, 73:19, 74:3, 74:8, 74:9, 76:3, 76:8, 80:23, 81:13, 82:15, 82:18, 83:16, 83:21, 84:19, 86:16, 87:1, 89:21, 89:23, 89:24, 90:1, 90:10, 93:11, 93:17, 94:4, 94:5, 94:22, 95:22, 97:15, 98:3, 98:9, 99:10, 99:22, 100:2, 100:12, 100:15
uphold [1] - 40:13

upholding [1] - 80:19
uses [5] - 44:15, 44:19, 45:14, 58:20, 92:3
utilize [1] - 48:7

**V**

V-fib [1] - 15:17
vacant [1] - 41:18
vague [8] - 33:16, 60:18, 69:4, 77:15, 78:1, 87:24, 91:10, 91:17
Valley [1] - 42:14
valve [1] - 19:16
variables [1] - 56:20
varies [1] - 15:11
various [3] - 42:3, 44:13, 45:14
varying [1] - 84:7
veer [1] - 47:23
vehicle [2] - 9:24, 75:6
ventilate [5] - 12:17, 20:12, 21:2, 21:8, 21:15
ventilation [1] - 12:22
ventilations [2] - 12:22, 19:22
venture [1] - 40:16
verbatim [1] - 67:2
victim [1] - 40:24
video [22] - 6:17, 6:18, 8:8, 10:8, 57:23, 80:8, 80:21, 88:25, 94:7, 94:8, 94:11, 94:14, 94:21, 95:3, 95:13, 96:9, 96:13, 98:3, 98:9, 98:14, 99:22, 100:12
videos [1] - 94:8
view [3] - 34:14, 55:11, 78:8
Vilke [1] - 84:4
violated [4] - 89:6, 100:17, 101:16, 101:20
violation [1] - 96:4
violence [1] - 73:11
voice [1] - 87:14
volume [1] - 6:25
Volume [3] - 7:1, 7:2, 7:8
vs [1] - 1:10

**W**

wait [1] - 9:14
waiting [2] - 9:2, 9:3
walk [1] - 9:25

**walking** [1] - 56:23
**warm** [2] - 18:3, 18:4
**warning** [3] - 90:18, 90:24, 91:6
**watched** [3] - 51:4, 92:23, 100:12
**ways** [1] - 72:13
**weapons** [1] - 44:8
**weekend** [2] - 102:9, 102:20
**weigh** [1] - 4:24
**weight** [6] - 28:6, 28:13, 45:4, 84:7, 84:12, 84:13
**West** [1] - 2:16
**whereas** [1] - 15:12
**whole** [5] - 5:5, 21:13, 37:1, 40:23, 73:20
**wills** [1] - 38:11
**wise** [2] - 41:5, 78:21
**WITH** [1] - 103:11
**WITNESS** [17] - 5:7, 5:8, 5:12, 33:21, 34:6, 36:21, 37:3, 37:4, 37:7, 37:14, 62:6, 65:12, 69:15, 77:17, 78:5, 80:5, 91:19
**witness** [5] - 4:17, 4:20, 4:22, 4:25, 57:24
**witnessed** [1] - 31:15
**WITNESSES** [1] - 3:3
**Woodland** [1] - 2:5
**word** [6] - 32:23, 33:2, 33:24, 67:2, 73:18
**words** [2] - 58:20, 92:3
**world** [6] - 40:15, 57:6, 57:18, 63:16, 71:17, 84:14
**worse** [1] - 88:17
**wrestler** [1] - 45:3
**wrote** [4] - 17:25, 18:16, 18:17

## Y

**Ye** [1] - 57:11
**year** [2] - 25:10, 41:18
**years** [9] - 5:23, 8:22, 25:12, 43:11, 46:9, 46:11, 48:1, 93:3, 99:6
**yes"/"no** [1] - 50:20
**yesterday** [22] - 43:12, 48:16, 49:13, 51:8, 54:23, 57:21, 62:9, 67:15, 67:21, 69:18, 72:2, 72:6, 81:16,

81:22, 82:11, 84:6, 85:7, 92:13, 92:21, 100:12, 102:1, 102:2
**York** [1] - 66:3
**yourself** [7] - 26:6, 43:18, 45:11, 50:21, 51:1, 74:20, 75:9