UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

|  |  |  |
|---|---|---|
| TRACY ALVES, Individually and as Successor in interest for KEVIN R. NIEDZIALEK, deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. EDCV 19-2083-JGB |
| RIVERSIDE COUNTY, RIVERSIDE COUNTY SHERIFF'S DEPARTMENT, SHERIFF-CORONER CHAD BIANCO, | ) ) ) ) | Jury Trial Day 5 AM Session |
| Defendants. | ) ) | |

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Tuesday, April 4, 2023

9:15 a.m.

PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

                    LAW OFFICES OF DALE K. GALIPO
                    BY:  **DALE GALIPO**
                    21800 Burbank Boulevard, Suite 310
                    Woodland Hills, California 91367

                    LAW OFFICES OF JOHN BURTON
                    BY:  **JOHN BURTON**
                    128 North Fair Oaks Avenue
                    Pasadena, California 91103

                    HELM LAW OFFICE, PC
                    BY:  **KENNEDY HELM**
                    644 40th Street, Suite 305
                    Oakland, California, 94609


For the Defendants:

                    LEWIS BRISBOIS BISGAARD & SMITH, LLP
                    BY:  **TONY SAIN**
                        **TORI BAKKEN**
                    633 West 5th Street, Suite 4000
                    Los Angeles, California 90071

I N D E X


WITNESSES                                                      PAGE


**CHAD BIANCO**
REDIRECT EXAMINATION BY MR. GALIPO                              5
RECROSS/REDIRECT EXAMINATION BY MR. SAIN                       29


**ROBERT ALVES**
DIRECT EXAMINATION BY MR. HELM                                 37
CROSS-EXAMINATION BY MS. BAKKEN                                46


**TRACY ALVES**
DIRECT EXAMINATION BY MR. GALIPO                               48
CROSS-EXAMINATION BY MS. BAKKEN                                64
REDIRECT EXAMINATION BY MR. GALIPO                             67


**KATHRYN VASQUEZ**
DIRECT EXAMINATION BY MR. SAIN                                 68
CROSS-EXAMINATION BY MR. GALIPO                                89


**ERIC MIRELES**
VIDEO DEPOSITION PLAYED                                        93


| EXHIBIT | ADMITTED |
|---|---|
| 10  pg 10-12 | 39 |
| 10  pg 10-22 | 41 |
| 10  pg 10-25 | 44 |
| 10  pg 10-9 | 52 |
| 10  pg 10-10 | 53 |
| 10  pg 10-13 | 53 |
| 10  pg 10-14 | 53 |
| 10  pg 10-15 | 54 |
| 10  pg 10-17 | 54 |
| 10  pg 10-19 | 55 |
| 10  pg 10-20 | 55 |
| 10  pg 10-21 | 55 |
| 10  pg 10-24 | 55 |
| 10  pg 10-28 | 56 |
| 360 | 73 |
| 124 | 89 |
| 388 | 94 |

TUESDAY, APRIL 4, 2023; RIVERSIDE, CALIFORNIA

-o0o-

(In the presence of the jury:)

THE CLERK:  Calling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please state your appearances for the record.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. BURTON:  Good morning, Your Honor.

MR. SAIN:  Good morning, Your Honor.  Tony Sain, with me, Tori Bakken, on behalf of Defendant Sheriff Chad Bianco and the Defendant County of Riverside.

THE COURT:  Good morning.

And good morning, ladies and gentlemen.  Thank you for being here on time.

Sheriff, would you please retake the stand.

And administer the oath again.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

**PLAINTIFF'S WITNESS, CHAD BIANCO**

THE CLERK:  Please be seated.  And please restate your name for the record.

THE WITNESS:  Chad Bianco, C-H-A-D B-I-A-N-C-O.

THE COURT:  Mr. Galipo.

MR. GALIPO:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Good morning, Sheriff Bianco.

A.   Good morning.

MR. GALIPO:  And good morning, ladies and gentlemen of the jury.

BY MR. GALIPO:

Q.   So you testified that your department did a complete and thorough investigation of this matter, correct?

A.   Yes.

Q.   The investigation was done by your department instead of an outside department, correct?

A.   That's correct.

Q.   And the medical examiner who performed the autopsy was someone who worked under the umbrella of the Sheriff's Department as opposed to an independent medical examiner; is that also correct?

A.   That is correct.

Q.   And, in fact, were you aware in this case, in this

complete and thorough investigation that Officer Keeney never even had his statement taken?

A.   Yes.

Q.   Were you also aware in this complete and thorough investigation you allege that Deputy Gomez was never even asked in her interview about the prone restraint?

A.   There's actually two different investigations that go on. And I believe they were both interviewed, and she did in one interview, but I think that the -- this criminal investigation, that is correct.

Q.   With respect to medical professionals, did you consult any independent medical professionals outside of your agency regarding cause of death?

A.   No.

Q.   Did you consult any independent use of force experts regarding the actions of these officers?

A.   No.

Q.   Now, you also testified that these deputies acted consistent with the policies and training of the Riverside Sheriff's Department, correct?

A.   Yes, they did.

Q.   And with respect to their training, you were in court when they testified, true?

A.   Yes.

Q.   And Deputy Keeney indicated, and you probably recall this,

that he had no training to move anyone off their chest after they were handcuffed and stopped resisting.  Do you recall that testimony?

MR. SAIN:  Misstates testimony.

THE COURT:  Overruled.

THE WITNESS:  I don't believe that's exactly what he said but --

BY MR. GALIPO:

Q.   Well, is that how your officers were trained at the time, that if someone was handcuffed and was stopped resisting, to keep them on their chest instead of moving them in a recovery position?

A.   That's exactly how they were trained is to keep them in the safest position possible.

Q.   Right.  And your officers were also trained at the time that keeping someone in a prone position does not impair breathing.  Is that also accurate?

A.   Yes, it does not impair their breathing.

Q.   And, in fact, your officers were not trained about any risk factors during prone restraint, such as excited delirium or someone being under the influence of drugs, namely, that they may be more in need of oxygen than other individuals that are being held down prone.  Is that also true?

MR. SAIN:  Objection.  Assumes facts not in evidence.

THE COURT:  Overruled.

THE WITNESS:  I think that's very broad, but hesitantly, I could agree with that.

BY MR. GALIPO:

Q.   And with respect to Deputy Gomez, you were here when she testified before this jury, correct?

A.   Yes.

Q.   And her testimony regarding training was she was not trained to sit them up or put them on their side.  You heard that, correct?

MR. SAIN:  Misstates testimony in part.

THE COURT:  Overruled.

THE WITNESS:  Again, I don't believe that's what she testified to, but we would -- in this particular case, with a combative suspect, she would not have been trained to sit them up unless it was safe to do so.

BY MR. GALIPO:

Q.   Even after they stop resisting, based on the training, correct?

MR. SAIN:  Cumulative.  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  That is correct because just because they stop does not mean they're not combative and that doesn't mean they're going to start again.

BY MR. GALIPO:

Q.   And also there's testimony of the training that -- and you

just indicated this -- that keeping someone down prone for a prolonged period of time does not impair breathing, correct?

A.    Yes, there is no medical evidence that we are aware of that says that it would pose any threat to their breathing.

Q.    And, in fact, your officers were trained -- rather than getting them off their chest in a situation where they're handcuffed and stop resisting, your officers were trained to actually keep them on their chest, true?

MR. SAIN:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  They're trained that if someone is combative, the best place for everyone is to keep them on their chest.  The actual term "keep," I mean, especially in this case, they weren't -- they weren't forcibly keeping him there, they were just -- he was remaining on his stomach, and they were ensuring that he knew they were there, and that would be exactly how they would be trained for a combative suspect.

BY MR. GALIPO:

Q.    Okay.  So when you're telling this jury that, in your opinion, these deputies acted consistent with their training and their policies, these are some of the training issues, correct, the training we're talking about now?

A.    I don't want to key on one word but -- but "issues" means -- I think it might mean something different to me than you.

Q.    Okay.  Let me ask it this way.

A.    Thank you.

Q.    The facts of this case, at some point the decedent, Mr. Niedzialek, is handcuffed and chest down, correct?

A.    Yes.

Q.    At some point he stops resisting, correct?

A.    Yes.

Q.    And after he stops resisting and is chest down, he's in that position for approximately four more minutes; is that also correct?

A.    That is correct.

Q.    And you're saying that's how your officers were trained?

A.    Absolutely.

Q.    Okay.  So when you tell the jury they acted consistent with their training, that's part of the training you're referring to?

A.    Yes.

Q.    And also I'm sure you were in court when you heard testimony that Mr. Niedzialek said "need help," "get me up," words to that effect.  Do you recall that testimony?

A.    I recall hearing something similar to that, yes.

Q.    And your officers testified that even if they had heard that, they wouldn't have gotten him up.  Do you recall that testimony?

A.    Something similar to that, yes.

Q.    In fact, one of the deputies said even if they had heard him say "I can't breathe," they still would have kept him chest down based on their training.  Do you recall that testimony?

A.    That isn't actually what she said, but just because someone says "I can't breathe," we would ensure they were breathing.  We wouldn't just assume that they were not breathing and move them.

Q.    And, in fact, at the time of this incident, your department had no written policies, written policies on positional asphyxia, restraint asphyxia, or the recovery position; is that true?

A.    Yes.

Q.    And is it also true that at the time of this incident, your department had no written training materials that we could look at here in court that talk about positional asphyxia, restraint asphyxia, or the recovery position; is that also true?

A.    Yes.

Q.    Now, let me ask you about your homicide issue.  You told the jury on questioning on counsel that it was Dr. Fajardo who decided this was a homicide, not you.  Is that your testimony?

A.    My testimony was that this entire investigation is put together by the Coroner's Bureau, which involves our captain on down to our investigating deputies in collaboration and cooperation and combining with our doctors who do the actual

autopsy.  Everything is recommended for completion basically for these review boards.  It is all sent to me.  I review the entire thing and then either agree or disagree.  If I disagreed with the findings, then I would disagree with them and we would go back and discuss and change, but in this particular case, what was recommended to me, that is what I agreed with.

Q.    Isn't it true, Sheriff Bianco, that your department, not Dr. Fajardo, came up with the manner of death as homicide?

A.    No.  It's a -- I just -- I just stated how the process works.  It's a combination of all of the doctors, it's a combination of the captain, the investigators, and the coroners-deputies that come up with this.  It's a -- it's an effort.  It's not a one person deciding anything, other than Dr. Fajardo obviously is deciding the cause of death.  He's the doctor.

Q.    Right.  And we talked before that "homicide" is defined in terms of medical terms related to the manner of death as death by the hands of another, correct?

A.    Technically, yes.

Q.    Now, in terms of Dr. Fajardo and your awareness of the medicine, I take it you're making your decisions as Sheriff regarding whether there are risks related to prone restraint based in part on your understanding of the medicine.  Is that a fair statement?

A.    Yes.

Q.    In fact, I think you told this jury that if there was even any doubt, any legitimate dispute that prone restraint could cause medical problems or impair breathing, then you would train your deputies to sit them up; is that fair?

A.    No.  I mean, just the nature of this case, where you have a so-called expert getting up here and testifying that based on 1995 evidence that was disproven, I mean, that -- that is technically out there.  He's -- we're aware that he is telling all of this.  So that doesn't necessarily -- just because someone else is saying something different doesn't mean that that is doubt.

Q.    So --

A.    So the totality of everything that we know, the medical studies that have been done, the peer-reviewed articles, everything that we have, aside from the fact that someone wants to say that that old stuff is true when it's not, that doesn't amount to an area where I would say err on the side of -- err on the side of caution.

Q.    Well, let's talk about current.  Wouldn't you agree that currently there is a debate among experts and medical professionals regarding positional asphyxia and restraint asphyxia?  Currently?

A.    Completely.  There -- I mean, there are doctors that say that there's no such thing as positional asphyxia.  There are doctors that say that obviously there is.  And that has gone on

forever.  Currently, there is a -- there is a push in the California legislature to completely eliminate positional asphyxia from any type of documentation -- our laws, our rules, our training, everything -- because there's so many people debating about what it even is.

Q.   Don't you have a current policy -- I'm assuming you approve your policies, right?

A.   I do.

Q.   A current policy acknowledging that there's a debate among medical experts and medical professionals with respect to positional and restraint asphyxia?

MR. SAIN:  Objection.  Relevance.  Subsequent remedial measures.

THE COURT:  Overruled.

THE WITNESS:  I apologize.  I didn't know if that was a question or if you were just stating that.

BY MR. GALIPO:

Q.   It was a question.  I want to see if that's true, that you currently have a policy that indicates there's a debate among experts and medical professionals related to positional asphyxia and restraint asphyxia?

A.   I don't know if -- that may be wording in a policy taken out of context, but we would -- there would be no reason to have a policy that says there's a difference of debate, but the wording, yes.

Q.   And don't you currently -- and, by the way, just so the record is clear, did you take any remedial measures in your department after this incident to change anything?

MR. SAIN:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. GALIPO:

Q.   And the policy also says, your current policy, that once someone is controlled, they should be placed in a recovery position; isn't that true?

MR. SAIN:  Objection.  Relevance.  Subsequent remedial measures.

THE COURT:  Re-ask that question.  I missed part of it, Mr. Galipo.

MR. GALIPO:  Sure.

BY MR. GALIPO:

Q.   Doesn't your current policy state that once -- after someone's been handcuffed and controlled, they should be placed into a recovery position supine or seated?

MR. SAIN:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Actually, I think we -- we went over this before, but the policy directs training.  So while a policy says when they are controlled, they will be put in that position, and I think I explained this to you, if I handcuffed you and said, *Put your hands behind your back*, and you're now

handcuffed and you're under arrest, I certainly am not going to lay you on the ground.  I would place you on the -- on a curb; I could place you in a car; I could place you anywhere.

BY MR. GALIPO:

Q.   Sheriff Bianco, I want you to concentrate --

THE COURT:  Let him finish his answer.

MR. SAIN:  Thank you, Your Honor.

THE WITNESS:  Thank you, Your Honor.

The policy is that if someone is combative, they are treated like a combative person.  Just because handcuffs go on and a psych -- handcuffs are a psychological tool for us. Handcuffs can be broken so easy, it isn't even funny.  They are psychologically -- people believe that they are stuck there, and it is a calming presence.  Just because someone is handcuffed does not mean they're automatically free from harming us, does -- does -- adequate -- doesn't automatically make us believe that we are safe.  So as we train, a combative person is treated as a combative person from the time they're arrested until the time they're placed in a jail cell when they get there.  We --

MR. GALIPO:  Your Honor, I'm talking about written policies, Your Honor.

THE COURT:  I think he's trying to explain.

Just finish your answer.

MR. SAIN:  Thank you, Your Honor.

THE WITNESS:  Thank you.

It would be impossible for us to put that wording in a policy.  A policy just directs our training.  That's how we are trained after for our policy is how we treat combative -- combative suspects, how we treat people that we are arresting, and we would -- we would not, there would be absolutely no reason to peacefully arrest and handcuff someone and then tell them to lay on their stomach.

BY MR. GALIPO:

Q.    Okay.  I just want to make sure you're clear on what I'm asking.  I'm asking about a written policy.  Do you understand that?

A.    Absolutely.

Q.    Okay.  Before this incident did you have a written policy about putting someone in a recovery position?

A.    No, we would not do that.

Q.    Before this incident did you have a written policy that having someone chest down could impair their breathing or respiratory capacity?

A.    Absolutely not.  We would not state that.  We don't -- that's not true, so we would not put that in a policy.

Q.    Okay.  Did you have any written policy before this incident that deputies were not authorized to use any restraint method that might unreasonably impair an individual's breathing or respiratory capacity for a period beyond the point when the

individual has been adequately and safely controlled?

A.    Yes.

Q.    Well, you have that policy now, correct?

A.    Yes.

Q.    But you did not have that written policy at the time of this incident; isn't that true?

A.    I don't have an independent recollection of what the policy was before we actually did our -- the exact wording of the policy, what it was before we did our -- our updates and -- and basically revamping.

Q.    Would it refresh your recollection if you looked at the current policy?

A.    No, I don't think so because the current policy may have been either slightly wording or substantially wording different than the policy before.

Q.    Okay.  Let's move on.  Dr. Fajardo, related to this case, did he tell you that the restraint maneuvers was a other significant condition in this case?

A.    I don't know if verbally he ever -- I don't -- he would never have said those words.  We are unfortunately stuck with that based on a form that indicates those words.

Q.    Did Dr. Fajardo ever tell you that the placement -- in his opinion in this case -- the placement of body weight to prevent movement increased Mr. Niedzialek's heart rate cardiac requirements and contributed to his fatal arrhythmia?

MR. SAIN:  Assumes facts not in evidence.  Misstates testimony.

THE COURT:  Overruled.

THE WITNESS:  He absolutely did not tell me that.

BY MR. GALIPO:

Q.   Did he tell you that the restraint maneuvers contributed to Mr. Niedzialek's death?

MR. SAIN:  Assumes facts not in evidence and misstates testimony.

THE COURT:  Overruled.

THE WITNESS:  He absolutely -- actually -- it actually was completely opposite.

BY MR. GALIPO:

Q.   Did you ask --

A.   He --

Q.   -- him?

A.   Oh, 100 percent I asked him.  We discussed this, and there is -- there is nothing about Dr. Fajardo's investigation that he believes that the restraints played any part, that the deputies played any part in his death.

Q.   Did Dr. Fajardo tell you that he could not say that Mr. Niedzialek would have died without the restraint?

MR. SAIN:  Vague as phrased.  Assumes facts not in evidence.  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  He would not have told me that.

BY MR. GALIPO:

Q.  Did he tell you that it would have been easier for Mr. Niedzialek to breathe if he was not on his chest in a prone position?

MR. SAIN:  Assumes facts not in evidence. Argumentative.  Misstates prior testimony.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MR. GALIPO:

Q.  Did he tell you that the restraint contributed to Mr. Niedzialek's death?

MR. SAIN:  Asked and answered.  Assumes facts not in evidence.  Misstates testimony.

THE COURT:  Overruled.

THE WITNESS:  He told me that they did not contribute to his death.

BY MR. GALIPO:

Q.  Have you read the deposition testimony of Dr. Fajardo in this case?

A.  I have not.

Q.  Now, excited delirium, did you think in this case -- you watched the video with us -- that Mr. Niedzialek was in a state of excited delirium when the officers first encountered him?

A.  Based on my experience and my training, I recognized this

immediately as methamphetamine.  I would not have said excited delirium.

Q.   Okay.  So you don't think he was in a state of excited delirium; is that your testimony?

A.   My testimony is that he was exhibiting severe signs of methamphetamine intoxication.

Q.   And with respect to excited delirium -- and we went over this briefly last week -- you recall the International Association of Chiefs of Police having their 2017 manual policy recommendations?  Recall that discussion?

A.   Yes.

Q.   And you, in fact, were a member at one point, correct?

A.   Yes.

Q.   When did you stop your membership?  Was that after you found out about their policy or before?

A.   It was probably before.

Q.   Okay.  And you would agree their policy recommendation from 2017, not 1995, you understand their policy recommendations are in 2017, true?

A.   This is the IACP?

Q.   Yes.

A.   Yes.

Q.   That would be two years before this death, correct?

A.   Yes.

Q.   And one of their recommendations was that officers should

position someone in a -- after they're controlled in a position to assist their breathing, including placement on their side or sitting up, correct?

MR. SAIN:  Assumes facts not in evidence.  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  My original testimony when I was asked this is -- is the same answer as now.  Just because they repeated the same policy or direction that they did in 1995, when the evidence has proven that that is incorrect, it actually astonishes me that they would disregard the safety of the people on the ground, the deputies, the bystanders, and still recommend that when there is absolutely no medical study or indication to anyone that it poses any type of a threat.  So I am aware that they're doing that, and, quite frankly, I have -- I have no idea why they would keep repeating the same thing over and over.

BY MR. GALIPO:

Q.   Okay.  Right now I'm not asking if you're astonished or not.  I'm asking if you're aware of the recommendation.  Do you understand that?

MR. SAIN:  Asked and answered.  Argumentative.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    Okay.  And they also recommend to avoid pressure to the chest, neck, or head, correct, while someone's prone?

MR. SAIN:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    And they also recommend not trying to attempt to control someone with continued resistance or exertion by pinning the person down to the ground against a solid object using body weight, correct?  That's their recommendation, true?

MR. SAIN:  Relevance.  Incomplete hypothetical.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. GALIPO:

Q.    They also recommend that officers should check the subject's pulse and respiration on a continuous basis, correct?

A.    I don't have an independent recollection of seeing that, but if you're reading it from that, I wouldn't disagree.

Q.    Do you agree with that recommendation?

A.    Yes.

Q.    And do you think your deputies checked the pulse of Mr. Niedzialek repeatedly before the paramedics got there?

A.    I can't do that.  We -- she's testified only once.

Q.    But you think everything they did was appropriate, correct?

A.    Yes.

Q.    And also don't they recommend that, "Following a struggle, a subject should show normal signs of physical exertion, such as heavy breathing; however, if the subject becomes calm and breathing is not labored during or after the application of restraints, it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest"?  That's one of their recommendations, correct?

A.    I agree that it says that.

Q.    All right.  Now, Lexipol, we talked about that.  Lexipol is a company that distributes policy language to different agencies, correct?

MR. SAIN:  Your Honor, I object.  This entire line of questioning was covered by Mr. Galipo on Friday.  This is cumulative.

THE COURT:  Overruled.

BY MR. GALIPO:

Q.    Right?

A.    For the most part, yes.

Q.    And one of Lexipol's recommendations is that, "If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright seated -- sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia."  That is one of the recommendations,

right, of Lexipol language?

A.    It could be.  I don't know what their recommended language is.

Q.    And also, in fact, Lexipol has a training policy on TASERs that states that after someone's being -- been tased, they should not be put in a position which -- in which their breathing could be compromised, correct?

MR. SAIN:  Assumes facts not in evidence. Argumentative.

THE COURT:  Overruled.

THE WITNESS:  That question is slightly different than the one before where -- just because you eliminated positional asphyxia.  Positional asphyxia is something very significant and in and of itself where a -- an -- the airway is stopped based on how the position -- the person is positioned either against something or something being placed against that.  That -- that is -- for me, it's not relevant to this case because they ensured his airway was breathing and there was nothing indicating that there was ever anything placed against his neck.

BY MR. GALIPO:

Q.    You told this jury that your department follows the law, correct?

A.    Yes.

Q.    Are you aware that there is a statute, a government code

section that defines positional asphyxia different from the description you've given to this jury?

MR. SAIN:  Vague as to time.  Calls for a legal conclusion.  Legal relevance.

THE COURT:  Just vague in general.  So can you re-ask the question.

BY MR. GALIPO:

Q.   Are you aware of a law or statute that defines positional asphyxia as including impairing a person's breathing or respiratory capacity by applying -- by unreasonably applying against a restrain -- weight against a restrained person's neck, torso, or back?

MR. SAIN:  Objection.  May we approach, Your Honor?

THE COURT:  Yes.

(Sidebar conference as follows:)

MR. SAIN:  Your Honor, this is unfairly prejudicial under Rule 403.  Mr. Galipo is asking about post-incident statutory changes, post-incident policy changes.  They have no legal relevance to what was the policy or the rule or the training at the time of this incident.  This particular statute was not enacted until last year, nearly three years after our incident.  It's completely improper for him to be asking the Sheriff about what the current statute is or how it applies to an incident three years prior.

THE COURT:  Response?

MR. GALIPO:  He testified in response to Mr. Sain that he keeps current on the law, they do everything on the law up until today on -- on their policies, their training --

THE COURT:  Yeah, but whether they follow the law today is not relevant.  Only if -- the only thing that's relevant in this case is whether at the time of the incident there were policies in place which were deliberately indifferent to a person's constitutional rights.

MR. GALIPO:  I'll move on, Your Honor.  Thank you, Your Honor.

MR. SAIN:  Thank you.

(Sidebar conference concluded.)

BY MR. GALIPO:

Q.   Now, this is not the only case that your department has had when someone has been restrained prone by law enforcement officers and died; isn't that true?

MR. SAIN:  Vague as phrased.  Assumes facts not in evidence.

THE COURT:  Why don't you give it a time context, Mr. Galipo.

MR. GALIPO:  Sure.

BY MR. GALIPO:

Q.   You were aware of other cases before this case where people had been restrained prone by officers from your department and died; isn't that true?

MR. SAIN:  Question implicitly assumes facts not in evidence that the restraint had a causal relationship to the death which plaintiff has failed to establish.

THE COURT:  Overruled.  You can answer that.

THE WITNESS:  I certainly am aware that we have had other people that have -- very similar situations of methamphetamine overdose that have died in custody or while we were arresting them.  I do not have an -- I don't have an independent recollection of any of them specifically being prone.  I -- so I can't say that.

BY MR. GALIPO:

Q.   Are you familiar with the Fernando Cruz case?

A.   Yes.

Q.   Are you familiar with the Ernie Serrano case?

A.   Yes.

Q.   Do you remember the Robert Appel case?

A.   Yes.  And those cases are -- those are not the same set of circumstances and facts as this case.  They're -- they're different.

Q.   Okay.  But is it fair to say that every single case where someone has died in custody while being restrained, after being restrained by officers from your department, you found every single one to be within policy; isn't that true?

A.   Yes.

Q.   Now, lastly, did you, Sheriff Bianco, reach out to this

family yourself after this incident, apologize for what happened?

MR. SAIN:  Relevance.  Argumentative.  403.

THE COURT:  Sustained.  Sustained.

BY MR. GALIPO:

Q.   Do you know whether or not your department provided information in a timely manner to this family after the incident?

MR. SAIN:  Relevance.

THE COURT:  I'll let that go.  "Information" is a little bit vague.

But you can answer that if you understand it.

THE WITNESS:  Obviously, it is our -- in any type of a death, the Coroner's Bureau notifies next of kin after someone has died.  I don't have an independent knowledge or recollection of when or even if they told me when that occurred.  We just know that it occurs.

BY MR. GALIPO:

Q.   Thank you.

MR. GALIPO:  That's all I have, Your Honor.

THE COURT:  Thank you.

MR. SAIN:  Thank you, Your Honor.

Good morning, ladies and gentlemen.

**RECROSS/REDIRECT EXAMINATION**

BY MR. SAIN:

Q.    Good morning, Sheriff.

A.    Good morning.

Q.    Unfortunately, I'm not quite as tall as Mr. Galipo so I'm going to lower this a little bit.

      At your department, is it customary when you're evaluating an in-custody death for you to consult or to retain an outside investigator or an outside agency?

A.    No.

Q.    Why not?

A.    Basically, because of the size of our -- of our department.  We have a completely independent homicide investigation team.  We have a completely independent team separate from that that investigates all law enforcement-related deaths.  And those teams work directly with either Department of Justice or with the DA's office.  I don't want to say outside of me, but I certainly am not supervising them.  They are their own unit doing that investigation in cooperation in dealing with DOJ and with the DA's office.

Q.    You mentioned that someone saying they're not breathing does not necessarily indicate that the subject is actually unable to breathe.  Does your department have any training on that issue?

A.    Yes.  It would be -- it would be something in the training that we talk about that -- technically it's like when a little -- it's like when you have children, if they're telling

you they can't breathe but they're talking, they're breathing. Do they feel like something is -- is causing them to not be able to breathe?  Are they excited?  That's very, very much a possibility, but if you're having a conversation with someone, by the nature of talking, you -- you're breathing.  You have to exchange oxygen if you're able to talk. 09:48

So we do have that training, and we tell people that you have to monitor, you have to be the judge of whether or not they're breathing.  You -- you don't necessarily take someone's word at their word. 09:49

Q.    And on Friday you explained to this jury in detail about how your deputies are trained to monitor that breathing by watching the rise and fall of the chest.  I don't want to go into all of that again.

In terms of the training and policies up to the time of the incident date -- not after, up to that time -- up to that point in time, your understanding is that the words "positional asphyxia" did not specifically appear in the policies leading up to the incident date; is that right? 09:49

A.    Correct. 09:49

Q.    And I think I heard you saying -- if I got it wrong, please correct me -- that you don't have an independent recollection as to whether or not the training after that period of time specifically mentioned the term "positional asphyxia"; is that correct? 09:49

A.    Yes.

Q.    Okay.  Notwithstanding the fact that your policies and training may or may not have mentioned that term, what did your department do leading up to the incident date to train deputies to mitigate the risk of positional asphyxia as you understood it?

A.    I mentioned this before the other day.  Our training is that you are to monitor their breathing to ensure people are breathing regardless of the cause of what's stopping them from breathing, whether it's something lodged in their throat, whether it's pressure on their throat, whether it's -- it's something completely different.  You are to monitor their breathing outside of the specific cause.  If you're monitoring their breathing and you're making sure they're breathing, regardless of what it was, you're going to eliminate that.

Q.    Does that training include training the deputies that they are required to make sure that the subject's airway is clear even when prone restrained?

A.    Absolutely.

Q.    Based on your review of the incident facts here, are you -- excuse me.  Based on your review of the incident facts here, do you believe that the two deputies did that here?

A.    Yes.  One of the -- in placing someone in a prone position and ensuring that their airway is unobstructed is to have their head to the side.  If their head is facedown, obviously there's

some type of obstruction, whether it's dirt or a mattress or a pillow or something could be facedown.  So you would never have someone facedown.  They would be belly down, but their head is turned to the side so you can see their mouth, they're able to breathe.

Q.   Does part of that training include avoiding having more than, say, 225 pounds of weight on a prone restrained subject's back?

A.   Yes.

Q.   Now, even though your prior policy did not specifically mention the term "positional asphyxia," is it your recollection that the current policy does, as Mr. Galipo asked you about?

A.   Yes.

Q.   Does that mean that your training from how to prevent positional asphyxia has subsequently changed just because you added that magic term?

A.   No, it's still the same.

Q.   Now, leading up to the date of the incident, you testified on Friday extensively about how your department trains deputies that they are only to move a subject out of the room -- the prone position into a recovery position when it's safe to do so.  You said that again in response to Mr. Galipo's questioning, yes?

        MR. GALIPO:  Objection.  Leading.

        THE COURT:  Sustained.

BY MR. SAIN:

Q.    According to your department's training, when are deputies expected to move a prone restrained subject out of the prone position?

A.    Only when it is safe for everyone involved.

Q.    Mr. Galipo was asking about a current policy that states that you are requiring deputies to move a subject to the recovery position when safely controlled.  Do you remember those questions by Mr. Galipo?

A.    Yes.

Q.    That language, "when safely controlled," what does that mean?

A.    It kind of goes back to how I explained before.  If there are no outside set of circumstances that indicate that that person is combative, then we assume that they are not going to be combative.  If they are combative, then we will assume that they are going to be combative from the time we -- they were combative until we book them into jail.  We even relay that information to the booking officers, that this person is combative, and we take extra precautions to ensure that if they are, we have enough staff there so that we can adequately control it and control it quickly.  So yes.

Q.    So even though the training -- excuse me.  Strike that.

        Even though the policy wording has changed somewhat, is the training that you provide your deputies still that they

are only required to move a subject out of the prone position when it is safe to do so?

MR. GALIPO:  Again, objection.  Leading.

THE COURT:  Sustained.

BY MR. SAIN:

Q.    What is your training now in terms of when deputies are required to move a subject out of the prone position?

A.    The training is still the same.  We will only move them out of a prone position -- a combative person.  We're not talking about -- when I'm saying this, I'm not talking about the regular person that we arrest on a day-to-day basis without incident.  I'm talking about a combative person.  We will only remove -- move those people when it is safe to do so with enough deputies, and we obviously have to.  So we can't leave them there indefinitely.  So when medical gets there, we have to move them from that position.  It's -- whether we believe it's safe or not, we have to move them eventually.  And we will ensure that there are plenty of people there to do that.

But the policy, as it states, is assuming a regular arrest.  The training is a combative person is treated differently because the threat they pose to themselves and to us.

Q.    As part of your effort as Sheriff and as part of your department's effort to maintain best practices, you said earlier that you have looked at IACP, POST, Lexipol, and other

sources; is that correct?

A.    Yes.

Q.    Whether it's IACP, POST, Lexipol, any other law enforcement agencies' recommendations or policies that you're aware of, do any of them recommend that a subject must be moved out of the prone position when it is unsafe to do so under the totality of the circumstances as perceived by the officer?

A.    No.

Q.    In any of your research, whether it's your personal research, your department, your training bureau's research, up to the date of the incident, did you ever become of any risk that prone restraint without airway obstriction -- obstruction, without more than 225 pounds of weight on the back, did you ever become of and consciously disregard or deliberately ignore any risk that that kind of prone restraint could cause death, asphyxia, or serious injury?

A.    Absolutely not.

Q.    Mr. Galipo asked you about some other cases involving Ernie Serrano or Fernando Cruz and others.  Are you aware of any case, as you sit here today, where there has been prone restraint by your department without airway obstruction and the deputies or the restraint has been found to be the cause of death?

A.    No.

Q.    Thank you.

MR. SAIN:  No further questions.

THE COURT:  Thank you, Sheriff.  You may step down.

MR. GALIPO:  Your Honor, Mr. Kennedy Helm will take the next witness.

THE COURT:  Very well.  Mr. Helm.

MR. HELM:  Thank you, Your Honor.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**PLAINTIFF'S WITNESS, ROBERT ALVES**

THE CLERK:  Please be seated.  Please state your full name and spell your first and last name for the record.

THE WITNESS:  Robert Michael Alves.  Spell the last name?

THE COURT:  Yes.

THE WITNESS:  A-L-V-E-S.

**DIRECT EXAMINATION**

BY MR. HELM:

Q.   Good morning, Mr. Alves.

A.   Good morning.

Q.   Are you able to hear me okay?

A.   Yeah.

Q.   What do you do for a living?

A.    I own a patio cover construction company.

Q.    And where is that company?

A.    Temecula.

Q.    And how many employees do you have?

A.    Right now three.

09:57

Q.    And what's your relationship to Tracy Alves, the plaintiff?

A.    My wife.

Q.    Okay.  And when did you and Tracy meet?

A.    2008.

09:57

Q.    And where did you and Ms. Alves meet?

A.    We met through my sister.  My sister is an RN, and Tracy was an RN.  That's just how we met.

Q.    And this was where?

A.    In St. George, Utah.

09:58

Q.    When did you and Tracy Alves get married?

A.    2010.

Q.    I'd like you to please reach over, there's the exhibit book.  It's plaintiff's -- it should be the one on the far left.

09:58

A.    This one here?

Q.    I believe so, yeah.  If you could flip to Exhibit 10, please.

A.    To where?

Q.    Exhibit 10, please.  Tab 10.

09:58

A.    Okay.

Q.    Are you there?

A.    Yeah.

Q.    And would you please flip to page 10-12.

A.    Okay.                                                          09:59

Q.    Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    That is our wedding.

Q.    Is it a photo?                                                 09:59

A.    Yes.

Q.    Does it appear to be a true and accurate representation of that photo from your wedding?

A.    Yes.

        MR. HELM:  Your Honor, plaintiff moves to admit             09:59
Exhibit 10, page 10-12 only into evidence.

        MS. BAKKEN:  I'm going to object on relevance.

        THE COURT:  Overruled.  I'll let it go.  Page --
Exhibit 10-12, the single page is received.

    (Plaintiff's Exhibit No. 10, page 10-12 was admitted.)         09:59

        MR. HELM:  Thank you, Your Honor.  May I publish the page to the jury?

        THE COURT:  You may.

BY MR. HELM:

Q.    When was this photo taken, Mr. Alves?                         10:00

A.    2010 at our wedding.

Q.    At your wedding?

A.    Yeah.

Q.    Where was your wedding?

A.    Lake Powell.

Q.    And who are the people in this photo?

A.    That is Tracy's mom, her oldest daughter, and Kevin.

Q.    And the -- this picture of -- at your wedding, was this the first time you'd met Kevin Niedzialek?

A.    It was, yes.

Q.    And you're aware that -- that Ms. Alves' mother in this photo passed away at some point, right?

A.    Yes.

Q.    Do you recall when she passed away?

A.    It would have been 2018.

Q.    And at that point, would you agree that Kevin Niedzialek was her last remaining relative from her nuclear family?

A.    Yes.

Q.    Thank you.  Now, if you could please turn to page 22, 10-22.  Are you there?

A.    Yes.

Q.    And do you recognize this document?

A.    Yes.  This is a trip we had to Las Vegas.

Q.    Okay.  So it's a photo of a trip that you -- that you took to Las Vegas?

A.    Yes.

Q.    Does it appear to be a true and accurate representation of that photo?

A.    Yes.

MR. HELM:    Your Honor, plaintiff moves to admit Exhibit 10, page 10-22 only into evidence.                     10:02

MS. BAKKEN:    No objection.

THE COURT:    Received.    You may publish.

(Plaintiff's Exhibit No. 10, page 10-22 was admitted.)

MR. HELM:    Thank you, Your Honor.                     10:02

BY MR. HELM:

Q.    There we go.    So, Mr. Alves, who are the people in this photograph?    If you can start from left to right, that would be great.

A.    Left of Kevin would be Hannah, our middle daughter; then Kevin; then our son Robert; Riley, our youngest below; and then Tracy and myself.                     10:03

Q.    And you said, "Our daughter Hannah."    Was Hannah -- is Hannah your biological daughter?

A.    She's not.                     10:04

Q.    So is it -- is it true that when you got married, you already had -- when you got married to Ms. Alves, you already had children; is that right?

A.    Yes.

Q.    And how many children did you have?                     10:04

A.   I had three.

Q.   And then at the time you got married, Ms. Alves also had children from -- from a previous relationship --

A.   Correct.

Q.   -- right?  And so now you don't distinguish between whether they're your biological children or not, they're all your -- part of your family --

A.   Yeah.

Q.   -- is that right?

A.   Yeah, for sure.

          MS. BAKKEN:  Objection.  Leading.

          THE COURT:  Sustained.

BY MR. HELM:

Q.   You would agree that you have a blended family where the children from each prior relationship are -- you treat as your own, right?

A.   Yes.

          MS. BAKKEN:  Objection.  Leading.

          THE COURT:  I'll let that go.  It is a little leading.

BY MR. HELM:

Q.   Now, this picture was taken where?

A.   Las Vegas.

Q.   And you were there to spend -- spend the holiday, I guess?

A.   Thanksgiving, yes.

Q.    And tell me -- tell me about that trip.

A.    It was -- we have a time-share so we just decided to go to Las Vegas because some of our kids live in St. George, Utah, and it was just kind of a -- a central meeting place.

Q.    And you-all took Kevin Niedzialek with you?

A.    Yes.

Q.    And was it common, if at all, that he would accompany you on family trips?

A.    Yeah.  If he was available to go, he was going for sure.

Q.    And what in particular were you all doing in this photograph?

A.    We were about to get on the -- they call it the High Roller.  It's a big huge Ferris wheel in Las Vegas.

Q.    And did Kevin Niedzialek spend other holidays with your family as well?

A.    Yes.

Q.    Which holidays?

A.    Christmas, Halloween.  I mean, pretty much all of them. 4th of July.

Q.    What was Christmas like with Kevin Niedzialek?

A.    He was -- he was like one of the kids.  He would wake us up on Christmas morning.  We always kind of laughed.  He was -- he was definitely a -- what I would call a big kid.

Q.    Thank you.  I'm going to take this down.  If you would please turn to page 10-25.  Are you -- are you there?

A.   Yes, I am.

Q.   And do you recognize this document?

A.   Yes.  This was Macy's pinning graduation for her nursing program.

Q.   And does it appear to be a true and accurate copy of that -- of that --

A.   Yes.

Q.   -- photo?

A.   Yes.

        MR. HELM:  Your Honor, plaintiff moves to admit Exhibit 10-25 only into evidence.

        MS. BAKKEN:  No objection.

        THE COURT:  Received.  You may publish.

    (Plaintiff's Exhibit No. 10, page 10-25 was admitted.)

        MR. HELM:  Thank you, Your Honor.

        And I'm publishing 10-25.

        THE CLERK:  If you click on document camera --

        MR. HELM:  Yeah, I did.

        THE CLERK:  -- just once and give it some time.

        MR. HELM:  Okay.

BY MR. HELM:

Q.   All right.  So this is the photo we were discussing?

A.   Mm-hmm.

Q.   And where was this taken?

A.   This is at a restaurant, like, a burger place called

Oscar's in -- in -- by Zion's.

Q.   And you-all were there for some event?

A.   Yeah, Tracy -- or Macy's graduation.

Q.   And did -- did Kevin Niedzialek play any -- any role in getting the family together for that?

A.   Yes.  There was -- Macy, she doesn't like the attention being on herself, so she actually didn't want us to come.  And actually, Kevin was the one that, you know, kind of told Macy this wasn't -- this wasn't about Macy, this was -- just about Macy, it was about everybody and really wanted to be there for it.

Q.   And is that Kevin -- where is Kevin in the photo?

A.   He's the one with the glasses on.

Q.   Thank you.  Now, I want to ask you now about how the loss of Kevin Niedzialek has affected Tracy Alves, your wife.  How has -- how has it affected her, the loss?

A.   It's affected her greatly.  She's -- you know, it was her last -- last living family member.  She is a lot more nervous. She's a little more withdrawn.  Just feels that emptiness there.  You know, that was her -- they had a lot in common. They were very much alike so -- you know, they talked a lot and -- and it was good for her to have that.

Q.   Has Sheriff-Coroner Bianco or anyone acting on his behalf ever contacted you or anyone in your family to express condolences about the death of Mr. Niedzialek?

MS. BAKKEN:  Objection.  Relevance.

THE COURT:  Sustained.

MR. HELM:  Thank you.  I have no further questions.

THE COURT:  Ms. Bakken.

MS. BAKKEN:  Thank you.                                    10:10

**CROSS-EXAMINATION**

BY MS. BAKKEN:

Q.   Good morning, Mr. Alves.

A.   Good morning.

Q.   Were you present for the interaction between            10:10
Mr. Niedzialek and the deputies?

A.   No, I was not.

Q.   So you did not witness any portion of the incident of what
took place between Mr. Niedzialek and the deputies?

A.   No, I did not.                                          10:10

Q.   You have no personal knowledge of anything that
Mr. Niedzialek did or did not do during that incident?

A.   No, just from what I've heard is -- is all.

Q.   So no personal knowledge about it?  I'm sorry, I didn't
catch your --                                               10:11

A.   No.  I'm sorry.

Q.   Thank you.  You have no personal knowledge of anything
that the deputies did or did not do during that incident,
correct?

A.   No.                                                    10:11

Q.   Have you ever been a police officer?

A.   I have not.

Q.   You don't have any expertise in police practices, policies, or training, correct?

A.   No, I do not.

Q.   Prior to this incident in July of 2019, the last time that you were aware of Mr. Niedzialek using drugs was in about 2015; is that correct?

A.   Yes.

Q.   Are you aware of Mr. Niedzialek using drugs any time other than in 2015 up until this incident in July of 2019?

A.   Just what I've been told, not firsthand.

Q.   So you have no personal knowledge of him using drugs in between 2015 and 2019?

A.   No.

Q.   Would you agree that Mr. Niedzialek was more of a sporadic drug user than a chronic drug user?

A.   Yes.

Q.   Thank you.

        MS. BAKKEN:  I don't have anything further.

        THE COURT:  Mr. Helm, anything?

        MR. HELM:  Nothing further, Your Honor.

        THE COURT:  You may step down, Mr. Alves.  Thank you.

        THE WITNESS:  Should I put this book back?

        THE COURT:  Yes.  Just leave it there.

MR. HELM:  Your Honor, may this witness be excused?

THE COURT:  Yes, this witness is excused.

MR. HELM:  Thank you, Your Honor.

THE COURT:  So Mr. Galipo.

MR. GALIPO:  Yes.  Thank you.  I'd like to call Tracy Niedzialek, please.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**PLAINTIFF'S WITNESS, TRACY ALVES**

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Tracy Alves, A-L-V-E-S.

MR. GALIPO:  Your Honor, may I confer with counsel for one moment, please?

THE COURT:  You may.

MR. GALIPO:  Thank you.

(Counsel confer.)

**DIRECT EXAMINATION**

BY MR. GALIPO:

Q.   Good morning, Ms. Alves.

A.   Good morning.

Q.   What do you do for a living?

A.    I'm a registered nurse.

Q.    Where did you grow up?

A.    Philadelphia, Pennsylvania.

Q.    And how many brothers and sisters did you have?

A.    I had one sister and one brother.

Q.    And who was -- where was your brother Kevin in the chronology?

A.    He was the baby.

Q.    He was the baby.  Okay.  What was he like growing up?

A.    He's really outgoing, always -- always smart, always way ahead of the game, like, you know, kind of a science nerd and -- loved his sports, though, loved his Philly teams from -- from the time he could play.  Played baseball himself where my dad coached him on teams.

Q.    Okay.  How was your relationship with Kevin growing up?

A.    I'm 11 years older than Kevin, so I was definitely the babysitter a lot of times.  I was definitely kind of mother hen, and -- and he spent a lot of time with me and -- and even my friends, like, he was just -- he was just around all the time.

Q.    Going more to adult life, you at some point remarried with Bob?

A.    Yes.

Q.    And the families kind of joined to some -- in some respects?

A.    Yes.

Q.    What was your relationship like with Kevin in adult life? Let's take the three or five years before his death.

A.    Three or five years before his death were some of the best years because they were some of his really good solid years of finally getting some things on track and his education.  He was about to graduate college.  He was like -- he moved to California with Bob and I, and he lived with me and -- and my -- some of my children at times before they'd come or gone and before he moved in with a roommate the last two years, but anyway, he -- he was just always around.  He vacationed with our family.  He was more like one of my kids that kind of just -- they treated him like a sibling more than an uncle and --

Q.    Can you tell the ladies and gentlemen of the jury some of the things Kevin liked to do?

A.    Kevin loved the beach, and that's how I knew I was going to sell him on moving to California with me, but he -- he loved the beach.  He loved to swim.  He loved to follow sports.  He loved to read.  He loved school.

Q.    I understand he liked to eat as well?

A.    He liked to eat, yes, yes.

Q.    Now, your other -- your sister --

A.    Mm-hmm.

Q.    -- she passed away at some point?

A.     Yes.

Q.     And your dad died when you were relatively young?

A.     I was 21 when my dad passed.

Q.     And how old would -- I guess Kevin would have been about 10 if you're 11 years' difference?

A.     Yeah, he -- my father died in August and Kevin turned 10 that September.

Q.     So there -- with your immediate family then, it would have been your mom, you, and Kevin left?

A.     Yes.  My sister was still alive at that time, but she'd been out on her own.  She's seven years older than me, so she's 17 years' difference from Kevin or 18 almost, yeah.

Q.     Okay.  And when again did your mother die?

A.     September of 2018.  She had eventually moved to Temec -- or to California also from Philadelphia.  And in 2018 she got -- she was diagnosed with Stage IV colon cancer, so she moved into my house as well, and I cared for her in my home.

Q.     And what was the length of time between the diagnosis and the death for your mother?

A.     About six months.

Q.     Was Kevin close to your mother?

A.     Yes, yes.

Q.     How did he take that, based on your observations, your mother's sickness and death?

A.     I was worried about that when she was sick, and I told him

just because I -- my specialty in nursing was oncology and -- and what she was going through, I told him this is -- this is going to go fast, this is going to happen fast.  And we agreed, we shook on it, and we're in this together, and she lived in my home.  She was on hospice, but I cared for her in my home and he was with me daily with her.

Q.   Okay.  Let me just show you some pictures.

MR. GALIPO:  Your Honor, these particular exhibit numbers have been agreed upon by stipulation, but I'll name them one at a time for the record.

THE COURT:  Yes.

MR. GALIPO:  And I'll move to admit each one and then publish.  The first is 10-9.

THE COURT:  Received.  You may publish.

(Plaintiff's Exhibit No. 10, page 10-9 was admitted.)

MR. GALIPO:  Okay.  I probably have to press something that I don't know.  Technology.

THE CLERK:  Document camera as well.

MR. GALIPO:  It's showing here -- oh, in doc cam.  That's pressed.

THE CLERK:  That's it.

MR. GALIPO:  Oh, there we go.  Thank you so much.  Zoom out a little bit for me.  Perfect.  Thank you.

BY MR. GALIPO:

Q.   Okay.  So this is a picture of you and Kevin?

53

A.    Yes.  Yes.

Q.    I'm going to show you some more.

        MR. GALIPO:  10-10 by agreement, Your Honor?

        THE COURT:  Received.  Publish.

    (Plaintiff's Exhibit No. 10, page 10-10 was admitted.)    10:19

BY MR. GALIPO:

Q.    Who's in that picture with Kevin?

A.    That's Kevin and my daughter Hannah and my son Robert.

Q.    How was he with the kids?

A.    I don't know if he really wanted to hang out with me.  He    10:19
wanted to hang out with my kids, but -- and they -- they adored
him.

        MR. GALIPO:  10-13 by agreement, Your Honor?

        THE COURT:  Received.  You may publish.

    (Plaintiff's Exhibit No. 10, page 10-13 was admitted.)    10:20

BY MR. GALIPO:

Q.    Who's in this photo?

A.    That's me and my mother covering her face and that's
Kevin.  That was her 73rd birthday and that was just before she    10:20
passed.

Q.    Okay.

        MR. GALIPO:  10-14 by agreement?

        THE COURT:  Received.  You may publish.

    (Plaintiff's Exhibit No. 10, page 10-14 was admitted.)

        MR. GALIPO:  Thank you, Your Honor.    10:20

BY MR. GALIPO:

Q.    Who's in this photo?

A.    These are some friends of Kevin.  That is his friend Megan holding the phone, his friend Jordan, and that would be his friend Johnnie.

Q.    Okay.

        MR. GALIPO:  10-15 by agreement, Your Honor?

        THE COURT:  Received.  You can publish.

    (Plaintiff's Exhibit No. 10, page 10-15 was admitted.)

BY MR. GALIPO:

Q.    I'm assuming that's Kevin sporting the Philadelphia hat?

A.    Yes, that's Kevin.

        MR. GALIPO:  10-17 by agreement?

        THE COURT:  Received.  You may publish.

    (Plaintiff's Exhibit No. 17, page 10-17 was admitted.)

BY MR. GALIPO:

Q.    When was this photograph taken approximately?

A.    November 2018.  This is a picture of Kevin and I in a room with my daughter who was laboring to deliver my first grandson, and you can bet Kevin wouldn't miss it.

Q.    And your relationship with your brother, Kevin, as of this time, how would you characterize it to the jury?

A.    He -- he was in such a good place and -- and he -- he was my person.  He -- he got me.  Bob used to -- my husband would tease that we were two peas in a pod.  He was just -- he -- he

was who would talk me off the ledge when I was angry at Bob or he would tell me, *You have a good life.  You have -- you have a really good life.*

Q.   You would talk to him often?

A.   Daily.

MR. GALIPO:  10-19 by agreement?

THE COURT:  Received.  You may publish.

(Plaintiff's Exhibit No. 10, page 10-19 was admitted.)

BY MR. GALIPO:

Q.   Who is in this photo?

A.   That's Kevin and my grandson Jackson.

MR. GALIPO:  10-20 by agreement?

THE COURT:  Received.  You may publish.

(Plaintiff's Exhibit No. 10, page 10-20 was admitted.)

THE WITNESS:  Kevin and Jackson.

MR. GALIPO:  10-21 by agreement?

THE COURT:  Received.  You may publish.

(Plaintiff's Exhibit No. 10, page 10-21 was admitted.)

THE WITNESS:  Kevin and Jackson.

MR. GALIPO:  All right.  10-24 by agreement?

THE COURT:  Received.  You can publish.

(Plaintiff's Exhibit No. 10, page 10-24 was admitted.)

THE WITNESS:  That's Kevin and my daughter Hannah and my daughter Macy and my son Robert.  And they're playing cards at my kitchen table.

MR. GALIPO:  And lastly, 10-28 by agreement?

THE COURT:  Received.  You may publish.

(Plaintiff's Exhibit No. 10, page 10-28 was admitted.)

THE WITNESS:  That's Kevin and Jackson on a trip we took back to Philadelphia in June of 2019 just weeks before he passed.  We went back to Phil -- after my mom -- my mom passed in September of '18, and then we went back to Philadelphia in June of 2019 to bury her with my father in Philadelphia.  So we took a family trip.

BY MR. GALIPO:

Q.    Let me ask you about that.  So this would be June 2019, this would be the month before July when this incident occurred?

A.    Yes.

Q.    And as of this time, June 2019, to your knowledge, was your brother clean as far as not doing drugs?

A.    Yes, clean and sober.

Q.    How was the trip in terms of the family being together?

A.    The trip was really good.  We were there for ten days.  Me and Kevin, it was kind of a trip down memory lane.  We took the kids to where we went to school and our old house.  And my oldest daughter, Macy, would remember all of that as she was 12 when we moved away from Philly, but my younger kids and -- and my son-in-law and my husband, like, this was all new to them.  So we did a lot of memory stuff.  We vacationed at the Jersey

Shore because that's what me and Kevin did growing up every summer. And I -- I recognized in the last couple days of that trip that he kind of -- the mood changed. He was a little somber.

Q. And during that trip, did you go back there in part to put your mom to rest?

A. Yes.

Q. And was it at some point after that and after you saw him somber the last few days that he relapsed on drugs?

A. Maybe not right away, a couple weeks. But he had been to my house and been very emotional. He was having some trouble with girl -- his girlfriend. She had even implied to me that he's -- he's not been the same since he came back. He's really struggling.

Q. Okay. So now I want to take -- at some point did you learn that something happened to your brother?

A. I did learn of his relapse through his roommate, Aaron. And Aaron said -- you know, Aaron had a four-year-old son at this time that lived with Kevin and Aaron, and he said, you know, *He knows the deal. He used. He has to go.* So he did go stay on another friend's couch for a couple days prior to the incident.

Q. And he was involved himself in going to school to be a drug rehab counselor?

A. Yes. He loved it.

Q.    Okay.  So now I want to move forward to July 29th, 2019. On that date or sometime thereafter, did you learn that something had happened to your brother, Kevin?

A.    Yes.

Q.    How did you learn?  What was the source that you learned?

A.    Actually, there was -- there's a local Facebook page in our neighborhood that somebody was questioning what was going on at the Sage Canyon Apartments.  There were detectives and a coroner and yellow tape.  And I knew that's where he was staying.  So I started reaching out to friends, like, "Is he okay?  He's not" -- so then I -- I was texting him earlier that morning with response, but then later that day, no answer.  And his -- his girlfriend said she had spoke to him around noon. So I was a little more relieved because this was maybe 3:00. So I was like, *Okay*, like -- and she said, *He seemed fine at that time*, but -- so then I tried to, like, settle myself down and think that maybe this is not related to him at all, but I -- I was worried, and Bob knew I was worried.

      And then within maybe an hour of that, I did get a call from Inland Valley Medical Center to say he was there in the emergency department.

Q.    Okay.  Did you go there?

A.    Yes.

Q.    At some point was it your understanding that they wanted to pronounce brain death?

A.    Not that day.  That day they said there was some swelling in the brain but they would give it overnight.  He was actually on a ventilator at that time and had been revived in the field and brought into the emergency department.  So at the time I'm seeing him, he's now on life support so --

Q.    At some point did the family make a decision based on doctors' recommendations to, I guess, you know, take him off the machines?

A.    Yes.  The following morning during a nursing assessment, the nurse had noted that he had no more pupil reaction and that they should repeat a CAT scan.  And on the repeat CAT scan, they said that the brain swelling had just continued to increase, and there was not going to be any viable life.

Q.    And was there a decision at some point regarding donating his organs?

A.    Yes.  Later that afternoon I met with the organ donation people and talked about it, and we got everything going for that.

Q.    For a period of time -- and I don't want the specifics of the conversations, but were you trying to find out what happened to your brother?

A.    Yes.  We were there for five days.  And I, as an RN, wasn't even aware how long it took for the process of harvesting organs and that going on.  So he remained on life support for -- for almost five full days.  And there were law

enforcement and detectives present 24/7.

Q.   Did you reach out to see if you can find out what happened?

A.   Repeatedly.

Q.   And for how long a period of time?

A.   The entire length of the hospital stay and for months on end after.

Q.   Did you get any response?

A.   No.  I -- I'm sorry.  They told me that he was confused and combative and that he was tased in the field and went into cardiac arrest.

Q.   Anything else?

A.   No.

Q.   Now, I want you to think about this.  With respect to the organ donation, did anyone interfere with that?

A.   Actually, yes.  The night he was set to go to the OR for donation, the police told the nursing staff that that's not going to happen.

Q.   Okay.  I want you -- this is my last couple questions. And I want you -- I know this is probably a difficult question. And I want you to tell the ladies and gentlemen on the jury how the death of your brother has affected you.

A.   It -- it's been -- it's been hard.  It's extremely painful, and I've been through grief before.  I'm kind of familiar with how that works, so I know there's some ups and

downs, but the unsettledness of not really having answers or -- that -- that made it harder.

I went -- I returned back to work after his death December of the same year, 2019, because I didn't feel ready before then, and I only lasted until February of 2019.  I -- I couldn't even be in a setting where CPR was being performed because by this time I had now seen the bystander video that I got through a friend of Kevin's.  And even the -- I -- I -- Bob knows I -- I probably won't be in the hospital setting.

Q.   How often do you think about your brother, Kevin?

A.   Every day.  Every day.

Q.   Do you think you'll ever be the same following his death?

A.   I don't think I'll be the same, no.

Q.   What do you miss most about Kevin?  What do you miss most on a daily basis?

A.   Everything.  He -- he was at our home two to three days a week when he wasn't living there.  There were times he was just living there, and I just miss something as simple as I make a pot of coffee every morning and I -- one of Kevin's -- we all say we miss this.  He would come in the door and say, *Is there coffee?*  And if I'd say, *No*.  He's like, *Can there be?*  So every time I make coffee, I say that.  *Is there coffee?  Can there be?*  He just -- he just -- yeah, I'm going to miss him. It's hard.  And my kids, I miss seeing him with my children. He was just one of them.

Q.   Did you in a way have some -- in your own mind some type of a mother role with Kevin?

A.   Yeah, sure.

MS. BAKKEN:  Objection.  Leading.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Sure.  After -- after my father died -- my mom was always a stay-home mom, but after my father died, she -- she had to get some form of income.  So I spent a -- my ex-husband and I spent a lot of time with Kevin.  He -- he stayed with us a lot of the time.  He was young so he was just part of my family when she was working.  And then when my sister passed, my mom was -- she was absent in the mother role for a little while then, and he -- he stayed with me then. I -- so it just kind of -- I think because he had older sisters and never really had, like, playing sibling situation, like, he just kind of clinged to my kids.  He just hung out with my family.  We were -- we were the family he didn't -- he didn't have.

Q.   Thank you very much.

MR. GALIPO:  That's all I have, Your Honor.

THE COURT:  Thank you.  Let's take our recess at this time.

Ladies and gentlemen, we'll be on a break for about 15 minutes.  Remember during that time, keep an open mind.  Do not talk to anybody about the case, even amongst yourselves.

Do not let others talk to you about the case.  And do not try to learn about this case in any way.  We'll be back in about 15 minutes.

(Out of the presence of the jury:)

THE COURT:  You may step down, Ms. Alves.

(Recess)

(In the presence of the jury:)

THE COURT:  Be seated, please.

THE CLERK:  Recalling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please restate your appearances for the record.

MR. GALIPO:  Good morning again, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff.  And can the plaintiff retake the stand, Your Honor?

THE COURT:  Yes, please.

Ms. Alves, you remain under oath.  You understand that?

THE WITNESS:  Yes.

THE COURT:  Mr. Sain.

MR. SAIN:  Thank you.  Good morning, Your Honor.  Tony Sain, with me, Ms. Tori Bakken, on behalf of Defendant Riverside County Sheriff Chad Bianco and the County of Riverside.

THE COURT:  Is there any cross-examination,

Ms. Bakken?

MS. BAKKEN:  Yes, Your Honor.

**CROSS-EXAMINATION**

BY MS. BAKKEN:

Q.    Good morning, Ms. Alves.

A.    Good morning.

Q.    Were you present at the Sage Canyon Apartments on the date that this incident occurred?

A.    No, I wasn't.

Q.    So you never witnessed any portion of the incident between Mr. Niedzialek and the deputies that day?

A.    No, I did not.

Q.    You have no personal knowledge as to what Mr. Niedzialek or the deputies did during this incident, correct?

A.    Correct.

Q.    You first became aware of Mr. Niedzialek using methamphetamines in 2005 when he was about 20 or 21, correct?

A.    That's not correct.

MS. BAKKEN:  Your Honor, may I have one moment?

THE COURT:  Yes.

MS. BAKKEN:  Thank you.

BY MS. BAKKEN:

Q.    You gave a deposition in this case, correct?

A.    Correct.

Q.    And when you gave a deposition in this case, you took an

oath to tell the truth, true?

A.    Yes.  Yes.

Q.    The same oath that you took today?

A.    Yes.

MS. BAKKEN:  Your Honor, permission to read from deposition -- her deposition transcript, page 29 -- sorry, I can wait.

THE COURT:  Page 29.

MS. BAKKEN:  29, lines 17 through 22.

MR. GALIPO:  No objection.

THE COURT:  You may read it.

THE WITNESS:  Where can I find that?

THE COURT:  Page 29.

THE WITNESS:  Page 29.  Okay.

THE COURT:  Line 17 to 22.

BY MS. BAKKEN:

Q.    "QUESTION:  Okay.  And you stated methamphetamines.  Um, when did he begin using methamphetamines?

"ANSWER:  I would say probably about 2005.

"And that would make him approximately in terms of age?

"ANSWER:  Probably 20, 21."

A.    Yes.  I guess I was unclear on the year.

Q.    From when you first became aware of Mr. Niedzialek using drugs up until the date of this incident, Mr. Niedzialek's drug

usage was on and off, correct?

A.   Yes.

Q.   So there would be periods of time when Mr. Niedzialek would use drugs for a year or so and then times when he wouldn't use drugs for a year or so?

A.   I don't know if he would use for a year or so.  Maybe.

Q.   You mean if not exact, approximately?

A.   Yeah.  Yes.

Q.   A year on --

A.   Approximately.

Q.   -- a year off.  Sorry.  We spoke over each other a little bit.  So approximately a year that he would use and then maybe a year that he didn't?

A.   Yes.

Q.   It was your understanding that Mr. Niedzialek was clean or not using drugs from 2015 until 2017, correct?

A.   Approximately.

Q.   And as far as you were aware, from 2015 up until the date of this incident in 2019, Mr. Niedzialek had only relapsed and used methamphetamines again on one occasion in 2017, true?

A.   I believe that's correct.

Q.   So based on your understanding, for the years leading up to July of 2019, your brother was not a chronic meth user, correct?

A.   Correct.

Q.   Other than that one day in 2017, Mr. Niedzialek's only other relapse with methamphetamine that you're aware of was about a week prior to this incident, true?

A.   Correct.

Q.   Thank you.

        MS. BAKKEN:  I don't have anything further.

        THE COURT:  Mr. Galipo.

**REDIRECT EXAMINATION**

BY MR. GALIPO:

Q.   You were asked whether you have any personal knowledge or were present at the scene.  You have at least now seen the video of what happened, correct?

A.   Now I have, yes.

Q.   And the questions that you were asked by counsel just now, showing you Exhibit 10-9 again, does that -- those questions asked about the fact that he had used drugs or relapsed once or twice in the last four years of his life, did that affect in any way the love you had for your brother?

A.   No.

Q.   Looking at Exhibit 10-17, did that affect the loss that you had as a result of his death?

A.   No.

Q.   Thank you.

        MR. GALIPO:  That's all I have, Your Honor.

        THE COURT:  Ms. Bakken.

MS. BAKKEN:  No, nothing further.

THE COURT:  Ms. Alves, you may step down.  Thank you.

THE WITNESS:  Thank you.

MR. GALIPO:  Your Honor, subject to subsequent discussion regarding exhibits, plaintiff rests at this time.

THE COURT:  Thank you.

Mr. Sain.

MR. SAIN:  Thank you, Your Honor.  Defendant calls as its first witness Ms. Kathryn Vasquez.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

**DEFENDANTS' WITNESS, KATHRYN VASQUEZ**

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Kathryn Vasquez, V-A-S-Q-U-E-Z.

THE COURT:  Proceed.

**DIRECT EXAMINATION**

BY MR. SAIN:

Q.   Good morning, Ms. Vasquez.

A.   Good morning.

Q.   The incident at issue in this action occurred on July 29th, 2019.  At that time where did you live?

A.   I lived in Temecula, California, in my old apartment complex.

Q.   Is that apartment located at 27G in 42200 Moraga Road in Temecula?

A.   Yes.

Q.   And where do you currently live?

A.   I live in Arizona, Phoenix, Arizona, at the moment.

Q.   And what is your current occupation?

A.   I work at CVS.

Q.   Have you ever been employed as a peace officer or law enforcement officer?

A.   No.

Q.   Have you ever attended a police academy or received any law enforcement training?

A.   No.

Q.   Do you have any expertise in police practices, policies, procedures, or tactics?

A.   No.

Q.   Turning back to the incident, at some time that afternoon, did you observe any interaction between an individual and Riverside County Sheriff's Department deputies outside of your apartment?

A.   I'm sorry, can you repeat that?

Q.   Sure.   On the date of our incident, did you ever observe any interaction between an individual and Riverside County Sheriff's Department deputies outside of your apartment?

A.   Yes.

Q.   Okay.  And fast-forwarding a little bit, at some point during the incident, did you ever see this man being restrained?

A.   Before the incident?

Q.   During the incident, at some point, any point, did you ever see him being restrained?

A.   Yes.

Q.   Now, had you ever seen that person before?

A.   No.

Q.   I'm going to represent to you that the name of the person being restrained was Kevin Niedzialek.  If I ask you any questions about Kevin Niedzialek, you understand I'm talking about the man at some point you saw being restrained by deputies that day?

A.   Yes.

Q.   Now, going back, was anyone with you at the time that you observed this incident with Mr. Niedzialek?

A.   My daughter.

Q.   Other than your daughter, was anyone else in your apartment at the time?

A.   No.

Q.   As far as you know, did your daughter witness any portion of the incident?

A.   No.

Q.   So at some point did something draw your attention to what was happening outside your apartment that afternoon?   11:10

A.   Yes.

Q.   What was it that drew your attention?

A.   I heard shouting outside my window.

Q.   And when you heard that shouting, was there anything that you could understand being said?   11:10

A.   Not at first, no.

Q.   The person that you heard shouting, was that a male or a female?

A.   It was a male.

Q.   And where was this voice coming from relative to where you were located?   11:10

A.   I was in my kitchen and so I heard it outside my bedroom window.

Q.   And did you go at some point to look and see what was happening outside?   11:10

A.   Yes.

Q.   And when you first looked outside to see what was happening, where were you located inside your apartment?

A.   I was located in my bedroom.

Q.   And when you first looked outside your bedroom window,   11:11

what did you observe happening outside?

A.    I saw a man standing, kind of yelling and, like, two officers in front of him trying to calm him down.

Q.    When you saw this man, Mr. Niedzialek, and the two deputies outside, how were they positioned relative to one another?

A.    The officers were next to each other, and he was across from them, and they were facing each other.

Q.    And how -- about how far away from you was the man and the deputies?

A.    Maybe from where you are to, like, the roof.

Q.    Okay.

A.    Looking --

Q.    So --

A.    Looking down.

Q.    About 12 or more feet?

A.    Yes.

        MR. SAIN:  I'd like to show to the witness only an exhibit that has been identified as 360.

        THE COURT:  Very well.  For the witness only.

BY MR. SAIN:

Q.    Ms. Vasquez, do you see on your screen there, right in front of you, do you see a photograph?

A.    No.  Yes.

Q.    Can you see it okay?  Okay.  So showing this photograph,

do you recognize what's depicted in this photograph?

A.    Yes.

Q.    What do you recognize it to be?

A.    It's the apartment across from mine but directly.  I'm a little bit up more.

Q.    Okay.  So is this photograph somewhat -- although the elevation is off, does it more or less reflect your perspective as you're watching this incident unfold?

A.    No.

Q.    A little bit higher, a little bit to the left, a little bit to the right?

A.    A little bit to the left.

Q.    Fair enough.  Does this photograph fairly and accurately depict the location where the incident occurred on the date of the incident?

A.    Yes.

        MR. SAIN:  Your Honor, may this photograph be admitted to the evidence and published to the jury?

        MR. GALIPO:  No objection.

        THE COURT:  What is the number again?

        MR. SAIN:  360, Your Honor.

        THE COURT:  Received.

        (Defendants' Exhibit No. 360 was admitted.)

        MR. SAIN:  Thank you, Your Honor.

BY MR. SAIN:

Q.   So once you looked outside and you saw the deputies interacting with Mr. Niedzialek, what's the very next thing you observed?  What happened next?

A.   I don't recall.

Q.   When you looked outside, did you still see or hear anyone screaming?

A.   Yes.

Q.   And who was screaming at that point?

A.   It was -- I'm sorry.  I forgot how to say his name, but it was still the -- the guy.

Q.   Not the deputies?

A.   No, not yet.

Q.   And did you see or hear anything that in your mind might have been making Mr. Niedzialek scream?

A.   Just that the officers were there trying to calm him down, but at this point, their hands were up.  I couldn't really hear anything that they were saying.

Q.   At that point were either of the deputies touching Mr. Niedzialek?

A.   No.

Q.   What did the two deputies look like?

A.   One was a male; one was a female.  Her hair was up, average, in uniform.

Q.   About how tall was the female?

A.   I would say five-six.

Q.    Okay.  Best estimate?

A.    Yes.

Q.    How about the male deputy?

A.    He was a little bit taller.  I would say five-seven, five-eight.

Q.    And you said that both of these deputies were wearing uniforms?

A.    Yes.

Q.    When you saw them, did you immediately recognize that they were law enforcement officers?

A.    Yes.

Q.    Had you ever seen either of those deputies before?

A.    No.

Q.    And when you first saw this man who's not the deputy, Mr. Niedzialek, what did he look like?

A.    He was bleeding from his face from what I remember or recall, and he first had a shirt on and jeans.

Q.    At some point did he take that shirt off?

A.    Yes.

Q.    So once you saw Mr. Niedzialek and the two deputies, is there anyone outside that day that you recognized?

A.    No.

Q.    What was the lighting condition like when you're watching this?

A.    It was the middle of the afternoon, so the sun was not

fully down.  It was day.

Q.   Was there anything blocking or obstructing your view of what was happening?

A.   No.

Q.   At this point when you look outside, is Mr. Niedzialek still screaming?

A.   Yes.

Q.   Were you able to understand anything he was saying at this point?

A.   No.

Q.   You said that it appeared to you that the deputies were trying to calm Mr. Niedzialek down at this point?

A.   Yes.

Q.   What is it that they were doing that in your mind meant that they were trying to calm him down?

A.   They had their hands up, and I couldn't hear what they were saying, but I know that they were talking about something because he was just yelling back and he would -- they would step back, step forward, hands up.

Q.   The deputies would step back?

A.   Mm-hmm, kind of like a back-and-forth, like, moving.  If he would come towards them like this and then come up.

Q.   So are you saying -- please correct me if I'm wrong -- that when he would move toward them, they would try to back away with their hands up?

A.    Yes.

Q.    And you said that you were unable to understand what the deputies were saying at this point?

A.    Yes.

Q.    Could you hear their tone of voice at this point?                    11:17

A.    Not yet.

Q.    When you saw them speaking to Mr. Niedzialek with the calm-down or hands-up gesture, did it appear to you that either of the deputies was angry or upset?

A.    No.                                                                  11:17

Q.    And at this point was anybody touching anybody?

A.    No.

Q.    What's the very next thing that happened?

A.    The next thing that happened, I believe that's when I pulled out my phone and he got tased.                                   11:17

Q.    And before you pulled out your phone, how was Mr. Niedzialek positioned?  Was he seated, standing?

A.    Standing.  Standing.

Q.    Was he always standing when you saw him outside or did he change position in any way?                                              11:17

A.    He changed positions.

Q.    So when you first laid eyes on him, what position was he in?

A.    Standing.

Q.    And so once you saw Mr. Niedzialek standing, what's the             11:17

very next thing you observed?

A.    I don't recall.

Q.    Did you see Mr. Niedzialek move at any point after he stood?

A.    Yes.

Q.    And where, if anywhere, did Mr. Niedzialek move?

A.    Kind of all around, just charging and moving.  He was very around.

Q.    Did you ever see him charge at any person?

A.    Towards the officers.

Q.    And did you see -- you said that at some point you saw Mr. Niedzialek get tased?

A.    Yes.

Q.    Did you see him charge at one of the officers before or after you saw the tasing?

A.    I don't recall.

Q.    When you saw the TASER, did you see anything coming out of the TASER?

A.    Yes.

Q.    What did you see coming out of the TASER?

A.    The little TASER wire.

Q.    And did you see that TASER wire connected to anybody?

A.    His chest.

Q.    Mr. Niedzialek?

A.    Mm-hmm.

Q.   That's a "yes"?

A.   Yes.  Sorry.

Q.   And then when you saw the TASER wire connected to Mr. Niedzialek, what's the very next thing you observed?

A.   He fell.                                                                11:18

Q.   And did he fall in any particular direction?

A.   I believe it was forward.

Q.   Once Mr. Niedzialek fell forward, what's the very next thing you observed?

A.   He was sitting down.  They had him sitting down to try and    11:19 arrest him.

Q.   At that point when Mr. Niedzialek was sitting down, did you see anybody touch him?

A.   One of the officers, I don't recall which one, to put his hands behind his back.                                                       11:19

Q.   And did you see that one officer actually touch him or did you see him approach him or something else at that point?

A.   Approach him.

Q.   Fair enough.  At this point what's the very next thing you observed happen?                                                           11:19

A.   I don't recall, but I -- I don't recall.

Q.   While Mr. Niedzialek was seated after this TASER, was he moving at all?

A.   He was -- yes.

Q.   How was he moving?                                                     11:20

A.    He was wiggling and kicking his feet.

Q.    At some point after you saw Mr. Niedzialek kicking while seated, did he change his position again?

A.    He stood back up.

Q.    And after he stood back up, did he move in any direction?

A.    No.

Q.    Did you ever see Mr. Niedzialek do anything that you would describe as violent?

A.    Yes.

Q.    What did you see him do that you would describe as violent?

A.    The whole thing.  The way he was running around, screaming, the blood everywhere.  Just how he was acting.

Q.    Did you perceive him charging toward the deputies as being violent?

A.    Yes.

Q.    After Mr. Niedzialek -- excuse me.  After Mr. Niedzialek stood up the second time, how far away was he from any deputy?

A.    Maybe about a foot.  They were pretty close.

Q.    And at that point when he's about a foot away from the deputy, did it appear to you that Mr. Niedzialek was still being violent?

A.    He was just shouting.

Q.    And how was the deputies?  Did they appear to be angry at this point?  Were they calm?  Were they something else?

A.    They seemed scared, maybe a little nervous.

Q.    At this point were the deputies still doing the calm-down gesture?

A.    No.  Now they were yelling at him to stand still.  I'm not sure.

Q.    Did it appear to you that Mr. Niedzialek was complying with any of their commands?

A.    He was not.

Q.    Did you ever see a second TASER discharge?

A.    Yes.

Q.    And what was happening at the time of the second TASER discharge?

A.    I don't recall if it was before or after he was on the ground again.

Q.    Okay.  When the second TASER discharge occurred, did Mr. Niedzialek change his position?

A.    I don't recall.

Q.    Okay.  When the second TASER discharge occurred, was Mr. Niedzialek standing, seated, or something else?

A.    I don't recall.

Q.    After the second TASER discharge, where was Mr. Niedzialek located?

A.    In the same spot.

Q.    Was he standing, seated, laying down, or something else?

A.    I believe at this point he was laying down.

Q.   Okay.   After the second TASER discharge when you saw Mr. Niedzialek laying down, was he laying down facedown, faceup, on his side, or something else?

A.   Facedown.

Q.   At this point did you ever see Mr. Niedzialek moving?

A.   He was just kicking his feet.

Q.   Did you view him kicking his feet as him being violent?

         MR. GALIPO:  Objection.  Leading.

         THE COURT:  Overruled.

         THE WITNESS:  Please repeat the question.

BY MR. SAIN:

Q.   Sure.  Did you view him kicking his feet as being violent?

A.   Yes.

Q.   What were the deputies doing as Mr. Niedzialek was down on the ground kicking his feet?

A.   They were on him.  One officer was more towards the front on his shoulder to hold him down, and then the second one was by his lower back.

Q.   Did you see how those deputies were touching Mr. Niedzialek at that point?

A.   Kneeling on him.

Q.   Did you see more than one deputy kneel on him?

A.   No.

Q.   The deputy you saw kneeling on him, how many knees did you see on Mr. Niedzialek?

A.    Just one.

Q.    Did you ever see more than one knee from one deputy on Mr. Niedzialek?

A.    No.

Q.    Did you ever see either of the deputies, like, punch him, kick him, strike him with any batons or objects?

A.    No.

Q.    Other than the two TASERs, did you ever see any deputy use any weapons or devices on him?

A.    No.

Q.    Did you ever see them pull out pepper spray and spray him in the eyes or spray any pepper spray at him?

A.    No.

Q.    Did you ever see the deputies pull out their guns?

A.    No.

Q.    When you saw the deputies, one deputy is kneeling on the ground, one deputy has got one knee on him, are they doing anything with their hands?

A.    Just holding him down.

Q.    Did you ever see them trying to handcuff him?

A.    Yes.

Q.    And about how long would you say that it took from Mr. Niedzialek hitting the ground until you saw Mr. Niedzialek placed into handcuffs?

A.    I believe he was in handcuffs when they had him sitting.

Q.    Okay.  Are you sure about that?

A.    Not 100 percent.

Q.    Fair enough.  So did you or did you not see handcuffs being placed on Mr. Niedzialek?

A.    I don't recall.

Q.    Fair enough.  But you saw them trying to hold him down; is that right?

A.    Yes.

Q.    And about how long did you see them trying to hold him down after the second TASER?

A.    It could have been anywhere between like seven to ten minutes.

Q.    Could have been less, could have been more?

A.    Yes.

Q.    Okay.  And what was Mr. Niedzialek doing during that time when the two deputies were trying to hold him down?

A.    Just moving his head side to side and kicking his feet.

Q.    Was he kicking his feet that whole time?

A.    Yes.

Q.    Was he moving his head side to side that whole time?

A.    Yes.

Q.    Was there anything you observed during that period that made you think that maybe he was having any problems breathing?

A.    No.

Q.    At some point did Mr. Niedzialek, while they were holding

him down, stop moving around?

A.    Yes.

Q.    And was that after about the seven to ten minutes you estimated?

A.    Yes, I believe so.

Q.    And what's the very next thing you saw after Mr. Niedzialek stopped moving around?

A.    They stood up, and I believe that's when the paramedics came.

Q.    How much time would you estimate passed from when you saw Mr. Niedzialek stop moving around on the ground until the deputies got up off of him?

A.    It was immediately.

Q.    And then how much time after the deputies got up off of him would you estimate until you saw paramedics come to the scene?

A.    Shortly after.  I don't recall exactly.

Q.    Fair enough.  How many paramedics did you see come to the scene?

A.    I don't recall.

Q.    Fair enough.  When the paramedics arrived on scene, do you recall what position Mr. Niedzialek was in?

A.    He was on his back.

Q.    Did you see him moved from -- you said he was facing down when the deputies were trying to hold him, right?

A.   Mm-hmm.   I don't recall how he got on his back.   I just remember them putting the -- the breathing thing on him.

Q.   The bag?

A.   Yes.

Q.   The paramedics put the bag or the deputies?

A.   The paramedics.

Q.   So just to be clear, when you saw the deputies holding Mr. Niedzialek down on the ground, they were holding him in a facing downward position?

A.   Yes.

Q.   Okay.   And then when you saw the paramedics arrive and you saw Mr. Niedzialek again, he's now in the facing upward position?

A.   Yes.

Q.   But you were unable to see how he changed from being -- facing downward or prone to facing upward or supine?

A.   Yes, I don't recall.

Q.   Okay.   Once the paramedics arrived, what did you see happen next?

A.   Them trying to revive him.

Q.   Who is "them"?

A.   The paramedics.

Q.   Do you have a specific memory of ever seeing Mr. Niedzialek in handcuffs?

A.   Yes.

Q.    At what point?

A.    I believe it was with -- when he was sitting with his hands behind his back or when it was when he was laying on his stomach.

Q.    One of those two?

A.    Yes.

Q.    But you're not sure which?

A.    No.

Q.    Fair enough.  At some point did you see Mr. Niedzialek transported from the scene?

A.    Yes.

Q.    After that did you ever see him again?

A.    No.

Q.    You said that on the date of the incident, at some point you took out your phone; is that right?

A.    Yes.

Q.    Did you make any recordings?

A.    Yes.

Q.    About when in the sequence of events did you start making a recording on your phone?

A.    Shortly after I realized what was happening when they were yelling and then I believe before the paramedics came or after.

Q.    At some point did you stop recording the incident?

A.    Yes.

Q.    Why?

A.    I don't recall.

Q.    Okay.

        MR. SAIN:  I'd like to show to the witness only an exhibit that's been identified as 124.  Just play a few moments, and then I'm going to ask her some foundational questions.

        Showing you --

        If we could just play like five seconds real quick.

                    (Video played.)

BY MR. SAIN:

Q.    Now, this video, does it have any audio component that you're aware of?

A.    Yes.

Q.    Okay.  But we're unable to hear it right now?

        MR. SAIN:  Five seconds' worth will be fine.  Thank you.  Let's play it again.

                    (Video played.)

        MR. SAIN:  Stop there.

BY MR. SAIN:

Q.    So showing you Exhibit 124, a video, do you recognize this video?

A.    Yes.

Q.    And is this the video that you took with your cellphone?

A.    Yes.

Q.    And does this video appear to fairly and accurately depict

what you recorded happening outside your window on the incident day involving Mr. Niedzialek?

A.   Yes.

MR. SAIN:  Your Honor, we'd ask that Exhibit 124 be admitted into evidence and published to the jury.

MR. GALIPO:  No objection.

THE COURT:  Received.  You can publish.

(Defendants' Exhibit No. 124 was admitted.)

MR. SAIN:  Thank you.  No further questions.

THE COURT:  Mr. Galipo.

MR. GALIPO:  Thank you.  If we could take that down, please.  Thank you.

May I inquire, Your Honor?

THE COURT:  You may.

**CROSS-EXAMINATION**

BY MR. GALIPO:

Q.   Good morning.

A.   Good morning.

Q.   So just to go over a few points of your testimony, it sounds like you're not sure when he was handcuffed, whether he was seated down or chest down; is that fair?

A.   Yes.

Q.   And as far as the second tasing, is it also fair you're not exactly sure when that happened?

A.   Yes.

Q.    But you're saying that you did see him bleeding at some point from the head and face?

A.    Yes.

Q.    And did you ever hear him verbally threaten to harm the officers?

A.    No.

Q.    Did you ever see him punch or try to punch any of the officers?

A.    No.

Q.    And then, if I'm understanding your testimony, you're saying that at some point you remember him chest down?

A.    Yes.

Q.    And this went on -- he was resisting, I guess you would say, moving his head and kicking his legs for about seven or ten minutes while he was chest down; is that your recollection?

A.    Yes.

Q.    And were you watching during this seven or ten minutes that he was kicking his legs?

A.    I don't recall if I watched the whole time.

Q.    And didn't he go limp at some point?

A.    I believe so, yes.

Q.    And at that point did he stop kicking his legs or moving?

A.    Yes.

Q.    And were you watching at that point?

A.    For a little bit, yes.

Q.    Okay.  And then how much time passed from when he stopped kicking his legs and went limp until they got off of him? You're saying immediately?

A.    Yes.

Q.    Okay.  So it's not like he was chest down and not kicking his legs for a period of -- of minutes and they were still holding him down?  That didn't happen, correct?

A.    Repeat that one more time.  I'm sorry.

Q.    It's not like he stopped moving and was chest down and they left him there or held him down for some period after that.  You're saying they immediately got off of him?

A.    Yes.

Q.    Okay.  And you also, I think, told us that during the time he was chest down for that seven or ten minutes, they were, based on your observations, holding him down?

A.    Yes.

Q.    Both deputies?

A.    Yes.

        MR. GALIPO:  May I have just one moment, Your Honor?

        THE COURT:  You may.

BY MR. GALIPO:

Q.    And when they finally turned him over, were you watching at that point?

A.    I don't recall.

        MR. GALIPO:  May I confer with counsel for one

moment?

THE COURT:  You may.

MR. GALIPO:  No further questions.  Thank you.

Thank you very much.

THE WITNESS:  Yeah.

THE COURT:  Mr. Sain.

MR. SAIN:  No further questions, Your Honor.  May the witness be excused?

THE COURT:  Yes.

Ms. Vasquez, you're excused.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Mr. Sain.

MR. SAIN:  Yes, Your Honor.  Thank you.  At this time the defense intends, with the Court's permission, to play the video deposition testimony of Witness Eric Mireles.  Our portion of that testimony should take approximately 27 minutes.

THE COURT:  Have you informed the other side which portions you intend to play?

MR. SAIN:  Yes, we have.  We filed that the day before trial, Your Honor, and I advised the Court about that on our first day.

MR. HELM:  Your Honor, if I may.  We would like to read certain portions that are not --

THE COURT:  Well, first of all, do you agree to them playing the portions that they indicated they will play?

MR. HELM:  Yes.

THE COURT:  And so you may do so.  And then after that, you may read some of the passages so long as you inform Mr. Sain which passages you intend to read.

MR. HELM:  Yes, I have informed him.

THE COURT:  Very well.  Go ahead.

MR. SAIN:  Thank you, Your Honor.

THE COURT:  You waive transcription of this portion?

MR. SAIN:  Yes, Your Honor.

MR. HELM:  Yes, Your Honor.

(Video deposition of Eric Mireles played.)

MR. SAIN:  Your Honor, may we have a moment?

THE COURT:  You may.

MR. SAIN:  Hit stop.

I'm sorry, there was a shorter version, and I just need to check with my staff to make sure it's the right one because I have a 27-minute version and a 36-minute so --

THE COURT:  Go ahead and check.

MR. SAIN:  Thank you.

My apologies, Your Honor, and to the members of the -- ladies and gentlemen of the jury.  We'll continue playing this version.  It's about five minutes longer than I anticipated, but --

THE COURT:  Very well.  You can play it.

MR. SAIN:  Thank you.

Mr. Lyons.  Thank you.

(Video deposition continued playing.)

THE COURT:  Very well.  Ladies and gentlemen, we'll take a lunch recess at this time.  Remember my advice to you -- my orders to you, not to talk about this case, keep an open mind, do not let others talk to you about it, do not try to learn about it in any way.  Let's be back at 1:30.

(Out of the presence of the jury:)

MR. SAIN:  Your Honor?

THE COURT:  Yes.

MR. SAIN:  Just for completeness of the record, we'd like to mark this video as Exhibit 388 and have it admitted into evidence since we were not transcribing.

THE COURT:  It's received.

(Defendants' Exhibit No. 388 was admitted.)

MR. SAIN:  Thank you.

THE COURT:  Anything from you, Mr. Galipo?

MR. GALIPO:  Yes.  So just very quickly, I did a rough calculation in my head based on your time estimates you gave us at the end of the day Friday, and it seemed like there was a total of about 11 hours of time left before today for both sides.  And I was thinking we normally get five and a half hours in per day.  So I'm envisioning or hoping we could do our closings on Thursday.  I know we only have one or two minutes of our reading for this witness, and then Dr. Fajardo is going

to be called, and then I think another expert, Kode, which we only have ten minutes of cross on because we're trying to preserve our time now.  So I just want to let counsel know and the Court because I think counsel's intent is to call his experts tomorrow and then Fonzi on Thursday morning, which I wasn't expecting, and I'm just wanting to let you know where we're at.

THE COURT:  Okay.  Very well.  So we'll talk about it after lunch.

MR. GALIPO:  Yeah, because we maybe end up early.

THE COURT:  I intend to do everything we can to get the testimony concluded by tomorrow afternoon.

MR. GALIPO:  Okay.  So --

THE COURT:  Mr. Fonzi has a scheduling conflict?

MR. SAIN:  Honestly, Your Honor, I don't know.  But in terms of the witnesses we were planning to call, I anticipate that Mr. -- Dr. Chan will not be here until tomorrow.  He is going to take us just on direct about an hour to 90 minutes.  Dr. Graham is being called tomorrow.  I believe Lieutenant Vickers is being called tomorrow.  And if we -- we will probably finish with Dr. Kode now today.

THE COURT:  We'll just go and you have the time that you have so you can use it all.

MR. SAIN:  Thank you, Your Honor.

(Lunch recess)

CERTIFICATE OF OFFICIAL REPORTER


        I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.



                        DATED THIS 4TH DAY OF APRIL, 2023



                        /s/ PHYLLIS A. PRESTON

                        _____

                        PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                         FEDERAL OFFICIAL COURT REPORTER

**'**

**'18** [1] - 56:7

**/**

**/s** [1] - 96:18

**1**

**10** [34] - 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 38:22, 38:25, 39:16, 39:20, 41:6, 41:9, 44:14, 51:5, 51:6, 52:15, 53:5, 53:15, 53:24, 54:9, 55:8, 55:14, 55:18, 55:22, 56:3
**10-10** [3] - 3:19, 53:3, 53:5
**10-12** [5] - 3:17, 39:4, 39:16, 39:19, 39:20
**10-13** [3] - 3:19, 53:13, 53:15
**10-14** [3] - 3:20, 53:22, 53:24
**10-15** [3] - 3:20, 54:7, 54:9
**10-17** [4] - 3:21, 54:13, 54:15, 67:20
**10-19** [3] - 3:21, 55:6, 55:8
**10-20** [3] - 3:22, 55:12, 55:14
**10-21** [3] - 3:22, 55:16, 55:18
**10-22** [4] - 3:17, 40:20, 41:6, 41:9
**10-24** [3] - 3:23, 55:20, 55:22
**10-25** [5] - 3:18, 43:25, 44:11, 44:14, 44:16
**10-28** [3] - 3:23, 56:1, 56:3
**10-9** [4] - 3:18, 52:13, 52:15, 67:15
**100** [2] - 19:17, 84:2
**11** [3] - 49:16, 51:5, 94:21
**12** [2] - 56:22, 72:16
**124** [5] - 3:24, 88:4, 88:20, 89:4, 89:8
**128** [1] - 2:7
**15** [2] - 62:24, 63:3
**17** [4] - 51:12, 54:15, 65:9, 65:15
**18** [1] - 51:12

**19-2083-JGB** [3] - 1:10, 4:4, 63:9
**1995** [3] - 13:7, 21:18, 22:9
**1:30** [1] - 94:7

**2**

**20** [2] - 64:17, 65:22
**2005** [2] - 64:17, 65:19
**2008** [1] - 38:10
**2010** [2] - 38:17, 40:1
**2015** [5] - 47:7, 47:11, 47:14, 66:16, 66:18
**2017** [6] - 21:9, 21:18, 21:19, 66:16, 66:20, 67:1
**2018** [4] - 40:15, 51:14, 51:15, 54:18
**2019** [13] - 47:6, 47:11, 47:14, 56:5, 56:8, 56:11, 56:15, 58:1, 61:4, 61:5, 66:19, 66:23, 69:2
**2023** [3] - 1:17, 4:1, 96:15
**21** [3] - 51:3, 64:17, 65:22
**21800** [1] - 2:5
**22** [3] - 40:19, 65:9, 65:15
**225** [2] - 33:7, 36:13
**24/7** [1] - 60:1
**27** [1] - 92:16
**27-minute** [1] - 93:17
**27G** [1] - 69:5
**28** [1] - 96:7
**29** [6] - 3:5, 65:6, 65:8, 65:9, 65:13, 65:14
**29th** [2] - 58:1, 69:2

**3**

**305** [1] - 2:10
**310** [1] - 2:5
**3470** [1] - 1:23
**36-minute** [1] - 93:17
**360** [4] - 3:24, 72:19, 73:21, 73:23
**37** [1] - 3:7
**388** [3] - 3:25, 94:12, 94:15
**39** [1] - 3:17
**3:00** [1] - 58:14

**4**

**4** [2] - 1:17, 4:1
**4000** [1] - 2:16
**403** [2] - 26:17, 29:3
**40th** [1] - 2:10

**41** [1] - 3:17
**42200** [1] - 69:5
**44** [1] - 3:18
**46** [1] - 3:7
**48** [1] - 3:9
**4TH** [1] - 96:15
**4th** [1] - 43:19

**5**

**5** [2] - 1:11, 3:4
**52** [1] - 3:18
**53** [3] - 3:19, 3:19, 3:20
**54** [2] - 3:20, 3:21
**55** [4] - 3:21, 3:22, 3:22, 3:23
**56** [1] - 3:23
**5th** [1] - 2:16

**6**

**633** [1] - 2:16
**64** [1] - 3:10
**644** [1] - 2:10
**67** [1] - 3:10
**68** [1] - 3:12

**7**

**73** [1] - 3:24
**73rd** [1] - 53:19
**753** [1] - 96:7

**8**

**8701** [1] - 96:20
**89** [2] - 3:13, 3:24

**9**

**90** [1] - 95:19
**90071** [1] - 2:17
**91103** [1] - 2:8
**91367** [1] - 2:5
**92501** [1] - 1:23
**93** [1] - 3:15
**94** [1] - 3:25
**94609** [1] - 2:10
**9:15** [1] - 1:18

**A**

**A-L-V-E-S** [2] - 37:18, 48:15
**a.m** [1] - 1:18
**Aaron** [4] - 57:17, 57:18, 57:19
**able** [5] - 31:3, 31:6, 33:4, 37:23, 76:8
**ABOVE** [1] - 96:10

**ABOVE-ENTITLED** [1] - 96:10
**absent** [1] - 62:12
**absolutely** [9] - 10:13, 17:6, 17:13, 17:20, 19:4, 19:11, 22:13, 32:19, 36:17
**academy** [1] - 69:15
**accompany** [1] - 43:7
**according** [1] - 34:2
**accurate** [4] - 7:17, 39:12, 41:2, 44:5
**accurately** [2] - 73:13, 88:25
**acknowledging** [1] - 14:9
**acted** [3] - 6:18, 9:20, 10:14
**acting** [2] - 45:23, 80:13
**action** [1] - 69:1
**actions** [1] - 6:16
**actual** [2] - 9:13, 11:25
**added** [1] - 33:16
**adequate** [1] - 16:16
**adequately** [2] - 18:1, 34:21
**administer** [1] - 4:20
**admit** [4] - 39:15, 41:5, 44:10, 52:12
**ADMITTED** [1] - 3:16
**admitted** [20] - 39:20, 41:9, 44:14, 52:15, 53:5, 53:15, 53:24, 54:9, 54:15, 55:8, 55:14, 55:18, 55:22, 56:3, 73:18, 73:23, 89:5, 89:8, 94:12, 94:15
**adored** [1] - 53:11
**adult** [2] - 49:21, 50:2
**advice** [1] - 94:4
**advised** [1] - 92:20
**affect** [2] - 67:17, 67:20
**affected** [4] - 45:15, 45:16, 45:17, 60:22
**afternoon** [5] - 59:16, 69:21, 71:5, 75:25, 95:12
**age** [1] - 65:21
**agencies** [1] - 24:12
**agencies'** [1] - 36:4
**agency** [2] - 6:12, 30:7
**agree** [10] - 8:2, 12:3, 13:19, 21:17, 23:19, 24:9, 40:16, 42:14, 47:16, 92:24
**agreed** [3] - 12:6, 52:3, 52:9

**agreement** [10] - 53:3, 53:13, 53:22, 54:7, 54:13, 55:6, 55:12, 55:16, 55:20, 56:1
**ahead** [3] - 49:11, 93:6, 93:18
**airway** [6] - 25:14, 25:18, 32:17, 32:24, 36:12, 36:21
**al** [2] - 4:5, 63:10
**alike** [1] - 45:21
**alive** [1] - 51:10
**allege** [1] - 6:5
**almost** [2] - 51:12, 59:25
**ALVES** [5] - 1:7, 3:6, 3:9, 37:12, 48:12
**Alves** [20] - 4:5, 37:15, 37:21, 38:6, 38:11, 38:16, 39:25, 41:12, 41:22, 42:2, 45:15, 46:8, 47:23, 48:15, 48:23, 63:5, 63:10, 63:17, 64:5, 68:2
**Alves'** [1] - 40:11
**AM** [1] - 1:12
**amount** [1] - 13:17
**AND** [3] - 96:5, 96:8, 96:10
**Angeles** [1] - 2:17
**angry** [3] - 55:1, 77:9, 80:24
**answer** [6] - 16:6, 16:24, 22:8, 28:4, 29:12, 58:12
**ANSWER** [2] - 65:19, 65:22
**answered** [5] - 8:19, 9:9, 20:13, 22:22, 23:3
**answers** [1] - 61:1
**anticipate** [1] - 95:17
**anticipated** [1] - 93:23
**anyway** [1] - 50:11
**apartment** [8] - 69:3, 69:5, 69:24, 70:3, 70:24, 71:5, 71:23, 73:4
**apartments** [2] - 58:8, 64:7
**apologies** [1] - 93:20
**apologize** [2] - 14:15, 29:1
**appear** [9] - 31:18, 39:12, 41:2, 44:5, 77:8, 80:21, 80:24, 81:6, 88:25
**appearances** [2] - 4:6, 63:11
**APPEARANCES** [1] -

2:1
**appeared** [1] - 76:11
**Appel** [1] - 28:16
**application** [1] - 24:5
**applies** [1] - 26:23
**applying** [2] - 26:10
**approach** [3] - 26:13, 79:17, 79:18
**appropriate** [1] - 23:24
**approve** [1] - 14:7
**April** [1] - 1:17
**APRIL** [2] - 4:1, 96:15
**area** [1] - 13:17
**argumentative** [4] - 20:7, 22:22, 25:9, 29:3
**Arizona** [2] - 69:9
**arrest** [7] - 16:1, 17:7, 24:8, 35:11, 35:20, 60:11, 79:11
**arrested** [1] - 16:19
**arresting** [2] - 17:5, 28:8
**arrhythmia** [1] - 18:25
**arrive** [1] - 86:11
**arrived** [2] - 85:21, 86:18
**articles** [1] - 13:14
**aside** [1] - 13:15
**asphyxia** [22] - 11:10, 11:15, 11:16, 13:21, 13:22, 13:24, 14:3, 14:11, 14:21, 24:25, 25:13, 26:1, 26:9, 31:18, 31:25, 32:5, 33:11, 33:15, 36:16
**assessment** [1] - 59:9
**assist** [1] - 22:2
**Association** [1] - 21:9
**assume** [3] - 11:6, 34:15, 34:16
**assumes** [10] - 7:24, 19:1, 19:8, 19:23, 20:6, 20:13, 22:4, 25:8, 27:17, 28:1
**assuming** [3] - 14:6, 35:19, 54:11
**astonished** [1] - 22:19
**astonishes** [1] - 22:11
**attempt** [1] - 23:7
**attended** [1] - 69:15
**attention** [4] - 24:7, 45:6, 71:4, 71:7
**audio** [1] - 88:11
**August** [1] - 51:6
**authorized** [1] - 17:23
**automatically** [2] - 16:15, 16:16
**autopsy** [2] - 5:20,

12:1
**available** [1] - 43:9
**Avenue** [1] - 2:7
**average** [1] - 74:23
**avoid** [2] - 23:1, 24:7
**avoiding** [1] - 33:6
**aware** [21] - 5:25, 6:4, 9:3, 13:8, 22:15, 22:20, 25:25, 26:8, 27:23, 28:5, 36:5, 36:19, 40:11, 47:7, 47:10, 59:23, 64:16, 65:24, 66:18, 67:2, 88:12
**awareness** [1] - 12:20

## B

**B-I-A-N-C-O** [1] - 5:4
**baby** [2] - 49:8, 49:9
**babysitter** [1] - 49:17
**back-and-forth** [1] - 76:21
**bag** [2] - 86:3, 86:5
**BAKKEN** [23] - 2:16, 3:7, 3:10, 39:17, 41:7, 42:11, 42:18, 44:12, 46:1, 46:5, 46:7, 47:20, 62:4, 64:2, 64:4, 64:19, 64:21, 64:22, 65:5, 65:9, 65:16, 67:6, 68:1
**Bakken** [5] - 4:14, 46:4, 63:22, 64:1, 67:25
**baseball** [1] - 49:13
**based** [14] - 8:17, 11:3, 12:23, 13:6, 18:21, 20:25, 25:15, 32:20, 32:21, 51:23, 59:6, 66:22, 91:15, 94:19
**basis** [3] - 23:16, 35:11, 61:15
**batons** [1] - 83:6
**beach** [2] - 50:17, 50:19
**became** [2] - 64:16, 65:24
**become** [2] - 36:11, 36:14
**becomes** [1] - 24:4
**bedroom** [3] - 71:17, 71:24, 71:25
**begin** [1] - 65:18
**behalf** [5] - 4:9, 4:14, 45:23, 63:14, 63:22
**behind** [3] - 15:25, 79:15, 87:3

**believes** [1] - 19:19
**belly** [1] - 33:3
**below** [1] - 41:16
**BERNAL** [1] - 1:5
**best** [4] - 9:12, 35:24, 50:4, 75:1
**bet** [1] - 54:20
**between** [9] - 42:5, 46:10, 46:14, 47:14, 51:18, 64:10, 69:22, 70:2, 84:11
**beyond** [1] - 17:25
**BIANCO** [3] - 1:12, 3:4, 5:1
**Bianco** [8] - 4:14, 5:4, 5:9, 12:7, 16:5, 28:25, 45:23, 63:23
**big** [2] - 43:13, 43:23
**biological** [2] - 41:19, 42:6
**birthday** [1] - 53:19
**BISGAARD** [1] - 2:15
**bit** [12] - 29:11, 30:4, 52:23, 66:12, 70:5, 73:5, 73:10, 73:11, 73:12, 75:4, 90:25
**bleeding** [2] - 75:16, 90:1
**blended** [1] - 42:14
**blocking** [1] - 76:2
**blood** [1] - 80:13
**boards** [1] - 12:2
**Bob** [6] - 49:22, 50:8, 54:24, 55:1, 58:18, 61:8
**body** [2] - 18:23, 23:9
**book** [3] - 34:18, 38:19, 47:24
**booking** [1] - 34:19
**Boulevard** [1] - 2:5
**brain** [3] - 58:25, 59:2, 59:12
**break** [1] - 62:23
**breathe** [7] - 11:2, 11:5, 20:4, 30:21, 31:1, 31:3, 33:5
**breathing** [28] - 7:17, 7:18, 9:2, 9:4, 11:6, 11:7, 13:3, 17:18, 17:24, 22:2, 24:4, 24:5, 25:7, 25:18, 26:9, 30:19, 31:1, 31:5, 31:9, 31:12, 32:8, 32:9, 32:10, 32:13, 32:14, 84:23, 86:2
**briefly** [1] - 21:8
**BRISBOIS** [1] - 2:15
**broad** [1] - 8:1
**broken** [1] - 16:12

**brother** [11] - 49:5, 49:6, 54:21, 56:16, 57:16, 58:3, 59:21, 60:22, 61:10, 66:23, 67:18
**brothers** [1] - 49:4
**brought** [1] - 59:4
**Burbank** [1] - 2:5
**Bureau** [2] - 11:23, 29:14
**bureau's** [1] - 36:10
**burger** [1] - 44:25
**Burton** [2] - 4:9, 63:14
**BURTON** [3] - 2:6, 2:7, 4:12
**bury** [1] - 56:8
**BY** [73] - 2:4, 2:7, 2:9, 2:15, 3:4, 3:5, 3:7, 3:7, 3:9, 3:10, 3:10, 3:12, 3:13, 5:8, 5:13, 7:8, 8:3, 8:16, 8:24, 9:18, 14:17, 15:6, 15:15, 16:4, 17:9, 19:5, 19:13, 20:2, 20:10, 20:18, 22:18, 22:25, 23:6, 23:14, 24:17, 25:21, 26:7, 27:13, 27:22, 28:11, 29:5, 29:18, 29:25, 34:1, 35:5, 37:20, 39:24, 41:11, 42:13, 42:21, 44:21, 46:7, 48:22, 52:24, 53:6, 53:16, 54:1, 54:10, 54:16, 55:9, 56:10, 64:4, 64:22, 65:16, 67:9, 68:23, 72:21, 73:25, 82:11, 88:10, 88:19, 89:16, 91:21
**bystander** [1] - 61:7
**bystanders** [1] - 22:12

## C

**calculation** [1] - 94:19
**CALIFORNIA** [3] - 1:2, 4:1, 96:6
**California** [11] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17, 14:2, 50:8, 50:18, 51:15, 69:3
**calm** [8] - 24:4, 72:3, 74:15, 76:12, 76:15, 77:8, 80:25, 81:2
**calm-down** [2] - 77:8, 81:2
**calming** [1] - 16:14
**cam** [1] - 52:19
**camera** [2] - 44:17, 52:18

**cancer** [1] - 51:16
**canyon** [2] - 58:8, 64:7
**capacity** [3] - 17:19, 17:25, 26:10
**captain** [2] - 11:23, 12:11
**car** [1] - 16:3
**cardiac** [3] - 18:24, 24:8, 60:11
**cards** [1] - 55:24
**cared** [2] - 51:17, 52:5
**Case** [2] - 4:4, 63:9
**case** [27] - 5:25, 8:13, 9:14, 10:3, 12:5, 13:5, 18:16, 18:18, 18:23, 20:20, 20:22, 25:18, 27:6, 27:14, 27:23, 28:12, 28:14, 28:16, 28:18, 28:20, 36:20, 62:25, 63:1, 63:2, 64:23, 64:25, 94:5
**cases** [3] - 27:23, 28:17, 36:18
**CAT** [2] - 59:11
**catch** [1] - 46:20
**causal** [1] - 28:2
**causing** [1] - 31:2
**caution** [1] - 13:18
**cell** [1] - 16:19
**cellphone** [1] - 88:23
**Center** [1] - 58:20
**CENTRAL** [2] - 1:2, 96:6
**central** [1] - 43:4
**certain** [1] - 92:23
**certainly** [3] - 16:1, 28:5, 30:16
**CERTIFICATE** [1] - 96:1
**CERTIFY** [1] - 96:6
**Chad** [3] - 4:14, 5:4, 63:23
**CHAD** [4] - 1:12, 3:4, 5:1, 5:4
**Chan** [1] - 95:17
**change** [5] - 12:5, 15:3, 77:20, 80:3, 81:16
**changed** [5] - 33:15, 34:24, 57:3, 77:21, 86:15
**changes** [2] - 26:18
**characterize** [1] - 54:22
**charge** [2] - 78:9, 78:14
**charging** [2] - 78:7, 80:14

check [3] - 23:15, 93:16, 93:18
checked [1] - 23:21
chest [19] - 7:1, 7:11, 9:6, 9:8, 9:13, 10:4, 10:8, 11:2, 17:18, 20:4, 23:2, 31:13, 78:23, 89:21, 90:11, 90:15, 91:5, 91:9, 91:14
Chiefs [1] - 21:9
children [8] - 30:25, 41:23, 41:25, 42:3, 42:6, 42:15, 50:9, 61:24
Christmas [3] - 43:18, 43:20, 43:22
chronic [2] - 47:17, 66:23
chronology [1] - 49:7
circumstances [3] - 28:18, 34:14, 36:7
clean [3] - 56:16, 56:17, 66:15
clear [4] - 15:2, 17:10, 32:17, 86:7
CLERK [15] - 4:4, 4:21, 5:2, 37:7, 37:13, 44:17, 44:19, 48:7, 48:13, 52:18, 52:21, 63:9, 68:10, 68:16, 68:18
click [1] - 44:17
clinged [1] - 62:16
close [2] - 51:21, 80:19
closings [1] - 94:24
coached [1] - 49:14
code [1] - 25:25
CODE [1] - 96:7
coffee [4] - 61:19, 61:21, 61:22
collaboration [1] - 11:24
college [1] - 50:7
colon [1] - 51:16
combative [20] - 8:14, 8:22, 9:12, 9:17, 16:9, 16:10, 16:17, 16:18, 17:4, 17:5, 34:15, 34:16, 34:17, 34:18, 34:20, 35:9, 35:12, 35:20, 60:10
combination [2] - 12:10, 12:11
combining [1] - 11:25
coming [3] - 71:15, 78:17, 78:20
commands [1] - 81:7
common [2] - 43:7,

45:20
company [3] - 24:11, 38:1, 38:2
complete [3] - 5:14, 6:1, 6:4
completely [7] - 13:23, 14:2, 19:12, 26:22, 30:11, 30:12, 32:12
completeness [1] - 94:11
completion [1] - 12:1
complex [1] - 69:4
complying [1] - 81:6
component [1] - 88:11
compromised [1] - 25:7
concentrate [1] - 16:5
concluded [2] - 27:12, 95:12
conclusion [1] - 26:4
condition [2] - 18:18, 75:23
condolences [1] - 45:25
confer [3] - 48:16, 48:20, 91:25
CONFERENCE [1] - 96:11
conference [2] - 26:15, 27:12
conflict [1] - 95:14
CONFORMANCE [1] - 96:11
confused [1] - 60:9
connected [2] - 78:22, 79:3
consciously [1] - 36:14
consistent [3] - 6:19, 9:20, 10:14
constitutional [1] - 27:8
construction [1] - 38:1
consult [3] - 6:11, 6:15, 30:6
contacted [1] - 45:24
context [2] - 14:23, 27:19
continue [1] - 93:21
continued [3] - 23:8, 59:12, 94:2
continuous [1] - 23:16
contribute [1] - 20:16
contributed [3] - 18:25, 19:6, 20:11
control [3] - 23:7, 34:22
controlled [7] - 15:8,

15:17, 15:23, 18:1, 22:1, 34:8, 34:11
conversation [1] - 31:4
conversations [1] - 59:20
cooperation [2] - 11:25, 30:18
copy [1] - 44:5
coroner [1] - 58:9
Coroner [1] - 45:23
CORONER [1] - 1:12
Coroner's [2] - 11:23, 29:14
coroners [1] - 12:12
coroners-deputies [1] - 12:12
correct [53] - 5:15, 5:18, 5:19, 5:23, 5:24, 6:10, 6:20, 8:5, 8:9, 8:18, 8:21, 9:2, 9:22, 10:4, 10:6, 10:10, 10:11, 12:18, 18:3, 21:12, 21:23, 22:3, 23:2, 23:10, 23:16, 23:25, 24:8, 24:12, 25:7, 25:23, 31:20, 31:22, 31:25, 36:1, 42:4, 46:24, 47:4, 47:8, 64:14, 64:15, 64:17, 64:18, 64:23, 64:24, 66:1, 66:16, 66:21, 66:24, 66:25, 67:4, 67:12, 76:23, 91:7
CORRECT [1] - 96:8
couch [1] - 57:21
counsel [8] - 4:6, 11:20, 48:16, 48:20, 63:11, 67:14, 91:25, 95:3
counsel's [1] - 95:4
counselor [1] - 57:24
COUNTY [2] - 1:11, 1:11
County [7] - 4:5, 4:15, 63:10, 63:23, 69:23, 70:2
couple [4] - 57:2, 57:10, 57:21, 60:19
court [3] - 6:22, 10:18, 11:15
COURT [114] - 1:1, 4:11, 4:16, 5:5, 7:5, 7:25, 8:11, 8:20, 9:10, 14:14, 15:5, 15:12, 15:20, 16:6, 16:23, 19:3, 19:10, 19:25, 20:8, 20:15, 22:6, 22:23, 23:4,

23:12, 24:16, 25:10, 26:5, 26:14, 26:25, 27:4, 27:19, 28:4, 29:4, 29:10, 29:21, 33:25, 35:4, 37:2, 37:5, 37:17, 39:18, 39:23, 41:8, 42:12, 42:19, 44:13, 46:2, 46:4, 47:21, 47:23, 47:25, 48:2, 48:4, 48:18, 52:11, 52:14, 53:4, 53:14, 53:23, 54:8, 54:14, 55:7, 55:13, 55:17, 55:21, 56:2, 62:5, 62:21, 63:5, 63:8, 63:16, 63:20, 63:25, 64:20, 65:8, 65:11, 65:13, 65:15, 67:7, 67:25, 68:2, 68:6, 68:21, 72:20, 73:20, 73:22, 82:9, 89:7, 89:10, 89:14, 91:20, 92:2, 92:6, 92:9, 92:12, 92:17, 92:24, 93:2, 93:6, 93:8, 93:13, 93:18, 93:24, 94:3, 94:10, 94:14, 94:17, 95:8, 95:11, 95:14, 95:22, 96:5, 96:21
Court [8] - 1:22, 1:22, 4:23, 37:9, 48:9, 68:12, 92:20, 95:4
Court's [1] - 92:14
cover [1] - 38:1
covered [1] - 24:14
covering [1] - 53:18
CPR [1] - 61:6
criminal [1] - 6:9
CROSS [6] - 3:7, 3:10, 3:13, 46:6, 64:3, 89:15
cross [2] - 63:25, 95:2
CROSS-EXAMINATION [6] - 3:7, 3:10, 3:13, 46:6, 64:3, 89:15
cross-examination [1] - 63:25
Cruz [2] - 28:12, 36:19
CSR [2] - 1:21, 96:20
cumulative [2] - 8:19, 24:15
curb [1] - 16:2
current [12] - 13:19, 14:6, 14:9, 15:7, 15:16, 18:12, 18:13, 26:23, 27:2, 33:12, 34:6, 69:10
custody [3] - 28:7,

28:21, 30:6
customary [1] - 30:5
CVS [1] - 69:11

D

DA's [2] - 30:15, 30:18
dad [3] - 49:14, 51:2, 51:3
daily [3] - 52:6, 55:5, 61:15
Dale [2] - 4:8, 63:13
DALE [2] - 2:4, 2:4
date [12] - 31:16, 31:19, 32:4, 33:18, 36:11, 58:2, 64:7, 65:25, 66:18, 70:1, 73:14, 87:14
DATED [1] - 96:15
daughter [12] - 40:7, 41:15, 41:18, 41:19, 53:8, 54:19, 55:23, 55:24, 56:22, 70:22, 70:23, 71:1
DAY [1] - 96:15
day-to-day [1] - 35:11
days [7] - 56:19, 57:2, 57:9, 57:21, 59:22, 59:25, 61:16
deal [1] - 57:20
dealing [1] - 30:18
death [25] - 6:13, 12:8, 12:14, 12:17, 19:7, 19:20, 20:12, 20:17, 21:23, 28:3, 29:14, 30:6, 36:15, 36:23, 45:25, 50:3, 50:4, 51:19, 51:24, 58:25, 60:22, 61:3, 61:12, 67:21
deaths [1] - 30:14
debate [4] - 13:20, 14:9, 14:19, 14:24
debating [1] - 14:5
deceased [1] - 1:8
decedent [1] - 10:3
December [1] - 61:4
decided [2] - 11:21, 43:2
deciding [2] - 12:13, 12:14
decision [2] - 59:6, 59:14
decisions [1] - 12:21
defendant [4] - 4:14, 4:15, 63:22, 68:8
Defendants [2] - 1:13, 2:14
Defendants' [3] - 73:23, 89:8, 94:15

**DEFENDANTS'** [1] - 68:15
**defense** [1] - 92:14
**defined** [1] - 12:16
**defines** [2] - 26:1, 26:8
**definitely** [3] - 43:23, 49:16, 49:17
**deliberately** [2] - 27:7, 36:14
**delirium** [6] - 7:20, 20:22, 20:24, 21:2, 21:4, 21:7
**deliver** [1] - 54:19
**DEPARTMENT** [1] - 1:11
**department** [21] - 5:14, 5:17, 5:18, 11:9, 11:14, 12:7, 15:3, 25:22, 27:14, 27:25, 28:22, 29:6, 30:5, 30:11, 30:21, 32:4, 33:19, 36:10, 36:21, 58:21, 59:4
**Department** [5] - 5:22, 6:20, 30:15, 69:23, 70:3
**department's** [2] - 34:2, 35:24
**depict** [2] - 73:14, 88:25
**depicted** [1] - 73:1
**deposition** [8] - 20:19, 64:23, 64:25, 65:6, 92:15, 93:11, 94:2
**DEPOSITION** [1] - 3:15
**deputies** [57] - 6:18, 9:20, 11:1, 11:24, 12:12, 13:4, 17:23, 19:20, 22:12, 23:21, 31:12, 32:4, 32:16, 32:22, 33:19, 34:2, 34:7, 34:25, 35:6, 35:14, 36:22, 46:11, 46:14, 46:23, 64:11, 64:14, 69:23, 70:3, 70:18, 72:5, 72:10, 74:1, 74:11, 74:18, 74:21, 75:6, 75:12, 75:20, 76:11, 76:20, 77:3, 77:9, 80:14, 80:24, 81:2, 82:14, 82:19, 83:5, 83:14, 83:16, 84:16, 85:12, 85:14, 85:25, 86:5, 86:7, 91:17
**deputy** [10] - 75:3, 75:14, 80:18, 80:21, 82:22, 82:24, 83:2,

83:8, 83:16, 83:17
**Deputy** [3] - 6:5, 6:25, 8:4
**describe** [2] - 80:8, 80:10
**description** [1] - 26:2
**detail** [1] - 31:11
**detectives** [2] - 58:8, 60:1
**devices** [1] - 83:9
**diagnosed** [1] - 51:16
**diagnosis** [1] - 51:18
**die** [1] - 51:13
**died** [10] - 19:22, 27:16, 27:25, 28:7, 28:21, 29:15, 51:2, 51:6, 62:6, 62:7
**difference** [3] - 14:24, 51:5, 51:12
**different** [9] - 6:7, 9:24, 13:10, 18:14, 24:11, 25:11, 26:1, 28:19, 32:12
**differently** [1] - 35:21
**difficult** [1] - 60:20
**direct** [1] - 95:18
**DIRECT** [6] - 3:7, 3:9, 3:12, 37:19, 48:21, 68:22
**direction** [3] - 22:9, 79:6, 80:5
**directly** [2] - 30:14, 73:4
**directs** [2] - 15:22, 17:3
**dirt** [1] - 33:1
**disagree** [3] - 12:3, 12:4, 23:18
**disagreed** [1] - 12:3
**discharge** [6] - 81:9, 81:12, 81:15, 81:18, 81:21, 82:1
**discuss** [1] - 12:5
**discussed** [1] - 19:17
**discussing** [1] - 44:22
**discussion** [2] - 21:10, 68:5
**disproven** [1] - 13:7
**dispute** [1] - 13:2
**disregard** [2] - 22:11, 36:14
**distinguish** [1] - 42:5
**distributes** [1] - 24:11
**DISTRICT** [5] - 1:1, 1:2, 1:5, 96:5, 96:6
**District** [1] - 1:22
**DIVISION** [1] - 1:3
**DIVISION-RIVERSIDE** [1] - 1:3
**DO** [1] - 96:6

**doc** [1] - 52:19
**doctor** [1] - 12:15
**doctors** [4] - 11:25, 12:10, 13:23, 13:25
**doctors'** [1] - 59:7
**document** [5] - 39:6, 40:22, 44:2, 44:17, 52:18
**documentation** [1] - 14:3
**DOJ** [1] - 30:18
**donating** [1] - 59:14
**donation** [3] - 59:16, 60:15, 60:17
**done** [2] - 5:17, 13:14
**door** [1] - 61:20
**doubt** [2] - 13:2, 13:11
**down** [51] - 7:23, 9:1, 10:4, 10:8, 11:3, 11:24, 17:18, 23:9, 33:3, 37:2, 43:24, 47:23, 56:20, 58:16, 63:5, 68:2, 72:3, 72:15, 74:15, 76:1, 76:12, 76:15, 77:8, 79:10, 79:12, 81:2, 81:24, 81:25, 82:2, 82:14, 82:17, 83:19, 84:6, 84:10, 84:16, 85:1, 85:24, 86:8, 89:11, 89:21, 90:11, 90:15, 91:5, 91:7, 91:9, 91:10, 91:14, 91:15
**downs** [1] - 61:1
**downward** [2] - 86:9, 86:16
**Dr** [13] - 11:20, 12:8, 12:14, 12:20, 18:16, 18:22, 19:18, 19:21, 20:19, 94:25, 95:17, 95:19, 95:21
**draw** [1] - 71:4
**drew** [1] - 71:7
**drug** [4] - 47:17, 57:24, 65:25
**drugs** [11] - 7:21, 47:7, 47:10, 47:13, 56:16, 57:9, 65:25, 66:4, 66:5, 66:16, 67:16
**during** [14] - 7:20, 24:5, 46:17, 46:23, 57:5, 59:9, 62:24, 64:14, 70:6, 70:9, 84:15, 84:22, 90:17, 91:13

## E

**early** [1] - 95:10

**easier** [1] - 20:3
**EASTERN** [1] - 1:3
**easy** [1] - 16:12
**eat** [2] - 50:21, 50:22
**EDCV** [2] - 4:4, 63:9
**eDCV** [1] - 1:10
**education** [1] - 50:6
**effect** [1] - 10:20
**effort** [3] - 12:13, 35:23, 35:24
**eight** [1] - 75:5
**either** [8] - 12:3, 18:14, 25:16, 30:15, 74:18, 75:12, 77:8, 83:5
**elevation** [1] - 73:7
**eliminate** [2] - 14:2, 32:15
**eliminated** [1] - 25:12
**emergency** [2] - 58:21, 59:4
**emotional** [1] - 57:11
**employed** [1] - 69:12
**employees** [1] - 38:4
**emptiness** [1] - 45:19
**enacted** [1] - 26:21
**encountered** [1] - 20:24
**end** [3] - 60:7, 94:20, 95:10
**enforcement** [7] - 27:15, 30:14, 36:4, 60:1, 69:13, 69:16, 75:10
**enforcement-related** [1] - 30:14
**ensure** [4] - 11:5, 32:8, 34:20, 35:18
**ensured** [1] - 25:18
**ensuring** [2] - 9:16, 32:24
**entire** [4] - 11:22, 12:3, 24:13, 60:6
**ENTITLED** [1] - 96:10
**envisioning** [1] - 94:23
**Eric** [2] - 92:15, 93:11
**ERIC** [1] - 3:14
**Ernie** [2] - 28:14, 36:19
**err** [2] - 13:17
**especially** [1] - 9:13
**establish** [1] - 28:3
**estimate** [3] - 75:1, 85:10, 85:15
**estimated** [1] - 85:4
**estimates** [1] - 94:19
**et** [2] - 4:5, 63:10
**evaluating** [1] - 30:6

**event** [1] - 45:2
**events** [1] - 87:19
**eventually** [2] - 35:17, 51:14
**everywhere** [1] - 80:13
**evidence** [19] - 7:24, 9:3, 13:7, 19:1, 19:8, 19:24, 20:6, 20:14, 22:4, 22:10, 25:8, 27:18, 28:2, 39:16, 41:6, 44:11, 73:18, 89:5, 94:13
**ex** [1] - 62:9
**ex-husband** [1] - 62:9
**exact** [2] - 18:8, 66:7
**exactly** [5] - 7:6, 7:13, 9:17, 85:17, 89:24
**EXAMINATION** [18] - 3:4, 3:5, 3:7, 3:7, 3:9, 3:10, 3:10, 3:12, 3:13, 5:7, 29:24, 37:19, 46:6, 48:21, 64:3, 67:8, 68:22, 89:15
**examination** [1] - 63:25
**examiner** [2] - 5:20, 5:22
**exchange** [1] - 31:6
**excited** [7] - 7:20, 20:22, 20:24, 21:1, 21:3, 21:7, 31:3
**excuse** [3] - 32:21, 34:23, 80:17
**excused** [4] - 48:1, 48:2, 92:8, 92:10
**exertion** [2] - 23:8, 24:3
**EXHIBIT** [1] - 3:16
**exhibit** [4] - 38:18, 52:8, 72:19, 88:4
**Exhibit** [28] - 38:22, 38:25, 39:16, 39:19, 39:20, 41:6, 41:9, 44:11, 44:14, 52:15, 53:5, 53:15, 53:24, 54:9, 54:15, 55:8, 55:14, 55:18, 55:22, 56:3, 67:15, 67:20, 73:23, 88:20, 89:4, 89:8, 94:12, 94:15
**exhibiting** [1] - 21:5
**exhibits** [1] - 68:5
**expected** [1] - 34:3
**expecting** [1] - 95:6
**experience** [1] - 20:25
**expert** [2] - 13:6, 95:1
**expertise** [2] - 47:3, 69:18

**experts** [5] - 6:15, 13:20, 14:10, 14:20, 95:5
**explain** [1] - 16:23
**explained** [3] - 15:24, 31:11, 34:13
**express** [1] - 45:24
**extensively** [1] - 33:19
**extra** [1] - 34:20
**extremely** [1] - 60:23
**eyes** [2] - 77:22, 83:12

**F**

**face** [3] - 53:18, 75:16, 90:2
**Facebook** [1] - 58:6
**facedown** [5] - 32:25, 33:2, 33:3, 82:2, 82:4
**faceup** [1] - 82:3
**facing** [6] - 72:8, 85:24, 86:9, 86:12, 86:16
**fact** [11] - 5:25, 7:19, 9:5, 11:1, 11:8, 13:1, 13:15, 21:12, 25:4, 32:2, 67:16
**factors** [1] - 7:20
**facts** [14] - 7:24, 10:3, 19:1, 19:8, 19:23, 20:6, 20:13, 22:4, 25:8, 27:17, 28:1, 28:18, 32:20, 32:21
**failed** [1] - 28:3
**fair** [12] - 12:24, 13:4, 28:20, 73:13, 79:19, 84:3, 84:6, 85:18, 85:21, 87:9, 89:21, 89:23
**Fair** [1] - 2:7
**fairly** [2] - 73:13, 88:25
**Fajardo** [9] - 11:20, 12:8, 12:14, 12:20, 18:16, 18:22, 19:21, 20:19, 94:25
**Fajardo's** [1] - 19:18
**fall** [2] - 31:13, 79:6
**familiar** [3] - 28:12, 28:14, 60:25
**families** [1] - 49:24
**family** [18] - 29:1, 29:7, 40:17, 42:7, 42:14, 43:8, 43:15, 45:5, 45:18, 45:24, 50:12, 51:8, 56:9, 56:18, 59:6, 62:11, 62:17
**far** [7] - 38:19, 56:16,

66:18, 71:1, 72:9, 80:18, 89:23
**fast** [3] - 52:3, 70:5
**fast-forwarding** [1] - 70:5
**fatal** [1] - 18:25
**father** [4] - 51:6, 56:8, 62:6, 62:7
**FCRR** [2] - 1:21, 96:20
**February** [1] - 61:5
**federal** [1] - 1:22
**FEDERAL** [2] - 96:4, 96:21
**feet** [8] - 72:16, 80:1, 82:6, 82:7, 82:12, 82:15, 84:17, 84:18
**fell** [2] - 79:5, 79:8
**female** [3] - 71:13, 74:22, 74:24
**Fernando** [2] - 28:12, 36:19
**Ferris** [1] - 43:13
**few** [3] - 57:9, 88:4, 89:19
**field** [2] - 59:3, 60:10
**filed** [1] - 92:19
**finally** [2] - 50:6, 91:22
**findings** [1] - 12:4
**fine** [2] - 58:15, 88:15
**finish** [3] - 16:6, 16:24, 95:21
**first** [16] - 20:24, 37:14, 40:9, 52:13, 54:19, 64:16, 65:24, 68:9, 71:11, 71:22, 71:25, 75:14, 75:17, 77:22, 92:21, 92:24
**firsthand** [1] - 47:12
**five** [11] - 50:3, 50:4, 59:22, 59:25, 74:25, 75:4, 75:5, 88:8, 88:15, 93:22, 94:22
**five-eight** [1] - 75:5
**five-seven** [1] - 75:4
**five-six** [1] - 74:25
**flip** [2] - 38:22, 39:4
**follow** [2] - 27:4, 50:19
**following** [3] - 24:2, 59:9, 61:12
**follows** [2] - 25:22, 26:15
**Fonzi** [2] - 95:5, 95:14
**foot** [2] - 80:19, 80:20
**FOR** [2] - 96:5
**force** [1] - 6:15
**forcibly** [1] - 9:14
**FOREGOING** [1] - 96:8
**forever** [1] - 14:1
**forgot** [1] - 74:9

**form** [2] - 18:21, 62:8
**FORMAT** [1] - 96:10
**forth** [1] - 76:21
**forward** [4] - 58:1, 76:19, 79:7, 79:8
**forwarding** [1] - 70:5
**foundational** [1] - 88:5
**four** [3] - 10:9, 57:18, 67:17
**four-year-old** [1] - 57:18
**frankly** [1] - 22:15
**free** [1] - 16:15
**Friday** [4] - 24:14, 31:11, 33:19, 94:20
**friend** [4] - 54:3, 54:4, 54:5, 61:8
**friend's** [1] - 57:21
**friends** [3] - 49:19, 54:3, 58:10
**front** [3] - 72:3, 72:23, 82:16
**full** [4] - 37:13, 48:13, 59:25, 68:18
**fully** [1] - 76:1
**funny** [1] - 16:12

**G**

**GALIPO** [93] - 2:4, 2:4, 3:4, 3:9, 3:10, 3:13, 4:8, 5:6, 5:8, 5:11, 5:13, 7:8, 8:3, 8:16, 8:24, 9:18, 14:17, 15:6, 15:14, 15:15, 16:4, 16:21, 17:9, 19:5, 19:13, 20:2, 20:10, 20:18, 22:18, 22:25, 23:6, 23:14, 24:17, 25:21, 26:7, 27:1, 27:9, 27:13, 27:21, 27:22, 28:11, 29:5, 29:18, 29:20, 33:24, 35:3, 37:3, 48:5, 48:16, 48:19, 48:22, 52:8, 52:12, 52:16, 52:19, 52:22, 52:24, 53:3, 53:6, 53:13, 53:16, 53:22, 53:25, 54:1, 54:7, 54:10, 54:13, 54:16, 55:6, 55:9, 55:12, 55:16, 55:20, 56:1, 56:10, 62:20, 63:13, 65:10, 67:9, 67:24, 68:4, 73:19, 82:8, 89:6, 89:11, 89:16, 91:19, 91:21, 91:25, 92:3, 94:18, 95:10,

95:13
**Galipo** [16] - 4:8, 5:5, 15:13, 24:14, 26:17, 27:20, 30:3, 33:12, 34:6, 34:9, 36:18, 48:4, 63:14, 67:7, 89:10, 94:17
**Galipo's** [1] - 33:22
**game** [1] - 49:11
**general** [1] - 26:5
**gentlemen** [8] - 4:17, 5:11, 29:23, 50:15, 60:21, 62:23, 93:21, 94:3
**George** [2] - 38:15, 43:3
**gesture** [2] - 77:8, 81:3
**girl** [1] - 57:12
**girlfriend** [2] - 57:12, 58:13
**given** [1] - 26:2
**glasses** [1] - 45:13
**God** [4] - 4:24, 37:10, 48:10, 68:13
**Gomez** [2] - 6:5, 8:4
**government** [1] - 25:25
**graduate** [1] - 50:7
**graduation** [2] - 44:3, 45:3
**Graham** [1] - 95:19
**grandson** [2] - 54:19, 55:11
**great** [1] - 41:14
**greatly** [1] - 45:17
**grief** [1] - 60:24
**ground** [10] - 16:2, 22:12, 23:9, 24:21, 81:14, 82:15, 83:17, 83:23, 85:11, 86:8
**grow** [1] - 49:2
**growing** [3] - 49:9, 49:15, 57:1
**guess** [5] - 42:24, 51:4, 59:7, 65:23, 90:13
**guns** [1] - 83:14
**guy** [1] - 74:10

**H**

**hair** [1] - 74:22
**half** [1] - 94:22
**Halloween** [1] - 43:18
**hand** [4] - 4:21, 37:7, 48:7, 68:10
**handcuff** [2] - 17:7, 83:20
**handcuffed** [10] - 7:2,

7:10, 9:7, 10:4, 15:17, 15:24, 16:1, 16:15, 24:21, 89:20
**handcuffs** [7] - 16:10, 16:11, 16:12, 83:24, 83:25, 84:3, 86:24
**hands** [10] - 12:18, 15:25, 74:16, 76:16, 76:19, 76:25, 77:8, 79:15, 83:18, 87:3
**hands-up** [1] - 77:8
**hang** [2] - 53:10, 53:11
**Hannah** [6] - 41:15, 41:18, 41:19, 53:8, 55:23
**hard** [2] - 60:23, 61:24
**harder** [1] - 61:2
**harm** [1] - 90:4
**harming** [1] - 16:16
**harvesting** [1] - 59:24
**hat** [1] - 54:11
**head** [9] - 23:2, 32:25, 33:3, 84:17, 84:20, 90:2, 90:14, 94:19
**hear** [8] - 37:23, 74:5, 74:13, 74:16, 76:16, 77:5, 88:14, 90:4
**heard** [10] - 8:8, 10:18, 10:22, 11:1, 31:21, 46:18, 71:8, 71:9, 71:12, 71:17
**hearing** [1] - 10:21
**heart** [1] - 18:24
**heavy** [1] - 24:4
**HELD** [1] - 96:9
**held** [2] - 7:23, 91:10
**HELM** [26] - 2:9, 2:9, 3:7, 37:6, 37:20, 39:15, 39:21, 39:24, 41:5, 41:10, 41:11, 42:13, 42:21, 44:10, 44:15, 44:18, 44:20, 44:21, 46:3, 47:22, 48:1, 48:3, 92:22, 93:1, 93:5, 93:10
**Helm** [5] - 4:9, 37:3, 37:5, 47:21, 63:14
**help** [5] - 4:24, 10:19, 37:10, 48:10, 68:13
**hen** [1] - 49:18
**HEREBY** [1] - 96:6
**herself** [1] - 45:7
**hesitantly** [1] - 8:2
**High** [1] - 43:12
**higher** [1] - 73:10
**Hills** [1] - 2:5
**himself** [2] - 49:13, 57:23
**hit** [1] - 93:14

**hitting** [1] - 83:23
**hmm** [5] - 44:23, 50:24, 76:21, 78:25, 86:1
**hold** [5] - 82:17, 84:6, 84:9, 84:16, 85:25
**holding** [7] - 54:4, 83:19, 84:25, 86:7, 86:8, 91:7, 91:15
**holiday** [1] - 42:24
**holidays** [2] - 43:14, 43:17
**home** [5] - 51:17, 52:5, 61:16, 62:7
**homicide** [5] - 11:19, 11:21, 12:8, 12:16, 30:11
**honestly** [1] - 95:15
**Honor** [61] - 4:8, 4:12, 4:13, 5:6, 16:7, 16:8, 16:21, 16:22, 16:25, 24:13, 26:13, 26:16, 27:9, 27:10, 29:20, 29:22, 37:3, 37:6, 39:15, 39:21, 41:5, 41:10, 44:10, 44:15, 47:22, 48:1, 48:3, 48:16, 52:8, 53:3, 53:13, 53:25, 54:7, 62:20, 63:13, 63:15, 63:21, 64:2, 64:19, 65:5, 67:24, 68:4, 68:8, 73:17, 73:21, 73:24, 89:4, 89:13, 91:19, 92:7, 92:13, 92:20, 92:22, 93:7, 93:9, 93:10, 93:12, 93:20, 94:9, 95:15, 95:24
**HONORABLE** [1] - 1:5
**hoping** [1] - 94:23
**hospice** [1] - 52:5
**hospital** [2] - 60:6, 61:9
**hour** [2] - 58:19, 95:18
**hours** [2] - 94:21, 94:23
**house** [3] - 51:17, 56:21, 57:11
**huge** [1] - 43:13
**hung** [1] - 62:16
**husband** [3] - 54:24, 56:24, 62:9
**hypothetical** [3] - 19:24, 22:5, 23:11

### I

**IACP** [3] - 21:20, 35:25, 36:3

**idea** [1] - 22:16
**identified** [2] - 72:19, 88:4
**ignore** [1] - 36:14
**immediate** [2] - 24:7, 51:8
**immediately** [5] - 21:1, 75:9, 85:13, 91:3, 91:11
**impair** [6] - 7:16, 7:18, 9:2, 13:3, 17:18, 17:24
**impairing** [1] - 26:9
**implicitly** [1] - 28:1
**implied** [1] - 57:12
**impossible** [1] - 17:2
**improper** [1] - 26:22
**IN** [3] - 96:5, 96:9, 96:10
**in-custody** [1] - 30:6
**incident** [50] - 11:8, 11:13, 15:3, 17:14, 17:17, 17:23, 18:6, 26:17, 26:18, 26:20, 26:22, 26:24, 27:6, 29:1, 29:8, 31:16, 31:19, 32:4, 32:20, 32:21, 33:18, 35:12, 36:11, 46:13, 46:17, 46:23, 47:6, 47:11, 56:12, 57:22, 64:8, 64:10, 64:14, 65:25, 66:19, 67:3, 69:1, 69:21, 70:1, 70:6, 70:8, 70:9, 70:21, 71:2, 73:8, 73:14, 73:15, 87:14, 87:23, 89:1
**include** [2] - 32:16, 33:6
**including** [2] - 22:2, 26:9
**income** [1] - 62:8
**incomplete** [3] - 19:24, 22:4, 23:11
**incorrect** [1] - 22:10
**increase** [1] - 59:13
**increased** [1] - 18:24
**indefinitely** [1] - 35:15
**independent** [10] - 5:22, 6:12, 6:15, 18:7, 23:17, 28:9, 29:15, 30:11, 30:12, 31:22
**indicate** [2] - 30:20, 34:14
**indicated** [3] - 6:25, 9:1, 92:25
**indicates** [2] - 14:19, 18:21

**indicating** [1] - 25:19
**indication** [2] - 22:14, 24:6
**indifferent** [1] - 27:8
**individual** [3] - 18:1, 69:22, 70:2
**individual's** [1] - 17:24
**Individually** [1] - 1:7
**individuals** [1] - 7:22
**influence** [1] - 7:21
**inform** [1] - 93:3
**information** [3] - 29:7, 29:10, 34:19
**informed** [2] - 92:17, 93:5
**injury** [1] - 36:16
**Inland** [1] - 58:20
**inquire** [1] - 89:13
**inside** [1] - 71:23
**instead** [2] - 5:17, 7:11
**intend** [3] - 92:18, 93:4, 95:11
**intends** [1] - 92:14
**intent** [1] - 95:4
**interacting** [1] - 74:2
**interaction** [3] - 46:10, 69:22, 70:2
**interest** [1] - 1:7
**interfere** [1] - 60:15
**International** [1] - 21:8
**interview** [2] - 6:6, 6:9
**interviewed** [1] - 6:8
**intoxication** [1] - 21:6
**investigates** [1] - 30:13
**investigating** [1] - 11:24
**investigation** [9] - 5:15, 5:17, 6:1, 6:5, 6:9, 11:22, 19:18, 30:12, 30:17
**investigations** [1] - 6:7
**investigator** [1] - 30:7
**investigators** [1] - 12:11
**involved** [2] - 34:5, 57:23
**involves** [1] - 11:23
**involving** [2] - 36:18, 89:2
**IS** [2] - 96:8, 96:10
**issue** [3] - 11:19, 30:22, 69:1
**issues** [2] - 9:21, 9:23
**itself** [1] - 25:14

**IV** [1] - 51:16

### J

**Jackson** [4] - 55:11, 55:15, 55:19, 56:4
**jail** [2] - 16:19, 34:18
**jeans** [1] - 75:17
**jeopardy** [1] - 24:7
**jersey** [1] - 56:25
**JESUS** [1] - 1:5
**John** [2] - 4:9, 63:14
**JOHN** [2] - 2:6, 2:7
**Johnnie** [1] - 54:5
**joined** [1] - 49:24
**Jordan** [1] - 54:4
**JUDGE** [1] - 1:5
**judge** [1] - 31:8
**JUDICIAL** [1] - 96:11
**July** [7] - 43:19, 47:6, 47:11, 56:12, 58:1, 66:23, 69:2
**June** [4] - 56:5, 56:8, 56:11, 56:15
**Jury** [1] - 1:11
**jury** [20] - 4:3, 5:12, 8:5, 9:19, 10:14, 11:20, 13:1, 25:22, 26:2, 31:11, 39:22, 50:15, 54:22, 60:21, 63:4, 63:7, 73:18, 89:5, 93:21, 94:8
**JURY** [1] - 1:15
**Justice** [1] - 30:15

### K

**Kathryn** [2] - 68:9, 68:20
**KATHRYN** [2] - 3:12, 68:15
**Keeney** [2] - 6:1, 6:25
**keep** [8] - 7:11, 7:13, 9:8, 9:12, 9:13, 22:16, 62:24, 94:5
**keeping** [3] - 7:16, 9:1, 9:14
**keeps** [1] - 27:2
**KENNEDY** [1] - 2:9
**Kennedy** [3] - 4:9, 37:3, 63:14
**kept** [1] - 11:2
**Kevin** [49] - 40:7, 40:9, 40:16, 41:15, 41:16, 43:5, 43:14, 43:20, 45:4, 45:8, 45:12, 45:15, 49:6, 49:15, 49:16, 50:2, 50:16, 50:17, 51:4, 51:6, 51:9, 51:12, 51:21,

52:25, 53:7, 53:8, 53:19, 54:3, 54:11, 54:12, 54:18, 54:20, 54:21, 55:11, 55:15, 55:19, 55:23, 56:4, 56:20, 57:1, 57:19, 58:3, 61:10, 61:14, 62:2, 62:9, 70:15, 70:16
**KEVIN** [1] - 1:7
**Kevin's** [2] - 61:8, 61:19
**key** [1] - 9:23
**kick** [1] - 83:6
**kicking** [13] - 80:1, 80:2, 82:6, 82:7, 82:12, 82:15, 84:17, 84:18, 90:14, 90:18, 90:22, 91:2, 91:5
**kid** [1] - 43:23
**kids** [9] - 43:3, 43:21, 50:12, 53:9, 53:11, 56:21, 56:23, 61:24, 62:16
**kin** [1] - 29:14
**kind** [17] - 34:13, 36:15, 43:4, 43:22, 45:8, 49:11, 49:17, 49:24, 50:12, 56:20, 57:3, 60:24, 62:14, 62:16, 72:2, 76:21, 78:7
**kitchen** [2] - 55:25, 71:17
**knee** [2] - 83:2, 83:17
**kneel** [1] - 82:22
**kneeling** [3] - 82:21, 82:24, 83:16
**knees** [1] - 82:24
**knowledge** [8] - 29:15, 46:16, 46:19, 46:22, 47:13, 56:15, 64:13, 67:10
**knows** [2] - 57:20, 61:9
**Kode** [2] - 95:1, 95:21

### L

**labored** [1] - 24:5
**laboring** [1] - 54:19
**ladies** [8] - 4:17, 5:11, 29:23, 50:15, 60:21, 62:23, 93:21, 94:3
**laid** [1] - 77:22
**lake** [1] - 40:5
**lane** [1] - 56:20
**language** [4] - 24:11, 25:1, 25:2, 34:11
**Las** [5] - 40:23, 40:25,

42:23, 43:3, 43:13
**last** [15] - 21:8, 26:21, 37:14, 37:15, 40:17, 45:18, 47:6, 48:14, 50:10, 57:2, 57:9, 60:19, 67:17, 68:19
**lasted** [1] - 61:5
**lastly** [2] - 28:25, 56:1
**laughed** [1] - 43:22
**law** [13] - 25:22, 26:8, 27:2, 27:4, 27:15, 30:13, 36:3, 56:24, 59:25, 69:12, 69:16, 75:10
**LAW** [3] - 2:4, 2:6, 2:9
**laws** [1] - 14:3
**lay** [2] - 16:2, 17:8
**laying** [5] - 81:24, 81:25, 82:2, 87:3
**leading** [11] - 31:19, 32:4, 33:18, 33:24, 35:3, 42:11, 42:18, 42:20, 62:4, 66:22, 82:8
**learn** [6] - 57:16, 57:17, 58:2, 58:5, 63:2, 94:7
**learned** [1] - 58:5
**least** [1] - 67:11
**leave** [2] - 35:14, 47:25
**ledge** [1] - 55:1
**left** [8] - 38:20, 41:13, 41:15, 51:9, 73:10, 73:12, 91:10, 94:21
**legal** [3] - 26:3, 26:4, 26:19
**legislature** [1] - 14:2
**legitimate** [1] - 13:2
**legs** [5] - 90:14, 90:18, 90:22, 91:2, 91:6
**length** [2] - 51:18, 60:6
**less** [2] - 73:7, 84:13
**LEWIS** [1] - 2:15
**Lexipol** [6] - 24:10, 25:1, 25:4, 35:25, 36:3
**Lexipol's** [1] - 24:20
**Lieutenant** [1] - 95:20
**life** [8] - 49:21, 50:2, 55:2, 55:3, 59:5, 59:13, 59:24, 67:17
**lighting** [1] - 75:23
**limp** [2] - 90:20, 91:2
**line** [2] - 24:13, 65:15
**lines** [1] - 65:9
**live** [4] - 43:3, 69:2, 69:8, 69:9
**lived** [4] - 50:8, 52:4,

57:19, 69:3
**living** [5] - 37:25, 45:18, 48:25, 61:17, 61:18
**LLP** [1] - 2:15
**local** [1] - 58:6
**located** [5] - 69:5, 71:16, 71:23, 71:24, 81:22
**location** [1] - 73:14
**lodged** [1] - 32:10
**look** [5] - 11:15, 71:19, 74:21, 75:15, 76:5
**looked** [6] - 18:11, 35:25, 71:22, 71:25, 74:1, 74:5
**looking** [3] - 67:20, 72:13, 72:15
**Los** [1] - 2:17
**loss** [3] - 45:14, 45:16, 67:20
**love** [1] - 67:18
**loved** [9] - 49:12, 50:17, 50:18, 50:19, 50:20, 57:25
**lower** [2] - 30:4, 82:18
**lunch** [3] - 94:4, 95:9, 95:25
**Lyons** [1] - 94:1

## M

**machines** [1] - 59:8
**Macy** [6] - 45:6, 45:8, 45:9, 45:10, 55:24, 56:22
**Macy's** [2] - 44:3, 45:3
**magic** [1] - 33:16
**maintain** [1] - 35:24
**male** [4] - 71:12, 71:14, 74:22, 75:3
**man** [6] - 70:6, 70:17, 72:2, 72:4, 72:9, 75:14
**maneuvers** [2] - 18:17, 19:6
**manner** [3] - 12:8, 12:17, 29:7
**manual** [1] - 21:9
**mark** [1] - 94:12
**married** [4] - 38:16, 41:21, 41:22, 42:2
**materials** [1] - 11:14
**MATTER** [1] - 96:10
**matter** [1] - 5:15
**mattress** [1] - 33:1
**mean** [13] - 8:22, 8:23, 9:13, 9:24, 13:5, 13:7, 13:10, 13:23, 16:15, 33:14, 34:12,

43:18, 66:7
**means** [1] - 9:24
**meant** [1] - 76:14
**measures** [3] - 14:13, 15:2, 15:11
**Medical** [1] - 58:20
**medical** [15] - 5:20, 5:22, 6:11, 6:12, 9:3, 12:17, 13:3, 13:13, 13:20, 14:10, 14:20, 22:13, 24:7, 35:15
**medicine** [2] - 12:21, 12:23
**meet** [2] - 38:9, 38:11
**meeting** [1] - 43:4
**Megan** [1] - 54:3
**member** [2] - 21:12, 45:18
**members** [1] - 93:20
**membership** [1] - 21:14
**memory** [3] - 56:20, 56:25, 86:23
**mention** [1] - 33:11
**mentioned** [4] - 30:19, 31:24, 32:3, 32:7
**met** [4] - 38:12, 38:13, 40:9, 59:16
**meth** [1] - 66:23
**methamphetamine** [4] - 21:1, 21:6, 28:7, 67:2
**methamphetamines** [4] - 64:17, 65:17, 65:18, 66:20
**method** [1] - 17:24
**Michael** [1] - 37:15
**middle** [2] - 41:15, 75:25
**might** [4] - 9:24, 17:24, 24:6, 74:13
**mind** [5] - 62:1, 62:24, 74:13, 76:14, 94:6
**mine** [1] - 73:4
**minutes** [14] - 10:9, 62:24, 63:3, 84:12, 85:3, 90:15, 90:17, 91:6, 91:14, 92:16, 93:22, 94:24, 95:2, 95:19
**Mireles** [2] - 92:15, 93:11
**MIRELES** [1] - 3:14
**miss** [7] - 54:20, 61:14, 61:18, 61:20, 61:23, 61:24
**missed** [1] - 15:12
**misstates** [6] - 7:4, 8:10, 19:1, 19:9, 20:7, 20:14

**mitigate** [2] - 24:24, 32:5
**mom** [8] - 40:7, 51:9, 56:6, 57:6, 62:7, 62:12
**moment** [6] - 48:17, 64:19, 69:9, 91:19, 92:1, 93:12
**moments** [1] - 88:5
**monitor** [4] - 31:8, 31:12, 32:8, 32:12
**monitoring** [1] - 32:13
**month** [1] - 56:12
**months** [2] - 51:20, 60:6
**mood** [1] - 57:3
**Moraga** [1] - 69:5
**morning** [31] - 4:8, 4:11, 4:12, 4:13, 4:16, 4:17, 5:9, 5:10, 5:11, 29:23, 30:1, 30:2, 37:21, 37:22, 43:22, 46:8, 46:9, 48:23, 48:24, 58:12, 59:9, 61:19, 63:13, 63:21, 64:5, 64:6, 68:24, 68:25, 89:17, 89:18, 95:5
**most** [3] - 24:19, 61:14
**mother** [8] - 40:11, 49:17, 51:13, 51:19, 51:21, 53:18, 62:2, 62:12
**mother's** [1] - 51:24
**mouth** [1] - 33:4
**move** [19] - 7:1, 11:7, 18:16, 27:9, 33:20, 34:3, 34:7, 35:1, 35:7, 35:8, 35:13, 35:16, 35:17, 52:12, 58:1, 76:24, 78:3, 78:6, 80:5
**moved** [7] - 36:5, 50:7, 50:10, 51:14, 51:17, 56:23, 85:24
**movement** [1] - 18:24
**moves** [3] - 39:15, 41:5, 44:10
**moving** [15] - 7:11, 50:18, 76:21, 78:7, 79:23, 79:25, 82:5, 84:17, 84:20, 85:1, 85:7, 85:11, 90:14, 90:22, 91:9
**MR** [185] - 3:4, 3:5, 3:7, 3:9, 3:10, 3:12, 3:13, 4:8, 4:12, 4:13, 5:6, 5:8, 5:11, 5:13, 7:4, 7:8, 7:24, 8:3,

8:10, 8:16, 8:19, 8:24, 9:9, 9:18, 14:12, 14:17, 15:4, 15:6, 15:10, 15:14, 15:15, 15:19, 16:4, 16:7, 16:21, 16:25, 17:9, 19:1, 19:5, 19:8, 19:13, 19:23, 20:2, 20:6, 20:10, 20:13, 20:18, 22:4, 22:18, 22:22, 22:25, 23:3, 23:6, 23:11, 23:14, 24:13, 24:17, 25:8, 25:21, 26:3, 26:7, 26:13, 26:16, 27:1, 27:9, 27:11, 27:13, 27:17, 27:21, 27:22, 28:1, 28:11, 29:3, 29:5, 29:9, 29:18, 29:20, 29:22, 29:25, 33:24, 34:1, 35:3, 35:5, 37:1, 37:3, 37:6, 37:20, 39:15, 39:21, 39:24, 41:5, 41:10, 41:11, 42:13, 42:21, 44:10, 44:15, 44:18, 44:20, 44:21, 46:3, 47:22, 48:1, 48:3, 48:5, 48:16, 48:19, 48:22, 52:8, 52:12, 52:16, 52:19, 52:22, 52:24, 53:3, 53:6, 53:13, 53:16, 53:22, 53:25, 54:1, 54:7, 54:10, 54:13, 54:16, 55:6, 55:9, 55:12, 55:16, 55:20, 56:1, 56:10, 62:20, 63:13, 63:21, 65:10, 67:9, 67:24, 68:4, 68:8, 68:23, 72:18, 72:21, 73:17, 73:19, 73:21, 73:24, 73:25, 82:8, 82:11, 88:3, 88:10, 88:15, 88:18, 88:19, 89:4, 89:6, 89:9, 89:11, 89:16, 91:19, 91:21, 91:25, 92:3, 92:7, 92:13, 92:19, 92:22, 93:1, 93:5, 93:7, 93:9, 93:10, 93:12, 93:14, 93:19, 93:25, 94:9, 94:11, 94:16, 94:18, 95:10, 95:13, 95:15, 95:24
**MS** [22] - 3:7, 3:10, 39:17, 41:7, 42:11, 42:18, 44:12, 46:1, 46:5, 46:7, 47:20, 62:4, 64:2, 64:4,

64:19, 64:21, 64:22, 65:5, 65:9, 65:16, 67:6, 68:1
**must** [1] - 36:5

## N

**name** [11] - 5:3, 37:14, 37:16, 48:14, 52:9, 68:18, 68:19, 70:14, 74:9
**namely** [1] - 7:21
**nature** [2] - 13:5, 31:5
**nearly** [1] - 26:21
**necessarily** [3] - 13:9, 30:20, 31:9
**neck** [3] - 23:2, 25:20, 26:12
**need** [3] - 7:22, 10:19, 93:16
**neighborhood** [1] - 58:7
**nerd** [1] - 49:11
**nervous** [2] - 45:18, 81:1
**never** [6] - 6:1, 6:5, 18:20, 33:2, 62:15, 64:10
**new** [1] - 56:24
**next** [13] - 29:14, 37:4, 72:7, 74:2, 74:3, 77:13, 77:14, 78:1, 79:4, 79:8, 79:19, 85:6, 86:19
**Niedzialek** [78] - 10:4, 10:19, 19:22, 20:4, 20:23, 23:22, 40:9, 40:16, 43:5, 43:14, 43:20, 45:4, 45:15, 45:25, 46:11, 46:14, 46:17, 47:7, 47:10, 47:16, 48:6, 64:11, 64:13, 64:16, 65:24, 66:3, 66:15, 66:19, 70:15, 70:16, 70:21, 72:4, 74:2, 74:14, 74:19, 75:15, 75:20, 76:5, 76:12, 77:7, 77:17, 77:25, 78:3, 78:6, 78:12, 78:24, 79:4, 79:8, 79:12, 79:22, 80:2, 80:7, 80:17, 80:21, 81:6, 81:16, 81:19, 81:21, 82:2, 82:5, 82:14, 82:20, 82:25, 83:3, 83:23, 84:4, 84:15, 84:25, 85:7, 85:11, 85:22, 86:8, 86:12, 86:24, 87:9, 89:2

**NIEDZIALEK** [1] - 1:8
**Niedzialek's** [5] - 18:24, 19:7, 20:12, 65:25, 67:1
**night** [1] - 60:16
**noon** [1] - 58:13
**normal** [1] - 24:3
**normally** [1] - 94:22
**North** [1] - 2:7
**noted** [1] - 59:10
**nothing** [8] - 4:24, 19:18, 25:19, 37:10, 47:22, 48:10, 68:1, 68:13
**notifies** [1] - 29:14
**notwithstanding** [1] - 32:2
**November** [1] - 54:18
**nuclear** [1] - 40:17
**number** [1] - 73:20
**numbers** [1] - 52:9
**nurse** [2] - 49:1, 59:10
**nursing** [4] - 44:3, 52:1, 59:9, 60:17

## O

**Oakland** [1] - 2:10
**Oaks** [1] - 2:7
**oath** [4] - 4:20, 63:17, 65:1, 65:3
**object** [3] - 23:9, 24:13, 39:17
**objection** [18] - 7:24, 14:12, 15:4, 15:10, 15:19, 26:13, 33:24, 35:3, 41:7, 42:11, 42:18, 44:12, 46:1, 62:4, 65:10, 73:19, 82:8, 89:6
**objects** [1] - 83:6
**observations** [2] - 51:23, 91:15
**observe** [3] - 69:22, 70:1, 72:1
**observed** [7] - 70:21, 74:3, 78:1, 79:4, 79:9, 79:20, 84:22
**obstriction** [1] - 36:12
**obstructing** [1] - 76:2
**obstruction** [3] - 33:1, 36:12, 36:21
**obviously** [5] - 12:14, 13:25, 29:13, 32:25, 35:14
**occasion** [1] - 66:20
**occupation** [1] - 69:10
**occurred** [7] - 29:17, 56:13, 64:8, 69:1, 73:14, 81:15, 81:18

**occurs** [1] - 29:17
**OF** [10] - 1:2, 1:15, 2:4, 2:6, 96:1, 96:6, 96:8, 96:11, 96:15
**OFFICE** [1] - 2:9
**office** [2] - 30:15, 30:18
**officer** [6] - 36:7, 47:1, 69:12, 69:13, 79:16, 82:16
**Officer** [1] - 6:1
**officers** [25] - 6:16, 7:9, 7:15, 7:19, 9:5, 9:7, 10:12, 10:22, 20:24, 21:25, 23:15, 24:22, 27:16, 27:24, 28:22, 34:19, 72:3, 72:7, 74:15, 75:10, 78:10, 78:14, 79:14, 90:5, 90:8
**OFFICES** [2] - 2:4, 2:6
**Official** [1] - 1:22
**OFFICIAL** [3] - 96:1, 96:4, 96:21
**often** [2] - 55:4, 61:10
**old** [5] - 13:16, 51:4, 56:21, 57:18, 69:3
**older** [3] - 49:16, 51:11, 62:14
**oldest** [2] - 40:7, 56:22
**once** [10] - 15:7, 15:16, 23:23, 44:19, 67:16, 74:1, 75:20, 77:25, 79:8, 86:18
**oncology** [1] - 52:1
**one** [50] - 6:8, 9:23, 11:1, 12:13, 21:12, 21:25, 24:8, 24:20, 24:25, 25:12, 28:23, 32:23, 38:19, 38:21, 43:21, 45:8, 45:13, 48:17, 49:5, 50:12, 52:10, 52:12, 61:19, 61:25, 64:19, 66:20, 67:1, 72:5, 74:22, 78:14, 79:14, 79:16, 82:16, 82:17, 82:22, 83:1, 83:2, 83:16, 83:17, 87:5, 91:8, 91:19, 91:25, 93:16, 94:24
**open** [2] - 62:24, 94:5
**opinion** [2] - 9:20, 18:23
**opposed** [1] - 5:22
**opposite** [1] - 19:12
**OR** [1] - 60:16
**orders** [1] - 94:5
**organ** [2] - 59:16,

60:15
**organs** [2] - 59:15, 59:24
**original** [1] - 22:7
**Oscar's** [1] - 45:1
**outgoing** [1] - 49:10
**outside** [23] - 5:18, 6:12, 30:7, 30:16, 32:13, 34:14, 69:23, 70:3, 71:5, 71:8, 71:17, 71:20, 71:22, 71:25, 72:1, 72:5, 74:1, 74:5, 75:21, 76:5, 77:19, 89:1
**overdose** [1] - 28:7
**overnight** [1] - 59:2
**overruled** [22] - 7:5, 7:25, 8:11, 8:20, 9:10, 14:14, 15:20, 19:3, 19:10, 19:25, 20:8, 20:15, 22:6, 22:23, 23:4, 23:12, 24:16, 25:10, 28:4, 39:18, 62:5, 82:9
**own** [5] - 30:17, 38:1, 42:16, 51:11, 62:1
**oxygen** [2] - 7:22, 31:6

## P

**PAGE** [2] - 3:2, 96:10
**page** [26] - 39:4, 39:16, 39:19, 39:20, 39:22, 40:19, 41:6, 41:9, 43:25, 44:14, 52:15, 53:5, 53:15, 53:24, 54:9, 54:15, 55:8, 55:14, 55:18, 55:22, 56:3, 58:6, 65:6, 65:8, 65:13, 65:14
**Page** [1] - 39:18
**painful** [1] - 60:24
**paramedics** [11] - 23:22, 85:8, 85:15, 85:18, 85:21, 86:5, 86:6, 86:11, 86:18, 86:22, 87:22
**part** [13] - 8:10, 10:15, 12:23, 15:12, 19:19, 19:20, 24:19, 33:6, 35:23, 42:7, 57:5, 62:11
**particular** [6] - 8:13, 12:5, 26:20, 43:10, 52:8, 79:6
**Pasadena** [1] - 2:8
**passages** [2] - 93:3, 93:4

**passed** [10] - 40:12, 40:14, 50:25, 51:3, 53:20, 56:6, 62:12, 85:10, 91:1
**patio** [1] - 38:1
**PC** [1] - 2:9
**peace** [1] - 69:12
**peacefully** [1] - 17:7
**peas** [1] - 54:25
**peer** [1] - 13:14
**peer-reviewed** [1] - 13:14
**Pennsylvania** [1] - 49:3
**people** [13] - 14:4, 16:13, 17:5, 22:12, 27:24, 28:6, 31:7, 32:8, 35:13, 35:18, 40:6, 41:12, 59:17
**pepper** [2] - 83:11, 83:12
**per** [1] - 94:23
**perceive** [1] - 80:14
**perceived** [1] - 36:7
**percent** [2] - 19:17, 84:2
**perfect** [1] - 52:23
**performed** [2] - 5:20, 61:6
**period** [8] - 9:2, 17:25, 31:24, 59:19, 60:5, 84:22, 91:6, 91:10
**periods** [1] - 66:3
**permission** [2] - 65:5, 92:14
**person** [19] - 12:13, 16:10, 16:18, 23:9, 24:21, 24:23, 25:15, 34:15, 34:19, 35:9, 35:11, 35:12, 35:20, 54:24, 70:12, 70:14, 71:12, 78:9
**person's** [3] - 26:9, 26:11, 27:8
**personal** [7] - 36:9, 46:16, 46:19, 46:22, 47:13, 64:13, 67:10
**perspective** [1] - 73:7
**pg** [14] - 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23
**Phil** [1] - 56:6
**Philadelphia** [6] - 49:3, 51:15, 54:11, 56:5, 56:7, 56:8
**Philly** [2] - 49:12, 56:23
**Phoenix** [1] - 69:9

**phone** [5] - 54:4, 77:15, 77:16, 87:15, 87:20
**photo** [13] - 39:10, 39:13, 39:25, 40:6, 40:12, 40:24, 41:3, 44:8, 44:22, 45:12, 53:17, 54:2, 55:10
**photograph** [9] - 41:13, 43:11, 54:17, 72:23, 72:25, 73:1, 73:6, 73:13, 73:17
**phrased** [2] - 19:23, 27:17
**PHYLLIS** [4] - 1:21, 96:4, 96:18, 96:20
**physical** [1] - 24:3
**picture** [5] - 40:8, 42:22, 52:25, 53:7, 54:18
**pictures** [1] - 52:7
**pillow** [1] - 33:2
**pinning** [2] - 23:8, 44:3
**place** [10] - 9:12, 16:2, 16:3, 24:22, 27:7, 43:4, 44:25, 46:14, 54:23
**placed** [7] - 15:8, 15:17, 16:19, 25:16, 25:19, 83:24, 84:4
**placement** [3] - 18:22, 18:23, 22:2
**placing** [1] - 32:23
**Plaintiff** [2] - 1:9, 2:3
**plaintiff** [9] - 4:9, 28:3, 38:7, 39:15, 41:5, 44:10, 63:15, 68:5
**plaintiff's** [1] - 38:19
**Plaintiff's** [14] - 39:20, 41:9, 44:14, 52:15, 53:5, 53:15, 53:24, 54:9, 54:15, 55:8, 55:14, 55:18, 55:22, 56:3
**PLAINTIFF'S** [3] - 5:1, 37:12, 48:12
**planning** [1] - 95:16
**play** [9] - 45:4, 49:13, 88:4, 88:8, 88:16, 92:14, 92:18, 92:25, 93:24
**played** [6] - 19:19, 19:20, 49:13, 88:9, 88:17, 93:11
**PLAYED** [1] - 3:15
**playing** [5] - 55:24, 62:15, 92:25, 93:22, 94:2
**plenty** [1] - 35:18

**pod** [1] - 54:25
**point** [53] - 10:3, 10:6, 17:25, 21:12, 31:17, 40:12, 40:16, 49:21, 50:25, 57:8, 57:15, 58:24, 59:6, 59:14, 70:5, 70:9, 70:17, 71:4, 71:19, 74:8, 74:16, 74:18, 75:18, 76:5, 76:9, 76:12, 77:3, 77:5, 77:11, 78:3, 78:11, 79:12, 79:17, 79:19, 80:2, 80:20, 80:25, 81:2, 81:25, 82:5, 82:20, 84:25, 87:1, 87:9, 87:14, 87:23, 90:2, 90:11, 90:20, 90:22, 90:24, 91:23
**points** [1] - 89:19
**police** [5] - 47:1, 47:3, 60:17, 69:15, 69:18
**Police** [1] - 21:9
**policies** [14] - 6:19, 9:21, 11:9, 14:7, 16:22, 27:3, 27:7, 31:15, 31:19, 32:2, 36:4, 47:4, 69:18
**policy** [41] - 14:6, 14:9, 14:19, 14:22, 14:24, 15:7, 15:16, 15:22, 15:23, 16:9, 17:3, 17:4, 17:11, 17:14, 17:17, 17:21, 17:22, 18:3, 18:5, 18:8, 18:9, 18:12, 18:13, 18:15, 21:9, 21:15, 21:17, 21:18, 22:9, 24:11, 25:4, 26:18, 26:19, 28:23, 33:10, 33:12, 34:6, 34:24, 35:19
**portion** [5] - 46:13, 64:10, 71:1, 92:16, 93:8
**portions** [3] - 92:18, 92:23, 92:25
**pose** [2] - 9:4, 35:21
**poses** [1] - 22:14
**position** [34] - 7:12, 7:14, 7:16, 10:9, 11:11, 11:16, 15:9, 15:18, 15:24, 17:15, 20:5, 22:1, 24:22, 24:23, 25:6, 25:15, 32:23, 33:21, 34:4, 34:8, 35:1, 35:7, 35:9, 35:16, 36:6, 77:20, 77:22, 80:3, 81:16, 85:22, 86:9,

86:13
**positional** [17] - 11:10, 11:15, 13:21, 13:24, 14:2, 14:11, 14:20, 24:25, 25:13, 26:1, 26:8, 31:18, 31:24, 32:5, 33:11, 33:15
**positioned** [3] - 25:15, 72:5, 77:17
**positions** [1] - 77:21
**possibility** [1] - 31:4
**possible** [2] - 7:14, 24:22
**post** [2] - 26:17, 26:18
**POST** [2] - 35:25, 36:3
**post-incident** [2] - 26:17, 26:18
**pot** [1] - 61:19
**potential** [1] - 24:24
**pounds** [2] - 33:7, 36:13
**Powell** [1] - 40:5
**practices** [3] - 35:24, 47:3, 69:18
**precautions** [1] - 34:20
**prejudicial** [1] - 26:16
**presence** [5] - 4:3, 16:14, 63:4, 63:7, 94:8
**present** [5] - 4:10, 46:10, 60:1, 64:7, 67:11
**preserve** [1] - 95:3
**PRESIDING** [1] - 1:5
**press** [1] - 52:16
**pressed** [1] - 52:20
**pressure** [2] - 23:1, 32:11
**PRESTON** [4] - 1:21, 96:4, 96:18, 96:20
**pretty** [2] - 43:18, 80:19
**prevent** [2] - 18:23, 33:14
**previous** [1] - 42:3
**problems** [2] - 13:3, 84:23
**procedures** [1] - 69:19
**proceed** [1] - 68:21
**PROCEEDINGS** [2] - 1:15, 96:9
**process** [2] - 12:9, 59:23
**professionals** [5] - 6:11, 6:12, 13:21, 14:10, 14:20
**program** [1] - 44:4
**prolonged** [1] - 9:2

**prone** [27] - 6:6, 7:16, 7:20, 7:23, 9:1, 12:22, 13:2, 20:4, 23:2, 24:21, 27:15, 27:24, 28:10, 32:18, 32:23, 33:7, 33:21, 34:3, 35:1, 35:7, 35:9, 36:6, 36:12, 36:15, 36:20, 86:16
**pronounce** [1] - 58:25
**proven** [1] - 22:10
**provide** [1] - 34:25
**provided** [1] - 29:6
**psych** [1] - 16:11
**psychological** [1] - 16:11
**psychologically** [1] - 16:13
**publish** [16] - 39:21, 41:8, 44:13, 52:13, 52:14, 53:4, 53:14, 53:23, 54:8, 54:14, 55:7, 55:13, 55:17, 55:21, 56:2, 89:7
**published** [2] - 73:18, 89:5
**publishing** [1] - 44:16
**pull** [2] - 83:11, 83:14
**pulled** [2] - 77:15, 77:16
**pulse** [2] - 23:16, 23:21
**punch** [3] - 83:5, 90:7
**pupil** [1] - 59:10
**PURSUANT** [1] - 96:7
**push** [1] - 14:1
**put** [11] - 8:8, 11:22, 15:23, 15:25, 17:2, 17:21, 25:6, 47:24, 57:5, 79:14, 86:5
**putting** [2] - 17:15, 86:2

**Q**

**QUESTION** [1] - 65:17
**questioning** [4] - 11:20, 24:14, 33:23, 58:7
**questions** [11] - 34:9, 37:1, 46:3, 60:19, 67:14, 67:15, 70:16, 88:6, 89:9, 92:3, 92:7
**quick** [1] - 88:8
**quickly** [2] - 34:22, 94:18
**quite** [2] - 22:15, 30:3

**R**

**raise** [4] - 4:21, 37:7, 48:7, 68:10
**rate** [1] - 18:24
**rather** [1] - 9:5
**re** [2] - 15:12, 26:5
**re-ask** [2] - 15:12, 26:5
**reach** [3] - 28:25, 38:18, 60:2
**reaching** [1] - 58:10
**reaction** [1] - 59:10
**read** [7] - 20:19, 50:20, 65:5, 65:11, 92:23, 93:3, 93:4
**reading** [2] - 23:18, 94:25
**ready** [1] - 61:4
**real** [1] - 88:8
**realized** [1] - 87:21
**really** [10] - 45:10, 49:10, 50:5, 53:10, 55:3, 56:19, 57:13, 61:1, 62:15, 74:16
**REALTIME** [1] - 96:4
**reason** [2] - 14:23, 17:7
**recalling** [1] - 63:9
**received** [18] - 39:19, 41:8, 44:13, 52:14, 53:4, 53:14, 53:23, 54:8, 54:14, 55:7, 55:13, 55:17, 55:21, 56:2, 69:15, 73:22, 89:7, 94:14
**recess** [4] - 62:21, 63:6, 94:4, 95:25
**recognize** [7] - 39:6, 40:22, 44:2, 73:1, 73:3, 75:9, 88:20
**recognized** [3] - 20:25, 57:2, 75:21
**recollection** [8] - 18:7, 18:11, 23:17, 28:9, 29:16, 31:23, 33:11, 90:15
**recommend** [6] - 22:13, 23:1, 23:7, 23:15, 24:2, 36:5
**recommendation** [4] - 21:17, 22:20, 23:10, 23:19
**recommendations** [8] - 21:10, 21:19, 21:25, 24:8, 24:20, 24:25, 36:4, 59:7
**recommended** [3] - 12:1, 12:6, 25:2
**record** [9] - 4:7, 5:3,

15:2, 37:14, 48:14, 52:10, 63:12, 68:19, 94:11
**recorded** [1] - 89:1
**recording** [2] - 87:20, 87:23
**recordings** [1] - 87:17
**recovery** [9] - 7:11, 11:10, 11:16, 15:8, 15:18, 17:15, 24:24, 33:21, 34:8
**RECROSS/ REDIRECT** [2] - 3:5, 29:24
**REDIRECT** [4] - 3:4, 3:10, 5:7, 67:8
**referring** [1] - 10:16
**reflect** [1] - 73:7
**refresh** [1] - 18:11
**regarding** [7] - 6:13, 6:16, 8:7, 12:22, 13:21, 59:14, 68:5
**regardless** [2] - 32:9, 32:15
**registered** [1] - 49:1
**regular** [2] - 35:11, 35:19
**REGULATIONS** [1] - 96:11
**rehab** [1] - 57:24
**relapse** [2] - 57:17, 67:2
**relapsed** [3] - 57:9, 66:19, 67:16
**related** [6] - 12:17, 12:22, 14:20, 18:16, 30:14, 58:17
**relationship** [7] - 28:2, 38:6, 42:3, 42:15, 49:15, 50:2, 54:21
**relative** [3] - 40:17, 71:15, 72:5
**relatively** [1] - 51:2
**relay** [1] - 34:18
**relevance** [11] - 14:12, 15:4, 15:10, 23:11, 26:4, 26:19, 29:3, 29:9, 39:17, 46:1, 62:4
**relevant** [3] - 25:17, 27:5, 27:6
**relieved** [1] - 58:14
**remain** [1] - 63:17
**remained** [1] - 59:24
**remaining** [2] - 9:15, 40:17
**remarried** [1] - 49:21
**remedial** [3] - 14:13, 15:2, 15:11
**remember** [8] - 28:16,

34:8, 56:22, 62:24, 75:16, 86:2, 90:11, 94:4
**remove** [1] - 35:13
**repeat** [5] - 59:11, 69:25, 82:10, 91:8
**repeated** [1] - 22:9
**repeatedly** [2] - 23:22, 60:4
**repeating** [1] - 22:16
**REPORTED** [1] - 96:9
**Reporter** [1] - 1:22
**REPORTER** [3] - 96:1, 96:5, 96:21
**REPORTER'S** [1] - 1:15
**represent** [1] - 70:14
**representation** [2] - 39:12, 41:2
**required** [3] - 32:17, 35:1, 35:7
**requirements** [1] - 18:25
**requires** [1] - 24:7
**requiring** [1] - 34:7
**research** [3] - 36:9, 36:10
**resistance** [1] - 23:8
**resisting** [7] - 7:2, 7:10, 8:17, 9:7, 10:6, 10:8, 90:13
**respect** [6] - 6:11, 6:22, 8:4, 14:10, 21:7, 60:14
**respects** [1] - 49:25
**respiration** [1] - 23:16
**respiratory** [4] - 17:19, 17:25, 24:24, 26:10
**response** [5] - 26:25, 27:1, 33:22, 58:12, 60:8
**rest** [1] - 57:6
**restate** [2] - 5:2, 63:11
**restaurant** [1] - 44:25
**restrain** [1] - 26:11
**restrained** [12] - 26:11, 27:15, 27:24, 28:21, 28:22, 32:18, 33:7, 34:3, 70:7, 70:10, 70:15, 70:17
**restraint** [19] - 6:6, 7:20, 11:10, 11:16, 12:22, 13:2, 13:21, 14:11, 14:21, 17:23, 18:17, 19:6, 19:22, 20:11, 28:2, 36:12, 36:15, 36:21, 36:22
**restraints** [2] - 19:19, 24:6

**rests** [1] - 68:5
**result** [1] - 67:21
**retain** [1] - 30:6
**retake** [2] - 4:19, 63:15
**returned** [1] - 61:3
**revamping** [1] - 18:10
**review** [4] - 12:2, 32:20, 32:21
**reviewed** [1] - 13:14
**revive** [1] - 86:20
**revived** [1] - 59:3
**rights** [1] - 27:8
**Riley** [1] - 41:16
**rise** [1] - 31:13
**risk** [4] - 7:20, 32:5, 36:11, 36:15
**risks** [1] - 12:22
**Riverside** [8] - 4:5, 4:15, 6:19, 63:10, 63:23, 63:24, 69:23, 70:2
**RIVERSIDE** [4] - 1:3, 1:11, 4:1
**riverside** [2] - 1:16, 1:23
**RN** [3] - 38:12, 38:13, 59:22
**Road** [1] - 69:5
**Robert** [5] - 28:16, 37:15, 41:16, 53:8, 55:24
**ROBERT** [2] - 3:6, 37:12
**role** [3] - 45:4, 62:2, 62:12
**Roller** [1] - 43:13
**roof** [1] - 72:11
**room** [2] - 33:20, 54:18
**roommate** [2] - 50:10, 57:17
**rough** [1] - 94:19
**Rule** [1] - 26:17
**rule** [1] - 26:19
**rules** [1] - 14:3
**running** [1] - 80:12

## S

**safe** [7] - 8:15, 16:17, 33:21, 34:5, 35:2, 35:13, 35:17
**safely** [3] - 18:1, 34:8, 34:11
**safest** [1] - 7:14
**safety** [1] - 22:11
**sage** [1] - 58:8
**Sage** [1] - 64:7
**SAIN** [70] - 2:15, 3:5,

3:12, 4:13, 7:4, 7:24, 8:10, 8:19, 9:9, 14:12, 15:4, 15:10, 15:19, 16:7, 16:25, 19:1, 19:8, 19:23, 20:6, 20:13, 22:4, 22:22, 23:3, 23:11, 24:13, 25:8, 26:3, 26:13, 26:16, 27:11, 27:17, 28:1, 29:3, 29:9, 29:22, 29:25, 34:1, 35:5, 37:1, 63:21, 68:8, 68:23, 72:18, 72:21, 73:17, 73:21, 73:24, 73:25, 82:11, 88:3, 88:10, 88:15, 88:18, 88:19, 89:4, 89:9, 92:7, 92:13, 92:19, 93:7, 93:9, 93:12, 93:14, 93:19, 93:25, 94:9, 94:11, 94:16, 95:15, 95:24
**Sain** [8] - 4:13, 27:1, 63:20, 63:22, 68:7, 92:6, 92:12, 93:4
**saw** [27] - 57:8, 70:17, 72:2, 72:4, 74:1, 75:9, 75:14, 75:20, 77:7, 77:19, 77:25, 78:11, 78:15, 78:17, 79:3, 80:2, 82:1, 82:24, 83:16, 83:23, 84:6, 85:6, 85:10, 85:15, 86:7, 86:11, 86:12
**scan** [2] - 59:11
**scared** [1] - 81:1
**scene** [5] - 67:11, 85:16, 85:19, 85:21, 87:10
**scheduling** [1] - 95:14
**school** [3] - 50:20, 56:21, 57:23
**science** [1] - 49:11
**scream** [1] - 74:14
**screaming** [4] - 74:6, 74:8, 76:6, 80:13
**screen** [1] - 72:22
**seated** [13] - 5:2, 15:18, 24:23, 37:13, 48:13, 63:8, 68:16, 77:17, 79:22, 80:3, 81:19, 81:24, 89:21
**second** [10] - 80:18, 81:9, 81:11, 81:15, 81:18, 81:21, 82:1, 82:17, 84:10, 89:23
**seconds** [1] - 88:8
**seconds'** [1] - 88:15

**section** [1] - 26:1
**SECTION** [1] - 96:7
**see** [45] - 14:18, 33:4, 60:2, 70:6, 70:10, 71:19, 71:22, 72:22, 72:23, 72:25, 74:5, 74:13, 78:3, 78:9, 78:11, 78:14, 78:17, 78:20, 78:22, 79:13, 79:16, 79:17, 80:7, 80:10, 81:9, 82:5, 82:19, 82:22, 82:25, 83:2, 83:5, 83:8, 83:11, 83:14, 83:20, 84:3, 84:9, 85:18, 85:24, 86:15, 86:18, 87:9, 87:12, 90:1, 90:7
**seeing** [4] - 23:17, 59:5, 61:24, 86:23
**sell** [1] - 50:18
**sent** [1] - 12:2
**separate** [1] - 30:13
**September** [3] - 51:7, 51:14, 56:7
**sequence** [1] - 87:19
**serious** [1] - 36:16
**Serrano** [2] - 28:14, 36:19
**Session** [1] - 1:12
**set** [3] - 28:17, 34:14, 60:16
**setting** [2] - 61:6, 61:9
**settle** [1] - 58:16
**seven** [7] - 51:11, 75:4, 84:11, 85:3, 90:14, 90:17, 91:14
**severe** [1] - 21:5
**share** [1] - 43:2
**Sheriff** [10] - 4:14, 12:7, 12:21, 16:5, 26:23, 28:25, 35:23, 37:2, 45:23, 63:23
**SHERIFF** [1] - 1:12
**sheriff** [3] - 4:19, 5:9, 30:1
**SHERIFF'S** [1] - 1:11
**Sheriff's** [4] - 5:21, 6:20, 69:23, 70:3
**Sheriff-Coroner** [1] - 45:23
**SHERIFF-CORONER** [1] - 1:12
**shirt** [2] - 75:17, 75:18
**shook** [1] - 52:4
**shore** [1] - 57:1
**shorter** [1] - 93:15
**shortly** [2] - 85:17, 87:21
**shoulder** [1] - 82:17

**shouting** [4] - 71:8, 71:9, 71:12, 80:23
**show** [5] - 24:3, 52:7, 53:2, 72:18, 88:3
**showing** [5] - 52:19, 67:15, 72:25, 88:7, 88:20
**sibling** [2] - 50:13, 62:15
**sick** [1] - 51:25
**sickness** [1] - 51:24
**side** [13] - 8:8, 13:17, 13:18, 22:2, 24:24, 32:25, 33:4, 82:3, 84:17, 84:20, 92:17
**Sidebar** [1] - 26:15
**sidebar** [1] - 27:12
**sides** [1] - 94:22
**significant** [2] - 18:18, 25:14
**signs** [2] - 21:5, 24:3
**similar** [3] - 10:21, 10:25, 28:6
**simple** [1] - 61:18
**single** [3] - 28:20, 28:23, 39:19
**sister** [6] - 38:12, 49:5, 50:23, 51:10, 62:12
**sisters** [2] - 49:4, 62:14
**sit** [4] - 8:8, 8:14, 13:4, 36:20
**sitting** [7] - 22:3, 24:23, 79:10, 79:12, 83:25, 87:2
**situation** [2] - 9:6, 62:15
**situations** [1] - 28:6
**six** [2] - 51:20, 74:25
**size** [1] - 30:10
**slightly** [2] - 18:14, 25:11
**smart** [1] - 49:10
**SMITH** [1] - 2:15
**so-called** [1] - 13:6
**sober** [1] - 56:17
**solemnly** [4] - 4:22, 37:8, 48:8, 68:11
**solid** [2] - 23:9, 50:5
**somber** [2] - 57:4, 57:9
**someone** [24] - 5:21, 7:10, 7:16, 7:21, 9:1, 9:11, 11:5, 13:10, 13:15, 15:8, 16:9, 16:14, 17:7, 17:15, 17:18, 22:1, 23:8, 27:15, 28:21, 29:15, 30:19, 31:4, 32:23,

33:3
**sometime** [1] - 58:2
**somewhat** [2] - 34:24, 73:6
**son** [5] - 41:16, 53:8, 55:24, 56:24, 57:18
**son-in-law** [1] - 56:24
**soon** [1] - 24:22
**sorry** [10] - 46:19, 46:21, 60:9, 65:6, 66:11, 69:25, 74:9, 79:2, 91:8, 93:15
**sounds** [1] - 89:20
**source** [1] - 58:5
**sources** [1] - 36:1
**speaking** [1] - 77:7
**specialty** [1] - 52:1
**specific** [2] - 32:13, 86:23
**specifically** [4] - 28:9, 31:18, 31:24, 33:10
**specifics** [1] - 59:19
**spell** [4] - 37:14, 37:15, 48:14, 68:18
**spend** [3] - 42:24, 43:14
**spent** [3] - 49:18, 62:8, 62:9
**sporadic** [1] - 47:16
**sporting** [1] - 54:11
**sports** [2] - 49:12, 50:19
**spot** [1] - 81:23
**spray** [4] - 83:11, 83:12
**St** [2] - 38:15, 43:3
**staff** [3] - 34:21, 60:17, 93:16
**stage** [1] - 51:16
**stand** [3] - 4:19, 63:15, 81:4
**standing** [9] - 72:2, 77:17, 77:18, 77:19, 77:24, 77:25, 81:19, 81:24
**start** [3] - 8:23, 41:13, 87:19
**started** [1] - 58:10
**state** [8] - 4:6, 15:16, 17:20, 20:23, 21:3, 37:13, 48:13, 68:18
**statement** [2] - 6:2, 12:24
**States** [1] - 1:22
**states** [3] - 25:5, 34:6, 35:19
**STATES** [4] - 1:1, 96:5, 96:7, 96:12
**stating** [1] - 14:16
**statute** [4] - 25:25,

26:8, 26:20, 26:23
**statutory** [1] - 26:18
**stay** [3] - 57:21, 60:6, 62:7
**stay-home** [1] - 62:7
**stayed** [2] - 62:10, 62:13
**staying** [1] - 58:10
**STENOGRAPHICAL LY** [1] - 96:9
**stenojag@aol.com** [1] - 1:24
**step** [7] - 37:2, 47:23, 63:5, 68:2, 76:19, 76:20
**still** [13] - 11:2, 22:13, 33:17, 34:25, 35:8, 51:10, 74:5, 74:10, 76:6, 80:21, 81:2, 81:4, 91:6
**stipulation** [1] - 52:9
**stomach** [3] - 9:15, 17:8, 87:4
**stood** [5] - 78:4, 80:4, 80:5, 80:18, 85:8
**stop** [10] - 8:17, 8:22, 9:7, 21:14, 85:1, 85:11, 87:23, 88:18, 90:22, 93:14
**stopped** [6] - 7:2, 7:10, 25:15, 85:7, 91:1, 91:9
**stopping** [1] - 32:9
**stops** [2] - 10:6, 10:8
**Street** [3] - 1:23, 2:10, 2:16
**strike** [2] - 34:23, 83:6
**struggle** [1] - 24:2
**struggling** [1] - 57:14
**stuck** [2] - 16:13, 18:20
**studies** [1] - 13:14
**study** [1] - 22:13
**stuff** [2] - 13:16, 56:25
**subject** [10] - 24:3, 24:4, 30:20, 33:20, 34:3, 34:7, 35:1, 35:7, 36:5, 68:4
**subject's** [3] - 23:16, 32:17, 33:7
**subsequent** [2] - 14:12, 68:4
**Subsequent** [1] - 15:10
**subsequently** [1] - 33:15
**substantially** [1] - 18:14
**Successor** [1] - 1:7
**Suite** [3] - 2:5, 2:10,

2:16
**summer** [1] - 57:2
**sun** [1] - 75:25
**supervising** [1] - 30:16
**supine** [2] - 15:18, 86:16
**support** [2] - 59:5, 59:25
**suspect** [2] - 8:14, 9:17
**suspects** [1] - 17:5
**sustained** [7] - 15:5, 29:4, 33:25, 35:4, 42:12, 46:2
**swear** [4] - 4:22, 37:8, 48:8, 68:11
**swelling** [2] - 59:1, 59:12
**swim** [1] - 50:19

**T**

**tab** [1] - 38:25
**table** [1] - 55:25
**tactics** [1] - 69:19
**tall** [2] - 30:3, 74:24
**taller** [1] - 75:4
**tape** [1] - 58:9
**tased** [4] - 25:5, 60:10, 77:15, 78:12
**TASER** [14] - 78:17, 78:18, 78:20, 78:21, 78:22, 79:3, 79:22, 81:9, 81:11, 81:15, 81:18, 81:21, 82:1, 84:10
**TASERs** [2] - 25:4, 83:8
**tasing** [2] - 78:15, 89:23
**team** [2] - 30:12
**teams** [3] - 30:14, 49:12, 49:14
**tease** [1] - 54:25
**technically** [3] - 12:19, 13:8, 30:24
**technology** [1] - 52:17
**Temec** [1] - 51:14
**Temecula** [3] - 38:3, 69:3, 69:6
**ten** [7] - 56:19, 84:11, 85:3, 90:15, 90:17, 91:14, 95:2
**term** [5] - 9:13, 31:24, 32:3, 33:11, 33:16
**terms** [8] - 12:17, 12:20, 31:15, 35:6, 56:18, 65:20, 95:16
**testified** [9] - 5:14,

6:18, 6:23, 8:5, 8:13, 10:22, 23:23, 27:1, 33:18
**testifying** [1] - 13:6
**testimony** [28] - 4:22, 7:3, 7:4, 8:7, 8:10, 8:25, 10:19, 10:20, 10:24, 11:3, 11:21, 11:22, 19:2, 19:9, 20:7, 20:14, 20:19, 21:4, 21:5, 22:7, 37:8, 48:8, 68:11, 89:19, 90:10, 92:15, 92:16, 95:12
**texting** [1] - 58:11
**Thanksgiving** [1] - 42:25
**THAT** [3] - 96:6, 96:7, 96:10
**THE** [178] - 4:4, 4:11, 4:16, 4:21, 4:25, 5:2, 5:4, 5:5, 7:5, 7:6, 7:25, 8:1, 8:11, 8:12, 8:20, 8:21, 9:10, 9:11, 14:14, 14:15, 15:5, 15:12, 15:20, 15:21, 16:6, 16:8, 16:23, 17:1, 19:3, 19:4, 19:10, 19:11, 19:25, 20:1, 20:8, 20:9, 20:15, 20:16, 22:6, 22:7, 22:23, 22:24, 23:4, 23:5, 23:12, 23:13, 24:16, 25:10, 25:11, 26:5, 26:14, 26:25, 27:4, 27:19, 28:4, 28:5, 29:4, 29:10, 29:13, 29:21, 33:25, 35:4, 37:2, 37:5, 37:7, 37:11, 37:13, 37:15, 37:17, 37:18, 39:18, 39:23, 41:8, 42:12, 42:19, 44:13, 44:17, 44:19, 46:2, 46:4, 47:21, 47:23, 47:24, 47:25, 48:2, 48:4, 48:7, 48:11, 48:13, 48:15, 48:18, 52:11, 52:14, 52:18, 52:21, 53:4, 53:14, 53:23, 54:8, 54:14, 55:7, 55:13, 55:15, 55:17, 55:19, 55:21, 55:23, 56:2, 56:4, 62:5, 62:6, 62:21, 63:5, 63:8, 63:9, 63:16, 63:19, 63:20, 63:25, 64:20, 65:8, 65:11, 65:12, 65:13, 65:14,

65:15, 67:7, 67:25, 68:2, 68:3, 68:6, 68:10, 68:14, 68:16, 68:17, 68:18, 68:20, 68:21, 72:20, 73:20, 73:22, 82:9, 82:10, 89:7, 89:10, 89:14, 91:20, 92:2, 92:5, 92:6, 92:9, 92:11, 92:12, 92:17, 92:24, 93:2, 93:6, 93:8, 93:13, 93:18, 93:24, 94:3, 94:10, 94:14, 94:17, 95:8, 95:11, 95:14, 95:22, 96:5, 96:6, 96:7, 96:8, 96:9, 96:10, 96:11, 96:12

**themselves** [1] - 35:21

**thereafter** [1] - 58:2

**thinking** [1] - 94:22

**THIS** [1] - 96:15

**thorough** [3] - 5:15, 6:1, 6:4

**threat** [3] - 9:4, 22:14, 35:21

**threaten** [1] - 90:4

**three** [7] - 26:21, 26:24, 38:5, 42:1, 50:3, 50:4, 61:16

**throat** [2] - 32:10, 32:11

**Thursday** [2] - 94:24, 95:5

**time-share** [1] - 43:2

**timely** [1] - 29:7

**TITLE** [1] - 96:7

**TO** [1] - 96:7

**today** [6] - 27:3, 27:5, 36:20, 65:3, 94:21, 95:21

**together** [4] - 11:23, 45:5, 52:4, 56:18

**tomorrow** [5] - 95:5, 95:12, 95:18, 95:19, 95:20

**tone** [1] - 77:5

**Tony** [2] - 4:13, 63:22

**TONY** [1] - 2:15

**took** [12] - 40:24, 43:5, 46:14, 56:5, 56:9, 56:20, 59:23, 64:25, 65:3, 83:22, 87:15, 88:23

**tool** [1] - 16:11

**TORI** [1] - 2:16

**Tori** [2] - 4:14, 63:22

**torso** [1] - 26:12

**total** [1] - 94:21

**totality** [2] - 13:13, 36:7

**touch** [2] - 79:13, 79:16

**touching** [3] - 74:18, 77:11, 82:19

**toward** [2] - 76:24, 80:14

**towards** [3] - 76:22, 78:10, 82:16

**track** [1] - 50:6

**TRACY** [3] - 1:7, 3:9, 48:12

**Tracy** [11] - 4:4, 38:6, 38:9, 38:12, 38:16, 41:17, 45:3, 45:15, 48:5, 48:15, 63:10

**Tracy's** [1] - 40:7

**train** [3] - 13:4, 16:17, 32:4

**trained** [13] - 7:9, 7:13, 7:15, 7:19, 8:8, 8:14, 9:5, 9:7, 9:11, 9:17, 10:12, 17:4, 31:12

**training** [40] - 6:19, 6:22, 7:1, 8:7, 8:17, 8:25, 9:20, 9:21, 9:22, 10:15, 11:3, 11:14, 14:4, 15:22, 17:3, 20:25, 25:4, 26:20, 27:3, 30:21, 30:23, 31:7, 31:15, 31:23, 32:3, 32:7, 32:16, 33:6, 33:14, 34:2, 34:23, 34:25, 35:6, 35:8, 35:20, 36:10, 47:4, 69:16

**trains** [1] - 33:19

**transcribing** [1] - 94:13

**TRANSCRIPT** [3] - 1:15, 96:8, 96:10

**transcript** [1] - 65:6

**transcription** [1] - 93:8

**transported** [1] - 87:10

**treat** [3] - 17:4, 17:5, 42:15

**treated** [4] - 16:10, 16:18, 35:20, 50:13

**trial** [1] - 92:20

**Trial** [1] - 1:11

**TRIAL** [1] - 1:15

**tried** [1] - 58:16

**trip** [10] - 40:23, 40:24, 43:1, 56:4, 56:9, 56:18, 56:19, 56:20, 57:3, 57:5

**trips** [1] - 43:8

**trouble** [1] - 57:11

**true** [24] - 6:23, 7:23, 9:8, 11:11, 11:13, 11:17, 12:7, 13:16, 14:18, 15:9, 17:21, 18:6, 21:19, 23:10, 27:16, 27:25, 28:23, 39:12, 41:2, 41:21, 44:5, 65:1, 66:20, 67:3

**TRUE** [1] - 96:8

**truth** [13] - 4:23, 4:24, 37:9, 37:10, 48:9, 48:10, 65:1, 68:12, 68:13

**try** [5] - 63:1, 76:24, 79:10, 90:7, 94:6

**trying** [14] - 16:23, 23:7, 59:20, 72:3, 74:15, 76:12, 76:15, 83:20, 84:6, 84:9, 84:16, 85:25, 86:20, 95:2

**Tuesday** [1] - 1:17

**TUESDAY** [1] - 4:1

**turn** [2] - 40:19, 43:25

**turned** [3] - 33:4, 51:6, 91:22

**turning** [1] - 69:21

**Twelfth** [1] - 1:23

**twice** [1] - 67:17

**two** [14] - 6:7, 21:23, 32:22, 50:10, 54:25, 61:16, 72:2, 72:4, 74:21, 75:20, 83:8, 84:16, 87:5, 94:24

**type** [5] - 14:3, 22:14, 29:13, 33:1, 62:1

## U

**umbrella** [1] - 5:21

**unable** [4] - 30:21, 77:2, 86:15, 88:14

**uncle** [1] - 50:13

**unclear** [1] - 65:23

**under** [6] - 5:21, 7:21, 16:1, 26:17, 36:6, 63:17

**understood** [1] - 32:5

**unfairly** [1] - 26:16

**unfold** [1] - 73:8

**unfortunately** [2] - 18:20, 30:3

**uniform** [1] - 74:23

**uniforms** [1] - 75:7

**unit** [1] - 30:17

**uNITED** [1] - 1:1

**UNITED** [3] - 96:5, 96:7, 96:12

**United** [1] - 1:22

**unless** [1] - 8:15

**unobstructed** [1] - 32:24

**unreasonably** [2] - 17:24, 26:10

**unsafe** [1] - 36:6

**unsettledness** [1] - 61:1

**up** [41] - 8:8, 8:15, 10:19, 10:23, 12:8, 12:12, 13:4, 13:6, 22:3, 27:3, 31:15, 31:16, 31:19, 32:4, 33:18, 36:10, 43:22, 47:11, 49:2, 49:9, 49:15, 57:1, 65:25, 66:18, 66:22, 73:5, 74:16, 74:22, 76:16, 76:19, 76:22, 76:25, 77:8, 80:4, 80:5, 80:18, 85:8, 85:12, 85:14, 95:10

**updates** [1] - 18:9

**upright** [1] - 24:23

**ups** [1] - 60:25

**upset** [1] - 77:9

**upward** [2] - 86:12, 86:16

**usage** [1] - 66:1

**user** [3] - 47:17, 66:23

**Utah** [2] - 38:15, 43:3

## V

**V-A-S-Q-U-E-Z** [1] - 68:20

**vacationed** [2] - 50:11, 56:25

**vague** [5] - 19:23, 26:3, 26:5, 27:17, 29:11

**Valley** [1] - 58:20

**VASQUEZ** [2] - 3:12, 68:15

**Vasquez** [5] - 68:9, 68:20, 68:24, 72:22, 92:10

**Vegas** [5] - 40:23, 40:25, 42:23, 43:3, 43:13

**ventilator** [1] - 59:3

**verbally** [2] - 18:19, 90:4

**version** [3] - 93:15, 93:17, 93:22

**viable** [1] - 59:13

**Vickers** [1] - 95:20

**video** [14] - 20:23, 61:7, 67:12, 88:9, 88:11, 88:17, 88:20, 88:21, 88:23, 88:25, 92:15, 93:11, 94:2, 94:12

**VIDEO** [1] - 3:15

**view** [3] - 76:2, 82:7, 82:12

**violent** [6] - 80:8, 80:11, 80:15, 80:22, 82:7, 82:12

**voice** [2] - 71:15, 77:5

**vs** [1] - 1:10

## W

**wait** [1] - 65:7

**waive** [1] - 93:8

**wake** [1] - 43:21

**wants** [1] - 13:15

**watched** [2] - 20:23, 90:19

**watching** [6] - 31:13, 73:8, 75:23, 90:17, 90:24, 91:22

**weapons** [1] - 83:9

**wearing** [1] - 75:6

**wedding** [6] - 39:9, 39:13, 40:1, 40:2, 40:4, 40:8

**week** [3] - 21:8, 61:17, 67:3

**weeks** [2] - 56:5, 57:10

**weight** [5] - 18:23, 23:10, 26:11, 33:7, 36:13

**West** [1] - 2:16

**wheel** [1] - 43:13

**whole** [8] - 4:23, 37:9, 48:9, 68:12, 80:12, 84:18, 84:20, 90:19

**wife** [2] - 38:8, 45:15

**wiggling** [1] - 80:1

**window** [4] - 71:8, 71:18, 71:25, 89:1

**wire** [3] - 78:21, 78:22, 79:3

**WITH** [1] - 96:11

**withdrawn** [1] - 45:19

**WITNESS** [48] - 4:25, 5:1, 5:4, 7:6, 8:1, 8:12, 8:21, 9:11, 14:15, 15:21, 16:8, 17:1, 19:4, 19:11, 20:1, 20:9, 20:16, 22:7, 22:24, 23:5, 23:13, 25:11, 28:5, 29:13, 37:11, 37:12, 37:15, 37:18, 47:24, 48:11, 48:12, 48:15,

55:15, 55:19, 55:23, 56:4, 62:6, 63:19, 65:12, 65:14, 68:3, 68:14, 68:15, 68:17, 68:20, 82:10, 92:5, 92:11

**witness** [12] - 37:4, 46:13, 48:1, 48:2, 68:9, 71:1, 72:18, 72:20, 88:3, 92:8, 92:15, 94:25

**witnessed** [1] - 64:10

**witnesses** [1] - 95:16

**WITNESSES** [1] - 3:2

**Woodland** [1] - 2:5

**word** [3] - 9:23, 31:10

**wording** [7] - 14:22, 14:25, 17:2, 18:8, 18:14, 34:24

**words** [4] - 10:20, 18:20, 18:21, 31:17

**works** [2] - 12:10, 60:25

**worried** [3] - 51:25, 58:18

**worth** [1] - 88:15

**written** [9] - 11:9, 11:14, 16:21, 17:11, 17:14, 17:17, 17:22, 18:5

## Y

**year** [11] - 26:21, 57:18, 61:4, 65:23, 66:4, 66:5, 66:6, 66:9, 66:11, 66:12, 66:13

**years** [12] - 21:23, 26:21, 26:24, 49:16, 50:3, 50:4, 50:5, 50:10, 51:11, 66:22, 67:17

**years'** [2] - 51:5, 51:12

**yelling** [4] - 72:2, 76:18, 81:4, 87:22

**yellow** [1] - 58:9

**you-all** [2] - 43:5, 45:2

**young** [2] - 51:2, 62:10

**younger** [1] - 56:23

**youngest** [1] - 41:16

**yourself** [1] - 29:1

**yourselves** [1] - 62:25

## Z

**Zion's** [1] - 45:1

**Zoom** [1] - 52:23