UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

TRACY ALVES, Individually and as    )
Successor in interest for KEVIN R. )
NIEDZIALEK, deceased,              )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      ) No. EDCV 19-2083-JGB
                                   )
RIVERSIDE COUNTY, RIVERSIDE        )    Jury Trial Day 6
COUNTY SHERIFF'S DEPARTMENT,       )
SHERIFF-CORONER CHAD BIANCO,       )    AM Session
                                   )
                    Defendants.    )
_____)


REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Wednesday, April 5, 2023

9:12 a.m.


PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

                LAW OFFICES OF DALE K. GALIPO
                BY:  **DALE GALIPO**
                21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367

                LAW OFFICES OF JOHN BURTON
                BY:  **JOHN BURTON**
                128 North Fair Oaks Avenue
                Pasadena, California 91103

                HELM LAW OFFICE, PC
                BY:  **KENNEDY HELM**
                644 40th Street, Suite 305
                Oakland, California, 94609


For the Defendants:

                LEWIS BRISBOIS BISGAARD & SMITH, LLP
                BY:  **TONY SAIN**
                    **TORI BAKKEN**
                633 West 5th Street, Suite 4000
                Los Angeles, California 90071

I N D E X

WITNESSES                                                    PAGE


**DR.  THEODORE CHAN**
DIRECT EXAMINATION BY SAIN                                     5
CROSS-EXAMINATION BY MR. BURTON                               51
REDIRECT EXAMINATION BY MR. SAIN                              76
RECROSS-EXAMINATION BY MR. BURTON                            85


**DR.  MICHAEL GRAHAM**
DIRECT EXAMINATION BY MR. SAIN                                88
CROSS-EXAMINATION BY MR. GALIPO                              105

WEDNESDAY, APRIL 5, 2023; RIVERSIDE, CALIFORNIA

-o0o-

(In the presence of the jury:)

THE CLERK:  Calling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, would you please state your appearances for the record.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff. And if it's okay, Your Honor, Mr. Burton is going to take the next witness, Dr. Chan.  And to create space, I'm going to sit next to my client.

THE COURT:  That's fine.

MR. GALIPO:  Thank you.

MR. SAIN:  Good morning, Your Honor.  Tony Sain, with me, my associate counsel, Ms. Tori Bakken, representing Defendant Sheriff Chad Bianco and the County of Riverside.

THE COURT:  Good morning.

And good morning, ladies and gentlemen.  Thank you for being on time.

So let's proceed.  Let's call -- you continue your examination of Lieutenant Vickers?

MR. SAIN:  Your Honor, as we mentioned yesterday, due to availability issues, we'll be calling Dr. Chan and Dr. Graham out of order and then resuming with Lieutenant

Vickers.

THE COURT:  Okay.  So as before, we're going to have to -- because of scheduling issues only, we're going to call a witness before the previous witness is done with his testimony. So treat the testimony the same way.

Call your witness.

MR. SAIN:  Thank you, Your Honor.  Defense calls Dr. Theodore Chan.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I swear.

**DEFENDANTS' WITNESS, DR. THEODORE CHAN**

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Theodore Craig Chan, C-H-A-N.

THE COURT:  Proceed.

MR. SAIN:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. SAIN:

Q.   Good morning, Dr. Chan.

MR. SAIN:  And good morning, ladies and gentlemen of the jury.

THE WITNESS:  Good morning.

BY MR. SAIN:

Q.   Sir, what is your current occupation?

A.   I'm a professor of emergency medicine and chair of the department of emergency medicine at the University of California San Diego.

Q.   And if you would please tell us a little bit about your educational background.  What degrees and licenses do you hold?

A.   So I've got my undergraduate degree at UC Berkeley in history, and then went to medical school at the University of California San Francisco.  I did a residency in emergency medicine at UC San Diego.  I was chief resident my last year. And I've been on faculty at the University of California San Diego since that time.

I'm board certified in emergency medicine.  I practice emergency medicine at the two emergency departments that UC San Diego runs.

Q.   Are you a licensed physician?

A.   Yes.

Q.   Since when?

A.   1993.

Q.   Fair enough.  You said you were board certified in emergency medicine.  Since when?

A.   1996 -- '97.

Q.   And since you obtained your medical degree, what medical positions have you held so far?

A.    Well, I was a medical director for our emergency department.  I was vice chair for clinical operations and then became department chair.  And I've held various different positions with the hospital.

Q.    What does the department chair do at your hospital?    09:16

A.    Well, I'm responsible for overseeing the two emergency departments that we run.  Actually, we run a third emergency department in El Centro, California, as well that's responsible for approximately 150,000 patient visits a year.

Q.    And you said you've held some teaching positions?    09:16

A.    Yes.  So part of my job is teaching with the University of California.

Q.    Teaching what?

A.    Teaching emergency medicine to residents who have finished medical school and also teaching medical students when they    09:16 come through the emergency department.

Q.    Now, without getting into any of the details just yet, have you participated in or conducted any medical studies?

A.    Yes.

Q.    And generally speaking, what kinds of medical studies have    09:16 you been involved in?

A.    Well, in general, they relate to emergency medicine and physiologic studies.  So I've done studies looking at emergency department flow, electronic medical records, as well as studies on different -- because we interface a lot with law enforcement    09:17

looking at different -- different physiologic effects of different restraint and police practices.

Q.   Have any of your studies regarding restraint and police practices been peer reviewed?

A.   Yes.

Q.   In what journals?

A.   The *Annals of Emergency Medicine*, *The Journal of Emergency Medicine*, *The American Journal of Forensic Medicine and Pathology*, the *Journal of Forensic Sciences* to name a few.

Q.   How many medical studies on restraint and the effects -- medical effects of restraint have you published that have been peer reviewed?

A.   That would be -- off the top of my head, it'd probably be anywhere from 10 to 15, maybe more.

Q.   And when was the first of those studies published?

A.   1997.

Q.   When was the last one published?

A.   Probably in just the last few years.  Probably the last two or three years.  I can't -- without my CV in front of me, I can't recall.

Q.   That's okay.  Have you ever testified in court as an expert witness on the issue of restraint as it relates to the impacts on breathing, respiration, or asphyxia?

A.   Yes.

Q.   About how many times?

A.    Probably 15 to 20 times.

Q.    And in terms of your background, education, training, and experience, does that include training and experience on the effects of narcotics on the human body?

A.    In some cases.

Q.    Does that experience include the effects of various narcotics on respiratory function?

A.    Yes.

Q.    Which party retained you in this case?

A.    The defense.

Q.    And generally speaking, what were you retained to do?

A.    Well, I was retained to review the case, the materials of the case, including any videos.  I was also asked to provide an opinion as to whether restraint asphyxia or positional asphyxia played a role in -- in the death.

Q.    Did anyone tell you what conclusions they wanted you to form in this case?

A.    No.

Q.    What hourly fees are you charging for your services in this case?

A.    $500 an hour.

Q.    Is that rate any different than you would've charged if plaintiffs had retained you?

A.    No.

Q.    And generally speaking, what work have you done in this

specific case?

A.    Well, I reviewed the case materials, including any reports related to the incident, reviewed the videos, provided some preliminary opinions, and then a -- a letter in regards to my opinions, and then I think I was deposed at one time regarding this case.

Q.    Based -- in light of the opinions that you formed in this case, do you believe that those opinions, based on your review of the evidence, have been formed to a reasonable degree of medical probability?

A.    Yes.

Q.    In forming those opinions, did you consider or evaluate any records?

A.    Yes.

Q.    What records did you consider or evaluate before forming your opinions?

A.    Well, all the records, including any incident reports from law enforcement, the medical records, including the paramedic reports and the hospital records, videos regarding the incident.

Q.    And did that review include any depositions in this case?

A.    Yes.

Q.    Which depositions?

A.    Well, I can't probably list them all but depositions of the individuals who are involved in the incident, depositions

of the experts that were retained.

Q.   Did your review include the deposition testimony and report of plaintiff's police practices expert, Jeffrey Noble?

A.   Yes.

Q.   Did it include the review of deposition and testimony and report of plaintiff's cardiologist, Dr. Dan Wohlgelernter?

A.   Yes.

Q.   Did it include the deposition testimony, autopsy report, lab reports, and autopsy photographs of Medical Examiner Mark Fajardo?

A.   Yes.

Q.   Did it include the depositions of the two involved deputies, Deputy Sonia Gomez and Brian Keeney?

A.   Yes.

Q.   Did it include the deposition testimony of the incident witnesses, Eric Mireles and Kathryn Vasquez?

A.   Yes.

Q.   Did it include review of the composite incident video and the bystander video of Ms. Vasquez?

A.   Yes.

Q.   As part of your process in this case, did you consult with any other experts?

A.   Yes.

Q.   What other experts did you consult with?

A.   Dr. Kode and Dr. Graham.

Q.   So before we delve into the details of your opinion, what's your understanding of what asphyxia is?

A.   Well, asphyxia is basically death or near death by the inability to breathe.  It is somewhat of a broad term because it really is death by dysfunction of the respiratory or your breathing system.

Q.   And what does "respiratory" mean?

A.   Well, the respiratory system is the system by which oxygen is brought in from the environment into your blood and carbon dioxide is eliminated from your blood back to the environment.

Q.   Mechanically, what's happening when a person is breathing properly?

A.   Well, when somebody is breathing properly, there are sort of three elements to that; that is, you need a connection from the environment into the lung tissue, so that's your airway, and then you need the lung tissue, which is the interface between your blood and that environment, and then you need a mechanism by which you bring air in and you extrude air out. So those are the three mechanisms, and that basically brings environmental air into your body, into your lungs, oxygen and carbon dioxide are exchanged between the environment and your blood, and then you exhale.

Q.   If a person were dying by asphyxia because they couldn't breathe, objectively, what would you expect to see that person do?  What signs would we expect to see?

A.  Well, if somebody is going to die by being unable to breathe, we would call that they're not able to ventilate, that is, move air in and out.  We would -- there would have to be some mechanism by why they can't breathe.  One, either they're not generating that force to bring air in and out or their airway is obstructed and they can't get air from the environment into their lungs.

So when that happens, the -- if you're unable to ventilate, the real first sign that we'll see is that the carbon dioxide level rises because that's -- that happens much faster than oxygen level dropping.  And the reason for that is oxygen in your blood is bound to hemoglobin.  So oxygen levels stay relatively high.  So if I were to stop breathing right now, the first thing that's going to happen is my carbon dioxide levels will rise, and that will also produce some acid in my blood, but my oxygen levels will actually stay relatively high until, you know, minutes, long time not being able to breathe.

Q.  Generally speaking, how long would it take for a person to die by asphyxia if he had stopped breathing?

A.  Well, so that depends.  If you mean completely stopping breathing, your oxygen levels probably won't drop for six to eight minutes.  Now, if there's one breath in between -- for example, like we've all held our breath when driving through a tunnel, right?  You hold your breath for a couple minutes and

then you breathe again.  That gets the carbon dioxide level out, brings some oxygen in, and so it depends on what you mean by "stopping breathing" and complete cessation.

Q.   Are you familiar with the term "positional asphyxia"?

A.   Yes.

Q.   What's your understanding of that term?

A.   So positional asphyxia, when it was originally described about 30 years in the literature, were individuals who were found by -- found dead in which it looks like they were in a position where they were, one, unable to breathe and, two, there was a reason why they wouldn't get out of that position, thus the term "positional asphyxia."  Most commonly these were described on individuals who were on something that depressed their respiratory or -- or their mental status, like they drank a lot of alcohol or they were -- had opiates on board, which would prevent them from getting out of the various position, and then they were found in positions with their neck slumped over or back this way where it looked like they obstructed their upper airway and they wouldn't get out of that position.

As I mentioned, if you obstruct the passage between the environment and your lungs, then you can't get air in.  And then there was a reason they wouldn't get out of that position is because they were on something that depressed their mental status and -- and they wouldn't get out of it.

In none of the -- in the original description of

positional asphyxia, none of them were restrained.

Q.    And are you familiar with a doctor by the name of Dr. Bell as it relates to positional asphyxia?

A.    Yes, he is the one who authored actually and made the initial term "positional asphyxia."

Q.    What about the term "restraint asphyxia"?  What's your understanding of that?

A.    Well, around -- so in the '70s or '80s, there began to be in the literature cases of sudden deaths that were happening with individuals who were restrained in various different positions: restrained in the prone position, restrained in the supine position, restrained in the sitting position.  And so some folks thought, *Well, is asphyxia happening here in this case as well?*  These cases were a little bit different than the original description of positional asphyxia.  In many of these case, these individuals were not on things that depressed their mental status but actually stimulated them, things like methamphetamine or cocaine.  But folks thought, *Okay, maybe they're being restrained in such a way that they can't generate that negative force to bring air into their lungs*, and that's why they were dying, because they were asphyxiating from that reason.

Q.    What about "compression asphyxia"?  What is that?

A.    So compression asphyxia is one where there was some thought that if I compress your torso or if some car runs over

you or a lot of weights are put onto you, you can't expand your lungs, you can't bring that air in.  So that was -- that's been described in the literature as well.

Q.    And based on the medical studies and the literature, what kind of weight effects or injuries would typically be associated with a death caused by compression asphyxia?

A.    Well, in the forensic literature, the compression asphyxia, remember, you would have to compress somebody such that they can't generate any negative force to bring air into their chest.  Now, that would also probably prevent them from bringing blood into -- you know, the blood returns to the heart through the venous system.  And so what we would see in these descriptions of compression asphyxia is blood -- evidence of blood flowing the wrong way, back the wrong way, breaking small blood vessels like the venous system, causing some swelling in the -- in -- above the head because the blood is flowing the wrong way because you're being -- your chest is being compressed to the point that the blood is flowing the wrong way in your venous system.  And you would probably see evidence of that trauma: broken ribs, contusions to the -- or bruises to the lungs, and that sort of thing.

Q.    And typically when there was compression asphyxia, where would these rib breakages tend to be?

A.    Well, they tend to be more on the lateral aspects because -- and in the post -- in the back areas, depending on

where that force was put.

Q.   When you say "lateral aspects," what does that mean?

A.   On the sides.

Q.   The sides of the ribs?

A.   Yes.

Q.   Are you familiar with the term "flail chest"?

A.   Yes.

Q.   What is that?

A.   So to sort of expand your chest, the ribs all work in concert together.  If you break one rib, you can still probably move your ribs normally.  If you break more than one rib, parts of the chest could move in the wrong direction; that is, to expand the chest, you sort of rely on your ribs to open up the chest back and forth.  But if a portion of the chest has multiple broken ribs, part of that chest could go -- move in an opposite direction, and that's what's known as a flail chest.

Q.   Would it be accurate to say that without the injuries you just described for flail chest and compression asphyxia, that compression asphyxia could be ruled out as a cause of death?

A.   Again, the term "compression asphyxia," as described in the literature, talks about these cases where on autopsy they find all this evidence that there was a lot of weight and compression that prevented the ability for the individual to bring air in but also caused all these blood vessel injuries as well as sort of rib cage and -- and lung injuries.

Q.    And if you did not find those injuries, would it be appropriate to exclude compression asphyxia as a cause of death?

A.    Yes.

Q.    Now, you're a fan of football?

A.    Yes.

Q.    Okay.  And in football we often see five or more guys dogpiling somebody else on the field, right?

A.    Yes.

Q.    Are you aware of any case where there have been multiple football players, thousand pounds of man on the back of another player where the positioning of that player and the positioning of those people on his back has resulted in someone dying of asphyxia?

A.    No.

Q.    Now, based on your review of the evidence here, was there ever enough weight on Mr. Niedzialek's back or sufficient damage to his chest cavity for compression asphyxia to apply to him?

A.    No.

Q.    Did you rule out compression asphyxia here?

A.    Yes.

Q.    Why?

A.    Well, first of all, again, on the pathologic exam, there was no evidence of significant trauma to the chest or the

torso.  There was also no evidence, as I mentioned, of blood -- sort of blood vessels breaking or -- or blood flowing the wrong way that would suggest that there was so much pressure on him that he wasn't able to bring air in and out.  And I think looking at the video, it does not look like there's enough force to prevent him from breathing.

Q.   Are you familiar with the historical studies on the issue of positional asphyxia and/or restraint asphyxia?

A.   Yes.

Q.   What do those historical studies, other than your own, basically say?

A.   Well, the original study that was done looking at this was done by Dr. Reay.  And he took healthy volunteers, exercised them, documented some drop in oxygenation, exercised them mildly to a heart rate of 120, and then put them in what was known as a "hobble position," that is, on your stomach with your -- you know, handcuffed behind your back with your sort of ankles secured behind that, and documented that oxygen levels recovered, I forget, about 20 seconds longer than if you were just sitting in a chair.

There are a number of problems with this study.  First of all, at a heart rate of 120 of exercising, you don't drop your oxygen level.  As I mentioned, because oxygen binds with hemoglobin, you would never see that in healthy volunteers at all, a drop in oxygen level.  And the second thing was he

actually didn't show that the position caused any hypoxia or drop in oxygen level.  He actually showed oxygen levels recovered when you were in that position.

Q.   Did Dr. Reay's study involve subjects who were under the influence of drugs or alcohol?

A.   No.

Q.   What role did drugs or alcohol play in Dr. Reay's evaluation, if any?

A.   None.  Not in that study.

Q.   As of July 2019 and up to today, as you understand it, are the findings of Dr. Reay's study generally accepted in the medical community?

A.   Well, Dr. Reay has subsequently written that there have been more comprehensive studies and that he considers the hobble position that I described, that prone restraint position, as physiologically neutral.  He's written that.

Q.   So after the original Reay study, has he ever published again on the issue of positional asphyxia?

A.   Just in a review article where he actually used the term "physiologically neutral."

Q.   And what does that mean in a lay person's perspective?

A.   Well, I think what he meant, and unfortunately Dr. Reay has passed, he was saying that that position should not cause respiratory compromise that would lead to asphyxia.

Q.   Are you saying that after reviewing additional studies,

Dr. Reay concluded that his contentions about positional asphyxia being caused by prone restraint, that they were wrong?

A.    Yes.

Q.    And when did that retraction by Dr. Reay come out?

A.    I don't -- I think it was 1998, but don't hold me to that. I can't remember the exact date.

Q.    After Dr. Reay retracted his theory of restraint or positional asphyxia, is there any peer-reviewed medical science that you're aware of that supports the notion that prone restraint with no more than the weight of a couple of police officers on a subject's back and without any obstruction of the airway, is there any peer-reviewed medical science that you're aware of that indicates that such prone restraint can cause someone to die by asphyxia?

A.    No.

Q.    From a medical perspective, you said that part of your practice involves frequent interactions with law enforcement?

A.    Yes.

Q.    From a medical perspective, are you aware of any police entities that after Dr. Reay's retraction continued to espouse the idea that prone restraint might cause someone to die by asphyxia?

A.    Well, I don't keep up with, you know, what's happening across the country in different law enforcement agencies, so I -- I really -- I can't really answer that, but I'm not aware

of it.

Q.    I want you to assume for the moment that there are still some agencies that indicate or suggest or imply that prone restraint could create a risk of someone dying by positional asphyxia even without airway obstruction.  Do you believe that that kind of advisory is consistent with the state of the medical evidence as you understand the medical evidence?

A.    Well, let me just say that there are in the literature deaths that -- from restraints, these sudden deaths that occur with individuals who are restrained in all sorts of different body positions, whether they're restrained sitting in a chair, restrained supine, which is on your back, restrained prone.  So the -- the literature doesn't support the notion that prone by itself is the problem.

Q.    Are you familiar with the term "epidemiology"?

A.    Yes.

Q.    What is that?

A.    Those are studies of larger populations of medical conditions.

Q.    As a medical professional, do you have experience in the field of epidemiology?

A.    Well, I've authored a number -- what would be considered epidemiologic studies.

Q.    Have you conducted any peer-reviewed medical studies on the issue of the effects of prone restraint on a subject's

ability to breathe and allegations of related asphyxial effects?

A.    Well, we -- I have published with my colleagues studies -- epidemiologic studies looking at prone restraint, yes.

Q.    So in terms of your studies, did some of those studies involve lab-style testing?

A.    Yes.

Q.    How many?

A.    Probably 8 to 12.

Q.    Did some of those studies involve epidemiology?

A.    Yes.

Q.    How many?

A.    One.

Q.    When you're conducting an epidemiological study, do you consider or evaluate real-world cases?

A.    In this particular study, yes.

Q.    So let's talk about your lab studies before we get to your epidemiology studies.  In terms of the lab studies that you performed to evaluate the effects of restraint on breathing and/or allegations of asphyxia, what methodology did you use to test, you know, this effect, for lack of a better word?

A.    Right.  So what we did was we took volunteers into a lab setting where we could measure things, we could measure how well people were breathing, we could measure oxygen levels and carbon dioxide levels from the blood.  And what we did was we

exercised individuals and we put them in different positions: sitting, on their back, on their stomach, and then hobbled and restrained.  And we did all these measurements to see, well, how well are they breathing, moving air in and out of their lungs in these different positions, and how well are they bringing oxygen into their blood and getting rid of carbon dioxide.

Q.   When you were conducting these lab-based studies on subjects, you said you exercised them.  What does that mean?

A.   Well, we -- we standardized a certain amount of exercise. So we had them get on either a treadmill or a bike and exercise, you know, a moderate amount.  And, in fact, in the first study, we got them to a heart rate of 169 beats per minute, which is pretty -- you know, pretty moderate exercise, as you can imagine.

Q.   In any of your lab-based studies, were any of these subjects that you tested and measured, were any of them restrained in the prone position?

A.   Yes.

Q.   How many?

A.   Well, I couldn't count them all up.  In all -- you mean all the studies?

Q.   Yes.

A.   Probably close to 100, but, you know, it's -- we've done a number of studies looking at this issue.

Q.   And in any of your lab-based studies when you were exercising prone-restrained subjects, did you ever have any of those subjects simulate resisting the restraint?

A.   Yes.

Q.   Approximately how many times over all of the studies?

A.   Well, in that one study, I think it was close to 30 subjects that we'd had that done.

Q.   Did any of your lab studies include prone-restrained persons who were obese?

A.   Yes.

Q.   Did any of your lab studies include prone-restrained subjects who were handcuffed behind the back?

A.   Yes.

Q.   Did any of your lab studies include prone-restrained studies -- excuse me -- prone-restrained persons who were under the influence or intoxicated by drugs like methamphetamine?

A.   In which studies?

Q.   The lab studies.

A.   The lab studies, no.

Q.   Why not?

A.   Well, again, we're trying to isolate what the human body is doing, the physiology.  So let's -- so if you look at, you know, how we've learned, you know, in medicine about how physiology works, we take human subjects and we say, *Okay, what's happening with their blood or their heart, and let's see*

*what* -- and we measure everything very specifically.  We have them on heart monitors, we draw blood, we do all that sort of thing to see just by itself what is the normal human physiological response to something.

Q.    For any of your lab studies, did you block their ability to breathe from their nose or mouth?

A.    No.

Q.    Why not?

A.    Well, that is a different issue than what we were looking at.  So as I mentioned, there are three elements to the respiratory system: having that connection, that airway connection between the environment and the lungs, having oxygen and carbon dioxide exchange at the lungs, and then the ability to bring -- create the mechanical force to bring air in and out.  And what we were most interested in is what is the impact of restraint for different body positions on that third element, being able to create the force that brings air in and out of the lungs.

Q.    In any of your lab studies, did you test the subjects' respiratory function when they had weight placed on their torso?

A.    Yes.

Q.    What weight experiments did you perform in your restraint studies?

A.    Well, in our initial study, we did 25 and 50 pounds

because we weren't sure what the impact would be.  And then in subsequent studies, we included weights up to 225 pounds.

Q.   In those weight studies, what were the form of the weights?

A.   Well, it -- we used sort of this birdshot, right, little sacks of weight.

Q.   In your experience with weight on the test subjects' back, was there any evidence that the weight effect on a person would have been different if the weight had been focused in a single area, like a knee or a hand, as opposed to being more spread out like a metal-filled sack or a barbell plate?

A.   No.

Q.   What did your lab studies show regarding the respiratory function of restrained persons?

A.   Well, so in our first study, we actually studied different positions that I mentioned: restrained and non-restrained, including laying on your stomach or laying on your back.  And what we would measure is we -- if you have a history of asthma or emphysema, you -- you breathe through a tube and that's how the doctors measure how much air you're moving in and out of your lungs.  And what we saw was actually when you lay down on your back or you lay on your stomach, you have about a 7 to 8 percent decrease in the lung volume, the amount of air that you would move in and out of your lungs.  And then when you were restrained with your hands behind your back and your ankles

secured to that, you saw about a 10 to 12 percent decrease in your lung volumes.  And that's what -- what we -- what we saw in this.

Now, what we didn't see was that the oxygen levels remained fine and the carbon dioxide, more importantly -- like I said, carbon dioxide levels are a more sensitive indicator of how well you're ventilating.  The carbon dioxide levels remained low or normal.  And so you might ask, *Why is that?* Well, it turns out, you know, when you're breathing, you have a lot of excess capacity; that is, as we all sit here today, as you -- each breath is about -- you probably breathe only about half a liter, but if I asked you to take a big breath in, in and out and breathe hard and fast, you could actually -- the normal adult-sized person could actually move about five liters or ten times the amount of air.  You just (indicating), you know, but as we sit here, we breathe like (indicating), and we're all oxygenating and getting rid of carbon dioxide fine.

It's also why, you know, in medicine, right, if somebody has lung cancer, we can actually remove one whole lung, one whole lung out of their body.  Like that's half their lung function, half their volume of their lung.  And with that one lung, they're able to oxygenate, bring oxygen in and get rid of carbon dioxide just fine.  So even though you see drops in lung volumes, this is why nobody -- you don't die because you can't breathe because you lay on your back to go to sleep

or lay on your stomach, you know.  What was interesting in our studies is whether you lay on your back or lay on your stomach, it was the same 7 to 8 percent drop in your lung volumes, but you were able to oxygenate and, more importantly, get rid of your carbon dioxide just fine.

Q.   Did your studies reveal that prone restraint caused any impairment to a subject's ability to breathe?

A.   No.

Q.   Were the results were -- excuse me.  Were the results the same when you put up to 225 pounds of weight on a subject's back?

A.   Yes.

Q.   Were the results the same when the subject was simulating resisting restraint?

A.   Well, yes.  Yes.

Q.   In any of your restraint effect studies, did you explore the effect of obesity on breathing?

A.   Yes.

Q.   What role, if any, did you find that obesity had for such persons?

A.   When we studied obese subjects, there was -- there was no difference.

Q.   Let's turn to your epidemiological studies.  How were those conducted?

A.   Those, we collected information from the police

departments, law enforcement on any restraints that they had done, including whether people were restrained in the prone position or not, and then we followed them in terms of their medical care and what happened to them.  And we -- we studied over a thousand cases.

Q.    Those were real-world cases?

A.    Yes.

Q.    Did those epidemiological studies involve prone-restrained persons?

A.    Yes.

Q.    Did those epidemiological studies involve persons who were obese?

A.    Yes.

Q.    Did those epidemiological studies involve persons who were handcuffed behind the back and restrained prone?

A.    Yes.

Q.    Did those epidemiological studies involve prone-restrained persons who resisted the restraint?

A.    Yes.

Q.    Did those epidemiological studies involve prone-restrained persons who resisted the restraint and were also on methamphetamine?

A.    Yes.

Q.    And what did the epidemiological studies reveal about the effects of prone restraint on breathing?

A.   Well, it indicated that nobody died from asphyxia of these thou -- over a thousand cases that we looked at.  And this has been -- you know, that was our study, but there have been a number of other studies out of Canada and the United States that included over 20 different law enforcement agencies where they actually looked at prone restraint versus people who were restrained in the supine position.  They reported one death, and that actually occurred in somebody who was restrained in the supine position, and no deaths in the group of people who were restrained in the prone position.  And that was published not too long ago.

Q.   About how long ago?

A.   Probably about five years ago.

Q.   In any of the epidemiological studies, whether the ones you yourself conducted or the ones that you are aware of, was there any finding that any prone restraint had a causal role in causing someone to asphyxiate?

A.   No.

Q.   In any of those epidemiological studies, was there any finding that prone restraint impaired a subject's ability to breathe in any way absent airway obstruction?

A.   No.

Q.   And those epidemiological studies, were they also peer reviewed and published?

A.   Yes.

Q.    Were those lab studies you did also peer reviewed and published?

A.    Yes.

Q.    So after you conducted all of these lab studies, these epidemiological studies, this research, what conclusion did you reach on the issue of positional asphyxia relative to prone restraint?

A.    We don't believe that prone restraint causes asphyxia or puts anybody inherently at risk for dying from asphyxia.

Q.    Based on your medical research, based on the studies you've conducted and the peer-reviewed studies that you're aware of, is it at all likely that a person whose airway is unobstructed is going to die from positional asphyxia just by being in the prone position or just by having less than 225 pounds of weight on their back?

A.    No.

Q.    Now, in terms of this case, in this case, did you observe any facts consistent with a prone asphyxia death?

A.    No.

Q.    Did you observe any facts consistent with a compression asphyxia death?

A.    No.

Q.    Did you observe any facts consistent with a restraint asphyxia death?

A.    No.

Q.   In your review of the evidence in this case, was there any evidence that you reviewed that indicated that any deputies ever placed any weight or pressure on Mr. Niedzialek's neck?

A.   No.

Q.   Was there any evidence you're aware of that his airway was ever blocked or restricted at any point during this incident?

A.   No.

Q.   Was there any evidence that you're aware of that Mr. Niedzialek choked on any bodily fluids or other substances?

A.   No.

Q.   Was there any evidence that you reviewed that indicated that when he was prone, the position of his head or the turn of his neck somehow prevented or significantly impaired his ability to take in oxygen?

A.   No.

Q.   Was there any evidence you reviewed that indicated that as a result of his position, as a result of his restraint, Mr. Niedzialek had a significant impairment to his ability to breathe?

A.   No.

Q.   There's been some talk about how the diaphragm is like a bellows function and it pulls in air into the lungs by moving the lungs in and they suck in air and that somehow the prone position will interfere with that bellows function.  Do you agree with that contention?

A.    No.

Q.    Why?

A.    Well, so what happens is the diaphragm is a dome-shaped muscle.  So it's up against the lungs.  When you contract that diaphragm, it actually shrinks and drops down, and that creates the negative force that brings air in.  Now, the diaphragm pushes obviously contents in the belly, right, to contract so that chest gets bigger, abdomen gets smaller, right?  But this is the beauty of nature.  The abdomen is designed to be shrunk, right, because the abdomen is full of, for lack of a better word, your guts, which are filled with air, so it's easy to compress those guts.  This is why, you know, you can take a deep breath and suck your gut in at the same time, right, because you can actually compress your abdomen quite a bit.  So that's why simply being prone doesn't cause such compression of your abdomen that you couldn't contract your diaphragm.  That's why you wouldn't die laying on your -- you know, laying on your stomach in a prone position.

Q.    Are you familiar with the term "end-tidal," T-I-D-A-L, "carbon dioxide" or CO2?

A.    Yes.

Q.    What is that?

A.    So end-tidal carbon dioxide is the amount of carbon dioxide that is in the air that you exhale out of your lungs. And we use it as a measure because, as I mentioned, carbon

dioxide exchanges with the blood into the environment at your lungs.  So the end-tidal carbon dioxide can be a measure of the carbon dioxide level in your blood because they equiv -- they -- they exchange at the point of the lungs and then you breathe it out, and we can measure that.

Q.   And did you review any end-tidal CO2 readings for Mr. Niedzialek?

A.   Yes.

Q.   And what were those readings that were relevant to your opinions?

A.   Well, the paramedics have a device after they took over the airway where they can measure that amount of carbon dioxide in the exhaled air, and the first number of measurements were in -- were low.  The normal is probably in the 40 to 50 range. These were 20, 17, as I recall, 21, in the first few minutes of his resuscitation with the paramedics.  And we -- we use it in the hospital as well.

So if we're measuring somebody's breathing, we will put an end-tidal measure -- and I would just say it's not just the number, but, again, there's a waveform that's created where, you know, because the carbon dioxide level is measured when you breathe out, but then when you breathe in, obviously the environment has much less carbon dioxide.  So when it passes that meter, the carbon dioxide level drops.  So there's a waveform that we can track where we can see how -- how well

somebody's breathing.

Q.   And what significance did Mr. Niedzialek's end-tidal CO2 readings play in your role of excluding asphyxia from any causal role in the death here?

A.   Well, as I mentioned, the -- the most sensitive indicator for ventilation, how well your ventilation, is your carbon dioxide levels.  And the fact that they were low with good waveforms in the paramedic report indicated that he did not have -- he was ventilating fine just before his cardiac arrest.

Now, the -- subsequently, minutes after his resuscitation up to 12 minutes later, the paramedics report carbon diox -- end-tidal CO2 levels of 99, but if you actually look at the waveforms, they -- they are not normal waveforms. So if I saw those waveforms in the emergency department, I'd say that's not reading accurately anymore.  And it comes to pass that once he got to the hospital and they changed the end-tidal CO2 monitor to the hospital one, his measurements were like 42 and 64, again, not the 99 that was recorded.

Q.   The first end-tidal CO2 measurement that we have in this case, was that taken by the paramedics?

A.   Yes.

Q.   And there's been testimony in this case that the paramedics first connected Mr. Niedzialek to monitoring devices between four and five minutes after he was flipped from a prone position into a supine position.  Are you aware of that

testimony?

A.   Yes.

          MR. BURTON:   Object.   I'm not aware of that testimony.

          THE COURT:   Overruled.

BY MR. SAIN:

Q.   What was the answer?

A.   Yes.

Q.   So are you saying then at the time that Mr. Niedzialek's end-tidal CO2 was measured, several minutes after he's flipped supine, he was still oxygenating in the normal range?

A.   Well, it wasn't oxygenating.   So what I'd say is his end-tidal carbon dioxide measurements at that point were low.

Q.   Still low?   They were still low?

A.   Yes.

Q.   And what does that signify in terms of his ability to breathe?

A.   Well, again, it would signify that just before his cardiac arrest, that his carbon dioxide levels were not high; that is, he was ventilating fine.

Q.   And when you say "just before his cardiac arrest," where in the sequence of events are you putting the cardiac arrest?

A.   Well, I think his cardiac occur -- occurs when he was in the prone position.

Q.   Okay.   So when you're saying that he's breathing

adequately before cardiac arrest, but the $CO_2$ isn't measured until after the cardiac arrest, could you explain that?  The time line is a little confusing.

A.   Well, so, again, blood flows to the lungs, it unloads the carbon dioxide, and then you breathe that, but if the blood flow stops to the lungs, then there's no more carbon dioxide, you know, whatever it was is there in your lungs.  So when they intubate him, they measure the carbon dioxide level, it's low.

Q.   And because they measured the carbon dioxide level and it was low four minutes after he flipped supine, is that one of the reasons that you excluded asphyxia as a causal factor in the death?

MR. BURTON:  Your Honor, could we approach?

THE COURT:  Yes.

(Sidebar conference as follows:)

MR. BURTON:  I was going to let this go, but this is not in his Rule 26 report.  This is way beyond the scope. There's no mention of end-tidal $CO_2$, of the paramedics, of it being high or low.  And it's not -- you know, now he's asking for an opinion that is not an opinion that he gave in his report.  It's not even close to anything mentioned in his report, which is only a few pages.

THE COURT:  Mr. Sain.

MR. SAIN:  In both his report and in the deposition that Mr. Burton conducted, he was asked about oxygenation and

how he supported his opinion.  That's what he stated, is that the oxygenation levels here were sufficient to exclude asphyxia.  He's now elaborating on that by talking about the medical records that he said in his deposition and in his report that he reviewed.  The end-tidal CO2 readings are a part of those medical records that were produced in this case long before the deposition ever occurred.

THE COURT:  So the question is whether he talked about or he rendered an opinion not in his depo but in his report about oxygenation and the different levels of CO2 before and after he suffered the cardiac arrest.

MR. SAIN:  May I get his report --

THE COURT:  Yes.

MR. SAIN:  -- Your Honor?

MR. BURTON:  Just for the record, Mr. --

THE COURT:  Wait.  Don't say anything until he comes back.

MR. SAIN:  Your Honor, his opinions begin here at page 8, which talks about respiratory compromise asphyxiation.  General points, the medical studies.

THE COURT:  So why don't you point me to specifically where he talks about CO2 levels.

MR. SAIN:  Okay.  Here's the general phrase about "evidence of hypoxia, decrease in oxygen levels," for a general statement, but then case specific, causing -- "It does not

appear that Mr. Niedzialek's restraint was causing significant respiratory or ventilatory compromise to put him at risk for asphyxiation."  That is about oxygen levels.

"No significant evidence of compression ... no sequelae," that's a medical term, "of increased intrathoracic or intraabdominal pressure, and no findings of traumatic injury."  "Death not caused by or contributed by positional, restraint, compression asphyxiation."

THE COURT:  Okay.  I think that's sufficient within the ballpark, so I will let him proceed.

MR. BURTON:  Thank you, Your Honor.

(Sidebar conference concluded.)

MR. SAIN:  Can I have the last question read back, please?

THE COURT REPORTER:  Your Honor, is that okay?

THE COURT:  Yes.

(Said question read back.)

THE WITNESS:  Yes.

BY MR. SAIN:

Q.   Doctor, what is "perfusion," P-E-R-F-U-S-I-O-N?

A.   Perfusion is how well you're able to -- blood goes to the tissues, how well you're able to pump blood to your tissues.

Q.   As part of reaching your conclusions in this case, you said that you reviewed the incident composite video, yes?

A.   Yes.

MR. SAIN:  I'd like to call up Exhibit 50 -- 150 -- excuse me -- at about the 11:59 mark.

BY MR. SAIN:

Q.   We're going to play about 11 seconds of it, then I'm going to ask you some questions.

MR. SAIN:  This has already been admitted.

THE COURT:  Proceed.

(Video played.)

MR. SAIN:  Stop there.

BY MR. SAIN:

Q.   So showing you at about the 12:09 mark of the composite video, do you see a handprint on the back there?

A.   Yes.

Q.   And do you see a different color around the handprint?

A.   Yes.

Q.   How would you describe that coloration?

A.   Well, so obviously the handprint is pale.  And around that is, I would say, you know, pink, reddish.

Q.   And does this moment in the video have any significance in your medical conclusions?

A.   Yes.

Q.   How so?

A.   Well, I think, first of all, if -- I think he's either peri-cardiac arrest or he's had his cardiac arrest.  What -- what the perfusion here shows though -- in the emergency

department, we will often push on a finger and, you know, it blanches your finger, and then we watch it turn back red, right?  That's an evidence of perfusion; that is, we're watching blood flow back into the finger after I've sort of put some pressure on the finger.  We call that capillary refill. Normal people, it's less than three seconds.  That would show that the heart is working and the cardiovascular system is working.  It's pumping blood to the fingertip, right?

In this case, what we see is that handprint where obviously they've -- they put -- they reduced the amount of vascular flow into the capillaries of the back there, and then when they take the hand off, you can see this is going to be imprinted longer than three seconds.  So clearly he is not pumping blood to his tissues at this point or his blood pressure is so low that he can't pump blood.  So this is evidence that he's had his cardiac arrest or he's around what we call a peri-cardiac arrest period.

The other important piece here, that does not happen, what you see here, because you can't breathe.  That happens because your heart and your cardiovascular system is not functioning, what we see here in this picture.

The other important part of this picture is that when somebody's not breathing and they drop their oxygen levels, they're -- and they're -- they have a lot of hemoglobin that's not bound to oxygen, that is a bluish color.  That's what's

called cyanosis or cyanotic.  In this case, around that handprint, we do not see the bluish coloration as if the blood around there was what we call deoxygenated or hemoglobin or blood without oxygen.

So there's two things here.  One, the color is not consistent with cyanosis or an inability to breathe.  The handprint and that delayed refill of that tissue that was under the hand is not evidence of an inability to breathe but evidence of the heart and the cardiovascular system not functioning to provide perfusion to that tissue.

Q.   Is it your testimony that this portion of the video is evidence that Mr. Niedzialek did not suffer any asphyxia of any kind?

A.   Correct.

Q.   Now, you talked about rib fractures and that if there had been compression asphyxia, we would see cracks on the sides of the ribs.  Do you remember that?

A.   Yes.

Q.   Based on your review of the evidence, were there any cracks on the sides of Mr. Niedzialek's ribs?

A.   I don't believe so.

Q.   Was there any internal damage to his lungs or his chest cavity?

A.   No.

MR. SAIN:  Just a moment, Your Honor.

BY MR. SAIN:

Q.   In your role as a medical professional, are you familiar with the effects of methamphetamine on a person's ability to breathe?

A.   Yes.                                                    10:03

        MR. BURTON:  Objection.  That's beyond the scope, Your Honor, of the report.

        THE COURT:  Overruled.

BY MR. SAIN:

Q.   And how did you become familiar with that?              10:03

A.   Well, obviously I work in the emergency department and take care of patients, so we see patients who come in who are high on methamphetamine, and in San Diego, a lot unfortunately.

Q.   In your experience in general, what effect does methamphetamine typically have on a person's ability to      10:04 breathe?

A.   Well, methamphetamine is -- in another colloquial term -- is an upper, it is a stimulant.  It -- it causes people to become hyper -- hyper -- it stimulates their system so that they -- their heart rate will beat faster, they'll breathe      10:04 faster, they'll actually hyperventilate a bit or increase their ventilation.

Q.   Based on your review of the evidence, did the methamphetamine affect Mr. Niedzialek's ability to breathe?

A.   Well, I would say looking at the video, he clearly --    10:04

MR. BURTON:  I'm going to object, Your Honor.  I mean, this is just not in his report.

THE COURT:  Overruled.

THE WITNESS:  He's clearly agitated.  He's stimulated.  He feels -- he looks like he's on an upper.  He probably is hyperventilating.

BY MR. SAIN:

Q.  Based on your review of all the evidence in this case, did position or positional asphyxia cause or contribute to Mr. Niedzialek's death here?

A.  No.

Q.  Based on your review of all the evidence in this case, did compression asphyxia cause or contribute to Mr. Niedzialek's death here?

A.  No.

Q.  Was there any evidence that you're aware of in this case that indicated that any restraint or asphyxia caused or contributed to Mr. Niedzialek's death here?

A.  No.

MR. SAIN:  Just a moment, Your Honor.  If I may.

THE COURT:  Yes.

BY MR. SAIN:

Q.  Do you recall giving a deposition in this case to Mr. Burton?

MR. BURTON:  It wasn't me, Your Honor.

THE WITNESS:  I was just going to say it wasn't Mr. Burton.

BY MR. SAIN:

Q.   Okay.  My apologies.  Do you recall giving a deposition in this case to plaintiff's counsel?

A.   Yes.

Q.   And in that deposition, you were asked about the effects of a TASER on someone's ability to breathe.  Do you remember that?

MR. BURTON:  I don't -- I don't --

THE COURT:  Say "objection" and state the basis.

MR. BURTON:  Objection.  It's not a proper use of the deposition.

THE COURT:  It's hearsay.  Sustained.

BY MR. SAIN:

Q.   Would any TASER-related increase in oxygen consumption have affected Mr. Niedzialek's ability to breathe here?

A.   Not his ability to breathe.

Q.   Based on your review of the evidence, about how much time passed from the last time Mr. Niedzialek was tased until he was placed into handcuffs?

A.   Well, I believe it was a couple minutes at least.

Q.   Are you familiar with the term "catecholamines"?

A.   Yes.

Q.   What are "catecholamines"?

A.    Catecholamines are a group of neurotransmitters or chemicals in your body that stimulate, cause stimulation.  So lack of a better word, adrenaline or norepinephrine, those are catecholamines.  They are the kind of neurochemical transmitters that increase when you have a fight or flight response.  If you feel stressed, your catecholamines will go up.

Q.    Generally speaking, would catecholamines go up if you're engaging in strenuous physical activity?

A.    Yes.

Q.    Would that include engaging in resistance to restraint?

A.    Yes.

Q.    Would any increase in catecholamines have affected or impaired Mr. Niedzialek's ability to breathe?

A.    Well, as stimulants, they probably would increase respiratory function as part of the fight or flight response. They would not cause a decreased ability to breathe.

Q.    There's been some discussion in this case about metabolic acidosis.  What's your understanding of that term?

A.    So acidosis is where -- you know, the normal blood pH is 7.4.  Acidosis is where there's more acid than what is normally physiologically the normal balance.  So in the scale, that means the pH goes down when you're more acidotic.  Metabolic acidosis is where there's a metabolic cause for that increased acid.

Q.    Based on your review of the records, what was
Mr. Niedzialek's acid level or pH level?

A.    Well, he had blood drawn.  I believe it was 7.16 or 7.19.
I can't remember exactly.  Normal being 7.4.  So he's clearly
acidotic or had acidosis.

Q.    Based on your review of the records, did Mr. Niedzialek's
acidosis reading play any role in forming your opinions about
the effects of restraint on breathing here?

A.    Well, I would say looking at the blood test from -- there
are two types of acidosis.  There's metabolic acidosis, which
is caused by metabolic or chemicals in the body.  And then
there's respiratory acidosis, which if you -- if you have high
levels of carbon dioxide for whatever reason, you can't
breathe, that carbon dioxide in your body will be converted to
acid.  And that's known as respiratory acidosis.  So it's an
acidosis that is caused by problems with your respiratory
system.  In the blood tests that were taken at the hospital, it
was very clear that Mr. Niedzialek has a metabolic acidosis,
not a respiratory acidosis.

Q.    In your role as an emergency room physician, are you
familiar with interpreting cardiac monitor strips and
identifying related heart rhythms?

A.    Yes.

Q.    And in your experience, is it possible for a person who
started out experiencing a V-tach cardiac rhythm or a V-fib to

then have that rhythm deteriorate into PEA?

MR. BURTON:  Objection.  Beyond the scope of his Rule 26 report.

THE COURT:  Sustained.

Wrap it up, Mr. Sain.

BY MR. SAIN:

Q.    In your studies of the effects of restraint on breathing, did you evaluate any cardiac rhythms?

A.    Well, we -- we -- we monitored -- we had a cardiac monitor in a number of those studies on patients.

Q.    And did you consider whether different rhythms, like V-tach or V-fib or PEA, have any association with asphyxia?

MR. BURTON:  Objection.  It's vague.  I understand him to be talking about living subjects, monitoring them.

THE COURT:  Rephrase the question.

MR. SAIN:  Sure.

BY MR. SAIN:

Q.    In your medical studies when you were evaluating cardiac rhythms, did you ever evaluate whether or not different cardiac rhythms, like V-tach or V-fib or PEA, had any specific association with negative effects on breathing such as might lead to asphyxia?

MR. BURTON:  Objection.  Vague as to "studies."

THE COURT:  Overruled.

THE WITNESS:  I'm not sure I quite understand your

question.  None of our subjects had V-tach or -- or any, you know, life-threatening cardiac rhythms in our laboratory studies.  And then in our epidemiologic studies, no one died in those cases.

BY MR. SAIN:

Q.    Fair enough.  Based on your review of the evidence here, was there any evidence that you've discovered that any use of force or restraint significantly impaired Mr. Niedzialek's ability to breathe?

A.    No.

Q.    Based on your review of the evidence here, did you find that any restraint or asphyxia contributed in any way towards Mr. Niedzialek's death?

A.    No.

Q.    Based on your evaluation of all the evidence here, to a reasonable degree of medical probability, did you exclude prone restraint or asphyxia from any causal role in Mr. Niedzialek's death?

A.    Correct.  We -- I do not believe prone restraint caused any asphyxia or death from asphyxia.

        MR. SAIN:  Thank you.  No further questions.

        MR. BURTON:  Can you keep that up a moment, please. With the Court's permission.

        THE COURT:  Yes.

        MR. BURTON:  Thank you.

Good morning.

**CROSS-EXAMINATION**

BY MR. BURTON:

Q. Good morning, Dr. Chan.

A. Good morning, Mr. Burton.

MR. BURTON: I'm sorry, can we get that back up? Yeah. So -- yeah, right there.

BY MR. BURTON:

Q. So that's right where we were, Dr. Chan. He's had his cardiac arrest?

A. Well, he's either had his cardiac arrest or he's in the process because he's not perfusing those tissues.

Q. And I understand from your testimony and from your report that he did -- he was not in cardiac arrest when he was put in handcuffs because he was still active, correct?

A. Yes.

Q. And at least for a little while after he was in handcuffs, he remained active. So the cardiac arrest happened sometime after that?

A. Yes.

Q. And certainly either he's having it now or it's happened by now, correct?

A. Yes.

Q. So the space of time between when he was put in handcuffs and when this still was taken, what length of time is that?

A.    Well, I can't give you an exact time.  I believe he was in handcuffs until he was turned over for about four or five minutes.

Q.    Well, I can give you an exact time.  This is four minutes after he stopped moving after he was handcuffed.    10:14

A.    Okay.

Q.    Okay.  So sometime in that four minutes, he had cardiac arrest, correct?

A.    Well, like I said, he was either -- had his cardiac arrest or he's in the process of having cardiac arrest.    10:14

Q.    So this patient we're looking at here is having a medical emergency at this moment, correct?

A.    Well, I would say even before, you know, he may have been in a medical condition even before this time.

Q.    And so if you had this patient in your emergency room,    10:15 where I'm sure you've saved thousands of people, and thank you for your service on that, you would make sure this person got advanced life support and CPR, correct?

A.    Well, I think as a medical professional, if I were on scene, we would -- I would do something related to my -- you    10:15 know, my training and my -- my medical expertise.

Q.    And if you had a cardiac monitor on him and it was PEA, you would not give him a defibrillation shock, would you?

A.    Well, no.  PEA is not an indicator for a defibrillation.

Q.    And so you would do chest compressions, correct?    10:15

A.    Well, depending -- I would medically evaluate him, check for a pulse, that sort of thing first.

Q.    And you would expect first responders to give chest compressions in a situation where somebody is in cardiac arrest, correct?

A.    Well, I guess what do you mean by first responders?  If there's paramedics there, yes, because they have the medical training to do that.

Q.    Now, could you pull your report up.  You don't have your report in front of you?

A.    I do not.

Q.    Well, why don't you go to one of those binders behind you.  And it should be Exhibit 214.

A.    214?

Q.    Yes.

A.    Yes.

Q.    Do you have it?

A.    Yes.

Q.    Okay.  So the part where you actually wrote your opinions goes from page 8 to page 11, correct?

A.    Yes.

Q.    So let's look at page 8.  Now, the third paragraph is a brief summary of this case.  You said, "Mr. Niedzialek was uncooperative, yelling, and appeared to be aggressive and combative with officers."  Do you see that?

A.   Yes.

Q.   Okay.  And then you said, "A TASER conductive -- conducted energy device, CED, was deployed in dart mode and discharged twice into -- on Mr. Niedzialek with an appropriate effect."  Do you see that?

A.   Yes.

Q.   Okay.  And the jury, everybody, we've all seen that on the video.

Now, he was recovering from that -- those two shocks when he was restrained and put in handcuffs, correct?

A.   Well, I think he was shocked, you know, and -- and particularly after the second shock, he went -- they restrained him after that second shock.

Q.   And you actually published a peer-review report with your colleague Gary Vilke in 2008 on a case study of one of your volunteers who had a -- a back fracture from the force of a TASER discharge during one of your studies, correct?

MR. SAIN:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes.

BY MR. BURTON:

Q.   And that shows the power -- I mean, I know that was an X26 and this was an X2, but that study shows the power of the muscle contractions that are caused by this device, correct?

A.   Well, people can be injured by TASERs, I mean, that's

well-documented, either from the muscle contraction or if they fall after they're tased and they -- they have some traumatic injury from that.

Q.    And in this particular case, you said, "The TASER creates intense involuntary contractions of skeletal muscles, causing the subject to lose the ability to directly control the actions of the voluntary muscles."  That's what you wrote in this peer-reviewed published study you did, correct?

A.    Yes.

Q.    And those intense skeletal muscle contractions release lactic acid just like any other kind of muscle contractions release lactic acid, correct?

A.    They can.

Q.    Well, they do, don't they?

A.    Well, any muscle contraction, depending on how much anaerobic metabolism that's not utilized in oxygen, would protect -- would produce lactic acid or lactate.

Q.    So those two TASER discharges that Mr. Niedzialek received before he was handcuffed certainly contributed to the metabolic acidosis that you were just testifying about, didn't they?

A.    Well, they could contribute.  Now, I would say that in our subsequent TASER studies, we actually measured different blood levels, and people recover pretty quickly within, you know, 30 seconds to a minute on those levels.

Q.    Okay.  Let's stop there a second.

MR. SAIN:  I'm sorry, was the witness done with his answer?

THE COURT:  I believe he was.

MR. BURTON:  Thank you, Your Honor.

BY MR. BURTON:

Q.  Now, people recover from metabolic acidosis.  We all get it, we go to the gym, me in my younger days, lift weight, get that burn, that lactic acid, and we recover, correct?

A.  Hopefully, yes.

Q.  And we do that by breathing and compensatory respiratory alkalosis; isn't that correct, Dr. Chan?

A.  Well, I'm going to correct you there.  The lactate you probably clear metabolically through your system.  So the lactate gets cleared not through your lungs.  What gets addressed by your lungs on a temporary basis is the acid level, but then eventually the kidneys and the liver begin to remove the lactate.

Q.  But to keep the pH from going into a dangerously low area, the human body reflexively hyperventilates to keep the acid level within a life-sustaining range, correct, Dr. Chan?

A.  It tries to, yes.

Q.  Okay.  So any restriction on respiration by somebody who is potentially acidotic has potential significant health consequences; isn't that correct, Dr. Chan?

A.  Well, it depends on whether or not they can hyperventilate

to reduce their carbon dioxide to address at least temporarily the rise in the acid level.  In this case, we have an arterial blood test from the hospital, which -- as well as the lactate level from the hospital, which clearly showed this was metabolic and that the p -- the carbon dioxide level was actually 29.  So his lab tests from the hospital are clearly indicative of a metabolic acidosis.

Q.   And you know as well as I know, Dr. Chan, that that hospital pH test is post-cardiac arrest and is not indicative of what his pH level and acidosis was pre-cardiac arrest; isn't that correct?

A.   Well, again, he probably was acidotic from all his exertion and his activity, and certainly the cardiac arrest would even create more lactate production and acidosis.

Q.   Now, let's talk about your criticism of Dr. Reay for a second.  Dr. Reay published his study in 1988.  That would have been, I think what, 35 years ago; is that correct?

A.   Yes.

Q.   And he was a medical examiner up in the state of Washington and he did his tests after encountering some restraint-related deaths that he was analyzing as a forensic pathologist; isn't that correct?

A.   I believe so.

Q.   And, in fact, after his study that you talked about, he published case reports on different people that he had done --

autopsied on who had died after police restraints, correct?

A.    Yes, I believe so.

Q.    Now, you quote Dr. Reay in your report, and I can invite your attention to the top of page 10, and you started in mid sentence saying, quote, "The hog-tied prone position should be viewed as not producing significant physiological respiratory compromise."  Do you see that?

A.    Yes.

Q.    Okay.  You cut off the beginning of that sentence that Dr. Reay has in his 22-page article that you're quoting from in 1998, which says, "Hence, in normal individuals, the hog-tied prone position should be viewed as not producing significant physiological respiratory compromise."  You cut off the part of the sentence that said, "Hence, in normal individuals."  You cut that off, correct?

A.    Well, we did not include that in the quote.

Q.    And you did not include the sentence that he wrote right before that, which reads, "These studies" -- which is referring to your studies -- "show that although body position does not influence the respiratory recovery, there is an average reduction of respiratory excursion by 10 to 12 percent."  He wrote that, didn't he?

A.    He wrote that based on our studies, as I mentioned.

Q.    And he, in fact, did not renounce his position on restrained asphyxia.  In fact, he wrote a letter to the

journal -- I'm sorry -- to the *Annals of Emergency Medicine* that had published your initial study, and in that, he said, "Our experience in reviewing deaths in police custody leads us to believe that multiple factors, rather than one single cause, play a role in deaths where restraint has been applied."  He wrote that, correct?

A.   But what year was that?

Q.   1998.  This was in response to the article that you had published with Dr. Neuman and Dr. Vilke.

A.   Right.  I believe he published that before his review article where then he states this quote that you -- I have in the letter.  I believe --

Q.   Well --

A.   -- that was timing that --

Q.   Well, the review article does not say he was wrong.  The review article says that restraints should be considered in assessing deaths where people die in police restraints; isn't that correct?

A.   I don't recall an exact quote to that effect.

Q.   Well, one quote you wrote is, "The consequences of excited delirium is that the victim may be particularly vulnerable to restraint-induced sudden death."  Do you recall that quote?

A.   Yes.

Q.   How about this one:  "If death occurs when there has been respiratory compromise leading to hypoxia, the restraint

maneuver must be identified as playing a major role in causing the death"?

A.   But in this case, we -- there's no identified hypoxia.

Q.   According to you?

A.   Well, I don't think there's any evidence of hypoxia in this case.

Q.   Did you read the deposition of Lisa La Russo, the paramedic who came in and testified to this jury?

A.   Yes.

Q.   Now, let's talk about your 1997 study.  That was your first, correct?

A.   Yes.

Q.   And in that study you had -- you started with 15 people, correct, subjects?

A.   I believe so.

Q.   And then you had them ride a bike for about four minutes?

A.   Yeah.  Yes.

Q.   And then you sat them in a chair to get your baseline pulmonary function measurements, correct?

A.   Yes.

Q.   And you used the chair because that's sort of the best position for people to get maximum call them PFTs or pulmonary function test readings, correct?

A.   Well, the standard test is by doing it sitting.  So we did it -- we said, *Okay, let's see what the standard test is,*

that's how you would do it if you had a history of asthma or you saw a pulmonologist to do this test.  So we said, *let's get that number*.

Q.    And then you took these 15 people and restrained them with, like, handcuffs behind their back, prone, tied their feet together, like you described, on a padded, like, table or examining table like we see in a doctor's office, correct?

A.    It was a clinical examination table.

Q.    And one of your 15 people said, *I'm not going to do that. I'm not comfortable doing that*, correct?

A.    One person was uncomfortable with it.

Q.    Okay.  So did you call some police to come in and force them into that position?

A.    No.

Q.    Okay.  So you only wound up with 14, correct?

A.    No.  I think the -- I think we still ended up at 15, but there were -- I'd have to look in the studies specifically.  I think we got to 15.  There may have been 16 enrollees.

Q.    And one of the pulmonary function tests that you measured is called maximal voluntary ventilation or MVV, correct?

A.    Yes.

Q.    And "MVV" means, measured in liters, basically the amount of air that goes in and out of a person's lungs in one minute, correct?

A.    Yes, or if I asked you to breathe hard and fast for one

minute, how much air could you move in and out of your lungs.

Q.    And when you put these volunteers, these healthy volunteers who had just done four minutes of exercise on this table prone in this restraint, their MVV, according to your article that was peer-reviewed that I have right here, the MVV went down 23 percent, correct?

A.    I believe so.

Q.    So that's almost one quarter of their ability to move air in and out of their lungs went down when they were prone, handcuffed behind their back with their feet tied together, correct?

A.    Again, that is MVV as opposed to the other lung volumes. And that decrement -- again, at that decrement, we would not expect to see any drop in oxygen or rise in carbon dioxide, and we didn't see that.

Q.    But you did see a loss of 25 percent of the person -- almost of the person's ability to move air in and out of his lungs over a period of one minute, correct?

A.    Correct, but again --

Q.    Thank you.

A.    -- volumes -- you have tremendous excess capacity in your ventilatory system.  As you know, when somebody -- when we talk about super athletes, right, and their ability to get oxygen --

MR. BURTON:  Your Honor, can I ask a question?

THE WITNESS:   -- into their tissues, they are --

THE COURT:  Let him finish.

THE WITNESS:  -- described as having tremendous cardiovascular fitness, not necessarily tremendous ventilatory fitness, because unless you have severe -- severe lung disease, most people can oxygenate their blood and get rid of carbon dioxide just fine.  What is the key in terms of keeping tissues going is getting that oxygenated blood to the tissues.

BY MR. SAIN:

Q.   Now, Dr. Chan, you and your colleague Dr. Vilke did another study in 2000, that would be about two or three years later, that you published in a peer-review publication.  I believe it was the -- title of this was "Spirometry in normal subjects in sitting, prone, and supine positions."  Do you recall that?

A.   Yes.

Q.   And spirometry is the science, the medicine that measures the ability to move air in and out of someone's lungs, correct?

A.   Yes.  It's a measure of how well you're able to move air -- volumes of air in and out of your lungs.

Q.   And in that study, you found that when you took these volunteers and handcuffed them behind their back and set them on the examining table and tied their feet together that you had a 16 -- 16, 1-6, 16 percent decrease in the force ventilatory capacity, correct?

A.   Well, I don't have the study in front of me, but as I

mentioned, when people are hobbled or put in that position, there are decreases in lung volumes.

Q.    And you also -- so -- so both your studies in 1997 and 2000 showed statistically significant drops in spirometric measurements of the ability of the lungs to move air relative to the sitting position when you put people on their chest, handcuffed behind their backs, correct?

A.    There are decreases when you lie down to go to sleep 8 to 9 percent.  That doesn't mean you die going -- because you can't breathe lying down to go to sleep.  That clearly doesn't happen.

Q.    Right, because your body tells you to roll over and get on your side so you can breathe better?

A.    Oh, that is -- that -- people sleep on their backs the full night and they're breathing fine.  So I don't think that's correct at all, Mr. Burton.

Q.    Okay.  So when you saw in this video Mr. Niedzialek trying to roll off his chest onto his side, you don't think that he was trying to improve his breathing position; is that correct?

A.    When I viewed this video --

        MR. SAIN:  Objection.  Calls for speculation.

        THE COURT:  Sustained.

BY MR. BURTON:

Q.    Do you think that when Mr. Niedzialek was rolling from flat to his side on this video that he was trying to improve

his breathing condition -- position?

MR. SAIN:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Now, you did another study with Dr. Vilke and Dr. Neuman in San Diego in 2004 called "Weight force during prone restraint and respiratory function"; is that correct?

A.   Yes.

Q.   And in that case, you also found a diminution in the spirometric measurements ranging from let's say 14 percent to 22 percent when you put people in this handcuffed-behind-their-back position and added weight, correct?

A.   Well, I don't have the study in front of me, but we did see the same decrements, very consistent across all our studies of -- in terms of lung volumes.

Q.   And then in 2007, you did a study, the lead author is a guy named -- or a doctor named Michael -- Michalewicz, 2007, and in this one, you put your volunteers, measured them again in the seating position, then put them on the table, handcuffed behind their backs, and put different levels of weight on their back, and you saw reductions up to 30 percent in maximum ventilatory volume, correct, MVV?

A.   Well, just to clarify, Dr. Michalewicz, it is a "she" --

Q.   Thank you.

A.    -- a female physician/scientist.  And we saw decrements, and at this point, we were putting up to 225 pounds of weight force.

Q.    And you were getting up to 30 percent decrements is your term, correct?

A.    I don't have the -- I don't have the study in front of me, but, again, we see consistent decreases in -- in lung volumes.

Q.    And this is the same study where you had the subjects struggling against the -- the restraints, correct?

A.    Well, that was the second phase of the study.  And the purpose of that part of the study was if you were --

Q.    It's really a "yes" or "no."  It was part of that study, correct?

          MR. SAIN:  Your Honor --

          MR. BURTON:  Your Honor, I'm sorry.

          THE COURT:  So answer the question.  Go ahead, Doctor.

          THE WITNESS:  I'm sorry, can you repeat the question then?

BY MR. BURTON:

Q.    It's just a "yes" or "no."  Another part of this study, you know, the report, the document that was published in 2007, was your data on subjects who struggled against the restraints once they were restrained, correct?

A.    Well, the data that we were obtaining for that part of the

study was actually what is your oxygen consumption in the tissues if you were -- when you were restrained.

Q.   And in that part of the study, one of the challenges that you had as researches was encouraging the subjects to complete the one minute of struggle against the restraints that you were trying to measure, correct?

A.   Well, we encouraged our subjects to struggle as hard as they could against the restraints so we could see how much oxygen they were consuming in that struggle.

Q.   And, in fact, several had problems completing the one minute of struggle.  That's what your report says, correct?

A.   Well, a number of them said this is -- this is hard to struggle against these restraints, to keep it up for a minute.

Q.   And then you took their blood gases after that, correct?

A.   Well, as I recall, what we were measuring actually was the oxygen consumption.

Q.   Well, you also found that they had elevated carbon dioxide, correct, relative to somebody who let's say was riding a bike?

A.   They were all within normal limits, as I recall.  I don't have the study in front of me but --

Q.   Thank you.  Now, there have been studies by other people who have studied the -- the effect of restraints on breathing, including an Australian group.  The lead author is Roeggla, R-O-E-G-G-L-A, 1999.  You're familiar with that?

A.   Did you say "Australian"?

Q.   Austria, I'm sorry.

A.   Austria.

Q.   Austria.

A.   Yes.                                                                    10:37

Q.   Yes.

A.   Yes.

Q.   And they found that in their six subjects, that putting them in a handcuffed, restrained position reduced their spirometric measurements by 40 percent?                               10:37

A.   I don't have that study in front of me, but I think they showed some decrements similar to ours.

Q.   Well, that's not similar to yours; that's about two or three times yours, correct?

A.   Well, again, I don't have the study in front of me, so I     10:38
can't verify what the exact number was.  But go ahead.

Q.   And then there was a group in the United Kingdom.  The lead author is Cary.  They did prone restraints.  And they found decrements up to -- up to one-third; isn't that correct?

A.   Well, again, I think you're quoting from abstract.  I'm     10:38
not sure that was a full publication.  I will say in both of those studies that they never -- none of them showed a decrease in oxygenation or an abnormal rise in carbon dioxide, which would be, of course, the key component of what the respiratory system is designed to do.                                            10:38

Q.    And then there was a 2000 study -- a 2008 study by Parkes that was in the United Kingdom.  And one of their subjects who was restrained and put down prone had a 57 percent drop in his MP -- MVV, correct?

A.    I don't have the Parkes study in front of me.

Q.    Now, there was another study attempted by a doctor named Meredith in 2005 who wanted to see how this worked with people who had COPD, correct?

A.    I don't have the Meredith study in front of me, so it's hard for me to comment on that.

Q.    Well, don't you recall that they had eight subjects who had COPD and they couldn't complete the study because three of them said, *I'm so uncomfortable lying prone with my COPD, I can't do it*?  You don't recall that?

        MR. SAIN:  Assumes facts not in evidence.  Calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  I don't have the study in front of me so it's difficult for me to comment.  Obviously, COPD is chronic obstructive pulmonary disease.  It's emphysema.  It is a lung disease.  So that would be a chronic lung disease.  So I can imagine that depending on their severity of the disease, like some emphysema patients have to have home oxygen because they -- their lungs are sort of scarred up and not functional, it would be hard for me to comment on a study of COPD patients

in this regard.

BY MR. BURTON:

Q.    Well --

A.    And I don't believe -- I don't believe Mr. Niedzialek had COPD.

Q.    Your colleague Dr. Vilke in 2020 published an article called "Restraint physiologic -- Restraint physiology: a review of the literature."  You're familiar with that, correct?

A.    I believe Dr. Vilke has published review articles before.

Q.    And that was in 2020, correct?

A.    I don't have the study in front of me.  I will have to take your word for it.

Q.    Now, this -- you participated in this study in 1998.  And so that was 25 years ago.  Over the last 25 years ago, how many times have you sat in front of a jury and said the same opinion that you're giving today, essentially that the police restraints did not cause the death that is being litigated?

A.    Well, I'm going to clarify your question here.  You know, I don't know how many times.  It's probably been 10 to 12 times.  But I'm not saying -- I'm saying that the restraint did not cause an asphyxial death.

Q.    And on each of those cases, you were retained by the defense, by the police agency?

A.    Well, I've been approached by plaintiffs as well as defense attorneys in these cases, but I always say, *This is*

*what our research shows*, and, you know, sometimes they retain me, sometimes they don't.

Q.   Every time you've been retrain -- re -- every time you've been retained and you've done a report, it's been for the defense, correct?

A.   No.

Q.   Well, you were retained for the defense in *Cruz v. County of Riverside* in asphyxial death, correct?

A.   I don't recall the details of all these cases, but I will take your word for it.

Q.   And you were -- and that was by Mr. Sain's firm, correct?

A.   I don't recall the details.

Q.   And another case named *Salazar v. County of San Bernardino*, you were retained in that case by Mr. Sain's firm?

A.   I will -- you know, I don't have my records in front of me, I will assume you're -- you're correct.

Q.   And you were retained by Mr. Sain's firm in a -- in another asphyxial alleged restraint death, *Nunis v. City of Chula Vista*?

A.   I believe so.

Q.   And you were retained by the County of Bakersfield in a case called *Garlick v. County of Kern*?

A.   I believe so.

Q.   And you're going to testify in that one next week, correct?

A.    I believe so.  I don't recall all the details.

Q.    And you were retained by the California Department of Justice in *Gonzalez v. California Highway Patrol*, another alleged restraint death case?

A.    I don't recall the details, but yes, I was retained.

Q.    And you were retained by the city attorney of the City of Los Angeles for two cases: one called *Mears v. City* and another one called *Wysocki v. City*?

A.    Again, I don't recall the details, but I will take your word for it.

Q.    And you were retained by the County of Kern in another restraint asphyxia case called *Hagood v. County of Kern*?

A.    I believe so.

Q.    And you were retained by an attorney for the City of Elk Grove in an asphyxia restraint alleged case called *Landeros*?

A.    Yes, I believe that was with Mr. Galipo.

Q.    And another one would be *Vargas v. County of San Bernardino*?

A.    I believe so.

Q.    So these are all cases where, just like Mr. Niedzialek, the person experienced cardiac arrest or at least stopped breathing while he was being restrained by the police or she was being restrained by the police, and you offered an opinion in one of these reports that the restraints were not a cause of the cardiac arrest or the death, correct?

A.    Okay.   Let me again clarify what I believe.   These are all different cases with different specifics, and I can't recall, but I would say that they may have involved my opinion that the deaths were not an asphyxial death as a result of the restraints.

MR. BURTON:  Can I just have --

MR. GALIPO:  Your Honor, may I confer with Mr. Burton?

MR. BURTON:  Can I have one second, Your Honor?

THE COURT:  Yes.

MR. BURTON:  Thank you.

(Plaintiff's counsel confer.)

THE COURT:  Let's take a recess at this time.

We'll take our morning break, ladies and gentlemen. Remember during that break to keep an open mind, don't talk about this case with anybody, don't let anybody else talk about it with you, and do not in any way try to learn about this case.  We'll be in recess for about 15 minutes.

(Out of the presence of the jury:)

THE COURT:  You may step down, Dr. Chan.

(Recess)

(In the presence of the jury:)

THE COURT:  Be seated, please.

THE CLERK:  Recalling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please restate your appearances for the record.

MR. BURTON:  John Burton, and with me are Dale Galipo and Kennedy Helm for the plaintiff.

THE COURT:  Good morning.

MR. SAIN:  Tony Sain with Tori Bakken on behalf of defendants.

THE COURT:  Good morning.

Dr. Chan, you remain under oath.  You understand?

THE WITNESS:  Yes.

THE COURT:  Proceed, Mr. Burton.

MR. BURTON:  Thank you.

BY MR. BURTON:

Q.   There was some testimony about epidemiological studies of a thousand cases that you looked at.  Was that -- were you talking about the Hall -- Dr. Hall's study or you were talking about something else?

A.   There was a Dr. Lassoff study.

Q.   Now, there's also what we call -- that's prospective, right?  We also have what we call "retrospective studies," correct?

A.   Yes.

Q.   And, in fact, you're familiar with Dr. O'Halloran's retrospective study of 21 asphyxial deaths during prone police restraints, correct?

A.    I would call that a case series, not necessarily epidemiologic, because he's taking cases that have already occurred whereas the other studies were taking all prone restraints and seeing what's happened.

Q.    So Dr. O'Halloran, who was the chief medical examiner for Ventura County, a little to the north of us, looked at 21 cases of asphyxial death during prone police restraints, correct?

A.    Well, I don't recall the exact details of the report, but I'll take your word for it.

Q.    And this was published after -- this was published in 1999 or 2000 actually after Dr. Reay, according to you, supposedly withdrew his theory that police restraints could cause asphyxial deaths, correct?

A.    I'll take your word for it.

Q.    And so you're -- right now, as we sit here today, besides this case, you are engaged in at least five other active cases that -- that involve similar issues of allegations of people who died during police restraint procedures?

A.    I don't know the number.  It's possible.  There are other cases that I'm involved in.

Q.    And I misspoke earlier when I said your trial next week. Your trial next week is in the *Hagood* case, correct, in Bakersfield?

A.    I believe so.

Q.    Okay.  Sorry I misspoke on that.  So of these active cases

you have right now, besides this one, you have three others with Mr. Sain's office, correct?

A.    I believe so.

Q.    And at least at one point when -- before you wrote your report in this case, you had a meeting that -- or maybe a series of meetings that went on for several hours with some of the other experts in this case, correct, Dr. Kode that we heard from, Dr. Graham that we're going to hear from in a minute; is that correct?

A.    I have consulted with those two in meetings, yes.

Q.    And they're also on these three other cases, correct?

A.    I don't know.  I don't recall specifically.

          MR. BURTON:  Can I have one moment, Your Honor?

          THE COURT:  Yes.

          MR. BURTON:  Thank you.  No further questions at this time.

          THE COURT:  Thank you.

          Mr. Sain.

          MR. SAIN:  Thank you, Your Honor.

                    **REDIRECT EXAMINATION**

BY MR. SAIN:

Q.    Doctor, you stated that as a medical professional, when you were conducting a medical evaluation, in response to Mr. Burton's question, that you would take a pulse before you would start CPR; is that correct?

A.   Yes.

Q.   Would you expect someone to start CPR if they had found a pulse on a subject?

A.   No.

Q.   What is hypoxia?                                                    11:12

A.   Hypoxia is abnormally low oxygen levels in the blood.

Q.   And did you find any evidence of hypoxia for Mr. Niedzialek?

        MR. BURTON:  Objection.  Beyond the scope.

        THE COURT:  Overruled on that basis.                            11:12

        THE WITNESS:  No.

BY MR. SAIN:

Q.   What is a decrement?

A.   Well, it's a decrease.

Q.   And you gave answers in response to Mr. Burton's                    11:12
questioning that in your own medical studies, you found that there was a decrease in some oxygen volume as a result of the prone position; is that correct?

A.   No.  We did not find a decrease in oxygen volume.  What we found is a decrease in volume, lung volume, the amount of air    11:13
in certain measures that we measure for pulmonary function or lung function testing.

Q.   Did any of those decreases or decrements that you found associated with prone restraint in any way impair a subject's ability to breathe?                                                    11:13

A.    It did not impair their ability to breathe.  More importantly, it did not impair their ability to get oxygen into their blood and get carbon dioxide out of their blood.

Q.    Did any of those decrements or decreases indicate in any way that prone restraint might cause asphyxia?

A.    No.

Q.    Mr. Burton asked you about some -- I think it was -- I didn't hear if it was Australian or Austrian or if it was the UK, but he asked you about a bunch of foreign studies.  Do you remember those questions?

A.    Yes.

Q.    Did any of those foreign studies show that restraint causes asphyxia?

A.    No.  They did not show any hypoxia as a result of these -- of these studies.

Q.    Mr. Burton asked you about the -- some sort of article by Dr. Ron O'Halloran.  Do you remember that?

A.    Yes.

Q.    And that was published before or after you started publishing your own peer-reviewed studies?

A.    Well, I can't remember the exact years to be honest.

Q.    Sometime back in the '90s?

A.    Sometime.

Q.    Do you remember the opinion or conclusion of the O'Halloran study?

A.    I don't.  I think what Dr. O'Halloran presented were a case series of deaths that occurred during restraint.  As I mentioned in the literature, there are sudden deaths occurring with restraint in all sorts of different positions: prone, supine, sitting.

Q.    Based on your own epidemiological studies, based on your review of other epidemiological studies, based on your own laboratory studies, from 2000 forward, are you aware of any medical evidence that prone restraint without airway obstruction causes any kind of asphyxia?

A.    No.

Q.    It does not?

A.    No.

Q.    Mr. Burton asked you about the time to recover from a TASER.  Do you remember those questions?

A.    Yes.

Q.    And he said -- or you asked -- or he asked you -- excuse me -- that TASER electricity could cause muscle contraction which could lead to some form of acidosis; is that correct?

A.    Yes.

Q.    Okay.  And he started to ask you about recovery time for that.  Could you explain the concept of recovery time associated with TASER electricity?

A.    Well, we've studied TASERs and drawn blood and measured different things, and there are some changes, but the recovery

is pretty quick after a five-second TASER jolt.  I mean, we measured, I can't recall, but in one minute and five minutes a number of other factors.  I was tased as part of the study just to undergo that and feel what we were asking subjects to do, and there are -- there's not long-lasting effects after, you know, a TASER exposure.

Q.   When you say "not long-lasting," what does that mean in terms of time?

A.   From a metabolic standpoint, really the recovery is within minutes, maybe even less in some -- some factors.

Q.   How many minutes?

A.   One to two minutes.

Q.   So would you expect, based on your own studies, that a TASER discharge or even multiple TASER discharge is going to cause some sort of metabolic acidosis if the time from the TASER discharge until the time that there's an urgent medical problem is more than four minutes?

A.   No.

Q.   There was some questions about your understanding of Dr. Reay's retraction of his positional asphyxia opinions. Where did you form that opinion?  Where did you form that understanding?

A.   Well, partially from his writing.  Dr. Reay actually, before he passed, also visited our laboratory in San Diego.

Q.   And did he communicate to you that he agreed that he was

wrong about prone restraint causing positional asphyxia?

MR. BURTON:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

BY MR. SAIN:

Q.    Was it your understanding that Dr. Reay no longer believed that positional asphyxia causes -- or prone restraint causes positional asphyxia?

MR. BURTON:  Objection.  Calls for speculation and hearsay.

THE COURT:  Sustained.

BY MR. SAIN:

Q.    Did you form an understanding as to whether or not Dr. Reay had retracted his positional asphyxia opinions?

MR. BURTON:  Same objections.

THE COURT:  Sustained.

BY MR. SAIN:

Q.    Is there any evidence that you're aware of that supports Dr. Reay's original positional asphyxia findings?

A.    Not from his original study.

Q.    Is there any evidence that you're aware of that contradicts his original positional asphyxia findings?

A.    Well, there's a number of studies, our studies as well as those of other investigators, including some of the studies that Mr. Burton mentioned.

Q.    And your own conclusion is that there is no evidentiary

support for Dr. Reay's original position of asphyxia findings, right?

A.    Correct.

Q.    And Dr. Reay agreed with you, right?

          MR. BURTON:  Well, objection.  Calls for hearsay.          11:18

          THE COURT:  Sustained.

BY MR. SAIN:

Q.    Is there any evidence that you're aware of --

          MR. SAIN:  Actually, Your Honor, may I approach?

          THE COURT:  Yes.          11:18

               (Sidebar conference as follows:)

          MR. SAIN:  Your Honor, I don't believe that it is hearsay for me to ask him what his understanding of the state of the literature or state of the studies or the state of Dr. Reay's opinion.          11:19

          THE COURT:  I think you can ask him that.

          MR. SAIN:  Which I did, Your Honor.

          THE COURT:  Right.  So what the literature is, you can ask him based on the literature.

          The other thing that you're doing that I don't think is proper is you're asking "do you know of any evidence."          11:19
There's no evidence.  There are studies, okay, he can rely on, there are medical opinions, but by saying "evidence," you're -- you're kind of wrapping in here what's happening in this case.

          MR. SAIN:  I see.  Okay.          11:19

THE COURT:  So medical studies are not evidence.

MR. SAIN:  Okay.  I'll be more precise in my questioning.

THE COURT:  Okay.

MR. SAIN:  But, Your Honor, just to be clear, I do intend to ask him about the medical opinion by Dr. Reay and his understanding of it.

MR. BURTON:  Your Honor, Dr. Reay published on this. We asked him about --

THE COURT:  If you limit it to what he wrote and he reviewed, then that's fine.

MR. SAIN:  Thank you, Your Honor.

(Sidebar conference concluded.)

BY MR. SAIN:

Q.   Dr. Chan, you -- have you reviewed what Dr. Reay wrote in terms of his medical opinions related to positional asphyxia?

A.   Yes.

Q.   And are you aware, based on that review, as to whether or not Dr. Reay's opinions as to the effect or association between prone restraint and positional asphyxia changed?

MR. BURTON:  Objection, Your Honor.  The only writings we know, we've asked him about --

MR. SAIN:  Sorry, is he testifying?

THE COURT:  Overruled.  What is the basis for your objection?

MR. BURTON:  Objection.  Vague as to what document he's talking about with Dr. Reay.

THE COURT:  Overruled.

THE WITNESS:  So I believe what Dr. Reay has indicated is that our study was more comprehensive because we actually measured oxygen and carbon dioxide levels in the blood.  We actually measured ability -- people's ability to breathe, how much air they were moving in and out.  Those are all things that he did not do in his studies.  So I think he actually described our study as more comprehensive than his.

BY MR. SAIN:

Q.    And what does "comprehensive" mean in this context?

A.    Well, I think that it means that we actually -- like I said, we actually measured the true blood oxygen levels and true carbon dioxide levels as well as lung volumes, which was the whole predicate for the idea of positional asphyxia, that they -- people aren't able to breathe enough volume in and out of their lungs when in the prone position, prone-restrained position.  And more specifically for Dr. Reay, his study was about the hobble position, not prone restraint by itself.  So in -- in a position that was actually not the position that Mr. Niedzialek was in or restrained.

MR. SAIN:  Thank you.  No further questions.

THE COURT:  Mr. Burton.

///

**RECROSS-EXAMINATION**

BY MR. BURTON:

Q.   Dr. Reay did not take or at least publish any spirometric measurements, correct?

A.   Correct.

Q.   And when you did record and publish spirometric measurement, in each of your studies, the prone restraint showed a decrease in the amount of volume of air that was moving in and out of the lungs to one degree or another, correct?

MR. SAIN:  Asked and answered.  Cumulative.

THE COURT:  Sustained.

BY MR. BURTON:

Q.   Now, you talked about the one to two minutes to recover from the TASER.  You, in your report -- well, let me ask this.  We all have seen the video.  He gets the second TASER.  How long after the second TASER shock were the handcuffs attached to Mr. Niedzialek?

MR. SAIN:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  I think it was approximately about two minutes.

BY MR. BURTON:

Q.   It wasn't 40 seconds?

A.   Well, I think he goes to the ground and then there is some

involvement of the officers.  I can't say exactly the amount of time, but it's, you know, around, you know, a little over a minute or two.

Q.   Well, Dr. Chan, you said it would take a minute or two to recover from the TASER, and then now you're testifying that, in your mind, it was two minutes between when he was tased and when he was handcuffed?

A.   Well, again, I -- I haven't seen the video, like, in front of me, but I'm not sure if you're asking that handcuffing him would prevent his recovery.  I don't think that makes any sense.

Q.   So you think that handcuffing him with a knee in his back, holding him down while he's still trying to engage in compensatory respiratory alkalosis to blow off CO2 to lower his blood acid, that that would affect his recovery; is that -- is that correct?

          MR. SAIN:  Assumes facts not in evidence as to the --

          THE COURT:  Overruled.

          THE WITNESS:  So if he has some acidosis, he's going to hyperventilate.  We see -- when he's -- during the handcuffing, he is shouting, he is screaming, he is clearly ventilating very well.  One could almost say he's hyperventilating.  So I don't see anything in the video that would prevent him from blowing off carbon dioxide to compensate for any minimal acidosis that was caused by the TASER.

BY MR. BURTON:

Q.   So you don't hear him on the video during that time you're talking about say "need help"?

MR. SAIN:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Saying "need help" doesn't mean that you're unable to compensate for your acidosis.

MR. BURTON:  Can I have a moment, Your Honor?

THE COURT:  Yes.

(Plaintiff's counsel confer.)

MR. BURTON:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.  Doctor, you're excused.

THE WITNESS:  Thank you.

MR. BURTON:  Your Honor, with the Court's permission, we're going to reshuffle a little bit.

THE COURT:  Go ahead.

MR. BURTON:  Thank you, Your Honor.

MR. SAIN:  Your Honor, may I call my next witness?

THE COURT:  Yes.

MR. SAIN:  Your Honor, the defense calls Dr. Michael Graham.

THE CLERK:  Please raise your right hand.  Do you solemnly swear that the testimony you're about to give in the cause now before this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

**DEFENDANTS' WITNESS, DR. MICHAEL GRAHAM**

THE CLERK:  Please be seated.  Please state your full name and spell your last name for the record.

THE WITNESS:  Dr. Michael Graham, G-R-A-H-A-M.

**DIRECT EXAMINATION**

BY MR. SAIN:

Q.   Good morning, Dr. Graham.

A.   Good morning.

MR. SAIN:  May I proceed, Your Honor?

THE COURT:  Yes, you may.

BY MR. SAIN:

Q.   Dr. Graham, I've known you for some time.  I just want to advise you, please speak slowly.

A.   I'll do my best.

Q.   Sir, what is your occupation?

A.   I'm a forensic pathologist.

Q.   And what professional positions do you currently hold?

A.   I'm the chief medical examiner for the City of St. Louis, Missouri.  I'm a deputy medical examiner in some of the surrounding jurisdictions.  I'm a professor of pathology at St. Louis University Medical School.

Q.   How long have you been a licensed physician?

A.   Since '81.  No, actually before that.  Probably '78.

Q.   Could you please tell the jury a little bit about your

educational background, including any degrees or medical positions you've had since starting in your profession?

A.    Yeah, I went to undergrad college at St. Louis University, received my undergrad degree in 1973.  I then attended medical school at St. Louis U and received my MD in 1977.  I spent the following four years at St. Luke's Episcopal Hospital in Houston, Texas, training in the general field of pathology and then came back to St. Louis for another year of training in forensic pathology.  I am certified by the American Board of Pathology in anatomic pathology, in clinical pathology, and in forensic pathology.

Q.    You mentioned some teaching positions.  How long have you had teaching positions related to medicine?

A.    I mean, at least at the senior pathologist level since -- it'd be since '81 or '82.

Q.    Are you a member of any professional associations associated with your field?

A.    I am.

Q.    Which are?

A.    The College of American Pathologists, The Society for Cardiovascular Pathology, the Pulmonary Pathology Society, the National Association of Medical Examiners, the American Academy of Forensic Sciences.

Q.    Have you ever been published in any peer-reviewed medical publications?

A.    I have.

Q.    On what topics?

A.    A varie -- a wide variety of forensic pathology topics. Everything from why babies die when they sleep facedown in soft bedding to some drug effects in transplant patients.

11:29

Q.    Have you ever been one of the peer reviewers on others' medical articles in a peer-reviewed publication?

A.    I have for several years, yeah.

Q.    How many articles have you been the peer reviewer on?

A.    Oh, boy.  I probably review maybe four or five a year.

11:29

Q.    And you've conducted autopsies?

A.    Yes.

Q.    Approximately how many autopsies have you performed as a forensic pathologist?

A.    Probably somewhere around 10,000.

11:29

Q.    Have you ever testified in a court of law as an expert on the issue of forensic pathology?

A.    Many times.

Q.    How many?

A.    Hundreds, if not thousands.

11:29

Q.    Which party retained you in this case?

A.    Defense.

Q.    And generally speaking, what were you retained to do?

A.    To re -- to review the available information and give an opinion as to why he died.

11:30

Q.   Did anyone tell you what opinions you were supposed to reach?

A.   No.

Q.   What rate were you charging the defendants in this case?

A.   The university bills my time at $500 an hour.

Q.   Is that rate any different than you would have charged if plaintiff had tried to retain you?

A.   No, all my time is billed the same.

Q.   Generally speaking, what work have you done on this case?

A.   I reviewed a wide variety of records.  I reviewed some videos and photographs.  That was -- that's primarily it, I think.

Q.   Did your review include the composite incident video consisting of the body-worn camera of Deputy Gomez and the bystander cellphone video of Ms. Vasquez?

A.   Yes.

Q.   Did your review include the deposition testimony and statements of Deputies Keeney and Gomez?

A.   Yes.

Q.   Did your review include the deposition testimony and statements of Witnesses Mireles and Vasquez?

A.   I think so.

Q.   Did your review include the deposition testimony, report, autopsy photographs, and autopsy protocol of Medical Examiner Dr. Mark Fajardo?

A.    Yes.

Q.    Did your review include any of the deposition testimony or reports of any of plaintiff's experts?

A.    I saw reports and rebuttal reports by a couple of them.  I don't recall if I saw the depositions.

Q.    Fair enough.  Did your review include any consultation with any other experts who were retained on this case?

A.    I mean, I've been on calls or Zoom with a -- with a couple of other experts.  I don't know that I would call it consulting with them though.

Q.    Fair enough.  Is there any evidence or information that you believe was needed by you to form your forensic pathology opinions in this case that you were lacking or missing?

A.    No.

Q.    So when you review a civil case like this one to evaluate from a forensic pathology process -- or perspective, what's the process that you follow?

A.    It's really I follow the -- the process that I follow with any case that I evaluate, whether I'm the medical examiner or a consultant, and that is, I guess, first of all, figure out what questions does somebody want me to address, and then I -- I treat it much like any other physician would treat seeing a patient in that I -- I look at history, I look at any physical examination which may include an autopsy, look at laboratory and x-ray studies, put all that information together, and then

try to answer the questions.

Q.   Is that the process you followed here in your review of the Kevin Niedzialek case?

A.   Yes.

Q.   How is that process different than when you yourself are performing an autopsy investigation?

A.   I mean, obviously if I'm performing the examination, I can tailor it to what I think the questions are going to be.  Here I have to rely on the dissection of someone else, but given that not only do I have that person's autopsy report, I've also got photographs.  And so in most cases, I don't think it makes much of a difference.

Q.   So having reviewed all the evidence in this case, did you form any forensic pathology opinions relative to Mr. Niedzialek?

A.   I did.

Q.   Was any of the evidence that you reviewed in this case, did you believe that any of the evidence supports the account that deputies asphyxiated Mr. Niedzialek?

A.   No.

Q.   Why not?

A.   I don't see any evidence of asphyxia either conceptually or in the objective findings.

Q.   Was there any evidence that you reviewed in this case that supported the idea that the deputies' prone restraint played a

causal role in Mr. Niedzialek's death?

A.    No.

Q.    Are you familiar with the term "petechiae"?

A.    Yes.

Q.    What are petechiae?                                    11:34

A.    Petechiae are little pinpoint areas of bleeding caused by the -- almost the smallest blood vessels in the body when they -- when they rupture.  You get just tiny bits of -- blood can get out because they're so tiny.  And so it looks like somebody speckles the area with little pinpoint red dots.    11:34

Q.    And based on your experience, what association, if any, do petechiae have with a finding of an asphyxia-related death?

A.    I mean, strictly with asphyxia, there -- there really isn't one, but there are different types of asphyxias that cause the blood vessels to distend and -- and then break.  And    11:34 so generally, if -- the blood vessels primarily in the head, the blood can't drain out of the head because the veins are compressed, but blood still can get pushed up into the head by the arteries, then those little blood vessels tend to distend and they break.                                             11:35

        And so often with manual strangulations where someone's, you know, squeezing the neck, what you -- what you often find is that the jugular veins are compressed before the carotid arteries.  And so for at least a very short period of time, blood doesn't get out of your head very well, but it's    11:35

still going in.  Those people tend to have a lot of petechiae.

Similarly, when you have a great weight placed on your chest to where the -- the pressure inside the chest prevents blood flow back to the heart as it normally would, you tend to get a lot of petechiae from that because the blood vessels are getting big.

You know, in contrast to that, if somebody puts a plastic bag over their head where there is none of this blood vessel compression, then you don't tend to see petechiae even though it's an asphyxia.

Q.   Did you see any petechiae anywhere on Mr. Niedzialek's body?

A.   No.

Q.   So in terms of your assessment of cause of death here, what were your conclusions after reviewing all the evidence?

A.   I mean, ultimately I think he died from methamphetamine toxicity.  The manifestation of the methamphetamine toxicity, in my opinion, was an entity called excited delirium or agitated delirium.  It's -- it's one of the ways some of the stimulants can kill people, but ultimately it was methamphetamine.

Q.   On the autopsy report of Dr. Fajardo, he lists, among other significant conditions, the application of restraint maneuvers.  I'll represent to you that here in court, he testified that what he was referencing was the TASER electrical

effects causing exertion by Mr. Niedzialek's muscles.  He also testified in this case, I'll represent to you, that he excluded any prone restraint from having any causal role in Mr. Niedzialek's death or any contribution toward the death. Based on that representation, do you agree or disagree with Dr. Fajardo?

A.    I mean, I disagree about the TASER part.  I don't think that had anything to do with anything.  As far as the -- the asphyxia side, I agree with him.

Q.    So is it your conclusion that based on your review of the evidence, that the prone restraint had no causal or contributory role to the death here?

A.    Yes.

Q.    Now, the manner of this death here was classified as a homicide.  Do you agree with that classification?

A.    Yeah, that's not the way that I would have classified it. Is it okay if I explain?

Q.    Please.

A.    Okay.  There are a number of terms that we use in death certification that can be used, I guess, kind of in the outside world, but the way they're used in death certification is fairly narrow definitions.  The two words that come into play here are "accident" and "homicide."  And a homicide to me, as a forensic pathologist or someone who certifies death, means that one person's death was caused by or contributed to by the

actions of another person, the volitional actions of another person.  And in that case, you could call it homicide.  It doesn't mean the law was broken or not broken.  That's -- that's almost irrelevant to us.  Accident, on the other hand, is something that's unpredictable and reasonably unforeseeable.  And so in a case like this, you can kind of go either way.

We understand that people who are markedly agitated or are exhibiting these signs from a variety of types of intoxication have a propensity to die suddenly, but we usually can't predict when it's going to happen.  And so if you kind of use that, I guess, philosophy or logic, then you tend to call these accidents.

If, on the other hand, you look at the philosophy or the -- the tradition that somebody else was involved, I mean, clearly law enforcement, you know, did have their hands on -- on him.  In that case, you could call it a homicide.  And so I do it one way.  I -- if somebody wants to call these types of deaths "homicides," I don't have any real problem with that.  I think you just kind of have to understand what the underlying reasoning is.

Q.   And in that circumstance, in this case, does this case being labeled as a "homicide," from your perspective as a forensic pathologist, in any way mean that deputies having hands or a knee or otherwise prone restraint on Mr. Niedzialek caused his death in any way?

A.    Not in any predictable fashion.  The response of Mr. Niedzialek to that restraint may have played a role in it.

Q.    When you say "response," what do you mean?

A.    His combative behavior, the fact of his very agitated state, and how he was reacting to -- to the officers may have played a role.  I don't think we can prove that it did, but it may have.

Q.    Okay.  Now, as part of your review in this case, did you review the medical records associated with Mr. Niedzialek?

A.    I did.

Q.    Did that include review of the cardiac rhythm that was measured by the paramedic for Mr. Niedzialek?

A.    Yes.

Q.    And what was that cardiac rhythm?

A.    It's called PEA, used to be called electromechanical dissociation.  Same term.

Q.    There's been some testimony in this case that PEA is a clear indicator that Mr. Niedzialek must have died as a result of asphyxia.  Do you agree with that testimony?

A.    No.

Q.    Why not?

A.    Because PEA is not a -- a rhythm that's specific for anything.  A number of conditions can cause PEA, one of which is asphyxia, but there are other electrolyte abnormalities, acidosis, a large amount of blood loss, and some other things

that can also cause it, some heart diseases.

Q.   Now, your opinion is that, and correct me if I'm wrong, that cause of death here was methamphetamine toxicity, which you describe as a form of excited delirium; is that correct?

A.   No, that's kind of backwards.

Q.   Okay.  Clear it up for me.

A.   There are -- I mean, ultimately his death was caused by the methamphetamine toxicity, but there are a lot of different ways that methamphetamine kills people.  And so if you just say he died of methamphetamine toxicity, that is correct, but for someone like me who hears that, I'd say, *Well, how did it do that? You know, Was it brain? Was it heart? Was it lungs? Was it something else?*  And so if you put this moniker of excited delirium and say it was methamphetamine causing the excited delirium, leading to the sudden death, I think it just gives you a little bit -- little bigger picture, a little better picture of what happened.

Q.   On the issue of excited delirium, are you aware of cases where a person has died of excited delirium without any prone restraint being involved?

A.   Yes.

Q.   And what significance did that have in forming your opinions here?

A.   I mean, I think it just shows you that you don't have to be prone or all of them aren't related to being prone, that

people with excited delirium can die in other positions.

Q.    Now, I'll represent to you that plaintiff's cardiology expert has testified in this case that he agrees that the state of defense toxicologist, Dr. Richard Clark, that his opinion in this case is that methamphetamine plus subject exertion caused the death.  Based on that representation, do you disagree with that opinion?

MR. GALIPO:  I apologize, Your Honor.  I think that mischaracterizes the opinion of the plaintiff's cardiologist.

THE COURT:  I'll sustain that.

BY MR. SAIN:

Q.    I want you to presume for the purposes of my question that there is an opinion that methamphetamine plus exertion caused the death.  Do you disagree or agree with that opinion?

A.    I don't think we know.  I think it probably did, but there's no way to prove that based on the current science.  My general feeling is that the extensive exertion probably does play a role in it.

Q.    So is there -- if that is an opinion, is there any material or irreconcilable difference of opinion between that opinion and your opinion?

MR. GALIPO:  I'm going to object to the question as vague as phrased.

THE COURT:  Overruled.

THE WITNESS:  I mean, not without hearing the entire

opinion, I don't know the answer to that, but if it's just that exertion probably played a role, then I would agree with it.

MR. SAIN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. SAIN:  A little editing here.

BY MR. SAIN:

Q.   Sir, are you familiar with the term "agonal breathing"?

A.   I am.

Q.   What is agonal breathing?

A.   That's basically an abnormal irregular breathing pattern that basically says you're dying.

Q.   And how is that different from regular breathing?

A.   Regular breathing tends to be regular.  I mean, we have a pattern to our breathing.  As I sit here, I'm not rapidly changing from fast to slow to deep to shallow.  It's just kind of steady.  If -- if my breathing picks up for whatever reason, it still has a rhythm to it.  When you see somebody with agonal breathing, it doesn't fit the circumstances you're under.  What you see is some irregular breathing.  It tends to be very slow. Some may be deep, some may be a little shallower, but you look at it and say, *Man, this is really bad breathing*.  You know it as soon as you see it.

Q.   Based on your review of the incident videos, from the moment in time that the knee is finally removed for the last time from Mr. Niedzialek's back, were you able to observe

Mr. Niedzialek at that point in time forward?

A.    Yes.

Q.    And during that point in time forward, were you able to tell whether or not he was breathing?

A.    He was.

Q.    And from that period of time -- from until that period of time until he's flipped into a supine position, would you describe that breathing as agonal or something else?

A.    It looked like -- it didn't look agonal to me for most of the time.  When the deputy realized or indicated that Mr. Niedzialek was unresponsive, the breathing at that point could have been agonal.

Q.    And when you say "unresponsive," what point in the sequence of events are you talking about?

A.    He made a statement, *I think he's unresponsive*, or something along those lines.  And right within seconds of that, I think either before or right during that time, the breathing was very, very slow, and it looked to me like it might be agonal.

Q.    And where did that moment occur relative to when they flipped him from prone into supine?

A.    It was like 10 or 11 seconds before.

Q.    Based on your review of all of the evidence in this case, is there anything that either of the deputies could have done differently that, in your opinion, would have prevented

Mr. Niedzialek from dying?

MR. GALIPO: I'm going to object as vague as to which evidence he's referring to.

THE COURT: Sustained.

BY MR. SAIN:

Q. My question was all of the evidence you've reviewed. You reviewed recordings, you reviewed medical records, you reviewed autopsy records, you reviewed witness testimony, you reviewed autopsy deposition; is that correct?

A. Yes.

Q. So based on all of the evidence that you reviewed in this case, is there anything that you believe either of the deputies could have done differently that would have prevented Mr. Niedzialek from dying?

A. Yeah, I don't see anything more predictably that could have changed the outcome because it's an unpredictable event.

Q. Are you familiar with the effects of TASER devices on human beings?

A. Yes.

Q. Are you familiar with the effect of TASER electricity on human beings?

A. Yes.

Q. How many cases have you evaluated from a forensic pathology standpoint where you evaluated the effects of TASER electricity on human beings?

A.   I mean, as -- as far as people who have died whether related to TASER or not, maybe a dozen, but then I've seen a lot of experimental studies, and myself being one of them, to evaluate the effect of it.

Q.   Is it your opinion that the TASER electrical discharges in this case played any causal role in Mr. Niedzialek's death?

A.   No.

Q.   Why not?

A.   The -- the TASER is discharged twice, each for basically five seconds of current.  And what the TASER does is stimulates nerves that stimulate your muscles.  And as soon as the electricity is shut off, the muscle goes -- everything goes right back to normal.  Say -- what it feels like, it's five seconds of a pretty bad cramp, and then it's absolutely normal again immediately.  And -- and then you can carry out any activity you'd like.  And so it really doesn't have any prolonged lasting effect over any other significant effect on people.

Q.   Based on your review of all of the evidence in this case, did you opine that any positioning or restraint played any causal or contributory role to Mr. Niedzialek's death?

A.   Again, other than what I talked about, and it's his reaction and the combative behavior, but the actual restraint itself, no.

Q.   Do you then exclude restraint or asphyxia from the cause

of death?

A.    Yes.

Q.    Why?

A.    There's no evidence to support it.  The sudden death is behaving like other methamphetamine or psychostimulant deaths that I've seen where you've got this very agitated behavior. The scientific evidence doesn't really support asphyxia as -- as causing these deaths.

Q.    So based on your review of all the evidence you mentioned, is there any evidence in this case that you're aware of that shows that either of the deputies played any causal or contributory role in Mr. Niedzialek's death?

A.    No.

Q.    Thank you.

        MR. SAIN:  No further questions.

        THE COURT:  Thank you.

        Mr. Galipo.

        MR. GALIPO:  Thank you.

                        **CROSS-EXAMINATION**

BY MR. GALIPO:

Q.    Good morning.

A.    Good morning.

Q.    So what state are you currently residing in?

A.    Missouri.

Q.    And how long have you been -- for what period of time were

you a medical examiner in Missouri?

A.    Starting in '82.

Q.    And you've indicated you've performed quite a few autopsies; is that fair?

A.    Yes.                                                                11:50

Q.    And I think you talked about this in your deposition, but there's been a few times a year during your career where you have performed autopsies where someone was restrained by the police and ended up dying?

A.    I've reviewed that -- yeah, yeah, that's true.  Okay.  I     11:50
see what you mean.  Yes.

Q.    Okay.  And how many years have you been doing the autopsies for?

A.    I've been doing autopsies --

Q.    You've been doing the autopsies during what time period?     11:50
Was it for 25 years?  How many years?

A.    How -- how long have I been doing autopsies?

Q.    Yes.

A.    Since 1977.

Q.    Okay.  I'm trying to think when I was born and do the        11:51
math.

A.    Don't tell me.

Q.    It's -- it's over 40 years?

A.    Yes.

Q.    And so obviously if there was, for example, a couple cases   11:51

like that a year, doing the math, that would be about 80 cases?

A.    The first probably four years of my career, I didn't do forensic cases.  I was doing kind of general hospital-type death cases.  I started the forensic cases in '81.

Q.    Okay.  Still about 40 years, right, because --

A.    No -- yeah, and I've been doing forensic cases a little over 40 years.

Q.    That's why I used 40 and I was trying to do some simple math.  You said two or three cases a year, so even 40 times 2 would be 80 cases; is that fair?

A.    Where there was restraint involved?

Q.    Restraint involved by law enforcement and a death.

A.    I mean, like in the excited delirium-type thing, we see zero to two a year.  So it wasn't two every year.  That's kind of the max.  But there are other cases where there may be restraint and injuries from, like, a fall or something so --

Q.    But I'm talking about -- and we'll get into excited delirium in a moment, but you're talking about restraint cases by law enforcement where someone died, you've had at least what, 40 or 60 of those you've autopsied?

A.    I mean, I don't keep count, but I suppose somewhere in there, yeah.

Q.    Okay.  And the majority of those, the person was held down in a prone position at some point, correct?

A.    Most of those would have been in a prone position for some

period of time, yes.

Q.   And the majority of those, the person went unresponsive while they were being held down in a prone position, true?

A.   Most of them, yes.

Q.   Okay.  So the issue became why are these people going unresponsive and dying while they're being held down in a prone position by the police?  That became a medical issue, correct?

A.   Yes.

Q.   Okay.  And I think you would agree that medical experts across the country have differing opinions on this issue?

MR. SAIN:  Vague as to time.

THE COURT:  At this present.  Overruled.

THE WITNESS:  There are differences of opinions about this, yes.

BY MR. GALIPO:

Q.   Right.  Many medical experts across the country believe that the prone restraint is playing a role in the deaths; is that fair?

A.   Some do.  I don't know if it's many.  I don't -- nobody has ever, you know, taken a vote or a poll.

Q.   Okay.

A.   But some do, I would agree with you there.

Q.   All right.  So, now, these are just cases you've autopsied, but you have been serving as an expert witness on these cases, particularly in recent years?

A.    Yes.

Q.    And that's not only -- that -- would that include your state?  Do you serve as an expert witness in your state?

A.    I mean, I do.  I don't -- I think I've -- I don't know that I've testified in any of these in Missouri related to restraint.

Q.    Okay.  What states have you testified about these law enforcement restraint death cases?  What other states?

A.    In trial?  I -- I --

Q.    Trial, deposition, or even cases you reviewed or wrote reports.

A.    California, Florida, I think Texas.

Q.    Okay.  Any other states you can think of?

A.    I think there are some, but off the hand, I don't remember specifically which ones.

Q.    Okay.  Because I remember I think in one of your depositions you mentioned several other states; is that fair?

A.    I may have mentioned others.  Just off the top of my head, I -- I don't recall.

Q.    Right.  And these cases that we're talking about that you have reviewed, just so we're clear, there was law enforcement restraint, usually with the person in a prone position, and the person that was being held down in a prone position by law enforcement went unresponsive?

A.    Some being held and some not being held but in the prone

position, yes.

Q.   All right.  That's one thing at least the majority had in common?

A.   Of those cases, yes.

Q.   Okay.  Now, when did you start serving as an expert witness on those type of cases?

A.   Oh, man.  I don't remember exactly.  It's been a long time.

Q.   How long ago?  20 years ago?

A.   Could have been.  Could have been.

Q.   So separate from the cases where you've done the autopsy yourself, 40 or so, how many cases per year have you been consulting on as an expert witness in cases like this, someone being held down prone or being in a prone position and going unresponsive and died?

A.   Probably less than half a dozen a year.

Q.   Half a dozen a year.  So when you say "less than half a dozen," are you thinking somewhere between three and five?

A.   I don't keep count.  I mean, that's just my general --

Q.   That's an estimate?

A.   It's an estimate.

Q.   Okay.  Three to five a year.  Let's take the number in between three and five, four.  Over 20 years, that would be another 80 cases, is that right, if that's -- my math is correct?

A.    Yeah, I'm not sure, like, in the earlier part that there were that many.  More recently, let's say the last five or so years, that's a little -- probably a little closer.

Q.    So exclusive of this year, would it be fair to say the 40 that you've done or so and the approximate 80 that you reviewed over the years, that would be 120 cases, 40 plus 80, that you have reviewed as an expert witness where the police were holding someone down prone or they were in a prone position and went unresponsive; is that generally a fair estimate?

A.    Again, I don't know what the number is, but most or a lot of the ones that I see are related to the prone position.

Q.    Right.  And so let's talk about currently.

A.    I'm sorry?

Q.    Currently.

A.    Oh, currently.  Okay.

Q.    Now, how many other open cases do you have other than this one where the person was being held down or in a prone position and went unresponsive?

A.    I think I've got a couple.

Q.    It's actually more than a couple, isn't it?  Don't you have at least five just in California?

A.    That are open right now?  I don't think so.  I've got -- not counting this one, I can think of two.

Q.    Two.  And those two are also in California?

A.    Where that's the issue, yes.

Q.    Right.  You had another one I think that I was the attorney on where a person was being held down and they died, but that case is no longer open; is that true?

A.    I --

Q.    You remember that one, *Santillan*?

A.    I remember the name.  As far as I know, it's not open.

Q.    That's not open anymore.  But for the open cases, you're thinking you have about three?

A.    Yeah, I got, you know, two or three, four sitting around.

Q.    Right.  And aren't some of those other cases where law enforcement was holding someone chest down and they went unresponsive and died?  Mr. Sain is also on some of those cases, isn't he?

A.    Some of them, not all of them.

Q.    Right.  And, in fact, you know how many other cases you have with Mr. Sain where someone was -- law enforcement held someone down and they ended up dying?

A.    Total ever?  Three or four maybe.

Q.    Three or four.  And, in fact, on those other cases, some of the same experts that are in this case are on the other cases too, aren't they?

A.    Yes.

Q.    Right.  For example, Dr. Kode, correct?

A.    Yes.

Q.    Dr. Chan?

A.   Yes.

Q.   Dr. Clark?

A.   I don't know anything about Dr. Clark.

Q.   Okay.  Let me just ask you a few more questions before --

MR. GALIPO:  I think we're going to take our lunch break at 12, Your Honor?

THE COURT:  Yes.

MR. GALIPO:  Okay.

BY MR. GALIPO:

Q.   Dr. Clark, you understand he was a medical expert retained by the defense in this case, correct?

A.   Yes.

Q.   And obviously you reviewed his report and deposition as part of your workup, correct?

A.   I did.

Q.   And Dr. Clark, you understood, had a specialty in toxicology, correct?

A.   I think he's a medical toxicologist.  I don't think he is a -- somebody who measures the drugs.

Q.   And Dr. Clark specifically said in his deposition that you reviewed that, in his opinion, this was not a meth overdose, correct?  That was what Dr. Clark said?

MR. SAIN:  Can he stop interrupting the witness, Your Honor?

THE COURT:  You can answer that.

THE WITNESS:  Yeah, using the -- the word "overdose," yes.

BY MR. GALIPO:

Q.   He said, "This was not a meth overdose."  In fact, Dr. Clark said he would consider the meth level to be in the recreational level?

A.   He said that.

Q.   Right.  And just so we're clear on levels, you have the recreational level, and then the next level up is toxic, and above that is lethal?

A.   No.

Q.   Let me ask you another question.  You wrote a report in this case, correct?

A.   I did.

Q.   And do you have a copy of your report handy?

A.   I do.

Q.   You do or do not?

A.   I do.

Q.   Oh, great.  Can you turn to page 26, please.

MR. GALIPO:  And if you can just allow me another 30 or 60 seconds, I'll conclude with this part of the questioning.

THE COURT:  Very well.

MR. GALIPO:  I'll have more after lunch but --

BY MR. GALIPO:

Q.   Are you there?

A.    I am.

Q.    Okay.  Now, you have the second paragraph of your report. You're referencing the coroner's certification of the cause of death, correct?

A.    Yes.

Q.    And you indicate the certification included, you wrote, and this is the second sentence, "'Application of restraint maneuver' was certified as a significant contributory factor to death."  That's what you wrote in your report, correct?

A.    That's what was on the -- the death certificate, yes.

Q.    Right.  "Significant contributory factor," those were the words on the death certificate and those are the words in your report, correct?

A.    Yeah, I mean, I used the term "significant contributory factor" because that's what is on the death certificate.

Q.    Right.  And prone restraint would at least be an example of a restraint maneuver, true?

        MR. SAIN:  Argumentative, assumes facts not in evidence, and misstates the testimony as to Dr. Fajardo.

        THE COURT:  Overruled.

        THE WITNESS:  I mean, it's part of the restraint process, yes.

BY MR. GALIPO:

Q.    Right.  I mean, it doesn't say anywhere here that the tasing was a significant contributory factor.  It says the

restraint maneuvers, correct?

A.   That would include everything.

Q.   And, "The manner of death was certified as 'homicide.'" That's your next sentence, true?

A.   Yes.

Q.   Which is death at the hands of another, correct?  That's the definition for forensic pathologists?

A.   Through a volitional act, yes.

Q.   Thank you.

MR. GALIPO:  Is this a good time for our lunch break?

THE COURT:  Yes.

We'll be in lunch, ladies and gentlemen.  Remember, keep an open mind, do not talk about this case with anyone, do not let others talk about it with you, do not learn or try to learn anything about this case, its issues, or its participants.  Have a good lunch.  We'll be back at 1:15.

(Out of the presence of the jury:)

THE COURT:  You may step down, Doctor.

MR. GALIPO:  Your Honor, is it possible to get our estimate of the time just so I can allot correctly?

THE COURT:  Let me see.  The plaintiff has 130 minutes left.

MR. GALIPO:  Okay.

THE COURT:  And the defendants have 126 minutes left.

MR. GALIPO:  Thank you so much.

MR. SAIN:  Your Honor, what time did you want us back?

THE COURT:  1:15.

MR. SAIN:  Thank you, Your Honor.

(Lunch recess)

-o0o-

12:03

CERTIFICATE OF OFFICIAL REPORTER


I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.



DATED THIS 5TH DAY OF APRIL, 2023



/s/ PHYLLIS A. PRESTON

_____

PHYLLIS A. PRESTON, CSR No. 8701, FCRR

FEDERAL OFFICIAL COURT REPORTER

## $

**$500** [2] - 9:21, 91:5

## '

**'70s** [1] - 15:8
**'78** [1] - 88:24
**'80s** [1] - 15:8
**'81** [3] - 88:24, 89:15, 107:4
**'82** [2] - 89:15, 106:2
**'90s** [1] - 78:22
**'97** [1] - 6:23
**'application** [1] - 115:7
**'homicide** [1] - 116:3

## /

**/s** [1] - 118:18

## 1

**1-6** [1] - 63:23
**10** [6] - 8:14, 28:1, 58:4, 58:21, 70:19, 102:22
**10,000** [1] - 90:15
**100** [1] - 24:24
**105** [1] - 3:10
**11** [3] - 41:4, 53:20, 102:22
**11:59** [1] - 41:2
**12** [6] - 23:9, 28:1, 36:11, 58:21, 70:19, 113:6
**120** [3] - 19:15, 19:22, 111:6
**126** [1] - 116:24
**128** [1] - 2:7
**12:09** [1] - 41:11
**130** [1] - 116:22
**14** [2] - 61:15, 65:10
**15** [8] - 8:14, 9:1, 60:13, 61:4, 61:9, 61:16, 61:18, 73:18
**150** [1] - 41:1
**150,000** [1] - 7:9
**16** [4] - 61:18, 63:23
**169** [1] - 24:13
**17** [1] - 35:15
**19-2083-JGB** [3] - 1:10, 4:4, 73:24
**1973** [1] - 89:4
**1977** [2] - 89:5, 106:19
**1988** [1] - 57:16
**1993** [1] - 6:20
**1996** [1] - 6:23
**1997** [3] - 8:16, 60:10, 64:3

**1998** [4] - 21:5, 58:11, 59:8, 70:13
**1999** [2] - 67:25, 75:10
**1:15** [2] - 116:16, 117:3

## 2

**2** [1] - 107:9
**20** [6] - 9:1, 19:19, 31:5, 35:15, 110:9, 110:23
**2000** [5] - 63:10, 64:4, 69:1, 75:11, 79:8
**2004** [1] - 65:6
**2005** [1] - 69:7
**2007** [3] - 65:17, 65:18, 66:22
**2008** [2] - 54:15, 69:1
**2019** [1] - 20:10
**2020** [2] - 70:6, 70:10
**2023** [3] - 1:17, 4:1, 118:15
**21** [3] - 35:15, 74:24, 75:6
**214** [2] - 53:13, 53:14
**21800** [1] - 2:5
**22** [1] - 65:11
**22-page** [1] - 58:10
**225** [4] - 27:2, 29:10, 32:14, 66:2
**23** [1] - 62:6
**25** [5] - 26:25, 62:16, 70:14, 106:16
**26** [3] - 38:17, 49:3, 114:19
**28** [1] - 118:7
**29** [1] - 57:6

## 3

**30** [6] - 14:8, 25:6, 55:24, 65:22, 66:4, 114:20
**305** [1] - 2:10
**310** [1] - 2:5
**3470** [1] - 1:23
**35** [1] - 57:17

## 4

**40** [12] - 35:14, 68:10, 85:24, 106:23, 107:5, 107:7, 107:8, 107:9, 107:20, 110:12, 111:4, 111:6
**4000** [1] - 2:16
**40th** [1] - 2:10
**42** [1] - 36:18

## 5

**5** [3] - 1:17, 3:6, 4:1
**50** [3] - 26:25, 35:14, 41:1
**51** [1] - 3:6
**57** [1] - 69:3
**5th** [1] - 2:16
**5TH** [1] - 118:15

## 6

**6** [1] - 1:11
**60** [2] - 107:20, 114:21
**633** [1] - 2:16
**64** [1] - 36:18
**644** [1] - 2:10

## 7

**7** [2] - 27:22, 29:3
**7.16** [1] - 48:3
**7.19** [1] - 48:3
**7.4** [2] - 47:21, 48:4
**753** [1] - 118:7
**76** [1] - 3:7

## 8

**8** [7] - 23:9, 27:22, 29:3, 39:19, 53:20, 53:22, 64:8
**80** [5] - 107:1, 107:10, 110:24, 111:5, 111:6
**85** [1] - 3:7
**8701** [1] - 118:20
**88** [1] - 3:9

## 9

**9** [1] - 64:9
**90071** [1] - 2:17
**91103** [1] - 2:8
**91367** [1] - 2:5
**92501** [1] - 1:23
**94609** [1] - 2:10
**99** [2] - 36:12, 36:18
**9:12** [1] - 1:18

## A

**a.m** [1] - 1:18
**abdomen** [5] - 34:8, 34:9, 34:10, 34:14, 34:16
**ability** [29] - 17:23, 23:1, 26:5, 26:13, 29:7, 31:20, 33:14, 33:18, 37:16, 44:3, 44:15, 44:24, 46:8, 46:17, 46:18, 47:14, 47:17, 50:9, 55:6, 62:8, 62:17, 62:23, 63:17, 64:5, 77:25, 78:1, 78:2, 84:7
**abnormal** [2] - 68:23, 101:10
**abnormalities** [1] - 98:24
**abnormally** [1] - 77:6
**ABOVE** [1] - 118:10
**ABOVE-ENTITLED** [1] - 118:10
**absent** [1] - 31:21
**absolutely** [1] - 104:14
**abstract** [1] - 68:20
**Academy** [1] - 89:22
**accepted** [1] - 20:11
**accident** [2] - 96:23, 97:4
**accidents** [1] - 97:12
**according** [3] - 60:4, 62:4, 75:11
**account** [1] - 93:18
**accurate** [1] - 17:17
**accurately** [1] - 36:15
**acid** [13] - 13:15, 47:21, 47:25, 48:2, 48:15, 55:11, 55:12, 55:17, 56:8, 56:15, 56:19, 57:2, 86:15
**acidosis** [24] - 47:19, 47:20, 47:21, 47:24, 48:5, 48:7, 48:10, 48:12, 48:15, 48:16, 48:18, 48:19, 55:20, 56:6, 57:7, 57:10, 57:14, 79:19, 80:15, 86:19, 86:25, 87:7, 98:25
**acidotic** [4] - 47:23, 48:5, 56:23, 57:12
**act** [1] - 116:8
**actions** [3] - 55:6, 97:1
**active** [4] - 51:15, 51:18, 75:16, 75:25
**activity** [3] - 47:9, 57:13, 104:16
**actual** [1] - 104:23
**added** [1] - 65:12
**additional** [1] - 20:25
**address** [2] - 57:1, 92:21
**addressed** [1] - 56:15

**adequately** [1] - 38:1
**admitted** [1] - 41:6
**adrenaline** [1] - 47:3
**adult** [1] - 28:14
**adult-sized** [1] - 28:14
**advanced** [1] - 52:18
**advise** [1] - 88:14
**advisory** [1] - 22:6
**affect** [2] - 44:24, 86:15
**affected** [2] - 46:17, 47:13
**agencies** [3] - 21:24, 22:3, 31:5
**agency** [1] - 70:23
**aggressive** [1] - 53:24
**agitated** [5] - 45:4, 95:19, 97:7, 98:4, 105:6
**ago** [8] - 31:11, 31:12, 31:13, 57:17, 70:14, 110:9
**agonal** [7] - 101:7, 101:9, 101:17, 102:8, 102:9, 102:12, 102:19
**agree** [9] - 33:25, 96:5, 96:9, 96:15, 98:19, 100:14, 101:2, 108:9, 108:22
**agreed** [2] - 80:25, 82:4
**agrees** [1] - 100:3
**ahead** [3] - 66:16, 68:16, 87:16
**air** [35] - 12:18, 12:20, 13:3, 13:5, 13:6, 14:21, 15:20, 16:2, 16:9, 17:24, 19:4, 24:4, 26:14, 26:17, 27:20, 27:23, 28:15, 33:22, 33:23, 34:6, 34:11, 34:24, 35:13, 61:23, 62:1, 62:8, 62:17, 63:17, 63:19, 64:5, 77:20, 84:8, 85:8
**airway** [11] - 12:15, 13:6, 14:19, 21:12, 22:5, 26:11, 31:21, 32:12, 33:5, 35:12, 79:9
**al** [2] - 4:5, 73:25
**alcohol** [3] - 14:15, 20:5, 20:7
**alkalosis** [2] - 56:11, 86:14
**allegations** [3] - 23:1, 23:20, 75:17
**alleged** [3] - 71:18,

72:4, 72:15
**allot** [1] - 116:20
**allow** [1] - 114:20
**almost** [5] - 62:8, 62:17, 86:22, 94:7, 97:4
**Alves** [2] - 4:5, 73:25
**ALVES** [1] - 1:7
**AM** [1] - 1:12
**American** [4] - 8:8, 89:9, 89:20, 89:22
**amount** [12] - 24:10, 24:12, 27:23, 28:15, 34:23, 35:12, 42:10, 61:22, 77:20, 85:8, 86:1, 98:25
**anaerobic** [1] - 55:16
**analyzing** [1] - 57:21
**anatomic** [1] - 89:10
**AND** [3] - 118:5, 118:8, 118:10
**Angeles** [2] - 2:17, 72:7
**ankles** [2] - 19:18, 27:25
**Annals** [2] - 8:7, 59:1
**answer** [7] - 21:25, 37:7, 56:2, 66:16, 93:1, 101:1, 113:25
**answered** [2] - 85:11, 85:19
**answers** [1] - 77:15
**apologies** [1] - 46:4
**apologize** [1] - 100:8
**appear** [1] - 40:1
**APPEARANCES** [1] - 2:1
**appearances** [2] - 4:6, 74:1
**appeared** [1] - 53:24
**application** [1] - 95:23
**applied** [1] - 59:5
**apply** [1] - 18:18
**approach** [2] - 38:13, 82:9
**approached** [1] - 70:24
**appropriate** [2] - 18:2, 54:4
**approximate** [1] - 111:5
**April** [1] - 1:17
**APRIL** [2] - 4:1, 118:15
**area** [3] - 27:10, 56:18, 94:10
**areas** [2] - 16:25, 94:6
**argumentative** [1] - 115:18
**arrest** [24] - 36:9,

37:19, 37:21, 37:22, 38:1, 38:2, 39:11, 41:24, 42:16, 42:17, 51:10, 51:11, 51:14, 51:18, 52:8, 52:9, 52:10, 53:5, 57:9, 57:10, 57:13, 72:21, 72:25
**arterial** [1] - 57:2
**arteries** [2] - 94:19, 94:24
**article** [9] - 20:19, 58:10, 59:8, 59:11, 59:15, 59:16, 62:5, 70:6, 78:16
**articles** [3] - 70:9, 90:7, 90:9
**aspects** [2] - 16:24, 17:2
**asphyxia** [87] - 8:23, 9:14, 12:2, 12:3, 12:23, 13:20, 14:4, 14:7, 14:12, 15:1, 15:3, 15:5, 15:6, 15:13, 15:15, 15:23, 15:24, 16:6, 16:8, 16:13, 16:22, 17:18, 17:19, 17:20, 18:2, 18:14, 18:18, 18:21, 19:8, 20:18, 20:24, 21:2, 21:8, 21:14, 21:22, 22:5, 23:20, 31:1, 32:6, 32:8, 32:9, 32:13, 32:18, 32:21, 32:24, 36:3, 38:11, 39:3, 43:12, 43:16, 45:9, 45:13, 45:17, 49:12, 49:22, 50:12, 50:17, 50:20, 58:25, 72:12, 72:15, 78:5, 78:13, 79:10, 80:20, 81:1, 81:6, 81:7, 81:13, 81:18, 81:21, 82:1, 83:16, 83:20, 84:16, 93:22, 94:12, 94:13, 95:10, 96:9, 98:19, 98:24, 104:25, 105:7
**asphyxia-related** [1] - 94:12
**asphyxial** [8] - 23:1, 70:21, 71:8, 71:18, 73:4, 74:24, 75:7, 75:13
**asphyxias** [1] - 94:14
**asphyxiate** [1] - 31:17
**asphyxiated** [1] - 93:19
**asphyxiating** [1] - 15:21

**asphyxiation** [3] - 39:19, 40:3, 40:8
**assessing** [1] - 59:17
**assessment** [1] - 95:14
**associate** [1] - 4:16
**associated** [5] - 16:6, 77:24, 79:23, 89:17, 98:9
**association** [4] - 49:12, 49:21, 83:19, 94:11
**Association** [1] - 89:22
**associations** [1] - 89:16
**assume** [2] - 22:2, 71:16
**assumes** [3] - 69:15, 86:17, 115:18
**asthma** [2] - 27:18, 61:1
**athletes** [1] - 62:23
**attached** [1] - 85:17
**attempted** [1] - 69:6
**attended** [1] - 89:4
**attention** [1] - 58:4
**attorney** [3] - 72:6, 72:14, 112:2
**attorneys** [1] - 70:25
**Australian** [3] - 67:24, 68:1, 78:8
**Austria** [3] - 68:2, 68:3, 68:4
**Austrian** [1] - 78:8
**author** [3] - 65:17, 67:24, 68:18
**authored** [2] - 15:4, 22:22
**autopsied** [3] - 58:1, 107:20, 108:24
**autopsies** [8] - 90:11, 90:13, 106:4, 106:8, 106:13, 106:14, 106:15, 106:17
**autopsy** [12] - 11:8, 11:9, 17:21, 91:24, 92:24, 93:6, 93:10, 95:22, 103:8, 103:9, 110:11
**availability** [1] - 4:24
**available** [1] - 90:24
**Avenue** [1] - 2:7
**average** [1] - 58:20
**aware** [19] - 18:10, 21:9, 21:13, 21:19, 21:25, 31:15, 32:12, 33:5, 33:8, 36:25, 37:3, 45:16, 79:8, 81:17, 81:20, 82:8,

83:18, 99:18, 105:10

## B

**babies** [1] - 90:4
**background** [3] - 6:7, 9:2, 89:1
**backs** [3] - 64:7, 64:14, 65:21
**backwards** [1] - 99:5
**bad** [2] - 101:21, 104:14
**bag** [1] - 95:8
**Bakersfield** [2] - 71:21, 75:23
**Bakken** [2] - 4:16, 74:6
**BAKKEN** [1] - 2:16
**balance** [1] - 47:22
**ballpark** [1] - 40:10
**barbell** [1] - 27:11
**based** [36] - 10:7, 10:8, 16:4, 18:16, 24:8, 24:16, 25:1, 32:10, 43:19, 44:23, 45:8, 45:12, 46:19, 48:1, 48:6, 50:6, 50:11, 50:15, 58:23, 79:6, 79:7, 80:13, 82:19, 83:18, 94:11, 96:5, 96:10, 100:6, 100:16, 101:23, 102:23, 103:11, 104:19, 105:9
**baseline** [1] - 60:18
**basis** [4] - 46:11, 56:15, 77:10, 83:24
**beat** [1] - 44:20
**beats** [1] - 24:13
**beauty** [1] - 34:9
**became** [3] - 7:3, 108:5, 108:7
**become** [2] - 44:10, 44:19
**bedding** [1] - 90:5
**began** [1] - 15:8
**begin** [2] - 39:18, 56:16
**beginning** [1] - 58:9
**behalf** [2] - 4:9, 74:6
**behaving** [1] - 105:5
**behavior** [3] - 98:4, 104:23, 105:6
**behind** [12] - 19:17, 19:18, 25:12, 27:25, 30:15, 53:12, 61:5, 62:10, 63:21, 64:7, 65:12, 65:21
**beings** [3] - 103:18, 103:21, 103:25

**bell** [1] - 15:2
**bellows** [2] - 33:22, 33:24
**belly** [1] - 34:7
**Berkeley** [1] - 6:8
**BERNAL** [1] - 1:5
**Bernardino** [2] - 71:14, 72:18
**best** [2] - 60:21, 88:15
**better** [5] - 23:21, 34:10, 47:3, 64:13, 99:17
**between** [12] - 12:17, 12:21, 13:23, 14:20, 26:12, 36:24, 51:24, 83:19, 86:6, 100:20, 110:18, 110:23
**beyond** [4] - 38:17, 44:6, 49:2, 77:9
**Bianco** [1] - 4:17
**BIANCO** [1] - 1:12
**big** [2] - 28:12, 95:6
**bigger** [2] - 34:8, 99:16
**bike** [3] - 24:11, 60:16, 67:19
**billed** [1] - 91:8
**bills** [1] - 91:5
**binders** [1] - 53:12
**binds** [1] - 19:23
**birdshot** [1] - 27:5
**BISGAARD** [1] - 2:15
**bit** [7] - 6:6, 15:14, 34:14, 44:21, 87:15, 88:25, 99:16
**bits** [1] - 94:8
**blanches** [1] - 42:2
**bleeding** [1] - 94:6
**block** [1] - 26:5
**blocked** [1] - 33:6
**blood** [62] - 12:9, 12:10, 12:17, 12:22, 13:12, 13:16, 16:11, 16:13, 16:14, 16:15, 16:16, 16:18, 17:24, 19:1, 19:2, 23:25, 24:6, 25:25, 26:2, 35:1, 35:3, 38:4, 38:5, 40:21, 40:22, 42:4, 42:8, 42:14, 42:15, 43:2, 43:4, 47:20, 48:3, 48:9, 48:17, 55:22, 57:3, 63:5, 63:7, 67:14, 77:6, 78:3, 79:24, 84:7, 84:14, 86:15, 94:7, 94:8, 94:15, 94:16, 94:17, 94:18, 94:19, 94:25, 95:4, 95:5, 95:8, 98:25

**blow** [1] - 86:14
**blowing** [1] - 86:24
**bluish** [2] - 42:25, 43:2
**board** [3] - 6:14, 6:21, 14:15
**Board** [1] - 89:9
**bodily** [1] - 33:9
**body** [15] - 9:4, 12:20, 22:11, 25:21, 26:16, 28:20, 47:2, 48:11, 48:14, 56:19, 58:19, 64:12, 91:14, 94:7, 95:12
**body-worn** [1] - 91:14
**born** [1] - 106:20
**Boulevard** [1] - 2:5
**bound** [2] - 13:12, 42:25
**boy** [1] - 90:10
**brain** [1] - 99:12
**break** [8] - 17:10, 17:11, 73:14, 73:15, 94:15, 94:20, 113:6, 116:10
**breakages** [1] - 16:23
**breaking** [2] - 16:14, 19:2
**breath** [6] - 13:23, 13:24, 13:25, 28:11, 28:12, 34:13
**breathe** [43] - 12:4, 12:24, 13:2, 13:4, 13:18, 14:1, 14:10, 23:1, 26:6, 27:19, 28:11, 28:13, 28:16, 28:25, 29:7, 31:21, 33:19, 35:5, 35:22, 37:17, 38:5, 42:19, 43:6, 43:8, 44:4, 44:16, 44:20, 44:24, 46:8, 46:17, 46:18, 47:14, 47:17, 48:14, 50:9, 61:25, 64:10, 64:13, 77:25, 78:1, 84:8, 84:17
**breathing** [42] - 8:23, 12:6, 12:11, 12:13, 13:13, 13:20, 13:22, 14:3, 19:6, 23:19, 23:24, 24:4, 28:9, 29:17, 30:25, 35:18, 36:1, 37:25, 42:23, 48:8, 49:7, 49:21, 56:10, 64:15, 64:19, 65:1, 67:23, 72:22, 101:7, 101:9, 101:10, 101:12, 101:13, 101:14, 101:16, 101:18,

101:19, 101:21, 102:4, 102:8, 102:11, 102:17
**Brian** [1] - 11:13
**brief** [1] - 53:23
**bring** [10] - 12:18, 13:5, 15:20, 16:2, 16:9, 17:24, 19:4, 26:14, 28:22
**bringing** [2] - 16:11, 24:6
**brings** [4] - 12:19, 14:2, 26:17, 34:6
**BRISBOIS** [1] - 2:15
**broad** [1] - 12:4
**broken** [4] - 16:20, 17:15, 97:3
**brought** [1] - 12:9
**bruises** [1] - 16:20
**bunch** [1] - 78:9
**Burbank** [1] - 2:5
**burn** [1] - 56:8
**BURTON** [55] - 2:6, 2:7, 3:6, 3:7, 37:3, 38:13, 38:16, 39:15, 40:11, 44:6, 45:1, 45:25, 46:10, 46:12, 49:2, 49:13, 49:23, 50:22, 50:25, 51:3, 51:6, 51:8, 54:21, 56:4, 56:5, 62:24, 64:23, 65:4, 66:15, 66:20, 70:2, 73:6, 73:9, 73:11, 74:3, 74:12, 74:13, 76:13, 76:15, 77:9, 81:2, 81:8, 81:14, 82:5, 83:8, 83:21, 84:1, 85:2, 85:13, 85:23, 87:1, 87:8, 87:11, 87:14, 87:17
**Burton** [15] - 4:9, 4:10, 38:25, 45:24, 46:2, 51:5, 64:16, 73:8, 74:3, 74:11, 78:7, 78:16, 79:14, 81:24, 84:24
**Burton's** [2] - 76:24, 77:15
**BY** [58] - 2:4, 2:7, 2:9, 2:15, 3:6, 3:6, 3:7, 3:7, 3:9, 3:10, 5:21, 6:1, 37:6, 40:19, 41:3, 41:10, 44:1, 44:9, 45:7, 45:22, 46:3, 46:15, 49:6, 49:17, 50:5, 51:3, 51:8, 54:21, 56:5, 63:8, 64:23, 65:4, 66:20, 70:2, 74:13,

76:21, 77:12, 81:4, 81:11, 81:16, 82:7, 83:14, 84:11, 85:2, 85:13, 85:23, 87:1, 88:7, 88:12, 100:11, 101:6, 103:5, 105:20, 108:15, 113:9, 114:3, 114:24, 115:23
**bystander** [2] - 11:19, 91:15

## C

**C-H-A-N** [1] - 5:17
**cage** [1] - 17:25
**CALIFORNIA** [3] - 1:2, 4:1, 118:6
**California** [16] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17, 6:5, 6:10, 6:12, 7:8, 7:12, 72:2, 72:3, 109:12, 111:21, 111:24
**camera** [1] - 91:14
**Canada** [1] - 31:4
**cancer** [1] - 28:19
**capacity** [3] - 28:10, 62:21, 63:24
**capillaries** [1] - 42:11
**capillary** [1] - 42:5
**car** [1] - 15:25
**carbon** [44] - 12:9, 12:21, 13:10, 13:14, 14:1, 23:25, 24:6, 26:13, 28:5, 28:6, 28:7, 28:17, 28:23, 29:5, 34:20, 34:23, 34:25, 35:2, 35:3, 35:12, 35:21, 35:23, 35:24, 36:6, 36:12, 37:13, 37:19, 38:5, 38:6, 38:8, 38:9, 48:13, 48:14, 57:1, 57:5, 62:14, 63:5, 67:17, 68:23, 78:3, 84:6, 84:15, 86:24
**cardiac** [35] - 36:9, 37:18, 37:21, 37:22, 37:23, 38:1, 38:2, 39:11, 41:24, 42:16, 42:17, 48:21, 48:25, 49:8, 49:9, 49:18, 49:19, 50:2, 51:10, 51:11, 51:14, 51:18, 52:7, 52:9, 52:10, 52:22, 53:4, 57:9, 57:10, 57:13, 72:21, 72:25, 98:11, 98:14
**cardiologist** [2] - 11:6, 100:9

**cardiology** [1] - 100:2
**Cardiovascular** [1] - 89:21
**cardiovascular** [4] - 42:7, 42:20, 43:9, 63:3
**care** [2] - 30:4, 44:12
**career** [2] - 106:7, 107:2
**carotid** [1] - 94:24
**carry** [1] - 104:15
**Cary** [1] - 68:18
**Case** [2] - 4:4, 73:24
**case** [85] - 9:9, 9:12, 9:13, 9:17, 9:20, 10:1, 10:2, 10:6, 10:8, 10:21, 11:21, 15:14, 15:16, 18:10, 32:17, 33:1, 36:20, 36:22, 39:6, 39:25, 40:23, 42:9, 43:1, 45:8, 45:12, 45:16, 45:23, 46:5, 47:18, 53:23, 54:15, 55:4, 57:2, 57:25, 60:3, 60:6, 65:9, 71:13, 71:14, 71:22, 72:4, 72:12, 72:15, 73:16, 73:18, 75:1, 75:16, 75:22, 76:5, 76:7, 79:2, 82:24, 90:21, 91:4, 91:9, 92:7, 92:13, 92:15, 92:19, 93:3, 93:13, 93:17, 93:24, 96:2, 97:2, 97:6, 97:16, 97:21, 98:8, 98:17, 100:3, 100:5, 102:23, 103:12, 104:6, 104:19, 105:10, 112:3, 112:20, 113:11, 114:13, 116:13, 116:15
**cases** [54] - 9:5, 15:9, 15:14, 17:21, 23:15, 30:5, 30:6, 31:2, 50:4, 70:22, 70:25, 71:9, 72:7, 72:20, 73:2, 74:15, 75:2, 75:6, 75:16, 75:20, 75:25, 76:11, 93:11, 99:18, 103:23, 106:25, 107:1, 107:3, 107:4, 107:6, 107:9, 107:10, 107:15, 107:18, 108:23, 108:25, 109:8, 109:10, 109:20, 110:4, 110:6, 110:11,

110:12, 110:13, 110:24, 111:6, 111:16, 112:7, 112:10, 112:13, 112:15, 112:19, 112:21
**catecholamines** [7] - 46:23, 46:25, 47:1, 47:4, 47:6, 47:8, 47:13
**causal** [10] - 31:16, 36:4, 38:11, 50:17, 94:1, 96:3, 96:11, 104:6, 104:21, 105:11
**caused** [18] - 16:6, 17:24, 20:1, 21:2, 29:6, 40:7, 45:17, 48:11, 48:16, 50:19, 54:24, 86:25, 94:6, 96:25, 97:25, 99:7, 100:5, 100:13
**causes** [6] - 32:8, 44:18, 78:13, 79:10, 81:6
**causing** [10] - 16:15, 31:17, 39:25, 40:1, 55:5, 60:1, 81:1, 96:1, 99:14, 105:8
**cavity** [2] - 18:18, 43:23
**CED** [1] - 54:3
**cellphone** [1] - 91:15
**CENTRAL** [2] - 1:2, 118:6
**Centro** [1] - 7:8
**certain** [2] - 24:10, 77:21
**certainly** [3] - 51:21, 55:19, 57:13
**certificate** [3] - 115:10, 115:12, 115:15
**CERTIFICATE** [1] - 118:1
**certification** [4] - 96:20, 96:21, 115:3, 115:6
**certified** [5] - 6:14, 6:21, 89:9, 115:8, 116:3
**certifies** [1] - 96:24
**CERTIFY** [1] - 118:6
**cessation** [1] - 14:3
**Chad** [1] - 4:17
**CHAD** [1] - 1:12
**chair** [8] - 6:3, 7:2, 7:3, 7:5, 19:20, 22:11, 60:18, 60:21
**challenges** [1] - 67:3

**CHAN** [2] - 3:5, 5:14
**Chan** [17] - 4:11, 4:24, 5:8, 5:17, 5:22, 51:4, 51:9, 56:11, 56:20, 56:24, 57:8, 63:9, 73:20, 74:9, 83:15, 86:4, 112:25
**changed** [3] - 36:16, 83:20, 103:16
**changes** [1] - 79:25
**changing** [1] - 101:15
**charged** [2] - 9:22, 91:6
**charging** [2] - 9:19, 91:4
**check** [1] - 53:1
**chemicals** [2] - 47:2, 48:11
**chest** [22] - 16:10, 16:17, 17:6, 17:9, 17:12, 17:13, 17:14, 17:15, 17:16, 17:18, 18:18, 18:25, 34:8, 43:22, 52:25, 53:3, 64:6, 64:18, 95:3, 112:11
**chief** [3] - 6:11, 75:5, 88:19
**choked** [1] - 33:9
**chronic** [2] - 69:20, 69:21
**Chula** [1] - 71:19
**circumstance** [1] - 97:21
**circumstances** [1] - 101:18
**City** [5] - 71:18, 72:6, 72:7, 72:8, 72:14
**city** [2] - 72:6, 88:19
**civil** [1] - 92:15
**clarify** [3] - 65:24, 70:18, 73:1
**Clark** [8] - 100:4, 113:2, 113:3, 113:10, 113:16, 113:20, 113:22, 114:5
**classification** [1] - 96:15
**classified** [2] - 96:14, 96:16
**clear** [7] - 48:18, 56:13, 83:5, 98:18, 99:6, 109:21, 114:8
**cleared** [1] - 56:14
**clearly** [9] - 42:13, 44:25, 45:4, 48:4, 57:4, 57:6, 64:10, 86:21, 97:15
**CLERK** [6] - 4:4, 5:9,

5:15, 73:24, 87:22, 88:3
**client** [1] - 4:12
**clinical** [3] - 7:2, 61:8, 89:10
**close** [3] - 24:24, 25:6, 38:21
**closer** [1] - 111:3
**CO2** [13] - 34:20, 35:6, 36:2, 36:12, 36:17, 36:19, 37:10, 38:1, 38:18, 39:5, 39:10, 39:22, 86:14
**cocaine** [1] - 15:18
**CODE** [1] - 118:7
**colleague** [3] - 54:15, 63:9, 70:6
**colleagues** [1] - 23:3
**collected** [1] - 29:25
**college** [1] - 89:3
**College** [1] - 89:20
**colloquial** [1] - 44:17
**color** [3] - 41:14, 42:25, 43:5
**coloration** [2] - 41:16, 43:2
**combative** [3] - 53:25, 98:4, 104:23
**comfortable** [1] - 61:10
**comment** [3] - 69:10, 69:19, 69:25
**common** [1] - 110:3
**commonly** [1] - 14:12
**communicate** [1] - 80:25
**community** [1] - 20:12
**compensate** [2] - 86:24, 87:7
**compensatory** [2] - 56:10, 86:14
**complete** [3] - 14:3, 67:4, 69:12
**completely** [1] - 13:21
**completing** [1] - 67:10
**component** [1] - 68:24
**composite** [4] - 11:18, 40:24, 41:11, 91:13
**comprehensive** [4] - 20:14, 84:5, 84:10, 84:12
**compress** [4] - 15:25, 16:8, 34:12, 34:14
**compressed** [3] - 16:18, 94:18, 94:23
**compression** [20] - 15:23, 15:24, 16:6, 16:7, 16:13, 16:22, 17:18, 17:19, 17:20, 17:23, 18:2, 18:18,

18:21, 32:20, 34:15, 40:4, 40:8, 43:16, 45:13, 95:9
**compressions** [2] - 52:25, 53:4
**compromise** [6] - 20:24, 39:19, 40:2, 58:7, 58:13, 59:25
**concept** [1] - 79:22
**conceptually** [1] - 93:22
**concert** [1] - 17:10
**conclude** [1] - 114:21
**concluded** [3] - 21:1, 40:12, 83:13
**conclusion** [4] - 32:5, 78:24, 81:25, 96:10
**conclusions** [4] - 9:16, 40:23, 41:20, 95:15
**condition** [2] - 52:14, 65:1
**conditions** [3] - 22:19, 95:23, 98:23
**conducted** [9] - 7:18, 22:24, 29:24, 31:15, 32:4, 32:11, 38:25, 54:2, 90:11
**conducting** [3] - 23:14, 24:8, 76:23
**conductive** [1] - 54:2
**confer** [3] - 73:7, 73:12, 87:10
**conference** [4] - 38:15, 40:12, 82:11, 83:13
**CONFERENCE** [1] - 118:11
**CONFORMANCE** [1] - 118:11
**confusing** [1] - 38:3
**connected** [1] - 36:23
**connection** [3] - 12:14, 26:11, 26:12
**consequences** [2] - 56:24, 59:20
**consider** [5] - 10:12, 10:15, 23:15, 49:11, 114:5
**considered** [2] - 22:22, 59:16
**considers** [1] - 20:14
**consistent** [7] - 22:6, 32:18, 32:20, 32:23, 43:6, 65:15, 66:7
**consisting** [1] - 91:14
**consult** [2] - 11:21, 11:24
**consultant** [1] - 92:20
**consultation** [1] - 92:6

**consulted** [1] - 76:10
**consulting** [2] - 92:9, 110:13
**consuming** [1] - 67:9
**consumption** [3] - 46:16, 67:1, 67:16
**contention** [1] - 33:25
**contentions** [1] - 21:1
**contents** [1] - 34:7
**context** [1] - 84:12
**continue** [1] - 4:21
**continued** [1] - 21:20
**contract** [3] - 34:4, 34:7, 34:16
**contraction** [3] - 55:1, 55:15, 79:18
**contractions** [4] - 54:24, 55:5, 55:10, 55:11
**contradicts** [1] - 81:21
**contrast** [1] - 95:7
**contribute** [3] - 45:9, 45:13, 55:21
**contributed** [5] - 40:7, 45:18, 50:12, 55:19, 96:25
**contribution** [1] - 96:4
**contributory** [7] - 96:12, 104:21, 105:12, 115:8, 115:11, 115:14, 115:25
**control** [1] - 55:6
**contusions** [1] - 16:20
**converted** [1] - 48:14
**COPD** [6] - 69:8, 69:12, 69:13, 69:19, 69:25, 70:5
**copy** [1] - 114:15
**CORONER** [1] - 1:12
**coroner's** [1] - 115:3
**CORRECT** [1] - 118:8
**correct** [103] - 43:14, 50:19, 51:15, 51:22, 52:8, 52:12, 52:18, 52:25, 53:5, 53:20, 54:10, 54:17, 54:24, 55:8, 55:12, 56:8, 56:11, 56:12, 56:20, 56:24, 57:11, 57:17, 57:22, 58:1, 58:15, 59:6, 59:18, 60:11, 60:14, 60:19, 60:23, 61:7, 61:10, 61:15, 61:20, 61:24, 62:6, 62:11, 62:18, 62:19, 63:17, 63:24, 64:7, 64:16, 64:19, 65:7, 65:13, 65:23, 66:5, 66:9, 66:13, 66:24,

67:6, 67:11, 67:14, 67:18, 68:14, 68:19, 69:4, 69:8, 70:8, 70:10, 71:5, 71:8, 71:11, 71:16, 71:25, 72:25, 74:21, 74:25, 75:7, 75:13, 75:22, 76:2, 76:7, 76:9, 76:11, 76:25, 77:18, 79:19, 82:3, 85:4, 85:5, 85:10, 86:16, 99:2, 99:4, 99:10, 103:9, 107:24, 108:7, 110:25, 112:23, 113:11, 113:14, 113:17, 113:22, 114:13, 115:4, 115:9, 115:13, 116:1, 116:6
**correctly** [1] - 116:20
**counsel** [6] - 4:6, 4:16, 46:5, 73:12, 74:1, 87:10
**count** [3] - 24:21, 107:21, 110:19
**counting** [1] - 111:23
**country** [3] - 21:24, 108:10, 108:16
**County** [6] - 4:5, 4:17, 71:13, 72:17, 73:25, 75:6
**county** [5] - 71:7, 71:21, 71:22, 72:11, 72:12
**COUNTY** [2] - 1:11, 1:11
**couple** [8] - 13:25, 21:10, 46:22, 92:4, 92:8, 106:25, 111:19, 111:20
**course** [1] - 68:24
**court** [3] - 8:21, 90:16, 95:24
**COURT** [82] - 1:1, 4:13, 4:18, 5:2, 5:18, 37:5, 38:14, 38:23, 39:8, 39:13, 39:16, 39:21, 40:9, 40:15, 40:16, 41:7, 44:8, 45:3, 45:21, 46:11, 46:14, 49:4, 49:15, 49:24, 50:24, 54:19, 56:3, 63:1, 64:22, 65:3, 66:16, 69:17, 73:10, 73:13, 73:20, 73:23, 74:5, 74:8, 74:11, 76:14, 76:17, 77:10, 81:3, 81:10, 81:15, 82:6, 82:10, 82:16, 82:18, 83:1,

83:4, 83:10, 83:24, 84:3, 84:24, 85:12, 85:20, 86:18, 87:5, 87:9, 87:12, 87:16, 87:19, 88:11, 100:10, 100:24, 101:4, 103:4, 105:16, 108:12, 113:7, 113:25, 114:22, 115:20, 116:11, 116:18, 116:21, 116:24, 117:3, 118:5, 118:21

**Court** [4] - 1:22, 1:22, 5:11, 87:24

**court's** [1] - 50:23

**Court's** [1] - 87:14

**CPR** [3] - 52:18, 76:25, 77:2

**cracks** [2] - 43:16, 43:20

**Craig** [1] - 5:17

**cramp** [1] - 104:14

**create** [5] - 4:11, 22:4, 26:14, 26:17, 57:14

**created** [1] - 35:20

**creates** [2] - 34:5, 55:4

**criticism** [1] - 57:15

**CROSS** [4] - 3:6, 3:10, 51:2, 105:19

**CROSS-EXAMINATION** [4] - 3:6, 3:10, 51:2, 105:19

**Cruz** [1] - 71:7

**CSR** [2] - 1:21, 118:20

**cumulative** [1] - 85:11

**current** [3] - 6:2, 100:16, 104:10

**custody** [1] - 59:3

**cut** [3] - 58:9, 58:13, 58:15

**CV** [1] - 8:19

**cyanosis** [2] - 43:1, 43:6

**cyanotic** [1] - 43:1

## D

**Dale** [2] - 4:8, 74:3

**DALE** [2] - 2:4, 2:4

**damage** [2] - 18:18, 43:22

**dan** [1] - 11:6

**dangerously** [1] - 56:18

**dart** [1] - 54:3

**data** [2] - 66:23, 66:25

**date** [1] - 21:6

**DATED** [1] - 118:15

**DAY** [1] - 118:15

**days** [1] - 56:7

**dead** [1] - 14:9

**death** [63] - 9:15, 12:3, 12:5, 16:6, 17:19, 18:3, 31:7, 32:18, 32:21, 32:24, 36:4, 38:12, 40:7, 45:10, 45:14, 45:18, 50:13, 50:18, 50:20, 59:22, 59:24, 60:2, 70:17, 70:21, 71:8, 71:18, 72:4, 72:25, 73:4, 75:7, 94:1, 94:12, 95:14, 96:4, 96:12, 96:14, 96:19, 96:21, 96:24, 96:25, 97:25, 99:3, 99:7, 99:15, 100:6, 100:14, 104:6, 104:21, 105:1, 105:4, 105:12, 107:4, 107:12, 109:8, 115:4, 115:9, 115:10, 115:12, 115:15, 116:3, 116:6

**deaths** [17] - 15:9, 22:9, 31:9, 57:21, 59:3, 59:5, 59:17, 73:4, 74:24, 75:13, 79:2, 79:3, 97:18, 105:5, 105:8, 108:17

**deceased** [1] - 1:8

**decrease** [10] - 27:23, 28:1, 39:24, 63:23, 68:22, 77:14, 77:17, 77:19, 77:20, 85:8

**decreased** [1] - 47:17

**decreases** [5] - 64:2, 64:8, 66:7, 77:23, 78:4

**decrement** [3] - 62:13, 77:13

**decrements** [7] - 65:15, 66:1, 66:4, 68:12, 68:19, 77:23, 78:4

**deep** [3] - 34:13, 101:15, 101:20

**defendant** [1] - 4:17

**Defendants** [2] - 1:13, 2:14

**defendants** [3] - 74:7, 91:4, 116:24

**DEFENDANTS'** [2] - 5:14, 88:2

**defense** [9] - 9:10, 70:23, 70:25, 71:5, 71:7, 87:20, 90:22, 100:4, 113:11

**Defense** [1] - 5:7

**defibrillation** [2] - 52:23, 52:24

**definition** [1] - 116:7

**definitions** [1] - 96:22

**degree** [6] - 6:8, 6:24, 10:9, 50:16, 85:9, 89:4

**degrees** [2] - 6:7, 89:1

**delayed** [1] - 43:7

**delirium** [11] - 59:21, 95:18, 95:19, 99:4, 99:14, 99:15, 99:18, 99:19, 100:1, 107:13, 107:18

**delirium-type** [1] - 107:13

**delve** [1] - 12:1

**deoxygenated** [1] - 43:3

**Department** [1] - 72:2

**department** [10] - 6:4, 7:2, 7:3, 7:5, 7:8, 7:16, 7:24, 36:14, 42:1, 44:11

**DEPARTMENT** [1] - 1:11

**departments** [3] - 6:15, 7:7, 30:1

**deployed** [1] - 54:3

**depo** [1] - 39:9

**deposed** [1] - 10:5

**deposition** [21] - 11:2, 11:5, 11:8, 11:15, 38:24, 39:4, 39:7, 45:23, 46:4, 46:7, 46:13, 60:7, 91:17, 91:20, 91:23, 92:2, 103:9, 106:6, 109:10, 113:13, 113:20

**depositions** [7] - 10:21, 10:23, 10:24, 10:25, 11:12, 92:5, 109:17

**depressed** [3] - 14:13, 14:23, 15:16

**Deputies** [1] - 91:18

**deputies** [7] - 11:13, 33:2, 93:19, 97:23, 102:24, 103:12, 105:11

**deputies'** [1] - 93:25

**Deputy** [1] - 91:14

**deputy** [3] - 11:13, 88:20, 102:10

**describe** [3] - 41:16, 99:4, 102:8

**described** [9] - 14:7,

14:13, 16:3, 17:18, 17:20, 20:15, 61:6, 63:2, 84:10

**description** [2] - 14:25, 15:15

**descriptions** [1] - 16:13

**designed** [2] - 34:9, 68:25

**details** [8] - 7:17, 12:1, 71:9, 71:12, 72:1, 72:5, 72:9, 75:8

**deteriorate** [1] - 49:1

**device** [3] - 35:11, 54:3, 54:24

**devices** [2] - 36:23, 103:17

**diaphragm** [5] - 33:21, 34:3, 34:5, 34:6, 34:16

**die** [12] - 13:1, 13:20, 21:14, 21:21, 28:24, 32:13, 34:17, 59:17, 64:9, 90:4, 97:9, 100:1

**died** [14] - 31:1, 50:3, 58:1, 75:18, 90:25, 95:16, 98:18, 99:10, 99:19, 104:1, 107:19, 110:15, 112:2, 112:12

**Diego** [7] - 6:5, 6:11, 6:13, 6:16, 44:13, 65:6, 80:24

**difference** [3] - 29:22, 93:12, 100:20

**differences** [1] - 108:13

**different** [33] - 7:3, 7:25, 8:1, 8:2, 9:22, 15:10, 15:14, 21:24, 22:10, 24:1, 24:5, 26:9, 26:16, 27:9, 27:15, 31:5, 39:10, 41:14, 49:11, 49:19, 55:22, 57:25, 65:21, 73:2, 79:4, 79:25, 91:6, 93:5, 94:14, 99:8, 101:12

**differently** [2] - 102:25, 103:13

**differing** [1] - 108:10

**difficult** [1] - 69:19

**diminution** [1] - 65:9

**diox** [1] - 36:12

**dioxide** [43] - 12:10, 12:21, 13:10, 13:15, 14:1, 23:25, 24:7, 26:13, 28:5, 28:6, 28:7, 28:17, 28:23,

29:5, 34:20, 34:23, 34:24, 35:1, 35:2, 35:3, 35:12, 35:21, 35:23, 35:24, 36:7, 37:13, 37:19, 38:5, 38:6, 38:8, 38:9, 48:13, 48:14, 57:1, 57:5, 62:14, 63:6, 67:18, 68:23, 78:3, 84:6, 84:15, 86:24

**DIRECT** [4] - 3:6, 3:9, 5:20, 88:6

**direction** [2] - 17:12, 17:16

**directly** [1] - 55:6

**director** [1] - 7:1

**disagree** [4] - 96:5, 96:7, 100:6, 100:14

**discharge** [4] - 54:17, 80:14, 80:16

**discharged** [2] - 54:3, 104:9

**discharges** [2] - 55:18, 104:5

**discovered** [1] - 50:7

**discussion** [1] - 47:18

**disease** [5] - 63:4, 69:20, 69:21, 69:22

**diseases** [1] - 99:1

**dissection** [1] - 93:9

**dissociation** [1] - 98:16

**distend** [2] - 94:15, 94:19

**DISTRICT** [5] - 1:1, 1:2, 1:5, 118:5, 118:6

**District** [1] - 1:22

**DIVISION** [1] - 1:3

**DIVISION-RIVERSIDE** [1] - 1:3

**DO** [1] - 118:6

**doctor** [7] - 15:2, 40:20, 65:18, 66:17, 69:6, 76:22, 87:12

**Doctor** [1] - 116:18

**doctor's** [1] - 61:7

**doctors** [1] - 27:20

**document** [2] - 66:22, 84:1

**documented** [3] - 19:14, 19:18, 55:1

**dogpiling** [1] - 18:8

**dome** [1] - 34:3

**dome-shaped** [1] - 34:3

**done** [17] - 5:4, 7:23, 9:25, 19:12, 19:13, 24:24, 25:7, 30:2, 56:1, 57:25, 62:3,

71:4, 91:9, 102:24, 103:13, 110:11, 111:5
**dots** [1] - 94:10
**down** [21] - 27:21, 34:5, 47:23, 62:6, 62:9, 64:8, 64:10, 69:3, 73:20, 86:13, 107:23, 108:3, 108:6, 109:23, 110:14, 111:8, 111:17, 112:2, 112:11, 112:17, 116:18
**dozen** [4] - 104:2, 110:16, 110:17, 110:18
**Dr** [85] - 4:11, 4:24, 4:25, 5:8, 5:22, 11:6, 11:25, 15:2, 19:13, 20:4, 20:7, 20:11, 20:13, 20:22, 21:1, 21:4, 21:7, 21:20, 51:4, 51:9, 56:11, 56:20, 56:24, 57:8, 57:15, 57:16, 58:3, 58:10, 59:9, 63:9, 65:5, 65:24, 70:6, 70:9, 73:20, 74:9, 74:16, 74:18, 74:23, 75:5, 75:11, 76:7, 76:8, 78:17, 79:1, 80:20, 80:23, 81:5, 81:13, 81:18, 82:1, 82:4, 82:15, 83:6, 83:8, 83:15, 83:19, 84:2, 84:4, 84:19, 85:3, 86:4, 87:20, 88:5, 88:8, 88:13, 91:25, 95:22, 96:6, 100:4, 112:23, 112:25, 113:2, 113:3, 113:10, 113:16, 113:20, 113:22, 114:5, 115:19
**DR** [4] - 3:5, 3:9, 5:14, 88:2
**drain** [1] - 94:17
**drank** [1] - 14:14
**draw** [1] - 26:2
**drawn** [2] - 48:3, 79:24
**driving** [1] - 13:24
**drop** [9] - 13:22, 19:14, 19:23, 19:25, 20:2, 29:3, 42:23, 62:14, 69:3
**dropping** [1] - 13:11
**drops** [4] - 28:23,

34:5, 35:24, 64:4
**drug** [1] - 90:5
**drugs** [4] - 20:5, 20:7, 25:16, 113:19
**due** [1] - 4:23
**during** [14] - 33:6, 54:17, 65:6, 73:15, 74:24, 75:7, 75:18, 79:2, 86:20, 87:2, 102:3, 102:17, 106:7, 106:15
**dying** [11] - 12:23, 15:21, 18:13, 22:4, 32:9, 101:11, 103:1, 103:14, 106:9, 108:6, 112:17
**dysfunction** [1] - 12:5

## E

**EASTERN** [1] - 1:3
**easy** [1] - 34:11
**EDCV** [2] - 4:4, 73:24
**eDCV** [1] - 1:10
**editing** [1] - 101:5
**education** [1] - 9:2
**educational** [2] - 6:7, 89:1
**effect** [13] - 23:21, 27:8, 29:16, 29:17, 44:14, 54:4, 59:19, 67:23, 83:19, 103:20, 104:4, 104:17
**effects** [20] - 8:1, 8:10, 8:11, 9:4, 9:6, 16:5, 22:25, 23:2, 23:19, 30:25, 44:3, 46:7, 48:8, 49:7, 49:21, 80:5, 90:5, 96:1, 103:17, 103:24
**eight** [2] - 13:23, 69:11
**either** [13] - 13:4, 24:11, 41:23, 51:11, 51:21, 52:9, 55:1, 93:22, 97:6, 102:17, 102:24, 103:12, 105:11
**El** [1] - 7:8
**elaborating** [1] - 39:3
**electrical** [2] - 95:25, 104:5
**electricity** [5] - 79:18, 79:23, 103:20, 103:25, 104:12
**electrolyte** [1] - 98:24
**electromechanical** [1] - 98:15
**electronic** [1] - 7:24

**element** [1] - 26:17
**elements** [2] - 12:14, 26:10
**elevated** [1] - 67:17
**eliminated** [1] - 12:10
**elk** [1] - 72:14
**emergency** [23] - 6:3, 6:4, 6:10, 6:14, 6:15, 6:22, 7:1, 7:6, 7:7, 7:14, 7:16, 7:22, 7:23, 8:7, 36:14, 41:25, 44:11, 48:20, 52:12, 52:15, 59:1
**emphysema** [3] - 27:19, 69:20, 69:23
**encountering** [1] - 57:20
**encouraged** [1] - 67:7
**encouraging** [1] - 67:4
**end** [13] - 34:19, 34:23, 35:2, 35:6, 35:19, 36:2, 36:12, 36:17, 36:19, 37:10, 37:13, 38:18, 39:5
**end-tidal** [13] - 34:19, 34:23, 35:2, 35:6, 35:19, 36:2, 36:12, 36:17, 36:19, 37:10, 37:13, 38:18, 39:5
**ended** [3] - 61:16, 106:9, 112:17
**energy** [1] - 54:3
**enforcement** [14] - 7:25, 10:18, 21:17, 21:24, 30:1, 31:5, 97:15, 107:12, 107:19, 109:8, 109:21, 109:24, 112:11, 112:16
**engage** [1] - 86:13
**engaged** [1] - 75:16
**engaging** [2] - 47:9, 47:11
**enrollees** [1] - 61:18
**entire** [1] - 100:25
**entities** [1] - 21:20
**ENTITLED** [1] - 118:10
**entity** [1] - 95:18
**environment** [10] - 12:9, 12:10, 12:15, 12:17, 12:21, 13:7, 14:21, 26:12, 35:1, 35:23
**environmental** [1] - 12:20
**epidemiologic** [4] - 22:23, 23:4, 50:3, 75:2

**epidemiological** [15] - 23:14, 29:23, 30:8, 30:11, 30:14, 30:17, 30:20, 30:24, 31:14, 31:19, 31:23, 32:5, 74:14, 79:6, 79:7
**epidemiology** [4] - 22:15, 22:21, 23:10, 23:18
**Episcopal** [1] - 89:6
**equiv** [1] - 35:3
**Eric** [1] - 11:16
**espouse** [1] - 21:20
**essentially** [1] - 70:16
**estimate** [4] - 110:20, 110:21, 111:9, 116:20
**et** [2] - 4:5, 73:25
**evaluate** [10] - 10:12, 10:15, 23:15, 23:19, 49:8, 49:19, 53:1, 92:15, 92:19, 104:4
**evaluated** [2] - 103:23, 103:24
**evaluating** [1] - 49:18
**evaluation** [3] - 20:8, 50:15, 76:23
**event** [1] - 103:16
**events** [2] - 37:22, 102:14
**eventually** [1] - 56:16
**evidence** [63] - 10:9, 16:13, 16:19, 17:22, 18:16, 18:25, 19:1, 22:7, 27:8, 33:1, 33:2, 33:5, 33:8, 33:11, 33:16, 39:24, 40:4, 42:3, 42:16, 43:8, 43:9, 43:12, 43:19, 44:23, 45:8, 45:12, 45:16, 46:19, 50:6, 50:7, 50:11, 50:15, 60:5, 69:15, 77:7, 79:9, 81:17, 81:20, 82:8, 82:21, 82:22, 82:23, 83:1, 86:17, 92:11, 93:13, 93:17, 93:18, 93:22, 93:24, 95:15, 96:11, 102:23, 103:3, 103:6, 103:11, 104:19, 105:4, 105:7, 105:9, 105:10, 115:19
**evidentiary** [1] - 81:25
**exact** [7] - 21:6, 52:1, 52:4, 59:19, 68:16, 75:8, 78:21
**exactly** [3] - 48:4, 86:1, 110:7

**exam** [1] - 18:24
**EXAMINATION** [12] - 3:6, 3:6, 3:7, 3:7, 3:9, 3:10, 5:20, 51:2, 76:20, 85:1, 88:6, 105:19
**examination** [4] - 4:22, 61:8, 92:24, 93:7
**examiner** [8] - 11:9, 57:19, 75:5, 88:19, 88:20, 91:24, 92:19, 106:1
**Examiners** [1] - 89:22
**examining** [2] - 61:7, 63:22
**example** [4] - 13:24, 106:25, 112:23, 115:16
**excess** [2] - 28:10, 62:21
**exchange** [2] - 26:13, 35:4
**exchanged** [1] - 12:21
**exchanges** [1] - 35:1
**excited** [10] - 59:20, 95:18, 99:4, 99:14, 99:15, 99:18, 99:19, 100:1, 107:13, 107:17
**exclude** [4] - 18:2, 39:2, 50:16, 104:25
**excluded** [2] - 38:11, 96:2
**excluding** [1] - 36:3
**exclusive** [1] - 111:4
**excursion** [1] - 58:21
**excuse** [4] - 25:15, 29:9, 41:2, 79:17
**excused** [1] - 87:12
**exercise** [4] - 24:10, 24:12, 24:14, 62:3
**exercised** [4] - 19:13, 19:14, 24:1, 24:9
**exercising** [2] - 19:22, 25:2
**exertion** [6] - 57:13, 96:1, 100:5, 100:13, 100:17, 101:2
**exhale** [2] - 12:22, 34:24
**exhaled** [1] - 35:13
**Exhibit** [2] - 41:1, 53:13
**exhibiting** [1] - 97:8
**expand** [3] - 16:1, 17:9, 17:13
**expect** [6] - 12:24, 12:25, 53:3, 62:14, 77:2, 80:13

**experience** [9] - 9:3, 9:6, 22:20, 27:7, 44:14, 48:24, 59:3, 94:11
**experienced** [1] - 72:21
**experiencing** [1] - 48:25
**experimental** [1] - 104:3
**experiments** [1] - 26:23
**expert** [10] - 8:22, 11:3, 90:16, 100:3, 108:24, 109:3, 110:5, 110:13, 111:7, 113:10
**expertise** [1] - 52:21
**experts** [10] - 11:1, 11:22, 11:24, 76:7, 92:3, 92:7, 92:9, 108:9, 108:16, 112:20
**explain** [3] - 38:2, 79:22, 96:17
**explore** [1] - 29:16
**exposure** [1] - 80:6
**extensive** [1] - 100:17
**extrude** [1] - 12:18

## F

**facedown** [1] - 90:4
**fact** [11] - 24:12, 36:7, 57:24, 58:24, 58:25, 67:10, 74:23, 98:4, 112:15, 112:19, 114:4
**factor** [5] - 38:11, 115:8, 115:11, 115:15, 115:25
**factors** [3] - 59:4, 80:3, 80:10
**facts** [6] - 32:18, 32:20, 32:23, 69:15, 86:17, 115:18
**faculty** [1] - 6:12
**fair** [9] - 6:21, 50:6, 92:11, 106:4, 107:10, 108:18, 109:17, 111:4, 111:9
**Fair** [2] - 2:7, 92:6
**fairly** [1] - 96:22
**Fajardo** [5] - 11:10, 91:25, 95:22, 96:6, 115:19
**fall** [2] - 55:2, 107:16
**familiar** [17] - 14:4, 15:2, 17:6, 19:7, 22:15, 34:19, 44:2,

44:10, 46:23, 48:21, 67:25, 70:8, 74:23, 94:3, 101:7, 103:17, 103:20
**fan** [1] - 18:5
**far** [4] - 6:25, 96:8, 104:1, 112:6
**fashion** [1] - 98:1
**fast** [3] - 28:13, 61:25, 101:15
**faster** [3] - 13:11, 44:20, 44:21
**FCRR** [2] - 1:21, 118:20
**FEDERAL** [2] - 118:4, 118:21
**federal** [1] - 1:22
**fees** [1] - 9:19
**feet** [3] - 61:5, 62:10, 63:22
**female** [1] - 66:1
**few** [7] - 8:9, 8:18, 35:15, 38:22, 106:3, 106:7, 113:4
**fib** [3] - 48:25, 49:12, 49:20
**field** [4] - 18:8, 22:21, 89:7, 89:17
**fight** [2] - 47:5, 47:16
**figure** [1] - 92:20
**filled** [2] - 27:11, 34:11
**finally** [1] - 101:24
**findings** [6] - 20:11, 40:6, 81:18, 81:21, 82:1, 93:23
**fine** [10] - 4:13, 28:5, 28:17, 28:23, 29:5, 36:9, 37:20, 63:6, 64:15, 83:11
**finger** [4] - 42:1, 42:2, 42:4, 42:5
**fingertip** [1] - 42:8
**finish** [1] - 63:1
**finished** [1] - 7:14
**firm** [3] - 71:11, 71:14, 71:17
**first** [18] - 8:15, 13:9, 13:14, 18:24, 19:22, 24:13, 27:15, 35:13, 35:15, 36:19, 36:23, 41:23, 53:2, 53:3, 53:6, 60:11, 92:20, 107:2
**fit** [1] - 101:18
**fitness** [2] - 63:3, 63:4
**five** [16] - 18:7, 28:14, 31:13, 36:24, 52:2, 75:16, 80:1, 80:2, 90:10, 104:10, 104:13, 110:18,

110:22, 110:23, 111:2, 111:21
**five-second** [1] - 80:1
**flail** [3] - 17:6, 17:16, 17:18
**flat** [1] - 64:25
**flight** [2] - 47:5, 47:16
**flipped** [5] - 36:24, 37:10, 38:10, 102:7, 102:21
**Florida** [1] - 109:12
**flow** [5] - 7:24, 38:6, 42:4, 42:11, 95:4
**flowing** [4] - 16:14, 16:16, 16:18, 19:2
**flows** [1] - 38:4
**fluids** [1] - 33:9
**focused** [1] - 27:9
**folks** [2] - 15:13, 15:18
**follow** [3] - 92:17, 92:18
**followed** [2] - 30:3, 93:2
**following** [1] - 89:6
**follows** [2] - 38:15, 82:11
**football** [3] - 18:5, 18:7, 18:11
**FOR** [2] - 118:5
**force** [14] - 13:5, 15:20, 16:9, 17:1, 19:6, 26:14, 26:17, 34:6, 50:8, 54:16, 61:12, 63:23, 65:6, 66:3
**FOREGOING** [1] - 118:8
**foreign** [2] - 78:9, 78:12
**Forensic** [1] - 89:23
**forensic** [20] - 8:8, 8:9, 16:7, 57:21, 88:17, 89:9, 89:11, 90:3, 90:14, 90:17, 92:12, 92:16, 93:14, 96:24, 97:23, 103:23, 107:3, 107:4, 107:6, 116:7
**forget** [1] - 19:19
**form** [9] - 9:17, 27:3, 79:19, 80:21, 81:12, 92:12, 93:14, 99:4
**FORMAT** [1] - 118:10
**formed** [2] - 10:7, 10:9
**forming** [4] - 10:12, 10:15, 48:7, 99:22
**forth** [1] - 17:14
**forward** [3] - 79:8, 102:1, 102:3
**four** [15] - 36:24,

38:10, 52:2, 52:4, 52:7, 60:16, 62:3, 80:17, 89:6, 90:10, 107:2, 110:23, 112:9, 112:18, 112:19
**fracture** [1] - 54:16
**fractures** [1] - 43:15
**Francisco** [1] - 6:10
**frequent** [1] - 21:17
**front** [15] - 8:19, 53:10, 63:25, 65:14, 66:6, 67:21, 68:11, 68:15, 69:5, 69:9, 69:18, 70:11, 70:15, 71:15, 86:8
**full** [5] - 5:15, 34:10, 64:15, 68:21, 88:3
**function** [13] - 9:7, 26:20, 27:14, 28:21, 33:22, 33:24, 47:16, 60:19, 60:23, 61:19, 65:7, 77:21, 77:22
**functional** [1] - 69:24
**functioning** [2] - 42:21, 43:10

## G

**G-R-A-H-A-M** [1] - 88:5
**Galipo** [4] - 4:8, 72:16, 74:3, 105:17
**GALIPO** [24] - 2:4, 2:4, 3:10, 4:8, 4:14, 73:7, 100:8, 100:22, 103:2, 105:18, 105:20, 108:15, 113:5, 113:8, 113:9, 114:3, 114:20, 114:23, 114:24, 115:23, 116:10, 116:19, 116:23, 116:25
**Garlick** [1] - 71:22
**Gary** [1] - 54:15
**gases** [1] - 67:14
**general** [9] - 7:22, 39:20, 39:23, 39:24, 44:14, 89:7, 100:17, 107:3, 110:19
**generally** [10] - 7:20, 9:11, 9:25, 13:19, 20:11, 47:8, 90:23, 91:9, 94:16, 111:9
**generate** [2] - 15:19, 16:9
**generating** [1] - 13:5
**gentlemen** [4] - 4:19, 5:23, 73:14, 116:12

**given** [1] - 93:9
**God** [2] - 5:12, 87:25
**Gomez** [3] - 11:13, 91:14, 91:18
**Gonzalez** [1] - 72:3
**Graham** [7] - 4:25, 11:25, 76:8, 87:21, 88:5, 88:8, 88:13
**GRAHAM** [2] - 3:9, 88:2
**great** [2] - 95:2, 114:19
**ground** [1] - 85:25
**group** [4] - 31:9, 47:1, 67:24, 68:17
**grove** [1] - 72:15
**guess** [4] - 53:6, 92:20, 96:20, 97:11
**gut** [1] - 34:13
**guts** [2] - 34:11, 34:12
**guy** [1] - 65:18
**guys** [1] - 18:7
**gym** [1] - 56:7

## H

**Hagood** [2] - 72:12, 75:22
**half** [6] - 28:12, 28:20, 28:21, 110:16, 110:17
**Hall** [1] - 74:16
**Hall's** [1] - 74:16
**hand** [8] - 5:9, 27:10, 42:12, 43:8, 87:22, 97:4, 97:13, 109:14
**handcuffed** [12] - 19:17, 25:12, 30:15, 52:5, 55:19, 62:10, 63:21, 64:7, 65:12, 65:20, 68:9, 86:7
**handcuffed-behind-their-back** [1] - 65:12
**handcuffing** [3] - 86:9, 86:12, 86:21
**handcuffs** [8] - 46:21, 51:15, 51:17, 51:24, 52:2, 54:10, 61:5, 85:17
**handprint** [6] - 41:12, 41:14, 41:17, 42:9, 43:2, 43:7
**hands** [4] - 27:25, 97:15, 97:24, 116:6
**handy** [1] - 114:15
**hard** [6] - 28:13, 61:25, 67:7, 67:12, 69:10, 69:25
**head** [9] - 8:13, 16:16, 33:12, 94:16, 94:17,

94:18, 94:25, 95:8, 109:18
**health** [1] - 56:23
**healthy** [3] - 19:13, 19:24, 62:2
**hear** [3] - 76:8, 78:8, 87:2
**heard** [1] - 76:7
**hearing** [1] - 100:25
**hears** [1] - 99:11
**hearsay** [5] - 46:14, 81:2, 81:9, 82:5, 82:13
**heart** [14] - 16:11, 19:15, 19:22, 24:13, 25:25, 26:2, 42:7, 42:20, 43:9, 44:20, 48:22, 95:4, 99:1, 99:12
**HELD** [1] - 118:9
**held** [14] - 6:25, 7:3, 7:10, 13:24, 107:23, 108:3, 108:6, 109:23, 109:25, 110:14, 111:17, 112:2, 112:16
**Helm** [2] - 4:9, 74:4
**HELM** [2] - 2:9, 2:9
**help** [4] - 5:12, 87:3, 87:6, 87:25
**hemoglobin** [4] - 13:12, 19:24, 42:24, 43:3
**hence** [2] - 58:11, 58:14
**HEREBY** [1] - 118:6
**high** [6] - 13:13, 13:17, 37:19, 38:19, 44:13, 48:12
**Highway** [1] - 72:3
**Hills** [1] - 2:5
**historical** [2] - 19:7, 19:10
**history** [4] - 6:9, 27:18, 61:1, 92:23
**hobble** [3] - 19:16, 20:15, 84:20
**hobbled** [2] - 24:2, 64:1
**hog** [2] - 58:5, 58:11
**hog-tied** [2] - 58:5, 58:11
**hold** [4] - 6:7, 13:25, 21:5, 88:18
**holding** [3] - 86:13, 111:8, 112:11
**home** [1] - 69:23
**homicide** [6] - 96:15, 96:23, 97:2, 97:16, 97:22

**homicides** [1] - 97:18
**honest** [1] - 78:21
**Honor** [45] - 4:8, 4:10, 4:15, 4:23, 5:7, 5:19, 38:13, 39:14, 39:18, 40:11, 40:15, 43:25, 44:7, 45:1, 45:20, 45:25, 56:4, 62:24, 66:14, 66:15, 73:7, 73:9, 76:13, 76:19, 82:9, 82:12, 82:17, 83:5, 83:8, 83:12, 83:21, 87:8, 87:11, 87:14, 87:17, 87:18, 87:20, 88:10, 100:8, 101:3, 113:6, 113:24, 116:19, 117:1, 117:4
**HONORABLE** [1] - 1:5
**hopefully** [1] - 56:9
**hospital** [12] - 7:4, 7:5, 10:19, 35:17, 36:16, 36:17, 48:17, 57:3, 57:4, 57:6, 57:9, 107:3
**Hospital** [1] - 89:6
**hospital-type** [1] - 107:3
**hour** [2] - 9:21, 91:5
**hourly** [1] - 9:19
**hours** [1] - 76:6
**Houston** [1] - 89:7
**human** [8] - 9:4, 25:21, 25:24, 26:3, 56:19, 103:18, 103:21, 103:25
**hundreds** [1] - 90:20
**hyper** [2] - 44:19
**hyperventilate** [3] - 44:21, 56:25, 86:20
**hyperventilates** [1] - 56:19
**hyperventilating** [2] - 45:6, 86:23
**hypoxia** [9] - 20:1, 39:24, 59:25, 60:3, 60:5, 77:5, 77:6, 77:7, 78:14

---

**I**

**idea** [3] - 21:21, 84:16, 93:25
**identified** [2] - 60:1, 60:3
**identifying** [1] - 48:22
**imagine** [2] - 24:15, 69:22
**immediately** [1] - 104:15

**impact** [2] - 26:15, 27:1
**impacts** [1] - 8:23
**impair** [3] - 77:24, 78:1, 78:2
**impaired** [4] - 31:20, 33:13, 47:14, 50:8
**impairment** [2] - 29:7, 33:18
**imply** [1] - 22:3
**important** [2] - 42:18, 42:22
**importantly** [3] - 28:5, 29:4, 78:2
**imprinted** [1] - 42:13
**improve** [2] - 64:19, 64:25
**IN** [3] - 118:5, 118:9, 118:10
**inability** [3] - 12:4, 43:6, 43:8
**incident** [10] - 10:3, 10:17, 10:20, 10:25, 11:15, 11:18, 33:6, 40:24, 91:13, 101:23
**include** [25] - 9:3, 9:6, 10:21, 11:2, 11:5, 11:8, 11:12, 11:15, 11:18, 25:8, 25:11, 25:14, 47:11, 58:16, 58:17, 91:13, 91:17, 91:20, 91:23, 92:2, 92:6, 92:24, 98:11, 109:2, 116:2
**included** [3] - 27:2, 31:5, 115:6
**including** [9] - 9:13, 10:2, 10:17, 10:18, 27:17, 30:2, 67:24, 81:23, 89:1
**increase** [5] - 44:21, 46:16, 47:5, 47:13, 47:15
**increased** [2] - 40:5, 47:24
**indicate** [3] - 22:3, 78:4, 115:6
**indicated** [9] - 31:1, 33:2, 33:11, 33:16, 36:8, 45:17, 84:5, 102:10, 106:3
**indicates** [1] - 21:13
**indicating** [2] - 28:15, 28:16
**indicative** [2] - 57:7, 57:9
**indicator** [4] - 28:6, 36:5, 52:24, 98:18
**individual** [1] - 17:23
**Individually** [1] - 1:7

**individuals** [9] - 10:25, 14:8, 14:13, 15:10, 15:16, 22:10, 24:1, 58:11, 58:14
**induced** [1] - 59:22
**influence** [3] - 20:5, 25:16, 58:20
**information** [4] - 29:25, 90:24, 92:11, 92:25
**inherently** [1] - 32:9
**initial** [3] - 15:5, 26:25, 59:2
**injured** [1] - 54:25
**injuries** [6] - 16:5, 17:17, 17:24, 17:25, 18:1, 107:16
**injury** [2] - 40:7, 55:3
**inside** [1] - 95:3
**intend** [1] - 83:6
**intense** [2] - 55:5, 55:10
**interactions** [1] - 21:17
**interest** [1] - 1:7
**interested** [1] - 26:15
**interesting** [1] - 29:1
**interface** [2] - 7:25, 12:16
**interfere** [1] - 33:24
**internal** [1] - 43:22
**interpreting** [1] - 48:21
**interrupting** [1] - 113:23
**intoxicated** [1] - 25:16
**intoxication** [1] - 97:9
**intraabdominal** [1] - 40:6
**intrathoracic** [1] - 40:5
**intubate** [1] - 38:8
**investigation** [1] - 93:6
**investigators** [1] - 81:23
**invite** [1] - 58:3
**involuntary** [1] - 55:5
**involve** [9] - 20:4, 23:6, 23:10, 30:8, 30:11, 30:14, 30:17, 30:20, 75:17
**involved** [9] - 7:21, 10:25, 11:12, 73:3, 75:20, 97:14, 99:20, 107:11, 107:12
**involvement** [1] - 86:1
**involves** [1] - 21:17
**irreconcilable** [1] - 100:20

**irregular** [2] - 101:10, 101:19
**irrelevant** [1] - 97:4
**IS** [2] - 118:8, 118:10
**isolate** [1] - 25:21
**issue** [13] - 8:22, 19:7, 20:18, 22:25, 24:25, 26:9, 32:6, 90:17, 99:18, 108:5, 108:7, 108:10, 111:25
**issues** [4] - 4:24, 5:3, 75:17, 116:15
**it'd** [2] - 8:13, 89:15
**itself** [4] - 22:14, 26:3, 84:20, 104:24

---

**J**

**Jeffrey** [1] - 11:3
**JESUS** [1] - 1:5
**job** [1] - 7:11
**JOHN** [2] - 2:6, 2:7
**John** [2] - 4:9, 74:3
**jolt** [1] - 80:1
**journal** [2] - 8:7, 59:1
**Journal** [2] - 8:8, 8:9
**journals** [1] - 8:6
**JUDGE** [1] - 1:5
**JUDICIAL** [1] - 118:11
**jugular** [1] - 94:23
**July** [1] - 20:10
**jurisdictions** [1] - 88:21
**jury** [9] - 4:3, 5:24, 54:7, 60:8, 70:15, 73:19, 73:22, 88:25, 116:17
**Jury** [1] - 1:11
**JURY** [1] - 1:15
**Justice** [1] - 72:3

---

**K**

**Kathryn** [1] - 11:16
**Keeney** [2] - 11:13, 91:18
**keep** [9] - 21:23, 50:22, 56:18, 56:19, 67:13, 73:15, 107:21, 110:19, 116:13
**keeping** [1] - 63:6
**Kennedy** [2] - 4:9, 74:4
**KENNEDY** [1] - 2:9
**Kern** [3] - 71:22, 72:11, 72:12
**Kevin** [1] - 93:3
**KEVIN** [1] - 1:7
**key** [2] - 63:6, 68:24

**kidneys** [1] - 56:16
**kill** [1] - 95:20
**kills** [1] - 99:9
**kind** [15] - 16:5, 22:6, 43:13, 47:4, 55:11, 79:10, 82:24, 96:20, 97:6, 97:10, 97:19, 99:5, 101:15, 107:3, 107:14
**kinds** [1] - 7:20
**Kingdom** [2] - 68:17, 69:2
**knee** [4] - 27:10, 86:12, 97:24, 101:24
**known** [4] - 17:16, 19:16, 48:15, 88:13
**Kode** [3] - 11:25, 76:7, 112:23

## L

**lab** [19] - 11:9, 23:6, 23:17, 23:18, 23:22, 24:8, 24:16, 25:1, 25:8, 25:11, 25:14, 25:18, 25:19, 26:5, 26:19, 27:13, 32:1, 32:4, 57:6
**lab-based** [3] - 24:8, 24:16, 25:1
**lab-style** [1] - 23:6
**labeled** [1] - 97:22
**laboratory** [4] - 50:2, 79:8, 80:24, 92:24
**lack** [3] - 23:21, 34:10, 47:3
**lacking** [1] - 92:13
**lactate** [6] - 55:17, 56:12, 56:14, 56:17, 57:3, 57:14
**lactic** [4] - 55:11, 55:12, 55:17, 56:8
**ladies** [4] - 4:19, 5:23, 73:14, 116:12
**Landeros** [1] - 72:15
**large** [1] - 98:25
**larger** [1] - 22:18
**Lassoff** [1] - 74:18
**last** [11] - 5:16, 6:11, 8:17, 8:18, 40:13, 46:20, 70:14, 88:4, 101:24, 111:2
**lasting** [3] - 80:5, 80:7, 104:17
**lateral** [2] - 16:24, 17:2
**law** [16] - 7:25, 10:18, 21:17, 21:24, 30:1, 31:5, 90:16, 97:3, 97:15, 107:12,

107:19, 109:7, 109:21, 109:23, 112:10, 112:16
**LAW** [3] - 2:4, 2:6, 2:9
**lay** [7] - 20:21, 27:21, 27:22, 28:25, 29:1, 29:2
**laying** [4] - 27:17, 34:17
**lead** [6] - 20:24, 49:22, 65:17, 67:24, 68:18, 79:19
**leading** [2] - 59:25, 99:15
**leads** [1] - 59:3
**learn** [3] - 73:17, 116:14, 116:15
**learned** [1] - 25:23
**least** [13] - 46:22, 51:17, 57:1, 72:21, 75:16, 76:4, 85:3, 89:14, 94:24, 107:19, 110:2, 111:21, 115:16
**left** [2] - 116:22, 116:24
**length** [1] - 51:25
**less** [6] - 32:14, 35:23, 42:6, 80:10, 110:16, 110:17
**lethal** [1] - 114:10
**letter** [3] - 10:4, 58:25, 59:12
**level** [24] - 13:10, 13:11, 14:1, 19:23, 19:25, 20:2, 35:3, 35:21, 35:24, 38:8, 38:9, 48:2, 56:15, 56:20, 57:2, 57:4, 57:5, 57:10, 89:14, 114:5, 114:6, 114:9
**levels** [29] - 13:12, 13:15, 13:16, 13:22, 19:18, 20:2, 23:24, 23:25, 28:4, 28:6, 28:7, 36:7, 36:12, 37:19, 39:2, 39:10, 39:22, 39:24, 40:3, 42:23, 48:13, 55:23, 55:24, 65:21, 77:6, 84:6, 84:14, 84:15, 114:8
**LEWIS** [1] - 2:15
**licensed** [2] - 6:17, 88:23
**licenses** [1] - 6:7
**lie** [1] - 64:8
**Lieutenant** [2] - 4:22, 4:25
**life** [3] - 50:2, 52:18,

56:20
**life-sustaining** [1] - 56:20
**life-threatening** [1] - 50:2
**lift** [1] - 56:7
**light** [1] - 10:7
**likely** [1] - 32:12
**limit** [1] - 83:10
**limits** [1] - 67:20
**line** [1] - 38:3
**lines** [1] - 102:16
**Lisa** [1] - 60:7
**list** [1] - 10:24
**lists** [1] - 95:22
**liter** [1] - 28:12
**literature** [13] - 14:8, 15:9, 16:3, 16:4, 16:7, 17:21, 22:8, 22:13, 70:8, 79:3, 82:14, 82:18, 82:19
**liters** [2] - 28:14, 61:22
**litigated** [1] - 70:17
**liver** [1] - 56:16
**living** [1] - 49:14
**LLP** [1] - 2:15
**logic** [1] - 97:11
**long-lasting** [2] - 80:5, 80:7
**look** [11] - 19:5, 25:22, 36:13, 53:22, 61:17, 92:23, 92:24, 97:13, 101:20, 102:9
**looked** [7] - 14:18, 31:2, 31:6, 74:15, 75:6, 102:9, 102:18
**looking** [10] - 7:23, 8:1, 19:5, 19:12, 23:4, 24:25, 26:9, 44:25, 48:9, 52:11
**looks** [3] - 14:9, 45:5, 94:9
**Los** [2] - 2:17, 72:7
**lose** [1] - 55:6
**loss** [2] - 62:16, 98:25
**Louis** [5] - 88:19, 88:22, 89:3, 89:5, 89:8
**low** [12] - 28:8, 35:14, 36:7, 37:13, 37:14, 38:8, 38:10, 38:19, 42:15, 56:18, 77:6
**lower** [1] - 86:14
**Luke's** [1] - 89:6
**lunch** [6] - 113:5, 114:23, 116:10, 116:12, 116:16, 117:5
**lung** [23] - 12:15,

12:16, 17:25, 27:23, 28:2, 28:19, 28:20, 28:21, 28:22, 28:24, 29:3, 62:12, 63:4, 64:2, 65:16, 66:7, 69:21, 77:20, 77:22, 84:15
**lungs** [35] - 12:20, 13:7, 14:21, 15:20, 16:2, 16:21, 24:5, 26:12, 26:13, 26:18, 27:21, 27:24, 33:22, 33:23, 34:4, 34:24, 35:2, 35:4, 38:4, 38:6, 38:7, 43:22, 56:14, 56:15, 61:23, 62:1, 62:9, 62:18, 63:17, 63:19, 64:5, 69:24, 84:18, 85:9, 99:12
**lying** [2] - 64:10, 69:13

## M

**major** [1] - 60:1
**majority** [3] - 107:23, 108:2, 110:2
**man** [3] - 18:11, 101:21, 110:7
**maneuver** [2] - 60:1, 115:17
**maneuver'** [1] - 115:8
**maneuvers** [2] - 95:24, 116:1
**manifestation** [1] - 95:17
**manner** [2] - 96:14, 116:3
**manual** [1] - 94:21
**mark** [4] - 11:9, 41:2, 41:11, 91:25
**markedly** [1] - 97:7
**material** [1] - 100:20
**materials** [2] - 9:12, 10:2
**math** [4] - 106:21, 107:1, 107:9, 110:24
**MATTER** [1] - 118:10
**max** [1] - 107:15
**maximal** [1] - 61:20
**maximum** [2] - 60:22, 65:22
**MD** [1] - 89:5
**mean** [39] - 12:7, 13:21, 14:2, 17:2, 20:21, 24:9, 24:21, 45:2, 53:6, 54:22, 54:25, 64:9, 80:1, 80:7, 84:12, 87:6, 89:14, 92:8, 93:7,

94:13, 95:16, 96:7, 97:3, 97:14, 97:23, 98:3, 99:7, 99:24, 100:25, 101:13, 104:1, 106:11, 107:13, 107:21, 109:4, 110:19, 115:14, 115:21, 115:24
**means** [4] - 47:23, 61:22, 84:13, 96:24
**meant** [1] - 20:22
**Mears** [1] - 72:7
**measure** [15] - 23:23, 23:24, 26:1, 27:18, 27:20, 34:25, 35:2, 35:5, 35:12, 35:19, 38:8, 63:18, 67:6, 77:21
**measured** [15] - 24:17, 35:21, 37:10, 38:1, 38:9, 55:22, 61:19, 61:22, 65:19, 79:24, 80:2, 84:6, 84:7, 84:14, 98:12
**measurement** [2] - 36:19, 85:7
**measurements** [9] - 24:3, 35:13, 36:17, 37:13, 60:19, 64:5, 65:10, 68:10, 85:4
**measures** [3] - 63:16, 77:21, 113:19
**measuring** [2] - 35:18, 67:15
**mechanical** [1] - 26:14
**mechanically** [1] - 12:11
**mechanism** [2] - 12:18, 13:4
**mechanisms** [1] - 12:19
**Medical** [2] - 88:22, 89:22
**medical** [67] - 6:9, 6:24, 7:1, 7:15, 7:18, 7:20, 7:24, 8:10, 8:11, 10:10, 10:18, 11:9, 16:4, 20:12, 21:8, 21:12, 21:16, 21:19, 22:7, 22:18, 22:20, 22:24, 30:4, 32:10, 39:4, 39:6, 39:20, 40:5, 41:20, 44:2, 49:18, 50:16, 52:11, 52:14, 52:19, 52:21, 53:7, 57:19, 75:5, 76:22, 76:23, 77:16, 79:9, 80:16,

82:23, 83:1, 83:6, 83:16, 88:19, 88:20, 89:1, 89:4, 89:24, 90:7, 91:24, 92:19, 98:9, 103:7, 106:1, 108:7, 108:9, 108:16, 113:10, 113:18
**medically** [1] - 53:1
**Medicine** [1] - 8:8
**medicine** [15] - 6:3, 6:4, 6:11, 6:14, 6:15, 6:22, 7:14, 7:22, 8:7, 8:8, 25:23, 28:18, 59:1, 63:16, 89:13
**meeting** [1] - 76:5
**meetings** [2] - 76:6, 76:10
**member** [1] - 89:16
**mental** [3] - 14:14, 14:23, 15:17
**mention** [1] - 38:18
**mentioned** [17] - 4:23, 14:20, 19:1, 19:23, 26:10, 27:16, 34:25, 36:5, 38:21, 58:23, 64:1, 79:3, 81:24, 89:12, 105:9, 109:17, 109:18
**Meredith** [2] - 69:7, 69:9
**metabolic** [12] - 47:18, 47:23, 47:24, 48:10, 48:11, 48:18, 55:19, 56:6, 57:5, 57:7, 80:9, 80:15
**metabolically** [1] - 56:13
**metabolism** [1] - 55:16
**metal** [1] - 27:11
**metal-filled** [1] - 27:11
**meter** [1] - 35:24
**meth** [3] - 113:21, 114:4, 114:5
**methamphetamine** [19] - 15:18, 25:16, 30:22, 44:3, 44:13, 44:15, 44:17, 44:24, 95:16, 95:17, 95:21, 99:3, 99:8, 99:9, 99:10, 99:14, 100:5, 100:13, 105:5
**methodology** [1] - 23:20
**Michael** [3] - 65:18, 87:20, 88:5
**MICHAEL** [2] - 3:9, 88:2
**Michalewicz** [2] -

65:18, 65:24
**mid** [1] - 58:4
**might** [5] - 21:21, 28:8, 49:21, 78:5, 102:18
**mildly** [1] - 19:15
**mind** [3] - 73:15, 86:6, 116:13
**minimal** [1] - 86:25
**minute** [12] - 24:14, 55:24, 61:23, 62:1, 62:18, 67:5, 67:11, 67:13, 76:8, 80:2, 86:3, 86:4
**minutes** [26] - 13:17, 13:23, 13:25, 35:15, 36:10, 36:11, 36:24, 37:10, 38:10, 46:22, 52:3, 52:4, 52:7, 60:16, 62:3, 73:18, 80:2, 80:10, 80:11, 80:12, 80:17, 85:14, 85:22, 86:6, 116:22, 116:24
**Mireles** [2] - 11:16, 91:21
**mischaracterizes** [1] - 100:9
**missing** [1] - 92:13
**Missouri** [4] - 88:20, 105:24, 106:1, 109:5
**misspoke** [2] - 75:21, 75:25
**misstates** [1] - 115:19
**mode** [1] - 54:3
**moderate** [2] - 24:12, 24:14
**moment** [12] - 22:2, 41:19, 43:25, 45:20, 50:22, 52:12, 76:13, 87:8, 101:3, 101:24, 102:20, 107:18
**moniker** [1] - 99:13
**monitor** [4] - 36:17, 48:21, 49:9, 52:22
**monitored** [1] - 49:9
**monitoring** [2] - 36:23, 49:14
**monitors** [1] - 26:2
**morning** [17] - 4:8, 4:15, 4:18, 4:19, 5:22, 5:23, 5:25, 51:1, 51:4, 51:5, 73:14, 74:5, 74:8, 88:8, 88:9, 105:21, 105:22
**most** [9] - 14:12, 26:15, 36:5, 63:5, 93:11, 102:9, 107:25, 108:4,

111:10
**mouth** [1] - 26:6
**move** [12] - 13:3, 17:11, 17:12, 17:15, 27:24, 28:14, 62:1, 62:8, 62:17, 63:17, 63:18, 64:5
**moving** [6] - 24:4, 27:20, 33:22, 52:5, 84:8, 85:9
**MP** [1] - 69:4
**MR** [156] - 3:6, 3:7, 3:7, 3:9, 3:10, 4:8, 4:14, 4:15, 4:23, 5:7, 5:19, 5:21, 5:23, 6:1, 37:3, 37:6, 38:13, 38:16, 38:24, 39:12, 39:14, 39:15, 39:18, 39:23, 40:11, 40:13, 40:19, 41:1, 41:3, 41:6, 41:9, 41:10, 43:25, 44:1, 44:6, 44:9, 45:1, 45:7, 45:20, 45:22, 45:25, 46:3, 46:10, 46:12, 46:15, 49:2, 49:6, 49:13, 49:16, 49:17, 49:23, 50:5, 50:21, 50:22, 50:25, 51:3, 51:6, 51:8, 54:18, 54:21, 56:1, 56:4, 56:5, 62:24, 63:8, 64:21, 64:23, 65:2, 65:4, 66:14, 66:15, 66:20, 69:15, 70:2, 73:6, 73:7, 73:9, 73:11, 74:3, 74:6, 74:12, 74:13, 76:13, 76:15, 76:19, 76:21, 77:9, 77:12, 81:2, 81:4, 81:8, 81:11, 81:14, 81:16, 82:5, 82:7, 82:9, 82:12, 82:17, 82:25, 83:2, 83:5, 83:8, 83:12, 83:14, 83:21, 83:23, 84:1, 84:11, 84:23, 85:2, 85:11, 85:13, 85:19, 85:23, 86:17, 87:1, 87:4, 87:8, 87:11, 87:14, 87:17, 87:18, 87:20, 88:7, 88:10, 88:12, 100:8, 100:11, 100:22, 101:3, 101:5, 101:6, 103:2, 103:5, 105:15, 105:18, 105:20, 108:11, 108:15, 113:5, 113:8, 113:9,

113:23, 114:3, 114:20, 114:23, 114:24, 115:18, 115:23, 116:10, 116:19, 116:23, 116:25, 117:1, 117:4
**multiple** [4] - 17:15, 18:10, 59:4, 80:14
**muscle** [8] - 34:4, 54:24, 55:1, 55:10, 55:11, 55:15, 79:18, 104:12
**muscles** [4] - 55:5, 55:7, 96:1, 104:11
**must** [2] - 60:1, 98:18
**MVV** [7] - 61:20, 61:22, 62:4, 62:5, 62:12, 65:23, 69:4

## N

**name** [7] - 5:16, 8:9, 15:2, 88:4, 112:6
**named** [4] - 65:18, 69:6, 71:13
**narcotics** [2] - 9:4, 9:7
**narrow** [1] - 96:22
**National** [1] - 89:22
**nature** [1] - 34:9
**near** [1] - 12:3
**necessarily** [2] - 63:3, 75:1
**neck** [4] - 14:17, 33:3, 33:13, 94:22
**need** [5] - 12:14, 12:16, 12:17, 87:3, 87:6
**needed** [1] - 92:12
**negative** [4] - 15:20, 16:9, 34:6, 49:21
**nerves** [1] - 104:11
**Neuman** [2] - 59:9, 65:5
**neurochemical** [1] - 47:4
**neurotransmitters** [1] - 47:1
**neutral** [2] - 20:16, 20:20
**never** [2] - 19:24, 68:22
**next** [8] - 4:11, 4:12, 71:24, 75:21, 75:22, 87:18, 114:9, 116:4
**NIEDZIALEK** [1] - 1:8
**Niedzialek** [29] - 33:9, 33:18, 35:7, 36:23, 43:12, 46:20, 48:18, 53:23, 54:4, 55:18, 64:17, 64:24, 70:4,

72:20, 77:8, 84:22, 85:18, 93:3, 93:15, 93:19, 97:24, 98:2, 98:9, 98:12, 98:18, 102:1, 102:11, 103:1, 103:14
**Niedzialek's** [25] - 18:17, 33:3, 36:2, 37:9, 40:1, 43:20, 44:24, 45:10, 45:13, 45:18, 46:17, 47:14, 48:2, 48:6, 50:8, 50:13, 50:17, 94:1, 95:11, 96:1, 96:4, 101:25, 104:6, 104:21, 105:12
**night** [1] - 64:15
**Noble** [1] - 11:3
**nobody** [3] - 28:24, 31:1, 108:19
**non** [1] - 27:16
**non-restrained** [1] - 27:16
**none** [6] - 14:25, 15:1, 20:9, 50:1, 68:22, 95:8
**norepinephrine** [1] - 47:3
**normal** [16] - 26:3, 28:8, 28:14, 35:14, 36:13, 37:11, 42:6, 47:20, 47:22, 48:4, 58:11, 58:14, 63:12, 67:20, 104:13, 104:14
**normally** [3] - 17:11, 47:21, 95:4
**North** [1] - 2:7
**north** [1] - 75:6
**nose** [1] - 26:6
**nothing** [2] - 5:12, 87:25
**notion** [2] - 21:9, 22:13
**number** [17] - 19:21, 22:22, 24:25, 31:4, 35:13, 35:20, 49:10, 61:3, 67:12, 68:16, 75:19, 80:3, 81:22, 96:19, 98:23, 110:22, 111:10
**Nunis** [1] - 71:18

## O

**O'Halloran** [4] - 75:5, 78:17, 78:25, 79:1
**O'Halloran's** [1] - 74:23
**Oakland** [1] - 2:10

**Oaks** [1] - 2:7
**oath** [1] - 74:9
**obese** [3] - 25:9, 29:21, 30:12
**obesity** [2] - 29:17, 29:19
**object** [4] - 37:3, 45:1, 100:22, 103:2
**objection** [15] - 44:6, 46:11, 46:12, 49:2, 49:13, 49:23, 64:21, 65:2, 77:9, 81:2, 81:8, 82:5, 83:21, 83:25, 84:1
**objections** [1] - 81:14
**objective** [1] - 93:23
**objectively** [1] - 12:24
**observe** [4] - 32:17, 32:20, 32:23, 101:25
**obstruct** [1] - 14:20
**obstructed** [2] - 13:6, 14:18
**obstruction** [4] - 21:11, 22:5, 31:21, 79:10
**obstructive** [1] - 69:20
**obtained** [1] - 6:24
**obtaining** [1] - 66:25
**obviously** [9] - 34:7, 35:22, 41:17, 42:10, 44:11, 69:19, 93:7, 106:25, 113:13
**occupation** [2] - 6:2, 88:16
**occur** [3] - 22:9, 37:23, 102:20
**occurred** [4] - 31:8, 39:7, 75:3, 79:2
**occurring** [1] - 79:3
**occurs** [2] - 37:23, 59:24
**OF** [10] - 1:2, 1:15, 2:4, 2:6, 118:1, 118:6, 118:8, 118:11, 118:15
**offered** [1] - 72:23
**OFFICE** [1] - 2:9
**office** [2] - 61:7, 76:2
**officers** [4] - 21:11, 53:25, 86:1, 98:5
**OFFICES** [2] - 2:4, 2:6
**OFFICIAL** [3] - 118:1, 118:4, 118:21
**Official** [1] - 1:22
**often** [4] - 18:7, 42:1, 94:21, 94:23
**once** [2] - 36:16, 66:24
**one** [66] - 8:17, 10:5, 13:4, 13:23, 14:10, 15:4, 15:24, 17:10,

17:11, 23:13, 25:6, 28:19, 28:20, 28:22, 31:7, 36:17, 38:10, 43:5, 50:3, 53:12, 54:15, 54:17, 59:4, 59:20, 59:24, 61:9, 61:11, 61:19, 61:23, 61:25, 62:8, 62:18, 65:19, 67:3, 67:5, 67:10, 68:19, 69:2, 71:24, 72:7, 72:8, 72:17, 72:24, 73:9, 76:1, 76:4, 76:13, 80:2, 80:12, 85:9, 85:14, 86:22, 90:6, 92:15, 94:14, 95:19, 96:25, 97:17, 98:23, 104:3, 109:16, 110:2, 111:17, 111:23, 112:1, 112:5
**one-third** [1] - 68:19
**ones** [4] - 31:14, 31:15, 109:15, 111:11
**open** [9] - 17:13, 73:15, 111:16, 111:22, 112:3, 112:6, 112:7, 116:13
**operations** [1] - 7:2
**opiates** [1] - 14:15
**opine** [1] - 104:20
**opinion** [29] - 9:14, 12:1, 38:20, 39:1, 39:9, 70:15, 72:23, 73:3, 78:24, 80:21, 82:15, 83:6, 90:25, 95:18, 99:2, 100:4, 100:7, 100:9, 100:13, 100:14, 100:19, 100:20, 100:21, 101:1, 102:25, 104:5, 113:21
**opinions** [21] - 10:4, 10:5, 10:7, 10:8, 10:12, 10:16, 35:10, 39:18, 48:7, 53:19, 80:20, 81:13, 82:23, 83:16, 83:19, 91:1, 92:13, 93:14, 99:23, 108:10, 108:13
**opposed** [2] - 27:10, 62:12
**opposite** [1] - 17:16
**order** [1] - 4:25
**original** [8] - 14:25, 15:15, 19:12, 20:17, 81:18, 81:19, 81:21, 82:1
**originally** [1] - 14:7

**others'** [1] - 90:6
**otherwise** [1] - 97:24
**outcome** [1] - 103:16
**outside** [1] - 96:20
**overdose** [3] - 113:21, 114:1, 114:4
**overruled** [15] - 37:5, 44:8, 45:3, 49:24, 54:19, 69:17, 77:10, 83:24, 84:3, 85:20, 86:18, 87:5, 100:24, 108:12, 115:20
**overseeing** [1] - 7:6
**own** [7] - 19:10, 77:16, 78:20, 79:6, 79:7, 80:13, 81:25
**oxygen** [39] - 12:8, 12:20, 13:11, 13:12, 13:16, 13:22, 14:2, 19:18, 19:23, 19:25, 20:2, 23:24, 24:6, 26:12, 28:4, 28:22, 33:14, 39:24, 40:3, 42:23, 42:25, 43:4, 46:16, 55:16, 62:14, 62:23, 67:1, 67:9, 67:16, 69:23, 77:6, 77:17, 77:19, 78:2, 84:6, 84:14
**oxygenate** [3] - 28:22, 29:4, 63:5
**oxygenated** [1] - 63:7
**oxygenating** [3] - 28:17, 37:11, 37:12
**oxygenation** [5] - 19:14, 38:25, 39:2, 39:10, 68:23

## P

**padded** [1] - 61:6
**PAGE** [2] - 3:3, 118:10
**page** [6] - 39:19, 53:20, 53:22, 58:4, 114:19
**pages** [1] - 38:22
**pale** [1] - 41:17
**paragraph** [2] - 53:22, 115:2
**paramedic** [4] - 10:18, 36:8, 60:8, 98:12
**paramedics** [7] - 35:11, 35:16, 36:11, 36:20, 36:23, 38:18, 53:7
**Parkes** [2] - 69:1, 69:5
**part** [22] - 7:11, 11:21, 17:15, 21:16, 39:5, 40:23, 42:22, 47:16, 53:19, 58:13, 66:11,

66:12, 66:21, 66:25, 67:3, 80:3, 96:7, 98:8, 111:1, 113:14, 114:21, 115:21
**partially** [1] - 80:23
**participants** [1] - 116:16
**participated** [2] - 7:18, 70:13
**particular** [2] - 23:16, 55:4
**particularly** [3] - 54:12, 59:21, 108:25
**parts** [1] - 17:11
**party** [2] - 9:9, 90:21
**Pasadena** [1] - 2:8
**pass** [1] - 36:16
**passage** [1] - 14:20
**passed** [3] - 20:23, 46:20, 80:24
**passes** [1] - 35:24
**pathologic** [1] - 18:24
**pathologist** [6] - 57:22, 88:17, 89:14, 90:14, 96:24, 97:23
**Pathologists** [1] - 89:20
**pathologists** [1] - 116:7
**pathology** [13] - 8:9, 88:21, 89:7, 89:9, 89:10, 89:11, 90:3, 90:17, 92:12, 92:16, 93:14, 103:24
**Pathology** [3] - 89:10, 89:21
**patient** [4] - 7:9, 52:11, 52:15, 92:23
**patients** [6] - 44:12, 49:10, 69:23, 69:25, 90:5
**Patrol** [1] - 72:3
**pattern** [2] - 101:10, 101:14
**PC** [1] - 2:9
**PEA** [9] - 49:1, 49:12, 49:20, 52:22, 52:24, 98:15, 98:17, 98:22, 98:23
**peer** [17] - 8:4, 8:12, 21:8, 21:12, 22:24, 31:23, 32:1, 32:11, 54:14, 55:8, 62:5, 63:11, 78:20, 89:24, 90:6, 90:7, 90:9
**peer-review** [2] - 54:14, 63:11
**peer-reviewed** [9] - 21:8, 21:12, 22:24, 32:11, 55:8, 62:5,

78:20, 89:24, 90:7
**people** [34] - 18:13, 23:24, 30:2, 31:6, 31:9, 42:6, 44:18, 52:16, 54:25, 55:23, 56:6, 57:25, 59:17, 60:13, 60:22, 61:4, 61:9, 63:5, 64:1, 64:6, 64:14, 65:11, 67:22, 69:7, 75:17, 84:17, 95:1, 95:20, 97:7, 99:9, 100:1, 104:1, 104:18, 108:5
**people's** [1] - 84:7
**per** [2] - 24:13, 110:12
**percent** [14] - 27:23, 28:1, 29:3, 58:21, 62:6, 62:16, 63:23, 64:9, 65:10, 65:11, 65:22, 66:4, 68:10, 69:3
**perform** [1] - 26:23
**performed** [4] - 23:19, 90:13, 106:3, 106:8
**performing** [2] - 93:6, 93:7
**perfusing** [1] - 51:12
**perfusion** [5] - 40:20, 40:21, 41:25, 42:3, 43:10
**PERFUSION** [1] - 40:20
**peri** [2] - 41:24, 42:17
**peri-cardiac** [2] - 41:24, 42:17
**period** [8] - 42:17, 62:18, 94:24, 102:6, 105:25, 106:15, 108:1
**permission** [2] - 50:23, 87:14
**person** [21] - 12:11, 12:23, 12:24, 13:19, 27:8, 28:14, 32:12, 48:24, 52:17, 61:11, 62:16, 72:21, 97:1, 97:2, 99:19, 107:23, 108:2, 109:22, 109:23, 111:17, 112:2
**person's** [7] - 20:21, 44:3, 44:15, 61:23, 62:17, 93:10, 96:25
**persons** [9] - 25:9, 25:15, 27:14, 29:20, 30:9, 30:11, 30:14, 30:18, 30:21
**perspective** [5] - 20:21, 21:16, 21:19, 92:16, 97:22

**petechiae** [8] - 94:3, 94:5, 94:6, 94:12, 95:1, 95:5, 95:9, 95:11

**PFTs** [1] - 60:22

**pH** [6] - 47:20, 47:23, 48:2, 56:18, 57:9, 57:10

**phase** [1] - 66:10

**philosophy** [2] - 97:11, 97:13

**photographs** [4] - 11:9, 91:11, 91:24, 93:11

**phrase** [1] - 39:23

**phrased** [1] - 100:23

**PHYLLIS** [4] - 1:21, 118:4, 118:18, 118:20

**physical** [2] - 47:9, 92:23

**physician** [4] - 6:17, 48:20, 88:23, 92:22

**physician/scientist** [1] - 66:1

**physiologic** [3] - 7:23, 8:1, 70:7

**physiological** [3] - 26:4, 58:6, 58:13

**physiologically** [3] - 20:16, 20:20, 47:22

**physiology** [3] - 25:22, 25:24, 70:7

**picks** [1] - 101:16

**picture** [4] - 42:21, 42:22, 99:16, 99:17

**piece** [1] - 42:18

**pink** [1] - 41:18

**pinpoint** [2] - 94:6, 94:10

**placed** [4] - 26:20, 33:3, 46:21, 95:2

**Plaintiff** [2] - 1:9, 2:3

**plaintiff** [4] - 4:9, 74:4, 91:7, 116:21

**plaintiff's** [8] - 11:3, 11:6, 46:5, 73:12, 87:10, 92:3, 100:2, 100:9

**plaintiffs** [2] - 9:23, 70:24

**plastic** [1] - 95:8

**plate** [1] - 27:11

**play** [7] - 20:7, 36:3, 41:4, 48:7, 59:5, 96:22, 100:18

**played** [9] - 9:15, 41:8, 93:25, 98:2, 98:6, 101:2, 104:6, 104:20, 105:11

**player** [2] - 18:12

**players** [1] - 18:11

**playing** [2] - 60:1, 108:17

**plus** [3] - 100:5, 100:13, 111:6

**point** [13] - 16:18, 33:6, 35:4, 37:13, 39:21, 42:14, 66:2, 76:4, 102:1, 102:3, 102:11, 102:13, 107:24

**points** [1] - 39:20

**police** [21] - 8:2, 8:3, 11:3, 21:10, 21:19, 29:25, 58:1, 59:3, 59:17, 61:12, 70:16, 70:23, 72:22, 72:23, 74:24, 75:7, 75:12, 75:18, 106:9, 108:7, 111:7

**poll** [1] - 108:20

**populations** [1] - 22:18

**portion** [2] - 17:14, 43:11

**position** [60] - 14:10, 14:11, 14:16, 14:19, 14:22, 15:11, 15:12, 19:16, 20:1, 20:3, 20:15, 20:16, 20:23, 24:18, 30:3, 31:7, 31:9, 31:10, 32:14, 33:12, 33:17, 33:24, 34:18, 36:25, 37:24, 45:9, 58:5, 58:12, 58:19, 58:24, 60:22, 61:13, 64:1, 64:6, 64:19, 65:1, 65:12, 65:20, 68:9, 77:18, 82:1, 84:18, 84:19, 84:20, 84:21, 102:7, 107:24, 107:25, 108:3, 108:7, 109:22, 109:23, 110:1, 110:14, 111:8, 111:11, 111:17

**positional** [27] - 9:14, 14:4, 14:7, 14:12, 15:1, 15:3, 15:5, 15:15, 19:8, 20:18, 21:1, 21:8, 22:4, 32:6, 32:13, 40:7, 45:9, 80:20, 81:1, 81:6, 81:7, 81:13, 81:18, 81:21, 83:16, 83:20, 84:16

**positioning** [3] - 18:12, 104:20

**positions** [17] - 6:25, 7:4, 7:10, 14:17, 15:11, 22:11, 24:1, 24:5, 26:16, 27:16, 63:13, 79:4, 88:18, 89:2, 89:12, 89:13, 100:1

**possible** [3] - 48:24, 75:19, 116:19

**post** [2] - 16:25, 57:9

**post-cardiac** [1] - 57:9

**potential** [1] - 56:23

**potentially** [1] - 56:23

**pounds** [6] - 18:11, 26:25, 27:2, 29:10, 32:15, 66:2

**power** [2] - 54:22, 54:23

**practice** [2] - 6:15, 21:17

**practices** [3] - 8:2, 8:4, 11:3

**pre** [1] - 57:10

**pre-cardiac** [1] - 57:10

**precise** [1] - 83:2

**predicate** [1] - 84:16

**predict** [1] - 97:10

**predictable** [1] - 98:1

**predictably** [1] - 103:15

**preliminary** [1] - 10:4

**presence** [4] - 4:3, 73:19, 73:22, 116:17

**present** [1] - 108:12

**presented** [1] - 79:1

**PRESIDING** [1] - 1:5

**pressure** [6] - 19:3, 33:3, 40:6, 42:5, 42:15, 95:3

**PRESTON** [4] - 1:21, 118:4, 118:18, 118:20

**presume** [1] - 100:12

**pretty** [5] - 24:14, 55:23, 80:1, 104:14

**prevent** [5] - 14:16, 16:10, 19:6, 86:10, 86:24

**prevented** [4] - 17:23, 33:13, 102:25, 103:13

**prevents** [1] - 95:4

**previous** [1] - 5:4

**primarily** [2] - 91:11, 94:16

**probability** [2] - 10:10, 50:16

**problem** [3] - 22:14, 80:17, 97:18

**problems** [3] - 19:21,

48:16, 67:10

**procedures** [1] - 75:18

**proceed** [6] - 4:21, 5:18, 40:10, 41:7, 74:11, 88:10

**PROCEEDINGS** [2] - 1:15, 118:9

**process** [9] - 11:21, 51:12, 52:10, 92:16, 92:17, 92:18, 93:2, 93:5, 115:22

**produce** [2] - 13:15, 55:17

**produced** [1] - 39:6

**producing** [2] - 58:6, 58:12

**production** [1] - 57:14

**profession** [1] - 89:2

**professional** [6] - 22:20, 44:2, 52:19, 76:22, 88:18, 89:16

**professor** [2] - 6:3, 88:21

**prolonged** [1] - 104:17

**prone** [88] - 15:11, 20:15, 21:2, 21:9, 21:13, 21:21, 22:3, 22:12, 22:13, 22:25, 23:4, 24:18, 25:2, 25:8, 25:11, 25:14, 25:15, 29:6, 30:2, 30:8, 30:15, 30:17, 30:20, 30:25, 31:6, 31:10, 31:16, 31:20, 32:6, 32:8, 32:14, 32:18, 33:12, 33:23, 34:15, 34:18, 36:24, 37:24, 50:16, 50:19, 58:5, 58:12, 61:5, 62:4, 62:9, 63:13, 65:6, 68:18, 69:3, 69:13, 74:24, 75:3, 75:7, 77:18, 77:24, 78:5, 79:4, 79:9, 81:1, 81:6, 83:20, 84:18, 84:20, 85:7, 93:25, 96:3, 96:11, 97:24, 99:19, 99:25, 102:21, 107:24, 107:25, 108:3, 108:6, 108:17, 109:22, 109:23, 109:25, 110:14, 111:8, 111:11, 111:17, 115:16

**prone-restrained** [9] - 25:2, 25:8, 25:11, 25:14, 25:15, 30:8,

30:17, 30:20, 84:18

**propensity** [1] - 97:9

**proper** [2] - 46:12, 82:21

**properly** [2] - 12:12, 12:13

**prospective** [1] - 74:19

**protect** [1] - 55:17

**protocol** [1] - 91:24

**prove** [2] - 98:6, 100:16

**provide** [2] - 9:13, 43:10

**provided** [1] - 10:3

**psychostimulant** [1] - 105:5

**publication** [3] - 63:11, 68:21, 90:7

**publications** [1] - 89:25

**publish** [2] - 85:3, 85:6

**published** [24] - 8:11, 8:15, 8:17, 20:17, 23:3, 31:10, 31:24, 32:2, 54:14, 55:8, 57:16, 57:25, 59:2, 59:9, 59:10, 63:11, 66:22, 70:6, 70:9, 75:10, 78:19, 83:8, 89:24

**publishing** [1] - 78:20

**pull** [1] - 53:9

**pulls** [1] - 33:22

**Pulmonary** [1] - 89:21

**pulmonary** [5] - 60:19, 60:22, 61:19, 69:20, 77:21

**pulmonologist** [1] - 61:2

**pulse** [3] - 53:2, 76:24, 77:3

**pump** [2] - 40:22, 42:15

**pumping** [2] - 42:8, 42:14

**purpose** [1] - 66:11

**purposes** [1] - 100:12

**PURSUANT** [1] - 118:7

**push** [1] - 42:1

**pushed** [1] - 94:18

**pushes** [1] - 34:7

**put** [22] - 16:1, 17:1, 19:15, 24:1, 29:10, 35:19, 40:2, 42:4, 42:10, 51:14, 51:24, 54:10, 62:2, 64:1, 64:6, 65:11, 65:19,

65:20, 65:21, 69:3, 92:25, 99:13

**puts** [2] - 32:9, 95:7

**putting** [3] - 37:22, 66:2, 68:8

**Q**

**quarter** [1] - 62:8

**questioning** [3] - 77:16, 83:3, 114:21

**questions** [12] - 41:5, 50:21, 76:15, 78:10, 79:15, 80:19, 84:23, 92:21, 93:1, 93:8, 105:15, 113:4

**quick** [1] - 80:1

**quickly** [1] - 55:23

**quite** [3] - 34:14, 49:25, 106:3

**quote** [7] - 58:3, 58:5, 58:16, 59:11, 59:19, 59:20, 59:22

**quoting** [2] - 58:10, 68:20

**R**

**raise** [2] - 5:9, 87:22

**range** [3] - 35:14, 37:11, 56:20

**ranging** [1] - 65:10

**rapidly** [1] - 101:14

**rate** [7] - 9:22, 19:15, 19:22, 24:13, 44:20, 91:4, 91:6

**rather** [1] - 59:4

**ray** [1] - 92:25

**re** [2] - 71:3, 90:24

**reach** [2] - 32:6, 91:2

**reaching** [1] - 40:23

**reacting** [1] - 98:5

**reaction** [1] - 104:23

**read** [3] - 40:13, 40:17, 60:7

**reading** [2] - 36:15, 48:7

**readings** [5] - 35:6, 35:9, 36:3, 39:5, 60:23

**reads** [1] - 58:18

**real** [4] - 13:9, 23:15, 30:6, 97:18

**real-world** [2] - 23:15, 30:6

**realized** [1] - 102:10

**really** [10] - 12:5, 21:25, 66:12, 80:9, 92:18, 94:13, 101:21, 104:16,

105:7

**REALTIME** [1] - 118:4

**reason** [6] - 13:11, 14:11, 14:22, 15:22, 48:13, 101:16

**reasonable** [2] - 10:9, 50:16

**reasonably** [1] - 97:5

**reasoning** [1] - 97:20

**reasons** [1] - 38:11

**Reay** [23] - 19:13, 20:13, 20:17, 20:22, 21:1, 21:4, 21:7, 57:15, 57:16, 58:3, 58:10, 75:11, 80:23, 81:5, 81:13, 82:4, 83:6, 83:8, 83:15, 84:2, 84:4, 84:19, 85:3

**Reay's** [9] - 20:4, 20:7, 20:11, 21:20, 80:20, 81:18, 82:1, 82:15, 83:19

**rebuttal** [1] - 92:4

**recalling** [1] - 73:24

**received** [3] - 55:18, 89:4, 89:5

**recent** [1] - 108:25

**recently** [1] - 111:2

**recess** [4] - 73:13, 73:18, 73:21, 117:5

**record** [6] - 4:7, 5:16, 39:15, 74:2, 85:6, 88:4

**recorded** [1] - 36:18

**recordings** [1] - 103:7

**records** [15] - 7:24, 10:13, 10:15, 10:17, 10:18, 10:19, 39:4, 39:6, 48:1, 48:6, 71:15, 91:10, 98:9, 103:7, 103:8

**recover** [6] - 55:23, 56:6, 56:8, 79:14, 85:14, 86:5

**recovered** [2] - 19:19, 20:3

**recovering** [1] - 54:9

**recovery** [7] - 58:20, 79:21, 79:22, 79:25, 80:9, 86:10, 86:15

**recreational** [2] - 114:6, 114:9

**RECROSS** [2] - 3:7, 85:1

**RECROSS-EXAMINATION** [2] - 3:7, 85:1

**red** [2] - 42:2, 94:10

**reddish** [1] - 41:18

**REDIRECT** [2] - 3:7, 76:20

**reduce** [1] - 57:1

**reduced** [2] - 42:10, 68:9

**reduction** [1] - 58:21

**reductions** [1] - 65:22

**referencing** [2] - 95:25, 115:3

**referring** [2] - 58:18, 103:3

**refill** [2] - 42:5, 43:7

**reflexively** [1] - 56:19

**regard** [1] - 70:1

**regarding** [4] - 8:3, 10:5, 10:19, 27:13

**regards** [1] - 10:4

**regular** [3] - 101:12, 101:13

**REGULATIONS** [1] - 118:11

**relate** [1] - 7:22

**related** [13] - 10:3, 23:1, 46:16, 48:22, 52:20, 57:21, 83:16, 89:13, 94:12, 99:25, 104:2, 109:5, 111:11

**relates** [2] - 8:22, 15:3

**relative** [5] - 32:6, 64:5, 67:18, 93:14, 102:20

**relatively** [2] - 13:13, 13:16

**release** [2] - 55:10, 55:12

**relevance** [2] - 54:18, 87:4

**relevant** [1] - 35:9

**rely** [3] - 17:13, 82:22, 93:9

**remain** [1] - 74:9

**remained** [3] - 28:5, 28:8, 51:18

**remember** [17] - 16:8, 21:6, 43:17, 46:8, 48:4, 73:15, 78:10, 78:17, 78:21, 78:24, 79:15, 109:14, 109:16, 110:7, 112:5, 112:6, 116:12

**remove** [2] - 28:19, 56:16

**removed** [1] - 101:24

**rendered** [1] - 39:9

**renounce** [1] - 58:24

**repeat** [1] - 66:18

**rephrase** [1] - 49:15

**report** [35] - 11:3, 11:6, 11:8, 36:8, 36:11, 38:17, 38:21,

38:22, 38:24, 39:5, 39:10, 39:12, 44:7, 45:2, 49:3, 51:13, 53:9, 53:10, 54:14, 58:3, 66:22, 67:11, 71:4, 75:8, 76:5, 85:15, 91:23, 93:10, 95:22, 113:13, 114:12, 114:15, 115:2, 115:9, 115:13

**reported** [1] - 31:7

**REPORTED** [1] - 118:9

**Reporter** [1] - 1:22

**REPORTER** [4] - 40:15, 118:1, 118:5, 118:21

**REPORTER'S** [1] - 1:15

**reports** [10] - 10:2, 10:17, 10:19, 11:9, 57:25, 72:24, 92:3, 92:4, 109:11

**represent** [3] - 95:24, 96:2, 100:2

**representation** [2] - 96:5, 100:6

**representing** [1] - 4:16

**research** [3] - 32:5, 32:10, 71:1

**researches** [1] - 67:4

**reshuffle** [1] - 87:15

**residency** [1] - 6:10

**resident** [1] - 6:11

**residents** [1] - 7:14

**residing** [1] - 105:23

**resistance** [1] - 47:11

**resisted** [2] - 30:18, 30:21

**resisting** [2] - 25:3, 29:14

**respiration** [2] - 8:23, 56:22

**respiratory** [25] - 9:7, 12:5, 12:7, 12:8, 14:14, 20:24, 26:11, 26:20, 27:13, 39:19, 40:2, 47:16, 48:12, 48:15, 48:16, 48:19, 56:10, 58:6, 58:13, 58:20, 58:21, 59:25, 65:7, 68:24, 86:14

**responders** [2] - 53:3, 53:6

**response** [8] - 26:4, 47:6, 47:16, 59:8, 76:23, 77:15, 98:1, 98:3

**responsible** [2] - 7:6,

7:8

**restate** [1] - 74:1

**restrained** [42] - 15:1, 15:10, 15:11, 15:12, 15:19, 22:10, 22:11, 22:12, 24:3, 24:18, 25:2, 25:8, 25:11, 25:14, 25:15, 27:14, 27:16, 27:25, 30:2, 30:8, 30:15, 30:17, 30:20, 31:7, 31:8, 31:10, 54:10, 54:12, 58:25, 61:4, 66:24, 67:2, 68:9, 69:3, 72:22, 72:23, 84:18, 84:22, 106:8

**restraint** [92] - 8:2, 8:3, 8:10, 8:11, 8:22, 9:14, 15:6, 19:8, 20:15, 21:2, 21:7, 21:10, 21:13, 21:21, 22:4, 22:25, 23:4, 23:19, 25:3, 26:16, 26:23, 29:6, 29:14, 29:16, 30:18, 30:21, 30:25, 31:6, 31:16, 31:20, 32:7, 32:8, 32:23, 33:17, 40:1, 40:8, 45:17, 47:11, 48:8, 49:7, 50:8, 50:12, 50:17, 50:19, 57:21, 59:5, 59:22, 59:25, 62:4, 65:7, 70:7, 70:20, 71:18, 72:4, 72:12, 72:15, 75:18, 77:24, 78:5, 78:12, 79:2, 79:4, 79:9, 81:1, 81:6, 83:20, 84:20, 85:7, 93:25, 95:23, 96:3, 96:11, 97:24, 98:2, 99:20, 104:20, 104:23, 104:25, 107:11, 107:12, 107:16, 107:18, 108:17, 109:6, 109:8, 109:22, 115:7, 115:16, 115:17, 115:21, 116:1

**restraint-induced** [1] - 59:22

**restraint-related** [1] - 57:21

**restraints** [19] - 22:9, 30:1, 58:1, 59:16, 59:17, 66:9, 66:23, 67:5, 67:8, 67:13, 67:23, 68:18, 70:17, 72:24, 73:5, 74:25,

75:4, 75:7, 75:12
**restricted** [1] - 33:6
**restriction** [1] - 56:22
**result** [6] - 33:17, 73:4, 77:17, 78:14, 98:18
**resulted** [1] - 18:13
**results** [3] - 29:9, 29:13
**resuming** [1] - 4:25
**resuscitation** [2] - 35:16, 36:11
**retain** [2] - 71:1, 91:7
**retained** [20] - 9:9, 9:11, 9:12, 9:23, 11:1, 70:22, 71:4, 71:7, 71:14, 71:17, 71:21, 72:2, 72:5, 72:6, 72:11, 72:14, 90:21, 90:23, 92:7, 113:10
**retracted** [2] - 21:7, 81:13
**retraction** [3] - 21:4, 21:20, 80:20
**retrain** [1] - 71:3
**retrospective** [2] - 74:20, 74:24
**returns** [1] - 16:11
**reveal** [2] - 29:6, 30:24
**review** [46] - 9:12, 10:8, 10:21, 11:2, 11:5, 11:18, 18:16, 20:19, 33:1, 35:6, 43:19, 44:23, 45:8, 45:12, 46:19, 48:1, 48:6, 50:6, 50:11, 54:14, 59:10, 59:15, 59:16, 63:11, 70:7, 70:9, 79:7, 83:18, 90:10, 90:24, 91:13, 91:17, 91:20, 91:23, 92:2, 92:6, 92:15, 93:2, 96:10, 98:8, 98:9, 98:11, 101:23, 102:23, 104:19, 105:9
**reviewed** [41] - 8:4, 8:12, 10:2, 10:3, 21:8, 21:12, 22:24, 31:24, 32:1, 32:11, 33:2, 33:11, 33:16, 39:5, 40:24, 55:8, 62:5, 78:20, 83:11, 83:15, 89:24, 90:7, 91:10, 93:13, 93:17, 93:24, 103:6, 103:7, 103:8, 103:11, 106:10, 109:10, 109:21, 111:5,

111:7, 113:13, 113:21
**reviewer** [1] - 90:9
**reviewers** [1] - 90:6
**reviewing** [3] - 20:25, 59:3, 95:15
**rhythm** [6] - 48:25, 49:1, 98:11, 98:14, 98:22, 101:17
**rhythms** [6] - 48:22, 49:8, 49:11, 49:19, 49:20, 50:2
**rib** [5] - 16:23, 17:10, 17:11, 17:25, 43:15
**ribs** [8] - 16:20, 17:4, 17:9, 17:11, 17:13, 17:15, 43:17, 43:20
**Richard** [1] - 100:4
**rid** [5] - 24:6, 28:17, 28:23, 29:4, 63:5
**ride** [1] - 60:16
**riding** [1] - 67:18
**rise** [4] - 13:15, 57:2, 62:14, 68:23
**rises** [1] - 13:10
**risk** [3] - 22:4, 32:9, 40:2
**RIVERSIDE** [4] - 1:3, 1:11, 4:1
**Riverside** [4] - 4:5, 4:17, 71:8, 73:25
**riverside** [2] - 1:16, 1:23
**Roeggla** [1] - 67:24
**ROEGGLA** [1] - 67:25
**role** [23] - 9:15, 20:7, 29:19, 31:16, 36:3, 36:4, 44:2, 48:7, 48:20, 50:17, 59:5, 60:1, 94:1, 96:3, 96:12, 98:2, 98:6, 100:18, 101:2, 104:6, 104:21, 105:12, 108:17
**roll** [2] - 64:12, 64:18
**rolling** [1] - 64:24
**Ron** [1] - 78:17
**room** [2] - 48:20, 52:15
**Rule** [2] - 38:17, 49:2
**rule** [1] - 18:21
**ruled** [1] - 17:19
**run** [2] - 7:7
**runs** [2] - 6:16, 15:25
**rupture** [1] - 94:8
**Russo** [1] - 60:7

## S

**sack** [1] - 27:11

**sacks** [1] - 27:6
**Sain** [7] - 4:15, 38:23, 49:5, 74:6, 76:18, 112:12, 112:16
**SAIN** [83] - 2:15, 3:6, 3:7, 3:9, 4:15, 4:23, 5:7, 5:19, 5:21, 5:23, 6:1, 37:6, 38:24, 39:12, 39:14, 39:18, 39:23, 40:13, 40:19, 41:1, 41:3, 41:6, 41:9, 41:10, 43:25, 44:1, 44:9, 45:7, 45:20, 45:22, 46:3, 46:15, 49:6, 49:16, 49:17, 50:5, 50:21, 54:18, 56:1, 63:8, 64:21, 65:2, 66:14, 69:15, 74:6, 76:19, 76:21, 77:12, 81:4, 81:11, 81:16, 82:7, 82:9, 82:12, 82:17, 82:25, 83:2, 83:5, 83:12, 83:14, 83:23, 84:11, 84:23, 85:11, 85:19, 86:17, 87:4, 87:18, 87:20, 88:7, 88:10, 88:12, 100:11, 101:3, 101:5, 101:6, 103:5, 105:15, 108:11, 113:23, 115:18, 117:1, 117:4
**Sain's** [4] - 71:11, 71:14, 71:17, 76:2
**Salazar** [1] - 71:13
**San** [10] - 6:5, 6:10, 6:11, 6:12, 6:16, 44:13, 65:6, 71:13, 72:17, 80:24
**Santillan** [1] - 112:5
**sat** [2] - 60:18, 70:15
**saved** [1] - 52:16
**saw** [10] - 27:21, 28:1, 28:2, 36:14, 61:2, 64:17, 65:22, 66:1, 92:4, 92:5
**scale** [1] - 47:22
**scarred** [1] - 69:24
**scene** [1] - 52:20
**scheduling** [1] - 5:3
**School** [1] - 88:22
**school** [3] - 6:9, 7:15, 89:5
**science** [4] - 21:8, 21:12, 63:16, 100:16
**Sciences** [1] - 89:23
**sciences** [1] - 8:9
**scientific** [1] - 105:7
**scope** [4] - 38:17,

44:6, 49:2, 77:9
**screaming** [1] - 86:21
**seated** [3] - 5:15, 73:23, 88:3
**seating** [1] - 65:20
**second** [12] - 19:25, 54:12, 54:13, 55:25, 57:16, 66:10, 73:9, 80:1, 85:16, 85:17, 115:2, 115:7
**seconds** [11] - 19:19, 41:4, 42:6, 42:13, 55:24, 85:24, 102:16, 102:22, 104:10, 104:14, 114:21
**SECTION** [1] - 118:7
**secured** [2] - 19:18, 28:1
**see** [48] - 12:24, 12:25, 13:9, 16:12, 16:19, 18:7, 19:24, 24:3, 25:25, 26:3, 28:4, 28:23, 35:25, 41:12, 41:14, 42:9, 42:12, 42:19, 42:21, 43:2, 43:16, 44:12, 53:25, 54:5, 58:7, 60:25, 61:7, 62:14, 62:15, 62:16, 65:15, 66:7, 67:8, 69:7, 82:25, 86:20, 86:23, 93:22, 95:9, 95:11, 101:17, 101:19, 101:22, 103:15, 106:11, 107:13, 111:11, 116:21
**seeing** [2] - 75:4, 92:22
**senior** [1] - 89:14
**sense** [1] - 86:11
**sensitive** [2] - 28:6, 36:5
**sentence** [6] - 58:5, 58:9, 58:14, 58:17, 115:7, 116:4
**separate** [1] - 110:11
**sequelae** [1] - 40:5
**sequence** [2] - 37:22, 102:14
**series** [3] - 75:1, 76:6, 79:2
**serve** [1] - 109:3
**service** [1] - 52:17
**services** [1] - 9:19
**serving** [2] - 108:24, 110:5
**Session** [1] - 1:12
**set** [1] - 63:21
**setting** [1] - 23:23

**several** [5] - 37:10, 67:10, 76:6, 90:8, 109:17
**severe** [2] - 63:4
**severity** [1] - 69:22
**shallow** [1] - 101:15
**shallower** [1] - 101:20
**shaped** [1] - 34:3
**SHERIFF** [1] - 1:12
**Sheriff** [1] - 4:17
**SHERIFF'S** [1] - 1:11
**SHERIFF-CORONER** [1] - 1:12
**shock** [4] - 52:23, 54:12, 54:13, 85:17
**shocked** [1] - 54:11
**shocks** [1] - 54:9
**short** [1] - 94:24
**shouting** [1] - 86:21
**show** [6] - 20:1, 27:13, 42:6, 58:19, 78:12, 78:14
**showed** [6] - 20:2, 57:4, 64:4, 68:12, 68:22, 85:8
**showing** [1] - 41:11
**shows** [6] - 41:25, 54:22, 54:23, 71:1, 99:24, 105:11
**shrinks** [1] - 34:5
**shrunk** [1] - 34:9
**shut** [1] - 104:12
**side** [4] - 64:13, 64:18, 64:25, 96:9
**sidebar** [3] - 38:15, 40:12, 83:13
**Sidebar** [1] - 82:11
**sides** [4] - 17:3, 17:4, 43:16, 43:20
**sign** [1] - 13:9
**significance** [3] - 36:2, 41:19, 99:22
**significant** [14] - 18:25, 33:18, 40:1, 40:4, 56:23, 58:6, 58:12, 64:4, 95:23, 104:17, 115:8, 115:11, 115:14, 115:25
**significantly** [2] - 33:13, 50:8
**signify** [2] - 37:16, 37:18
**signs** [2] - 12:25, 97:8
**similar** [3] - 68:12, 68:13, 75:17
**similarly** [1] - 95:2
**simple** [1] - 107:8
**simply** [1] - 34:15
**simulate** [1] - 25:3

**simulating** [1] - 29:13
**single** [2] - 27:9, 59:4
**sit** [5] - 4:11, 28:10, 28:16, 75:15, 101:14
**sitting** [9] - 15:12, 19:20, 22:11, 24:2, 60:24, 63:13, 64:6, 79:5, 112:9
**situation** [1] - 53:4
**six** [2] - 13:22, 68:8
**sized** [1] - 28:14
**skeletal** [2] - 55:5, 55:10
**sleep** [5] - 28:25, 64:8, 64:10, 64:14, 90:4
**slow** [3] - 101:15, 101:19, 102:18
**slowly** [1] - 88:14
**slumped** [1] - 14:17
**small** [1] - 16:14
**smaller** [1] - 34:8
**smallest** [1] - 94:7
**SMITH** [1] - 2:15
**Society** [2] - 89:20, 89:21
**soft** [1] - 90:4
**solemnly** [2] - 5:10, 87:23
**someone** [16] - 18:13, 21:14, 21:21, 22:4, 31:17, 77:2, 93:9, 96:24, 99:11, 106:8, 107:19, 110:13, 111:8, 112:11, 112:16, 112:17
**sometime** [4] - 51:18, 52:7, 78:22, 78:23
**sometimes** [2] - 71:1, 71:2
**somewhat** [1] - 12:4
**somewhere** [3] - 90:15, 107:21, 110:18
**Sonia** [1] - 11:13
**soon** [2] - 101:22, 104:11
**sorry** [9] - 51:6, 56:1, 59:1, 66:15, 66:18, 68:2, 75:25, 83:23, 111:13
**sort** [15] - 12:13, 16:21, 17:9, 17:13, 17:25, 19:2, 19:17, 26:2, 27:5, 42:4, 53:2, 60:21, 69:24, 78:16, 80:15
**sorts** [2] - 22:10, 79:4
**space** [2] - 4:11, 51:24
**speaking** [7] - 7:20, 9:11, 9:25, 13:19,

47:8, 90:23, 91:9
**specialty** [1] - 113:16
**specific** [4] - 10:1, 39:25, 49:20, 98:22
**specifically** [7] - 26:1, 39:21, 61:17, 76:12, 84:19, 109:15, 113:20
**specifics** [1] - 73:2
**speckles** [1] - 94:10
**speculation** [4] - 64:21, 65:2, 69:16, 81:8
**spell** [2] - 5:16, 88:4
**spent** [1] - 89:5
**spirometric** [5] - 64:4, 65:10, 68:10, 85:3, 85:6
**spirometry** [2] - 63:12, 63:16
**spread** [1] - 27:10
**squeezing** [1] - 94:22
**St** [6] - 88:19, 88:22, 89:3, 89:5, 89:6, 89:8
**standard** [2] - 60:24, 60:25
**standardized** [1] - 24:10
**standpoint** [2] - 80:9, 103:24
**start** [3] - 76:25, 77:2, 110:5
**started** [6] - 48:25, 58:4, 60:13, 78:19, 79:21, 107:4
**starting** [2] - 89:2, 106:2
**state** [14] - 4:6, 5:15, 22:6, 46:11, 57:19, 82:13, 82:14, 88:3, 98:5, 100:3, 105:23, 109:3
**statement** [2] - 39:25, 102:15
**statements** [2] - 91:18, 91:21
**STATES** [4] - 1:1, 118:5, 118:7, 118:12
**States** [2] - 1:22, 31:4
**states** [5] - 59:11, 109:7, 109:8, 109:13, 109:17
**statistically** [1] - 64:4
**status** [3] - 14:14, 14:24, 15:17
**stay** [2] - 13:13, 13:16
**steady** [1] - 101:16
**STENOGRAPHICAL LY** [1] - 118:9

**stenojag@aol.com** [1] - 1:24
**step** [2] - 73:20, 116:18
**still** [13] - 17:10, 22:2, 37:11, 37:14, 51:15, 51:25, 61:16, 86:13, 94:18, 95:1, 101:17, 107:5
**stimulant** [1] - 44:18
**stimulants** [2] - 47:15, 95:20
**stimulate** [2] - 47:2, 104:11
**stimulated** [2] - 15:17, 45:5
**stimulates** [2] - 44:19, 104:10
**stimulation** [1] - 47:2
**stomach** [7] - 19:16, 24:2, 27:17, 27:22, 29:1, 29:2, 34:18
**stop** [4] - 13:13, 41:9, 55:25, 113:23
**stopped** [3] - 13:20, 52:5, 72:21
**stopping** [2] - 13:21, 14:3
**stops** [1] - 38:6
**strangulations** [1] - 94:21
**Street** [3] - 1:23, 2:10, 2:16
**strenuous** [1] - 47:9
**stressed** [1] - 47:6
**strictly** [1] - 94:13
**strips** [1] - 48:21
**struggle** [5] - 67:5, 67:7, 67:9, 67:11, 67:13
**struggled** [1] - 66:23
**struggling** [1] - 66:9
**students** [1] - 7:15
**studied** [5] - 27:15, 29:21, 30:4, 67:23, 79:24
**studies** [101] - 7:18, 7:20, 7:23, 7:24, 8:3, 8:10, 8:15, 16:4, 19:7, 19:10, 20:14, 20:25, 22:18, 22:23, 22:24, 23:3, 23:4, 23:5, 23:10, 23:17, 23:18, 24:8, 24:16, 24:22, 24:25, 25:1, 25:5, 25:8, 25:11, 25:14, 25:15, 25:17, 25:18, 25:19, 26:5, 26:19, 26:24, 27:2, 27:3, 27:13, 29:2,

29:6, 29:16, 29:23, 30:8, 30:11, 30:14, 30:17, 30:20, 30:24, 31:4, 31:14, 31:19, 31:23, 32:1, 32:4, 32:5, 32:10, 32:11, 39:20, 49:7, 49:10, 49:18, 49:23, 50:3, 54:17, 55:22, 58:18, 58:19, 58:23, 61:17, 64:3, 65:15, 67:22, 68:22, 74:14, 74:20, 75:3, 77:16, 78:9, 78:12, 78:15, 78:20, 79:6, 79:7, 79:8, 80:13, 81:22, 81:23, 82:14, 82:22, 83:1, 84:9, 85:7, 92:25, 104:3
**study** [57] - 19:12, 19:21, 20:4, 20:9, 20:11, 20:17, 23:14, 23:16, 24:13, 25:6, 26:25, 27:15, 31:3, 54:15, 54:23, 55:8, 57:16, 57:24, 59:2, 60:10, 60:13, 63:10, 63:20, 63:25, 65:5, 65:14, 65:17, 66:6, 66:8, 66:10, 66:11, 66:12, 66:21, 67:1, 67:3, 67:21, 68:11, 68:15, 69:1, 69:5, 69:6, 69:9, 69:12, 69:18, 69:25, 70:11, 70:13, 74:16, 74:18, 74:24, 78:25, 80:3, 81:19, 84:5, 84:10, 84:19
**style** [1] - 23:6
**subject** [4] - 29:13, 55:6, 77:3, 100:5
**subject's** [6] - 21:11, 22:25, 29:7, 29:10, 31:20, 77:24
**subjects** [21] - 20:4, 24:9, 24:17, 25:2, 25:3, 25:7, 25:12, 25:24, 29:21, 49:14, 50:1, 60:14, 63:13, 66:8, 66:23, 67:4, 67:7, 68:8, 69:2, 69:11, 80:4
**subjects'** [2] - 26:19, 27:7
**subsequent** [2] - 27:2, 55:22
**subsequently** [2] - 20:13, 36:10
**substances** [1] - 33:9

**Successor** [1] - 1:7
**suck** [2] - 33:23, 34:13
**sudden** [6] - 15:9, 22:9, 59:22, 79:3, 99:15, 105:4
**suddenly** [1] - 97:9
**suffer** [1] - 43:12
**suffered** [1] - 39:11
**sufficient** [3] - 18:17, 39:2, 40:9
**suggest** [2] - 19:3, 22:3
**Suite** [3] - 2:5, 2:10, 2:16
**summary** [1] - 53:23
**super** [1] - 62:23
**supine** [11] - 15:12, 22:12, 31:7, 31:9, 36:25, 37:11, 38:10, 63:13, 79:5, 102:7, 102:21
**support** [5] - 22:13, 52:18, 82:1, 105:4, 105:7
**supported** [2] - 39:1, 93:25
**supports** [3] - 21:9, 81:17, 93:18
**suppose** [1] - 107:21
**supposed** [1] - 91:1
**supposedly** [1] - 75:11
**surrounding** [1] - 88:21
**sustain** [1] - 100:10
**sustained** [10] - 46:14, 49:4, 64:22, 65:3, 81:3, 81:10, 81:15, 82:6, 85:12, 103:4
**sustaining** [1] - 56:20
**swear** [3] - 5:10, 5:13, 87:23
**swelling** [1] - 16:15
**system** [15] - 12:6, 12:8, 16:12, 16:15, 16:19, 26:11, 42:7, 42:20, 43:9, 44:19, 48:17, 56:13, 62:22, 68:25

---

**T**

**table** [6] - 61:6, 61:7, 61:8, 62:4, 63:22, 65:20
**tach** [4] - 48:25, 49:12, 49:20, 50:1
**tailor** [1] - 93:8
**talks** [3] - 17:21, 39:19, 39:22

**tased** [4] - 46:20, 55:2, 80:3, 86:6
**TASER** [29] - 46:8, 46:16, 54:2, 54:17, 55:4, 55:18, 55:22, 79:15, 79:18, 79:23, 80:1, 80:6, 80:14, 80:16, 85:15, 85:16, 85:17, 86:5, 86:25, 95:25, 96:7, 103:17, 103:20, 103:24, 104:2, 104:5, 104:9, 104:10
**TASER-related** [1] - 46:16
**TASERs** [2] - 54:25, 79:24
**tasing** [1] - 115:25
**teaching** [7] - 7:10, 7:11, 7:13, 7:14, 7:15, 89:12, 89:13
**temporarily** [1] - 57:1
**temporary** [1] - 56:15
**ten** [1] - 28:15
**tend** [7] - 16:23, 16:24, 94:19, 95:1, 95:5, 95:9, 97:11
**tends** [2] - 101:13, 101:19
**term** [20] - 12:4, 14:4, 14:6, 14:12, 15:5, 15:6, 17:6, 17:20, 20:19, 22:15, 34:19, 40:5, 44:17, 46:23, 47:19, 66:5, 94:3, 98:16, 101:7, 115:14
**terms** [12] - 9:2, 23:5, 23:18, 30:3, 32:17, 37:16, 63:6, 65:16, 80:8, 83:16, 95:14, 96:19
**test** [10] - 23:21, 26:19, 27:7, 48:9, 57:3, 57:9, 60:23, 60:24, 60:25, 61:2
**tested** [1] - 24:17
**testified** [8] - 8:21, 60:8, 90:16, 95:25, 96:2, 100:3, 109:5, 109:7
**testify** [1] - 71:24
**testifying** [3] - 55:20, 83:23, 86:5
**testimony** [22] - 5:4, 5:5, 5:10, 11:2, 11:5, 11:8, 11:15, 36:22, 37:1, 37:4, 43:11, 51:13, 74:14, 87:23, 91:17, 91:20, 91:23, 92:2, 98:17, 98:19,

103:8, 115:19
**testing** [2] - 23:6, 77:22
**tests** [4] - 48:17, 57:6, 57:20, 61:19
**Texas** [2] - 89:7, 109:12
**THAT** [3] - 118:6, 118:7, 118:10
**THE** [118] - 4:4, 4:13, 4:18, 5:2, 5:9, 5:13, 5:15, 5:17, 5:18, 5:25, 37:5, 38:14, 38:23, 39:8, 39:13, 39:16, 39:21, 40:9, 40:15, 40:16, 40:18, 41:7, 44:8, 45:3, 45:4, 45:21, 46:1, 46:11, 46:14, 49:4, 49:15, 49:24, 49:25, 50:24, 54:19, 54:20, 56:3, 62:25, 63:1, 63:2, 64:22, 65:3, 66:16, 66:18, 69:17, 69:18, 73:10, 73:13, 73:20, 73:23, 73:24, 74:5, 74:8, 74:10, 74:11, 76:14, 76:17, 77:10, 77:11, 81:3, 81:10, 81:15, 82:6, 82:10, 82:16, 82:18, 83:1, 83:4, 83:10, 83:24, 84:3, 84:4, 84:24, 85:12, 85:20, 85:21, 86:18, 86:19, 87:5, 87:6, 87:9, 87:12, 87:13, 87:16, 87:19, 87:22, 88:1, 88:3, 88:5, 88:11, 100:10, 100:24, 100:25, 101:4, 103:4, 105:16, 108:12, 108:13, 113:7, 113:25, 114:1, 114:22, 115:20, 115:21, 116:11, 116:18, 116:21, 116:24, 117:3, 118:5, 118:6, 118:7, 118:8, 118:9, 118:10, 118:11, 118:12
**THEODORE** [2] - 3:5, 5:14
**Theodore** [2] - 5:8, 5:17
**theory** [2] - 21:7, 75:12
**they've** [1] - 42:10
**thinking** [2] - 110:18,

112:8
**third** [4] - 7:7, 26:16, 53:22, 68:19
**THIS** [1] - 118:15
**thou** [1] - 31:2
**thousand** [4] - 18:11, 30:5, 31:2, 74:15
**thousands** [2] - 52:16, 90:20
**threatening** [1] - 50:2
**three** [19] - 8:19, 12:14, 12:19, 26:10, 42:6, 42:13, 63:10, 68:14, 69:12, 76:1, 76:11, 107:9, 110:18, 110:22, 110:23, 112:8, 112:9, 112:18, 112:19
**tidal** [13] - 34:19, 34:23, 35:2, 35:6, 35:19, 36:2, 36:12, 36:17, 36:19, 37:10, 37:13, 38:18, 39:5
**TIDAL** [1] - 34:19
**tied** [5] - 58:5, 58:11, 61:5, 62:10, 63:22
**timing** [1] - 59:14
**tiny** [2] - 94:8, 94:9
**tissue** [4] - 12:15, 12:16, 43:7, 43:10
**tissues** [8] - 40:22, 42:14, 51:12, 62:25, 63:6, 63:7, 67:2
**TITLE** [1] - 118:7
**title** [1] - 63:12
**TO** [1] - 118:7
**today** [4] - 20:10, 28:10, 70:16, 75:15
**together** [5] - 17:10, 61:6, 62:10, 63:22, 92:25
**TONY** [1] - 2:15
**Tony** [2] - 4:15, 74:6
**took** [6] - 19:13, 23:22, 35:11, 61:4, 63:20, 67:14
**top** [3] - 8:13, 58:4, 109:18
**topics** [2] - 90:2, 90:3
**TORI** [1] - 2:16
**Tori** [2] - 4:16, 74:6
**torso** [3] - 15:25, 19:1, 26:21
**total** [1] - 112:18
**toward** [1] - 96:4
**towards** [1] - 50:12
**toxic** [1] - 114:9
**toxicity** [5] - 95:17, 99:3, 99:8, 99:10

**toxicologist** [2] - 100:4, 113:18
**toxicology** [1] - 113:17
**track** [1] - 35:25
**TRACY** [1] - 1:7
**Tracy** [2] - 4:4, 73:25
**tradition** [1] - 97:14
**training** [6] - 9:2, 9:3, 52:21, 53:8, 89:7, 89:8
**TRANSCRIPT** [3] - 1:15, 118:8, 118:10
**transmitters** [1] - 47:5
**transplant** [1] - 90:5
**trauma** [2] - 16:20, 18:25
**traumatic** [2] - 40:6, 55:2
**treadmill** [1] - 24:11
**treat** [3] - 5:5, 92:22
**tremendous** [3] - 62:21, 63:2, 63:3
**Trial** [1] - 1:11
**trial** [4] - 75:21, 75:22, 109:9, 109:10
**TRIAL** [1] - 1:15
**tried** [1] - 91:7
**tries** [1] - 56:21
**TRUE** [1] - 118:8
**true** [7] - 84:14, 84:15, 106:10, 108:3, 112:3, 115:17, 116:4
**truth** [6] - 5:11, 5:12, 87:24, 87:25
**try** [3] - 73:17, 93:1, 116:14
**trying** [8] - 25:21, 64:17, 64:19, 64:25, 67:6, 86:13, 106:20, 107:8
**tube** [1] - 27:19
**tunnel** [1] - 13:25
**turn** [4] - 29:23, 33:12, 42:2, 114:19
**turned** [1] - 52:2
**turns** [1] - 28:9
**Twelfth** [1] - 1:23
**twice** [2] - 54:4, 104:9
**two** [27] - 6:15, 7:6, 8:19, 11:12, 14:10, 43:5, 48:10, 54:9, 55:18, 63:10, 68:13, 72:7, 76:10, 80:12, 85:14, 85:21, 86:3, 86:4, 86:6, 96:22, 107:9, 107:14, 111:23, 111:24, 112:9
**type** [3] - 107:3,

107:13, 110:6
**types** [4] - 48:10, 94:14, 97:8, 97:17
**typically** [3] - 16:5, 16:22, 44:15

**U**

**UC** [3] - 6:8, 6:11, 6:16
**UK** [1] - 78:9
**ultimately** [3] - 95:16, 95:20, 99:7
**unable** [4] - 13:1, 13:8, 14:10, 87:7
**uncomfortable** [2] - 61:11, 69:13
**uncooperative** [1] - 53:24
**under** [5] - 20:4, 25:15, 43:7, 74:9, 101:18
**undergo** [1] - 80:4
**undergrad** [2] - 89:3, 89:4
**undergraduate** [1] - 6:8
**underlying** [1] - 97:19
**understood** [1] - 113:16
**unforeseeable** [1] - 97:5
**unfortunately** [2] - 20:22, 44:13
**UNITED** [3] - 118:5, 118:7, 118:12
**uNITED** [1] - 1:1
**United** [4] - 1:22, 31:4, 68:17, 69:2
**university** [1] - 91:5
**University** [6] - 6:4, 6:9, 6:12, 7:11, 88:22, 89:3
**unless** [1] - 63:4
**unloads** [1] - 38:4
**unobstructed** [1] - 32:13
**unpredictable** [2] - 97:5, 103:16
**unresponsive** [10] - 102:11, 102:13, 102:15, 108:2, 108:6, 109:24, 110:15, 111:9, 111:18, 112:12
**up** [31] - 17:13, 20:10, 21:23, 24:21, 27:2, 29:10, 34:4, 36:11, 41:1, 47:7, 47:8, 49:5, 50:22, 51:6, 53:9, 57:19, 61:15,

61:16, 65:22, 66:2, 66:4, 67:13, 68:19, 69:24, 94:18, 99:6, 101:16, 106:9, 112:17, 114:9
**upper** [3] - 14:19, 44:18, 45:5
**urgent** [1] - 80:16
**utilized** [1] - 55:16

**V**

**V-fib** [3] - 48:25, 49:12, 49:20
**V-tach** [4] - 48:25, 49:12, 49:20, 50:1
**vague** [6] - 49:13, 49:23, 84:1, 100:23, 103:2, 108:11
**Vargas** [1] - 72:17
**varie** [1] - 90:3
**variety** [3] - 90:3, 91:10, 97:8
**various** [4] - 7:3, 9:6, 14:16, 15:10
**vascular** [1] - 42:11
**Vasquez** [4] - 11:16, 11:19, 91:15, 91:21
**veins** [2] - 94:17, 94:23
**venous** [3] - 16:12, 16:15, 16:19
**ventilate** [2] - 13:2, 13:9
**ventilating** [4] - 28:7, 36:9, 37:20, 86:22
**ventilation** [4] - 36:6, 44:22, 61:20
**ventilatory** [5] - 40:2, 62:22, 63:3, 63:24, 65:23
**Ventura** [1] - 75:6
**verify** [1] - 68:16
**versus** [1] - 31:6
**vessel** [2] - 17:24, 95:9
**vessels** [7] - 16:15, 19:2, 94:7, 94:15, 94:16, 94:19, 95:6
**vice** [1] - 7:2
**Vickers** [2] - 4:22, 5:1
**victim** [1] - 59:21
**video** [19] - 11:18, 11:19, 19:5, 40:24, 41:8, 41:12, 41:19, 43:11, 44:25, 54:8, 64:17, 64:20, 64:25, 85:16, 86:8, 86:23, 87:2, 91:13, 91:15
**videos** [5] - 9:13, 10:3,

10:19, 91:11, 101:23
**viewed** [3] - 58:6, 58:12, 64:20
**Vilke** [6] - 54:15, 59:9, 63:9, 65:5, 70:6, 70:9
**visited** [1] - 80:24
**visits** [1] - 7:9
**Vista** [1] - 71:19
**volitional** [2] - 97:1, 116:8
**volume** [9] - 27:23, 28:21, 65:23, 77:17, 77:19, 77:20, 84:17, 85:8
**volumes** [10] - 28:2, 28:24, 29:3, 62:12, 62:21, 63:19, 64:2, 65:16, 66:7, 84:15
**voluntary** [2] - 55:7, 61:20
**volunteers** [8] - 19:13, 19:24, 23:22, 54:16, 62:2, 62:3, 63:21, 65:19
**vote** [1] - 108:20
**vs** [1] - 1:10
**vulnerable** [1] - 59:21

**W**

**wait** [1] - 39:16
**wants** [1] - 97:17
**Washington** [1] - 57:20
**watch** [1] - 42:2
**watching** [1] - 42:4
**waveform** [2] - 35:20, 35:25
**waveforms** [4] - 36:8, 36:13, 36:14
**ways** [2] - 95:19, 99:9
**WEDNESDAY** [1] - 4:1
**Wednesday** [1] - 1:17
**week** [3] - 71:24, 75:21, 75:22
**Weight** [1] - 65:6
**weight** [19] - 16:5, 17:22, 18:17, 21:10, 26:20, 26:23, 27:3, 27:6, 27:7, 27:8, 27:9, 29:10, 32:15, 33:3, 56:7, 65:12, 65:21, 66:2, 95:2
**weights** [3] - 16:1, 27:2, 27:4
**well-documented** [1] - 55:1
**West** [1] - 2:16
**whereas** [1] - 75:3

**whole** [5] - 5:11, 28:19, 28:20, 84:16, 87:24
**wide** [2] - 90:3, 91:10
**WITH** [1] - 118:11
**withdrew** [1] - 75:12
**witness** [14] - 4:11, 5:4, 5:6, 8:22, 56:1, 87:18, 103:8, 108:24, 109:3, 110:6, 110:13, 111:7, 113:23
**WITNESS** [27] - 5:13, 5:14, 5:17, 5:25, 40:18, 45:4, 46:1, 49:25, 54:20, 62:25, 63:2, 66:18, 69:18, 74:10, 77:11, 84:4, 85:21, 86:19, 87:6, 87:13, 88:1, 88:2, 88:5, 100:25, 108:13, 114:1, 115:21
**WITNESSES** [1] - 3:3
**witnesses** [2] - 11:16, 91:21
**Wohlgelernter** [1] - 11:6
**Woodland** [1] - 2:5
**word** [9] - 23:21, 34:11, 47:3, 70:12, 71:10, 72:10, 75:9, 75:14, 114:1
**words** [3] - 96:22, 115:12
**works** [1] - 25:24
**workup** [1] - 113:14
**world** [3] - 23:15, 30:6, 96:21
**worn** [1] - 91:14
**would've** [1] - 9:22
**wound** [1] - 61:15
**wrap** [1] - 49:5
**wrapping** [1] - 82:24
**writing** [1] - 80:23
**writings** [1] - 83:22
**written** [2] - 20:13, 20:16
**wrote** [15] - 53:19, 55:7, 58:17, 58:22, 58:23, 58:25, 59:6, 59:20, 76:4, 83:10, 83:15, 109:10, 114:12, 115:6, 115:9
**Wysocki** [1] - 72:8

**X**

**x-ray** [1] - 92:25
**X2** [1] - 54:23

**X26** [1] - 54:22

**Y**

**year** [15] - 6:11, 7:9, 59:7, 89:8, 90:10, 106:7, 107:1, 107:9, 107:14, 110:12, 110:16, 110:17, 110:22, 111:4
**years** [23] - 8:18, 8:19, 14:8, 31:13, 57:17, 63:10, 70:14, 78:21, 89:6, 90:8, 106:12, 106:16, 106:23, 107:2, 107:5, 107:7, 108:25, 110:9, 110:23, 111:3, 111:6
**yelling** [1] - 53:24
**yesterday** [1] - 4:23
**younger** [1] - 56:7
**yourself** [3] - 31:15, 93:5, 110:12

**Z**

**zero** [1] - 107:14
**Zoom** [1] - 92:8