UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION-RIVERSIDE

- - -

HONORABLE JESUS G. BERNAL, DISTRICT JUDGE PRESIDING

- - -

TRACY ALVES, Individually and as    )
Successor in interest for KEVIN R.  )
NIEDZIALEK, deceased,               )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )   No. EDCV 19-2083-JGB
                                    )
RIVERSIDE COUNTY, RIVERSIDE         )      Jury Trial Day 7
COUNTY SHERIFF'S DEPARTMENT,        )
SHERIFF-CORONER CHAD BIANCO,        )
                                    )
                    Defendants.     )
_____)

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

Riverside, California

Thursday, April 6, 2023

9:27 a.m.

PHYLLIS A. PRESTON, CSR, FCRR
Federal Official Court Reporter
United States District Court
3470 Twelfth Street
Riverside, California 92501
stenojag@aol.com

APPEARANCES:


For the Plaintiff:

    LAW OFFICES OF DALE K. GALIPO
    BY:  **DALE GALIPO**
    21800 Burbank Boulevard, Suite 310
    Woodland Hills, California 91367

    LAW OFFICES OF JOHN BURTON
    BY:  **JOHN BURTON**
    128 North Fair Oaks Avenue
    Pasadena, California 91103

    HELM LAW OFFICE, PC
    BY:  **KENNEDY HELM**
    644 40th Street, Suite 305
    Oakland, California, 94609


For the Defendants:

    LEWIS BRISBOIS BISGAARD & SMITH, LLP
    BY:  **TONY SAIN**
        **TORI BAKKEN**
    633 West 5th Street, Suite 4000
    Los Angeles, California 90071

THURSDAY, APRIL 6, 2023; RIVERSIDE, CALIFORNIA

-o0o-

(Out of the presence of the jury:)

THE CLERK:  Calling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please state your appearances for the record.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain with Tori Bakken on behalf of Defendant Sheriff Chad Bianco and Defendant Riverside County.

THE COURT:  Good morning.

You received my proposed final set of instructions. I have included, I think it was tabbed for you, the instruction which Mr. Galipo requested yesterday.  Do you want to lodge your objection to that and/or others, Mr. Sain?

MR. SAIN:  Yes.  I believe the Court has already ruled.  So I'll just submit on the Court's ruling, but to clarify my objection, we object to the absence of a federal law proximate causation instruction for the reasons already stated.

As to the verdict form, we object to the inclusion of the multiple causation instruction, not because we believe that

it is an inaccurate statement of the law, but because we do not believe it is applicable to the facts as shown by the evidence in this case.

As to the verdict form, as elaborated in our briefs on verdict form by issue as opposed to by claim, which was at Docket 110, and as elaborated in our brief on the *Hayes* case, which was at Docket 111, we believe that the inclusion of 3 -- Questions 3 and 4 runs the risk of claim splitting and an inconsistent verdict. We believe that all of the force claims and all of the seizure-related medical care claims are decided by the exact same legal standard in both federal and California law, and, therefore, it is inappropriate to have Questions 3 and 4 on the form.

At a minimum, we would argue that Question 3 should follow Question 1 and that -- so that you have the force question and the vague negligence question together and then the two causation questions together. We also reserve our objection to the fact that Question 3 does not specify that it is pertaining to negligence in medical care as opposed to negligence in force, therefore, making it duplicative to Question 1.

However, the Court has already ruled on all these issues and we submit to the Court's ruling.

THE COURT: Very well. To the extent you make any new objections, those are overruled. Would you like to make

your motion?

MR. SAIN:  Yes, Your Honor.  Defendants have moving -- are moving -- excuse me -- as elaborated in our brief at 184, for judge -- or directed verdict at this time.  We believe that the evidence is clear and undisputed that as to what restraint asphyxia, compression asphyxia, positional asphyxia is, plaintiffs put on no evidence to dispute what it is, as stated by the defense experts, namely, that positional asphyxia is a condition that occurs where an airway is completely obstructed, that absent complete obstruction of the airway, there is no such thing as positional asphyxia.

We also submit that it is undisputed in this case that compression asphyxia occurs only where there is more than 550 pounds of weight on the restrained person's back, where there is internal organ damage, and cracks to the sides of the ribs.  Plaintiffs put on exactly zero evidence to dispute these points, zero evidence to dispute that the only forms of restraint asphyxia are compression and positional asphyxia.

The evidence was also undisputed in this case that the conditions for positional asphyxia and compression asphyxia were not satisfied here in any way, shape, or form.  For this particular case, it was undisputed that after Mr. Niedzialek was moved out of the prone position, he was still visibly breathing.  Both the video and the paramedic testimony assert this.  The fact that he was breathing for several minutes after

he's moved out of the prone position, that fact by itself negates the idea that prone positioning caused his restraint, which is the core and essence of plaintiff's case.

There's also no evidence in this case to dispute the fact that the County and the Riverside County Sheriff's Department and the Sheriff himself acted with deliberate indifference toward the preservation of the constitutional rights of Mr. Niedzialek, toward life or freedom from excessive force, or that they consciously disregarded any risk of harm or violation of his rights by positional asphyxia and/or prone restraint.  In fact, the undisputed evidence in this case is completely contrary to that, that this Sheriff and this Sheriff's Department engaged in active efforts, active research, ongoing research, extensive research, perennial research to try to figure out what the best practice was to preserve not only the safety of their community but the safety of Mr. Niedzialek and the safety of all officers involved in enforcing the law.  Active research.  Not deliberate indifference.

Plaintiffs also point out exactly zero evidence that their research was wrong.  There was zero evidence presented by plaintiffs to contradict the 20 years plus of medical studies showing that the current state of medical evidence is that prone restraint without airway obstruction and with no more than 225 pounds of weight on the back, there was zero evidence

presented by them that that kind of prone restraint creates any risk of asphyxia, any risk of harm.  They put on exactly one medical evidence -- excuse me -- one medical expert.  Exactly one.  And he never put on any evidence to contradict those studies at all.  They put on no evidence to show that the epidemiological studies or the medical studies or the lab studies put on by Dr. Chan were incorrect, no evidence by them to contradict the 20 years of research that this Sheriff's Department relied upon to support their decision to teach their deputies that prone restraint was safe as long as the airway was clear.

And it was undisputed in this case that all of the deputies followed that training.  They made sure Mr. Niedzialek's airway was clear.  They never even touched his neck, let alone restrained him.  They made sure he was breathing.  In fact, even when the paramedic arrived, the evidence shows undisputedly that he was breathing.  Now, plaintiffs want to attack what the deputies knew at the time and say, *Well, that wasn't real breathing; that was agonal breathing*.  It's undisputed in this case that deputies are not doctors.  They are not paramedics.  What they saw was a man breathing.  What they saw was a man who had a pulse.  And all of their training told them that at that point, especially with paramedics on the way, you leave him be.

There is zero evidence to support this idea that

plaintiffs are proffering that somehow the County training failed to take into account the risks of prone restraint when all the evidence is contrary.

There's zero evidence to show that the deputies or the Sheriff or the Sheriff's Department consciously disregarded any risk or were deliberately indifferent toward any risk.

And as Mr. Noble himself conceded after initially stating that when you prone restrain someone, you immediately get them into handcuffs no matter what, he backed off of that and basically admitted that that's not true, that the way that the Sheriff and every other witness that was put on who talked about police standards was the same rule, that you hold someone prone while it is safe to do so, that you are not going to move them out of that position because of all of the risks of doing so if it is unsafe to do so.  He said, *No, of course, you wouldn't move a subject out of the prone position if they're still struggling.*

All of the evidence in this case shows that the standard police practice was that if they are still struggling or if you still perceive them as a threat under the totality of the circumstances, you keep them prone to keep them safe, to keep the officers safe, and to keep the community safe.  And plaintiffs failed to sustain their burden.  And a reasonable jury could not conclude based on the actual evidence submitted in this case otherwise.

For those reasons, Your Honor, we move for a directed verdict under Rule 50.

THE COURT:  Okay.  The motion is denied.

Anything else by Mr. Galipo?

MR. GALIPO:  No, Your Honor.  Everything is fine.  The only things I wanted to point out were so minor I don't even know if it's worth it.  There's one instruction about evidence for a limited purpose.  I couldn't remember whether we even had that or not, but I don't see it on --

THE COURT:  Which one is that?

MR. GALIPO:  That's -- I think it's Number 8.  I don't see any harm in reading it.  I just couldn't remember if we had it.

THE COURT:  Yes.  So I'll skip that one.

MR. GALIPO:  And then the only other minor thing, again, it's just a slight typographical situation on Instruction 15.  Mr. Burton pointed this out to me.  At the end of the first paragraph where the sentence says "or to the issues it involves," I think it's supposed to be a "comma except" as part of the same sentence, but I'm not sure.

THE COURT:  A comma after what word?

MR. GALIPO:  I think after "involves," but maybe -- maybe that's the way it's supposed to be.  It just --

THE COURT:  No, I think that's the way it is.

MR. GALIPO:  Okay.

THE COURT:  It might be ungrammatical, but I think it's good.

MR. GALIPO:  That's fine.  That's all we have, Your Honor.  Thank you.

THE COURT:  Very well.  So let's bring in the jury.

MR. GALIPO:  And so -- just so Your Honor knows, my understanding is you're going to pre-instruct.

THE COURT:  Right.

MR. GALIPO:  And then what my plan is, usually my plans don't go so well, I'm going to try to go for 25 minutes, stop, play the video since you agreed that would not go against my hour's time, and then after the video plays, use 15 more minutes for a total of 40, trying to save 20 for my rebuttal argument.  That's what I'm going to try to do.

THE COURT:  Are you going to keep your own time or do you want --

MR. GALIPO:  Oh, yeah, well, we're going to keep it, but I wouldn't mind -- any reminders you think would be prudent, I wouldn't mind that.  For example, if it's -- if I'm 35 minutes in and I have five minutes left before the 40 minutes, I wouldn't mind it, but I'm pretty sure we're going to be on top of it here.

THE COURT:  Okay.  Any reminders by, Mr. Sain, that you wish me to give you during your time?

MR. SAIN:  Not really, Your Honor.  I think we can

keep time.  I'll have my associate give me a five-minute warning.

THE COURT:  Very well.

MR. SAIN:  Thank you.

THE COURT:  Thank you.

Okay.  Let's bring the jury in.

Mr. Galipo, I know you're serious because you're wearing your blue suit.

MR. GALIPO:  Well, I promised everyone I was going to wear a bright suit today and I didn't want to disappoint them.

(In the presence of the jury:)

THE CLERK:  Recalling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please restate your appearances for the record.

MR. GALIPO:  Good morning, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff, who is present.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain with Tori Bakken on behalf of Defendant Sheriff Chad Bianco and the Riverside County Sheriff's Department.

THE COURT:  Good morning.

And good morning, ladies and gentlemen.  As I mentioned yesterday, I will now read to you the final set of

instructions that I spoke to you about in the beginning.  After that the parties will provide their closing arguments.  So bear with me for a while.  This is going to take a bit.

Members of the jury, now that you have heard all of the evidence, it is my duty to instruct you on the law that applies to the case.  A copy of these instructions will be available to each of you in the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means you must decide the case only on the evidence before you.  You'll recall that you took an oath to do just that.

Please do not read into these instructions or anything I may say or do or have said or done during the trial as me having an opinion regarding the evidence or what your verdict should be.

The parties have agreed to certain facts that will be -- that I will read to you.  At this point you must treat these facts as having been proved.

Number 1, on the afternoon of July 29th, 2019, Deputies Brian Keeney and Sonia Gomez were deputy sheriffs

employed by Defendant County of Riverside through the Riverside County Sheriff's Department.

Number 2, the involved deputies were acting under color of law at the time of the incident.

Number 3, the involved deputies were acting within the course and scope of their employment with Defendant County of Riverside through the Riverside County Sheriff's Department at the time of the incident.

4, on July 30th, 2019, at the Inland Valley Medical Center, Kevin Niedzialek was pronounced brain-dead. His organs were later donated.

Number 5, Defendant Sheriff-Coroner Chad Bianco, at all times, was the primary policy maker for Defendant Riverside Sheriff's Department and acted under color of state law.

To help you follow the evidence or to review the evidence, I will give you a brief summary again of the position of the parties:

Plaintiff Tracy Alves brings this action both on her own behalf and as successor-in-interest to her brother, Kevin Niedzialek. She contends that County of Riverside deputy sheriffs acted unreasonably by holding him down in a prone position after he was handcuffed, restricting his ability to breathe, and causing his cardiac arrest, anoxic brain injury, and ultimately his death.

Plaintiff asserts that the unreasonable acts of the

deputies were pursuant to policy, practice, or custom of Defendant County of Riverside through the Riverside County Sheriff's Department.  Plaintiff contends that the training provided to the deputies by the County of Riverside through the Sheriff -- through the Riverside County Sheriff's Department was inadequate.

Plaintiff further contends that Riverside County Sheriff-Coroner Chad Bianco was responsible for the alleged constitutional violations as a supervisor, and that he ratified the deputies' conduct.

Plaintiff seeks damages as permitted by law. Plaintiff has the burden of proving these claims.

Defendants deny each and all of plaintiff's claims against the defendants, and defendants contend that, based on the facts actually known to them, Deputies Brian Keeney and/or Sonia Gomez acted reasonably under the totality of the circumstances during the incident involving Kevin Niedzialek, using only reasonable force on Kevin Niedzialek in self-defense and to protect the public safety, and that Kevin Niedzialek died as a result of his methamphetamine overdose, not as a result of the deputies' use of TASER force and/or manual restraint.

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or

affirmative defense is more probably true than not true.

You should base your decision on all the evidence, regardless of which side presented it.

You should decide the case as to plaintiff and each defendant separately.  Unless otherwise stated, the instructions apply to all parties.

The evidence you are to consider in deciding the facts of this case consists of the following:  Number 1, the sworn testimony of any witness; Number 2, the exhibits that were admitted into evidence; Number 3, any facts to which the lawyers have agreed; and, Number 4, any facts I instruct you to accept as proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence, along with the stipulated facts.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

Number 1, arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they said in their opening statements, will say in their closing arguments, and at any other time is intended to help you interpret the evidence, but it is not itself evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Number 2, questions and objections by lawyers are not

evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence.  You must not be influenced by the objection to the question or by my ruling on it.

Number 3, testimony that is excluded or stricken, or that you've been instructed to disregard, is not evidence and must not be considered.  In addition, I don't think it happened in this case, but sometimes evidence is received for a limited purpose.  If evidence was received for that limited purpose, you must consider it only for that purpose.

And, Number 4, anything you may have seen or heard when the court was not in session is not evidence you.  Are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial.

Direct evidence is direct proof of a fact, such as testimony by a witness as to what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from which you can find another fact.

You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is up to you to decide how much weight to give to any evidence.

There are Rules of Evidence that control what can be received into evidence.  When a lawyer asks a questions or

offers an exhibit into evidence and the lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore certain evidence. That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

From time to time during the trial, it became necessary for me to talk with the attorneys outside of your hearing, either by having a conference at sidebar or by taking a recess.  Please understand that while you were waiting, we were working.  The purpose of these conferences is not to keep relevant information from you but to decide how certain evidence is to be treated under the Rules of Evidence and to avoid any confusion or error.

Of course, we've done what we can to keep the number and the length of these conferences to a minimum.  I may not have always granted a request for a conference.  Do not consider me granting or denying a request for a conference as any indication of my opinion of the case or what your verdict

should be.

In deciding the facts of the case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account the following:  Number 1, the opportunity and ability of the witness to see or hear or know the things testified to; Number 2, the witness's memory; Number 3, the witness's manner while testifying; Number 4, the witness's interest in the outcome of the case, if any; Number 5, the witness's bias or prejudice, if any; Number 6, whether other evidence contradicted the witness's testimony; Number 7, the reasonableness of the witness's testimony in light of all the evidence; and, Number 8, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has

deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part that you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses that testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

The evidence that a witness has lied under oath on a prior occasion may be considered, along with all the other evidence, in deciding whether or not to believe the witness and how much weight to give to the testimony of the witness and for no other reason.

A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers on each side get to ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

The deposition of Eric Mireles was taken on September 1st, 2020. Insofar as possible, you should consider the deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves.  Except for discussing this case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anybody else communicate with you in any way about the merits of the case or anything having to do with it.  This includes including discussing the case in person, in writing, by phone, tablet, or computer, or any other electronic means, via email, text messaging, or any Internet chat room, blog, website, or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other form of social media.  This restriction applies to communicating with your family members, your employer, the media or the press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything having to do with this case, you must respond that you've been ordered not to talk about the case and report the contact immediately to me.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything having to do

with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about this case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify me immediately.

You have heard testimony from expert witnesses in this case who testified to opinions and the reasons for the opinions.  This opinion testimony is allowed because of the education or experience of these witnesses.

Such opinion testimony should be judged just like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

You have heard a recording, a video that was received into evidence.  A transcript of the recording was provided to help you identify the speakers and as a guide to help you listen to the recording.  However, bear in mind that the recording is the evidence, not the transcript.  If you heard something different from what appeared in the transcript, what you heard is controlling.  There was also a transcript with the video deposition.

Those exhibits received into evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room.  A computer, projector, or printer and accessory equipment will be available to you in the jury room.  And if it's not, and you want to see the video again, you can just send us a note asking for that and it can be played here in court.

A court technician will show you how to operate the computer and equipment, how to locate and view that video.  You will be provided a paper list of the exhibits and the evidence.  You may request a paper copy of any exhibit received in evidence by sending a note through the bailiff.  Although, all the exhibits that were not in electronic format will be provided to you in the jury room.

If a technical problem or question arises, if you're trying to watch the video, the court technician may enter the

jury room to help you with that technical matter. When the technician is in the courtroom -- I mean in the jury room, the jury shall not deliberate. No juror shall say anything to the court technician or any other non-juror other than to describe the technical problems or to seek information about operating the equipment. Do not discuss any exhibit with any -- or any aspect of the case with anybody who is not a juror.

The sole purpose of providing the computer in the jury room is to enable the jurors to view the exhibits received in the case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or any outside website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room, and do not copy any such data.

The plaintiff brings the claims under the federal statute called Title 42, United States Code, Section 1983, which provides that any person or persons who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

In order to prevail on her Section 1983 claim against Defendant County of Riverside alleging liability based on an official policy, practice, or custom, the plaintiff must prove each of the following elements by a preponderance of the evidence:

Number 1, Deputies Brian Keeney and/or Sonia Gomez acted under color of state law;

Number 2, the acts of Deputies Brian Keeney and/or Sonia Gomez deprived Kevin Niedzialek of his particular rights under the laws of the United States and/or the United States Constitution as explained in later instructions;

Number 3, Deputies Brian Keeney and/or Sonia Gomez acted pursuant to an expressly adopted official policy or a widespread or longstanding practice or custom of the Defendant County of Riverside through the Riverside County Sheriff's Department;

And, Number 4, the Defendant County of Riverside through the Riverside Sheriff's Department official policy or widespread or longstanding practice or custom caused the deprivation of Kevin Niedzialek's rights by Deputies Brian Keeney and/or Sonia Gomez; that is, the acts of Defendant County of Riverside, through the Sheriff's Department's official policy or widespread or longstanding practice or custom, is so closely related to the deprivation of Kevin Niedzialek's rights as to be the moving force that caused the

ultimate injury.

A person acts "under color of state law" when the person acts or purports to act in the performance of official duties under any statute -- under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that Deputies Brian Keeney and Sonia Gomez acted under color of state law.

"Official policy" means a formal policy such as a rule or regulation adopted by Defendant County of Riverside through the Riverside County Sheriff's Department resulting from a deliberate choice to follow a course of action made from among various alternatives by official or officials responsible for establishing final policy with respect to the subject matter in question.

"Practice or custom" means any longstanding, widespread, or well-settled practice or custom that constitutes a standard operating procedure of Defendant County of Riverside through the Riverside County Sheriff's Department.  A practice or custom can be established by repeated constitutional violations that were not properly investigated and for which the violator was not disciplined, reprimanded, or punished.

If you find the plaintiff has proved each of these elements, and if you find that the plaintiff has proved all the elements she is required to prove under the instructions that deals with the Fourth Amendment right to be free from

unreasonable seizures, excessive force or restraint, your verdict should be for the plaintiff on this claim.  If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for defendant on this claim.

In order to prevail under a Section 1983 claim against Defendant County of Riverside through the Riverside Sheriff's Department -- the Riverside County Sheriff's Department alleging liability based on a policy that fails to prevent violations of law by its failure to train deputies, the plaintiff must prove each of the following elements by a preponderance of the evidence:

Number 1, the acts or failures to act of Deputies Brian Keeney and/or Sonia Gomez deprived Kevin Niedzialek of particular rights under the laws of the United States or the United States Constitution as explained in later instructions;

Number 2, Deputies Brian Keeney and/or Sonia Gomez acted under color of state law;

Number 3, the training policies of Defendant County of Riverside through the Riverside County Sheriff's Department were not adequate to prevent violations of law by its deputies or train its deputies to handle the usual and recurring situations with which they must deal;

Number 4, Defendant County of Riverside through the Riverside County Sheriff's Department was deliberately

indifferent to the known or obvious consequences of its failure to train its deputies adequately;

And, Number 5, the failure of Defendant County of Riverside through the Riverside County Sheriff's Department to provide adequate training caused the deprivation of Kevin Niedzialek's rights by Deputies Brian Keeney and/or Sonia Gomez; that is, the defendant's failure to train played a substantial part in bringing about or actually causing the injury or damage to Kevin Niedzialek.

A person acts "under color of state law" when that person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that Deputies Brian Keeney and Sonia Gomez acted under color of state law.

A policy is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  A policy of inaction or omission may be based on a failure to implement procedural safeguards to prevent constitutional violations.  To establish that there is a policy based on the failure to preserve constitutional rights, plaintiff must show, in addition to the constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional rights, and that the policy caused the

violation, in the sense that the municipality could have prevented the violation with an appropriate policy.

"Deliberate indifference" is the conscious choice to disregard the consequences of one's acts or omissions.  The plaintiff may prove deliberate indifference in this case by showing that the facts available to the Defendant County of Riverside through the Riverside County Sheriff's Department put it on actual or constructive notice that its failure to implement adequate policies or failure to train adequately was substantially certain to result in the violation of the constitutional rights of persons such as Kevin Niedzialek due to its' deputies' conduct.

If you find the plaintiff has proved each of these elements, and if you find that the plaintiff has proved all of the elements she is required to prove under the instructions that deal with the Fourth Amendment right to be free from unreasonable seizures, excessive force or restraint, your verdict should be for the plaintiff on this claim.  If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant on this claim.

In order to prevail on her Section 1983 claim against Defendant County of Riverside, through its subsidiary, the Riverside Sheriff's County Department, alleging liability based on ratification by a final policy maker, the plaintiff must

prove each of the following elements by a preponderance of the evidence:

Number 1, Deputies Brian Keeney and/or Sonia Gomez acted under color of state law;

Number 2, the acts and failures to act of Deputies Brian Keeney and/or Sonia Gomez deprived Kevin Niedzialek of particular rights under the United States Constitution as explained in later instructions;

Number 3, Sheriff-Coroner Chad Bianco acted under color of state law;

Number 4, Sheriff-Coroner Chad Bianco had final policy-making authority from Defendant Riverside County concerning the acts and failures to act of Deputies Brian Keeney and Sonia Gomez;

And, Number 5, Sheriff-Coroner Chad Bianco ratified Deputies Brian Keeney's and Sonia Gomez's acts and failures to act; that is, Sheriff-Coroner Chad Bianco knew of and specifically made a deliberate choice to approve Deputies Brian Keeney's and Sonia Gomez's acts and failures to act and the basis for it.

Again, a person acts "under color of state law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that Sheriff-Coroner Bianco acted under color of state law.

The parties have stipulated that Sheriff-Coroner Bianco, at all relevant times, was the primary policy maker for Defendant Riverside County Sheriff's Department.

If you find the plaintiff has proved each of the elements, and if you find that the plaintiff has proved all of the elements she is required to prove under the instructions that deal with the Fourth Amendment right to be free from unreasonable seizures, excessive force or restraint, your verdict should be for the plaintiff on this claim.  If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant on this claim.

In order to prevail on her Section 1983 claim against the supervisory defendant, Sheriff-Coroner Chad Bianco, the plaintiff must prove each of the following elements by a preponderance of the evidence:

Number 1, the supervisory defendant, Sheriff-Coroner Chad Bianco, acted under color of state law;

Number 2, the acts and failures to act of the Deputies Brian Keeney and/or Sonia Gomez deprived decedent Kevin Niedzialek of his particular rights under the United States Constitution as explained in later instructions;

Number 3, the supervisory defendant, Sheriff-Coroner Chad Bianco, disregarded the known or obvious consequences that a particular training deficiency or omission would cause his

subordinates to violate decedent's constitutional rights, and the deficiency or omission actually caused his subordinates to deprive decedent of his constitutional rights;

And, Number 4, the supervisory defendant's conduct was so closely related to the deprivation of Kevin Niedzialek's rights as to be the moving force that caused the ultimate injury.

Again, a person acts "under color of law" when that person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance, or regulation.  The parties have stipulated that Sheriff-Coroner Chad Bianco acted under color of state law.

If you find the plaintiff proved each of these elements, and if you find that the plaintiff has proved all of the elements she is required to prove under the instructions that deal with the Fourth Amendment right to be free from unreasonable seizures, excessive force or restraint, your verdict should be for the plaintiff on this claim.  If, on the other hand, you find that the plaintiff has failed to prove any one or more of these elements, your verdict should be for the defendant on this claim.

In general, a seizure of a person is unreasonable under the Fourth Amendment if a law enforcement officer uses excessive force or restraint in making a lawful arrest or defending himself or herself or others, and/or in attempting to

stop a fleeing or escaping suspect.  Therefore, in order to establish an unreasonable seizure through the use of excessive force or restraint in violation of the Constitution or other laws, the plaintiff must prove by a preponderance of the evidence that Deputies Brian Keeney and/or Sonia Gomez used excessive force or restraint when they restrained Kevin Niedzialek on his chest after handcuffing.

Under the Fourth Amendment, a law enforcement officer may use only such force or restraint as is "objectively reasonable" under the totality of the circumstances.  You must judge the reasonableness of a particular use of force or restraint from the perspective of a reasonable law enforcement officer on the scene and not with 20/20 vision of hindsight. Although the facts known to the officer are relevant to your inquiry, a law enforcement officer's subjective intent or motive is not relevant to your inquiry.

In determining whether a deputy used excessive force or restraint in this case, consider all of the circumstances known to each officer on the scene, including:

Number 1, the nature of the crime or other circumstances known to the deputies at the time force was applied;

Number 2, whether Kevin Niedzialek posed an immediate threat to the safety of the deputies or to others;

Number 3, whether Kevin Niedzialek was actively

resisting arrest or attempting to evade arrest by flight;

Number 4, the amount of time the deputies had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;

Number 5, the relationship between the need for the use of force and the amount of force used;

Number 6, the extent of the decedent's injury;

Number 7, the availability of alternative methods to take the decedent into custody;

Number 8, whether it was practical for the deputies to give warnings of imminent use of force, and whether such warnings were given;

Number 9, whether it should have been apparent to the deputies that the person they used force against was emotionally disturbed;

Number 10, whether a reasonable deputy would have or should have accurately perceived a mistaken fact;

And, Number 11, whether there was probable cause for a reasonable officer to believe that Kevin Niedzialek had committed a crime involving the infliction or threatened infliction of serious physical harm.

"Probable cause" exists when, under all of the circumstances known to the deputies at the time, an objectively reasonable law enforcement officer would conclude there is a fair probability that Kevin Niedzialek had committed or was

committing a crime.

An employer is responsible for the harm caused by the wrongful conduct of its employees while acting within the scope of their employment.

The following claims for the deputies' conduct arise under state law: battery by a peace officer and negligence. Under state law, plaintiff contends that the deputies engaged in battery by a peace officer and negligence.

If you find that Deputies Brian Keeney and/or Sonia Gomez engaged in battery by a peace officer or negligence as defined by other instructions, then the County of Riverside is responsible for the harm caused by the deputies' wrongful conduct occurring within the scope of their employment.

The parties have stipulated that Deputies Brian Keeney and Sonia Gomez were employees of the Defendant County of Riverside and that they were acting within the scope of their employment during the incident.

Plaintiff claims that Deputies Brian Keeney and/or Sonia Gomez harmed Kevin Niedzialek by using unreasonable force after handcuffing. To establish this claim, plaintiff must prove all of the following:

Number 1, that Deputies Brian Keeney and/or Sonia Gomez used unreasonable force or restraint on Kevin Niedzialek;

Number 2, that Deputies Brian Keeney's and/or Sonia Gomez's use of unreasonable force or restraint was a

substantial factor in causing Kevin Niedzialek's death.

A deputy may use reasonable force or restraint to arrest, detain, prevent the escape, or overcome the resistance of any person when the deputy has reasonable cause to believe that a person has committed a crime.  Even if the officer is mistaken, a person being arrested or detained has a duty not to use force or resist the officer unless the officer is using unreasonable force or restraint.

In deciding whether the defendants used unreasonable force or restraint, you must consider the totality of the circumstances and determine what amount of force or restraint a reasonable officer in Defendant Brian Keeney's and/or Sonia Gomez's position would have used under the same or similar circumstances.  "Totality of the circumstances" means all facts known to the deputy at the time, including the conduct of Kevin Niedzialek leading up to the use of force or restraint.  You should consider, among other factors, the following:

A, whether Kevin Niedzialek reasonably appeared to pose an immediate threat to the safety of a deputy or others;

B, the seriousness of the crime at issue;

And, C, whether Kevin Niedzialek was actively resisting arrest or attempting to evade arrest.

An officer who makes or attempts -- an officer who makes or attempts to make an arrest does not have to retreat or stop because the person being arrested resists or threatens to

resist. Tactical repositioning or other de-escalation tactics are not retreat. An officer does not lose the right to self-defense by using objectively reasonable force to arrest, detain, prevent escape, or overcome resistance.

A law enforcement officer may use reasonable force or restraint to arrest, detain, prevent escape of, or overcome resistance by a person when the officer has a reasonable cause to believe that the person has committed or is committing a crime. However, the officer may use only that degree of force or restraint necessary to arrest, detain, prevent escape of, or overcome resistance by a person. Even if the officer is mistaken, a person being arrested or detained has a duty not to use force or resist the officer unless the officer is using unreasonable force or restraint.

Plaintiff claims that Deputies Brian Keeney and/or Sonia Gomez were negligent in using unreasonable force or restraint to arrest, detain, prevent escape of, or overcome resistance by Kevin Niedzialek. To establish this claim, Plaintiff Tracy Alves must prove all of the following:

Number 1, that Deputies Brian Keeney and/or Sonia Gomez used force or restraint to arrest, detain, prevent escape of, or overcome resistance of Kevin Niedzialek;

Number 2, the amount of force or restraint used by Deputies Brian Keeney and/or Sonia Gomez was unreasonable;

Number 3, that the use of the unreasonable force or

restraint by Deputies Brian Keeney and/or Sonia Gomez was a substantial factor in causing Kevin Niedzialek's death.

In deciding whether Deputies Brian Keeney and/or Sonia Gomez used unreasonable force or restraint, you must consider the totality of the circumstances to determine what amount of force or restraint a reasonable law enforcement officer in Deputies Brian Keeney's and/or Sonia Gomez's position would have used under the same or similar circumstances.

Again, "totality of the circumstances" means all facts known to the officers at the time, including the conduct of Deputies Brian Keeney and/or Sonia Gomez and Kevin Niedzialek leading up to the use of force or restraint.  Among the factors to be considered are the following:

Number A, whether Kevin Niedzialek reasonably appeared to pose an immediate threat to the safety of Officers Brian Keeney and/or Sonia Gomez or others;

B, the seriousness of the crime at issue;

C, whether Kevin Niedzialek was actively resisting arrest/detention or attempting to avoid arrest or detention by flight;

And, D, Deputies Brian Keeney's and/or Sonia Gomez's tactical conduct and decisions before using force or restraint on Kevin Niedzialek.

An officer who makes or attempts to make an arrest

does not have to retreat or stop because the person being arrested is resisting or threatening to resist.  Tactical repositioning or other de-escalation tactics are not retreat. An officer does not lose the right to self-defense by using objectively reasonable force to arrest, detain, prevent escape of, or overcome resistance by the person.

You may decide that more -- that one -- you may decide that more than one of the deputies was negligent, but that the negligence of only one of them could have actually caused Kevin Niedzialek's death.  If you cannot decide which of the deputies caused Kevin Niedzialek's death, you must decide that they are both responsible for the death.

However, if a deputy proves that he or she did not cause Kevin Niedzialek's death, then you must conclude that that person is not responsible.

A substantial factor in causing death is a factor that a reasonable person would consider to have contributed to the death.  It must be more than a remote or trivial factor. It does not have to be the only cause of the death.

Conduct is not a substantial factor in causing death if it would have occurred without that conduct.

A person's negligence may combine with another factor to cause harm.  If you find that Deputy Brian Keeney and/or Sonia Gomez's negligence was a substantial factor in causing Kevin Niedzialek's death, then Deputy Brian Keeney and/or Sonia

Gomez is responsible for that harm.  Deputy Brian Keeney and/or Sonia Gomez cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing Kevin Niedzialek's harm.

Defendants claim that Kevin Niedzialek's own negligence contributed to his harm.  To succeed on this claim, the defendants must prove both of the following:

Number 1, that Kevin Niedzialek was negligent;

And, Number 2, that Kevin Niedzialek's negligence was a substantial factor in causing his harm.

If defendants prove the above, the damages awarded are reduced by your determination of the percentage of Kevin Niedzialek's responsibility.  And I will calculate that reduction.

Negligence is the failure to use reasonable care to prevent harm to oneself or to others.  A person can be negligent by acting or failing to act.  A person is negligent if that person does something that a reasonable person would not do in the same situation or fails to do something that a reasonable person -- a reasonable careful person would do in the same situation.  You must decide how a reasonably careful person would have acted in Kevin Niedzialek's situation.

It is duty of the Court to instruct you about the measure of damages.  By instructing you on damages, I do not mean to suggest for which party your verdict should be

rendered.

If you find for the plaintiff on any of plaintiff's claims, you must determine Plaintiff Tracy Alves's damages and Kevin Niedzialek's damages.  The plaintiff has a burden of proving damages by a preponderance of the evidence.  Damages means the amount of money that would reasonably and fairly compensate the plaintiff and Kevin Niedzialek for any injury you find was caused by a defendant or its employee or agent.

When determining decedent Kevin Niedzialek's damages, you should consider the following:

Number 1, the nature and extent of the injuries;

Number 2, the loss of life;

And, Number 3, the mental, physical, and emotional pain and suffering experienced.

When determining Plaintiff Tracy Alves's damages, you should consider the following:

The loss of Kevin Niedzialek's love, companionship, comfort, care, assistance, protection, society, and moral support;

And, Number 2, the loss of Kevin Niedzialek's training and guidance.

It is for you to determine what damages, if any, have been proved.  Your award must be based upon evidence and not upon speculation, guesswork, or conjecture.

No fixed standard exists for deciding the amount of

noneconomic damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense.

For Plaintiff Tracy Alves's damages, determine the amount in current dollars paid at the time of judgment that will compensate the plaintiff for those damages.  This amount of noneconomic damages should not be further reduced to present cash value.

In deciding Tracy Alves's loss, do not consider:  1, Tracy Alves's grief, sorrow, mental anguish; Kevin Niedzialek's pain and suffering; or the poverty or wealth of Tracy Alves.

In deciding a person's life expectancy, you may consider, among other factors, the average life expectancy of any person of that age, as well as that person's health, habits, activities, lifestyle, and occupation.

According to Vital Statistics of the United States, published by the National Center for Health Statistics, the average further life expectancy of a 47-year-old female is 34.47 years, and the average further life expectancy of a 35-year-old male is 41.23 years.  This published information is evidence of how long a person is likely to live but is not conclusive.  Some people live longer and others die sooner.

If you find for the plaintiff, you may, but are not required to, award punitive damages against Sheriff-Coroner Chad Bianco.  The purpose of punitive damages is to punish a defendant and to deter similar acts in the future.  Punitive

damages may not be awarded to compensate a plaintiff.

The plaintiff has the burden of proving by a preponderance of the evidence that punitive damages should be awarded and, if so, the amount of such damages.

You may award punitive damages only if you find that the Sheriff-Coroner Chad Bianco conducted -- I'm sorry, let me start that sentence over.  I'm running out of saliva.

You may award punitive damages only if you find that the Sheriff-Coroner Chad Bianco's conduct that harmed Kevin Niedzialek was malicious, oppressive, or in reckless disregard of Kevin Niedzialek's rights.

Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring Kevin Niedzialek.

Conduct is in reckless disregard of Kevin Niedzialek's right if, under the circumstances, it reflects complete indifference to Kevin Niedzialek's safety or rights, or if the defendant acts in the face of a perceived risk that his or her actions will violate Kevin Niedzialek's rights under federal law.

An act or omission is oppressive if the defendant injures or damages or otherwise violates the rights of Kevin Niedzialek with unnecessary harshness or severity, such as by misusing or abusing authority or power or by taking advantage of some weakness or disability or misfortune of Kevin

Niedzialek.

Punitive damages may not be awarded against the County of Riverside or the Riverside County Sheriff's Department.

Before you begin your deliberations, elect one member of the jury as your presiding juror.  That presiding juror will preside over the deliberations and serve as the spokesperson for you here in court.

You shall diligently strive to reach an agreement with all the other jurors if you can do so.  Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should only do so after you have considered all of the evidence, discussed it fully with your other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision.  Do not be unwilling to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think that it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff,

signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or hear in open court. If you send out a question, I will consult with the lawyers before answering, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone, including me, how the jury stands, whether in terms of vote count or otherwise, until you have been -- until you have reached a unanimous verdict or have been discharged.

We will provide you with a verdict form with questions you must answer.  I have already instructed you on the law that applies and to use in answering the questions. You must follow my instructions and the forms carefully.  You must consider each question separately.  Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict form in the order they appear.  After you answer a question, the form tells you what to do next.

All of you must deliberate on and answer each question.  All of you of you must agree on an answer before you move on to the next question.

After you reach a unanimous agreement on a verdict, your foreperson should complete the verdict form according to

10:30
10:30
10:31
10:31
10:31

your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom.

That was a mouthful.  Luckily, you will have these in writing with you so you can consult carefully.

Very well.  Now is the time for closing argument.

Mr. Galipo, are you prepared?

MR. GALIPO:  Yes, I am.

May I begin, Your Honor.

THE COURT:  You may begin.

MR. GALIPO:  Thank you.

Good morning, ladies and gentlemen of the jury. First of all, I want to thank all of you very much for not only being on the jury, on behalf of myself, Mr. Burton, Mr. Helm, Tracy Alves, and Bob Alves, but for being here every day, for obviously taking this very seriously, for listening very carefully to all the evidence.  It's very much appreciated.

I would like to review some of the evidence with you. I would also like to review the verdict form with you -- you're going to be getting a verdict form that has specific questions for you to answer -- talk a little bit about the instructions the judge just read.  You'll get a chance to see the video one more time uninterrupted.  It's been a little while since you've seen it.  And why are we here?

Well, we know Kevin Niedzialek was 34 years old.  He had lost his dad, he had lost his sister, and had recently lost

his mom.  In fact, as you heard, it was a short time period between her being diagnosed with colon cancer and dying.  And, in fact, we saw this photo, you know, on a birthday shortly before her passing, and it's obvious from looking at the joy on his face how close he was with his mother.  And really, his mother then passed away, they went to Philadelphia to lay her to rest, and it was at the end of that trip in June when he came back in July and he relapsed on drugs.  He had been clean, as we heard, for two years.

And I think it's on question the closeness and the love between the sister and brother.  Imagine, that's all they have left was each other as far as the immediate family.

Couple things to keep in mind at the outset.  Number 1, this is not a criminal case.  That's important for several reasons.  We don't have to prove anyone committed a crime, anyone had an intent to kill anyone, or anything like that.  This is a civil case.

Second reason that's important is the burden of proof.  Most of you have probably heard, Well, in a criminal case, the burden is very high.  Proof beyond a reasonable doubt.  But that's not the case here.  The judge several times talked about preponderance of the evidence.  The plaintiff only has to prove by a preponderance of the evidence.  What that means, and there's an instruction on it, is more likely true than not true.  If you think about the scales of justice or

percentages, it would be slightly over 50 percent.  Even 50.0001 percent would be enough.  So if there's an issue that you're thinking about, and you see points on both sides, but on balance you feel it's slightly in favor of the plaintiff, scales of justice, even -- even a feather tipping it in favor of the plaintiffs, that is enough in this case.

Credibility.  You judge credibility.  It's probably one of the most important roles jurors play.  You remember when we started the judge talked about the importance and the history of jury trials, going back to the Declaration of Independence, quoting Thomas Jefferson.  And the essence of what Thomas Jefferson was saying, a jury trial is a way that we can let's say control our government and hold them accountable when necessary.  So jury trials are extremely important.  Each and every one of you obviously is very important.

What's at the heart of this case?  The drug issue. Let's just get right on it now.  Okay?  I asked you about it in jury selection.  Does anyone have such strong feelings about drugs or methamphetamine, they hear that, they're tuning out, they think they can't give the plaintiff a fair trial?  All of you said, *No.  We're not going to do that.  We'll listen to the evidence.  We'll weigh.  We'll be fair to both sides.*

The other side has contested, and even read as part of the jury instruction, they claim this was a drug overdose, period.  The officers had nothing to do with this.  That is not

what the evidence shows.

First of all, their very own expert, Dr. Richard Clark, a specialist in toxicology, said, *This is not a drug overdose*.  A drug overdose, the manner of death would be accident or suicide, not homicide.  In fact, he said, *It was a high recreational level*.  Without the restraint, without the struggle during the restraint, he wouldn't have died.

Dr. Fajardo put on the death certificate on his autopsy report, "Other significant conditions: restraint maneuvers."  Now, they want you to believe the only thing he really meant was tasing, but use your common sense.  We know what the restraint was in this case.  We generally know what "restraint maneuvers" mean.  And the defense has put on evidence to suggest positional asphyxia doesn't exist, restraint asphyxia doesn't exist.  The medicine and science is so clear on this, nobody dies from being held down prone by the police.  It's a non-issue.

And the fact that Riverside County had no training, no policies on it at all, that's totally fine.  That's their position.  And the fact that these deputies held him down for four minutes after he was handcuffed, after he stopped moving, after he stopped resisting, totally fine.  That's how they were trained.

So you have to decide whether that's adequate training or not in line with everything else going on.

And what else did we hear?  We heard from experts. Dr. Fajardo, who arguably is somewhat biased in this case, okay?  Why?  He works for the Sheriff.  He works for Riverside County.  They didn't do an independent investigation by having another agency do this or an outside medical examiner.  They had their own person do the autopsy, not only in this restraint death case but other restraint death cases Riverside County has had, in anticipation of litigation, anticipation of a jury trial so that they can have their medical examiner come up here and try to tell you it really wasn't the officers.  So you again judge bias and you judge credibility.

I asked Dr. Fajardo, *How many cases have you had where law enforcement restrained someone prone, chest down, and they died?  About 50.*

Dr. Graham, his own cases and other cases, we did the math, about 120.  Mr. Noble, 10 to 20.  Mr. Fonzi, 20. Dr. Chan, who knows?  50.  Start adding up the numbers. Hundreds and hundreds, probably thousands of people die by prone restraint being held down, and the defense wants you to believe there's no connection at all.

This is where you get to use your common sense and your life experience, ladies and gentlemen.  And so then the question becomes, *Well, was anyone else training or having policies to sit their people up after they're handcuffed?*  And let's be clear, that is the plaintiff's position, which

Mr. Noble, the first witness, who laid out the policy and the training -- and Mr. Noble, unlike Mr. Fonzi, doesn't do 98.5 percent of his work for the defense.  Mr. Fonzi 30 times has testified for the County of Riverside.  285 times he's come into court, just like this, in a case where there's an allegation of excessive force and told the jury these officers did nothing wrong.  And guess what?  Every time he got paid.  And do the math.  He's got 160 current cases.  Multiply that by 10,000 or 20,000 a case and see what numbers you come up with. 1.6 million, 3.2 million.  You think maybe Mr. Fonzi might be a little biased?

Mr. Noble does 50 percent of his work for the law enforcement agencies, 50 percent of his work for the plaintiff. And what did he say?  The standard of every competent agency in the United States is when someone is handcuffed, put them in a recovery position.  Officers can easily control someone seated up that's handcuffed.  They're trained to do so by standing behind one on each side.  The person's not going anywhere. This business that they get out of handcuffs, they take officers' guns, they go on murderous sprees, you have to decide how credible that is in this case.

And so who has this training?  Who has this policy? I mean, first of all, the International Association of Chiefs of Police say sit people up or lay them on their side, especially if they appear to be in excited delirium, to prevent

against cardiac arrest, to prevent against positional asphyxia. And this is sent over all the country to do.  And everyone does it except Riverside.  The Department of Justice says to do it. Riverside ignores that.

Lexipol, the company that makes the policies for the agencies, they create the language.  "If the person being handcuffed is on the ground or in a prone position, officers should, as soon as possible, place the person in an upright sitting position or on their side for respiratory recovery and to mitigate the potential for positional asphyxia."  That is the suggested wording for policies across the country by Lexipol.

POST references positional asphyxia, Peace Officer Standards and Training.  How many cities did Mr. Noble go through with Mr. Burton that had these policies?  New York, New Orleans, Detroit, Indianapolis, Denver, Berkeley, Washington DC.  We could have been here all day long.  Even San Bernardino County.

Their expert, Mr. Fonzi, now he didn't want to concede much to me, but he had to admit they have written policies on positional asphyxia, restraint asphyxia, and the recovery position, and they have written training materials on all three of those and the risk factors, risk factors like someone who might be in a mental health crisis, in a state of excited delirium, being tased, under the influence of drugs,

being injured.

Dr. Chan's studies that they want to rely on, they want to stand up here and tell you, *Oh, unless you have 500 pounds on you and broken ribs, you can't die by being restrained.* Really? His studies of normally completely healthy people is going to replicate what's going on in real life?

So for them to take the position -- and guess what? Did they name one agency, even one in the entire country that doesn't have these training policies or bulletins? Not one. And you know why this is so important in this case, ladies and gentlemen? Because these deputies said, *We followed our training. That's how we were trained, to keep him prone, to keep holding him down. After they're handcuffed, even if they stop moving, even if they stop resisting, we just keep holding him down. We were going to hold him down all the way until the paramedics got there.* Well, what if the paramedics got there ten minutes later? *That's our training.*

That's why the training is an issue. And they want to say, *Oh, they had this training bureau and we did all this research.* What proof of there is (sic)? Do they have one memorandum they showed you, one written document that they showed you? And they -- Riverside claims, *We don't need this policy*, right? But interestingly, they didn't have one at the time of this incident, but they have one now. Something that

they say they don't believe in, something they say that doesn't occur.

And think about it.  Sheriff Bianco said, *You know, if I thought there was any possibility, any legitimate dispute about whether prone restraint causes or contributes to medical issues or death, I would absolutely have the property -- the -- the policy and the training.  Absolutely.  We're all for the sanctity of life, reverence for life, people's constitutional rights.*  Well, guess what?  People have a constitutional right to be free from excessive force or restraint.  And that includes after you're handcuffed to be sat up so you can breathe, so you can recover.  That's why they call it "the recovery position."

And they made it look like some quack, Dr. Reay, came up with this theory, recanted it, and everyone in the country knows he's wrong.  Really?

There's evidence that came in this record that medical professionals and experts throughout the country believe that prone restraint causes death, especially in at-risk individuals.

Now, there might be some dispute as to the mechanism.  Is it, quote/unquote, asphyxia?  Is it the acidosis?  Is it the catecholamines?  Is it some form of excited delirium where Dr. Graham says, *We don't really know what the mechanism is.  We just know it happens and they die.*  Well, if they keep

dying, and you're supposed to have reverence for human life, don't do it.  Why are you risking someone's only brother, his death, and other cases too?  We heard that Riverside has had other cases of prone restraint and death.  How long is this going to go on?  And what's going to happen?

*Okay, there's a death case, we'll get our experts together, call Chan and Kode.  We'll have Kode say it was less than 500 pounds.  Chan will come in.  The jury always buys his -- his discussion.  He's testifying next week in Bakersfield on another restraint death case, and we'll just keep going on to the next case.*  How about changing your training and policies?  Why do you need to put people at risk where they could die?

And causation.  Okay?  The judge just read some instructions on causation.  It's important to know you can have more than one cause, more than one cause of death.  Just has to be a substantial factor.  The judge read to you just this instruction, and as he indicated, you will have these in the jury room.  "A person's negligence may combine with another factor to cause harm.  If you find" -- and I'm paraphrasing -- "that the deputies' negligence was a substantial factor in causing Kevin's harm, then the deputies are responsible.  They cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the harm."  So if someone says, *Well, he was on drugs*, that

doesn't matter.  That's even more reason not to keep him held down prone.

So what happened in this case?  They get calls, right?  They show up.  He needs help.  He's a fellow human being.  He needed help.  He hadn't hurt anyone.  He hadn't committed any serious crime.  He wasn't -- hadn't committed a felony or didn't have a weapon.  He never verbally threatened to harm the officers.  He never punched them.  He was bleeding from his head.  He was in an excited state.  If that's not excited delirium, I don't know what is.

That's another credibility point for you, ladies and gentlemen.  They want to say, *Oh, we have training on excited delirium, but we didn't think he was in a state of excited delirium.*  You know why they said that?  Because, number one, if it's a medical emergency, the person needs immediate medical care; and, number two, if it's excited delirium, you shouldn't hold them down prone.  So they just thought they'd tell you, *Oh, I just thought it was the drugs.  Excited delirium never crossed my mind.*  But excited delirium is brought on by stimulant drugs.

Then what happens?  He's bleeding, he's sitting there, he gets up.  We've all seen the video.  We'll see it in a minute.  And he approaches the officer, tased once, then tased twice, and goes facedown.  Two tases, already injured.  Falls facedown because he can't control himself.

Understandably, he would be winded and out of breath at that point.  They handcuff him within about 34 to 40 seconds, and he should have been right then sat up.  If he was sat up right then, ladies and gentlemen, we would not be here.  That's what they should have done.  But they didn't do it.  Why did they not do it?  Because they claim that's not how they're trained.  *We had no training to do that.  We had no policy to do that.  In fact, we were trained to keep him down.*

That's horrible.  That's horrible.  We're all going to go home, go on with our lives.  Tracy Alves has to live with this the rest of her life.  Every day she thinks of her brother.  This case really isn't just about Kevin Niedzialek.  This is about everyone's constitutional rights and the reverence for human life.

So you heard from -- you heard from --

May I confer one moment with counsel?

THE COURT:  You may.

MR. GALIPO:  Thank you.  I know where I'm at.  I got to keep track of my time.  I'm sorry.

You heard from Mr. Noble.  He was the first witness.  You heard from Dr. Dan, a cardiologist, the only cardiologist in this case.  So -- and I'll tell you about the medical evidence in a moment.  So he goes chest down, they handcuff him, they don't sit him up, put him on his side.  Within a very short period of time, he stops moving.  You've seen the video.

Now, from our perspective -- and Mr. Noble talked about the physiology of a struggle, which officers should be trained on, which the model policies say you need to be aware of this.  If somebody particularly who is at risk, maybe under the influence of drugs, maybe they've just been tased -- by the way, the Lexipol policy on tasing, once you tase someone, don't put them in a position that can impair their breathing, which obviously is chest down.

So physiology of a struggle.  A person's panicked, they have two officers holding them down chest down, they're already out of breath, they feel they can't breathe.  What is the natural reaction?  They're going to turn or try to lift so that they can expand their diaphragm and breathe.  Would've the officers, if they're not properly trained on the physiology of a struggle, *Ah, this guy is trying to get up and get away. He's resisting.  We need to hold him down more.  We need to put more weight on him.*  And the person now becomes more anxious trying to move or breathe.

What's one of the last things we hear Kevin say? *Help me.  Get me up.*  Our view is he wasn't resisting.  Our view, he was trying to breathe.  But the officers, because they're not well-trained, perhaps didn't realize that.  And then it even gets worse.  He stops moving altogether.  The training is that if someone calms down a lot from being in an agitated state, you better be aware they could be in serious

medical trouble.  You better take immediate steps because they could have a -- they could have a cardiac arrest.  They didn't do that.

They held him down for approximately four minutes after he stopped moving, saying they thought he was sleeping.  Still didn't turn him over.  Calling out his name.  No response.  Still didn't turn him over.  Finally, they realize, *Huh, he doesn't look to be breathing.  Turn him over.*  And you see how he looks when they turn him over.  He's not breathing.  His eyes are fixed and dilated.  They wrote in their reports, "We turned him over.  He wasn't breathing."  But now they want you to say that's incorrect too.  Why?  Because they know they didn't do any CPR.  *So we'll just say we thought he was breathing so we don't have to do the CPR.*  And agonal breathing's not real breathing.

They take his pulse once.  No pulse.  Try it again.  *Oh, very faint.  Very, very faint.*  If someone has a very faint pulse, that's a life-threatening situation.  They stand before you and tell you, ladies and gentlemen, *We did not think this was any life-threatening medical situation until the paramedics got there.*  You have to decide how believable is that.

Deputy Gomez says -- Deputy Gomez says, *Well, he didn't appear to be breathing, but about 60 seconds later, I saw him open his mouth and he appeared to maybe take a breath.*  You don't think that is a serious medical situation?  And if

you had a very faint pulse, why not take it every 15 seconds to make sure that pulse is still there?  Because once it goes away, you definitely have to start CPR.  They didn't do that either.

So what we're going to do now is play the video uninterrupted, and then I'll make some comments afterwards.  Thank you.

(Video played.)

MR. GALIPO:  So there it is again.  I know you haven't seen it in a while, but we wanted you to be able to see it again in its entirety uninterrupted.

I'd like to say something about the paramedic, La Russo.  If you think about it, arguably, she's the only witness in this case who's totally unbiased.  She wasn't retained by any side, paid by any side, doesn't work for the Sheriff's Department.  And she came here and testified, you remember, last Friday morning.  And she clearly said that when he -- and you hear it on the video.  *He's not breathing.*  But maybe even more importantly than that, she checked at one point, once they got the blood trying to circulate again, his end-tidal $CO_2$.  $CO_2$ is carbon dioxide.

So when someone asphyxiates, they have a high level of carbon dioxide because they can't blow off the carbon dioxide if they're not adequately breathing.  And when she initially took it, the blood wasn't circulating.  It was lower.

But once the blood started circulating, it was extremely high, she testified before you, ladies and gentlemen, about in the 90s, which was clear evidence to her, based on all her experience as a paramedic, there was hypoxia, lack of oxygen, that preceded the cardiac arrest.  That's exactly what happens when someone asphyxiates.

Plus Dr. Dan said, *This is a PEA cardiac arrest.* Dr. Graham yesterday conceded, *This is a PEA cardiac arrest.* PEA is pulseless electrical activity.  If you have a cardiac arrest due to just drugs, it's ventricular fibrillation or ventricular tachycardia.  He didn't have that.  Plus they want to say, *Well, maybe ventricular fibrillation that's completely unorganized can go into an organized pulseless electrical activity.*  Not without being shocked, it can't.  Dr. Dan explained that.

And then they want to say, *Well, you need petechial hemorrhages.*  But the doctors -- even their doctors admitted, *You don't need petechial hemorrhages to have asphyxiation.*

And this 500-pound theory is totally unsupported.

So we believe the evidence is clear that one of the causes of his death was his restraint.  Hypoxia, lack of oxygen, plus acidosis, which he had a buildup of, and, remember, if you can't breathe adequately, you can't get rid of the acidosis, and those two together cause cardiac arrhythmia.

La Russo also indicated, which is pretty obvious when

you see the video, *His eyes were fixed and dilated.*  We all know that.  That's basic understanding.  If someone's eyes are fixed and dilated, that's a medical emergency, which also is evidence of a hypoxic brain injury.

And time is of the essence, right, I mean, if someone is in medical trouble as he was.  One of their doctors said, *I think he had the cardiac arrest early on, when he stopped moving.  That's when I think it happened.*  Another one of their doctors said, *No, I think it happened three or four minutes later.*  They're not even clear on that.  But one thing is for sure, if you're in trouble with breathing or with your cardiac function, the sooner you can get help, the sooner you could be sat up, the sooner you can get CPR, the better chance you have at surviving.  Anybody who had a loved one in that situation would want their loved one sat up and given CPR and at least try to do something.

Okay.  Thank you.

They're keeping track of my time.

The special verdict form, I want to talk to you about it.  You're going to have it, and I'm going to tell you what some of the questions are just so you can start thinking about it and what I believe the evidence supports a finding of.  Remember, on each question, it's only more probably true than not.  Right?  Just slightly in our favor.

Question 1 is whether the force or restraint by the

deputies was excessive or unreasonable.  We believe the answer is "yes."  As soon as he was handcuffed, they should have sat him up.  Keeping him prone after he was handcuffed, after he stopped moving, after he stopped making any sounds for all those minutes, all of that combined was excessive and unreasonable, particularly given the national standards on that.

Question 2 is, "Was that a cause of injury, loss, or death to Kevin Niedzialek?"  Well, yes.  Remember, it just has to be a cause, not the only cause.  So if you're feeling, *Well, drugs played a part in this*, that's okay.  That's even more reason why he needed not to be restrained by that -- like that and to be sat up.

So was it a cause of harm to him or death?  Yes, it was.  That's why this is a homicide.  That's what Dr. Dan told you.  Even the death certificate certifies "restraint maneuvers" as a contributing cause of death.  Just because they hire some experts and pay them a lot of money to tell you, *Oh, no, it wasn't asphyxia*, you're the jury.  You get to decide what you think.

Question 3 is whether they were negligent.  The judge has an instruction on negligence.  And we believe the evidence supports, "Yes, they were," in not sitting him up, in keeping him prone, in holding him down for all those minutes.  And they were also negligent in not turning him over sooner.  And when

they did turn him over, they were negligent: not rechecking his pulse, not starting CPR sooner.  Even on the video when Gomez finally says to Keeney, *Do you think we should sit him up now? A little late, right?*  *No, I don't think so.*

Was the negligence a cause of death?  Again, that's when it gets back to the instruction.  If we could put the -- that's when it gets back to the instruction I told you, that you could have multiple causes -- we almost had it.  There it is.  A person's negligence can combine with other factors.  So the last sentence is what's really important.  "The deputies cannot avoid responsibility just because some other person, condition, or event was also a substantial factor."

So their conduct was a cause of death.  Even Dr. Clark said, *Without the restraint and the struggle during the restraint, he wouldn't have died.  The meth level alone was not high enough.*

Question 5, "Was Kevin negligent?"  I would say he was, I guess, in terms of taking drugs.  I mean, he was acting in a bizarre fashion.  We see that on the video.

"Was his negligence a cause of death?"  That's trickier.  I guess you could say in a way it was because if he was negligent in taking the drugs and that played a part in the death.  But you can also say, *Well, if they didn't restrain him the way they did, based on the evidence, he wouldn't have died.*  Even Dr. Fajardo admitted, *I can't say that if they didn't*

*restrain him he would have died.*  So that's Question 6.

And then Question 7, and you'll have this, it apportions the fault.  What percentage to the deputies, what percentage to Kevin, given 100 percent.

And then we get into the training questions, right?  Because when I started all this, I explained the problem from the plaintiff's perspective is that the department had no training, no policies.  In fact, their training was to keep him chest down, apparently even after they're handcuffed, even after they stop resisting.

So Question 8, "Did the Sheriff disregard the known or obvious consequences that a particular training deficiency or omission would cause deputies to violate Kevin's constitutional rights?"  The answer is "yes," because they -- clearly across the country you're having prone restraint deaths, and if you're not going to have any training or policy on it but tell your deputies that's what you should do, that's really bad.

Question 9, "Was the disregard for the training a cause of injury or harm to Kevin?"  "Yes," because the officers said they did what they did because that's how they were trained.

Question 10, "Was the inadequate training closely related to the deprivation of Kevin's constitutional rights, causing his injury, loss, damage, harm, or death?"  "Yes."

Question 11, "Did the County of Riverside have a policy, practice, or custom with regard to prone restraint and positional/restraint asphyxia that violated the constitutional right to be free from excessive and unreasonable force?"  This is how they always did it.  That's the testimony.  *We've been doing it this way for years.  This is how we do it.  And yes, we've had other deaths, but this is how we do it in Riverside.* Even the next county over, San Bernardino, doesn't do it that way nor any other agency that they cited.

"Was that a moving force?"  Question 12.  "Yes."

"Did they fail to adequately train their deputies?" Question 13.  "Yes."

"Did their failure to train" -- "Did they show deliberate indifference?"  "Yes."

And "Did their failure to train cause in part what happened?"  "Yes."

And then all the way to Question 16 -- I think there's 19 questions altogether -- "Did the Sheriff make a deliberate choice to approve their conduct?"  See, that's part of the problem, ratification, because if you tell your deputies -- remember the testimony was, *We reviewed this, we did the thorough investigation*, although, you know, they didn't take Keeney's statement, they didn't ask Gomez any questions about the restraint, they didn't have an outside agency.  *And we told our deputies you did fine.  You did exactly what you're*

*trained to do.* That's ratification. That's why it keeps happening. Because if you tell your deputies, *Keep doing it that way. Someone died, no problem. Keep doing it that way, keep doing it that way*, that's ratification. Rather than someone stepping up and saying, *You know what, I'm not 100 percent sure on the medicine. There's people that say one thing, there are people that say something else, but I don't want to see people keep dying. So let's sit them up. Let's sit them up. You guys are trained to control people when they're handcuffed and seated up. Everyone else in the country does it, why can't our deputies do it?*

And by the way, my contentions, the plaintiff's contentions in this case are not against law enforcement. I have good friends who are police officers, but the most important thing that law enforcement needs is good training.

Going to -- then there's damages. So you have an instruction on damages. There's two types of damages that the plaintiffs are entitled to under the law. One is for Kevin's damages, his pre-death pain and suffering and loss of life. That's Question 17. I would submit for his loss of life and pre-death pain and suffering, a fair number would be $5 million. It's up to you, what you think's appropriate. This is against the County of Riverside.

Question 18 are for Tracy's loss, past and future, of her brother. So for her whole life, she's not going to have

her brother anymore.  She thinks about him every day.  She has to live with this the rest of her life.  And that's two lines, past and future.  I would suggest an appropriate number total is $10 million for that.  So a total of 15 million, but it's totally up to you, what you think is appropriate for someone losing their only brother.

The last question is whether Chad Bianco acted with malice, oppression, or in reckless disregard of Kevin's rights.  And you're going to have a definition of what those terms mean.  "Conduct is in reckless disregard if, under the circumstances, it reflects complete indifference ... or acts in the face of a perceived risk that his or her actions will violate Kevin Niedzialek's rights under federal law."

And the issue we have here, ladies and gentlemen, is the national standards, the International Association of Chiefs of Police, POST, Lexipol, all the other agencies in the country sitting people up, not keeping them prone like this, but for whatever reason, this department, this Sheriff said, *We're ignoring all that.  This is what we're going to do.  We're going to keep them prone, and if they die, they die.*  That's not right.  That's not right.

So I thank you for listening to me.  I know opposing counsel is going to have some things to say, and I'll have a short time to respond.  Thank you.

THE COURT:  Very well.  Let's take a short break.

We'll be in recess for about 10, 15 minutes.  During that time, remember, don't talk about the case, don't let anybody else talk about it with you, keep an open mind.  And we'll be back in 15 minutes.

(Recess)

(In the presence of the jury:)

THE COURT:  Be seated, please.

THE CLERK:  Recalling Case No. EDCV 19-2083-JGB, Tracy Alves v. Riverside County, et al.

Counsel, please restate your appearances for the record.

MR. GALIPO:  Good morning again, Your Honor.  Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff.

THE COURT:  Good morning.

MR. SAIN:  Good morning, Your Honor.  Tony Sain with Tori Bakken on behalf of the defendants.

THE COURT:  Good morning.

Mr. Sain, are you ready to deliver your closing argument?

MR. SAIN:  Yes, Your Honor.

THE COURT:  Proceed please.

MR. SAIN:  Hindsight has 20/20 vision.  And if you set aside all of the wordplay, all of the moving of the goalposts, all of the taking of things out of context,

plaintiff's case boils down to nothing more than second-guessing what the officers, the deputies knew at the time of the incident, pretending without any evidence that the facts were different than what you could see with your own eyes.

Now, ladies and gentlemen, this is actually my favorite part of the case because it's the first and the only and the last time I ever get to talk to you not just about what the evidence will show but what it means.  When I sit down here today and you never get to hear from me again, plaintiffs will get back up and say a bunch of stuff trying to contradict whatever I just said, and then the case will be with you.  You get to go back into that chamber, get to pick a foreperson -- and you should pick someone that you think will help facilitate your discussion, someone you think is fair to both sides, that will help each and every one of you be heard as you discuss what you believe happened based on the evidence.  The evidence is what controls this case.

The first jury instruction you were given told you, "Do not decide this case based on sympathy or bias.  Decide it based exclusively on the evidence."

What is not evidence?  Arguments and statements by lawyers are not evidence.  Just because they say it's true, if they didn't put on a witness that you believed, if they did not show you a document that you found credible, it's not evidence.

Evidence, fact, reason alone must decide the outcome of this case.

Now, I want to draw your attention to a few jury instructions that I think will make it easier for you to make your decision.  You heard the judge read these instructions.  And you'll notice that a bunch of the claims against the County, against the Sheriff, they have one feature in common, they say this over and over and over again, that in order to vote for plaintiffs, you must find that Deputy Keeney or Deputy Gomez violated Kevin Niedzialek's constitutional rights.  So let's talk about that.

All of the case law that you were read today tells you that when you evaluate whether or not Kevin Niedzialek's constitutional or legal rights were violated, you must evaluate the totality of the circumstances known to them and not with the 20/20 vision of hindsight.

What did those deputies know?  They were told that Kevin Niedzialek was terrorizing the neighborhood.  You heard Eric Mireles both in his testimony and on that video say he was scared.  And I'll paraphrase so as not to curse.  *He was scaring the crap out of my children, running around, banging on doors, methed out.*  When they arrived at the scene, the Kevin Niedzialek that these deputies encountered was not the smiling man who was holding a baby, he's not the happy guy who was at his mother's birthday.  They didn't get the luxury of that

Kevin Niedzialek.  They got the one you saw, the one who was so patently intoxicated by meth that it was undisputed by any of their experts, the one who was speaking incoherently, who was visibly agitated, who no instructions, no commands pierced his mind.  None of them gained his compliance.  *Calm down, buddy. Stay down, sit down.  Get on your stomach.*  None of them followed.  Not a one.  That's the Niedzialek they met, the one who, when they tried to talk to him, tried to calm him down, attacked a uniformed deputy in broad daylight.

When they tried to stop him with non-deadly force with a TASER, after he goes down, he went back up again, kicked at the deputy, got up a second time, despite commands to stay down, despite commands to lay on his stomach, despite commands to put his hands behind his back, despite being told to calm down, he charged at a deputy again.  And then even after two attacks by one man, who is clearly high on meth, a drug that makes you irrational, unpredictable, that makes you desensitized to pain, that increases your strength, that makes you more dangerous, even after two TASERs, they still tried to de-escalate.  *Calm down.*  Even after two TASERs, they tried to get him into handcuffs and he still fought them.

Plaintiffs want you to ignore the totality of the circumstances.  They want you to look at this incident from cuffing forward.  That's not the law.

You have to look at everything that happened and

evaluate it from the perspective of a reasonable peace officer who knew what these two deputies knew at the time.  That is the totality of the circumstances.  It includes, as you heard in the jury instructions, what Kevin Niedzialek was doing.

And what was he doing?  He wasn't sitting there peacefully.  He wasn't complying with commands.  He wasn't cooperating.  He committed a crime.  Attacking a police officer is a crime.  It's a serious crime.  We charge these people to put on the uniform and to go out in the community and to deal with the things that we are too scared to deal with.  The people who are too dangerous for us to handle.  We don't want them to be attacked.  We make it a crime to attack them because if you are going to attack and kill and harm our protectors, then how does that leave us?  Vulnerable, exposed, in danger.

The instruction says that a person has a legal duty not to resist the effort to detain or arrest him.  You saw Kevin Niedzialek violate that duty.  You saw him commit another crime both before and after he was handcuffed as he violently resisted the deputies' efforts to restrain him.

With their Monday morning quarterbacking, the plaintiff wants you to believe that the deputies should have been mind readers.  *Oh, that wasn't resistance.  He was just trying to breathe.*  Despite putting on zero evidence of that, that's their theory, their hypothesis.  And even if it were true, it doesn't matter.  The deputies have to react to what

they can see.  They, in their duty to protect us, to keep us safe, can't take that risk.  They can't take the risk that someone who is methed out doesn't follow commands, is attacking police.  They can't take that risk of just letting him go.  A person who gets free, a person willing to attack an officer cannot be allowed to continue the attack, to go free.  After the handcuffing, the resistance continued.

Now, in this case, their own expert told you that everything that happened up to the handcuffs going on was reasonable.  The TASERs, the communications, the attempts to de-escalate, the prone restraint, everything that happened up through the handcuffs going on, it's undisputed in this case, was reasonable.  But they want you to ignore all of that and focus on after the handcuffing.  But the law says you can't do that because what happened before the handcuffing directly informs what happens after.  What happened before the handcuffing is what makes what happened after the handcuffing necessary.

There was zero evidence to dispute the witness testimony you heard that officers are trained that handcuffs alone are not a guarantee of safety.  They are not a guarantee that you can protect the public.  Handcuffs alone fail.  They can be broken.  A person can move their handcuffs behind their back and seize keys and weapons.  Some people, especially people who have no sensitivity to pain, can slip their

handcuffs from behind their back to the front, use the cuffs as a weapon.  And they put on zero evidence to refute that.  They can talk themselves blue in the face but not a single one of their witnesses contradicted that fact, not one.

Now, there was something that was very interesting that happened when I asked Mr. Noble a question.  Plaintiff's counsel just got up here and told you that the national standard is as soon as they're in cuffs, you move a prone person out of the prone position.  That's not what Mr. Noble said when I asked the questions.  He said that if they're in cuffs and they're still struggling, of course you would keep them prone.  Why?  If the rule is the way that they say it is, why would Mr. Noble say that?  Because the rule is not what you're being told by the attorneys.  The rule is the way every police witness who got on the stand has said, *Prone restraint is the best and safest position.  It prevents the subject or reduces their ability to fight at you, to get back up, to attack you again, to get free, to go and hurt the community. It keeps you safe.  Keeps the community safe.*

And the science, the undisputed science in this case is that it's also safe for the person being restrained as long as you don't restrict the airway, as long as you don't restrict or compress or close the mouth, nose, and throat, as long as you don't put more than 225 pounds of weight on the back.

Plaintiffs put on exactly zero witnesses to refute

the medical science, the state of the medical evidence that has been in existence from 2000 to the present.  They put on zero. No witness got up here and told you that the evidence was any different, the state of the medical evidence was any different than what I just said.  No one.  And attorneys can speak and profess all they want.  Their statements are not evidence.

The evidence here is that the way deputies and law enforcement officers are trained nationwide is because prone reduces the risk from the subject.  You're going to keep them prone as long as you believe it is safer to do so.  You will move them out of the prone position only under two circumstances:  One, from your perception, based on the facts you observe, there is a life-threatening medical emergency; two, you believe it is safe to do so.

The undisputed testimony in this case was that the deputies did not believe it was safe to move Mr. Niedzialek out of the prone position until just a few seconds before they did. The first time they thought it might be safe was at about the 11:59 mark.  And ten seconds later, he was moved from prone to supine.

Before that you had over a minute of resistance pre- and post-cuff.  Before that you had the two TASER attacks. Before that you had complete noncompliance with any commands. They couldn't trust Mr. Niedzialek when he stopped.  They couldn't trust that he wasn't playing possum, that he wasn't

playing a game, that this was all just some sort of ruse to resume the attack as soon as they let down their guard, and they put on no witness evidence to contradict that fact.  They did not believe it was safe to move him out of the prone position because of what he had done.

Now, you've heard a lot of statements, speeches about the County not having any training on prone positioning or about the County not believing in prone positioning.  That wasn't the evidence that you heard.  It was the exact opposite. Both deputies told you that they had been trained that they should monitor a subject's breathing in any position.  The Sheriff and the former training bureau official told you that deputies had been trained all the way up to the incident that their obligation was to make sure the subject was breathing regardless of the position.  Their obligation was to make sure the airway was clear, that nothing was restricting the neck. And it was undisputed in this case that that is exactly what both deputies did.

Both of them told you, as you can see for yourself in the video, that after he was restrained prone, he was still breathing.  You watched it with Deputy Gomez bit by bit.  In the video you just saw just minutes ago, you can see for yourself the deputies' hands rising and falling on his back. You can see his neck moving up and down with each breath.  Even after he's no longer resisting, even after the knee comes

after -- off of him for the very last time, you can still see he's breathing.  And that's just what's captured on the camera. We weren't there.  The deputies were there.  They could hear whether or not he was breathing.  They could feel whether or not he was breathing.  And they told you that they felt and saw and heard him breathing all the way up until about 11:59, then for a moment, they thought he wasn't breathing.

And as soon as they thought there might be a life-threatening medical problem, the very first time they ever even suspected that was true, what did they do?  Flipped him over.  Within ten seconds of first believing there was a problem, they flipped him from prone to on his back, supine, and they checked him.

Plaintiffs put forward this evidence of, *Oh, well, maybe Deputy Gomez got it wrong.  Maybe it wasn't a true pulse that she felt.*  So we're supposed to second-guess what someone can feel with their own fingers, what they can see with their own eyes?  That's not the law.

Even the doctors who testified on this told you that if you have a pulse, as they felt that they did, and particularly if you see breathing, which they said they saw after he's flipped supine, you're not going to start CPR.  That would be unreasonable to do that because CPR might actually interfere with their cardiac rhythm.  It might actually make them worse.  And they told you that their job, their intent,

their effort was to try to keep Mr. Niedzialek safe.

You heard Deputy Gomez.  When she found a pulse, she said, *Whew*.  She was relieved because both deputies wanted him to live.  And they did everything they knew how to do based on what they were observing at the time to protect that.

Plaintiffs want you to believe facts that the deputies did not know.  They want you to believe things that no witness testified to happening, that you cannot see in the video, that no document in the exhibits in evidence actually supports.  They want you to take their word for it and ignore the evidence.  And that's not how it works, ladies and gentlemen.

Now, on this verdict form, you'll notice that the very first question on it, "Did Deputy Keeney and/or Deputy Gomez use excessive or unreasonable force to restrain Mr. Niedzialek?"

Now, the jury instructions tell you that you are required to go through this verdict form in order.  You cannot skip around on questions.  You have to go in numerical order one by one.  You can't answer Question 2 until you've answered Question 1.  You can't answer Question 3 until you've answered Question 2.  It's very important that you follow that instruction because the law holds that we do not even get to an analysis of what the Sheriff or the County may or may not have done unless you conclude that these deputies violated the

Constitution, unless you conclude that they engaged in negligence in violation of California law.  And the only way you can get to that conclusion is if you ignore the law, if you ignore the facts, the totality of the circumstances known to these deputies at the time, if you try to insert facts they should have known into their brains rather than what they saw with their own eyes, and that is not the law.

So the answer to Question 1 on this evidence must be "no."

What you're going to find when you look carefully at those instructions is that the negligence and the federal excessive law claim -- excuse me -- excessive force claim, the 1983 claim, are decided by basically the same standard.  You evaluate the totality of the circumstances known to the officers at the time.  You evaluate it with what they knew at the time, not with the benefit of 20/20 hindsight.  You evaluate it from the perspective of a reasonable peace officer, which means that the answer to Question 3 must be the same as the answer to Question 1.

But plaintiffs want you to think about training.  And even though you should never even reach that question, I want you to know we're not afraid of that.  We're going to talk about the training because there's a huge difference between what they're telling you happened and what the evidence actually showed.

The jury instruction repeats over and over again various formulations of the same phrase, that in order to find the Sheriff or the County violated the Constitution, you must find that the Sheriff or the County acted with deliberate indifference, that they consciously disregarded a known risk. Deliberate indifference. Conscious disregard. There was literally no evidence of that in this case.

In this case, they put on zero witnesses that proved that the Sheriff or his department were deliberately indifferent to risks. The only evidence in this case is that, to the contrary, they have a whole bureau whose whole job is to go out and figure out what the best practices should be. And they don't just look at law enforcement sources. They actually go to the trouble of looking at medical studies because they're doing what we want them to do, base their decisions on science.

They put on zero evidence to contradict the fact that although in the '90s Dr. Reay came out with a theory that prone restraint might lead to positional asphyxia, they came out with zero evidence to contradict the fact that he later, after evaluating the Chan studies, said he was wrong about that. No witness disagreed with that fact. The plaintiffs can speak until they're blue in the face. No witness disagreed with that fact.

Positional asphyxia has been defined very precisely, and no witness that they put on contradicted these definitions.

Positional asphyxia occurs when your airway is completely obstructed due to your position.  It is different than compression asphyxia.  Compression asphyxia occurs when you have so much weight on your torso that it crushes your chest cavity, resulting in breakages to the sides of the ribs, damage to the heart and the lungs.  Those two forms of restraint asphyxia are the meat of this case.  And they put on zero witness evidence to contradict that fact.  Their cardiologist, the sole medical expert they put on, doesn't dispute that at all.

The Sheriff's Department and the Sheriff looked at the science.  There was a theory that was unproved in the '90s, and so a set of doctors began to test that theory.  And you heard the methodology they used.  They didn't just use healthy subjects.  In the lab studies, they used different folks: some obese, different ages, different sizes.  They had some of them resist restraint.  They had some of them in handcuffs.  They had some of them hog-tied.  They had some of them with up to 225 pounds of weight on their back.  20 years of lab studies. And they measured whether or not all of this prevented them from breathing.  The maximum they found is some decrease in oxygen in the lungs but not enough to impair breathing.  Did they put on any evidence that anyone in these lab studies died because of the prone restraint?  No.

And when lab studies weren't good enough, Dr. Chan

explained to you that they did real-world studies, epidemiology studies, analyzing thousands of real-world people, including obese people, including people who were on meth, including people who were fighting multiple cops, real-world studies to try to figure out if prone restraint causes positional or compression asphyxia.  And the results were the same.  Without more than 500 pounds of weight on the back and without airway obstruction, you don't get restraint asphyxia, period.

And plaintiffs put on zero evidence to contradict that fact.  All they did was raise questions and snipe.  But none of their witnesses contradicted any of that evidence, the evidence on which this Sheriff and this Sheriff's Department relied to reach their conclusion that as long as their deputies were trained not to restrict the airway, as long as they were trained to make sure the subject was still breathing, prone restraint was safe.

You can't consciously disregard a risk that all the science tells you does not exist.  You can't be deliberately indifferent to a danger when you're actively searching for it and can't find it.  Plaintiffs have hung their entire hat on the idea that because before July 2019, the training didn't mention the words "positional asphyxia," that the training did not adequately protect against it.

Let's set aside for the moment that you heard some evidence that the training did mention positional asphyxia,

that there was some evidence in this case that in their academy days, they probably did hear that phrase. But that's okay. Neither deputy remembered hearing that phrase. Let's assume for the purposes of this discussion that that's true. Let's assume for the purposes of this discussion that there was never any training, never any mention of the magic words "positional asphyxia." Let's assume that's true. It doesn't matter.

Does anyone sitting here know the names of the kinds of injuries you can suffer if you're driving a car without a seat belt and get into an accident? You don't need to. You just need to know put on your seat belt so that if you get an accident, you'll be safe.

The magic words "positional asphyxia" did not need to be in the training in order for the training to protect against its risks. And the risks that the department was aware of, based on all of the available science, was that as long as the airway was unobstructed, there was no risk. As long as there was less than 500 pounds of weight on the back, there was no risk. And that's why the training of the deputies at the time said to do what is necessary to avoid positional asphyxia. Keep the airway clear, monitor the breathing, make sure whether they're prone, seated, standing, laying down, laying up, whatever position they're in, make sure you can be sure they're breathing. That's what the deputies did here. In fact, it's undisputed that that's what they did here.

Plaintiffs want to argue again semantics, word games, about recovery position.  We already talked about that.  Their own expert admitted that that rule that they're putting out there, that they're trying to sell you on isn't true.  And if you think about it, it's because it doesn't make sense.  Why, if you have a combative subject who is in cuffs, would you let him get into a position where he could fight you better?  Makes no sense, because that rule is unreasonable, and that's why it's not the rule.

All of the citations they gave you said, "Move them into a recovery position as soon as possible," which every witness who got on the stand said *as soon as it's safe to do so*.  The idea that the training did not address the risk of positional asphyxia is hogwash.  It is lawyers moving the goalposts and ignoring the undisputed evidence that you actually heard in this case.

Now, let's assume just for the sake of discussion that there was something wrong, didn't cause the death or injuries here.  What injuries did Mr. Niedzialek have?  He had a bleeding head wound.  It's undisputed in this case he had that before any deputy even got there.  It's undisputed in this case no deputy even touched his head, let alone caused that injury.  Nothing they did caused that injury.  That injury, it's undisputed.  No witness in this case disputed the fact that that injury played no role in his death.  None.

Some abrasions, some scrapes, some contusions, some bruises, when did those occur?  We don't really know.  Let's assume for the moment that they happened because of the tasing.  Let's assume for the moment that they happened after he's down on the ground and he's being restrained.  Let's assume that's true.  The jury instruction requires you to analyze injuries from unreasonable force.  If the force is reasonable, those injuries are not actionable.  If the TASER caused those injuries, if him being tased and him falling is what caused those injuries, it's undisputed in this case that the TASERs were reasonable force.

And if the restraint caused those injuries, the scrapes, the bruises, those could only have occurred when he is resisting the restraint.  But the fact of the matter is, we don't know.  They put on zero evidence as to what time or how the scrapes and the bruises occurred.  There's no evidence that they can point to that shows it's more likely than not that unreasonable force caused any of those injuries.  So where does that leave us?  The death.

If you remember back in opening statement, they suggested that meth played no role in this case, that it was a low level of meth.  Mr. Galipo even just got up here and said it was a recreational level of meth.  Even their own medical expert admitted that this was a toxic amount of meth.  And their own expert admitted that the meth played some causal role

in this death.

Now, the experts disagree.  Some view the meth by itself as enough to have caused this death.  Some view this as a meth overdose case.  Others view it as a meth plus exertion case.  But there was no credible witness testimony indicating that it was the restraint that caused this death.  Why? Because there was no evidence to support the idea that prone restraint caused Niedzialek to asphyxiate.

How do we know this?  Even after he was flipped supine, the evidence shows he was breathing.  Even when the paramedic got there, when she first laid eyes on him, she said he was still breathing.  Now, they want to make a big deal about agonal or not.  But the fact of the matter is, three minutes after he's moved out of the prone position, he's still breathing.  There was literally no forensic evidence to support the idea that Mr. Niedzialek died by asphyxia.  None.

Where was plaintiff's forensic pathologist who got up here and told you the cause of death was asphyxia?  Where was the evidence they put on to support that, other than a doctor who doesn't do cause of death investigations, who's not a forensic pathologist?  He's not even a toxicologist.

You can't asphyxiate someone from the prone position without airway obstruction or destroying their chest cavity and resulting in lung damage, heart damage.  And we know for a fact that none of that happened.  Even Paramedic La Russo told you

that when she got there, there were no obstructions to his airway.  You could see in the video that throughout the prone restraint, Kevin Niedzialek's head is turned to the left, his face is not buried in the dirt.  You can see for yourselves that he's breathing.  And we know that his chest cavity was never crushed because if it had been, his heart and lungs would not be saving someone else's life right now.

The math, the science, the evidence does not support what plaintiffs are selling.  And the reason for that is simple:  It is untrue.

Now, you may have heard just how tragic this situation is.  I don't know if you caught it, but no one is saying that Mr. Niedzialek was a bad guy.  I don't know if you heard his sister tell you that in that period where he had been sober, he was a drug counselor.  He was trying to help other people.  No one disputes that.  But you know what they also did not dispute?  That he fell off the wagon, that after being kicked out of his girlfriend's house, he was then kicked out of his roommate's house because he started using meth and the roommate felt threatened, felt he was a danger to his kids.

MR. GALIPO:  Your Honor, I apologize, but I didn't hear any evidence in that regards at all.

THE COURT:  Sustained.

MR. SAIN:  The witness said that he was kicked out of the roommate's apartment because he was using meth and he had

children there.  Why would that matter if it wasn't because the roommate felt threatened?  The roommate felt that the meth use was a danger to his kids.

The deputies did not get a smiling happy Kevin Niedzialek that Tracy Alves remembers, and they wish they did. They do.  But they had to deal with the Kevin Niedzialek that you saw, the one who not only threatened them but attacked them, the one who would not comply with any commands, the one who fought restraint, fought handcuffing, fought after -- after being handcuffed, the one who was violent, the one who was dangerous, the one they could not take the risk of getting free.  By taking that meth, toxic amounts of meth, five times the toxic amount was the undisputed testimony you heard, Kevin Niedzialek set in motion a chain reaction that led to an unavoidable result.

Plaintiffs point to the PEA cardiac arrest.  But notice one thing they kind of glossed over.  Exactly one doctor talked about the survivability of a PEA cardiac arrest.  And he told you that when you're in PEA, CPR is not going to save your life.

So on the question of whether or not what the deputies did, whether or not their unreasonable force, their unreasonable restraint, whether or not that caused Mr. Niedzialek's death, based on the evidence, not sympathy, not we wish had been true, but what is actually true proved by

evidence, the answer to that question must also be "no."

These deputies followed the law.  This department followed best practices.  And the only reason that we're here is because Kevin Niedzialek did not.  For that reason, we ask you to bring your verdict for the defense.  Thank you.

THE COURT:  Thank you, Mr. Sain.

Mr. Galipo.

MR. GALIPO:  Yes.  Thank you.

It's now afternoon, so good afternoon.

It's kind of interesting that counsel says whatever lawyers say are not evidence, and he wants to yell at you for half of his speech telling you what the evidence is or is not.  I'm confident that all of you know what the evidence is, will discuss it with each other, and make the right decision based on the evidence and the law.  But I want to clarify a few points that counsel made.

First of all, the burden of proof, as I told you, the burden of proof is probably only required to be 50.01 percent or 51 percent.  From the plaintiff's perspective, we believe the evidence in this case is substantial on all the claims, maybe in the area of 70 to 80 percent.  You might have some questions or some doubts, but there is strong evidence to support each and every claim in this case.

20/20 vision of hindsight that counsel talked about, we're not talking about the 20/20 vision of hindsight.  You

won't even see that wording in the state law instructions.  You will see it in one instruction.  But 20/20 vision of hindsight is something different.  I'll give you an example.

An officer is in a dark alley.  They see what they believe to be a real gun pointed at them and they shoot in self-defense, believing it was a real gun.  It turns out it was a toy gun.  But the officers didn't know it at the time.  That's 20/20 vision of hindsight.  The whole reason why the training and policies are so important is because people are dying all over the country from being restrained prone.  They knew about that.  And they knew about agencies across the country and everyone else recommending to have these training and policies, and they deliberately chose not to do it, even though people were dying in their jurisdiction.  That is deliberate indifference.

And counsel said, *You know, where's the evidence? Where are the documents?*  Did they produce, the Sheriff's Department produce one document?

MR. SAIN:  Objection.  Misstates the burden.

MR. GALIPO:  May I continue?

THE COURT:  Continue.

MR. GALIPO:  Did they produce one policy written, one training document written, one memorandum from this so-called group that's investigating these issues?  Did they call one person from this group that they allege is looking at all of

these issues?  One memorandum?  Nothing.  Nothing.

500 pounds and broken ribs you need to asphyxiate someone?  Really?  No evidence that he asphyxiated?  Dr. Dan, who was probably one of the best witnesses and experts in this whole trial, who looked at you and explained to you how the heart works, as a cardiologist -- they had no cardiologist.  When someone dies from their -- a cardiac arrest, a cardiologist is an important doctor to hear from because he knows how the heart works and what caused it to stop.  He told you that Mr. Niedzialek died from asphyxia.  His inability to breathe in the prone position coupled with the acidosis caused him to die.

So when counsel stands up and said there's no witness or anyone that said he died from that, that's not accurate.  And there's a lot of supporting evidence that he died from it.  In addition to saying, you know, *get me up* and asking for help and trying to move in a position to breathe, he had a PEA cardiac arrest.  Which guess what?  Consistent with asphyxia.  La Russo had his end-tidal CO2 in the 90s.  What does that prove?  Asphyxia.  Pupils fixed and dilated.  What is that?  Asphyxia.

And guess what else?  You might remember this.  I asked one of their doctors, "Okay.  Let's assume for a second that Deputy Gomez did feel a pulse.  Let's just assume it wasn't a phantom pulse -- pulse.  It was a pulse.  So if

someone's breathing stops, I'm not talking about agonal breathing, but if their normal breathing stops, and the officers both wrote in their reports, 'We turned him over, he appeared to stop breathing,' and they still have a pulse, what is that consistent with?"  "That's consistent with asphyxia." "Why?"  "Because the respiratory arrest, the stoppage of the breathing, took place, and the heart will still beat for a short period of time and you'll get a faint pulse."  That's exactly what happened here.  That's exactly what happened. That's why he died while he was prone being held down.

And then for them to continue to tell you, *Well, he had agonal breaths*, you heard agonal breaths is not effective breathing.  Did La Russo come and say, *Oh, I see some agonal breaths.  Let's not do CPR.*  No.  She said, *Start CPR immediately*.  I guess the officers didn't have that training either.

And really, are you supposed to hold someone down until they stop breathing?  Then once they stop breathing, it's okay to turn them over?  Well, it's a little too late then. They already died.

Counsel says, *Well, we all know to put our seat belt on.*  True.  Put your seat belt on.  Well, guess what?  It's just as easy.  You handcuff them, sit them up.  Sit them up. You want to have reverence for human life?  Sit the person up. He's handcuffed.  You're two officers.  You sit him up, you

stand behind him, you hold him, he's handcuffed.  He's not going anywhere.  Mr. Noble told you that.  Sit him up.  But to keep someone down for four minutes, including after they stop moving, we have to except -- expect better of our law enforcement.  We have to expect that, better actions, better training.

The verdict form.  They love this one.  They put it up on the ELMO and they tell you how to -- how to fill it out because somehow they've had some training.  You know what?  If we mark this in front of the jury, it sends a subliminal message that that's how they should fill out the form.  So maybe they won't consider all the evidence against us.  Maybe they'll just fill out the form like we tell them.  So why don't we put it up there and check the boxes the way we want to have it checked and hopefully they'll just do it the way we say.  That'll be great.  Then we can go on to our next death case.  I'm not going to check the boxes for you because I believe you're going to check the boxes "yes" for the ones you feel that should be "yes" based on the evidence and the law the judge has given.

Even Dr. Fajardo conceded that the restraint was a contributing cause of death because he had an increased need for oxygen, increased acidosis, increased catacholamines, increased blood pressure, and increased cardiac requirements.

MR. SAIN:  Objection.  Misstates testimony.

THE COURT:  Overruled.

MR. GALIPO:  And I don't want to keep saying the same thing, but their own expert said, *This is not a meth overdose.* So I don't know why they keep saying it is when their own expert toxicologist said it's not.

Deputy Keeney and Deputy Gomez used unreasonable and excessive force and restraint.  They did violate his constitutional rights.  It would have been anyone's rights that would have been violated, not just Mr. Niedzialek.  And you know the main reason why they did it?  Because they had poor training.  They didn't have the right training.

And one thing that I didn't hear when counsel got up that you may consider as extremely important, if my argument that they had inadequate training and policies on this issue that people should be sat up or put on their side or risk factors or recovery position, wouldn't they at least point one other agency in the country, in California, somewhere, to say, *Hey, this is how LAPD does it.  This is how the County of Los Angeles, they do it the same way we do.*  Not one agency.  Zero. That should tell you something.  Even their own expert from San Bernardino had policies and training on it.  It's so bad.

And I'm not blaming the deputies completely because they didn't have the training.  When they were asked at their deposition what the recovery position is, they didn't even know.  They never even heard the term.

And if they want to tell you this doesn't exist and we don't need policies like this, then why do they have one now?  Counsel wants to say, *Let's get to the truth.*  You're going to decide what the truth is.  You, ladies and gentlemen, are going to decide what the truth is.

*Counsel doesn't want you to look at the totality of the circumstances.*  Oh, yes, I do.  I want you to consider everything.  And I would say that some of what counsel suggested is a complete exaggeration.  *He completely attacked the officers?*  Really?  Fonzi said he never touched them.  No verbal threat, no punch.  They didn't even have any kind of injury at all.  What attack?  He committed a serious crime?  What crime?  A possible misdemeanor?  Unarmed, shirtless, shoeless, in a state of excited delirium, and needed help?  They want you to think that this guy is going out, you know, attacking people with guns and knives or something, he's so violent.

And the physiology of a struggle, that's another problem.  Because maybe the officers didn't realize that this guy is trying to move or lift to breathe.  And then maybe the fact that he slowed down so fast, they didn't realize he's in medical trouble because they didn't have the right training.

*Violently resisting?*  Really?  *After he's handcuffed, he's violently resisting?*  He's moving a little bit to try to breathe and then stops completely.  That's violent resisting?

Police officers aren't mind readers.  That's exactly the point.  That's what Mr. Noble said.  That's why they need the right training.  That's why you sit people up and put them on their side.

Noble talked about physiology of a struggle.  He also talked about sitting them up and controlling them.  I mean, really?  If the -- if the standard is going to be to hold them down prone until they stop moving and breathing and they're dead, that can't be the standard.

Keep the community safe.  See, they like this one because they want you to somehow think, *Oh, drugs are bad.  We need to be safe.  Let's vote for the defense.*  But that's not what the case is about.  The case is about once they handcuffed him and he's in a state of a medical emergency and needed help, get him help.  Sit him up.  See what's going on with him.  Don't hold him down for four minutes and kill him.  Does anyone here think that this young man deserved the death penalty?  Deserved to be killed?

He says, *Oh, it's all on the video.*  You watched the video.  You could see whether you think he's breathing normally when they turn him over or whether he even appears to be breathing normally in the last couple minutes he's being held down.

So there's a lot of evidence of asphyxia in this case.  A lot.  But even if it wasn't quote/unquote asphyxia,

although the substantial evidence support it was, the important fact is the fact that they continued to hold him down was a cause of his death and they should not have done that.

And there is a difference between negligence on Question 3 because, as you'll see in the instruction, negligence includes tactics.  The officers' tactical decisions were very poor.  They're having a good old conversation.  *Hey, gee, glad you had the TASER.  Hmm, maybe he's going to sleep.*  Even several experts said, *That's absurd*.  That he's going to take a nap now after the excited state you saw him in?  *Gee, I think this is a good time for a nap.*  Even after they call out his name and he doesn't respond, they don't turn him over for a minute and a half.  Three minutes after the deputy said, *I think he's sleeping*, it was three more minutes before they turned him over.

And think about it.  If you really had this "faint, faint, very faint pulse," and the paramedics are not getting there for two or three minutes, why in the world would you not take his pulse again?  Why?

At some point, ladies and gentlemen, this cycle has to stop.  We can't have people being held down prone by police and having them die when, based on the evidence, there has been hundreds of cases like this, and then have the agencies deny all responsibility, as they have here, forcing a case to go to trial, not admitting any wrongdoing at all, zero.  That's why

we're here.  They have not admitted anything at all was wrong.

I'll concede Kevin did drugs.  That's not good.  But once he was handcuffed, he should have been sat up and his medical needs.  This whole concept that he was some crazy person attacking everyone, that's not true.  The poor kid needed help.

And he had a good heart.  Literally, a good heart. But we know in -- he wasn't a situation he had a diseased heart, right?  If someone's a chronic drug user, they have a diseased heart.  If someone has cardiovascular disease, you don't donate their heart.  You only donate a heart that's a good, healthy heart.  Dr. Dan talked about it, so we know it wasn't his heart.  He had a good strong heart.  It wasn't the drugs by itself; it was the restraint.  And did the drugs play a part?  Yes.  I'm not saying they didn't play a part.  But what we're saying is that's even more reason why you shouldn't be holding him down because those are risk factors: under the influence, excited delirium.  Get him up.  Get him up.  They didn't have the training.

So when you see these questions, whether the excessive force or restraint, the evidence clearly supports a finding of "yes" on Questions 1 and 2 and 3 --

THE COURT:  You have 20 seconds left.

MR. GALIPO:  Thank you.

-- and 4, 5.  You could say "yes" on 5, that Kevin

was negligent.  And whether it was a cause of death is up to you.  And the apportionment, you'll decide.  And then you'll go through the questions on the training and et cetera.

I want to leave you --

THE COURT:  That's it.

MR. GALIPO:  I want to thank you.

Thank you, Your Honor.

THE COURT:  Ladies and gentlemen, now you will retire to deliberate.  You will have with you the exhibits that were received into evidence.  The computer that I alluded to before has already been set up in the jury room.

You may decide when and how often you wish to deliberate, but you can only deliberate when all of you are present and only in the jury room.  So if you're deliberating and somebody takes a break and goes outside, you must stop deliberating until all of you are back together again.

I think lunch will be provided to you, so you're free to deliberate or start your deliberations after lunch.

As I instructed you at the beginning of the case, you will not have a transcript of what was said in court.  If you need to have some testimony read back to you, send us a note asking for that.

One of the first things I'll ask you to do is select a foreperson for your jury and tell us how long you intend to deliberate today.

You will each have a copy of the jury instructions that were read to you.  You'll also have copies of the verdict form.  The foreperson should keep the original of the verdict form in the folder provided.  And when the jury reaches a unanimous verdict, the foreperson should keep that verdict form, sign it and keep it, until I ask him or her here in court to give it to somebody else.  So don't give it to anybody else until you're here in court.

There will be notes, blank note forms provided to you.  If you have a question, you can send us a question written on the note forms that will be provided to you.

For now I believe you will proceed to lunch, and then you'll begin your deliberations.

Will the bailiff come forward, please.

THE CLERK:  Please state your full name for the record.

THE BAILIFF:  David Williams.

THE CLERK:  Please raise your right hand.  Do you solemnly swear to keep this jury together in some private and convenient place, that you will not permit any person to speak or communicate with them, nor do so yourself unless by order of the Court or to ask them whether they have agreed upon a verdict, and that you will return them into court when they have so agreed, or when ordered by the Court, so help you God?

THE BAILIFF:  I do.

THE COURT:  Very well.  Ladies and gentlemen, you will now retire to have lunch and then deliberate.

THE CLERK:  All rise for the jury.

(Out of the presence of the jury:)

THE COURT:  Very well.  We're adjourned.  Please remain within ten minutes of your chairs.  Once I know how long they intend to deliberate, I'll let you know.

MR. GALIPO:  Thank you, Your Honor.

MR. SAIN:  Thank you, Your Honor.

(Proceedings adjourned.)

-o0o-

CERTIFICATE OF OFFICIAL REPORTER


        I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

THE UNITED STATES.



                        DATED THIS 6TH DAY OF APRIL, 2023



                        /s/ PHYLLIS A. PRESTON

                        _____

                        PHYLLIS A. PRESTON, CSR No. 8701, FCRR

                         FEDERAL OFFICIAL COURT REPORTER

**$**

$10 [1] - 67:4

**'**

'90s [2] - 80:17, 81:12
'we [1] - 92:3

**/**

/s [1] - 102:18

**1**

1 [22] - 4:15, 4:21, 12:24, 15:8, 15:18, 18:7, 24:6, 26:13, 29:3, 30:17, 32:20, 34:22, 36:20, 39:8, 40:11, 41:8, 46:14, 61:25, 78:21, 79:8, 79:19, 98:22
1.6 [1] - 50:10
10 [4] - 33:16, 49:16, 64:23, 68:1
10,000 [1] - 50:9
100 [2] - 64:4, 66:6
11 [2] - 33:18, 65:1
110 [1] - 4:6
111 [1] - 4:7
11:59 [2] - 75:19, 77:6
12 [1] - 65:10
120 [1] - 49:16
128 [1] - 2:7
13 [1] - 65:12
15 [6] - 9:17, 10:12, 59:1, 67:4, 68:1, 68:4
16 [1] - 65:17
160 [1] - 50:8
17 [1] - 66:20
18 [1] - 66:24
184 [1] - 5:4
19 [1] - 65:18
19-2083-JGB [4] - 1:10, 3:4, 11:12, 68:8
1983 [6] - 23:21, 24:1, 26:6, 28:22, 30:13, 79:13
1st [1] - 19:22

**2**

2 [18] - 13:3, 15:9, 15:25, 18:9, 24:8, 26:17, 29:5, 30:19, 32:23, 34:24, 36:23, 39:9, 40:12, 40:20, 62:8, 78:20, 78:22,

98:22
20 [7] - 6:22, 7:8, 10:13, 49:16, 81:19, 98:23
20,000 [1] - 50:9
20/20 [8] - 32:13, 68:23, 70:16, 79:16, 89:24, 89:25, 90:2, 90:8
2000 [1] - 75:2
2019 [3] - 12:24, 13:9, 82:21
2020 [1] - 19:22
2023 [3] - 1:17, 3:1, 102:15
21800 [1] - 2:5
225 [3] - 6:25, 74:24, 81:19
25 [1] - 10:10
28 [1] - 102:7
285 [1] - 50:4
29th [1] - 12:24

**3**

3 [21] - 4:7, 4:8, 4:12, 4:14, 4:18, 13:5, 15:10, 16:5, 18:9, 24:12, 26:19, 29:9, 30:23, 32:25, 36:25, 40:13, 62:21, 78:21, 79:18, 97:5, 98:22
3.2 [1] - 50:10
30 [1] - 50:3
305 [1] - 2:10
30th [1] - 13:9
310 [1] - 2:5
34 [2] - 45:24, 56:2
34.47 [1] - 41:18
3470 [1] - 1:23
35 [1] - 10:20
35-year-old [1] - 41:19

**4**

4 [12] - 4:8, 4:13, 13:9, 15:11, 16:11, 18:10, 24:17, 26:24, 29:11, 31:4, 33:2, 98:25
40 [3] - 10:13, 10:21, 56:2
4000 [1] - 2:16
40th [1] - 2:10
41.23 [1] - 41:19
42 [1] - 23:21
47-year-old [1] - 41:17

**5**

5 [9] - 13:12, 18:11, 27:3, 29:15, 33:5,

63:17, 66:22, 98:25
50 [6] - 9:2, 47:1, 49:14, 49:17, 50:12, 50:13
50.0001 [1] - 47:2
50.01 [1] - 89:18
500 [5] - 52:4, 54:8, 82:7, 83:18, 91:2
500-pound [1] - 60:19
51 [1] - 89:19
550 [1] - 5:14
5th [1] - 2:16

**6**

6 [5] - 1:17, 3:1, 18:12, 33:7, 64:1
60 [1] - 58:23
633 [1] - 2:16
644 [1] - 2:10
6TH [1] - 102:15

**7**

7 [4] - 1:11, 18:13, 33:8, 64:2
70 [1] - 89:21
753 [1] - 102:7

**8**

8 [4] - 9:11, 18:15, 33:10, 64:11
80 [1] - 89:21
8701 [1] - 102:20

**9**

9 [2] - 33:13, 64:19
90071 [1] - 2:17
90s [2] - 60:3, 91:19
91103 [1] - 2:8
91367 [1] - 2:5
92501 [1] - 1:23
94609 [1] - 2:10
98.5 [1] - 50:3
9:27 [1] - 1:18

**A**

a.m [1] - 1:18
ability [3] - 13:22, 18:8, 74:17
able [2] - 22:11, 59:10
ABOVE [1] - 102:10
ABOVE-ENTITLED [1] - 102:10
abrasions [1] - 85:1
absence [1] - 3:22
absent [1] - 5:10
absolutely [2] - 53:6,

53:7
absurd [1] - 97:9
abusing [1] - 42:24
academy [1] - 83:1
accept [3] - 15:12, 19:5, 21:17
access [3] - 23:12, 23:15, 23:16
accessory [1] - 22:12
accident [3] - 48:5, 83:10, 83:12
accompanied [1] - 42:12
according [2] - 41:15, 44:25
account [2] - 8:2, 18:7
accountable [1] - 47:13
accounts [1] - 20:25
accurate [1] - 91:14
accurately [1] - 33:17
acidosis [5] - 53:22, 60:22, 60:24, 91:11, 93:23
act [12] - 25:3, 26:13, 27:11, 29:5, 29:13, 29:17, 29:19, 29:22, 30:19, 31:9, 39:17, 42:21
acted [17] - 6:6, 13:14, 13:21, 14:16, 24:7, 24:13, 25:6, 26:18, 27:14, 29:4, 29:9, 29:25, 30:18, 31:12, 39:22, 67:7, 80:4
acting [6] - 13:3, 13:5, 34:3, 34:16, 39:17, 63:18
action [3] - 13:18, 25:11, 27:16
actionable [1] - 85:8
actions [3] - 42:19, 67:12, 93:5
active [3] - 6:13, 6:18
actively [4] - 32:25, 35:21, 37:19, 82:19
activities [1] - 41:14
activity [2] - 60:9, 60:14
acts [21] - 13:25, 24:8, 24:21, 25:2, 25:3, 26:13, 27:10, 27:11, 28:4, 29:5, 29:13, 29:16, 29:19, 29:21, 29:22, 30:19, 31:8, 31:9, 41:25, 42:18, 67:11
actual [2] - 8:24, 28:8
adding [1] - 49:17
addition [3] - 16:7,

27:23, 91:16
address [2] - 21:7, 84:13
adequate [4] - 26:21, 27:5, 28:9, 48:24
adequately [6] - 27:2, 28:9, 59:24, 60:23, 65:11, 82:23
adjourned [2] - 101:5, 101:10
admit [1] - 51:20
admitted [8] - 8:10, 15:10, 60:17, 63:25, 84:3, 85:24, 85:25, 98:1
admitting [1] - 97:25
adopted [2] - 24:13, 25:9
advantage [1] - 42:24
advise [1] - 45:1
afraid [1] - 79:22
afternoon [3] - 12:24, 89:9
afterwards [1] - 59:6
age [1] - 41:13
agencies [5] - 50:13, 51:6, 67:16, 90:11, 97:23
agency [7] - 49:5, 50:14, 52:9, 65:9, 65:24, 94:17, 94:19
agent [1] - 40:8
ages [1] - 81:16
agitated [2] - 57:25, 71:4
ago [1] - 76:22
agonal [7] - 7:19, 58:14, 86:13, 92:1, 92:12, 92:13
agree [2] - 12:12, 44:22
agreed [5] - 10:11, 12:21, 15:11, 100:22, 100:24
agreement [2] - 43:9, 44:24
airway [14] - 5:9, 5:11, 6:24, 7:10, 7:14, 74:22, 76:16, 81:1, 82:7, 82:14, 83:17, 83:21, 86:23, 87:2
al [3] - 3:5, 11:13, 68:9
allegation [1] - 50:6
allege [1] - 90:25
alleged [1] - 14:8
alleging [3] - 24:2, 26:9, 28:24
alley [1] - 90:4
allowed [2] - 21:14, 73:6

**allows** [1] - 23:16
**alluded** [1] - 99:10
**almost** [1] - 63:8
**alone** [6] - 7:15, 63:15, 70:1, 73:21, 73:22, 84:22
**alter** [1] - 23:14
**alternative** [1] - 33:8
**alternatives** [2] - 25:12, 27:16
**altogether** [2] - 57:23, 65:18
**Alves** [10] - 3:5, 11:13, 13:18, 36:19, 41:10, 45:14, 56:10, 68:9, 88:5
**ALVES** [1] - 1:7
**Alves's** [5] - 40:3, 40:15, 41:3, 41:8, 41:9
**amendment** [1] - 28:16
**Amendment** [5] - 25:25, 30:7, 31:16, 31:23, 32:8
**amount** [14] - 33:2, 33:3, 33:6, 35:11, 36:23, 37:6, 40:6, 40:25, 41:2, 41:4, 41:5, 42:4, 85:24, 88:13
**amounts** [2] - 27:24, 88:12
**analysis** [1] - 78:24
**analyze** [1] - 85:6
**analyzing** [1] - 82:2
**AND** [3] - 102:5, 102:8, 102:10
**Angeles** [2] - 2:17, 94:19
**anguish** [1] - 41:9
**anoxic** [1] - 13:23
**answer** [16] - 17:8, 44:7, 44:13, 44:18, 44:19, 44:21, 44:22, 45:20, 62:1, 64:14, 78:20, 78:21, 79:8, 79:18, 79:19, 89:1
**answered** [4] - 17:4, 17:5, 78:20, 78:21
**answering** [2] - 44:6, 44:14
**answers** [2] - 19:18, 20:2
**anticipation** [2] - 49:8
**anxious** [1] - 57:17
**apartment** [1] - 87:25
**apologize** [1] - 87:21
**apparent** [1] - 33:13
**appear** [3] - 44:19,

50:25, 58:23
**APPEARANCES** [1] - 2:1
**appearances** [3] - 3:6, 11:14, 68:10
**appeared** [6] - 22:6, 33:3, 35:18, 37:16, 58:24, 92:4
**applicable** [1] - 4:2
**application** [1] - 20:15
**applied** [1] - 32:22
**applies** [3] - 12:6, 20:17, 44:14
**apply** [2] - 12:10, 15:6
**apportionment** [1] - 99:2
**apportions** [1] - 64:3
**appreciated** [1] - 45:16
**approached** [1] - 20:20
**approaches** [1] - 55:23
**appropriate** [4] - 28:2, 66:22, 67:3, 67:5
**approve** [2] - 29:18, 65:19
**APRIL** [2] - 3:1, 102:15
**April** [1] - 1:17
**area** [1] - 89:21
**arguably** [2] - 49:2, 59:13
**argue** [2] - 4:14, 84:1
**argument** [4] - 10:14, 45:5, 68:20, 94:13
**arguments** [4] - 12:2, 15:18, 15:20, 69:22
**arise** [1] - 34:5
**arises** [1] - 22:24
**arrest** [29] - 13:23, 31:24, 33:1, 35:3, 35:22, 35:24, 36:3, 36:6, 36:10, 36:17, 36:21, 37:20, 37:25, 38:5, 51:1, 58:2, 60:5, 60:7, 60:8, 60:10, 61:7, 72:16, 88:16, 88:18, 91:7, 91:18, 92:6
**arrest/detention** [1] - 37:20
**arrested** [4] - 35:6, 35:25, 36:12, 38:2
**arrhythmia** [1] - 60:24
**arrived** [2] - 7:16, 70:22
**aside** [2] - 68:24, 82:24
**aspect** [1] - 23:7

**asphyxia** [45] - 5:6, 5:7, 5:9, 5:11, 5:13, 5:18, 5:20, 6:10, 7:2, 48:14, 48:15, 51:1, 51:10, 51:13, 51:21, 53:22, 62:19, 65:3, 80:18, 80:24, 81:1, 81:3, 81:7, 82:6, 82:8, 82:22, 82:25, 83:7, 83:13, 83:20, 84:14, 86:16, 86:18, 91:10, 91:18, 91:20, 91:21, 92:5, 96:24, 96:25
**asphyxiate** [3] - 86:8, 86:22, 91:2
**asphyxiated** [1] - 91:3
**asphyxiates** [2] - 59:22, 60:6
**asphyxiation** [1] - 60:18
**assert** [1] - 5:24
**asserts** [1] - 13:25
**assist** [1] - 21:23
**assistance** [1] - 40:18
**associate** [1] - 11:1
**Association** [1] - 67:15
**association** [1] - 50:23
**assume** [9] - 83:3, 83:5, 83:7, 84:17, 85:3, 85:4, 85:5, 91:23, 91:24
**at-risk** [1] - 53:20
**attack** [8] - 7:18, 72:12, 72:13, 73:5, 73:6, 74:18, 76:2, 95:12
**attacked** [4] - 71:9, 72:12, 88:7, 95:9
**attacking** [4] - 72:7, 73:3, 95:16, 98:5
**attacks** [2] - 71:16, 75:22
**attempt** [3] - 23:14, 43:16, 44:2
**attempting** [4] - 31:25, 33:1, 35:22, 37:20
**attempts** [4] - 35:23, 35:24, 37:25, 73:10
**attention** [1] - 70:3
**attorneys** [4] - 16:1, 17:14, 74:14, 75:5
**authority** [2] - 29:12, 42:24
**autopsy** [2] - 48:9, 49:6
**availability** [1] - 33:8
**available** [4] - 12:7,

22:13, 28:6, 83:16
**Avenue** [1] - 2:7
**average** [3] - 41:12, 41:17, 41:18
**avoid** [6] - 17:20, 37:20, 39:2, 54:23, 63:11, 83:20
**award** [4] - 40:23, 41:23, 42:5, 42:8
**awarded** [4] - 39:11, 42:1, 42:4, 43:2
**aware** [3] - 57:3, 57:25, 83:15

# B

**baby** [1] - 70:24
**backed** [1] - 8:9
**bad** [4] - 64:18, 87:13, 94:21, 96:11
**BAILIFF** [2] - 100:17, 100:25
**bailiff** [4] - 22:21, 43:25, 45:1, 100:14
**Bakersfield** [1] - 54:10
**Bakken** [3] - 3:13, 11:21, 68:17
**BAKKEN** [1] - 2:16
**balance** [1] - 47:4
**banging** [1] - 70:21
**base** [3] - 15:2, 20:3, 80:15
**based** [22] - 8:24, 14:14, 21:6, 24:2, 26:9, 27:19, 27:21, 28:24, 40:23, 41:2, 60:3, 63:24, 69:17, 69:20, 69:21, 75:12, 78:4, 83:16, 88:24, 89:14, 93:19, 97:22
**basic** [1] - 61:2
**basis** [1] - 29:20
**battery** [3] - 34:6, 34:8, 34:10
**bear** [3] - 12:2, 18:15, 22:4
**beat** [1] - 92:7
**became** [1] - 17:13
**becomes** [3] - 43:24, 49:23, 57:17
**began** [1] - 81:13
**begin** [4] - 43:5, 45:8, 45:9, 100:13
**beginning** [2] - 12:1, 99:19
**behalf** [8] - 3:9, 3:13, 11:17, 11:21, 13:19, 45:13, 68:13, 68:17
**behavior** [1] - 20:1
**behind** [5] - 50:18,

71:14, 73:23, 74:1, 93:1
**belief** [1] - 43:22
**believability** [1] - 18:16
**believable** [2] - 19:8, 58:21
**belt** [4] - 83:10, 83:11, 92:21, 92:22
**benefit** [1] - 79:16
**Berkeley** [1] - 51:16
**BERNAL** [1] - 1:5
**Bernardino** [3] - 51:17, 65:8, 94:21
**best** [5] - 6:15, 74:16, 80:12, 89:3, 91:4
**better** [7] - 57:25, 58:1, 61:13, 84:7, 93:4, 93:5
**between** [6] - 16:21, 33:5, 46:2, 46:11, 79:23, 97:4
**beyond** [1] - 46:20
**Bianco** [18] - 3:13, 11:21, 13:12, 14:8, 29:9, 29:11, 29:15, 29:17, 29:25, 30:2, 30:14, 30:18, 30:24, 31:12, 41:24, 42:6, 53:3, 67:7
**BIANCO** [1] - 1:12
**Bianco's** [1] - 42:9
**bias** [3] - 18:12, 49:11, 69:20
**biased** [2] - 49:2, 50:11
**big** [1] - 86:12
**birthday** [2] - 46:3, 70:25
**BISGAARD** [1] - 2:15
**bit** [5] - 12:3, 45:20, 76:21, 95:24
**bizarre** [1] - 63:19
**blaming** [1] - 94:22
**blank** [1] - 100:9
**bleeding** [3] - 55:8, 55:21, 84:20
**blog** [1] - 20:14
**blood** [4] - 59:20, 59:25, 60:1, 93:24
**blow** [1] - 59:23
**blue** [3] - 11:8, 74:3, 80:22
**Bob** [1] - 45:14
**boils** [1] - 69:1
**Boulevard** [1] - 2:5
**boxes** [3] - 93:14, 93:17, 93:18
**brain** [3] - 13:10, 13:23, 61:4

**brain-dead** [1] - 13:10
**brains** [1] - 79:6
**break** [2] - 67:25, 99:15
**breakages** [1] - 81:5
**breath** [4] - 56:1, 57:11, 58:24, 76:24
**breathe** [12] - 13:23, 53:12, 57:11, 57:13, 57:18, 57:21, 60:23, 72:23, 91:11, 91:17, 95:20, 95:25
**breathing** [46] - 5:24, 5:25, 7:16, 7:17, 7:19, 7:20, 7:22, 57:7, 58:8, 58:9, 58:11, 58:14, 58:15, 58:23, 59:18, 59:24, 61:11, 76:11, 76:14, 76:21, 77:2, 77:4, 77:5, 77:6, 77:7, 77:21, 81:21, 81:22, 82:15, 83:21, 83:24, 86:10, 86:12, 86:15, 87:5, 92:1, 92:2, 92:4, 92:7, 92:13, 92:18, 96:8, 96:20, 96:22
**breathing's** [1] - 58:15
**breaths** [3] - 92:12, 92:14
**Brian** [36] - 12:25, 14:15, 24:6, 24:8, 24:12, 24:20, 25:6, 26:14, 26:17, 27:6, 27:13, 29:3, 29:6, 29:13, 29:16, 29:18, 30:20, 32:5, 34:9, 34:14, 34:18, 34:22, 34:24, 35:12, 36:15, 36:20, 36:24, 37:1, 37:3, 37:7, 37:12, 37:17, 37:22, 38:23, 38:25, 39:1
**brief** [3] - 4:6, 5:3, 13:16
**briefs** [1] - 4:4
**bright** [1] - 11:10
**bring** [3] - 10:5, 11:6, 89:5
**bringing** [1] - 27:8
**brings** [2] - 13:18, 23:20
**BRISBOIS** [1] - 2:15
**broad** [1] - 71:9
**broken** [3] - 52:4, 73:23, 91:2
**brother** [7] - 13:19, 46:11, 54:2, 56:12, 66:25, 67:1, 67:6

**brought** [1] - 55:19
**bruises** [3] - 85:2, 85:13, 85:16
**buddy** [1] - 71:5
**buildup** [1] - 60:22
**bulletins** [1] - 52:10
**bunch** [2] - 69:11, 70:6
**Burbank** [1] - 2:5
**burden** [10] - 8:23, 14:12, 14:23, 40:4, 42:2, 46:18, 46:20, 89:17, 89:18, 90:19
**bureau** [3] - 52:20, 76:12, 80:11
**buried** [1] - 87:4
**Burton** [6] - 3:9, 9:17, 11:17, 45:13, 51:15, 68:13
**BURTON** [2] - 2:6, 2:7
**business** [1] - 50:19
**buys** [1] - 54:8
**BY** [4] - 2:4, 2:7, 2:9, 2:15

## C

**calculate** [1] - 39:13
**CALIFORNIA** [3] - 1:2, 3:1, 102:6
**California** [9] - 1:16, 1:23, 2:5, 2:8, 2:10, 2:17, 4:11, 79:2, 94:17
**calm** [4] - 71:5, 71:8, 71:14, 71:20
**calms** [1] - 57:24
**camera** [1] - 77:2
**cancer** [1] - 46:2
**cannot** [9] - 17:5, 17:6, 38:10, 39:2, 54:23, 63:11, 73:6, 78:8, 78:18
**capable** [1] - 22:10
**captured** [1] - 77:2
**car** [1] - 83:9
**carbon** [3] - 59:21, 59:23
**cardiac** [16] - 13:23, 51:1, 58:2, 60:5, 60:7, 60:8, 60:9, 60:24, 61:7, 61:11, 77:24, 88:16, 88:18, 91:7, 91:18, 93:24
**cardiologist** [6] - 56:21, 81:8, 91:6, 91:8
**cardiovascular** [1] - 98:10
**care** [5] - 4:10, 4:19,

39:15, 40:18, 55:16
**careful** [2] - 39:20, 39:21
**carefully** [4] - 44:15, 45:4, 45:16, 79:10
**Case** [3] - 3:4, 11:12, 68:8
**case** [95] - 4:3, 4:6, 5:12, 5:19, 5:22, 6:3, 6:4, 6:11, 7:12, 7:20, 8:18, 8:25, 12:6, 12:10, 12:14, 15:4, 15:8, 16:8, 16:13, 17:11, 17:25, 18:2, 18:11, 20:4, 20:6, 20:7, 20:11, 20:12, 20:21, 20:22, 20:25, 21:4, 21:13, 21:20, 23:7, 23:10, 28:5, 32:18, 43:12, 44:4, 46:14, 46:17, 46:20, 46:21, 47:6, 47:16, 48:12, 49:2, 49:7, 50:5, 50:9, 50:21, 52:11, 54:6, 54:10, 54:11, 55:3, 56:12, 56:22, 59:14, 66:13, 68:2, 69:1, 69:7, 69:12, 69:18, 69:20, 70:2, 70:12, 73:8, 73:12, 74:20, 75:15, 76:17, 80:7, 80:8, 80:10, 81:7, 83:1, 84:16, 84:20, 84:22, 84:24, 85:10, 85:21, 86:4, 86:5, 89:20, 89:23, 93:16, 96:13, 96:25, 97:24, 99:19
**cases** [8] - 49:7, 49:12, 49:15, 50:8, 54:3, 54:4, 97:23
**cash** [1] - 41:7
**catacholamines** [1] - 93:23
**catecholamines** [1] - 53:23
**caught** [1] - 87:12
**causal** [1] - 85:25
**causation** [5] - 3:23, 3:25, 4:17, 54:14, 54:15
**caused** [24] - 6:2, 24:19, 24:25, 27:5, 27:25, 31:2, 31:6, 34:2, 34:12, 38:10, 38:11, 40:8, 84:22, 84:23, 85:8, 85:9, 85:12, 85:18, 86:3, 86:6, 86:8, 88:23, 91:9, 91:11

**causes** [5] - 53:5, 53:19, 60:21, 63:8, 82:5
**causing** [12] - 13:23, 27:8, 35:1, 37:2, 38:16, 38:20, 38:24, 39:4, 39:10, 54:22, 54:24, 64:25
**cavity** [3] - 81:5, 86:23, 87:5
**Center** [1] - 41:16
**center** [1] - 13:10
**CENTRAL** [2] - 1:2, 102:6
**certain** [5] - 12:21, 15:15, 17:10, 17:18, 28:10
**CERTIFICATE** [1] - 102:1
**certificate** [2] - 48:8, 62:16
**certifies** [1] - 62:16
**CERTIFY** [1] - 102:6
**cetera** [1] - 99:3
**CHAD** [1] - 1:12
**Chad** [16] - 3:13, 11:21, 13:12, 14:8, 29:9, 29:11, 29:15, 29:17, 30:14, 30:18, 30:24, 31:12, 41:24, 42:6, 42:9, 67:7
**chain** [1] - 88:14
**chairs** [1] - 101:6
**chamber** [1] - 69:13
**Chan** [6] - 7:7, 49:17, 54:7, 54:8, 80:20, 81:25
**Chan's** [1] - 52:2
**chance** [2] - 45:21, 61:13
**change** [2] - 43:19, 43:21
**changing** [2] - 33:4, 54:11
**charge** [1] - 72:8
**charged** [1] - 71:15
**chat** [1] - 20:14
**check** [3] - 93:14, 93:17, 93:18
**checked** [3] - 59:19, 77:13, 93:15
**chest** [9] - 32:7, 49:13, 56:23, 57:8, 57:10, 64:9, 81:4, 86:23, 87:5
**chiefs** [1] - 50:23
**Chiefs** [1] - 67:15
**children** [2] - 70:21, 88:1
**choice** [5] - 25:11,

27:15, 28:3, 29:18, 65:19
**choose** [1] - 19:2
**chose** [1] - 90:13
**chronic** [1] - 98:9
**circulate** [1] - 59:20
**circulating** [2] - 59:25, 60:1
**circumstances** [22] - 8:21, 14:17, 32:10, 32:18, 32:21, 33:4, 33:23, 35:11, 35:14, 37:5, 37:9, 37:10, 42:16, 67:10, 70:15, 71:23, 72:3, 75:12, 79:4, 79:14, 95:7
**circumstantial** [3] - 16:14, 16:18, 16:22
**citations** [1] - 84:10
**cited** [1] - 65:9
**cities** [1] - 51:14
**civil** [1] - 46:17
**claim** [26] - 4:5, 4:8, 14:23, 14:25, 24:1, 26:2, 26:5, 26:6, 28:18, 28:21, 28:22, 30:9, 30:12, 30:13, 31:18, 31:21, 34:20, 36:18, 39:5, 39:6, 47:24, 56:6, 79:12, 79:13, 89:23
**claims** [12] - 4:9, 4:10, 14:12, 14:13, 23:20, 34:5, 34:18, 36:15, 40:3, 52:23, 70:6, 89:20
**clarify** [2] - 3:22, 89:15
**Clark** [2] - 48:3, 63:14
**clean** [1] - 46:8
**clear** [10] - 5:5, 7:11, 7:14, 48:16, 49:25, 60:3, 60:20, 61:10, 76:16, 83:21
**clearly** [4] - 59:17, 64:15, 71:16, 98:21
**CLERK** [6] - 3:4, 11:12, 68:8, 100:15, 100:18, 101:3
**clients** [1] - 16:1
**close** [2] - 46:5, 74:23
**closely** [3] - 24:24, 31:5, 64:23
**closeness** [1] - 46:10
**closing** [4] - 12:2, 15:20, 45:5, 68:19
**CO2** [3] - 59:21, 91:19
**Code** [1] - 23:21
**CODE** [1] - 102:7
**colon** [1] - 46:2

color [16] - 13:4, 13:14, 23:22, 24:7, 25:2, 25:7, 26:18, 27:10, 27:14, 29:4, 29:10, 29:21, 29:25, 30:18, 31:8, 31:12
combative [1] - 84:6
combine [3] - 38:22, 54:19, 63:9
combined [1] - 62:5
comfort [1] - 40:18
comma [2] - 9:19, 9:21
commands [8] - 71:4, 71:12, 71:13, 72:6, 73:3, 75:23, 88:8
commentary [1] - 20:25
comments [1] - 59:6
commit [1] - 72:17
committed [9] - 33:20, 33:25, 35:5, 36:8, 46:15, 55:6, 72:7, 95:12
committing [2] - 34:1, 36:8
common [4] - 41:2, 48:11, 49:21, 70:7
communicate [6] - 20:9, 20:10, 43:25, 44:2, 44:3, 100:21
communicating [1] - 20:18
communications [1] - 73:10
community [6] - 6:16, 8:22, 72:9, 74:18, 74:19, 96:10
companionship [1] - 40:17
company [1] - 51:5
compensate [3] - 40:7, 41:5, 42:1
competent [1] - 50:14
complete [6] - 5:10, 42:17, 44:25, 67:11, 75:23, 95:9
completely [8] - 5:10, 6:12, 52:5, 60:12, 81:1, 94:22, 95:9, 95:25
compliance [1] - 71:5
comply [1] - 88:8
complying [1] - 72:6
compress [1] - 74:23
compression [7] - 5:6, 5:13, 5:18, 5:20, 81:3, 82:6
computer [10] - 20:13, 22:12, 22:18, 23:8,

23:10, 23:12, 23:14, 23:15, 23:18, 99:10
concede [2] - 51:20, 98:2
conceded [3] - 8:7, 60:8, 93:21
concept [1] - 98:4
concerning [2] - 29:13, 44:4
conclude [5] - 8:24, 33:24, 38:14, 78:25, 79:1
conclusion [2] - 79:3, 82:13
conclusive [1] - 41:21
condition [4] - 5:9, 39:3, 54:24, 63:12
conditions [2] - 5:20, 48:9
conduct [17] - 14:10, 28:12, 31:4, 34:3, 34:5, 34:13, 35:15, 37:11, 37:23, 38:20, 38:21, 42:9, 42:12, 42:15, 63:13, 65:19, 67:10
conducted [1] - 42:6
confer [1] - 56:16
conference [3] - 17:15, 17:23, 17:24
CONFERENCE [1] - 102:11
conferences [2] - 17:17, 17:22
confident [1] - 89:13
CONFORMANCE [1] - 102:11
confusion [1] - 17:20
conjecture [1] - 40:24
connection [1] - 49:20
conscientious [1] - 43:18
conscious [2] - 28:3, 80:6
consciously [4] - 6:9, 8:5, 80:5, 82:17
consequences [4] - 27:1, 28:4, 30:24, 64:12
consider [22] - 15:7, 15:13, 15:16, 16:10, 16:20, 17:12, 17:24, 18:22, 19:22, 32:18, 35:10, 35:17, 37:5, 38:17, 40:10, 40:16, 41:8, 41:12, 44:16, 93:12, 94:13, 95:7
considered [4] - 16:7, 19:11, 37:14, 43:13
considering [2] - 18:6,

21:18
consistent [4] - 18:18, 91:18, 92:5
consists [1] - 15:8
constitutes [1] - 25:16
Constitution [8] - 23:24, 24:11, 26:16, 29:7, 30:22, 32:3, 79:1, 80:3
constitutional [19] - 6:7, 14:9, 25:19, 27:20, 27:22, 27:23, 27:25, 28:11, 31:1, 31:3, 53:8, 53:9, 56:13, 64:14, 64:24, 65:3, 70:10, 70:14, 94:8
constructive [1] - 28:8
consult [3] - 12:7, 44:5, 45:4
consulting [1] - 21:1
contact [1] - 20:23
contend [1] - 14:14
contends [4] - 13:20, 14:3, 14:7, 34:7
contentions [2] - 66:12, 66:13
contested [1] - 47:23
context [1] - 68:25
continue [5] - 44:6, 73:6, 90:20, 90:21, 92:11
continued [2] - 73:7, 97:2
contradict [9] - 6:22, 7:4, 7:8, 69:11, 76:3, 80:16, 80:19, 81:8, 82:9
contradicted [4] - 18:13, 74:4, 80:25, 82:11
contrary [3] - 6:12, 8:3, 80:11
contributed [2] - 38:17, 39:6
contributes [1] - 53:5
contributing [2] - 62:17, 93:22
control [5] - 16:24, 47:13, 50:16, 55:25, 66:9
controlling [2] - 22:7, 96:6
controls [2] - 15:24, 69:18
contusions [1] - 85:1
convenient [1] - 100:20
conversation [1] - 97:7

cooperating [1] - 72:7
copies [1] - 100:2
cops [1] - 82:4
copy [4] - 12:6, 22:20, 23:19, 100:1
core [1] - 6:3
coroner [2] - 29:25, 42:6
CORONER [1] - 1:12
Coroner [13] - 13:12, 14:8, 29:9, 29:11, 29:15, 29:17, 30:1, 30:14, 30:17, 30:23, 31:11, 41:23, 42:9
CORRECT [1] - 102:8
counsel [16] - 3:6, 11:14, 56:16, 67:23, 68:10, 74:7, 89:10, 89:16, 89:24, 90:16, 91:13, 92:21, 94:12, 95:3, 95:6, 95:8
counselor [1] - 87:15
count [1] - 44:9
country [11] - 51:2, 51:11, 52:9, 53:15, 53:18, 64:15, 66:10, 67:16, 90:10, 90:12, 94:17
county [15] - 6:5, 8:1, 25:4, 27:12, 28:24, 29:23, 31:10, 65:8, 70:7, 76:7, 76:8, 78:24, 80:3, 80:4
County [49] - 3:5, 3:14, 11:13, 11:22, 13:1, 13:2, 13:6, 13:7, 13:20, 14:2, 14:4, 14:5, 14:7, 24:2, 24:15, 24:17, 24:22, 25:9, 25:10, 25:17, 25:18, 26:7, 26:8, 26:19, 26:20, 26:24, 26:25, 27:3, 27:4, 28:6, 28:7, 28:23, 29:12, 30:3, 34:11, 34:15, 43:3, 48:18, 49:4, 49:7, 50:4, 51:18, 65:1, 66:23, 68:9, 94:18
COUNTY [2] - 1:11, 1:11
couple [2] - 46:13, 96:22
coupled [1] - 91:11
course [7] - 8:15, 13:6, 17:21, 25:11, 27:15, 43:17, 74:11
COURT [37] - 1:1, 3:11, 3:15, 4:24, 9:3, 9:10, 9:14, 9:21,

9:24, 10:1, 10:5, 10:8, 10:15, 10:23, 11:3, 11:5, 11:19, 11:23, 45:9, 56:17, 67:25, 68:7, 68:15, 68:18, 68:22, 87:23, 89:6, 90:21, 94:1, 98:23, 99:5, 99:8, 101:1, 101:5, 102:5, 102:21
court [14] - 4:22, 16:12, 19:23, 22:16, 22:17, 22:25, 23:4, 43:8, 44:4, 50:5, 99:20, 100:6, 100:8, 100:23
Court [7] - 1:22, 1:22, 3:20, 23:17, 39:23, 100:22, 100:24
court's [2] - 3:21, 4:23
courtroom [2] - 23:2, 45:2
CPR [11] - 58:13, 58:14, 59:3, 61:13, 61:15, 63:2, 77:22, 77:23, 88:19, 92:14
cracks [1] - 5:15
crap [1] - 70:21
crazy [1] - 98:4
create [1] - 51:6
creates [1] - 7:1
credibility [4] - 47:7, 49:11, 55:11
credible [3] - 50:21, 69:25, 86:5
crime [16] - 32:20, 33:20, 34:1, 35:5, 35:20, 36:9, 37:18, 46:16, 55:6, 72:7, 72:8, 72:12, 72:18, 95:12, 95:13
criminal [2] - 46:14, 46:19
crisis [1] - 51:24
crossed [1] - 55:19
crushed [1] - 87:6
crushes [1] - 81:4
CSR [2] - 1:21, 102:20
cuff [1] - 75:22
cuffing [1] - 71:24
cuffs [4] - 74:1, 74:8, 74:11, 84:6
current [3] - 6:23, 41:4, 50:8
curse [1] - 70:20
custody [1] - 33:9
custom [9] - 14:1, 24:3, 24:14, 24:19, 24:24, 25:15, 25:16, 25:19, 65:2

**cycle** [1] - 97:20

## D

**dad** [1] - 45:25
**Dale** [3] - 3:8, 11:16, 68:12
**DALE** [2] - 2:4, 2:4
**damage** [6] - 5:15, 27:9, 64:25, 81:5, 86:24
**damages** [28] - 14:11, 39:11, 39:24, 40:3, 40:4, 40:5, 40:9, 40:15, 40:22, 41:1, 41:3, 41:5, 41:6, 41:23, 41:24, 42:1, 42:3, 42:4, 42:5, 42:8, 42:22, 43:2, 66:16, 66:17, 66:19
**dan** [6] - 56:21, 60:7, 60:14, 62:15, 91:3, 98:12
**danger** [4] - 72:14, 82:19, 87:20, 88:3
**dangerous** [3] - 71:19, 72:11, 88:11
**dark** [1] - 90:4
**data** [2] - 23:18, 23:19
**database** [1] - 23:13
**date** [1] - 45:1
**DATED** [1] - 102:15
**David** [1] - 100:17
**DAY** [1] - 102:15
**daylight** [1] - 71:9
**days** [1] - 83:2
**DC** [1] - 51:17
**de** [4] - 36:1, 38:3, 71:20, 73:11
**de-escalate** [2] - 71:20, 73:11
**de-escalation** [2] - 36:1, 38:3
**dead** [2] - 13:10, 96:9
**deadly** [1] - 71:10
**deal** [8] - 26:23, 28:16, 30:7, 31:16, 72:9, 72:10, 86:12, 88:6
**deals** [1] - 25:25
**death** [49] - 13:24, 35:1, 37:2, 38:10, 38:11, 38:12, 38:14, 38:16, 38:18, 38:19, 38:20, 38:25, 48:4, 48:8, 49:7, 53:6, 53:19, 54:3, 54:4, 54:6, 54:10, 54:16, 60:21, 62:9, 62:14, 62:16, 62:17, 63:5, 63:13, 63:20, 63:23,

64:25, 66:19, 66:21, 84:18, 84:25, 85:19, 86:1, 86:3, 86:6, 86:18, 86:20, 88:24, 93:16, 93:22, 96:17, 97:3, 99:1
**deaths** [2] - 64:16, 65:7
**deceased** [1] - 1:8
**decedent** [4] - 30:20, 31:3, 33:9, 40:9
**decedent's** [2] - 31:1, 33:7
**decide** [26] - 12:14, 15:4, 16:13, 16:22, 17:18, 18:3, 18:23, 18:25, 38:7, 38:8, 38:10, 38:11, 39:21, 41:1, 43:12, 48:24, 50:20, 58:21, 62:19, 69:20, 70:1, 95:4, 95:5, 99:2, 99:12
**decided** [3] - 4:10, 44:17, 79:13
**deciding** [10] - 15:7, 15:16, 17:11, 18:2, 19:12, 35:9, 37:3, 40:25, 41:8, 41:11
**decision** [6] - 7:9, 15:2, 43:18, 43:20, 70:5, 89:14
**decisions** [3] - 37:23, 80:15, 97:6
**declaration** [1] - 47:10
**decrease** [1] - 81:21
**Defendant** [4] - 25:9, 25:17, 26:24, 34:15
**defendant** [32] - 3:13, 3:14, 11:21, 13:1, 13:6, 13:12, 13:13, 14:2, 15:5, 24:2, 24:14, 24:17, 24:21, 26:5, 26:7, 26:19, 27:3, 28:6, 28:21, 28:23, 29:12, 30:3, 30:12, 30:14, 30:17, 30:23, 31:21, 35:12, 40:8, 41:25, 42:18, 42:21
**defendant's** [2] - 27:7, 31:4
**Defendants** [2] - 1:13, 2:14
**defendants** [9] - 5:2, 14:13, 14:14, 35:9, 39:5, 39:7, 39:11, 68:17
**defending** [1] - 31:25
**defense** [12] - 5:8, 14:18, 14:24, 15:1,

36:3, 38:4, 48:13, 49:19, 50:3, 89:5, 90:6, 96:12
**deficiency** [3] - 30:25, 31:2, 64:12
**defined** [2] - 34:11, 80:24
**definitely** [1] - 59:3
**definition** [1] - 67:9
**definitions** [1] - 80:25
**degree** [1] - 36:9
**deliberate** [22] - 6:6, 6:18, 23:3, 25:11, 27:15, 27:24, 28:3, 28:5, 29:18, 44:21, 65:14, 65:19, 80:4, 80:6, 90:15, 99:9, 99:13, 99:18, 99:25, 101:2, 101:7
**deliberately** [6] - 8:6, 19:1, 26:25, 80:9, 82:18, 90:13
**deliberating** [2] - 99:14, 99:16
**deliberations** [9] - 12:8, 20:8, 43:5, 43:7, 43:24, 44:7, 45:1, 99:18, 100:13
**delirium** [11] - 50:25, 51:25, 53:23, 55:10, 55:13, 55:14, 55:16, 55:18, 55:19, 95:14, 98:18
**deliver** [1] - 68:19
**denied** [1] - 9:3
**Denver** [1] - 51:16
**deny** [2] - 14:13, 97:23
**denying** [1] - 17:24
**department** [6] - 28:24, 64:7, 67:18, 80:9, 83:15, 89:2
**Department** [27] - 6:6, 6:13, 7:9, 8:5, 11:22, 13:2, 13:7, 13:14, 14:3, 14:5, 24:16, 24:18, 25:10, 25:18, 26:8, 26:9, 26:20, 26:25, 27:4, 28:7, 30:3, 43:4, 51:3, 59:16, 81:11, 82:12, 90:18
**DEPARTMENT** [1] - 1:11
**department's** [1] - 24:22
**deposition** [6] - 19:15, 19:19, 19:21, 19:23, 22:8, 94:24
**deprivation** [5] - 24:20, 24:24, 27:5,

31:5, 64:24
**deprive** [1] - 31:3
**deprived** [4] - 24:9, 26:14, 29:6, 30:20
**deprives** [1] - 23:23
**Deputies** [19] - 25:6, 26:13, 26:17, 27:6, 27:13, 29:3, 29:5, 29:13, 32:5, 34:9, 34:14, 34:18, 34:22, 34:24, 36:20, 36:24, 37:1, 37:3, 37:12
**deputies** [70] - 7:10, 7:13, 7:18, 7:20, 8:4, 12:25, 13:3, 13:5, 14:1, 14:4, 14:15, 24:6, 24:8, 24:12, 24:20, 26:10, 26:21, 26:22, 27:2, 29:16, 29:18, 30:20, 32:21, 32:24, 33:2, 33:10, 33:14, 33:23, 34:7, 36:15, 37:7, 37:22, 38:8, 38:11, 48:20, 52:12, 54:22, 62:1, 63:10, 64:3, 64:13, 64:17, 65:11, 65:21, 65:25, 66:2, 66:11, 69:2, 70:17, 70:23, 72:2, 72:21, 72:25, 75:7, 75:16, 76:10, 76:13, 76:18, 77:3, 78:3, 78:7, 78:25, 79:5, 82:13, 83:19, 83:24, 88:4, 88:22, 89:2, 94:22
**deputies'** [8] - 14:10, 14:21, 28:12, 34:5, 34:12, 54:21, 72:19, 76:23
**Deputy** [12] - 58:22, 70:9, 76:21, 77:15, 78:2, 78:14, 91:24, 94:6
**deputy** [19] - 12:25, 13:20, 32:17, 33:16, 35:2, 35:4, 35:15, 35:19, 38:13, 38:23, 38:25, 39:1, 71:9, 71:12, 71:15, 83:3, 84:21, 84:22, 97:13
**describe** [1] - 23:4
**desensitized** [1] - 71:18
**deserved** [2] - 96:17, 96:18
**deserves** [2] - 19:9, 21:18
**despite** [5] - 71:12, 71:13, 71:14, 72:23

**destroying** [1] - 86:23
**detain** [8] - 35:3, 36:4, 36:6, 36:10, 36:17, 36:21, 38:5, 72:16
**detained** [2] - 35:6, 36:12
**detention** [1] - 37:20
**deter** [1] - 41:25
**determination** [1] - 39:12
**determine** [6] - 33:3, 35:11, 37:5, 40:3, 40:22, 41:3
**determining** [3] - 32:17, 40:9, 40:15
**Detroit** [1] - 51:16
**diagnosed** [1] - 46:2
**diaphragm** [1] - 57:13
**dictionaries** [1] - 21:2
**die** [9] - 41:21, 49:18, 52:4, 53:25, 54:13, 67:20, 91:12, 97:22
**died** [14] - 14:20, 48:7, 49:14, 63:15, 63:24, 64:1, 66:3, 81:23, 86:16, 91:10, 91:14, 91:15, 92:10, 92:20
**dies** [2] - 48:16, 91:7
**differ** [1] - 15:23
**difference** [2] - 79:23, 97:4
**differences** [1] - 18:22
**different** [11] - 18:19, 22:6, 69:4, 75:4, 81:2, 81:15, 81:16, 90:3
**differently** [1] - 18:22
**differs** [1] - 18:24
**dilated** [4] - 58:10, 61:1, 61:3, 91:20
**diligently** [1] - 43:9
**dioxide** [3] - 59:21, 59:23, 59:24
**direct** [4] - 16:14, 16:15, 16:22
**directed** [2] - 5:4, 9:1
**direction** [1] - 23:11
**directly** [1] - 73:15
**directory** [1] - 23:13
**dirt** [1] - 87:4
**disability** [1] - 42:25
**disagree** [1] - 86:2
**disagreed** [2] - 80:21, 80:22
**disappoint** [1] - 11:10
**discharged** [1] - 44:11
**disciplined** [1] - 25:21
**discover** [1] - 23:15
**discuss** [4] - 23:6, 44:17, 69:16, 89:14

**discussed** [1] - 43:14
**discussing** [2] - 20:7, 20:12
**discussion** [6] - 43:19, 54:9, 69:15, 83:4, 83:5, 84:17
**disease** [1] - 98:10
**diseased** [2] - 98:8, 98:10
**dislikes** [1] - 12:13
**displayed** [1] - 22:10
**dispute** [9] - 5:7, 5:16, 5:17, 6:4, 53:4, 53:21, 73:19, 81:9, 87:17
**disputed** [1] - 84:24
**disputes** [1] - 87:16
**disregard** [11] - 16:6, 17:10, 28:4, 42:10, 42:15, 64:11, 64:19, 67:8, 67:10, 80:6, 82:17
**disregarded** [4] - 6:9, 8:5, 30:24, 80:5
**distinction** [1] - 16:21
**DISTRICT** [5] - 1:1, 1:2, 1:5, 102:5, 102:6
**District** [1] - 1:22
**disturbed** [1] - 33:15
**DIVISION** [1] - 1:3
**DIVISION-RIVERSIDE** [1] - 1:3
**DO** [1] - 102:6
**docket** [2] - 4:6, 4:7
**doctor** [3] - 86:19, 88:17, 91:8
**doctors** [8] - 7:21, 60:17, 61:6, 61:9, 77:19, 81:13, 91:23
**document** [5] - 52:22, 69:25, 78:9, 90:18, 90:23
**documents** [1] - 90:17
**dollars** [1] - 41:4
**donate** [2] - 98:11
**donated** [1] - 13:11
**done** [6] - 12:18, 17:21, 56:5, 76:5, 78:25, 97:3
**doors** [1] - 70:22
**doubt** [1] - 46:21
**doubts** [1] - 89:22
**down** [44] - 13:21, 48:16, 48:20, 49:13, 49:19, 52:14, 52:16, 55:2, 55:17, 56:8, 56:23, 57:8, 57:10, 57:16, 57:24, 58:4, 62:24, 64:9, 69:1,

69:9, 71:5, 71:6, 71:8, 71:11, 71:13, 71:15, 71:20, 76:2, 76:24, 83:22, 85:4, 92:10, 92:17, 93:3, 95:21, 96:8, 96:16, 96:23, 97:2, 97:21, 98:17
**Dr** [22] - 7:7, 48:2, 48:8, 49:2, 49:12, 49:15, 49:17, 52:2, 53:14, 53:24, 56:21, 60:7, 60:8, 60:14, 62:15, 63:14, 63:25, 80:17, 81:25, 91:3, 93:21, 98:12
**draw** [1] - 70:3
**driving** [1] - 83:9
**drug** [7] - 47:16, 47:24, 48:3, 48:4, 71:16, 87:15, 98:9
**drugs** [15] - 46:8, 47:19, 51:25, 54:25, 55:18, 55:20, 57:5, 60:10, 62:11, 63:18, 63:22, 96:11, 98:2, 98:14
**due** [3] - 28:11, 60:10, 81:2
**duplicative** [1] - 4:20
**during** [13] - 10:24, 12:8, 12:18, 14:17, 17:13, 20:7, 21:21, 33:4, 34:17, 43:24, 48:7, 63:14, 68:1
**duties** [4] - 25:4, 27:12, 29:23, 31:10
**duty** [9] - 12:5, 12:9, 16:1, 35:6, 36:12, 39:23, 72:15, 72:17, 73:1
**dying** [5] - 46:2, 54:1, 66:8, 90:10, 90:14

## E

**early** [1] - 61:7
**easier** [1] - 70:4
**easily** [1] - 50:16
**EASTERN** [1] - 1:3
**easy** [1] - 92:23
**EDCV** [3] - 3:4, 11:12, 68:8
**eDCV** [1] - 1:10
**education** [2] - 21:15, 21:19
**effect** [1] - 43:22
**effective** [1] - 92:12
**effort** [2] - 72:16, 78:1
**efforts** [2] - 6:13,

72:19
**either** [4] - 16:21, 17:15, 59:4, 92:16
**elaborated** [3] - 4:4, 4:6, 5:3
**elect** [1] - 43:5
**electrical** [2] - 60:9, 60:13
**electronic** [3] - 20:13, 22:22, 23:18
**electronically** [1] - 22:10
**elements** [16] - 24:4, 25:23, 25:24, 26:4, 26:11, 28:14, 28:15, 28:20, 29:1, 30:5, 30:6, 30:11, 30:15, 31:14, 31:15, 31:20
**ELMO** [1] - 93:8
**email** [1] - 20:14
**emergency** [4] - 55:15, 61:3, 75:13, 96:14
**emotional** [1] - 40:13
**emotionally** [1] - 33:15
**employed** [1] - 13:1
**employee** [1] - 40:8
**employees** [2] - 34:3, 34:15
**employer** [2] - 20:18, 34:2
**employment** [4] - 13:6, 34:4, 34:13, 34:17
**enable** [1] - 23:9
**encountered** [1] - 70:23
**end** [4] - 9:17, 46:7, 59:21, 91:19
**end-tidal** [2] - 59:21, 91:19
**enforcement** [14] - 31:23, 32:8, 32:12, 32:15, 33:24, 36:5, 37:6, 49:13, 50:13, 66:13, 66:15, 75:8, 80:13, 93:5
**enforcing** [1] - 6:18
**engaged** [4] - 6:13, 34:7, 34:10, 79:1
**ensure** [2] - 21:5, 23:12
**enter** [1] - 22:25
**entire** [3] - 21:10, 52:9, 82:20
**entirety** [1] - 59:11
**ENTITLED** [1] - 102:10
**entitled** [1] - 66:18

**epidemiological** [1] - 7:6
**epidemiology** [1] - 82:1
**equipment** [3] - 22:13, 22:18, 23:6
**Eric** [2] - 19:21, 70:19
**error** [1] - 17:20
**escalate** [2] - 71:20, 73:11
**escalation** [2] - 36:1, 38:3
**escape** [7] - 35:3, 36:4, 36:6, 36:10, 36:17, 36:21, 38:5
**escaping** [1] - 32:1
**especially** [4] - 7:23, 50:25, 53:19, 73:24
**essence** [3] - 6:3, 47:11, 61:5
**establish** [4] - 27:21, 32:2, 34:20, 36:18
**established** [1] - 25:19
**establishing** [2] - 25:13, 27:17
**et** [4] - 3:5, 11:13, 68:9, 99:3
**evade** [2] - 33:1, 35:22
**evaluate** [6] - 70:13, 70:14, 72:1, 79:14, 79:15, 79:17
**evaluating** [1] - 80:20
**event** [4] - 18:21, 39:3, 54:24, 63:12
**evidence** [160] - 4:2, 5:5, 5:7, 5:16, 5:17, 5:19, 6:4, 6:11, 6:20, 6:21, 6:23, 6:25, 7:3, 7:4, 7:5, 7:7, 7:17, 7:25, 8:3, 8:4, 8:18, 8:24, 9:8, 12:5, 12:10, 12:15, 12:19, 13:15, 13:16, 14:24, 14:25, 15:2, 15:7, 15:10, 15:14, 15:15, 15:19, 15:22, 16:1, 16:6, 16:8, 16:9, 16:12, 16:13, 16:14, 16:15, 16:18, 16:20, 16:22, 16:23, 16:25, 17:1, 17:9, 17:10, 17:12, 17:19, 18:13, 18:15, 19:6, 19:10, 19:12, 20:4, 21:6, 21:20, 22:2, 22:5, 22:9, 22:19, 22:21, 24:5, 26:12, 29:2, 30:16, 32:5, 40:5, 40:23, 41:2, 41:20,

42:3, 43:14, 43:22, 44:17, 45:16, 45:17, 46:22, 46:23, 47:22, 48:1, 48:14, 53:17, 56:23, 60:3, 60:20, 61:4, 61:22, 62:22, 63:24, 69:3, 69:9, 69:17, 69:21, 69:22, 69:23, 69:25, 70:1, 72:23, 73:19, 74:2, 75:1, 75:3, 75:4, 75:6, 75:7, 76:3, 76:9, 77:14, 78:9, 78:11, 79:8, 79:24, 80:7, 80:10, 80:16, 80:19, 81:8, 81:23, 82:9, 82:11, 82:12, 82:25, 83:1, 84:15, 85:15, 85:16, 86:7, 86:10, 86:15, 86:19, 87:8, 87:22, 88:24, 89:1, 89:11, 89:12, 89:13, 89:15, 89:20, 89:22, 90:16, 91:3, 91:15, 93:12, 93:19, 96:24, 97:1, 97:22, 98:21, 99:10
**Evidence** [4] - 16:3, 16:24, 17:2, 17:19
**exact** [2] - 4:11, 76:9
**exactly** [12] - 5:16, 6:20, 7:2, 7:3, 60:5, 65:25, 74:25, 76:17, 88:17, 92:9, 96:1
**exaggeration** [1] - 95:9
**examiner** [2] - 49:5, 49:9
**example** [2] - 10:19, 90:3
**except** [6] - 9:20, 20:6, 44:2, 44:4, 51:3, 93:4
**excessive** [19] - 6:8, 26:1, 28:17, 30:8, 31:17, 31:24, 32:2, 32:6, 32:17, 50:6, 53:10, 62:1, 62:5, 65:4, 78:15, 79:12, 94:7, 98:21
**excited** [13] - 50:25, 51:25, 53:23, 55:9, 55:10, 55:12, 55:13, 55:16, 55:18, 55:19, 95:14, 97:10, 98:18
**excluded** [1] - 16:5
**exclusively** [1] - 69:21
**excuse** [3] - 5:3, 7:3, 79:12
**exertion** [1] - 86:4

**exhibit** [5] - 17:1, 17:4, 17:5, 22:20, 23:6
**exhibits** [8] - 15:9, 15:14, 22:9, 22:19, 22:22, 23:9, 78:9, 99:9
**exist** [4] - 48:14, 48:15, 82:18, 95:1
**existence** [1] - 75:2
**exists** [2] - 33:22, 40:25
**expand** [1] - 57:13
**expect** [2] - 93:4, 93:5
**expectancy** [4] - 41:11, 41:12, 41:17, 41:18
**experience** [4] - 21:15, 21:19, 49:22, 60:4
**experienced** [1] - 40:14
**expert** [12] - 7:3, 21:12, 48:2, 51:19, 73:8, 81:9, 84:3, 85:24, 85:25, 94:3, 94:5, 94:20
**experts** [9] - 5:8, 49:1, 53:18, 54:6, 62:18, 71:3, 86:2, 91:4, 97:9
**explained** [8] - 24:11, 26:16, 29:8, 30:22, 60:15, 64:6, 82:1, 91:5
**exposed** [3] - 20:5, 21:10, 72:14
**expressly** [1] - 24:13
**extensive** [1] - 6:14
**extent** [3] - 4:24, 33:7, 40:11
**extremely** [3] - 47:14, 60:1, 94:13
**eyes** [7] - 58:10, 61:1, 61:2, 69:5, 77:18, 79:7, 86:11

**F**

**face** [6] - 42:18, 46:5, 67:11, 74:3, 80:22, 87:4
**Facebook** [1] - 20:15
**facedown** [2] - 55:24, 55:25
**facilitate** [1] - 69:14
**fact** [34] - 4:18, 5:25, 6:1, 6:5, 6:11, 7:16, 16:15, 16:19, 19:6, 33:17, 46:1, 46:3,

48:5, 48:18, 48:20, 56:8, 64:8, 70:1, 74:4, 76:3, 80:16, 80:19, 80:21, 80:23, 81:8, 82:10, 83:24, 84:24, 85:14, 86:13, 86:24, 95:21, 97:2
**factor** [15] - 35:1, 37:2, 38:16, 38:18, 38:20, 38:22, 38:24, 39:3, 39:10, 54:17, 54:20, 54:21, 54:24, 63:12
**factors** [9] - 18:15, 35:17, 37:14, 41:12, 51:23, 63:9, 94:16, 98:17
**facts** [23] - 4:2, 12:9, 12:10, 12:21, 12:23, 14:15, 15:8, 15:10, 15:11, 15:15, 15:16, 15:22, 16:18, 18:2, 28:6, 32:14, 35:14, 37:11, 69:4, 75:12, 78:6, 79:4, 79:5
**fail** [2] - 65:11, 73:22
**failed** [6] - 8:2, 8:23, 26:3, 28:19, 30:10, 31:19
**failing** [1] - 39:17
**fails** [2] - 26:9, 39:19
**failure** [11] - 26:10, 27:1, 27:3, 27:7, 27:19, 27:21, 28:8, 28:9, 39:15, 65:13, 65:15
**failures** [6] - 26:13, 29:5, 29:13, 29:16, 29:19, 30:19
**faint** [8] - 58:17, 59:1, 92:8, 97:16, 97:17
**fair** [6] - 21:6, 33:25, 47:20, 47:22, 66:21, 69:15
**Fair** [1] - 2:7
**fairly** [1] - 40:6
**fairness** [1] - 21:8
**Fajardo** [5] - 48:8, 49:2, 49:12, 63:25, 93:21
**falling** [2] - 76:23, 85:9
**falls** [1] - 55:25
**family** [2] - 20:18, 46:12
**far** [1] - 46:12
**fashion** [1] - 63:19
**fast** [1] - 95:21
**fault** [1] - 64:3
**favor** [3] - 47:4, 47:5, 61:24

**favorite** [1] - 69:7
**FCRR** [2] - 1:21, 102:20
**feather** [1] - 47:5
**feature** [1] - 70:7
**federal** [7] - 1:22, 3:22, 4:11, 23:20, 42:20, 67:13, 79:11
**FEDERAL** [2] - 102:4, 102:21
**feelings** [1] - 47:18
**fell** [1] - 87:17
**fellow** [3] - 20:7, 21:25, 55:4
**felony** [1] - 55:7
**felt** [7] - 77:5, 77:16, 77:20, 87:20, 88:2
**female** [1] - 41:17
**few** [3] - 70:3, 75:17, 89:15
**fibrillation** [2] - 60:10, 60:12
**fight** [2] - 74:17, 84:7
**fighting** [1] - 82:4
**figure** [3] - 6:15, 80:12, 82:5
**fill** [3] - 93:8, 93:11, 93:13
**final** [6] - 3:16, 11:25, 25:13, 27:17, 28:25, 29:11
**finally** [2] - 58:7, 63:3
**fine** [5] - 9:5, 10:3, 48:19, 48:22, 65:25
**fingers** [1] - 77:17
**first** [15] - 9:18, 45:12, 48:2, 50:1, 50:23, 56:20, 69:7, 69:19, 75:18, 77:9, 77:11, 78:14, 86:11, 89:17, 99:23
**five** [3] - 10:20, 11:1, 88:12
**five-minute** [1] - 11:1
**fixed** [5] - 40:25, 58:10, 61:1, 61:3, 91:20
**fleeing** [1] - 32:1
**flight** [2] - 33:1, 37:21
**flipped** [4] - 77:10, 77:12, 77:22, 86:9
**focus** [1] - 73:14
**folder** [1] - 100:4
**folks** [1] - 81:15
**follow** [8] - 4:15, 12:11, 13:15, 25:11, 27:15, 44:15, 73:3, 78:22
**followed** [5] - 7:13, 52:12, 71:7, 89:2,

89:3
**following** [14] - 15:8, 18:7, 24:4, 26:11, 29:1, 30:15, 34:5, 34:21, 35:17, 36:19, 37:14, 39:7, 40:10, 40:16
**Fonzi** [6] - 49:16, 50:2, 50:3, 50:10, 51:19, 95:10
**FOR** [2] - 102:5
**force** [62] - 4:9, 4:15, 4:20, 6:9, 14:18, 14:21, 24:25, 26:1, 28:17, 30:8, 31:6, 31:17, 31:24, 32:3, 32:6, 32:9, 32:11, 32:17, 32:21, 33:3, 33:6, 33:11, 33:14, 34:19, 34:23, 34:25, 35:2, 35:7, 35:8, 35:10, 35:11, 35:16, 36:3, 36:5, 36:9, 36:13, 36:14, 36:16, 36:21, 36:23, 36:25, 37:4, 37:6, 37:13, 37:23, 38:5, 50:6, 53:10, 61:25, 65:4, 65:10, 71:10, 78:15, 79:12, 85:7, 85:11, 85:18, 88:22, 94:7, 98:21
**forcing** [1] - 97:24
**FOREGOING** [1] - 102:8
**forensic** [3] - 86:15, 86:17, 86:21
**foreperson** [5] - 44:25, 69:13, 99:24, 100:3, 100:5
**forget** [1] - 18:20
**form** [23] - 3:24, 4:4, 4:5, 4:13, 5:21, 20:17, 22:11, 44:12, 44:18, 44:19, 44:25, 45:18, 45:19, 53:23, 61:19, 78:13, 78:18, 93:7, 93:11, 93:13, 100:3, 100:4, 100:6
**formal** [1] - 25:8
**FORMAT** [1] - 102:10
**format** [1] - 22:22
**former** [1] - 76:12
**forms** [5] - 5:17, 44:15, 81:6, 100:9, 100:11
**formulations** [1] - 80:2
**forward** [3] - 71:24, 77:14, 100:14

**fought** [4] - 71:21, 88:9
**four** [5] - 48:21, 58:4, 61:9, 93:3, 96:16
**fourth** [1] - 28:16
**Fourth** [5] - 25:25, 30:7, 31:16, 31:23, 32:8
**free** [11] - 25:25, 28:16, 30:7, 31:16, 53:10, 65:4, 73:5, 73:6, 74:18, 88:12, 99:17
**freedom** [1] - 6:8
**Friday** [1] - 59:17
**friends** [1] - 66:14
**front** [2] - 74:1, 93:10
**full** [1] - 100:15
**fully** [1] - 43:14
**function** [1] - 61:12
**future** [3] - 41:25, 66:24, 67:3

**G**

**gained** [1] - 71:5
**Galipo** [9] - 3:8, 3:18, 9:4, 11:7, 11:16, 45:6, 68:13, 85:22, 89:7
**GALIPO** [27] - 2:4, 2:4, 3:8, 9:5, 9:11, 9:15, 9:22, 9:25, 10:3, 10:6, 10:9, 10:17, 11:9, 11:16, 45:7, 45:10, 56:18, 59:9, 68:12, 87:21, 89:8, 90:20, 90:22, 94:2, 98:24, 99:6, 101:8
**game** [2] - 23:13, 76:1
**games** [1] - 84:1
**gee** [2] - 97:8, 97:10
**general** [1] - 31:22
**generally** [1] - 48:12
**gentlemen** [15] - 11:24, 45:11, 49:22, 52:12, 55:12, 56:4, 58:19, 60:2, 67:14, 69:6, 78:12, 95:4, 97:20, 99:8, 101:1
**girlfriend's** [1] - 87:18
**given** [8] - 16:21, 21:19, 33:12, 61:15, 62:6, 64:4, 69:19, 93:20
**glad** [1] - 97:8
**glossed** [1] - 88:17
**goalposts** [2] - 68:25, 84:15
**God** [1] - 100:24

**Gomez** [40] - 12:25, 14:16, 24:6, 24:9, 24:12, 24:21, 25:6, 26:14, 26:17, 27:7, 27:14, 29:3, 29:6, 29:14, 30:20, 32:5, 34:10, 34:15, 34:19, 34:23, 36:16, 36:21, 36:24, 37:1, 37:4, 37:12, 37:17, 39:1, 39:2, 58:22, 63:2, 65:23, 70:10, 76:21, 77:15, 78:2, 78:15, 91:24, 94:6
**Gomez's** [7] - 29:16, 29:19, 34:25, 35:13, 37:7, 37:22, 38:24
**government** [1] - 47:13
**Graham** [3] - 49:15, 53:24, 60:8
**granted** [1] - 17:23
**granting** [1] - 17:24
**great** [1] - 93:16
**grief** [1] - 41:9
**ground** [2] - 51:7, 85:5
**group** [2] - 90:24, 90:25
**guarantee** [2] - 73:21
**guard** [1] - 76:2
**guess** [11] - 17:7, 50:7, 52:8, 53:9, 63:18, 63:21, 77:16, 91:18, 91:22, 92:15, 92:22
**guessing** [1] - 69:2
**guesswork** [1] - 40:24
**guidance** [1] - 40:21
**guide** [1] - 22:3
**gun** [3] - 90:5, 90:6, 90:7
**guns** [2] - 50:20, 95:16
**guy** [5] - 57:15, 70:24, 87:13, 95:15, 95:20
**guys** [1] - 66:9

## H

**habits** [1] - 41:14
**half** [2] - 89:12, 97:13
**hand** [6] - 19:3, 26:3, 28:19, 30:10, 31:19, 100:18
**handcuff** [3] - 56:2, 56:23, 92:23
**handcuffed** [19] - 13:22, 48:21, 49:24, 50:15, 50:17, 51:7, 52:14, 53:11, 62:2,

62:3, 64:9, 66:10, 72:18, 88:10, 92:25, 93:1, 95:23, 96:13, 98:3
**handcuffing** [8] - 32:7, 34:20, 73:7, 73:14, 73:15, 73:17, 88:9
**handcuffs** [10] - 8:9, 50:19, 71:21, 73:9, 73:12, 73:20, 73:22, 73:23, 74:1, 81:17
**handle** [2] - 26:22, 72:11
**hands** [2] - 71:14, 76:23
**happy** [2] - 70:24, 88:4
**harm** [20] - 6:9, 7:2, 9:12, 33:21, 34:2, 34:12, 38:23, 39:1, 39:4, 39:6, 39:10, 39:16, 54:20, 54:22, 54:25, 55:8, 62:14, 64:20, 64:25, 72:13
**harmed** [2] - 34:19, 42:9
**harshness** [1] - 42:23
**hat** [1] - 82:20
**Hayes** [1] - 4:6
**head** [4] - 55:9, 84:20, 84:22, 87:3
**health** [2] - 41:13, 51:24
**Health** [1] - 41:16
**healthy** [3] - 52:6, 81:14, 98:12
**hear** [12] - 18:8, 44:4, 47:19, 49:1, 57:19, 59:18, 69:10, 77:3, 83:2, 87:22, 91:8, 94:12
**heard** [33] - 12:4, 16:11, 16:17, 21:12, 22:1, 22:5, 22:7, 46:1, 46:9, 46:19, 49:1, 54:3, 56:15, 56:20, 56:21, 69:16, 70:5, 70:18, 72:3, 73:20, 76:6, 76:9, 77:6, 78:2, 81:14, 82:24, 84:16, 87:11, 87:14, 88:13, 92:12, 94:25
**hearing** [2] - 17:15, 83:3
**heart** [16] - 47:16, 81:6, 86:24, 87:6, 91:6, 91:9, 92:7, 98:7, 98:9, 98:10,

98:11, 98:12, 98:13
**held** [8] - 48:16, 48:20, 49:19, 55:1, 58:4, 92:10, 96:22, 97:21
**HELD** [1] - 102:9
**Helm** [4] - 3:9, 11:17, 45:13, 68:13
**HELM** [2] - 2:9, 2:9
**help** [18] - 13:15, 15:21, 22:3, 23:1, 55:4, 55:5, 57:20, 61:12, 69:14, 69:16, 87:15, 91:16, 95:14, 96:14, 96:15, 98:6, 100:24
**hemorrhages** [2] - 60:17, 60:18
**HEREBY** [1] - 102:6
**herself** [1] - 31:25
**high** [6] - 46:20, 48:6, 59:22, 60:1, 63:16, 71:16
**Hills** [1] - 2:5
**himself** [4] - 6:6, 8:7, 31:25, 55:25
**hindsight** [8] - 32:13, 68:23, 70:16, 79:16, 89:24, 89:25, 90:2, 90:8
**hire** [1] - 62:18
**history** [1] - 47:10
**hmm** [1] - 97:8
**hog** [1] - 81:18
**hog-tied** [1] - 81:18
**hogwash** [1] - 84:14
**hold** [10] - 8:12, 47:13, 52:16, 55:17, 57:16, 92:17, 93:1, 96:7, 96:16, 97:2
**holding** [7] - 13:21, 52:14, 52:15, 57:10, 62:24, 70:24, 98:17
**holds** [1] - 78:23
**home** [1] - 56:10
**homicide** [2] - 48:5, 62:15
**honest** [1] - 43:22
**Honor** [18] - 3:8, 3:12, 5:2, 9:1, 9:5, 10:4, 10:6, 10:25, 11:16, 11:20, 45:8, 68:12, 68:16, 68:21, 87:21, 99:7, 101:8, 101:9
**HONORABLE** [1] - 1:5
**hopefully** [1] - 93:15
**horrible** [2] - 56:9
**hour's** [1] - 10:12
**house** [2] - 87:18, 87:19
**huge** [1] - 79:23

**human** [4] - 54:1, 55:4, 56:14, 92:24
**hundreds** [3] - 49:18, 97:23
**hung** [1] - 82:20
**hurt** [2] - 55:5, 74:18
**hypothesis** [1] - 72:24
**hypoxia** [2] - 60:4, 60:21
**hypoxic** [1] - 61:4

## I

**idea** [6] - 6:2, 7:25, 82:21, 84:13, 86:7, 86:16
**identify** [1] - 22:3
**ignore** [8] - 17:7, 17:10, 19:5, 71:22, 73:13, 78:10, 79:3, 79:4
**ignores** [1] - 51:4
**ignoring** [2] - 67:19, 84:15
**ill** [1] - 42:12
**imagine** [1] - 46:11
**immediate** [6] - 32:23, 35:19, 37:16, 46:12, 55:15, 58:1
**immediately** [5] - 8:8, 20:23, 21:11, 23:17, 92:15
**imminent** [1] - 33:11
**immunities** [1] - 23:24
**impair** [2] - 57:7, 81:22
**implement** [2] - 27:19, 28:9
**importance** [1] - 47:9
**important** [17] - 19:1, 19:8, 43:16, 46:14, 46:18, 47:8, 47:14, 47:15, 52:11, 54:15, 63:10, 66:15, 78:22, 90:9, 91:8, 94:13, 97:1
**importantly** [1] - 59:19
**improper** [1] - 16:2
**IN** [3] - 102:5, 102:9, 102:10
**inability** [1] - 91:10
**inaccurate** [1] - 4:1
**inaction** [1] - 27:19
**inadequate** [3] - 14:6, 64:23, 94:14
**inappropriate** [1] - 4:12
**incident** [8] - 13:4, 13:8, 14:17, 34:17, 52:25, 69:3, 71:23,

76:13
**included** [1] - 3:17
**includes** [4] - 20:12, 53:11, 72:3, 97:6
**including** [10] - 20:12, 20:15, 32:19, 35:15, 37:11, 44:8, 82:2, 82:3, 93:3
**inclusion** [2] - 3:24, 4:7
**incoherently** [1] - 71:3
**inconsistent** [1] - 4:9
**incorrect** [2] - 7:7, 58:12
**increased** [5] - 93:22, 93:23, 93:24
**increases** [1] - 71:18
**Independence** [1] - 47:11
**independent** [1] - 49:4
**Indianapolis** [1] - 51:16
**indicated** [2] - 54:18, 60:25
**indicating** [1] - 86:5
**indication** [1] - 17:25
**indifference** [11] - 6:7, 6:19, 27:24, 28:3, 28:5, 42:17, 65:14, 67:11, 80:5, 80:6, 90:15
**indifferent** [4] - 8:6, 27:1, 80:10, 82:19
**Individually** [1] - 1:7
**individuals** [1] - 53:20
**infliction** [2] - 33:20, 33:21
**influence** [3] - 51:25, 57:4, 98:18
**influenced** [3] - 12:13, 16:3, 21:24
**inform** [1] - 23:16
**information** [5] - 17:18, 20:6, 21:11, 23:5, 41:19
**informs** [1] - 73:16
**injured** [3] - 23:25, 52:1, 55:24
**injures** [1] - 42:22
**injuries** [10] - 40:11, 83:9, 84:19, 85:6, 85:8, 85:9, 85:10, 85:12, 85:18
**injuring** [1] - 42:13
**injury** [15] - 13:23, 25:1, 27:9, 31:7, 33:7, 40:7, 61:4, 62:8, 64:20, 64:25, 84:23, 84:25, 95:12
**Inland** [1] - 13:9

**inquiry** [2] - 32:15, 32:16
**insert** [1] - 79:5
**insofar** [1] - 19:22
**Instagram** [1] - 20:16
**instruct** [4] - 10:7, 12:5, 15:11, 39:23
**instructed** [3] - 16:6, 44:13, 99:19
**instructing** [1] - 39:24
**instruction** [18] - 3:17, 3:23, 3:25, 9:7, 46:24, 47:24, 54:18, 62:22, 63:6, 63:7, 66:17, 69:19, 72:15, 78:23, 80:1, 85:6, 90:2, 97:5
**Instruction** [1] - 9:17
**instructions** [26] - 3:16, 12:1, 12:6, 12:17, 15:6, 20:4, 24:11, 25:24, 26:16, 28:15, 29:8, 30:6, 30:22, 31:15, 34:11, 44:15, 45:20, 54:15, 70:4, 70:5, 71:4, 72:4, 78:17, 79:11, 90:1, 100:1
**intend** [2] - 99:24, 101:7
**intended** [1] - 15:21
**intent** [3] - 32:15, 46:16, 77:25
**interest** [3] - 1:7, 13:19, 18:11
**interesting** [2] - 74:5, 89:10
**interestingly** [1] - 52:24
**interfere** [1] - 77:24
**internal** [1] - 5:15
**International** [1] - 67:15
**international** [1] - 50:23
**Internet** [3] - 20:14, 21:2, 23:12
**interpret** [1] - 15:21
**intoxicated** [1] - 71:2
**investigated** [1] - 25:20
**investigating** [1] - 90:24
**investigation** [3] - 21:3, 49:4, 65:22
**investigations** [1] - 86:20
**involved** [4] - 6:17, 13:3, 13:5, 20:19
**involves** [3] - 9:19,

9:22, 20:6
**involving** [2] - 14:17, 33:20
**irrational** [1] - 71:17
**IS** [2] - 102:8, 102:10
**issue** [9] - 4:5, 35:20, 37:18, 47:2, 47:16, 48:17, 52:19, 67:14, 94:14
**issues** [7] - 4:23, 9:19, 20:6, 44:17, 53:6, 90:24, 91:1
**itself** [4] - 6:1, 15:22, 86:3, 98:14

**J**

**Jefferson** [2] - 47:11, 47:12
**jeopardizes** [1] - 21:8
**JESUS** [1] - 1:5
**job** [2] - 77:25, 80:11
**John** [3] - 3:9, 11:17, 68:13
**JOHN** [2] - 2:6, 2:7
**joy** [1] - 46:4
**judge** [13] - 5:4, 32:11, 45:21, 46:21, 47:7, 47:9, 49:11, 54:14, 54:17, 62:21, 70:5, 93:20
**JUDGE** [1] - 1:5
**judged** [1] - 21:16
**judgment** [2] - 41:1, 41:4
**JUDICIAL** [1] - 102:11
**July** [4] - 12:24, 13:9, 46:8, 82:21
**June** [1] - 46:7
**jurisdiction** [1] - 90:14
**juror** [7] - 21:7, 21:10, 23:3, 23:4, 23:7, 43:6
**jurors** [7] - 20:7, 21:25, 23:9, 43:10, 43:14, 43:21, 47:8
**Jury** [1] - 1:11
**jury** [48] - 3:3, 8:24, 10:5, 11:6, 11:11, 12:4, 12:7, 20:20, 22:11, 22:13, 22:23, 23:1, 23:2, 23:3, 23:9, 23:18, 43:6, 44:1, 44:3, 44:9, 45:11, 45:13, 47:10, 47:12, 47:14, 47:18, 47:24, 49:8, 50:6, 54:8, 54:19, 62:19, 68:6, 69:19, 70:3, 72:4, 78:17, 80:1,

85:6, 93:10, 99:11, 99:14, 99:24, 100:1, 100:4, 100:19, 101:3, 101:4
**JURY** [1] - 1:15
**Justice** [1] - 51:3
**justice** [2] - 46:25, 47:5

**K**

**Keeney** [34] - 12:25, 14:15, 24:6, 24:8, 24:12, 24:21, 25:6, 26:14, 26:17, 27:6, 27:14, 29:3, 29:6, 29:14, 30:20, 32:5, 34:9, 34:15, 34:18, 34:22, 36:15, 36:20, 36:24, 37:1, 37:3, 37:12, 37:17, 38:23, 38:25, 39:1, 63:3, 70:9, 78:14, 94:6
**Keeney's** [7] - 29:16, 29:19, 34:24, 35:12, 37:7, 37:22, 65:23
**keep** [38] - 8:21, 8:22, 10:15, 10:17, 11:1, 17:17, 17:21, 46:13, 52:13, 52:14, 52:15, 53:25, 54:11, 55:1, 56:8, 56:19, 64:8, 66:2, 66:3, 66:4, 66:8, 67:20, 68:3, 73:1, 74:11, 75:9, 78:1, 83:21, 93:3, 94:2, 94:4, 96:10, 100:3, 100:5, 100:6, 100:19
**keeping** [4] - 61:18, 62:3, 62:23, 67:17
**keeps** [3] - 66:1, 74:19
**Kennedy** [3] - 3:9, 11:17, 68:13
**KENNEDY** [1] - 2:9
**KEVIN** [1] - 1:7
**Kevin** [79] - 13:10, 13:19, 14:17, 14:18, 14:19, 24:9, 24:20, 24:24, 26:14, 27:5, 27:9, 28:11, 29:6, 30:21, 31:5, 32:6, 32:23, 32:25, 33:19, 33:25, 34:19, 34:23, 35:1, 35:15, 35:18, 35:21, 36:18, 36:22, 37:2, 37:12, 37:15, 37:19, 37:24, 38:10, 38:11, 38:14, 38:25, 39:4, 39:5, 39:8, 39:9, 39:12, 39:22,

40:4, 40:7, 40:9, 40:17, 40:20, 41:9, 42:9, 42:11, 42:13, 42:15, 42:17, 42:19, 42:22, 42:25, 45:24, 56:12, 57:19, 62:9, 63:17, 64:4, 64:20, 67:12, 70:10, 70:13, 70:18, 70:22, 71:1, 72:4, 72:17, 87:3, 88:4, 88:6, 88:13, 89:4, 98:2, 98:25
**Kevin's** [5] - 54:22, 64:13, 64:24, 66:18, 67:8
**keys** [1] - 73:24
**kicked** [4] - 71:11, 87:18, 87:24
**kid** [1] - 98:5
**kids** [2] - 87:20, 88:3
**kill** [3] - 46:16, 72:13, 96:16
**killed** [1] - 96:18
**kind** [4] - 7:1, 88:17, 89:10, 95:11
**kinds** [2] - 16:20, 83:8
**knee** [1] - 76:25
**knives** [1] - 95:16
**known** [15] - 14:15, 27:1, 30:24, 32:14, 32:19, 32:21, 33:23, 35:15, 37:11, 64:11, 70:15, 79:4, 79:6, 79:14, 80:5
**knows** [4] - 10:6, 49:17, 53:16, 91:9
**Kode** [2] - 54:7

**L**

**lab** [5] - 7:6, 81:15, 81:19, 81:23, 81:25
**lack** [2] - 60:4, 60:21
**ladies** [15] - 11:24, 45:11, 49:22, 52:11, 55:11, 56:4, 58:19, 60:2, 67:14, 69:6, 78:11, 95:4, 97:20, 99:8, 101:1
**laid** [2] - 50:1, 86:11
**language** [1] - 51:6
**LAPD** [1] - 94:18
**last** [7] - 57:19, 59:17, 63:10, 67:7, 69:8, 77:1, 96:22
**late** [2] - 63:4, 92:19
**LAW** [3] - 2:4, 2:6, 2:9
**law** [65] - 3:22, 4:1, 4:12, 6:18, 12:5, 12:10, 12:11, 13:4,

13:14, 14:11, 16:20, 21:5, 23:23, 24:7, 25:2, 25:5, 25:7, 26:10, 26:18, 26:21, 27:10, 27:12, 27:14, 29:4, 29:10, 29:21, 29:23, 29:25, 30:18, 31:8, 31:10, 31:12, 31:23, 32:8, 32:12, 32:15, 33:24, 34:6, 34:7, 36:5, 37:6, 42:20, 44:14, 49:13, 50:12, 66:13, 66:15, 66:18, 67:13, 70:12, 71:24, 73:14, 75:7, 77:18, 78:23, 79:2, 79:3, 79:7, 79:12, 80:13, 89:2, 89:15, 90:1, 93:4, 93:19
**lawful** [1] - 31:24
**laws** [4] - 23:24, 24:10, 26:15, 32:4
**lawyer** [3] - 16:25, 17:1, 17:3
**lawyers** [10] - 15:11, 15:18, 15:19, 15:23, 15:25, 19:17, 44:5, 69:23, 84:14, 89:11
**lay** [3] - 46:6, 50:24, 71:13
**laying** [2] - 83:22
**lead** [1] - 80:18
**leading** [2] - 35:16, 37:13
**learn** [1] - 21:4
**least** [2] - 61:15, 94:16
**leave** [4] - 7:24, 72:14, 85:19, 99:4
**led** [1] - 88:14
**left** [4] - 10:20, 46:12, 87:3, 98:23
**legal** [3] - 4:11, 70:14, 72:15
**legitimate** [1] - 53:4
**length** [1] - 17:22
**less** [2] - 54:7, 83:18
**letting** [1] - 73:4
**level** [5] - 48:6, 59:22, 63:15, 85:22, 85:23
**LEWIS** [1] - 2:15
**Lexipol** [4] - 51:5, 51:12, 57:6, 67:16
**liability** [3] - 24:2, 26:9, 28:24
**liable** [1] - 23:25
**lied** [1] - 19:10
**lieu** [1] - 19:23
**life** [24] - 6:8, 40:12, 41:11, 41:12, 41:17, 41:18, 49:22, 52:7,

53:8, 54:1, 56:11, 56:14, 58:18, 58:20, 66:19, 66:20, 66:25, 67:2, 75:13, 77:9, 87:7, 88:20, 92:24

**life-threatening** [4] - 58:18, 58:20, 75:13, 77:9

**lifestyle** [1] - 41:14

**lift** [2] - 57:12, 95:20

**light** [1] - 18:14

**likely** [3] - 41:20, 46:24, 85:17

**limited** [4] - 9:8, 16:8, 16:9, 20:15

**line** [1] - 48:25

**lines** [1] - 67:2

**LinkedIn** [1] - 20:16

**list** [2] - 15:16, 22:19

**listen** [3] - 20:24, 22:4, 47:21

**listened** [1] - 43:15

**listening** [2] - 45:15, 67:22

**literally** [3] - 80:7, 86:15, 98:7

**litigation** [1] - 49:8

**live** [6] - 19:24, 41:20, 41:21, 56:10, 67:2, 78:4

**lives** [1] - 56:10

**LLP** [1] - 2:15

**locate** [1] - 22:18

**lodge** [1] - 3:18

**longstanding** [4] - 24:14, 24:19, 24:23, 25:15

**look** [7] - 53:14, 58:8, 71:23, 71:25, 79:10, 80:13, 95:6

**looked** [2] - 81:11, 91:5

**looking** [3] - 46:4, 80:14, 90:25

**looks** [1] - 58:9

**Los** [2] - 2:17, 94:18

**lose** [2] - 36:2, 38:4

**losing** [1] - 67:6

**loss** [9] - 40:12, 40:17, 40:20, 41:8, 62:8, 64:25, 66:19, 66:20, 66:24

**lost** [3] - 45:25

**love** [3] - 40:17, 46:11, 93:7

**loved** [2] - 61:14, 61:15

**low** [1] - 85:22

**lower** [1] - 59:25

**luckily** [1] - 45:3

**lunch** [4] - 99:17, 99:18, 100:12, 101:2

**lung** [1] - 86:24

**lungs** [3] - 81:6, 81:22, 87:6

**luxury** [1] - 70:25

## M

**magic** [2] - 83:6, 83:13

**main** [1] - 94:10

**maker** [3] - 13:13, 28:25, 30:2

**male** [1] - 41:19

**malice** [1] - 67:8

**malicious** [2] - 42:10, 42:12

**man** [5] - 7:21, 7:22, 70:24, 71:16, 96:17

**maneuvers** [3] - 48:10, 48:13, 62:17

**manner** [2] - 18:10, 48:4

**manual** [1] - 14:21

**mark** [2] - 75:19, 93:10

**material** [1] - 23:14

**materials** [5] - 21:3, 23:15, 23:16, 23:17, 51:22

**math** [3] - 49:16, 50:8, 87:8

**MATTER** [1] - 102:10

**matter** [10] - 8:9, 23:1, 25:14, 27:18, 55:1, 72:25, 83:7, 85:14, 86:13, 88:1

**maximum** [1] - 81:21

**mean** [8] - 23:2, 39:25, 48:13, 50:23, 61:5, 63:18, 67:9, 96:6

**means** [12] - 12:14, 14:25, 17:11, 20:13, 25:8, 25:15, 35:14, 37:10, 40:6, 46:24, 69:9, 79:18

**meant** [1] - 48:11

**measure** [1] - 39:24

**measured** [1] - 81:20

**meat** [1] - 81:7

**mechanism** [2] - 53:21, 53:24

**media** [3] - 20:17, 20:19, 20:24

**medical** [31] - 4:10, 4:19, 6:22, 6:23, 7:3, 7:6, 13:9, 49:5, 49:9, 53:5, 53:18, 55:15, 56:22, 58:1, 58:20, 58:25, 61:3, 61:6,

75:1, 75:4, 75:13, 77:9, 80:14, 81:9, 85:23, 95:22, 96:14, 98:4

**medicine** [2] - 48:15, 66:6

**member** [3] - 43:5, 44:1, 44:3

**members** [2] - 12:4, 20:18

**memorandum** [3] - 52:22, 90:23, 91:1

**memory** [4] - 15:24, 18:9, 21:23

**mental** [3] - 40:13, 41:9, 51:24

**mention** [3] - 82:22, 82:25, 83:6

**mentioned** [1] - 11:25

**merits** [1] - 20:11

**message** [1] - 93:11

**messaging** [1] - 20:14

**met** [1] - 71:7

**meth** [18] - 63:15, 71:2, 71:16, 82:3, 85:21, 85:22, 85:23, 85:24, 85:25, 86:2, 86:4, 87:19, 87:25, 88:2, 88:12, 94:3

**methamphetamine** [2] - 14:20, 47:19

**methed** [2] - 70:22, 73:3

**methodology** [1] - 81:14

**methods** [1] - 33:8

**might** [12] - 10:1, 17:8, 50:10, 51:24, 53:21, 75:18, 77:8, 77:23, 77:24, 80:18, 89:21, 91:22

**million** [5] - 50:10, 66:22, 67:4

**mind** [10] - 10:18, 10:19, 10:21, 22:4, 46:13, 55:19, 68:3, 71:5, 72:22, 96:1

**minimum** [2] - 4:14, 17:22

**minor** [2] - 9:6, 9:15

**minute** [4] - 11:1, 55:23, 75:21, 97:13

**minutes** [23] - 5:25, 10:10, 10:13, 10:20, 10:21, 48:21, 52:18, 58:4, 61:9, 62:5, 62:24, 68:1, 68:4, 76:22, 86:14, 93:3, 96:16, 96:22, 97:13, 97:14, 97:18, 101:6

**Mireles** [2] - 19:21, 70:19

**misdemeanor** [1] - 95:13

**misfortune** [1] - 42:25

**misstates** [2] - 90:19, 93:25

**mistaken** [3] - 33:17, 35:6, 36:12

**mistakes** [1] - 18:20

**mistrial** [1] - 21:9

**misusing** [1] - 42:24

**mitigate** [1] - 51:10

**model** [1] - 57:3

**mom** [1] - 46:1

**moment** [6] - 56:16, 56:23, 77:7, 82:24, 85:3, 85:4

**Monday** [1] - 72:20

**money** [2] - 40:6, 62:18

**monitor** [2] - 76:11, 83:21

**moral** [1] - 40:18

**morning** [16] - 3:8, 3:11, 3:12, 3:15, 11:16, 11:19, 11:20, 11:23, 11:24, 45:11, 59:17, 68:12, 68:15, 68:16, 68:18, 72:20

**most** [3] - 46:19, 47:8, 66:14

**mother** [2] - 46:5, 46:6

**mother's** [1] - 70:25

**motion** [3] - 5:1, 9:3, 88:14

**motive** [1] - 32:16

**mouth** [2] - 58:24, 74:23

**mouthful** [1] - 45:3

**move** [13] - 8:13, 8:16, 9:1, 44:23, 57:18, 73:23, 74:8, 75:11, 75:16, 76:4, 84:10, 91:17, 95:20

**moved** [4] - 5:23, 6:1, 75:19, 86:14

**moving** [18] - 5:3, 24:25, 31:6, 48:21, 52:15, 56:25, 57:23, 58:5, 61:8, 62:4, 65:10, 68:24, 76:24, 84:14, 93:4, 95:24, 96:8

**MR** [38] - 3:8, 3:12, 3:20, 5:2, 9:5, 9:11, 9:15, 9:22, 9:25, 10:3, 10:6, 10:9, 10:17, 10:25, 11:4, 11:9, 11:16, 11:20,

45:7, 45:10, 56:18, 59:9, 68:12, 68:16, 68:21, 68:23, 87:21, 87:24, 89:8, 90:19, 90:20, 90:22, 93:25, 94:2, 98:24, 99:6, 101:8, 101:9

**multiple** [3] - 3:25, 63:8, 82:4

**multiply** [1] - 50:8

**municipal** [4] - 25:5, 27:12, 29:23, 31:10

**municipality** [1] - 28:1

**murderous** [1] - 50:20

**must** [51] - 12:11, 12:12, 12:14, 12:22, 14:25, 16:3, 16:7, 16:10, 17:7, 17:11, 20:3, 20:5, 20:21, 23:16, 24:3, 26:11, 26:23, 27:22, 28:25, 30:15, 32:4, 32:10, 34:20, 35:10, 36:19, 37:4, 38:11, 38:14, 38:18, 39:7, 39:21, 40:3, 40:23, 41:1, 43:10, 43:12, 44:13, 44:15, 44:16, 44:18, 44:21, 44:22, 70:1, 70:9, 70:14, 79:8, 79:18, 80:3, 89:1, 99:15

## N

**name** [4] - 52:9, 58:6, 97:12, 100:15

**namely** [1] - 5:8

**names** [1] - 83:8

**nap** [2] - 97:10, 97:11

**national** [4] - 41:16, 62:6, 67:15, 74:7

**nationwide** [1] - 75:8

**natural** [1] - 57:12

**nature** [2] - 32:20, 40:11

**necessarily** [1] - 19:7

**necessary** [7] - 17:14, 33:4, 36:10, 43:24, 47:14, 73:18, 83:20

**neck** [3] - 7:15, 76:16, 76:24

**need** [17] - 33:5, 52:23, 54:12, 57:3, 57:16, 60:16, 60:18, 83:10, 83:11, 83:13, 91:2, 93:22, 95:2, 96:2, 96:12, 99:21

**needed** [5] - 55:5, 62:12, 95:14, 96:14,

98:6
**needs** [4] - 55:4, 55:15, 66:15, 98:4
**negates** [1] - 6:2
**negligence** [22] - 4:16, 4:19, 4:20, 34:6, 34:8, 34:10, 38:9, 38:22, 38:24, 39:6, 39:9, 39:15, 54:19, 54:21, 62:22, 63:5, 63:9, 63:20, 79:2, 79:11, 97:4, 97:6
**negligent** [11] - 36:16, 38:8, 39:8, 39:17, 62:21, 62:25, 63:1, 63:17, 63:22, 99:1
**neighborhood** [1] - 70:18
**never** [12] - 7:4, 7:14, 55:7, 55:8, 55:18, 69:10, 79:21, 83:5, 83:6, 87:6, 94:25, 95:10
**New** [2] - 51:15
**new** [1] - 4:25
**news** [1] - 20:24
**next** [6] - 44:20, 44:23, 54:9, 54:11, 65:8, 93:16
**Niedzialek** [59] - 5:22, 6:8, 6:17, 13:10, 13:20, 14:17, 14:18, 14:19, 24:9, 26:14, 27:9, 28:11, 29:6, 30:21, 32:7, 32:23, 32:25, 33:19, 33:25, 34:19, 34:23, 35:16, 35:18, 35:21, 36:18, 36:22, 37:13, 37:15, 37:19, 37:24, 39:8, 40:7, 42:10, 42:14, 42:23, 43:1, 45:24, 56:12, 62:9, 70:18, 70:23, 71:1, 71:7, 72:4, 72:17, 75:16, 75:24, 78:1, 78:16, 84:19, 86:8, 86:16, 87:13, 88:5, 88:6, 88:14, 89:4, 91:10, 94:9
**NIEDZIALEK** [1] - 1:8
**Niedzialek's** [30] - 7:14, 24:20, 24:25, 27:6, 31:5, 35:1, 37:2, 38:10, 38:11, 38:14, 38:25, 39:4, 39:5, 39:9, 39:13, 39:22, 40:4, 40:9, 40:17, 40:20, 41:9, 42:11, 42:16, 42:17,

42:19, 67:13, 70:10, 70:13, 87:3, 88:24
**Noble** [14] - 8:7, 49:16, 50:1, 50:2, 50:12, 51:14, 56:20, 57:1, 74:6, 74:9, 74:13, 93:2, 96:2, 96:5
**nobody** [1] - 48:16
**non** [3] - 23:4, 48:17, 71:10
**non-deadly** [1] - 71:10
**non-issue** [1] - 48:17
**non-juror** [1] - 23:4
**noncompliance** [1] - 75:23
**none** [7] - 18:5, 71:5, 71:6, 82:11, 84:25, 86:16, 86:25
**noneconomic** [2] - 41:1, 41:6
**normal** [1] - 92:2
**normally** [3] - 52:5, 96:20, 96:22
**North** [1] - 2:7
**nose** [1] - 74:23
**note** [6] - 22:15, 22:21, 43:25, 99:21, 100:9, 100:11
**notes** [5] - 21:21, 21:22, 21:23, 21:24, 100:9
**nothing** [7] - 47:25, 50:7, 69:1, 76:16, 84:23, 91:1
**notice** [4] - 28:8, 70:6, 78:13, 88:17
**notify** [1] - 21:11
**Number** [60] - 9:11, 12:24, 13:3, 13:5, 13:12, 15:8, 15:9, 15:10, 15:18, 15:25, 16:5, 16:11, 18:7, 18:9, 18:10, 18:11, 18:12, 18:13, 18:15, 24:6, 24:8, 24:12, 24:17, 26:13, 26:17, 26:19, 26:24, 27:3, 29:3, 29:5, 29:9, 29:11, 29:15, 30:17, 30:19, 30:23, 31:4, 32:20, 32:23, 32:25, 33:2, 33:5, 33:7, 33:8, 33:10, 33:13, 33:16, 33:18, 34:22, 34:24, 36:20, 36:23, 36:25, 39:8, 40:11, 40:12, 40:13, 40:20, 46:14
**number** [9] - 15:11, 17:21, 19:7, 37:15,

39:9, 55:14, 55:16, 66:21, 67:3
**numbers** [2] - 49:17, 50:9
**numerical** [1] - 78:19

## O

**Oakland** [1] - 2:10
**Oaks** [1] - 2:7
**oath** [3] - 12:16, 19:10, 19:16
**obese** [2] - 81:16, 82:3
**object** [4] - 3:22, 3:24, 16:1, 17:3
**objection** [9] - 3:19, 3:22, 4:18, 16:3, 17:3, 17:5, 17:6, 90:19, 93:25
**objections** [2] - 4:25, 15:25
**objectively** [4] - 32:9, 33:23, 36:3, 38:5
**obligation** [2] - 76:14, 76:15
**observe** [1] - 75:13
**observing** [1] - 78:5
**obstructed** [2] - 5:10, 81:2
**obstruction** [4] - 5:10, 6:24, 82:8, 86:23
**obstructions** [1] - 87:1
**obtain** [1] - 23:14
**obvious** [5] - 27:1, 30:24, 46:4, 60:25, 64:12
**obviously** [3] - 45:15, 47:15, 57:7
**occasion** [1] - 19:11
**occupation** [1] - 41:14
**occur** [2] - 53:2, 85:2
**occurred** [3] - 38:21, 85:13, 85:16
**occurring** [1] - 34:13
**occurs** [4] - 5:9, 5:13, 81:1, 81:3
**OF** [10] - 1:2, 1:15, 2:4, 2:6, 102:1, 102:6, 102:8, 102:11, 102:15
**offers** [1] - 17:1
**OFFICE** [1] - 2:9
**officer** [33] - 31:23, 32:8, 32:13, 32:14, 32:19, 33:19, 33:24, 34:6, 34:8, 34:10, 35:5, 35:7, 35:12, 35:23, 36:2, 36:5, 36:7, 36:9, 36:11,

36:13, 37:7, 37:25, 38:4, 51:13, 55:23, 72:1, 72:7, 73:5, 79:17, 90:4
**officer's** [1] - 32:15
**officers** [27] - 6:17, 8:22, 37:11, 37:16, 47:25, 49:10, 50:6, 50:16, 51:7, 55:8, 57:2, 57:10, 57:14, 57:21, 64:20, 66:14, 69:2, 73:20, 75:8, 79:15, 90:7, 92:3, 92:15, 92:25, 95:10, 95:19, 96:1
**officers'** [2] - 50:20, 97:6
**OFFICES** [2] - 2:4, 2:6
**OFFICIAL** [3] - 102:1, 102:4, 102:21
**official** [12] - 24:3, 24:13, 24:18, 24:23, 25:3, 25:8, 25:12, 27:11, 27:16, 29:23, 31:9, 76:12
**Official** [1] - 1:22
**officials** [2] - 25:12, 27:17
**often** [2] - 18:20, 99:12
**old** [2] - 45:24, 97:7
**omission** [5] - 27:19, 30:25, 31:2, 42:21, 64:13
**omissions** [1] - 28:4
**once** [10] - 55:23, 57:6, 58:16, 59:2, 59:20, 60:1, 92:18, 96:13, 98:3, 101:6
**one** [81] - 7:2, 7:3, 7:4, 9:7, 9:10, 9:14, 16:18, 26:4, 28:20, 30:11, 31:20, 38:7, 38:8, 38:9, 43:5, 44:1, 45:21, 47:8, 47:15, 50:18, 52:9, 52:10, 52:21, 52:22, 52:24, 52:25, 54:16, 55:14, 56:16, 57:19, 59:19, 60:20, 61:6, 61:8, 61:10, 61:14, 61:15, 66:6, 66:18, 69:16, 70:7, 71:1, 71:3, 71:7, 71:16, 74:3, 74:4, 75:5, 75:12, 78:20, 87:12, 87:16, 88:7, 88:8, 88:10, 88:11, 88:17, 90:2, 90:18, 90:22, 90:23, 90:24, 91:1,

91:4, 91:23, 93:7, 94:12, 94:16, 94:19, 95:2, 96:10, 99:23
**one's** [1] - 28:4
**ones** [1] - 93:18
**oneself** [1] - 39:16
**ongoing** [1] - 6:14
**open** [3] - 44:4, 58:24, 68:3
**opening** [2] - 15:20, 85:20
**operate** [1] - 22:17
**operating** [2] - 23:5, 25:17
**opinion** [6] - 12:19, 17:25, 21:14, 21:16, 21:19, 43:19
**opinions** [3] - 12:13, 21:13, 21:14
**opportunity** [2] - 18:7, 21:7
**opposed** [2] - 4:5, 4:19
**opposing** [1] - 67:22
**opposite** [1] - 76:9
**oppression** [1] - 67:8
**oppressive** [2] - 42:10, 42:21
**order** [14] - 17:9, 24:1, 26:6, 28:22, 30:13, 32:1, 44:17, 44:18, 70:8, 78:18, 78:19, 80:2, 83:14, 100:21
**ordered** [2] - 20:22, 100:24
**ordinance** [4] - 25:5, 27:12, 29:24, 31:10
**organ** [1] - 5:15
**organized** [1] - 60:13
**organs** [1] - 13:10
**original** [1] - 100:3
**Orleans** [1] - 51:16
**otherwise** [4] - 8:25, 15:5, 42:22, 44:10
**outcome** [2] - 18:11, 70:1
**outset** [1] - 46:13
**outside** [6] - 17:14, 21:11, 23:13, 49:5, 65:24, 99:15
**overcome** [7] - 35:3, 36:4, 36:6, 36:11, 36:17, 36:22, 38:6
**overdose** [6] - 14:20, 47:24, 48:4, 86:4, 94:3
**overly** [1] - 21:24
**overrule** [1] - 17:3
**overruled** [2] - 4:25, 94:1

own [20] - 10:15, 13:19, 21:4, 21:22, 39:5, 43:18, 48:2, 49:6, 49:15, 69:4, 73:8, 77:17, 77:18, 79:7, 84:3, 85:23, 85:25, 94:3, 94:4, 94:20
oxygen [4] - 60:4, 60:22, 81:22, 93:23

**P**

PAGE [1] - 102:10
paid [3] - 41:4, 50:7, 59:15
pain [6] - 40:14, 41:10, 66:19, 66:21, 71:18, 73:25
panicked [1] - 57:9
paper [2] - 22:19, 22:20
paragraph [1] - 9:18
paramedic [6] - 5:24, 7:16, 59:12, 60:4, 86:11, 86:25
paramedics [6] - 7:21, 7:24, 52:17, 58:20, 97:17
paraphrase [1] - 70:20
paraphrasing [1] - 54:20
part [12] - 9:20, 18:4, 19:5, 27:8, 47:23, 62:11, 63:22, 65:15, 65:19, 69:7, 98:15
particular [8] - 5:22, 24:9, 26:15, 29:7, 30:21, 30:25, 32:11, 64:12
particularly [3] - 57:4, 62:6, 77:21
parties [11] - 12:2, 12:21, 13:17, 15:6, 21:6, 25:5, 27:13, 29:24, 30:1, 31:11, 34:14
party [4] - 14:23, 21:7, 23:25, 39:25
Pasadena [1] - 2:8
passed [1] - 46:6
passing [1] - 46:4
past [2] - 66:24, 67:3
patently [1] - 71:2
pathologist [2] - 86:17, 86:21
pay [1] - 62:18
PC [1] - 2:9
PEA [7] - 60:7, 60:8, 60:9, 88:16, 88:18,

88:19, 91:17
peace [6] - 34:6, 34:8, 34:10, 51:13, 72:1, 79:17
peacefully [1] - 72:6
penalty [1] - 96:17
people [30] - 18:20, 18:21, 20:19, 41:21, 49:18, 49:24, 50:24, 52:6, 53:9, 54:12, 66:6, 66:7, 66:8, 66:9, 67:17, 72:8, 72:11, 73:24, 73:25, 82:2, 82:3, 82:4, 87:16, 90:9, 90:14, 94:15, 95:16, 96:3, 97:21
people's [1] - 53:8
perceive [1] - 8:20
perceived [3] - 33:17, 42:18, 67:12
percent [10] - 47:1, 47:2, 50:3, 50:12, 50:13, 64:4, 66:6, 89:18, 89:19, 89:21
percentage [3] - 39:12, 64:3, 64:4
percentages [1] - 47:1
perception [1] - 75:12
perennial [1] - 6:14
performance [4] - 25:3, 27:11, 29:22, 31:9
perhaps [1] - 57:22
period [7] - 33:4, 46:1, 47:25, 56:25, 82:8, 87:14, 92:8
permit [2] - 23:12, 100:20
permitted [2] - 14:11, 17:2
person [54] - 19:18, 19:19, 20:2, 20:12, 23:22, 25:2, 25:3, 27:10, 27:11, 29:21, 29:22, 31:8, 31:9, 31:22, 33:14, 35:4, 35:5, 35:6, 35:25, 36:7, 36:8, 36:11, 36:12, 38:1, 38:6, 38:15, 38:17, 39:3, 39:16, 39:17, 39:18, 39:20, 39:22, 41:13, 41:20, 49:6, 51:6, 51:8, 54:23, 55:15, 57:17, 63:11, 72:15, 73:5, 73:23, 74:9, 74:21, 90:25, 92:24, 98:5, 100:20
person's [8] - 5:14,

38:22, 41:11, 41:13, 50:18, 54:19, 57:9, 63:9
personal [1] - 12:13
personally [1] - 16:16
persons [2] - 23:22, 28:11
perspective [6] - 32:12, 57:1, 64:7, 72:1, 79:17, 89:19
persuaded [1] - 14:25
persuades [1] - 43:19
pertaining [1] - 4:19
petechial [2] - 60:16, 60:18
phantom [1] - 91:25
Philadelphia [1] - 46:6
phone [1] - 20:13
photo [1] - 46:3
phrase [3] - 80:2, 83:2, 83:3
PHYLLIS [4] - 1:21, 102:4, 102:18, 102:20
physical [2] - 33:21, 40:13
physiology [5] - 57:2, 57:9, 57:14, 95:18, 96:5
pick [2] - 69:13, 69:14
pierced [1] - 71:4
place [4] - 20:1, 51:8, 92:7, 100:20
placed [1] - 19:16
Plaintiff [2] - 1:9, 2:3
plaintiff [54] - 3:9, 11:17, 13:18, 13:25, 14:3, 14:7, 14:11, 14:12, 15:4, 23:20, 24:3, 25:22, 25:23, 26:2, 26:3, 26:11, 27:22, 28:5, 28:13, 28:14, 28:18, 28:19, 28:25, 30:4, 30:5, 30:9, 30:10, 30:15, 31:13, 31:14, 31:18, 31:19, 32:4, 34:7, 34:18, 34:20, 36:15, 36:19, 40:2, 40:3, 40:4, 40:7, 40:15, 41:3, 41:5, 41:22, 42:1, 42:2, 46:22, 47:4, 47:20, 50:13, 68:14, 72:21
plaintiff's [11] - 6:3, 14:13, 27:24, 40:2, 49:25, 64:7, 66:12, 69:1, 74:6, 86:17, 89:19
plaintiffs [22] - 5:7,

5:16, 6:20, 6:22, 7:18, 8:1, 8:23, 47:6, 66:18, 69:10, 70:9, 71:22, 74:25, 77:14, 78:6, 79:20, 80:21, 82:9, 82:20, 84:1, 87:9, 88:16
plan [1] - 10:9
plans [1] - 10:10
play [5] - 10:11, 47:8, 59:5, 98:14, 98:15
played [8] - 22:15, 27:7, 59:8, 62:11, 63:22, 84:25, 85:21, 85:25
playing [2] - 75:25, 76:1
plays [1] - 10:12
plus [5] - 6:22, 60:7, 60:11, 60:22, 86:4
point [12] - 6:20, 7:23, 9:6, 12:22, 55:11, 56:2, 59:20, 85:17, 88:16, 94:16, 96:2, 97:20
pointed [2] - 9:17, 90:5
points [3] - 5:17, 47:3, 89:16
Police [1] - 67:16
police [10] - 8:12, 8:19, 48:17, 50:24, 66:14, 72:7, 73:4, 74:15, 96:1, 97:21
policies [17] - 26:19, 28:9, 48:19, 49:24, 51:5, 51:11, 51:15, 51:21, 52:10, 54:12, 57:3, 64:8, 90:9, 90:13, 94:14, 94:21, 95:2
policy [29] - 13:13, 14:1, 24:3, 24:13, 24:18, 24:23, 25:8, 25:13, 26:9, 27:15, 27:17, 27:18, 27:21, 27:23, 27:25, 28:2, 28:25, 29:12, 30:2, 50:1, 50:22, 52:24, 53:7, 56:7, 57:6, 64:16, 65:2, 90:22
policy-making [1] - 29:12
poor [3] - 94:10, 97:7, 98:5
pose [2] - 35:19, 37:16
posed [1] - 32:23
position [35] - 5:23, 6:1, 8:14, 8:16, 13:16, 13:22, 35:13,

37:8, 48:20, 49:25, 50:16, 51:7, 51:9, 51:22, 52:8, 53:13, 57:7, 74:9, 74:16, 75:11, 75:17, 76:5, 76:11, 76:15, 81:2, 83:23, 84:2, 84:7, 84:11, 86:14, 86:22, 91:11, 91:17, 94:16, 94:24
positional [21] - 5:6, 5:8, 5:11, 5:18, 5:20, 6:10, 48:14, 51:1, 51:10, 51:13, 51:21, 80:18, 80:24, 81:1, 82:5, 82:22, 82:25, 83:6, 83:13, 83:20, 84:14
positional/restraint [1] - 65:3
positioning [3] - 6:2, 76:7, 76:8
possibility [1] - 53:4
possible [4] - 19:22, 51:8, 84:11, 95:13
possum [1] - 75:25
POST [2] - 51:13, 67:16
post [1] - 75:22
post-cuff [1] - 75:22
potential [1] - 51:10
pounds [9] - 5:14, 6:25, 52:4, 54:8, 74:24, 81:19, 82:7, 83:18, 91:2
poverty [1] - 41:10
power [1] - 42:24
practical [1] - 33:10
practice [11] - 6:15, 8:19, 14:1, 24:3, 24:14, 24:19, 24:23, 25:15, 25:16, 25:18, 65:2
practices [2] - 80:12, 89:3
pre [4] - 10:7, 66:19, 66:21, 75:21
pre-death [2] - 66:19, 66:21
pre-instruct [1] - 10:7
preceded [1] - 60:5
precisely [1] - 80:24
prejudice [1] - 18:12
prejudices [1] - 12:14
prepared [1] - 45:6
preponderance [10] - 14:24, 24:4, 26:12, 29:1, 30:16, 32:4, 40:5, 42:3, 46:22, 46:23

**presence** [4] - 3:3, 11:11, 68:6, 101:4
**present** [6] - 3:10, 11:18, 19:25, 41:6, 75:2, 99:14
**presented** [4] - 6:21, 7:1, 15:3, 19:23
**preservation** [1] - 6:7
**preserve** [2] - 6:16, 27:22
**preside** [1] - 43:7
**PRESIDING** [1] - 1:5
**presiding** [2] - 43:6
**press** [1] - 20:19
**pressure** [1] - 93:24
**PRESTON** [4] - 1:21, 102:4, 102:18, 102:20
**pretending** [1] - 69:3
**pretty** [2] - 10:21, 60:25
**prevail** [4] - 24:1, 26:6, 28:22, 30:13
**prevent** [13] - 26:10, 26:21, 27:20, 35:3, 36:4, 36:6, 36:10, 36:17, 36:21, 38:5, 39:16, 50:25, 51:1
**prevented** [2] - 28:2, 81:20
**prevents** [1] - 74:16
**primary** [2] - 13:13, 30:2
**printer** [1] - 22:12
**private** [1] - 100:19
**privileges** [1] - 23:23
**probability** [1] - 33:25
**probable** [2] - 33:18, 33:22
**problem** [7] - 22:24, 64:6, 65:20, 66:3, 77:9, 77:12, 95:19
**problems** [1] - 23:5
**procedural** [1] - 27:20
**procedure** [1] - 25:17
**proceed** [2] - 68:22, 100:12
**PROCEEDINGS** [2] - 1:15, 102:9
**proceedings** [2] - 21:9, 101:10
**process** [1] - 21:10
**produce** [3] - 90:17, 90:18, 90:22
**profess** [1] - 75:6
**professionals** [1] - 53:18
**proffering** [1] - 8:1
**projector** [1] - 22:12
**promised** [1] - 11:9

**prone** [58] - 5:23, 6:1, 6:2, 6:10, 6:24, 7:1, 7:10, 8:2, 8:8, 8:13, 8:16, 8:21, 13:21, 48:16, 49:13, 49:19, 51:7, 52:13, 53:5, 53:19, 54:4, 55:2, 55:17, 62:3, 62:24, 64:15, 65:2, 67:17, 67:20, 73:11, 74:8, 74:9, 74:12, 74:15, 75:8, 75:10, 75:11, 75:17, 75:19, 76:4, 76:7, 76:8, 76:20, 77:12, 80:17, 81:24, 82:5, 82:15, 83:22, 86:7, 86:14, 86:22, 87:2, 90:10, 91:11, 92:10, 96:8, 97:21
**pronounced** [1] - 13:10
**proof** [7] - 16:15, 16:18, 46:19, 46:20, 52:21, 89:17, 89:18
**properly** [2] - 25:20, 57:14
**property** [1] - 53:6
**proposed** [1] - 3:16
**protect** [6] - 14:19, 73:1, 73:22, 78:5, 82:23, 83:14
**protection** [1] - 40:18
**protectors** [1] - 72:13
**prove** [21] - 24:3, 25:24, 26:3, 26:11, 28:5, 28:15, 28:19, 29:1, 30:6, 30:10, 30:15, 31:15, 31:19, 32:4, 34:21, 36:19, 39:7, 39:11, 46:15, 46:23, 91:20
**proved** [13] - 12:23, 15:12, 25:22, 25:23, 28:13, 28:14, 30:4, 30:5, 31:13, 31:14, 40:23, 80:8, 88:25
**proves** [1] - 38:13
**provide** [3] - 12:2, 27:5, 44:12
**provided** [9] - 14:4, 22:2, 22:10, 22:19, 22:23, 99:17, 100:4, 100:9, 100:11
**provides** [2] - 23:16, 23:22
**providing** [1] - 23:8
**proving** [4] - 14:12, 14:23, 40:5, 42:2
**proximate** [1] - 3:23
**prudent** [1] - 10:19

**public** [2] - 14:19, 73:22
**published** [2] - 41:16, 41:19
**pulse** [18] - 7:22, 58:16, 58:18, 59:1, 59:2, 63:2, 77:15, 77:20, 78:2, 91:24, 91:25, 92:4, 92:8, 97:17, 97:19
**pulseless** [2] - 60:9, 60:13
**punch** [1] - 95:11
**punched** [1] - 55:8
**punish** [1] - 41:24
**punished** [1] - 25:21
**punitive** [7] - 41:23, 41:24, 41:25, 42:3, 42:5, 42:8, 43:2
**pupils** [1] - 91:20
**purports** [4] - 25:3, 27:11, 29:22, 31:9
**purpose** [10] - 9:8, 16:9, 16:10, 17:12, 17:17, 23:8, 23:11, 41:24, 42:13
**purposes** [2] - 83:4, 83:5
**pursuant** [2] - 14:1, 24:13
**PURSUANT** [1] - 102:7
**put** [41] - 5:7, 5:16, 7:2, 7:4, 7:5, 7:7, 8:11, 28:7, 48:8, 48:13, 50:15, 54:12, 56:24, 57:6, 57:16, 63:6, 69:24, 71:14, 72:9, 74:2, 74:24, 74:25, 75:2, 76:3, 77:14, 80:8, 80:16, 80:25, 81:7, 81:9, 81:23, 82:9, 83:11, 85:15, 86:19, 92:21, 92:22, 93:7, 93:14, 94:15, 96:3
**putting** [2] - 72:23, 84:3

## Q

**quack** [1] - 53:14
**quarterbacking** [1] - 72:20
**questions** [23] - 4:8, 4:12, 4:17, 15:25, 16:25, 19:17, 19:18, 20:2, 44:13, 44:14, 44:18, 45:19, 61:21, 64:5, 65:18, 65:23,

74:10, 78:19, 82:10, 89:22, 98:20, 98:22, 99:3
**quote/unquote** [2] - 53:22, 96:25
**quoting** [1] - 47:11

## R

**raise** [2] - 82:10, 100:18
**rather** [2] - 66:4, 79:6
**ratification** [4] - 28:25, 65:20, 66:1, 66:4
**ratified** [2] - 14:9, 29:15
**reach** [6] - 43:9, 43:16, 43:23, 44:24, 79:21, 82:13
**reached** [1] - 44:10
**reaches** [1] - 100:4
**reaching** [1] - 15:13
**react** [1] - 72:25
**reaction** [2] - 57:12, 88:14
**read** [12] - 11:25, 12:17, 12:22, 20:24, 45:21, 47:23, 54:14, 54:17, 70:5, 70:12, 99:21, 100:2
**readers** [2] - 72:22, 96:1
**reading** [2] - 9:12, 20:2
**ready** [2] - 45:2, 68:19
**real** [8] - 7:19, 52:6, 58:15, 82:1, 82:2, 82:4, 90:5, 90:6
**real-world** [3] - 82:1, 82:2, 82:4
**realize** [4] - 57:22, 58:7, 95:19, 95:21
**really** [17] - 10:25, 46:5, 48:11, 49:10, 52:5, 53:16, 53:24, 56:12, 63:10, 64:18, 85:2, 91:3, 92:17, 95:10, 95:23, 96:7, 97:16
**REALTIME** [1] - 102:4
**reason** [12] - 19:14, 46:18, 55:1, 62:12, 67:18, 70:1, 87:9, 89:3, 89:4, 90:8, 94:10, 98:16
**reasonable** [28] - 8:23, 14:18, 32:10, 32:12, 33:16, 33:19, 33:24, 35:2, 35:4, 35:12, 36:3, 36:5, 36:7,

37:6, 38:5, 38:17, 39:15, 39:18, 39:20, 41:2, 46:20, 72:1, 73:10, 73:13, 79:17, 85:7, 85:11
**reasonableness** [2] - 18:14, 32:11
**reasonably** [6] - 14:16, 33:3, 35:18, 37:15, 39:21, 40:6
**reasons** [5] - 3:23, 9:1, 21:13, 21:19, 46:15
**Reay** [2] - 53:14, 80:17
**rebuttal** [1] - 10:13
**recalling** [2] - 11:12, 68:8
**recanted** [1] - 53:15
**received** [14] - 3:16, 15:14, 16:8, 16:9, 16:13, 16:25, 17:4, 17:6, 20:4, 22:1, 22:9, 22:20, 23:9, 99:10
**recently** [1] - 45:25
**recess** [3] - 17:16, 68:1, 68:5
**rechecking** [1] - 63:1
**reckless** [4] - 42:10, 42:15, 67:8, 67:10
**recommending** [1] - 90:12
**record** [6] - 3:7, 11:15, 17:10, 53:17, 68:11, 100:16
**recorded** [1] - 19:18
**recording** [4] - 22:1, 22:2, 22:4, 22:5
**recover** [1] - 53:12
**recovery** [8] - 50:16, 51:9, 51:22, 53:13, 84:2, 84:11, 94:16, 94:24
**recreational** [2] - 48:6, 85:23
**recurring** [1] - 26:22
**reduced** [2] - 39:12, 41:6
**reduces** [2] - 74:17, 75:9
**reduction** [1] - 39:14
**reference** [1] - 21:2
**references** [1] - 51:13
**reflects** [2] - 42:16, 67:11
**refrain** [1] - 23:17
**refute** [2] - 74:2, 74:25
**regard** [1] - 65:2
**regarding** [1] - 12:19

**regardless** [2] - 15:3, 76:15
**regards** [1] - 87:22
**regulation** [5] - 25:5, 25:9, 27:13, 29:24, 31:11
**REGULATIONS** [1] - 102:11
**reject** [1] - 21:17
**relapsed** [1] - 46:8
**related** [4] - 4:10, 24:24, 31:5, 64:24
**relationship** [1] - 33:5
**relevant** [4] - 17:18, 30:2, 32:14, 32:16
**relied** [2] - 7:9, 82:13
**relieved** [1] - 78:3
**rely** [2] - 21:22, 52:2
**remain** [1] - 101:6
**remember** [15] - 9:8, 9:12, 15:23, 18:21, 18:22, 44:8, 47:8, 59:17, 60:23, 61:23, 62:9, 65:21, 68:2, 85:20, 91:22
**remembered** [1] - 83:3
**remembers** [1] - 88:5
**remind** [1] - 20:5
**reminders** [2] - 10:18, 10:23
**remote** [1] - 38:18
**remove** [1] - 23:18
**rendered** [1] - 40:1
**repeated** [1] - 25:19
**repeats** [1] - 80:1
**replicate** [1] - 52:6
**report** [2] - 20:22, 48:9
**REPORTED** [1] - 102:9
**Reporter** [1] - 1:22
**REPORTER** [3] - 102:1, 102:5, 102:21
**REPORTER'S** [1] - 1:15
**reports** [2] - 58:10, 92:3
**repositioning** [2] - 36:1, 38:3
**reprimanded** [1] - 25:21
**request** [3] - 17:23, 17:24, 22:20
**requested** [1] - 3:18
**require** [1] - 21:9
**required** [7] - 25:24, 28:15, 30:6, 31:15, 41:23, 78:18, 89:18
**requirements** [1] - 93:24

**requires** [2] - 21:5, 85:6
**research** [9] - 6:14, 6:15, 6:18, 6:21, 7:8, 21:1, 52:21
**reserve** [1] - 4:17
**resist** [6] - 35:7, 36:1, 36:13, 38:2, 72:16, 81:17
**resistance** [10] - 35:3, 36:4, 36:7, 36:11, 36:18, 36:22, 38:6, 72:22, 73:7, 75:21
**resisted** [1] - 72:19
**resisting** [14] - 33:1, 35:22, 37:19, 38:2, 48:22, 52:15, 57:16, 57:20, 64:10, 76:25, 85:14, 95:23, 95:24, 95:25
**resists** [1] - 35:25
**respect** [2] - 25:13, 27:18
**respiratory** [2] - 51:9, 92:6
**respond** [3] - 20:21, 67:24, 97:12
**response** [1] - 58:7
**responsibility** [5] - 39:2, 39:13, 54:23, 63:11, 97:24
**responsible** [9] - 14:8, 25:12, 27:17, 34:2, 34:12, 38:12, 38:15, 39:1, 54:22
**rest** [4] - 19:5, 46:7, 56:11, 67:2
**restate** [2] - 11:14, 68:10
**restrain** [5] - 8:8, 63:23, 64:1, 72:19, 78:15
**restrained** [10] - 5:14, 7:15, 32:6, 49:13, 52:5, 62:12, 74:21, 76:20, 85:5, 90:10
**restraint** [80] - 5:6, 5:18, 6:2, 6:11, 6:24, 7:1, 7:10, 8:2, 14:22, 26:1, 28:17, 30:8, 31:17, 31:24, 32:3, 32:6, 32:9, 32:12, 32:18, 34:23, 34:25, 35:2, 35:8, 35:10, 35:11, 35:16, 36:6, 36:10, 36:14, 36:17, 36:21, 36:23, 37:1, 37:4, 37:6, 37:13, 37:23, 48:6, 48:7, 48:9, 48:12, 48:13,

48:15, 49:6, 49:7, 49:19, 51:21, 53:5, 53:10, 53:19, 54:4, 54:10, 60:21, 61:25, 62:16, 63:14, 63:15, 64:15, 65:2, 65:24, 73:11, 74:15, 80:18, 81:6, 81:17, 81:24, 82:5, 82:8, 82:16, 85:12, 85:14, 86:6, 86:8, 87:3, 88:9, 88:23, 93:21, 94:7, 98:14, 98:21
**restrict** [3] - 74:22, 82:14
**restricting** [2] - 13:22, 76:16
**restriction** [1] - 20:17
**restrictions** [2] - 21:5, 21:8
**result** [5] - 14:20, 14:21, 21:9, 28:10, 88:15
**resulting** [3] - 25:10, 81:5, 86:24
**results** [1] - 82:6
**resume** [1] - 76:2
**retained** [1] - 59:15
**retire** [2] - 99:8, 101:2
**retreat** [4] - 35:24, 36:2, 38:1, 38:3
**return** [2] - 45:2, 100:23
**reverence** [4] - 53:8, 54:1, 56:14, 92:24
**review** [3] - 13:15, 45:17, 45:18
**reviewed** [1] - 65:21
**rhythm** [1] - 77:24
**ribs** [4] - 5:16, 52:4, 81:5, 91:2
**Richard** [1] - 48:2
**rid** [1] - 60:23
**rights** [30] - 6:8, 6:10, 23:23, 24:9, 24:20, 24:25, 26:15, 27:6, 27:22, 27:25, 28:11, 29:7, 30:21, 31:1, 31:3, 31:6, 42:11, 42:17, 42:19, 42:22, 53:9, 56:13, 64:14, 64:24, 67:8, 67:13, 70:10, 70:14, 94:8
**rise** [1] - 101:3
**rising** [1] - 76:23
**risk** [25] - 4:8, 6:9, 7:2, 8:6, 42:18, 51:23, 53:20, 54:12, 57:4, 67:12, 73:2, 73:4, 75:9, 80:5, 82:17,

83:17, 83:19, 84:13, 88:11, 94:15, 98:17
**risking** [1] - 54:2
**risks** [5] - 8:2, 8:14, 80:10, 83:15
**Riverside** [57] - 3:5, 3:14, 6:5, 11:13, 11:22, 13:1, 13:7, 13:13, 13:20, 14:2, 14:4, 14:5, 14:7, 24:2, 24:15, 24:17, 24:18, 24:22, 25:9, 25:10, 25:17, 25:18, 26:7, 26:8, 26:20, 26:24, 26:25, 27:4, 28:7, 28:23, 28:24, 29:12, 30:3, 34:11, 34:16, 43:3, 48:18, 49:3, 49:7, 50:4, 51:3, 51:4, 52:23, 54:3, 65:1, 65:7, 66:23, 68:9
**RIVERSIDE** [4] - 1:3, 1:11, 3:1
**riverside** [2] - 1:16, 1:23
**role** [3] - 84:25, 85:21, 85:25
**roles** [1] - 47:8
**room** [12] - 12:7, 20:14, 22:12, 22:13, 22:23, 23:1, 23:2, 23:9, 23:19, 54:19, 99:11, 99:14
**roommate** [3] - 87:20, 88:2
**roommate's** [2] - 87:19, 87:25
**rule** [9] - 8:12, 9:2, 25:9, 74:12, 74:13, 74:14, 84:3, 84:8, 84:9
**ruled** [2] - 3:21, 4:22
**Rules** [4] - 16:2, 16:24, 17:2, 17:19
**ruling** [3] - 3:21, 4:23, 16:4
**running** [2] - 42:7, 70:21
**runs** [1] - 4:8
**ruse** [1] - 76:1
**Russo** [5] - 59:13, 60:25, 86:25, 91:19, 92:13

---

**S**

**safe** [19] - 7:10, 8:13, 8:21, 8:22, 73:2, 74:19, 74:21, 75:14,

75:16, 75:18, 76:4, 78:1, 82:16, 83:12, 84:12, 96:10, 96:12
**safeguards** [1] - 27:20
**safer** [1] - 75:10
**safest** [1] - 74:16
**safety** [9] - 6:16, 6:17, 14:19, 32:24, 35:19, 37:16, 42:17, 73:21
**SAIN** [14] - 2:15, 3:12, 3:20, 5:2, 10:25, 11:4, 11:20, 68:16, 68:21, 68:23, 87:24, 90:19, 93:25, 101:9
**Sain** [7] - 3:12, 3:19, 10:23, 11:20, 68:16, 68:19, 89:6
**sake** [1] - 84:17
**saliva** [1] - 42:7
**San** [3] - 51:17, 65:8, 94:20
**sanctity** [1] - 53:8
**sat** [9] - 53:11, 56:3, 61:13, 61:15, 62:2, 62:13, 94:15, 98:3
**satisfied** [1] - 5:21
**save** [2] - 10:13, 88:19
**saving** [1] - 87:7
**saw** [14] - 7:21, 7:22, 16:16, 46:3, 58:24, 71:1, 72:16, 72:17, 76:22, 77:5, 77:21, 79:6, 88:7, 97:10
**scales** [2] - 46:25, 47:5
**scared** [2] - 70:20, 72:10
**scaring** [1] - 70:21
**scene** [3] - 32:13, 32:19, 70:22
**science** [9] - 48:15, 74:20, 75:1, 80:15, 81:12, 82:18, 83:16, 87:8
**scope** [4] - 13:6, 34:3, 34:13, 34:16
**scrapes** [3] - 85:1, 85:13, 85:16
**searching** [2] - 21:2, 82:19
**seat** [4] - 83:10, 83:11, 92:21, 92:22
**seated** [4] - 50:16, 66:10, 68:7, 83:22
**second** [5] - 46:18, 69:2, 71:12, 77:16, 91:23
**second-guess** [1] - 77:16
**second-guessing** [1]

- 69:2

**seconds** [7] - 56:2, 58:23, 59:1, 75:17, 75:19, 77:11, 98:23

**section** [2] - 26:6, 30:13

**SECTION** [1] - 102:7

**Section** [3] - 23:21, 24:1, 28:22

**secured** [1] - 23:24

**see** [35] - 9:9, 9:12, 18:8, 18:21, 22:14, 45:21, 47:3, 50:9, 55:22, 58:9, 59:10, 61:1, 63:19, 65:19, 66:8, 69:4, 73:1, 76:19, 76:22, 76:24, 77:1, 77:17, 77:21, 78:8, 87:2, 87:4, 90:1, 90:2, 90:4, 92:13, 96:10, 96:15, 96:20, 97:5, 98:20

**seek** [1] - 23:5

**seeks** [1] - 14:11

**seize** [1] - 73:24

**seizure** [3] - 4:10, 31:22, 32:2

**seizure-related** [1] - 4:10

**seizures** [4] - 26:1, 28:17, 30:8, 31:17

**select** [1] - 99:23

**selection** [1] - 47:18

**self** [4] - 14:18, 36:3, 38:4, 90:6

**self-defense** [4] - 14:18, 36:3, 38:4, 90:6

**sell** [1] - 84:4

**selling** [1] - 87:9

**semantics** [1] - 84:1

**send** [5] - 22:15, 43:25, 44:5, 99:21, 100:10

**sending** [1] - 22:21

**sends** [1] - 93:10

**sense** [6] - 28:1, 41:2, 48:11, 49:21, 84:5, 84:8

**sensitivity** [1] - 73:25

**sent** [1] - 51:2

**sentence** [4] - 9:18, 9:20, 42:7, 63:10

**separately** [2] - 15:5, 44:16

**September** [1] - 19:22

**serious** [7] - 11:7, 33:21, 55:6, 57:25, 58:25, 72:8, 95:12

**seriously** [1] - 45:15

**seriousness** [2] - 35:20, 37:18

**serve** [1] - 43:7

**service** [1] - 20:20

**session** [1] - 16:12

**set** [7] - 3:16, 11:25, 68:24, 81:13, 82:24, 88:14, 99:11

**settled** [1] - 25:16

**several** [4] - 5:25, 46:15, 46:21, 97:9

**severity** [1] - 42:23

**shall** [4] - 23:3, 23:25, 43:9

**shape** [1] - 5:21

**SHERIFF** [1] - 1:12

**Sheriff** [17] - 3:13, 11:21, 13:12, 14:8, 29:9, 29:11, 29:15, 29:17, 30:1, 30:14, 30:17, 30:23, 31:11, 41:23, 42:9, 53:3, 65:18

**sheriff** [18] - 6:6, 6:12, 8:5, 8:11, 14:5, 29:25, 42:6, 49:3, 64:11, 67:18, 70:7, 76:12, 78:24, 80:3, 80:4, 80:9, 81:11, 82:12

**sheriff's** [2] - 24:22, 28:24

**Sheriff's** [26] - 6:5, 6:13, 7:8, 8:5, 11:22, 13:2, 13:7, 13:14, 14:3, 14:5, 24:15, 24:18, 25:10, 25:18, 26:8, 26:20, 26:25, 27:4, 28:7, 30:3, 43:3, 59:16, 81:11, 82:12, 90:17

**SHERIFF'S** [1] - 1:11

**Sheriff-Coroner** [13] - 13:12, 14:8, 29:9, 29:11, 29:15, 29:17, 30:1, 30:14, 30:17, 30:23, 31:11, 41:23, 42:9

**sheriff-coroner** [2] - 29:25, 42:6

**SHERIFF-CORONER** [1] - 1:12

**sheriffs** [2] - 12:25, 13:21

**shirtless** [1] - 95:13

**shocked** [1] - 60:14

**shoeless** [1] - 95:14

**shoot** [1] - 90:5

**short** [5] - 46:1, 56:25, 67:24, 67:25, 92:8

**shortly** [1] - 46:3

**show** [8] - 7:5, 8:4, 22:17, 27:22, 55:4, 65:13, 69:9, 69:25

**showed** [3] - 52:22, 52:23, 79:25

**showing** [2] - 6:23, 28:6

**shown** [1] - 4:2

**shows** [5] - 7:17, 8:18, 48:1, 85:17, 86:10

**sic** [1] - 52:21

**side** [12] - 15:3, 17:2, 19:17, 47:23, 50:18, 50:24, 51:9, 56:24, 59:15, 94:15, 96:4

**sidebar** [1] - 17:15

**sides** [5] - 5:15, 47:3, 47:22, 69:15, 81:5

**sign** [2] - 45:1, 100:6

**signed** [2] - 44:1, 44:2

**significance** [1] - 20:1

**significant** [1] - 48:9

**similar** [3] - 35:13, 37:8, 41:25

**simple** [1] - 87:10

**simply** [2] - 43:20, 43:23

**single** [1] - 74:3

**sister** [3] - 45:25, 46:11, 87:14

**sit** [15] - 49:24, 50:24, 56:24, 63:3, 66:8, 66:9, 69:9, 71:6, 92:23, 92:24, 92:25, 93:2, 96:3, 96:15

**sitting** [7] - 51:9, 55:21, 62:23, 67:17, 72:5, 83:8, 96:6

**situation** [10] - 9:16, 39:19, 39:21, 39:22, 58:18, 58:20, 58:25, 61:14, 87:12, 98:8

**situations** [1] - 26:23

**sizes** [1] - 81:16

**skip** [2] - 9:14, 78:19

**sleep** [1] - 97:8

**sleeping** [2] - 58:5, 97:14

**slight** [1] - 9:16

**slightly** [3] - 47:1, 47:4, 61:24

**slip** [1] - 73:25

**slowed** [1] - 95:21

**smiling** [2] - 70:23, 88:4

**SMITH** [1] - 2:15

**Snapchat** [1] - 20:16

**snipe** [1] - 82:10

**so-called** [1] - 90:23

**sober** [1] - 87:15

**social** [1] - 20:17

**society** [1] - 40:18

**sole** [2] - 23:8, 81:9

**solely** [1] - 16:13

**solemnly** [1] - 100:19

**someone** [27] - 8:8, 8:12, 49:13, 50:15, 50:16, 51:24, 54:25, 57:6, 57:24, 58:17, 59:22, 60:6, 61:5, 66:3, 66:5, 67:5, 69:14, 69:15, 73:3, 77:16, 86:22, 87:7, 91:3, 91:7, 92:17, 93:3, 98:10

**sometimes** [4] - 16:8, 17:9, 18:17, 18:18

**somewhat** [1] - 49:2

**somewhere** [1] - 94:17

**Sonia** [36] - 12:25, 14:16, 24:6, 24:9, 24:12, 24:21, 25:6, 26:14, 26:17, 27:6, 27:14, 29:3, 29:6, 29:14, 29:16, 29:19, 30:20, 32:5, 34:9, 34:15, 34:19, 34:22, 34:24, 35:12, 36:16, 36:20, 36:24, 37:1, 37:4, 37:7, 37:12, 37:17, 37:22, 38:24, 38:25, 39:2

**soon** [7] - 51:8, 62:2, 74:8, 76:2, 77:8, 84:11, 84:12

**sooner** [6] - 41:21, 61:12, 61:13, 62:25, 63:2

**sorrow** [1] - 41:9

**sorry** [2] - 42:6, 56:19

**sort** [1] - 76:1

**sounds** [1] - 62:4

**sources** [1] - 80:13

**speakers** [1] - 22:3

**speaking** [1] - 71:3

**special** [1] - 61:19

**specialist** [1] - 48:3

**specific** [1] - 45:19

**specifically** [1] - 29:18

**specify** [1] - 4:18

**speculation** [1] - 40:24

**speech** [1] - 89:12

**speeches** [1] - 76:6

**spite** [1] - 42:13

**splitting** [1] - 4:8

**spokesperson** [1] - 43:7

**sprees** [1] - 50:20

**stand** [5] - 52:3, 58:18, 74:15, 84:12, 93:1

**standard** [9] - 4:11, 8:19, 25:17, 40:25, 50:14, 74:8, 79:13, 96:7, 96:9

**standards** [4] - 8:12, 51:14, 62:6, 67:15

**standing** [2] - 50:17, 83:22

**stands** [2] - 44:9, 91:13

**start** [8] - 21:10, 42:7, 49:17, 59:3, 61:21, 77:22, 92:14, 99:18

**started** [4] - 47:9, 60:1, 64:6, 87:19

**starting** [1] - 63:2

**state** [34] - 3:6, 6:23, 13:14, 15:23, 23:23, 24:7, 25:2, 25:4, 25:7, 26:18, 27:10, 27:12, 27:14, 29:4, 29:10, 29:21, 29:23, 29:25, 30:18, 31:10, 31:12, 34:6, 34:7, 51:24, 55:9, 55:13, 57:25, 75:1, 75:4, 90:1, 95:14, 96:14, 97:10, 100:15

**statement** [3] - 4:1, 65:23, 85:20

**statements** [5] - 15:18, 15:20, 69:22, 75:6, 76:6

**STATES** [4] - 1:1, 102:5, 102:7, 102:12

**States** [11] - 1:22, 23:21, 23:25, 24:10, 26:15, 26:16, 29:7, 30:22, 41:15, 50:15

**stating** [1] - 8:8

**statistics** [2] - 41:15, 41:16

**statute** [2] - 23:21, 25:4

**stay** [2] - 71:6, 71:12

**STENOGRAPHICALLY** [1] - 102:9

**stenojag@aol.com** [1] - 1:24

**stepping** [1] - 66:5

**steps** [2] - 23:11, 58:1

**still** [17] - 5:23, 8:17, 8:19, 8:20, 58:6, 58:7, 59:2, 71:19, 71:21, 74:11, 76:20, 77:1, 82:15, 86:12,

86:14, 92:4, 92:7
**stimulant** [1] - 55:20
**stipulated** [7] - 15:15, 25:6, 27:13, 29:24, 30:1, 31:11, 34:14
**stomach** [2] - 71:6, 71:13
**stop** [16] - 10:11, 32:1, 35:25, 38:1, 52:15, 64:10, 71:10, 91:9, 92:4, 92:18, 93:3, 96:8, 97:21, 99:15
**stoppage** [1] - 92:6
**stopped** [7] - 48:21, 48:22, 58:5, 61:7, 62:4, 75:24
**stops** [5] - 56:25, 57:23, 92:1, 92:2, 95:25
**Street** [3] - 1:23, 2:10, 2:16
**strength** [1] - 71:18
**stricken** [3] - 16:5, 17:9, 17:12
**strive** [1] - 43:9
**strong** [3] - 47:18, 89:22, 98:13
**struggle** [7] - 48:7, 57:2, 57:9, 57:15, 63:14, 95:18, 96:5
**struggling** [3] - 8:17, 8:19, 74:11
**studies** [16] - 6:22, 7:5, 7:6, 7:7, 52:2, 52:5, 80:14, 80:20, 81:15, 81:19, 81:23, 81:25, 82:1, 82:2, 82:4
**stuff** [1] - 69:11
**subject** [8] - 8:16, 25:13, 27:18, 74:16, 75:9, 76:14, 82:15, 84:6
**subject's** [1] - 76:11
**subjective** [1] - 32:15
**subjects** [1] - 81:15
**subliminal** [1] - 93:10
**submit** [4] - 3:21, 4:23, 5:12, 66:20
**submitted** [1] - 8:24
**subordinates** [2] - 31:1, 31:2
**subsidiary** [1] - 28:23
**substantial** [14] - 27:8, 35:1, 37:2, 38:16, 38:20, 38:24, 39:3, 39:10, 54:17, 54:21, 54:24, 63:12, 89:20, 97:1
**substantially** [1] -

28:10
**succeed** [1] - 39:6
**successor** [1] - 13:19
**Successor** [1] - 1:7
**successor-in-
  interest** [1] - 13:19
**suffer** [1] - 83:9
**suffering** [4] - 40:14, 41:10, 66:19, 66:21
**suggest** [3] - 39:25, 48:14, 67:3
**suggested** [3] - 51:11, 85:21, 95:9
**suicide** [1] - 48:5
**suit** [2] - 11:8, 11:10
**Suite** [3] - 2:5, 2:10, 2:16
**summary** [1] - 13:16
**supervisor** [1] - 14:9
**supervisory** [4] - 30:14, 30:17, 30:23, 31:4
**supine** [4] - 75:20, 77:12, 77:22, 86:10
**support** [9] - 7:9, 7:25, 40:19, 86:7, 86:15, 86:19, 87:8, 89:23, 97:1
**supporting** [1] - 91:15
**supports** [4] - 61:22, 62:23, 78:10, 98:21
**supposed** [5] - 9:19, 9:23, 54:1, 77:16, 92:17
**survivability** [1] - 88:18
**surviving** [1] - 61:14
**suspect** [1] - 32:1
**suspected** [1] - 77:10
**sustain** [3] - 8:23, 17:4, 17:6
**sustained** [1] - 87:23
**swear** [1] - 100:19
**sworn** [2] - 15:9, 19:15
**sympathy** [3] - 12:14, 69:20, 88:24

**T**

**tabbed** [1] - 3:17
**tablet** [1] - 20:13
**tachycardia** [1] - 60:11
**tactical** [4] - 36:1, 37:23, 38:2, 97:6
**tactics** [3] - 36:1, 38:3, 97:6
**tase** [1] - 57:6
**tased** [5] - 51:25,

55:23, 55:24, 57:5, 85:9
**TASER** [5] - 14:21, 71:11, 75:22, 85:8, 97:8
**TASERs** [4] - 71:19, 71:20, 73:10, 85:10
**tases** [1] - 55:24
**tasing** [3] - 48:11, 57:6, 85:3
**teach** [1] - 7:9
**technical** [3] - 22:24, 23:1, 23:5
**technician** [4] - 22:17, 22:25, 23:2, 23:4
**technicians** [1] - 23:11
**ten** [4] - 52:18, 75:19, 77:11, 101:6
**term** [1] - 94:25
**terms** [3] - 44:9, 63:18, 67:9
**terrorizing** [1] - 70:18
**test** [1] - 81:13
**testified** [9] - 18:9, 19:1, 19:3, 21:13, 50:4, 59:16, 60:2, 77:19, 78:8
**testify** [3] - 19:7, 19:19, 19:25
**testifying** [2] - 18:10, 54:9
**testimony** [30] - 5:24, 15:9, 15:14, 16:5, 16:16, 18:3, 18:6, 18:13, 18:14, 18:23, 18:24, 19:9, 19:13, 19:15, 19:23, 19:24, 21:12, 21:14, 21:16, 21:17, 65:5, 65:21, 70:19, 73:20, 75:15, 86:5, 88:13, 93:25, 99:21
**text** [1] - 20:14
**THAT** [3] - 102:6, 102:7, 102:10
**that'll** [1] - 93:16
**THE** [50] - 3:4, 3:11, 3:15, 4:24, 9:3, 9:10, 9:14, 9:21, 9:24, 10:1, 10:5, 10:8, 10:15, 10:23, 11:3, 11:5, 11:12, 11:19, 11:23, 45:9, 56:17, 67:25, 68:7, 68:8, 68:15, 68:18, 68:22, 87:23, 89:6, 90:21, 94:1, 98:23, 99:5, 99:8, 100:15, 100:17, 100:18,

100:25, 101:1, 101:3, 101:5, 102:5, 102:6, 102:7, 102:8, 102:9, 102:10, 102:11, 102:12
**themselves** [1] - 74:3
**theory** [6] - 53:15, 60:19, 72:24, 80:17, 81:12, 81:13
**therefore** [3] - 4:12, 4:20, 32:1
**they've** [2] - 57:5, 93:9
**think's** [1] - 66:22
**thinking** [2] - 47:3, 61:21
**thinks** [3] - 17:2, 56:11, 67:1
**THIS** [1] - 102:15
**Thomas** [2] - 47:11, 47:12
**thorough** [1] - 65:22
**thousands** [2] - 49:18, 82:2
**threat** [5] - 8:20, 32:24, 35:19, 37:16, 95:11
**threatened** [5] - 33:20, 55:7, 87:20, 88:2, 88:7
**threatening** [5] - 38:2, 58:18, 58:20, 75:13, 77:9
**threatens** [1] - 35:25
**three** [6] - 51:23, 61:9, 86:13, 97:13, 97:14, 97:18
**throat** [1] - 74:23
**throughout** [2] - 53:18, 87:2
**THURSDAY** [1] - 3:1
**Thursday** [1] - 1:17
**tidal** [2] - 59:21, 91:19
**tied** [1] - 81:18
**TikTok** [1] - 20:16
**tipping** [1] - 47:5
**TITLE** [1] - 102:7
**Title** [1] - 23:21
**TO** [1] - 102:7
**today** [4] - 11:10, 69:10, 70:12, 99:25
**together** [6] - 4:16, 4:17, 54:7, 60:24, 99:16, 100:19
**tone** [1] - 20:1
**TONY** [1] - 2:15
**Tony** [3] - 3:12, 11:20, 68:16
**took** [4] - 12:15, 21:22, 59:25, 92:7
**top** [1] - 10:22

**TORI** [1] - 2:16
**Tori** [3] - 3:13, 11:21, 68:17
**torso** [1] - 81:4
**total** [3] - 10:13, 67:3, 67:4
**totality** [13] - 8:20, 14:16, 32:10, 35:10, 35:14, 37:5, 37:10, 70:15, 71:22, 72:3, 79:4, 79:14, 95:6
**totally** [5] - 48:19, 48:22, 59:14, 60:19, 67:5
**touched** [3] - 7:14, 84:22, 95:10
**toward** [3] - 6:7, 6:8, 8:6
**toxic** [3] - 85:24, 88:12, 88:13
**toxicologist** [2] - 86:21, 94:5
**toxicology** [1] - 48:3
**toy** [1] - 90:7
**track** [2] - 56:19, 61:18
**TRACY** [1] - 1:7
**Tracy** [14] - 3:4, 11:13, 13:18, 36:19, 40:3, 40:15, 41:3, 41:8, 41:9, 41:10, 45:14, 56:10, 68:9, 88:5
**Tracy's** [1] - 66:24
**tragic** [1] - 87:11
**train** [8] - 26:10, 26:22, 27:2, 27:7, 28:9, 65:11, 65:13, 65:15
**trained** [17] - 48:23, 50:17, 52:13, 56:6, 56:8, 57:2, 57:14, 57:22, 64:22, 66:1, 66:9, 73:20, 75:8, 76:10, 76:13, 82:14, 82:15
**training** [60] - 7:13, 7:23, 8:1, 14:3, 26:19, 27:5, 30:25, 40:21, 48:18, 48:25, 49:23, 50:2, 50:22, 51:14, 51:22, 52:10, 52:13, 52:18, 52:19, 52:20, 53:7, 54:12, 55:12, 56:7, 57:24, 64:5, 64:8, 64:12, 64:16, 64:19, 64:23, 66:15, 76:7, 76:12, 79:20, 79:23, 82:21, 82:22, 82:25, 83:6, 83:14, 83:19, 84:13,

90:9, 90:12, 90:23, 92:15, 93:6, 93:9, 94:11, 94:14, 94:21, 94:23, 95:22, 96:3, 98:19, 99:3
**transcript** [5] - 22:2, 22:5, 22:6, 22:7, 99:20
**TRANSCRIPT** [3] - 1:15, 102:8, 102:10
**treat** [1] - 12:22
**treated** [1] - 17:19
**Trial** [1] - 1:11
**trial** [15] - 12:18, 16:13, 17:13, 19:16, 19:19, 19:20, 20:19, 21:6, 21:10, 21:21, 47:12, 47:20, 49:9, 91:5, 97:25
**TRIAL** [1] - 1:15
**trials** [2] - 47:10, 47:14
**trickier** [1] - 63:21
**tried** [5] - 71:8, 71:10, 71:19, 71:20
**trip** [1] - 46:7
**trivial** [1] - 38:18
**trouble** [5] - 58:1, 61:6, 61:11, 80:14, 95:22
**TRUE** [1] - 102:8
**true** [19] - 8:10, 15:1, 19:5, 46:24, 46:25, 61:23, 69:23, 72:25, 77:10, 77:15, 83:4, 83:7, 84:4, 85:6, 88:25, 92:22, 98:5
**trust** [2] - 75:24, 75:25
**truth** [5] - 19:4, 19:17, 95:3, 95:4, 95:5
**try** [12] - 6:15, 10:10, 10:14, 21:4, 49:10, 57:12, 58:16, 61:16, 78:1, 79:5, 82:5, 95:24
**trying** [12] - 10:13, 22:25, 57:15, 57:18, 57:21, 59:20, 69:11, 72:23, 84:4, 87:15, 91:17, 95:20
**tuning** [1] - 47:19
**turn** [9] - 57:12, 58:6, 58:7, 58:8, 58:9, 63:1, 92:19, 96:21, 97:12
**turned** [4] - 58:11, 87:3, 92:3, 97:15
**turning** [1] - 62:25
**turns** [1] - 90:6
**Twelfth** [1] - 1:23

**twice** [1] - 55:24
**Twitter** [1] - 20:16
**two** [19] - 4:17, 18:21, 46:9, 55:16, 55:24, 57:10, 60:24, 66:17, 67:2, 71:15, 71:19, 71:20, 72:2, 75:11, 75:14, 75:22, 81:6, 92:25, 97:18
**type** [1] - 33:3
**types** [1] - 66:17
**typographical** [1] - 9:16

## U

**ultimate** [2] - 25:1, 31:6
**ultimately** [1] - 13:24
**unanimous** [5] - 43:11, 43:16, 44:11, 44:24, 100:5
**unarmed** [1] - 95:13
**unavailable** [1] - 19:19
**unavoidable** [1] - 88:15
**unbiased** [1] - 59:14
**under** [55] - 8:20, 9:2, 13:3, 13:14, 14:16, 16:2, 17:19, 19:10, 19:16, 23:20, 23:22, 24:7, 24:10, 25:2, 25:4, 25:7, 25:24, 26:6, 26:15, 26:18, 27:10, 27:12, 27:14, 28:15, 29:4, 29:7, 29:9, 29:21, 29:23, 29:25, 30:6, 30:18, 30:21, 31:8, 31:10, 31:12, 31:15, 31:23, 32:8, 32:10, 33:22, 34:6, 34:7, 35:13, 37:8, 42:16, 42:19, 51:25, 57:4, 66:18, 67:10, 67:13, 75:11, 98:17
**understandably** [1] - 56:1
**undisputed** [19] - 5:5, 5:12, 5:19, 5:22, 6:11, 7:12, 7:20, 71:2, 73:12, 74:20, 75:15, 76:17, 83:25, 84:15, 84:20, 84:21, 84:24, 85:10, 88:13
**undisputedly** [1] - 7:17
**ungrammatical** [1] - 10:1
**uniform** [1] - 72:9

**uniformed** [1] - 71:9
**uninterrupted** [3] - 45:22, 59:6, 59:11
**UNITED** [3] - 102:5, 102:7, 102:12
**uNITED** [1] - 1:1
**United** [11] - 1:22, 23:21, 23:24, 24:10, 26:15, 26:16, 29:7, 30:21, 41:15, 50:15
**unless** [7] - 15:5, 35:7, 36:13, 52:3, 78:25, 79:1, 100:21
**unlike** [1] - 50:2
**unnecessary** [1] - 42:23
**unobstructed** [1] - 83:17
**unorganized** [1] - 60:13
**unpredictable** [1] - 71:17
**unproved** [1] - 81:12
**unreasonable** [28] - 13:25, 26:1, 28:17, 30:8, 31:17, 31:22, 32:2, 34:19, 34:23, 34:25, 35:8, 35:9, 36:14, 36:16, 36:24, 36:25, 37:4, 62:1, 62:6, 65:4, 77:23, 78:15, 84:8, 85:7, 85:18, 88:22, 88:23, 94:6
**unreasonably** [1] - 13:21
**unsafe** [1] - 8:15
**unsupported** [1] - 60:19
**untrue** [2] - 18:23, 87:10
**untruthfully** [2] - 19:1, 19:3
**unwilling** [1] - 43:19
**up** [66] - 16:22, 35:16, 37:13, 49:9, 49:17, 49:24, 50:9, 50:17, 50:24, 52:3, 53:11, 53:15, 55:4, 55:22, 56:3, 56:24, 57:15, 57:20, 61:13, 61:15, 62:3, 62:13, 62:23, 63:3, 66:5, 66:8, 66:9, 66:10, 66:22, 67:5, 67:17, 69:11, 71:11, 71:12, 73:9, 73:11, 74:7, 74:17, 75:3, 76:13, 76:24, 77:6, 81:18, 83:22, 85:22, 86:17, 91:13,

91:16, 92:23, 92:24, 92:25, 93:2, 93:8, 93:14, 94:12, 94:15, 96:3, 96:6, 96:15, 98:3, 98:18, 99:1, 99:11
**upright** [1] - 51:8
**user** [1] - 98:9
**uses** [1] - 31:23
**usual** [1] - 26:22

## V

**vague** [1] - 4:16
**Valley** [1] - 13:9
**value** [1] - 41:7
**various** [3] - 25:12, 27:16, 80:2
**ventricular** [3] - 60:10, 60:11, 60:12
**verbal** [1] - 95:11
**verbally** [1] - 55:7
**verdict** [39] - 3:24, 4:4, 4:5, 4:9, 5:4, 9:2, 12:20, 15:13, 17:25, 20:3, 26:2, 26:4, 28:18, 28:20, 30:9, 30:11, 31:18, 31:20, 39:25, 43:10, 43:17, 43:23, 44:11, 44:12, 44:18, 44:24, 44:25, 45:18, 45:19, 61:19, 78:13, 78:18, 89:5, 93:7, 100:2, 100:3, 100:5, 100:23
**versions** [1] - 18:19
**via** [1] - 20:14
**video** [24] - 5:24, 10:11, 10:12, 22:1, 22:8, 22:14, 22:18, 22:25, 45:21, 55:22, 56:25, 59:5, 59:8, 59:18, 61:1, 63:2, 63:19, 70:19, 76:20, 76:22, 78:9, 87:2, 96:19, 96:20
**view** [8] - 22:11, 22:18, 23:9, 57:20, 57:21, 86:2, 86:3, 86:4
**viewing** [1] - 23:17
**views** [1] - 43:15
**violate** [6] - 31:1, 42:19, 64:13, 67:12, 72:17, 94:7
**violated** [6] - 65:3, 70:10, 70:14, 78:25, 80:3, 94:9
**violates** [2] - 21:7, 42:22

**violation** [7] - 6:10, 27:23, 28:1, 28:2, 28:10, 32:3, 79:2
**violations** [5] - 14:9, 25:20, 26:10, 26:21, 27:20
**violator** [1] - 25:21
**violent** [3] - 88:10, 95:17, 95:25
**violently** [3] - 72:18, 95:23, 95:24
**visibly** [2] - 5:23, 71:4
**vision** [7] - 32:13, 68:23, 70:16, 89:24, 89:25, 90:2, 90:8
**Vital** [1] - 41:15
**voice** [1] - 20:2
**vote** [3] - 44:9, 70:9, 96:12
**vs** [1] - 1:10
**vulnerable** [1] - 72:14

## W

**wagon** [1] - 87:17
**waiting** [2] - 17:16, 44:7
**wants** [4] - 49:19, 72:21, 89:11, 95:3
**warning** [1] - 11:2
**warnings** [2] - 33:11, 33:12
**Washington** [1] - 51:16
**watch** [2] - 20:24, 22:25
**watched** [2] - 76:21, 96:19
**weakness** [1] - 42:25
**wealth** [1] - 41:10
**weapon** [2] - 55:7, 74:2
**weapons** [1] - 73:24
**wear** [1] - 11:10
**wearing** [1] - 11:8
**website** [2] - 20:15, 23:13
**week** [1] - 54:9
**weigh** [1] - 47:22
**weight** [15] - 5:14, 6:25, 16:21, 16:23, 19:6, 19:9, 19:13, 21:18, 43:22, 57:17, 74:24, 81:4, 81:19, 82:7, 83:18
**well-settled** [1] - 25:16
**well-trained** [1] - 57:22
**West** [1] - 2:16

**Whew** [1] - 78:3
**whole** [6] - 66:25, 80:11, 90:8, 91:5, 98:4
**widespread** [4] - 24:14, 24:19, 24:23, 25:16
**Williams** [1] - 100:17
**willing** [1] - 73:5
**winded** [1] - 56:1
**wish** [4] - 10:24, 88:5, 88:25, 99:12
**WITH** [1] - 102:11
**witness** [35] - 8:11, 15:9, 16:16, 18:4, 18:6, 18:8, 18:17, 18:25, 19:2, 19:3, 19:10, 19:12, 19:13, 19:15, 19:16, 19:24, 50:1, 56:20, 59:14, 69:24, 73:19, 74:15, 75:3, 76:3, 78:8, 80:21, 80:22, 80:25, 81:8, 84:12, 84:24, 86:5, 87:24, 91:13
**witness's** [7] - 18:9, 18:10, 18:12, 18:13, 18:14, 21:18
**witnesses** [11] - 15:19, 18:19, 19:7, 19:8, 21:12, 21:15, 74:4, 74:25, 80:8, 82:11, 91:4
**Woodland** [1] - 2:5
**word** [3] - 9:21, 78:10, 84:1
**wording** [2] - 51:11, 90:1
**wordplay** [1] - 68:24
**words** [3] - 82:22, 83:6, 83:13
**works** [5] - 49:3, 78:11, 91:6, 91:9
**world** [4] - 82:1, 82:2, 82:4, 97:18
**worse** [2] - 57:23, 77:25
**worth** [1] - 9:7
**would've** [1] - 57:13
**wound** [1] - 84:20
**writing** [4] - 20:12, 44:2, 44:4, 45:4
**written** [6] - 51:20, 51:22, 52:22, 90:22, 90:23, 100:11
**wrongdoing** [1] - 97:25
**wrongful** [2] - 34:3, 34:12
**wrote** [2] - 58:10, 92:3

## Y

**years** [8] - 6:22, 7:8, 41:18, 41:19, 45:24, 46:9, 65:6, 81:19
**yell** [1] - 89:11
**yesterday** [3] - 3:18, 11:25, 60:8
**York** [1] - 51:15
**young** [1] - 96:17
**yourself** [4] - 43:12, 76:19, 76:23, 100:21
**yourselves** [1] - 87:4
**YouTube** [1] - 20:16

## Z

**zero** [20] - 5:16, 5:17, 6:20, 6:21, 6:25, 7:25, 8:4, 72:23, 73:19, 74:2, 74:25, 75:2, 80:8, 80:16, 80:19, 81:7, 82:9, 85:15, 94:19, 97:25