UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

- - -

HONORABLE JESUS G. BERNAL
UNITED STATES DISTRICT JUDGE PRESIDING
- - -

TRACY ALVES,                          )
                                      )
        PLAINTIFF,                    )
                                      )
VS.                                   )   CASE NO.:
                                      )   ED CV 19-2083-JGB
RIVERSIDE COUNTY, ET AL.,             )
                                      )
        DEFENDANT.                    )
                                      )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(P.M. SESSION)

TUESDAY, MARCH 28, 2023

RIVERSIDE, CALIFORNIA

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA 90012
PH: (213) 894-0374

UNITED STATES DISTRICT COURT

APPEARANCES OF COUNSEL:


ON BEHALF OF PLAINTIFF:


       LAW OFFICES OF DALE K. GALIPO
       BY: DALE K. GALIPO, ESQ.

       21800 BURBANK BOULEVARD
       SUITE 310
       WOODLAND HILLS, CA 91367


       THE LAW OFFICES OF JOHN BURTON
       BY:  JOHN BURTON, ESQ.

       128 NORTH FAIR OAKS AVENUE
       PASADENA, CA 91103


       HELM LAW OFFICE, PC
       BY:  T. KENNEDY HELM, IV, ESQ.

       644 40TH STREET
       SUITE 305
       OAKLAND, CA 94609



ON BEHALF OF DEFENDANT:

       LEWIS BRISBOIS BISGAARD & SMITH LLP

       BY: TONY M. SAIN, ESQ.
          TORI L. BAKKEN, ESQ.
       633 WEST 5TH STREET
       SUITE 4000
       LOS ANGELES, CA 90071

3

INDEX


PROCEEDINGS                                        PAGE


JURY VOIR DIRE                                       4


PRELIMINARY INSTRUCTIONS                            36


OPENING STATEMENTS

BY:  MR. GALIPO                                     51

BY:  MR. SAIN                                       67

UNITED STATES DISTRICT COURT

LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 28, 2023; 1:47 P.M.

- - -

THE CLERK:  We're back on the record.

Calling Case No. CV 19-2083-JBG.

Tracy Alves versus Riverside County, et al.

Counsel, please make your appearances.

MR. GALIPO:  Good afternoon, Your Honor.

Dale Galipo with John Burton and Kennedy Helm on behalf of the plaintiff.

THE COURT:  Good afternoon.

MR. SAIN:  Good afternoon, Your Honor.

Tony Sain on behalf of defendant.  With me, Tori Bakken, also on behalf of defendant.  County Representative Mark -- or excuse me, Mark Phillips and Defendant Sheriff Chad Bianco.

THE COURT:  Good afternoon.

Is there a request to approach?

MR. GALIPO:  Yes, there is, Your Honor.

THE COURT:  Very well, you may approach.

(The following proceedings occurred at side bar.)

THE COURT:  Mr. Galipo.

MR. GALIPO:  Yes, Your Honor.

The plaintiff has two challenges for cause of the people of the first eight.  And the first challenge is with Prospective Juror No. 3.  Basically, he said he has a bias in

favor of the police and we are starting behind.  He would hold me to a higher burden.  And I guess at one time he wanted to be an LAPD officer.  Just a very, very strong supporter of the police.

THE COURT:  Okay.  What is your response, Mr. Sain?

MR. SAIN:  In response to Mr. Galipo's questions, Mr. Coleman expressly stated he could set aside any leaning and he would have and give a fair hearing.  In response to multiple questions by the Court and Mr. Galipo, he said that he could set aside his biases and be fair.  I didn't see indicia on his part of being deceptive.  He seemed honest about his ability to set aside any leaning he might have and he stated on the record he would.

THE COURT:  Your second challenge, Mr. Galipo?

MR. GALIPO:  Is Prospective Juror No. 6.  Two bases for the challenge.  The one he said he was biased in favor of the police and it would be very difficult for him to be fair.  He also said about me starting behind and having a higher burden and expressed his views on the police.

Beyond that, we know that he has a brother-in-law who has been recently killed and said he also has a very strong negative feeling about drugs when he heard meth was involved in this case.  That was another reason he could not be fair.

THE COURT:  Mr. Sain.

6

MR. SAIN:  Your Honor, I would love to be able to tell you that I believe Juror No. 6 could be fair and impartial, but I believe under the Court's questioning, it was very clear he could not.  I saw no indicia of him being deceptive.  Meth is an emotional trigger for him and he's emotional about the police.  I don't have valid grounds to show he's not biased.

THE COURT:  Mr. Sain, do the defendants have challenges for cause?

MR. SAIN:  Juror No. 5 stated that his father had been placed in jail.  Although, he stated to the contrary, it was very clear in terms of the emotional reaction, it was a negative experience for him.  He had strong feelings and bias about it.  On questions about anti-police bias, he characterized police misconduct as police brutality and he said multiple times he's a supporter of anti-police protests which by definition constitutes bias.

I don't think he could be fair and impartial even though he stated he could.  There's indicia he could not and has an emotional predisposition against officers in this case.  Therefore, we believe that he should be stricken for cause.

THE COURT:  Any other challenges for cause to the first eight by the defendants?

MR. SAIN:  That's all.

UNITED STATES DISTRICT COURT

THE COURT:  The ruling is as follows.

As to Mr. Basak, the request is the granted.  He will be stricken for cause.  As to both Mr. Coleman and Mr. Serrano, the request will be denied.  So let's call the next juror and proceed.

(Side bar concluded.)

THE COURT:  So Mr. Basak, we thank you for being here and thank you for your honesty.  You are now excused.  You may leave.

Call the next juror, please.

THE CLERK:  Calling Gillian Ann Dozier, take Jury Seat No. 6.

THE COURT:  Good afternoon to you.

MS. DOZIER:  Good afternoon.

THE COURT:  Thank you for being here.

Please answer the first eight questions for us.

MS. DOZIER:  Okay.  My name is Gillian Ann Dozier.  I am an Operations Manager in a small business that does worker's comp.  And I'm high school educated.  I live in Riverside.  I'm single, no children.  Uh, my father lives with me, and he's a draftsman.  And --

THE COURT:  I'm sorry.  Your father is a what?

MS. DOZIER:  Draftsman.

THE COURT:  Okay.

MS. DOZIER:  Sorry.

THE COURT:  And you have no previous experience with juries?

MS. DOZIER:  No.

THE COURT:  And how long have you worked as an operation manager?

MS. DOZIER:  The last few months, but I've been in worker's comp for 12 years.

THE COURT:  And before you were in worker's comp, did you ever do any other employment?

MS. DOZIER:  No.

THE COURT:  Have you ever -- in the course of working in worker's comp, have you ever dealt with people that were injured by police officers or as a course of their work as police officers?

MS. DOZIER:  No.

THE COURT:  Then turn to Question No. 9 for me. And what is your answer?

MS. DOZIER:  Uh, I believe no.

THE COURT:  No. 10?

MS. DOZIER:  No.

THE COURT:  No. 11?

MS. DOZIER:  No.

THE COURT:  No. 12?

MS. DOZIER:  No.

THE COURT:  No. 13?

9

MS. DOZIER:  No.

THE COURT:  No. 14?

MS. DOZIER:  No.

THE COURT:  No. 15?

MS. DOZIER:  No.

THE COURT:  No. 16?

MS. DOZIER:  No.

THE COURT:  No. 17?

MS. DOZIER:  No.

THE COURT:  No. 18?

MS. DOZIER:  No.

THE COURT:  And No. 19?

MS. DOZIER:  No.

THE COURT:  Thank you.

The challenge is with the plaintiff.

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  You may.

MR. GALIPO:  Thank you, Your Honor.  The plaintiff would like to ask the Court to thank and excuse Juror No. 3, Mr. Coleman.

THE COURT:  Thank you for being here.  You're excused.

Next name?

THE CLERK:  Calling Warren Dewayne Mason, take Jury Seat 3.

UNITED STATES DISTRICT COURT

10

THE COURT:  Mr. Mason, good afternoon to you.

MR. MASON:  Good afternoon.

THE COURT:  And can you please answer the first eight questions for us?

MR. MASON:  My name's Warren Dewayne Mason, Jr. I'm a configuration manager analyst for the Boeing Company. I live in Corona.  I'm married.  I have no children at present, but my wife is pregnant.

THE COURT:  Congratulations.

MR. MASON:  Thank you.  My wife's occupation, she's in marketing for a company Altrix.  It's just the two adults in our house.  And I've never served on a jury.

THE COURT:  Okay.  And how long have you worked for Boeing?

MR. MASON:  Uh, it'd be five years in May.

THE COURT:  Before that, what you did do?

MR. MASON:  Uh, engineering work.  Before this, I was working for a company called Aerospace Products.

THE COURT:  Doing?

MR. MASON:  Drafting.  Uh, drafting and design for ducting in airplanes.

THE COURT:  And before that, did you do any other employment?

MR. MASON:  Uh, been doing engineering since 2007. So it's just been engineering.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  And you didn't mention educational background.

MR. MASON:  Oh.  I apologize.  Uh, I have an Associates degree in Computer Drafting Design.

THE COURT:  Okay.  And your wife works in marketing?  How long has she been doing that?

MR. MASON:  Uh, since 2011.

THE COURT:  And before that, did she have any other employment?

MR. MASON:  Just express and retail stores.

THE COURT:  So go to Question No. 9 and tell me your answer?

MR. MASON:  Uh, no.

THE COURT:  No. 10?

MR. MASON:  I have a cousin who works for the Sheriff's Department in Los Angeles County, and I also have -- my cousin's husband is a police officer for Los Angeles County as well.

THE COURT:  Okay.  And how often do you speak with them?

MR. MASON:  My cousin who works for the Sheriff's Department, not much, maybe last time I spoke to him was maybe five years ago.

THE COURT:  Do you think that him being your cousin and his or her partner being in law enforcement also would

prevent you from being fair to both sides?

MR. MASON:  No.

THE COURT:  Okay.  Any other associations with law enforcement?

MR. MASON:  Uh, no.

THE COURT:  No. 11, what is your answer?

MR. MASON:  Uh, no.

THE COURT:  No. 12?

MR. MASON:  Uh, just the charity, uh, for children -- police officers' children, a yearly charity I donate to.

THE COURT:  Okay.  So you donate to police department?

MR. MASON:  I'm not sure -- it's a phone call I get.  It's for, uh, I think it's of slain police officer children.  I get a phone call every year that I donate to.

THE COURT:  Okay.  No. 13, what is your answer?

MR. MASON:  No.

THE COURT:  No. 14?

MR. MASON:  No.

THE COURT:  No. 15?

MR. MASON:  I do have a cousin who's had a negative experience for the last three years, but I don't know the particulars of his case.  I was just supporting him.

THE COURT:  Is he in custody?

MR. MASON:  No, he's out.

THE COURT:  Okay.  And he went through some kind of prosecution?

MR. MASON:  Yes.

THE COURT:  And he was incarcerated for a period of time?

MR. MASON:  For about three years.

THE COURT:  Do you know, um, were you a part of that as a witness or anything?

MR. MASON:  No.

THE COURT:  Do you feel that your cousin was treated fairly or unfairly?  Or you don't know.

MR. MASON:  I don't know cause I only have his perspective, and based off his perspective, it seemed unfair.

THE COURT:  But your -- you acknowledge that it's his perspective.

MR. MASON:  Yes.

THE COURT:  Okay.  What -- what is your answer to No. 16?

MR. MASON:  No.

THE COURT:  17?

MR. MASON:  No.

THE COURT:  18?

MR. MASON:  No.

THE COURT:  And 19?

14

MR. MASON:  No.

THE COURT:  All right.

Challenge is with the defendants.

MR. SAIN:  Your Honor, may we approach for cause?

THE COURT:  Yes.

(The following proceedings occurred at side bar.)

THE COURT:  Mr. Sain.

MR. SAIN:  As regards to Juror No. 6 Ms. Dozier, when I previously conducted voir dire with her, she specifically stated that she was 100 percent biased against defendants in this case and that she would not be able to set aside her biases.  That she was a supporter of the anti-police protests and movement and could not set aside her passion.  She was very specific and vociferous when I was asking questions just before the lunch break.

THE COURT:  Any response, Mr. Galipo?

MR. GALIPO:  Yes.  Well, first of all, I was confused cause I thought we did -- we were going to the cause before the last juror was selected.  I think there's an insufficient basis for cause.  Just because someone is against police brutality, does not mean they cannot be a fair juror.  Many of the jurors said they support the police and that they have to hear the evidence in this case, and they would decide this case based on the evidence in this case.

So I don't agree with Mr. Sain that just because

someone makes certain comments that's automatically a cause, and I don't think enough has been established to challenge her for cause.

THE COURT:  Mr. Sain.

MR. SAIN:  Your Honor, setting aside the fact that when you asked her the questions as to whether or not she could be fair and impartial, she said yes.  When I asked her, she said no.  There's a discrepancy under oath and very concerning over the lunch break she could have developed an agenda given her passion before the lunch break, her anti-police views, how vociferous she was, how passionate.

I don't believe she can be fair and impartial and that she now claims to be is suggestive she could not be.  I believe she should be dismissed.

THE COURT:  I'll follow-up with some questioning to go at the contradiction and I may or may not allow you additional time to voir dire.

MR. SAIN:  I don't want to challenge Mr. Mason for cause just yet.  Maybe some additional questioning would be appropriate?

THE COURT:  You had an opportunity to ask him questions in voir dire.  I don't see any basis to strike him for cause.

MR. SAIN:  Very well, Your Honor.  Thank you.

                (Side bar concluded.)

16

THE COURT:  So Ms. Dozier, I just want to ask you a few follow-up questions.  When Mr. Sain was asking you some questions, you expressed some sympathy for the anti-police movement or the ELM movement and expressed that you would be sort of biased against the police.  When I asked you questions, you said that you could be fair and impartial.  Can you explain that?

MS. DOZIER:  Well, I feel it always depends on the facts of the case.  Like it depends on the evidence that's provided.  If the evidence shows, you know, that the police were in the wrong, then they're in the wrong.  If it shows they were in the right, they were in the right.

THE COURT:  So you're saying that although you are sympathetic to the ELM movement and you think there are instances of police brutality, you're not biased as to this case?

MS. DOZIER:  Yes.

THE COURT:  And you would be able to fairly and objectively weigh the evidence.  And if the evidence suggested you should rule for the defendants, you would do that?

MS. DOZIER:  Yes.

THE COURT:  All right.  So the challenge is denied.  The challenge then is with the defendant at this point.

MR. SAIN:  May I have a moment, Your Honor?

UNITED STATES DISTRICT COURT

17

THE COURT:  Yes.

MR. SAIN:  Your Honor, I would like to the Court to thank and excuse Ms. Dozier.

THE COURT:  You're excused.  Thank you for being here.

THE CLERK:  Calling Regina Louise Zavatsky, take Jury Seat 6.

THE COURT:  Ms. Zavatsky, good afternoon to you. Please answer the first eight questions.

MS. ZAVATSKY:  Sure.  My name is Regina Zavatsky. I'm retired from AT&T in executive research recruiter.  My education is high school with some college.  I live in Riverside.  I am married.  My husband, uh, did 20 years in the U.S. Air Force, retired, and now he's got over 20 years with UPS.  No children.  No one else in our household, and I was on a trial about 35 years ago.

THE COURT:  Do you remember whether that trial was a civil trial or a criminal trial?

MS. ZAVATSKY:  I believe it was a criminal trial.

THE COURT:  And did the jury reach a verdict in that trial?

MS. ZAVATSKY:  Yes.

THE COURT:  So can you go to Question No. 9, and give me your answer?

MS. ZAVATSKY:  No.

18

THE COURT:  No. 10?

MS. ZAVATSKY:  No.

THE COURT:  No. 11?

MS. ZAVATSKY:  No.

THE COURT:  No. 12?

MS. ZAVATSKY:  No.

THE COURT:  No. 13?

MS. ZAVATSKY:  No.

THE COURT:  No. 14?

MS. ZAVATSKY:  No.

THE COURT:  No. 15?

MS. ZAVATSKY:  No.

THE COURT:  No. 16?

MS. ZAVATSKY:  No.

THE COURT:  No. 17?

MS. ZAVATSKY:  No.

THE COURT:  No. 18?

MS. ZAVATSKY:  No.

THE COURT:  No. 19?

MS. ZAVATSKY:  No.

THE COURT:  Thank you.

The challenge is back with the plaintiff.

MS. ZAVATSKY:  Pardon me?

THE COURT:  Sorry.  I was talking to the attorneys.

MR. GALIPO:  May I have one moment, Your Honor?

UNITED STATES DISTRICT COURT

THE COURT:  You may.

MR. GALIPO:  Thank you, Your Honor.

The plaintiff would like to ask the Court to please thank and excuse, uh, Mr. Romero.

THE COURT:  Mr. Romero, thank you very much for being here.

MR. ROMERO:  Thank you.

THE COURT:  So can we agree that the next juror can be excused for cause?

MR. SAIN:  Yes, Your Honor.

MR. GALIPO:  Yes, Your Honor.

THE COURT:  Very well.  Call the next after that.

Yeah, you may leave.  Thank you.

THE CLERK:  Mark Orhan Sengul take Jury Seat 8.

THE COURT:  Is there a request to approach?

MR. SAIN:  Yes, Your Honor.

THE COURT:  Okay, approach.

(The following proceedings occurred at side bar:)

THE COURT:  Mr. Sain.

MR. SAIN:  Yes, Your Honor.  Mr. Sengul is the one who stated expressly that he has anti-police bias and is not only a supporter and participated in the anti-police protest, but he stated that he believes police departments have policies that trump constitutional rights.  On multiple times he said he would not be able to set aside his feelings to be

20

fair and impartial.  He should be dismissed.

THE COURT:  Mr. Galipo.

MR. GALIPO:  I agree that he has expressed some strong views, but I would feel more comfortable if Your Honor would follow-up with a few questions.  I don't think the Court has had a chance to examine him.  If the Court feels it's unnecessary, I'll defer to you.

THE COURT:  I think he said enough.  He would be excused for cause.

(Side bar concluded.)

THE COURT:  Mr. Sengul, you are excused.

Thank you for being here.

THE CLERK:  Calling Kerwin Simeus, please take Jury Seat 8.

THE COURT:  How do you pronounce your name?

MR. SIMEUS:  Uh, Kerwin and last name is Simeus.

THE COURT:  Thank you for being here.

Can you please answer the first eight questions for us?

MR. SIMEUS:  Yes.  Uh, first name is Kerwin.  Last name's Simeus.  Uh, occupation, I'm a graphic designer.  I have a Bachelor's.  I live in Riverside.  I'm not married and have no children.  I live with one roommate.  He is a park ranger.  I have been on a jury before in a civil case.

THE COURT:  Did the jury in that case reach a

21

verdict?

MR. SIMEUS:  Yes.

THE COURT:  What is your Bachelor's degree in?

MR. SIMEUS:  I have a Bachelor's in Graphic Design.

THE COURT:  Very well.  Go to Question 9.  And what is your answer to Question 9?

MR. SIMEUS:  Uh, yes.  One of my close friends is a member of the Sheriff's Department in Riverside.

THE COURT:  Okay.  And how often do you speak with him?

MR. SIMEUS:  Pretty regularly, uh, two or three times a week.

THE COURT:  And do you ever speak with him about his job and what he does on a day-to-day basis?

MR. SIMEUS:  Uh, once in a while, not -- not often, though.

THE COURT:  Do you feel that that association, him being your close friend, would prevent you from being fair to both sides in this case?

MR. SIMEUS:  No, it would not.

THE COURT:  Do you understand that if I -- if you are selected as a member of the jury in this case, you will be ordered to have absolutely no contact with your friend?

MR. SIMEUS:  I understand.

THE COURT:  And you would have no problem obeying

UNITED STATES DISTRICT COURT

22

my order?

MR. SIMEUS:  No problem.

THE COURT:  Okay.  Any other answers to Question No. 9?

MR. SIMEUS:  My roommate's mother works for the County of Riverside, and his girlfriend works for the County of Riverside.

THE COURT:  In what capacity do they work?

MR. SIMEUS:  I don't know specifically what his mother does, but his girlfriend, I believe, is administration.  I'm not sure what role.

THE COURT:  Okay.  And, again, same question as to those two individuals.  Do you think that your association and/or your roommate's association with them would prevent you from being fair to both sides in this case?

MR. SIMEUS:  Uh, no.

THE COURT:  Okay.  Any other answers for No. 9?

MR. SIMEUS:  No other answers.

THE COURT:  No. 10?

MR. SIMEUS:  Uh, no.

THE COURT:  So aside from what you told us; right?  You told us a close friend is in law enforcement; right?

MR. SIMEUS:  Yes.

THE COURT:  No. 11?

MR. SIMEUS:  Uh, no.

UNITED STATES DISTRICT COURT

THE COURT:  No. 12?

MR. SIMEUS:  No.

THE COURT:  No. 13?

MR. SIMEUS:  No.

THE COURT:  No. 14?

MR. SIMEUS:  Yes.

THE COURT:  Okay.  You want to tell me about that?

MR. SIMEUS:  Um, not necessarily, uh, you know, any excessive force or -- or injury, but, um, you know, uh, I guess profiling, um, being pulled out of a car, um, the assumption's being made that I may be under the influence or on drugs, um, but nothing beyond that fortunately.

THE COURT:  So these incidents have occurred to you?

MR. SIMEUS:  Yes.

THE COURT:  And how many such incidents in the last five years?

MR. SIMEUS:  Five years?  None.

THE COURT:  And how many incidents in the last ten years?

MR. SIMEUS:  Ten years?  None.

THE COURT:  Okay.  How many times in total?

MR. SIMEUS:  Twice.

THE COURT:  Okay.  And by which department or agency?

UNITED STATES DISTRICT COURT

24

MR. SIMEUS:  This was, uh, Rialto PD.

THE COURT:  Okay.  Can you tell me what happened?

MR. SIMEUS:  Uh, I was on my way home from tutoring a friend.  Uh, I was at a gas station, exhausted.  Uh, I was on my way home.  Got pulled over, was made to get out of my vehicle, made to take a sobriety test.  Uh, officer threatened me with arrest and taking me in for not admitting that I was high on marijuana which I was not.  Uh, fortunately, she let me go.

THE COURT:  Okay.  So you were not detained.

MR. SIMEUS:  Uh, no.  No, I was not.  No.

THE COURT:  Very well.  And the second incident?

MR. SIMEUS:  Second incident was in La Mirada, California.  I was pulled over, uh, for, uh, was it reckless -- reckless driving, I believe.  But I was not that person in the car.  I was made out to be the person speeding and running through the intersection, but that was not me.

THE COURT:  Okay.  And what happened?  Were you detained?

MR. SIMEUS:  No.  I was not, fortunately.

THE COURT:  You explained that it wasn't you, and you weren't believed?

MR. SIMEUS:  Uh, I was not believed.  Uh, I was still given a ticket.

THE COURT:  And what happened with that ticket?

MR. SIMEUS:  I didn't bother fighting it at that point.

THE COURT:  So you paid the ticket.

MR. SIMEUS:  Yeah, I just paid it off.

THE COURT:  So you've had some incidents in which you feel you were treated unfairly by law enforcement.  Even though it's not the agency at trial here, do you feel that those incidents would prevent you from being fair to both sides in this case?

MR. SIMEUS:  They would not.

THE COURT:  You're positive about that?

MR. SIMEUS:  Yes.

THE COURT:  Okay.  What is your answer as to No. 15?

MR. SIMEUS:  No.

THE COURT:  No. 16?

MR. SIMEUS:  No.

THE COURT:  I'm sorry.  I don't remember if I asked you 12 through 14, you answered no?

MR. SIMEUS:  For 12, no.  13, no.  And then 14 -- sorry.

THE COURT:  Yeah.  So 14 is the one we talked about.  15 is no; correct?

MR. SIMEUS:  Uh, 16 is no.  17 is no.  Uh, 18, no.  Uh, 19, no.

26

THE COURT:  Now, when you were being questioned by the attorneys, Mr. Sain, you expressed some sympathy or beliefs regarding abuse of police powers and infliction of harm on others.  Do you feel you can keep that separate from the evidence in this case and make your decision entirely based on the evidence that is presented in this case?

MR. SIMEUS:  Yes.

THE COURT:  Very well.

The challenge is with the defendant.

MR. SAIN:  May we approach, Your Honor?

THE COURT:  Yes.

(The following proceedings occurred at side bar:)

MR. SAIN:  We would bring our cause challenge as to Juror No. 8.  In addition to him seeking a hardship to be excused from this case, he stated quite eloquently very significant anti-police views, excessive force, not being held accountable.  His views that they are -- he didn't use the word, but it's a form of racism.  He said he was treated unfairly.  The Court appeared to me to be skeptical of his response.

Setting those aside, I was very skeptical of that response.  The passion he displayed against police officers and I believe he cannot be fair and impartial to the police defendants and therefore should be dismissed.

THE COURT:  Mr. Galipo.

UNITED STATES DISTRICT COURT

MR. GALIPO:  First of all, the hardship issue is a totally separate, independent issue.  Second of all, I don't think it's a fair reflection of the record that the Court was skeptical.  The Court will state whatever's appropriate on the record.  Lastly and most importantly, the Court did extensive follow-up just now with him and he unequivocally said he would base his decision on the evidence in this case and nothing else.  He answered different questions two or three times.  I feel it's insufficient for cause.

THE COURT:  I do think both things can be true.  I think he is interested in the issue of police abuse, but he's also of the mind he can be fair and impartial in this case and make his decision based on this case.  He's an educated man and said he could set aside any issues he has.  So I'll deny the challenge at this time.

(Side bar concluded.)

THE COURT:  Mr. Sain.

MR. SAIN:  Your Honor, we'd ask the Court to thank and excuse Mr. Simeus, Juror No. 8.

THE COURT:  You're excused.  Thank you.

MR. GALIPO:  Your Honor, may I approach counsel very quickly regarding the next prospective juror?

THE COURT:  Yes.

MR. GALIPO:  Your Honor, we have a stipulation regarding the next prospective juror to excuse him.  I don't

know how you want to handle it.

THE COURT:  That's fine.  I'll accept that stipulation.

Mr. Tsadeek, you are excused, and you may leave.

MR. GALIPO:  Thank you, Your Honor.

MR. SAIN:  Thank you, Your Honor.

THE CLERK:  Calling Vicki Woodall, will you take Juror Seat No. 8?

THE COURT:  Ms. Woodall, good afternoon to you. Thank you for being here.

Will you answer the first eight questions for us?

MS. WOODALL:  My name is Vicki Woodall.  My occupation is I am an optician.  My educational background is high school and vocational college.  I live in Jurupa Valley. I am married.  My husband's occupation is a truck driver and a martial arts instructor.

I have two children.  They are 33 and 36?  37?  And my daughter is a stay-at-home mom.  My son is in marketing for a corporation called AECON.  There are no other adults living in our household.  I have served on a trial before.

THE COURT:  When was that?

MS. WOODALL:  Probably 15 years ago.

THE COURT:  Do you remember whether it was a civil case or a criminal case?

MS. WOODALL:  I think it was criminal.

29

THE COURT:  Did the jury reach a verdict?

MS. WOODALL:  No, we did not.

THE COURT:  How long have you been an optician?

MS. WOODALL:  18 years.

THE COURT:  And before that, did you have another occupation?

MS. WOODALL:  Before that, I was a stay-at-home mom, and I had a daycare.

THE COURT:  You mentioned your husband is currently a truck driver.  How long has he been doing that?

MS. WOODALL:  Oh, 38 years now.

THE COURT:  So that has been his primary occupation.

MS. WOODALL:  Yes.

THE COURT:  And one of your offspring, your daughter, is a stay-at-home mom; is that correct?

MS. WOODALL:  Correct.

THE COURT:  Has she had occupations outside of the home?

MS. WOODALL:  Yes.  She worked as a dispatcher for a heating and air conditioning company.

THE COURT:  Okay.  And your son is in marketing?

MS. WOODALL:  Yes.

THE COURT:  And how long has he been doing that?

MS. WOODALL:  Oh, probably 20 years.

UNITED STATES DISTRICT COURT

THE COURT:  Okay.  Can you turn to Question No. 9.  What is your answer to Question No. 9?

MS. WOODALL:  Uh, my husband does have contact with the Riverside Sheriff's Department along with many other law enforcement departments in his capacity as a martial arts instructor.

THE COURT:  So do you know if he provides instruction in martial arts to any police department?

MS. WOODALL:  Not directly to the department, no, but to the officers that are students at the school he teaches it.

THE COURT:  So do you know approximately how many law enforcement officers are his students?

MS. WOODALL:  I do not.  I would say upward of ten.

THE COURT:  Okay.  Do you think that that association with law enforcement would make you favor one side or the other in this case?

MS. WOODALL:  I don't think it would.  Um, I'm not the one training them.  It's more or less I kinda stay uninvolved in that aspect of his life.

THE COURT:  Okay.  Any other answers to Question No. 9 that you want to provide?

MS. WOODALL:  No.

THE COURT:  No. 10, what is your answer?

MS. WOODALL:  I have a cousin whose husband is a

captain in San Bernardino Sheriff's Department.  Her son is also a sheriff.  And then one of my son's best friends is a sheriff in Riverside County.

THE COURT:  Okay.  And how often do you speak to these people about what they do?

MS. WOODALL:  I honestly don't.  I haven't -- I just recently reconnected with my cousin, and I haven't met her husband or her son yet.

THE COURT:  And again the same question.  Do you feel that those associations would make you favor one side or the other in this case?

MS. WOODALL:  No.

THE COURT:  No. 11?

MS. WOODALL:  Uh, no.

THE COURT:  No. 12?

MS. WOODALL:  Yes.  Just as many people in here, when that phone call comes, you make the donation.

THE COURT:  Yes.

MS. WOODALL:  They send you the sticker.

THE COURT:  And that's the extent of it?

MS. WOODALL:  That's the extent of it.

THE COURT:  No. 13?

MS. WOODALL:  Uh, no.

THE COURT:  No. 14?

MS. WOODALL:  No.

32

THE COURT:  No. 15?

MS. WOODALL:  Uh, no.

THE COURT:  No. 16?

MS. WOODALL:  No.

THE COURT:  No. 17?

MS. WOODALL:  No.

THE COURT:  No. 18?

MS. WOODALL:  No.

THE COURT:  And No. 19?

MS. WOODALL:  No.

THE COURT:  Thank you.

And the challenge is back with the plaintiff.

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  You may.

MR. GALIPO:  Thank you, Your Honor.  The plaintiff will accept the panel as presently constituted.

THE COURT:  Thank you.

The challenge is then with the defendants.

MR. SAIN:  May I have a moment, Your Honor?

THE COURT:  Yes.

MR. SAIN:  Your Honor, we'd ask the Court to thank and excuse Juror No. 5, Mr. Serrano.

THE COURT:  Mr. Serrano, you are excused.

Thank you for being here.

THE CLERK:  Kay Darlene Heaton.  Take Jury Seat

UNITED STATES DISTRICT COURT

No. 5.

THE COURT:  Good afternoon.

MS. HEATON:  Good afternoon.

THE COURT:  Can you please answer the first eight questions for us?

MS. HEATON:  My name is Kay Heaton.  High school. I live in Norco.  I'm married.  My husband is -- he does composite work.  I have two kids.  They are 39 and 32.  And the oldest one, she does medical insurance, and the other one works for a pest control place.  No one lives at home, and no, I've never served on a jury before.

THE COURT:  Do you have an occupation?

MS. HEATON:  No.

THE COURT:  Do have an occupation outside the home?

MS. HEATON:  No.

THE COURT:  So you've always been a stay-at-home mom?

MS. HEATON:  Yes.

THE COURT:  And your husband you said works in composite.  What is that?

MS. HEATON:  Like aerospace.  He makes parts for airplanes and like that.

THE COURT:  And how long has he been doing that?

MS. HEATON:  52 years?

THE COURT:  That's long enough.

34

MS. HEATON:  Yeah.

THE COURT:  Very well.  Can you turn to page 2 and Question No. 9?  What is your answer to No. 9?

MS. HEATON:  No. 9 is no.

THE COURT:  No. 10?

MS. HEATON:  No. 10 is yes.  My sister was -- she's retired L.A. Sheriff Department.

THE COURT:  Okay.  Was she an officer?

MS. HEATON:  Uh, yes.

THE COURT:  Okay.  And any other people that are close to you that are associated with law enforcement?

MS. HEATON:  No, just her friends, but I don't really know them.

THE COURT:  And how often do you talk or did you talk with your sister about what she did?

MS. HEATON:  Oh, no.  She didn't talk about her work.

THE COURT:  Do you feel your sister having been in law enforcement would make you favor law enforcement?

MS. HEATON:  No.

THE COURT:  Do you feel confident that you can be fair to both sides in this case?

MS. HEATON:  Absolutely.

THE COURT:  How about No. 11?  What is your answer?

MS. HEATON:  No.

35

THE COURT:  No. 12?

MS. HEATON:  No.

THE COURT:  No. 13?

MS. HEATON:  No.

THE COURT:  No. 14?

MS. HEATON:  No.

THE COURT:  No. 15?

MS. HEATON:  No.

THE COURT:  No. 16?

MS. HEATON:  No.

THE COURT:  17?

MS. HEATON:  No.

THE COURT:  18?

MS. HEATON:  No.

THE COURT:  19?

MS. HEATON:  No.

THE COURT:  Thank you very much.

You still have a challenge if you want it, Mr. Galipo.

MR. GALIPO:  May I have one moment, Your Honor?

THE COURT:  Yes.

MR. GALIPO:  Thank you, Your Honor.

Plaintiff will accept the panel as presently constituted.

THE COURT:  Very well.  Please swear the jury.

UNITED STATES DISTRICT COURT

36

THE CLERK:  Ladies and gentlemen, please rise and raise your right hand.

(Jury sworn.)

THE COURT:  Ladies and gentlemen in the audience, this concludes our process of jury selection.  You are now all free to leave, and thank you for being here today.

Very well.  Ladies and gentlemen, what we're going to do right now is I am going to give you some pre-instructions.

MR. SAIN:  Your Honor, I'm sorry to interrupt.  One of the jurors who just departed and left their glasses behind.

THE COURT:  Okay.  Can somebody try to help them with that?

All right.  Thank you, Mr. Sain.

So I'm gonna give you some preliminary jury instructions just to help you follow the evidence as it comes in.  At the end of the case, I will give you each a full set of written instructions that are the final instructions that will govern your deliberations when you deliberate at the end of the case.

After I give you those instructions, preliminary ones, then we'll take a break.  Mr. Galvez will show you the jury room and how to get in and out and tell you stuff about the jury room, and then you will come back, and we'll hear

opening statements from the attorneys.

So let me give you the instructions.

Ladies and gentlemen, you are now the jury in this case.  It is my duty to instruct you on the law and give you these preliminary instructions.  These instructions I'm about to read to you and am reading to you as I said are preliminary instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as it you listen to it.

You at the end of the case will be given in writing a final set of instructions that will govern your deliberations.

It is your duty to find the facts from all the evidence in the case.  To those facts, you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  You must not be influenced by any personal likes or dislikes, opinions prejudices or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do just that.

Please do not read into these instructions or anything I may say or do during the trial as me having an opinion regarding the evidence or what your verdict should be.

The parties have agreed to certain facts that I

38

will now read to you.  You must therefore treat these facts as having been proved.

No. 1.  On the afternoon of July 29th, 2019, Deputies Brian Keeney and Sonia Gomez were deputy sheriffs employed by Defendant County of Riverside through the Riverside County Sheriff's Department.

Number 2.  The involved deputies were acting under color of state law at the time of the incident.

Number 3.  The involved deputies were acting within the course and scope of their employment with defendant, County of Riverside through the Riverside County Sheriff's Department at the time of the incident.

Number 4.  On July 30th, 2019, at the Inland Valley Medical Center, Kevin Niedzialek was pronounced brain dead. His organs were later donated.

Number 5.  Defendant Sheriff-Coroner Chad Bianco at all relevant times was the primary policy maker for defendant Riverside Sheriff's Department and acted under color of state law.

To help you follow the evidence, I will give you a brief summary of the position of the parties.

Plaintiff, Tracey Alves, brings this action both on her own behalf and as successor in interest to her brother Kevin Niedzialek.  She contends the County of Riverside Deputy Sheriffs acted unreasonably in holding him down in a

prone position after he was handcuffed, restricting his ability to breathe and causing his cardiac arrest and also brain injury and ultimately, his death.

Plaintiff asserts that the unreasonable acts of the deputies were pursuant to policy, practice or custom of defendant, County of Riverside through the Riverside County Sheriff's Department.

Plaintiff contends that the training provided to the deputies by the County of Riverside through the Riverside County Sheriff's Department was inadequate.

Plaintiff further contends that Riverside County Sheriff-Coroner Chad Bianco was responsible for the alleged constitutional violations as a supervisor and that he ratified the deputies' conduct.

Plaintiff seeks damages as permitted by law.

Plaintiff has the burden of proving these claims.

Defendants deny each and all of plaintiff's claims against the defendants, and defendants contend that based on the facts actually known to them, Deputies Brian Keeney and/or Sonia Gomez acted reasonably under the totality of the circumstances during the incident involving Kevin Niedzialek using only reasonable force on Kevin Niedzialek in self-defense and to protect public safety.

And that Kevin Niedzialek died as a result of his methamphetamine overdose, not as a result of the deputies use

40

of taser, force and/or manual restraint.

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.  You should base your decision on all of the evidence regardless of which side presented it.

You should decide the case as to plaintiff and each defendant separately.  Unless otherwise stated, the instructions apply to all the parties.

The evidence you are to consider in deciding what the facts are consists of the following:

(1) the sworn testimony of any witness;

(2) the exhibits that are received into evidence;

(3) any facts to which the lawyers have agreed; and

(4) any facts that I may instruct you to accept as having been proved.

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are, and I will list them for you.

No. 1.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they may say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it

is not itself evidence.  If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

No. 2.  Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the Rules of Evidence.  You should not be influenced by the objection or by my ruling on it.

No. 3.  Testimony that is excluded or stricken or you've been instructed to disregard is not evidence and must not be considered.  In addition, some evidence may be admitted for a limited purpose.  When I instruct you that certain evidence can be considered only for a limited purpose, you must do so, and you may not consider the evidence for any other purpose.

No. 4.  Anything you may see or hear when the court is not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial, and you've heard those terms before.  Direct evidence is direct proof of a fact such as testimony by a witness as to what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you can find another fact.

You should consider both kinds of evidence.  The

42

law makes to distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

There are Rules of Evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence, and a lawyer on the other side thinks that it is not permitted by the Rules of Evidence, that lawyer may object.

If I overrule the objection, the question may be received or the exhibit receive.  If I sustain the objection, the question will not be received, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that certain evidence be stricken from the record, and that you disregard or ignore that evidence.  That means that when you are deciding the case, you must not consider the stricken evidence for any purpose.

From time to time during the trial, and this has already happened, it may be necessary for me to hear from the attorneys outside of your hearing, what we call at side bar. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the Rules of Evidence and to avoid any

confusion or error.

We will do what we can to keep the number and the length of these conferences to a minimum.  I may not always grant a request by an attorney to a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

In deciding the facts of the case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness say or part of it or none of it.

In considering the testimony of any witness, you may take into account the following:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case, if any;

(5) the witness's bias or prejudice, if any;

(6) whether other evidence contradicted the witness's testimony;

(7) the reasonableness of the witness's testimony in light of all the evidence; and

(8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things and/or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide the testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose to not believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part that you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witness who testify.  What is important how believable the witnesses were and how much weight you think their testimony deserves.

I urge you to pay close attention to the trial testimony as it is given.  During the deliberations at the end of the case, you will not have a transcript of the trial testimony.  We will be giving you notepads, and you can take notes if you wish.

I will now say a few words about your conduct as

jurors.  First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must not decide this case based -- because you must decide this case based only on the evidence received in the case and in my instructions as to the law that applies, you must not be exposed to any other information about this case or the issues that it involves during the course of your jury duty.

Thus until the of the case or unless I tell you otherwise, do not communicate with anyone in any way, and do not allow anybody else communicate with you in any way about the merits of the case or anything having to do with it.

This includes discussing this case in-person, in writing, by phone, tablet, computer or any other electronic means via email, text messaging or any Internet chat room, blog, website or application including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, Tik-Tok or any other form of social media.  I can't list all the social media applications, but just because I'm missing one doesn't mean that you can do it with that one.  Don't do it in any form.

This applies communicating with your fellow jurors until I give you the case for deliberations at the end.  And

46

it applies to communicating with anyone involved in the case, um, including your family members, your employer, the media or press and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case and how long you expect the trial to last.

But if you are asked or approached in any way about your jury service or anything about this case you must respond that you've been ordered not to discuss the matter and report the content to me.  And so if anybody approaches you to ask about the case, even if you say nothing, you have to report that contact to me to see who is doing that.  I'll investigate who is doing that cause nobody should be doing that.

Because you will receive all the evidence and legal instructions you properly may consider to return a verdict, do not read watch or listen to any news or media accounts or commentary about the case or anything having to do with it although I have no information that there will be any such reports.

Do not do any research such as consulting dictionaries, searching the Internet or using any other reference materials, and do not make any investigation or in any way try to learn about this case on your own.  Do not visit or view anyplace discussed in the case, and do not use

the Internet or any other resource to search for or view anyplace discussed during the trial.

Also, do not do any research about the case, the law or the people involved including the parties, the witnesses or the lawyers until you have been excused as jurors at the end of the case.  If you happen to read or hear anything touching on this case in the media, turn away from it and report it to me as soon as possible.

These rules are very strict, but they protect each party's rights to have this case decided only on the evidence that is presented here in trial.  Witnesses here take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside of the courtroom or give any information from improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process.

Each of the parties here is entitled to a fair trial by an impartial jury.  If you decide the case based on information not presented here in court, you will have denied the parties a fair trial.  Remember you've taken an oath to follow the rules, and it is very important you follow them.

Any juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result that would require the entire trial to start

over.  So if any juror is exposed to any outside information, please notify me immediately.

If you wish, you may take notes to help you remember the evidence.  If you do take notes, please keep them to yourself until you go to the jury room to decide the case at the end.  Do not let note taking distract you.  When you leave, your notes should be left in the jury room.  No one will read your notes.

Whether or not you took notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.

Trials generally proceed in the following way.  First, each side makes an opening statement.  An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

The plaintiff will then present evidence, and counsel for the defendant may cross-examine.  Then the defendants may present evidence, and counsel for the plaintiff may cross-examine.

After the evidence has been presented, I will give you those final set of instructions, and the attorneys will make those closing arguments to you.  After that, you will go to the jury room to deliberate on your verdict.

So, again, these are a subset of what I will give you at the end of the case to help you follow the evidence. We will now take a break, and you will meet with Mr. Galvez who will go over the jury room, what's there and how to get in and out. After that, we'll come back, and we'll do the opening statements.

So until then, keep an open mind, do not do any research about this case, do not talk to anybody about the case, do not try to learn about this case in any way. We'll be in recess.

THE CLERK: All rise. This court stands in recess.

(Recess taken.)

(Jury not present.)

THE COURT: And I understand, Mr. Galipo, you'd like to make a motion?

MR. GALIPO: Yes, Your Honor. I would like to make a motion to exclude witnesses which would include the two involved deputies.

THE COURT: Any response to that, Mr. Sain?

MR. SAIN: As to witnesses, that motion is appropriate as long it is reciprocal meaning that plaintiff's witnesses would also be excluded from the courtroom during witness exam.

As to opening statements, that motion is inappropriate. All parties are -- parties, civilians are

50

permitted to be here for opening statements.

THE COURT:  But during the testimony, you agree that the individual sheriffs, uh, deputies should be excluded?

MR. SAIN:  As long as it's reciprocal to plaintiff's witnesses, yes, Your Honor, I do.

THE COURT:  Do you agree to that compromise?

MR. GALIPO:  Yes, I do.

THE COURT:  So bring the jury in.

Remind me how much time I gave you for opening.  Is it 45?

MR. SAIN:  45, Your Honor.  Your Honor, may I inquire as to Friday what time we're starting?

THE COURT:  We'll go to noon.

MR. SAIN:  So we'll start at 9:00?

THE COURT:  Yes.

MR. SAIN:  Thank you, Your Honor.

MR. GALIPO:  You gave up to 45.

I don't think I'll use all that.

THE COURT:  Yes, I remember that.

THE CLERK:  All rise.

(Jury present.)

(Case recalled.)

(Appearances as heretofore noted.)

THE COURT:  Good afternoon.  So as I said, ladies

51

and gentlemen, now is the time for opening statements.

Mr. Galipo, are you prepared to make your opening statement?

MR. GALIPO:  Yes, I am.  Thank you, Your Honor.

THE COURT:  Proceed.

MR. GALIPO:  Good afternoon, everyone.  As the Court just indicated, it's our opportunity to give you an opening statement and hopefully, just to give you a little bit more of an idea of what the case is about, give you some insight as to what witnesses will be called in what order so may be that'll help you follow along.  I can assure you we all know your time is very valuable in your personal and professional lives so we're gonna do our best to get this case to you as efficiently and quickly as possible.  And thank you for that.

This incident happened on July 29th, 2019 in Temecula at an apartment complex where Kevin Niedzialek was staying.  He was 34 years old.  He was 34 years old.  He had in the past battled with drug use, specifically methamphetamine.  He had been clean for about two years.  He lost his father when he was younger and lost his sister.  He had one remaining living sister, and that's Tracey Alves who is the plaintiff in this case.  She's here with two of her daughters.

Shortly before this incident took place, he lost

his mother from colon cancer.  There was approximately six months of time in between the diagnosis and the death.  And, in fact, the family's originally from Philadelphia.  They went back there to bury their mother.  And when he came back, it was -- that is what we believe the evidence will show precipitated him starting back on the methamphetamine.

And at about 2:30 that afternoon, neighbors called 911 because they noticed him injured, bleeding a lot from the face and head.  It was unclear at that time how he got the injury although he told one neighbor that he had been beaten up.  And he was screaming and pounding on some of the neighbors' doors asking for help.  The neighbors didn't know what to make of the situation and understandably called 911.

And two officers arrived.  And these are the two deputies who are here in court today, Deputy Keeney and Deputy Gomez.  They got there at about the same time.  Deputy Sonia Gomez was the primary officer assigned to the call, and Deputy Brian Keeney was the backup officer assigned to the call.

Now, importantly, the call did not come out as a real crime or someone having a weapon.  It really was a call for which Kevin needed help.  And when the officers saw him, they realized almost immediately that he was seriously injured and needed help.  Um, he was crouched down almost in a seated position on a porch, hiding to some extent, bleeding

quite a bit from the face and head.

And when they saw him, initially, I believe he was seen by Deputy Keeney, he called out to him, and it was very quickly apparent to him and Deputy Gomez joined shortly thereafter that he needed immediate medical attention, first because of the wound to his face and head that was bleeding a lot. And he, in fact, had blood not just on his face and head but other parts of his body. They also noticed at some point, there was an apartment that he was staying at that was opened that had a lot of blood in the apartment and around the door area.

The way he was talking right away, it was clear that he either was having a mental health crisis, was under the influence of a stimulant such as methamphetamine and was in a -- in a state of what you'll hear referred to as excited or agitated delirium. He was repeatedly rambling saying the same thing over and over again. For example, please, please, please, please, please, please, please, please, please.

Now, one of the two deputies had a body worn camera that was activated so you'll be able to see that footage as part of the evidence in this case. The other, Deputy Keeney, somehow did not have his body worn camera that day. I think he had left it at the station, and another deputy mistakenly picked it up, but you'll hear about that.

So he got up -- I believe the evidence will be that

Deputy Keeney like called him out, and he got up, and he quickly approached Deputy Keeney.  Deputy Gomez was not sure what he was gonna do.  He was shirtless, in pajama bottoms and with bear feet.  She didn't see any weapon on him or think he had any weapon, but when he approached Deputy Keeney rapidly, she wasn't sure if he was gonna try to do something to Deputy Keeney.

So she took ought her taser and tased him.  And you'll hear from the evidence that the taser can be used in different ways.  One way you could shoot someone from a distance where two probes or darts will come out, they'll be a spread, and there's an electrical circuit created in the body.

I believe the type of taser that was used by Deputy Gomez was called an X2, and it delivered about 1400 watts of electricity.  And it was immediately effective, and you'll see this on the video that you'll see, because he immediately locked up, and there's a five-second cycle associated with it and went to the ground.  And both probes embedded in his body.

Now, when he did that, Deputy Keeney approached to try to see if he could secure him, but as he approached, and the cycle was ending, you'll see from the video that Kevin was moving and kicking to some extent and then stood up again, and Deputy Gomez tased him again.  Cause once the

probes are in, the way the taser works, and you press the button again, you have a good circuit, you get another five seconds.

And after that five seconds, the second tasing, he went face or chest down. And you'll see he landed pretty hard chest or face down because the evidence will be when you're locked up from the taser, you can't really brace your fall. And one inference you'll see from the evidence is that he may have had the wind knocked out of him when he initially went chest down.

Now, there's a training and policy that once you tase someone, they're gonna need medical attention just for being tased, part to have the probes removed from your body but also to be checked out. So after he was tased, it was clear he needed medical attention for at least two reasons, maybe more. One was the head injury and the excessive bleeding. Two was the fact that he had been tased now, and you need medical attention once you're tased.

But also, he was in a state of excited delirium which you'll see in the video, and the training is or at least should be that when someone's in a state of excited delirium, that is a medical emergency for which someone needs immediate medical attention.

So once he goes chest down, and there's a time line that you'll see presented, he was handcuffed in fairly short

order.  It didn't take long to get him cuffed.  Deputy Keeney went to his left side, Deputy Gomez on the right side.  They eventually got his hands cuffed and behind his back.  Now, you'll see some evidence, and you'll hear testimony about where they had a knee on his back or on back of his shoulder or et cetera.

Now he's handcuffed.  He's chest down.  He's injured and needs medical attention.  And this, ladies and gentlemen, is where the dispute lies in this case.  It's not so much what happened next because you're gonna be able to see with your own eyes what happened next.  The question is was it appropriate or not?  Did these deputies through the Riverside County Sheriff's Department and the County of Riverside and under Sheriff Chad Bianco have adequate training to handle this type of situation?

And the reason I say that is because understandably, many people are handcuffed initially chest down.  You'll hear the term prone.  Chest down or prone.  The question is, especially for someone with these risk factors, head injury, under the influence of a stimulant, excited or agitated delirium, already had been tased, what do you do after you get him handcuffed?

The first witness in this case that we're gonna hear from tomorrow morning, and Mr. John Burton will call this witness, is a police practice expert by the name of Jeff

Noble.  He will tell you both locally, regionally and across the country what the expectations are, the standards are, the rules, if you will, for law enforcement officers in that type of situation.  And what that is, you get the person off their chest.  You put the person in a recovery position either seated up preferably or on their side.

And the reason the evidence will be you do that is twofold.  One, if you keep a person chest down, especially if you're holding them down with knees or hands or any pressure, it could interfere with their ability to breathe.  It could cause other medical complications.  It could cause serious injury and/or death.  And so to alleviate that risk of causing death to someone, especially someone who's in a state of medical emergency and already handcuffed, the appropriate training is don't keep them chest down.

You'll hear terms like recovery position, positional asphyxia, restraint asphyxia.  The reason and the evidence will bear this out that the training is to make sure and put 'em timely in a recovery position, don't hold them chest down, is because of the number of deaths that have occurred to individuals restrained prone by law enforcement, especially after they're already handcuffed chest down.  The medical evidence will be it interferes with your ability to breathe, especially for someone like Kevin who was already oxygen deprived and needed greater oxygen intake because of

58

his excited delirium, his head injury, him being tased.

There's also something you'll hear reference to called physiology of a struggle. And the training that officers should have and most agencies do have is that officers have to be aware when they're holding someone chest down, and that person being held chest down is experiencing difficulty breathing, that person may try to roll to a side or lift up in order to be able to expand their diaphragm in order to breathe.

The officers if they're not properly trained may misinterpret that as a form of resistance. Ah. This person's trying to roll a little bit to the side or this person's trying to lift up. I need to push him down more and make sure they don't move. And then the person is more panicked because they really can't breathe, and they'll try even more to get in a position to breathe, and, again, the officers misinterpret that absent good training, and this cycle ends up in an unnecessary death.

Now, in this case, the decedent was not turned over within five seconds of being handcuffed or ten seconds or thirty seconds or sixty seconds. In fact, you'll see from the video and the audio that goes with it, he was moving for some period of time, kicking his bear feet, trying to turn to his side to get a position to breathe. At one point, he was trying to roll slightly, but the officers kept him chest down

59

and were holding him down.

Now, there may be dispute as to how much weight they were applying, but they'll concede, and I think they have conceded, they were holding him down. And at some point, about a minute or so after he's handcuffed, he stops moving. And the evidence will be they don't sit him up then. They don't roll him over then. Another minute goes by. He's still being held chest down.

At some point, he stops making any sounds. Another minute goes by. He's still being held chest down. It's almost five minutes from the point in time he is cuffed chest down to when they finally turn him, and at least the last three minutes of that, I believe the evidence will show, he's not moving at all. Making little to no sounds.

Now, the officers will say at some point, they said well, gee, maybe he's fallen asleep. You'll hear Deputy Keeney whisper to Deputy Gomez maybe he feel asleep. And you'll have to decide how reasonable is that to think, that someone in this agitated state on meth suddenly decided to take a nap?

And then the officers at some point will tell you they didn't think he's breathing. And they turn him over. And I believe the evidence will be that they were aware when they turn him over almost five minutes later, he wasn't breathing.

60

They tried to take his pulse. At first, they didn't think there was a pulse. Then Deputy Gomez believes, believes, and this could be questionable, you'll have to decide, she felt a faint pulse. The evidence will be sometimes people think they feel a pulse under these circumstances but maybe not. But in any event, I believe both deputies will concede he wasn't breathing.

Now, you'll hear something called agonal breaths. Agonal breaths is when someone is post-cardiac arrest or is post-asphyxiation, the lungs could still -- like could be gasp or two. Agonal breathing, not normal breathing like we normally breathe.

So Mr. Noble will tell you tomorrow morning about the importance of training on restraint asphyxia, the risk of that, positional asphyxia, the risk of that, the risk of prone restraint, the important of putting someone in a recovery position as soon as they're handcuffed and secured, particularly if they stop moving and resisting.

And, in fact, if someone stops moving and resisting, he will tell you that could be a sign that officers should know something might be wrong, if they calm down that fast that quickly. And he will tell you that officers should have training in all the risk factors I've been discussing.

And the reason I mentioned the training, ladies and

gentlemen, is cause the evidence will be from these officers and from the sheriff, they don't have training on positional asphyxia.  They don't have training on restraint asphyxia.  They are not trained to put someone in a recovery position after they're handcuffed.  In fact, they're not trained on risk factors.  They will even tell you that their training is -- when someone is handcuffed, chest down, even if they're not resisting or moving, their training is to keep them chest down.  And Mr. Noble will tell you that that is contrary to all the standards and training of good police departments through out this country.

In fact, to give you some examples, the International Association of the Chiefs of Police which Sheriff Bianco is a part of has instructions and model policies on the recovery position of getting people off their chest after handcuff, not putting weight down in a prone position, positional asphyxia, and Sheriff Bianco says he doesn't follow all of that.  He disagrees with that.  So his officers are not trained on it.

And the officers I believe will tell you, well, we were -- did what we were trained to do.  So in our mind, we didn't really think we were doing anything wrong because that's how we were trained, to hold them down, chest down. So that's why the policies and training, ladies and gentlemen, are such a big part of this case.

62

Now, as soon as the paramedics got there, Paramedic LaRusso, and you'll see her on the body worn camera, immediately says he's not breathing.  Start CPR.  Take the cuffs off.  And, of course, sadly, particularly for the family and loved ones, he was at a point of no return.  They tried their best, the paramedics, everyone, the hospital, to resuscitate him, to save him.  It was too late.  The deprivation of oxygen to his heart to his brain was so great that he had irreversible brain damage.

And his cardiac rhythm you will hear that was taken was PEA.  This is an important factor in this case, pulseless electrical activity.  That was his heart rhythm.  And his heart rhythm, that is consistent with astyphia.

Now, there will be evidence, and I believe the defense will put on some evidence, he died from the drugs. He was on methamphetamine, and that was, they'll argue, the sole cause of his death.  Well, you will hear evidence to the contrary.

For example, one of their experts, Dr. Richard Clark, one of the defense experts, who was an expert in toxicology said that the amount of meth in his system was of the recreational meth, not toxic or lethal, and the amount was not high enough in and of itself to kill him.  This is not a meth overdose.  This is their expert.  Without the restraint, he wouldn't have died.

63

The medical examiner, Mark Fajardo, who did opine that methamphetamine toxicity was the cause of death conceded that the other significant condition was the application of the restraint maneuvers, and in his deposition conceded that that was a contributing cause of death.

And the manner of death. So there's five categories on the manner of death; suicide, natural causes, undetermined, homicide and accident. This was determined to be a homicide defined as death by the hands of another.

Now, the medical examiner agreed that this was a homicide. And in Riverside County, it's a Sheriff-Coroner county so Sheriff Bianco signs off on the cause and manner of death, and he signed off on the manner of death in this case as being homicide. I believe now the defense is taking the position well, that doesn't mean anyone did anything wrong. It just means the deputies were present when it happened. You'll have to judge the credibility, ladies and gentlemen, of the testimony.

Then we get to the medical issues in this case. And the plaintiffs have two medical experts who will testify. Mr. Burton will call a Dr. Daniel Wohlgelernter. I've been practicing that because it's really hard so I hope I didn't mess it up too much. But he's a cardiologist.

He's gonna explain to you the medicine and what happened to Kevin and why it was asphyxia. And he's gonna

64

talk to you about his oxygen-deprived body and what holding him in that restrained position did to him, not only in terms of his lack of oxygen to his heart and brain but the acidosis that was building up in his body, both because of being held down and because of the inability to breathe. And he will tell you it's the restraint that killed him. He was asphyxiated, and it was a homicide.

Dr. Michael Freeman, another medical expert for the plaintiff, will explain to you the same thing.

Now, I am also gonna call Sheriff Chad Bianco because I want to get evidence in this record for you to make your decision, whatever it is, to decide, ladies and gentlemen, did these deputies have appropriate and sufficient training on these issues? And did that play a part in what happened? Because you may find if they didn't have any training on the areas I'm saying the evidence shows, that the training was inadequate and played a role in this occurring.

You're also gonna hear from Tracy and some of the family members. Now, that's all she really had left was her brother. She's married, she has children, but from her immediate family, she lost both parents, the mother recently, she had lost her sister, it was only sister and brother. And they were very, very close. As I mentioned, he was only 34 years old.

In fact, he, himself, was going to school to be a

65

counselor to help people get off drugs ironically.  And he, himself, had this relapse after his mother died.  And the evidence will be that someone in his condition in this excited delirium state is very treatable had he gotten the timely medical attention.

Now, the defense is gonna call a whole slew of experts, maybe five.  And they have experts who, I believe, will tell you that the restraint had nothing to do with his death.  It was he just so happened to have a cardiac arrest while he was being held down.  And you're gonna have to decide how credible that is.

They have an expert, Dr. Chan, who has been performing experiments, if you will, for years trying to say someone prone with weight on them doesn't really significantly affect their breathing although every study they've shown it does.  But what you'll hear, ladies and gentlemen, is the studies they're doing are not replicating real life situations.  These aren't people that have excited delirium, on drugs, injured and in the state that Kevin was.

We believe when you hear all the evidence in this case, number one, you will find that it was unnecessary and inappropriate to hold him down for almost five minutes, chest down after he was handcuffed, and three or four of those minutes, he wasn't even moving.

Because as I mentioned before, there's two

important reasons to get someone into a recovery position right away.  Number one, to allow them to breathe and ventilate.  Number two, you can properly assess them.  Look into their eyes.  Check their breathing.  Check their pulse.  You can much more easily do that when someone's seated up as opposed to being chest down, head down on a hard surface.

The second point is to the extent these officers were trained -- not trained in all the issues I've discussed and instead trained to hold someone down like that when they stop moving and stop resisting when they're handcuffed, that was bad training.  And we're gonna ask you at the end of this case for not only a decision more likely than not it was inappropriate what they did to him, but it was the result of inadequate training and bad policies.

Lastly, we're gonna ask you for fair damages to Tracy Alves for the loss of her beloved brother.  And I'm just gonna show you a few photos that you'll see.

And you'll hear how he loved being with his family. He loved being with Tracy and her family.  He loved swimming, going to the beach.  And all the times and memories and fun they had together and what a loving brother and loving person he was and what a compassionate, kind person he was.

He was in crisis the evidence will show, and he needed help.  And instead of getting help, he ended up being killed, and that's why we're here.

67

At the end of the case, I'll have a chance to address you again to go over the evidence with you, the instructions of the judge. Thank you so much.

THE COURT: Thank you, Mr. Galipo.

Mr. Sain, are you prepared to give your opening statement?

MR. SAIN: Yes, Your Honor.

THE COURT: Proceed.

MR. SAIN: Meth kills. But the evidence in this case will show that without airway obstruction, prone restraint does not.

The evidence in this case will show that after terrorizing a neighborhood in broad daylight, intoxicated with five times the toxic amount, potentially fatal amount of meth in his system, Mr. Niedzialek then twice tried to attack Deputy Keeney, that his attacks could only be stopped by the use of a taser device.

That after the deputies tried to deescalate with him, he fought against them, violently resisted their efforts to place him into handcuffs, and that even after he was handcuffed, he continued that resistance until tragically, his meth taxed heart gave out.

The evidence will show that on Monday, July 29th, 2019 at about 2:12 p.m., Deputy Brian Keeney, a 17-year veteran of the Riverside County Sheriff's Department, and

68

Deputy Sonia Gomez, a 13-year veteran also of the same department received the same call, that a man who was bleeding was going around an apartment complex located at 42200 Moraga Road in the city of Temecula, that he was banging on doors, that he was acting erratically, and that the deputies immediately began to suspect that this person might be under the influence of drugs.

So they responded separately to the incident location, heading toward initially Apartment 27A.  That they arrived separately about 2:33 and 2:35 respectively.  And that they encountered a man who matched the subject description, a man identified as Kevin Niedzialek.  He was sitting by Apartment 22D, the apartment of a resident later identified as Eric Morales.  He was crouched down.  He was speaking incoherently.  He was visibly agitated, rapidly speaking, bleeding from his head.

And the evidence will show that on sight of that bleeding head wound, both deputies immediately called for medical aid to come to the scene.  The evidence will show that Deputy Keeney immediately began trying to deescalate the situation, saying things like we're here to help, calm down, stay put, don't get up.  But the evidence will also show that Mr. Niedzialek did not comply with those instructions.

Instead what he did is he got to his feet and advanced quickly toward Deputy Keeney closing to within arm's

69

distance, pausing for a moment and then resuming that charge. The evidence will show that both deputies in that moment believed that Mr. Niedzialek was attacking Deputy Keeney. Both deputies perceived him as a threat of violence.

The evidence will show that in response to that threat, Deputy Gomez pulled out her taser device and used it in probe mode to stop the threat, striking him in the right biceps and just above the right rib.

The evidence will show that this taser device sends a five-second electrical discharge into the skeletal muscles of his body.  The evidence will show that such a tasing sends electricity only to the skeletal muscles, not to the brain, not to the heart, not to the internal organs, not to the lungs.  And that in response to this electrical effect, an effect called neuromuscular incapacitation or NMI, Mr. Niedzialek fell face forward onto the ground as the video evidence will show.

(Video played.)

MR. SAIN:  The evidence will show as you can see for yourselves that after that first taser, Deputy Keeney moved in to try to restrain Mr. Niedzialek because he had just been attacked, because Mr. Niedzialek had just committed a serious crime, assault on a peace officer in violation of Penal Code Section 243.  But that once Deputy Keeney advanced toward Mr. Niedzialek to try to restrain him, Mr. Niedzialek

flipped on his back and began kicking.

So the evidence will show that Deputy Keeney backed away and tried to deescalate; stay down, stop, calm down. The evidence will show that Deputy Gomez gave him additional commands, roll onto your stomach, put your hands behind your back, commands that Mr. Niedzialek never obeyed.

Instead the evidence will show that what he did is despite being told to stay down, despite being told to get onto his stomach, despite being told to put his hands behind his back, what he did instead is he got up, and he attacked Deputy Keeney again forcing Deputy Gomez to deploy a second five-second electrical discharge into his body as the video evidence will show.

The evidence will show that at this point, the deputies had been twice attacked.  They were dealing with a serious crime, and their training said that their priority in that moment was to restrain Mr. Niedzialek and to take him into custody.

Now, the evidence will show that the Riverside County Sheriff's Department has a Training Bureau whose job it is to go out and research best practices, that they look at all kinds of things.  They look at what other agencies are doing.  They look at what the courts have ordered law enforcement to do.  And they also look at medical studies, peer reviewed, verified by other doctors, published medical

studies that have to do with policing.

The evidence will show that the reason they have this bureau is because the Sheriff's Department wants its officers to be the best at what they do, to fulfill their duties, to keep the community safe, to enforce the law and to protect the rights of subjects like Mr. Niedzialek.

The evidence will show that according to the Training Bureau's research, and they train deputies accordingly, when you're confronted with a subject who may be either mentally ill or intoxicated with drugs, if that subject is resistant or combative as Mr. Niedzialek was towards the deputies, your first priority is to make the scene safe.

Your first priority is to render the scene safe by securing the subject because only when the scene is safe can you then bring in help.  You're not gonna bring in paramedics or mental health professionals or anybody else while this subject is still actively resisting, while the subject is still actively a threat because that would be to expose other people to danger.

The evidence will also show that the Riverside County Sheriff's Department Training Bureau in looking at all this research and trying to decide what the best practices were, that what they knew changed over time.

The evidence will show that the term positional

asphyxia was first coined by a doctor named Dr. Bell, and he published a peer-reviewed medical study about the effects of when somebody is so intoxicated, so drunk, so high that they've passed out with their face and mouth buried in a pillow or they've passed out with their neck bent at such a steep angle that their airway is completely closed like a hose being bent in half.

And then a few years later, also in the 1990s, a different doctor named Dr. Donald Reay, R-e-a-y, published a paper.  He was theoretical.  He didn't do any measurements like Dr. Bell had done, didn't do any laboratories studies, but he posited an idea that because of where our diaphragm is on the front of our body -- because the diaphragm helps our lungs suck in air and expel carbon dioxide, Dr. Reay posits this theory that if you put people in a prone position, it might lead to Dr. Bell's positional asphyxia.

So in early 1990s, a lot of law enforcement agencies began warning their officers, their deputies, hey, don't keep people prone for too long because it might lead to positional asphyxia.  Some used the term positional asphyxia.  Some just said it might cause breathing problems.  They all approached it slightly differently.

But here's the part you didn't hear.  Beginning in early 2000s, a set of doctors began testing Dr. Reay's theory starting with laboratory tests where they hooked various

subjects of different ages, different backgrounds, different sizes up to devices to monitor their actual breathing to determine how much oxygen they were getting.

That they had these subjects violently resist the restraint, that they had these subjects handcuffed behind the back, that they had these subjects hogtied with the cuffs connected to their feet.  That they had these subjects with 225 pounds of weight on their upper torso, and after nearly 20 years of these laboratory studies, they found that prone restraint did not impair breathing at all.

You will also receive evidence in this case that these same doctors, Dr. Ted Chan and Dr. Gary Vale, also conducted what is called epidemiological studies. Epidemiology is the study of real world conditions where you look at thousands of real world cases, thousands of people who have been restrained by officers, who have been restrained prone, who have been on drugs, obese or whatever was true in reality.

Thousands of real world cases, and you do a statistical analysis to see if you can find a linkage between the prone restraint and people dying.  And their epidemiological studies also proved that nobody was dying because of the prone restraint.  Unless your airway is obstructed, positional asphyxia does not occur.

Based on these studies, Riverside County Sheriff's

Department Training Bureau with this new information in hand, decades of reliable peer reviewed, verified medical information in hand realized that prone restraint without airway obstruction was safe for the restrained subject.

The evidence will also show that the Riverside County Sheriff's Department consistent with many other departments including it's consistent with the National Policing Standards understand that prone restraint creates a tactical advantage that enhances the safety to the officer and the community.  Why?

Because a person who is on their side can still fight with you.  A person who is on their side or seated can kick at you.  They can head butt you.  Some people who are even handcuffed behind the back, if they're standing up, they're flexible enough to move the cuffs to the side where they could grab keys or they could grab weapons, where they can break the cuffs on an object and get free.

Some people are so flexible, even when handcuffed behind the back, according to officers training and research, they can slide the cuffs around their feet, get the cuffs to the front and use them as a weapon.

And officers are trained to avoid that threat, not because of their own safety, that's a part of it, but because if these dangerous, violent suspects get free, if they're allowed to break out of their restraint, they can get access

to the officers' weapons.  They can take a gun.  They can take a taser.

They can go on a murderous spree if they wanted to unless the officer does what we pay them to do which is to keep us safe by restraining them in a maximum, tactical position of prone.  And the evidence will show that that's what those two deputies did.

The evidence will show that after that second taser, when Mr. Niedzialek fell face forward toward the tree, landing in the ground, his head was turned slightly to the left.  You can hear him in the video.  He's still making verbal noises.

The evidence will show that both deputies then moved in to try to restrain him to put him into handcuffs. Deputy Gomez moved to his right, placing both of her knees on the ground as leverage to get his right arm out from under his body and move it up behind his back for handcuffing. Deputy Keeney moving to his left with one knee on his upper back, somewhere between the mid-back and the left shoulder blade.

But what they left out and what the evidence will show is that from approximately 34 seconds, over half a minute, Kevin Niedzialek was violently resisting their evidence to handcuff him; bucking, kicking, popping his chest up off the ground, rolling, trying to pull his arms free of

their grasp.  34 seconds it took to overcome that resistance and to get him into cuffs.

And here's something you need to understand.  It is an undisputed fact of this case, and their own expert has testified this is true that all of the force I just described, everything that the deputies did from the tasers to the prone restraint to the knee on the back, all the way up to handcuffs, it's undisputed in this case that that force was consistent with standard police practices for the reasonable use of force as the video evidence will support.

(Video played.)

MR. SAIN:  The evidence will show that after being placed in handcuffs, the deputies for a third time called for medical aid to come to the scene.

The evidence will show that consistent with their department training, the deputies determined that because Mr. Niedzialek had been combative with them, had twice tried to attack Deputy Keeney, was violently resisting their efforts, their concern was that he was still a threat.  They had training and experience that people in similar circumstances if not kept prone can get up and attack somebody else.

The evidence will show that the standard you just heard from the other side is not the correct, legal standard. That officers are not trained to move someone into a recovery

position while the suspect is still violently resisting. That would make no sense is what the evidence will show in this case because that would subject both the officers and the community to danger.

So for the next 45 seconds, as Mr. Niedzialek continued his post-handcuffing resistance, they tried to hold him in place.  The evidence will show that the maximum amount of weight they applied during this phase was about 95 pounds. The weight force of about one knee and two sets of hands, a set of hands on the upper arms and hands on the lower arm. Far less than the weight of even one person.

You will hear evidence in this case that explains what positional asphyxia is and how it is different from compressional asphyxia.  That compressional asphyxia -- whereas positional asphyxia is where your body position completely obstructs the airway preventing you from being able to take in air, compressional asphyxia is a different phenomenon.

You will hear evidence from biomechanical expert Swathi Kode, and medical restraint expert, Dr. Ted Chan, who will explain to you that compression asphyxia occurs when there's so much weight on your torso that your chest cavity literally collapses.  And that you're only gonna see compression asphyxia when you see certain kind of injuries, namely cracks on the sides of the ribs, not the front, not

the kind you get with CPR, on the sides, and very importantly, organ damage.

Because for compressional asphyxia to happen, typically, you need more than 500 pounds of weight force to crush that chest cavity.  And here's how you know that did not happen here.  Not only was there no cracks to the sides of the ribs, but Mr. Niedzialek's heart and lungs were in such perfect condition that they were okay to donate, and they're keeping somebody else alive as we speak.

The evidence will show that the deputies had been trained that when you have a subject that's that combative, that resistant, that noncompliant with commands, even when they stop resisting, you want to monitor them because they may be playing a ruse on you.  They may be playing possum. And you want to make sure that they do not get back into a position where they can attack you again or they can threaten the community again.

So then after approximately 45 seconds of post-cuffing resistance, the evidence will show that Mr. Niedzialek finally stops moving but because he had been violent for so long, so hard, because he had attacked the deputy twice, because he had not complied with any commands, the deputies were concerned that he might be playing possum, and so they kept him in the same position.

For the next roughly one minute and 46 seconds,

nobody really changes position, but consistent with their training, and you can see it in the video, they continue to monitor Mr. Niedzialek's safety.  They continue to monitor his breathing.  They can feel the rise and fall of his chest.  They could hear his breathing because according to their training, protecting his safety was important to them as the video evidence will show for us.

(Video played.)

MR. SAIN:  Approximately 1 minute and 46 seconds after the resistance stops, Deputy Keeney finally begins to suspect that perhaps Mr. Niedzialek is not playing possum, maybe the knee can come off.  So the last time that Mr. Niedzialek ever has a knee on his back is about the 9-minute and 50 second mark.  And after that point in time, the only weight force that Mr. Niedzialek has on his back is two sets of hands, less than 20 pounds.

The two deputies during that period of time after the last knee continue to monitor his breathing.  You can see in the video their hands and rise and fall as his chest takes in air and lets it back out.  You can hear in the video that he was breathing, and both of them could see and hear and feel that he was still breathing.

Then approximately 2 minutes and 9 seconds after that last knee comes off for the last time, something changes.  Deputy Keeney believes that Mr. Niedzialek is

becoming too still, too quiet.  They start trying to talk to Mr. Niedzialek.  Deputy Gomez is asking him questions mistakenly thinking that his name is Eric.  Deputy Keeney starts looking at his face which is turned toward Deputy Keeney.

And within ten seconds of this check, within ten seconds of either deputy first beginning to even suspect that there might be a medical problem, a life threatening medical problem, they flip Mr. Niedzialek from prone to on his back supine.  Ten seconds after they suspect a problem for the very first time, they flip him prone -- excuse me, from prone to supine as the evidence and the video will support.

(Video played.)

MR. SAIN:  Within ten seconds of first detecting there was a problem, they flipped him from prone to supine to check him.  Initially, Deputy Gomez was unable to feel a pulse, but then when she rechecked him, she could feel a pulse.  It was low and faint.  But there are contentions in this case that maybe she was feeling her own pulse, but she will tell you that at that time, her heart was beating not slow and faint, but strong and steady, if not fast.

The evidence will show that according to deputies' training, at this point, they did not perceive that Mr. Niedzialek was experiencing a medical emergency.  They flipped him.  They heard what sounded like a breath after

they flipped him.  They checked his pulse.  He appeared to have a pulse.

According to their training, you're not gonna start CPR.  You're not gonna start emergency life saving measures on someone whose heart is beating.  And they already knew Deputy Beauman had arrived about two minutes earlier.  They could hear sirens on the way.  They knew that paramedics with advance life saving training were on the way.  So they waited.

About two minutes after this point, the paramedics finally arrive on the scene.  You will hear the testimony of paramedic Lisa LaRusso who told the deputies for the very first time alerting them that Mr. Niedzialek was not breathing.  That before she said that, they never knew that. And that as soon as she was told, as soon as she told them that, as soon as the paramedics said get in there, Deputy Keeney rushed in and started doing CPR because the evidence will show that he did not want Mr. Niedzialek to die.  He was trying to help Mr. Niedzialek.

However, tragically, Mr. Niedzialek did die.  And after an autopsy exam, the cause of death was found to be acute methamphetamine toxicity.

Now, you've heard some commentary about how it wasn't the drugs, it was asphyxia, but support of that commentary is based on the testimony of Michael Freeman.

Michael Freeman you will hear is not a licensed doctor in his home state of Oregon.  Michael Freeman is not a licensed doctor here in California.  Michael Freeman is not a licensed doctor anywhere in America.

The evidence will show that in the medical field, there are specialties of medicine that licensed doctors can become specialists in.  You can become a specialist in toxicology, the study of how drugs and other toxins affect our body and can cause death.  You could become a specialist in things like cardiology, the study of how the heart works.

And you could become a specialist in the field called forensic pathology.  Forensic pathology is a medical specialty for medical examiners, for people whose job it is to determine cause of death.

But the evidence will show that Michael Freeman is not board certified in toxicology.  He's not board certified in forensic pathology.  He's not board certified in anything.  He's never done an autopsy by himself in his life.  He's never done any kind of lab studies about the effect of restraint on human beings.  None.

They also offer the testimony of Dr. Dan Wohlgelernter, a cardiologist.  But he will tell you that he's not a forensic pathologist either.  His job isn't determining cause of death.  His job is treating living patients.  He's only had to deal with cause of death in maybe

one percent of his cases he says.  And the idea that pulseless electrical activity is only associated with asphyxia is not supported by the medical science.

In addition, by the time that that PEA is measured, that is several minutes after Mr. Niedzialek had been flipped from prone to supine.  In other words, we don't know what his heart rate was, what heart rhythm he had at that point.  And other heart rhythms often deteriorate into PEA without asphyxia being involved.

Now, the evidence will show that there is exactly one board certified forensic pathologist who actually examined Mr. Niedzialek's body who actually autopsied his body, and that he specifically looked for the forensic signs consistent with asphyxia.  He looked for the oxygen deprivation to the brain called a fatal anoxic brain injury. He found none.  He looked for the breakages in the blood vessels, these hemorrhages called petechiae.  He found none.

He reviewed the instant video, the one you just saw, to see if maybe something the deputies had done had caused this death.  And you know what he testified?  He excluded any asphyxia from playing any causal role in this death.  None.  In fact, after reviewing the incident video and looking at the forensic evidence himself, he has testified that the deputy restraint played no proximal causal role in the death here.

You will hear testimony from Dr. Michael Graham, an independent forensic pathologist from Missouri who came in and looked at the forensic slides, looked at lab slides, looked at the testimony of every witness, looked at the video, and Dr. Graham will explain to you that there's a debate in forensic pathology about manner of death.

That some pathologists like Dr. Fajardo believe that if a subject dies or goes into cardiac arrest when people are present, especially when those people are touching the person, for transparency purposes, you should label that matter of death as a homicide even if you don't think the people actually caused the death.

But you'll hear from Dr. Graham who comes from a different school who believes that you should not label a manner of death as a homicide unless you found causation. And since both Dr. Graham and Dr. Fajardo agree that nothing the deputies did was a proximate cause of Mr. Niedzialek's death, Dr. Graham will tell you this should have been labeled as an accident because the true cause of death here was meth.

You will hear the testimony of Dr. Rich Clark, a toxicologist board certified, who will explain to you that by itself, meth was not enough to kill Mr. Niedzialek, but that he had over five times the minimum fatal toxic amount of meth in his system, and combined with Mr. Niedzialek's resistance, his exertion, that those two things combined caused the death

here.  Meth plus resistance caused the death here.

The evidence will also show that contrary to the contentions of some, there is no national standard that orders police officers that as soon as you are in handcuffs, you must be moved out of the prone position.  That would be self defeating.  That would be dangerous.

What officers are trained is that you should move them out of that position (A) when it's safe to do so and (B) if you observe what you perceive as a life threatening medical emergency, neither of which apply to what these deputies saw.

The evidence will show, and you will hear from Robert Fonzi, the former undersheriff, the former number two guy at the San Bernardino County Sheriff's Department, an agency with ten times the number of officers that Mr. Noble supervised, an agency with ten times the population to law enforcement to patrol, an officer who has terminated officers who he found to use excessive force, and he will tell you that the standard that Chief Noble is putting out there is not true.

He will tell you that according to the real standard for law enforcement, the real standard for policing in terms of restraint, in terms of use of force, according to the real standards, these deputies acted consistently with national policing standards.

He will tell you that he reviewed the department's training and policies, and that they were also consistent with national policing standards because contrary to the idea that Riverside County Sheriff's Department was deliberately indifferent to preserving the constitutional rights and the life of Kevin Niedzialek, contrary to the idea that they consciously disregarded risk, they did the opposite.

They did research based on science to figure out what the best thing to do was to keep the community safe, to keep the officers safe and to keep even the subjects safe.

And because of that, ladies and gentlemen, because according to the national policing standards, because according to the evidence, what these two deputies did was reasonable under standard police standards, because what they did was appropriate under the totality of the circumstances known to them, we will be asking you to render a defense verdict.

Thank you.

THE COURT:  Thank you, Mr. Sain.

Ladies and gentlemen, we will now recess for the day.  I ask you to return tomorrow morning at 8:45 so we can begin promptly.

Remember that we cannot start until all of you are here so be considerate of each other, the time of the attorneys and the parties and myself and staff and try to be

on time so we can start on time.  If for some reason you are not able to be here on time, I believe Mr. Galvez has given you a phone number that you can call to alert us to what your estimated arrival time will be.

Until tomorrow morning at 8:45, please do not talk about this case with anybody, don't let anybody else talk to you about this case, do not in any way try to learn about this case, and keep an open mind until the conclusion of the case.

Have a good evening.  We'll see you back here tomorrow morning at 8:45 a.m.

THE CLERK:  All rise for the jury.

(Jury not present.)

THE COURT:  Is there any issue to take up before tomorrow morning?

MR. GALIPO:  I don't believe so.  The only one issue, we don't have to take it up now, but maybe the Court could think about it.  I explained to Mr. Sain that we were considering calling Dr. Michael Freeman as a rebuttal expert because he wrote a rebuttal report.  He was designated initially, but also wrote a rebuttal report including his disagreements with the four defense medical experts.

Mr. Sain was of the mind frame we can't call him as a rebuttal expert, only in our case-in-chief.  I'm not so sure that's accurate.  We don't have to decide it now, but

88

maybe we can discuss it tomorrow or just wanted to the raise the issue.

THE COURT:  Very well.  So generally, I prefer calling a witness once and having it all be out there.

MR. GALIPO:  I was only gonna call him once in rebuttal.  That was my plan.

THE COURT:  So we'll talk about it if we need to talk about it tomorrow or the day after.

So any issues from the defendants?

MR. SAIN:  Just briefly on that issue, Your Honor, Mr. Galipo succinctly summarized our position.  We don't think that that's appropriate.  They designated him as an initial expert.  Uh, they designated him and they listed him on their witness list as being a witness in their case-in-chief.  We don't believe that this kind of sandbagging is appropriate, but we will respect the Judge's decision.

THE COURT:  Very well.  Thank you.

See you tomorrow morning.

THE CLERK:  This court stands in recess.

(Proceedings were concluded 4:56 p.m.)

UNITED STATES DISTRICT COURT

CERTIFICATE OF REPORTER

COUNTY OF LOS ANGELES      )

                           )  SS.

STATE OF CALIFORNIA        )


I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION OF MY STENOGRAPHIC NOTES.



DATE:  MARCH 28, 2023


     /s/  LAURA MILLER ELIAS
LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER

**'**

'em [1] - 57:19

**/**

/s [1] - 89:20

**1**

1 [5] - 38:3, 40:13, 40:22, 43:14, 79:9
10 [7] - 8:19, 11:14, 18:1, 22:19, 30:24, 34:5, 34:6
100 [1] - 14:10
10019 [2] - 1:22, 89:21
11 [6] - 8:21, 12:6, 18:3, 22:24, 31:13, 34:24
12 [9] - 8:7, 8:23, 12:8, 18:5, 23:1, 25:19, 25:20, 31:15, 35:1
128 [1] - 2:10
13 [7] - 8:25, 12:17, 18:7, 23:3, 25:20, 31:22, 35:3
13-year [1] - 68:1
14 [9] - 9:2, 12:19, 18:9, 23:5, 25:19, 25:20, 25:22, 31:24, 35:5
1400 [1] - 54:15
15 [8] - 9:4, 12:21, 18:11, 25:14, 25:23, 28:22, 32:1, 35:7
16 [7] - 9:6, 13:19, 18:13, 25:16, 25:24, 32:3, 35:9
17 [6] - 9:8, 13:21, 18:15, 25:24, 32:5, 35:11
17-year [1] - 67:24
18 [7] - 9:10, 13:23, 18:17, 25:24, 29:4, 32:7, 35:13
19 [6] - 9:12, 13:25, 18:19, 25:25, 32:9, 35:15
19-2083-JBG [1] - 4:4
19-2083-JGB [1] - 1:9
1990s [2] - 72:8, 72:17
1:47 [1] - 4:1

**2**

2 [6] - 34:2, 38:7, 40:14, 41:4, 43:16, 79:23
20 [5] - 17:13, 17:14,

29:25, 73:9, 79:16
2000s [1] - 72:24
2007 [1] - 10:24
2011 [1] - 11:7
2019 [4] - 38:3, 38:13, 51:16, 67:24
2023 [3] - 1:16, 4:1, 89:18
213 [1] - 1:24
21800 [1] - 2:6
22D [1] - 68:13
225 [1] - 73:8
243 [1] - 69:24
27A [1] - 68:9
28 [3] - 1:16, 4:1, 89:18
29th [3] - 38:3, 51:16, 67:23
2:12 [1] - 67:24
2:30 [1] - 52:7
2:33 [1] - 68:10
2:35 [1] - 68:10

**3**

3 [7] - 4:25, 9:19, 9:25, 38:9, 40:15, 41:9, 43:17
305 [1] - 2:14
30th [1] - 38:13
310 [1] - 2:6
32 [1] - 33:8
33 [1] - 28:17
34 [5] - 51:18, 64:24, 75:22, 76:1
35 [1] - 17:16
350 [1] - 1:23
36 [2] - 3:7, 28:17
37 [1] - 28:17
38 [1] - 29:11
39 [1] - 33:8

**4**

4 [5] - 3:5, 38:13, 40:16, 41:16, 43:18
4000 [1] - 2:20
40TH [1] - 2:13
42200 [1] - 68:4
4455 [1] - 1:23
45 [5] - 50:11, 50:12, 50:18, 77:5, 78:18
46 [2] - 78:25, 79:9
4:56 [1] - 88:21

**5**

5 [5] - 6:10, 32:22, 33:1, 38:16, 43:20
50 [1] - 79:14

500 [1] - 78:4
51 [1] - 3:9
52 [1] - 33:24
5TH [1] - 2:20

**6**

6 [6] - 5:15, 6:2, 7:12, 14:8, 17:7, 43:21
633 [1] - 2:20
644 [1] - 2:13
67 [1] - 3:10

**7**

7 [1] - 43:23

**8**

8 [6] - 19:14, 20:14, 26:14, 27:19, 28:8, 43:25
894-0374 [1] - 1:24
8:45 [3] - 86:21, 87:5, 87:11

**9**

9 [14] - 8:16, 11:11, 17:23, 21:5, 21:6, 22:4, 22:17, 30:1, 30:2, 30:22, 34:3, 34:4, 79:23
9-minute [1] - 79:14
90012 [1] - 1:23
90071 [1] - 2:21
911 [2] - 52:8, 52:13
91103 [1] - 2:10
91367 [1] - 2:7
94609 [1] - 2:14
95 [1] - 77:8
9:00 [1] - 50:15

**A**

a.m [1] - 87:11
ability [5] - 5:12, 39:2, 43:14, 57:10, 57:23
able [9] - 6:1, 14:11, 16:18, 19:25, 53:20, 56:10, 58:8, 77:17, 87:2
absent [1] - 58:17
absolutely [2] - 21:23, 34:23
abuse [2] - 26:3, 27:11
accept [5] - 28:2, 32:16, 35:23, 40:16, 44:14
access [1] - 74:25

accident [2] - 63:8, 84:19
according [9] - 71:7, 74:19, 79:5, 80:22, 81:3, 85:21, 85:23, 86:12, 86:13
accordingly [1] - 71:9
account [1] - 43:13
accountable [1] - 26:17
accounts [1] - 46:17
accuracy [1] - 47:12
accurate [1] - 87:25
acidosis [1] - 64:3
acknowledge [1] - 13:15
acted [4] - 38:18, 38:25, 39:20, 85:24
acting [3] - 38:7, 38:9, 68:5
action [1] - 38:22
activated [1] - 53:20
actively [2] - 71:18, 71:19
activity [2] - 62:12, 83:2
acts [1] - 39:4
actual [1] - 73:2
acute [1] - 81:22
addition [3] - 26:14, 41:11, 83:4
additional [3] - 15:17, 15:19, 70:4
address [1] - 67:2
adequate [1] - 56:14
administration [1] - 22:11
admitted [1] - 41:12
admitting [1] - 24:7
adults [2] - 10:11, 28:19
advance [1] - 81:8
advanced [2] - 68:25, 69:24
advantage [1] - 74:9
AECON [1] - 28:19
Aerospace [1] - 10:18
aerospace [1] - 33:21
affect [2] - 65:15, 82:8
afternoon [16] - 4:7, 4:10, 4:11, 4:16, 7:13, 7:14, 10:1, 10:2, 17:8, 28:9, 33:2, 33:3, 38:3, 50:25, 51:6, 52:7
agencies [3] - 58:4, 70:22, 72:18
agency [4] - 23:25, 25:7, 85:15, 85:16
agenda [1] - 15:10

ages [1] - 73:1
agitated [4] - 53:16, 56:21, 59:19, 68:15
ago [3] - 11:23, 17:16, 28:22
agonal [3] - 60:8, 60:9, 60:11
agree [7] - 14:25, 19:8, 20:3, 37:16, 50:2, 50:7, 84:16
agreed [3] - 37:25, 40:15, 63:10
aid [2] - 68:19, 76:14
AIDED [1] - 89:13
air [4] - 29:21, 72:14, 77:17, 79:20
Air [1] - 17:14
airplanes [2] - 10:21, 33:22
airway [5] - 67:10, 72:6, 73:23, 74:4, 77:16
AL [1] - 1:9
al [1] - 4:5
alert [1] - 87:3
alerting [1] - 81:13
alive [1] - 78:9
alleged [1] - 39:12
alleviate [1] - 57:12
allow [3] - 15:16, 45:13, 66:2
allowed [1] - 74:25
almost [5] - 52:23, 52:24, 59:11, 59:24, 65:22
Altrix [1] - 10:11
Alves [4] - 4:5, 38:22, 51:22, 66:16
ALVES [1] - 1:6
America [1] - 82:4
AMERICA [1] - 1:1
amount [6] - 62:21, 62:22, 67:14, 77:7, 84:23
analysis [1] - 73:20
analyst [1] - 10:6
AND [4] - 89:8, 89:11, 89:13, 89:14
ANGELES [4] - 1:23, 2:21, 4:1, 89:4
Angeles [2] - 11:16, 11:18
angle [1] - 72:6
Ann [2] - 7:11, 7:17
anoxic [1] - 83:15
answer [19] - 7:16, 8:17, 10:3, 11:12, 12:6, 12:17, 13:18, 17:9, 17:24, 20:18, 21:6, 25:13, 28:11,

30:2, 30:24, 33:4, 34:3, 34:24, 42:13
**answered** [2] - 25:19, 27:8
**answers** [4] - 22:3, 22:17, 22:18, 30:21
**anti** [8] - 6:14, 6:16, 14:13, 15:11, 16:3, 19:21, 19:22, 26:16
**anti-police** [8] - 6:14, 6:16, 14:13, 15:11, 16:3, 19:21, 19:22, 26:16
**anyplace** [2] - 46:25, 47:2
**apartment** [5] - 51:17, 53:9, 53:10, 68:3, 68:13
**Apartment** [2] - 68:9, 68:13
**apologize** [1] - 11:3
**apparent** [1] - 53:4
**APPEARANCES** [1] - 2:1
**Appearances** [1] - 50:24
**appearances** [1] - 4:6
**appeared** [2] - 26:19, 81:1
**application** [2] - 45:18, 63:3
**applications** [1] - 45:21
**applied** [1] - 77:8
**applies** [3] - 45:8, 45:24, 46:1
**apply** [4] - 37:8, 37:14, 40:10, 85:10
**applying** [1] - 59:3
**approach** [7] - 4:17, 4:19, 14:4, 19:15, 19:17, 26:10, 27:21
**approached** [6] - 46:7, 54:2, 54:5, 54:21, 54:22, 72:22
**approaches** [1] - 46:10
**appropriate** [9] - 15:20, 27:4, 49:21, 56:12, 57:14, 64:13, 86:15, 88:12, 88:16
**area** [1] - 53:11
**areas** [1] - 64:16
**argue** [1] - 62:16
**arguments** [3] - 40:22, 40:24, 48:24
**arm** [2] - 75:16, 77:10
**arm's** [1] - 68:25
**arms** [2] - 75:25, 77:10
**arrest** [5] - 24:7, 39:2,

60:9, 65:9, 84:8
**arrival** [1] - 87:4
**arrive** [1] - 81:11
**arrived** [3] - 52:14, 68:10, 81:6
**arts** [3] - 28:16, 30:5, 30:8
**aside** [10] - 5:7, 5:10, 5:12, 14:12, 14:13, 15:5, 19:25, 22:21, 26:21, 27:14
**asleep** [2] - 59:16, 59:17
**aspect** [1] - 30:20
**asphyxia** [26] - 57:17, 60:14, 60:15, 61:3, 61:17, 63:25, 72:1, 72:16, 72:20, 73:24, 77:13, 77:14, 77:15, 77:17, 77:21, 77:24, 78:3, 81:24, 83:3, 83:9, 83:14, 83:21
**asphyxiated** [1] - 64:7
**asphyxiation** [1] - 60:10
**assault** [1] - 69:23
**asserts** [1] - 39:4
**assess** [1] - 66:3
**assigned** [2] - 52:17, 52:18
**assist** [1] - 48:10
**associated** [3] - 34:11, 54:18, 83:2
**Associates** [1] - 11:4
**Association** [1] - 61:13
**association** [4] - 21:17, 22:13, 22:14, 30:16
**associations** [2] - 12:3, 31:10
**assumption's** [1] - 23:11
**assure** [1] - 51:11
**astyphia** [1] - 62:13
**AT** [1] - 89:11
**AT&T** [1] - 17:11
**attack** [4] - 67:15, 76:18, 76:21, 78:16
**attacked** [4] - 69:22, 70:10, 70:15, 78:21
**attacking** [1] - 69:3
**attacks** [1] - 67:16
**attention** [8] - 44:20, 53:5, 55:12, 55:15, 55:18, 55:23, 56:8, 65:5
**attorney** [1] - 43:4
**attorneys** [7] - 18:24, 26:2, 37:1, 41:5,

42:22, 48:23, 86:25
**audience** [1] - 36:4
**audio** [1] - 58:22
**automatically** [1] - 15:1
**autopsied** [1] - 83:12
**autopsy** [2] - 81:21, 82:18
**AVENUE** [1] - 2:10
**avoid** [2] - 42:25, 74:22
**aware** [2] - 58:5, 59:23

## B

**Bachelor's** [3] - 20:22, 21:3, 21:4
**backed** [1] - 70:2
**background** [2] - 11:2, 28:13
**backgrounds** [1] - 73:1
**backup** [1] - 52:18
**bad** [2] - 66:11, 66:14
**BAKKEN** [1] - 2:19
**Bakken** [1] - 4:13
**banging** [1] - 68:5
**bar** [9] - 4:20, 7:6, 14:6, 15:25, 19:18, 20:10, 26:12, 27:16, 42:22
**Basak** [2] - 7:2, 7:7
**base** [2] - 27:7, 40:6
**based** [11] - 13:14, 14:24, 26:6, 27:13, 39:18, 45:5, 45:6, 47:19, 73:25, 81:25, 86:8
**bases** [1] - 5:15
**basis** [3] - 14:20, 15:22, 21:14
**battled** [1] - 51:19
**beach** [1] - 66:20
**bear** [4] - 43:25, 54:4, 57:18, 58:23
**beaten** [1] - 52:10
**beating** [2] - 80:20, 81:5
**Beauman** [1] - 81:6
**become** [4] - 82:7, 82:9, 82:11
**becoming** [1] - 80:1
**began** [5] - 68:6, 68:20, 70:1, 72:18, 72:24
**begin** [1] - 86:22
**beginning** [2] - 72:23, 80:7
**begins** [1] - 79:10
**BEHALF** [2] - 2:3, 2:17

**behalf** [4] - 4:9, 4:12, 4:13, 38:23
**behind** [10] - 5:1, 5:18, 36:12, 56:3, 70:5, 70:9, 73:5, 74:14, 74:19, 75:17
**beings** [1] - 82:20
**beliefs** [1] - 26:3
**believability** [1] - 43:25
**believable** [1] - 44:18
**believes** [5] - 19:23, 60:2, 60:3, 79:25, 84:14
**bell** [2] - 72:1, 72:11
**bell's** [1] - 72:16
**beloved** [1] - 66:16
**bent** [2] - 72:5, 72:7
**BERNAL** [1] - 1:4
**Bernardino** [2] - 31:1, 85:14
**best** [7] - 31:2, 51:13, 62:6, 70:21, 71:4, 71:23, 86:9
**between** [4] - 42:1, 52:2, 73:20, 75:19
**beyond** [2] - 5:20, 23:12
**Bianco** [8] - 4:15, 38:16, 39:12, 56:14, 61:14, 61:17, 63:12, 64:10
**bias** [6] - 4:25, 6:13, 6:14, 6:17, 19:21, 43:20
**biased** [5] - 5:16, 6:7, 14:10, 16:5, 16:15
**biases** [2] - 5:10, 14:12
**biceps** [1] - 69:8
**big** [1] - 61:25
**biomechanical** [1] - 77:19
**BISGAARD** [1] - 2:18
**bit** [3] - 51:9, 53:1, 58:12
**blade** [1] - 75:20
**bleeding** [7] - 52:8, 52:25, 53:6, 55:17, 68:3, 68:16, 68:18
**blog** [1] - 45:18
**blood** [3] - 53:7, 53:10, 83:16
**board** [5] - 82:16, 82:17, 83:11, 84:21
**body** [17] - 53:8, 53:19, 53:22, 54:13, 54:20, 55:13, 62:2, 64:1, 64:4, 69:11, 70:12, 72:13, 75:17,

77:15, 82:9, 83:12, 83:13
**Boeing** [2] - 10:6, 10:14
**bother** [1] - 25:1
**bottoms** [1] - 54:3
**BOULEVARD** [1] - 2:6
**brace** [1] - 55:7
**brain** [8] - 38:14, 39:3, 62:8, 62:9, 64:3, 69:12, 83:15
**break** [7] - 14:15, 15:9, 15:10, 36:23, 49:3, 74:17, 74:25
**breakages** [1] - 83:16
**breath** [1] - 80:25
**breathe** [10] - 39:2, 57:10, 57:24, 58:9, 58:15, 58:16, 58:24, 60:12, 64:5, 66:2
**breathing** [18] - 58:7, 59:22, 59:25, 60:7, 60:11, 62:3, 65:15, 66:4, 72:21, 73:2, 73:10, 79:4, 79:5, 79:18, 79:21, 79:22, 81:14
**breaths** [2] - 60:8, 60:9
**Brian** [4] - 38:4, 39:19, 52:18, 67:24
**brief** [1] - 38:21
**briefly** [1] - 88:10
**bring** [4] - 26:13, 50:9, 71:16
**brings** [1] - 38:22
**BRISBOIS** [1] - 2:18
**broad** [1] - 67:13
**brother** [6] - 5:20, 38:23, 64:20, 64:22, 66:16, 66:21
**brother-in-law** [1] - 5:20
**brutality** [3] - 6:15, 14:21, 16:15
**bucking** [1] - 75:24
**building** [1] - 64:4
**BURBANK** [1] - 2:6
**burden** [4] - 5:2, 5:19, 39:16, 40:2
**Bureau** [3] - 70:20, 71:22, 74:1
**bureau** [1] - 71:3
**Bureau's** [1] - 71:8
**buried** [1] - 72:4
**BURTON** [2] - 2:8, 2:9
**Burton** [3] - 4:8, 56:24, 63:21
**bury** [1] - 52:4
**business** [1] - 7:18

**butt** [1] - 74:13
**button** [1] - 55:2
**BY** [7] - 2:5, 2:9, 2:12, 2:19, 3:9, 3:10, 89:13

**C**

**CA** [4] - 2:7, 2:10, 2:14, 2:21
**California** [2] - 24:14, 82:3
**CALIFORNIA** [6] - 1:2, 1:17, 1:23, 4:1, 89:6, 89:9
**calm** [3] - 60:21, 68:21, 70:3
**camera** [3] - 53:19, 53:22, 62:2
**cancer** [1] - 52:1
**cannot** [4] - 14:21, 26:23, 42:11, 86:23
**capacity** [2] - 22:8, 30:5
**captain** [1] - 31:1
**car** [2] - 23:10, 24:16
**carbon** [1] - 72:14
**cardiac** [5] - 39:2, 60:9, 62:10, 65:9, 84:8
**cardiologist** [2] - 63:23, 82:22
**cardiology** [1] - 82:10
**case** [94] - 5:23, 6:21, 12:24, 14:11, 14:23, 14:24, 16:9, 16:16, 20:24, 20:25, 21:19, 21:22, 22:15, 25:9, 26:5, 26:6, 26:15, 27:7, 27:12, 27:13, 28:24, 30:17, 31:11, 34:22, 36:18, 36:21, 37:4, 37:10, 37:14, 37:19, 40:8, 41:18, 42:18, 43:6, 43:8, 43:19, 44:22, 45:4, 45:5, 45:6, 45:7, 45:9, 45:11, 45:14, 45:15, 45:25, 46:1, 46:5, 46:8, 46:11, 46:18, 46:24, 46:25, 47:3, 47:6, 47:7, 47:10, 47:19, 48:6, 49:2, 49:8, 49:9, 50:23, 51:9, 51:14, 51:23, 53:21, 56:9, 56:23, 58:19, 61:25, 62:11, 63:13, 63:19, 65:21, 66:12, 67:1, 67:10, 67:12, 73:11,

76:4, 76:8, 77:3, 77:12, 80:19, 87:6, 87:7, 87:8, 87:9, 87:24, 88:15
**Case** [1] - 4:4
**CASE** [1] - 1:8
**case-in-chief** [2] - 87:24, 88:15
**cases** [3] - 73:15, 73:19, 83:1
**categories** [1] - 63:7
**causal** [2] - 83:21, 83:24
**causation** [1] - 84:15
**caused** [4] - 83:20, 84:12, 84:25, 85:1
**causes** [1] - 63:7
**causing** [2] - 39:2, 57:13
**cavity** [2] - 77:22, 78:5
**Center** [1] - 38:14
**CENTRAL** [2] - 1:2, 89:9
**certain** [7] - 15:1, 37:25, 40:19, 41:13, 42:15, 42:24, 77:24
**CERTIFICATE** [1] - 89:2
**certified** [5] - 82:16, 82:17, 83:11, 84:21
**CERTIFY** [2] - 89:10, 89:14
**cetera** [1] - 56:6
**Chad** [5] - 4:15, 38:16, 39:12, 56:14, 64:10
**challenge** [16] - 4:24, 5:14, 5:16, 9:15, 14:3, 15:2, 15:18, 16:23, 16:24, 18:22, 26:9, 26:13, 27:15, 32:12, 32:18, 35:18
**challenges** [3] - 4:23, 6:9, 6:23
**Chan** [3] - 65:12, 73:12, 77:20
**chance** [2] - 20:6, 67:1
**changed** [1] - 71:24
**changes** [2] - 79:1, 79:25
**characterized** [1] - 6:15
**charge** [1] - 69:1
**charity** [2] - 12:9, 12:10
**chat** [1] - 45:17
**check** [4] - 66:4, 80:6, 80:16
**checked** [2] - 55:14, 81:1
**chest** [29] - 55:5, 55:6,

55:10, 55:24, 56:7, 56:17, 56:18, 57:5, 57:8, 57:15, 57:20, 57:22, 58:5, 58:6, 58:25, 59:8, 59:10, 59:11, 61:7, 61:8, 61:16, 61:23, 65:22, 66:6, 75:24, 77:22, 78:5, 79:4, 79:19
**Chief** [1] - 85:19
**chief** [2] - 87:24, 88:15
**Chiefs** [1] - 61:13
**children** [9] - 7:20, 10:7, 12:10, 12:16, 17:15, 20:23, 28:17, 64:20
**choose** [1] - 44:11
**circuit** [2] - 54:12, 55:2
**circumstances** [4] - 39:21, 60:6, 76:21, 86:15
**circumstantial** [3] - 41:19, 41:22, 42:2
**city** [1] - 68:4
**civil** [4] - 17:18, 20:24, 28:23, 37:8
**civilians** [1] - 49:25
**claim** [2] - 40:2, 40:4
**claims** [3] - 15:13, 39:16, 39:17
**Clark** [2] - 62:20, 84:20
**clean** [1] - 51:20
**clear** [4] - 6:4, 6:12, 53:12, 55:15
**CLERK** [13] - 4:3, 7:11, 9:24, 17:6, 19:14, 20:13, 28:7, 32:25, 36:1, 49:11, 50:21, 87:12, 88:20
**clients** [1] - 41:5
**close** [6] - 21:7, 21:18, 22:22, 34:11, 44:20, 64:23
**closed** [1] - 72:6
**closing** [3] - 40:24, 48:24, 68:25
**Code** [1] - 69:24
**coined** [1] - 72:1
**Coleman** [3] - 5:7, 7:3, 9:20
**collapses** [1] - 77:23
**college** [2] - 17:12, 28:14
**colon** [1] - 52:1
**color** [2] - 38:8, 38:18
**combative** [3] - 71:11, 76:17, 78:11
**combined** [2] - 84:24,

84:25
**comfortable** [1] - 20:4
**commands** [4] - 70:5, 70:6, 78:12, 78:22
**commentary** [3] - 46:18, 81:23, 81:25
**comments** [1] - 15:1
**committed** [1] - 69:22
**communicate** [2] - 45:12, 45:13
**communicating** [2] - 45:24, 46:1
**communications** [1] - 47:15
**community** [5] - 71:5, 74:10, 77:4, 78:17, 86:9
**comp** [4] - 7:19, 8:7, 8:8, 8:12
**Company** [1] - 10:6
**company** [3] - 10:11, 10:18, 29:21
**compassionate** [1] - 66:22
**completed** [1] - 45:3
**completely** [2] - 72:6, 77:16
**complex** [2] - 51:17, 68:3
**complications** [1] - 57:11
**complied** [1] - 78:22
**comply** [1] - 68:23
**composite** [2] - 33:8, 33:20
**compression** [2] - 77:21, 77:24
**compressional** [4] - 77:14, 77:17, 78:3
**compromise** [1] - 50:7
**Computer** [1] - 11:4
**COMPUTER** [1] - 89:13
**computer** [1] - 45:16
**COMPUTER-AIDED** [1] - 89:13
**concede** [2] - 59:3, 60:7
**conceded** [3] - 59:4, 63:2, 63:4
**concern** [1] - 76:19
**concerned** [1] - 78:23
**concerning** [1] - 15:9
**concluded** [5] - 7:6, 15:25, 20:10, 27:16, 88:21
**concludes** [1] - 36:5
**conclusion** [1] - 87:8
**condition** [3] - 63:3, 65:3, 78:8

**conditioning** [1] - 29:21
**conditions** [1] - 73:14
**conduct** [2] - 39:14, 44:25
**conducted** [2] - 14:9, 73:13
**conference** [2] - 43:4, 43:5
**conferences** [2] - 42:23, 43:3
**confident** [1] - 34:21
**configuration** [1] - 10:6
**confronted** [1] - 71:9
**confused** [1] - 14:18
**confusion** [1] - 43:1
**congratulations** [1] - 10:9
**connected** [1] - 73:7
**consciously** [1] - 86:7
**consider** [9] - 40:11, 40:18, 40:20, 41:14, 41:25, 42:18, 43:5, 44:6, 46:16
**considerate** [1] - 86:24
**considered** [2] - 41:11, 41:13
**considering** [2] - 43:12, 87:19
**consistent** [9] - 44:2, 62:13, 74:6, 74:7, 76:9, 76:15, 79:1, 83:14, 86:2
**consistently** [1] - 85:24
**consists** [1] - 40:12
**constituted** [2] - 32:16, 35:24
**constitutes** [1] - 6:17
**constitutional** [3] - 19:24, 39:13, 86:5
**consulting** [1] - 46:21
**contact** [3] - 21:23, 30:3, 46:12
**contend** [1] - 39:18
**contends** [3] - 38:24, 39:8, 39:11
**content** [1] - 46:10
**contentions** [2] - 80:18, 85:3
**continue** [3] - 79:2, 79:3, 79:18
**continued** [2] - 67:21, 77:6
**contradicted** [1] - 43:21
**contradiction** [1] - 15:16

**contrary** [6] - 6:11, 61:9, 62:18, 85:2, 86:3, 86:6
**contributing** [1] - 63:5
**control** [2] - 33:10, 42:4
**controls** [1] - 41:3
**Corona** [1] - 10:7
**Coroner** [3] - 38:16, 39:12, 63:11
**corporation** [1] - 28:19
**correct** [4] - 25:23, 29:16, 29:17, 76:24
**CORRECT** [1] - 89:14
**COUNSEL** [1] - 2:1
**counsel** [4] - 4:6, 27:21, 48:19, 48:20
**counselor** [1] - 65:1
**country** [2] - 57:2, 61:11
**County** [26] - 4:5, 11:16, 11:18, 22:6, 31:3, 38:5, 38:6, 38:11, 38:24, 39:6, 39:9, 39:10, 39:11, 56:13, 63:11, 67:25, 70:20, 71:22, 73:25, 74:6, 85:14, 86:4
**COUNTY** [2] - 1:9, 89:4
**county** [2] - 4:13, 63:12
**course** [5] - 8:11, 8:13, 38:10, 45:10, 62:4
**Court** [14] - 5:9, 9:19, 17:2, 19:3, 20:6, 26:19, 27:3, 27:4, 27:5, 27:18, 32:21, 51:7, 87:17
**court** [5] - 41:16, 47:20, 49:11, 52:15, 88:20
**COURT** [237] - 1:1, 1:22, 4:10, 4:16, 4:19, 4:21, 5:5, 5:14, 5:25, 6:8, 6:23, 7:1, 7:7, 7:13, 7:15, 7:22, 7:24, 8:1, 8:4, 8:8, 8:11, 8:16, 8:19, 8:21, 8:23, 8:25, 9:2, 9:4, 9:6, 9:8, 9:10, 9:12, 9:14, 9:17, 9:21, 10:1, 10:3, 10:9, 10:13, 10:16, 10:19, 10:22, 11:1, 11:5, 11:8, 11:11, 11:14, 11:19, 11:24, 12:3, 12:6, 12:8,

12:12, 12:17, 12:19, 12:21, 12:25, 13:2, 13:5, 13:8, 13:11, 13:15, 13:18, 13:21, 13:23, 13:25, 14:2, 14:5, 14:7, 14:16, 15:4, 15:15, 15:21, 16:1, 16:13, 16:18, 16:23, 17:1, 17:4, 17:8, 17:17, 17:20, 17:23, 18:1, 18:3, 18:5, 18:7, 18:9, 18:11, 18:13, 18:15, 18:17, 18:19, 18:21, 18:24, 19:1, 19:5, 19:8, 19:12, 19:15, 19:17, 19:19, 20:2, 20:8, 20:11, 20:15, 20:17, 20:25, 21:3, 21:5, 21:9, 21:13, 21:17, 21:21, 21:25, 22:3, 22:8, 22:12, 22:17, 22:19, 22:21, 22:24, 23:1, 23:3, 23:5, 23:7, 23:13, 23:16, 23:19, 23:22, 23:24, 24:2, 24:10, 24:12, 24:18, 24:21, 24:25, 25:3, 25:5, 25:11, 25:13, 25:16, 25:18, 25:22, 26:1, 26:8, 26:11, 26:25, 27:10, 27:17, 27:20, 27:23, 28:2, 28:9, 28:21, 28:23, 29:1, 29:3, 29:5, 29:9, 29:12, 29:15, 29:18, 29:22, 29:24, 30:1, 30:7, 30:12, 30:15, 30:21, 30:24, 31:4, 31:9, 31:13, 31:15, 31:18, 31:20, 31:22, 31:24, 32:1, 32:3, 32:5, 32:7, 32:9, 32:11, 32:14, 32:17, 32:20, 32:23, 33:2, 33:4, 33:12, 33:14, 33:16, 33:19, 33:23, 33:25, 34:2, 34:5, 34:8, 34:10, 34:14, 34:18, 34:21, 34:24, 35:1, 35:3, 35:5, 35:7, 35:9, 35:11, 35:13, 35:15, 35:17, 35:21, 35:25, 36:4, 36:13, 49:14, 49:19, 50:2, 50:7, 50:9, 50:14, 50:16, 50:20, 50:25, 51:5, 67:4, 67:8, 86:19, 87:14, 88:3, 88:7, 88:18,

89:9, 89:22
**Court's** [1] - 6:3
**courtroom** [2] - 47:14, 49:22
**courts** [1] - 70:23
**cousin** [7] - 11:15, 11:21, 11:24, 12:22, 13:11, 30:25, 31:7
**cousin's** [1] - 11:17
**CPR** [4] - 62:3, 78:1, 81:4, 81:17
**cracks** [2] - 77:25, 78:6
**created** [1] - 54:12
**creates** [1] - 74:8
**credibility** [1] - 63:17
**credible** [1] - 65:11
**crime** [3] - 52:21, 69:23, 70:16
**criminal** [4] - 17:18, 17:19, 28:24, 28:25
**crisis** [2] - 53:13, 66:23
**cross** [2] - 48:19, 48:21
**cross-examine** [2] - 48:19, 48:21
**crouched** [2] - 52:24, 68:14
**crush** [1] - 78:5
**CSR** [2] - 1:22, 89:21
**cuffed** [3] - 56:1, 56:3, 59:11
**cuffing** [1] - 78:19
**cuffs** [7] - 62:4, 73:6, 74:15, 74:17, 74:20, 76:2
**custody** [2] - 12:25, 70:18
**custom** [1] - 39:5
**CV** [2] - 1:9, 4:4
**cycle** [3] - 54:18, 54:23, 58:18

## D

**dale** [1] - 4:8
**DALE** [2] - 2:4, 2:5
**damage** [2] - 62:9, 78:2
**damages** [2] - 39:15, 66:15
**Dan** [1] - 82:21
**danger** [2] - 71:20, 77:4
**dangerous** [2] - 74:24, 85:6
**Daniel** [1] - 63:21
**Darlene** [1] - 32:25
**darts** [1] - 54:11

**DATE** [1] - 89:18
**daughter** [2] - 28:18, 29:16
**daughters** [1] - 51:24
**day-to-day** [1] - 21:14
**daycare** [1] - 29:8
**daylight** [1] - 67:13
**dead** [1] - 38:14
**deal** [1] - 82:25
**dealing** [1] - 70:15
**dealt** [1] - 8:12
**death** [30] - 39:3, 52:2, 57:12, 57:13, 58:18, 62:17, 63:2, 63:5, 63:6, 63:7, 63:9, 63:13, 65:9, 81:21, 82:9, 82:14, 82:24, 82:25, 83:20, 83:22, 83:25, 84:6, 84:11, 84:12, 84:15, 84:18, 84:19, 84:25, 85:1
**deaths** [1] - 57:20
**debate** [1] - 84:6
**decades** [1] - 74:2
**decedent** [1] - 58:19
**deceptive** [2] - 5:11, 6:5
**decide** [20] - 14:24, 37:18, 40:8, 41:17, 42:3, 42:24, 43:9, 44:7, 44:9, 45:2, 45:5, 45:6, 47:19, 48:5, 59:18, 60:4, 64:12, 65:11, 71:23, 87:25
**decided** [2] - 47:10, 59:19
**deciding** [4] - 40:11, 40:21, 42:17, 43:8
**decision** [7] - 26:5, 27:7, 27:13, 40:6, 64:12, 66:12, 88:17
**deescalate** [3] - 67:18, 68:20, 70:3
**defeating** [1] - 85:6
**DEFENDANT** [2] - 1:10, 2:17
**defendant** [9] - 4:12, 4:13, 16:24, 26:9, 38:10, 38:17, 39:6, 40:9, 48:19
**Defendant** [3] - 4:14, 38:5, 38:16
**defendants** [12] - 6:8, 6:24, 14:3, 14:11, 16:20, 26:24, 32:18, 39:17, 39:18, 48:20, 88:9
**defense** [9] - 39:23, 40:3, 40:5, 62:15,

62:20, 63:14, 65:6, 86:16, 87:22
**defer** [1] - 20:7
**defined** [1] - 63:9
**definition** [1] - 6:17
**degree** [2] - 11:4, 21:3
**deliberate** [2] - 36:20, 48:25
**deliberately** [2] - 44:10, 86:4
**deliberations** [5] - 36:20, 37:12, 44:21, 45:3, 45:25
**delirium** [7] - 53:16, 55:19, 55:22, 56:21, 58:1, 65:4, 65:19
**delivered** [1] - 54:15
**denied** [3] - 7:4, 16:23, 47:20
**deny** [2] - 27:15, 39:17
**denying** [1] - 43:5
**departed** [1] - 36:11
**department** [6] - 12:13, 23:24, 30:8, 30:9, 68:2, 76:16
**Department** [20] - 11:16, 11:22, 21:8, 30:4, 31:1, 34:7, 38:6, 38:12, 38:18, 39:7, 39:10, 56:13, 67:25, 70:20, 71:3, 71:22, 74:1, 74:6, 85:14, 86:4
**department's** [1] - 86:1
**departments** [4] - 19:23, 30:5, 61:10, 74:7
**deploy** [1] - 70:11
**deposition** [1] - 63:4
**deprivation** [2] - 62:8, 83:15
**deprived** [2] - 57:25, 64:1
**Deputies** [2] - 38:4, 39:19
**deputies** [36] - 38:7, 38:9, 39:5, 39:9, 39:25, 49:18, 50:3, 52:15, 53:19, 56:12, 60:7, 63:16, 64:13, 67:18, 68:6, 68:18, 69:2, 69:4, 70:15, 71:8, 71:12, 72:18, 75:7, 75:13, 76:6, 76:13, 76:16, 78:10, 78:23, 79:17, 81:12, 83:19, 84:17, 85:11, 85:24, 86:13
**deputies'** [2] - 39:14,

80:22
**deputy** [6] - 38:4, 53:23, 54:2, 78:22, 80:7, 83:24
**Deputy** [44] - 38:25, 52:15, 52:16, 52:18, 53:3, 53:4, 53:21, 54:1, 54:2, 54:5, 54:7, 54:14, 54:21, 54:25, 56:1, 56:2, 59:16, 59:17, 60:2, 67:16, 67:24, 68:1, 68:20, 68:25, 69:3, 69:6, 69:20, 69:24, 70:2, 70:4, 70:11, 75:15, 75:18, 76:18, 79:10, 79:25, 80:2, 80:3, 80:5, 80:16, 81:6, 81:17
**described** [1] - 76:6
**description** [1] - 68:12
**deserves** [1] - 44:19
**design** [1] - 10:20
**Design** [2] - 11:4, 21:4
**designated** [3] - 87:20, 88:12, 88:13
**designer** [1] - 20:21
**despite** [3] - 70:8, 70:9
**detained** [2] - 24:10, 24:19
**detecting** [1] - 80:14
**deteriorate** [1] - 83:8
**determine** [2] - 73:3, 82:14
**determined** [2] - 63:8, 76:16
**determining** [1] - 82:24
**developed** [1] - 15:9
**device** [3] - 67:17, 69:6, 69:9
**devices** [1] - 73:2
**Dewayne** [2] - 9:24, 10:5
**diagnosis** [1] - 52:2
**diaphragm** [3] - 58:8, 72:12, 72:13
**dictionaries** [1] - 46:22
**die** [2] - 81:19, 81:20
**died** [4] - 39:24, 62:15, 62:25, 65:2
**dies** [1] - 84:8
**differ** [1] - 41:2
**differences** [1] - 44:7
**different** [11] - 27:8, 44:3, 54:10, 72:9, 73:1, 77:13, 77:17, 84:14

**differently** [2] - 44:6, 72:22
**differs** [1] - 44:8
**difficult** [1] - 5:17
**difficulty** [1] - 58:7
**dioxide** [1] - 72:14
**DIRE** [1] - 3:5
**dire** [3] - 14:9, 15:17, 15:22
**direct** [4] - 41:19, 41:20, 42:2
**directly** [1] - 30:9
**disagreements** [1] - 87:22
**disagrees** [1] - 61:18
**discharge** [2] - 69:10, 70:12
**discrepancy** [1] - 15:8
**discuss** [2] - 46:9, 88:1
**discussed** [3] - 46:25, 47:2, 66:8
**discussing** [2] - 45:15, 60:24
**dislikes** [1] - 37:17
**dismissed** [3] - 15:14, 20:1, 26:24
**dispatcher** [1] - 29:20
**displayed** [1] - 26:22
**dispute** [2] - 56:9, 59:2
**disregard** [2] - 41:10, 42:16
**disregarded** [1] - 86:7
**distance** [2] - 54:11, 69:1
**distinction** [1] - 42:1
**distract** [1] - 48:6
**DISTRICT** [5] - 1:1, 1:2, 1:4, 89:9
**DIVISION** [1] - 1:2
**DO** [2] - 89:10, 89:13
**doctor** [5] - 72:1, 72:9, 82:1, 82:3, 82:4
**doctors** [4] - 70:25, 72:24, 73:12, 82:6
**Donald** [1] - 72:9
**donate** [4] - 12:11, 12:12, 12:16, 78:8
**donated** [1] - 38:15
**donation** [1] - 31:17
**done** [4] - 72:11, 82:18, 82:19, 83:19
**door** [1] - 53:11
**doors** [2] - 52:12, 68:5
**down** [41] - 38:25, 52:24, 55:5, 55:6, 55:10, 55:24, 56:7, 56:18, 57:8, 57:9, 57:15, 57:20, 57:22,

58:6, 58:13, 58:25, 59:1, 59:4, 59:8, 59:10, 59:12, 60:22, 61:7, 61:9, 61:16, 61:23, 64:5, 65:10, 65:22, 65:23, 66:6, 66:9, 68:14, 68:21, 70:3, 70:8
**Dozier** [2] - 7:11, 7:17
**dozier** [3] - 14:8, 16:1, 17:3
**DOZIER** [22] - 7:14, 7:17, 7:23, 7:25, 8:3, 8:6, 8:10, 8:15, 8:18, 8:20, 8:22, 8:24, 9:1, 9:3, 9:5, 9:7, 9:9, 9:11, 9:13, 16:8, 16:17, 16:22
**dr** [1] - 64:8
**Dr** [22] - 62:19, 63:21, 65:12, 72:1, 72:9, 72:11, 72:14, 72:16, 72:24, 73:12, 77:20, 82:21, 84:1, 84:5, 84:7, 84:13, 84:16, 84:18, 84:20, 87:19
**drafting** [2] - 10:20
**Drafting** [1] - 11:4
**draftsman** [2] - 7:21, 7:23
**driver** [2] - 28:15, 29:10
**driving** [1] - 24:15
**drug** [1] - 51:19
**drugs** [10] - 5:22, 23:12, 62:15, 65:1, 65:19, 68:7, 71:10, 73:17, 81:24, 82:8
**drunk** [1] - 72:3
**ducting** [1] - 10:21
**during** [10] - 37:22, 39:21, 42:20, 44:21, 45:10, 47:2, 49:22, 50:2, 77:8, 79:17
**duties** [1] - 71:5
**duty** [4] - 37:4, 37:13, 41:5, 45:10
**dying** [2] - 73:21, 73:22

## E

**early** [2] - 72:17, 72:24
**easily** [1] - 66:5
**EASTERN** [1] - 1:2
**ED** [1] - 1:9
**educated** [2] - 7:19, 27:13
**education** [1] - 17:12
**educational** [2] - 11:2,

28:13
**effect** [3] - 69:14, 69:15, 82:19
**effective** [1] - 54:16
**effects** [1] - 72:2
**efficiently** [1] - 51:14
**efforts** [2] - 67:19, 76:19
**eight** [8] - 4:24, 6:24, 7:16, 10:4, 17:9, 20:18, 28:11, 33:4
**either** [6] - 42:2, 53:13, 57:5, 71:10, 80:7, 82:23
**electrical** [6] - 54:12, 62:12, 69:10, 69:14, 70:12, 83:2
**electricity** [2] - 54:16, 69:12
**electronic** [1] - 45:16
**ELIAS** [4] - 1:22, 89:8, 89:20, 89:21
**ELM** [2] - 16:4, 16:14
**eloquently** [1] - 26:15
**email** [1] - 45:17
**embedded** [1] - 54:19
**emergency** [5] - 55:22, 57:14, 80:24, 81:4, 85:10
**emotional** [4] - 6:5, 6:6, 6:12, 6:20
**employed** [1] - 38:5
**employer** [2] - 46:2, 46:4
**employment** [4] - 8:9, 10:23, 11:9, 38:10
**encountered** [1] - 68:11
**end** [11] - 36:18, 36:20, 37:10, 44:22, 45:3, 45:25, 47:6, 48:6, 49:2, 66:11, 67:1
**ended** [1] - 66:24
**ending** [1] - 54:23
**ends** [1] - 58:18
**enforce** [1] - 71:5
**enforcement** [16] - 11:25, 12:4, 22:22, 25:6, 30:5, 30:13, 30:16, 34:11, 34:19, 57:3, 57:21, 70:24, 72:17, 85:17, 85:22
**engineering** [3] - 10:17, 10:24, 10:25
**enhances** [1] - 74:9
**entire** [1] - 47:25
**entirely** [1] - 26:5
**entitled** [1] - 47:18
**epidemiological** [2] -

73:13, 73:22
**epidemiology** [1] - 73:14
**Eric** [2] - 68:14, 80:3
**erratically** [1] - 68:5
**error** [1] - 43:1
**especially** [6] - 56:19, 57:8, 57:13, 57:22, 57:24, 84:9
**ESQ** [5] - 2:5, 2:9, 2:12, 2:19, 2:19
**established** [1] - 15:2
**estimated** [1] - 87:4
**ET** [1] - 1:9
**et** [2] - 4:5, 56:6
**evening** [1] - 87:10
**event** [2] - 44:5, 60:6
**eventually** [1] - 56:3
**Evidence** [4] - 41:7, 42:4, 42:8, 42:25
**evidence** [132] - 14:23, 14:24, 16:9, 16:10, 16:19, 26:5, 26:6, 27:7, 36:17, 37:9, 37:14, 37:19, 37:23, 38:20, 40:3, 40:4, 40:6, 40:11, 40:14, 40:19, 40:20, 40:23, 40:25, 41:1, 41:5, 41:10, 41:11, 41:13, 41:15, 41:17, 41:18, 41:19, 41:20, 41:23, 41:25, 42:2, 42:3, 42:5, 42:6, 42:15, 42:17, 42:18, 42:24, 43:21, 43:24, 44:16, 45:7, 46:15, 47:10, 48:4, 48:10, 48:15, 48:16, 48:18, 48:20, 48:22, 49:2, 52:5, 53:21, 53:25, 54:9, 55:6, 55:8, 56:4, 57:7, 57:18, 57:23, 59:6, 59:13, 59:23, 60:4, 61:1, 62:14, 62:15, 62:17, 64:11, 64:16, 65:3, 65:20, 66:23, 67:2, 67:9, 67:12, 67:23, 68:17, 68:19, 68:22, 69:2, 69:5, 69:9, 69:11, 69:17, 69:19, 70:2, 70:4, 70:7, 70:13, 70:14, 70:19, 71:2, 71:7, 71:21, 71:25, 73:11, 74:5, 75:6, 75:8, 75:13, 75:21, 75:24, 76:10, 76:12, 76:15, 76:23, 77:2, 77:7, 77:12, 77:19,

78:10, 78:19, 79:7, 80:12, 80:22, 81:18, 82:5, 82:15, 83:10, 83:23, 85:2, 85:12, 86:13
**exactly** [1] - 83:10
**exam** [2] - 49:23, 81:21
**examine** [3] - 20:6, 48:19, 48:21
**examined** [1] - 83:12
**examiner** [2] - 63:1, 63:10
**examiners** [1] - 82:13
**example** [2] - 53:17, 62:19
**examples** [1] - 61:12
**excessive** [4] - 23:9, 26:16, 55:16, 85:18
**excited** [7] - 53:15, 55:19, 55:21, 56:20, 58:1, 65:4, 65:18
**exclude** [1] - 49:17
**excluded** [4] - 41:9, 49:22, 50:4, 83:21
**excuse** [8] - 4:14, 9:19, 17:3, 19:4, 27:19, 27:25, 32:22, 80:11
**excused** [11] - 7:8, 9:22, 17:4, 19:9, 20:9, 20:11, 26:15, 27:20, 28:4, 32:23, 47:5
**executive** [1] - 17:11
**exertion** [1] - 84:25
**exhausted** [1] - 24:4
**exhibit** [3] - 42:6, 42:10, 42:11
**exhibits** [2] - 40:14, 40:19
**expand** [1] - 58:8
**expect** [1] - 46:5
**expectations** [1] - 57:2
**expects** [1] - 48:16
**expel** [1] - 72:14
**experience** [4] - 6:13, 8:1, 12:23, 76:20
**experiencing** [2] - 58:6, 80:24
**experiments** [1] - 65:13
**expert** [11] - 56:25, 62:20, 62:24, 64:8, 65:12, 76:4, 77:19, 77:20, 87:19, 87:24, 88:13
**experts** [6] - 62:19, 62:20, 63:20, 65:7,

87:22
**explain** [6] - 16:7, 63:24, 64:9, 77:21, 84:5, 84:21
**explained** [2] - 24:21, 87:18
**explains** [1] - 77:12
**expose** [1] - 71:19
**exposed** [2] - 45:8, 48:1
**express** [1] - 11:10
**expressed** [5] - 5:19, 16:3, 16:4, 20:3, 26:2
**expressly** [2] - 5:7, 19:21
**extensive** [1] - 27:6
**extent** [5] - 31:20, 31:21, 52:25, 54:24, 66:7
**eyes** [2] - 56:11, 66:4

## F

**face** [10] - 52:9, 53:1, 53:6, 53:7, 55:5, 55:6, 69:16, 72:4, 75:9, 80:4
**Facebook** [1] - 45:19
**fact** [14] - 15:5, 41:21, 41:24, 44:16, 52:3, 53:7, 55:17, 58:21, 60:19, 61:5, 61:12, 64:25, 76:4, 83:22
**factor** [1] - 62:11
**factors** [4] - 43:25, 56:19, 60:23, 61:6
**facts** [13] - 16:9, 37:13, 37:14, 37:25, 38:1, 39:19, 40:12, 40:15, 40:16, 40:21, 41:1, 41:23, 43:8
**faint** [3] - 60:4, 80:18, 80:21
**FAIR** [1] - 2:10
**fair** [22] - 5:8, 5:10, 5:17, 5:24, 6:2, 6:18, 12:1, 14:21, 15:7, 15:12, 16:6, 20:1, 21:18, 22:15, 25:8, 26:23, 27:3, 27:12, 34:22, 47:18, 47:21, 66:15
**fairly** [3] - 13:12, 16:18, 55:25
**fairness** [1] - 47:24
**Fajardo** [3] - 63:1, 84:7, 84:16
**fall** [3] - 55:8, 79:4, 79:19

**fallen** [1] - 59:16
**family** [7] - 46:2, 46:4, 62:5, 64:19, 64:21, 66:18, 66:19
**family's** [1] - 52:3
**far** [1] - 77:11
**fast** [2] - 60:22, 80:21
**fatal** [3] - 67:14, 83:15, 84:23
**father** [4] - 6:10, 7:20, 7:22, 51:21
**favor** [5] - 5:1, 5:16, 30:16, 31:10, 34:19
**FEDERAL** [2] - 1:22, 89:22
**feelings** [2] - 6:13, 19:25
**feet** [5] - 54:4, 58:23, 68:24, 73:7, 74:20
**fell** [2] - 69:16, 75:9
**fellow** [3] - 45:3, 45:24, 48:12
**felt** [1] - 60:4
**few** [6] - 8:6, 16:2, 20:5, 44:25, 66:17, 72:8
**field** [2] - 82:5, 82:11
**fight** [1] - 74:12
**fighting** [1] - 25:1
**figure** [1] - 86:8
**final** [3] - 36:19, 37:11, 48:23
**finally** [4] - 59:12, 78:20, 79:10, 81:11
**fine** [1] - 28:2
**first** [25] - 4:24, 6:24, 7:16, 10:3, 14:17, 17:9, 20:18, 20:20, 27:1, 28:11, 33:4, 45:1, 48:14, 53:5, 56:23, 60:1, 69:20, 71:12, 71:14, 72:1, 80:7, 80:11, 80:14, 81:13
**FIRST** [1] - 1:23
**five** [17] - 10:15, 11:23, 23:17, 23:18, 54:18, 55:2, 55:4, 58:20, 59:11, 59:24, 63:6, 65:7, 65:22, 67:14, 69:10, 70:12, 84:23
**five-second** [3] - 54:18, 69:10, 70:12
**flexible** [2] - 74:15, 74:18
**flip** [2] - 80:9, 80:11
**flipped** [5] - 70:1, 80:15, 80:25, 81:1, 83:5

**follow** [12] - 15:15, 16:2, 20:5, 27:6, 36:17, 37:15, 38:20, 47:22, 49:2, 51:11, 61:18
**follow-up** [4] - 15:15, 16:2, 20:5, 27:6
**following** [7] - 4:20, 14:6, 19:18, 26:12, 40:12, 43:13, 48:13
**follows** [1] - 7:1
**Fonzi** [1] - 85:13
**footage** [1] - 53:20
**FOR** [2] - 89:8, 89:9
**force** [12] - 23:9, 26:16, 39:22, 40:1, 76:5, 76:8, 76:10, 77:9, 78:4, 79:15, 85:18, 85:23
**Force** [1] - 17:14
**forcing** [1] - 70:11
**FOREGOING** [1] - 89:11
**forensic** [10] - 82:12, 82:17, 82:23, 83:11, 83:13, 83:23, 84:2, 84:3, 84:6
**forget** [1] - 44:4
**FORM** [1] - 89:13
**form** [4] - 26:18, 45:20, 45:23, 58:11
**former** [2] - 85:13
**FORTH** [1] - 89:12
**fortunately** [3] - 23:12, 24:9, 24:20
**forward** [2] - 69:16, 75:9
**fought** [1] - 67:19
**four** [2] - 65:23, 87:22
**frame** [1] - 87:23
**free** [4] - 36:6, 74:17, 74:24, 75:25
**Freeman** [7] - 64:8, 81:25, 82:1, 82:2, 82:3, 82:15, 87:19
**Friday** [1] - 50:13
**friend** [4] - 21:18, 21:23, 22:22, 24:4
**friends** [3] - 21:7, 31:2, 34:12
**front** [3] - 72:13, 74:21, 77:25
**fulfill** [1] - 71:4
**full** [1] - 36:18
**fun** [1] - 66:20
**FURTHER** [1] - 89:14

## G

**Galipo** [12] - 4:8, 4:21,

5:9, 5:14, 14:16, 20:2, 26:25, 35:19, 49:14, 51:2, 67:4, 88:11
**GALIPO** [29] - 2:4, 2:5, 3:9, 4:7, 4:18, 4:22, 5:15, 9:16, 9:18, 14:17, 18:25, 19:2, 19:11, 20:3, 27:1, 27:21, 27:24, 28:5, 32:13, 32:15, 35:20, 35:22, 49:16, 50:8, 50:18, 51:4, 51:6, 87:16, 88:5
**Galipo's** [1] - 5:6
**Galvez** [3] - 36:23, 49:3, 87:2
**Gary** [1] - 73:12
**gas** [1] - 24:4
**gasp** [1] - 60:11
**gee** [1] - 59:16
**generally** [2] - 48:13, 88:3
**gentlemen** [13] - 36:1, 36:4, 36:7, 37:3, 51:1, 56:9, 61:1, 61:25, 63:17, 64:13, 65:17, 86:11, 86:20
**Gillian** [2] - 7:11, 7:17
**girlfriend** [2] - 22:6, 22:10
**given** [6] - 15:10, 24:24, 37:10, 42:1, 44:21, 87:2
**glasses** [1] - 36:11
**Gomez** [18] - 38:4, 39:20, 52:16, 52:17, 53:4, 54:2, 54:15, 54:25, 56:2, 59:17, 60:2, 68:1, 69:6, 70:4, 70:11, 75:15, 80:2, 80:16
**gonna** [21] - 36:16, 51:13, 54:3, 54:6, 55:12, 56:10, 56:23, 63:24, 63:25, 64:10, 64:18, 65:6, 65:10, 66:11, 66:15, 66:17, 71:16, 77:23, 81:3, 81:4, 88:5
**govern** [2] - 36:20, 37:11
**grab** [2] - 74:16
**Graham** [4] - 84:1, 84:13, 84:16, 84:18
**graham** [1] - 84:5
**grant** [1] - 43:4
**granted** [1] - 7:2
**granting** [1] - 43:5
**graphic** [1] - 20:21

**Graphic** [1] - 21:4
**grasp** [1] - 76:1
**great** [1] - 62:8
**greater** [1] - 57:25
**ground** [5] - 54:19, 69:16, 75:10, 75:16, 75:25
**grounds** [1] - 6:6
**guess** [3] - 5:2, 23:10, 42:13
**gun** [1] - 75:1
**guy** [1] - 85:14

## H

**half** [2] - 72:7, 75:22
**hand** [4] - 36:2, 44:12, 74:1, 74:3
**handcuff** [2] - 61:16, 75:24
**handcuffed** [18] - 39:1, 55:25, 56:7, 56:17, 56:22, 57:14, 57:22, 58:20, 59:5, 60:17, 61:5, 61:7, 65:23, 66:10, 67:21, 73:5, 74:14, 74:18
**handcuffing** [2] - 75:17, 77:6
**handcuffs** [5] - 67:20, 75:14, 76:8, 76:13, 85:4
**handle** [2] - 28:1, 56:15
**hands** [10] - 56:3, 57:9, 63:9, 70:5, 70:9, 77:9, 77:10, 79:16, 79:19
**hard** [4] - 55:6, 63:22, 66:6, 78:21
**hardship** [2] - 26:14, 27:1
**harm** [1] - 26:4
**head** [12] - 52:9, 53:1, 53:6, 53:8, 55:16, 56:20, 58:1, 66:6, 68:16, 68:18, 74:13, 75:10
**heading** [1] - 68:9
**health** [2] - 53:13, 71:17
**hear** [36] - 14:23, 36:25, 41:16, 42:21, 43:15, 47:6, 53:15, 53:24, 54:9, 56:4, 56:18, 56:24, 57:16, 58:2, 59:16, 60:8, 62:10, 62:17, 64:18, 65:16, 65:20, 66:18, 72:23, 75:11, 77:12,

77:19, 79:5, 79:20, 79:21, 81:7, 81:11, 82:1, 84:1, 84:13, 84:20, 85:12
**heard** [6] - 5:22, 41:20, 41:22, 76:24, 80:25, 81:23
**hearing** [2] - 5:8, 42:22
**heart** [13] - 62:8, 62:12, 62:13, 64:3, 67:22, 69:13, 78:7, 80:20, 81:5, 82:10, 83:7, 83:8
**heating** [1] - 29:21
**Heaton** [2] - 32:25, 33:6
**HEATON** [24] - 33:3, 33:6, 33:13, 33:15, 33:18, 33:21, 33:24, 34:1, 34:4, 34:6, 34:9, 34:12, 34:16, 34:20, 34:23, 34:25, 35:2, 35:4, 35:6, 35:8, 35:10, 35:12, 35:14, 35:16
**held** [6] - 26:17, 58:6, 59:8, 59:10, 64:4, 65:10
**Helm** [1] - 4:8
**HELM** [2] - 2:12, 2:12
**help** [19] - 36:13, 36:17, 37:7, 37:8, 38:20, 40:25, 48:3, 48:15, 49:2, 51:11, 52:12, 52:22, 52:24, 65:1, 66:24, 68:21, 71:16, 81:19
**helps** [1] - 72:13
**hemorrhages** [1] - 83:17
**HEREBY** [1] - 89:10
**HEREINBEFORE** [1] - 89:11
**heretofore** [1] - 50:24
**hiding** [1] - 52:25
**high** [7] - 7:19, 17:12, 24:8, 28:14, 33:6, 62:23, 72:3
**higher** [2] - 5:2, 5:18
**HILLS** [1] - 2:7
**himself** [4] - 64:25, 65:2, 82:18, 83:23
**hogtied** [1] - 73:6
**hold** [6] - 5:2, 57:19, 61:23, 65:22, 66:9, 77:6
**holding** [6] - 38:25, 57:9, 58:5, 59:1, 59:4, 64:1

**home** [10] - 24:3, 24:5, 28:18, 29:7, 29:16, 29:19, 33:10, 33:14, 33:16, 82:2
**homicide** [7] - 63:8, 63:9, 63:11, 63:14, 64:7, 84:11, 84:15
**honest** [1] - 5:11
**honestly** [1] - 31:6
**honesty** [1] - 7:8
**Honor** [40] - 4:7, 4:11, 4:18, 4:22, 6:1, 9:16, 9:18, 14:4, 15:5, 15:24, 16:25, 17:2, 18:25, 19:2, 19:10, 19:11, 19:16, 19:20, 20:4, 26:10, 27:18, 27:21, 27:24, 28:5, 28:6, 32:13, 32:15, 32:19, 32:21, 35:20, 35:22, 36:10, 49:16, 50:6, 50:12, 50:17, 51:4, 67:7, 88:10
**HONORABLE** [1] - 1:4
**hooked** [1] - 72:25
**hope** [1] - 63:22
**hopefully** [1] - 51:8
**hose** [1] - 72:7
**hospital** [1] - 62:6
**house** [1] - 10:12
**household** [2] - 17:15, 28:20
**human** [1] - 82:20
**husband** [8] - 11:17, 17:13, 29:9, 30:3, 30:25, 31:8, 33:7, 33:19
**husband's** [1] - 28:15

## I

**idea** [5] - 51:9, 72:12, 83:1, 86:3, 86:6
**identified** [2] - 68:12, 68:14
**ignore** [3] - 42:13, 42:16, 44:15
**ill** [1] - 71:10
**immediate** [3] - 53:5, 55:23, 64:21
**immediately** [8] - 48:2, 52:23, 54:16, 54:17, 62:3, 68:6, 68:18, 68:20
**impair** [1] - 73:10
**impartial** [9] - 6:3, 6:18, 15:7, 15:12, 16:6, 20:1, 26:23, 27:12, 47:19
**importance** [1] - 60:14

**important** [7] - 44:11, 44:18, 47:22, 60:16, 62:11, 66:1, 79:6
**importantly** [3] - 27:5, 52:20, 78:2
**improper** [2] - 41:6, 47:15
**IN** [1] - 89:8
**in-person** [1] - 45:15
**inability** [1] - 64:5
**inaccurate** [1] - 47:16
**inadequate** [3] - 39:10, 64:17, 66:14
**inappropriate** [3] - 49:25, 65:22, 66:13
**incapacitation** [1] - 69:15
**incarcerated** [1] - 13:5
**incident** [9] - 24:12, 24:13, 38:8, 38:12, 39:21, 51:16, 51:25, 68:8, 83:22
**incidents** [5] - 23:13, 23:16, 23:19, 25:5, 25:8
**include** [1] - 49:17
**includes** [1] - 45:15
**including** [5] - 45:18, 46:2, 47:4, 74:7, 87:21
**incoherently** [1] - 68:15
**incomplete** [1] - 47:16
**independent** [2] - 27:2, 84:2
**INDEX** [1] - 3:2
**indicated** [1] - 51:7
**indication** [1] - 43:6
**indicia** [3] - 5:11, 6:4, 6:19
**indifferent** [1] - 86:5
**individual** [1] - 50:3
**individuals** [2] - 22:13, 57:21
**inference** [1] - 55:8
**infliction** [1] - 26:3
**influence** [4] - 23:11, 53:14, 56:20, 68:7
**influenced** [4] - 37:17, 41:7, 47:16, 48:11
**information** [9] - 42:24, 45:9, 46:19, 47:15, 47:17, 47:20, 48:1, 74:1, 74:3
**initial** [1] - 88:13
**injured** [5] - 8:13, 52:8, 52:24, 56:8, 65:19
**injuries** [1] - 77:24
**injury** [8] - 23:9, 39:3,

52:10, 55:16, 56:20, 57:12, 58:1, 83:15
**Inland** [1] - 38:13
**inquire** [1] - 50:13
**insight** [1] - 51:10
**Instagram** [1] - 45:19
**instances** [1] - 16:15
**instant** [1] - 83:18
**instead** [5] - 66:9, 66:24, 68:24, 70:7, 70:10
**instruct** [3] - 37:4, 40:16, 41:12
**instructed** [1] - 41:10
**instruction** [1] - 30:8
**INSTRUCTIONS** [1] - 3:7
**instructions** [18] - 36:9, 36:17, 36:19, 36:22, 37:2, 37:5, 37:7, 37:11, 37:21, 40:10, 45:7, 46:16, 48:23, 61:14, 67:3, 68:23
**instructor** [2] - 28:16, 30:6
**insufficient** [2] - 14:20, 27:9
**insurance** [1] - 33:9
**intake** [1] - 57:25
**intended** [1] - 40:25
**interest** [2] - 38:23, 43:18
**interested** [1] - 27:11
**interfere** [1] - 57:10
**interferes** [1] - 57:23
**internal** [1] - 69:13
**International** [1] - 61:13
**Internet** [3] - 45:17, 46:22, 47:1
**interpret** [1] - 40:25
**interrupt** [1] - 36:10
**intersection** [1] - 24:17
**intoxicated** [3] - 67:13, 71:10, 72:3
**investigate** [1] - 46:13
**investigation** [2] - 46:23, 47:14
**involved** [8] - 5:23, 38:7, 38:9, 46:1, 46:3, 47:4, 49:18, 83:9
**involves** [1] - 45:9
**involving** [1] - 39:21
**ironically** [1] - 65:1
**irreversible** [1] - 62:9
**IS** [1] - 89:14
**issue** [7] - 27:1, 27:2,

27:11, 87:14, 87:17, 88:2, 88:10
**issues** [6] - 27:14, 45:9, 63:19, 64:14, 66:8, 88:9
**it'd** [1] - 10:15
**itself** [3] - 41:1, 62:23, 84:22
**IV** [1] - 2:12

**J**

**jail** [1] - 6:11
**Jeff** [1] - 56:25
**jeopardizes** [1] - 47:24
**JESUS** [1] - 1:4
**job** [5] - 21:14, 70:20, 82:13, 82:23, 82:24
**JOHN** [2] - 2:8, 2:9
**John** [2] - 4:8, 56:24
**joined** [1] - 53:4
**Jr** [1] - 10:5
**judge** [2] - 63:17, 67:3
**JUDGE** [1] - 1:4
**Judge's** [1] - 88:16
**July** [4] - 38:3, 38:13, 51:16, 67:23
**juries** [1] - 8:2
**juror** [11] - 6:10, 7:5, 7:10, 14:19, 14:22, 19:8, 27:22, 27:25, 46:5, 47:23, 48:1
**Juror** [9] - 4:25, 5:15, 6:2, 9:19, 14:8, 26:14, 27:19, 28:8, 32:22
**jurors** [7] - 14:22, 36:11, 45:1, 45:3, 45:24, 47:6, 48:12
**Jurupa** [1] - 28:14
**Jury** [7] - 7:11, 9:24, 17:7, 19:14, 20:13, 32:25, 49:13
**jury** [25] - 10:12, 17:20, 20:24, 20:25, 21:22, 29:1, 33:11, 35:25, 36:3, 36:5, 36:16, 36:24, 36:25, 37:3, 45:10, 46:8, 47:19, 48:5, 48:7, 48:25, 49:4, 50:9, 50:22, 87:12, 87:13
**JURY** [1] - 3:5

**K**

**Kay** [2] - 32:25, 33:6
**Keeney** [29] - 38:4, 39:19, 52:15, 52:18,

53:3, 53:21, 54:1, 54:2, 54:5, 54:7, 54:21, 56:1, 59:17, 67:16, 67:24, 68:20, 68:25, 69:3, 69:20, 69:24, 70:2, 70:11, 75:18, 76:18, 79:10, 79:25, 80:3, 80:5, 81:17
**keep** [16] - 26:4, 42:23, 43:2, 45:1, 48:4, 49:7, 57:8, 57:15, 61:8, 71:5, 72:19, 75:5, 86:9, 86:10, 87:8
**keeping** [1] - 78:9
**Kennedy** [1] - 4:8
**KENNEDY** [1] - 2:12
**kept** [3] - 58:25, 76:21, 78:24
**Kerwin** [3] - 20:13, 20:16, 20:20
**Kevin** [14] - 38:14, 38:24, 39:21, 39:22, 39:24, 51:17, 52:22, 54:23, 57:24, 63:25, 65:19, 68:12, 75:23, 86:6
**keys** [1] - 74:16
**kick** [1] - 74:13
**kicking** [4] - 54:24, 58:23, 70:1, 75:24
**kids** [1] - 33:8
**kill** [2] - 62:23, 84:22
**killed** [3] - 5:21, 64:6, 66:25
**kills** [1] - 67:9
**kind** [6] - 13:2, 66:22, 77:24, 78:1, 82:19, 88:15
**kinda** [1] - 30:19
**kinds** [2] - 41:25, 70:22
**knee** [8] - 56:5, 75:18, 76:7, 77:9, 79:12, 79:13, 79:18, 79:24
**knees** [2] - 57:9, 75:15
**knocked** [1] - 55:9
**known** [2] - 39:19, 86:16
**Kode** [1] - 77:20

**L**

**L.A** [1] - 34:7
**lab** [2] - 82:19, 84:3
**label** [2] - 84:10, 84:14
**labeled** [1] - 84:18
**laboratories** [1] - 72:11

**laboratory** [2] - 72:25, 73:9
**lack** [1] - 64:3
**ladies** [13] - 36:1, 36:4, 36:7, 37:3, 50:25, 56:8, 60:25, 61:24, 63:17, 64:12, 65:16, 86:11, 86:20
**landed** [1] - 55:5
**landing** [1] - 75:10
**LAPD** [1] - 5:3
**LaRusso** [2] - 62:2, 81:12
**Last** [1] - 20:20
**last** [13] - 8:6, 11:22, 12:23, 14:19, 20:16, 23:16, 23:19, 46:6, 59:12, 79:12, 79:18, 79:24
**lastly** [2] - 27:5, 66:15
**late** [1] - 62:7
**LAURA** [4] - 1:22, 89:8, 89:20, 89:21
**law** [27] - 5:20, 11:25, 12:3, 22:22, 25:6, 30:4, 30:13, 30:16, 34:11, 34:19, 37:4, 37:14, 37:15, 38:8, 38:19, 39:15, 42:1, 45:8, 47:4, 57:3, 57:21, 70:23, 71:5, 72:17, 85:16, 85:22
**LAW** [3] - 2:4, 2:8, 2:12
**lawyer** [3] - 42:5, 42:6, 42:8
**lawyers** [6] - 40:15, 40:22, 40:23, 41:2, 41:4, 47:5
**lead** [2] - 72:16, 72:19
**leaning** [2] - 5:7, 5:12
**learn** [3] - 46:24, 49:9, 87:7
**least** [3] - 55:15, 55:21, 59:12
**leave** [5] - 7:9, 19:13, 28:4, 36:6, 48:7
**left** [9] - 36:11, 48:7, 53:23, 56:2, 64:19, 75:11, 75:18, 75:19, 75:21
**legal** [2] - 46:15, 76:24
**length** [1] - 43:3
**less** [3] - 30:19, 77:11, 79:16
**lethal** [1] - 62:22
**leverage** [1] - 75:16
**LEWIS** [1] - 2:18
**licensed** [4] - 82:1, 82:2, 82:3, 82:6

**lies** [1] - 56:9
**life** [8] - 30:20, 65:18, 80:8, 81:4, 81:8, 82:18, 85:9, 86:6
**lift** [2] - 58:8, 58:13
**light** [1] - 43:24
**likely** [1] - 66:12
**limited** [3] - 41:12, 41:13, 45:18
**line** [1] - 55:24
**linkage** [1] - 73:20
**LinkedIn** [1] - 45:19
**Lisa** [1] - 81:12
**list** [3] - 40:21, 45:20, 88:14
**listed** [1] - 88:13
**listen** [2] - 37:9, 46:17
**literally** [1] - 77:23
**live** [7] - 7:19, 10:7, 17:12, 20:22, 20:23, 28:14, 33:7
**lives** [3] - 7:20, 33:10, 51:13
**living** [3] - 28:20, 51:22, 82:24
**LLP** [1] - 2:18
**locally** [1] - 57:1
**located** [1] - 68:3
**location** [1] - 68:9
**locked** [2] - 54:18, 55:7
**look** [6] - 66:3, 70:21, 70:22, 70:23, 70:24, 73:15
**looked** [7] - 83:13, 83:14, 83:16, 84:3, 84:4
**looking** [3] - 71:22, 80:4, 83:23
**LOS** [4] - 1:23, 2:21, 4:1, 89:4
**Los** [2] - 11:16, 11:18
**loss** [1] - 66:16
**lost** [5] - 51:21, 51:25, 64:21, 64:22
**Louise** [1] - 17:6
**love** [1] - 6:1
**loved** [4] - 62:5, 66:18, 66:19
**loving** [2] - 66:21
**low** [1] - 80:18
**lower** [1] - 77:10
**lunch** [3] - 14:15, 15:9, 15:10
**lungs** [4] - 60:10, 69:14, 72:14, 78:7

**M**

**maker** [1] - 38:17

**man** [4] - 27:14, 68:2, 68:11, 68:12
**Manager** [1] - 7:18
**manager** [2] - 8:5, 10:6
**maneuvers** [1] - 63:4
**manner** [7] - 43:17, 63:6, 63:7, 63:12, 63:13, 84:6, 84:15
**manual** [1] - 40:1
**MARCH** [3] - 1:16, 4:1, 89:18
**marijuana** [1] - 24:8
**Mark** [3] - 4:14, 63:1
**mark** [2] - 19:14, 79:14
**marketing** [4] - 10:11, 11:6, 28:18, 29:22
**married** [6] - 10:7, 17:13, 20:22, 28:15, 33:7, 64:20
**martial** [3] - 28:16, 30:5, 30:8
**Mason** [4] - 9:24, 10:1, 10:5, 15:18
**MASON** [31] - 10:2, 10:5, 10:10, 10:15, 10:17, 10:20, 10:24, 11:3, 11:7, 11:10, 11:13, 11:15, 11:21, 12:2, 12:5, 12:7, 12:9, 12:14, 12:18, 12:20, 12:22, 13:1, 13:4, 13:7, 13:10, 13:13, 13:17, 13:20, 13:22, 13:24, 14:1
**matched** [1] - 68:11
**materials** [1] - 46:23
**matter** [2] - 46:9, 84:11
**maximum** [2] - 75:5, 77:7
**mean** [3] - 14:21, 45:22, 63:15
**meaning** [1] - 49:21
**MEANS** [1] - 89:13
**means** [5] - 37:18, 40:4, 42:17, 45:17, 63:16
**measured** [1] - 83:4
**measurements** [1] - 72:10
**measures** [1] - 81:4
**media** [5] - 45:20, 45:21, 46:2, 46:17, 47:7
**Medical** [1] - 38:14
**medical** [33] - 33:9, 53:5, 55:12, 55:15, 55:18, 55:22, 55:23, 56:8, 57:11, 57:14,

57:23, 63:1, 63:10, 63:19, 63:20, 64:8, 65:5, 68:19, 70:24, 70:25, 72:2, 74:2, 76:14, 77:20, 80:8, 80:24, 82:5, 82:12, 82:13, 83:3, 85:10, 87:22

**medicine** [2] - 63:24, 82:6

**meet** [1] - 49:3

**member** [2] - 21:8, 21:22

**members** [2] - 46:2, 64:19

**memories** [1] - 66:20

**memory** [4] - 41:2, 43:16, 48:10, 48:11

**mental** [2] - 53:13, 71:17

**mentally** [1] - 71:10

**mention** [1] - 11:1

**mentioned** [4] - 29:9, 60:25, 64:23, 65:25

**merits** [1] - 45:14

**mess** [1] - 63:23

**messaging** [1] - 45:17

**met** [1] - 31:7

**meth** [12] - 5:22, 6:5, 59:19, 62:21, 62:22, 62:24, 67:15, 67:22, 84:19, 84:22, 84:23, 85:1

**Meth** [1] - 67:9

**methamphetamine** [7] - 39:25, 51:20, 52:6, 53:14, 62:16, 63:2, 81:22

**Michael** [8] - 64:8, 81:25, 82:1, 82:2, 82:3, 82:15, 84:1, 87:19

**mid** [1] - 75:19

**mid-back** [1] - 75:19

**might** [9] - 5:12, 42:14, 60:21, 68:7, 72:16, 72:19, 72:21, 78:23, 80:8

**MILLER** [3] - 1:22, 89:20, 89:21

**mind** [6] - 27:12, 45:1, 49:7, 61:21, 87:8, 87:23

**minimum** [2] - 43:3, 84:23

**minute** [6] - 59:5, 59:7, 59:10, 75:23, 78:25, 79:9

**minutes** [9] - 59:11, 59:13, 59:24, 65:22,

65:24, 79:23, 81:6, 81:10, 83:5

**Mirada** [1] - 24:13

**misconduct** [1] - 6:15

**misinterpret** [2] - 58:11, 58:17

**misleading** [1] - 47:16

**missing** [1] - 45:21

**Missouri** [1] - 84:2

**mistakenly** [2] - 53:23, 80:3

**mistakes** [1] - 44:4

**mistrial** [1] - 47:24

**mode** [1] - 69:7

**model** [1] - 61:14

**mom** [4] - 28:18, 29:8, 29:16, 33:17

**moment** [9] - 9:16, 16:25, 18:25, 32:13, 32:19, 35:20, 69:1, 69:2, 70:17

**Monday** [1] - 67:23

**monitor** [5] - 73:2, 78:13, 79:3, 79:18

**months** [2] - 8:6, 52:2

**Moraga** [1] - 68:4

**Morales** [1] - 68:14

**morning** [7] - 56:24, 60:13, 86:21, 87:5, 87:11, 87:15, 88:19

**most** [2] - 27:5, 58:4

**mother** [6] - 22:5, 22:10, 52:1, 52:4, 64:21, 65:2

**motion** [4] - 49:15, 49:17, 49:20, 49:24

**mouth** [1] - 72:4

**move** [5] - 58:14, 74:15, 75:17, 76:25, 85:7

**moved** [4] - 69:21, 75:14, 75:15, 85:5

**movement** [4] - 14:13, 16:4, 16:14

**moving** [11] - 54:24, 58:22, 59:6, 59:14, 60:18, 60:19, 61:8, 65:24, 66:10, 75:18, 78:20

**MR** [133] - 3:9, 3:10, 4:7, 4:11, 4:18, 4:22, 5:6, 5:15, 6:1, 6:10, 6:25, 9:16, 9:18, 10:2, 10:5, 10:10, 10:15, 10:17, 10:20, 10:24, 11:3, 11:7, 11:10, 11:13, 11:15, 11:21, 12:2, 12:5, 12:7, 12:9, 12:14, 12:18, 12:20, 12:22,

13:1, 13:4, 13:7, 13:10, 13:13, 13:17, 13:20, 13:22, 13:24, 14:1, 14:4, 14:8, 14:17, 15:5, 15:18, 15:24, 16:25, 17:2, 18:25, 19:2, 19:10, 19:11, 19:16, 19:20, 20:3, 20:16, 20:20, 21:2, 21:4, 21:7, 21:11, 21:15, 21:20, 21:24, 22:2, 22:5, 22:9, 22:16, 22:18, 22:20, 22:23, 22:25, 23:2, 23:4, 23:6, 23:8, 23:15, 23:18, 23:21, 23:23, 24:1, 24:3, 24:11, 24:13, 24:20, 24:23, 25:1, 25:4, 25:10, 25:12, 25:15, 25:17, 25:20, 25:24, 26:7, 26:10, 26:13, 27:1, 27:18, 27:21, 27:24, 28:5, 28:6, 32:13, 32:15, 32:19, 32:21, 35:20, 35:22, 36:10, 49:16, 49:20, 50:5, 50:8, 50:12, 50:15, 50:17, 50:18, 51:4, 51:6, 67:7, 67:9, 69:19, 76:12, 79:9, 80:14, 87:16, 88:5, 88:10

**MS** [92] - 7:14, 7:17, 7:23, 7:25, 8:3, 8:6, 8:10, 8:15, 8:18, 8:20, 8:22, 8:24, 9:1, 9:3, 9:5, 9:7, 9:9, 9:11, 9:13, 16:8, 16:17, 16:22, 17:10, 17:19, 17:22, 17:25, 18:2, 18:4, 18:6, 18:8, 18:10, 18:12, 18:14, 18:16, 18:18, 18:20, 18:23, 28:12, 28:22, 28:25, 29:2, 29:4, 29:7, 29:11, 29:14, 29:17, 29:20, 29:23, 29:25, 30:3, 30:9, 30:14, 30:18, 30:23, 30:25, 31:6, 31:12, 31:14, 31:16, 31:19, 31:21, 31:23, 31:25, 32:2, 32:4, 32:6, 32:8, 32:10, 33:3, 33:6, 33:13, 33:15, 33:18, 33:21, 33:24, 34:1, 34:4, 34:6, 34:9, 34:12, 34:16, 34:20, 34:23, 34:25, 35:2, 35:4,

35:6, 35:8, 35:10, 35:12, 35:14, 35:16

**multiple** [3] - 5:9, 6:16, 19:24

**murderous** [1] - 75:3

**muscles** [2] - 69:10, 69:12

**must** [15] - 37:15, 37:16, 37:18, 38:1, 40:4, 41:10, 41:14, 42:13, 42:18, 45:5, 45:6, 45:8, 46:8, 85:5

**MY** [1] - 89:15

## N

**name** [10] - 7:17, 9:23, 17:10, 20:15, 20:16, 20:20, 28:12, 33:6, 56:25, 80:3

**name's** [2] - 10:5, 20:21

**named** [2] - 72:1, 72:9

**namely** [1] - 77:25

**nap** [1] - 59:20

**National** [1] - 74:7

**national** [4] - 85:3, 85:25, 86:3, 86:12

**natural** [1] - 63:7

**nearly** [1] - 73:8

**necessarily** [2] - 23:8, 44:17

**necessary** [1] - 42:21

**neck** [1] - 72:5

**need** [6] - 55:12, 55:18, 58:13, 76:3, 78:4, 88:7

**needed** [6] - 52:22, 52:24, 53:5, 55:15, 57:25, 66:24

**needs** [2] - 55:22, 56:8

**negative** [3] - 5:22, 6:13, 12:22

**neighbor** [1] - 52:10

**neighborhood** [1] - 67:13

**neighbors** [2] - 52:7, 52:12

**neighbors'** [1] - 52:12

**neuromuscular** [1] - 69:15

**never** [6] - 10:12, 33:11, 70:6, 81:14, 82:18, 82:19

**new** [1] - 74:1

**news** [1] - 46:17

**next** [11] - 7:5, 7:10, 9:23, 19:8, 19:12, 27:22, 27:25, 56:10,

56:11, 77:5, 78:25

**Niedzialek** [38] - 38:14, 38:24, 39:21, 39:22, 39:24, 51:17, 67:15, 68:12, 68:23, 69:3, 69:16, 69:21, 69:22, 69:25, 70:6, 70:17, 71:6, 71:11, 75:9, 75:23, 76:17, 77:5, 78:20, 79:11, 79:13, 79:15, 79:25, 80:2, 80:9, 80:24, 81:13, 81:18, 81:19, 81:20, 83:5, 84:22, 86:6

**Niedzialek's** [5] - 78:7, 79:3, 83:12, 84:17, 84:24

**NMI** [1] - 69:15

**NO** [1] - 1:8

**noble** [3] - 60:13, 61:9, 85:15

**Noble** [2] - 57:1, 85:19

**nobody** [3] - 46:13, 73:22, 79:1

**noises** [1] - 75:12

**noncompliant** [1] - 78:12

**none** [7] - 23:18, 23:21, 43:11, 82:20, 83:16, 83:17, 83:22

**noon** [1] - 50:14

**Norco** [1] - 33:7

**normal** [1] - 60:11

**normally** [1] - 60:12

**NORTH** [1] - 2:10

**note** [1] - 48:6

**noted** [1] - 50:24

**notepads** [1] - 44:23

**NOTES** [1] - 89:15

**notes** [8] - 44:24, 48:3, 48:4, 48:7, 48:8, 48:9, 48:10, 48:12

**nothing** [5] - 23:12, 27:8, 46:11, 65:8, 84:16

**noticed** [2] - 52:8, 53:8

**notify** [2] - 46:4, 48:2

**Number** [3] - 38:7, 38:16, 66:3

**number** [10] - 38:9, 38:13, 43:2, 44:17, 57:20, 65:21, 66:2, 85:13, 85:15, 87:3

## O

**OAKLAND** [1] - 2:14

**OAKS** [1] - 2:10
**oath** [4] - 15:8, 37:20, 47:11, 47:21
**obese** [1] - 73:17
**obeyed** [1] - 70:6
**obeying** [1] - 21:25
**object** [3] - 41:5, 42:8, 74:17
**objection** [4] - 41:7, 42:9, 42:10, 42:12
**objections** [1] - 41:4
**objectively** [1] - 16:19
**observe** [1] - 85:9
**obstructed** [1] - 73:24
**obstruction** [2] - 67:10, 74:4
**obstructs** [1] - 77:16
**occupation** [8] - 10:10, 20:21, 28:13, 28:15, 29:6, 29:13, 33:12, 33:14
**occupations** [1] - 29:18
**occur** [1] - 73:24
**occurred** [6] - 4:20, 14:6, 19:18, 23:13, 26:12, 57:21
**occurring** [1] - 64:17
**occurs** [1] - 77:21
**OF** [14] - 1:1, 1:2, 1:14, 2:1, 2:3, 2:4, 2:8, 2:17, 89:2, 89:4, 89:6, 89:9, 89:13, 89:15
**offer** [1] - 82:21
**offers** [1] - 42:6
**OFFICE** [1] - 2:12
**officer** [11] - 5:3, 11:17, 12:15, 24:6, 34:8, 52:17, 52:18, 69:23, 74:9, 75:4, 85:17
**officers** [34] - 6:20, 8:13, 8:14, 26:22, 30:10, 30:13, 52:14, 52:22, 57:3, 58:4, 58:5, 58:10, 58:17, 58:25, 59:15, 59:21, 60:21, 60:23, 61:1, 61:19, 61:20, 66:7, 71:4, 72:18, 73:16, 74:19, 74:22, 76:25, 77:3, 85:4, 85:7, 85:15, 85:17, 86:10
**officers'** [2] - 12:10, 75:1
**OFFICES** [2] - 2:4, 2:8
**OFFICIAL** [3] - 1:22, 89:8, 89:22
**offspring** [1] - 29:15

**often** [7] - 11:19, 21:9, 21:15, 31:4, 34:14, 44:4, 83:8
**old** [3] - 51:18, 64:24
**oldest** [1] - 33:9
**ON** [2] - 2:3, 2:17
**once** [8] - 21:15, 54:25, 55:11, 55:18, 55:24, 69:24, 88:4, 88:5
**one** [44] - 5:2, 5:16, 9:16, 17:15, 18:25, 19:20, 20:23, 21:7, 25:22, 29:15, 30:16, 30:19, 31:2, 31:10, 32:13, 33:9, 33:10, 35:20, 36:10, 41:23, 45:22, 48:8, 51:22, 52:10, 53:19, 54:10, 55:8, 55:16, 57:8, 58:24, 62:19, 62:20, 65:21, 66:2, 75:18, 77:9, 77:11, 78:25, 83:1, 83:11, 83:18, 87:16
**ones** [2] - 36:23, 62:5
**open** [3] - 45:1, 49:7, 87:8
**opened** [1] - 53:10
**OPENING** [1] - 3:8
**opening** [13] - 37:1, 40:24, 48:14, 48:17, 49:6, 49:24, 50:1, 50:10, 51:1, 51:2, 51:8, 67:5
**operation** [1] - 8:5
**Operations** [1] - 7:18
**opine** [1] - 63:1
**opinion** [2] - 37:23, 43:6
**opinions** [1] - 37:17
**opportunity** [3] - 15:21, 43:14, 51:7
**opposed** [1] - 66:6
**opposite** [1] - 86:7
**optician** [2] - 28:13, 29:3
**order** [6] - 22:1, 42:15, 51:10, 56:1, 58:8, 58:9
**ordered** [3] - 21:23, 46:9, 70:23
**orders** [1] - 85:4
**Oregon** [1] - 82:2
**organ** [1] - 78:2
**organs** [2] - 38:15, 69:13
**Orhan** [1] - 19:14
**originally** [1] - 52:3
**otherwise** [2] - 40:9,

45:12
**ought** [1] - 54:8
**outcome** [1] - 43:18
**outline** [1] - 48:15
**outside** [5] - 29:18, 33:14, 42:22, 47:14, 48:1
**overcome** [1] - 76:1
**overdose** [2] - 39:25, 62:24
**overly** [1] - 48:11
**overrule** [1] - 42:9
**own** [7] - 38:23, 46:24, 48:10, 56:11, 74:23, 76:4, 80:19
**oxygen** [7] - 57:25, 62:8, 64:1, 64:3, 73:3, 83:14
**oxygen-deprived** [1] - 64:1

**P**

**P.M** [2] - 1:15, 4:1
**p.m** [2] - 67:24, 88:21
**page** [1] - 34:2
**PAGE** [1] - 3:4
**paid** [2] - 25:3, 25:4
**pajama** [1] - 54:3
**panel** [2] - 32:16, 35:23
**panicked** [1] - 58:15
**paper** [1] - 72:10
**Paramedic** [1] - 62:1
**paramedic** [1] - 81:12
**paramedics** [6] - 62:1, 62:6, 71:16, 81:7, 81:10, 81:16
**pardon** [1] - 18:23
**parents** [1] - 64:21
**park** [1] - 20:23
**part** [11] - 5:11, 13:8, 43:10, 44:14, 53:21, 55:13, 61:14, 61:25, 64:14, 72:23, 74:23
**participated** [1] - 19:22
**particularly** [2] - 60:18, 62:4
**particulars** [1] - 12:24
**parties** [9] - 37:25, 38:21, 40:10, 47:4, 47:18, 47:21, 49:25, 86:25
**party** [3] - 40:2, 48:16, 48:17
**party's** [1] - 47:10
**PASADENA** [1] - 2:10

**passed** [2] - 72:4, 72:5
**passion** [3] - 14:14, 15:10, 26:22
**passionate** [1] - 15:11
**past** [1] - 51:19
**pathologist** [3] - 82:23, 83:11, 84:2
**pathologists** [1] - 84:7
**pathology** [4] - 82:12, 82:17, 84:6
**patients** [1] - 82:25
**patrol** [1] - 85:17
**pausing** [1] - 69:1
**pay** [2] - 44:20, 75:4
**PC** [1] - 2:12
**PD** [1] - 24:1
**PEA** [3] - 62:11, 83:4, 83:8
**peace** [1] - 69:23
**peer** [3] - 70:25, 72:2, 74:2
**peer-reviewed** [1] - 72:2
**Penal** [1] - 69:24
**people** [26] - 4:24, 8:12, 31:5, 31:16, 34:10, 44:4, 44:5, 46:3, 47:4, 56:17, 60:5, 61:15, 65:1, 65:18, 71:20, 72:15, 72:19, 73:15, 73:21, 74:13, 74:18, 76:20, 82:13, 84:9, 84:12
**perceive** [2] - 80:23, 85:9
**perceived** [1] - 69:4
**percent** [2] - 14:10, 83:1
**perfect** [1] - 78:8
**performing** [1] - 65:13
**perhaps** [1] - 79:11
**period** [3] - 13:5, 58:23, 79:17
**permitted** [3] - 39:15, 42:7, 50:1
**person** [16] - 24:16, 45:15, 57:4, 57:5, 57:8, 58:6, 58:7, 58:14, 66:21, 66:22, 68:6, 74:11, 74:12, 77:11, 84:10
**person's** [2] - 58:12, 58:13
**personal** [2] - 37:17, 51:12
**personally** [1] - 41:22
**perspective** [3] - 13:14, 13:16
**persuaded** [1] - 40:4
**pest** [1] - 33:10

**petechiae** [1] - 83:17
**PH** [1] - 1:24
**phase** [1] - 77:8
**phenomenon** [1] - 77:18
**Philadelphia** [1] - 52:3
**Phillips** [1] - 4:14
**phone** [5] - 12:14, 12:16, 31:17, 45:16, 87:3
**photos** [1] - 66:17
**physiology** [1] - 58:3
**picked** [1] - 53:24
**pillow** [1] - 72:5
**place** [4] - 33:10, 51:25, 67:20, 77:7
**PLACE** [1] - 89:11
**placed** [2] - 6:11, 76:13
**placing** [1] - 75:15
**PLAINTIFF** [2] - 1:7, 2:3
**plaintiff** [20] - 4:9, 4:23, 9:15, 9:18, 18:22, 19:3, 32:12, 32:15, 35:23, 38:22, 39:4, 39:8, 39:11, 39:15, 39:16, 40:8, 48:18, 48:21, 51:23, 64:9
**plaintiff's** [3] - 39:17, 49:21, 50:6
**plaintiffs** [1] - 63:20
**plan** [1] - 88:6
**play** [1] - 64:14
**played** [6] - 64:17, 69:18, 76:11, 79:8, 80:13, 83:24
**playing** [5] - 78:14, 78:23, 79:11, 83:21
**plus** [1] - 85:1
**point** [16] - 16:24, 25:2, 53:9, 58:24, 59:5, 59:9, 59:11, 59:15, 59:21, 62:5, 66:7, 70:14, 79:14, 80:23, 81:10, 83:7
**Police** [1] - 61:13
**police** [37] - 5:1, 5:4, 5:17, 5:19, 6:6, 6:14, 6:15, 6:16, 8:13, 8:14, 11:17, 12:10, 12:12, 12:15, 14:13, 14:21, 14:22, 15:11, 16:3, 16:5, 16:10, 16:15, 19:21, 19:22, 19:23, 26:3, 26:16, 26:22, 26:23, 27:11, 30:8, 56:25, 61:10, 76:9, 85:4, 86:14

**policies** [5] - 19:24, 61:15, 61:24, 66:14, 86:2
**policing** [5] - 71:1, 85:22, 85:25, 86:3, 86:12
**Policing** [1] - 74:8
**policy** [3] - 38:17, 39:5, 55:11
**popping** [1] - 75:24
**population** [1] - 85:16
**porch** [1] - 52:25
**posited** [1] - 72:12
**position** [25] - 38:21, 39:1, 52:25, 57:5, 57:16, 57:19, 58:16, 58:24, 60:17, 61:4, 61:15, 61:17, 63:15, 64:2, 66:1, 72:15, 75:6, 77:1, 77:15, 78:16, 78:24, 79:1, 85:5, 85:8, 88:11
**positional** [11] - 57:17, 60:15, 61:2, 61:17, 71:25, 72:16, 72:20, 73:24, 77:13, 77:15
**positive** [1] - 25:11
**posits** [1] - 72:14
**possible** [2] - 47:8, 51:14
**possum** [3] - 78:14, 78:23, 79:11
**post** [4] - 60:9, 60:10, 77:6, 78:19
**post-asphyxiation** [1] - 60:10
**post-cardiac** [1] - 60:9
**post-cuffing** [1] - 78:19
**post-handcuffing** [1] - 77:6
**potentially** [1] - 67:14
**pounding** [1] - 52:11
**pounds** [4] - 73:8, 77:8, 78:4, 79:16
**powers** [1] - 26:3
**practice** [2] - 39:5, 56:25
**practices** [3] - 70:21, 71:23, 76:9
**practicing** [1] - 63:22
**pre** [1] - 36:9
**pre-instructions** [1] - 36:9
**precipitated** [1] - 52:6
**predisposition** [1] - 6:20
**prefer** [1] - 88:3
**preferably** [1] - 57:6

**pregnant** [1] - 10:8
**prejudice** [1] - 43:20
**prejudices** [1] - 37:18
**PRELIMINARY** [1] - 3:7
**preliminary** [4] - 36:16, 36:22, 37:5, 37:7
**prepared** [2] - 51:2, 67:5
**preponderance** [1] - 40:3
**present** [8] - 10:8, 48:18, 48:20, 49:13, 50:22, 63:16, 84:9, 87:13
**presented** [6] - 26:6, 40:7, 47:11, 47:20, 48:22, 55:25
**presently** [2] - 32:16, 35:23
**preserving** [1] - 86:5
**PRESIDING** [1] - 1:4
**press** [2] - 46:3, 55:1
**pressure** [1] - 57:9
**pretty** [2] - 21:11, 55:5
**prevent** [4] - 12:1, 21:18, 22:14, 25:8
**preventing** [1] - 77:16
**previous** [1] - 8:1
**previously** [1] - 14:9
**primary** [3] - 29:12, 38:17, 52:17
**principles** [1] - 37:8
**priority** [3] - 70:16, 71:12, 71:14
**probe** [1] - 69:7
**probes** [4] - 54:11, 54:19, 55:1, 55:13
**problem** [6] - 21:25, 22:2, 80:8, 80:9, 80:10, 80:15
**problems** [1] - 72:21
**proceed** [4] - 7:5, 48:13, 51:5, 67:8
**PROCEEDINGS** [3] - 1:14, 3:4, 89:11
**proceedings** [6] - 4:20, 14:6, 19:18, 26:12, 47:24, 88:21
**process** [3] - 36:5, 47:13, 47:17
**Products** [1] - 10:18
**professional** [1] - 51:13
**professionals** [1] - 71:17
**profiling** [1] - 23:10
**promptly** [1] - 86:22
**prone** [25] - 39:1,

56:18, 57:21, 60:16, 61:16, 65:14, 67:10, 72:15, 72:19, 73:9, 73:17, 73:21, 73:23, 74:3, 74:8, 75:6, 76:7, 76:21, 80:9, 80:11, 80:15, 83:6, 85:5
**pronounce** [1] - 20:15
**pronounced** [1] - 38:14
**proof** [2] - 41:21, 41:23
**properly** [3] - 46:16, 58:10, 66:3
**prosecution** [1] - 13:3
**prospective** [2] - 27:22, 27:25
**Prospective** [2] - 4:25, 5:15
**protect** [3] - 39:23, 47:9, 71:6
**protecting** [1] - 79:6
**protest** [1] - 19:22
**protests** [2] - 6:16, 14:13
**proved** [3] - 38:2, 40:17, 73:22
**provide** [1] - 30:22
**provided** [2] - 16:10, 39:8
**provides** [1] - 30:7
**proving** [2] - 39:16, 40:2
**proximal** [1] - 83:24
**proximate** [1] - 84:17
**public** [1] - 39:23
**published** [3] - 70:25, 72:2, 72:9
**pull** [1] - 75:25
**pulled** [4] - 23:10, 24:5, 24:14, 69:6
**pulse** [10] - 60:1, 60:2, 60:4, 60:5, 66:4, 80:17, 80:18, 80:19, 81:1, 81:2
**pulseless** [2] - 62:11, 83:2
**purpose** [5] - 41:12, 41:14, 41:15, 42:19, 42:23
**purposes** [1] - 84:10
**pursuant** [1] - 39:5
**push** [1] - 58:13
**put** [9] - 57:5, 57:19, 61:4, 62:15, 68:22, 70:5, 70:9, 72:15, 75:14
**putting** [3] - 60:16, 61:16, 85:19

### Q

**questionable** [1] - 60:3
**questioned** [1] - 26:1
**questioning** [3] - 6:3, 15:15, 15:19
**questions** [19] - 5:6, 5:9, 6:14, 7:16, 10:4, 14:15, 15:6, 15:22, 16:2, 16:3, 16:6, 17:9, 20:5, 20:18, 27:8, 28:11, 33:5, 41:4, 80:2
**quickly** [6] - 27:22, 51:14, 53:4, 54:2, 60:22, 68:25
**quiet** [1] - 80:1
**quite** [2] - 26:15, 53:1

### R

**racism** [1] - 26:18
**raise** [2] - 36:2, 88:1
**rambling** [1] - 53:16
**ranger** [1] - 20:24
**rapidly** [2] - 54:6, 68:15
**rate** [1] - 83:7
**ratified** [1] - 39:14
**reach** [3] - 17:20, 20:25, 29:1
**reaching** [1] - 40:18
**reaction** [1] - 6:12
**read** [6] - 37:6, 37:21, 38:1, 46:17, 47:6, 48:8
**reading** [1] - 37:6
**real** [8] - 52:21, 65:18, 73:14, 73:15, 73:19, 85:21, 85:22, 85:24
**reality** [1] - 73:18
**realized** [2] - 52:23, 74:3
**really** [9] - 34:13, 52:21, 55:7, 58:15, 61:22, 63:22, 64:19, 65:14, 79:1
**reason** [7] - 5:23, 56:16, 57:7, 57:17, 60:25, 71:2, 87:1
**reasonable** [4] - 39:22, 59:18, 76:10, 86:14
**reasonableness** [1] - 43:23
**reasonably** [1] - 39:20
**reasons** [2] - 55:15, 66:1
**Reay** [2] - 72:9, 72:14

**REAY** [1] - 72:9
**Reay's** [1] - 72:24
**rebuttal** [5] - 87:19, 87:20, 87:21, 87:24, 88:6
**recalled** [1] - 50:23
**receive** [3] - 42:10, 46:15, 73:11
**received** [9] - 40:14, 40:19, 41:18, 42:5, 42:10, 42:11, 42:12, 45:7, 68:2
**recently** [3] - 5:21, 31:7, 64:21
**recess** [4] - 49:10, 49:11, 86:20, 88:20
**Recess** [1] - 49:12
**rechecked** [1] - 80:17
**reciprocal** [2] - 49:21, 50:5
**reckless** [2] - 24:15
**reconnected** [1] - 31:7
**record** [6] - 4:3, 5:13, 27:3, 27:5, 42:16, 64:11
**recovery** [8] - 57:5, 57:16, 57:19, 60:17, 61:4, 61:15, 66:1, 76:25
**recreational** [1] - 62:22
**recruiter** [1] - 17:11
**REDUCED** [1] - 89:12
**reference** [2] - 46:23, 58:2
**referred** [1] - 53:15
**reflection** [1] - 27:3
**regarding** [4] - 26:3, 27:22, 27:25, 37:23
**regardless** [1] - 40:6
**regards** [1] - 14:8
**Regina** [2] - 17:6, 17:10
**regionally** [1] - 57:1
**regularly** [1] - 21:11
**relapse** [1] - 65:2
**relevant** [2] - 38:17, 42:23
**reliable** [1] - 74:2
**rely** [1] - 48:9
**remaining** [1] - 51:22
**remember** [10] - 17:17, 25:18, 28:23, 41:1, 44:5, 44:6, 47:21, 48:4, 50:20, 86:23
**remind** [1] - 50:10
**removed** [1] - 55:13
**render** [2] - 71:14, 86:16

repeatedly [1] - 53:16
replicating [1] - 65:17
report [5] - 46:10, 46:12, 47:8, 87:20, 87:21
REPORTED [1] - 89:10
REPORTER [4] - 1:22, 89:2, 89:8, 89:22
REPORTER'S [1] - 1:14
reports [1] - 46:20
Representative [1] - 4:13
request [6] - 4:17, 7:2, 7:4, 19:15, 43:4, 43:5
require [1] - 47:25
required [1] - 48:17
research [10] - 17:11, 46:21, 47:3, 47:13, 49:8, 70:21, 71:8, 71:23, 74:19, 86:8
resident [1] - 68:13
resist [1] - 73:4
resistance [8] - 58:11, 67:21, 76:1, 77:6, 78:19, 79:10, 84:24, 85:1
resistant [2] - 71:11, 78:12
resisted [1] - 67:19
resisting [9] - 60:18, 60:20, 61:8, 66:10, 71:18, 75:23, 76:18, 77:1, 78:13
resource [1] - 47:1
respect [1] - 88:16
respectively [1] - 68:10
respond [1] - 46:9
responded [1] - 68:8
response [9] - 5:5, 5:6, 5:8, 14:16, 26:20, 26:22, 49:19, 69:5, 69:14
responsible [1] - 39:12
rest [1] - 44:15
restrain [4] - 69:21, 69:25, 70:17, 75:14
restrained [5] - 57:21, 64:2, 73:16, 73:17, 74:4
restraining [1] - 75:5
restraint [22] - 40:1, 57:17, 60:14, 60:16, 61:3, 62:25, 63:4, 64:6, 65:8, 67:11, 73:5, 73:10, 73:21,

73:23, 74:3, 74:8, 74:25, 76:7, 77:20, 82:20, 83:24, 85:23
restricting [1] - 39:1
restrictions [1] - 47:23
result [4] - 39:24, 39:25, 47:25, 66:13
resuming [1] - 69:1
resuscitate [1] - 62:7
retail [1] - 11:10
retired [3] - 17:11, 17:14, 34:7
return [3] - 46:16, 62:5, 86:21
reviewed [5] - 70:25, 72:2, 74:2, 83:18, 86:1
reviewing [1] - 83:22
rhythm [4] - 62:10, 62:12, 62:13, 83:7
rhythms [1] - 83:8
Rialto [1] - 24:1
rib [1] - 69:8
ribs [2] - 77:25, 78:7
rich [1] - 84:20
Richard [1] - 62:19
rights [4] - 19:24, 47:10, 71:6, 86:5
rise [6] - 36:1, 49:11, 50:21, 79:4, 79:19, 87:12
risk [8] - 56:19, 57:12, 60:14, 60:15, 60:23, 61:6, 86:7
Riverside [29] - 4:5, 7:20, 17:13, 20:22, 21:8, 22:6, 22:7, 30:4, 31:3, 38:5, 38:6, 38:11, 38:18, 38:24, 39:6, 39:9, 39:11, 56:13, 56:14, 63:11, 67:25, 70:19, 71:21, 73:25, 74:5, 86:4
RIVERSIDE [2] - 1:9, 1:17
Road [1] - 68:4
Robert [1] - 85:13
role [4] - 22:11, 64:17, 83:21, 83:25
roll [5] - 58:7, 58:12, 58:25, 59:7, 70:5
rolling [1] - 75:25
romero [2] - 19:4, 19:5
ROMERO [1] - 19:7
room [7] - 36:24, 36:25, 45:17, 48:5, 48:7, 48:25, 49:4
ROOM [1] - 1:23
roommate [1] - 20:23

roommate's [2] - 22:5, 22:14
roughly [1] - 78:25
rule [1] - 16:20
Rules [4] - 41:6, 42:4, 42:7, 42:25
rules [3] - 47:9, 47:22, 57:3
ruling [2] - 7:1, 41:8
running [1] - 24:17
ruse [1] - 78:14
rushed [1] - 81:17

## S

sadly [1] - 62:4
safe [10] - 71:5, 71:13, 71:14, 71:15, 74:4, 75:5, 85:8, 86:9, 86:10
safety [5] - 39:23, 74:9, 74:23, 79:3, 79:6
SAIN [36] - 2:19, 3:10, 4:11, 5:6, 6:1, 6:10, 6:25, 14:4, 14:8, 15:5, 15:18, 15:24, 16:25, 17:2, 19:10, 19:16, 19:20, 26:10, 26:13, 27:18, 28:6, 32:19, 32:21, 36:10, 49:20, 50:5, 50:12, 50:15, 50:17, 67:7, 67:9, 69:19, 76:12, 79:9, 80:14, 88:10
Sain [17] - 4:12, 5:5, 5:25, 6:8, 14:7, 14:25, 15:4, 16:2, 19:19, 26:2, 27:17, 36:15, 49:19, 67:5, 86:19, 87:18, 87:23
SAME [1] - 89:12
San [2] - 31:1, 85:14
sandbagging [1] - 88:16
save [1] - 62:7
saving [2] - 81:4, 81:8
saw [6] - 6:4, 41:22, 52:22, 53:2, 83:19, 85:11
scene [6] - 68:19, 71:13, 71:14, 71:15, 76:14, 81:11
school [7] - 7:19, 17:12, 28:14, 30:10, 33:6, 64:25, 84:14
science [2] - 83:3, 86:8
scope [1] - 38:10
screaming [1] - 52:11

search [1] - 47:1
searching [1] - 46:22
Seat [7] - 7:12, 9:25, 17:7, 19:14, 20:14, 28:8, 32:25
seated [5] - 46:5, 52:25, 57:6, 66:5, 74:12
second [13] - 5:14, 24:12, 24:13, 27:2, 45:5, 54:18, 55:4, 66:7, 69:10, 70:11, 70:12, 75:8, 79:14
seconds [17] - 55:3, 55:4, 58:20, 58:21, 75:22, 76:1, 77:5, 78:18, 78:25, 79:9, 79:23, 80:6, 80:7, 80:10, 80:14
Section [1] - 69:24
secure [1] - 54:22
secured [1] - 60:17
securing [1] - 71:15
see [31] - 5:10, 15:22, 41:16, 43:15, 44:5, 46:12, 53:20, 54:4, 54:17, 54:22, 54:23, 55:5, 55:8, 55:20, 55:25, 56:4, 56:11, 58:21, 62:2, 66:17, 69:19, 73:20, 77:23, 77:24, 79:2, 79:18, 79:21, 83:19, 87:10, 88:19
seeking [1] - 26:14
seeks [1] - 39:15
selected [2] - 14:19, 21:22
selection [1] - 36:5
self [2] - 39:23, 85:6
self-defense [1] - 39:23
send [1] - 31:19
sends [2] - 69:9, 69:11
Sengul [1] - 19:14
sengul [2] - 19:20, 20:11
sense [1] - 77:2
separate [2] - 26:4, 27:2
separately [3] - 40:9, 68:8, 68:10
serious [3] - 57:11, 69:23, 70:16
seriously [1] - 52:23
Serrano [3] - 7:4, 32:22, 32:23
served [3] - 10:12, 28:20, 33:11
service [1] - 46:8

SESSION [1] - 1:15
session [1] - 41:17
SET [1] - 89:11
set [12] - 5:7, 5:10, 5:12, 14:11, 14:13, 19:25, 27:14, 36:18, 37:11, 48:23, 72:24, 77:10
sets [2] - 77:9, 79:16
setting [2] - 15:5, 26:21
several [1] - 83:5
sheriff [3] - 31:2, 31:3, 61:2
Sheriff [10] - 4:14, 34:7, 38:16, 39:12, 56:14, 61:14, 61:17, 63:11, 63:12, 64:10
Sheriff's [19] - 11:16, 11:21, 21:8, 30:4, 31:1, 38:6, 38:11, 38:18, 39:7, 39:10, 56:13, 67:25, 70:20, 71:3, 71:22, 73:25, 74:6, 85:14, 86:4
Sheriff-Coroner [3] - 38:16, 39:12, 63:11
sheriffs [2] - 38:4, 50:3
Sheriffs [1] - 38:25
shirtless [1] - 54:3
shoot [1] - 54:10
short [1] - 55:25
shortly [2] - 51:25, 53:4
shoulder [2] - 56:5, 75:19
show [49] - 6:7, 36:23, 48:17, 52:5, 59:13, 66:17, 66:23, 67:10, 67:12, 67:23, 68:17, 68:19, 68:22, 69:2, 69:5, 69:9, 69:11, 69:17, 69:19, 70:2, 70:4, 70:7, 70:13, 70:14, 70:19, 71:2, 71:7, 71:21, 71:25, 74:5, 75:6, 75:8, 75:13, 75:22, 76:12, 76:15, 76:23, 77:2, 77:7, 78:10, 78:19, 79:7, 80:22, 81:18, 82:5, 82:15, 83:10, 85:2, 85:12
shown [1] - 65:16
shows [3] - 16:10, 16:11, 64:16
side [21] - 4:20, 7:6, 14:6, 19:18, 26:12, 30:17, 31:10, 40:7,

42:7, 42:22, 48:14, 56:2, 57:6, 58:7, 58:12, 58:24, 74:11, 74:12, 74:15, 76:24
**Side** [3] - 15:25, 20:10, 27:16
**sides** [8] - 12:1, 21:19, 22:15, 25:9, 34:22, 77:25, 78:1, 78:6
**sight** [1] - 68:17
**sign** [1] - 60:20
**signed** [1] - 63:13
**significant** [2] - 26:16, 63:3
**significantly** [1] - 65:15
**signs** [2] - 63:12, 83:13
**Simeus** [4] - 20:13, 20:16, 20:21, 27:19
**SIMEUS** [40] - 20:16, 20:20, 21:2, 21:4, 21:7, 21:11, 21:15, 21:20, 21:24, 22:2, 22:5, 22:9, 22:16, 22:18, 22:20, 22:23, 22:25, 23:2, 23:4, 23:6, 23:8, 23:15, 23:18, 23:21, 23:23, 24:1, 24:3, 24:11, 24:13, 24:20, 24:23, 25:1, 25:4, 25:10, 25:12, 25:15, 25:17, 25:20, 25:24, 26:7
**similar** [1] - 76:20
**simply** [1] - 48:15
**single** [1] - 7:20
**sirens** [1] - 81:7
**sister** [7] - 34:6, 34:15, 34:18, 51:21, 51:22, 64:22
**sit** [1] - 59:6
**sitting** [1] - 68:13
**situation** [4] - 52:13, 56:15, 57:4, 68:21
**situations** [1] - 65:18
**six** [1] - 52:1
**sixty** [1] - 58:21
**sizes** [1] - 73:2
**skeletal** [2] - 69:10, 69:12
**skeptical** [3] - 26:19, 26:21, 27:4
**slain** [1] - 12:15
**slew** [1] - 65:6
**slide** [1] - 74:20
**slides** [2] - 84:3
**slightly** [3] - 58:25, 72:22, 75:10
**slow** [1] - 80:21

**small** [1] - 7:18
**SMITH** [1] - 2:18
**Snapchat** [1] - 45:19
**sobriety** [1] - 24:6
**social** [2] - 45:20, 45:21
**sole** [1] - 62:17
**solely** [2] - 37:19, 41:18
**someone** [23] - 14:20, 15:1, 52:21, 54:10, 55:12, 55:22, 56:19, 57:13, 57:24, 58:5, 59:19, 60:9, 60:16, 60:19, 61:4, 61:7, 65:3, 65:14, 66:1, 66:9, 76:25, 81:5
**sometimes** [4] - 42:15, 44:1, 44:2, 60:5
**somewhere** [1] - 75:19
**son** [4] - 28:18, 29:22, 31:1, 31:8
**son's** [1] - 31:2
**Sonia** [4] - 38:4, 39:20, 52:17, 68:1
**soon** [7] - 47:8, 60:17, 62:1, 81:15, 81:16, 85:4
**sorry** [6] - 7:22, 7:25, 18:24, 25:18, 25:21, 36:10
**sort** [1] - 16:5
**sounded** [1] - 80:25
**sounds** [2] - 59:9, 59:14
**speaking** [2] - 68:15, 68:16
**specialist** [3] - 82:7, 82:9, 82:11
**specialists** [1] - 82:7
**specialties** [1] - 82:6
**specialty** [1] - 82:13
**specific** [1] - 14:14
**specifically** [4] - 14:10, 22:9, 51:19, 83:13
**speeding** [1] - 24:16
**spread** [1] - 54:12
**spree** [1] - 75:3
**SS** [1] - 89:5
**staff** [1] - 86:25
**standard** [8] - 76:9, 76:23, 76:24, 85:3, 85:19, 85:22, 86:14
**standards** [7] - 57:2, 61:10, 85:24, 85:25, 86:3, 86:12, 86:14
**Standards** [1] - 74:8

**standing** [1] - 74:14
**stands** [2] - 49:11, 88:20
**start** [8] - 47:25, 50:15, 62:3, 80:1, 81:3, 81:4, 86:23, 87:1
**started** [1] - 81:17
**starting** [5] - 5:1, 5:18, 50:13, 52:6, 72:25
**starts** [1] - 80:4
**state** [12] - 27:4, 38:8, 38:18, 41:2, 53:15, 55:19, 55:21, 57:13, 59:19, 65:4, 65:19, 82:2
**STATE** [1] - 89:6
**statement** [6] - 48:14, 48:15, 48:17, 51:3, 51:8, 67:6
**STATEMENTS** [1] - 3:8
**statements** [7] - 37:1, 40:22, 40:24, 49:6, 49:24, 50:1, 51:1
**STATES** [4] - 1:1, 1:1, 1:4, 89:9
**station** [2] - 24:4, 53:23
**statistical** [1] - 73:20
**stay** [8] - 28:18, 29:7, 29:16, 30:19, 33:16, 68:22, 70:3, 70:8
**stay-at-home** [4] - 28:18, 29:7, 29:16, 33:16
**staying** [2] - 51:18, 53:9
**steady** [1] - 80:21
**steep** [1] - 72:6
**STENOGRAPHIC** [1] - 89:15
**STENOGRAPHICAL LY** [1] - 89:10
**sticker** [1] - 31:19
**still** [13] - 24:24, 35:18, 59:8, 59:10, 60:10, 71:18, 71:19, 74:11, 75:11, 76:19, 77:1, 79:22, 80:1
**stimulant** [2] - 53:14, 56:20
**stipulation** [2] - 27:24, 28:3
**stomach** [2] - 70:5, 70:9
**stood** [1] - 54:24
**stop** [6] - 60:18, 66:10, 69:7, 70:3, 78:13

**stopped** [1] - 67:16
**stops** [5] - 59:5, 59:9, 60:19, 78:20, 79:10
**stores** [1] - 11:10
**STREET** [3] - 1:23, 2:13, 2:20
**stricken** [5] - 6:21, 7:3, 41:9, 42:16, 42:18
**strict** [1] - 47:9
**strike** [1] - 15:22
**striking** [1] - 69:7
**strong** [5] - 5:3, 5:22, 6:13, 20:4, 80:21
**struggle** [1] - 58:3
**students** [2] - 30:10, 30:13
**studies** [9] - 65:17, 70:24, 71:1, 72:11, 73:9, 73:13, 73:22, 73:25, 82:19
**study** [5] - 65:15, 72:2, 73:14, 82:8, 82:10
**stuff** [1] - 36:24
**subject** [10] - 68:11, 71:9, 71:11, 71:15, 71:18, 74:4, 77:3, 78:11, 84:8
**subjects** [7] - 71:6, 73:1, 73:4, 73:5, 73:6, 73:7, 86:10
**subset** [1] - 49:1
**successor** [1] - 38:23
**succinctly** [1] - 88:11
**suck** [1] - 72:14
**suddenly** [1] - 59:19
**sufficient** [1] - 64:13
**suggested** [1] - 16:20
**suggestive** [1] - 15:13
**suicide** [1] - 63:7
**SUITE** [3] - 2:6, 2:14, 2:20
**summarized** [1] - 88:11
**summary** [1] - 38:21
**supervised** [1] - 85:16
**supervisor** [1] - 39:13
**supine** [4] - 80:10, 80:12, 80:15, 83:6
**support** [4] - 14:22, 76:10, 80:12, 81:24
**supported** [1] - 83:3
**supporter** [4] - 5:4, 6:16, 14:12, 19:22
**supporting** [1] - 12:24
**surface** [1] - 66:6
**suspect** [5] - 68:6, 77:1, 79:11, 80:7, 80:10
**suspects** [1] - 74:24

**sustain** [2] - 42:10, 42:12
**Swathi** [1] - 77:20
**swear** [1] - 35:25
**swimming** [1] - 66:19
**sworn** [2] - 36:3, 40:13
**sympathetic** [1] - 16:14
**sympathy** [3] - 16:3, 26:2, 37:18
**system** [3] - 62:21, 67:15, 84:24

## T

**tablet** [1] - 45:16
**tactical** [2] - 74:9, 75:5
**tase** [1] - 55:12
**tased** [8] - 54:8, 54:25, 55:13, 55:14, 55:17, 55:18, 56:21, 58:1
**taser** [12] - 40:1, 54:8, 54:9, 54:14, 55:1, 55:7, 67:17, 69:6, 69:9, 69:20, 75:2, 75:9
**tasers** [1] - 76:6
**tasing** [2] - 55:4, 69:11
**taxed** [1] - 67:22
**teaches** [1] - 30:11
**Ted** [2] - 73:12, 77:20
**Temecula** [2] - 51:17, 68:4
**ten** [10] - 23:19, 23:21, 30:14, 58:20, 80:6, 80:10, 80:14, 85:15, 85:16
**term** [3] - 56:18, 71:25, 72:20
**terminated** [1] - 85:17
**terms** [6] - 6:12, 41:20, 57:16, 64:2, 85:23
**terrorizing** [1] - 67:13
**test** [1] - 24:6
**tested** [2] - 47:13, 47:17
**testified** [6] - 43:15, 44:10, 44:13, 76:5, 83:20, 83:24
**testify** [2] - 44:17, 63:20
**testifying** [1] - 43:17
**testimony** [24] - 40:13, 40:19, 41:9, 41:21, 43:9, 43:12, 43:22, 43:23, 44:7, 44:8, 44:19, 44:21, 44:23,

47:12, 50:2, 56:4, 63:18, 81:11, 81:25, 82:21, 84:1, 84:4, 84:20
**testing** [1] - 72:24
**tests** [1] - 72:25
**text** [1] - 45:17
**THAT** [3] - 89:10, 89:12, 89:14
**that'll** [1] - 51:11
**THE** [252] - 2:8, 4:3, 4:10, 4:16, 4:19, 4:21, 5:5, 5:14, 5:25, 6:8, 6:23, 7:1, 7:7, 7:11, 7:13, 7:15, 7:22, 7:24, 8:1, 8:4, 8:8, 8:11, 8:16, 8:19, 8:21, 8:23, 8:25, 9:2, 9:4, 9:6, 9:8, 9:10, 9:12, 9:14, 9:17, 9:21, 9:24, 10:1, 10:3, 10:9, 10:13, 10:16, 10:19, 10:22, 11:1, 11:5, 11:8, 11:11, 11:14, 11:19, 11:24, 12:3, 12:6, 12:8, 12:12, 12:17, 12:19, 12:21, 12:25, 13:2, 13:5, 13:8, 13:11, 13:15, 13:18, 13:21, 13:23, 13:25, 14:2, 14:5, 14:7, 14:16, 15:4, 15:15, 15:21, 16:1, 16:13, 16:18, 16:23, 17:1, 17:4, 17:6, 17:8, 17:17, 17:20, 17:23, 18:1, 18:3, 18:5, 18:7, 18:9, 18:11, 18:13, 18:15, 18:17, 18:19, 18:21, 18:24, 19:1, 19:5, 19:8, 19:12, 19:14, 19:15, 19:17, 19:19, 20:2, 20:8, 20:11, 20:13, 20:15, 20:17, 20:25, 21:3, 21:5, 21:9, 21:13, 21:17, 21:21, 21:25, 22:3, 22:8, 22:12, 22:17, 22:19, 22:21, 22:24, 23:1, 23:3, 23:5, 23:7, 23:13, 23:16, 23:19, 23:22, 23:24, 24:2, 24:10, 24:12, 24:18, 24:21, 24:25, 25:3, 25:5, 25:11, 25:13, 25:16, 25:18, 25:22, 26:1, 26:8, 26:11, 26:25, 27:10, 27:17,

27:20, 27:23, 28:2, 28:7, 28:9, 28:21, 28:23, 29:1, 29:3, 29:5, 29:9, 29:12, 29:15, 29:18, 29:22, 29:24, 30:1, 30:7, 30:12, 30:15, 30:21, 30:24, 31:4, 31:9, 31:13, 31:15, 31:18, 31:20, 31:22, 31:24, 32:1, 32:3, 32:5, 32:7, 32:9, 32:11, 32:14, 32:17, 32:20, 32:23, 32:25, 33:2, 33:4, 33:12, 33:14, 33:16, 33:19, 33:23, 33:25, 34:2, 34:5, 34:8, 34:10, 34:14, 34:18, 34:21, 34:24, 35:1, 35:3, 35:5, 35:7, 35:9, 35:11, 35:13, 35:15, 35:17, 35:21, 35:25, 36:1, 36:4, 36:13, 49:11, 49:14, 49:19, 50:2, 50:7, 50:9, 50:14, 50:16, 50:20, 50:21, 50:25, 51:5, 67:4, 67:8, 86:19, 87:12, 87:14, 88:3, 88:7, 88:18, 88:20, 89:8, 89:9, 89:10, 89:11, 89:12
**theoretical** [1] - 72:10
**theory** [2] - 72:15, 72:24
**thereafter** [1] - 53:5
**THEREAFTER** [1] - 89:12
**therefore** [3] - 6:21, 26:24, 38:1
**they've** [3] - 65:16, 72:4, 72:5
**thinking** [1] - 80:3
**thinks** [1] - 42:7
**third** [1] - 76:13
**thirty** [1] - 58:21
**THIS** [1] - 89:14
**thousands** [3] - 73:15, 73:19
**threat** [6] - 69:4, 69:6, 69:7, 71:19, 74:22, 76:19
**threaten** [1] - 78:16
**threatened** [1] - 24:7
**threatening** [2] - 80:8, 85:9
**three** [6] - 12:23, 13:7, 21:11, 27:9, 59:13, 65:23

**throughout** [1] - 45:1
**ticket** [3] - 24:24, 24:25, 25:3
**Tik** [1] - 45:20
**Tik-Tok** [1] - 45:20
**TIME** [1] - 89:11
**timely** [2] - 57:19, 65:5
**TO** [1] - 89:12
**today** [2] - 36:6, 52:15
**together** [1] - 66:21
**Tok** [1] - 45:20
**tomorrow** [9] - 56:24, 60:13, 86:21, 87:5, 87:11, 87:15, 88:1, 88:8, 88:19
**Tony** [1] - 4:12
**TONY** [1] - 2:19
**took** [5] - 37:20, 48:9, 51:25, 54:8, 76:1
**Tori** [1] - 4:12
**TORI** [1] - 2:19
**torso** [2] - 73:8, 77:22
**total** [1] - 23:22
**totality** [2] - 39:20, 86:15
**totally** [1] - 27:2
**touching** [2] - 47:7, 84:9
**toward** [5] - 68:9, 68:25, 69:25, 75:9, 80:4
**towards** [1] - 71:12
**toxic** [3] - 62:22, 67:14, 84:23
**toxicity** [2] - 63:2, 81:22
**toxicologist** [1] - 84:21
**toxicology** [3] - 62:21, 82:8, 82:16
**toxins** [1] - 82:8
**Tracey** [2] - 38:22, 51:22
**TRACY** [1] - 1:6
**Tracy** [4] - 4:5, 64:18, 66:16, 66:19
**tragically** [2] - 67:21, 81:20
**train** [1] - 71:8
**trained** [13] - 58:10, 61:4, 61:5, 61:19, 61:21, 61:23, 66:8, 66:9, 74:22, 76:25, 78:11, 85:7
**Training** [4] - 70:20, 71:8, 71:22, 74:1
**training** [33] - 30:19, 39:8, 55:11, 55:20, 56:15, 57:15, 57:18, 58:3, 58:17, 60:14,

60:23, 60:25, 61:2, 61:3, 61:6, 61:8, 61:10, 61:24, 64:14, 64:16, 64:17, 66:11, 66:14, 70:16, 74:19, 76:16, 76:20, 79:2, 79:6, 80:23, 81:3, 81:8, 86:2
**transcript** [1] - 44:22
**TRANSCRIPT** [1] - 1:14
**TRANSCRIPTION** [2] - 89:13, 89:14
**transparency** [1] - 84:10
**treat** [1] - 38:1
**treatable** [1] - 65:4
**treated** [4] - 13:12, 25:6, 26:18, 42:25
**treating** [1] - 82:24
**tree** [1] - 75:9
**trial** [23] - 17:16, 17:17, 17:18, 17:19, 17:21, 25:7, 28:20, 37:22, 41:18, 42:20, 44:20, 44:22, 45:1, 46:3, 46:6, 47:2, 47:11, 47:13, 47:17, 47:19, 47:21, 47:25
**trials** [2] - 37:8, 48:13
**tried** [7] - 60:1, 62:6, 67:15, 67:18, 70:3, 76:17, 77:6
**trigger** [1] - 6:5
**truck** [2] - 28:15, 29:10
**TRUE** [1] - 89:14
**true** [8] - 27:10, 40:5, 44:14, 73:18, 76:5, 84:19, 85:20
**trump** [1] - 19:24
**truth** [2] - 44:13, 47:12
**try** [12] - 36:13, 46:24, 49:9, 54:6, 54:22, 58:7, 58:15, 69:21, 69:25, 75:14, 86:25, 87:7
**trying** [10] - 58:12, 58:13, 58:23, 58:25, 65:13, 68:20, 71:23, 75:25, 80:1, 81:19
**Tsadeek** [1] - 28:4
**TUESDAY** [2] - 1:16, 4:1
**turn** [8] - 8:16, 30:1, 34:2, 47:7, 58:23, 59:12, 59:22, 59:24
**turned** [3] - 58:19, 75:10, 80:4
**tutoring** [1] - 24:3

**twice** [5] - 23:23, 67:15, 70:15, 76:17, 78:22
**Twitter** [1] - 45:19
**two** [31] - 4:23, 5:15, 10:11, 21:11, 22:13, 27:8, 28:17, 33:8, 44:5, 49:17, 51:20, 51:23, 52:14, 53:19, 54:11, 55:15, 55:17, 60:11, 63:20, 65:25, 66:3, 75:7, 77:9, 79:16, 79:17, 81:6, 81:10, 84:25, 85:13, 86:13
**twofold** [1] - 57:8
**type** [3] - 54:14, 56:15, 57:3
**TYPEWRITTEN** [1] - 89:12
**typically** [1] - 78:4

## U

**U.S** [1] - 17:14
**ultimately** [1] - 39:3
**unable** [1] - 80:16
**unclear** [1] - 52:9
**under** [16] - 6:3, 15:8, 23:11, 38:7, 38:18, 39:20, 41:6, 42:25, 53:13, 56:14, 56:20, 60:5, 68:7, 75:16, 86:14, 86:15
**undersheriff** [1] - 85:13
**understandably** [2] - 52:13, 56:17
**undetermined** [1] - 63:8
**undisputed** [2] - 76:4, 76:8
**unequivocally** [1] - 27:6
**unfair** [1] - 13:14
**unfairly** [3] - 13:12, 25:6, 26:19
**uninvolved** [1] - 30:20
**UNITED** [4] - 1:1, 1:1, 1:4, 89:8
**unless** [5] - 40:9, 45:11, 73:23, 75:4, 84:15
**unnecessary** [3] - 20:7, 58:18, 65:21
**unreasonable** [1] - 39:4
**unreasonably** [1] - 38:25
**untrue** [1] - 44:7

**untruthfully** [2] - 44:10, 44:13
**up** [31] - 15:15, 16:2, 20:5, 27:6, 50:18, 52:11, 53:24, 53:25, 54:1, 54:18, 54:24, 55:7, 57:6, 58:8, 58:13, 58:18, 59:6, 63:23, 64:4, 66:5, 66:24, 68:22, 70:10, 73:2, 74:14, 75:17, 75:25, 76:8, 76:21, 87:14, 87:17
**upper** [3] - 73:8, 75:18, 77:10
**UPS** [1] - 17:15
**upward** [1] - 30:14
**urge** [1] - 44:20

## V

**Vale** [1] - 73:12
**valid** [1] - 6:6
**Valley** [2] - 28:14, 38:13
**valuable** [1] - 51:12
**various** [1] - 72:25
**vehicle** [1] - 24:6
**ventilate** [1] - 66:3
**verbal** [1] - 75:12
**verdict** [11] - 17:20, 21:1, 29:1, 37:23, 40:18, 43:6, 45:2, 46:16, 47:15, 48:25, 86:17
**verified** [2] - 70:25, 74:2
**versions** [1] - 44:3
**versus** [1] - 4:5
**vessels** [1] - 83:17
**veteran** [2] - 67:25, 68:1
**via** [1] - 45:17
**Vicki** [2] - 28:7, 28:12
**video** [18] - 54:17, 54:23, 55:20, 58:22, 69:16, 69:18, 70:12, 75:11, 76:10, 79:2, 79:7, 79:19, 79:20, 80:12, 80:13, 83:18, 83:22, 84:5
**Video** [2] - 76:11, 79:8
**view** [2] - 46:25, 47:1
**views** [5] - 5:19, 15:11, 20:4, 26:16, 26:17
**violates** [1] - 47:23
**violation** [1] - 69:23
**violations** [1] - 39:13
**violence** [1] - 69:4

**violent** [2] - 74:24, 78:21
**violently** [5] - 67:19, 73:4, 75:23, 76:18, 77:1
**visibly** [1] - 68:15
**visit** [1] - 46:25
**vocational** [1] - 28:14
**vociferous** [2] - 14:14, 15:11
**VOIR** [1] - 3:5
**voir** [3] - 14:9, 15:17, 15:22
**VS** [1] - 1:8

## W

**waited** [1] - 81:9
**wants** [1] - 71:3
**warning** [1] - 72:18
**Warren** [2] - 9:24, 10:5
**WAS** [1] - 89:12
**watch** [1] - 46:17
**watts** [1] - 54:15
**ways** [1] - 54:10
**weapon** [4] - 52:21, 54:4, 54:5, 74:21
**weapons** [2] - 74:16, 75:1
**website** [1] - 45:18
**week** [1] - 21:12
**weigh** [1] - 16:19
**weight** [14] - 42:1, 42:3, 44:16, 44:19, 59:2, 61:16, 65:14, 73:8, 77:8, 77:9, 77:11, 77:22, 78:4, 79:15
**WEST** [2] - 1:23, 2:20
**whatever's** [1] - 27:4
**whereas** [1] - 77:15
**whisper** [1] - 59:17
**whole** [1] - 65:6
**wife** [2] - 10:8, 11:5
**wife's** [1] - 10:10
**wind** [1] - 55:9
**wish** [2] - 44:24, 48:3
**witness** [19] - 13:9, 40:13, 41:21, 41:22, 43:10, 43:12, 43:14, 44:1, 44:9, 44:12, 44:17, 49:23, 56:23, 56:25, 84:4, 88:4, 88:14
**witness's** [6] - 43:16, 43:17, 43:18, 43:20, 43:22, 43:23
**witnesses** [10] - 40:23, 44:3, 44:18, 47:5, 47:11, 49:17,

49:20, 49:22, 50:6, 51:10
**Wohlgelernter** [2] - 63:21, 82:22
**Woodall** [3] - 28:7, 28:9, 28:12
**WOODALL** [31] - 28:12, 28:22, 28:25, 29:2, 29:4, 29:7, 29:11, 29:14, 29:17, 29:20, 29:23, 29:25, 30:3, 30:9, 30:14, 30:18, 30:23, 30:25, 31:6, 31:12, 31:14, 31:16, 31:19, 31:21, 31:23, 31:25, 32:2, 32:4, 32:6, 32:8, 32:10
**WOODLAND** [1] - 2:7
**word** [1] - 26:18
**words** [2] - 44:25, 83:6
**worker's** [4] - 7:19, 8:7, 8:8, 8:12
**works** [9] - 11:5, 11:15, 11:21, 22:5, 22:6, 33:10, 33:19, 55:1, 82:10
**world** [3] - 73:14, 73:15, 73:19
**worn** [3] - 53:19, 53:22, 62:2
**wound** [2] - 53:6, 68:18
**writing** [2] - 37:10, 45:16
**written** [1] - 36:19
**wrote** [2] - 87:20, 87:21

## X

**X2** [1] - 54:15

## Y

**year** [1] - 12:16
**yearly** [1] - 12:10
**years** [24] - 8:7, 10:15, 11:23, 12:23, 13:7, 17:13, 17:14, 17:16, 23:17, 23:18, 23:20, 23:21, 28:22, 29:4, 29:11, 29:25, 33:24, 51:18, 51:20, 64:24, 65:13, 72:8, 73:9
**younger** [1] - 51:21
**yourself** [1] - 48:5
**yourselves** [1] - 69:20
**YouTube** [1] - 45:19

## Z

**Zavatsky** [3] - 17:6, 17:8, 17:10
**ZAVATSKY** [15] - 17:10, 17:19, 17:22, 17:25, 18:2, 18:4, 18:6, 18:8, 18:10, 18:12, 18:14, 18:16, 18:18, 18:20, 18:23